1           UNREDACTED

2      IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TENNESSEE
3              EASTERN DIVISION

4    ------------------------------------------------

5

UNITED STATES OF AMERICA              )
6                                     )
                                      )
VS                                    )NO.1:19-cr-10040
7                                     )JACKSON, TENNESSEE
                                      )
8    JEFF YOUNG                       )

9    ------------------------------------------------

10

11              DETENTION HEARING

12              VIA FTR RECORDING

13               APRIL 17, 2019

14

15

16       BEFORE THE HONORABLE JON A. YORK,

17        UNITED STATES MAGISTRATE JUDGE

18

19

20

21            KRISTI HEASLEY, RPR
             OFFICIAL COURT REPORTER
22        U.S. COURTHOUSE, SUITE 450
           111 SOUTH HIGHLAND AVENUE
23          JACKSON, TENNESSEE 38301

24

25

                 UNREDACTED TRANSCRIPT

1                              APPEARANCES

2

3

4     FOR THE UNITED STATES:

5     JASON KNUTSON, ESQ.
      U.S. DEPT OF JUSTICE FRAUD SECTION
6     1400 New York Avenue NW
      Washington, DC 20530
7

8

9

10    FOR THE DEFENDANT:

11    CLAIBORNE HAMBRICK FERGUSON, ESQ.
      THE CLAIBORNE FERGUSON LAW FIRM
12    294 Washington Avenue
      Memphis, TN 38103
13

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXAMINATION INDEX

2

3     JOHN TANKERSLEY

4

5          DIRECT BY MR. KNUTSON                                16
           CROSS BY MR. FERGUSON                                21
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              EXHIBITS

