REDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

--------------------------------------------------

UNITED STATES OF AMERICA                    )
                                            )
VS                                          )NO.1:19-cr-10040
                                            )JACKSON, TENNESSEE
                                            )
JEFFREY YOUNG                               )

--------------------------------------------------


MOTION HEARING


MAY 13, 2019




BEFORE THE HONORABLE J. DANIEL BREEN,

UNITED STATES DISTRICT JUDGE




KRISTI HEASLEY, RPR
OFFICIAL COURT REPORTER
U.S. COURTHOUSE, SUITE 450
111 SOUTH HIGHLAND AVENUE
JACKSON, TENNESSEE 38301



REDACTED TRANSCRIPT

2

1                              APPEARANCES

2

3

4    FOR THE UNITED STATES:

5    ANDREW PENNEBAKER, ESQ.
     JASON KNUTSON, ESQ.
6    U.S. DEPT OF JUSTICE FRAUD SECTION
     1400 New York Avenue NW
7    Washington, DC 20530

8

9

10

11   FOR THE DEFENDANT:

12   CLAIBORNE HAMBRICK FERGUSON, ESQ.
     THE CLAIBORNE FERGUSON LAW FIRM
13   294 Washington Avenue
     Memphis, TN 38103
14

15

16

17

18

19

20

21

22

23

24

25

                         REDACTED TRANSCRIPT

1                          EXAMINATION INDEX

2

3    SHIRLEY PICKERING

4
         DIRECT BY MR. PENNEBAKER                      22
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBITS

2

3                    NO EXHIBITS MARKED

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Defendant Present.)

2           THE COURT:  All right.  The next matter,

3   case of U.S. versus Jeffrey Young, Jr., 19-10040.

4           This is a request on behalf of the

5   government, basically an appeal of the Magistrate Judge's

6   previously ruling allowing Mr. Young to remain, to remain

7   on bond.

8           This is under Section -- 18, United States

9   Code, Section, 3145(a)(1) for a request for revocation of

10  the Magistrate Judge's ruling.

11          MR. PENNEBAKER:  Your Honor, trying to get

12  hooked up for him.

13          THE COURT:  Okay.  Go ahead.

14          MR. KNUTSON:  Your Honor, I'm Jason

15  Knutson for the government.

16          THE COURT:  All right.

17          MR. KNUTSON:  Just trying to make sure we

18  have the right hookup for...

19          THE COURT:  No problem.  Go right ahead.

20          MR. KNUTSON:  Thank you, Judge.

21          THE COURT:  Just let me know, Mr. Knutson,

22  when you are ready.

23          MR. KNUTSON:  Yes, Your Honor.  With the

24  Court's permission, may we just test the audio?

25          THE COURT:  That will be fine.

REDACTED TRANSCRIPT

6

1          MR. KNUTSON:  Thank you, Your Honor.

2          THE COURT:  Yes, sir.

3          MR. PENNEBAKER:  Your Honor, Mr.

4   Pennebaker for the government.  May I approach and give

5   the Court a copy of the first witness's exhibits and put

6   one on the witness stand as well?

7          THE COURT:  Yes, sir.

8          MR. PENNEBAKER:  Thank you, Your Honor.

9          And, Your Honor, just a housekeeping

10  matter --

11         THE COURT:  By the way, are you Mr.

12  Pennebaker?

13         MR. PENNEBAKER:  I am, Judge.

14         THE COURT:  We haven't had the chance to

15  introduce each other, so I just wanted to make sure I was

16  addressing who I thought I was.

17         MR. PENNEBAKER:  Absolutely.  Yes, Your

18  Honor.

19         Drew Pennebaker for the government, for

20  the record.

21         This is, this binder relates to the first

22  witness that the government will call, Shirley Pickering,

23  who is an investigator with the State Medical Board.  We

24  have a number of documents in this binder that contain

25  information that is potentially sensitive, may involve

 1   patient information, may involve names and identifiers of

 2   individuals in the community who would not like those

 3   things to be publicized.

 4                    And so for the purpose of today's hearing,

 5   we would ask that either, one, we can have the exhibits

 6   entered with the Court under seal.  Or after the hearing,

 7   the government is happy to go through and redact

 8   identifying information appropriately.  Either one would

 9   work.

10                    THE COURT:  Mr. Ferguson, do you have any

11   objection to that, sir?

12                    MR. FERGUSON:  I prefer sealed, if we

13   could.

14                    THE COURT:  All right.

15                    MR. FERGUSON:  Be easier for every one.

16                    THE COURT:  Why don't we just do that.

17                    MR. PENNEBAKER:  That works for the

18   government, Your Honor.

19                    THE COURT:  Thank you.

20                    Mr. Powell, are you involved in this as

21   well?

22                    MR. POWELL:  Tangentially, yes, Your

23   Honor.

24                    THE COURT:  Mr. Wilson as well?

25                    MR. WILSON:  No.  I'm just trying to help

8

1   out.

2                   THE COURT:  Okay.  You are just observing.

3                   MR. POWELL:  He's observing.

4                   (Pause in Proceedings.)

5                   MR. KNUTSON:  I apologize, Your Honor.

6                   THE COURT:  That's all right.  You're not

7   the first person that's had problems.

8                   MR. PENNEBAKER:  Your Honor, Drew

9   Pennebaker for the government again.

10                  I'm not going to be using any sort of

11  Power Point or anything like that for the opening

12  statement and for the first witness, who I anticipate the

13  government will have on the stand for an hour, maybe a

14  little bit more.

15                  If it's okay with the Court, maybe we

16  could get through those two things and take a break to

17  just have a minute to adjust this.

18                  THE COURT:  Any way we can move faster

19  through this, that's fine with me.

20                  MR. PENNEBAKER:  I think this is it, Your

21  Honor.

22                  THE COURT:  All right, sir.

23                  MR. PENNEBAKER:  And a final housekeeping

24  request.

25                  It is possible, because we are all going

REDACTED TRANSCRIPT

1    to be looking at unredacted things, that somebody's name,

2    and in particular a patient's name is mentioned not by

3    the patient's initials but by their given name as it

4    appears in the docket.  I would just ask that the record

5    reflect the initials in the instance that we can correct

6    that.

7                    THE COURT:  All right, sir.

8                    MR. PENNEBAKER:  Hopefully I can catch it

9    in the real time.  But if that's okay.

10                   THE COURT:  Help me watch that.  We will

11   try to do that as much as possible.

12                   MR. PENNEBAKER:  Yes, Your Honor.

13                   May it please the Court.

14                   THE COURT:  Yes, sir.

15                   MR. PENNEBAKER:  Your Honor, we're here

16   today because a Grand Jury found that the defendant, Jeff

17   Young, that there was probable cause to believe that he

18   is a drug dealer, and the law treats him like one.

19                   He deals drugs for money.  And he's dealt

20   drugs for sex.  What is the most insidious part about his

21   drug dealing is that he deals drugs from a script pad and

22   he does it on the shoulders of his position of trust in

23   the community as a nurse practitioner.

24                   The evidence today is going to show that

25   whenever Mr. Young gets caught dealing drugs as,

1    masquerading as a doctor, or a nurse practitioner, or

2    Rock Doc, as he calls himself, he pivots to another way

3    to turn his prescription pad into drug money.

4              That was true after the DEA raided his

5    clinic in January of 2017.  It was true after the medical

6    board started its investigation.  It has been true when

7    the medical board restricted his license in November of

8    '18.  It remains true today.

9              Right now he's open for business, able to

10   prescribe, among other things, anabolic steroids, namely

11   testosterone, and benzodiazepines.  Dangerous drug in his

12   repertoire since the PreventaGenix days that got him into

13   trouble.  He's even able to prescribe codeine today,

14   which is an opioid.

15             A major focus today is going to be that

16   November 2018 medical board order restricting his

17   license.  The reason that's going to be a major focus is

18   because when Judge York heard the government's motion to

19   detain Mr. Young, we heard that the medical board had his

20   practice under control.  That the medical board had

21   before it the evidence that you are going to hear today.

22             And at least as to that statement, the

23   medical board did have a awful lot of evidence before it

24   when it decided to allow him to continue practicing

25   medicine in the community.

1           The best we can tell, while the

2    investigators working for the medical board gathered a

3    mountain of evidence that Mr. Young should not be

4    practicing medicine, should not be in a position of trust

5    in the community, the licensing decision makers, and

6    those are different from the investigators that are out

7    there meeting with these people, gathering the facts,

8    conveying that information to the decision makers, the

9    decision makers were looking the other way.

10           And one question that may be on minds in

11   the courtroom today is how many of the fires of addiction

12   were fueled by this man between when the board started

13   investigating him in 2014, and November of 2018 when it

14   restricted his license?  How many people died during that

15   time as a result of this man continuing to be out among

16   the public practicing medicine, prescribing narcotics to

17   the community, to drug seekers, to all comers?

18           Our first witness today is going to be one

19   of the investigators for the board.  And we're going to

20   walk through some of that evidence that she and her

21   colleagues gathered in the course of investigating

22   Mr. Young.

23           I'll submit to you, Judge, that by the end

24   of this hearing you will be asking what on earth took the

25   medical board so long.  And maybe the simple response to

 1   that question is, investigations take time.  Sometimes a

 2   long time.  The evidence leads where it leads.

 3             But as the government's evidence today

 4   will show, there is no rational explanation, no deference

 5   should be afforded, absolutely no explanation for why

 6   Jeff Young still has a medical license, still able to

 7   prescribe drugs of abuse to addicts, and still

 8   prescribing drugs of abuse in a woefully deficient

 9   medical practice that he runs today.

10             Even though it's mostly cosmetic, and the

11   government is happy to characterize it that way, he

12   continues to write drugs to people that he should not be

13   writing to, without checking the databases that he ought

14   to be checking to confirm those people are not doctor

15   shopping, are not just blatantly abusing the medical

16   system.

17             The agreed order even provided

18   Mr. Young —— I mean, far from tamping down on his danger

19   to the community, the agreed order sheltered him, or he

20   used it to shelter himself in the bond hearing as a

21   shield, claiming that the community was safe because the

22   board order was in place.  That is a travesty.

23             The government's evidence will show the

24   order hasn't had the intended effect.

25             And what if the Court were to correct what

1   the government contends is the board's costly mistake,

2   allowing Jeff Young to continue practicing as a nurse,

3   and simply take away his license.  Make a condition of

4   his release that he not be able to practice medicine.

5              What if the Court does what the board

6   should have done and takes away that position of trust

7   that Jeff Young has abused.  Will that be enough to keep

8   this community safe pending a trial in this case?

9              Maybe for some medical providers who go

10  down the road of using their powers of prescription to

11  make people sicker instead of better, but not with Jeff

12  Young.  He is dangerous with or without a prescription

13  pad.  He's got no regard for physical or sexual

14  boundaries.

15             And this isn't a question about whether or

16  not today he has some sort of a mental defect that

17  animates him to assault people, sexually assault people,

18  threaten people.  This is about what his actions over and

19  over and over again, the actions known about by the

20  board, the actions the evidence will show, the actions

21  alleged in the indictment, this is about the trend, and

22  protecting the community from that trend.

23             He has a documented history of assault.

24  He has a documented history -- importantly, so

25  importantly, he has a documented history of threatening

1   those, or causing others to threaten those who would

2   speak against him.

3            This was true all throughout the course of

4   the medical board's investigation.  This has been true in

5   the public eye on Facebook.  And you don't even have to

6   have -- in a lot of these instances you didn't even have

7   to have a friendship, quote, unquote, on Facebook with

8   Mr. Young.  You could just see it in the public eye on

9   the PreventaGenix page, on the Jeff Young page, on the

10  Rock Doc page.

11           You will hear from the witnesses today

12  that people in this community are scared of Jeff Young.

13  And for good reason.  It's not only Jeff Young who

14  threatens people in the community.  It's the Rock Doc

15  disciples.  The man has a subculture.  He's infamous.

16  He's got a subculture of fandom that will go out and do

17  his bidding.  We're going to show the Court evidence of

18  that today.

19           Jeff Young also has no regard at all for

20  authority.  He's been found in contempt of Court orders.

21  He's ignored warnings and admonitions from the medical

22  board.  What is perhaps most disturbing that Your Honor

23  will hear today, is that Jeff Young views himself as the

24  victim of a witch hunt.  The victim of a witch hunt.

25           I hope that he realizes after he sees the

1   evidence today how ridiculous, how preposterous the
2   presumption that this is a witch hunt is.  He cannot
3   blame this on disgruntled ex-wives or disgruntled former
4   colleagues or disgruntled employees or people who are out
5   to get him and don't like his tattoos.
6              None of that has anything to do with what
7   the evidence shows of him communicating to others in the
8   real time, which is what we're going to get into today.
9   Of him lying over and over and over again to the medical
10  board about what he does and doesn't do in his practice.
11  About him lying under oath when being examined by the
12  medical board in connection with the proceeding that got
13  us the medical board order.
14              This is all a big witch hunt, according to
15  him.  And we'll let the evidence speak to that.
16              The other troubling thing is that
17  Mr. Young is utterly remorseless.  He is utterly without
18  fault in his own mind.  Report after report, interview
19  after interview, deposition, statements on social media,
20  its all, I've never done anything wrong.  I mean, it
21  really is.  It's challenging to find admission of a
22  single possible mistake.
23              The evidence is just going to show that
24  he's got no regard for the truth.  The blame goes
25  everywhere else.  But ultimately the responsibility falls

1   on the shoulders of the trusted members of society we

2   call medical providers, and that is utterly lost on Jeff

3   Young.

4              After the Court hears all the evidence, we

5   respectfully ask the Court to detain him pending trial.

6              THE COURT:  Mr. Ferguson.

7              MR. FERGUSON:  Your Honor, if this is a

8   witch hunt, it's a witch hunt that Jeff Young brought on

9   himself.

10             For the last two and a half years it's

11  been a different Jeff Young.  But prior to that, we do

12  acknowledge to this Court he was living a rock and roll

13  lifestyle.  He was trying to get a, actually a reality TV

14  show.  And he was doing outrageous things, that through

15  the course of social media he was pushing out into the

16  community that he was a wild and crazy kind of guy.

17             Unfortunately, that did put wild and crazy

18  kind of people around him who now are out to get him.

19  He's going currently through a divorce with his ex-wife

20  where there is a contempt proceedings.  And she is very

21  angry about it and very active in pushing out to either

22  legal news agencies or to, as happened last week, to the

23  police, and they called me, that there are issues that

24  are still to this day haunting him from the decisions he

25  made two and a half years ago.

REDACTED TRANSCRIPT

1          What the Court has to look at is whether
2    or not -- and again, the government has conceded that
3    there are grounds in order to overcome the presumption.
4    In their own filing they agree that the filings with the
5    Board of Nursing overcome the presumption.
6          So they're not proceeding based on their
7    own filings with a presumption.  They're going to try to
8    put on evidence to show that there are no reasonable
9    restrictions that can be placed on Mr. Young to protect
10   the safety of the community.
11         I'm assuming that, as they did last time,
12   they're also not pursuing the flight risk as the --
13   obviously, there is no issue of flight in this case.
14   Proof would be that he's been under investigation both by
15   the DEA and by the Board of Nursing for multiple years.
16         In fact, we have had a -- I believe it was
17   in this courtroom, we had a -- a year ago we had a filing
18   where we returned some of the property that got seized
19   from 2017 in this case.
20         So the issue here before Your Honor is
21   whether or not he is a danger to the community.
22         I find it troublesome that the government
23   seems to want to interject itself into the realm of
24   policing the license pre-trial of healthcare providers.
25   That, obviously, was the purview of the Board of Nursing.

1   It was a multi year long investigation in which I handled
2   with Mr. Young where there was multiple depositions by
3   Mr. Young.  He submitted multiple depositions with the
4   Board of Nursing in order for them to -- in order to --
5   for us to -- in order for us to come to the resolution
6   that we did.
7               The proof within the resolution of the
8   disposition of that, unlike what the government suggests
9   in its filing, is not proof that Mr. Young did something.
10   In fact, it's exactly opposite of what the government put
11   in its filings before this Court.
12               It's very clear that Mr. Young maintained
13   that he had done nothing wrong.  That the facts were what
14   the facts were.  And that he was denying those.  But he
15   agreed to a consent order, which led to a multi year
16   suspension of his Schedule II drugs and a limited
17   Schedule III.
18               Again, those Schedule III are basically
19   testosterone.  And the government talks about codeine.
20   What the government forgets to mention is that codeine
21   means cough syrup.  That is cough syrup with codeine.
22               He is not a threat.  The Board of Nursing
23   would not have placed him back out into the community,
24   would not have allowed him to continue practicing, would
25   not have continued to allow him to have a license for

1  prescribing, if, in fact, he was found by them to be a

2  threat to his community.

3             They are the experts in this field.  They

4  are the ones in the state of Tennessee that are

5  statutorily empowered with the investigation, with the

6  decision-making process, and the power to protect the

7  community.  And they exercise that over many, many, many

8  years.

9             And now they're continuing to exercise

10 that authority over Mr. Young for an additional two

11 years, where he has to take certain and special steps in

12 order to remain able to practice within this community.

13 And also he, at the end of that two years, he'll have to

14 take certain steps in order to retrieve or reactivate his

15 Schedule II privileges.  We're talking about a situation

16 where they didn't even permanently restrict him from

17 Schedule II.

18             The same information that the government

19 has in order that they led to this investigation and the

20 indictments in this case, is the same evidence and

21 information that the Board of Nursing had.  To say that

22 they somehow were negligent in their supervision of

23 healthcare providers in this state is -- well, I was not

24 expecting that.

25             And, obviously, we're going to want to be

1    able to put on proof, and have those folks that actually

2    came to that agreement, and have them testify that they,

3    in fact, did not get snookered by Mr. Young in some way,

4    and that this was the appropriate decision in this case.

5           There are -- and the proof will be that

6    Mr. Young was -- he does have a lot of friends and there

7    was a lot of sex going on.  It may be unseemly at the

8    time.  Again, these are events and actions that took

9    place years ago and have not been repeated, and are in

10   his past.

11          They don't have any impact to the decision

12   this Court should have to make today based on whether or

13   not at the current time Mr. Young is a threat to this

14   community.  He is within, working within the realm and

15   bounds of the Board of Nursing's consent order.  He is

16   still practicing.  And he's a single father and the only

17   sole provider for his son.

18          I would ask the Court -- at the end of

19   this, the Court will find that the release that

20   Magistrate York issued in this case was appropriate with

21   the conditions.  Basically, Magistrate York found that

22   the Board of Nursing's restrictions were the proper

23   restrictions, and he incorporated those into the release.

24          I ask the Court to do the same.

25          THE COURT:  All right.  Thank you.

1              Mr. Pennebaker, call your first witness.

2              MR. PENNEBAKER:  Government calls Shirley

3    Pickering, Your Honor.

4                   ***************

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED TRANSCRIPT

1              SHIRLEY PICKERING THEREUPON CALLED AS A

2     WITNESS ON BEHALF OF THE GOVERNMENT, AND HAVING BEEN

3     FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

4                          DIRECT EXAMINATION

5                    THE WITNESS:  Yes, I do.

6                    THE COURT:  Be seated, please.

7     BY MR. PENNEBAKER:

8     Q.    Good afternoon, Ms. Pickering.

9     A.    Good afternoon.

10    Q.    If you need it, there is a binder with some

11    exhibits that I will refer to today.  And that is for you

12    to peruse as you see fit.

13          I want to get a little bit of detail about your

14    background.

15          First, where do you work?

16    A.    I work for the state of Tennessee, Office of

17    Investigations for Health Related Boards.

18    Q.    Okay.  Describe your job duties, please.

19    A.    I perform investigations that have been assigned to

20    me by our central office of healthcare providers who have

21    had allegations filed against them.  I'm also the

22    supervisor for other investigators in the West Tennessee

23    office.

24                    THE COURT:  Ms. Pickering, I'm going to

25    ask you to pull that microphone just a little bit closer

1    or you might move up.  Not right on top of it.  But we've

2    been having some trouble regretfully of our being able to

3    hear.  And I want to make sure my court reporter and I

4    both hear you, please.  Thank you.

5    BY MR. PENNEBAKER:

6    Q.    Okay.  So I think you mentioned that you are now in

7    a supervisory role.

8    A.    Yes.

9    Q.    Are you here today to testify just about what you

10   individually have learned in your investigations, or are

11   you going to testify some about other investigators who

12   have reported to you what they found?