2

3                        NO EXHIBITS MARKED

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    (Defendant Present.)
2                    THE COURT:  Next case is case number
3    19-cr-10040, United States versus Jeffrey Young, Jr.
4                    We are here for a detention hearing.
5                    Mr. Ferguson?
6                    MR. FERGUSON:  Yes, Your Honor.
7                    THE COURT:  Mr. Knutson?
8                    MR. KNUTSON:  Yes, Your Honor, Jason
9    Knutson for the government.
10                   THE COURT:  Okay.  I'll get it right by
11   the end of the day.
12                   Government is moving for detention in this
13   case as well?
14                   MR. KNUTSON:  That is correct.  And it's
15   also a rebuttable presumption case number 3142(e).
16                   THE COURT:  Mr. Ferguson.
17                   MR. FERGUSON:  Your Honor, we're ready to
18   rebut that presumption.  I think the government will tell
19   you why they think (inaudible).  This obviously is a case
20   that for Mr. Young and I, we've been dealing with at
21   least the last two years.  This case has, based on the
22   indictment, has an ongoing conspiracy alleging the
23   distribution of drugs within the community of the Western
24   District of Tennessee between the years, I believe it was
25   2014 to 2017.
```

1           That gives us a two year period in which

2    the government is not making any allegations that Mr.

3    Young engaged in any criminal activity that has injured

4    or threatened the health and safety of the citizens of

5    the Western District of Tennessee.

6           And, in fact, I will go straight to what I

7    believe this Court's concern is, which is going to be the

8    ongoing safety of the community, and what conditions have

9    been put in place in these last two years to ensure the

10   safety.

11          Again, I'm sure the Court has or will read

12   the pre-trial report.  Understand that he's been a

13   resident of Jackson for almost forty years.  He's not a

14   flight risk.

15          Again, briefly, Your Honor, not to belabor

16   the point.  Two years ago his practice and house was

17   raided by the DEA.  He's been through a nursing board

18   hearing on this matter.  Been through seizures.  And

19   (inaudible) based on these allegations.  Had federal

20   cases in this courthouse to return his property from

21   those search warrants.

22          And so for over two years we've known the

23   facts and circumstances surrounding this case.  If he's

24   going to be a flight risk, he had two (inaudible).  So

25   again, I think that the Court is correct, the issue is

7

1   safety.

2            As a part of this ongoing investigation,

3   the local police and Federal agency, joint task force,

4   either made it known or it became known to the Board of

5   Nursing, and several petitions were filed with the

6   nursing board alleging the same and/or similar events

7   that are contained within the indictment that we're here

8   on today.

9            There is a, almost a year long process in

10  which the Board of Nursing investigated these

11  allegations.  They had multiple depositions.  We were set

12  to go to trial, we had our experts lined up.  Between our

13  side and the attorneys for the state of Tennessee, and

14  the Department, I think it's the Board of Nursing, we

15  entered into a consent decree which, where Mr. Young did

16  not admit any wrongdoing, but agreed that the board –– if

17  the (inaudible) had proceeded, it was likely they would

18  have put on evidence as far as a civil nature went there

19  may be grounds in which they would be able to (inaudible)

20  the parties must enter into a consent decree.

21            The terms and conditions of that consent

22  decree, which was filed and entered on November 2018,

23  about six 6 months ago, five months ago, are controlling

24  on Mr. Young right now.  They are restrictive.  They are,

25  as the Board of Nursing stated in the order, they are

1   designed to protect not only the integrity and

2   verification of all physicians and caregivers in the

3   state of Tennessee from unethical practices of others,

4   but it's also, and more importantly, to protect the

5   health and safety of citizens in the state of Tennessee

6   and another state.

7          In that order the parties agree that he

8   would be placed on probation for two years.  He is, his

9   privilege to practice in any other state is void.  So he

10  cannot transfer his license to circumvent the conditions

11  and the stipulations that I'm stating to the Court.  He

12  is to surrender his Schedule II prescription, or his

13  ability to write prescription II.

14         There was also in a -- because again --

15  and I would submit -- I keep hearing the government talk

16  about Schedule IV.  Of course, if you're familiar with

17  the schedules, the farther down you go the less and less

18  danger, the less and less addictive they are.

19         I'm not really sure why they are skipping

20  (inaudible) II and III, which were the ones that were

21  more addictive and more subject to abuse.

22         He also surrendered his Schedule III,

23  except for he -- and again, based on the agreements that

24  we made with the state of Tennessee, he maintained his