13   A.    My investigations, as well as information provided

14   to me by other investigators.

15   Q.    Okay.  What kinds of allegations do you

16   investigate?

17   A.    We investigate just multiple types of allegations

18   against providers.  Anything from drug diversion to use

19   of medication to improper conduct with patients, sexual

20   crimes.  Just the gamut of different types of things.

21   Q.    Okay.  And just for the sake of a complete record,

22   because not everybody understands or knows drug diversion

23   and what that means, can you just tell us briefly what is

24   drug diversion?

25   A.    That would be the use or the removal of medications

1    that either do not belong to you, that belong to someone

2    else.  It can be something such as a nurse taking

3    medication from the Pyxis System at a hospital.  It can

4    be the fraudulent use of prescriptions to gain access to

5    controlled substances.  Those types of thing.

6    Q.    Okay.  How about prescribing controlled drugs when

7    you know it's not medically necessary?

8    A.    We do that.  That's usually referred to as either

9    inappropriate and/or excessive prescription of controlled

10   substances.

11   Q.    Okay.  Does your job require you to have medical

12   training?

13   A.    All of the investigators are registered nurses.  We

14   all have nursing degrees.  We also are now all certified

15   through the Counsel of Licensure Enforcement and

16   Regulation.  And we all have now received some extensive

17   training through the Reid Technique and some other

18   things.

19              THE COURT REPORTER:  What technique?

20              THE WITNESS:  Reid, R-E-I-D, Technique.

21   BY MR. PENNEBAKER:

22   Q.    Okay.  Is that the technique that -- interview and

23   interrogation --

24   A.    Yes.

25   Q.    -- series of techniques?

1          How long have you been an investigator for the

2     state?

3     A.     Almost 13 years.

4     Q.     Have you ever personally investigated the nurse

5     practitioner sitting here at defense counsel table?

6     A.     Yes, sir.

7     Q.     Have you done so in connection with more than one

8     matter?

9     A.     Yes, sir.

10    Q.     We'll get to those shortly.  But just first

11    generally speaking, is there more than one way an

12    investigation assignment might get to your desk?

13    A.     Our investigation assignments all are forwarded to

14    us from the central office in Nashville.  They come into

15    the central office.  They're triaged there, then assigned

16    out to individual investigators in the field.

17    Q.     And do you sometimes get complaints -- I mean, you

18    as the investigators.

19          Do you sometimes get complaints that you will

20    forward to the, forward to Nashville, I'll just use as a

21    shorthand?

22    A.     Yes, sir.  Investigators may receive information

23    either by phone or e-mail or even by regular mail.  We

24    cannot open complaints.  We don't make those decisions.

25    So therefore we forward that information up to our

1    central office where it's reviewed.  And then it's sent

2    out as a complaint, if they deem that it's worthy of

3    such.

4    Q.    Okay.  So at the end of the day, you may think

5    something is worthy of an open investigation.  But that's

6    above your pay grade.  You don't make that decision.

7    A.    We do not make the decision as to whether a

8    complaint is opened or not.

9    Q.    Okay.  Describe what you do just briefly after you

10   received an assignment.

11   A.    We review the information that's in our internal

12   system as to licensure, if there has been any prior

13   complaints.  We review a listing from our office of

14   general counsel, as to information they want us to

15   obtain.  List of witnesses that we are asked to speak to.

16   What records are required to be obtained.

17        We do get medical records.  We get law enforcement

18   records.  Anything that's pertinent to that

19   investigation.  And as the investigation progresses,

20   there may be additional things that may appear to be of

21   use to the boards.

22   Q.    Okay.  After you have completed your work, what is

23   the next step?

24   A.    Once our investigation is completed, we do a,

25   what's called an investigative form, a file, that we

1   forward up to our central office in Nashville.

2          At that point our role is complete.  We have

3   provided the data, which is what our role is, data

4   gathering.

5          It's then reviewed by central office.  And the

6   decisions is made at that level, whether there should be

7   discipline action.  And if so, what type.

8   Q.    And are the investigators consulted in connection

9   with the decision-making process?

10  A.    We are not part of that decision-making process.

11  Our role is simply to gather the data, gather the

12  information, and submit it.

13  Q.    Let's say that there is a deposition or some

14  proceeding before a panel or something like that.  Does

15  that come back to the investigator?  Does the

16  investigator testify there?

17  A.    We have testified at some depositions.  But as far

18  as something coming back to us in a case, I don't think

19  that's normally something that we get is a copy of the

20  deposition.  Unless we have directly been involved in

21  that deposition.

22  Q.    Okay.  And how about hearings before the ultimate

23  arbiter?  Are you all participants in those?

24  A.    As far as we will go to a board hearing if we are

25  subpoenaed to testify at a administrative board hearing.

1    But as far as their meeting for the review boards, I

2    think that we have gone as guests a couple of times.  But

3    as far as naturally, we are not usually there, no.

4    Q.    Okay.  Now in your investigation report you

5    enumerate conclusions, right?

6    A.    A summary of what he have found.

7    Q.    Okay.  So it's not a conclusion about what should

8    happen --

9    A.    No.

10   Q.    -- it's just a -- this is the high level, what the

11   evidence has shown.

12   A.    We make no conclusion as to what should or should

13   not be decided.  We simply record the information that we

14   have found.

15   Q.    So you play a fact finding role.

16   A.    Exactly.

17   Q.    How did Jeff Young first come to your attention?

18   A.    I received an investigative file to be -- a file to

19   be investigated regarding him.

20   Q.    Okay.  Do you remember about when this was?

21   A.    I don't remember the exact date.  2013, 2014 is

22   when I received it.

23   Q.    Okay.  I think you mentioned earlier that he has

24   been investigated repeatedly since.  And we're going to

25   talk about those in detail.

1              Have you reviewed documentation that I provided to

2      you that I subpoenaed from, as far as I know, from the

3      board, the health related boards, but they came to me

4      from the Office of General Counsel?

5      A.     You did provide me with some information to review.

6      Q.     Okay.  Are there complaints in there, in the

7      evidence that -- or the materials that I provided to you

8      that you weren't asked to investigate?

9      A.     There appear to be some allegations or complaints

10     that were forwarded to our central office in Nashville

11     that we do not have investigative files on.

12     Q.     Okay.  Do you know how that determination is made?

13     I might have already asked you.

14              But do you know how that determination is made,

15     which ones that the powers that be will have you all

16     investigate and which ones won't?

17     A.     No, I do not.

18     Q.     Okay.  When you conduct your interviews, is it

19     important that practitioners tell you the truth --

20     A.     Yes.  Yes, it is.

21     Q.     Why is that?

22     A.     For us to be able to provide correct information

23     for the board to review, or to consider, then we have to

24     be given accurate information.

25     Q.     And just quickly a couple more just background

1   points that I think would be helpful to come in through

2   you at this point.

3          Could you give the Court a quick overview of the

4   purpose of and kind of the nature of the supervising

5   physician rules and regulations that pertain to nurse

6   practitioners like Mr. Young?

7   A.    I do have some specific statutes or rules here if

8   that will be okay.  And I can do them briefly.

9   Q.    Absolutely.

10  A.    Kind of get an overview --

11  Q.    Sure.

12  A.    -- so that I'm sure that I give you the correct

13  information.

14  Q.    Sure.

15  A.    According to the rules of the Tennessee State Board

16  of Medical Examiners, Chapter 0880-6.  Clinical

17  supervision requirements.  The intent of it is to make

18  sure to maximize the collaborative practice of certified

19  nurse practitioners and supervising physicians to be sure

20  that there is quality healthcare delivery.

21  Q.    Just stop you right there for one second.

22         Fair to say that to get a medical license, like an

23  MD, you're going to be -- it's a lot more of an intensive

24  and longer process with residency and everything else,

25  that you're going to specialize, for example, or become a

1   family practitioner -- but nevertheless, a lot of

2   indentured servitude involved with walking in that

3   direction, and the training and licensing necessary to be

4   a nurse practitioner.  Still, I mean, no -- nothing,

5   obviously, to sneeze about.

6        But there is a reason that you have a physician

7   supervising a nurse practitioner, right?

8   A.    As it says, it's so that there can be a manner

9   consistent with quality healthcare delivery.  That's

10  their definition.

11  Q.    Okay.

12  A.    It does require protocols.

13  Q.    What does that mean?

14  A.    Those are -- the protocols are the practice

15  guidelines, the things that you are allowed to do and you

16  should do.

17       So you have protocols that shall be jointly

18  developed.  And then they should be approved by the

19  supervising physician and the nurse practitioner.

20  They'll outline and cover the applicable standard of

21  care.  They have to be reviewed and updated bi-annually.

22  They should be maintained at the practice site.

23       They will account for all the protocol drugs by

24  appropriate formulary, specific to your population seen,

25  dated and signed.

1            And copies of those protocols and formularies

2    shall be maintained at the practice site, and shall be

3    made available upon request for inspection by the

4    respective boards.

5    Q.    Okay.  Can a nurse practitioner write prescriptions

6    for controlled substances without a supervising

7    physician?

8    A.    They are supposed to have a supervising physician.

9    And that should be on their formulary as to what they can

10   and cannot write.

11   Q.    Okay.  Is it okay in Tennessee if a nurse

12   practitioner goes without a supervising physician for a

13   while and just keeps the shop open and continues to write

14   prescriptions for controlled substances?

15   A.    It is my understanding that they have to maintain a

16   supervising physician.

17   Q.    Okay.  Is that the law?

18   A.    It is my understanding that that is their statute,

19   yes.

20   Q.    And is there anything in the supervising physician

21   regime, the legal regime that requires review by the

22   supervising physician of controlled substance

23   prescriptions?

24   A.    The supervising physician has to review at least at

25   a minimum 20 percent of overall charts.  But --

1   Q.    That's for any patient in the practice --

2   A.    Yes, sir.

3   Q.    -- regardless of whether or not a controlled

4   substance has been prescribed?

5   A.    Exactly.

6        When a controlled drug has been prescribed,

7   however, the supervising physician is supposed to make a

8   personal review every 10 business days of the history,

9   the physical, the therapeutic data, and shall so certify

10  by signature on any patient.

11  Q.    Okay.  So is it fair to say that the board would be

12  concerned if a nurse practitioner's supervising physician

13  were to be say in Chattanooga, when the nurse

14  practitioner is in Jackson, and the supervising physician

15  comes down once a month, when the nurse practitioner is

16  prescribing controlled substances regularly?

17  A.    I do not know that there is any -- I don't know

18  that there is any restriction on where the supervising

19  physician is located.

20       But a supervising physician has to be available

21  for consultation at all times.

22  Q.    Okay.  But I'm just -- I'm sorry.  I knows that was

23  a long question and an inartful one.

24       But the -- what I want to focus on is that rule

25  about needing to review the file and sign off 10 days

1    after -- at least every 10 days, right?

2    A.    Every ten business days.

3    Q.    So if a, if a supervising physician, either because

4    he or she lives in Chattanooga and is supervising

5    somebody in Memphis, or for whatever reason, is only

6    checking in once a month on a practice with controlled

7    substances patients, would that be concerning to the

8    board?

9    A.    That's not a question that I would be able to

10   answer.  That would be a board decision.

11   Q.    Does that seem to conflict with the requirements

12   under the statute?

13   A.    Physicians can review charts electronically.

14   However, they do have to be available for collaboration

15   or consultation at all times.

16   Q.    Okay.

17   A.    That means they have to be available if there is an

18   incident or problem, or something that the nurse

19   practitioner has an issue with.

20   Q.    Okay.  And there is no limit as to how many mid

21   levels, if you will, nurse practitioners, registered

22   nurses --

23   A.    I do not know of any limit.

24   Q.    There is no limit on how many a physician can have?

25   A.    I do not know of any limit.

1   Q.   So do you know of any way that, if a physician is

2   supervising let's say a dozen mid levels, and each of

3   those mid levels have a full time practice, and the

4   physician that's supervising has a full time practice, do

5   you know of any way that the physician could get all that

6   supervising done and still perform the duties that the

7   state requires for all those jobs?

8   A.   Again, it -- I cannot speak specifically for what

9   that physician would or would not do.

10     But it would appear that just physically it would

11   be difficult to be in that many places in that time

12   frame. But, again, I can't speak to what he would or

13   would not do.

14   Q.   Sure. Just one last thing before we dive in, I

15   want to talk about over prescribing.

16     What should prescribers do to make sure they're

17   not essentially dealing drugs to addicts?

18   A.   There are many recommendations that have been made.

19   One is checking the controlled substance monitoring

20   database before prescribing to make sure that the patient

21   is not doctor shopping, that the patient is not obtaining

22   controlled substances from someone else that might

23   interact with something that you're prescribing or might

24   be also duplicating what you are prescribing.

25     The obtaining of urine drug screens. Monitoring

1   those drug screens, the results.  If they're aberrant

2   results, discussing that with the patient, document it.

3   Taking any type of action that might be warranted if

4   there are illicit drugs in their system, or if drugs that

5   should be there are not.

6          Pill counts to make sure that they are taking

7   their medication appropriately, the dosage and quantity

8   appropriately.

9   Q.   Okay.  Is that industry standard that all of those

10  things are kind of a low hanging fruit of due diligence

11  for somebody writing addictive narcotics or controlled

12  substances?

13  A.   I believe that those are the recommended practices.

14  And I believe in the Tennessee Chronic Pain Guidelines

15  those things are also mentioned as being good practice in

16  the prescribing of controlled substances.

17  Q.   Okay.  So moving on to the complaints and the

18  investigative reports that I've got in your binder.  And

19  you may have notes on some of these in the files that you

20  brought with you.  And that's fine if you want to use

21  those.

22         Let's turn to complaint 201500623, which is at Tab

23  A.

24  A.   Okay.

25  Q.   It looks like, if you look at that first sheet

1    there in the binder, you've got a letter from the state

2    of Tennessee, Department of Health, on June 23rd, 2015.

3        Do you see that?

4    A.    Yes, sir.

5    Q.    And that first sentence, a complaint was filed

6    against you, to Dr. Young, excuse me, Mr. Young, was

7    filed against you alleging that you keep alcohol in your

8    office at your clinic.

9        Even though you may not be consuming alcohol

10    during work hours, its mere presence in your office gives

11    the appearance of impropriety.

12        That's in June of 2015, correct?

13    A.    Yes.

14    Q.    In your investigations did you come to gather

15    evidence that Mr. Young continued to keep alcohol in his

16    office in contravention of this advice the medical board

17    had given?

18    A.    There were photographs of alcohol in Mr. Young's

19    office that were sent to us that we forwarded on to

20    central office.  Also during one investigation I

21    questioned whether he was having Botox parties at his

22    office after hours.  And he did confirm that he was

23    having Botox parties where Botox are administered to

24    patients, Botox is administered.

25        He did say that alcohol was served at those

38

1   parties.  And that the patients did not consume alcohol

2   until after they had signed a consent.  However, alcohol

3   was being served at the party, and the patients did have

4   the opportunity to consume alcohol.

5   Q.    Okay.  And I believe that Mr. Young actually

6   testified under oath a little differently, and we'll get

7   to that in a bit.

8         Just to focus on this -- because I kind of want to

9   establish a chronology here of what the evidence showed

10  and when.

11        It looks like on the next page we've got a memo to

12  the file by Ken Jones.  Who is he?

13  A.    Ken Jones was an investigator in the central

14  office.  There was a period of time when they were short

15  staffed that he helped to triage some complaints when

16  they came in.

17  Q.    Looks like he says, an Internet search of Mr. Young

18  revealed a possible 2011 DUI arrest in Florida.

19        Do you see that?

20  A.    Yes.

21  Q.    And an RBS search revealed that Mr. Young does not

22  have a current notice of formulary listing his

23  supervising physician on file with HRB.  And says, please

24  open a complaint file on Mr. Young.

25        The complaint file was not just an allegation

1   about keeping alcohol on the premises, was it?

2   A.    If you are referring to --

3   Q.    And if you turn to the next page --

4   A.    -- complaint 201500623.

5   Q.    Yes.

6   A.    No, sir.  It says the complaint is that the

7   respondent was abusing illegal drugs.

8   Q.    Okay.  And specifically there some talk about a

9   limousine trip to Memphis with staff and guests,

10   allegations of use of illegal drugs and allegations of

11   drug abuse.

12        Do you see that?

13   A.    Yes, sir.

14   Q.    I want to ask you, is this -- did you investigate

15   and interview individuals that were in that limousine?

16   A.    Yes, sir.

17   Q.    And did you get a lot of -- well, first of all, how

18   did this complaint come in?  Was it anonymous?

19   A.    Yes.

20   Q.    And it looks like you conducted a lot of interviews

21   in connection with this complaint, right?

22   A.    Yes.

23   Q.    What was your genral sense about whether or not the

24   occupants of the limousine were being honest with you?

25   A.    A majority of these --

1          MR. FERGUSON:  I object to that, Judge.

2          THE COURT:  Hold on.  I'm sorry.  What?

3          MR. FERGUSON:  I want to object to that.

4          THE COURT:  What is your basis?

5          MR. FERGUSON:  That calls for speculation

6  as to whether or not they were being truthful.  It's her

7  opinion.

8          THE COURT:  Well, I think you would have

9  to set up some kind of a basis for that question, her

10  opinion about that.

11          MR. PENNEBAKER:  Well, Your Honor --

12          THE COURT:  Have to give some kind of

13  basis for that, I think, for her to give that opinion.

14          MR. PENNEBAKER:  Your Honor, just a couple

15  of points.

16          One, the foundation rules don't apply at a

17  bond hearing under these circumstances.

18          But, number two, even if they did, Ms.

19  Pickering has already established that she was the one

20  who went around, who conducted this investigation, she

21  interviewed people.  And what she put into her report has

22  to do with her present sense impressions --

23          THE COURT:  Let me hear Ms. Pickering say

24  that, as opposed to you, Counsel.

25          MR. PENNEBAKER:  Absolutely.  Yes, Your

1   Honor.

2   BY MR. PENNEBAKER:

3   Q.    So, Ms. Pickering, what did you -- what was your

4   purpose in interviewing the persons that were in the

5   limousine?

6   A.    The majority of these individuals were either

7   PreventaGenix employees or friends or family of

8   PreventaGenix employees.

9         And the reason for the interview was to determine

10  whether or not they had viewed the use of illegal

11  substances in the limousine, or whether they viewed that

12  they were present in the limousine.

13  Q.    On.  And is part of your job as an investigator to

14  determine the credibility of the witnesses that you are

15  interviewing?

16  A.    I simply document what they state to me.

17  Q.    Okay.  And so are you saying that if you felt a

18  witness was not being honest with you, that you would not

19  indicate that in your report?

20  A.    We do not indicate that in our report.  We simply

21  indicate in our report what is said to us.

22  Q.    Okay.  And actually, you know what, I'm glad you

23  said that.  Because one thing I see you doing in your

24  reports quite a bit is indicating that, you know, witness

25  said this, right after you have got a recitation of some

42

1    evidence that shows the opposite of whatever the witness
2    stated.  Is that accurate?
3    A.    We document what is said to us.  And we document
4    what we view, what we review, what is stated in something
5    that we review.  We don't give any personal opinions as
6    to anything.  We just simply state what is there and what
7    we have heard.
8    Q.    Okay.  Let's get back to what you said about the
9    friends and family.
10         And actually, was there a patient that was in the
11   limousine as well?
12   A.    I believe there was a mention of a patient, yes.
13   Q.    I think -- we shouldn't say the names.  But there
14   was some patients and employees.
15         Were there some spouses of employees?
16   A.    I believe so, yes.
17   Q.    Including a law enforcement officer?
18   A.    Yes, sir.
19   Q.    And what was the allegation that had happened in
20   the limousine?
21   A.    That there was use of marijuana.  And that
22   marijuana was being passed around to the passengers in
23   the limousine.
24   Q.    Now almost everybody that you spoke to who wasn't
25   either one of the complainants or a patient that you had,

1    that one of the complainants had heard this from

2    secondhand, denied that that happened.  Right?

3    A.    Yes, sir.  They all denied, with the exception of

4    one person.

5    Q.    Okay.  And that one person said what?

6    A.    That she witnessed Mr. Young smoke a marijuana

7    cigarette in the limousine.

8    Q.    Okay.  Now also in the report you have, at page

9    three of 27, complaint 201500623.  You have an allegation

10   of ingestion of alcohol while on duty.

11        In that first sentence it says, in interview J.

12   Young stated that he maintained alcohol in his personal

13   office at PreventaGenix.