25  privilege to prescribe what we would consider

UNREDACTED TRANSCRIPT

1    testosterone and testosterone like drugs, and also

2    Tylenol with codeine, which is a controlled substance.

3    It's in cough syrups that would be normally prescribed --

4    somebody that had a bad cough would get Tylenol with

5    codeine.

6              But what hasn't been addressed here in

7    this Court, and what I think that when you are dealing

8    with healthcare providers and people who understand how

9    to set up and establish safely nets, safety standards,

10   when they (inaudible) allow him to continue to prescribe

11   those limited Schedule III and Schedule IV and Schedule

12   V, that he is not to prescribe more than 30 morphine

13   equivalent daily doses, or what are called meds,

14   (inaudible) meds, as determined and reviewed by the

15   Tennessee Controlled Substance Monitoring Database.

16             Now somebody has already addressed the

17   TCSMD, which is the statewide database that keeps up with

18   doctors' prescribing habits.

19             So not only is he being monitored for what

20   he his prescribing.  If -- he doesn't prescribe it, and

21   can't prescribe whatever he wants to.  He is limited in

22   degree and number.  And again, that's a condition of the

23   ongoing probation with the Board of Nursing.

24             He shall demonstrate compliance by

25   providing a quarterly copy of his CSM (inaudible) to the

1    Board of Nursing.  And that he will submit a notice and

2    formulary, how do you spell it, F-O-R-M-U-L-A-R-Y,

3    showing that he has an active supervising physician.

4                      And I think this is real key.  Your Honor,

5    had some MDs in it -- (inaudible) supervising physicians.

6                      Mr. Young is a nurse-practitioner.  He has

7    a BS in Nursing.  He has a Masters in Nursing.  He has

8    had some course work to his doctorate.

9                      He can't practice as a nurse practitioner.

10   He cannot prescribe medications without a licensed

11   medical doctor who is his, who is supervising him.

12                     Obviously, what we've seen today with some

13   of the doctors that have been in here, that's not

14   foolproof.  However, since we have known about this for

15   the last two years, and this is -- now that this is in

16   place, there is no doubt that anybody that is asked to

17   supervise him, supervises Mr. Young, knows of his

18   situation, and knows of the conditions of why it would be

19   very dangerous for them not to take that supervision very

20   seriously.

21                     Obviously, they would probably conduct

22   (inaudible).

23                     So he has -- and only if he can continue

24   to find doctors that will supervise him will he be able

25   to prescribe to patients.

UNREDACTED TRANSCRIPT

1          THE COURT:  Is he currently under the

2   supervision of any MD?

3          MR. FERGUSON:  Yes, he is.  He is

4   practicing.

5          What happened was, is around 2017, at the

6   end of this alleged conspiracy, he was driven out of his

7   practice by competing interests within the practice.  He

8   shifted off and moved into a whole different field and is

9   now doing about 80 percent of cosmetic, cosmetic work.

10  I'm not sure how to say it any better than that.  And so

11  his practice has completely changed.  He's no longer

12  doing the high volume.

13          And I'm sure the government is going to

14  get up here and tell you about how many drugs and what

15  his drugs, how many he sold or prescribed and all of

16  this.

17          But again, I was thinking while I was

18  sitting here, I'm not a baseball fan, but (inaudible) if

19  I got up here and told you, I only hit one time

20  (inaudible) be able to say they hit 10 times, sounds like

21  they're 10 times better than me, but probably (inaudible)

22  hit once in about 100 times -- the bottom line, it's an

23  issue of numbers.

24          He had a very high volume practice.  Also

25  led to what ended up being the problem with the board is

1   that he had really substandard recordkeeping, which is

2   not what you want to be a licensed professional.  It

3   would be like an attorney who didn't keep good records.

4   And that goes back to (inaudible).

5               So we have an issue now where based on

6   that he cannot, he cannot, he cannot prescribe again the

7   Schedule II or the Schedule III.  And at the end of the

8   two year supervised probation with the board, once that

9   expires, he still can't prescribe Schedule II drugs.

10  Unless and until he takes certain classes, agrees to

11  certain conditions of having a one year practice

12  monitoring who will make sure he's being compliant and

13  has best record keeping processes in place.

14              He abides by all the recommendations that

15  that monitor makes.  He doesn't have the authority to

16  override the monitor.  Whatever the monitor says, goes.

17  And that that monitor is Court ordered, or we should say

18  board ordered that he shall review at least 10 cases

19  every 90 days.  That he monitor his cases by Mr. Young.

20  And monitor and review more than that if he feels it is

21  necessary and appropriate.

22              Again, he also has, the supervising

23  physician has to sign off on a certain number of his