14        So he's confirming that there, right?

15   A.    Yes.

16   Q.    And then you've also got allegation that J. Young

17   was found asleep while on duty at Primary Care

18   Specialists.

19        Do you see that?

20   A.    Yes.

21   Q.    And here we've got in an interview JXX MXXXXXX

22   reported that he, excuse me, JM reported that he came to

23   Primary Care Specialists for a check up.  He walked out

24   of the room and down the hall.  He found a man laying

25   down on the floor in the office.  And then that same man

44

1    came up and provided him care later on during that visit.

2    Right?

3    A.    Yes.

4    Q.    So in this complaint to summarize, is it fair to

5    say that the board is receiving information that

6    Mr. Young is smoking marijuana, he is partying with

7    patients, he's keeping alcohol at his office, he is, he

8    was potentially passed out on the floor in his office

9    while on duty.

10         Are all of those fair characterizations of what

11   you gathered?

12   A.    There is.  Information was presented that he was

13   asleep.  That the patient waited for 45 minutes to one

14   hour before he went down the hall and found him asleep.

15         He did maintain alcohol in his personal office.

16         And one individual did report that she witnessed

17   him smoking marijuana in the limousine.  And there was a

18   patient present in that limousine as well.

19   Q.    Okay.  I'm going to skip to -- we have got some --

20   just to summarize what is in here.  We've got some

21   supervising physician issues that are mentioned, right?

22   Some confusion about who is supervising.

23         And then -- oh, one thing I do want to point out

24   as well.

25         There is an interview by a provider -- or excuse

1   me, an office manager, last name Wheeler.

2         Do you remember that?

3   A.    Yes.

4   Q.    I want to turn to that for a second.  If you look

5   at page 15 of 27 in your report, the third paragraph

6   down.

7         Would you read, I asked Ms. Wheeler?

8   A.    I asked Ms. Wheeler if she had personally seen a

9   stocked bar --

10  Q.    Sorry.  Next paragraph.

11  A.    I asked Ms. Wheeler if she was present when Jeff

12  Young threatened X SXXXX, APN.  She stated that she was

13  present when Mr. Young called Ms. SXXXX.  Mr. Young was

14  placed on speaker phone in the kitchen at Primary Care

15  Specialists.  Mr. Young was, quotation marks, off the

16  wall, quotation marks closed, and, quotation, real smart,

17  closed.

18        And that Mr. Young told me Ms. SXXXX that

19  Ms. SXXXX, quotation marks, best be minding her Ps and

20  Qs.

21        Ms. Wheeler reported Mr. Young told Ms. SXXXX that

22  Ms. SXXXX, quotation, best not be talking about him on

23  Facebook.

24  Q.    Okay.  And that's good.

25        Did you interview Mr. Young --

1   A.     Yes, sir.

2   Q.     -- in connection with this investigation?

3   A.     Yes, sir.

4   Q.     And it looks like that's on April 1st of 2015,

5   correct?

6   A.     Yes.

7   Q.     At page 22 and 27.

8          Does it say there that Mr. Young denied a history

9   of illegal drugs use and denied present use of illegal

10  substances?

11  A.     Yes.

12               THE COURT:  I'm sorry.  Mr. Pennebaker,

13  where are you now?

14               MR. PENNEBAKER:  I'm sorry about that,

15  Judge.  Page 22 of 27.

16               THE COURT:  Okay.

17               MR. PENNEBAKER:  Yes, Your Honor.  And

18  down there at paragraph 22, about the third, second or

19  third sentence, or second or third line under number 22.

20               THE COURT:  Second or third line in which

21  paragraphs?

22               MR. PENNEBAKER:  Paragraph 22.

23               THE COURT:  I mean, there is several

24  paragraphs there.

25               MR. PENNEBAKER:  Yes.  It's the first

REDACTED TRANSCRIPT

1    paragraph, second line down at the very far right.  Mr.

2    Young denied --

3                    THE COURT:  I see that.

4                    MR. PENNEBAKER:  -- history of illegal

5    drug use and denied present use of illegal substances.

6                    THE COURT:  All right.

7    BY MR. PENNEBAKER:

8    Q.    Now, Ms. Pickering, you all record, you audiotape

9    your interviews now, correct?

10   A.    Yes, sir, we do now.

11   Q.    At that time were you allowed to do that?

12   A.    I believe this was prior to the time that we were

13   allowed to audiotape our interviews.

14   Q.    Okay.  When you send your audio taped interviews,

15   when you submit those to Nashville with your report, do

16   you keep a copy of them as a matter of course?

17   A.    No, sir.

18   Q.    Okay.  So everything goes to Nashville and they

19   take possession?

20   A.    Yes, sir.

21   Q.    I think this may also be the first time we start to

22   see pictures of Mr. Young on Facebook.  Correct?

23   A.    I believe there were some Facebook pictures.

24   Q.    If you turn to -- and I apologize the pages aren't

25   numbered.  But there is attachment number one after the

1    report concludes.  And let's see --

2                    MR. PENNEBAKER:  I don't know if -- do we

3    have an input where I can use the Elmo, Your Honor?

4                    THE COURT:  Here we go.

5    BY MR. PENNEBAKER:

6    Q.    Okay.  All right.  So was this part of your, this

7    is an attachment to your report?

8    A.    I believe that it was.  I believe it was attachment

9    number 11, to the best of my recall.

10   Q.    Okay.  And what did Mr. Young tell you he was doing

11   there?

12   A.    He said that he was smoking a regular cigarette as

13   he was exiting the building.

14   Q.    Okay.  And what is that in the lower right hand

15   corner that I'm pointing to?

16   A.    It appears to be a marijuana plant picture.

17   Q.    Okay.  All right.  So that's what is before the

18   board in, looks like about June of 2015.

19         And what we get is, we saw there at the first page

20   of Exhibit A, don't keep alcohol in our office, please,

21   sir.

22   A.    Yes, sir.

23   Q.    Okay.  And that was not your call to provide that

24   admonition and close out the complaint.

25   A.    No, sir, I don't make those decisions.

REDACTED TRANSCRIPT

49

1    Q.    Okay.  Now No. 201500686.  This is Exhibit B in the
2    binder.
3         And it looks like we've got a date of initial
4    incident of 3/19 of 2015.  And you authored this report
5    5/4 of 2015.  Is that right?
6    A.    Let me -- this is -- give me the number again for
7    that report.
8    Q.    Sure.  It's Exhibit B in the binder.  And it is
9    201500623.
10   A.    Yes.
11   Q.    All right.  I believe that if you flip about -- I
12   apologize.  These documents sometimes come in strange
13   order.  It's about 10 pages in.
14        You will see there is another complaint.  I'll
15   just put it up here.
16        Do you have a screen where you can see this on?
17   A.    Yes, I do.
18   Q.    Okay.  So this one is 3/24 of 2015.  Looks like
19   that 623 is one of the companion cases, right?
20   A.    Yes.
21   Q.    And then you see the complainant is RR.
22   A.    Yes.
23   Q.    Okay.  So you wrote this report on 8/10 of 2015?
24   A.    Yes.
25   Q.    Now just generally speaking, without reading off of

1    anything, or looking at it, what is your recollection

2    about the relationship between RR and Mr. Young?

3    A.    I believe at that time, to the best of my recall,

4    they were business associates and friends.

5    Q.    Okay. Now why did the board investigate a claim in

6    relation to RR?

7    A.    Mr. Young was alleged to have failed to diagnose

8    hypertension in this individual RR.  RR later

9    subsequently did suffer a stroke.

10         There were also some allegations of having

11   inappropriately or excessively prescribed medications for

12   RR.  And to have prescribed medications for RR without

13   having an appropriate established client-provider

14   relationship.

15   Q.    Okay.  And you looked into those claims, right?

16   A.    I investigated the allegations.

17   Q.    Okay.  And in your investigation summary, can you

18   kind of hit the highlights for me?

19                THE COURT:  Where are we?

20                MR. PENNEBAKER:  This is going to be page

21   2 of 10.  And it looks like it's complaint number

22   201500686.

23                Your Honor, I apologize there aren't page

24   numbers.  But I'm putting what the page looks like.  It's

25   kind of near the front of Exhibit B.

1            THE COURT:  I've got it.

2            MR. PENNEBAKER:  Yes.  Thank you, sir.

3            THE WITNESS:  I did get prescription,

4  certified copies of prescription records from multiple

5  pharmacies and viewed those.  The documentation on those

6  records reflected that Mr. Young had prescribed

7  medications, including controlled substances, for RR on

8  numerous occasions.  And that they were filled by RR in

9  multiple pharmacies in multiple states.

10            And that RR filled prescriptions for

11  Hydrocodone ordered by Mr. Young in different pharmacies

12  on 10/17/2013 and 10/25/2013.  And that Hydrocodone

13  scripts were filled by RR early.

14            One was written 2/27/2013 and it was

15  filled early on 3/17/2013.

16  BY MR. PENNEBAKER:

17  Q.    Okay.  I just want to stop you there.

18        So that's a lot of controlled substance

19  prescribing by Jeff Young for RR.  Correct?

20  A.    He did prescribe Hydrocodone and he did prescribe

21  other controlled substances.

22  Q.    Okay.  And that included Alprazolam and Adderall,

23  correct?

24  A.    To the best of my knowledge, yes, sir, best of my

25  recall.

1    Q.    Okay.  And, in fact, I want to say -- yeah.

2         So you say here about halfway down that third

3    bullet on the page we're looking at.

4         You say, Mr. Young reported that RR asked Mr.

5    Young for prescription refills.  He provided those

6    refills.  He would sometimes mail prescriptions to New

7    York for Mr. RR.

8         But he recalled prescribing Adderall,

9    testosterone, Hydrocodone, Xanax --

10                   THE COURT:  Slow down.  Slow down.

11                   MR. PENNEBAKER:  -- and Fioricet.

12                   THE COURT REPORTER:  And what?

13                   MR. PENNEBAKER:  Fioricet,

14   F-I-O-R-I-C-E-T.

15                   Did I read that right?

16                   THE WITNESS:  Yes, sir.

17   BY MR. PENNEBAKER:

18   Q.    And I want you, if you will, please, to turn with

19   me to page seven of 10 of your report.

20        And do you see the first full paragraph at seven

21   of 10 --

22   A.    Yes.

23   Q.    -- which starts, I asked Mr. Young if he prescribed

24   controlled substances --

25   A.    Yes.

1   Q.    -- for RR without having seen him at the clinic for

2   evaluation.

3         Do you see that?

4   A.    Yes.

5   Q.    It says, Mr. Young stated he did not recall what he

6   had prescribed for RR.

7   A.    Yes.

8   Q.    Now going all the way down to the fifth line from

9   the bottom in that same paragraph.

10        You say, I asked Mr. Young if.

11        Do you see that?

12  A.    Yes.

13  Q.    And if you could just read from, I asked Mr. Young

14  if RR.

15  A.    I asked Mr. Young if RR had office visits that

16  corresponded with the dates and the prescriptions written

17  for RR by Mr. Young.

18        Mr. Young replied, no, it was a concierge type

19  thing.  He stated that the first date documented in RR's

20  medical record at Skyline Cardiovascular was the first

21  time that Mr. Young saw RR for an established office

22  visit.

23  Q.    And did you understand that first date at Skyline

24  to correspond with -- if you look back at two of 10, the

25  fourth bullet point there.  I apologize, because we don't

54

1    have the attachments to these reports.

2         It looks like you say, review of Mr. RR's medical

3    records reflected that the first documented date of

4    Mr. Young having evaluated/treated Mr. RR was 04/15/14 at

5    Skyline.  Correct?

6    A.    Correct.

7    Q.    And it looks like if you go up to that second

8    bullet point, we're seeing pharmacies filling for

9    Hydrocodone multiple times in 2013.  And that's for RR

10   off of Jeff Young's prescription pad.

11        It looks like there is another instance of -- of,

12   here at the end of page nine of your report you say,

13   Mr. Young confirmed that he prescribed Adderall for RR on

14   1/29/2014.

15        So that's also going to be before the date of that

16   first Skyline consult.  Right?

17   A.    Correct.

18   Q.    So once again you say -- you asked Mr. Young if RR

19   had office visits that corresponded with the dates of the

20   prescriptions.  And he said, no, it was a concierge type

21   thing.  The first date that we see RR show up at Skyline

22   is the first time Mr. Young saw RR for an established

23   visit.  Correct?

24   A.    That was what was said to me, yes, sir.

25   Q.    Okay.  And then in the next sentence you say,

REDACTED TRANSCRIPT

1    Mr. Young stated that he provided RR with a, quote,

2    curbside consult.

3    A.    Yes.

4    Q.    He and RR lived in the same apartment building at

5    the time.  Right?

6    A.    Yes.

7    Q.    And you asked if he documented the, quote, curbside

8    consults.

9         And what was his reply to you?

10   A.    Text messages, that type of thing.

11   Q.    Okay.  So now I want you to take a look at what I

12   believe is Exhibit Z in the binder.  So it's at the very

13   back.  I'm sorry to make you flip around.

14        But what I'm asking you to look at is a deposition

15   of Jeff Young, August 8th, 2018.  And this is an attorney

16   from the board questioning him under oath.  Okay?

17   A.    Okay.

18   Q.    Now if you flip to page 208.

19        Do you see where Ms. Alcock, who is the attorney

20   for the board -- are you with me?

21   A.    Yes.

22   Q.    So she is saying, in the medical records that we

23   have before us, which is all we have on this patient,

24   there is nothing else.  And she is talking about RR,

25   right?

1   A.    Yes.

2   Q.    They're talking about whether there is

3   documentation of these earlier prescriptions.

4         Do you remember that?

5   A.    Yes.

6   Q.    Because you have had a chance to look this over

7   before this hearing today?

8   A.    Yes, sir.

9   Q.    And Mr. Young says, there is nothing else that you

10  have.  I'm saying there is other medical records out

11  there.  And I told you this guys is hostile.  And I

12  don't -- I mean, I'm not going to get into all that,

13  because I don't want to argue.

14        Do you understand that to mean that he is talking

15  about his legal dispute with RR that postdated the stroke

16  that RR had?

17  A.    I can't for certain.  But I do know that there was

18  a legal dispute.

19  Q.    Okay.  But needless to say, if you go back to page

20  184, for example, of the deposition.  And you look at --

21              THE COURT:  Which page?

22              MR. PENNEBAKER:  That's 184, Your Honor.

23              THE COURT:  All right.

24  BY MR. PENNEBAKER:

25  Q.    You look at line 21.

REDACTED TRANSCRIPT

1          Question.  Do you think that it meets the standard

2     of care to prescribe a controlled substance to someone

3     that you haven't even seen in the office?

4          Answer.  I had seen him.

5          I'm curious about this, this being the complete

6     thing on from Skyline, because when we first -- let me

7     look at the dates again on that.

8          Was this a complete medical record and so on and

9     so forth?

10         And then skipping down on 185 to line 23.

11         What I'm looking at and what I'm concerned about

12    is -- and this is the question.

13         What I'm looking at and what I'm concerned about

14    is the CSMD's proof basically that you prescribed a

15    Schedule II at this time, Lortab, multiple occasions

16    without that being in the record.

17         And then the answer is at 828, 1013.  Where this

18    actually may be -- I may have actually seen him down at

19    Primary Care Specialists South.

20         So we're getting a story here that, I did see him.

21    Right?

22    A.    That's what this says, yes.

23    Q.    And, in fact, it's saying on page 184, I had seen

24    him.

25         There is no equivocation there, right?

1   A.     That's what it says.

2   Q.     So that is the exact -- and that's under oath,

3   right?

4   A.     Yes, sir.

5   Q.     That's the exact opposite of what he admitted to

6   you when you interviewed him back in 2015, isn't it?

7   A.     Yes, sir.

8   Q.     Where he said, it was a curbside consult.

9   A.     Yes, sir.

10  Q.     Did you have any reason to make that up that he

11  said that?

12  A.     No, sir.

13  Q.     Would you ever do something like that?

14  A.     I report exactly what they tell me, only what they

15  tell me.

16  Q.     Any idea what might have changed in the interim

17  that would have made Mr. Young's memory get sharper as

18  time went on, as opposed to --

19  A.     I cannot answer that.  I have no idea as to...

20  Q.     Okay.  Now if you will turn with me, please -- and

21  I know we're flipping around, Exhibit B, page -- page

22  five.

23        This is a memo to the file on August 11th, 2015.

24             THE COURT:  Where are you now?

25             MR. PENNEBAKER:  This is the fifth page of

1    Exhibit B, Your Honor.

2                    I hope that somebody is furiously

3    numbering binders behind me.  That's an oversight on my

4    part, Judge.  I apologize.

5                    THE COURT:  Page five of?

6                    MR. PENNEBAKER:  Exhibit B.

7                    THE COURT:  Okay.

8    BY MR. PENNEBAKER:

9    Q.    It's a memo to the file, is it not?

10   A.    Yes, sir.

11   Q.    What do you say here?

12   A.    I say, I submitted this case on 8/10/15.

13   Respondent Jeffrey Young, APN.

14         I just received a call from RR, complainant,

15   stating that RR had reviewed postings made by Mr. Young

16   on Facebook.  And that RR felt threatened by the

17   postings.  RR forwarded copies of those postings to me

18   via e-mail.  Please see attached.

19   Q.    Now is this going to become a theme in this

20   evidence that we're looking at, these threats on

21   Facebook?

22   A.    There were other allegations of threats on Facebook

23   by other individuals.

24   Q.    Okay.  And they weren't just allegations, right?

25   You actually went --

REDACTED TRANSCRIPT

60

1    A.    We did get copies, yes.

2    Q.    You were able to get copies.  And you have seen the

3    threats on Facebook.

4    A.    There were some threats that were on Facebook and

5    we did forward those this central office.  Anything that

6    we receive, whether it be phone messages, text messages,

7    Facebook, anything that is sent to us, we forward on to

8    our central office for review.

9    Q.    Okay.  All right.  So suffice it to say that at

10   this point in August of 2015, the board has a indication

11   from you that Mr. Young has admitted to you that he was

12   doing curbside consults with a business associate, RR,

13   without performing any sort of a medical evaluation in an

14   office setting.  Right?

15   A.    Correct.

16   Q.    He's prescribing him multiple controlled

17   substances, including Lortab, which is an opioid used to

18   treat pain.  He's prescribing a Benzodiazepine for

19   anxiety.  He's prescribing Adderall, which is a stimulant

20   for attention deficit disorder, correct?

21   A.    Correct.

22   Q.    And do you know whether or not Mr. Young has any

23   formal training in psychiatry or psychology?

24   A.    To my knowledge that's not listed in his licensure

25   file, to my knowledge.

REDACTED TRANSCRIPT

61

1    Q.    Okay.  And all of this is happening in a patient

2    with hypertension, correct?

3    A.    Yes, sir.

4    Q.    He stroked out, right, before Mr. Young ever saw

5    him in his office, correct?

6    A.    He did suffer from a stroke, yes, sir.

7    Q.    And, in fact, he filed a lawsuit against Mr. Young

8    for that, didn't he?

9    A.    Yes, sir.

10   Q.    So the board has admissions to this effect from

11   Mr. Young back in August of 2015?

12   A.    Yes, sir.

13   Q.    And what happens with this complaint?

14   A.    I was not formally notified --

15   Q.    Okay.

16   A.    -- of this.  But his license was not, to my

17   knowledge -- well, I know his license was not in any way

18   revoked or suspended or anything like that.  He continued

19   to practice.

20   Q.    Right.  And setting aside what dispute RR and

21   Mr. Young might have, it was Mr. Young who told you the

22   facts that I just stated to you, right, not RR?

23   A.    Yes, sir.

24   Q.    About the curbside consults and the concierge

25   medicine and living in the same apartment and medicine by

1    text.

2    A.    Yes, sir.

3    Q.    And also we heard that the day after you submitted

4    the investigation report, that you also forwarded along a

5    threat that you had been informed of via Facebook from

6    RR.

7    A.    Yes, sir.

8    Q.    Okay.  Now in Exhibit C –– and it looks like this

9    one is out of order, but we'll just touch on it.

10         This looks like it's a complaint, an allegations

11   report that was received by the department in October of

12   2016, correct?

13   A.    Yes, sir.

14   Q.    Now if you flip to the third page –– do you

15   recognize, first of all, GE, the complainant?

16   A.    Yes, sir.

17   Q.    And in this complaint we're getting some

18   allegations about HIPAA concerns.  Right?