24  records depending on what is done for that patient

25  contact.

1          So there is -- of course, all the money --

2    so he is unlike anyone else that's been before you today.

3    He has already dealt with and addressed the civil side,

4    not the criminal side.  He is currently being monitored.

5    And that monitoring is designed and set up by people in

6    the medical community who know the medical practice, and

7    know the best practices to put in place to supervise him.

8          The government gets back to the Schedule

9    IV.  I don't know if anyone in here could name me all the

10   Schedule IV drugs.  It makes no sense to say we want to

11   (inaudible) in all Schedule IV.

12         The board, through its experts and

13   expertise in this case, and in these facts, and with the

14   knowledge of how best to protect the citizens of

15   Tennessee, have established these as the appropriate

16   grounds to ensure the safety.

17         And I would ask the Court to incorporate

18   this agreement, or that he maintains his practice in

19   accordance with this as a condition of his release.

20         Pre-trial has interviewed him.  And based

21   on his interview and have heard all their findings,

22   they're recommending a 5,000 unsecured bond.

23         I think that based on his connections to

24   the community, and again with the agreed order, that he

25   is, has to maintain in order to practice -- he has no

1    choice not to practice.  And if he chooses not to follow

2    that agreement, he won't be practicing.  And again, he

3    won't be a threat, and under that agreement he can't be a

4    threat.

5              So I think that should satisfy this Court

6    that conditions are in place to protect the community.

7              THE COURT:  Thank you, Mr. Ferguson.

8              Mr. Knutson.  Did I get it right that

9    time?

10             MR. KNUTSON:  Yes, Your Honor.  Thank you.

11             Your Honor, there is not going to be an

12   issue with the government parsing through the schedules

13   in this case, because we don't think he should be

14   practicing at all.  He shouldn't have a license right

15   now.  And he shouldn't be exposing himself to patients in

16   a position of trust, considering all the evidence that

17   the government has against him.

18             Your Honor, we would like to do some of

19   this by proffer, but we also have one short witness that

20   we would like to call.

21             THE COURT:  Sure.

22             MR. KNUTSON:  And that's John Tankersley.

23             THE COURT:  Go ahead and call that witness

24   now.

25             MR. KNUTSON:  John Tankersley.

UNREDACTED TRANSCRIPT

1                        * * * * * * * * * * * * * * *

UNREDACTED TRANSCRIPT

1          JOHN TANKERSLEY THEREUPON CALLED AS A WITNESS

2    ON BEHALF OF THE GOVERNMENT, AND HAVING BEEN FIRST DULY

3    SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                    DIRECT EXAMINATION

5               THE WITNESS:  Yes.

6               THE CLERK:  Please, be seated.

7    BY MR. KNUTSON:

8    Q.    Please state your name for the record.

9    A.    Sure.  John.  Last name is Tankersley, that's

10   T-A-N-K-E-R-S-L-E-Y.

11   Q.    Who do you work for?

12   A.    The Drug Enforcement Administration.

13   Q.    How long have you worked for the DEA?

14   A.    Twenty-one years.

15   Q.    Are you aware of an investigation into a Jeff

16   Young?

17   A.    Yes, sir.

18   Q.    And did the DEA, in their investigation, speak with

19   many of Jeff Young's former employees?

20   A.    They did.

21   Q.    Did they speak to -- did they tell the DEA about

22   inappropriate relationships that Mr. Young had with

23   patients?

24   A.    They did.

25   Q.    And what did they say?

1    A.    Said that Mr. Young had many, many woman that

2    frequented the clinic that he was at.  They were coming

3    in front door, back door, going straight to his office,

4    where they were trading sex for prescribed drugs,

5    scheduled drugs.

6    Q.    Is that true that actually many witnesses said

7    that, correct?

8    A.    Yes, sir.

9    Q.    And how did those witnesses say they knew that he

10   was trading sex for controlled substances?

11   A.    He would boast about it.  And also he had, he would

12   show pictures on his phone of the activities, sexual

13   activity.

14   Q.    So he would show pictures to the other employees at

15   his office?

16   A.    That's correct, sir.

17   Q.    So did DEA, were they able to corroborate those

18   statements by the many witnesses?

19   A.    Yes.

20   Q.    And did they perform a search warrant on

21   Mr. Young's phone?

22   A.    They did.

23   Q.    And what did they find on Mr. Young's phone?

24              MR. FERGUSON:  Judge, I want to object at

25   this time.  If this is showing that he is a current

1    danger at this time, we need some dates.

2              Because if we're talking about the

3    allegations that are contained in the indictment, they

4    are just allegations and they have to be -- not for this,

5    I understand, but somewhere down the road they're going

6    to be subject to cross-examination and an investigation.

7    We'll actually have discovery and know about this.

8              This issue is we're talking about things