19   A.    Yes.

20   Q.    And when the patient confronted Mr. Young about her

21   HIPAA concerns –– and it's that last paragraph on what is

22   marked at the top as page four of 49 there...

23                MR. PENNEBAKER:  And let me show you all

24   what document I'm looking at, just so you know.

25                It's the fourth page of Exhibit C.

1          THE COURT:  Fourth page?

2          MR. PENNEBAKER:  Yes, Your Honor.  Starts

3  on 6/6/16.

4          THE COURT:  I'm sorry.  What was that?

5          MR. PENNEBAKER:  It starts, it says 6/6/16

6  at the top.

7          THE COURT:  Yes.  I see it.  Sorry.

8  BY MR. PENNEBAKER:

9  Q.    Okay.  Now that last paragraph, Ms. Pickering,

10  without reading -- I guess there is not, there is not any

11  patient names.  So if you could just read that.

12  A.    I told Jeff that he is a liar and he lied to me and

13  violated my HIPAA rights.

14         I told him that I had checked with an attorney to

15  see if I had overreacted.  When Jeff heard the word

16  attorney, he proceeded to get very ugly.  He called me

17  a...

18  Q.    And you can just use the letters --

19  A.    GDFB.  I called him a F liar.

20  Q.    Okay.  And there are a number of allegations on the

21  next page.  It looks like unprofessionalism, broke

22  confidentiality.  There is a notification about the

23  Facebook page being very vulgar.  Post videos on

24  Periscope of himself being drunk.  Sniffing girls'

25  panties and saying he can tell the age of a female by

64

1   sniffing them.

2         Were you aware of all that?

3   A.    Yes, sir.

4   Q.    Are you aware of any sort of action by the board

5   that came out of things like being drunk on Facebook or

6   Periscope and sniffing girls' panties?

7   A.    I did not receive any investigations related

8   directly to that.  And I checked with my other

9   investigators in my office.  And they did not have any

10  investigations to their knowledge directly related to

11  that.

12  Q.    In fact, the sniffing panties thing –– I'm sorry

13  to, that's just ground we're going to have to cross in

14  this hearing today –– that was actually something that

15  Mr. Young promoted in his TV pilot, right?

16  A.    To my knowledge, yes.

17  Q.    That was actually something that as the Rock Doc

18  persona he was doing, he was boasting about being able to

19  do that with his friend Uncle Kevin Puffy K.  Right?

20  A.    To my knowledge, yes, sir.

21  Q.    Now I want to turn to Tab D.  I've got a –– I'm

22  going to try to hit the high points here, because we

23  don't have a long time and I've got to get you out of

24  here for Nashville, I know that.

25         But this is an allegation report from someone

1   named Barry Cooper.

2          Do you see that?

3   A.    Yes, sir.

4   Q.    And did you ever receive, did any investigator ever

5   receive anything -- was there an investigation opened on

6   this complaint?

7   A.    To the best of my knowledge, not by my office in

8   West Tennessee, no, sir.

9   Q.    Okay.  So the -- okay.  So the -- if you look at

10  the second page of this handwritten complaint, you see

11  that -- I've enclosed photos of current or former

12  patients stating that Mr. Young has told them to, quote,

13  just smoke marijuana to help treat their symptoms.

14         Do you see that?

15  A.    Yes, sir.

16  Q.    Is that something that -- in spite of the fact you

17  never saw this document -- am I right that you've never

18  seen this complaint until I showed it to you?

19  A.    To best of my knowledge, no, sir.

20  Q.    But that was not the first time that you heard that

21  Jeff Young instructs his patients to smoke marijuana, was

22  it?

23  A.    No, sir.

24  Q.    It says, I've included screen shots of him serving

25  alcohol in his clinic.  This happened on multiple

1    occasions.  Right?

2    A.    That's what it says, yes, sir.

3    Q.    And he has Facebook page that has some very foul

4    posts, including him telling a lady he hopes he died from

5    cancer.  Right?

6    A.    Yes, sir.

7    Q.    It says, I believe Mr. Young to be a threat and

8    danger to his current clients.  Please look into the

9    evidence being sent.  Right?

10   A.    Yes, sir.

11   Q.    Okay.  So next page we see -- this is a incident

12   report from September 1 of 2016.

13         So this is a full two years before the board's

14   agreed order in November of 2018.  Right?

15   A.    Yes, sir.

16   Q.    And it looks like, according to AB, she is

17   approached by a male, Jeff Young, in a very threatening

18   manner.  He's yelling at her to stop soliciting.  Trying

19   to explain what she was doing there.

20         And she thought he was going to assault her.  And

21   his actions put her in great fear for her safety.

22         Do you see that?

23   A.    Yes, sir.

24   Q.    And then as you flip through the pages here you

25   also see what Mr. Cooper is talking about.  And this

REDACTED TRANSCRIPT

67

1    we're going to get into in another minute.  But I want to

2    focus your attention -- and we're going to have to

3    reverse engineer this.

4         If you look at Exhibit E, and then turn back one

5    page so that you are at the page of Exhibit D.

6    A.    Okay.

7    Q.    Do you see -- and is it consistent with your

8    recollection that this is part of a conversation

9    Mr. Cooper and Mr. Young were having about using

10   marijuana as a medicine?

11   A.    I believe so, yes.

12   Q.    And that is going to be the subject of later

13   testimony.

14        But what I want to point you to is that very last

15   page.  And it says, Jeff Young to.  Barry Cooper, I don't

16   think we were talking to you -- and by the way, who is

17   Barry Cooper?

18   A.    I am not -- he is -- excuse me.  Barry Cooper,

19   trying to recall.  I did not get this attachment, so I

20   can't say his current position.  I don't know.

21   Q.    Okay.  Is it consistent with your understanding

22   just from working in the community that he is the head of

23   the Counsel on Alcoholism and Drug Dependency --

24   A.    He was.  As to whether that is his current

25   position, he was.

REDACTED TRANSCRIPT

1    Q.    Yeah.  I don't want you to speculate about what he

2    does now.

3          So in this capacity -- I think he might even

4    mention it in the beginning of this report.  But he is --

5    he might not.

6          But he says -- he and Jeff are having this

7    Facebook discussion, quote, unquote.  And then there on

8    that last page, Barry Cooper, Jeff says to Mr. Cooper, I

9    don't think we were talking to you, we were talking about

10   your punk ass.

11         Remember this is my page and my post and I can say

12   whatever the F I want.

13              THE COURT:  I'm sorry.  I've lost you

14   again, sir.

15              MR. PENNEBAKER:  Yeah.  Your Honor, if you

16   turn to the E, Tab E.

17              THE COURT:  I did --

18              MR. PENNEBAKER:  And then just flip one

19   page backwards.

20              THE COURT:  That was -- well --

21              MR. PENNEBAKER:  And you will see, it's

22   got this search at the very top.  I'll put it on the

23   screen so you can see.

24              THE COURT:  Okay.  Well, okay.  All right.

25   Apologize.  Okay.  I got it.

1          MR. PENNEBAKER:  Absolutely, Your Honor.

2          THE COURT:  Yes, I got it.

3    BY MR. PENNEBAKER:

4    Q.    So I'm down there where it says, Jeff Young to.

5    And that he's tagging Mr. Cooper.  And he says, I don't

6    think we're talking to you, we're talking about your punk

7    ass.  Remember this is my page and my post, and I can say

8    whatever the F I want.

9          Then I guess he's talking to Robert Gordon

10   Spencer.  And he wants to take screen shots for Rock Doc

11   TV so people can see the pussy ass bullshit I put up

12   with.

13         And then to Darrell Becham, who just before had

14   said, settle it like men.  This guy would be the first to

15   call the police if we tried to settle it like men.  You

16   know his type.  And then calls him another derogatory

17   name.  And it keeps going from there.

18         But again, the date on here is 11/3 of 2016.  And

19   that's the date on the complaint.

20         This was never opened.

21   A.    To my knowledge, no.

22   Q.    Okay.  I'm just asking you as a human being, would

23   you consider that to be a threatening post on public

24   forum?

25         MR. FERGUSON:  Judge, again I object.

REDACTED TRANSCRIPT

1    Speculation, relevance.  It's not what she thinks.

2              MR. PENNEBAKER:  I'll move on, Your Honor.

3    BY MR. PENNEBAKER:

4    Q.    Okay.  This is another important one.  If we can

5    turn to F.

6         Let me know when you are there.

7    A.    I'm there.

8    Q.    Would you read the letter -- and so we don't have

9    to flip all the way through this.  There is a September

10   9th, that second e-mail down.

11   A.    Okay.

12   Q.    Will you start with, she says I'm MXXXXXX JXXX.

13   Will you start that next sentence, thank you for your

14   e-mails.

15   A.    Thank you for your e-mails notifying us to

16   allegations of unprofessional behavior by Jeff Young.  We

17   are greatly concerned about the health and welfare of

18   these young possibly high school students.

19        However, in order for us to properly investigate

20   these allegations we will need names and valid contact

21   information of possible witnesses that are willing to be

22   interviewed.

23        Unfortunately, without names this is just a he

24   said/she said type of allegation and cannot be factually

25   proven.

REDACTED TRANSCRIPT

1          I would also like to include you and the

2    respiratory therapist that was mentioned in your e-mails

3    to be included on this list as well.

4    Q.    I'll just stop you there.

5          Now let's get something -- let's be right up front

6    with something.

7          Ms. Young, that's Dawn Young, the ex-wife who is

8    one of the members of the supposed witch hunt, correct?

9    A.    That would be -- there is no first name, but that

10   would be my assumption, yes, sir.

11   Q.    Okay.  And actually, if you look at the e-mail

12   above that one it says, Dawn Young, RN.

13         So it looks like Dawn is about to respond back.

14   A.    Okay.

15   Q.    But if you turn to the next page.  We've got text

16   message exchanges between what appears to be Dawn and

17   this person SXXXXX LXXXXX CXXX, correct?

18   A.    Uh-huh (affirmative response).  Yes, sir.

19   Q.    So I need to know why your ex-husband has a problem

20   with my husband, it says there.  Correct?

21   A.    Yes, sir.

22   Q.    Then response is, he's crazy.  You need to call the

23   cops and report it.

24         The next page.  Yes, he is posting my address on

25   social media, as in home address, and taking picture of

1    SXXXX outside our house.

2          Do you see that?

3    A.    Yes, sir.

4    Q.    And I'm so sorry, says the recipient.

5          And then the following page it says, I know for a

6    fact that he is meeting teenage boys and giving them

7    testosterone shots.  That's so illegal.

8          Do you see that?

9    A.    Yes, sir.

10   Q.    Following page.

11         Are you serious?  How do you know that?  You need

12   to report that to the Board of Nursing.  OMG.  You're a

13   nurse, right?

14         Talking to Dawn, who is a nurse.

15         Oh, I'm sorry, that's Dawn who is saying you need

16   to report that to the Board of Nursing because you,

17   SXXXXX, are a nurse.

18         Dawn says -- excuse me.  That's -- yeah.  So Dawn

19   is saying, SXXXXX, you're a nurse.

20         And SXXXXX says, I'm not a nurse.  I have had some

21   of the Crockett County football players tell me he is

22   giving them shots.

23         And then the next page.

24         Do their parents know?

25         And then the response is, I work at a place that

1    deals a lot with him.  No, their parents don't know.

2    They pay him cash money on the side.

3         Okay.  And it just goes on.  There is a few pages

4    later.

5         How do you know it's not just gossip?

6         And then the recipient says, I know for sure.  The

7    kids have personally told me.

8         And on and on.

9         So flipping back to the first page of Exhibit F.

10   You get Dawn saying, Ms. JXXX, I have spoken to the

11   person who sent the messages to me.  And she gave me a

12   young male's name who is supposedly paying cash.

13        I've contacted the drug task force and was told by

14   Investigator Pate that there is already an active

15   investigation against Jeff Young.  I would be glad to

16   forward to you at the very end.  She said TBI is

17   investigating.  I would be glad to forward to you.

18        Again, you said that as to the allegations of

19   testosterone and misuse of testosterone, it's not

20   something that was ever, had an investigation that came

21   to your knowledge?

22   A.    To my knowledge, no.

23   Q.    And do you know whether or not testosterone is an

24   anabolic steroid that's a Schedule III drug?

25   A.    Yes, sir.

74

1   Q.    Does Schedule III mean that it has addictive and a

2   high potential for abuse?

3   A.    Has potential for abuse, yes, sir.

4   Q.    Not the highest --

5   A.    Not the highest, but it does have --

6   Q.    -- but it's still --

7   A.    -- a potential for addiction and abuse.

8   Q.    Right.  And are anabolic steroids, specifically

9   testosterone, something that the board order, the agreed

10  order carved out that Jeff Young can still write you a

11  prescription or me a prescription for today?

12  A.    It's my understanding that he can write

13  prescriptions for testosterone.

14  Q.    Okay.  And as far as you know, the board has never

15  opened a investigation into this September 10, 2016

16  allegation with text messages --

17  A.    Not to my knowledge.

18  Q.    Okay.  Okay.  Moving on to Exhibit G.

19        We've got JW, who files an allegation report.  And

20  if you look at the second page there.

21        This is in April of 2016.  Right?

22  A.    Yes, sir.

23  Q.    It looks like on April 20, 2016, Mr. Young posted a

24  live video on Periscope in which he and a local drug

25  representative were obviously intoxicated and drawing

1    graphic, obscene and lude pictures of three other local

2    nurse practitioners who were labeled and referenced by

3    name.

4           On April 21, 2016, Mr. Young posted another live

5    video stream to Periscope in which he is again clearly

6    intoxicated.  During the video he and two other males,

7    one of whom is the same drug rep, are using graphic and

8    obscene language.

9           These streams are not likely to be accessible, but

10   they can contact me or another individual to receive

11   copies of the videos.

12          Do you see that?

13   A.   Yes, sir.

14   Q.   Do you know whether that was ever done?

15   A.   To my knowledge, we did not receive that to

16   investigate at West Tennessee.

17   Q.   Okay.  But, I mean, this is an allegations report

18   for the Department of Health.  Right?

19   A.   Yes, sir.

20   Q.   Okay.  Just making sure.

21          Now the next page says, Dear Board of Nursing.

22          The next page is a Jeff Young Facebook post.

23          Do you see that?

24   A.   Yes.

25   Q.   And --

 1            THE COURT:  Where are you now, sir?

 2            MR. PENNEBAKER:  So I'm on Exhibit H.  I

 3  apologize.

 4            THE COURT:  Sorry.  Yes.  Go ahead.

 5            MR. PENNEBAKER:  It's the third page of

 6  Exhibit H.

 7            THE COURT:  Okay.  Thank you.

 8  BY MR. PENNEBAKER:

 9  Q.    And Jeff Young says, hope Trump's surgeon general

10  will do something about slapping a warning label on it.

11  Hash tag real talk.

12        And underneath that is a statement, cigarettes and

13  alcohol have warning labels because they are addictive,

14  dangerous and destroy lives, and yet vaginas are just

15  allowed to roam about freely.

16        Do you see that?

17  A.    Yes, sir.

18  Q.    Next page, this is a black and white photo.

19        Have you seen that photo before?

20  A.    Yes, sir.

21  Q.    What is that?

22  A.    I believe it is a photograph of a penis with a

23  cloth on top of it.

24  Q.    And it's made to look like a ghost, right?

25  A.    Yes.

1   Q.   And if you flip three additional pages.  So there

2   is one with "applies" at the top.  There is one with

3   "search" at the top.  There is one with "Jeff Young to"

4   at the top.  And there is another, looks like a mug shot

5   pulled with 6:22 p.m. at the top.

6   A.   Yes, sir.

7   Q.   And there is something that says, criminal, beat up

8   wife.

9   A.   Yes, sir.

10  Q.   Do you see that?

11  A.   Yes, sir.

12  Q.   And then flip that page, the following page, the

13  following page, the following page.

14       And this is another posting from Jeff Young's

15  Facebook.  I don't think I'm going to read that one out

16  loud.

17       But have you seen this?

18  A.   Yes, sir.

19  Q.   I'll sensor it.

20       Little Johnny couldn't wait to see that B his C.

21  Bs love Cs.

22       Is that appropriate for a practicing nurse

23  practitioner in Jackson or the state of Tennessee?

24  A.   Again, that would be my personal opinion.

25                 MR. FERGUSON:  Judge, I'm going to object.

1    Move to strike.  Personal opinion.

2                 THE COURT:  Yes, sir.  Sustain that

3    objection.

4                 MR. FERGUSON:  Thank you.

5    BY MR. PENNEBAKER:

6    Q.    Okay.  In the same batch it looks like we've got

7    the same picture that we saw blown up, or smaller

8    earlier.  But now you can see what Jeff tags with it.

9    It's California.  I'm the blue dot surrounded by weed.

10   Hash tag medical marijuana, hash tag herb, hash tag

11   legalize MJ.

12        Do you see that?

13   A.    Yes, sir.

14   Q.    And you've also got a picture -- you've got a copy

15   of what is called the CSMD report for JA.

16   A.    Yes, sir.

17   Q.    Do you see that on the screen?

18   A.    I do.

19   Q.    So that I don't have to have you flip, I'll just

20   have you look at the screen.

21   A.    I do.

22   Q.    Now it looks like there is -- the date there is --

23   and I can make it out.  It's 3/3/16, 3/1/16, 3/1/16,

24   2/15/16, 2/15/16, 2/15/16.  They're all Jeff Young

25   prescriptions, right?

1   A.    Yes, sir.

2   Q.    It says at the top, Young's new weight loss

3   adviser.

4        Do you see that?

5   A.    Yes, sir.

6   Q.    And these drugs, reading from the bottom up,

7   Oxycodone, Clonazepam, Fentanyl, Amphetamine, Hydrocodone

8   and Alprazolam.

9        Is that three different types of opioids, a

10  stimulant and two benzodiazepines?

11  A.    Yes, sir.

12  Q.    So if somebody is turning this in and saying, hey,

13  medical board, look at this.  This person works for Jeff

14  Young.  And she's getting -- can you speak to the

15  morphine equivalent of 183.75 that we see on that page?

16  And I'll just put it up so you don't have take my word

17  for it.

18        Is that a lot?

19  A.    That is a high morphine equivalent dosage, yes,

20  sir.

21            THE COURT:  I can't hear what you are

22  saying, ma'am.

23            THE WITNESS:  To my knowledge, yes, sir,

24  that is a high morphine equivalent dosage.

25  BY MR. PENNEBAKER:

1    Q.    Is 90 a high morphine equivalent dosage?

2    A.    90 is one that would show up as concerning, yes,

3    sir.

4    Q.    Concerning?

5    A.    Yes, sir.

6    Q.    Right.  So that's double that.

7          So somebody is really sounding the alarm here

8    saying, hey, check this out.  This guy is on Facebook

9    posting inappropriate things.  He is prescribing to

10   employees in ways that -- whoever it was that was

11   reporting found it concerning.

12         Do you know specifically whether or not there was

13   ever any investigation opened into those allegations?

14   A.    I do not have any knowledge of any investigation by

15   our office in West as to that.  I do recall that that was

16   sent in in an envelope from a, someone who did not

17   identify themselves.  It was forwarded to central office

18   by our office.  And it was also sent to Tennessee

19   Professional Assistance Program, who also sent it to our

20   central office.

21   Q.    Okay.  Whether that was sent in by someone who has

22   a mortal vendetta against Mr. Young or not, does that --

23   I mean, would that -- should that make a difference to

24   the board about the contents of what Mr. Young personally

25   posted?

1    A.    I cannot say what the board would or would not

2    regard.  I can say that as far as an investigator, it

3    does not matter who the complainant is or the nature of

4    their relationship to the respondent, we still

5    investigate everything that is sent to us and then we

6    just document the facts that we learned.

7    Q.    Okay.  In looking at Exhibit L, please.  We're

8    going to pass Exhibit K, which is concerned nurse

9    practitioners and pharmacists that make this report on

10   the 2nd of November, 2015.  I'll just touch on this

11   quickly.

12       I practiced for many years in Jackson.  I had a

13   patient who wished to make an appointment with me.  I ran

14   a prescription monitoring prior to her visit --

15              THE COURT:  I apologize.  Is this in L?

16              MR. PENNEBAKER:  I'm sorry, Judge.  I

17   wandered back to K.

18              THE COURT:  Okay.  Hold on.  Is this

19   number three under K?