9    that happened years ago, I'm assuming, but I've not heard

10   any dates.

11             And if they're not recent, I'm going to

12   object to the, on the grounds that they're not relevant

13   to his threat to the community at this current time.

14             THE COURT:  I'm going to overrule your

15   objection.  I think this might be worth (inaudible) the

16   way that Mr. Young engaged with some his patients.  I'll

17   let the government clarify (inaudible).

18   BY MR. KNUTSON:

19   Q.    Isn't it true that the initial search warrant on

20   Mr. Young's clinic was on or about January of 2017?

21   A.    Yes, sir.

22   Q.    Was the search warrant on the phone on or about

23   that time frame?

24   A.    Yes, sir.

25   Q.    And so what was seen on the phone after the DEA

1   looked at the phone?

2   A.   Mr. Young having sexual activities with a lot of

3   woman on the phone.

4   Q.   Okay.  And was there one in particular that showed

5   that Mr. Young could be a danger to the community?

6   A.   Yes.

7   Q.   Can you tell us about that?

8   A.   There was a young woman that Mr. Young was having

9   sex with that appeared to be lifeless, motionless, eyes

10  closed.

11  Q.   And did agents determine who that woman was?

12  A.   Not at this point, sir.

13  Q.   Okay.  Was that a video of that woman that appeared

14  Mr. Young was having sex with?

15  A.   That's correct.

16  Q.   And also did agents review a patient file for a

17  patient AR in this case?

18  A.   Yes, sir.

19  Q.   I mean HR.

20  A.   That's correct.

21  Q.   Is that the same HR that's alleged in the

22  indictment in Counts 2 through 7?

23  A.   That's correct.

24  Q.   Did they also have an expert review the file, Jeff

25  Young's file of patient HR?

1    A.    They did.

2    Q.    And what did that patient file show?

3    A.    That the young lady was pregnant.

4    Q.    Okay.  Were there several notations in the patient

5    file showing that Mr. Young knew that the young lady was

6    pregnant?

7    A.    That's correct.

8    Q.    Okay.  And did it also have, show the prescriptions

9    that Mr. Young was prescribing to HR while she was

10   pregnant?

11   A.    That's correct.

12   Q.    Are those reflected in Counts 2 through 7 in the

13   indictment, and do they include Oxycodone and

14   Hydrocodone?

15   A.    That is correct.

16   Q.    Did the agents investigate what happened to patient

17   HR's baby?

18   A.    They did.

19   Q.    What did they find out?

20   A.    They reviewed the file.  They also did a interview

21   of her.  And came to the conclusion that the baby was,

22   suffered from withdrawals from opiate addiction.

23   Q.    So the baby was born, but it was born addicted to

24   opioids.  Is that correct?

25   A.    That's correct.

1           MR. KNUTSON:  I pass the witness.

2           CROSS-EXAMINATION

3  BY MR. FERGUSON:

4  Q.    You don't know who the person was on the phone, do

5  you?

6  A.     (No verbal answer.)

7  Q.    The phone, you don't know who the person was.

8  A.     No, sir.

9  Q.    No charges have been filed.

10 A.     That I'm aware of.

11 Q.    Nobody has come forward and said I was raped.

12 A.     That I'm aware of.

13 Q.    Don't know what was going on on that phone.

14 A.     No, sir.

15 Q.    Just looked at it?

16 A.     No, sir, I didn't look at it.

17 Q.    Who looked at it?

18 A.     Other agents.

19 Q.    Have you seen it?

20 A.     I have not.

21 Q.    How do you know what it shows?

22 A.     They told me.

23 Q.    So your testimony, you're telling a story about

24 something you have no personal knowledge about.

25 A.     That's correct.

22

1          MR. FERGUSON:  Move to strike.

2          MR. KNUTSON:  Your Honor, the Rules of

3   Evidence don't apply.  Hearsay is admissible in this type

4   of hearing.

5          THE COURT:  I agree that hearsay is

6   admissible.

7          MR. FERGUSON:  Well, it's got to be --

8   well, that's fine.  Thank you.

9   BY MR. FERGUSON:

10  Q.    Since 2017, have you done any further investigation

11  of Jeff Young?

12  A.    I haven't, sir.

13  Q.    Are you aware of any other ongoing investigations

14  of Jeff Young?

15  A.    I'm not sure, sir.

16  Q.    And are you aware of any other criminal activity of

17  Jeff Young alleged as a hearsay (inaudible)?

18  A.    I'm not privy to that, no, sir.

19  Q.    Were you ever asked by the Board of Nursing for

20  your opinion or your information you developed during the

21  course of your investigation?

22  A.    No, sir.

23  Q.    Did you know there was an ongoing Board of Nursing

24  investigation into Mr. Young?

25  A.    No, sir.

1   Q.    Are you aware there was a consent order entered

2   against Mr. Jeff Young?

3   A.    No, sir.

4   Q.    Even though it was in the (inaudible) social media

5   in Jackson, passed around through Facebook postings and

6   the newspaper and on TV?

7   A.    No, sir.

8   Q.    Are you (Inaudible)?

9   A.    I am.

10  Q.    Okay.

11  A.    I was out there, yes, sir.

12  Q.    Were you aware that Hydrocodone is not

13  contra-indicated with pregnancy?

14  A.    Sir?  No, sir.

15  Q.    And you're not suggesting to this Court that a

16  prescription of Hydrocodone is contra-indicated to

17  pregnancy?

18  A.    Repeat that, sir.

19  Q.    You're not suggesting to this Court that a