20              MR. PENNEBAKER:  This is -- it says --

21   yes, this is page three under K.

22              THE COURT:  I've got it.

23   BY MR. PENNEBAKER:

24   Q.    So, yeah.  If you look at it, it's got allegations

25   of harmful prescribing.  Couldn't believe -- from another

1    nurse practitioner.  Couldn't believe the number of

2    controlled meds.  Some of the most flagrant prescribing.

3    Something must be done.  He's abusing alcohol.  He's been

4    intoxicated at a recent dinner meeting.

5         And this is not the only place where that

6    complaint about the intoxicated at the recent dinner

7    meeting, had to be escorted out was made, correct?

8    A.    Correct.

9    Q.    So multiple sources are reporting that he's having

10   to be escorted out of professional events.  This is just

11   one of them.

12        Attachment is the PMP report for this patient.

13   Okay.  So if you want to know whether or not this is

14   overprescribing, I'm attaching the CSM, the controlled

15   substance monitoring database, just like we saw for JA

16   earlier.

17        You will see why many pharmacists in Jackson

18   refuse to fill any controlled meds written by Jeff Young.

19        Is that, is that a red flag to you as an

20   investigator if pharmacies are refusing to fill a

21   licensed provider's prescriptions for controlled drugs?

22   A.    As an investigator, that would be something that we

23   would want to investigate further if we were notified of

24   that.  We would want to know why they are refusing to

25   fill those controlled substance prescriptions.

1    Q.    Right.  And would that be concerning to you, as an

2    investigator, if the report that you got back was, I'm

3    afraid for my pharmacy license?

4    A.    That is something that we would make note of.

5    Q.    Okay.  So now moving to L.

6          This is a complaint from November 16th of 2015.

7    And we have the name of the person on the first page.

8    It's SB.  And the date is November of 2015.  And the

9    third page the details of the complaint.

10         And you see there is an asterisk at the bottom.

11   It says, I would not like my name revealed. Just want to

12   make you aware.

13         But she's reporting, not a patient, but seen a lot

14   of HIPAA violations and disturbing actions on social

15   media.  The victim was pretty much attacked because they

16   reported they weren't being able to see the doctor.

17         And then if you start flipping through the pages

18   you can see the names of the patient and her husband

19   circled.  And then, once again, you have just a town hall

20   of people starting to beat up on this patient.

21         Is that correct, that these exchanges that we go

22   through are the patient getting attacked for complaining

23   about not being able to get in to see her doctor?

24   A.    There are some very derogatory and ugly comments

25   made, yes, sir.

1  Q.    Actually there was an investigation opened up

2  because of those allegations, was there not?

3  A.    I believe that was part of an allegation that was

4  opened, yes, sir.

5  Q.    Okay.  Here on Exhibit M we've got another

6  allegations report, November of 2015.  This is a type

7  written complaint.

8        And if you look on the third page, this is a

9  patient of Jeff Young.  Correct?

10 A.    Yes, sir.

11 Q.    And let me have you read, just read from the top,

12 please.

13 A.    On page 7, where it say Facebook comments?

14 Q.    No.  I'm sorry.  It's this M.

15 A.    Okay.  The initial --

16 Q.    It's the typewritten page.

17 A.    Okay.

18              THE COURT:  Counsel, tell you what, before

19 we get into that let's take a break.  We've been going

20 for quite a while.

21              MR. PENNEBAKER:  Yes, Your Honor.

22              (Recess taken.)

23              THE COURT:  All right.  You may proceed.

24              MR. PENNEBAKER:  Thank you, Your Honor.

25 BY MR. PENNEBAKER:

1  Q.    Ms. Pickering, we were looking at Exhibit M and the
2  type written page.
3  A.    Yes, sir.
4  Q.    Do you see that?
5  A.    Yes, sir.
6  Q.    You have had a chance to look at that while the
7  break was happening?
8  A.    Yes, sir.
9  Q.    Does this person say that Mr. Young has been my
10 primary care physician since June of 2014?
11 A.    Yes, sir.
12              THE COURT:  Exhibit N?
13              MR. PENNEBAKER:  M, like in mother.
14              THE COURT:  On page two of 27?
15              MR. PENNEBAKER:  Third page.  I'm sorry,
16 Judge.  I believe that I'm on M.
17              THE COURT:  Oh, M?  I'm sorry.  I
18 apologize.
19              MR. PENNEBAKER:  Yes, Your Honor.
20              THE COURT:  Third page of M?
21              MR. PENNEBAKER:  Yes, sir, Your Honor.
22              THE COURT:  Okay.
23 BY MR. PENNEBAKER:
24 Q.    So this person says that he's hung over and smells
25 terrible.  She had to unfriend him on Facebook because

REDACTED TRANSCRIPT

1    he's constantly posting statuses and comments trying to

2    get girls to come over and have sex with him.  She

3    mentions the friend of hers who had been sick for a long

4    time, strep.  Trying to make an appointment for two days

5    while her kids were at school.

6         And this person says that Jeff's office staff, on

7    Facebook, I guess, the office staff was rude.  And then

8    Jeff and his office manager Christy started commenting on

9    that status and tagging my name and cussing me and the

10   original poster.  Christy also sent me a private message

11   threatening to post on Facebook that I owed the office

12   $450.

13        Then there is some allegations about Jeff known to

14   falsify charts and give prescriptions to convicted drug

15   dealers such as Elstem and Hemby.

16                    THE COURT REPORTER:  Who?

17                    MR. PENNEBAKER:  H-E-M-B-Y.

18   BY MR. PENNEBAKER:

19   Q.    There is an allegation about some billing fraud.

20        But if we look at -- and I'm just going to put it

21   up, so that I don't have to get you all to flip all the

22   way to where I'm going.  I'm still in Exhibit M.

23        And if you look at the screen, Ms. Pickering, do

24   you see how there is Christy, the office manager?

25                    THE COURT:  Got twenty-five in the upper

REDACTED TRANSCRIPT

1    right hand corner?

2                    MR. PENNEBAKER:  Yes, sir, Your Honor.

3                    THE WITNESS:  Yes, I see that.

4    BY MR. PENNEBAKER:

5    Q.    And so this is the office manager saying, you owe

6    us 450.  Should I blast that out on Facebook?

7    A.    Yes, sir.

8    Q.    And we have got the complainant here who is saying,

9    Jeff is my PCP.  Right?

10   A.    Yes.

11   Q.    So this is an office manager threatening to blast

12   out a debt to a medical practice on Facebook?

13   A.    Yes, sir.

14   Q.    And then the patient says, it's illegal for you to

15   put that information on Facebook.

16         And then you get back from the office manager,

17   funny how you can bash Jeff on this and not tell the

18   entire truth.  You don't pay you bill, yet you have the

19   nerve to say something about him.

20         She says, yes, I can't say anything about the

21   money you owe -- yes, I can say anything about the money

22   you owe.  I can't tell your medical history, but I can

23   tell everyone you don't pay your bills.  And I'm not

24   going to, because I have more class than that.

25         Is that the, as an investigator into compliance

88

1   with medical ethics and rules and law, is that consistent

2   with how an office manager should be behaving with

3   respect to a medical practice?

4   A.    I've not seen an office manager behaving that way

5   before, no.

6   Q.    And it's not like -- if you just flip back a few

7   pages.  If you look back -- let's see, you flip back

8   another two pages to the, it says page 23 at the top

9   right.

10          This is Jeff talking to the same person.

11          I bashed your front desk staff and office manager.

12   I said you and your nurses and Cortina were amazing.  I

13   told you about these issues multiple times at your

14   office, but whatever.

15          Jeff says, find better elsewhere.

16          And then, okay, I'll pick up my chart tomorrow.

17          And then, please do.  Your comments about alcohol

18   are slanderous and you can expect me to sue you.  I'm

19   contacting my attorney.  They have no basis in fact and

20   are flat out slander and libel.  In state of Tennessee

21   carry a very stiff penalty.  Better be prepared to lawyer

22   up or take them down.

23          Is that something that's consistent with medical

24   ethics to say, hey, you don't like waiting a long time,

25   find better elsewhere?

1   A.    I have not seen that before either.  Normally a

2   patient is given a certain number of days.  They're given

3   a discharge letter and they're treated for a certain

4   number of days prior to that discharge.

5   Q.    Okay.  And then here we've got White Knight Jeff

6   Young.  Once again, pleading for, hey, I'm just trying to

7   point out about your staff.

8          And then Jeff's text message is, nobody else you

9   would have access to way you have access to me.  I called

10  hospitals and cussed out ER docs for you.  No good deed

11  goes unpunished.

12         He says this on a public forum to a patient.

13  Right?

14  A.    Yes, sir.

15                MR. PENNEBAKER:  That was page 21, Your

16  Honor.

17  BY MR. PENNEBAKER:

18  Q.    And all of this is something that is in the medical

19  board's hands.

20         I know I sound like a broken record here.  But

21  looks like this was back in November of 2015.

22         Now in a second we're going to flip over to N,

23  Exhibit N.

24         Now this is complaint number 201600067.  And it's

25  something that you submitted it looks like on 6/6/16.

1        Is that right?

2   A.    Yes.

3   Q.    And this is a 27 page investigative report that you

4   submit.

5        And at the beginning you say that the

6   investigation revealed the following.  And it is a fairly

7   extensive list.  Right?

8   A.    Yes, sir.

9   Q.    It's several pages of investigative findings.  And

10  I think you said earlier, you're not characterizing

11  whether or not you feel things are credible or not

12  credible, you are just reporting what you've been told.

13  A.    I report data, yes, sir.

14  Q.    Okay.  So we've got several categories of things.

15  And again, this is mid '16.

16       Multiple witnesses working without physician

17  supervision on 2 of 27.  Multiple witnesses reporting

18  Young worked without physician supervision.

19       And then that last sentence of that working

20  without physician supervision, his explanations of why

21  these two people that were supposedly supervising him

22  conflicted with those physician's explanations.

23       And do you recall what those physicians told you

24  about supervising Mr. Young?

25  A.    To the best of my recall, they were concerned about

91

1    his practice --

2    Q.    Okay.

3    A.    -- and the prescribing of controlled substances.

4    Q.    Okay.  And do they dispute his time line of when

5    they were supervising him?

6    A.    Yes, sir.

7    Q.    For example, Mr. Yogesh is one of the precepting

8    physicians that is interviewed, right?

9    A.    Yes, sir.

10   Q.    And does he say, and you reflect this in your

11   report, that he came in once to enter into the agreement.

12   And then he came in a second time to review charts.  And

13   based on what he saw, he withdrew immediately?

14   A.    Yes, sir.

15   Q.    Is that right?

16   A.    Yes, sir.

17   Q.    And then if you go inappropriate and/or excessive

18   prescribing of controlled substances.

19         I won't read all through this.  But that, that

20   first sentence, j. Young reported no patient received

21   more than one narcotic concurrently for pain.  And he

22   never ordered two or more Schedule II controlled

23   substances concurrently.

24         You say, this conflicted with documentation found

25   in multiple medical reports.

1           If what we're concerned about with today is not

2    the prescribing of opioids, because Mr. Young can't do

3    that any more, but instead Mr. Young's veracity, his

4    ability to tell the truth about what he is doing and what

5    he plans to do when it comes to persons who are

6    supervising him, is it consistent with your report here

7    that he tells the truth under circumstances like that?

8    A.    I would say that the information he provides is not

9    supported by documentation.

10   Q.    And does that happen over and over and over again

11   in these investigations?

12   A.    It has happened multiple times, yes.

13   Q.    Has that happened just to you, or has it happened

14   to other investigators that you're aware of?

15   A.    Other investigators have come to me with those

16   concerns when they've done investigations also.

17   Q.    Because something like prescribing more than one

18   narcotic concurrently, that's something that you can just

19   look up.  Right?

20   A.    Yes, sir.

21   Q.    And with obtaining a urine drug screen at least

22   every other month.  And if illicit substances —— and I'm

23   reading from the same paragraph now a little more toward

24   the bottom.

25           If illicit substances were found in the drug

1    screen, the patient was fired immediately.

2        Was that true?

3    A.    When I reviewed the medical records, the

4    documentation and medical records did not support that

5    statement.

6    Q.    That was demonstrative false actually, right?

7    A.    It would appear so, yes, sir.

8               THE COURT:  Excuse me.  The information

9    that the patient was -- what was you're saying was false?

10   What was the indication that you drew from that was

11   false?

12              THE WITNESS:  The medical records

13   documentation did not reflect that he consistently

14   obtained urine drug screens at least every other month.

15              THE COURT:  Okay.

16              THE WITNESS:  And every file reviewed with

17   the exception of one, had inconsistent urine drug

18   screens.  And that file had only one urine drug screen.

19              THE COURT:  Okay.

20   BY MR. PENNEBAKER:

21   Q.    So then we go down.  And this is on page three,

22   that first full paragraph, J. Young reported.

23        He reports that he's going to fire patients from

24   his practice for CSMD reports showing doctor shopping.

25        And that wasn't true, was it?

1    A.    No, sir.

2    Q.    And so that -- there is a very important sentence

3    also that kind of goes to what I'm talking about.  The

4    fourth line down in the middle.

5         J. Young reported that he did not obtain

6    controlled substance contracts.

7    A.    Correct.

8    Q.    Correct?  I mean, that is actually what he said to

9    you in the English language.  I do not do that.

10   A.    Yes, sir.

11   Q.    Which is the opposite of I do do that with every

12   patient.

13   A.    Yes, sir.

14   Q.    Okay.  And now I want to go to the sworn testimony

15   that he gave in his medical board deposition a few years

16   later.

17                  THE COURT:  What exhibit are you going to?

18                  MR. PENNEBAKER:  This is Exhibit Z, Your

19   Honor.

20                  THE COURT:  Okay.  What page?

21                  MR. PENNEBAKER:  That would be --

22   BY MR. PENNEBAKER:

23   Q.    And while I'm looking for this, Ms. Pickering, I'm

24   going to ask you about -- if you turn to page four of 27.

25   I'm sorry to have y'all flip around.  I just don't want

1   to have you waiting here while I'm locating this tab.

2        But the page four of 27, Exhibit N.

3        There is a -- would you read the whole paragraph

4   about Botox parties.

5   A.   J. Young confirmed hosting a Botox party at

6   PreventaGenix on 2/11/16, and reported he had hosted

7   another one since then.  Reported alcohol was served on

8   the premises at that party.  Informed consents were

9   obtained from the patients.

10       Alcohol was not served to the patients until after

11  the informed consents were signed.  He kept a roster of

12  the attendees.  He was the only provider.  Medical

13  records were kept on the individuals receiving the Botox.

14       He stated that the supervising physician would

15  have reviewed those records if they were pulled for the

16  random pull of medical records to be reviewed.

17       I obtained from J. Young/PreventaGenix, a

18  certified copy of the roster for that Botox party.

19  Copies of Facebook postings advertising the Botox party

20  were downloaded from the Internet.

21  Q.   Okay.  So now flipping back to Exhibit Z.  And

22  let's start with page 127, please.  Actually, let's do

23  138 -- I'm sorry, 137 in the middle at line 14.

24       Will you read from line 14, Ms. Pickering, to the

25  following page?

REDACTED TRANSCRIPT

1    A.    This is 137?

2    Q.    This is 137, at line 14.

3    A.    Question.  Okay.  Do you -- you said you don't

4    prescribe marijuana.  Do you ever suggest that your

5    patients take marijuana?

6          Answer.  No, I do not.

7          Question.  Or smoke it, I should say, or whatever.

8    Do you partake in the drug?

9          Answer.  I do not.

10         Question.  You never would at the office?

11         Answer.  Of course not.

12   Q.    Ms. Pickering, can I just pause.  I just want to

13   stress to the Court.

14         Under oath.  Do you partake in marijuana?

15         No, I do not.

16         That's just a very relevant lie, frankly, for the

17   evidence that would come in shortly.

18         But, okay, go ahead, Ms. Pickering.  I'm sorry.

19   A.    Question.  Do you ever drink at the office?

20         I have after hours.

21         Ever with patients?

22         After hours.  No, not patients.

23   Q.    Okay.  Now I want to stop you for just a second.

24   Because didn't you just read from your report that

25   Mr. Young admitted to you that he served alcohol at

1    PreventaGenix on February 11th of 2016, and that informed

2    consents were obtained from the patients?  And, of

3    course, they were not served with alcohol until after

4    they signed their consents.

5         But is that consistent with this statement under

6    oath that he gives two years later that, no, I would

7    never drink with my patients?

8                    MR. FERGUSON:  Judge, I'm going to object

9    to that.  That's a mischaracterization of the sworn

10   testimony.

11                   The question preceding that is, have you

12   ever drank at the office?

13                   The questioning is designed to elicit

14   whether or not he drinks at the office, not whether or

15   not patients were fed alcohol at the --

16                   MR. PENNEBAKER:  Well, actually, no.

17   Question two, page 138, line two.

18                   Ever with patients, question mark.

19                   Answer.  After hours.  No, no, not

20   patients.

21                   THE COURT:  Well, possibly unclear.  It

22   could be, did he have a drink with them.

23                   MR. PENNEBAKER:  Oh, maybe he's specifying

24   that he -- he never drank after hours.  Maybe he did

25   drink on the weekends or during the day with patients.

1   That's a -- okay.

2                    THE COURT:  Whatever.

3   BY MR. PENNEBAKER:

4   Q.    Okay.  So regardless.  Let's look at 140, please.

5         I'm sorry.  I asked you to read to line 11.  And

6   I'll just go ahead and read it in.

7         What if a patient comes in with cocaine in their

8   system and that shows up in the blood test?

9         They are fired.

10        And then he says, I don't know that it was one

11  strike and you're out, but they were probably counseled.

12  They were let go.  For the most part they were let go.

13        Definitely if, you know, an illicit drug.  Yeah,

14  they were probably let go on site.

15        Is that consistent with the record that you

16  reviewed?

17  A.    It's not consistent with the records I reviewed, to

18  my recall.

19  Q.    Okay.  And then I would like to turn you to page

20  140 of the deposition.  And right after in line 9, where

21  he is asked about pill counts.  And that's one of the

22  things that is kind of the recommended practice for

23  controlled substance --

24  A.    Yes, sir.

25  Q.    -- prescribing, correct?

1       He says, no, not routinely.

2       And then he says, but -- if you would read that

3  please, on line 11.

4  A.    But everybody had a narcotic contract on their

5  chart if they were on any sort of controlled substance.

6  They had a, you know, a typical, you know, narcotic

7  controlled substance, you know, contract that they would

8  have to sign.

9       Would they sign that before you ever initiated?

10      Yes.   Therapy, yes.   That was part of the intake

11  on any, you know, stack of paperwork that they were

12  given.

13  Q.    Okay.   And so that is, once again, upside down and

14  opposite from what you were told, that I do not get

15  controlled substance contracts on my patients.

16  A.    Yes.

17  Q.    Can both of those things be true?

18  A.    No.

19  Q.    Now there is another statement -- and since we're

20  in the neighborhood of the deposition, there is another

21  statement on page 127.   It looks like at line 13 on 127.

22      He's talking about -- you can see the top of the

23  page.   He's listing his supervising physicians.

24      Alston, Alperovich, Yogesh, Rudin --

25           THE COURT REPORTER:   Wait, wait, wait.

REDACTED TRANSCRIPT

1          MR. PENNEBAKER:  I'm sorry.  That's
2     A-L-S-T-O-N.
3          THE COURT:  She wants you to slow down.
4          MR. PENNEBAKER:  And then Alperovich,
5     A-L-P-E-R-O-V-I-C-H.
6          THE COURT:  What page are you reading
7     from?
8          MR. PENNEBAKER:  127, Your Honor.
9          THE COURT:  127.
10          MR. PENNEBAKER:  Line one to two.
11          THE COURT:  Thank you.
12          MR. PENNEBAKER:  And Yogesh, Y-O-G-E-S-H.
13     And then Rudin, R-U-D-I-N.
14     BY MR. PENNEBAKER:
15     Q.    Then, Ms. Pickering, would you read line 13?
16     A.    So do you have proof of any of that?  Would you
17     have paperwork signatures?
18          Answer.  I would.  I have signatures.  I mean,
19     there is signatures or the chart.  I mean, these guys --
20     I mean, can we not ask the doctors?  I mean, those --
21     there is none of those guys that would deny precepting me
22     during those periods of time.
23          During those time periods did you have the
24     supervising physicians review 100 percent of your
25     controlled substance --

1          Yes.

2          -- charts.