20  prescription of Hydrocodone is contra-indicated during

21  pregnancy.

22  A.    I'm not sure, sir.

23  Q.    Okay.  And Jeff Young has been aware that he's been

24  under investigation since 2017?

25  A.    I'm not sure, sir.

1    Q.    What was your role in this?

2    A.    I have been involved with this investigation, but

3    in middle Tennessee and east Tennessee area.

4    Q.    I know.  In Jeff Young's investigation, what is

5    your role in Jeff Young's investigation?

6    A.    I have no role in it at all, sir.

7    Q.    Why are you testifying?

8    A.    I'm testifying on behalf my fellow agents.

9    Q.    Okay.  Is there a reason why they can't be here

10   today to testify as to their personal knowledge?

11   A.    I have no idea, sir.

12   Q.    Did you hear what I had to say about Jeff Young and

13   all of his knowledge and training he has gone through?

14   A.    I have, sir.

15   Q.    Do you have any indication that anything I said is

16   not correct or true?

17   A.    I have no idea.

18   Q.    Did you hear what I told this Court, and as an

19   officer of this Court that I would be subject to this

20   Court's at least wrath (inaudible), did you hear what I

21   said about the Board of Nursing?

22   A.    Yes, sir, I heard everything you said.

23              MR. KNUTSON:  Objection to the relevance

24   of whether he heard it or not.  I think this is

25   repetitive.  He's already said that he was one of the

1   main case agents, so I object on those grounds.

2               MR. FERGUSON:  Goes to the weight.

3               THE COURT:  I agree, Mr. Ferguson.

4   However, the witness answered he hasn't seen the consent

5   order, so --

6               MR. FERGUSON:  Thank you, Judge.  That's

7   all I have.

8               THE COURT:  Mr. Knutson.

9               MR. KNUTSON:  Your Honor, I have no

10  further questions for this witness.  However, I do have

11  additional evidence to proffer.

12              THE COURT:  Mr. Tankersley, you can step

13  down.

14              THE WITNESS:  Yes, sir.

15              MR. KNUTSON:  Your Honor, as Mr.

16  Tankersley testified to, the government could put

17  witnesses up there, many of them who are ex-employees of

18  Jeff Young, who would say that he exchanged controlled

19  substances with his patients for sex.  And they knew that

20  because he told them.  He bragged about it.

21              THE COURT:  Mr. Knutson, I understand

22  that.  I've taken into consider what the agent just

23  testified to.  But I think that goes to the argument that

24  needs to be made to the District Court when it comes to

25  the question of whether he is innocent or guilty of these

1    charges.

2              My concern today is simply, does he pose

3    any type of danger to the community if he is released?

4              MR. KNUTSON:  Yes, sir.

5              THE COURT:  And from what Mr. Ferguson has

6    advised the Court, is that there are severe restrictions

7    on Mr. Young's ability to practice medicine right now

8    that apparently was at the satisfaction of the Tennessee

9    Board of Nursing.

10             I guess I need the government to tell me

11   why the Tennessee Board of Nursing's restrictions are

12   insufficient in this case to protect the public from

13   Mr. Young if he's released on pre-trial release.

14             MR. KNUTSON:  Well, first of all, there

15   was an investigation for a long time and nothing actually

16   was done to restrict his license (inaudible) took down

17   (inaudible).

18             And as far as the Tennessee Nursing Board,

19   I've read that agreed Court order.  It didn't talk about

20   having sex with patients in exchange for controlled

21   substances.  It didn't include all the evidence that's

22   been gathered through this investigation.

23             And it doesn't -- it's not -- it doesn't

24   just go to, well, can he prescribe or see patients?

25   Because as this case is differentiated from many of those

1  other cases, I mean, has as all the other stuff, the
2  trinity and all that stuff.
3              But how it's differentiated is you have
4  like people who are trusting this guy.  And he's using
5  his power to prescribe to exploit them.  You have a guy
6  that on his phone is in having sex with an unconscious
7  woman.
8              That doesn't go to, well, is he a good
9  practitioner?  Is he going to prescribe the right things?
10 That goes to a guy who is using a position of power that
11 he still has.  Yeah, he can't control or prescribe
12 controlled substances to a degree.  But using that to
13 exploit people.  Right?  So he's in a whole different
14 area here.
15             And that's something that just doesn't go
16 away when you take their license away.  That doesn't go
17 away when you take their DEA prescribing rights away.
18             And you put that in combination with his
19 criminal history the Court has seen, which is violence
20 towards woman.  That he has a drinking -- well, as
21 several of his former employers would say, he came to the
22 office intoxicated.  If we put evidence up there, if we
23 put witnesses up there, he smelled of marijuana and he
24 treated patients in that condition.
25             So this is a totally different ball game

28

1    than just the prescribing.  This is a guy also who