3          Yes.  Yes.

4    Q.    And then the next page.

5    A.    And, I mean, like I said, I'll be more than happy

6    for you to interview or call, or however we need to do

7    it, for those guys.  But that is the time line.

8          And then the question was.  And you never went

9    months without a supervising physician?

10         Answer.  Never.  I never went a day without a

11   supervising physician.  That's where the Yogesh thing

12   came in.  Because Alex was like, I just can't do it, I'm

13   too busy.

14   Q.    Okay.  Two part question.

15         Number one, in the medical charts that you have

16   seen provided to you by PreventaGenix, did you see that

17   every controlled substance chart was signed off by a

18   supervising physician?

19   A.    To my recall, I did not.

20   Q.    In fact, isn't it true that most of the charts were

21   not signed by a supervising physician?

22   A.    To my recall that is what it reflected.

23   Q.    And so less than half is less than 100 percent, as

24   you testified under oath on page 127, correct?

25   A.    Yes, sir.

1  Q.    And there is a invocation in this setting where the

2  supervising physicians are not there to testify, hey, we

3  could just ask these guys.  Right?

4  A.    Yes, sir.

5  Q.    You did ask those guys, right, Ms. Pickering?

6  A.    Yes, sir.

7  Q.    And what conclusion did you come to after talking

8  to them and getting their story and then hearing

9  Mr. Young's story?

10 A.    The information he provided, as I documented in my

11 report, conflicted with the information they provided.

12 They reported concerns regarding controlled prescribing

13 practices.  They did not tell me they were too busy or

14 they had other commitments.

15 Q.    And then on page 143 -- actually, it is 142, we

16 talk about -- down at 19.  Line 19 on page 142.

17        How often do you do urine drug screen?

18        Every time.

19        Is that consistent with your review of the files?

20 A.    No, not consistent with the medical records that I

21 reviewed.

22 Q.    And is it consistent, now on page 143, line one,

23 the sworn testimony that, as well as pulling the CSMD

24 database was printed off and put on their chart every

25 time?

1    A.    I did not see one on their chart every time.

2    Q.    Did you even see a chart for every patient that you

3    asked for?

4    A.    I believe there were some charts that were not

5    provided.

6    Q.    Okay.  Any explanation for why that was?

7    A.    Not to my recall.

8    Q.    So now I want to take you back to Exhibit N.

9          Because we've got working without physician

10   supervision on page two.

11         Inappropriate prescribing of controlled substances

12   on three.

13                    THE COURT:  What tab?

14                    MR. PENNEBAKER:  That is tab N, like

15   Nancy.

16                    THE COURT:  Okay.

17   BY MR. PENNEBAKER:

18   Q.    And it looks like -- and we just left off on page

19   four with Botox parties.  And then we've got the

20   revitalize hydration clinic.  And I don't need you to

21   read it.

22         But what do you remember about the revitalize

23   hydration clinic that Mr. Young was running at the time?

24   A.    I do recall that he confirmed on direct questioning

25   that he would provide a 10 percent discount on that

1    therapy if the patient brought in a tab or a receipt from

2    a bar.

3    Q.    Clothing, on the next page, sold or worn by

4    PreventaGenix staff.

5    A.    He reported selling hoodies with a GAF logo.  And

6    posting photos of those hoodies on the PreventaGenix

7    Facebook site.

8         He denied that GAF meant give a F-U-C-K.

9    According to him it meant, we get all the facts.

10   Q.    That's what he told you when you asked him

11   directly --

12   A.    Yes, sir.

13   Q.    -- does that mean we give a F?

14   A.    Yes.

15   Q.    Which in your investigation you came to learn was

16   actually --

17   A.    That's what multiple people had told us, yes.

18   Q.    And that's, in fact, the way that Mr. Young talked

19   about it, advertised it on social media and things like

20   that?

21   A.    (No verbal response.)

22   Q.    If you don't know, you don't know.  We can cross

23   that bridge with another witness, so I will withdraw that

24   question.

25        But what he told you, in any event, was it means

1    we get all the facts, for Ms. Pickering, that's what WGAF

2    was?

3    A.    Yes, sir.

4    Q.    Okay.  And now you're addressing obscenities,

5    obscene gestures, sexual comments remarks posted on

6    Facebook.  And he confirmed that he was like referring to

7    himself as the Rock Doc and Doc Hollywierd.  And he

8    admits that some of his patients refer to him as a

9    physician.

10        He denied posting nude photos, making sexual

11   innuendoes or remarks, posting photos of himself drinking

12   or making obscene gestures or remarks on his

13   PreventaGenix Facebook site.  But we've already seen all

14   of that, except the nude photos.

15        Unless you think that the ghost picture that he

16   posted is -- I mean, if you think that that falls into

17   that category, then we have seen all of that stuff.

18   Right?

19   A.    I believe you have seen all of that stuff.  That's

20   my belief.

21   Q.    And then there is also something about he's

22   dispensing medications right out of his office without

23   being appropriately credentialed to do that.  Right?

24   A.    I did ask him about Phentermine.  And he said he

25   believed he was registered to dispense with the Board of

1    Pharmacy.  I requested documentation of his registration.

2         And I was provided with a copied e-mail from

3    Adarex (phonetic) that stated they could find no

4    reference for any requirement for them to register.

5    Q.    Then at the end on page 23, that very last

6    paragraph, it's a witch hunt.  Right?  This is

7    harassment.  It's taking time out of the practice.

8    A.    Yes, he stated it was harassment.

9    Q.    Constant harassment from the board.

10   A.    Yes, sir.

11   Q.    Wanted to file some sort of complaint, I guess, on

12   the board.

13        Let's look at O really quickly.  I want to direct

14   you to page three.

15        So this is a May 3rd, 2016 report.  And I think

16   you even mention it in the one that we were just looking

17   at.

18   A.    Yes, sir.

19   Q.    So this is -- the board is aware of this --

20   A.    Yes, sir.

21   Q.    -- obviously.

22        If you look at the third page.  Let's see how many

23   units of Alprazolam, which is a benzodiazepine,

24   Hydrocodone, Oxycodone that he's dumping out on to the

25   streets of Jackson, Tennessee, and it turns out the

1  contiguous and even further counties.  Because people
2  come and see him, right, from all around?
3  A.    Yes.
4  Q.    And he told you that, didn't he?   That is in one
5  of your reports.
6  A.    Yes, sir, that is in my report.  Yes, sir.
7  Q.    Okay.  So it looks like -- and by the way, what
8  is -- when you combine Alprazolam, Hydrocodone and
9  Carisoprodol, what is that called?
10  A.    It's referred to as the holy trinity.
11  Q.    Is that because it's a cocktail of abuse?
12  A.    It has been, yes, sir.
13  Q.    And what does the FDA and the CDC say about
14  prescribing those things together?
15  A.    They recommend that they not be prescribed together
16  due to the potentiation of a fix, increase of the
17  possibility for respiratory depression and evidence of
18  death.
19  Q.    And it quadruples actually if you mix even a opioid
20  and a benzodiazepine, right?
21  A.    Yes, sir.
22  Q.    Right.  So opioids include the Hydrocodone and the
23  Oxycodone.  The benzos include the Alprazolam and the
24  Clonazepam.
25         I mean, we're talking about hundreds of thousands

1    of dosage units in one year.

2         Is that normal for a family practice doctor?  And

3    I'm talking about a physician now.

4    A.    The quantities were larger than many of the

5    investigations that I conducted.

6    Q.    Yeah.  It looks like in the, on the first page,

7    Office of Inspector General is reporting that we are

8    looking at a high number of controlled substances

9    prescriptions written.

10        Mr. Young admits during his deposition, so I don't

11   think this is disputed, that he has no certification in

12   pain management.

13   A.    Correct.

14   Q.    And, in fact, he's got no -- nothing other than

15   kind of on-the-job and self-study and maybe some

16   continuing medical education, he's got no expertise in

17   pain management.

18   A.    That's my understanding, yes, sir.

19   Q.    So, in fact -- I mean, does that suggest to you,

20   those numbers that are high enough for OIG to flag it, is

21   that something that is a witch hunt?  Does that sound

22   like witch a hunt to you?

23   A.    No, sir.  We don't get reports from the Office of

24   Inspector General unless they're concerned.

25   Q.    Okay.  And the -- something like the controlled

109

1    substance monitoring database, kind of compendium of the

2    data like that, analysis and data, that's just an

3    analysis of data, right?

4    A.    Yes, sir.

5    Q.    You can't have an agenda if you've got, hey, this

6    is your prescribing of --

7    A.    It's just an analysis of data.

8    Q.    Okay.  So all of this, again, two years prior to

9    the board entering the agreed order -- and by the way,

10   before we leave this, I've just got to mention this.

11        What is the number one product prescribed by Jeff

12   Young in this 2015 document?

13   A.    Alprazolam.

14   Q.    Is he still able to prescribe Alprazolam today

15   right now, one of the members of the holy trinity, under

16   the board order?

17   A.    Yes, my understanding that he is.

18   Q.    Okay.  And Clonazepam is another one, number four.

19   That's another one that he can still write today?

20   A.    Yes, sir.

21   Q.    And he's not a psychiatrist or a psychiatry nurse

22   that you know of, is he?

23   A.    Not to my knowledge, no, sir.

24   Q.    Okay.  Now I think we can just skip P, because

25   that's just about him.

1              Well, I mean, I think this illustrates the type of

2       person that we're dealing with.  So let's -- this is an

3       interview with G. Dardy, RN, on August 2016, once again,

4       and the medical board, in the records that we got from

5       the Office of General Counsel.

6              He comes in for some procedure --

7                      THE COURT:  Where are we now?

8                      MR. PENNEBAKER:  This is just right on P,

9       Exhibit P.

10                     THE COURT:  Okay.  Thank you.

11      BY MR. PENNEBAKER:

12      Q.    And he is referring to, refers to race, refers to

13      the race of the person that's taking him in.  And then he

14      talks about how Christy, his office manager, says that's

15      my bitch.  And this is in a medical facility.

16             He asks the person at the front desk to get on the

17      desk and do it with him.  And then Dardy, who is the RN,

18      if you turn to the second page, Dardy reported that Young

19      said he had been drinking alcohol until 2:00 or 3:00 a.m.

20             But Dardy is of the mind that it's hard to

21      determine whether he's on something or whether this is

22      normal behavior, right?

23      A.    That's what is documented, yes, sir.

24      Q.    Do you see that?

25      A.    Yes, sir.

1    Q.    And that brings us to Q, which is a very -- I would
2    image that as the investigator you find this troubling,
3    right?
4    A.    Yes, sir.
5    Q.    And I'm going to go with a factual summary so that
6    I can get on with it.
7          But who are the NXXXX?
8    A.    The NXXXX are a family who, they lived in Ohio.
9    The father of Mr. NXXX I believe is the one who actually
10   filed this allegation because he was concerned about the
11   controlled substances prescriptions that they were
12   receiving from Mr. Young and that they were driving from
13   Ohio to Mr. Young's clinic in Tennessee.
14   Q.    Okay.  And you mentioned -- so his concern was that
15   his son was doctor shopping and was getting medication he
16   didn't need.
17   A.    Yes, sir.
18   Q.    When you checked out -- and I'm just going to ask
19   you to kind of summarize, because I want to try to move
20   forward.
21         When you checked out whether the NXXXX -- and this
22   is a whole family, husband, wife and 14 year old
23   daughter.  Right?
24   A.    A minor child, yes, sir.
25   Q.    When you -- and by the way, I've been using the

1    name of the patient.  It's DN, RN and MN, for the record.
2    That was inadvertent.
3         When you checked out what those people were being
4    prescribed, and compared that to their medical records,
5    did those things match up?
6    A.    No, sir.  They were inconsistent drug screens where
7    D NXXX took more medicine than was prescribed.  He
8    violated his opiate pain management agreement, and he was
9    continued to be prescribed controlled substances.
10        Hydrocodone dosage was increased on multiple
11   visits.  It did not reflect referrals to mental health or
12   orthopaedics; although, he had diagnoses of back pain,
13   knee pain and anxiety.
14        There were no records from prior providers.  There
15   were no results of radiology testing.
16   Q.    Okay.  And then the second part of this
17   investigation, as we see on, starting kind of around page
18   21 of this same report.
19        You've got a pharmacist, Mr. Crow, who is giving a
20   statement.
21        Do you remember talking with him?
22   A.    Yes, sir.
23   Q.    When you spoke with Mr. Crow, did he recount for
24   you an incident where Mr -- it's MY, right?
25   A.    Yes, sir.

1    Q.    Where MY, who was a patient of Mr. Young's, had

2    done some alarming things?

3    A.    Yes, sir.

4    Q.    And would you just briefly tell the Court what

5    happened with MY?

6    A.    MY called the pharmacist to report that he had

7    ingested 70 Ativan pills without affect.

8              THE COURT REPORTER:  Antivan?

9              THE WITNESS:  Ativan, A-T-I-V-A-N.

10             He asked if it was sugar pills, rather

11   than placebos, rather than actual Ativan.  And the

12   pharmacist showed him the stock bottle of Ativan and

13   assured him the medication he was given was Ativan.

14             The pharmacist reported that to Mr. Young

15   office.

16   BY MR. PENNEBAKER:

17   Q.    Okay.  So he's alerted, Mr. Young, that this

18   patient of his is calling in and saying I took 70 --

19   that's seven zero, correct --

20   A.    Yes, sir, seven zero.

21   Q.    -- Ativan?

22         And there is, the third paragraph from the bottom.

23   Mr. Crow reported that YXXXXX filled additional

24   prescriptions written by Mr. Young.  Lists some of them.

25   He was concerned by the trinity meds that we talked

1   about, right?

2   A.    Yes, sir.

3   Q.    Did he specifically name that?

4   A.    Yes, sir, he did.

5   Q.    So he says that Mr. XXXXXX had called him asking

6   for injectable Fentanyl?

7   A.    Yes, sir.

8   Q.    What ended up happening to Mr. XXXXXX that you were

9   investigating?

10  A.    Mr. XXXXXX was found dead in his bed at his home by

11  his wife.

12  Q.    Okay.  And what was concerning to you about the

13  circumstances of that death?

14  A.    Mr. XXXXXX was found with a syringe underneath his

15  pillow.  There were multiple other syringes in the home.

16  Some were filled, some were not.

17        There were needle marks, track marks on his feet,

18  arms and legs.  There was no police report or incident

19  report made.  The coroner or medical examiner did not

20  come to the home, did not examine him.  There was no

21  autopsy ordered.  There was no blood sent in to be

22  tested.  So those were some of the issues that concerned

23  me.

24        There was also a notation in a medical record from

25  the emergency room where Mr. XXXXXX had been, that he

1  told them that he would rather be dead than to continue

2  to suffer the pain that he was suffering.  And that they

3  had reported it to Mr. Young's office --

4  Q.    I'm sorry to stop you.  I apologize.

5        How long before he died was that, was that

6  notation, if you remember?

7  A.    I don't remember exactly, but it was not very long.

8  Q.    So the recent -- he went to the hospital saying I

9  don't want to live.  The hospital record indicates they

10  told Mr. Young.

11       And then did you find something suspicious in Mr.

12  YXXXXXX medical records that you didn't expect?

13  A.    I found something I didn't expect.  I did find a do

14  not resuscitate order --

15  Q.    Okay.

16  A.    -- that was signed by Mr. Young.  Mr. YXXXXX did

17  not have a terminal diagnosis.

18       So I did question Mr. Young as to whether he did

19  sign that.

20  Q.    And why -- was that alarming to you that you found

21  a do not resuscitate order in a patient that did not have

22  a terminal diagnosis?

23  A.    It was confusing to me.  Normally the patient has a

24  terminal diagnosis, and this gentleman did not.

25  Q.    Okay.  Did his wife say -- did MY's wife say

1    anything about do not resuscitate orders?

2    A.    She said that she had been asked to sign one for

3    him and that she refused.

4    Q.    Okay.  And that was around the same time that he

5    seems to have gotten one from Mr. Young?

6    A.    Yes, sir.

7    Q.    Now when you look -- when you asked Mr. Young about

8    the do not resuscitate order, did he deny it at first?

9    A.    Yes, sir.  I asked him three times.  He denied

10   each time.

11   Q.    Okay.  And then what happened when you showed it to

12   him?

13   A.    He became visibly angry.

14   Q.    Okay.  And I want you to look at page 22 of 32,

15   paragraph 7, the 3rd paragraph down.

16   A.    Yes, sir.

17   Q.    You say, Mr. Young reported that the investigations

18   of him were a concerned effort by a few to cause him as

19   much grief as possible.

20          We've heard that one before, right?

21   A.    Yes, sir.

22   Q.    And then Mr. Young reported that Investigator

23   Pickering had been personally named in the tabloids, so

24   they knew what was going on.

25   A.    Yes, sir.

1  Q.    Wait.  What?  What did you take that to mean?

2  A.    Honestly, I felt it was a form of intimidation.

3  Q.    Okay.  Are you used to being intimidated when you

4  interview people?

5  A.    No, sir.

6  Q.    And I want to go over to, I want to go over to page

7  26 of 32.  And that first full paragraph at the top,

8  Mr. Young again.

9       So this is after you have essentially presented

10  him with the do not resuscitate that he signed that he

11  thrice denied signing, correct?

12  A.    (No verbal response.)

13  Q.    And would you read what you wrote there?  Mr. Young

14  again.

15  A.    Mr. Young again asked this investigator if she knew

16  that she was mentioned personally in local tabloids. Told

17  this investigator that she had been named particularly

18  and that she was mentioned in those tabloids as Ms.

19  Shirley.

20       I did not comment on this question by Mr. Young.

21  Q.    Ms. Pickering, how did you feel after the second

22  time that he reminds you that people know who you are and

23  calls you by Ms. Shirley?

24  A.    I was disturbed by that and I did feel a little

25  bit -- very uncomfortable.

1   Q.    And did you feel so uncomfortable, in fact, that

2   you started to carry a weapon on you, a gun, that you had

3   not carried on you prior to this interview?

4   A.    I did have a gun at my home, yes, that I did.

5   Q.    Okay.  And was that a result of the feeling that

6   you had when you left this interview, or like the

7   cumulative effect of some of other things that started to

8   happen to you at this time?

9   A.    That, along with things that were posted on social

10  media, some of the behaviors exhibited by Mr. Young.  It

11  was a cumulative effect of things.  Yes, I was fearful.

12  Q.    Okay.  And did you get -- have you gotten a sense

13  from the other investigators about how they feel as far

14  as their personal security when it comes to Mr. Young and

15  investigating cases into him?

16  A.    My investigators have come to me and they have

17  expressed concerns for their safety.  They have expressed

18  that people have told them they are fearful, when they

19  try to interview individuals, that they are fearful of

20  Mr. Young, or people that know Mr. Young.

21  Q.    Right.  And I want to ask you about something that

22  you told me when we met earlier about your son.

23       Well, first of all, about people coming to your

24  house, being in your yard, you getting strange phone

25  calls.

1          I mean, can you just give the Court a summary of

2     what started to happen to you around this time?

3     A.    Around this time I did begin to get hang ups.  I

4     began to get phone calls that were whispers, couldn't

5     understand what they were saying.

6          There was an occasion when I came home alone,

7     there was no one in my house, it was very dark.  Got out

8     of the car, and there was someone in the end of my front

9     yard.

10         I did run in.  Called my son.  He came over.  By

11    that time they had left.

12         I have had multiple occasions when I would come

13    out -- I failed to lock my car when I went to sleep.  I

14    would come out the next morning, my car doors would all

15    be standing open.

16         Then the final occasion was my son was actually at

17    the home with my husband and myself.  And we did hear

18    someone outside.  We went out.  We saw them running

19    across our yard into -- our yard is boarded by woods.

20    They did run away into the woods.  My son did have a gun.

21         And again, that was very concerning to me.

22    Q.    And, Ms. Pickering, I'm sorry to ask you this,

23    because it's a personal question, but it's relevant.

24         Do you feel safe with Mr. Young being out there

25    and knowing that you have testified today?

REDACTED TRANSCRIPT

120

1    A.    I am very nervous about it, honestly.  Not only

2    about Mr. Young, but about people that Mr. Young may

3    know.

4    Q.    Right.

5    A.    I am concerned, yes.

6    Q.    Have you seen gang ups of Mr. Young's, I sometimes

7    call them the Rock Doc disciples or his, the people that

8    associate with him and defend all of his actions, have

9    you seen gang ups on witnesses --

10   A.    I have seen multiple media postings where that has

11   happened, yes.