2    suffers from depression, and at least one witness that we

3    spoke to was suicidal.

4              So I think he's a danger to himself also.

5    But he's certainly, with the way he's manipulated people,

6    and the way he's exploited patients, should not be able

7    to practice medicine.

8              And I guarantee you the board didn't

9    consider all those things when they did something that

10   was pretty extraordinary for the board and didn't allow

11   him to prescribe Schedule II controlled substances and

12   others.  That is not in the Court order.  These things

13   are not in the Court order.

14             We have to do something to stop him from

15   exploiting patients again.  And I think that's the main

16   reason the government believes that he should be

17   detained, so no else is exploited.

18             And the government would request that on

19   that basis.

20             MR. FERGUSON:  Your Honor, I have to

21   object to a few things the government just said.

22             I don't believe he was in the room with us

23   when we were discussions what the board reviewed

24   (inaudible).  Everything that (inaudible) two years ago.

25   Everything that the government told you that the board

1    didn't consider (inaudible) because the government

2    (inaudible) stuff, they had no basis in fact.

3                  Every bit of that was discussed at the

4    Board of Nursing.  (Inaudible).  This community is safe

5    because the board -- again, it's the board (inaudible) is

6    that the word?  That fellow government, state government,

7    kind of give differential respect to each other.

8                  Licensing for doctors is a state

9    function -- excuse, me for nurses is a state function.

10   Your job is to ensure the safety.  And I'm sure you will

11   do that.

12                 I think again safety has been guaranteed

13   by the board.

14                 THE COURT:  Mr. Ferguson, do you have a

15   copy of that consent decree or the order?

16                 MR. FERGUSON:  I do, Your Honor.  I've

17   been writing on it.  If you would (inaudible).

18                 THE COURT:  Sure.  I'd like to review it.

19                 MR. FERGUSON:  At the bottom of page four

20   starts the order.

21                 (Pause in Proceedings.)

22                 THE COURT:  For purposes of the record,

23   the Court has reviewed an agreed order that was entered

24   on November 8th, 2018, the state of Tennessee Department

25   of Health before the Tennessee Board of Nursing, Docket

1   No. 17.19–1517998, styled in the matter of Jeffrey W.

2   Young, Jr, RN/APRN respondent.

3                    This is an agreed order in which defense

4   counsel has previously referenced in this matter.  There

5   was a number of restrictions that was placed on

6   Mr. Young's ability to practice medicine as a nurse

7   practitioner in the state of Tennessee.

8                    Mr. Knutson, I assume you have a copy of

9   this order?

10                    MR. KNUTSON:  I do, Your Honor, but not

11   with me.

12                    THE COURT:  Okay.  Because this isn't a

13   clean copy, I'm not going to make this an exhibit.  But I

14   have identified it --

15                    MR. FERGUSON:  It's a public record and on

16   line, so it's easily accessible and can be referenced by,

17   incorporated by reference to the Board of Nursing's

18   website.

19                    THE COURT:  Okay.  We'll return your

20   marked up copy.  Yes.  We will make one -- going on to

21   their website and getting (inaudible).

22                    Mr. Ferguson, is there any other

23   statements you would like to make at this point?

24                    MR. FERGUSON:  No, Your Honor.  Just that

25   we are hoping the Court will accept the recommendation of

31

1    pre-trial.

2                    THE COURT:  Mr. Knutson?

3                    MR. KNUTSON:  Your Honor, we would reurge

4    that the evidence has shown that he's a danger to the

5    community, and we ask for you to detain him accordingly.

6                    THE COURT:  Thank you.

7                    If my determination was based upon the

8    conduct that was alleged that Mr. Young may have

9    committed that gave rise to this indictment, without

10   question he would be detained for the duration of this

11   matter.  But that's not what my inquiry or focus is on.

12   It's whether he's a flight risk or a present danger to

13   the community.

14                   As far as flight risk is concerned, I find

15   that Mr. Young is not a flight risk.  He has lived in the

16   Jackson, Tennessee, area for most of his life.  He has

17   family here.  Has practiced medicine here for a number of

18   years.  So I do not find that he's a flight risk.

19                   As far as him being a danger to the

20   community, that's a much closer call.  The allegations

21   against Mr. Young's behavior that gave rise to this

22   indictment is quite disturbing.

23                   However, a lot of my concerns are allayed

24   based upon the agreed order that the Board of Nursing has

25   entered into in this case, which has severely restricted

UNREDACTED TRANSCRIPT

1    Mr. Young's ability to practice medicine as a nurse

2    practitioner in this community.

3                    I do give credit to the Board of Nursing