12   Q.    Okay.  And does that include, for example,

13   Mr. Young's ex-wife, an image appearing of her nude on

14   line that was attributed to either him or his, people

15   he's affiliated with?

16   A.    Yes, sir.  I did see a posting where one of his

17   friends threatened to take care of someone in the old

18   Mafia style.

19   Q.    Okay.  And what about -- are you aware that Uncle

20   Kevin, who we were talking about earlier, was arrested

21   for threatening a life of a DEA agent?

22   A.    Yes, sir.

23   Q.    And DEA was investigating Mr. Young, correct?

24   A.    Yes, sir.

25   Q.    Now before I get to the most current

REDACTED TRANSCRIPT

1   investigations, I want to -- the board is also aware and

2   has been aware, correct, that Mr. Young has been arrested

3   for assault previously.  Correct?

4   A.    Yes, sir.

5   Q.    At least assault on his ex-wife in Florida in 2011.

6   And then there is another instance where he was arrested

7   for assault in Memphis.

8   A.    Yes, sir.

9   Q.    Are you aware of that?

10  A.    Yes, sir.

11  Q.    And I want to show you something that was an

12  e-mail, but appears to have been sent to you.  Because I

13  think this drives the point home.

14        And this is Exhibit U.  And it says, Ms. Alcock

15  and Ms. Pickering, and that's the attorney and yourself.

16  And this is from Dawn Young.  I mean, no doubt about it.

17  This is from the head witch hunter, or whatever.

18        But be that as it may, right, we're going to let

19  the thing speak for itself.

20        But the context we get here on July 1, 2018.  So

21  before the board order comes out.  Still time not to

22  allow this man to continue to practice.

23        So she says, he was arrested, Young was arrested

24  for assaulting this woman.  And they've had 22 resets of

25  the court date.  And then at the bottom of the body of

1  the e-mail, she committed suicide, intentional or not is

2  unknown.  But she was another patient of Jeff's, who was

3  harassed by him and exploited on social media by him.

4  Right?

5  A.    Yes, sir.

6  Q.    Her opinion that she was harassed and exploited on

7  social media.

8        However, the attached photo that she got off of

9  social media -- and I just want to put this up here.  Is

10  this a picture of Young the night that she was

11  allegedly -- and he disputes this.  We know he disputes

12  this.

13        Is this a picture of him pointing down at JXXXXXXX

14  RXXXXX the night that he was arrested?

15  A.    It is a picture of him that appears for be a

16  picture of her and he's pointing at her.

17  Q.    Okay.

18  A.    What it appears.

19  Q.    And then if we look down at what he says on social

20  media.

21        This cunt talks about how I won't prescribe her

22  narcotics, all caps.

23        Do you see that?

24  A.    Yes, sir.

25  Q.    I think I'm just going to let that speak for

1    itself.

2            And she killed herself, right?

3    A.    That's my understanding, yes, sir.

4    Q.    And there are more instances.  For example -- and

5    this is just another e-mail that I don't --

6                MR. PENNEBAKER:  It's in the exhibits,

7    Your Honor, but I don't know exactly where it is.

8    BY MR. PENNEBAKER:

9    Q.    But this is another e-mail where you have somebody

10   e-mailing you.

11           I just wanted you to know that on Topics my life

12   was threatened.  And they had a field day calling me

13   names, making fun of me.  I'm 99 percent sure, well

14   actually 100 percent, it's Jeff telling people what to

15   post.

16           We couldn't get an order of protection because we

17   were never intimate, says the DA.

18           And the reason I put this up here is not to have

19   you vouch for the veracity or it or anything, but just --

20   I'm trying to illustrate the volume of these kinds of

21   complaints and allegations that are so much, it appears,

22   that the board doesn't even have them all investigated,

23   right?

24   A.    Yes, sir.  That was forwarded on to the board.

25   Q.    Right.  This one was.

124

1      But, I mean, this is just -- and the -- I know

2 that this is getting redundant, so I'm going to wrap it

3 up.

4      Here's another, here's another post that was sent

5 in to the board.

6           THE COURT:  Is this another tab somewhere?

7           MR. PENNEBAKER:  Your Honor, I might have

8 to add this one page as an exhibit.  Because this is part

9 of -- and we got sort of the medical board records in

10 various states of undress.  So this is a supplemental

11 production.

12           THE COURT:  All right.

13 BY MR. PENNEBAKER:

14 Q.   What you see here is -- this is associated, though,

15 with file 201500686.  That looks like this is a second

16 installation.

17      But here we've got Jeff Young once again on

18 Facebook.

19      And he says, unfriend me or whatever, but

20 attacking my children is completely acceptable.  And I

21 will kill a mother fucker.  You heard it here first.

22 JPD, something, P, sheriff's department, DA office, I

23 don't give a fuck.

24      If I find out what son of a bitch is attacking my

25 children on Topics, I will kill them.  Confession signed.

1    Be very afraid.  Et cetera, et cetera.

2         Doctor, nurse practitioner, Rock Doc Young on

3    social media announcing to the world that he will kill a

4    mother fucker.  Right?

5    A.    That's what it says, yes, sir.

6    Q.    And this is something that is in a file with a

7    compliant number 2015?

8    A.    Yes, sir.

9    Q.    Okay.  The last thing I want to talk to you about

10   is we've got two complaints that postdate the order.

11   Again, just to summarize.

12        So the board at this point, at the time that it is

13   determining what conditions to put on this man, whether

14   or not to take his license, they know that, or have

15   credible allegations, photos, just a mass of evidence,

16   whether it's all a witch hunt or not, right, a lot of it

17   photographic with his own words.

18        They know that he has been arrested for assault,

19   correct?

20   A.    Yes, sir.

21   Q.    And this is during the pendency of the

22   investigation?

23   A.    Yes, sir.

24   Q.    They know that he has prescribed medications on

25   countless -- I don't want to say countless, because

1    that's -- I don't want to have anybody take issue with

2    that.

3          On numerous occasions he's prescribed medications

4    where there is no documentation to suggest that he even

5    has a patient relationship with the person, right?  There

6    is no medical file.

7    A.    Yes, sir.

8    Q.    And that his controlled substance prescribing is

9    high?

10   A.    Yes, sir.

11   Q.    And that he threatens people on social media?

12   A.    Yes, sir.

13   Q.    And that his conduct on social media is unbecoming

14   of a medical professional --

15   A.    Yes, sir.

16   Q.    -- correct?

17         I mean, there actually is an admonition that he

18   gets.  Remember this one.  Where it's a Facebook -- the

19   admonition is, hey, we got wind of you making threats on

20   Facebook.  This is an admonition that will not be made

21   public.

22         I think that's maybe complaint seven or something

23   like that --

24   A.    Yes, sir.

25   Q.    -- out of a dozen or more.

REDACTED TRANSCRIPT

1          So all of this.

2          And not only that, but Tylenol with Codeine, which

3   by the way, Tylenol III.  That's not cough syrup --

4   A.    No, sir.

5   Q.    -- right?

6          No.  That's a pill.  That's Tylenol III.  And he

7   can also prescribe cough syrup with Codeine, an opiate?

8   A.    Yes, sir.

9   Q.    Schedule II, III, XVII, I, does not matter, right?

10  Those are opioids.

11         Are those known drugs of abuse, both of them?

12  A.    Yes, sir.

13  Q.    And he can still prescribe those.

14         And opioids are totally the reason that he was

15  before the board, or one of the many.

16         Then he can still prescribe benzodiazepines.  We

17  saws those in there over and over again.  That's part of

18  the trinity.

19  A.    Yes, sir.

20  Q.    He can prescribe testosterone still.  There was an

21  un-investigated, apparently, complaint about him shooting

22  up the high school football team.  Right?

23  A.    Yes, sir.

24              MR. FERGUSON:  I object to that.  It's a

25  mischaracterization.  That never --

1           MR. PENNEBAKER:  I will withdraw the

2   characterization.

3   BY MR. PENNEBAKER:

4   Q.    But there it was.  The medical board certainly

5   didn't investigate it, did they?

6   A.    No, sir, not to my knowledge.

7   Q.    Okay.  And so in spite of all that, he gets to go

8   out, and with a suspend license and a precepting

9   physician in Chattanooga, by the way.  So supervising

10  physician is in Chattanooga, Tennessee, five hours from

11  here.

12  A.    That's my understanding, yes, sir.

13  Q.    So now he's practicing.  And he's able to, and

14  actually to this day writing prescriptions for

15  benzodiazepine and testosterone.

16  A.    Yes, sir, that's my understanding.

17  Q.    And we'll see some of the PNP on that later.

18        Now we've got two investigations that were open in

19  2019, correct?

20  A.    Yes, sir.

21  Q.    One of those investigations involved -- and that is

22  another investigator, not you, that's working on those?

23  A.    Correct.

24  Q.    One of those investigations involved allegations by

25  a former patient that she was raped by Mr. Young, right?

1    A.     Correct.

2    Q.     And were the allegations there --

3                     MR. PENNEBAKER:  Your Honor, I want to

4    give you the exhibits here.  I believe -- this is R that

5    we're looking at.

6    BY MR. PENNEBAKER:

7    Q.     And so after all of the, after all of the evidence

8    is gathered, the report is written, and the investigation

9    file is sent to the board.  On March 5th, 2019, so after

10   it leaves the investigator's hands, Mr. Young gets a

11   letter of warning.

12          By the way, still on probation for all of the good

13   stuff back in the Rock Doc days.  Letter of warning.

14          And by the way, it's -- we received a complaint

15   alleging that you had inappropriate sexual contact with

16   patients, right?

17   A.     Yes, sir.

18   Q.     You are admonished that any further conduct of this

19   nature could result in the filing of formal charges.

20   Right?

21   A.     Yes, sir, that's what it says.

22   Q.     And otherwise, it's confidential and not going to

23   be further disclosed.

24   A.     Yes, sir.

25   Q.     And I just want to, I just want to point out, that

1    there were former employees, current employees

2    interviewed.  Is that correct?

3    A.    Yes, sir.

4    Q.    And one of the former employees who actually -- one

5    of the former employees, who is not one of the alleged

6    witch hunters, at least not that I've seen so far, is a

7    phlebotomist who worked for him.  What did she say about

8    whether or not -- and this is relevant to what is

9    happening now.  Now, now.  Not at PreventaGenix.

10        This is Genexis, right?

11   A.    Yes, sir.

12   Q.    And this employee never worked at PreventaGenix,

13   did she?

14   A.    Not to my knowledge.

15   Q.    So the employee says what about Jeff Young having

16   sex with patients?

17   A.    That she heard Mr. Young having sex with patients

18   in the exam room and occasionally in his private office

19   on multiple occasions.  And it was obvious because she

20   could hear Mr. Young and the female patient moaning.  And

21   that Mr. Young admitted to staff that he was having sex

22   with his patients.

23   Q.    And is that consistent with what you now know about

24   what was going on at PreventaGenix?

25   A.    That's what the -- some of the types of allegations

1    that were received.

2    Q.    And then there is another -- so this is the

3    investigation summary on page two of 16 in this exhibit.

4         Mr. Young denied having a sexual relationship with

5    Ms. HXXXXX, with CH, who is the complainant, correct?

6    A.    Yes, sir.

7    Q.    And we are going to hear about that.  That he --

8    there were multiple witnesses from PreventaGenix and

9    Genexis interviewed that reported that Mr. Young

10   routinely had sex with his patients in exam rooms and his

11   personal office.

12        Do you know if it's appropriate for a medical

13   provider to have sex with patients he's prescribing

14   controlled substances to?

15   A.    I believe that is inappropriate to happen.

16   Q.    Is that consistent with the notion of consent, that

17   someone in a position of trust and authority over a

18   patient with drugs that they might potentially be

19   dependent on -- is that consistent with what you know

20   about consent?

21   A.    No, sir.

22   Q.    Now there is a office manager -- and this is --

23   I'll just go ahead and say it for the record, according

24   to Mr. Young's view of the world, the office manager is

25   one of the witch hunters.

1        But she recalls a specific incident with Ms.

2   HXXXXX, that in the third paragraph down in the summary,

3   that she felt might not have been consensual.  Because

4   she recalls him having sex with her repeatedly at

5   PreventaGenix.

6        She stated it was close to the end of the day when

7   she noticed Ms. HXXXXX sitting on the couch -- or Ms --

8   excuse me, CH sitting on the couch in Mr. Young's office

9   drinking an alcoholic beverage.

10       CHXXXX stated that she did not feel right.  CHXXXX

11  acted like she had been drugged.  Mr. Young comes in and

12  has sex with her.  And then when he comes out, she is

13  passed out on the couch.

14       She wasn't aware of anybody ever spiking anyone,

15  Mr. Young ever spiking anyone's drink.  But she has had

16  woman come up to her and say your boss drugged and raped

17  me.

18       And that's right there in the medical board

19  report, correct?

20  A.    Yes, sir.

21  Q.    And what was given was an admonition, you really

22  shouldn't be having sex with patients.  Correct?

23  A.    There was an admonition, yeah.

24  Q.    Okay.  And the last investigation file that we have

25  here is, I believe, at S.  All right.

1          So S.  If you look at that, now we've got -- if

2     you look at that first page of S.  And it goes on to the

3     second page too.

4          I count one, two, three, four, five, six, seven,

5     eight, nine, ten, eleven, twelve, thirteen is the number

6     of complaints that have been entered.  So these are --

7     when it gets a number like that, does that mean an

8     investigation --

9     A.    Yes, sir.

10    Q.    So 13 investigations since it looks like 2015.  And

11    he's still got his license, able to write controlled

12    substances after the agreed board order in November.  And

13    now we've got two additional complaints, right?

14    A.    Yes, sir.

15    Q.    So this one, what is your understanding about what

16    this complaint relates to?

17    A.    Violation of HIPAA.

18    Q.    Okay.  And is that because Mr. Young used his

19    ability to log into the controlled substances monitoring

20    database to access information that he was not entitled

21    to access?

22    A.    That was the allegation.

23    Q.    And tell -- if you would, please, tell me more

24    about that allegation.

25    A.    In that allegation the complainant alleged that her

1    ex-husband, who was a patient of Mr. Young's, accessed

2    the CSMD for information on their children to use in a

3    contested divorce hearing.  That he accessed the CSMD

4    without legitimate reason, as her children were never his

5    patients.

6    Q.    Okay.  So the children are never his patients.  And

7    once again -- I mean, this is not a person whose

8    credibility is without stain, if you will.  Correct?

9    A.    Correct.

10   Q.    Can you just give the Court a little bit, just one

11   or two sentences about why?

12   A.    CH had been investigated by our boards.  And she

13   did receive a disciplinary action.

14   Q.    Yes.  So this is another provider.

15   A.    Yes, sir.

16   Q.    And she has been disciplined before.  And maybe

17   there is some bad blood or something between her and

18   Mr. Young.

19         But let's just let the computer reflect what

20   really happened, which is -- and I'm not sure which page

21   this is.  But this is probably hopefully the last I'll

22   have to do that.

23         So here is the controlled substances monitoring

24   database, what is called a footprint.

25         Will you tell the Court what a footprint means?

1    A.    It shows who accessed that database.

2    Q.    Okay.  And is this Jeff Young, the provider,

3    requesting PNP data on the child of a complainant whose

4    never been his patient, for the period of 6/26/16 to

5    6/26/17.  And it looks like this was done 6/26/17 at 2:29

6    p.m.

7    A.    That's what it appears.

8    Q.    Let's just say for a minute that nurse practitioner

9    Young was just curious.  And, in fact, he was not the one

10   who disseminated the results of the child's confidential

11   medical information to someone, because they were going

12   to use it in an adversarial proceeding.  Let's just

13   assume for a minute that this was morbid curiosity.

14        Is that against the law?

15   A.    You have to have a specific reason for accessing

16   the database.  It can't be for curiosity.

17   Q.    So regardless of the motive that the witch hunters

18   may be making up, this is not something that you can do.

19   A.    Not to my knowledge.

20   Q.    Is that an exotic rule or one that is rarely

21   understood or mentioned?

22   A.    It's pretty plain.  I can access the database.  But

23   for me to access it, I have to have a open complaint or I

24   have to have, one of my investigators has to have an open

25   complaint.  There is no other reason why I can access it.

1    I can't access it for curiosity or anything like that.

2    Q.    Okay.  And then lastly, T.  Exhibit T.

3         This is an April 13th, 2018 civil contempt order.

4    I'll just represent to you, it's something that the board

5    had, once again, before it decided to allow him to be

6    released on his own recognizance, if you will, and abide

7    by the terms of this agreed order in November of 2018.

8         And this is a civil contempt order from

9    Mr. Young's divorce proceeding with his ex-wife.  And

10   this is a Chancery Court finding again and again on

11   ground after ground, that I will not bore you or the

12   Court with, that Mr. Young is not a credible witness,

13   calling into question his candor and holding him in civil

14   contempt on ground after ground after ground.  Right?

15   A.    Yes, sir.

16             MR. PENNEBAKER:  I'll pass the witness.

17   Thank you, Ms. Pickering.  I'll pass the witness.

18             MR. FERGUSON:  Your Honor, if I may

19   address the Court.

20             THE COURT:  Yes, sir.

21             MR. FERGUSON:  Coming up on 5:00 o'clock.

22   I was here at 9:00 for Judge Anderson.  It's going to be

23   a long drive home.  I just got handed just before we

24   started this hearing about 700 pages, which would have

25   been nice to have since we had a two week delay in the

1    filing for this.

2                    I know the Court tried to give me as much

3    time as possible.  Again, we're not talking about enough

4    time.

5                    I do need to review these records.  They

6    provide me a copy of them with the purpose of me

7    reviewing them.  I've been trying to go through both

8    reading them and listening at the same time.  It is a

9    tremendous amount of information to try to go through.

10                   Your Honor, this witness has been

11   testifying for four hours, four and a half hours.  And I

12   just think it would be appropriate at this time to give

13   the defense a chance to review these records.

14                   My short review of them has been

15   statements have been cherry picked.  Obviously, I've not

16   had time to go back and establish whether that

17   cross-examination of what the government has presented to

18   this Court, now to properly indicate to the Court or to

19   this witness where those statements are not full and fair

20   recitations of what the facts are and the documents.

21                   THE COURT:  Well, there are a lot of

22   documents, no question about it.

23                   I said there are a lot of documents.

24                   MR. FERGUSON:  Yes, Your Honor.

25                   We're definitely not finishing today.  I

1   know that.  I've got witnesses that are going to testify.

2   So, I mean, it's not an issue of we are delaying for

3   delay's sake.  We're going to be back.

4                THE COURT:  Mr. Pennebaker, how many

5   additional witnesses does the government intend to

6   present in this hearing?

7                MR. PENNEBAKER:  The government is going

8   to present an agent -- actually, an agent and a nurse

9   with TBI, the Bureau of Investigation, and a fact

10  witness.  I anticipate that the three together would take

11  a couple of hours.

12               THE COURT:  Well, it's obvious we're not

13  going to be able to finish this today.

14               MR. PENNEBAKER:  Yes, Your Honor.

15               THE COURT:  And, you know, I think counsel

16  for the defendant is certainly entitled to be able to go

17  through these documents.

18               MR. PENNEBAKER:  Well, Your Honor, just in

19  response to that quickly.

20               Number one, these documents that we

21  received from the medical board are documents that we

22  only received -- in large part, we only received them I

23  want to say late last week in many cases.

24               THE COURT:  That's more time that this man

25  has had.

1          MR. PENNEBAKER:  And that is correct.

2          The second point that I would make is that

3  these were, or should have been part of the record when

4  his licensing hearing was going on, with the exception of

5  the last two investigation documents.

6          So to quote my opposing counsel, he was

7  there, he knew what evidence was before that tribunal,

8  and this is -- he's got years on us, in terms of becoming

9  acquainted with what was going on in the medical board

10  and what kind of evidence they had.

11          So I would just dispute that this is a

12  surprise.

13          MR. FERGUSON:  This is, I think, the third

14  time the government has said that they know about what

15  happened in his previous Board of Nursing hearing.

16          MR. PENNEBAKER:  No.  I said I don't.

17          MR. FERGUSON:  Well, you said it was --

18  should have been turned over to me in that -- there are

19  allegations that had nothing to do with the one that I

20  was handling.  I've never seen these documents.

21          There are documents in here that are

22  internal documents.  This is the first time I've seen

23  these.  The deposition back -- obviously, I handled that.

24  The allegations contained within the Board of Nursing I

25  handled we've seen.

REDACTED TRANSCRIPT

1           But this is a widely broadly cast net that
2   had nothing to do with what I handled.
3           THE COURT:  How many witnesses do you
4   intend to present, Mr. Ferguson?
5           MR. FERGUSON:  Between two and three,
6   possibly four.
7           MR. PENNEBAKER:  Your Honor, just to
8   follow up on our phone call that we had earlier today on
9   another matter.
10           My guess is that Mr. Knutson and I could
11   make ourselves available tomorrow by moving some things
12   around and canceling -- we do have travel arrangements
13   and were planning on being out of state.  But we would --
14   if the Court is available --
15           THE COURT:  Well, that's my problem.  I'm
16   committed to a hearing.  I've got to be in Memphis by --
17   well, actually, I've got to be there earlier.  I've got
18   to be there at 12:30 and I've got a hearing starting at
19   2:00.  I don't know how long it's going to last.  It's
20   something assigned by Chief Judge Anderson that I had
21   already committed to.
22           And so Wednesday I've got court.  Thursday
23   I have two full, well pretty much two full days of court.
24           I know I mentioned something about Friday.
25   But I think you all said you were out of pocket at that

1     time.

2                        I could -- my wife is not going to like

3     it, but I could take it up on the 20th, which is a week

4     from today.

5                        MR. PENNEBAKER:  Your Honor, on Friday --

6     once again, I mean, didn't anticipate, although probably

7     should have anticipated going over and --

8                        THE COURT:  He's got --

9                        MR. PENNEBAKER:  That's right.

10                       MR. FERGUSON:  Root canal.

11                       MR. PENNEBAKER:  I remember, yes.

12                       THE COURT:  You know, everybody has got

13    commitments.  I mean, obviously, this is an important

14    case to everyone, but it's not the only one we've got.

15                       MR. PENNEBAKER:  Yes, Your Honor.

16                       MR. KNUTSON:  Your Honor, I was just told

17    by one of the agents that, for what it's worth, they have

18    a mandatory training on the 20th through the 23rd.  Just

19    wanted to make you aware of that.

20                       THE COURT:  Is this the agent that's going

21    to testify?

22                       MR. KNUTSON:  Yes, Your Honor.

23                       THE COURT:  How long is his testimony

24    going to be?

25                       MR. KNUTSON:  I would anticipate an hour

1    to an hour and a half for us.  But I think he would have

2    said that about his last witness.  But I think it's going

3    be shorter than Ms. Pickering.

4                    THE COURT:  I would hope so.

5                    MR. KNUTSON:  Yes.

6                    THE COURT:  But --

7                    MR. PENNEBAKER:  Judge, another

8    possibility is, I think Mr. Ferguson works, has an office

9    in Memphis.  Is that correct?

10                   MR. FERGUSON:  Correct.

11                   MR. PENNEBAKER:  So if you have -- if

12   you're going to be in Memphis kind of until the end of

13   the day, we could get in some time --

14                   THE COURT:  Well --

15                   MR. FERGUSON:  I need time to read.

16                   THE COURT:  The problem I've got tomorrow

17   is that I don't have how long the hearing -- I would

18   suspect it's going to last two or three hours.  It is

19   starting at 2:00.  And I have a commitment at 5:30.  So I

20   can't stay past the time I put this particular...

21                       If we want to take a shot at the agent in

22   terms of his testimony, we can try to do some.  But, of

23   course, the problem is is that we're going to 6:00 or

24   after, then he's got to examine this witness too.

25                       And after the 20th, I'm going to be out

1    from the 21st through the 30th, gentlemen.  I'm sorry.

2    That's -- I've got a planned vacation that I would play

3    havoc with my family if I wasn't there.

4              MR. PENNEBAKER:  Your Honor, I think which

5    may be able to -- do you mind if I confer with...

6              THE COURT:  Sure.  Go ahead.

7         (ATTORNEY/ATTORNEY CONFERENCE.)

8              MR. PENNEBAKER:  We've talked to the

9    agents and actually the other witness that works for TBI

10   as a nurse that works for them.  And she's telling us

11   that they can make the 20th work, if that's the best day

12   for the Court.

13             THE COURT:  Mr. Ferguson.

14             MR. FERGUSON:  That's the best day for me.

15   I would appreciate it.  I'm supposed to start a trial,

16   white collar trial that week.  It's going on Monday.  But

17   I think I can get the Judge to push it back.  If not...

18             THE COURT:  Is that a case in Memphis?

19             MR. FERGUSON:  It is.  This individual is

20   out of custody.  It's all -- so I don't have, I don't

21   think I have any problem with the Judge.

22             If I did, I have associates that can start

23   the process of voir dire.  That won't be a problem.  I'll

24   make it work.  I appreciate the time.

25             THE COURT:  Okay.  Well, we can start 9:00

1    or 9:30 on Monday morning.  That's the best I can do.

2                    I expect this case, the hearing to be

3    finished certainly by, before the end of the day.  It has

4    to be.  I mean, if you can do it, I'll give you that

5    time.

6                    MR. PENNEBAKER:  Yes, Judge.

7                    THE COURT:  I'm sorry.  I just -- it's

8    unfortunate.  But I think that's the best we can do.

9                    What time do you want to start?

10                    MR. FERGUSON:  9:00 o'clock.

11                    MR. PENNEBAKER:  Works for the government,

12    Your Honor.

13                    THE COURT:  Be here at 9:00 o'clock.

14                    Is there anything else that, anything else

15    you want to submit to me to look at, that I need look at?

16                    MR. PENNEBAKER:  Judge --

17                    THE COURT:  I'll --

18                    MR. PENNEBAKER:  -- I think -- there is

19    nothing that we would submit now.  There is a lot to

20    digest in the medical board records.

21                    One thing that I would suggest, given that

22    we are going to be unable to conclude today, is that the

23    government would ask that pending the next hearing date,

24    that the -- that Jeff Young not be allowed to practice

25    medicine, at least not to prescribe controlled substances

1    of any sort at all.

2                    And the government would just rest on,

3    we've shown by clear and convincing evidence, just with

4    what exists in the text messages, what exists in the

5    current allegations, this man should not be -- he should

6    not be practicing medicine, but certainly prescribing

7    controlled substances.

8                    And I'll just -- because, hopefully, if

9    you will indulge me.  I would proffer to you that one of

10   the witnesses that we're going to put on will be

11   testifying about what the controlled substance monitoring

12   database shows about Mr. Young's prescribing today.

13                   And what it shows is that he is continuing

14   to prescribe controlled substances, including

15   benzodiazepines, to patients even that were receiving

16   powerful opioids from him at PreventaGenix, his practice

17   in connection with all the medical board stuff.

18                   And the CSMD footprint that we were just

19   talking about reflects that he is not checking the CSMD

20   to see if his patients are doctor shopping.

21                   THE COURT:  Is that reflect -- I mean,

22   that can be verified by going into that system to see who

23   has --

24                   MR. PENNEBAKER:  That can be verified by

25   going into that system.


REDACTED TRANSCRIPT

1            And we have pulled the footprint and

2   determined, for example, that after Mr. Young was

3   arrested and initially arraigned and we had the first

4   hearing, there are four entries for controlled substances

5   in the CSMD database.

6            One of those is a patient who, for whom

7   there had not been any log-ins by Mr. Young to check the

8   CSMD.  And for who doing so would have revealed this

9   patient is getting prescriptions for the balance of the

10  cocktail, the holy trinity, at least as far as

11  Hydrocodone from multiple doctors.  And Mr. Young didn't

12  even check the CSMD database to see whether or not this

13  person was getting pills from somebody else.

14            And it's just again and again and again.

15  The man is a danger with the ability to write addictive

16  and harmful drugs.

17            And granted, they've met their burden of

18  production to put the government to its burden of

19  persuasion on whether or not detention is appropriate.

20  The presumption still matters.

21            The man has been indicted by a Grand Jury

22  for being a drug dealer.  And we are leaving him, if we

23  leave him able to prescribe controlled substances, and I

24  would argue practice medicine at all, with the mechanism

25  that he uses to do the things that he's accused of in the

147

1    indictment, including allegations that have been

2    documented in the records that we have seen today.

3              THE COURT:  When was the last occasion

4    when this occurred?

5              MR. PENNEBAKER:  This was on April 20th, I

6    believe, was the occasion when the person who is the,

7    getting Hydrocodone from other providers, filled a Jeff

8    Young prescription that is reflected at least in the CSMD

9    to have been written by him on the 20th of April.

10             That's April 20th, Your Honor.  He was

11   arraigned on the 17th.

12             So, you know, it's just a -- like so much

13   here, it just defies reason.  Why do we still have

14   someone who -- he's out on unsecured bond.  He's able to

15   practice medicine.  He's sheltering --

16             THE COURT:  Well, I mean, bond was set --

17   we're not getting into that today.

18             MR. PENNEBAKER:  Yes, Your Honor.

19             THE COURT:  But if there is some

20   indication, Mr. Ferguson, that your client is not

21   coordinating a prescription he's giving to X with

22   something that someone else is giving -- I'm not saying

23   he's giving it, but someone else is giving it, which

24   together becomes an extremely potentially deadly

25   combination, that is very concerning to the Court.

1        MR. FERGUSON:  And if that were what had

2   happened I would share the Court's concern.  But we're

3   not -- we've got several things going on.

4        First, we have the witness who has not

5   been cross-examined.  The government is asking you to

6   take steps to make decisions today based on

7   unsubstantiated testimony.  It's not considered --

8   cross-examination is the crucible of truth, as they say.

9        THE COURT:  Well --

10        MR. FERGUSON:  Second is, he's -- our

11   witnesses are here to testify to that.  He literally has

12   prescribed four, four prescriptions since he was granted

13   release on this case.  He's -- the one they're talking

14   about is a pain management patient.  The prescriptions

15   are appropriate.

16        He has to turn in his prescriptions every

17   90 days.  He has to submit that to the Board of Nursing.

18   He's done that twice as of May 7th.  So they are

19   reviewing and keeping up with his prescription habits.

20        The fact he's prescribed four

21   prescriptions since he was released on this indicates

22   that he's not willy nilly writing prescriptions.  He's

23   very limited in his practice.  He's being very careful in

24   how he handles that, because he doesn't want to come into

25   a situation where there can be any allegations that he's

1    doing something inappropriate.

2              And that's —— right now we don't have any

3    proof of anything.

4              He is fully compliant with the order from

5    the Board of Nursing that was put down to protect the

6    public.

7              MR. PENNEBAKER:  Your Honor, I'm just

8    getting another note that —— and by the way,

9    cross-examination being the crucible of truth, sure.

10              But the Rules of Evidence and ordinary

11    examination do not apply in these hearings.  And part of

12    the reason for that is the urgency of something like a

13    doctor shopper, a pain management patient, or whatever it

14    is —— and by the way, if Young is not checking the CSMD,

15    he's taking a pain management patient's word for it that

16    he's not doctor shopping.

17              He's taking the other provider, who may be

18    writing the Hydrocodone, that person's word for it and

19    maybe that person is —— it's just, it's reckless.

20              MR. FERGUSON:  It's a patient he's treated

21    for seven years.

22              THE COURT:  That still doesn't negate the

23    requirement.

24              MR. FERGUSON:  That means he knows the

25    person's history.

```
 1                 THE COURT:  Well, he's taking -- to going
 2     into that program, or whatever that is, that repository
 3     of other potential medications that this person, whoever
 4     that person is, I'm not asking who it is or, you know,
 5     the relationship he had with that person, but if that
 6     individual is also going to another physician and getting
 7     something else that with a combination is dangerous, then
 8     that's --
 9                 MR. FERGUSON:  But it's not --
10                 THE COURT:  -- that's problematic to me.
11                 MR. FERGUSON:  But it's not illegal.
12     That's the problem.  What the government is trying to
13     allege is that somehow it's illegal.  If, if, and we
14     don't know yet, but if, it's not illegal.  It's not a
15     crime.
16                 THE COURT:  Could be negligence.
17                 MR. FERGUSON:  In fact, Your Honor, from
18     the CSMD, from the website itself, it says, reading --
19     pass me...
20                 (ATTORNEY/ATTORNEY CONFERENCE.)
21                 MR. FERGUSON:  Yeah.  Doesn't even -- it
22     says, the -- it's not mandatory -- you may know the
23     patient's status, but is encouraged to ensure his --
24                 THE COURT:  Hold on.  Slow down.
25                 THE COURT REPORTER:  Come up here.
```

REDACTED TRANSCRIPT

1              THE COURT:  Come up here to the podium and

2    speak into that so we can hear what you are saying.

3              MR. FERGUSON:  Reading the clinical notes

4    of patients is not mandatory -- this is talking about the

5    CSMD -- since you may know the patient's status, which is

6    what we have here, but is encouraged to ensure these

7    particularly adverse patients are reviewed for potential

8    risk, especially if they have not visited your practice

9    recently, which is what we don't have here.

10             There is not any prescribed action on your

11   part.  These notifications are informational in nature

12   and the prescription data may need to be investigated

13   further to justify any actions.

14             That's from the CSMD's own clinical

15   notification response to Mr. Young.

16             MR. PENNEBAKER:  Your Honor, I would also

17   note, because this sounds -- it's just -- I think the

18   indictment speaks for what -- this patient that Mr. Young

19   has known for seven years.  Okay.  That's back into the

20   Rock Doc era.  Right?

21             So this patient was being treated by the

22   Rock Doc when he was sexing it up and all the things that

23   the Court heard about and, you know, was cultivating this

24   image and everything else.

25             This person is a -- if I'm thinking of the

1   right person, this person is an addict who would be on

2   Suboxone, which is a drug for the treatment of

3   addictions.  And then would drop off of Suboxone.  And go

4   in to see his buddy Jeff.  And would get prescribed a

5   litany of powerful narcotics.  Then he would go back on

6   Suboxone, and back and forth.

7              And then the -- now it's that he's got a

8   long term relationship with this patient.  And by the

9   way, the other thing that just defies reasons is, why is

10  Jeff Young, a nurse practitioner with no psychological

11  specialization, no psychology, no psychiatry

12  specialization, why is he prescribing benzodiazepines?

13  That's the number one drug that he wrote.  Part of the

14  holy trinity.  Why is he doing that?

15             Why did the board allow him to keep that

16  privilege?  Because that is not just, hey, the government

17  has approached Jeff Young on the street and said, I don't

18  like that you're prescribing this guy that's also getting

19  Suboxone from a doctor, or an opiate -- even if I've got

20  the wrong patient.  That is not what this is.

21             This is a Jeff Young, the indicted drug

22  dealer, among other things, for doling out the trinity in

23  ways that harmed pregnant mothers, harmed the city of

24  Jackson.  It's abysmally, abysmally, as the evidence at

25  trial is going to show, just reckless and -- his practice

1    was a drug dealer.  He partied with his patients.  This

2    is man who has shown --

3                    THE COURT:  Okay.

4                    MR. PENNEBAKER:  -- demonstrated that he

5    can't --

6                    THE COURT:  I'm sure I'll hear that at

7    trial.  I'm sure I'll hear that at trial.

8                    MR. FERGUSON:  Here's the problem again

9    with what the government says.  They haven't read the

10   label on Hydrocodone.  They keep saying he prescribed it

11   to pregnant women.

12                   He's, in fact, indicted for -- prescribing

13   it to pregnant women.  And it's perfectly legal to do it.

14   In fact, the black box label on the drug says, if you

15   have to prescribe it to pregnant women, be aware of the

16   fetal withdrawal syndrome.  And get with the OB-GYNs and

17   have them prepared and ready for it if that is necessary.

18                   It's best not to prescribe it.  But if you

19   have to, here's the risk.  You eliminate it.  You

20   mitigate it by getting a high risk OB on board.  And then

21   it's perfectly fine.

22                   There is nothing in the law that says it

23   is illegal to prescribe drugs to pregnant women.

24                   Now the other thing is, the patient we're

25   talking about is a COPD patient.

1          However, I would say to the Court, if the

2    Court is concerned about this one patient, the simplest

3    way to handle it is that Mr. Young won't have any further

4    contact with him until after the 20th.  If that's what

5    the concern is, the four prescriptions he's written in --

6              (ATTORNEY/CLIENT CONFERENCE.)

7              MR. FERGUSON:  And, of course, our

8    psychiatry specialist is here to testify as to the reason

9    why he's prescribing these medications, be part of our

10   proof.

11         So again, the government doesn't have the

12   full picture of what is going on because that weren't

13   inside his practice.

14             THE COURT:  What about restricting him on

15   this individual that you indicated is a drug addict?

16             MR. PENNEBAKER:  Your Honor, I just --

17             THE COURT:  I'm asking you, sir.  What

18   about that?

19             MR. PENNEBAKER:  I mean, I don't think --

20   I think that would be woefully inadequate the protect the

21   public.  If his practice is mostly cosmetic, as he claims

22   now, why does he need to be prescribing benzodiazepines,

23   that's part of the trinity, to patients at all?

24         I don't understand that.  I don't think

25   it's safe.

155

1            MR. FERGUSON:  Even prescribing the

2    trinity is not illegal.  It's highly frowned upon, but

3    not illegal.  And he's not doing it.  That's what our --

4    he's not doing it.

5            They keep saying he's prescribing a part

6    of.  He's not prescribing the trinity.

7            THE COURT:  Well --

8            MR. PENNEBAKER:  It's not --

9            THE COURT:  Well, it's done in conjunction

10   with somebody else prescribing the other parts of it, it

11   becomes a problem.

12           MR. FERGUSON:  And that would be proof

13   that we haven't seen yet.  And I don't believe that is

14   the proof.

15           THE COURT:  All right.  What I'm going to

16   do is I'm going to restrict him on that person that we

17   were talking about.  So he knows that.  Nothing between

18   now and next Monday.

19           MR. FERGUSON:  All right.  We'll let the

20   patient know in case he needs...

21           THE COURT:  And, and if I hear of any

22   indication from the government or anyone else that he's

23   doing anything in contrary to that or that he's

24   prescribing things that don't need to be, he'll be locked

25   up.

REDACTED TRANSCRIPT

1          MR. FERGUSON:  Absolutely.  And we would

2   expect no less.

3          THE COURT:  As well, I don't want to be

4   having him or any of his —— he can tell all his folks, no

5   contact with any of these people that we've been talking

6   about.  Because I'm not going to have any kind of

7   retaliation or any kind of indication of someone who is

8   going to try to put these people in fear of coming forth.

9          If I hear of anything again about that,

10  that's going to be another issue we're going to take up.

11         MR. FERGUSON:  Your Honor, you will not

12  hear of anything from us.  I do notice there were members

13  of the press here.  And unfortunately this always gets

14  written up.  And that will start the Topics, which is a

15  website here in town.

16         We will not have anything to do with it,

17  will not be on it, will be posting nothing on social

18  media, will be a full black out.

19         THE COURT:  None whatsoever.

20         MR. FERGUSON:  And that includes not

21  advertising the business until after the 20th.  Not on

22  line ——

23         (ATTORNEY/CLIENT CONFERENCE.)

24         THE COURT:  Stay off line.  Just stay off

25  line.

1            MR. FERGUSON:  I would be more comfortable

2   with that.  And I will explain to Mr. Young why.  I just

3   don't want that to be a source of contention between us

4   and the --

5            THE COURT:  All right.  Otherwise, we'll

6   be in adjournment.  And we will be back at 9:00 on the

7   20th.  Is that right, the 20th?

8            THE CLERK:  Yes, sir.

9            THE COURT:  We will be back in session

10  then.  We will be in adjournment, please.

11            (End of Proceedings.)

12            (End of Requested Material.)

13

14

15

16

17

18

19

20

21

22

23

24

25

158

1            I, Kristi Heasley, do hereby certify that the

2      foregoing 157 pages are, to the best of my knowledge,

3      skill and ability, a true and accurate redacted

4      transcript from my stenotype notes in the matter of:

5      UNITED STATES OF AMERICA

6                                          )

       VS                                  )NO.1:19-cr-10040

7                                          )JACKSON, TENNESSEE
                                           )
8      JEFFREY YOUNG                       )

9

10           Dated this 6th day of August, 2019.

11

12

13

14     _____
       Kristi Heasley, RPR
15     Official Court Reporter
       United States District Court
16     Western District of Tennessee
       Eastern Division
17

18

19

20

21

22

23

24

25

                          REDACTED TRANSCRIPT