4    who investigated this matter.  And after their

5    investigation, they found that these were adequate

6    restrictions to place upon Mr. Young to protect the

7    public from him in his capacity as a healthcare provider.

8                    So I am going to deny the motion, the

9    government's motion to detain Mr. Young pending

10   resolution of this matter.  And I am going to, as a

11   condition of his release, incorporate the Board of

12   Nursing agreed order and all of those conditions that

13   were placed upon his practice.

14                   I am also going to order that Mr. Young be

15   supervised by pre-trial services.  That he continue his

16   employment in accordance with the agreed order from the

17   Board of Nursing.

18                   Does Mr. Young have a passport?

19                   MR. FERGUSON:  He does not.  I believe

20   it's —— no, he does not have a passport.

21                   THE COURT:  Okay.  He will not apply for a

22   passport.  And he is restricted to reside any traveling

23   in the Western District of Tennessee.

24                   Mr. Ferguson, if Mr. Young seeks to travel

25   outside of West Tennessee, he will need to notify the

UNREDACTED TRANSCRIPT

33

1  government as well at the Court and to get permission

2  from the Court.

3                    MR. FERGUSON:  Yes, Your Honor.

4                    THE COURT:  To avoid all contact directly

5  or indirectly with any person who is or may be a victim

6  or witness in the investigation of prosecution.

7                    He will comply with any directions from

8  pre-trial services, as far as any medical or psychiatric

9  treatment.

10                    No use of any controlled substances that

11  are not lawfully prescribed to him.

12                    No use of any street drugs, marijuana or

13  anything along those lines.

14                    No excessive use of alcohol.

15                    I do have a little concern with some of

16  the prior battery and domestic violence.

17                    MR. FERGUSON:  All --

18                    THE COURT:  I know they've been pre-trial

19  diversion and --

20                    MR. FERGUSON:  The other one was dismissed

21  and --

22                    THE COURT:  -- dismissed.  However, the

23  pre-trial services does indicate that Mr. Young possess

24  as firearm.  Is that correct?

25                    MR. FERGUSON:  He does.  Your Honor, he

UNREDACTED TRANSCRIPT

1   has, or would have access to it.  It needs to be -- his

2   father is here.  And if the Court is so inclined, I think

3   his father should be the one -- since they don't live

4   together, his father should -- he should divest himself

5   of it.  He shouldn't be holding on to it.

6               I'm assuming the father -- you would be

7   okay with that?

8               THE DEFENDANT:  Sure.

9               MR. FERGUSON:  And then with the

10  understanding that he's not to have access to it.

11              THE COURT:  Because I don't want Mr. Young

12  to have access or possess any firearms.

13              MR. FERGUSON:  I would agree.

14              THE COURT:  Is there anything else from

15  pre-trial services?

16              I am going to place a $5,000 unsecured

17  bond on him.

18              MR. FERGUSON:  Thank you.

19              THE COURT:  We are working on some

20  paperwork.

21              MR. FERGUSON:  Thank you.

22              THE COURT:  While we are waiting on that

23  paperwork, we can go ahead and arraign Mr. Young.

24              MR. FERGUSON:  Yes, sir.  We would

25  (inaudible) -- we would enter a plea of not guilty.

1    Mr. Young is (inaudible).

2              THE COURT:  I will enter a not guilty plea

3    on Mr. Young's behalf.

4              The next court appearance will be set by

5    Judge Breen in this matter.  Mr. Ferguson will have 30

6    days in which to file any pre-trial motions.

7              MR. FERGUSON:  Thank you, Your Honor.  May

8    I be excused?

9              THE COURT:  Wait just a minute.  We are

10   working on the paperwork.

11             MR. FERGUSON:  Sure.

12             THE COURT:  It's almost done.

13             (Pause in Proceedings.)

14             THE COURT:  Mr. Young, I'm going to remand

15   you to the custody of the United States Marshal Service

16   and they will process you.

17             Thank you, Mr. Ferguson.

18             MR. FERGUSON:  Thank you, sir.  Very nice

19   to meet you.

20             (End of Proceedings.)

21             (End of Requested Material.)

22

23

24

25

UNREDACTED TRANSCRIPT

36

1        I, Kristi Heasley, do hereby certify that the

2   foregoing 34 pages are, to the best of my knowledge,

3   skill and ability, a true and accurate unredacted

4   transcript from the FTR recording in the matter of:

5   UNITED STATES OF AMERICA

6                                    )
    VS                               )NO.1:19-cr-10040
7                                    )JACKSON, TENNESSEE
                                     )
8   JEFF YOUNG                       )

9

10       Dated this 25th day of May, 2019.

11

12

13

14  _____
    Kristi Heasley, RPR
15  Official Court Reporter
    United States District Court
16  Western District of Tennessee
    Eastern Division
17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT