IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION
_____

UNITED STATES OF AMERICA,
          Plaintiff,

 V.                              No. 1:19-cr-10040-JDB


JEFFREY W. YOUNG, JR.,
          Defendant.
_____



**MOTION HEARING**

**BEFORE THE HONORABLE J. DANIEL BREEN**

**MAY 20, 2019**


CATHY BEST, RPR
Official Court Reporter
167 North Main Street, Suite 242
Memphis, Tennessee 38103

REDACTED TRANSCRIPT

**APPEARANCES**

For the Plaintiff:

ANDREW PENNEBAKER, ESQ.
JASON KNUTSON, ESQ.
U.S. Department of Justice, Fraud Section
1400 New York Avenue NW
Washington, DC 20530


JAMES W. POWELL, ESQ.
U.S. Attorney's Office
109 South Highland Avenue, Suite 300
Jackson, Tennessee 38301




For the Defendant:


CLAIBORNE H. FERGUSON, ESQ.
The Claiborne Ferguson Law Firm, P.A.
294 Washington Avenue
Memphis, Tennessee 38103

REDACTED TRANSCRIPT

1                              **INDEX**

2    **WITNESS:**                                        **PAGE**

3    **SHIRLEY PICKERING**

4    Cross-Examination
     By Mr. Ferguson ----------------------- 7

5
     Redirect Examination
6    By Mr. Pennebaker --------------------- 98

7    **JOHN CHEW**

8    Direct Examination
     By Mr. Knutson ---------------------- 111

9
     Cross-Examination
10   By Mr. Ferguson --------------------- 158

11   Redirect Examination
     By Mr. Knutson ---------------------- 167

12
     Recross-Examination
13   By Mr. Ferguson --------------------- 172

14   **BARRY COOPER**

15   Direct Examination
     By Mr. Knutson ---------------------- 174

16
     Cross-Examination
17   By Mr. Ferguson --------------------- 191

18   **NATALIE SEABOLT**

19   Direct Examination
     By Mr. Pennebaker ------------------- 199

20
     Cross-Examination
21   By Mr. Ferguson --------------------- 237

22

23

24

25

1
                           **INDEX CONTINUED**

2
    **WITNESS:**                                                      **PAGE**

3

4
    **KARLA WRIGHT**

5
    Direct Examination
    By Mr. Ferguson ---------------------- 256

6
    Cross-Examination
    By Mr. Pennebaker -------------------- 271

7
    **NANCY PLUNK**

8

9
    Direct Examination
    By Mr. Ferguson ---------------------- 288

10
    Cross-Examination
    By Mr. Knutson ----------------------- 295

11

12
    Redirect Examination
    By Mr. Ferguson ---------------------- 305

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **EXHIBITS**

2      **NO.**   **DESCRIPTION**                **MARKED/ADMITTED**

3       1     White binder                      109
              (Sealed)
4
       2-24  Black binder                       209
5             (Sealed)

6       25    White binder                      315
              (Sealed)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          BE IT REMEMBERED that the above-captioned

2    cause came on for hearing this, the 20th day of May,

3    2019, at 9:16 a.m., in the above court, before the

4    Honorable J. Daniel Breen, presiding, when and where the

5    following proceedings were had, to wit:

6               (Defendant Young is present.)

7          **THE COURT:**  All right.  We are continuing the

8    matter of *U.S. v. Jeffrey Young*, the government's request

9    to reverse the ruling of Judge Thorpe.  I believe, the

10   government had concluded its direct examination.  I

11   think, Mr. Ferguson was going to cross.

12          Is that right, Mr. Ferguson?

13          **MR. FERGUSON:**  I believe, that's where we are,

14   Your Honor.

15          **THE COURT:**  All right.  Where is our witness?

16          If you'll come around, please, ma'am.  You're

17   still under oath.  Take the stand and respond to

18   Mr. Ferguson's questions.

19

20

21

22

23

24

25

REDACTED TRANSCRIPT

1                     **SHIRLEY PICKERING,**

2          having been previously duly sworn, was examined

3          and testified as follows:

4               **THE COURT:**  You may proceed, sir, as soon as

5     she gets on the stand.

6               **MR. FERGUSON:**  Yes, Your Honor.  Thank you.

7                         **CROSS-EXAMINATION**

8     **BY MR. FERGUSON:**

9     Q.    For the record, would you state your name again,

10    please.

11    A.    Shirley Pickering.

12    Q.    And, Ms. Pickering, who do you work for?

13    A.    I work for the State of Tennessee, Office of

14    Investigations for the Health Related Boards.

15              **THE COURT:**  Mr. Ferguson, our speaker system

16    doesn't always act like it ought to.  You've got a soft

17    voice.  I'm going to have to ask you to speak up.  Let's

18    use our outside voice, please, if you would so that I can

19    hear you, the court reporter can, and obviously the

20    witness.

21              **MR. FERGUSON:**  Absolutely.  Thank you, Your

22    Honor.  I was actually trying to speak quiet because I

23    can hear it better than you can.

24              **THE COURT:**  Well, I apologize.  It's just...

25              **MR. FERGUSON:**  No, sir, I appreciate the

1    feedback.  It always helps me.

2              **THE COURT:**  Yes, sir.

3    **BY MR. FERGUSON:**

4    Q.    All right.  Ms. Pickering, do you have the big

5    folder you had last time.

6    A.    No, I do not.

7              **MR. FERGUSON:**  Do we have that for her?

8              **MR. PENNEBAKER:**  It should be coming over on a

9    cart shortly.

10             **MR. FERGUSON:**  Do you have yours, Your Honor?

11             **THE COURT:**  Yes, sir.

12             **MR. FERGUSON:**  I want you to have yours.

13   **BY MR. FERGUSON:**

14   Q.    I'm going to try -- until the cart gets here, I'm

15   going to try to do the best I can.

16   A.    Okay.

17   Q.    If you need to see something, will you let me know,

18   and I'll bring the binder over to you?

19   A.    Yes.

20   Q.    I don't want you to feel like I'm being unfair to

21   you.  It's important that you have this.  So, again, if

22   you need anything or want to look at anything, please,

23   let me know.

24   A.    Okay.  I will.

25   Q.    In fact, if I need to come over there, we can just

REDACTED TRANSCRIPT

1    look at it together, but I'm going to try to stand here

2    as long as I can.  Okay?

3    A.    Okay.

4    Q.    All right.  The binder I'm talking about, it's that

5    big book that had like A through Z in the tabs.  Do you

6    remember that book?

7    A.    Yes.

8    Q.    Did you assist in participating in the preparation

9    of that exhibit?

10   A.    No, that was given to me.

11   Q.    Was it given to you prior to your testimony?

12   A.    No, the day of the testimony.

13   Q.    All right.  But you did have a chance to look over

14   it as you testified?

15   A.    Yes, sir.

16   Q.    And the majority of the information that was in

17   there was either prepared by you or you had reviewed in

18   previous cases or previous times?

19   A.    Some of the information I had.  There was some that

20   I had not.

21   Q.    Okay.  I think that's the real important part.  If

22   I start to talk to you about something you hadn't seen

23   before until that day, will you let me know so I can make

24   sure we give you time to review it?

25   A.    Yes.

REDACTED TRANSCRIPT

1    Q.    All right.  Just going through it, the Court has

2    his copy -- a copy of it and it's tabbed.  The first part

3    the government was asking you about under tab A was a

4    letter of concern dated June 23, 2015, and it was

5    involving alcohol during work hours.  Do you remember

6    testifying as to that?

7    A.    I believe I -- I'm not sure I remember that

8    specific document.  I do remember discussing that last

9    Monday.

10             **THE COURT:**  Mr. Ferguson, just so we can speed

11   this up a little bit, this is not ordinary, but I'm going

12   to let you put it on that screen, and that way she can

13   see it.  I assume the government doesn't have any

14   objection to that.

15             **MR. PENNEBAKER:**  No, Your Honor.

16             **THE COURT:**  That way you'll have it.  Turn it

17   where she can see it.  There you go.

18             Can you see that, ma'am?

19             **THE WITNESS:**  Yes, sir.

20             **THE COURT:**  You did for a minute.  There we

21   go.

22             **MR. FERGUSON:**  I am going to do that.  There

23   we go.

24             **THE WITNESS:**  Yes, sir.

25             **MR. FERGUSON:**  All right.

1   **BY MR. FERGUSON:**

2   Q.    All right.  Letter of concern.  Down there at the

3   bottom where it's highlighted it says -- and I'm going to

4   do this real quick to mark it in red.  The screen that

5   you're looking at is active.  I may touch it.  And if I

6   do, it's accidental.  I'm going to try not to touch it

7   because it will write on it.  It says, "This is not a

8   formal disciplinary action.  No record will appear in

9   your licensed file."  Is that correct?

10  A.    Yes.

11  Q.    So basically back June 23, 2015, the Board of

12  Nursing took no action other than to send a letter of

13  concern to Mr. Young; is that correct?

14  A.    They did send a letter of concern to Mr. Young.

15  Q.    All right.  And, again, it was an anonymous

16  complaint; is that correct?

17  A.    That's what it says.

18  Q.    Again, the complainant information: not available.

19  Correct?

20  A.    That's what it says, yes, sir.

21  Q.    This is your document, is it not?

22  A.    That's my signature on the front page, yes, sir.

23          **THE COURT:**  Sorry.  Are you referring to the

24  next page beyond --

25          **MR. FERGUSON:**  I'm still on Exhibit A on the

1   third page of that exhibit.

2   **BY MR. FERGUSON:**

3   Q.   So it's your signature on the document?  It's your

4   document?

5   A.   That's the investigator's signature.

6   Q.   All right.  Interestingly enough, what we find when

7   we look on page 2 of 27, it appears that the source of

8   the allegations --

9          **THE COURT:**  Pull that down.

10          **MR. FERGUSON:**  Sorry, Judge.  Thank you.

11  **BY MR. FERGUSON:**

12  Q.   This is going to be difficult to read.  This

13  anonymous source, the same photographs and list were

14  provided to S. Maclin, which is a BIV investigator --

15  what does "BIV" mean?

16  A.   Board of Investigations.

17  Q.   -- by R. Fuller, sister of John Briley.  Who is

18  John Briley?

19  A.   He is a healthcare provider in Jackson.

20  Q.   Through the course of your time with these

21  investigations, you've come to know that John Michael

22  Briley and Jeff Young had a, shall we say, contentious

23  relationship with each other?

24  A.   That has been alleged, yes, sir.

25  Q.   In fact, at some point Mr. Young was running

1    Mr. Briley's practice as he was either going through drug

2    treatment or being prosecuted in federal court here in

3    Jackson?

4    A.    I understand that Mr. Young was filling in for

5    Mr. Briley in his absence.  As to the reason for that, I

6    don't know the exact time frame of all that.

7    Q.    You don't know what his absence was for?

8    A.    During some of it, yes.  But for me to be able to

9    say the entire time frame, I would have to know those

10   dates, and I don't have those dates.

11   Q.    You know that part of his absence was due to drug

12   treatment?

13   A.    I believe that part of it was.  But again, I don't

14   have those dates in front of me.  So...

15   Q.    I'm not worried about the dates.  I'm worried about

16   the reason.

17   A.    Again, for me to say some reasons, I'm going to

18   have to know was that the time frame he was gone for

19   certain things.

20   Q.    And you also are aware he was prosecuted federally?

21   A.    I'm aware of that, yes.

22   Q.    Now, these allegations came in from the sister of

23   John Briley -- that's probably spelled right -- except

24   for the fact it says, basically, when you read through it

25   she just found this folder, this list on her desk that

1    had all these allegations on it, and she has absolutely

2    no idea where these allegations came from; is that

3    correct?

4    A.    I would have to have a moment to read it, please.

5    Q.    Sure.  Starting about right here (indicating).

6    A.    It says:  During the interview she did deny direct

7    knowledge of the allegations but that she found a list on

8    her desk of concerns.

9    Q.    And she just found it on her desk one day?

10   A.    That's what it says, yes.

11   Q.    It says that because you wrote that, correct?

12   A.    Well, then, we need to go to my interview.

13   Q.    I know.  We'll get there.  But this is your

14   document, correct?

15   A.    This is my document.  It says she denied direct

16   knowledge and confirmed that she had not begun her

17   employment until after J. Young had ceased working at

18   Primary Care Specialists.

19   Q.    This is your document, correct?

20   A.    This is my report.

21   Q.    And it's based on your interviews with these

22   people?

23   A.    Yes.

24   Q.    And as you've already testified, your job is not to

25   decide whether someone is telling the truth or not.  It's

1   just to gather their statements?

2   A.    My job is to gather data.

3   Q.    In this incident -- this is what we like to refer

4   to as the "limousine" complaint.  This is the one where

5   somebody told somebody else that told somebody else that

6   Joel Presson was saying that there were drugs in the

7   limousine that Jeff was in, driving to a Grizzlies game

8   in Memphis, more or less; is that correct?

9   A.    The allegation was that there were drugs in the

10  limousine.

11  Q.    That Jeff Young was in?

12  A.    Yes.

13  Q.    That was being driven to Memphis?

14  A.    Yes.

15  Q.    Now, as part of your investigation, pretty much

16  everybody but -- M. Maness, M-A-N-E-S-S, is the only

17  person that you found that reported any smoking of

18  marijuana in the limousine; is that correct?

19  A.    I believe, to the best of my knowledge, yes.

20  Q.    The other 13 people, including a Tennessee Highway

21  Patrol officer, that were in the limo denied any illegal

22  drugs in the vehicle?

23  A.    That's correct.

24  Q.    They all indicated that there was alcohol in the

25  vehicle?

CROSS - SHIRLEY PICKERING                                    16

1   A.    I remember that they said there were drugs in the

2   vehicle, but I don't recall specifically the alcohol.  I

3   would need to review this.

4   Q.    They also said that the -- the claim itself was

5   that bags of drugs were being passed around?

6   A.    I believe that that was part of the allegation.

7   Q.    And nobody verified that complaint, did they?

8   A.    To my knowledge, they did not.

9   Q.    Including M. Maness; is that correct?

10  A.    I believe so.

11  Q.    Mr. Young denied the use of any illegal substances?

12  A.    Correct.

13  Q.    Denied the illegal or abuse of any prescription

14  drugs?

15  A.    Correct.

16  Q.    And, in fact, when they were talking about a photo

17  that was circulating on the Internet that was alleged to

18  be a marijuana cigarette, he denied it was marijuana and

19  thought it had been placed on the Internet by his

20  soon-to-be ex-wife; is that correct?

21          **THE COURT:**  Excuse me.  When you're saying

22  "he," are you referring to Mr. Young?

23          **MR. FERGUSON:**  Yes, Your Honor.

24          **THE COURT:**  Please refer to the names so we'll

25  be clear who we're talking about.

REDACTED TRANSCRIPT

1              **MR. FERGUSON:**  Yes, Your Honor.

2              **THE COURT:**  Thank you.

3      A.    He denied he was smoking marijuana, and he thought

4      the photo had been sent by his soon-to-be ex-wife.

5      **BY MR. FERGUSON:**

6      Q.    So this is sometime around March 2015.  Mr. Young

7      at this point is beginning to go through a divorce; is

8      that correct?

9      A.    He said he thought it'd been sent by his soon-to-be

10     ex-wife.  As to his divorce status, I can't say.  I don't

11     know that.  I just know that he said it was his

12     soon-to-be ex-wife.

13     Q.    You know his ex-wife, right?

14     A.    I'm assuming that, yes, I believe --

15     Q.    Dawn Young.  Were you --

16     A.    Yes, I know that's his ex, Dawn Young, yes.

17     Q.    You've spoken to her?

18     A.    Yes, sir.

19     Q.    You've emailed her?

20     A.    Yes, sir.

21     Q.    And you've received emails from her?

22     A.    Yes.

23     Q.    She emails you information for you to investigate?

24     A.    Among other sources, yes, sir.

25     Q.    Now, part of what your testimony was the last time

1    you were testifying was that Mr. Young was making threats

2    to people?

3    A.    Yes.

4    Q.    Now, when you talk about threats, you're talking

5    about that Mr. Young was notifying XXXXXXXXX and others,

6    who we'll get to them, that he would pursue lawsuits

7    against them if they continued to post defamatory remarks

8    on social media; is that correct?

9    A.    In questioning him as to whether there were any

10   threats of physical violence, he did say that they would

11   pursue a lawsuit against XXXXXXXXX if she continued to

12   post defamatory remarks against Mr. Young.

13   Q.    Okay.  During the course of this investigation, you

14   received a copy of a negative toxicology report as to

15   Mr. Young; is that correct?

16   A.    It says a certified copy of a negative toxicology

17   report, J. Young, was provided by J. Young via H. Goslee

18   from PreventaGenix.

19   Q.    Is that a "yes" or a "no"?

20   A.    It said it's a negative toxicology report.

21   Q.    The question is did you receive a copy of a

22   negative toxicology report.  Was it "yes" or "no"?

23   A.    Yes.

24   Q.    There was allegations of alcohol while on duty.  He

25   denied that.  He discussed with you the fact that alcohol

1   was at the office for after-hour entertaining of drug

2   reps and other people that he would have over to his

3   office; is that correct?

4   A.   At that time, yes.

5   Q.   Did that change at some other time?

6   A.   I believe that he did report that alcohol was

7   served at Botox parties that were at the clinic, that

8   patients were not served the alcohol until after they had

9   signed a release for a -- where they had been provided

10  with the information about the Botox, a consent.

11  Q.   Are you familiar with the idea of Botox parties?

12  A.   Just vaguely, yes.

13  Q.   You are aware that alcohol is routinely served at

14  Botox parties?

15  A.   I've not been to Botox parties, so I can't tell you

16  whether it is or it's not.

17  Q.   Hopefully here in a little bit, if I can get the

18  computer to work, I'll show you some fliers of Botox

19  parties, and we can discuss whether or not it's common

20  for alcohol to be served at these.

21       Is it your testimony right now that you have no

22  idea whether or not alcohol is routinely served at Botox

23  parties?

24  A.   I do not know whether it is or is not.  I was only

25  assigned this case, not routinely Botox parties.

REDACTED TRANSCRIPT

1    Q.    Have you ever investigated a Botox party?

2    A.    To my knowledge, this is the only one that I've

3    looked at.

4    Q.    So you would have no basis in your background or

5    training as to what is normal at a Botox party?

6    A.    My investigation was not what was normal at a Botox

7    party.  It was whether alcohol was served.

8    Q.    Not in your investigation.  I'm talking about your

9    training.

10   A.    Again --

11   Q.    Your training.

12   A.    No, I do not know whether it is routinely served.

13   My investigation was this specific.

14   Q.    The question was asked or a story was told by you

15   last time about somebody lying on the floor, asleep.  It

16   appears to be XXXXXXXXXX -- excuse me, J.M. stated that

17   he was not sure of the date.  The exam was fine.  The

18   provider seemed fine.  And there wasn't anything illegal

19   going on.  Is that what you were told by XXXXXXXXXX?

20   A.    That was a report in the interview, not a story.

21   Yes, XXXXXXXXXX did explain to me that he had been

22   waiting for the provider for 45 minutes to an hour.  If

23   you could, go back please.

24   Q.    Sure.  Yes, ma'am.

25   A.    That he walked out of the room and found a man

1   lying on the floor in the office where J. Briley was.

2   The man was asleep.  He could not provide me with the

3   man's name, just said it was the fellow who took over for

4   Briley when Briley was gone.  The nurse got the provider

5   to come in the exam room, and the provider was the same

6   person he had seen asleep.  He was not sure of the date

7   of the appointment.  That provider finished his exam.

8   The exam was fine.  The provider seemed fine.  And there

9   wasn't anything illegal --

10  Q.    -- going on.

11  A.    Yes.

12  Q.    This and several other of your investigations kept

13  circling back to certain allegations that the staff

14  and/or Mr. Young of PreventaGenix stole clients; is that

15  correct?

16  A.    I remember this one referring to that.

17  Q.    If you'll just give me a "yes" or "no," and I'll

18  let you go on and --

19  A.    Well, I can't say yes or no because this is the one

20  I was referred to.  I would need to look at my other

21  reports.  It's been some time since I did these.

22  Q.    I understand, ma'am.  This one specifically talks

23  about current and former staff of PreventaGenix,

24  previously employed at Primary Care Specialists,

25  recruiting patients?

1    A.    Yes, I see that.

2    Q.    Primary Care Specialists, that's John Michael

3    Briley's clinic; is that correct?

4    A.    Yes.

5    Q.    So all of this about them stealing clients is in

6    relation to John Michael Briley's office?

7    A.    Primary Care Specialists, yes, sir.

8    Q.    And that's one of the reasons why, based on your

9    investigation of this case, Dr. Briley doesn't like

10   Jeff?

11   A.    I can't --

12   Q.    Mr. Young.  I'm sorry.

13   A.    I can't say whether someone likes or dislikes

14   someone.

15   Q.    Do you like somebody who steals from you?

16   A.    Again, I can't speak for someone else.  I can say

17   this is in my report and this is the allegation, but I

18   can't speak for what they do or do not feel.

19   Q.    Would it be safe to say that Mr. Briley or someone

20   from Primary Care Specialists is making this complaint

21   about taking patients?

22   A.    I can only say that they denied having recruited

23   patients from Primary Care Specialists.

24   Q.    You're asking them about taking --

25   A.    I asked --

REDACTED TRANSCRIPT

1   Q.    Because somebody made that allegation?

2   A.    Someone made it, yes.

3   Q.    They denied removing medical reports from Primary

4   Care Specialists.  That was another allegation that was

5   made against --

6   A.    That was an allegation.  They did deny it.

7   Q.    And there was even an allegation that they stole

8   equipment?

9   A.    That was an allegation, and they did deny it.

10  Q.    And you found nothing to support it or verify it?

11  A.    I found nothing to support those allegations.

12  Q.    In fact, when you would start to interview people,

13  like this is L. Mayo, identified in the complaint as

14  having viewed medical records and supplies being moved

15  from Primary Care Specialists, he denied directly

16  witnessing this?

17  A.    Yes, he denied directly witnessing it.  He stated

18  records were seen in the back of M. Matthews' vehicle,

19  but he would not state that he directly viewed this.

20  Q.    Who is M. Matthews?

21  A.    I don't recall the first name.

22  Q.    Dr. Goodwin filed a complaint against Jeff Young,

23  alleging theft of the property from Primary Care

24  Specialists.  Who is Dr. Goodwin?

25  A.    I believe, Dr. Goodwin was listed at some point as

24

1    his supervising physician, to the best of my recall.

2    Q.    And also Mr. Briley's supervising physician?

3    A.    I don't recall specifically.  I'm sorry.  I would

4    need to look at that.

5    Q.    Would you say that he was connected to Primary Care

6    Specialists?

7    A.    In some way, yes, sir.

8    Q.    You understood -- well, actually, he filed a

9    complaint saying that property had been stolen?

10   A.    I did not investigate that complaint, but I do see

11   here where that complaint was investigated by a different

12   investigator.  So I can assume that was accurate.

13   Q.    But during the course of your investigation, all of

14   a sudden he lawyers up, his lawyer contacts you and says

15   Dr. Goodwin didn't have anything to do with that

16   allegation, doesn't know anything about the allegation,

17   and refused to speak to you; is that correct?

18   A.    He did not refuse to speak to me.  As you can see

19   it says that S. Maclin, BIV investigator, was notified by

20   Dr. Goodwin's attorney.  And it does say that Dr. Goodwin

21   did client interview by S. Maclin in reference to

22   complaint of a 20140 and 849.

23   Q.    And that he had no direct knowledge of theft of

24   property, copying or removing medical records?

25   A.    That's what it says in that complaint, yes.

REDACTED TRANSCRIPT

1   Q.    That's what his attorney told the investigator?

2   A.    That's what was in that complaint, yes, sir.

3   Q.    Did you ever determine why he went from at one

4   point making the complaint to all of the sudden having a

5   lawyer call to say that he had no personal knowledge?

6   A.    No, sir, that was a different complaint I

7   referenced.

8   Q.    Did you receive any information that he had been

9   told that he was slandering Dr. Young -- excuse me,

10  Mr. Young by making statements that were not true?

11  A.    Not to my recall, no, sir.  I just recall

12  referencing that complaint.

13  Q.    Do you know why he had to get an attorney to have

14  that conversation with the Board investigator?

15  A.    No, I do not.

16  Q.    Witnesses from Primary Care Specialists and

17  PreventaGenix allege slander/misconduct/harassment on the

18  part of each of those other clinics against -- one of the

19  clinics against the other.  Copies of Webmail

20  pages/documentation was provided by staff of both

21  clinics.  These two clinics were going back and forth

22  alleging slander to each other?

23  A.    Both clinics were, yes, sir.

24  Q.    And misconduct?

25  A.    Yes, sir.

REDACTED TRANSCRIPT

1    Q.    And you investigated some of the misconduct of

2    John Michael Briley?  For example, the use of his stamped

3    name during times in which he was not in the office

4    because he had stepped away from the office, his staff

5    using stamps on his name?  We'll get to it.

6    A.    Okay.  I don't want to say without actually looking

7    at it.  This has been a while back.

8    Q.    I could tell by the look on your face you were

9    trying to be nice and answer my question but didn't want

10   to.  I appreciate that.  I don't want to put you in that

11   position.

12         So in 2015 Mr. Young reports to you that the

13   allegations and complaints were harassment, not by the

14   state, meaning you and the Board of Nursing, but by the

15   complainants, the Brileys.  J. Young asked the Board be

16   notified that the repeated and unfounded complaints and

17   allegations were frustrating and upsetting his staff,

18   disrupting patient care.  He stated his staff were not

19   sleeping, were sick due to the complaints and the

20   investigations, complaints and investigations were

21   negatively affecting staff morale, and the

22   complaints/investigations negatively impacted patient

23   care.  Mr. Young provided a copy of cease and desist

24   letters as well as Facebook posts.  Is that correct?

25   A.    Yes.

1    Q.    Sergeant Wayne Jackson, this is the Tennessee

2    Highway Patrol officer who was in the limousine; is that

3    correct?

4    A.    Correct.

5            **THE COURT:**  Excuse me, Mr. Ferguson.  Give me

6    an idea where you are reading from.

7            **MR. FERGUSON:**  I am, Judge, I'm sorry, at ten

8    of 27.  I apologize.

9            **THE COURT:**  Ten of 27.  Sorry to interrupt.

10           **MR. FERGUSON:**  No, no, sir.  That's my fault.

11   I shouldn't have done it.

12   **BY MR. FERGUSON:**

13   Q.    Sergeant Wayne Jackson, this is the Tennessee

14   Highway patrolman; is that correct?

15   A.    Yes, sir.  He was not in the -- excuse me.

16   Q.    I'm sorry, you were saying?

17   A.    Yes.

18   Q.    What?

19   A.    Yes, yes.

20   Q.    Yeah, he was in the vehicle?

21   A.    Yes, I'm double-checking on those names.

22   Q.    Sure.  And this is Ms. Goslee's husband; is that

23   correct?

24   A.    Yes, sir.

25   Q.    Heather Goslee, a PreventaGenix employee?

REDACTED TRANSCRIPT

1   A.    Yes, sir.

2   Q.    Now, information was sent to the Highway Patrol

3   regarding this alleged drugs in the car, and Sergeant

4   Jackson was investigated; is that correct?

5   A.    Yes.

6   Q.    Nothing became of that investigation, did it?

7   A.    Correct.

8   Q.    Page 11 of 27.  This starts with XXXXXXXXXXXXXX.

9   She's the one that got this investigation going.  She

10  reported it to the -- I think that she's the one that

11  reported it to the Tennessee Highway Patrol.

12       But more importantly, down here in this paragraph

13  you asked if Jeff Young had ever made threatening phone

14  calls to Primary Care Specialists.  She stated, well,

15  before Mike asked us to be nice, Mike was --

16            **THE COURT:**  Slow down.

17            **MR. FERGUSON:**  Sorry.

18  **BY MR. FERGUSON:**

19  Q.    "Mike" is John Michael Briley?

20  A.    That's my understanding, yes, sir.

21  Q.    Briley asked us to be nice.  Jeff said something on

22  Facebook about Mike, and I kind of said something back.

23  She kind of said something back, what?

24  A.    I don't believe that she gave specifics.  She just

25  said she said something back.

1    Q.    Did you ask?

2    A.    I don't recall if I did or not.  It would be in my

3    interview of her, and I don't see it.  So...

4    Q.    Would it be important to know what the kind of said

5    something back was?

6    A.    Once she said he did threaten her with a lawsuit,

7    that he did not threaten bodily harm -- that was the

8    concern, whether or not he did threaten bodily harm.  And

9    she said he did not threaten bodily harm.

10   Q.    He really didn't threaten her.  It says threatened

11   me with a lawsuit, not really threatening somebody.

12   You're saying if you continue to slander and commit

13   intentional torts, I'm going to exercise my right and

14   take you to court for that tortious act?

15   A.    It says there, "He threatened me with slander."

16   Q.    She called it threatening, right?

17   A.    "He threatened me with slander."

18   Q.    Whose words are those?

19   A.    Hers.  She did not specify what Mr. Young said on

20   Facebook or what she said on Facebook, only that there

21   was a back and forth.

22   Q.    She took it as a threat?

23   A.    She took it as a threat, yes.

24   Q.    A lawyer might take it as a statement or promise:

25   If you continue to commit tortious interference, I'm

1    going to exercise my legal right to take you to court.

2    Are you aware of that?

3    A.    That's what you're telling me.  I'm not an

4    attorney.  So that's what you're telling me, yes, sir.

5    Q.    Most important part in here, he was not threatening

6    her with any physical violence?

7    A.    Bodily harm.  That's what it says.

8    Q.    I'm going to go back real quick to 11 of 27.

9    XXXXXXXXXXXXX talks about the person telling somebody

10   else that there were drugs in the vehicle.  That person

11   that was supposed to be telling people there were drugs

12   in the car, that was Joel Preston?

13   A.    Presson.

14   Q.    Presson.  Is that correct?

15   A.    Correct.

16   Q.    And yet when you interviewed him, he said he didn't

17   see any drugs in the limo?

18   A.    Correct.

19   Q.    Again, back to -- we're on page 12 of 27.

20   Jason Goslee, the state trooper, absolutely no drugs

21   passed around the vehicle, didn't witness any passengers

22   in that vehicle using drugs.  He reported that it was his

23   perception that the complaints and allegations was

24   retaliatory action on the part of John Briley and the

25   Briley Clinic.  He reported that Rhea Fuller,

1    Dr. Briley's sister, on a regular basis posts on social

2    media defamatory remarks about Trooper Goslee's wife,

3    Heather Goslee, correct?

4    A.    Correct.

5    Q.    We've got Guinevere Rogers here.  No drugs in the

6    limo.  Correct?

7    A.    Correct.

8    Q.    Now, back to 12 of 27.  Jackie Wheeler, that's the

9    office manager for Primary Care Specialists.  She's the

10   one who was telling you that Mr. Presson told

11   XXXXXXXXX --

12              **THE COURT:**  Mr. Ferguson?

13              **MR. FERGUSON:**  I did something.  I'm sorry.

14              **THE COURT:**  I understand we're going through a

15   lot of documents.  As opposed to testifying, if you

16   would, just ask a question.

17              **MR. FERGUSON:**  Sure.

18              **THE COURT:**  Both sides have been doing that.

19   And, frankly, we don't need that.  We got this witness up

20   here.  Let her respond to the questions as opposed to

21   comments or statements about what each attorney believes

22   or thinks.  Ask a question.

23   **BY MR. FERGUSON:**

24   Q.    XXXXXXXXX told what?

25   A.    XXXXXXXXX reported she told Ms. Wheeler that

                          REDACTED TRANSCRIPT

1   Mr. Presson told XXXXXXXXX that during the limousine

2   ride, Mr. Young pulled out a bag of dope and started

3   passing it around.

4   Q.    And Mr. Presson said what?

5   A.    That he did not see that.

6   Q.    Ms. Wheeler, when being asked about items attached

7   to the letter that she sent to the highway patrol, pulled

8   what out of the file cabinet?

9   A.    Documents from a filing cabinet and referred to

10  them during my questioning.

11  Q.    And you asked her had she personally made that list

12  of concerns and she said?

13  A.    No.

14  Q.    When you asked her if she knew who made out the

15  list, she said?

16  A.    She said no.

17  Q.    When you asked her how she obtained the list of

18  concerns, she said?

19  A.    I don't know.  It was on my desk.  I don't know if

20  it was dictated or written.  I did not write it.

21  Q.    Have you ever seen a photo or the original of the

22  file that was found at the Briley's office that was

23  labeled "Evil Jeff"?

24  A.    I don't recall something sent to me labeled "Evil

25  Jeff."

1    Q.    Did this folder -- did you see it when you were

2    talking to her about it?

3    A.    I don't recall reviewing that folder as we were

4    talking about it.

5    Q.    So you're not aware if this folder is the one that

6    was labeled "Evil Jeff"?

7    A.    No, sir, I'm sorry I don't.

8    Q.    Do you have any reason to know why there was a

9    folder of complaints at Dr. Briley's office about Jeff?

10   A.    No.

11   Q.    Were you ever able to determine who was putting

12   together this folder of complaints against Jeff?

13   A.    I am not aware.  I don't have direct knowledge of

14   that folder or who was putting it together.  If it was

15   something that was sent to us anonymously, I'm not aware

16   that that would have been that same folder.  Do you

17   understand what I'm saying?  I didn't see the folder that

18   day, so I don't know if those documents would have been

19   the same.

20   Q.    Ms. Wheeler is friends with who on Facebook?

21   A.    Ms. Wheeler stated Jeff Young's ex-wife is posting

22   photos on Facebook showing him smoking pot outside a

23   cathedral.  She's my friend on Facebook.

24   Q.    So Ms. Wheeler is friends with Dawn Young on

25   Facebook; is that correct?

1    A.    She appears as someone that's friended on Facebook

2    where they can read one another's posts.

3    Q.    And send information back and forth to each other?

4    A.    That's my understanding, yes, sir.

5    Q.    Of course, your investigation, Jeff Young's

6    ex-wife, you were told said what?

7    A.    Where is that?

8    Q.    Right here.  Thank you.

9    A.    Ms. Wheeler stated his ex-wife said that he told

10   her he would be owning what Briley had owned one day

11   soon.

12   Q.    Okay.  So do you know if that was a statement that

13   Mr. Young actually made?

14   A.    No, sir, I'm just saying Ms. Wheeler stated this.

15   I did not hear the statement.

16   Q.    Could you say that that's just something that

17   Dawn Young was saying to either Ms. Wheeler or to

18   Mr. Briley to kind of rile them up?

19   A.    I can't say that one way or the other, no, sir.

20   Q.    I think there was some testimony previous about

21   individuals not riding back in the limo from Memphis

22   after the Grizzlies game.  You were told the reason why

23   "we" did not ride back was what?

24   A.    Because Alicia and Joel had to go to work the next

25   morning and it was getting late.

CROSS - SHIRLEY PICKERING                                    35

1   Q.   And those folks denied or some of those denied that

2   there were drugs present or passed around in the limo as

3   well; is that correct?

4   A.   Ms. Farrar denied there were any drugs present or

5   passed around on the way to the Grizzlies game.

6   Q.   In your interview with Alicia -- Farrar maybe?

7   F-A-R-R-A-R.  She worked for who?

8   A.   PreventaGenix.

9   Q.   That means with Jeff Young; is that correct?

10  A.   Yes, sir.

11  Q.   She reported that she and who had a bad breakup?

12  A.   Joel Presson.

13  Q.   The person who at some point was supposedly the

14  person saying there were drugs in the vehicle that

15  ultimately denied making that statement; is that correct?

16  A.   Yes, sir, I believe that was the individual.

17  Q.   Again, Jessica Parker said what?

18  A.   Ms. Parker denied that a bag of dope was passed

19  around in that limousine.

20  Q.   Cortina Seward?

21  A.   She denied also that there were drugs in the

22  limousine.

23  Q.   Jay Seward?

24  A.   He did not see any drugs in the limousine.

25  Q.   Taylor Harris?

REDACTED TRANSCRIPT

1    A.    Never saw a bag of drugs in the limousine.

2    Q.    Now, Misty Maness, M-A-N-E-S-S, what happened with

3    her employment at PreventaGenix?

4    A.    It's my understanding she had been terminated.

5    Q.    And yet she out of all these people is the only one

6    who indicated to you what?

7    A.    She stated that she saw Jeff Young smoke marijuana

8    in the limousine on the way back from the game.

9    Q.    And about 13 folks who said nothing was going on

10   and that one who said there was smoking in the back, that

11   was a fired employee; is that correct?

12   A.    It was an employee that had been terminated, yes,

13   sir.

14   Q.    And she had concerns about even making that

15   statement?

16   A.    She stated:  They will think I called because I

17   don't work there anymore.

18   Q.    She actually called you.  It says, I think, "I

19   called."  Did she call you?

20   A.    If you will, flip back.  I don't recall.

21   Q.    Well --

22   A.    It was my understanding that I had called her.

23   Q.    Yeah, probably so because it says "I interviewed."

24   A.    Yeah, it's my understanding I called her.

25   Q.    That's the way you would have written it --

1   A.    Yes, sir.

2   Q.    -- when you call somebody?

3   A.    Yes, sir.

4   Q.    If they had called you, you would say?

5   A.    "I was contacted by."

6   Q.    All right.  I understand.  Thank you for that.

7         So not only -- on page 22 of 27, Dr. Stephen

8   Goodwin, not only did he have his attorney to contact you

9   and say that he had absolutely no first-hand knowledge of

10  theft, copying or removal of medical records, his

11  attorney what?

12  A.    Declined an interview.

13  Q.    His attorney would not let you speak to

14  Dr. Goodwin, would he?

15  A.    He declined an interview.  And this was to

16  Ms. Maclin in relation to that complaint 20140 and 849.

17  So he declined an interview with Ms. Maclin.

18  Q.    Yes.  Ms. Maclin is the?

19  A.    She was the investigator for that complaint.

20  Q.    Mr. Young stated that this was what?

21  A.    A witch hunt.

22  Q.    And it was initiated by?

23  A.    Briley.

24  Q.    And some people are dead set on revenge and smear.

25  He had personally been what?

REDACTED TRANSCRIPT

CROSS - SHIRLEY PICKERING                                           38

1    A.    He says he has been personally threatened by his

2    ex-wife that she will call the state.

3    Q.    And she and who are in cahoots?

4    A.    He reported that she and Briley.

5    Q.    He indicated to you Ms. Maness was fired for what?

6    A.    Insubordination.

7    Q.    And, again, he verified that when he called

8    XXXXXXXXX he told her to do what?

9    A.    That he threatened her with legal action, that she

10   stop or he would sue her for defamation of character.

11   Q.    That was consistent with what you learned from her?

12   A.    Yes.

13   Q.    Moving on to "B."  Again, this is (indicating)?

14   A.    My signature.

15   Q.    The complainant?

16   A.    That would be anonymous.

17   Q.    There was a lawsuit filed by Mr. -- is it Reitz,

18   R-E-I-T-Z?

19              **MR. PENNEBAKER:**  Mr. Ferguson, before you go

20   on...

21              May I approach?

22              **THE COURT:**  Sure.

23              **MR. PENNEBAKER:**  Thank you, Your Honor.

24              (Binder tendered to Mr. Ferguson.)

25   **BY MR. FERGUSON:**

REDACTED TRANSCRIPT

CROSS - SHIRLEY PICKERING                                    39

1   Q.   All right.  So there was a complaint made in which

2   he supposedly did not properly diagnose hypertension in a

3   patient.  That was placed in 95 status.  What is 95

4   status?

5   A.   I believe they were holding it until they received

6   a copy of the medical malpractice judgment.

7   Q.   Are you aware that that case has been resolved?

8   A.   No, sir, I am not.

9   Q.   Are you aware how it was resolved?

10  A.   No, sir.

11  Q.   Do you know anything about this complaint ever

12  being reactivated?

13  A.   I believe, yes, sir, it was.  I did receive -- no,

14  I don't believe it was reactivated.  This was my original

15  complaint that I investigated.

16  Q.   You haven't done anything with it since then?

17  A.   Not since I turned this in on August 10, 2015.

18  Q.   Where it was placed in 95 status?

19  A.   I don't know if anything -- I don't know, sir.

20  Q.   Let's move to tab C.

21       **THE COURT:**  I'm sorry, ma'am, what did you say

22  95 status was?

23       **THE WITNESS:**  They were waiting the results of

24  the court action.

25       **THE COURT:**  Another court.

REDACTED TRANSCRIPT

1            **THE WITNESS:**  Malpractice case, yes, sir.

2            **MR. FERGUSON:**  It was a malpractice case filed

3    in Madison County.

4            **THE COURT:**  Yeah, I just wasn't certain what

5    the 95 status was.

6            **MR. FERGUSON:**  Yes, Your Honor.

7    **BY MR. FERGUSON:**

8    Q.    Tab C.  Egner, E-G-N-E-R, was that the complainant?

9    A.    It's the complainant listed on the allegations

10   report.

11   Q.    Are you aware she's friends with Dawn Young?

12   A.    I think I'm aware that they were associated.  As to

13   friendship or what type of relationship, I don't know for

14   sure on that.

15   Q.    In this case she was complaining because they hired

16   Becca McGowan, M-C-G-O-W-A-N.  That's on page -- well,

17   these aren't individually numbered.  It's a fax,

18   page 449.

19   A.    Okay.  I see that.

20   Q.    Very top.

21   A.    Yes.

22   Q.    Now, her entire complaint is based on that

23   Becca McGowan dates her ex-boyfriend's son, James, and

24   she's afraid somehow that's going to lead to a HIPAA

25   violation?

REDACTED TRANSCRIPT

CROSS - SHIRLEY PICKERING                                    41

1          **THE COURT:**  I'm sorry, where are you referring

2     to, sir?

3          **MR. FERGUSON:**  It's going to be probably the

4     third page in.  At the very top it says page 4 of 49.  It

5     has a fax header.  It says shelter.

6          **THE COURT:**  Okay.  I see.  Where are you

7     referring to?

8          **MR. FERGUSON:**  Top two paragraphs.

9          **THE COURT:**  Okay.

10    **BY MR. FERGUSON:**

11    Q.    She's concerned about a HIPAA violation based on an

12    employee they hired?

13    A.    That's what that appears to say.

14    Q.    The very last paragraph of that page she starts

15    talking about checking with an attorney, and he gets

16    angry; is that correct?

17    A.    I see where it says:  I told Jeff that he is a

18    liar, that he lied to me and violated my HIPAA rights.  I

19    told him that I checked with an attorney to see if I had

20    overreacted.  When Jeff heard the word attorney, he

21    proceeded to get very ugly.  He called me a -- it looks

22    like some expletives.  And I called him an expletive

23    liar.

24    Q.    They're cussing back and forth at each other,

25    correct?

REDACTED TRANSCRIPT

1    A.    It looks like that, yes, sir.

2    Q.    Okay.  Turn to --

3              **THE COURT:**  Excuse me a second.  This is

4    between Mr. -- supposedly between your client and

5    Ms. Egnew?

6              **MR. FERGUSON:**  Egner.

7              **THE COURT:**  Egner.  I'm sorry.  All right.  Go

8    ahead.

9    **BY MR. FERGUSON:**

10   Q.    Tab D.

11   A.    Okay.  I'm seeing a second page to that -- to that

12   fax.  So this is past that second page, D?

13   Q.    Tab D.  It's another allegations report.  Do you

14   see that?

15   A.    Yes.

16   Q.    It's by Barry Flynn Cooper.

17   A.    Yes.

18   Q.    You're aware that he's connected to some joint

19   committee on alcohol and drug something-something here in

20   Jackson, Tennessee?

21   A.    I am not familiar with Barry Cooper other than what

22   this allegations report is showing me.  I believe, there

23   were some emails or texts or something passed back and

24   forth between Mr. Cooper and Mr. Young.  But as far as

25   knowing this individual, I don't.

REDACTED TRANSCRIPT

1    Q.    Okay.  On the next page in, it says part of his

2    complaint where he's talking about the ethical and

3    professional concerns he has, one of his concerns in the

4    middle of that paragraph:  A lady at my church told

5    him -- and I guess "him" is Barry Flynn Cooper -- she was

6    dropped as a patient, assumingly from Mr. Young, because

7    she failed a drug screen for morphine.  Is that correct?

8    A.    She had sciatic nerve pain, had been given several

9    prescriptions for opiates and benzos.  On her last visit

10   she was dropped as a patient because she failed a drug

11   screen for morphine and stated she had never taken

12   morphine, ever.  Is that what you're...

13   Q.    It is.  And that isn't unusual for somebody who is

14   testing positive for drugs they're not supposed to be

15   taking to be dropped from a provider; is that correct?

16   A.    I do see files where patients are discharged for

17   inappropriate or drug screen results, inconsistent drug

18   screen results.

19   Q.    She further stated what?  The next sentence.

20   A.    She states she was administered drug screens every

21   visit and would get outrageous bills for the screens and

22   that this was her last visit.  Even though she was never

23   physically seen by Mr. Young, she was given

24   prescriptions.

25   Q.    So she's either telling the truth, that she

1   received drug screens every time she went in, or she's

2   lying; is that correct?

3   A.    Again, it just says that she received administered

4   drug screens every visit.

5   Q.    And that information comes from somebody that's not

6   related to, as far as we know, Mr. Briley or Ms. Cox --

7   excuse me, Dawn Young?

8   A.    I can't answer that.  I don't know who this person

9   is or who they are or are not related to.

10  Q.    All right.  If you'll turn to, I think, it's about

11  two or three pages in.  We get to our first set of

12  Facebook posts.  It says -- down at the bottom right it

13  says one of seven.

14  A.    Okay.

15  Q.    Go all the way back up to the top.  There's a

16  posting by XXXXXXXXXXXX.  Underneath it it says share.

17  And then it says John Michael Briley.  Are you familiar

18  with Facebook?

19  A.    A little.  I'm not very proficient at it.  But I do

20  see what you're saying the name, who that is.

21  Q.    That would be the John Michael Briley we've been

22  talking about that has a grudge against Mr. Young because

23  he makes these allegations that he's stolen patients and

24  stolen files and stolen equipment?

25  A.    Again, I can only say it says John Michael Briley.

1    Q.    Do you know of any other John Michael Brileys?

2    A.    No, but I don't know that there's not another

3    John Michael Briley.  So I can only say it says

4    John Michael Briley.

5    Q.    Turn the page.  Two-thirds of the way down,

6    XXXXXXXXXXXXXXX, where it says personally I think.

7    A.    Okay.  I see that.

8    Q.    Can you read that?

9    A.    XXXXXXXXXXXXXXXX, XXXXXXXXXXX:  Personally I think

10   Jeff Young II and the staff is outstanding.  Never have I

11   had anyone actually want to help with the problems versus

12   putting a Band-Aid over the symptoms and not treating the

13   problem itself.  Jeff, you're all doing a wonderful job.

14   His office is overloaded.  Try another branch of his

15   clinic.  If that one can't see you at that time, there's

16   more than one office.

17   Q.    Hashtag?

18   A.    They all GAF.

19   Q.    Very last one on the page, read that.

20   A.    Jeff Young II:  Do take yourself and family

21   elsewhere.  Do.  Hashtag we GAF.  But contrary to popular

22   opinion I'm not God and cannot work at the 24-7.  I'm

23   sure you will find a clinic that will answer FB IM's 24-7

24   personally.  Exclamation points.  Hashtag good luck.

25   Q.    Next page.  First full posting.  Kristie Gutgsell.

REDACTED TRANSCRIPT

CROSS - SHIRLEY PICKERING                                    46

1    First of all, do you know who Kristie Gutgsell -- how

2    she's related in this issue?

3    A.    Is that --

4    Q.    She used to be his office manager?

5    A.    Yes, yes.

6    Q.    Used to be whose office manager?

7    A.    I believe, she was Jeff Young's office manager.  Am

8    I correct?

9    Q.    Yes.  She posts what?

10   A.    Kristie Kelsey Gutgsell:  I just talked with my

11   nurse.  She did talk to your wife and did give her

12   options.  We can't call in antibiotics without seeing the

13   patient.  I'm sorry I wish we could.  We also offered her

14   to go to our walk-in clinic today.  She said no.  I don't

15   know what else we can do to make things better.

16   Q.    Two down.  XXXXXXXXXXXXXXXX.  It's really the

17   second sentence that starts out, okay, I am gone.  What

18   does that say?

19   A.    Okay.  I am gone now but sure the hell wasn't going

20   to watch Jeff and his staff be bashed simply because they

21   are booked.  I personally was there today.  They have

22   been running nonstop since I walked in.  Jeff and his

23   staff work their A-S-S off to get everyone seen as

24   always.

25   Q.    Three down.  XXXXXXXXXXXXX?

CROSS - SHIRLEY PICKERING                                    47

1   A.     XXXXXXXXXXXX:   XXXXXXXXXXX, I do hope your wife

2   feels better soon.  But the best thing to do, if you

3   can't get an appointment with your PCP, is try a

4   fast-paced urgent care if possible.  I personally

5   witnessed yesterday how busy the ladies at the front desk

6   were, and I honestly felt horrible for them.  Sorry if my

7   opinion is not needed.  Just trying to help.

8   Q.     Two down is Jeff Young.  There's a sentence about

9   just a little over halfway into it.  It starts off if

10  indeed you see -- sorry.  Well, let's back up to where it

11  says I can't wait.

12  A.     Where are you again?

13  Q.     Three up from the bottom.

14  A.     Okay.

15  Q.     It's the long one.

16  A.     Yes.

17  Q.     Middle of the paragraph there's a sentence that

18  starts out I can't wait to see the care.

19  A.     I can't wait to see the care and attention you get

20  personally from the PCP if indeed you see the same one

21  each time, let alone have access to them via FB.  Best of

22  luck in your search for perfection XXXXXXXXXXXXXX, XXX.

23  The elusive all-knowing, all-caring, "no time for anyone

24  else but you and your family" is out there somewhere.

25  Multiple exclamation points.  Wishing you and your family

1   the awesome health, wealth, and vitality.  Hashtag and

2   exclamation points.  Peace out.  Exclamation points.  I

3   still GAF.  Sorry if it wasn't good enough for you.  And

4   then it's Kristie Kelsey Gutgsell.

5   Q.    Next page.  Third one down.  XXXXXXXXXXXXX, XXX,

6   says:  How many were fired as patients today and how many

7   appointments were canceled today?  Too many to figure it

8   out?  And Jeff Young's response is?

9   A.    His response was:  Yeah, we fired a bunch of

10  drug seekers.  Thanks for bringing that up, XXXXXXX,

11  XXXXXXXXXXXXX, XXX.  We have a zero tolerance for people

12  who pop positive for illicit drug use.  Exclamation

13  point.

14  Q.    Two down.  XXXXXXX XXXXXXX (phonetic) responds.

15  A.    I am in state -- I am in shock of all this mess I

16  just read.  I have worked in the medical field for 21

17  years in a clinic setting and never have I ever seen a

18  physician or practitioner or management staff talk and

19  behave like this on public forum.  It is absolutely

20  unprofessional and you should be embarrassed.  Pitiful.

21  Q.    And she follows it up with the next one.

22  A.    You should savor what dignity you have left and

23  stop responding.  Isn't your practice and reputation more

24  meaningful to you than being hotheaded and sarcastic on

25  freakin' Facebook?

REDACTED TRANSCRIPT

1    Q.    It would be fair to say that one of the -- well, I

2    think we'll get to it.  Maybe I'll ask this question.

3    But if you don't remember it, we'll wait until we get

4    there.  The Board didn't like his Internet activity, his

5    postings?

6              **THE COURT:**  Are you talking about Mr. Young?

7              **MR. FERGUSON:**  Mr. Young's, yes.

8              **THE COURT:**  Is that a question?

9              **MR. FERGUSON:**  It is.

10             **THE COURT:**  You can answer that.

11   A.    I recall something, but I would rather directly see

12   it than try to remember it because I want to be accurate

13   when I respond.

14   **BY MR. FERGUSON:**

15   Q.    Okay.  Remind me when we get there.  We'll talk

16   about it a little bit more.  Would it be fair to say that

17   you've read a lot of these Facebook postings, ones that

18   are in here you have at some point read?

19   A.    I have read some of them.  I can't say a lot

20   because I don't know how many were actually posted and

21   told, but I have read some.

22   Q.    You've read some.  And the opinion of Mr. Young

23   runs a very polarizing gamut.  People either like him a

24   lot or hate him a lot in those postings?

25   A.    There are people who express positive comments and

1    people who express negative comments.

2    Q.    And a lot of people who express the negative

3    comments reference the fact that that's just not the way

4    a healthcare provider should act or talk?

5    A.    I have seen that reference, but I can't say a lot

6    of the time.  I can only say I've seen it referenced at

7    some point.

8    Q.    Let's move to -- I don't know how to tell you the

9    page.  It's this one (indicating).  It's about four more

10   in.

11   A.    I think I see something that looks like that.

12   Q.    XXXXXXX XXXXX is the person?

13   A.    Yes, the one above it is redacted and the one

14   below; is that correct?

15   Q.    Yes.  Why was she dismissed from the clinic?

16   A.    According to this it says:  She was dismissed from

17   the clinic and told the meds were not in my system.  The

18   reason my meds was not in my system is because he was out

19   of the office and had to put my appointment off for five

20   days.  So that was the reason the meds was not in my

21   system.  I asked many times to explain this to the doctor

22   or office manager and was told no and was handed a paper

23   about rehab.  I have many severe medical problems.  And

24   I'm well -- was on a lot of different meds.  Many people

25   have been fired due to mistakes because the nurse fires

1    you and will not let you explain anything to the office

2    manager.  So now due to the fact he said I could smoke

3    pot, I'm having a hard time finding a new doctor.  And in

4    the meanwhile I am without my heart pills, blood pressure

5    pills, and many other.  I also called the office prior to

6    writing this review to try to explain one more time and

7    again got nowhere.  He is a great doctor and has too much

8    other stuff going on to keep up with what is and what is

9    not going on.

10   Q.    She's complaining that the nurse fired her; is that

11   correct?

12   A.    It says here that the nurse fired her.

13   Q.    And the reason was because somebody who's on pain

14   medication but doesn't test for those pain medications is

15   suspect of diverting those pills?

16   A.    I can say that they said she did not have it in her

17   system when she was tested.  And that's her reasoning

18   they said for her being discharged.

19   Q.    Right.  But my question is, as an investigator and

20   the reason why you look for urine screens, you look for

21   urine screens that show the wrong drugs in the urine

22   screen or no drugs in the urine screen, correct?

23   A.    That is correct.

24   Q.    The wrong drugs, especially illegal drugs

25   because -- I forget what the term is -- polypharmacy or

1   whatever, they're using illegal or street or some other

2   drugs or they're practitioner shopping, correct?

3   A.      That could be correct, yes, sir.

4   Q.      And if there's no drugs in their system and they

5   have prescriptions for multiple drugs, it raises the

6   issue, the red flag, that they may be selling those

7   pills?

8   A.      That could be a reason.  Again, that's one of the

9   reasons they would discuss that with their provider.

10  Q.      Let's turn five more pages in.  This page

11  (indicating).

12  A.      Okay.

13  Q.      Now, some of the allegations here seem to focus in

14  on Jeff Young trying to hook people on drugs.  This

15  posting celebrates what?

16  A.      It says:  Ninety days clean today.  So proud of

17  XXXXX XXXXXX.  Love you, dude.  Hearing your story

18  inspires and humbles me.  If you are out there and think

19  there is no hope, please, contact us as PreventaGenix.

20  Let us help facilitate your recovery and getting your

21  life back.

22  Q.      Some of the questions you asked Mr. Young involved

23  IV revitalization; is that correct?

24  A.      Where are you referring to?

25  Q.      Just generally right now.  I didn't have a specific

REDACTED TRANSCRIPT

1    place.

2    A.    I would need to look at that --

3    Q.    All right.

4    A.    -- to be able to refresh my memory, but thank you.

5    Q.    Are you familiar with IV revitalization?

6    A.    I believe that I -- again, I would want to be able

7    to look at my record.  It's some sort of a -- a service

8    offered, hydration therapy of some sort.  But again --

9    Q.    You're familiar with the idea?

10   A.    With the idea, yes.

11   Q.    Now it's a common -- or not common.  We have it in

12   Memphis.  I don't know how to say this.  It's not

13   illicit, right?

14   A.    Not to my knowledge.

15   Q.    If you would, turn a little further.  Actually, if

16   you go to tab E, the very first page of the tab E is a

17   letter from whom?

18   A.    I believe, it's from a Dr. Alperovich.

19   Q.    And he is notifying Mr. Young as to what?

20   A.    Giving written notice that he wishes to terminate

21   his rights and obligations under the physician

22   supervisory agreement.

23   Q.    And his reasoning for that in the first paragraph

24   the very middle of it.  Dr. Alperovich?

25   A.    Dr. Alperovich feels he no longer has the required

1    time to review the medical charts.  In addition,

2    Dr. Alperovich's practice is mostly limited to

3    cardiology, cardiovascular, and varicose vein patient

4    treatments.  Due to your growth in multiple medical

5    arenas, Dr. Alperovich is no longer comfortable in

6    providing supervisory services in your clinic's expanding

7    medical practices.

8    Q.    If you'll turn the page to the next page, the very

9    top of it is an email alleging Mr. Young is taking cash

10   to provide testosterone to children.  And that email came

11   from who?

12   A.    I believe, it is a Dawn Young to a XXXXXXX XXXX.

13   Q.    And Dawn Young is his?

14   A.    To my understanding, she's his ex-wife.

15   Q.    Did you take part in any investigation of alleged

16   testosterone to underage children?

17   A.    I did not.

18   Q.    The next page.  XXXXXX XXXXXX XXXX.  It's a

19   messenger IM, instant messages.  Are you aware that the

20   person speaking to XXXXXX XXXXXX XXXX is Dawn Young?

21   A.    Not on that.  It doesn't say.  It just says

22   XXXXX XXXX.  I don't see anyone else's name so far.  No,

23   I don't see anyone else's name unless I've missed it.

24   Q.    I think we're moved to G tab.  Again, it has on the

25   first page -- it has XXXXX XXXXX, XXXXXXXXX, Walker as

1   the complainant.  And it's complaining of inappropriate

2   comments, nude photos, remote hydration therapy, and a

3   number of other things.

4        But if you flip to the third page, the email from

5   Elaine Eaton, it says March 21, 2016.  It says:  This

6   came to us in an envelope with no return address.  My

7   guess is it came from who?

8   A.    This is the one from Elaine Eaton from TnPAP.  It

9   says:  It came to us in an envelope with no return

10  address.  My guess is that it came from John Briley.

11  Q.    So, again, we have yet another anonymous complaint

12  that's linked back to John Briley; is that correct?

13  A.    Again, this is what Ms. Eaton has said.  I can't

14  say.  I did not see this.  This was not one I

15  investigated.

16  Q.    Let's turn to "I," December 11, 2015.  TnPAP.

17  A.    Yes.

18  Q.    Second page.  December 7, 2015, they received a

19  referral as to Jeff Young.  We suspect what?

20  A.    It says:  We suspect that the referral source is

21  either Michael Briley or affiliated with Mr. Briley's

22  clinic.  TnPAP was proceeding and reaching out to

23  Mr. Young.  Given the allegations, we believe the

24  Tennessee Department of Health needs to be promptly

25  notified.

1        Continue?

2   Q.    No, I want to move you to that large paragraph at

3   the bottom.  In the middle it says:  Our office has

4   received many requests from patients to become new

5   patients.  It's right in the middle.

6   A.    On that same page from TnPAP?

7   Q.    Yes, ma'am.

8   A.    Okay.  Our office has received many requests from

9   patients to become new patients.  And when you run a

10  TnPAP report for drugs on the state website, 80 percent

11  of these patients have been prescribed oxycodone,

12  hydrocodone, Adderall, Phentermine, Xanax, Klonopin.  And

13  this was all on one patient.  He continues to post

14  sexually explicit photographs of women with defaming

15  comments.  He had T shirts printed for his clinic with

16  the logo we give a F-U-C-K on the back.  For this, the

17  parents association at Trinity Christian held meetings

18  about what to do about this disgrace since he attends

19  school functions with this on his clothing.

20  Q.    I'm okay with the church stuff.  You don't have to

21  go into that.  There's an allegation from what appears to

22  be from Mr. Briley's clinic that my client who the

23  government is accusing of illegally giving drugs to that,

24  I guess, for the purposes of hooking them on those drugs

25  that they're making allegations that those, I guess,

1    supposed addicts are leaving his clinic and going

2    someplace else.  So they're not getting the drugs?

3    A.    I can't say.  I can only say what it says in here.

4    Q.    Did you check any of their charts and --

5    A.    I did not get this to investigate.  I do not know.

6    The specific one from TnPAP, to my knowledge, I did not

7    get that one.

8    Q.    If you turn to the next page, the third line down.

9    Again, this anonymous complaint from Mr. Briley says

10   Mr. Young pulls out a bag of narcotic pills to share with

11   his guests --

12             THE COURT:  Wait, wait.  Where are you?

13             MR. FERGUSON:  I am on the second page of the

14   TnPAP.  We're on the second page.

15             THE COURT:  What is TnPAP?

16             MR. FERGUSON:  It is the letter --

17             THE COURT:  Ask the witness.

18             THE WITNESS:  It's the Tennessee Professional

19   Assistance Program.

20             THE COURT:  Okay.

21             MR. FERGUSON:  We're on the third page of "I."

22   BY MR. FERGUSON:

23   Q.    Three lines down about taking out the bag of

24   narcotics, that's the one where you actually investigated

25   that claim.  And 13 out of 14 people said that never

1   happened, correct?

2   A.    That's, I believe, what this is referring to.

3   Q.    Some of the guests were so upset, they called

4   friends and others to drive them to Memphis, to bring

5   them home.  They refused to ride back with Mr. Young and

6   his staff.  Through your investigation that was not what

7   they told you.  They said they had to go to work?

8   A.    That's what they told me, yes.

9   Q.    Again, yet more complaints of him stealing EKGs,

10   otoscopes, laptop computers, 8,000 pages of medical

11   records, volumes of charts.  Also, none of that was

12   verified in your investigation; is that correct?

13   A.    No one gave me any verification.

14   Q.    In fact, what you received is exactly the opposite.

15   Everyone you asked about it said it never happened?

16   A.    There were individuals who said that they did not

17   witness it.

18   Q.    Yet we're still getting complaints of that same

19   action.  What, is this like the third time, fourth time

20   we've seen that same complaint?

21   A.    I did not count, no, sir.

22   Q.    Again, another admonishment.  This is the one we

23   were talking about a little while ago.  First paragraph:

24   Please be advised that the office of investigation

25   received a complaint filed against you alleging that you

1    engaged in public Facebook dispute --

2              **THE COURT:**  Wait, wait.  Slow down.

3              **MR. FERGUSON:**  Oh, I'm sorry.

4              **THE COURT:**  Go ahead.

5    **BY MR. FERGUSON:**

6    Q.    The second sentence says what?

7    A.     Please be aware that this behavior is a

8    professional boundary violation.  Further, such behavior

9    reflects poorly on the profession of nursing.  You are on

10   notice that any future complaints of this nature will

11   result in discipline to your nursing license.  Comport

12   your behavior accordingly.

13   Q.    All right.  Again, the attachments to this exhibit

14   are the same ones we've gone over with the Facebook

15   postings.  Let's go to "M."  Again, this is starting

16   off -- the third page in.  It's a typed page attached to

17   the complaint.  Again, we're talking about a Facebook

18   friend of mine posted a status talking about Jeff and how

19   his wife had been sick for a long time with strep, trying

20   to make an appointment.

21         Again, that's the exact same Facebook posting we

22   just read.  It's the second or third complaint in here

23   about the Facebook posting.  Same one, correct?

24   A.    It appears to be the Facebook posting in which

25   Mr. Young engaged in some interactions with a patient.

1  Q.    And based on that, again, as we said from "J," he

2  was admonished, who says it's not formal disciplinary

3  action.  The record will appear in the licensing file.

4  Just don't do it again.

5  A.    Yes, sir, he received a letter of warning.

6          **THE COURT:**  He received a letter of warning

7  on --

8          **THE WITNESS:**  A letter of warning.

9          **THE COURT:**  On this complaint.

10          **THE WITNESS:**  Yes, sir.  It is not a formal

11  disciplinary action.  It is an informal action that will

12  be maintained in the complaint history file.

13  **BY MR. FERGUSON:**

14  Q.    I want to ask you on Exhibit N to turn to the third

15  page.  At the top it says three out of 27.

16  A.    Okay.  Yes.

17  Q.    All right.  Now, I know you go back and you review

18  these reports.  I think this one may actually be the one

19  that someplace in it you had put the wrong drug name and

20  went back and changed it.  It indicates at least at some

21  point you go back and read these.

22          I have a question on page 3 of 27, though, about

23  something you reported.  In the second paragraph, the

24  first full paragraph, four lines down, you report

25  Mr. Young reported that he did not obtain controlled

CROSS - SHIRLEY PICKERING                                          61

1   substance contracts.  Do you see where that is?

2   A.    Yes.

3   Q.    But then the next line contradicts that to some

4   extent?

5   A.    He reported he did not obtain controlled substance

6   contracts.  That's what he reported.  When I reviewed 23

7   medical records, there were controlled substance

8   contracts in a few of those, and the patients had

9   violated those contracts.

10  Q.    So is it possible that he told you that he obtains

11  controlled substance contracts on every patient, and you

12  went back and looked, and you're writing that, in fact,

13  he didn't because his records didn't contain -- every

14  record didn't contain one?

15  A.    To my recall, he reported he did not obtain

16  controlled substance contracts.

17  Q.    Did you address the fact with him that you

18  immediately found at least some drug contracts?

19  A.    I didn't immediately find those.  I reviewed these

20  after I got the records and was back at my office.

21  Q.    You asked him to clarify why he said he didn't do

22  contracts when he --

23  A.    No, I did not.

24  Q.    Is there any possibility in your mind that that

25  might have been him telling you he did it every time and

1    you were trying to say that he didn't do it every time?

2    A.    I don't believe so.  I believe, he said he did not.

3    Q.    Okay.

4    A.    Whether that was something he said without knowing,

5    I don't know.  But I do believe he told me he did not.

6    Q.    There's a lot of times in here when we're talking

7    about you reviewing records or people reviewing records

8    and there were drug contracts, that they violated them or

9    there were drug contracts, weren't drug contracts.  There

10   is proof in your investigation that he was at least at

11   times using drug contracts?

12   A.    I noted in the 23 medical records controlled

13   substance contracts.  And a few of those, the patients

14   had violated the contracts.  That's what I have here.

15         **THE COURT:**  Before you move away from that

16   just for explanation, what is a drug contract?

17         **THE WITNESS:**  It is a contract that the

18   patient signs as to what is expected of the patient and

19   what will happen if certain things occur or don't occur.

20         **THE COURT:**  Okay.  Thank you.

21   **BY MR. FERGUSON:**

22   Q.    On page -- it's marked 12 of 27.  I'm assuming

23   that's pronounced Yogesh, Dr. Yogesh, Y-O-G-E-S-H.  First

24   full paragraph, last sentence, what does Dr. Yogesh tell

25   you about Mr. Young and signing charts?

                    REDACTED TRANSCRIPT

CROSS - SHIRLEY PICKERING                                    63

1    A.    He stated he only reviewed charts at Mr. Young's

2    office on the first day.  Dr. Yogesh reported that

3    Mr. Young had been calling him, wanting him to sign more

4    charts after he ceased being Mr. Young's preceptor, and

5    he had refused to sign more charts.

6    Q.    So Mr. Young is -- he has to have charts reviewed?

7    A.    Yes.

8    Q.    And the information you received from the doctor is

9    that Mr. Young was trying to get him to review those

10   charts?

11   A.    After he had ceased being his preceptor.

12   Q.    Is that a "yes"?

13   A.    That is, after he had ceased being his preceptor,

14   Mr. Young wanted him to sign more charts.

15   Q.    So if my question was he was still trying to get

16   him to sign charts, the answer would be?

17   A.    Yes, after he ceased being his preceptor.

18   Q.    Turn to page 15 of 27.  Second full paragraph,

19   middle sentence says:  He reported that he also had a

20   practice in Trezevant, Tennessee?

21   A.    He reported that he also had a practice in

22   Trezevant, Tennessee.  That clinic was extremely

23   short-lived.  It opened sometime in the summer of 2015,

24   somewhere around June.  We closed by August or September

25   2015.  It was a satellite clinic.  And he would go there

1   on Fridays.  He reported that the same supervising

2   physician covered his practice at all three locations.

3   He reported that the nature of his practice was family

4   practice.

5   Q.    Do you know who opened up a practice in that same

6   space in Trezevant?

7   A.    No, I don't.

8   Q.    Are you aware that one of the investigating DEA

9   agents in this case's wife is a nurse practitioner?

10  A.    No, I can't say that I do.  I just remember

11  something vaguely about a nurse practitioner, but I don't

12  recall whether it was a DEA agent or not.

13  Q.    Let's take a look at XXXXXX XXXXX.  What did

14  XXXXXX XXXXX do that came to light?  First sentence.

15  A.    OIG had encountered this provider earlier this year

16  during an investigation of an enrollee.  Mr. Young wrote

17  a postdated prescription for XXXXXX XXXXX for

18  hydrocodone/APAV, A-P-A-V, 10/325 milligrams.  This

19  script was written on 12/22/15 and dated 1/1/16 but did

20  not include written directions not to fill it until

21  1/1/16.  Due to this lapse, XXXXXXXXX was able to alter

22  the script to read 12/21/15 and fill it early.  XXXXXXXXX

23  was investigated for forgery and the case forwarded to

24  OIG/CID for further investigation and prosecution.

25  Q.    She forged the prescription?

1    A.    Yes.

2    Q.    Let's go to "Q."  Page 3 of 32.  Patient MY.  M, as

3    in "Mary," Y.

4    A.    Page 3 of 32?

5    Q.    Yes, ma'am.  Summary of findings regarding patient

6    MY.  Do you see that?

7    A.    Yes.

8    Q.    MY was a patient who was being seen by Mr. Young;

9    is that correct --

10   A.    Yes.

11   Q.    -- who died?

12   A.    Yes.

13   Q.    He had been -- turn to four of 32.  Six lines up

14   from the bottom of the first paragraph where it starts

15   9/20/14, that's actually the end of one sentence.  Start

16   at that next sentence where it says MY was noted.

17   A.    Again, I'm sorry, could you clarify what it is you

18   are wanting me to read?

19   Q.    You see the first paragraph?

20   A.    Uh-huh.

21   Q.    Counting from the bottom, the last sentence in that

22   paragraph says:  Young denied he was notified.  Count

23   down one, two, three, four, five -- six lines.  You'll

24   see 9/20/14.

25   A.    Okay.

1   Q.     That's the end of the sentence.

2   A.     Right.

3   Q.     The sentence starts out:  MY was noted in the

4   medical record.

5   A.     Yes.  XXXXXXXXX was noted in that medical record to

6   be expressing suicidal ideations, to report it was easier

7   to buy drugs on the street than live with pain, and had

8   told a friend he had rather put a gun to his head.  The

9   record reflected that Mr. Young was notified.  The

10  medical record from Regional Tennova Hospital reflected

11  that XXXXXXXXX suffered from depression, suicidal

12  ideation, substance abuse, and acute psychotic rage.

13  Mr. Young continued to prescribe controlled substances.

14  No mental health referral was noted by Mr. Young.

15  Mr. Young denied that he was notified of the 9/10/14

16  findings by Regional Tennova Hospital.

17  Q.     You had an individual who through your

18  investigation presented at a local emergency room after

19  allegedly taking, was it, 70 Ativan?  What did he take?

20  Let me see if I can find it real quick.  Seventy Ativan.

21  Do you remember that?

22  A.     I believe that the documentation says that on

23  2/10/15 he reported to the pharmacist at Fred's pharmacy

24  that he had taken 70 Ativan, 2 milligram, without effect.

25  Mr. Young's office was notified.  Mr. Young scheduled an

1   appointment for 2/12/15.  I did not note the urine drug

2   screen result for 2/12/15 in the medical record.  And

3   Mr. Young prescribed controlled substances for MY on that

4   clinic visit.

5   Q.    Turn back to four of 32.  About three sentences up

6   from that last line you started on, over to the far

7   right-hand side, XXXXXXXXXXXX medical records from

8   Regional --

9   A.    Okay.

10  Q.    -- that he went to the facility on 9/10/2014 and

11  received a prescription for what?

12  A.    For 90 Percocet per month.  And he used all his

13  Percocet and couldn't get more until 9/20/14.

14  Q.    Now, this was in 2016.  Do you remember when the

15  CDC started to really promote this idea that you should

16  limit the amount of drugs somebody received for pain when

17  the report came out that --

18  A.    I don't recall a specific date.

19  Q.    Are you aware that current teachings within the

20  industry of medicine is that the increase in overall

21  deaths due to opioids was the decreased availability of

22  prescription opioids?

23  A.    No, I've not seen that specific report.

24  Q.    And that when those prescription opioids are taken

25  away from chronic pain patients, they then go out and

1    search for illegal or street drugs?

2    A.    I've not seen that specific report.

3    Q.    Or that decreasing the availability of prescription

4    drugs on the street does not decrease the number of

5    opioid deaths rather increases it?

6    A.    Again, as I said, I've not seen that specific

7    report.

8    Q.    You're familiar with one of the last investigations

9    of Mr. Young where he entered into a consent order with

10   the Board of Nursing?

11   A.    I am aware that he entered into a consent order,

12   yes, sir.

13   Q.    And as part of that he was to take certain classes

14   on opioid prescribing?

15   A.    Do we have a copy of that in this book, a copy of

16   that consent order?

17   Q.    I'm going to put it on the screen in just a second.

18   Were you aware he was supposed to take that class?

19   A.    I was aware of some classes, but I would rather

20   refer directly to that consent order.

21   Q.    Let me show you a screenshot of what I'll hold out

22   to you and allege to you is part of the opioid -- let me

23   change that.  It's part of the PBI and Best Practices of

24   Prescribing Opioids, Pain Management, and Addiction

25   class.  University of California, Irvine, School of

1    Medicine, April 15, 2019, completion.  Let me ask you

2    this:  I failed to ask this of you.  You're an

3    investigator?

4    A.    Correct.

5    Q.    You're not a doctor?

6    A.    No.

7    Q.    Are you a nurse?

8    A.    A registered nurse.

9    Q.    Okay.  So you went to school to become a nurse?

10   A.    Yes.

11   Q.    Are you a BSN?

12   A.    I have a bachelor's of science in healthcare

13   management.

14   Q.    Does that mean you did two years for your nursing

15   degree?

16   A.    I originally was an associate degree in nursing and

17   I went back.

18   Q.    So now you are a BSN?

19   A.    No, I'm a BSA.  I have a bachelor's degree in

20   healthcare management not necessarily nursing.

21   Q.    Okay.  You'll have to forgive me because I don't

22   know the difference anymore between --

23            **THE COURT:**  Mr. Ferguson, speak in the

24   microphone.  It's hard for me to hear you.

25            **MR. FERGUSON:**  Forgive me.

                    REDACTED TRANSCRIPT

1    **BY MR. FERGUSON:**

2    Q.    I don't remember or I don't know today when you

3    were in school what the difference was.  You did do

4    clinicals?

5    A.    Yes.

6    Q.    Did you work as a nurse?

7    A.    Yes.

8    Q.    Okay.  In that class it indicated or teaches:  We

9    can't prove that someone is or is not in pain, just as we

10   can't prove the presence or absence of pain relief.  In

11   the end, treaters must accept the maxim:  Pain is what

12   the patient says it is.

13   A.    I see that that's what that said.  We were taught

14   to look for indicators as well as testing and that sort

15   of thing, results of testing.

16   Q.    How do you test for pain?

17   A.    If they're complaining of back pain, you would look

18   to see if there's a reason for that.  Knee pain, same

19   thing.

20   Q.    But not all pain is necessarily brought on by

21   physical manifestations?

22   A.    Could you clarify your question?

23   Q.    You don't get an x-ray for neuropathy?

24   A.    No, I believe --

25   Q.    Nerve pain?

REDACTED TRANSCRIPT

1  A.      -- there may be other testing out there, but I

2  don't think you get an x-ray for neuropathy.

3  Q.     Can you tell me what testing is out there?

4  A.     Again, I can't say exactly what tests are or are

5  not out there.

6  Q.     You can't look at somebody and measure the level of

7  pain they're in, accurately?

8  A.     You can look at indicators, but there's no way to

9  accurately measure the level of pain, just as if someone

10 tells you they're in pain and they're not, there's no way

11 that you can determine exactly whether they are or are

12 not.

13 Q.     You can't tell if they are or are not in pain,

14 correct?

15 A.     Correct.

16 Q.     Also, in the class, people in pain who take

17 prescribed opioids, the great majority never become

18 addicted or misuse the medications.  That's Dr. Volkow,

19 V-O-L-K-O-W, Director of the National Institute for Drug

20 Abuse.  Do you agree with that?

21 A.     Again, my opinion on that does not enter into my

22 investigations.

23 Q.     Do you agree with it?

24 A.     I can't say that I do or I don't.  I've not done

25 the research.

REDACTED TRANSCRIPT

1    Q.    And, again, from the same class:  Therefore, the

2    cause of the increase in overdose deaths due to opioids

3    was the decreased availability of prescription opioids on

4    the street.

5          I think I already said you've not been made aware

6    of that statement or that fact?

7    A.    I have heard -- not -- especially as you've said in

8    that.  But I have heard that expressed.  Again, I have

9    not read all of the research either way on that.

10   Q.    I want to talk about this real quick.  We're about

11   to get into morphine equivalents.  And at some point the

12   CDC came out with a guideline that said you shouldn't

13   prescribe more than, what, 90?

14   A.    According to -- and I have a copy here -- our

15   chronic opioid management guidelines, after it reaches

16   120, you are to make a referral to a pain management

17   clinic.

18   Q.    Now, who is that from?  Who said that?

19   A.    State of Tennessee, I believe, it is.

20   Q.    That's a recommendation?

21   A.    I'll get it for you.

22          **THE COURT:**  I'm sorry, you said --

23          **THE WITNESS:**  This is a Tennessee --

24          **THE COURT:**  Ma'am, ma'am.

25          **THE WITNESS:**  Oh, I'm sorry.

1          **THE COURT:**  You said "after it gets to 120."

2     what are you referring to?

3          **THE WITNESS:**  Morphine milliequivalents.

4     **BY MR. FERGUSON:**

5     Q.    Sometimes you will hear -- you might say, is it,

6     MEE?

7     A.    MED or --

8     Q.    Morphine equivalent.  Okay.  The way of measuring

9     the effectiveness.

10    A.    It says:  Patients on opioid doses of

11    120 milligrams MED or greater should be referred to a

12    pain specialist for consultation and/or management.  And,

13    I believe --

14    Q.    Who says that?

15    A.    This is the Tennessee chronic pain guidelines,

16    clinical practice guidelines for outpatient management of

17    chronic nonmalignant pain.

18    Q.    Now, what I have on the overhead here, Dr. Harris,

19    president elect of the American Medical Association,

20    says:  The AMA appreciates that the CDC recognizes that

21    patients in pain require individualized care and that the

22    agency's 2016 guidelines on opioids have been widely

23    misapplied.  The guidelines have been treated as hard and

24    fast rules, leaving physicians unable to offer the best

25    care for their patients.

1    Were you aware that that's the American Medical

2 Association's stand on setting a limit on MEDs?

3 A.    I recognize that that's what they're stating here.

4 Q.    Guidelines have been misapplied so widely that it

5 will be a challenge to undo the damage.

6    Do you agree with that?

7 A.    Again, that is their guideline and their statement.

8 I don't have their studies, so I can't say I agree or not

9 agree.  Just as it says here, pain medicine specialists

10 deal with patients being treated with more than

11 120 milligrams of morphine milliequivalents daily,

12 because they are 11 times more likely to suffer an

13 adverse effect, including overdose.  That's in our pain

14 guidelines.

15 Q.    Referring you back to page 4 of 32 of Exhibit Q,

16 the second paragraph:  MY reported his injury --

17    **THE COURT:**  Excuse me.  I'm sorry.  What page

18 did you say?

19    **MR. FERGUSON:**  Four of 32.

20    **THE COURT:**  Thank you.  I'm there.  I just was

21 writing something and didn't hear you.

22 **BY MR. FERGUSON:**

23 Q.    I'm going to call it the second paragraph.  It may

24 actually be the first full paragraph, the second

25 paragraph of the page, about three sentences down.  MY

1  was telling the doctors at the hospital what had happened

2  to him.

3  A.    Okay.  I think I know what you're referring to.

4  Which paragraph?

5  Q.    Let's call it the second one.  The one that starts

6  on 8/3/15.

7  A.    Okay.

8  Q.    There's a -- three lines down.  He reports he went

9  to Regional, I guess, that this Tennova, T-E-N-N-O-V-A,

10 Hospital --

11 A.    Yes.

12 Q.    -- and reported what?

13 A.    Well, on 8/10/15 XXXXXXXXX went to Regional Tennova

14 Hospital and reporting he had fallen down stairs.  Note:

15 Records from multiple medical providers reflect multiple

16 complaints by XXXXXXXXX that he had fallen/injured

17 himself.

18 Q.    People who are doctor shopping and drug seeking,

19 they have to make up a reason to get those drugs; is that

20 correct?

21 A.    That could be a possibility, yes, sir.

22 Q.    You wouldn't think a healthcare provider would give

23 him opioids if he didn't complain of some pain or injury?

24 A.    I can't say what a provider would do or would not

25 do.  I just reflect what's there.

REDACTED TRANSCRIPT

1    Q.    But MY didn't tell the hospital that he was being

2    seen by Jeff Young?

3    A.    According to this he did not notify the hospital

4    that he was currently being prescribed controlled

5    substances.  By M. Young:  Told that hospital he had not

6    recently seen a physician.  However, on 8/3 he had been

7    seen by M. Young.  His urine drug screen was

8    inconsistent.  He wrote -- M. Young wrote the

9    prescriptions for hydrocodone with acetaminophen, No. 30,

10   and clonazepam, No. 45.

11   Q.    MY's family was adamant they didn't want an

12   autopsy; is that correct?

13   A.    Yes.

14   Q.    Turn to page 9 of 32 in that same exhibit.

15          **THE COURT:**  Mr. Ferguson, let's take a morning

16   break.

17          **MR. FERGUSON:**  Yes, Your Honor.

18          **THE COURT:**  Let's take about a ten-, 15-minute

19   recess, please, and come back.  Thank you.

20          (Recess taken at 10:55 a.m.)

21          **THE COURT:**  You may proceed.

22          **MR. FERGUSON:**  Thank you, Your Honor.

23   **BY MR. FERGUSON:**

24   Q.    Turning to page 9 of 32, second paragraph under

25   John Copeland, EMT.  Well, first, let me ask you, who was

1   John Copeland?

2   A.    He was the director of the Crockett County

3   Emergency Medical System.

4   Q.    Okay.  Second paragraph, last sentence he states

5   that the guy what?

6   A.    He stated that the guy had significant back

7   pain/injury, couldn't work, and the use of pain meds had

8   progressed over the years.

9   Q.    Page 10 of 32, four paragraphs up from the bottom.

10  I asked Mr. Copeland why?

11  A.    I asked Mr. Copeland why an autopsy was not

12  performed on XXXXXXXXXX.  Mr. Copeland reported that

13  nothing seemed criminal.  He called Dr. Emison to see

14  what he wanted to do.  And they felt that the blood drawn

15  from XXXXXXXXXX would give answers.  On direct

16  questioning Mr. Copeland confirmed that Dr. Emison did

17  not come to the scene of XXXXXXXXXXXX death or the

18  funeral home.  I asked if that was customary procedure,

19  and Mr. Copeland stated that it was.

20  Q.    Page 12 of 32, third paragraph down, the three

21  sentences -- or three lines of it.

22  A.    Investigator Gilliland reported there was no

23  suspicion of foul play.  I asked him if there was any

24  suspicion of overdose.  He stated that there was not at

25  the time initially.  He stated that when they found the

REDACTED TRANSCRIPT

1    syringes, it was in the back of their minds.

2    Q.    During the course of your investigation, you did

3    not locate any evidence that XXXXXXXXX had prescribed

4    anything that was to be administered with needles?

5    A.    Correct.

6    Q.    Last paragraph, the first, say, three sentences.

7    A.    According to Investigator Gilliland, everything

8    that they had seen did not show signs of foul play and

9    that they usually did not carry an investigation out any

10   further.  I asked him if blood was drawn from XXXXXXXXX

11   for testing.  He stated that blood was drawn at the

12   funeral home.

13   Q.    Okay.  That's fine.  Page 13 of 32, the first full

14   paragraph.  It looks like it's about two sentences.  I

15   asked Investigator Gilliland.

16   A.    I asked Investigator Gilliland if XXXXXXXXXXXX

17   death could have been an assisted suicide.

18   Investigator Gilliland stated that he did not think so

19   and that he had never worked an assisted suicide.

20   Q.    Second paragraph from the bottom, last two

21   sentences.  I had attempted to contact

22   Investigator Gilliland.

23   A.    I had attempted to contact Investigate Gilliland by

24   phone multiple times to determine the status of my prior

25   request for documentation.  And that would be referring

1  to incident reports, investigation photographs, and

2  toxicology report.  I could not reach him by phone.  He

3  did not return any of my messages to call me back.

4  Q.    Stopped talking to you?

5  A.    Well, he didn't return any of my messages.  I did

6  go see him in person after that.

7  Q.    Oh, I see what you're talking about.  Okay.  That

8  last paragraph he stated that no investigations was

9  conducted into XXXXXXXXXXXX death, he found nothing

10 suspicious.

11         **THE COURT:**  Wait, wait.  Where are you reading

12 from?  And slow down just a little bit.

13         **MR. FERGUSON:**  Last paragraph.

14         **THE COURT:**  All right.

15         **MR. FERGUSON:**  I think it's the second

16 sentence.

17         **THE COURT:**  Okay.  Are you going to read this,

18 or are you going to ask her about something?

19 **BY MR. FERGUSON:**

20 Q.    Why did he tell you an investigation was going to

21 be conducted?

22 A.    I had asked him about getting an incident report

23 for both his initial arrival on the scene and for when he

24 was called back after the used syringe was found on

25 XXXXXXXXXXXX pillow.  He stated that they did not do an

1    investigation into XXXXXXXXXXXX death because they found

2    nothing suspicious.  Therefore, they would not have had

3    an incident report or an investigative report to provide

4    me.  He said that the Crockett County Emergency Medical

5    Services made photographs, so he had no photographs to

6    provide me.  He stated he realized he never sent the

7    blood specimen taken from XXXXXXXXXX to the Tennessee

8    Bureau of Investigation for analysis.  He stated that he

9    still had that sample and that he would send it to the

10   Tennessee Bureau of Investigation and that it would take

11   around three months to get the results back.  He

12   confirmed again that there was no documentation to

13   provide me from the Crockett County Sheriff's Department

14   regarding XXXXXXXXXXXX death.

15   Q.    Did you ever get a report on the blood sample?

16   A.    No, they never sent us a report on the blood

17   sample, to my knowledge.

18   Q.    Do you know if they sent the blood in for testing?

19   A.    I do not.  They did not send it in initially, and

20   this was some time after the death.  So I do not know.

21   Q.    All right.  Let's go to tab R, second page,

22   complainant information, N/A, not applicable.  Why does

23   it say N/A?

24   A.    Because the name of the complainant is an internal

25   office of investigation, so therefore the information

1   would be -- to interview your own offices would have been

2   nonapplicable.

3   Q.    This was an allegation of Mr. Young having sex with

4   a patient; is that correct?

5   A.    That's what it says here, yes, sir.

6   Q.    The supposed patient, on page 7 of 16, refused to

7   discuss the situation with you or with -- let me see who

8   this is.  Is this --

9           **THE COURT:**  I'm sorry.  I can't hear what

10  you're saying.

11          **MR. FERGUSON:**  I'm sorry.  I had to look back.

12  **BY MR. FERGUSON:**

13  Q.    This is actually Raney Blair?

14  A.    Yes, she's one of the investigators in the West

15  Tennessee office.

16  Q.    It appears Raney Blair, on page 7 of 16, tried to

17  speak to XXXXXXXX XXXXXX.  The result of that attempt

18  was?

19  A.    She agreed to -- initially, she did not want to

20  talk over the phone.  She agreed to meet Ms. Blair at the

21  Office of Investigations in Jackson.  She did not show up

22  for that appointment, and then she refused to reschedule

23  when contacted and did not want to provide a sworn

24  statement.

25  Q.    It appears she did talk to Kristie Gutgsell

1    G-U-T-S-G-E-L-L (sic).

2    A.    It appears so from the report, yes.

3    Q.    Who at one point worked for PreventaGenix?

4    A.    Yes.

5    Q.    And left to open her own clinic; is that correct?

6    A.    That's what it says here.

7    Q.    Last paragraph there.  Who supposedly made a voice

8    recording of them having sex?

9    A.    Ms. Gutgsell stated that Karla Wright made a voice

10   recording of Mr. Young having sex with XXXXXXXXXX on her

11   cell phone.  However, the DEA has the recording.  And

12   Ms. Gutgsell is unsure if Ms. Wright will provide a copy

13   for this investigation because Ms. Wright is currently

14   working with Mr. Young at Genexis.

15   Q.    Page 12 of 16.  Interview:  John Michael Briley.

16   Mr. Briley comes up again in this investigation, doesn't

17   he?

18   A.    That's the name that's here.

19   Q.    Last couple of sentences of that first paragraph,

20   apparently he's having -- when XXXXXXXXXX comes back into

21   the office -- the story is she comes back in the office

22   all upset.  And he's administering to her or having

23   somebody administer to her Phenergan to calm her down.

24   That's not Jeff Young doing that, right?  That's

25   Mr. Briley?

1   A.     Ms. Martin administers a shot of Phenergan to calm

2   XXXXXXXXXX down.  It says XXXXXXXXXX was hysterical.

3   Q.     It says:  However, later in the interview

4   Mr. Briley what?

5   A.     It says:  Later in the interview Mr. Briley changed

6   his whole story about what happened on the day XXXXXXXXXX

7   came in.

8   Q.     So somewhere in the investigation he told one story

9   and then completely changed it to another story?

10  A.     Yeah, I think in terms of the shot of Phenergan and

11  who administered it.

12  Q.     Let's go to "U."  In the first page of "U," there

13  appears to be an email; is that correct?

14  A.     Yes.

15  Q.     The email is from who to who?

16  A.     From Dawn Young to Tracy Alcock and

17  Shirley Pickering.

18  Q.     Now, Shirley Pickering would be you?

19  A.     Yes.

20  Q.     Tracy Alcock is an attorney for, I guess, the Board

21  of Nursing?

22  A.     Yes, she is one of our attorneys, yes, sir, Office

23  of General Counsel.

24  Q.     So, again, this is being, I don't like the word

25  instigated, how about initiated, with a Dawn Young?

1  A.    Ms. Young sent this to us.  This is what it

2  appears.

3  Q.    And in your investigation, you're aware that that

4  case was dismissed?

5  A.    Which case are you referring to?

6  Q.    Well, you're aware that Mr. Young, based on

7  XXXXXXXX XXXXXXXX allegations -- XXXXXXXX XXXXXX is a

8  friend of Dawn Young's -- had Mr. Young arrested in

9  Memphis?

10  A.    I'm not -- I did not investigate that case.  So I'm

11  not sure as to the whole --

12  Q.    Are you aware he got arrested for assault?

13  A.    I was aware he got arrested.  As far as any

14  investigation of that, I did not do that.

15  Q.    Asking if you're aware.  Are you aware --

16  A.    I'm aware, yes.

17  Q.    Are you also aware it was dismissed?

18  A.    No, I did not follow-up on it.  I did not have an

19  investigation.

20  Q.    After review by the prosecutor's office, it was

21  dismissed.

22          **THE COURT:**  Is that a question?

23          **MR. FERGUSON:**  Maybe.  Let me see.  I might be

24  able to...  I may have to make it a question in a little

25  bit.  There's a document I will have to find.  I'm not

REDACTED TRANSCRIPT

1    worried about it.

2    **BY MR. FERGUSON:**

3    Q.    Reading emails from Gidget Egner, E-G-N-E-R.

4    A.    Where are we at?

5    Q.    First page of "V."

6    A.    Oh, "V."

7    Q.    V, as in "Victor."

8    A.    Yes, I do see that.

9    Q.    Okay.  "W."  Again, reading emails from Dawn.

10          **THE COURT:**  Again, I'm sorry.  Was there

11   something about "V"?

12          **MR. FERGUSON:**  I was going to, and I think I'm

13   just going to skip it.

14          **THE COURT:**  Okay.  I wanted to make sure I

15   hadn't missed something.

16          **MR. FERGUSON:**  No, I changed my mind.

17          **THE COURT:**  Now we're at "W."

18   A.    Now we're at "W."  Yes, I see, yes, where I

19   forwarded this to Ms. Welch, my director, and Ms. Alcock

20   at the Office of General Counsel.

21   **BY MR. FERGUSON:**

22   Q.    Do you know about how often Dawn Young would be

23   contacting you?

24   A.    I can't say with any kind of accuracy.

25   Q.    Would it be fair to say she contacted you

1    frequently?

2    A.    There would be periods of times when I might get

3    several in a week, and then periods of time when I

4    wouldn't.  So it would be hard to average that out and

5    say whether it's frequently or not.  I apologize.  But

6    again, I don't have an exact number for you.

7    Q.    That's fine.  Have you seen or are you aware of the

8    drug utilization review board and the forms in which they

9    send out to providers concerning the controlled substance

10   prescribers?

11   A.    I have seen that in cases before, but it's not --

12   I'm not really that familiar, but I have seen them.

13   Q.    Have you seen this or a similar --

14   A.    The TennCare Prescriber Report Card?

15   Q.    Yes.

16   A.    I think I've seen that on occasion but not

17   frequently.

18   Q.    This one, the prescriber is Jeffrey Young.

19   The location is Jackson.  And it talks about the

20   mid-level APNs, the average, and then the actual

21   provider, Mr. Young.

22   A.    Uh-huh.

23          **THE COURT:**  Let me just make these comments.

24   Are you going to seek to introduce it?  What's the basis

25   of this document?

1              **MR. FERGUSON:**  She --

2              **THE COURT:**  Does she have any knowledge about

3    it?  Is she qualified to say what this is?

4              **MR. FERGUSON:**  She's seen it before.  She

5    knows what the --

6              **THE COURT:**  Well, I mean --

7              **THE WITNESS:**  Not this specific --

8              **THE COURT:**  I've seen a lot of documents.

9    That doesn't mean I'm qualified to talk about it.

10             **MR. FERGUSON:**  I think, she's reviewed them

11   before.  She's uses them within her investigations.

12             **THE WITNESS:**  I have seen them on occasion,

13   not frequently.  But this specific one I don't recall

14   seeing.

15   **BY MR. FERGUSON:**

16   Q.   I wouldn't think you would have unless you pulled

17   it.  But you're familiar with what it is?

18   A.   Vaguely.  I can tell you what it says in terms of

19   total claims.  Apparently, the average is 997.  And

20   Mr. Young's was 2,118.  Is that correct?

21   Q.   Right.  So he's -- basically, the document would

22   tell you that in his practice he sees over twice the

23   number of patients as the average provider; is that

24   correct?

25   A.   That's -- I can say the average is 997 and his is

1    2,118.  Again...

2    Q.    And his percentage of controlled --

3    A.    In his practice it reports the percentage of his

4    controlled substances, prescriptions, it looks

5    26.16 percent.  Opioids are 21.06 percent.

6    Q.    And the controlled percentage average is about

7    26 percent.  It's 25.84?

8    A.    It says here 25.84 average.  This is TennCare

9    prescriber report card.

10   Q.    His opioid is actually below the average?

11   A.    His opioid, the average is 22.62.  His is slightly

12   below at 21.06.

13   Q.    And his average MEDD is actually below average?

14   A.    Average is 46.57.  His is 44.8 for TennCare.

15   Q.    You had previously testified that you're scared of

16   Mr. Young.  You said people were calling your house and

17   not saying anything.

18   A.    Correct.

19   Q.    Did that in any way ever get linked back to

20   Mr. Young?

21   A.    Not directly, no.

22   Q.    You said people were calling, and you could hear

23   them talking in quiet voices.  Did that ever get linked

24   back to Mr. Young?

25   A.    Not directly, no.

REDACTED TRANSCRIPT

1    Q.    Did it get linked back indirectly?

2    A.    Mr. Young had made multiple threats against other

3    people as had some of his associates both on Facebook, on

4    other social media.

5    Q.    Did he ever threaten you on Facebook?

6    A.    No, not on Facebook that I found.

7    Q.    Did he ever threaten you directly?

8    A.    There were statements made during the interview

9    that I thought were.

10   Q.    They made you uncomfortable?

11   A.    They made me very uncomfortable.

12   Q.    Did you tell him that he was making you

13   uncomfortable?

14   A.    No, I didn't address those.  We moved on with the

15   subject that I was discussing with him.

16   Q.    So he wouldn't have known he was making you

17   uncomfortable?

18   A.    I can't say whether he knew that or not.

19   Q.    You didn't tell him?

20   A.    Again, if they were meant to make me uncomfortable,

21   he would've known.  That would have been the purpose of

22   it.  But again, I can't say that.

23   Q.    Right.  What we can say is you didn't say anything

24   to him about it?

25   A.    I didn't feel that was appropriate.  The point of

REDACTED TRANSCRIPT

1    my investigation was to simply get data from him.

2    Q.    You said that people were walking in your yard?

3    A.    At night, yes.

4    Q.    Was that ever linked back to Mr. Young?

5    A.    Not directly.

6    Q.    Was it linked back indirectly?

7    A.    There were -- I felt that they were coincidental to

8    the investigation that I made in which he made those

9    remarks and based upon some of his actions on Facebook

10   toward other people.

11   Q.    Did you see these people?

12   A.    They were shadows.  The people ran.  When we came

13   outside, they ran.

14   Q.    Do you know who they were?

15   A.    No.

16   Q.    Did you call the police?

17   A.    I discussed it with -- I did discuss it with some

18   law enforcement.  I discussed it with my supervisor,

19   direct supervisor.  I discussed it with my director and

20   the office of general counsel.  Did I file a police

21   report?  No, I did not.

22   Q.    Did you file a police report about these phone

23   calls?

24   A.    No.  They stopped right at the point when I

25   decided -- they stopped about the same time that his

REDACTED TRANSCRIPT

1    friend Kevin was arrested for threatening a DEA agent.

2    After that I did not get any more.  So I did not file a

3    police report.

4    Q.   You're aware that Kevin -- I can't remember his

5    last name, I'm sorry -- Kevin, who got arrested, that was

6    in response to the DEA investigating his girlfriend who

7    was a pharmacist?

8    A.   I don't know the specifics.  I just know he was

9    arrested.  And they stopped at about the same time.

10   Q.   So if I say it was during the course of the

11   investigation of his girlfriend, the pharmacist, you

12   don't have any indication one way or the other about --

13   A.   I don't investigate pharmacists.

14   Q.   You're aware that Mr. Young was not charged or has

15   not been charged with threating DEA agents?

16   A.   Correct.

17   Q.   Or any police officers?

18   A.   There was a posting that was sent to us that

19   indicated that he was, I believe, booked or something in

20   2014 for assaulting a police officer.

21   Q.   Somebody told you that?

22   A.   I thought there was something here written on it.

23   But again, I can't confirm that because we don't have the

24   actual arrest record or anything.

25   Q.   Based on your investigation, are you aware -- well,

1    I'm not sure I'll ask that question.  I'll move on.  Are

2    you aware that Mr. Young made numerous complaints to the

3    Jackson Police Department regarding harassment by and

4    from Dawn Young and others that are associated with her?

5    A.    I don't have direct knowledge of that, no.  I

6    didn't receive anything from anyone in terms of that, no

7    police reports or anything like that.

8    Q.    Were you aware that on 10/26/2018 he made a report

9    against Kristie Gutgsell grabbing him at a funeral, made

10   him uncomfortable, saying he owed her $19,000?

11   A.    No, sir, I wasn't aware of that.  That wasn't

12   reported.

13   Q.    Are you aware that on March 12, 2018, he had to

14   call the police because of Kristie Gutgsell outside his

15   office, harassing him?  Are you aware of that?

16   A.    No, sir.

17   Q.    March 6, 2018, another report of Kristie Gutgsell

18   making threats, hanging out around the business, taking

19   pictures of the car, trying to start something to get him

20   in trouble with the court systems?

21   A.    No, sir, I'm not aware of that.

22   Q.    3/5/2018?

23   A.    I've received no reports of that either.

24   Q.    2/27/2018, his vehicle being vandalized?

25   A.    I've not received anything to that effect.

REDACTED TRANSCRIPT

93

1    Q.    February 16, 2016, he may not have reported it but

2    a person known on social media as Jerry Lytle, L-Y-T-L-E,

3    saying that he was going to come to his office and fight

4    him?

5    A.    No, I don't have that.

6    Q.    November 30, 2015, he reported his ex-wife calling,

7    harassing, leaving --

8    A.    Again, none of that was sent in for us to review.

9    Q.    7/15/2015, when the divorce was finalized, he got

10   possession of the house.  Blinds, drapes, door handles,

11   knobs taken from the house?

12   A.    No, sir.

13   Q.    Presumably from Dawn Young?

14   A.    I don't...

15   Q.    7/1/2015, phone harassment from his ex-wife,

16   Dawn Young?

17   A.    I don't have any documentation of that.

18   Q.    Another report.  2014.  She's -- nevermind.  You

19   didn't make any police reports?

20   A.    No.

21         **THE COURT:**  What was the question?

22   **BY MR. FERGUSON:**

23   Q.    You didn't make any police reports?

24   A.    No, I did not.

25   Q.    I'm going to ask this question.  I'm not asking for

1   an address.  It's just simply I don't know.  Do you live

2   in the immediate area?

3   A.    No.

4   Q.    Can you put me in a ballpark of what part of the

5   state you live in?

6   A.    I live just outside of the Jackson -- we're listed

7   as Madison County, but we're just outside, basically.

8   It's in a rural area.

9   Q.    I would count that local.

10  A.    Well...

11  Q.    You're within less than an hour's drive time?

12  A.    Oh, yes.  But in terms of living close in Jackson,

13  no, I do not.

14  Q.    Has anything happened recently that caused you

15  harm?

16  A.    No, not recently.

17  Q.    How long ago were these people that you didn't see

18  their face and these phone calls?

19  A.    I would say probably 2017, maybe.

20  Q.    So about two years ago?

21  A.    Probably, yes.

22  Q.    Nothing has happened since then?

23  A.    No.

24  Q.    Obviously, then, nothing has happened since the

25  filing of this case?

REDACTED TRANSCRIPT

1    A.    Not since the filing of this case.

2    Q.    Have you had any additional -- since the filing of

3    this case, have you had any reason or any opportunity to

4    be around Mr. Young?

5    A.    No, I have not investigated any cases of his since

6    that one that we haven't discussed.

7    Q.    Would you need to be?

8    A.    Would I need to be what?

9    Q.    Around him.  As far as you know, is there any

10   reason why you would need to be around him?

11   A.    I wouldn't need to be around him.

12   Q.    And quite frankly, he doesn't need to be around you

13   and shouldn't be around you?

14   A.    He shouldn't be, no, or should any acquaintances of

15   his.

16   Q.    You don't want any contact with him?

17   A.    No.

18   Q.    You don't want any contact, directly or indirectly?

19   A.    No, sir, not at this time, no.

20   Q.    Even though as far as you know he's never had any

21   direct contact with you?

22   A.    As far as I'm able to definitively say.

23   Q.    I don't really have any problem with that.  I would

24   agree it would seem there's no reason he would need to

25   discuss anything with you.  Would you agree with that?

REDACTED TRANSCRIPT

1   A.    Agree with that or to post anything on social media

2   concerning or to encourage anyone else to contact me or

3   post anything concerning me.

4   Q.    Based on his previous admonishing, he's been warned

5   if he posts anything inappropriate that the Board can

6   take action against him, correct?

7   A.    He has been admonished not to do that.  But again,

8   whether people comply with that is another matter.

9   Q.    Sure.  Not, basically, as we like to say troll

10  people.  It just looks bad, right?

11  A.    It is bad, yes.

12  Q.    I'm going to tell -- be honest with you, I'm the

13  worst at it.  I am --

14         **THE COURT:**  Let's just ask questions.  We

15  don't need to comment.

16  **BY MR. FERGUSON:**

17  Q.    But that's what you're asking for is that he's not

18  to have any contact with you, directly or indirectly, and

19  not to post anything about you?

20  A.    Or to have others on his behalf post anything.

21  Q.    Absolutely.  Is there anything else you're asking

22  for?

23  A.    Again, there are a great many people who will make

24  statements or who will make threats or who will do

25  actions on behalf of other people.  That concerns me as

1   well.  Based upon some of his previous Facebook and

2   texting and interactions I've seen, I've seen things he's

3   said about other people.  I've seen things people have

4   said and would do on his behalf.  That worries me.  I

5   will not be dishonest and say it doesn't.  It does worry

6   me.

7   Q.    I think that's fine.  What I'm asking is, is there

8   anything else other than him not doing that, not

9   contacting you?

10  A.    He -- again, whether someone agrees not to do that

11  and doesn't do it, or whether they agree not to do it and

12  then go ahead and do it, that's -- you know, I can't say

13  whether someone will or will not.  But that concern is

14  there.

15  Q.    But he can?

16  A.    He can.  But again, will he follow that?  I don't

17  know.

18  Q.    I would -- I would -- well --

19  A.    You're asking me about predictions I can't make.

20  Q.    I was going to make a statement, and I shouldn't do

21  that.  So I'll leave that alone.

22         **MR. FERGUSON:**  Your Honor, I think that's all

23  I have for now.

24         **MR. PENNEBAKER:**  Redirect, Your Honor.

25         **THE COURT:**  All right.

REDACTED TRANSCRIPT

1                    **REDIRECT EXAMINATION**

2    **BY MR. PENNEBAKER:**

3    Q.    Good morning, Ms. Pickering.

4    A.    Good morning.

5    Q.    I don't want to assume anything, but I believe that

6    maybe what Mr. Ferguson was driving at was would you feel

7    more comfortable if Jeff Young were detained prior to

8    trial, in other words, if he were to be detained in

9    prison awaiting trial because you feel that he is a

10   danger to the community?

11   A.    Are you asking for my personal feelings or my

12   feelings -- just my personal feelings?

13   Q.    (Nods head up and down.)

14   A.    Well, I don't -- you know, this is -- I don't

15   necessarily like to see anyone detained.  Again, based

16   upon some of the things he's done in the past, I have

17   concerns that he will not or he will have others not

18   abide by the court ruling.  That's just my feelings.

19   Q.    Okay.  Just to make sure I understand what you're

20   saying.  Would you feel more comfortable if he were

21   detained prior to trial or if he were allowed to stay out

22   on the streets of Jackson prior to trial?  I'm asking you

23   personally just which one would make you more comfortable

24   out there in terms of your safety.

25   A.    Personally, I -- as much as I dislike saying it,

REDACTED TRANSCRIPT

1    personally I probably would feel more comfortable if he

2    were not on the streets.  But again, that's personal.

3    Q.    Okay.  Thank you.

4          Just briefly, we've heard a lot about, in

5    Mr. Ferguson's examination, several people.  Dawn Young

6    is one name that we've heard a lot, right?

7    A.    Yes, sir.

8    Q.    And Gidget Egner I think is her name?

9    A.    Egner?

10   Q.    Egner.

11   A.    Yes, sir.

12   Q.    And RR, who's a former business partner of

13   Mr. Young's?

14   A.    Yes, sir.

15   Q.    We've heard about Dr. Briley or Nurse Briley?

16   A.    Yes, sir.

17   Q.    We've heard about now, actually, it sounds like

18   maybe there's a DEA angle to the witch hunt.  Did you

19   catch that?

20   A.    I heard the remark, but I'm not sure who that is

21   being referred to or who that is.

22   Q.    Right.  And now I just want to ask you as to those

23   people that I just mentioned, during the course of your

24   investigation, did you determine that any of those people

25   wrote prescriptions on Jeff Young's prescription pad?

REDACTED TRANSCRIPT

1    A.    No, sir.

2    Q.    Did you find any evidence of that whatsoever?

3    A.    No, sir.

4    Q.    How about whether any of those people scribed in

5    Jeff Young's charts?

6    A.    I don't think so.  I don't recall that.

7    Q.    How about whether any of them stocked Mr. Young's

8    fridge at PreventaGenix with alcohol?

9    A.    I don't recall that.

10   Q.    How about that they logged into his social media

11   accounts and posted things on his behalf?

12   A.    That was never brought to my attention.

13   Q.    Okay.  Did any of them, to your knowledge, hit

14   Record on the videos that went along with Mr. Young's

15   wannabe reality TV show that he had, the "Rock Doc"?

16   A.    Nothing was ever brought up about the "Rock Doc"

17   video recordings.  I don't recall that at all.

18   Q.    Okay.  Are those types of things, what I just

19   mentioned, the way Mr. Young wrote prescriptions, the way

20   that he wrote his charts, his practices as a nurse

21   practitioner, his public persona that we saw the

22   admonishment of, are those the matters that you were

23   tasked with investigating for the Board?

24   A.    I was tasked with investigating allegations of such

25   things as abusing illegal drugs.

1    Q.    Okay.  And I don't mean to make you go over those.

2    A.    That's okay.  And appropriate or excessive

3    prescribing of controlled substances, failure to

4    appropriately write a prescription, negligence in

5    practice, those types of issues are what I was assigned

6    to investigate.

7    Q.    Sure.

8    A.    Unethical conduct, failure to take action on

9    inappropriate patient urine drug screen results, working

10   without a supervising physician, billing clients without

11   a supervising physician.  We're assigned those

12   allegations when we receive the complaint.  And those are

13   the things we're supposed to look at.

14   Q.    Okay.  And one exhibit that we haven't talked about

15   is 1Y in your binder.

16   A.    "Y"?

17   Q.    Yes.  And just by way of background, it looks like

18   this is a letter from the State of Tennessee, Department

19   of Health, Office of General Counsel, dated November 14,

20   2016.

21   A.    Okay.  I see that.

22   Q.    And the "Dear Mr. Young," there's a first

23   paragraph, and then the second paragraph that concludes

24   on the following page.  Would you read that second

25   paragraph, please?

1   A.    The department has received complaints against your

2   license.  The department's investigation reviewed your

3   prescribing practices at PreventaGenix.  The

4   investigation revealed, among other things, that you had

5   inappropriately overprescribed controlled substances,

6   frequently prescribed dangerous combinations of

7   controlled substances, and inadequately charted your

8   patients' office visits.  All of which fall below the

9   standard of care for a registered nurse and advance

10  practice nurse practicing in Tennessee.

11  Q.    That's good.  Because, then, there's a laundry list

12  of these allegations.

13          **MR. PENNEBAKER:**  Your Honor, if I may just in

14  the interest of expediency, if I could list a few of

15  these numbers for the record that the government would

16  ask the Court to focus on, but I don't need Ms. Pickering

17  to read them.  It's 6, 7, 10, 12, 13, 14, 16, 18, 21, 22,

18  23, 24, 25, 27, 29, 30, 31, and 33.

19  **BY MR. PENNEBAKER:**

20  Q.    Now, have you seen this list before, the one

21  through -- gosh, it goes into patient records and kind of

22  a detailed analysis of the problems with several of

23  those.  Have you seen that list?

24  A.    I don't believe that I have seen this.  I did see

25  the consent order, I believe, after it was signed.  I

1    don't recall seeing this.

2    Q.    Okay.  Now, if you head over to -- there's a draft

3    consent order in that exhibit.  Is it directly after the

4    signature page.

5    A.    Yes.

6    Q.    Okay.  Are you with me?

7    A.    Yes, I think so.

8    Q.    And if you can go to page 13 of this draft order.

9          **THE COURT:**  I'm sorry.  There is a consent

10   order.  Is that what you're talking about?

11         **MR. PENNEBAKER:**  The consent order, yes, Your

12   Honor.

13         **THE COURT:**  What page?

14         **MR. PENNEBAKER:**  It's page 13.

15   **BY MR. PENNEBAKER:**

16   Q.    Are you with me?

17   A.    Yes, sir.

18   Q.    And it's got paragraph 53 after the "now

19   therefore"?

20   A.    Yes, sir.

21   Q.    What is the recommended agreed order recommending

22   with respect to Mr. Young's RN and APRN licenses?

23   A.    Hereby permanently voluntarily surrendered.  And he

24   acknowledges this will have the same effect as permanent

25   revocation of his RN and APRN licenses.

1    Q.    And the same thing with 54.  It looks like the

2    agreement here initially is calling for permanent

3    surrender of his DEA number, right?

4    A.    Yes, sir.

5    Q.    Are you aware of anything developing in the

6    investigation between this point here -- I guess, it's

7    November of 2016 to November of 2018 -- that undermined

8    the evidence that the Board had that this was an

9    appropriate remedy?

10   A.    I would not have been -- once my report goes in,

11   I'm not really notified.  I'm out of the loop.  So in

12   terms of additional information, unless it's something

13   specifically they want from me, I wouldn't have access to

14   that.  I wouldn't be a party to that.

15   Q.    Okay.  And, I think, before that November of 2018

16   agreed order, two additional investigations were opened

17   into new allegations.  I think one involved the assault,

18   the sexual assault, that you were just discussing with

19   Mr. Ferguson.  Another involved a HIPAA violation for

20   pulling a nonpatient's CSMD, which is a big no-no, right?

21   A.    I recall those were worked by Brandy Blair.  And

22   the HIPAA issues were worked by Barbara Jones.  I don't

23   have the exact dates on those.

24   Q.    Okay.  In the end we know that the Board did not

25   take Mr. Young's nursing license as this original

REDACTED TRANSCRIPT

1    proposal recommended, right?

2    A.    That's my understanding.

3    Q.    That's fair enough.  In your investigation did you

4    review every single piece of evidence that may or may not

5    have corroborated the complaints that you were

6    investigating?

7    A.    I -- within the guidelines that I was provided, the

8    instructions and the time frame, I feel like I did a

9    thorough investigation.  I interviewed my witnesses.  I

10   picked up medical records.  I picked up pharmacy records,

11   other documentation.

12        In terms of every single possibility that could

13   have been done, I can't say that that would have

14   necessarily been, no, sir.  But I feel like I did a

15   thorough investigation.

16   Q.    Sure.  And there were certain constraints.  And, I

17   think, you mentioned a few of them, that with the time

18   that you had, et cetera.  And obviously those are

19   concerns in every investigation.  You certainly couldn't

20   have gone into Jeff Young's clinic and seized his cell

21   phone and downloaded it, right?

22   A.    No, sir.  I'm not law enforcement.  I'm just

23   administrative.

24   Q.    And you certainly couldn't have secured a search

25   warrant for his social media accounts to find out what he

1    was saying in private?

2    A.    No, sir.  Again, I'm not law enforcement.

3    Q.    And you would not have been able to seize Kevin,

4    Uncle Kevin, Mr. Young's friend that was convicted of

5    threatening the DEA officer, you certainly wouldn't have

6    been able to get his phone and see Mr. Young having sex

7    with a semiconscious woman, correct?

8    A.    I couldn't have seized his phone for any reason,

9    no, sir.

10   Q.    You couldn't have gone into his clinic and grabbed

11   anything you wanted, right?

12   A.    No, sir.

13   Q.    That you had probable cause to seize obviously.

14   A.    No.

15   Q.    Okay.  So suffice to say that you came to the

16   conclusions that you came to with administrative

17   authority.  But whatever the Board's reason for the

18   ultimate order allowing Mr. Young to keep his license,

19   there's certainly evidence like what I just described

20   that would be relevant that that the Board would not have

21   seen?

22   A.    Again, I only gather data pursuant to our

23   administrative actions.  That's submitted to our office

24   for review.  Beyond that, my role is done unless there's

25   something additional they need from me.  Anything else I

1    have no -- as to what enters into a decision, that's

2    above me.

3                **MR. PENNEBAKER:**  Thank you so much for your

4    time, Ms. Pickering, and your work.

5                **THE COURT:**  Step down, ma'am.

6                (Witness excused.)

7                **THE COURT:**  Call your next witness.

8                **MR. KNUTSON:**  Your Honor, the next witness is

9    John Chew.  I think he stepped outside.

10               Your Honor, I would ask permission -- I'm

11   going to be running a PowerPoint at the same time so we

12   show the evidence more efficiently.  I would ask

13   permission if I could do the examination at counsel

14   table.

15               **THE COURT:**  Sure.  That's fine.

16               **MR. KNUTSON:**  Would the Court also be okay

17   with me sitting so I can actually --

18               **THE COURT:**  Pull the microphone up close to

19   you so we can make sure we hear you.

20               **MR. KNUTSON:**  Okay.  Thank you.

21               **THE COURT:**  S-H-O-E or S-H-U-E?

22               **MR. KNUTSON:**  C-H-E-W.

23               **THE COURT:**  Okay.  John Chew.

24               **MR. KNUTSON:**  Your Honor, we also have exhibit

25   binders to be used for this witness.

1    **THE COURT:**  Gentlemen, let me make a statement

2    here.  This big binder was submitted to me on the outset.

3    This was never introduced as an exhibit, was it?  Did you

4    ever formally move it as an exhibit?

5    **MR. PENNEBAKER:**  We never did, Your Honor.  We

6    are going to, after the hearing, file an exhibit list

7    that is actually in this binder and ask the judge to

8    admit all of the exhibits that we discussed.

9    **THE COURT:**  Well, I don't think -- I would

10   think it would be appropriate to do it at the time you

11   use it so if there's going to be objections, I could go

12   ahead and rule on them one way or the other.  Even though

13   we're a little lax on the rules of evidence, if this case

14   goes up and the Sixth Circuit doesn't have -- somebody

15   doesn't have these exhibits in front of them, they're

16   going to be wondering what the heck happened down here.

17   **MR. PENNEBAKER:**  Yes, Your Honor.  Would it be

18   okay for me to move to exhibit -- admit Exhibit 1 at this

19   time?

20   **THE COURT:**  Any objection to that?

21   **MR. FERGUSON:**  Your Honor, the only objection

22   I would have is that the exhibits of the presumptive

23   order is not the actual final order, and I would ask for

24   a supplement -- you already have one.

25   **THE COURT:**  I think I have a copy of the

REDACTED TRANSCRIPT

1    ultimate one that was issued by the Court.

2             **MR. FERGUSON:**  Okay.  I think it would be in

3    there.  It was entered as an exhibit in the magistrate

4    court.

5             **THE COURT:**  I believe it was.

6             **MR. FERGUSON:**  If it's in there, that's fine.

7    I just want to make sure the Court did have that

8    available for review.

9             **THE COURT:**  Okay.  The one that we were

10   talking about earlier was simply the one that had been

11   proposed, I guess, or was a draft at some point?

12            **MR. FERGUSON:**  Right, it just got sent out

13   early on in the litigation, when no attorneys were

14   involved, to Mr. Young.

15            **THE COURT:**  All right.  We will make this

16   Collective Exhibit 1 is that what I understand?

17            **MR. PENNEBAKER:**  Yes, Your Honor.

18            **THE COURT:**  I'll let you have that.

19            **THE CLERK:**  Marked as Collective Exhibit 1.

20            **THE COURT:**  All right.  That will be

21   Collective Exhibit 1.

22            (Collective Exhibit No. 1 was marked.)

23            **THE COURT:**  This is the binder counsel is

24   going to be using in his presentation; is that correct?

25            **MR. KNUTSON:**  Yes, it's the binder for the

REDACTED TRANSCRIPT

1    remainder -- mostly for this next witness.  We've also

2    include a flash drive.  And you'll see that on the

3    exhibit list some of the exhibits say Exhibit -- for

4    instance, Exhibit 2 on flash drive.

5              The reason we did it that way is those are the

6    witness exhibits.  Another one is the PMP data, which is

7    a large document.  And also we put the recordings on the

8    flash drive too.  So it will also indicate if it's a

9    video.  It will say it on the flash drive.  And that's

10   all on this flash drive that was handed over to the

11   Court.

12             **THE COURT:**  Okay.  Come around here, please,

13   sir, and be sworn in.

14             **THE CLERK:**  Would you raise your right hand,

15   please.

16             **THE WITNESS:**  Yes, ma'am.

17

18

19

20

21

22

23

24

25

1              **JOHN CHEW,**

2         having been first duly sworn, was examined

3         and testified as follows:

4              **THE CLERK:**  Be seated.

5              **THE WITNESS:**  Thank you.

6              **THE COURT:**  I probably need to ask you, sir,

7    to move up close to that microphone, not right on top of

8    it but enough to where you can be picked up.

9              **THE WITNESS:**  Is this good?

10             **THE COURT:**  All right.  Sir, you may proceed.

11             **MR. KNUTSON:**  Thank you, Judge.

12                     **DIRECT EXAMINATION**

13   **BY MR. KNUTSON:**

14   Q.    Please state your name for the record.

15   A.    John Chew, C-H-E-W.

16   Q.    Mr. Chew, where do you work?

17   A.    Tennessee Bureau of Investigation.

18   Q.    What do you do for them?

19   A.    I am assigned to the Medicaid Fraud Control Unit.

20             **THE COURT:**  I'm sorry.  Would you say that

21   again?

22             **THE WITNESS:**  TBI.

23             **THE COURT:**  Pull it just a little bit closer.

24             **THE WITNESS:**  How is that?

25             **THE COURT:**  That's fine.

                    REDACTED TRANSCRIPT

1    BY MR. KNUTSON:

2    Q.    And are you considered a special agent?

3    A.    Yes, sir.

4    Q.    How long have you worked for them?

5    A.    Approximately, three years.

6    Q.    Where did you work before TBI?

7    A.    Jackson Police Department.

8    Q.    How long did you work for JPD?

9    A.    Five years.

10   Q.    As part of your work for TBI, did you take part in

11   an investigation on a Jeffrey Young?

12   A.    Yes, sir.

13   Q.    Approximately, when did that investigation start?

14   A.    July of 2016.

15   Q.    Okay.  And what were -- what was TBI investigating?

16   A.    TBI was investigating allegations or, excuse me,

17   TennCare recipient debt from overprescribing by a

18   provider here in West Tennessee.

19   Q.    Did you also conduct a broader investigation of

20   overprescribing?

21   A.    Yes, sir.

22   Q.    Did y'all pull what they call a CSMD or CSMD data

23   for Jeff Young?

24   A.    Yes, sir, we did.

25   Q.    Did you get an approximate amount of how many

REDACTED TRANSCRIPT

1    opioids he prescribed?

2    A.    During, I believe, a three-year period,

3    three-and-a-half-year period, it was 800,000 opioids.

4    Q.    Is that including hydrocodone and oxycodone?

5    A.    Yes, sir.

6    Q.    Did you also look to see how many benzodiazepines

7    Mr. Young prescribed during that three-year time frame?

8    A.    Yes, sir, we did.

9    Q.    And how many approximately was that?

10   A.    300,000.

11   Q.    Could it have been 600,000 benzodiazepines?

12   A.    That could be correct, yes, sir.  I don't have the

13   document in front of me.

14   Q.    Okay.  Do you have anything to refresh your memory

15   up there?

16   A.    Not right here.  No, it's not in this binder.

17   Q.    Okay.  And so when you say 300,000 or 800,000, that

18   means actual dosage units or pills; is that correct?

19   A.    That's my understanding, yes, sir.

20   Q.    And did you find when y'all reviewed that CSMD

21   data, he actually had prescribed those two together, the

22   opioid and the benzodiazepines on many occasions?

23   A.    Yes, sir, we did.

24   Q.    And is that one of the things you look for when you

25   investigate these cases?

1   A.    Yes, sir.

2   Q.    And why is that?

3   A.    The combination of those two prescriptions or

4   controlled substances have a lot of adverse effects, to

5   my understanding.  Those include depression of the

6   central nervous system, which can lead to overdose,

7   whether accidental or intentional.  Those drugs are often

8   diverted to the street-level users.  And the

9   benzodiazepines increase the euphoric effect or "high" of

10  the opioids.

11  Q.    Is that also another word for potentiator?

12  A.    Yes, sir.

13          **THE COURT:**  Spell it for me, please.

14          **MR. KNUTSON:**  P-O-T -- do you want him to

15  spell it or --

16          **THE WITNESS:**  I probably won't spell it

17  correct.

18          **MR. KNUTSON:**  I was hoping you would.

19          **THE COURT:**  One of you just so that I have it

20  for the record.

21          **THE WITNESS:**  P-O-T-E-N- --

22          **THE COURT:**  -- -T-I-A-T-O-R.

23          **THE WITNESS:**  Sounds good to me.

24  **BY MR. KNUTSON:**

25  Q.    Is that one of the reasons that it has value on the

REDACTED TRANSCRIPT

1    street is because of that combination?

2    A.    Yes, sir.

3    Q.    Do addicts seek that combination?

4    A.    Yes, sir.

5    Q.    Did y'all look for evidence that people did become

6    addicts or were overprescribed by Jeff Young?

7    A.    Yes, sir.

8    Q.    And in some of that evidence seized, did you

9    perform a search warrant on his Facebook account?

10   A.    Yes, sir.

11   Q.    And just briefly, did you get Facebook messages

12   from that?

13   A.    Yes, sir, they were recovered.

14   Q.    Now, I don't actually use Facebook.  So can you

15   tell me what Facebook messages are?

16   A.    Facebook Messenger is essentially a messaging app

17   designed and created by Facebook for people to

18   communicate --

19            **THE COURT:**  You can just talk to him.  I can

20   hear you.

21            **THE WITNESS:**  All right.  Sorry.

22   A.    That's really -- that's the explanation of it.

23   **BY MR. KNUTSON:**

24   Q.    So it's just a way of sending messages over the

25   Internet?

116

1    A.    Correct.

2    Q.    Did you obtain Facebook messages from a person with

3    the initials SW to Jeff Young regarding addiction?

4    A.    Yes.

5    Q.    And I'm showing you the screen.  Is that Facebook

6    message, is that contained in the larger Exhibit 3?

7    A.    Yes, it is.

8    Q.    Okay.  What did that Facebook message from SW say?

9    A.    It's dated 8/28/2016.  SW:  Jeff, you always been

10   cool as a fan.  But my girl for eight years is an addict,

11   addictive person, XXXXX XXXXX (phonetic).  You write her

12   any more scripts you're going to kill her, man.  She

13   talked about suicide the other night as she was coming

14   off.  You've given her enough to kill a horse as many as

15   she's eating.  And there's nothing wrong with her -- with

16   he.  Thanks.  And again, do not contact her or Messenger

17   and do not write her any more stupid scripts.

18   Q.    Did you find other similar messages to Jeff Young

19   from other people?

20   A.    Yes, sir.

21   Q.    And was one of those from JPG?

22   A.    Yes, sir.

23   Q.    And what did they say?

24   A.    Slander.  Really?  You must not know what that

25   means.  I never once said anything but what my mother,

1    your patient, has told me and that she has been taking

2    what you have prescribed for too long.  I been there and

3    I've done the slander thing.  Been to the sheriff's

4    department myself.  So try again.  I have screenshots,

5    too, of her telling me about what -- you showing up to

6    your office with alcohol.  So, okay, let's go to court.

7    Then all I have done is tell my mother that the addictive

8    drug you prescribed her, she has been on for far.

9    Q.    Now, there's a lot of typos in that.  And you've

10   read this several times, correct?

11   A.    Yes, sir.

12   Q.    What does that appear to be saying, or what does

13   that person appear to be saying?

14   A.    This gentleman is concerned that his mother has

15   been overprescribed.

16   Q.    Did you also talk to employees of Mr. Young's

17   clinic, PreventaGenix?

18   A.    Yes, sir.

19   Q.    Did they also talk about people who were addicted

20   that were patients of Jeff Young?

21   A.    Yes, sir.

22   Q.    Did you speak with a XXXXXXXXXXX?

23   A.    We did.

24   Q.    And what did she say?

25   A.    XXXXX stated that her mother was a patient of

REDACTED TRANSCRIPT

1    Young's and that she received controlled prescriptions

2    that fueled her mother's addiction.  XXXXX stated that

3    she told XXXXX that her mother was an addict, yet he

4    prescribed medication to her anyway.

5    Q.    Did you also speak to an actual patient about her

6    addiction?

7    A.    Yes, sir.

8    Q.    When I say "did you," I mean, did agents in general

9    speak --

10   A.    Yes.

11   Q.    -- to these people?

12   A.    Yes.

13   Q.    So, for instance, XXXXXXXXXXX, you didn't speak to

14   her directly, correct?

15   A.    Correct.

16   Q.    But agents did?

17   A.    Correct.

18   Q.    Okay.  So did you also speak to a XXXXXXXX XXXXXX?

19   A.    Yes.

20   Q.    And what did she say?

21   A.    XXXXXXXX XXXXXX, a former patient of Jeff Young II,

22   XXXXXX wished to speak about her time as a patient of

23   Young's, which was from approximately May 23, 2016,

24   through December of 2016.  XXXXXX, in summary, stated

25   that she was addicted to pain medication when she

REDACTED TRANSCRIPT

1   discovered Young as a practitioner.  XXXXXX stated that

2   she was given controlled substances without any medical

3   testing or procedures conducted by Young.  TFO Wray

4   received the call.

5   Q.    Now, when somebody receives opioids and other

6   controlled substances without any testing, is that a red

7   flag for law enforcement?

8   A.    Yes, sir.

9   Q.    Why is that?

10  A.    There's not a proper diagnosis to justify that

11  prescription.

12  Q.    Okay.  And, also, are they supposed to have a urine

13  drug analysis?

14  A.    Yes, sir.

15  Q.    And did it appear that XXXXXXXX XXXXXX was saying

16  that she didn't receive those things?

17  A.    It appears that way, yes, sir.

18  Q.    Do you know anything about did she go to recovery?

19  A.    As far as I know, yes, sir, she did.

20  Q.    And so did you also investigate whether Young was

21  trading prescriptions for his own sexual gratification?

22  A.    Yes, sir.

23  Q.    And was one of the things that you did also for

24  that issue was to review the Facebook messages that were

25  obtained by search warrant?

1    A.    Yes, sir.

2    Q.    And did you also interview his former employees at

3    PreventaGenix?

4    A.    We did.

5    Q.    Did you interview a Kristie Gutgsell?

6    A.    Yes, sir.

7    Q.    What was her job there at PreventaGenix?

8    A.    My understanding, she was the office manager.

9    Q.    Do you remember roughly when she worked for

10   PreventaGenix?

11   A.    That was a period of about a year and a half, I

12   believe, maybe sometime in '16 to the beginning of 2017.

13   Q.    And did agents interview her and write a report?

14   A.    Yes, sir.

15   Q.    And what did she say about trading prescriptions

16   for sexual gratification?

17   A.    Gutgsell stated that there are at least 50 females

18   that have or still do trade sex with Young for

19   prescriptions.  Gutgsell stated that not all of the

20   females have patient charts.  Gutgsell stated that the

21   females come in during office hours and after hours.

22   Sometimes as many as three females a day come to see

23   Young.  Gutgsell stated it is not uncommon for the

24   females to come in daily.  Gutgsell stated Young would

25   tell her so-and-so is coming in for a nooner or it is

1    tap-that-ass Tuesday, tap-that-ass Thursday.  Gutgsell

2    stated she would watch females leave Young's office with

3    a prescription.  Gutgsell stated some of the office staff

4    had recordings of Young's activities.

5    Q.    And did you also speak with a Madison Wooley?

6    A.    Yes, sir.

7    Q.    And approximately how old was Madison Wooley?

8    A.    I believe, she was in her early twenties.

9    Q.    What did she say about trading scripts for sex?

10   A.    Wooley stated that every day Young would show

11   employees new pics on his cell phone of girls he had sex

12   with.  Wooley stated that Young would brag about having

13   sex at lunchtime with girls, and it was likely that he

14   would write prescriptions for those girls.

15   Q.    And did you speak with a Daniel Rogers?

16   A.    We did.

17   Q.    Did he work for Young's PreventaGenix?

18   A.    Yes, sir.

19   Q.    What did he say about trading sex for scripts?

20   A.    Rogers stated, on average, five to ten patients a

21   week, sometimes more, came to the back door to see Young.

22   Rogers stated they did not have an appointment, nothing

23   was documented in the patient charts, but they all got

24   prescriptions.  Rogers stated females would come in the

25   side business door and wait in Young's office.  Rogers

1   stated Young would go to his office and have sex with

2   those females, and then the females would leave with a

3   prescription.  Rogers stated a female patient told him

4   that he was at Young's house one night for a party, and

5   Young and Kevin Phillips gave her oxycodone.

6   Q.    And who's Kevin Phillips?

7   A.    It's my understanding that Kevin Phillips is a

8   friend and associate of Mr. Young.

9   Q.    Okay.  And did you speak with or did agents speak

10  with any other employees in this case --

11  A.    Yes, sir.

12  Q.    -- of Jeff Young?

13        And did they corroborate or say similar things

14  about the sex for scripts exchange?

15  A.    Yes, sir.

16  Q.    Besides speaking with other employees at

17  PreventaGenix, did you also corroborate these interviews

18  with other evidence?

19  A.    Yes.

20  Q.    And does that include the Facebook messages?

21  A.    It does.

22  Q.    Did you find a Facebook message between Young and

23  patient AS?

24  A.    Yes, sir.

25  Q.    And what did she say?

1  A.    July 30, 2016:  Just waking up, running behind,

2  waiting to see if my friend is going to drive me.  Can't

3  wait to see you again.  I hope you weren't disappointed

4  yesterday.  Just believe me:  When we are somewhere I can

5  do what I want and be as loud and destructive as we want,

6  things will be better and different.  Thank you for

7  taking care of me, not just the sex and satisfaction but

8  the Soma too.  It helps better than any other out there.

9  I wrote a post about it.  You can check it out and at

10 least Like it or comment or no one will take me.

11 Q.    Now, is she indicating there that she had sex with

12 Mr. Young?

13 A.    Yes.

14 Q.    Do you know if she was a patient of Mr. Young?

15 A.    We do.

16 Q.    How do you know she was a patient of Mr. Young?

17 A.    Her PMP or CSMD data.

18 Q.    So you pulled her prescription history, correct?

19 A.    Yes.

20 Q.    And does the next slide show a portion of that

21 prescription history from Jeff Young to patient AS?

22 A.    It does.

23 Q.    And what we was he prescribing?

24 A.    Carisoprodol, if I'm saying that correctly, also

25 known as Soma; oxycodone, Schedule II.

1   Q.    Let me stop you there.  So those were both on the

2   same day, correct?

3   A.    Yes, sir.

4   Q.    Is there a problem or is there a red flag in your

5   investigations when carisoprodol, or Soma, is prescribed

6   in combination with oxycodone?

7   A.    Yes.

8   Q.    What is that problem?

9   A.    It's my understanding that they do not work well

10  together.  I really can't explain it.  I don't have the

11  medical background to do that.

12  Q.    Is that one of the red flags you look for, however?

13  A.    Yes.

14  Q.    And carisoprodol, what schedule is that?

15  A.    Schedule IV.

16  Q.    Is it your understanding that Mr. Young still

17  prescribes Schedule IV substances?

18  A.    Yes, sir.

19  Q.    And so how many times does he prescribe that

20  combination to the patient he was having sex with?

21  A.    Mr. Young consistently prescribes this combination

22  from looks to be about June of 2016 all the way through

23  December of 2016.

24  Q.    And so the first time, though, it appears he

25  prescribed on 7/29/2016, when was that Facebook message

1    sent to Jeff Young?

2    A.     7/30/2016.

3    Q.     So the day before he actually prescribed her the

4    Soma, correct?

5    A.     Yes, sir.

6    Q.     Does she mention the Soma in her Facebook message

7    to her medical provider, Jeff Young?

8    A.     She did.

9    Q.     And is it clear that he actually prescribed that to

10   her after she had mentioned it?

11   A.     Yes.

12   Q.     Or actually the day before, correct?

13   A.     Yes, absolutely.

14   Q.     And did you also pull some Facebook messages for a

15   patient TP?

16   A.     We did.

17   Q.     Can you tell us what those Facebook messages from

18   Jeff Young or between Jeff Young and TP said?

19   A.     On September 14, 2015, Jeff Young.  I'll omit the

20   dates in the rest, if that's okay, and just read the

21   text.

22   Q.     Okay.

23   A.     Jeff Young:  Come fuck me at my office right now.

24   TP:  When?  Jeff Young:  Now.  TP:  I can't right now.

25   I'm cooking for kids.  Jeff Young:  Okay.  TP:  Do you

1  write your own scripts?  Jeff Young:  I need a blow job.

2  TP:  Haha.  Jeff Young:  You're supposed to say I can

3  handle that.  TP:  You crack me up.  I like you.  You're

4  straightforward and say what you mean and a lot like me.

5  I can handle that.  So if I say, hey, Jeff, I'm a

6  squirter, you're good with that?  LOL.  Jeff Young:  OMG

7  deal sealed.  Those words are music to my ears.  TP:  You

8  need to write me a script for Adderall, Doc.

9  Q.    Do you know what Adderall is?

10 A.    I do.  I don't know much about it but know a little

11 bit.

12 Q.    Do you know what schedule it is?

13 A.    I believe a II.

14 Q.    Is it a stimulant or depressant?

15 A.    It's a stimulant.

16 Q.    But it's a Schedule II controlled substance,

17 correct?

18 A.    Correct.

19 Q.    Now, did he actually -- did you pull her

20 prescription history from Young?

21 A.    We did.

22 Q.    And, well, first of all, when those text messages

23 were sent, sometimes there's attachments, correct?

24 A.    Correct.

25 Q.    Was there an attachment sent from TP to Jeff Young?

1    A.    Yes.

2    Q.    And is that showing on the screen right now?

3    A.    It is.

4    Q.    Okay.  Did you find -- in your reviewing of those

5    Facebook messages, did you find few or many of these sort

6    of illicit sexual photographs being sent back and forth

7    between Jeff Young and people, including his patients?

8    A.    Many photos.

9    Q.    And what did Jeff Young prescribe TP?

10   A.    According to the PMP, on February 18, 2016,

11   Jeff Young wrote TP a prescription for the Schedule IV

12   controlled substance phentermine.

13   Q.    Now, she was asking for an Adderall script,

14   correct, in the Facebook message?

15   A.    Correct.

16   Q.    But she got phentermine.  Do you know a little bit

17   about phentermine?

18   A.    Obviously, it's a Schedule IV, but it is also a

19   stimulant.

20   Q.    Okay.  So it's similar to the way that it's a

21   stimulant, similar to Adderall; is that correct?

22   A.    Correct.

23   Q.    And did you review more Facebook messages between

24   Jeff Young and his patients?

25   A.    We did.

128

1   Q.    Did you review a Facebook message between patient

2   TMP and Jeff Young?

3   A.    We did.

4   Q.    And can you tell us what that said?

5   A.    9/20/2016, Jeff Young:  I have frustrations to work

6   out.  It would be violent.  TMP:  Mmm, thank God I

7   have -- I'm going to have to come see you tomorrow.

8   Jeff Young:  Please.  I'll see you in my private office.

9   TMP:  I will try my best, I promise.  I need it.

10  Jeff Young:  Me too.

11  Q.    And was there more to that Facebook conversation?

12  A.    Yes, I'm sorry.  Jeff Young:  You've seen mine.

13  Show me your pussy and let's see if I think it's a good

14  fit.  TMP:  Oh, damn.  Jeff Young:  I'll wait for mine.

15  TMP:  Biting my lip.  Jeff Young:  Send me something in

16  return.  TMP:  I definitely can't take you in my ass, at

17  least not in your office where I'll need to be quiet.

18  Jeff Young:  I want to eat that pussy, baby.

19  Q.    And there's more to that text message?

20  A.    Yes, sir.  Jeff Young:  I'm going to try to sleep.

21  You want to come by for a check-up tomorrow?  TMP: I

22  promise I'm going to go try, babe, tonight -- excuse me,

23  I'm going to redo that -- I promise I'm going to try,

24  baby.  Goodnight.  Jeff Young:  Please.  TMP:  Mmm.

25  Jeff Young:  Wear a short skirt and no panties.  TMP:

<u>DIRECT - JOHN CHEW</u>                                                  129

1    Yes, sir.  Jeff Young:  Text me first thing tomorrow and

2    let me know when you can come.

3    Q.    Was there also attachments to these Facebook

4    conversations?

5    A.    Yes, sir.

6    Q.    And did agents pull those?

7    A.    We did.

8    Q.    And this one is blocked out, but can you tell us

9    what that is a photo of based on the context of those

10   text messages?

11   A.    That is Mr. Young's penis.

12   Q.    And did he send that to TMP, his patient?

13   A.    He did.

14   Q.    And what is the exhibit or the next slide, which is

15   also contained -- labeled as Exhibit 5?  What does that

16   show?

17   A.    TMP's vagina or vaginal area.

18   Q.    And did she send that to Jeff Young?

19   A.    Yes.

20   Q.    Now, did you confirm she was a patient of

21   Jeff Young?

22   A.    We did.

23   Q.    And how did you do that?

24   A.    Through review of the CSMD.

25   Q.    What and when was Jeff Young prescribing to patient

REDACTED TRANSCRIPT

1   TMP?

2   A.    So from August of 2016 through December 2016, he

3   was prescribing her hydrocodone.

4   Q.    And is that the same time that they're exchanging

5   sexually explicit photos and having these sexually

6   charged conversations?

7   A.    Yes, sir.

8   Q.    Now, are all those Schedule II opioids that he

9   prescribed to her?

10  A.    Yes, sir.

11  Q.    Did you also review the messages between Jeff Young

12  and patient CHT?

13  A.    Yes, sir.

14  Q.    And what did those say?

15  A.    February 16, 2016.  CHT:  Thank you for taking good

16  care of my husband.  I truly appreciate it.  You are an

17  amazing doc.  Jeff Young:  Absolutely.  Did he tell you

18  about the Botox deal?  CHT:  Yes.  He spoils me.  I am

19  super excited Jeff Young, II:  When do you want to get it

20  done?  CHT:  I have no idea because we start his

21  radiation today.  I am off work every Wednesday if that's

22  possible anytime.

23  Q.    Now, she talks about her husband there, correct?

24  A.    Yes.

25  Q.    Is he -- apparently, he's a cancer patient.  Is

REDACTED TRANSCRIPT

1    that what you discovered?

2    A.    Yes, sir.

3    Q.    And did they continue this conversation?

4    A.    Yes.

5    Q.    And what else did they say in this conversation?

6    A.    Jeff Young:  We could have a great time if you are

7    discrete.  CHT:  Well, duh, I am married to a wonderful

8    man.  Just curious and bad.  LOL.  Jeff Young:  Well, I'm

9    down if you want to explore more.  CHT:  Should.  Time is

10   hard for this working mommie and sick hubby.  Need an

11   appointment for more Botox.  How much for the same area?

12   Q.    Did you find a lot of Facebook messages where he's

13   talking about Botox also?

14   A.    Yes.

15   Q.    And is that one of the services that he appears to

16   be providing this patient?

17   A.    Yes, sir.

18   Q.    Did you also find out that this patient's husband,

19   the cancer patient, was also a Jeff Young patient?

20   A.    Yes.

21   Q.    How did you find that out?

22   A.    Through a review of CSMD.

23   Q.    So did it appear to you from the Facebook messages

24   and other evidence that she actually engaged in a sexual

25   relationship with Jeff Young?

1    A.    It would appear that way.

2    Q.    Did you also obtain a recording from Jeff Young's

3    phone?

4    A.    We did.

5    Q.    Okay.  And was it from CHT?

6    A.    Yes.

7          **MR. KNUTSON:**  Your Honor, permission to play

8    that recording.

9          **THE COURT:**  All right, sir.

10         **MR. KNUTSON:**  I'm going to have to back out of

11   the presentation to play it.

12         (Audio played.)

13   **BY MR. KNUTSON:**

14   Q.    Now, you've listened to this recording several

15   times, correct?

16   A.    Yes, sir.

17   Q.    What does she apparently appear to be saying in

18   that recording?

19   A.    Appears that she would like him to come or she is

20   waiting for him at his house.

21   Q.    In his Jacuzzi, correct?

22   A.    Yes.

23   Q.    What, if you remember -- and I'll pull that up for

24   you.  When was that first conversation that y'all pulled

25   between Jeff Young and CHT?

1   A.   February of '16.

2   Q.   And when was this (indicating)?

3   A.   Those are from June of 2016.

4   Q.   The first one was February.  Then there were some

5   from June.  And when was that recording made?

6   A.   June 24, 2016.

7   Q.   And so the next slide, what does that show?

8   A.   That is CHT's husband.  And it's a snapshot of the

9   PMP prescriptions he was receiving.

10  Q.   And when did he receive his prescriptions?

11  A.   7/28/2015.

12  Q.   So it appears he was a patient even back in 2015 of

13  Jeff Young, correct?

14  A.   Correct.

15  Q.   And did she receive prescriptions from Jeff Young?

16  A.   She did.

17  Q.   Did those prescriptions include benzodiazepines?

18  A.   Yes.

19  Q.   And did they also include opioids?

20  A.   Yes, they did.

21  Q.   Can you just summarize some of the prescriptions

22  she received?

23  A.   6/11/2016, diazepam, Schedule IV benzodiazepine.

24  Also received another prescription on 6/21/2016,

25  phenobarbital, if I'm saying that correctly.

REDACTED TRANSCRIPT

1    Q.    What schedule is that?

2    A.    That is a Schedule IV.  May 11, 2016, she received

3    a prescription for alprazolam and Tramadol, both

4    Schedule IV's.  6/1/2016, diazepam, Schedule IV.

5    6/13/2016, diazepam, Schedule IV.  9/1/2016, hydrocodone,

6    Schedule II.  9/13/2016, diazepam, Schedule IV.

7    Q.    What do you know diazepam to be as far as a class

8    of drugs?

9    A.    Benzodiazepine.

10   Q.    And is he still able to prescribe benzodiazepines

11   today?

12   A.    Yes.

13   Q.    Now, that first one he prescribes on 6/21/2016, was

14   that close to the date of that recording?

15   A.    It was, yes, sir.

16   Q.    In fact, that was three days before, correct?

17   A.    Correct.

18   Q.    Did you also review the Facebook messages between

19   Young and a patient JA?

20   A.    We did.

21   Q.    Can you tell us what those said and the initial

22   date of those texts or Facebook messages?

23   A.    August 1, 2015, JA:  So are you a real doctor, or

24   do you just like to play one?  LOL.  JA:  On a serious

25   note, I need one -- I need to know if you only specialize

1   in prevention.  Not a good pickup line, huh?  LOL.

2   Jeff Young:  In what way do you need one?  I just like to

3   play doctor.  JA:  Shit.  LOL.  Playing is fun, but I

4   actually need a real one.  I'm a mess.  LOL.  Took my

5   doctor.  LOL.  You work Saturdays?  Jeff Young:  Only if

6   you'll give up or give in.  JA:  LOL.  Give up what?  I

7   don't need on OB.  LOL.

8   Q.    What does "OB" stand for?

9   A.    Female examination.

10  Q.    And can you continue reading the rest of the text

11  conversation or Facebook conversation?

12  A.    JA:  Seriously this is work.  I am work.  I am in

13  shitty health and about to jump off a bridge.  Are you at

14  a concert?  Why wasn't I invited, sir?  I've heard you

15  are pretty good at being a doctor.  LOL.  A real one.

16  Jeff Young:  I'm good at everything.  I accept all

17  insurance.  Will be glad to take the balance out of your

18  ass.  I will be open to you anytime.  I mean, feel free

19  to send me pics anytime.  JA:  Well, to me, it's an

20  emergency because I am nearly out of meds and feel

21  horrible and helpless.  But on a scale from one through

22  nine, I'm a four.  I honestly don't know what happens if

23  I completely run out because it's never happened in four

24  years.  But like I said, I feel so bad anyway, even with

25  them.  I'm sure I can live.  LOL.  I honestly wish we

1    could maybe video chat tomorrow, if available.  Maybe we

2    can go from there.  Maybe not make it at first though.

3    LOL.  Can you do a video chat visit and bill me?  LOL.

4    Jeff Young:  I can meet you at my office at 4P tomorrow

5    if not sooner via pic.  JA:  That would just be awkward.

6    LOL.  Here's a pic and here's my lymph nodes, haha.

7    Q.    Do you find that a lot with other text messages

8    that you reviewed that he tries to get them back at his

9    office and have sex with them?

10   A.    We do.

11   Q.    And was there more to this Facebook conversation.

12   A.    There was.  3/1/2016.  JA:  Well, bring your script

13   pad.  You accidently shorted me a week's worth of meds

14   because you were understandably distracted.  I didn't

15   realize --

16   Q.    Let me stop you there just for interest of clarity.

17   This actually was in 2016, right?

18   A.    Correct.

19   Q.    So this is actually a different Facebook

20   conversation?

21   A.    Correct.

22   Q.    Okay.  Proceed, please.

23   A.    Well, bring your script pad.  You accidentally

24   shorted me a week's worth of meds because you were

25   understandably distracted.  I didn't realize it.  Plus,

1    I'm done with Percocet for a while.  And my Adderall

2    refill is due today.  LOL.  Are you going -- you are

3    going to love me.

4    Q.    Let me stop you there.  What is Percocet?

5    A.    It's a Schedule II drug.

6    Q.    Is that an opioid?

7    A.    It is.

8    Q.    And is Adderall a Schedule II drug you spoke of

9    earlier?

10   A.    Yes, sir.

11   Q.    Please, continue.

12   A.    Jeff Young:  Of course.  What med did I short you?

13   JA:  The Percocet.  LMAO.  Not only did I ask you for a

14   drop in strength from 10 to 7.5 because of the fentanyl

15   and we dropped fentanyl, too, but I realized that you

16   accidently wrote TID instead of QID.  So we dropped a

17   whole one day.  Only we didn't mean to do that.  So I had

18   been taking QID.  Anyway, I'm breaking out again, and I

19   know Percocet is the culprit.  Hydrocodone is weak, but I

20   think I will be okay with it as long as I have the patch,

21   which I have now adjusted, too, at the lower dose.  LOL.

22   I just want to D.

23   Q.    Now, earlier she spoke about fentanyl.  Do you know

24   what fentanyl is?

25   A.    I know it's a very potent and powerful opioid.

1    Q.    Is it more potent and powerful than oxycodone and

2    hydrocodone?

3    A.    That's my understanding, yes.

4    Q.    Is it also a Schedule II controlled substance?

5    A.    Yes.

6    Q.    Did you confirm that this person was a patient of

7    Jeff's?

8    A.    Yes.

9    Q.    And you also pulled her prescription history; is

10   that correct?

11   A.    Correct.

12   Q.    And what did Jeff Young prescribe to patient JA?

13   A.    All right.  So from August 2015 through January of

14   2016 looks like he gave her a combination of oxycodone,

15   amphetamine salts, phentermine, Tramadol, and whatever

16   this dia -- I can't say that correctly.  You'll have to

17   excuse me.

18   Q.    Did you pull more prescriptions for patient JA?

19   A.    We did.

20   Q.    And what were the dates for those prescriptions?

21   A.    From December 2015 through March of 2016.  Same

22   combination of hydrocodone, amphetamine, alprazolam,

23   oxycodone, butrins.  Fentanyl is in there.  Clonazepam.

24   And amphetamine salts.

25   Q.    Now, I want you to look at the date January 25,

1    2016.  What does Jeff Young prescribe to the patient JA

2    on that date?

3    A.    Alprazolam, Schedule IV drug; and Fentanyl

4    transdermal system, Schedule II.

5    Q.    And, then, is there a third?

6    A.    Oh, I'm sorry.  Oxycodone HCL, which is also a

7    Schedule II.

8    Q.    And how much oxycodone does he prescribe along with

9    the fentanyl and the alprazolam?

10   A.    Ten milligrams.

11   Q.    Is Alprazolam a benzodiazepine?

12   A.    It is.

13   Q.    And it's one of those that's not supposed to be in

14   combination with opioids, correct?

15   A.    Correct.

16   Q.    Do you know what the fentanyl transdermal system

17   is?

18   A.    It's my understanding it's a patch that you place

19   on your skin.

20   Q.    Okay.  Do you know what type of patients usually

21   receive that type of opioid?

22   A.    My understanding is terminally ill patients,

23   typically, receive that medication.

24   Q.    During the times that he's prescribing to her, is

25   he also having sexual conversations with patient JA?

REDACTED TRANSCRIPT

1   A.   Yes.

2   Q.   I'm going to go to the next slide.  Is that even

3   more prescriptions from Jeff Young to patient JA?

4   A.   Yes, sir, from March through May.

5   Q.   Okay.  And this is going to be discussed by the

6   next witness, but did you also confirm that there's

7   recent prescriptions to patient JA?

8   A.   Yes.

9   Q.   Now, when is your understanding that his first

10  clinic stopped operating?

11  A.   Sometime, I believe, maybe March of 2017, January

12  or March.

13  Q.   And that was soon after there was a search warrant

14  executed on PreventaGenix?

15  A.   Correct.

16  Q.   After PreventaGenix did he open another clinic?

17  A.   He did.

18  Q.   What's the name of that clinic?

19  A.   Genexis.

20  Q.   Did he appear to be prescribing to this same person

21  that he was apparently having sex with even after he

22  stopped operating PreventaGenix?

23  A.   Yes.

24  Q.   Now, this next slide, what does that show?

25  A.   That is his 2018 prescription history.

REDACTED TRANSCRIPT

1    Q.    Now, is he still prescribing her the alprazolam,
2    which is a benzodiazepine?
3    A.    He is.
4    Q.    And on a few or many occasions?
5    A.    Looks like it appears to be monthly.
6    Q.    Now, also, the top one, on 1/6/2018, shows that
7    he's prescribing alprazolam with amphetamine.  What is
8    the name of that?  Is that also a name for Adderall?
9    A.    Dextroamphetamine, yes, sir.
10   Q.    And is that a Schedule II drug we spoke about?
11   A.    Yes.
12   Q.    Did you also look up to find out or ask an expert
13   about what butorphanol is?
14   A.    Yes.
15   Q.    And what is that?
16   A.    I can't recall.
17   Q.    How about clonazepam?  What class of drug is that?
18   A.    IV, Schedule IV.
19   Q.    And is that a benzodiazepine?
20   A.    It is.
21   Q.    And is it your understanding that there's many more
22   prescriptions that were prescribed by Young to JA in the
23   last two years?
24   A.    Yes.
25   Q.    And that next slide, does that include the rest of

REDACTED TRANSCRIPT

1   2018?

2   A.    It does.  From May all the way through December.

3   Q.    Of 2018; is that correct?

4   A.    Yes, sir.

5   Q.    Now, did you also investigate whether he was having

6   sex with patients not only at PreventaGenix but at his

7   new clinic, Genexis?

8   A.    We did.

9   Q.    Did you also receive -- obtain medical board

10  information regarding that?

11  A.    Yes, sir.

12  Q.    And did they provide you with a recording of an

13  interview of a former employee of his new clinic,

14  Genexis?

15  A.    They did.

16        **MR. KNUTSON:**  Your Honor, permission to play

17  that recording.

18        **THE COURT:**  Yes, sir.

19        (Audio played.)

20  **BY MR. KNUTSON:**

21  Q.    Now, how is this former employee saying that she

22  knows that Jeff Young was having sex at Genexis?

23  A.    Through his own admissions and through hearing it

24  at the office.

25  Q.    These are just excerpts.  Did you pull another

REDACTED TRANSCRIPT

143

1    excerpt from that?

2    A.    We did.

3               (Audio played.)

4               **MR. KNUTSON:**  And, then, I'll just play the

5    last one.

6               (Audio played.)

7    **BY MR. KNUTSON:**

8    Q.    Now, is this -- when this employee was working

9    there, is this after he closed down PreventaGenix?

10   A.    Yes.

11   Q.    Is this after the Board had started investigating

12   him in 2015?

13   A.    Yes, sir.

14   Q.    Is it after the search warrant was executed in

15   January of 2017?

16   A.    Yes, sir.

17   Q.    And it's certainly within two years, correct?

18   A.    Correct.

19   Q.    And does her account of how she knew the sex was

20   going on at Genexis, is it similar to the accounts you've

21   heard from the PreventaGenix employees?

22   A.    Yes, sir.

23   Q.    Similar, in that, he would admit it to the

24   employees or show photos, correct?

25   A.    Correct.

                          REDACTED TRANSCRIPT

1   Q.    And similarly because they could sometimes hear it;

2   is that correct?

3   A.    That's correct as well.

4   Q.    Is she talking about him actually having sex in his

5   office?

6   A.    Yes.

7   Q.    Okay.  As part of your investigation, did you pull

8   some information regarding past assaults?

9   A.    Yes.

10  Q.    And did you pull a report and some photographs of

11  him assaulting his ex-wife?

12  A.    We did.

13  Q.    What's his ex-wife's name?

14  A.    Dawn Young.

15  Q.    And I'm going to show you on the screen what's

16  marked as Exhibit 21.  What does that show?

17  A.    That's a photo of Dawn Young with an injury to her

18  right forearm and elbow.

19  Q.    And when was that assault allegation?

20  A.    2011.

21  Q.    And where did that occur?

22  A.    In Florida.

23  Q.    And what's this next photo a photo of?

24  A.    That's an image of Dawn Young with an injury to her

25  left elbow, arm.

REDACTED TRANSCRIPT

1    Q.    And the next photo?

2    A.    That appears to be a photo of Dawn Young's hands.

3    The left hand is bandaged or wrapped up and swollen.

4    Q.    And the last photo?

5    A.    That is Ms. Young with severe bruising to her upper

6    right leg/buttocks area.

7    Q.    Did you review the offense report from the Florida

8    investigators on that case?

9    A.    Yes, sir.

10   Q.    And based upon your review, what happened in that

11   case?

12   A.    It's my understanding --

13   Q.    If you know without looking at this, just like a

14   general --

15   A.    My understanding is that Mr. Young assaulted

16   Ms. Young.  They had been partying the night before, woke

17   up the next morning, and he was standing over top of her,

18   and he had assaulted her at some point.

19   Q.    Did she also make some sexual allegations?

20   A.    She did.

21   Q.    And what were those?

22   A.    Ms. Young also explained she believed her husband

23   intended to commit sexual battery against her the night

24   prior.  When asked to clarify, she stated he was making

25   sexual advances towards her against her will as he was

1    naked.  However, no penetration occurred at any time.

2    The incident was interrupted by XXXXXX Wick (phonetic),

3    who witnessed Mr. Young, naked, standing over his wife as

4    she was yelling for help.

5    Q.    Based on your review of that report, did Mr. Young

6    cause those bruises?

7    A.    I would assume so.

8    Q.    Did you also pull reports regarding rape

9    allegations against Mr. Young?

10   A.    We did.

11   Q.    One specifically including a victim with the

12   initials AG?

13   A.    Yes.

14   Q.    And what were those allegations?

15   A.    April 2016 -- excuse me, April 2, 2016, I responded

16   to Jackson-Madison County General Hospital and made

17   contact.  Advised that the night before she was at a

18   house party with friends after leaving the club Slide and

19   Ride.  Went on to say that while at the house party

20   Jeff Young made her drinks.  She advised that she did --

21            **THE COURT:**  Slow down just a little bit.

22            **THE WITNESS:**  Okay.

23   A.    Drank all night.  And the two later ended up in a

24   room with bunk beds.  She stated Grant put the mattress

25   on the floor and the two laid on them, talking.  At some

1   point she passed out but woke at one point and saw Jeff

2   on top of her.  She could not advise exactly what

3   happened.  She left Young's home around 11 or 11:30 on

4   4/2/2016 and said that when she woke up she was naked and

5   had some bruises on her thighs and knees.  A complete

6   formal/adopted written statement was taken.

7   Q.    Do you know what happened with that rape

8   allegation?

9   A.    I don't know the disposition of that.

10  Q.    Do you know the disposition of the assault

11  allegation?

12  A.    Yes, I believe that one was resolved.

13  Q.    Was it your understanding that his wife at the time

14  didn't want to press charges?

15  A.    That's correct.

16  Q.    Did you also find evidence on Jeff Young's phone

17  that there were other allegations that he had raped a

18  woman?

19  A.    Yes.

20  Q.    The next slide, is that a text message from

21  Jeff Young?

22  A.    It is an iMessage from Jeff Young to

23  Kevin Phillips.

24  Q.    Text of AH:  Accusing me of rape.  Would explain

25  how I got involved in the no contact with the kids.  That

1   was on 12/8/2016.

2   Q.    So do you know who AH is?

3   A.    I don't remember her full name.

4   Q.    Okay.  And AG, do you know, she wasn't necessarily

5   a patient of Jeff Young, was she?

6   A.    No, sir.

7   Q.    And AH, you don't know if she was a patient of

8   Jeff Young either?

9   A.    I don't know.

10   Q.    Now, Kevin comes up again.  Is that the person also

11   known as Uncle Kevin that we spoke about before?

12   A.    Yes, sir.

13   Q.    Is one of the things in your investigation that you

14   reviewed the other online materials that Jeff Young

15   posted online?

16   A.    We did.

17   Q.    And I'm showing you a photo, which is also a video.

18   What is that from?

19   A.    That appears to be Kevin Phillips in Jeff's office

20   holding a pair of women's panties.

21   Q.    And have you watched this video?

22   A.    I have.

23         **MR. KNUTSON:**  Your Honor, permission to play

24   the video.

25         **THE COURT:**  All right, sir.

```
 1                    (video played.)
 2   BY MR. KNUTSON:
 3   Q.    Now, does he appear to be at his clinic when he's
 4   making this video?
 5   A.    Yes, sir.
 6   Q.    And you see Uncle Kevin.  Is that the same
 7   Kevin Phillips that's been in this court before and his
 8   bond was revoked?
 9   A.    Yes, sir.
10   Q.    Do you see that a lot that he was -- in your
11   investigation that he had filmed a lot of the stuff that
12   Jeff Young had done?
13   A.    Yes, sir.
14   Q.    And he kind of describes when they're talking about
15   the underwear and laughing about it sort of a type of
16   woman.  Do you see -- have you determined by your
17   investigation what type of woman he sort of looks for and
18   goes after?
19   A.    Yes, sir.
20   Q.    And what type of woman is that?
21   A.    I would say that he tends to lean towards women
22   that are attractive, in pretty good physical health,
23   oftentimes younger.
24   Q.    Oftentimes younger.  And so did you also obtain the
25   phone of Uncle Kevin?
```

1    A.    We did.

2    Q.    And were there videos of Jeff Young on Uncle

3    Kevin's phone?

4    A.    Yes, sir.

5    Q.    One in particular, was there an explicit sexual

6    video that was taken off Uncle Kevin's phone?

7    A.    Yes, sir.

8    Q.    Can you tell us what that shows?

9    A.    Mr. Young was having sexual intercourse with an

10   unidentified female at a room.  It appears to be a hotel

11   room.

12   Q.    And what did it appear to be the state of the

13   unidentified female?

14   A.    The unidentified female was semiconscious, appeared

15   to be under the influence of drug and/or alcohol.

16         **MR. KNUTSON:**  Your Honor, this is a very

17   explicit sexual video.  I think it's relevant.  I don't

18   know, we just have a couple of excerpts we want to play,

19   very short, with the Court's permission.  I just wanted

20   to let you know that before I played it.

21         **THE COURT:**  Go ahead.

22         (Video played.)

23   **BY MR. KNUTSON:**

24   Q.    Now, that's just a short excerpt, but he does a

25   motion in that video, correct?

REDACTED TRANSCRIPT

1    A.    Correct.

2    Q.    What motion does he do?

3    A.    He motions for Kevin or whoever is recording the

4    video to come closer.

5    Q.    Okay.  So it appears he's directing that sex video?

6    A.    Correct.

7    Q.    And he's obviously having sex with her?

8    A.    Correct.

9          (Video played.)

10   **BY MR. KNUTSON:**

11   Q.    Now, does that appear to be the female talking?

12   A.    It does.

13   Q.    And can you understand at all what she's saying?

14   A.    I have no idea what she said.

15         (Video played.)

16   **BY MR. KNUTSON:**

17   Q.    Did you ever find out how old --

18   A.    No.

19   Q.    -- the woman or girl in that video is?

20   A.    No.

21   Q.    Do you know if that's a patient of his?

22   A.    We do not know.

23   Q.    From the context of that, where does that appear to

24   be at?

25   A.    It appears to be a hotel room.

REDACTED TRANSCRIPT

1    Q.    Okay.  Now, the recording was made approximately in

2    2016, correct?

3    A.    Correct.

4    Q.    Have agents looked for this woman?

5    A.    Yes.

6    Q.    And why is it -- why have you been looking for her?

7    A.    To determine if that was consensual or not.

8    Q.    Based upon your training and experience, does it

9    appear that it is consensual?

10         **MR. FERGUSON:**  Judge, I object.  It's outside

11    the scope.

12         **MR. KNUTSON:**  Your Honor, I'll let the video

13    speak for itself.  I'll withdraw it.

14         **THE COURT:**  Yes, sir.

15   **BY MR. KNUTSON:**

16   Q.    Now, in your investigation did you see a lot of or

17   at least some interaction between Young and local law

18   enforcement?

19   A.    We did.

20   Q.    Did he appear to have at least a few of local law

21   enforcement as patients?

22   A.    He did.

23   Q.    And did he use his relationship with them to try to

24   obtain information to his benefit?

25   A.    Yes.

1   Q.    Did you pull the text from Mr. Young with a

2   XXXXXXXX?

3   A.    We did.

4   Q.    And who is XXXXXXXX?

5   A.    Police officer with the city of Humboldt, or was at

6   the time.

7   Q.    Okay.  What did those text messages say?

8   A.    February 10, 2016.  Jeff Young:  Yes, sir.  You a

9   cop in Gibson, right?  XXXXXXXX:  Humboldt.  Jeff Young:

10  I need you to find this fucker.  XXXXXXXX:  Do you want

11  criminal history?  Jeff Young:  Sure, anything and

12  everything.

13  Q.    Now, based upon your training and experience as an

14  officer, can you field those types of requests from

15  people in the community?

16  A.    I would not.

17  Q.    And why?

18  A.    First of all, it's unethical in my opinion.

19  Q.    Okay.  And it possibly is illegal, correct?

20  A.    Correct.

21  Q.    Did other -- did he call upon other local law

22  enforcement with similar requests?

23  A.    He did.

24  Q.    Do you know who -- first of all, let me ask you

25  this:  Was XXXXXXXX a patient of Jeff Young's?

REDACTED TRANSCRIPT

1    A.    He was.

2    Q.    And you know that because of his prescription

3    history, correct?

4    A.    Correct.

5    Q.    What was Jeff Young prescribing the law enforcement

6    officer, XXXXXXXX?

7    A.    Hydrocodone, Schedule II; Zolpidem Tartrate,

8    Schedule IV; Tramadol, Phentermine, hydrocodone,

9    amphetamine.

10   Q.    Does he appear to be getting opioids and

11   benzodiazepines also?

12   A.    Correct.

13   Q.    And was there another officer that appeared to

14   be giving Jeff Young information and was a patient of

15   Jeff Young?

16   A.    Yes.

17   Q.    And who was that?

18   A.    XXXXX XXXXXXX.

19   Q.    Okay.  Who does he work for?

20   A.    Jackson Police Department.

21   Q.    Exhibit 18, actually, what phone did you get that

22   off?

23   A.    I believe that came from Young's phone.

24   Q.    And what does that show?

25   A.    That's a screenshot of a text message between

155

1    XXXXX XXXXXXX and, well, Kristie Gutgsell sent to Young.

2    Q.    Is it your understanding from the context of this

3    that Kristie Gutgsell had sent Young a screenshot of

4    XXXXX XXXXXXXXX phone?

5    A.    Yes.

6    Q.    Who's XXXXX XXXXXXX?

7    A.    XXXXX XXXXXXX is XXXXX XXXXXXXXX wife.

8    Q.    Okay.  What does it say on the screenshot that she

9    sent to Jeff Young?

10   A.    Any chance you can get your husband to check and

11   see if Jeff has a warrant in Madison County that got

12   transferred from Shelby County.  Rumor is he does.

13         She responds:  Yes, ma'am.

14         Kristie responds:  Thank you so much.

15   Q.    And then there's a second part to that, right, on

16   Exhibit 19?

17   A.    Yes.

18         Okay.  Thanks.  It is not entered into NCIC,

19   National Crime Information Center, as of now.  So if

20   somebody were to run him --

21               **THE COURT:**  Slow down.

22               **THE WITNESS:**  Yes, sir.

23   A.    -- or his tag in Jackson, it would not show up that

24   he had a warrant.  XXXXX said he would check again in the

25   morning when he gets to work and see if it has been

                         REDACTED TRANSCRIPT

1    entered.  He advised that he go turn himself in and get

2    it taken care of before somebody like Briley, for

3    instance, around here gets wind of it and it hits the

4    news and runs rampant and spreads like wildfire.  If

5    XXXXX sees it come across NCIC, he will let you know

6    ASAP.  Does that makes sense?

7          And Kristie responds:  Yes, perfect.  Thank you so

8    much.

9    **BY MR. KNUTSON:**

10   Q.    And was XXXXX XXXXXXX a patient of Jeff Young's?

11   A.    Yes.

12   Q.    And did you pull his prescription history?

13   A.    We did.

14   Q.    And what was he receiving from Jeff Young?

15   A.    Between January 2015 and July of 2015, amphetamine

16   salt combos, a Schedule II; Phentermine; and Clonazepam,

17   which is Schedule IV.

18         **THE COURT:**  Mr. Knutson, how much longer do

19   you have on this witness?

20         **MR. KNUTSON:**  Your Honor, probably five to ten

21   more minutes.

22         **THE COURT:**  Okay.

23   **BY MR. KNUTSON:**

24   Q.    And did you also obtain the phone of office

25   manager, Kristie Gutgsell?

1    A.    We did.

2    Q.    Did that have text messages back and forth with

3    Mr. Young?

4    A.    It did.

5    Q.    Did she provide law enforcement also with

6    screenshots from her phone?

7    A.    Yes.

8    Q.    Did that show images that possibly show that he's a

9    danger to himself?

10   A.    Yes.

11   Q.    And I'm showing you what's marked as Exhibit 8.

12   What is that?

13   A.    That is Jeff Young holding a firearm to his head.

14   Q.    And were there text messages that go along with

15   that image of his having a gun to his head?

16   A.    Yes, sir.

17   Q.    Can you, please, tell us what those said?

18   A.    This will make a great periscope.  Kristie:  Put

19   that gun up.  I have 2,500 live years (phonetic) today

20   during clinic, but I can hit 10,000 tonight.  She says:

21   Don't.  A live suicide would make y'all famous.  I'm

22   already famous because I'm alive.  You could be infamous.

23   I'd rather not.  I'd rather keep you.  Write a book.  Put

24   in a college fund for XXXX and XXXXXX.

25   Q.    And can you read the rest of it, please?

1   A.    If she wins this round, I kill myself.  I'm not

2   fucking playing.  Please don't say that.  I wasn't there

3   for the beginning of the divorce.  I will be here to fix

4   it.  No worries.  Have I ever let you down or lied to

5   you?  No, you haven't.  I want to die.  I'm so tired.

6   Success is the best revenge.  I'm exhausted.  What do we

7   need to do to fix it?  Win for once.  I trust Donahoe.

8             **MR. KNUTSON:**  Pass the witness.

9             **THE COURT:**  Let's go ahead and take a break

10  for lunch.  It's a quarter to one.  Come back in about an

11  hour, and we'll pick up with cross-examination.  Let's

12  take a break, please.

13            **THE CLERK:**  All rise, please.  This Honorable

14  District Court now stands in a recess.

15            (Recess taken at 12:53 p.m.)

16            **THE COURT:**  Mr. Ferguson, cross-examine the

17  witness when he gets to the stand.

18            **MR. FERGUSON:**  Yes, Your Honor.  Thank you.

19                       **CROSS-EXAMINATION**

20  **BY MR. FERGUSON:**

21  Q.    Can you hear me okay?

22  A.    Yes, thank you.

23  Q.    It's Agent Chew?

24  A.    Yes, sir.

25  Q.    All right.  Let me start off.  One of the earliest

                        REDACTED TRANSCRIPT

1    things you said is that the opioids that were prescribed

2    by Mr. Young was 800,000 in a year?

3    A.    Yes, sir.

4    Q.    And you're familiar with the prescribing of the

5    hydrocodone?  For example, it's typically four pills a

6    day?

7    A.    Correct.

8    Q.    So what's called QID, meaning four times a day; is

9    that correct?

10   A.    Correct.

11   Q.    And previously we had seen he was seeing some 2,000

12   patients or more a month, and about 20, 25 percent of

13   those patients were receiving opioids.  I don't know if

14   you were in the room.

15   A.    I was, yes, sir.

16   Q.    Well, if you've got, say, 25 percent of 2,500

17   people getting four hydrocodones a day, 365 a year,

18   that's, what, somewhere around -- let's see.  If it was a

19   thousand, that would be 1,000,460.  So half of that is

20   about 730 -- almost 800,000 pills?

21   A.    Correct.

22   Q.    So those numbers, while they seem large, they

23   actually reflect accurately what the prescription amounts

24   would have been in that situation, right, those numbers?

25   A.    Yes, sir.

1    Q.    Okay.  When you talk about opioids and

2    benzodiazepines being prescribed together, you're not a

3    healthcare provider?

4    A.    That's correct.

5    Q.    Not a doctor?

6    A.    Correct.

7    Q.    There is what we call a warning label, black box

8    label, that does warn practitioners to be very careful

9    about it?

10   A.    Correct.

11   Q.    There's nothing in the prescribing itself that is

12   illegal?

13   A.    To my understanding, yes, sir.

14   Q.    Including when people talk about the Holy Trinity

15   where you add Soma to it, that is definitely a black

16   label warning, that it should be avoided at all costs

17   except for extreme or unusual situations?

18   A.    That's my understanding.

19   Q.    Again, nothing about it in and of itself is

20   illegal?

21   A.    No, sir.

22   Q.    It could be negligent?

23   A.    Correct.  Yes, sir.

24   Q.    Or it could be criminal if you somehow are knowing

25   that the patients aren't taking it and are diverting it

1    to street use?

2    A.    Correct.

3    Q.    Of the 800,000 pills that you were able to locate,

4    how many of those were diverted to street use?

5    A.    I can't quantify that.

6    Q.    Do you know if any number were diverted to street

7    use?

8    A.    No, I don't.

9    Q.    We've heard and seen images and audio of Mr. Young

10   having sex with people.  The allegations are he was

11   having sex with his patients.  Do you know if those

12   patients had a medical diagnosis that would require them

13   to receive the drugs that they did?

14   A.    I did not review the charts, medical charts.

15   Q.    So if I would say that they all had medical

16   conditions that required that, you wouldn't be able to

17   say that I'm right or wrong?

18   A.    Correct.

19   Q.    If I were to say these were his girlfriends, you

20   wouldn't know if I was right or wrong?

21   A.    That's correct as well.

22   Q.    There's nothing necessarily illegal about having

23   sex with a patient?

24   A.    Doesn't seem appropriate to me, but I'm not the

25   provider.  So...

1    Q.    It seems unsavory and possibly unethical?

2    A.    Absolutely.

3    Q.    But not illegal, that you're aware of?

4          **THE COURT:**  Mr. Ferguson, you said unsavory --

5          **MR. FERGUSON:**  -- or unethical.

6    **BY MR. FERGUSON:**

7    Q.    But as far as you know nothing that is illegal?

8    A.    Correct.

9    Q.    All right.  I don't have the exhibits up.  The one

10   that we were talking about, the fentanyl patches, do you

11   remember the fentanyl patches?

12   A.    Yes, sir.

13   Q.    I believe that's JA.  Are you aware that she

14   suffers from severe lupus?

15   A.    Again, I don't review medical charts.

16   Q.    Okay.  So you're not testifying that the

17   medications she was receiving was inappropriate?

18   A.    I've only -- the only thing I know about the

19   fentanyl patches is that they're, typically, for people

20   who are in severe pain or terminally ill patients.

21   Q.    Cancer?  Terminal illness?

22   A.    Correct.

23   Q.    Things that have severe pain?

24   A.    Correct.  But my experience is very limited, and my

25   knowledge is very limited.

163

1    Q.    All right.  The messages we saw and, I think, the

2    audio with the person named CHT --

3    A.    Yes.

4    Q.    -- that is the same CH that when the allegation of

5    rape, the witness previous to you, refused to cooperate

6    with the Board of Nursing investigators, that's the same

7    CH?

8    A.    I can't confirm that.  I don't know if it is or

9    not.

10   Q.    The issue involving the text messages where

11   Mr. Young had the gun, I may have been talking to my

12   client.  So if I'm repeating what you've already

13   testified to, please, let me know.  Okay?

14   A.    Yes, sir.

15   Q.    There was an additional screenshot in that

16   series.  I didn't see you go through that last

17   screenshot.

18   A.    You'll have to refresh my memory.

19   Q.    I think it was located at eight in the book you

20   have.

21   A.    Okay.  Give me just a second.  Okay.

22   Q.    The last page.

23   A.    All right.  I'm with you.

24   Q.    Would you read that part out loud?

25   A.    Absolutely.

REDACTED TRANSCRIPT

1          You have to understand it's not just the last three

2     years.  It's the majority of my marriage and now the last

3     three years after I left the crazy ass.  I'm going

4     insane.  I thought leaving her would solve my pain.

5     She's made it worse.  At least when I was married to her

6     psycho ass I got my kids.  We're going to file a

7     countersuit.  It's all going to work out.  I promise.  I

8     trust you just don't understand how tired I am.  It has

9     changed me.  It's killing me like a cancer.

10    Q.    Okay.  From your -- all these documents that are

11    contained in this, did you review these?

12    A.    Yes, sir.

13    Q.    And you were talking about events and times for the

14    most part from around the 2016 time frame?

15    A.    Correct.

16    Q.    He was going through or had just recently gone

17    through a very contentious divorce; is that right?

18    A.    That's what I've been told.

19    Q.    And his staff reported in some of those reports

20    that it really took a lot out of him, correct?

21    A.    Yes, sir.

22    Q.    Changed him, correct?

23    A.    That's what they said.

24    Q.    The report to the Jackson Police involving the

25    alleged rape --

CROSS - JOHN CHEW                                                       165

1   A.    Yes, sir.

2   Q.    -- let me see if I can locate it real quick.  I

3   think it's going to be at tab 6.

4   A.    Okay.  I have it.

5   Q.    That was an occurrence from 2016; is that correct?

6   A.    Yes, sir, it says April 2, 2016.

7   Q.    So in those last three years from the time of this

8   to today, do you know of any criminal charges having been

9   filed against Mr. Young for this?

10  A.    I don't know what Jackson Police Department did to

11  follow-up with this investigation.

12  Q.    Okay.

13  A.    There are supplements in here, but there are not

14  many supplements.

15  Q.    You would agree on -- we're looking at -- let me

16  make sure I get this right.  The supplement dated 4/11,

17  it's the one that starts out:  On this day I spoke with

18  AG in regards to case in follow-up.

19  A.    Yes, sir.

20          **THE COURT:**  Which tab are you looking at?

21          **MR. FERGUSON:**  It is tab 6, Your Honor.

22          **THE COURT:**  Still on tab 6.  Okay.

23          **MR. FERGUSON:**  I'm sorry?

24          **THE COURT:**  You're still on tab 6?

25          **MR. FERGUSON:**  Yes, sir.

CROSS - JOHN CHEW                                             166

1    **BY MR. FERGUSON:**
2    Q.    On the 4/11 case supplement report, she indicates
3    that still unable to remember anything that may have
4    happened to her sexually; is that correct?
5    A.    That's what investigator Danielle Jones wrote.
6    Q.    And, I guess, finally, the text messages you went
7    through where he was talking sexually and being sexually
8    explicit to certain females you've shown the Court --
9    A.    Yes, sir.
10   Q.    -- do you know if any of those were his girlfriend
11   at the time?
12   A.    I do not personally know that, no, sir.
13   Q.    Okay.  And, again, do you know some of those -- I
14   think, one in particular you were showing text messages
15   where she was asking for some drug.  I can't remember
16   what it was.  And then you showed the -- showed the CSMD
17   to show that she was a patient?
18   A.    Correct.
19   Q.    And the dates were fairly far apart from each
20   other, if I remember correctly, and it was for a
21   different drug than what was contained in the text
22   message.  Do you remember that series?
23   A.    Not without having it in front of me.  I remember
24   the text messages but not exactly what you're speaking
25   of.

REDACTED TRANSCRIPT

1    Q.    But again, you're not able to testify whether or

2    not these were patients?  Or they were patients?

3    A.    They were.

4    Q.    Whether or not they had a diagnosis?

5    A.    I did not review their medical charts, not all of

6    theirs.

7              **MR. FERGUSON:**  That's all I have, Your Honor.

8              **THE COURT:**  Mr. Knutson.

9              **MR. KNUTSON:**  A few questions, Your Honor.

10             **THE COURT:**  Go ahead.

11                        **REDIRECT EXAMINATION**

12   **BY MR. KNUTSON:**

13   Q.    Did you find out that many of those patients that

14   we talked about that had those sexually explicit

15   conversations with Jeff Young, did you find he had a

16   patient file for?

17   A.    Yes, during the execution of the search warrant.

18   Q.    And how many patient files, roughly, did you get?

19   A.    I don't know even know the exact number.  There

20   were a lot.

21   Q.    Did I ask you to look to see if some of these

22   patients not only had CSMD but that he prescribed -- but

23   that he also had patient files on those people?

24   A.    Yes.

25   Q.    Were there -- we just went over a few of the

1    patients that had these sexual conversations, correct?

2    A.    Correct.

3    Q.    Did you review those -- that full Facebook message

4    packet -- I think it's Exhibit No. 2 or 3.  You don't

5    have to look at it now.  Did you review those Facebook

6    messages?

7    A.    Everything I was given, yes, sir.

8    Q.    Was it just a few or many more that had the same

9    types of conversations and were getting prescriptions

10   from Jeff Young?

11   A.    There were a lot of conversations of that nature.

12   Q.    Okay.  And so I'm going to ask you -- the defense

13   attorney asked about he saw a lot of patients.  How many

14   patients a day, according to the witnesses, approximately

15   did he see?

16   A.    From my understanding through the course of our

17   investigation, there were some times in excess of 70

18   patients a day.

19   Q.    Sometimes up to a hundred?

20   A.    Correct.

21   Q.    And do you remember what those employees said about

22   how many people out of Jeff Young's patients were

23   receiving controlled substances?

24   A.    If I recall correctly, I think it was upwards of

25   90 percent.

1   Q.    Okay.  And did you ask that question, meaning did

2   agents ask that question of many of the ex-employees of

3   Jeff Young?

4   A.    Yes.

5   Q.    And so did any of them say that it was below

6   50 percent?

7   A.    Not that I can remember.

8   Q.    Okay.  And also -- so you do know a little bit

9   about what happened as far as patient visits, don't you?

10  A.    Yes, sir.

11  Q.    And how is that?

12  A.    My understanding is that Mr. Young was very quick

13  with patients or -- typically, from the experience that I

14  have reviewing documents.  And so there was no physical

15  exam.  He was in and out of the exam room very, very

16  quickly.  May take a note or two.  And he would give that

17  patient a prescription, and he would walk out the door.

18  Q.    Well, and did you actually review videos of patient

19  interactions?

20  A.    Yes, sir.

21  Q.    What were the circumstances of those videos?

22  A.    Similar.  Exactly what I said.  The patient would

23  walk in the room --

24  Q.    Let me ask you:  Were there undercover officers

25  that went into his clinic?

                    REDACTED TRANSCRIPT

1    A.    Yes, yes.

2    Q.    And did you review those videos of those undercover

3    agents?

4    A.    Yes.

5    Q.    And can you tell us about one of those videos that

6    you reviewed?

7    A.    This one in particular the young lady went into the

8    room, had correspondence with Mr. Young, told what the

9    issue was.  She requested fentanyl, and that was given to

10   her upon her request.

11   Q.    Was that the first time she had ever been to

12   Mr. Young's office?

13   A.    No, I don't -- the second or third time.  I can't

14   remember exactly.

15   Q.    Okay.  But the first time she went in as an

16   undercover was the first time she had ever been there?

17   A.    Correct.

18   Q.    And that undercover officer, was that a female?

19   A.    It was.

20   Q.    We talked about his type.  Did she fit Mr. Young's

21   type?

22   A.    Yes.

23   Q.    And what is that?

24   A.    She was a young lady, athletic, and attractive by

25   society's standards.

171

1   Q.   And did he ask her -- did he flirt with her?

2   A.   In my opinion, yes.

3   Q.   Okay.  And why is that your opinion?

4   A.   Just the banter and the way they're interacting I

5   would consider that flirting.

6   Q.   And how long did you say that visit was,

7   approximately?

8   A.   Just a few minutes.  Without having the report I

9   don't know the exact.  I would say less than ten minutes.

10  Q.   And so you -- the defense attorney asked you about

11  whether you knew if these -- what sort of diagnosis the

12  patients had, and you said you don't review those files.

13  Does law enforcement typically get an expert to review

14  those files?

15  A.   Yes.

16  Q.   And really that's to determine whether those visits

17  are outside the course of professional conduct?

18  A.   Correct.  Yes, sir.

19  Q.   Do you need an expert to determine whether

20  prescribing a patient, in exchange for sex prescribing

21  them opioids, whether that's outside the course of

22  professional conduct?

23  A.   In my opinion, I would agree, yes.

24           **MR. KNUTSON:**  Pass the witness.

25           **THE COURT:**  All right, sir.

REDACTED TRANSCRIPT

1                          **RECROSS-EXAMINATION**

2     **BY MR. FERGUSON:**

3     Q.    Do you know what the average length of time of a

4     patient/physician contact is?

5     A.    I do not.

6     Q.    Do you know if ten minutes is unusually long or

7     unusually short?

8     A.    I don't -- I can't answer that.  It may have been

9     less than ten minutes.  It may have been closer to five.

10    But it seemed extremely brief.

11    Q.    Were there other people who had contact with the

12    patient before Mr. Young was in the room?

13    A.    I believe so, triage.

14    Q.    There were nurses that took information?

15    A.    I would imagine so, yes.

16    Q.    So that all comes together and makes up part of the

17    interaction between a healthcare provider and a patient?

18    A.    Sure.

19    Q.    The undercover -- the first office visit, were you

20    aware if a urine screen was conducted?

21    A.    I do not know.

22    Q.    Or if the CSMD was reviewed?

23    A.    I can't answer that.

24            **MR. FERGUSON:**  That's all I have, Judge.

25            **THE COURT:**  All right.  You can step down,

REDACTED TRANSCRIPT

1    sir.

2              **THE WITNESS:**  Thank you.

3                 (Witness excused.)

4              **THE COURT:**  Call your next witness.

5              **MR. KNUTSON:**  The government calls

6    Barry Cooper.

7              **THE CLERK:**  Would you raise your right hand,

8    please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         **BARRY COOPER,**

2         having been first duly sworn, was examined

3         and testified as follows:

4              **THE CLERK:**  Be seated, please.

5                   **DIRECT EXAMINATION**

6   **BY MR. KNUTSON:**

7   Q.    Good afternoon, Mr. Cooper.

8   A.    Afternoon.

9   Q.    Please state your name for the record.

10  A.    Barry Cooper.

11  Q.    Mr. Cooper, who do you work for?

12  A.    I work for the Jackson Area Council on Alcoholism

13  and Drug Dependency here in Jackson.

14  Q.    Is that also known as JACOA?

15  A.    Yes, sir.

16  Q.    How long have you worked for them?

17  A.    It'll be 15 years in August.

18  Q.    Is that a nonprofit organization?

19  A.    Yes, sir, it is.

20  Q.    What does JACOA do?

21  A.    JACOA is a 28-day program that treats substance

22  abuse and mental health disorders with substance abuse

23  being the primary.

24  Q.    Do you treat substance abuse for people addicted to

25  opioids?

1    A.    Yes, sir, we do.

2    Q.    And also benzodiazepines?

3    A.    Yes, sir, we do.

4    Q.    Do you know who Jeff Young is?

5    A.    I do.

6    Q.    Did you file a complaint with the medical board

7    against Jeff Young?

8    A.    Yes, sir, I did.

9    Q.    And what was the basis of that complaint?

10   A.    The basis of that complaint was conversations that

11   I heard from professionals in the community, which led to

12   me just kind of looking on an open Facebook page of his

13   and seeing things that were disturbing.

14         I also had a lady from church that approached me to

15   speak in private that stated that she saw Mr. Young, and

16   that she had been prescribed amounts of opiates, and that

17   she was fearful that she would have to detox.  She was

18   being treated for sciatic nerve.  And she was fearful

19   that the amount she had been prescribed and taken was

20   going to cause her to have to go through withdrawal, and

21   she would have to be detoxed from those.

22   Q.    And was that one of the things or one of the people

23   that you discussed in your complaint?

24   A.    Yes, sir.

25   Q.    And did she also talk about at some point that he

REDACTED TRANSCRIPT

DIRECT - BARRY COOPER                                              176

1    had discharged her or fired her as a patient?

2    A.    Yes, sir.  He stated that he -- she stated that on

3    a few occasions she was drug screened and sometimes she

4    wasn't.  But she came in on one visit, and her drug

5    screen, quote, tested positive for morphine, that she

6    stated she had never taken morphine before.  So she was

7    discharged as a patient.

8    Q.    Do you know another person personally who has been

9    a patient of Jeff Young and has received opioids from

10   Jeff Young?

11   A.    Yes, sir, I do.

12   Q.    And how do you know that person?

13   A.    That person is a current employee.

14   Q.    Okay.  And she works in what capacity with

15   JACOA?

16   A.    She's a monitor.  So she works on the front lines

17   with our clients daily.

18   Q.    Now, what did she tell you about her treatment at

19   Jeff Young's clinic?

20   A.    She stated that she saw Jeff back in, roughly,

21   2016, and that she was in active addiction at the time,

22   and that she was prescribed large amounts of opioids at

23   the time, and that they were very readily accessible from

24   him, and that pretty much anytime she needed them she

25   could call or text to receive those.

DIRECT - BARRY COOPER                                              177

1          She stated that she was given those drugs or

2    prescription for those drugs at an art show that had

3    taken place in his clinic.  She also stated that her and

4    her husband were going to go on vacation for a week, and

5    that she called and asked him for a prescription, and

6    that he had called in a prescription for a month and

7    stated that they would be out of the country.

8    Q.    Did she say when she went to see him to be examined

9    or tested for a urinalysis test before she got that

10   prescription?

11   A.    She did.  She stated that she had been screened at

12   some points and sometimes she hadn't, that she knew she

13   would pop dirty for screens.  She felt like he knew that

14   and didn't care.

15   Q.    So she admitted to you that she knew she would be

16   dirty for some drugs?

17   A.    She did.

18   Q.    Did she say Jeff Young still prescribed her drugs

19   even though she would test dirty?

20   A.    Yes, sir.

21   Q.    You've been in the courtroom for this hearing,

22   correct?

23   A.    Yes, sir.

24   Q.    Have you heard about Jeff Young's type being young,

25   attractive females?

1    A.    Yes, sir.

2    Q.    Your employee, is she in that type of Jeff Young

3    where she's young and considered attractive?

4    A.    Yes, sir, she is.  She's probably late twenties,

5    athletic, fit.

6    Q.    And how about the lady that you know from church,

7    the one that was treated differently, was she -- did she

8    fit into that mold of being young, trim, good-looking?

9    A.    No, sir, she didn't.

10   Q.    How old is she?

11   A.    She would probably be in her late forties, early

12   fifties.

13   Q.    Now, you filed a complaint, and that's marked as

14   Exhibit 1D, and you attached some Facebook posts; is that

15   correct?

16   A.    Yes, sir.

17   Q.    Let me show you on the Elmo, if we can get the Elmo

18   screen up and --

19             **MR. KNUTSON:**  Your Honor, may I approach the

20   witness with a copy of 1D?

21             **THE COURT:**  You can put it on the screen.

22   It's already an exhibit.

23             **MR. KNUTSON:**  It's really small.  So he may

24   need to get even closer.

25             **THE COURT:**  All right.

                    REDACTED TRANSCRIPT

1   **BY MR. KNUTSON:**

2   Q.    I'm going to show you -- it's marked at the bottom

3   right-hand corner 3 of 7, Exhibit 1D.  Can you read the

4   highlighted portion?

5   A.    Both the highlighted portions?

6   Q.    And you can look at the screen.  I apologize.  I

7   didn't realize it blew up that well.

8              **THE COURT:**  It does.

9   A.    We have a PreventaGenix VIP program if you want to

10  check into com surg medicine.  Pay a fee and I'll drop

11  everything 24/7 365.  Welcome to healthcare 2015.

12  Otherwise, shut the fuck up and go to another clinic.

13  Time to find a new PCP.

14  **BY MR. KNUTSON:**

15  Q.    Why did you attach that to your complaint?

16  A.    Because I felt like that was detrimental to a

17  patient that would be seeking his services, and that that

18  was basically telling a patient he would no longer see

19  them, that he was dropping them.

20  Q.    Is he, basically, responding to a patient with that

21  post?

22  A.    Yes.

23  Q.    And what was the patient's concern?

24  A.    I'm not quite sure of that.

25  Q.    And let me go to the next page.  Can you read the

180

1    top of that page and the two paragraphs down.

2    A.    We pride ourself on the care we give and are the

3    fastest growing in clinics in West Tennessee.  If it's

4    not good enough for you, take your ass elsewhere.

5    Q.    And the next one?

6    A.    Hashtags are the one below that.

7    Q.    And did you see that a lot as far as Young being

8    sort of abusive to patients on the Facebook posts.

9    A.    Yes, sir.

10   Q.    Now, you also attached some photos.  We don't have

11   the color copies.  So, please, tell us what this says and

12   tell the Court --

13            **THE COURT:**  Move it over a little bit more.

14   **BY MR. KNUTSON:**

15   Q.    So you attached some photos to this post.  What

16   were those photos of?

17   A.    I cannot make out the top photo on that, just the

18   text.

19   Q.    Okay.  Can you read that Facebook message?

20   A.    Just the highlighted portion?

21   Q.    I would read the whole thing.

22   A.    Okay.

23         I was dismissed from the clinic and was told that

24   my meds was not in my system.  The reason my meds was not

25   in my system is because he was out of the office and had

REDACTED TRANSCRIPT

1    to put my appointment off for five days.  So that was the

2    reason the meds was not in my system.  I asked many times

3    to explain this to the doctor or office manager and was

4    told no and was handed a paper about rehab.  I have many

5    severe medical problems, and I am well -- I am well was

6    on a lot of different meds.  Many people have been fired

7    due to mistakes, because the nurse fires you and will not

8    let you explain anything to the office manager.  So now

9    due to the fact that he said I can smoke pot, I am having

10   a hard time finding a new doctor.  And in the meanwhile,

11   I am without my heart pills, blood pressure pills, and

12   many other.  I also called the office prior to writing

13   this review to try to explain one more time and, again,

14   got nowhere.  He is a great doctor, just has too much

15   other stuff going on to keep up with what is and what is

16   not going on.

17   Q.    So why did you include that in your complaint?

18   A.    This patient sounds likes she's suffering from some

19   issues, such as needing heart pills, blood pressure pills

20   but the fact that he stated or she states that he stated

21   that she could just smoke pot for that.

22   Q.    What's wrong with that?

23   A.    (A) It's illegal in the state of Tennessee to

24   possess/prescribe, due to medicinal, recreational

25   marijuana.  That would be contrary to what we do at our

1    treatment facility.

2    Q.    Now, did Mr. Young respond to some of these

3    patients?

4    A.    Say that again.

5    Q.    Did Mr. Young respond to some of these patients on

6    Facebook?

7    A.    Yes, he did.

8    Q.    Can you, please, read the highlighted portion of

9    this response in your complaint.

10   A.    I also told her I don't take kindly to threats or

11   bringing my personal business into the clinic.  So she

12   can take my -- her fat ass and bitchy opinion elsewhere.

13   He has harassed me ever since and even recently assaulted

14   me.  Of course, he will deny that.  But I have several

15   pictures of the bruises he left on me and witnesses that

16   heard me tell him to leave Mr. The Fuck Alone and not to

17   touch me.

18   Q.    Were there also other posts that you showed that

19   Mr. Young had told patients to smoke weed?

20   A.    Yes, sir.

21   Q.    And did you include that in your complaint?

22   A.    I did.

23   Q.    Can you read that one from Exhibit 1D?

24   A.    He also told me I just needed to smoke weed.  I'm

25   pretty sure the board of ethics will frown upon him

1    advising patients to do illegal drugs to solve their

2    medical issues.

3    Q.    Did you find that sort of a common practice based

4    upon reading his Facebook posts?

5    A.    For several posts, yes, sir, I did.

6    Q.    Do you know who XXXXXXXX XXXXXX is?

7    A.    Not personally, no, sir, I do not.

8    Q.    Let me show you another post regarding

9    XXXXX XXXXXX.  Can you read that post, please?

10   A.    Ninety days clean today.  So proud of XXXXX XXXXXX.

11   Love you, dude.  You and your story inspires and humbles

12   me.

13   Q.    Let me stop you there.  Are you aware that

14   Jeff Young has any sort of rehabilitation practice or a

15   practice where he helps people get off opioids?

16   A.    Addiction treatment?

17   Q.    Is he an addictionologist?

18   A.    I'm not aware that he is, sir.

19   Q.    Are you aware of XXXXX XXXXXX, the patient he's

20   talking about?

21   A.    I'm aware of him through my staff, yes, sir.

22   Q.    And what do you know about XXXXX XXXXXX?

23   A.    I know that he did have some clean time after he

24   had went through a treatment program, but he overdosed.

25   Q.    Did he overdose and die?

DIRECT - BARRY COOPER                                              184

1    A.    He did.

2    Q.    Based upon what you knew about him, was he an

3    addict?

4    A.    Yes, sir, at one point he was.

5    Q.    At some point did his Facebook messages get so

6    abusive he was taken off of Facebook?

7    A.    Yes, sir.

8    Q.    And how do you know that?

9    A.    By reading the posts that was printed.

10   Q.    I'm showing you the next page on 1D.  Can you read

11   that post?

12   A.    Yes, sir.  This is Kristie, Jeff's office manager:

13   Facebook has put on a timeout for 24 hours due to posts I

14   made about someone that should remain nameless.  I'm not

15   ignoring your messages.  I simply can't respond.

16   However, we are open today.

17   Q.    Now, you attached several other pictures on your

18   complaint, correct?

19   A.    Yes, sir.

20   Q.    Were those also from Facebook?

21   A.    Yes, sir.

22   Q.    And we couldn't get the color copy of this, but

23   what's that a photo of?

24   A.    That would be a photo of Jeff Young with a Corona

25   in his hand.

1   Q.    And I'm showing you the next page.  What's that a

2   photo of?

3   A.    That would be photos of bottles of alcohol that

4   were inside his clinic.

5   Q.    Is there a posted message above those photos?

6   A.    Yes, it is.

7   Q.    And who is it from?

8   A.    That would be from Jeff Young tagging

9   Kristie Gutgsell and several others.

10  Q.    And what does that say?

11  A.    PreventaGenix is not just a clinic.  It's a way of

12  life.  We GAF.  Congrats Tessa James.  We love you.

13  Q.    Were you aware that Tessa James was an employee?

14  A.    I was not.

15  Q.    Now, we can't see those photos very well, but did

16  those appear to be taken at his clinic?

17  A.    Yes, they did.

18  Q.    Now, you attached a few more of these photos of

19  alcoholic beverages.  This one here, does it also have a

20  picture that's at his clinic where you can see in the

21  background it says PreventaGenix?

22  A.    Yes, sir.

23  Q.    Why did you include that in your complaint?

24  A.    Because any patient that may have seen Mr. Young

25  that had an addictive personality or was in active

1    addiction, if they were to go in and see that, that would

2    be very unhealthy and would be possibly a trigger for

3    them.

4    Q.    Do you recommend that your patients, even if they

5    may be addicted to opioids, do you recommend they go to

6    parties where hard liquor is served?

7    A.    Absolutely not.

8    Q.    Would you recommend if there's a clinic that they

9    receive opioids from that they go to a clinic that has

10   alcohol and hard liquor?

11   A.    Absolutely not.

12   Q.    Why is that?

13   A.    Because those two mixtures can be lethal, and one

14   could lead to the other.

15   Q.    So is it sort of -- is alcohol sort of a gateway in

16   a sense to some of the other drugs?

17   A.    It can be referred to that sometimes.

18   Q.    And is it advisable to mix alcohol with opioids?

19   A.    No, it's not.

20   Q.    How about alcohol with benzodiazepines?

21   A.    No, it's not.

22   Q.    Now, there was actually -- you attached Facebook

23   messages between yourself and Mr. Young, correct?

24   A.    Correct.

25   Q.    I'm not going to have you read all of them because

1    it's a few pages.  But you guys go back and forth about

2    an issue.  What is that issue about?

3    A.    The issue was about marijuana use.

4    Q.    Okay.  And what was your issue with -- what were

5    you telling him about marijuana use?

6    A.    That I was staunchly opposed to it, and that it was

7    at the time, and currently still, illegal in our state,

8    and that having read those posts where he had stated that

9    those clients could smoke marijuana would be detrimental

10   to his patients.

11   Q.    So you did it out of concern for the addicts in the

12   community.  Would that be an accurate statement?

13   A.    Say that again, please.

14   Q.    Did you do it out of concern for your patients or

15   the other addicted people in the community?

16   A.    Yes, sir.

17   Q.    And what was his response?  And I'm going to show

18   you the last few posts.  Can you read Mr. Young's

19   response to you?

20   A.    I don't think we were talking to you.  We were

21   talking about your punk ass.  Remember, this is my page,

22   my posts, and I can say whatever the fuck I want.

23   Robert Gordon XXXXXXX you can take screenshots for "Rock

24   Doc" TV so people can see the pussy ass bullshit I put up

25   with.  Darryl Beckham, this guy would be the first to

REDACTED TRANSCRIPT

1   call the police if we tried to settle it like men.  You

2   know his type.  All caps pussy.

3   Q.    Who is he talking about when he says you know his

4   type and this guy would be the first to call the police

5   if we tried to settle like men?  Who did you think he was

6   talking about?

7   A.    He was talking about me.

8   Q.    Did you feel threatened by that?

9   A.    Actually, I did.

10  Q.    Why did that make you feel threatened?

11  A.    Because it seemed like him or someone associated

12  with him was trying to arrange to where we would, quote,

13  settle it like men.

14  Q.    Did he know what your job was?  Did he know that

15  you worked for JACOA?

16  A.    He did.

17  Q.    How did he know that?

18  A.    We had some exchanges about that.

19  Q.    Did he know that before he sent this message to

20  you?

21  A.    Yes, he did.

22  Q.    Did you actually reach out to him and try to help

23  Jeff Young?

24  A.    I actually did, sir.

25  Q.    And tell us about that.

189

1    A.    Just through a Facebook message I sent him and told

2    him that we would be glad to offer him help, if it wasn't

3    in our place it'd be somewhere, anywhere.

4    Q.    Help for what?

5    A.    What I felt like was a substance abuse or alcohol

6    problem.

7    Q.    Now, why did you think he had a substance abuse

8    problem?

9    A.    Because of the pictures and the things that I had

10   seen posted on Facebook for well over a year.

11   Q.    Do you have people at your -- do you call it a

12   clinic or facility?

13   A.    Facility.

14   Q.    -- at your facility that are addicted to opioids?

15   A.    Yes, we do.

16   Q.    Do you have a few or many?

17   A.    We have quite a few, sir.  It depends on what month

18   it is really.

19   Q.    Do you also have people who are addicted to

20   benzodiazepines alone?

21   A.    Yes, we do.

22   Q.    Can you give us an example of some of the

23   benzodiazepines?

24   A.    Clonazepam and Xanax.  Those are probably the

25   primary ones.

REDACTED TRANSCRIPT

190

1    Q.    Did you know those are only Schedule IV substances?

2    A.    Yes, sir.

3    Q.    Those substances, based on your experience at

4    JACOA, can those cause death?

5    A.    If overused, yes, they can.

6    Q.    Have you -- do you know of any stories where that

7    has actually happened?

8    A.    Yes, sir, I actually do.

9    Q.    Can you tell us about that?

10   A.    I had a good friend that was in active recovery for

11   13 years.  He had been through treatment.  And this guy

12   was a high school football coach.  And he had a family.

13   And he relapsed on one occasion and had been taken to the

14   emergency room and was released after they pumped his

15   stomach, and sent him back home.

16        And the very next week he had coached a football

17   game on Friday night, told his wife that he would be

18   home.  They lived in Scotts Hill.  Drove to Jackson that

19   night.  And he had taken an overdose of Xanax and drank

20   alcohol as well, and they found him deceased the next

21   morning.

22   Q.    Now, is that something that -- is that combination

23   of alcohol and benzodiazepines something that could cause

24   a higher risk of death without just the benzos?  I'm

25   sorry.  That's a poorly worded question.  I think you

1   know what I mean.  Is it advised to mix those two,

2   meaning alcohol and benzodiazepines?

3   A.    No, it's not.

4   Q.    Is that one of the reasons you were so worried

5   about all these Facebook posts from a supposed pain

6   management clinic promoting the use of alcohol?

7   A.    Yes, sir.

8            **MR. KNUTSON:**  Pass the witness.

9            **THE COURT:**  Mr. Ferguson.

10                    **CROSS-EXAMINATION**

11   **BY MR. FERGUSON:**

12   Q.    Mr. Cooper?

13   A.    Yes, sir.

14   Q.    Why, why would you post anything to Jeff Young?

15   A.    Why would I post anything to Jeff Young?

16   Q.    Right.  If Jeff's on Facebook talking about

17   medicinal marijuana, why would you interject yourself

18   into that conversation?

19   A.    Because I have that right to do so, sir.

20   Q.    And he has that right to post on Facebook too?

21   A.    Yes, sir.

22   Q.    And he has his opinion?

23   A.    Correct.

24   Q.    And you have your opinion?

25   A.    Correct.

REDACTED TRANSCRIPT

1    Q.    And y'all disagree with each other?

2    A.    Correct.

3    Q.    And that disagreement got disagreeable quickly?

4    A.    You could say that.

5    Q.    As in the saying "that escalated quickly."  That's

6    a famous Internet meme.  Have you seen that before?

7    A.    I have seen that.

8    Q.    It means that online people lose inhibition quickly

9    in the way that they post and what they say to each

10   other?

11   A.    Some people can do that, yes, sir.

12   Q.    In fact, on this one it is not Mr. Young who says

13   or even suggests fighting you.  It's a Darryl Beckham who

14   says settle it like men, like a bunch of shit talk.  And

15   Jeff Young says -- and that's where his post is about

16   this guy would be the first to call the police if we

17   tried to settle it like men.  He doesn't suggest settling

18   it like men, does he?

19   A.    That statement does not say that.

20   Q.    In fact, his response is not necessarily to you.

21   It's to Darryl Beckham, who's trying to even escalate

22   this even further?

23   A.    Whether he is, I can't say that or not but...

24   Q.    Well, because then right after that first call to

25   police, Darryl Beckham responds again:  Figures.

REDACTED TRANSCRIPT

1              In fact, there are other people responding to your

2     engagement in this Facebook.  XXXXXXXXX XXXXXXX is

3     saying -- talking about her experience with people being

4     detoxed from opioids.  One, you don't even have an

5     opinion on what Jeff is talking about.  You're talking

6     about recreational use.  He's talking about medicinal.

7     Two, shouldn't this be used for treatment of addicts?  To

8     treat addiction?  No, absolutely not.  Other people are

9     also engaging in conversations with you?

10    A.    They are.

11    Q.    Your clinic is an abstinence clinic?

12    A.    Our clinic?  Yes.

13    Q.    Your facility.  I'm sorry.

14    A.    No, we're --

15    Q.    You're not a licensed healthcare provider?

16    A.    We're licensed by the State of Tennessee.

17    Q.    As an addiction --

18    A.    Treatment facility.

19    Q.    -- treatment facility but not a clinic?

20    A.    No, not a hospital or clinic.

21    Q.    And y'all -- there's two different major types of

22    facilities.  One that's, say, a Suboxone style, and the

23    other one is abstinence?

24    A.    Correct.

25    Q.    You are abstinence?

REDACTED TRANSCRIPT

1   A.    We are an abstinence based program.  But we do

2   offer one MAT, medication assisted treatment.

3   Q.    The pictures the government was talking to you

4   about, one of them was -- again, it says:  PreventaGenix

5   is not just a clinic, it's a way of life.  And it says:

6   Congrats Tessa James.

7         The government asked did you know that that was an

8   employee.  I'll ask it a little bit differently.  Did you

9   know that that was a reception for her wedding day?

10  A.    I believe that that was posted on there, sir, that

11  that wedding took place at the clinic.

12  Q.    It did not take place during office hours, correct?

13  A.    To my knowledge.  I'm not sure.

14  Q.    And this photo is posted nearly at 7:00 at night;

15  is that correct?

16  A.    Yes, sir.

17  Q.    You said that Mr. Young had been banned from

18  Facebook.  But this is Mr. Young's Facebook page or his

19  account:  This is Kristie, Jeff's office manager.

20  Facebook has put me on a timeout.

21        It wasn't Jeff.  It was Kristie Gutgsell.  Is that

22  correct?

23  A.    I cannot say that that's correct or not.

24  Q.    Is that what it says?

25  A.    It says:  This is Kristie, Jeff's office manager.

1   Q.    XXXXX XXXXXX, he ended up relapsing and dying,

2   correct?

3   A.    Yes, sir.

4   Q.    Do you know if he was still being treated by

5   Jeff Young when he died?

6   A.    To my knowledge, I do not know that.

7   Q.    You were asked if you knew if Mr. Young was an

8   addictionologist.  Do you not have licensed healthcare

9   providers in your facility?

10  A.    Yes, we have a medical doctor that oversees our

11  program.

12  Q.    Okay.  Do you know if Jeff Young in this one it's

13  saying that he's responsible for the 90 days clean or

14  he's just celebrating 90 days clean?

15  A.    It appears that he's congratulating XXXXXXXXXXX.

16  Q.    And also asking people to contact him if they need

17  help in recovering and getting your life back on line,

18  correct?

19  A.    Correct.

20  Q.    That would be a good thing, wouldn't it?

21  A.    Recovery from substance abuse addiction?

22  Q.    Yes, sir.

23  A.    Yes, it would.

24  Q.    This is a posting when they were asking about

25  getting booted out.  They were talking about Jeff Young

196

1    responding.  But this, it doesn't have a name at the top

2    of it.  Booted out.  Same statement.  It's actually

3    XXXXXXXX XXXXXX who was responding; is that correct?

4    A.    According to that, yes.

5    Q.    It wasn't Jeff Young, correct?

6    A.    According to that statement on the Facebook page.

7    Q.    I think when you were talking about the lady from

8    your church who got dismissed, you said off and on she

9    was administered drug screens; is that correct?

10   A.    Yes, sir.

11   Q.    Your initial complaint says that she was

12   administered drug screens every visit and was getting

13   outrageous bills from them, correct?

14   A.    On that complaint.  Upon further asking her, she

15   stated that she did not receive a drug screen every

16   visit.

17   Q.    Why did you write that she had said she got one

18   every visit if you didn't know that to be a fact?

19   A.    Because at the time that's what she stated.

20   Q.    She changed her story?

21   A.    She could have.

22   Q.    Well, I'm asking you.  Did she?

23   A.    I cannot say that she...

24   Q.    Did she tell you originally when you wrote this to

25   the Board that she received drug screens every visit?

                    REDACTED TRANSCRIPT

1    A.    Yes.

2    Q.    And at some other time she said, well, no, I didn't

3    get them every other time?

4    A.    She did.

5    Q.    We would call that changing your story, right?

6    A.    Yes.

7    Q.    You testified and told the story about someone at

8    your facility that was going to Mr. Young was an addict

9    and was getting pills.  Do you remember talking about

10   that?

11   A.    I do.

12   Q.    Do you know what her diagnosis was or what she was

13   telling the clinic and Mr. Young what her problem or

14   condition was?

15   A.    I was not privy to that information, no.

16   Q.    You're aware that addicts frequently lie to

17   healthcare providers in order to seek out prescription

18   drugs?

19   A.    Often they do.

20   Q.    And addicts become good liars?

21   A.    Often they do.

22             **MR. FERGUSON:**  That's all I have, Judge.

23             **THE COURT:**  Anything further, Mr. Knutson?

24             **MR. KNUTSON:**  No, Your Honor.

25             **THE COURT:**  All right.  You can step down.

                              REDACTED TRANSCRIPT

1              (Witness excused.)

2          **THE COURT:**  Call your next witness.

3          **MR. PENNEBAKER:**  The government calls

4    Natalie Seabolt, Your Honor.  And, Judge, this is the

5    government's last witness.

6          **THE CLERK:**  Would you raise your right hand,

7    please.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED TRANSCRIPT

1          **NATALIE SEABOLT,**

2      having been first duly sworn, was examined

3      and testified as follows:

4              **THE CLERK:**  Be seated.

5              **DIRECT EXAMINATION**

6  **BY MR. PENNEBAKER:**

7  Q.    Good afternoon.  Would you, please, introduce

8  yourself.

9  A.    My name is Natalie Seabolt.

10             **THE COURT:**  Spell the last name, please.

11             **THE WITNESS:**  I'm sorry.  Last name is spelled

12  S-E-A-B, as in "boy," -O-L-T, as in "Tom."

13  **BY MR. PENNEBAKER:**

14  Q.    Where do you work, Ms. Seabolt?

15  A.    I work for the Tennessee Bureau of Investigation in

16  the Medicaid Fraud Control Unit.

17  Q.    Can you give us a brief description of your job

18  duties there?

19  A.    Sure.  I'm a nurse consultant for the MFCU at TBI,

20  and my primary job is to be the primary healthcare

21  consultant.

22  Q.    When you say "MFCU," what does that stand for?

23  A.    Medicaid Fraud Control Unit, which is a national --

24  each state has a unit, and we oversee the use and the

25  abuse of Medicaid dollars.

REDACTED TRANSCRIPT

1    Q.    Okay.  And that sometimes brings you into the world

2    of investigating overprescribing?

3    A.    Correct.

4    Q.    Does your job require you to have medical training?

5    A.    Yes, it does.

6    Q.    And describe the training and education that you

7    have.

8    A.    I have a bachelor's of science in human

9    enviromental sciences.  I have a master's of science in

10   nursing, which led to my nurse practitioner from

11   Vanderbilt University.  And I have a doctor of nursing

12   practice from UT in Knoxville.

13   Q.    Did you practice before you took your present job?

14   A.    Yes, I was in private practice as a nurse

15   practitioner for four years.

16   Q.    How long have you been doing what you do now?

17   A.    It was five years yesterday.

18   Q.    Wow.  Happy anniversary.  So just so we're clear, I

19   think that your DNP means that I call you doctor, but

20   that's doctor in a doctor of nursing and not M.D.?

21   A.    Correct.

22   Q.    Okay.  What was just briefly your involvement, if

23   any, in the PreventaGenix investigation into that

24   practice before the DEA raid?

25   A.    I was actually solicited by John Chew, Agent, to

1    look at some patient charts and to look at CSMD review.

2    Q.    Okay.  Now, what about his current practice,

3    Genexis?

4    A.    I actually was only brought in to look at the

5    Genexis examples of evidence in the last two and a half

6    weeks.

7    Q.    Okay.  So suffice to say that you have not reviewed

8    all of the evidence that may somewhere be available to

9    look at the ins and outs of Mr. Young's practice at

10   Genexis today?

11   A.    Correct.

12   Q.    What have you reviewed in connection with your

13   testimony into his Genexis practice?

14   A.    I actually reviewed past and current CSMD reports

15   of his prescribing --

16           **THE COURT:**  Hold it a second.  Tell us what

17   those initials mean.

18           **THE WITNESS:**  I'm sorry.  CSMD is controlled

19   substance monitoring database.

20           **THE COURT:**  Okay.

21   A.    And so I reviewed his past and current CSMD reports

22   of what he prescribed patients.  I have examined some of

23   those patients' personal CSMD reports to look at other

24   prescriptions they were getting.  And I have looked at a

25   few excerpts of some medical records that were provided

1    to me.

2    **BY MR. PENNEBAKER:**

3    Q.    And are those medical records from Mr. Young's

4    PreventaGenix practice?

5    A.    Yes.

6    Q.    Now, you mentioned CSMD.  Were you here when

7    Ms. Pickering and I talked about the CSMD footprint?

8    A.    Correct.

9    Q.    Does that -- does analyzing CSMD footprint data

10   figure into your testimony today?

11   A.    Yes, it does.

12   Q.    And would you just briefly summarize what that CSMD

13   footprint is?

14   A.    Yes.  So a CSMD footprint is actually the digital

15   record when a provider under their login password looks

16   up a patient to get a report to see what other controlled

17   substances they're being provided by other providers.

18   Q.    So it helps -- it's sort of a tool that you can use

19   to check on whether or not doctors have been running

20   patients controlled substance prescription acquisitions?

21   A.    Yes, if they're receiving prescriptions from other

22   providers.

23   Q.    What do you understand your purpose to be in

24   testifying here today?

25   A.    My purpose to testify today is just to provide

1    factual information to help decide whether -- whether

2    Mr. Young is a public threat.

3    Q.    Okay.  And you're going to discuss what you believe

4    are some deficiencies in his ongoing practice, right?

5    A.    Correct.

6    Q.    Are you going to talk about trends in his

7    prescribing practices starting with kind of generally

8    what you see in the PreventaGenix days and then into the

9    Genexis days and then after the Board order comes down?

10   A.    Correct.

11   Q.    If you haven't reviewed -- you said that you had

12   not seen any Genexis medical records?  Did I ask you

13   that?

14   A.    Correct.

15   Q.    How can you draw conclusions about deficiencies in

16   Mr. Young's practice without having reviewed those --

17   reviewed the actual patient files?

18   A.    There's multiple ways.  According to the Tennessee

19   Chronic Pain Guidelines, to continue to prescribe

20   controlled substances, all practitioners have a

21   responsibility to check the CSMD report for that patient

22   to see what other controlled substances they're getting

23   from other providers to see if there's going to be a

24   danger prescribing two different controls simultaneously.

25   Q.    Okay.  So is it fair to say that something like

                       REDACTED TRANSCRIPT

1    checking the CSMD on patients who are receiving

2    controlled drugs is -- that is kind of a -- even though

3    there's no law mandating that, that that's part of any

4    practice that's up to kind of snuff, medically?

5    A.    Correct, the Tennessee Chronic Pain Guidelines are

6    put out by the Department of Health as a guideline of how

7    we should practice.

8    Q.    Okay.  Why don't you tell the Court, just

9    generally, what are the trends that you see in

10   Mr. Young's prescribing starting with PreventaGenix.

11   A.    The CSMD reviews that I did during his

12   PreventaGenix days show that he was prescribing, while it

13   may not be super high MEDs on every patient, it was

14   continuous prescribing on a monthly basis for a lot of

15   patients of opioids, benzodiazepines, muscle relaxers,

16   stimulants at some times, and also sleep aids.

17   Q.    Okay.  Would you tell the Court -- because we've

18   heard a little bit about the dangers of prescribing those

19   kinds of things together.  As part of your practice, as

20   part of your job investigating the cases that you

21   investigate, what have you come to learn about the

22   dangers of those drugs?  Let me retract that question

23   because what I mean is, in your training as a nurse

24   practitioner, what have you come to learn about the

25   dangers of those drugs?  And then move on to your

1   investigation.

2   A.    The dangers of those drugs -- benzodiazepines,

3   opioids, muscle relaxers, and even sleep aids -- is that

4   all of those medications, if prescribed simultaneously,

5   can cause respiratory depression issues, which can lead

6   to an overdose or death.

7   Q.    Okay.  Throw in stimulant medication along with,

8   let's say, one of each of those categories that you just

9   mentioned.  Medically speaking, why is that a danger?

10  A.    Stimulant medications, the biggest danger is that

11  those are just as addictive as these other medications

12  that actually have, most of the time, an opposite effect.

13  Opioids, benzodiazepines are actually neurological

14  depressants.  And stimulants are actually the opposite.

15  They cause increased neural activity.

16  Q.    And when you see a patient receive, let's say, a

17  sleep aid, muscle relaxer, a benzodiazepine, which are

18  anxiety drugs, and opioid and a stimulant from the same

19  provider, is that a red flag in what you do as an

20  investigator?

21  A.    Yes.

22  Q.    What about if you see that as a pattern, lots of

23  patients receiving combinations or near combinations of

24  those kinds of drugs?

25  A.    It's just that it's a huge concern that these

REDACTED TRANSCRIPT

1   patients are being put at risk as a population of the

2   practice and also as individuals, that they are being

3   exposed to a lot of different medications that cause

4   addiction and actually have serious effects, they do

5   cause adverse events.

6   Q.    Have you in your training and experience come to

7   understand that doctor shoppers -- let me ask you this

8   first:  What is doctor shopping?

9   A.    So doctor shopping is when you have someone that is

10  physically addicted to a controlled substance or

11  addictive substance of any kind, and they actually -- to

12  feed their addiction, which is a physical ailment, a

13  mental ailment, they actually will go to multiple

14  providers trying to obtain that substance.

15  Q.    And is it unusual for you to see a doctor shopper

16  seeking, for example, sedatives and opioids, analgesics,

17  at the same time that they're seeking stimulants?

18  A.    If the patient themselves have an addictive

19  propensity, then you'll see them looking for multiple

20  controlled substances that are highly addictive.

21  Q.    And of those drugs that we're talking about --

22  let's say setting aside something like a sleep aid like

23  Ambien, or Zolpidem, that we see sometimes --

24  A.    Correct.

25  Q.    -- those all have pretty substantial street value,

REDACTED TRANSCRIPT

1  right, on the black market?

2  A.    Right.

3  Q.    Okay.  So tell me what you see in the prescribing

4  after the DEA raid in January of 2017.

5  A.    I did look at an analysis of his prescribing habits

6  after the DEA raid, and his opioid prescribing did

7  decrease.  However, his amphetamine prescribing did go up

8  and so did his benzodiazepines prescribing overall

9  looking at a number of benzodiazepine scripts on a

10 monthly basis.

11 Q.    Okay.  And this is -- you're talking about his per

12 capita prescribing and his patient population?

13 A.    Correct.

14 Q.    What happened after the Board order came down in

15 November of 2018 curtailing Mr. Young's ability to

16 prescribe opioids and stimulants and Schedule II?

17 A.    There actually was -- he still prescribes

18 benzodiazepines on a regular basis.  He is doing a little

19 more testosterone prescribing.  And then he also -- I saw

20 some more prescribing of a different opioid called

21 Stadol, which is a Schedule IV.

22           **THE COURT:**  Spell that last --

23           **THE WITNESS:**  The medication?

24           **THE COURT:**  Yeah.

25           **THE WITNESS:**  It's S-T-A-D-O-L.

1          **THE COURT:**  Thank you.  What is that?

2          **THE WITNESS:**  It is a Schedule IV opioid.

3     BY MR. PENNEBAKER:

4     Q.    So, in fact, under the agreed order, Jeff Young can

5     still prescribe multiple opioids, right?  Tylenol 3,

6     being Tylenol with codeine, that's one of the ones he --

7     A.    It's very limited though.

8     Q.    Okay.  But at least one in Schedule III, one in

9     Schedule IV?

10    A.    Correct.

11    Q.    And we actually see him doing that in the CSMD,

12    correct?

13    A.    Correct.

14    Q.    Any other trends between when the DEA raid occurred

15    and the stimulants and benzos go up and when the order

16    came down and no more stimulants on the table?

17    A.    He just continued to prescribe, like I said, the

18    benzodiazepines, and then his testosterone or steroid

19    prescribing went up.

20    Q.    Okay.  So let's take a look at some of the

21    exhibits.

22         **MR. PENNEBAKER:**  And by the way, the

23    government would offer Government's 25.  And I'll give

24    one copy to the Court and one to Mr. Ferguson.

25         **THE COURT:**  Is this the book that Mr. Knutson

                              REDACTED TRANSCRIPT

1    relied on?  Is that being marked as Exhibit 2?  Is that

2    what --

3              **MR. PENNEBAKER:**  To keep things

4    extraordinarily confusing, Your Honor, that's 2 to 24.

5              **THE COURT:**  Two to 24.

6              **MR. PENNEBAKER:**  Yes, Your Honor, and the

7    government would offer that as well.

8              **MR. FERGUSON:**  No objection.  With no

9    objection that will be marked Exhibit 2-24.

10             **MR. KNUTSON:**  Your Honor, if I may just to

11   clarify, that, again, is one that we included the flash

12   drive --

13             **THE COURT:**  Yes, sir.

14             **MR. KNUTSON:**  -- with the bigger documents.

15             **THE COURT:**  I understand.

16             (Exhibit Nos. 2-24 were marked.)

17             **THE COURT:**  All right.  Thank you.

18   **BY MR. PENNEBAKER:**

19   Q.    Do you know whether or not Jeff Young has ever been

20   certified in any way as a pain management doctor or has

21   run a certified pain management clinic?

22   A.    I'm unaware of that information.

23             **MR. PENNEBAKER:**  Okay.  I'd first like to show

24   the Court a video of one of the undercover consults with

25   Jeff Young.  If that's all right, Your Honor, we would

1    like to play that.

2              **THE COURT:**  All right.

3              **MR. PENNEBAKER:**  And it's an excerpt, by the

4    way.  This is an excerpt from, basically, when Mr. Young

5    sits down for a consult.  And by way of background, there

6    are two undercover officers in his office seeing him at

7    the same time.

8              **THE COURT:**  What was the date of this, please?

9              **MR. PENNEBAKER:**  This is October 11, 2016, I

10   believe.

11             **THE COURT:**  Okay.

12             (Video played.)

13   **BY MR. PENNEBAKER:**

14   Q.    Just to pause for a minute and talk about that, are

15   you aware that these patients were getting fentanyl,

16   oxycodone, a number of other prescriptions written by

17   Dr. Young as this conversation is going on?

18   A.    Yes, I am.

19   Q.    Not Dr. Young, excuse me, Jeff Young.  And at the

20   same time what did you understand them to be talking

21   about so far?

22   A.    A Halloween party.

23   Q.    At his house?

24   A.    At his house and getting drunk with one of his

25   coworkers.

1    Q.    And does it sound like he's inviting these women to

2    his Halloween party?

3    A.    If he's not, it's just short of an invitation.

4    Q.    Okay.  I think you've heard earlier that there was

5    some testimony about the advisability of drinking on

6    opioid medications.  Could you just in your medical

7    training and experience speak to that a little bit?

8    A.    Sure.  Patients that take opioids, opioids or

9    benzodiazepines, are recommended not to partake in

10   alcohol consumption because they are all neurological

11   depressants.

12   Q.    Okay.

13             (Video played.)

14   **BY MR. PENNEBAKER:**

15   Q.    And when he says "let's start with you, XXXX," is

16   that the undercover that at this time has seen him

17   already?

18   A.    Correct.

19   Q.    Okay.

20             (Video played.)

21   **BY MR. PENNEBAKER:**

22   Q.    Okay.  And thus ends the consult of Patient 1,

23   correct?

24   A.    Correct.

25   Q.    Do you know whether it was part of the undercover

1   officer's profile that she go in to lie about whether or

2   not she had ever had an MRI?

3   A.   I'm unaware because that was DEA's decision.

4            **THE COURT:**  I can't hear you, ma'am.

5            **THE WITNESS:**  I was unaware because DEA made

6   that decision.

7   **BY MR. PENNEBAKER:**

8   Q.   Okay.  But regardless, she's being continued on

9   medications with no confirmation by the doctor that --

10  the nurse has not yet seen this supposed MRI, right?

11  A.   Correct.

12  Q.   Did you hear the questions asked during the

13  consult?

14  A.   Yes.

15  Q.   How's your medication working?  Where is the MRI?

16  A.   Correct.

17  Q.   We'll get to that eventually, I think, is sort of

18  like a statement at the end, right?

19  A.   Possibly.

20  Q.   Is that above, at, or below the acceptable standard

21  of care for someone receiving a prescription for

22  fentanyl?

23  A.   I would consider it to be below the standard of

24  care.  He in no way, according to this video, touched the

25  patient to examine her or he also -- he asked her a vague

1    question about how her medication was helping her, but

2    did not talk about things that are required by the

3    Tennessee Chronic Pain Guidelines about having a pain

4    plan and about how it impacts their activities of daily

5    living, their family function, their social function, all

6    of the things that are impacted by someone that's in

7    pain.

8    Q.    Did you see the undercover patient standing up and

9    walking around prior to Mr. Young walking into the exam

10   room?

11   A.    Correct.

12   Q.    As a medical provider, did that appear to you based

13   on what you saw there to be somebody that needed

14   fentanyl?

15   A.    It's hard to make that decision without knowing her

16   diagnosis.  I actually did not know that undercover

17   person.

18   Q.    Okay.  Given her age and the lack of any sort of

19   limitations of movement, the energy level, are those

20   things -- would that be unusual for a patient on

21   fentanyl, which I think we heard earlier is a drug

22   typically used to treat cancer patients for pain?

23   A.    I can't say that it would lead to questions about

24   whether the medication was really required for her

25   illness.

1    Q.    And we're about to get into the consult of Patient

2    No. 2, correct?

3    A.    Yes.

4    Q.    Is it okay for a provider to see two patients who

5    are unrelated, there's not one that's a caregiver or

6    anything, two friends at the same time?

7    A.    I wouldn't call it common, no.

8    Q.    And this next patient, this is the initial consult,

9    correct?

10   A.    Correct.

11            **MR. PENNEBAKER:**  Okay.  Let's go ahead.

12            (Video played.)

13   **BY MR. PENNEBAKER:**

14   Q.    Okay.  We saw there -- what did you take -- there's

15   a description of the symptoms, right?

16   A.    Correct.

17   Q.    And who's describing her pain symptoms primarily?

18   I mean, in other words, is she being -- is she being

19   asked open-ended questions or leading questions?

20   A.    She's being asked leading questions.

21   Q.    Okay.  And why -- is that a problem?  Like, is the

22   pain radiating down your leg, is that a problem for a

23   provider to ask a question like that?

24   A.    It's better to let a patient describe their

25   symptoms the best way they can to provide accurate

1    information and not to put words in their mouth.

2    Q.    Why is that?

3    A.    Because it gives you a more accurate representation

4    of what the patient's actually experiencing and not to

5    give them ideas of what to say to procure the

6    medications.

7    Q.    We also heard that in the past for this pain, first

8    of all, she's never had an x-ray or MRI even though the

9    pain has allegedly been ongoing for four years, right?

10   A.    Correct.

11   Q.    Is that a red flag?

12   A.    It's just that there's been no radiology to

13   determine what her pain is actually from.

14   Q.    Okay.  And he hasn't seen her before either, right?

15   A.    Correct.

16   Q.    And then he asks "What works for you?"  Did you

17   hear him ask that?

18   A.    Yes.

19   Q.    What did she say?

20   A.    She mentions oxycodone and that smoking marijuana

21   helps.

22   Q.    Did she mention she had received those things from

23   a doctor?

24   A.    No.

25   Q.    Does he ask?

1    A.    No.

2    Q.    So what do we know at this point about the source

3    of whatever oxycodone that she's tried in the past that

4    has not helped?

5    A.    Without asking her directly or checking the CSMD,

6    we don't know where it came from and it could possibly be

7    diverted medication.

8    Q.    We don't know and this provider doesn't know?

9    A.    Correct.

10   Q.    And then, of course, we hear:  You are just fine

11   smoking marijuana here.  In fact, I'm on the -- I work

12   with NORML.

13         Did you hear that?

14   A.    Yes.

15   Q.    Is it acceptable under the Tennessee Chronic Pain

16   Guidelines for patients to smoke marijuana?

17   A.    Not currently, no.

18            **MR. PENNEBAKER:**  Okay.  Let's go ahead and

19   finish.

20            (Video played.)

21   **BY MR. PENNEBAKER:**

22   Q.    What are your general opinions about what we just

23   saw?

24   A.    So I will say that some of biggest concerns or red

25   flags that I see in the care that is below the standard

1   of accepted care is that we see in the video that he --

2   well, we think we see he's talking about it with the

3   patient, examining her back.  However, when you see a

4   patient for the first time, they deserve a thorough

5   history and physical, especially if you're going to be

6   prescribing medications that are going to put them at any

7   kind of risk.

8   Q.    Okay.  Anything else?

9   A.    He doesn't discuss -- he doesn't discuss, again,

10  with the second patient about what their goals are

11  necessarily, about how their medication should help them

12  and what they're looking at.  And personally, to me, it

13  almost seems like a social call than a medical visit.

14  Q.    Did we see or hear anything about the controlled

15  substance monitoring data on either patient?

16  A.    No.

17  Q.    Did the new patients receive any sort of pain

18  contract or anything like that?

19  A.    I can't answer that question because I haven't seen

20  the documentation for the chart.

21  Q.    Okay.  I think you reviewed the deposition with the

22  medical board, correct?

23  A.    I did.

24  Q.    Do you recall in the deposition Mr. Young making

25  representations on more than one occasion that "I never

1   started a patient on narcotics.  I only continued care by

2   others"?

3   A.    Yes, I do recall that.

4   Q.    And, I think, he indicated there that he was nearly

5   a hundred percent sure that was true?

6   A.    Correct.

7   Q.    Did we just see that not happening?

8   A.    Correct.

9   Q.    Okay.  And while we're on the deposition, there's

10  just a couple other things that -- you know what?  I'm

11  not going to go there just yet.

12        Let's take a look at the exhibit binder that you

13  brought, and let's talk about what's in there.  Are you

14  with me?

15  A.    Uh-huh.

16  Q.    Let's start just with Exhibit A.  What are we

17  looking at here?

18  A.    So Exhibit A is a document that was put together by

19  one of the drug diversion agents from the DEA.  And what

20  it does is it compares the CSMD prescription provider

21  report with the CSMD footprint to show if when these

22  prescriptions were provided, was the CSMD checked.

23  Q.    Okay.  And we've got the RX dates column.  Is it

24  your understanding that that column reflects dates that

25  are only post medical board order?

1    A.    Correct.

2    Q.    In other words, November of 2018 --

3    A.    Correct.  Yes.

4    Q.    -- to present?

5    A.    Yes, sir.

6    Q.    And then the JYP&P checked, this is the footprint

7    we were talking about?

8    A.    Yes, if it was present on the footprint that he

9    checked it, that column has a date in it.

10   Q.    Okay.  And, then, the PreventaGenix patient, yes or

11   no, I guess, what is that column telling us?

12   A.    That column is telling us that that's a patient

13   that was a patient while he had the established

14   PreventaGenix clinic compared to where they are now.

15   Q.    Okay.  So, in other words, PreventaGenix's patients

16   that are now seeing him at Genexis?

17   A.    Correct.

18   Q.    And then the RX, what do you understand we're

19   looking at in that column?

20   A.    The name of the prescription.

21   Q.    And these are benzodiazepines?

22   A.    Correct.

23   Q.    Okay.  Now, what about this, if anything, causes

24   you concern?

25   A.    My biggest concern is when looking at the

1  spreadsheet that shows the prescriptions that there is a

2  lack of checking the CSMD before prescribing the

3  clonazepam or the benzodiazepines when, in fact, having

4  checked the CSMD he would have noted that these patients

5  were being prescribed other controlled substances by

6  other providers, which could be -- could pose a health

7  adverse effect.

8  Q.   So is it fair to say that Jeff Young was on notice

9  as of January 2017 that at least the DEA believed his

10 prescribing practices were suspect?

11 A.   I can't speak for what the DEA said.

12 Q.   Well, there was a raid on the clinic, a search

13 warrant executed, meaning probable cause to believe

14 crimes were committed there, are you aware of that?

15 A.   Yes.

16 Q.   And so that fact notwithstanding, there are still

17 patients of that clinic that are no longer receiving

18 opioids from him but who he is prescribing

19 benzodiazepines without checking the CSMD to see if

20 they're also possibly getting opioids somewhere else,

21 doctor shopping, whatever the case may be?

22 A.   Correct.

23 Q.   And, I think, that we've heard this before, but

24 benzodiazepines alone can be dangerous, correct?

25 A.   Correct.

1   Q.    And why is that?

2   A.    One of the dangers of benzodiazepine is if you're

3   on it for a long period of time is that if you have any

4   occurrence of withdrawal that it can cause seizures or

5   death.

6   Q.    Okay.  Then, of course, we've already heard the

7   dangers of opioids.  So I won't go back through that.  Is

8   there anything you feel like we need talk about with

9   respect to that first exhibit?

10  A.    I don't believe so.

11  Q.    How about Exhibit B?  What are we looking at here?

12  A.    So Exhibit B is an actual patient CSMD report for

13  XXXXXXXX XXXXX or --

14  Q.    That's --

15  A.    -- JD.

16  Q.    Yeah, JD.  If we can still apply the same rules

17  about if we're talking about a patient, use initials even

18  if we accidentally say the full name.

19  A.    I apologize.

20  Q.    I've been making the same boo-boo.  Okay.  So what

21  did we learn from this?

22  A.    So the things that stood out to me on the CSMD for

23  JD is that he went through -- he went through a period of

24  a three-year Suboxone, intermittent Suboxone addiction

25  treatment.  And prior to that his opioids were being

1    prescribed by Mr. Young.

2    Q.    Okay.  And is that -- can you say a little bit more

3    about why that's troubling.

4    A.    What is troubling is that he actually is continuing

5    to get clonazepam and benzodiazepine in the midst of

6    having his Suboxone treatment.  So even though this

7    patient is in rehab for a period of time for Suboxone

8    treatment, he's still getting an addictive substance from

9    Jeff Young.

10   Q.    Do you know if Jeff Young is a psychiatrist?

11   A.    To my understanding, he is a family nurse

12   practitioner.

13   Q.    Any idea why the M.D. prescribing the Suboxone

14   wouldn't also be the keeper of whatever other controlled

15   substances for mental I hate to say disorders but for

16   mental conditions?  Why wouldn't that just be the same

17   provider?

18   A.    I can't speak personally for the provider that's

19   providing the Suboxone.  However, addiction is a

20   psychological issue.  And he -- I mean, either he -- he

21   doesn't feel it's necessary obviously.

22   Q.    I mean, it's possible there's care coordination

23   going on, right?

24   A.    It's always possible.

25   Q.    Okay.  Let's move onto Exhibit C.  By the way, is

1    there anything else we need to touch on with that?

2    A.    I don't believe so.

3    Q.    Okay.  And what are we looking at with Exhibit C?

4    A.    So we're looking at a patient --

5              **THE COURT:**  Excuse me just a second.  You may

6    have described this.  Suboxone is used for what now?

7              **THE WITNESS:**  The Suboxone is actually

8    buprenorphine.

9              **THE COURT:**  It's what now?

10             **THE WITNESS:**  It's buprenorphine, and it's

11   used for addiction recovery.

12             **THE COURT:**  Okay.

13             **THE WITNESS:**  It's a medication-assisted

14   treatment.

15             **THE COURT:**  All right.  Thank you.

16   **BY MR. PENNEBAKER:**

17   Q.    And just one additional quick thing about that,

18   Mr. Young was prescribing opioids at PreventaGenix for

19   this individual.  Is it fair to say that the trend was

20   this individual would be prescribed opioids and then go

21   on Suboxone and then go back to the opioids, and then go

22   back to Suboxone?  Is that the trend that you saw in, I

23   guess, it's JD's --

24   A.    Well, he had -- he was -- during the three-year

25   period where he was getting the intermittent Suboxone

                              REDACTED TRANSCRIPT

1    treatment, there were occasions during that three-year

2    period -- let's see.  There were occasions during that

3    three-year period where he would, I would call it, fall

4    out of treatment and go back to Jeff Young, and

5    Jeff Young or someone -- another provider at his clinic

6    would actually prescribe him an opioid again.

7    Q.    Okay.  So moving onto Exhibit C, what are we

8    looking at here?

9    A.    So Exhibit C is, again, it's a patient CSMD report

10   for JM.

11   Q.    Okay.  And where did you get this?

12   A.    This was actually provided to me through our --

13   it's from -- the DEA requested it for us.

14   Q.    Okay.  And what do we see here that's troubling?

15   A.    So the troubling thing about this CSMD report for

16   this patient is that Mr. Young was still prescribing

17   gabapentin, Ambien, and clonazepam to a patient during

18   April of this year when, in fact, had he checked the

19   CSMD, he would have noticed that the patient had actually

20   been doctor shopping for hydrocodone.

21   Q.    So just to make sure I understand that, you said

22   that Jeff Young is prescribing clonazepam and gabapentin

23   and Ambien?

24   A.    Correct.

25   Q.    Now, does gabapentin -- which I think is

DIRECT - NATALIE SEABOLT                                         225

1    Neurontin -- is that one of the brand names?

2    A.    Correct.

3    Q.    Gabapentin is sometimes used as a substitute for

4    carisoprodol, or Soma.  Right?

5    A.    It's used to treat neuropathy, but it does have a

6    sedative effect.

7    Q.    And what I mean by sometimes used as a substitute

8    is the Trinity that we've heard some talk about.  Is it

9    becoming more or less common to see Soma, benzo, opioid?

10   A.    Are you trying to say Ambien?

11   Q.    No, no, I'm saying like Soma, benzo, opioid is kind

12   of the classic Trinity?

13   A.    Right.

14   Q.    Is it becoming less common to see Soma prescribed

15   in conjunction with the other two by the same provider

16   because of law enforcement efforts and things like that?

17   A.    Yes.

18   Q.    And has gabapentin kind of replaced Soma in a lot

19   of the cocktail writing that goes on now?

20   A.    I don't know that it's necessarily replaced it.

21   But the use and prescribing of gabapentin has gone up

22   significantly, which is why, in fact, it did end up

23   becoming a scheduled drug.

24   Q.    Does gabapentin have a synergistic effect when

25   combined with a benzodiazepine and opioid?

REDACTED TRANSCRIPT

1    A.    Well, it also has sedative properties.

2    Q.    Got it.  So what we see is that this individual,

3    JM, is getting gabapentin, not Soma, gabapentin and a

4    benzodiazepine from Jeff Young, and then he's going and

5    getting the opioid somewhere else; is that right?

6    A.    Correct.

7    Q.    What is the date of the most recent prescription by

8    Mr. Young?

9    A.    It's April 20, 2019.

10   Q.    April 20, 2019?

11   A.    Uh-huh.

12   Q.    That postdates his arrest in this case, correct?

13   A.    Yes.

14   Q.    And just before his arrest, he prescribed

15   clonazepam, that benzodiazepine, right?

16   A.    Yes.

17   Q.    And if you look at the hydrocodone prescriptions on

18   here -- there's one on March 27, 2019, and one on

19   April 26, 2019 -- are those the same provider or

20   different providers issuing those prescriptions?

21   A.    There's one on March 27, 2019.  And there is one

22   prior to that, which is on March 12, 2019.  And those are

23   two separate providers.

24   Q.    Got it.  And then, actually, if you look on that

25   second page, you see on January 3, 2019, there's yet

1    another provider writing for hydrocodone, right?

2    A.    Correct.

3    Q.    So three providers in as many months?

4    A.    Correct.

5    Q.    Is that a lot?

6    A.    It's unusual.

7    Q.    Is that a red flag for doctor shopping?

8    A.    It can be considered abhorrent behavior, yes.

9    Q.    Okay.  And I just want to make sure that if you

10   hesitate to characterize it that way that I can find out

11   from you sort of what the hesitancy is, if there is any.

12   A.    So patients that are patients, like I said, that

13   are going to multiple providers to get their opioid

14   prescriptions or any other controlled substance that

15   they're addicted to, they -- I mean, they are considered

16   addicts.

17   Q.    Okay.  And just to square the circle, had

18   Jeff Young been checking, he would know, would have

19   known, when he wrote that gabapentin, for example, that

20   there were three providers rounding out effectively a

21   known cocktail of abuse for this patient?

22   A.    He would have noticed there was troubling behavior

23   from the patient going to different physicians.

24   Q.    Okay.  Let's go to Exhibit D.  What are we looking

25   at here?

1   A.    So Exhibit D is another CSMD patient report.  This

2   was for patient VG.  VG actually is another patient that

3   received -- the last prescription she received was Ambien

4   on April 10.  The prescription was written April 1st of

5   this year for Ambien.  And actually on April 1st

6   Mr. Young also wrote a prescription for clonazepam.  And

7   had he checked the CSMD, he would see that in the end or

8   middle of February through the middle of March that this

9   patient also displayed some doctor shopping, went and got

10  hydrocodone from three separate providers.

11  Q.    But he didn't check the CSMD, did he?

12  A.    No, not according to our records.

13  Q.    And was that one of the things that the medical

14  board noticed was lacking in PreventaGenix when they

15  issued their order?

16  A.    I'm not -- I'm not completely familiar with the

17  Board order.

18  Q.    Do you recall reading in the deposition with the

19  medical board anything about Mr. Young having to take a

20  course on the pain guidelines you were talking about

21  earlier?

22  A.    Yes, he openly offered that he had taken a two-hour

23  course.

24  Q.    And yet this is postdating that course, obviously?

25  A.    If you say so.

1    Q.    Well, that deposition was in August of '18, and it

2    looks like we're not checking in 2019, right?

3    A.    Okay.  Correct.

4    Q.    I know -- I don't mean to say you should know or

5    anything like that.  So to the extent that he simply

6    didn't have that knowledge that he ought to be checking

7    the CSMD before the Board order and that his obligations

8    under it came down, he certainly knows now, right?

9    A.    Correct.

10   Q.    Let's go to Exhibit E.  Are you with me?

11   A.    I am.

12   Q.    Exhibit E is what?

13   A.    Exhibit E is another CSMD patient report, and this

14   is for patient JA.

15   Q.    We've already heard some about patient JA.  We

16   heard Officer Chew testify about some messages between

17   Mr. Young and JA, correct?

18   A.    Correct.

19   Q.    And we heard the -- we saw the medical board

20   materials that someone had sent in a complaint with some

21   Facebook postings about JA becoming an employee of

22   PreventaGenix.  Do you remember that?

23   A.    Yes.

24   Q.    And that same complaint also had excerpts from the

25   CSMD for JA back in whatever it was, '15, '16?

1   A.     Correct.

2   Q.     And not to belabor the CSMD, let's go ahead and

3   head over to -- well, what kinds of drugs are we seeing

4   JA getting from Jeff Young in PreventaGenix days?

5   A.     So at the very end of 2015, Mr. Young was

6   prescribing to JA -- on a regular basis, he was

7   prescribing amphetamine salt, which is a medication for

8   ADHD, and alprazolam, which is a benzodiazepine.  She was

9   getting oxycodone with acetaminophen on a regular basis.

10  Q.     Okay.  Now, moving ahead to or back as it were to

11  the first page of Exhibit E, we have -- the most recent

12  prescription from Mr. Young appears to be written

13  12/6/18, correct?

14  A.     Correct.

15  Q.     And that is for clonazepam, butorphanol, and that's

16  it?

17  A.     Correct.

18  Q.     And do you know -- and you mentioned earlier

19  butorphanol is a Schedule IV opioid analgesic, right?

20  A.     Correct.

21  Q.     So someone who has previously been getting all

22  kinds of opioids and benzodiazepines and stimulants from

23  Mr. Young continues, at least in December of '18 under

24  the Board order, to receive an opioid and a

25  benzodiazepine from him, correct?

REDACTED TRANSCRIPT

1   A.   Correct.

2   Q.   Okay.  And we have some of her medical records from

3   PreventaGenix as Exhibit F, don't we?

4   A.   Yes, we do.

5   Q.   Let's take a look at -- some of these are drug

6   screens, correct?

7   A.   Yes, they are.

8   Q.   And this is an excerpt of her PreventaGenix medical

9   file?

10  A.   Yes.

11  Q.   So the first drug screen -- let's go ahead and flip

12  to the second drug screen.  So you get past page 4 of 4,

13  and then there's two additional pages.  And then there's

14  a second toxicology report about six pages in.

15  A.   Uh-huh.

16  Q.   And the date is -- 3/25/16 is the date it was

17  collected?

18  A.   Correct.

19  Q.   What can you tell the Court about what's concerning

20  about this?

21  A.   Looking back at the CSMD for the prescriptions that

22  he provided to her, my biggest concern about this, about

23  this urinary drug screen report, were that he made a

24  notation that the alprazolam was prn.  However, he was

25  prescribing the Xanax to her, up to 3 milligrams a day,

1    on a regular basis, almost monthly basis.  And so you

2    would think that if she's taking it that often, even

3    though it is prn, that it would show up in her drug

4    screen.

5    Q.    Okay.  What else do you see?  And I think that

6    count -- what was the count of alprazolam he was

7    prescribing per day?

8    A.    He was prescribing three 1-milligram pills a day.

9    Q.    So the prescriptions were like 90 pills at a time?

10   A.    Correct.

11   Q.    All right.  What is -- is there anything else about

12   this that is concerning?

13   A.    The only other thing that's concerning is that she

14   did have Tramadol detected in her urinary drug screen.

15   He made a notation it was an old prescription.  However,

16   combining opioids on top of each other can still add to

17   the risk of having an overdose.  So, clearly, she was not

18   taking her medication as prescribed.

19   Q.    She's on Adderall, alprazolam, clonazepam,

20   fentanyl, hydrocodone, and oxycodone it indicates at the

21   top.  Do you see that?

22   A.    Yes.

23   Q.    Can you speak to that combination of drugs being

24   written by someone who's not a pain specialist and who

25   has no training, formally anyway, in psychiatry?

1    A.    I'll just say that those are a lot of very potent

2    controlled substances/prescriptions that are being

3    prescribed simultaneously to a patient, that all of them

4    except the Adderall had the additive effect for

5    respiratory depression.

6    Q.    The Adderall gets you high, right?

7    A.    It can be abused in a way because it's a stimulant.

8    Q.    And that's why it's Schedule II, which is the most

9    addictive of any of the "legal for a doctor to write"

10   drugs?

11   A.    Correct.

12   Q.    And is it fair to say that we see a lot of

13   inconsistencies in the rest of these drug tests?  I don't

14   want to go back and go through every single screen with

15   PreventaGenix.  But this patient has a lot of

16   inconsistencies in her drug screens in the PreventaGenix

17   files, right?

18   A.    Her results do raise questions about her practices

19   of taking her medications as prescribed or using

20   medications that are not prescribed to her.

21   Q.    Okay.  Actually, there are a couple of other things

22   that I want to look at here.  Toward the back -- and, I

23   think, maybe you pointed this out to me.  I'm going to

24   put this on the Elmo because I don't want to count the

25   pages.

1          What does that say about -- and this is, by the

2    way -- it looks like these are all Jeff Young

3    prescriptions.  The prescriber here is Young, Young,

4    Young, Young.  Looks like she got Suboxone from somebody

5    else at the top of this, right?

6    A.    Correct.

7    Q.    That cumulative morphine equivalent is 302.5?

8    A.    Correct.

9    Q.    Is that normal? a little high? really high? low?

10   A.    I mean, I would consider it dangerous based on the

11   CDC guidelines and the chronic pain guidelines of

12   concerns about prescribing a benzodiazepine with a

13   patient that has a morphine equivalent of 90 or a

14   hundred.

15   Q.    Above 90 or a hundred.  So this is two standard

16   deviations over what would be very concerning in

17   combination with a benzodiazepine?

18   A.    I wouldn't say two standard deviations, but I would

19   say it's three times.

20   Q.    Three times.  Sorry.  I abused standard deviation.

21   I was checking you to see if you studied your statistics.

22   The last thing I want to look at in Exhibit F is --

23   there's a sticky.  Do you remember which one I'm talking

24   about?

25   A.    Yes, it's the very last page.

REDACTED TRANSCRIPT

1    Q.    Okay.  So it's the last page.  And this is actually

2    from the PreventaGenix file on XXXXXXX -- excuse me, JA,

3    right?

4    A.    This is part of the file, yes, that was provided to

5    me.

6    Q.    Okay.  And what does the sticky say?

7    A.    It says she must, underlined and highlighted, be

8    drug tested before any, underlined and highlighted, more

9    medication is wrote per Kristie.

10   Q.    And that's the office manager, right?

11   A.    To my knowledge.

12   Q.    So warning about this one, right?

13   A.    Clearly, there's some concern about writing her

14   prescriptions.

15   Q.    Nevertheless, we get all the way into almost 2019.

16   After the raid, after the Board order, we're still

17   getting benzos, among other things, and a Schedule IV

18   opioid without checking the CSMD?

19   A.    Correct.

20   Q.    Is that below, at, or above the standard of care

21   that Tennessee law really requires?

22   A.    It's below the standard of care to not be checking

23   the CSMD or to continue to prescribe to someone who

24   displays abhorrent behavior.

25   Q.    And looking at G --

                        REDACTED TRANSCRIPT

1    A.    Uh-huh.

2    Q.    -- what is this we're looking at?

3    A.    This is a CSMD report pulled prescribing after

4    4/18 of this year until 5/3 of '19.

5    Q.    So that's the two-week period after he got

6    arrested?

7    A.    Correct.

8    Q.    And still writing controlled substances, right?

9    A.    Correct.

10   Q.    And JM there, that's one of the patients we talked

11   about who's doctor shopping, right?

12   A.    Yes, it is.

13              **THE COURT:**  Gentlemen, can we take a break for

14   a few minutes?

15              **MR. PENNEBAKER:**  Your Honor, I think I'm just

16   about done.  We have maybe one or two more questions.

17              **THE COURT:**  Okay.

18   **BY MR. PENNEBAKER:**

19   Q.    Last thing.  Hydromorphone -- Dilaudid, right? --

20   is that --

21   A.    Uh-huh.

22   Q.    -- used for the treatment of addiction?

23   A.    No.

24   Q.    What is it used for?

25   A.    It's used for the treatment of pain.

REDACTED TRANSCRIPT

1   Q.   Is it a -- on the spectrum of potency, where does

2   it fall?

3   A.   It's more potent -- it's in the higher end of the

4   potency of the medications that are available.

5   Q.   So more potent than oxycodone?

6   A.   Yes.

7   Q.   Less potent than fentanyl?

8   A.   For sure more potent than oxycodone.  As far as

9   fentanyl, I'd have to look at my potency list from the

10  case.

11          **MR. PENNEBAKER:**  Pass the witness, Your Honor.

12          **THE COURT:**  Let's go ahead and take a break

13  before you start, Mr. Ferguson.

14          **MR. FERGUSON:**  Yes, Your Honor.

15          **THE COURT:**  Recess for 15 minutes or so.

16  Let's take a recess, please.

17          **THE CLERK:**  All rise, please.  This Honorable

18  United States District Court now stands in recess.

19          (Recess taken at 3:57 p.m.)

20          **THE COURT:**  All right.  Mr. Ferguson.

21                    **CROSS-EXAMINATION**

22  **BY MR. FERGUSON:**

23  Q.   Dr. Seabolt, good morning or afternoon, I guess,

24  now.

25  A.   Good afternoon.

REDACTED TRANSCRIPT

1   Q.    So you're not a medical doctor?

2   A.    No, sir, I'm not.

3   Q.    But you are a nurse practitioner, and you have a

4   B.S. in nursing; is that correct?

5   A.    No, I have a doctorate of nursing practice in

6   nursing.

7   Q.    You have a doctorate in what?

8   A.    I have a doctor of nursing practice, a DNP.

9   Q.    Nursing practice?

10   A.    Uh-huh.

11   Q.    And as part of your training, you would say that

12   each patient is treated as an individual; is that

13   correct?

14   A.    Correct.  Nurses believe in holistic nursing.

15   Q.    And that there's not one cookie cutter way to

16   approach every person with the exact same symptoms?

17   A.    Correct.

18   Q.    You have to actually meet that person, ask

19   questions, figure out what their goals and their needs

20   are, and then you develop a plan, a treatment plan around

21   those?

22   A.    Correct.

23   Q.    If you've already had an established relationship

24   with a patient, it might be simply that you're there to

25   follow-up, see how the pain management or the treatment

1   is progressing, and get prescriptions refilled?

2   A.    That may be the purpose of the visit, yes.

3   Q.    And in the videos that we saw, the first person we

4   were talking about, that was the purpose of her visit?

5   A.    Correct.

6   Q.    And did you notice that the nursing staff of the

7   clinic had already interviewed her and received

8   information up to and including the point where her pain

9   she listed was four out of ten?

10  A.    That may have been possible, but I have not seen

11  that portion of the video.

12          **MR. FERGUSON:**  Mine doesn't work on sound.

13  Can you key back up the first video?

14          **MR. KNUTSON:**  Your Honor, I was prepared to

15  play the video.  Can we take the screen down while I find

16  it?  It's got all the --

17          **THE COURT:**  Take the screen down?

18          **MR. KNUTSON:**  Yeah, just take it --

19          **THE COURT:**  Sure.

20          **MR. KNUTSON:**  I just got to locate that video.

21          **THE COURT:**  Whatever you need, go ahead.

22          **MR. KNUTSON:**  Which video?

23          **THE COURT:**  Is this the two ladies?

24          **MR. FERGUSON:**  There's two videos.  One

25  basically starts with them sitting in the lobby, and the

1   other one starts off with Mr. Young interviewing them in

2   the patient room.  We're looking for the first one, then

3   we'll move to the second one.

4          Sorry, I just received this a little while

5   ago.  I can't seem to get the volume to play, or I would

6   do it from my computer.

7          **THE COURT:**  All right, sir.

8          (Video played.)

9   **BY MR. FERGUSON:**

10  Q.    Do you hear him asking the questions typical for a

11  physical?

12  A.    The triage.

13  Q.    Yes, this is the same person we saw at the end of

14  the video that was the subject of the --

15         **THE COURT:**  Mr. Ferguson, we're having trouble

16  hearing you, sir.

17  **BY MR. FERGUSON:**

18  Q.    That's Jeff Young's nurse conducting the initial

19  history and physical, was it not?

20  A.    A nurse or medical assistant.

21  Q.    Nurse, radiology tech, MA.

22  A.    Okay.

23  Q.    So he's taking down information from the patient?

24  A.    Correct.

25  Q.    Okay.  When we get later on into the video,

CROSS - NATALIE SEABOLT                                                      241

1    Mr. Young is reviewing the notes that were taken from the

2    initial interview?

3    A.    Correct.

4    Q.    So there was more done to her than Mr. Young

5    walking into the room and writing prescriptions?

6    A.    It appears so.

7              **MR. FERGUSON:**  And if we can go to the second

8    video, if we can go to the part where he begins talking

9    to the second patient.

10             (Video played.)

11   **BY MR. FERGUSON:**

12   Q.    I want you to watch when he --

13             **MR. PENNEBAKER:**  It will be less choppy if you

14   can hand me that little jump drive.

15             **MR. FERGUSON:**  Okay.

16             **MR. PENNEBAKER:**  Thank you.

17             (Video played.)

18   **BY MR. FERGUSON:**

19   Q.    When he begins to look --

20             **THE COURT:**  Wait.  Wait a minute.  You got

21   conversations on here, and you're trying to talk over

22   them.  I'm not hearing what you're saying.

23             **MR. FERGUSON:**  Yes, Your Honor.

24   **BY MR. FERGUSON:**

25   Q.    When he picks up the pink sheets, I want you to

                                                    REDACTED TRANSCRIPT

1    look and see what's underneath it, remembering that the

2    report you're saying that isn't on the file is sideways

3    where you would have to turn sideways if it's in this

4    way.  Okay?

5              **MR. FERGUSON:**  Go ahead and play it.

6              (Video played.)

7    **BY MR. FERGUSON:**

8    Q.    Do you see the CSMD?

9    A.    It possibly could be that, yes.

10   Q.    Well, that's what he's turning sideways to look at;

11   is that correct?  Because you remember at the end of this

12   he says, basically, we'll continue you on your

13   prescription.

14   A.    I wasn't aware the CSMD was in the chart.  I

15   haven't reviewed this chart.

16   Q.    I thought your testimony was that he would've known

17   it if he pulled one.  From the questions that were being

18   asked it seemed to imply he didn't have one.  But it

19   appears from now looking at this and seeing the form

20   underneath it, it appears there was a CSMD; is that

21   correct?

22   A.    If that's what that is in that picture, yes.

23   Q.    Okay.  The chronic pain guidelines, I believe, you

24   referred to those as guidelines that help assist

25   healthcare providers in their treatment of pain patients;

1    is that correct?

2    A.    The Tennessee Chronic Pain Guidelines for

3    nonmalignant pain are guidelines to guide any providers

4    that treat that pain, and they are also used to decide if

5    patients -- if providers need to be disciplined in their

6    practice.

7    Q.    Now, does that mean that anytime somebody deviates

8    from the guidelines that they are committing malpractice?

9    A.    Malpractice is not my decision to make.

10   Q.    Does it mean anytime somebody deviates from the

11   guidelines they're automatically punished by whatever

12   regulatory board that they're under?

13   A.    That's up to the regulatory board.  I don't make

14   that decision.

15   Q.    Okay.  So they're just guidelines?

16   A.    They are guidelines, but they're put there by the

17   Department of Health for the safety of the patients.

18   Q.    Sure.  But they're guidelines and each individual

19   agency determines how they use them?

20   A.    They use them as guidelines as to what should be

21   happening as to the standard of care.

22   Q.    Well, if it's the standard of care, then that means

23   malpractice if you deviate from it.

24   A.    I don't help prosecute malpractice.  I'm only here

25   to give expert opinion about fraud, abuse, neglect, and

1    anything that's related to that.

2    Q.    If a doctor believed it was in the patient's best

3    interest to deviate from the guidelines, they would be

4    able to do that?

5    A.    With the proper documentation.

6    Q.    Right.  So they would be able to do it?

7    A.    With the proper documentation.  And the important

8    part is that whatever their prescribing practices are,

9    are legitimate.

10   Q.    Right.

11   A.    Legitimate medical necessity.

12   Q.    In fact, they could do it without asking anyone for

13   permission, correct?

14   A.    Are we talking about a physician or nurse

15   practitioner now?

16   Q.    Well, I guess, it depends on what the standard

17   procedures are for that nurse practitioner through the

18   doctor supervising them.  So let's stick with the doctor

19   that's a sole, independent healthcare provider.  The

20   doctor wouldn't have to ask the Board for permission,

21   would he?

22   A.    No.

23   Q.    In this video we watched, there was some questions

24   about whether or not it was appropriate for Mr. Young to

25   be continuing medications on somebody he's been seeing on

1    a regular basis because she had not had an x-ray or MRI;

2    is that correct?

3    A.     That came into question, yes.

4    Q.     Do you or have you reviewed that chart to determine

5    whether or not she had had an x-ray or MRI at any time?

6    A.     No, that was not provided to me to review.

7    Q.     And part of the conversation was a referral to a

8    provider to get that done and instructions on how to

9    handle the finances of paying for that?

10   A.     Correct.

11   Q.     I think the statement he makes to the second

12   individual in there is he's going to put her back on the

13   prescription.  He would have known what the prescription

14   was because it would have been on the CSMD?

15   A.     I can't answer that.  I don't know if it's on the

16   CSMD or that she has stated she took it previously.

17   Q.     If he was reviewing the CSMD and she had been

18   prescribed medicine in the state of Tennessee, it would

19   have been on that CSMD?

20   A.     It should be.

21   Q.     Is there a way it wouldn't be?

22   A.     No data entry system is perfect.

23   Q.     Except for the random human error or mistake, the

24   system works pretty well; is that correct?

25   A.     We all hope so.

1          **THE COURT:**  What was that answer?

2          **THE WITNESS:**  We all hope it does.

3    **BY MR. FERGUSON:**

4    Q.    Now, you don't have to check the CSMD every time

5    you have patient interaction with a well-established

6    patient, do you?

7    A.    If you're prescribing controlled substances that

8    can be in combination with other prescriptions from other

9    providers at risk and you know that, it is your

10   responsibility.

11   Q.    We keep saying controlled substance.  Is there --

12   anything that you write a prescription for, is that a

13   controlled substance?

14   A.    No.

15   Q.    Okay.  What is your definition, then, of controlled

16   substance so I know what you're talking about?  You said

17   any controlled substance.

18   A.    So the controlled substances that actually show up

19   are actually all the ones that show up on the CSMD.

20   Q.    Schedule II through V?

21   A.    The ones that are designated as controlled, yes.

22   Q.    And it's your testimony that even with a

23   well-established relationship with a physician, you have

24   to pull the CSMD every time?

25   A.    If you are prescribing a medication that can have

REDACTED TRANSCRIPT

247

1   possible interactions with other medications that are

2   being prescribed, it is your responsibility, best

3   standard of care, to check.

4   Q.    So it's standard of care again; is that correct?

5   A.    Best practices are in place for a reason.

6   Q.    And that is?

7   A.    To protect the patient.

8   Q.    I'm not sure you've ever given me a "yes" or "no."

9   Is it "yes" or "no" you have to check it every time?

10   A.    It is part of the guidelines.

11   Q.    If you'll give me a "yes" or "no," I'll let you

12   answer anything else after that.

13          MR. PENNEBAKER:  Objection, Your Honor, asked

14   and answered several times.

15          MR. FERGUSON:  I haven't gotten an answer.

16          THE COURT:  Well, I guess, I'm a little

17   unclear.  Are you saying based on is it a legal

18   requirement?  Is that what you're asking?

19   BY MR. FERGUSON:

20   Q.    Is it required?

21          THE COURT:  By who?

22          MR. FERGUSON:  By anyone.  Whoever said -- she

23   keeps saying you're supposed to do it.  So somebody

24   apparently is saying you're supposed to do it.

25   BY MR. FERGUSON:

REDACTED TRANSCRIPT

1   Q.    Who are you saying says you have to do it every

2   time?

3   A.    I'm saying it's an ethical responsibility to take

4   care of your patients and make sure they're safe.  So if

5   you're prescribing medications that are scheduled that

6   could have interactions with other medications that might

7   be prescribed by other providers, it is your

8   responsibility to do it as a good provider.

9   Q.    Right.  Who says that?

10  A.    It's part of our scope of practice.  It's part of

11  our standards of care.  It's a well-known thing in

12  nursing and the medical community.

13  Q.    The nursing community says you have to?

14  A.    We have a very large standard of guidelines and

15  scope of practice about not prescribing harmful

16  medications.

17  Q.    Who's the "we"?

18  A.    Nursing as a profession.

19  Q.    Okay.  So nursing as a profession says you have to

20  check it every time?

21  A.    No.  Nursing as a profession knows that we have

22  responsibility to our patients to keep them safe.

23  Q.    In your exhibit -- in Exhibit A, do you know out of

24  these patients how many had ongoing, long-term relations

25  with Mr. Young?

1    A.    I would assume the PreventaGenix patients that

2    followed him to Genexis did.

3    Q.    And how would you know if they were PreventaGenix

4    patients?

5    A.    Because it is notated in the sixth column.

6    Q.    I know it's in the sixth column, but how did that

7    get put there?

8    A.    That was actually used -- those patients were id'd

9    by prescriptions that were provided by the provider, by

10   Mr. Young.

11   Q.    Exhibit B, that's JD.

12   A.    Uh-huh.

13            MR. FERGUSON:  Can we switch the video back to

14   the...

15            THE COURT:  She's done it.

16   BY MR. FERGUSON:

17   Q.    So you're saying that this gives you great pause

18   that Mr. Young is prescribing clonazepam; is that

19   correct?

20            THE COURT:  You're going to have to move the

21   microphone over.  I'm sorry.

22   BY MR. FERGUSON:

23   Q.    The prescription of clonazepam gives you pause?

24   A.    That gives me concern.

25   Q.    Even though there's another physician that's

REDACTED TRANSCRIPT

1    prescribing, a month afterwards, the Suboxone?  Of

2    course, with the standard of care, as you've stated, he

3    would also be checking the CSMD?

4    A.    He should be.

5    Q.    Okay.  And if he's checking it and sees the

6    clonazepam and he has no problem with it, then you have

7    two healthcare providers who have made a medical decision

8    on how to treat a patient; is that correct?

9    A.    That is correct.

10   Q.    Are you aware of whether or not JD and his Suboxone

11   clinic and Mr. Young are in communication with each

12   other?

13   A.    I'm not.

14   Q.    Would it give you or make you feel better if you

15   knew that they were?

16   A.    It would depend on the quality of the

17   communication.

18   Q.    Well, if they're having communication -- right now

19   you assume they're not communicating, right?

20   A.    Right now my thought is the best interest of the

21   patient.

22   Q.    Well, right now we're talking about a bond hearing,

23   and I want you to think about whether or not you're

24   concerned that these two doctors, this doctor and nurse

25   practitioner, are not communicating.  Because if they are

1    communicating, they made a healthcare decision, correct?

2    A.    If they are communicating.  But I have no knowledge

3    of that.

4    Q.    Okay.  This is the -- on the encounter --

5    Subjective:  Patient is here to follow-up and get a

6    refill on his Klonopin for his GAD.  Do you know what

7    "GAD" is?

8    A.    Yes, generalized anxiety disorder.

9    Q.    He is in a Suboxone clinic and his M.D. is aware of

10   him being on his Klonopin.

11         So, again, a doctor obviously, as the standard of

12   care is that they must always check the CSMD, knew about

13   it from checking it or they were having communications

14   with each other.  Do you agree with that?

15   A.    It appears that there was a statement made by the

16   patient.  I do not know if that statement is true or

17   incorrect.

18   Q.    Well, this one -- the CSMD we're looking at here

19   has prescriber information on it, and there's a WEAST99.

20   Have you looked up -- since you can look on the back of

21   this and see who it is, have you contacted that physician

22   and asked him if he was aware of the Klonopin?

23   A.    No, I haven't because that's not my job.

24   Q.    But again, you've come in here and testified about

25   your concerns as to this patient that is based solely on

1   this form, correct?

2   A.    Correct.

3   Q.    You didn't look at anything else, correct?

4   A.    Correct.

5   Q.    Didn't look at the patient file, did you?

6   A.    I was not offered the patient file.

7   Q.    Didn't follow-up with any of the providers?

8   A.    No.

9   Q.    Didn't talk to the patient?

10  A.    I don't typically talk to the patients.

11  Q.    Did you talk to this patient?

12  A.    No.

13  Q.    That's pretty much the answer for every one of

14  these we've gone over; is that correct?  Since you don't

15  talk to patients and don't talk to doctors and you don't

16  get the files, all your testimony here today has been

17  based on just looking at these forms; is that correct?

18  A.    I performed the duties that I was asked to perform.

19  Q.    Which was?

20  A.    Which was to analyze CSMD.

21  Q.    To look at them and come into court and testify?

22  A.    Correct.

23  Q.    Without doing anything else to figure out if your

24  testimony was accurate, correct, and thorough?

25  A.    It is accurate to the basis of my knowledge that I

1    have at this moment in time.

2    Q.    Which is one piece of paper, right?

3    A.    Correct.

4    Q.    And that's not the way we treat patients, is it?

5    That wouldn't be appropriate for a healthcare provider to

6    look at one piece of paper and make decisions for a

7    patient, would it?  That would fall below the standard of

8    care, wouldn't it?

9    A.    I think that your question isn't related.

10   Q.    Well, I'm not really worried if you think it is or

11   not.  That would be inappropriate, wouldn't it?

12   A.    I can't really formulate an answer to that

13   question.

14   Q.    You can't testify looking at a piece of paper,

15   walking in, and making a healthcare decision without

16   talking to the patient would be below the standard of

17   care?

18   A.    To base it on one written document?

19   Q.    Yes.

20   A.    I suppose so.

21   Q.    And that's what you've done here, isn't it?

22   A.    I performed the duties I was asked to perform.

23   Q.    You were following orders, correct?

24   A.    Correct.

25   Q.    When you were looking at Exhibit F and you were

1    concerned about the amount of medication JA was on, are

2    you aware of what JA's diagnosis is?

3    A.    I've heard you disclose that she has lupus.

4    Q.    Severe lupus.  My question, when you were

5    reviewing -- I guess, I should ask, when you were

6    reviewing these documents, did you know what her

7    diagnosis was?

8    A.    No.

9    Q.    Do you know anything about how well her pain is

10   being managed?

11   A.    No.  I've not looked at her chart.

12   Q.    Do you know if the treatments, the modality that's

13   been put in place for her is assisting with her pain

14   management or not assisting with her pain management?

15   A.    I have not seen her chart.

16   Q.    So you don't know, correct?

17   A.    I don't know if her medication management is

18   helping her or not.

19          **MR. FERGUSON:**  If I can have just a moment,

20   Your Honor.

21          That's all I have, Your Honor.  Thank you.

22          **MR. PENNEBAKER:**  Nothing more from this

23   witness, Your Honor.  This is our last witness.

24          **THE COURT:**  Step down, ma'am.

25          (Witness excused.)

                        REDACTED TRANSCRIPT

1          **THE COURT:**  Mr. Ferguson.

2          **MR. FERGUSON:**  Your Honor, we would call

3     Karla Wright to the stand.

4          **THE COURT:**  Is she outside?

5          **THE CLERK:**  Would you raise your right hand,

6     please.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

REDACTED TRANSCRIPT

1          **KARLA WRIGHT,**

2          having been first duly sworn, was examined

3          and testified as follows:

4              **THE CLERK:**  Be seated, please.

5                    **DIRECT EXAMINATION**

6     BY MR. FERGUSON:

7     Q.    Would you, please, state your name for the record

8     and spell your name?

9     A.    Sure.  Karla Wright, W-R-I-G-H-T.

10    Q.    Ms. Wright, what do you do for a living?

11    A.    I'm a medical assistant.

12    Q.    Who do you work for?

13    A.    Jeffrey Young.

14    Q.    How long have you worked for him?

15    A.    Since June 2015.

16    Q.    I'm sorry for some of the questions I may have to

17    ask you.  I'm not trying to embarrass you.  I'm just

18    trying to clear up some information.  Okay?

19    A.    Sure.

20    Q.    For the life of me I cannot remember the last time

21    if there were allegations that somehow you and Jeff were

22    involved in a relationship.  Are you and Jeff involved a

23    physical relationship?

24    A.    No.

25    Q.    Have you ever been in a physical relationship with

1  Jeff Young?

2  A.    No.

3  Q.    How long have you worked for him?

4  A.    Since June 2015.

5  Q.    Okay.  And so were you part of while he was working

6  for Mr. Briley?

7  A.    No.

8  Q.    It was after he left and opened up PreventaGenix?

9  A.    PreventaGenix, yes.

10  Q.    How did you come to work at PreventaGenix?

11  A.    I was going through my -- I was going to school.

12  And I knew he was needing a medical assistant that was

13  bilingual.  So I put in my resumé, and I was hired there.

14  Q.    Okay.  Describe the practice of PreventaGenix, how

15  many people a day, how many were treated, patient load,

16  patient care you had.

17  A.    It was hectic.  Between 50 to 70 patients a day.

18  Q.    Were there multiple locations?

19  A.    Yes, sir.

20  Q.    Did you work at any one particular location?

21  A.    I worked with nurse practitioner, Britney Petway,

22  downtown before she was closed down.  I worked there for

23  about three months.

24  Q.    And then you returned back to the main office?

25  A.    I was put in the hospital with a major surgery.  So

REDACTED TRANSCRIPT

1   that put me out for about three months.  Then I returned

2   to PreventaGenix North.

3   Q.    And is that the clinic that Mr. Young worked at?

4   A.    Yes, sir.

5   Q.    There's been talk of him having sex with women at

6   the office.  Did you ever witness that?

7   A.    No, sir.

8   Q.    Do you know of anytime that ever happened?

9   A.    No, sir.

10  Q.    I think there was some testimony here that you had

11  audio or video of that?

12  A.    Actually, the video that I had, it was of Kristie,

13  or KG, with other patients -- with peers, making out in

14  the third floor while I was working -- I was working on

15  the second -- first floor.  I went upstairs, Jeff was out

16  that day, and they were having a little get-together.

17  Which my background, I don't drink.

18       I was all into work.  I was getting extra money

19  actually to -- because I was working and nobody else was

20  working, and working a lot.

21       So I went upstairs just to have some snacks.  And

22  we even took a picture on the roof.  That's all I did.

23  And then there was -- I did make a video how ridiculous

24  it was of KG and some other reps in the clinic having a

25  party.  And because of what went down with PreventaGenix,

1    I deleted that video, but that's the video that I had.

2    Q.    Now, I think, there was also some testimony that

3    you may have given that video to the DEA.  Did you give a

4    video to the DEA?

5    A.    No, sir, never did.

6    Q.    All right.  And we're talking about KG?  That's

7    Kristie Gugenhall or --

8    A.    Gutgsell.  I don't know.

9    Q.    The party you're talking about that she was

10   throwing upstairs, was that during work hours?

11   A.    During work hours.  We all showed up, you know,

12   like normal hours.  I think Jeff had -- or Mr. Jeff had

13   some stomach virus.  He never did show up, so I continue.

14   My job load was always heavy.  So I was there from eight

15   until 7:30 at night every day.  I would pick up my

16   daughter from Polk (phonetic), take her to the clinic,

17   and I would continue to work.  And so that was during

18   hours.

19   Q.    Now, was she supposed to be doing that?

20   A.    No, sir.

21   Q.    And was there other times in which people were

22   drinking during work hours?

23   A.    Yes, sir.

24   Q.    Who would that be?

25   A.    That would be KG, MD -- he was a drug rep or the

1    lab rep -- plus underage coworkers.

2    Q.    All right.  They weren't supposed to be doing that,

3    were they?

4    A.    No, sir.

5    Q.    Did you have any conversations with Mr. Young about

6    that?

7    A.    I did.  I did try to warn him what was going on.

8    KG always knew a way to go around it.

9    Q.    KG was basically the office manager at that time?

10   A.    Yes, sir.

11   Q.    She ran the office?

12   A.    Yes.

13   Q.    She would know when Jeff was going to be there or

14   not?

15   A.    Yes.

16   Q.    Jeff pretty much would see patients while she took

17   care of the business side; is that --

18   A.    That's exactly right.

19   Q.    Did you ever see Jeff engaged in any business, like

20   the business side of the practice as opposed to the

21   medical side?

22   A.    Never.

23   Q.    Can you describe to this Court -- there's been some

24   talk about drug screens and drug contracts.  Can you tell

25   this Court how that's handled when it comes down to the

1    drug contract?

2    A.    Every time a new patient came in, they had a file.

3    They had a file that you would have to fill in, and it

4    was about their information and then about pain

5    management, what they're supposed to do, what they're

6    required to do, and always to take a drug screen.

7    Q.    And is that part of the initial, if you will, the

8    paperwork that you got to fill out when you come to a

9    doctor's office for the first time?

10   A.    It was at PreventaGenix.

11   Q.    Okay.  Was it something that the front, the intake

12   took care of?  Or was it something that Mr. Young and/or

13   the healthcare providers would take care of?

14   A.    Excuse me?

15   Q.    Was it handled in the front of the office, or was

16   it handled by Jeff Young in the back when he was meeting

17   with the patients?

18   A.    At the front office.

19   Q.    That wasn't something that Mr. Young did

20   personally?

21   A.    No, it was -- yeah, it was handled by the front

22   office while they were waiting to be called to be triaged

23   and then go from there.

24   Q.    Okay.  You saw the video of Mr. Young seeing two

25   patients at the same time?

1    A.    I did.

2    Q.    Nowhere in there does he discuss a pain -- a

3    medicine contract, pain medicine contract.  Is that

4    typically what you would expect?

5    A.    Can you repeat that, please?

6    Q.    Sure.  He doesn't talk to them -- he doesn't have

7    them sign it in his presence, correct?

8    A.    Correct.  It was signed at the front office.  And

9    the nurse and the medical assistant would make sure it's

10   signed and all the personal information is filled in.

11   Q.    And signing it, is that the patient's indication

12   that they've read and agree to it?

13   A.    And they agree to it.

14   Q.    What happens if they don't sign it?

15   A.    They were not treated.

16   Q.    How does the office handle drug screens?

17   A.    It was by actually -- actually, it was MD, who had

18   his own lab.

19   Q.    Who is MD?

20   A.    Michael Dodd.

21   Q.    Okay.

22   A.    Which the lab was run by him and Kristie, or KG,

23   I'm sorry.  He saw people.  One that is straight

24   toxicology and one that did the blood.

25   Q.    I just realized what you're doing.  We were using

                         REDACTED TRANSCRIPT

1    initials of the patients' names.  But the regular people,

2    employees, you don't have to worry about using initials

3    if you don't want to.

4    A.    All right.

5    Q.    Who handled the checks of the CSMD?

6    A.    I would.  Most of the time I would just because I

7    had to -- we were doing a lot of TennCare patients.  I

8    would have to get medicine approved, Schedule IIs, most

9    of the time.  And if, for instance, they were on Adderall

10   and they were trying to get pain medicine, it was one or

11   the other.  So we couldn't do that.  We knew that that

12   was a no-no.  So I would always check the PMP or CSMD.

13   Q.    How did you get the copy of the CSMD?

14   A.    We have a login.  Everybody is logged in under the

15   DEA, Mr. Jeffrey.  And that's how we get it.

16   Q.    And is it only under his name and number, or do

17   other people have access to the CSMD?

18   A.    As far as I know, it's his DEA.

19   Q.    You said TennCare.  When you were dealing with

20   TennCare patients and there was a prescription that might

21   be needed, you would have to get preapproval?

22   A.    Preapproval from TennCare.

23   Q.    Do you know how many -- can you estimate what

24   percentage of your patients were TennCare recipients?

25   A.    I couldn't tell you an average, but yeah, it was a

REDACTED TRANSCRIPT

1    lot.

2    Q.    It was a lot?

3    A.    (Nods head up and down.)

4    Q.    So throughout the course of his practice and his

5    current practice now, there are other people that are

6    reviewing his prescription decisions?

7    A.    Yes.

8    Q.    You're also aware of the agreed order that he has

9    with the nursing board?

10   A.    Yes.

11   Q.    And he can't prescribe Schedule IIs and has very

12   limited Schedule IIIs?

13   A.    Yes.

14   Q.    Have you seen --

15         **THE COURT:**  Speak up, please.  Did you say

16   "yes"?

17         **THE WITNESS:**  Yes.  Yes, sir.

18         **THE COURT:**  Please speak up so we can hear

19   you.  Thank you.

20   **BY MR. FERGUSON:**

21   Q.    Have you seen him deviate from that practice?  Have

22   you seen him break those rules?

23   A.    No, sir.

24   Q.    Seems to be conscientious about his agreement with

25   the Board of Nursing?

265

1    A.    Yes, sir.

2    Q.    Back in 2015, 2016 was he under anything that

3    particularly put him in a stressful state or made it

4    difficult for him?

5    A.    Meaning?

6    Q.    Like, a divorce with his wife?

7    A.    When I started working, I always heard his divorce

8    put him through all this mess, which I wasn't -- I mean,

9    it was a large group of people that we work together.

10   I'm not into drama at all.  But I did hear a lot of times

11   when I was triaging people that he was going through a

12   really rough divorce.

13         I went to one of his work dates and just to -- you

14   know, just for support.  It was just not me, but it was

15   different people from work, you know, just to show him

16   support.  And, yes, he was going through a rough divorce

17   and child visitation.

18   Q.    Would you say that he seems to be better today,

19   now, than he was back in 2016?

20   A.    As, what, for the clinic?

21   Q.    Like, making better decisions?

22   A.    Of course.  A hundred percent.

23   Q.    Does he seem and appear to be under less stress?

24   A.    Yes, sir.

25   Q.    The new clinic, what's it called?  I forget.

REDACTED TRANSCRIPT

1   A.    Genexis.

2   Q.    Genexis.  How is it there?  How do you like it?

3   A.    It's so much better since, you know, we don't have

4   to -- we don't have Schedule IIs.  We don't have to worry

5   about if this person is doctor shopping or whatever, you

6   know, everybody is saying.  He's more down to earth.  We

7   check everything.  And I do make sure that -- it's a

8   small clinic.  So everything is being checked and --

9   Q.    Go ahead.

10  A.    The only thing that we write would be Schedule IVs.

11  I know everybody is saying, you know, benzos,

12  benzodiazepines.  But Klonopin, which is a long-acting

13  benzo -- and, I mean, it's not as addictive I would say,

14  which I'm not a doctor, though.

15  Q.    Is he seeing the same number of patients?

16  A.    No.

17  Q.    So the number has gone down?

18  A.    It's gone down, yes.

19  Q.    How many, on average, a day do you think?

20  A.    I would say between ten to 15 patients.  Then,

21  again, we see a lot of cosmetics.  It's more cosmetic

22  than preventative now.

23  Q.    And who is responsible for keeping up with the

24  medical files and the records?

25  A.    I do.

1   Q.    And is it easier to keep up with those records when

2   your practice number is almost cut in half?

3   A.    Of course, yes.

4   Q.    Have you seen Mr. Young do anything that causes you

5   concern that he is a danger to his patients?

6   A.    No, sir.

7   Q.    What about a danger to himself?

8   A.    No.

9   Q.    Or a danger to other people?

10  A.    No.  I don't think I would be with him if that was

11  the case, because I have my kids with me sometimes at the

12  clinic.

13  Q.    Recently there's been some additional drama at the

14  office, though, is that correct, with Kristie -- or

15  actually, I guess, it's Gidget?

16  A.    Yeah, it started with Gidget and Kristie and the

17  others.

18  Q.    And the others.  Coming by -- while we're pending

19  this hearing, they've been coming by and parking in front

20  of the office and --

21  A.    Yes, sir.

22  Q.    -- trying to instigate something --

23  A.    Sending voicemails, Ms. Dawn Young left us a

24  voicemail the day that he was arrested on the 17th and

25  threatened me in the voicemail saying that I was next.  I

REDACTED TRANSCRIPT

1    don't know what she meant by that, but yes.

2    Q.    On the day he got arrested?

3    A.    Yes.

4    Q.    She sent a text message and said she was going to

5    get you arrested next?

6    A.    She left a voicemail that Jeff was being picked up

7    by the feds, thank God, and I just wanted to let you know

8    that you are next.

9    Q.    And they've been trying to do that, haven't they?

10   A.    They have.

11   Q.    You haven't gotten arrested?

12   A.    Have not.

13   Q.    And you handled those situations by calling the

14   Jackson Police Department?

15   A.    We did.  My husband -- they even -- that day really

16   scared me because I was working at the clinic by myself.

17   And I called my husband, and I told him what was going

18   on.  And he said, look, we need to go to the police.  We

19   have gone several times, but nothing gets taken care of.

20   Q.    And the Jackson Police Department is aware of this

21   harassment?

22   A.    They have.  They have been to the office.  It got

23   to the point that my husband had to -- because of me --

24   he knows that I'm paranoid and the downtown area really

25   kind of scares me, especially during the winter hours --

REDACTED TRANSCRIPT

1    you know, it gets dark faster -- he hired Guardmax, I

2    believe, after Gidget threatened to come in and beat me

3    up.

4    Q.    He hired a guard?

5    A.    Uh-huh.

6    Q.    Now, in order to feel safe at your own clinic, you

7    have to have a guard there?

8    A.    He paid for a few days until the Jackson Police

9    would do something about it.  It just went unhandled like

10   always, which is -- we always try to get out of there

11   together and early.

12   Q.    I guess it was...

13         **MR. FERGUSON:**  If I can have just one second,

14   Your Honor.

15         **THE COURT:**  Yes, sir.

16   **BY MR. FERGUSON:**

17   Q.    The day after Mr. Young was released from detention

18   in this, did he indicate to you anything about a phone

19   call and conversation he had with me, with a member of

20   the Jackson Police Department, about a phone call that

21   they received that he was attempting suicide?

22   A.    I can't recall that.  I can't remember.

23   Q.    Do you know what the word "SWAT team" means?

24   A.    Oh, yes, yes.

25   Q.    When you call the police and you have them go

270

1    rushing over to someone's house in order to bust in and

2    it ends up possibly hurting or killing the person in the

3    house?

4    A.    Yes.

5    Q.    Did you become aware of a situation of that?

6    A.    I think he mentioned it.

7    Q.    In fact, did he tell you:  I received a phone call

8    from Jackson Police Department and had to put him on

9    three-way with the Jackson Police Department --

10   A.    Correct.

11   Q.    -- because they were checking --

12   A.    Yes, sir, he did.

13   Q.    -- even though they said they knew it was not true

14   and that they figured it was Dawn or someone associated

15   with Dawn?

16   A.    Associated with that, yes, sir.

17        **MR. PENNEBAKER:**  Your Honor, I'm going to

18   object.  The attorney is testifying.  This is not -- it's

19   not about whether or not Mr. Young is safe in the

20   community.  It's about whether he's a danger to the

21   community.  So whether or not he's being stalked by some

22   faceless nemesis is of no moment now.

23        **MR. FERGUSON:**  It goes to the weight in which

24   this Court should place on the testimony and any evidence

25   that's been brought --

REDACTED TRANSCRIPT

1            **THE COURT:**  Well, two parts.  Number one, you

2    are testifying.  You are orating and going on.

3            **MR. FERGUSON:**  Okay.

4            **THE COURT:**  You're not under oath, and you're

5    not a witness.

6            **MR. FERGUSON:**  Yes, sir.

7            **THE COURT:**  I'd ask you to refrain from doing

8    that.  Secondly, I've heard what I need to know about

9    that, so you can move on.

10           **MR. FERGUSON:**  Yes, Your Honor.  Thank you.

11           I think that's all I have for you.

12           **THE COURT:**  Does the government have any

13   questions?

14           **MR. PENNEBAKER:**  Yes, Your Honor.  And if you

15   wouldn't mind if I sit here, I have a couple things to

16   display.

17           **THE COURT:**  Yes, go ahead and speak into

18   microphone, please.

19           **MR. PENNEBAKER:**  Yes, Your Honor.

20                        **CROSS-EXAMINATION**

21   BY MR. PENNEBAKER:

22   Q.    Are you Ms. Wright?  Can I call you Ms. Wright?

23   A.    Sure.

24   Q.    Okay.

25           **THE COURT:**  Ms. Wright, make sure you speak in

272

1    that microphone.  I'm having trouble hearing you.

2              **THE WITNESS:**  Okay.

3              **THE COURT:**  Thank you, ma'am.

4    **BY MR. PENNEBAKER:**

5    Q.    Okay.  Ms. Wright, I just want to remind you that

6    you are under oath.  You know what that means, right?

7    A.    Of course.

8    Q.    And so it's your testimony today under oath that

9    you never were aware at any of the time that you've been

10   working with Mr. Young of sex with patients in the

11   office?  That's your testimony under oath?

12   A.    Yes, that's what I said.  I never seen it.

13   Q.    No, I didn't ask you that.  I asked you have you

14   heard about Mr. Young having sex with patients in the

15   office?

16   A.    No.

17   Q.    From no one, ever?

18   A.    No.

19   Q.    Not a patient?

20   A.    Not a patient.

21   Q.    Not an employee?

22   A.    Employees can say all they want.

23   Q.    Okay.  Well, for right --

24   A.    See it?  No.  Did I hear it?  No.

25   Q.    Okay.  So if anybody said that you did, that was --

REDACTED TRANSCRIPT

1   do you have any idea why someone would want to fabricate

2   something like that, like Dede?  You were here when we

3   heard it was Dede who said that?

4   A.   Yes.

5   Q.   Do you guys have some sort of grudge?

6   A.   No, we don't.  Actually, we were friends.  Dede was

7   let go, not by Mr. Jeff, was let go by the lab.  She was

8   pregnant, and she was out sick.  So I was -- I always got

9   there at 9:00 -- I mean, 8:00.  She would always show up

10  at about 9:00.  So, no, I didn't see it.  I didn't hear

11  it.

12  Q.   Never heard of it?

13  A.   Like I say, I mean, I can tell the stories about

14  other, you know...

15  Q.   All right.  Well, I want you to take a look at the

16  screen here.  Now, "Karla," right there, (731)217-8993,

17  that's your phone number, correct?

18  A.   Correct.

19  Q.   "Is today tap-that-ass Tuesday, Jeff?"  Do you

20  remember when you heard Officer Chew testify about

21  "tap-that-ass Tuesday"?

22  A.   I heard it.

23  Q.   And that doesn't count for you as having to do with

24  having sex with his patients at all?

25  A.   Sir, there was a large group message in that

1   clinic.

2   Q.    Uh-huh.

3   A.    Did I pay attention to that?  No, I never did.  I

4   was never involved in any of those messages.

5   Q.    Well, I think the evidence can speak for itself.

6   A.    Yeah, sure, it's my number.  Did I answer to that?

7   I did not answer to that.

8   Q.    Do you see the first remote party on this message?

9   Do you see how it says "Jeff Young" right there?

10  A.    Uh-huh.

11          **THE COURT:**  Excuse me.  Is that "yes"?

12          **THE WITNESS:**  Yes.

13  **BY MR. PENNEBAKER:**

14  Q.    Okay.  So do you remember people talking about

15  "tap-that-ass Tuesday"?

16  A.    I saw it on the messages, yes.

17  Q.    Okay.  And did Jeff Young ever say:  Hey, wait a

18  minute, that's not the kind of practice that I run here.

19  Did he ever argue with that?  Is there any reason for you

20  to believe that this was something that would have been

21  offensive or unreasonable to Jeff Young?

22  A.    To tell you the truth, I blocked everybody because

23  it was ongoing messages to like two or 3:00 in the

24  morning.  So I had to block those numbers, because I

25  couldn't do group messages.  And if you have records of

275

1    that, you will see that there is no responses from my

2    phone number.

3    Q.    Well, I -- okay.  Be that as it may -- and we could

4    pull -- I could pull up responses but...

5    A.    You should, I mean, because you're never going to

6    see my number in there.

7    Q.    Okay.  Well, maybe after a break we can, because I

8    don't want to delay the proceedings.  But I can assure

9    you I've seen lots of responses of yours.

10          **THE COURT:**  All right.  Let's not -- I told

11   him don't testify.  Don't you either.

12          **MR. PENNEBAKER:**  Yes, Your Honor.  I'll move

13   on.

14   **BY MR. PENNEBAKER:**

15   Q.    And so it's your testimony that -- okay.  Do you

16   ever remember Jeff Young not showing up for work because

17   he slept in because he was drunk?

18   A.    I was just told that he wasn't showing up.  I was

19   never told why, the reason.  I have my own office.  I

20   worked.  Everybody can tell you that.

21   Q.    Okay.

22   A.    I never questioned why or why he didn't show.  That

23   was none of my business.  I was getting paid to do my

24   job, and that's what I was doing.

25   Q.    Okay.  Now, let's look at this from -- I believe,

                          REDACTED TRANSCRIPT

1   this is actually a text message from after the one we

2   just saw.  Because I can pull up the one that we just

3   saw.  Tuesday -- oh, no, so this is a few weeks, maybe a

4   month, before the one we just saw.  So let's take a look

5   at what it says.  This is once again from you.  That's

6   your phone number.  And then you say:  Can I write Dottie

7   her pain medication?  Jeff didn't write.

8           Did you say you were a medical assistant?  What is

9   your medical training?

10  A.    I'm just the medical assistant.

11  Q.    Okay.  You know you can't write pain medication,

12  don't you?

13  A.    Yes, and I got in trouble for that.

14  Q.    Okay.  Well, it seems like that was okay with

15  Kristie Gutgsell.  By the way, she's the one who

16  apparently wants Jeff's head on a stick, right?

17  A.    Yeah.

18  Q.    Okay.

19          Well, yeah, you can write it.  What's her medicine?

20          She's been taking Percocet but wants to go back to

21  hydrocodone.

22          Here you are having a conversation with

23  Kristie Gutgsell about whether or not to prescribe a very

24  powerful Schedule II opioid or to go back to hydrocodone,

25  right?

1    A.    Right.

2    Q.    Okay.  So does this refresh your recollection at

3    all about whether or not you ever responded to any of the

4    text messages?

5    A.    I probably did.  I can't recall but...

6    Q.    Okay.  And how about -- do you remember this one

7    where Kristie writes and Jeff is the first recipient.

8    It's right in this general time frame we just saw, 12/16,

9    where you're getting that text message:  I got Jeff's STD

10   panel back.  He is STD free.  I repeat STD free.  That

11   fucker needs to play the lottery.

12         Remember this one?

13   A.    Who said that?

14   Q.    This is Kristie with Jeff on the --

15   A.    Like I say, there were lots of messages, and I

16   can't recall all of the messages.

17   Q.    And this is kind of just par for the course for the

18   banter, right?  This is not an unusual tone or topic for

19   these group text messages with the office, correct?

20   A.    Correct.

21   Q.    And how about this one where Kristie is emailing

22   Jeff -- and this is 1/10/17, the same date of the earlier

23   text message with you.  Kristie is emailing you and Jeff,

24   and this is the whole office:  Jeff has a warrant for his

25   arrest in Memphis over XXXXXXXX XXXXXX.  Hopefully, I can

REDACTED TRANSCRIPT

278

1    get it fixed before Madison County tries to pick him up.

2    If by chance a cop shows up at work to pick him up,

3    please say that he is, quote/unquote, at the bank.

4    Someone else tell Jeff to leave so whoever tells the cop

5    he's at the bank won't be lying.  Jeff is parking at the

6    apartments tomorrow.  If Jeff is in a room, get him out,

7    and tell him to leave, et cetera, et cetera.

8         Does it sound like a witch hunt that she's on, or

9    is she trying to protect Jeff?

10   A.   No, she was not trying to protect him.  That

11   started way -- I will tell you that summer of that year

12   when she was trying to -- she put us all together, along

13   with Michael Dodd and all the employees, and trying to

14   tell us that she was going to open up her own clinic, and

15   she was going to need a medical assistant.  And, again,

16   she was going to need me because I -- we had a lot of

17   Hispanic patients.

18        When she -- we were in the lab talking, and she

19   said:  And you know what?  You're going to be my --

20   you're going to be with me.  I'm going to pay you the

21   same.  And if we have to, we'll take this damn place

22   because it belongs to me.

23        That's what she said.  So, yes, I remember this

24   message clearly.

25   Q.   Okay.  But you're talking about in the summer,

1    right?  And this is her instructing the employees to make

2    sure that Jeff can get away before the cops get him and

3    to lie on his --

4    A.    That didn't happen because he was already in clinic

5    when -- we were already working.  We were in clinic when

6    that happened.

7    Q.    Okay.  I don't know if that answers my question,

8    but I will move on.  Have you ever seen these Facebook

9    messages between -- do you remember who XXXX XXXX is?

10   A.    I do.

11   Q.    Okay.  And she had a relationship of some kind with

12   Jeff, right?

13   A.    Not that I can recall.

14   Q.    Okay.  Well, around 1/9 of 2017 where my arrow is,

15   Jeff is saying:  Quickies aren't bad.  Had two in my

16   office last week.

17         Do you see that?

18   A.    I do.

19   Q.    And then you see below:  So that's where all the

20   gray hairs are coming from.

21         And then after that:  And the stains on my couches.

22   And that's from Jeff.

23         So you're saying that somehow in all of the time

24   that you have worked for Mr. Young you have never noticed

25   that he's having multiple "quickies" a week in the office

280

1   according -- I mean, this is according to him in this

2   text message exchange.  You never noticed that at all?

3   A.     No, sir.

4   Q.     And, I think, you said earlier it wasn't any of

5   your business, right?

6   A.     I don't think it is.

7   Q.     Does it surprise you, based on what you know about

8   Jeff, to see that he was representing to someone else

9   that "I had two quickies in my office last week"?

10  A.     Well, that's what he's saying.  I don't know.

11  Q.     Okay.  Now, you actually were hospitalized in

12  October of 2016, right?

13  A.     No, sir.

14  Q.     No?

15  A.     It was August something, I think.  I can't remember

16  the first time.  It was here in General.

17          **MR. PENNEBAKER:**  If I could get the overhead

18  really quick, I'll be brief, Your Honor.

19  **BY MR. PENNEBAKER:**

20  Q.     So here is a Jackson County General --

21          **THE COURT:**  Jackson-Madison County.

22  **BY MR. PENNEBAKER:**

23  Q.     Excuse me, Jackson-Madison County record.  Do you

24  recognize that?  Are you Karla Valeska Wright, date of

25  birth 11/26/80?

                        REDACTED TRANSCRIPT

1  A.     That's right.

2  Q.     Okay.  So, here, it looks like you were admitted on

3  10/22/16, right?

4  A.     Maybe that's one of the many hospitalizations that

5  I have had.

6  Q.     Okay.  Let's look at what the history of present

7  illness is.  Why don't you just go ahead and read for me

8  starting at 35.

9  A.     Thirty-five years old.  Female with chronic pain

10 attributed to degenerative spinal disease, interstitial

11 cystitis, and mild irritation of the gut, IBS.  Underwent

12 cystoscopy last week and was given Demerol tablets.  In

13 addition, she has migraines.  Her husband states that she

14 has been in severe pain over the last day, including a

15 migraine and took several Demerol tablets.  Was difficult

16 to arouse.

17 Q.     Okay.  And then it says:  She was in the ER.  Very

18 difficult to arouse.  Husband at bedside.  Confirms

19 taking multiple opiates.  No SI/HI.

20        What does that mean?

21 A.     No -- where are you?

22 Q.     What?

23 A.     No SI --

24 Q.     Okay.  And no illicit drug use.  And, I think, you

25 said earlier that you don't drink alcohol, correct?

1    A.    I think last time I drank was -- I can't even

2    remember.  It's been years and years.

3    Q.    Okay.  Now, let's see here.  They drug tested you

4    when you were admitted, and the results were kind of

5    surprising.  Do you remember that?  Do you see here where

6    it talks about amphetamines, barbiturates, cocaine,

7    opioids, et cetera, et cetera?

8    A.    I do not take -- well, I was taking Vyvanse at one

9    point for not even six months.

10   Q.    Okay.  And who was prescribing you Vyvanse, a

11   controlled II stimulant?

12   A.    I started it with Mr. Jeff.  I mean, I tried it and

13   I didn't see the help, so I stopped.

14   Q.    Okay.  But regardless, it looks like the report

15   that they're getting is that you are there for -- and by

16   the way, I don't want to put words in the mouth of

17   Jackson-Madison.  Let's just say reason for visit:

18   Accidental drug overdose, intentional drug overdose,

19   oversedation, chronic pain.  Right?  That's what they've

20   got you checking in with.  And, then, the drug test

21   results are positive for amphetamines but nothing else,

22   right?

23   A.    Right.

24   Q.    So, then, let's turn to your prescription

25   monitoring database information relating to prescriptions

1   from Jeff Young.  And it turns out that during this time

2   he's not just prescribing you Vyvanse, he's prescribing

3   you Tramadol.  He's prescribing you Vyvanse 40

4   milligrams, Vyvanse 50 milligrams.  He's prescribing you

5   until 10/21, the day before your admission, you get

6   oxycodone.

7   A.    Yes, because I was trying to get admitted to bone

8   and joint.  I have scoliosis.  I don't know if you know

9   that.  Before he get me to the hospital to get some

10  x-rays and some MRIs, he was treating me.  Finally, bone

11  and joint took over my care, and that's where I was

12  going.

13  Q.    Okay.  Any idea why the hospital is getting a

14  report that you're on multiple Demerol and multiple

15  opioids meanwhile?

16  A.    I don't know because, actually, it's kind of funny.

17  If you pull my medications.  Every time I have a surgery

18  they having a hard time giving me pain medicine because

19  I'm allergic to anything that they give me.

20       I just recently got a prescription because I fell

21  on my back, went to the hospital, and I just got a

22  Toradol shot because that's all they could give me.  Went

23  back to my primary care, Dr. Mayer.  He gives me

24  hydrocodone, knowing that I'm allergic to it.  I didn't

25  even know that was -- he said it's okay to take.  And I

1   can still show you the prescription that I have not taken

2   not even one.

3   Q.   Okay.  Well, needless to say, you're getting a

4   number of different medications from Jeff Young in and

5   around the time that you're admitted to the hospital for

6   a suspected accidental overdose, correct?

7   A.   That was -- that was due to a severe migraine.

8   That's what I used to suffer from years ago, severe

9   migraines, which as the neurologist not only here but in

10  Vanderbilt -- and I don't know if you know what a

11  migraine is.  But if you had one, you would only know

12  what the pain is, so yes.

13  Q.   Okay.  And I'm just -- I'm not really wanting to

14  know your medical history or anything.  I'm just asking

15  about the --

16  A.   Well, you asked me for the medications.

17  Q.   Well, I was just asking you if he was prescribing

18  you certain medications or not.  So if you look at this

19  page, it looks like you are getting Tramadol, alprazolam,

20  Vyvanse from Jeff Young through at least mid-'18, right?

21  A.   I only got it for a few months until I was going to

22  bone and joint.

23  Q.   Okay.  Well, so what we were just looking at before

24  was 2016.  This is 2018.  You seem to be getting the same

25  medications.  That's more than a couple of months, isn't

1    it?

2    A.    It is.  Yeah, you're right.  Well, Tramadol, yeah.

3    Q.    Well, and --

4    A.    Because that's the only medication that I can

5    actually take for pain.

6    Q.    Right, but I'm talking about the Vyvanse and the --

7    A.    Yeah, Vyvanse was taken for at least three to four

8    months.  That was not taken for a long period of time.

9    Q.    Okay.  I don't mean to -- I don't want to argue

10   with you.  I'm just pointing out what is reflected in the

11   CSMD wherein, let's see, March of '18 you're getting

12   Vyvanse.  And you're also getting Vyvanse it looks like

13   in June of '16.  And --

14   A.    And you can see the --

15   Q.    -- 9 of '16 and 10 of '16.  And then, yeah, you get

16   another prescription in --

17   A.    In '18.  So that's two years apart.

18   Q.    Okay.  Well, needless to say, you have a

19   patient/physician relationship with Jeff and you're his

20   employee, correct?

21   A.    Yes.

22   Q.    Ms. Wright, have you ever been arrested for writing

23   hot checks, felony writing hot checks in Arkansas?

24   You're under oath, by the way.

25   A.    Arrested?

286

1    Q.    Yes, ma'am.

2    A.    No, sir.

3    Q.    So you've never had a warrant for your arrest for

4    felony writing hot checks in Arkansas in 2009?

5    A.    I have no idea.

6    Q.    Okay.

7    A.    I only lived there for a few years and moved back

8    with my son here.  I was going through a custody battle,

9    really nasty one.  So I moved back to Tennessee.  So I

10   don't know.

11   Q.    Okay.  And, yeah, actually --

12   A.    Are you sure the check --

13   Q.    You were arrested for domestic violence in

14   connection with that?

15   A.    Here, yes, because my son was taken by a drunk

16   father.

17            **MR. PENNEBAKER:**  No further questions.

18            **MR. FERGUSON:**  Nothing, Judge.

19            **THE COURT:**  All right.  Step down.  Thank you.

20            (Witness excused.)

21            **MR. FERGUSON:**  Your Honor, we call

22   Nancy Plunk.

23            **THE COURT:**  Ms. Plunk.

24            **THE CLERK:**  Would you raise your right hand,

25   please.

REDACTED TRANSCRIPT

1          **THE WITNESS:**  Yes.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **NANCY PLUNK,**

2          having been first duly sworn, was examined

3          and testified as follows:

4              **THE CLERK:**  Be seated please.

5                    **DIRECT EXAMINATION**

6     **BY MR. FERGUSON:**

7     Q.    Can you, please, state your name for the record and

8     spell it.

9     A.    Nancy Plunk, P-L-U-N-K.

10    Q.    What do you do for a living, Ms. Plunk?

11    A.    I'm sorry?

12    Q.    What do you do for a living?

13    A.    I'm a licensed professional counselor, mental

14    health service provider, and a specialization in EMDR.

15    Q.    All right.  What is that?

16    A.    Eye movement desensitization and reprocessing.

17    It's a trauma therapy, phobias, anxiety.  Specialized

18    treatment.

19    Q.    And as part of your practice, are you able to

20    prescribe medication?

21    A.    No.

22    Q.    Do you, at times, have recommendations for patients

23    to take medication?

24    A.    I sometimes have recommendations for them to go

25    talk to their doctor for possible medication

                         REDACTED TRANSCRIPT

1  recommendations.

2  Q.   And when that occurs, do you make referrals?

3  A.   Back to their -- the physician that sent them to

4  me.  I get a bunch of referrals from many physicians or

5  nurse practitioners.  Whoever sends them to me, I refer

6  them back to their doctor.

7  Q.   Let me ask it a different way.  Do you have a --

8  what is your connection to Jeff Young?

9  A.   It's a professional connection.

10 Q.   Is there anything -- well, what do you mean by

11 "professional"?

12 A.   I can go back to 2015 when his mother called my

13 colleague, Will Beyer, and asked for somebody to see

14 Jeff's son.  He was going through some things.  And Will

15 made that referral to me.  So I started seeing Trey in

16 counseling.

17 Q.   All right.  And so you saw his son in counseling at

18 or around the time that he was going through the divorce?

19 A.   It was in 2015.

20 Q.   So it may have been before?  Do you remember?

21 A.   I don't remember.

22        **THE COURT:**  What year was that, please, ma'am?

23 Ms. Plunk, what did you say?

24        **MR. FERGUSON:**  What was the year?

25        **THE WITNESS:**  2015.

REDACTED TRANSCRIPT

290

1              **THE COURT:**  2015.  Thank you.

2              **THE WITNESS:**  Yes.

3    BY MR. FERGUSON:

4    Q.    At some point did you start to see Jeff Young?

5    A.    I did.

6    Q.    And what was the reason for seeing Jeff Young?

7    A.    The first time I saw him -- can I look at my notes?

8    I can give you better dates.  I'm sorry.  It was right

9    after the DEA raid.  So the first time he started coming

10   to me, looks like, February 8, 2017.

11   Q.    You said you believe that was after the DEA raid?

12   A.    Yes.

13   Q.    And what was the reason for him coming to see you?

14   I mean, I know it's the raid.  What was the presenting

15   symptoms?

16   A.    He had symptoms of PTSD, but that can only be

17   diagnosed after a month of having symptoms.  He did have

18   symptoms of that.  Extreme anxiety, depression, sadness.

19   Q.    And did you begin to treat him?

20   A.    Began seeing him in counseling, yes.

21   Q.    And you have continued to see him since that time?

22   A.    Periodically, yes.

23   Q.    Over time it tapered off?

24   A.    Correct.

25   Q.    Why did it taper off?

                                  REDACTED TRANSCRIPT

1    A.    No need.

2    Q.    Because it was resolving?

3    A.    Was doing better.

4    Q.    As a patient gets better, then you can step down

5    the number of in-person --

6    A.    Sessions, yes.

7    Q.    -- sessions?

8          Would you have an opinion as to his state of mind

9    at this time?

10   A.    I saw him on, I believe, April 12th.  Let me look

11   on the last note.  April 13th.  I saw him on April 13th

12   for an hour.  And he -- the time before that was -- I saw

13   him on April 13th, and he was doing great.

14   Q.    It had been a while since you had seen him before

15   that?

16   A.    Yes, it looks like I talked to him on 3/4/18.

17   Q.    And when he came to you this last time, it was

18   after he had been arrested?

19   A.    Correct.

20   Q.    And he is the one that initiated that visit?

21   A.    He did, I believe.  I think I sent him -- I

22   probably sent him a text saying are you okay, and then he

23   initiated the contact to come in and talk to me.

24   Q.    And did he indicate why he did that?

25   A.    When he said he wanted to talk to me -- I'm just

1    trying to recall.  I don't know the exact words or

2    anything.  I assumed it was because he might have been

3    experiencing a lot of anxiety or because of what was

4    happening.  But when he got in there, his biggest concern

5    was over Trey.

6    Q.    Over his son?

7    A.    Over his son and how his son was handling

8    everything.

9    Q.    You're aware of his situation?  He's the sole

10   provider for Trey?

11   A.    Correct.

12   Q.    He's a single parent?

13   A.    Correct.

14   Q.    Would you say that after this last time he saw you

15   after he'd been arrested he was handling the situation,

16   the stressors, better or worse than when he first came in

17   after the DEA raid?

18   A.    In my opinion, much better.

19   Q.    And would you have an opinion as to his ability to

20   continue to stay out and not be locked up pretrial and

21   stay out of trouble?  Is he -- does he seem to have the

22   same -- let me back up and try a different way.  After

23   the DEA raid, was he acting in his best interest at all

24   times?

25   A.    As far as I was aware.

1   Q.    Okay.  And was he -- did he indicate to you -- so

2   you didn't see him when he was going through the divorce

3   back in like 2015, 2016?

4   A.    No, I saw Trey.  I did not see him.  A lot of times

5   Jeff would be working, and Trey's grandfather or

6   grandmother would bring him in.

7   Q.    I understand.  I'm sorry I was confused on the

8   dates.  Is Mr. Young a danger to himself at this point?

9   A.    Based on my session with him and -- I don't believe

10  he is, no.

11  Q.    Is he a danger to others?

12  A.    I don't feel he is.

13  Q.    Is he capable of following instructions and rules?

14  Is there anything that you know of that would block his

15  ability?

16  A.    There's nothing I'm aware of.

17  Q.    Does he seem to have any impulse control issues,

18  currently?

19  A.    Currently, no, he seems to be doing pretty good.

20  Q.    Do you get referrals from Mr. Young?

21  A.    I do.

22  Q.    So you have a business relationship?

23  A.    Correct.

24  Q.    And then you would refer those patients back to him

25  if --

REDACTED TRANSCRIPT

1   A.     If need be.

2   Q.     -- if they needed additional follow-up?

3   A.     Correct.

4   Q.     Do you conduct any testing or review of patients to

5   determine whether or not they are susceptible to

6   addiction?

7   A.     I do.

8   Q.     What is that?

9   A.     It's called SASSI.

10  Q.     What is that?

11  A.     It's a substance abuse scale that tests for

12  alcoholism, past and present; prescription drug --

13  substance abuse disorder issues.  It determines whether

14  there's a low probability for a substance abuse disorder

15  or a high probability.

16  Q.     And if they come with a high score, what happens?

17  What's the result of that?

18  A.     What do I do with it?

19  Q.     Yes, or anyone.  What does one do with this score?

20  A.     I usually put it into a report.  If I'm sending

21  them back to whoever sent them to me, I'm going to put it

22  in the report that they have a high probability for a

23  substance abuse disorder.  If they have a low

24  probability, most of the time that goes in the report.

25  Sometimes it doesn't.

1    But if it's a high probability, it will absolutely

2    go in the report.  Or maybe even stronger than that, it

3    might be starred "pay attention to this."  Or sometimes

4    there's been a time or two where I didn't have to do a

5    SASSI because I'll have a client that admits to having a

6    problem.

7    Q.    Does that score in any way control the treating

8    health provider?

9    A.    I didn't hear you.

10   Q.    The score we're talking about, does it control in

11   any way, that you're aware of, what the healthcare

12   provider can do?  What I mean by that is, is it just a

13   warning or is it --

14   A.    It's an indication that there's a possibility of a

15   substance abuse problem.

16   Q.    It's a "be on the lookout"?

17   A.    Yes.

18          **MR. FERGUSON:**  That's all I have, Your Honor.

19          **THE COURT:**  Mr. Knutson.

20                    **CROSS-EXAMINATION**

21   **BY MR. KNUTSON:**

22   Q.    Ms. Plunk, did you finish describing all of the

23   types of relationships you have with Mr. Young?  When you

24   said there's a professional relationship, what do you

25   mean by professional relationship?

1    A.    He makes referrals to me, I see his patients, but

2    we also have a bit of a friendship in that I know his mom

3    very well and his son very well.

4    Q.    And so you actually became friends with him back in

5    2015 when he started seeing your son; isn't that right?

6    A.    No, not really.

7    Q.    I mean, didn't y'all get tattoos together?

8    A.    We went one time about a year ago.  We have a

9    mutual friend.  She was a client, and I have known her

10   since probably 2002, which means that she was friends

11   with Jeff most of her life.  And she was going through

12   some things.  And there's a poem or a story called

13   *The Dash*.  And we were talking about how we only get one

14   life.  It's the dash between your birth date and your

15   death date that you have to make count.  And she asked me

16   if I would go with her to get a tattoo.

17        And I have a friend that owns a tattoo shop.  And I

18   said, yeah, let's do that.  It's something I believed in.

19   And she asked if it would be okay if she invited Jeff.

20   And I said, yes, I can get us all three an appointment.

21   So we all three met down at the tattoo shop.

22   Q.    So you've been friends with him for about a year.

23   Is that what you had said?

24   A.    No, maybe two.

25   Q.    About two years?

1    A.    Uh-huh, yes.

2    Q.    Also, you saw his son in a professional

3    relationship?

4    A.    Correct.

5    Q.    And his daughter?

6    A.    No.

7    Q.    You didn't see his daughter?

8    A.    No.

9    Q.    Okay.  Do y'all have any sort of business

10   partnership going on?

11   A.    No.

12   Q.    Were you aware that he believes that he really was

13   the one that was able to launch your full-time practice?

14   A.    He had a big part in it because when I first

15   started, I was working for a juvenile --

16   Q.    Were you aware of that?  Were you aware that he

17   credits himself for really starting your practice, your

18   sole practice?

19   A.    I'm not aware of that, but I give him some of the

20   credit.

21   Q.    Okay.  And do you feel like you owe him for that,

22   or have you said that you owe him for that?

23   A.    I may have.

24   Q.    Okay.  And what exactly do you owe him for?

25   A.    For helping me begin my private practice.  I went

REDACTED TRANSCRIPT

1   around to many different offices, family nurse

2   practitioners, doctor offices, WRAP, Omni Visions, and

3   told them what I do and asked for referrals, if they had

4   anybody they thought I could help.

5   Q.    So it wouldn't surprise you if he said in his

6   deposition, "Nancy went into full-time private practice

7   based upon the shear volume of referrals that I sent her

8   for mental health"?  That wouldn't surprise you, would

9   it?

10  A.    Can you read that, again, please?

11  Q.    Nancy went into full-time private practice based

12  upon the shear volume of referrals that I sent her for

13  mental health.

14  A.    No, I went into private practice before I started

15  seeing Trey, but not full-time.

16  Q.    So is that not correct when Jeff Young said that

17  under oath in a deposition?  Would you agree with that

18  statement?

19  A.    Not necessarily.  I got a fair amount of referrals

20  from my colleague, Will Beyer, and from Jeff and also

21  from Cinda Gee at WRAP, and Deborah Phillips at Omni

22  Visions.  And there were two more family nurse

23  practitioners I received quite a bit from.  Most of them

24  came from Mr. Young and my colleague, Will Beyer.

25  Q.    Okay.  Do you recall texting him that you would be

1  forever grateful or you are forever grateful to him for

2  his referrals?

3  A.    Probably.  I don't recall it, but that sounds like

4  something I would say.

5  Q.    Okay.  And beyond this sort of semi-business

6  relationship with them, do you advise them on how to

7  prescribe drugs?

8  A.    Not necessarily.  There's been times where I would

9  say:  This person doesn't appear to be doing well on this

10  particular medication that she says she's on.  Could you

11  maybe consider something else?

12  Q.    Okay.  So you've texted him before telling him what

13  drugs he might want to prescribe to his patients?

14  A.    If I did, it was maybe once or twice in a period

15  over two years.  I don't recall.

16  Q.    And were you also a patient of his?

17  A.    Two times.  One time in PreventaGenix days I was --

18  I lost two family nurse practitioners.  I don't know

19  where they went.  And I was taking depression meds,

20  antianxieties, and was also -- felt like I was little

21  overweight.  So I went and saw him one time for that and

22  then went back to the Jackson Clinic because I have a

23  blood clot -- two blood clotting disorders.  So my doctor

24  at the Jackson Clinic said it would be best to keep

25  everything there.

1   Q.    Ma'am, I'm going to ask you just to try to answer

2   my question.  Okay?

3   A.    Okay.

4   Q.    So isn't it true that he actually prescribed you

5   something called Belsomra, right?

6   A.    Oh, yeah.

7   Q.    And isn't it true that you texted him:  Hi, Jeff.

8   You told me to let you know if I liked the Belsomra for

9   sleep and you'd call me in a prescription.  I like it and

10  would like to give a shot.  Would you be comfortable

11  calling in a script for me?  I use CVS in Jackson.

12  A.    Uh-huh, yes.

13  Q.    Then you actually sent him your information,

14  correct?  And he sent you that or called in that

15  prescription for you, right?

16  A.    I'm not sure.  I don't recall.

17  Q.    But you didn't see him as a patient, did you?

18  A.    I had prior.  I think I had seen him for that one

19  time before I did that.

20  Q.    And so you also were prescribed another drug by

21  him, a stimulant, weren't you?

22  A.    The Phentermine?

23  Q.    Isn't it true that December 16, 2015, you said:

24  Jeff, I hate to ask you this, and I will likely never ask

25  again but was wondering if you could call me in one

REDACTED TRANSCRIPT

1    refill of the Phentermine and one refill of the

2    Topiramate.  Just struggling through the holiday food

3    binge.

4          Phentermine, that's actually a stimulant,

5    amphetamine, isn't it?

6    A.    I don't know.  I just know it's a weight loss drug.

7    Q.    Okay.  So you were his patient, right?

8    A.    Correct.

9    Q.    Or at least he prescribed you drugs?

10   A.    Correct.

11   Q.    And Phentamine is a controlled substance, right?

12   A.    I guess so.  I don't know.

13   Q.    And he's your patient?

14   A.    He was after that.

15   Q.    Okay.

16   A.    I was his patient one time first.

17   Q.    Okay.  You also had a business relationship.  You

18   referred him clients, right?

19   A.    I referred his clients back to him.

20   Q.    Okay.  You've referred him several clients

21   throughout the years, haven't you?

22   A.    A handful maybe.  I'm not even sure.

23   Q.    Okay.  And he refers you clients?

24   A.    He does refer clients to me.

25   Q.    Is there something about the ethics of that you've

REDACTED TRANSCRIPT

1    learned as you're trained that might cause a conflict of

2    interest?

3    A.    Not that I -- I don't feel so.

4    Q.    Well, are you supposed to play that many roles,

5    friend/business partner or business referral

6    relationship/patient also --

7    A.    I consider it a professional friendship.  We went

8    to a tattoo -- we met at the tattoo place together.  But

9    I don't hang out with him.  I don't go out with him

10   anywhere.

11   Q.    So you're comfortable with that situation and those

12   many roles with him?

13   A.    I am.

14   Q.    Now, you sat here during this hearing, correct?

15   A.    Correct.

16   Q.    And you heard about all the evidence of exchanging

17   sex for scripts?

18   A.    Correct.

19   Q.    You're certainly not here to defend that, the

20   evidence that you saw that he's, basically, prescribing

21   to patients and having sex with them?  You're not here to

22   defend that, are you?

23   A.    I -- I don't know why I'm here.  I got subpoenaed,

24   and nobody ever really told me why.

25   Q.    Did it change your opinion at all of him as you sat

REDACTED TRANSCRIPT

1    through this whole day of evidence, listening to all

2    these patients?

3    A.    Honestly, no, because it still is alleged.  And I'm

4    just a firm believer in innocent until proven guilty.

5    Q.    Did it change your opinion at all of him that

6    certain patients, he was having sex with their wives?

7    Did that change your opinion at all?  Is that something

8    that's an ethical thing to do for a medical provider?

9    A.    That would just be my opinion.  It wouldn't be

10   ethical for me to do it.

11   Q.    I'm not just talking about you.  Any medical

12   provider, that wouldn't be ethical for them to do, would

13   it?

14   A.    I don't know.  It depends on their personal ethics.

15   Q.    Okay.  And so before this hearing you didn't know

16   anything about all that, did you?

17   A.    I didn't.

18   Q.    You didn't see that video where he appeared to have

19   sex with --

20   A.    I did not.  I didn't watch it this time either.

21   Q.    Okay.  Well, would that change your opinion if that

22   were true?

23   A.    If it were true that he had sex with somebody

24   that -- can you rephrase it?

25   Q.    Yeah, that's a pretty dangerous act, isn't it?

REDACTED TRANSCRIPT

1   A.    I'm not sure.  Could you rephrase or explain it to

2   me what you're asking exactly?

3   Q.    Well, having sex with a semi-conscious woman is a

4   pretty dangerous act?

5   A.    I -- I don't know how to answer that.

6   Q.    Well, the fact is you don't know a whole lot about

7   Mr. Young, do you, because you didn't know about all

8   these allegations?  And you don't know his prescribing

9   practice, do you?

10  A.    I do not.

11  Q.    Okay.  Now, I read through the materials you

12  brought to us.

13  A.    Uh-huh.

14  Q.    In those materials, those are your notes of your

15  sessions with Mr. Young?

16  A.    Correct.

17  Q.    Did he ever talk about any remorse for having sex

18  with his patients or having sex with his patients' wives?

19  A.    No.

20  Q.    Did he ever indicate to you that, look, maybe I

21  overdid it with the whole "Rock Doc" thing and promoting

22  drinking and promoting prescribing opioids?  Did he ever

23  express like, hey, maybe I should have toned it down, I

24  maybe shouldn't have done that?

25  A.    The only thing he ever --

1    Q.    Is that a "yes" or a "no"?

2    A.    No.

3    Q.    Okay.  Have you seen that he's a changed man at all

4    since you knew him in 2015?  Because as I look at that, I

5    haven't seen one thing in your documentation of his

6    visits with you where he says I've changed, I'm

7    different, I'm not going to do that anymore.  Isn't that

8    correct?

9    A.    But we also didn't talk about him having sex with

10   patients.  So he wouldn't have said that to me.

11   Q.    He didn't bring that up, did he?

12   A.    Having sex with patients?  No, he didn't.

13            MR. KNUTSON:  I'll pass the witness.

14                    REDIRECT EXAMINATION

15   BY MR. FERGUSON:

16   Q.    Who has you under subpoena?

17   A.    The federal government.

18   Q.    And what records did you bring to them?

19   A.    My session notes -- I have the subpoena here

20   somewhere.  My session notes and any contracts I had with

21   Jeff, any time sheets or pay stubs or things like that.

22   Q.    His medical records?  Session notes?

23   A.    Correct.  Can I read it to you?

24   Q.    Yes.

25   A.    I have it somewhere.  I was asked to bring -- let's

1    see.  You must bring with you the following documents and

2    electronically stored information or objects --

3              **THE COURT:**  Slow down.

4    A.    Okay.

5          You must also bring with you the following

6    documents, electronically stored information, or objects:

7    Jeffrey W. Young II's patient file and any medical

8    records of any other kind that relate to that individual,

9    and all documents other than patient files relating to

10   your business relationship with Jeff W. Young II

11   including contracts, employment agreements, protocols,

12   invoices, payment records, time sheets, activity logs,

13   and correspondence with Young and/or his agents.

14   **BY MR. FERGUSON:**

15   Q.    Okay.  And did any agents -- FBI, DEA, TBI -- ever

16   come to you prior to this subpoena and ask you for those

17   records?

18   A.    Prior to the subpoena?  No.

19   Q.    Okay.  Can I have that subpoena and get you a copy

20   later?

21   A.    Yes.

22   Q.    If you'll just leave it up there, I'll get it after

23   the hearing.

24   A.    Okay.

25   Q.    The questions the government was asking you tend to

1   suggest that these events that they were asking you about

2   did, in fact, happen.  You're aware of the problems and

3   the issues surrounding Jeff and his ex-wife?

4   A.    I'm aware of a lot of them, yes.

5   Q.    And that many of these allegations the government

6   just stood up here and assumed that they were true come

7   from Dawn Young or her cohorts?

8   A.    I have known through Jeff that they probably had

9   and from what I've heard today, yes.

10  Q.    And that would be consistent with the ongoing

11  pattern of abuse and, if you will, retaliation that he's

12  suffered at the hands of Dawn Young?

13  A.    Could you rephrase that?

14  Q.    She likes to stir things up, doesn't she?

15  A.    According to Jeff and according to what I'm hearing

16  in here.  And there was a post she made on Facebook about

17  me also.

18  Q.    How did that make you feel?

19  A.    Attacked.

20            **MR. FERGUSON:**  That's all I have, Your Honor.

21            **THE COURT:**  You can step down, ma'am.

22            (Witness excused.)

23            **THE COURT:**  Any additional witnesses?

24            **MR. FERGUSON:**  No, Your Honor.

25            **THE COURT:**  Anything from the government?

1      **MR. KNUTSON:**  No, Your Honor.

2      **THE COURT:**  I'll hear from you.

3      **MR. KNUTSON:**  I'm sorry, Your Honor?

4      **THE COURT:**  I said, I'll hear from you if you

5  wish to be heard.  If you don't, I've heard everything

6  and taken notes.  I have a decent memory.  The older I

7  get I have to kind of call on my notes, but whatever you

8  wish to say.

9      **MR. KNUTSON:**  Yes, Your Honor.

10      **THE COURT:**  Come to the podium so I can hear

11  you.

12      **MR. KNUTSON:**  Your Honor, I think you've heard

13  a bountiful amount of evidence on how Jeff Young is a

14  danger to the community.  And there's no set of

15  conditions or a combination of conditions that this Court

16  can set that can protect the people of Jackson,

17  Tennessee, especially the women of Jackson, Tennessee.

18          Now, even though they've rebutted the

19  presumption, the presumption is still in place the law

20  states.  The presumption is when you're a drug dealer,

21  it's presumed that you're a danger to the community.

22          And make no mistake about it he's just like

23  any other drug dealer.  The same presumption should apply

24  to him.  Just because he hides behind a white coat or his

25  reality TV show, the same presumption applies to a nurse

1   practitioner who spews out opioids and benzodiazepines to

2   a community in the amount of 800,000 opioids along with

3   600,000 benzodiazepines, many times in combination.

4   That's just like any other drug dealer.

5          And he's got less of an excuse for it because

6   he's educated, he's white, he has money, he's got

7   parents.  His dad is a preacher.  He's got no excuse.

8   So, please, treat him just like any of the other drug

9   dealers that the presumption applies to, because he's got

10  less of an excuse for what he's doing.

11         Now, one of the things that I know the defense

12  attorney may bring up is that, well, you haven't showed

13  these large, huge amounts of him prescribing today.

14  Well, that's not exactly the case.  Because even though

15  the medical board took away his Schedule II prescription

16  power, he still got around that and is prescribing

17  Schedule IV benzodiazepines.

18         And the problem with that is that he's not

19  checking the CSMD.  And it's a pretty simple thing that

20  just because you're prescribing somebody something

21  doesn't mean that another doctor is not.  That's why it's

22  a very simple task, and it's something that's within

23  their standard of care for the protection of the patient

24  for him to look at the CSMD to see if he's still

25  prescribing that dangerous combination even if he's not

1    writing both of those prescriptions.  And as Ms. Seabolt

2    testified to, he was doing that.

3            **THE COURT:**  Now, Mr. Ferguson put up one

4    document which indicated apparently some conversation,

5    recorded conversation he may have had with another

6    physician or another health provider that they discussed

7    the fact that he was, "he" being Mr. Young, prescribing

8    some medication.  And in that conversation, he informed

9    the other, I guess, health provider that they were aware

10   of this combination.  That's one instance.

11           **MR. KNUTSON:**  And I have not investigated

12   that.

13           **THE COURT:**  I understand.

14           **MR. KNUTSON:**  I'm just basing it upon what

15   PMP -- and even if he's just doing the benzodiazepines

16   alone, we heard Barry Cooper talk about, look, people can

17   still die after having benzodiazepines.  They can still

18   die of an overdose from those types of drugs.

19           So the fact that this guy after all of the

20   things he's been doing with his prescribing habits -- I

21   mean, he had up to a hundred patients a day.  And you saw

22   that undercover video.  It's like these undercover young

23   girls come in there like laughing, joking.  It's probably

24   a total of seven minutes for two patients, and they both

25   come out with Schedule II drugs.  That's how he does it.

1          And then we showed you all of those Facebook

2    messages.  And those speak for themselves.  And as the

3    agent testified to, we've got a huge -- and it's in

4    Exhibit 2 or 3.  It outlines all of them.  If there's any

5    doubt about how he ran his practice and how he operated

6    in order to like gratify himself sexually is he used that

7    prescription power.  And he still has that prescription

8    power, because most of those people also got those

9    benzodiazepines.  So he can still do that today.

10          The other thing that he still is doing -- and

11    that's why we played the recording that the medical board

12    got and was through Mr. Chew -- he's still having sex

13    with his patients.

14          I mean, the medical board has investigated him

15    since 2015.  They had an order where at some point -- it

16    was not signed.  It was recommended:  Take that guy's

17    license away.  Now, I don't know why the medical board in

18    2016 didn't take his license away, but they didn't.  And

19    so he continues, though, to go down that road and

20    prescribe in that way.

21          Now, the other thing is -- and you've heard

22    about the sex with patients over and over again.  But the

23    thing is, I think, the easy solution would be like, okay,

24    we'll just take away his prescribing power.  But look

25    what he's also using.  You saw those texts about him

REDACTED TRANSCRIPT

1    using Botox.

2            That's another thing.  These Botox parties,

3    you don't have to be able to prescribe to do that.  Hey,

4    ladies, come on over, we'll drink, and I've got my power

5    of the Botox.  That one person that he was texting back

6    and forth was CHC.  He was hanging that out there.  Hey,

7    you want to come in for a Botox treatment?  Well, at the

8    same time he's trying to have sex with her, and her

9    husband is also a patient of his.

10           I mean, that's just how he operates.  If you

11   are able to look through that whole document, it will

12   show that that it wasn't three or four times as we showed

13   you an example of.  It occurred over and over again.  And

14   that's just how he does his business.

15           One of the things that I really wanted to

16   point out and the last question that Mr. Pennebaker asked

17   Ms. Seabolt was what's hydromorphone.  The reason I had

18   him ask that question was because hydromorphone, he was

19   prescribing that to XXXXX XXXXXX.  Now, XXXXX XXXXXX is

20   the one, you recall, that me and Mr. Cooper talked about

21   where:  This is Kristie, Jeff's office manager -- wrong

22   one.  Jeff Young says:  90 days clean today.  So proud of

23   XXXXX XXXXXX.  Love you, dude.  You and your story

24   inspires and humbles me.

25           So that complaint is in November of 2016.  So

                        REDACTED TRANSCRIPT

1    he is saying, hey, 90 days clean sometime before November

2    of 2016.  Now, I wish this had a date for when this post

3    was.  But if we could pull up Mr. Young's prescription

4    history for XXXXX XXXXXX and if we can flip it to the

5    laptop, it shows that XXXXX XXXXXX before that -- that

6    post has got to be before 2016 because the complaint was

7    in November 2016 -- XXXXX XXXXXX is getting 12/30/2016 --

8    after that, after he supposedly congratulates him for

9    being 90 days clean and so proud of him, he's giving him

10   hydromorphone, 90 tablets of hydromorphone in November of

11   2016 and December of 2016, after he says and admits he's

12   an addict.

13          And Ms. Seabolt said that hydromorphone is

14   above hydrocodone.  It's above oxycodone.  It's more

15   powerful than both of those.  And he's giving him 90.

16   That's three a day.  And that guy is dead.  XXXXX XXXXXX

17   is dead.

18          Now, if that's not a danger to the community,

19   if someone can be so callous to know that this guy is

20   addicted but then prescribe him in the next few months

21   after he celebrates his recovery from addiction, I don't

22   know what is.  So there's that.

23          But then there's -- I think the Court has to

24   decide is there any conditions that could stop this type

25   of behavior.  I don't think the solution is just taking

REDACTED TRANSCRIPT

1    his prescription power away.  Because then you go and

2    look at the bruises that he gave to his wife back in

3    2011.  That had nothing to do with prescribing.  That's

4    just him.  That's who he is.  And then you look at some

5    of the other stuff.

6          I mean, what can you do?  The Board has tried

7    to do their thing, was ineffective.  They did a good

8    investigation and did nothing with it.  And so what can

9    stop somebody from doing that kind of stuff?

10         Well, you look at the video.  I admit we don't

11   know who that girl is on that video.  We don't know how

12   old that girl is on the video.  We don't know if when

13   she's babbling that means that she's consenting, but she

14   is babbling in that video.  But we do know that he's on

15   it.  His friend Uncle Kevin is videoing it.  It was on

16   his phone.  And Jeff Young, when he's on top of that

17   woman, goes like this (indicating).  He's directing that

18   video of this semi-unconscious woman.

19         Can he still do that type of thing if he can't

20   prescribe?  Can he still do that type of thing if he's

21   not a doctor?  Yes.  The only way you can stop him from

22   being a sexual predator -- and that's what he is -- is to

23   detain him.  And that's why I'm asking this Court, that

24   there are no -- I'm asking this Court, because there are

25   no conditions that can stop this type of behavior, to

1    detain him and detain him today.  Thank you.

2              **THE COURT:**  When you step down, again, I think

3    we've got this last notebook --

4              **MR. KNUTSON:**  I'm sorry?

5              **THE COURT:**  I assume you want to move that for

6    admission.

7              **MR. KNUTSON:**  Oh, I thought we already did.

8              **MR. PENNEBAKER:**  That's Exhibit 25, Your

9    Honor.  So we kind of --

10             **THE COURT:**  Just one exhibit?

11             **MR. PENNEBAKER:**  That is Exhibit 25 with the

12   subparts.

13             **THE COURT:**  Mr. Ferguson?

14             **MR. FERGUSON:**  No objection.

15             **THE COURT:**  All right.

16             **MR. KNUTSON:**  We would ask that they all be

17   sealed just for purposes of...

18             **THE COURT:**  All right.  First of all, mark

19   that Exhibit 25.  The exhibits will be under seal.

20             **THE CLERK:**  Number 3.  Exhibit 25 --

21             **THE COURT:**  Exhibit 25, that notebook.

22             (Exhibit No. 25 was marked.)

23             **THE COURT:**  Mr. Ferguson.

24             **MR. FERGUSON:**  Thank you, Your Honor.

25             Your Honor, referring back to the agreed order

                    REDACTED TRANSCRIPT

1    Mr. Young entered into with the State of Tennessee and

2    specifically the Tennessee Board of Nursing, very

3    specifically the Board indicated that they were to -- it

4    was their duty and responsibility to enforce the

5    Tennessee Nursing Practice Act in a manner to promote the

6    public health and safety and welfare in every practical

7    way, including disciplining nurses who violate the

8    provisions.

9           Now, I appreciate the fact that the government

10   in their filing with this Court admitted that the

11   presumption would be overcome and, basically, conceded

12   that fact again in closing.

13          This is a case in which people who had the

14   statutory duty, the responsibility, and the authority to

15   investigate this case as it applied to the health and

16   safety of the state of Tennessee and the citizens of

17   Tennessee, including up to and being able to have a full

18   hearing on this and to revoke Mr. Young's license fully,

19   came to a conclusion that it was in the best interest of

20   Tennessee that Mr. Young continue to practice but

21   continue to practice in a limited role in which after two

22   years, after two years he would able to go back after he

23   met certain conditions and follow the rules, would be

24   able to go back and seek the reinstatement of his

25   Schedule II privileges.

1          All of these allegations, everything that

2    we've heard today, for most of the allegations this Court

3    has heard over two days have been double and triple

4    hearsay.  They have been allegations that went on either

5    to be unfounded or were repeated over and over.  And

6    repeating the same lie over and over does not make it a

7    truth.

8          There are instances where there have been

9    allegations of sexual misconduct, but there's been no

10   proof before this Court to back up any of those

11   allegations.  Not a single person has come here and said,

12   yes, he did that to me.  In fact, just the opposite.

13   When the investigators went out to ask, they didn't want

14   to have anything to do with the investigation.

15         The one that's pending was from, I guess,

16   2016, Jackson Police Department fully investigated it.

17   There's no charges.  It was never prosecuted.

18         The incident with the cell phone, again,

19   there's been no allegations.  There's been no charging.

20   There's been nothing that's come out of that, if you

21   will.  Nothing that occurred at the time obviously.  And

22   it is what it is.  It may be unsavory to us, but it is

23   not at this point anything that was illegal.  This kind

24   of flippant -- we don't even know how old she is.  It's

25   kind of ridiculous.  We all saw her on video.

REDACTED TRANSCRIPT

318

1       **THE COURT:**  Well, Mr. Ferguson, of course, one

2   of the reasons it wasn't prosecuted was because they

3   don't know who she was.  If you don't have the person,

4   the complainant, it would be kind of hard to prosecute

5   somebody.

6       What was concerning to the Court is when I

7   watched that video and looked at that woman's eyes, she

8   didn't look like she was with it.  Her eyes were closed.

9   She looked to be in pretty rough shape.

10      Did you not get that from the video, sir?

11      **MR. FERGUSON:**  I can't tell what to get from

12  that.  I see that she is caressing him and is physically

13  engaged with him.  So I can't make --

14      **THE COURT:**  I don't know whether she was or

15  not.  I think -- her eyes are closed.  It looked like she

16  was not too cognizant of what was going on to me.

17      **MR. FERGUSON:**  Well, I think, it appeared to

18  me she was caressing him.  And I would think if you're

19  caressing him, there is some cognitive functions going

20  on.  Again, whether or not they had been drinking does

21  not change the fact whether or not it was consensual sex

22  or not.  And I think that's the issue here is we have

23  absolutely zero proof that it was anything but

24  consensual.

25      Now, the federal government has the video, and

REDACTED TRANSCRIPT

1   they can't figure out who the person is or how to find

2   her.  I'm sure they've checked police records.  That

3   should have a date and time on at least.  We can narrow

4   it down.  And there's been nothing that they've done in

5   order to bring evidence before this Court that it was

6   anything but consensual.

7          I know that the Court has heard multiple

8   people with multiple stories about sex in the office.

9   Again, that's why we asked the question such as was it

10  his girlfriend or not.  We haven't had anyone come in

11  here and actually testify that they either actually saw

12  it or were actually involved in sex in the office.

13  However, even if they had gotten that before the Court,

14  it's not illegal.

15          **THE COURT:**  Well, your client admitted to such

16  in an email or text message.

17          **MR. FERGUSON:**  Well, he was talking.  Again, I

18  don't know if that was truthful or not.  The Internet --

19          **THE COURT:**  Whether your client was truthful

20  or not?

21          **MR. FERGUSON:**  When guys talk about sex, I

22  don't know, Judge, I mean, I assume, but again, my

23  assumptions I don't think are proof.  You can assume he

24  was being truthful.  And, again, but it didn't say that

25  it was a patient on that text message.  It just said, "I

REDACTED TRANSCRIPT

1   had a quickie in my office," which could have been with

2   his girlfriend or someone else or an employee.  Again,

3   having sex with your employees wouldn't be a good thing

4   either.  It would be inappropriate and setting somebody

5   up for a sexual harassment suit.  But again, it doesn't

6   make it illegal.

7           And on top of that, we're talking about events

8   that were from 2016, 2017.  The question is, is he a

9   threat today.  He is running a much slower and a smaller

10  volume business under a limited and restricted license

11  and is focusing the majority or a large part of his

12  practice on cosmetics.

13          This is not a situation in which he is engaged

14  in high volume, quick turnaround.  The Court saw the

15  video, the undercover.  It's clear that there was a

16  physical -- history and physical taken from the radiology

17  tech or medical assistant.

18          When he comes in, he's checking over the

19  paperwork and verifying the information.  There was what

20  appeared to be a CSMD on the file for the new patient,

21  including the language he used:  We'll just continue with

22  the prescription.  I forget what the exact term was, but

23  it is something that indicated that he was aware of the

24  prescription, just continued it, and then told her and

25  sent her or gave her instructions to go get an x-ray or

1   MRI.  The issue of whether or not --

2            **THE COURT:**  I hate to interrupt you, but there

3   was some other testimony -- I don't know whether it is

4   this particular one or not.  I know you brought that up

5   in that document you're holding.  But there was some

6   evidence in the record before the Court that would

7   indicate that there was other medication, other

8   narcotics, being prescribed to some of his patients at or

9   about the same time your client was giving these people

10  medication, that using them in tandem is not very --

11  certainly below the professional standards and probably

12  down right dangerous.  Don't you remember that testimony?

13           **MR. FERGUSON:**  Are you talking about when they

14  would double the benzodiazepines and --

15           **THE COURT:**  We've got a lot of exhibits.  I'm

16  going on what I recall from the testimony and my

17  recollection.

18           **MR. FERGUSON:**  I think --

19           **THE COURT:**  Just a second.

20           **MR. FERGUSON:**  I'm sorry.

21           **THE COURT:**  I'll give you the opportunity when

22  I get through.  Okay?

23           **MR. FERGUSON:**  Yes, sir.

24           **THE COURT:**  My recollection is, is there were

25  times when your client prescribed some medications,

REDACTED TRANSCRIPT

1    narcotics, to a certain of these patients -- there were

2    several of them that were mentioned -- during a time when

3    there was maybe three or four other doctors, because we

4    use -- not "we" -- they were using the word "doctor

5    shopping."

6            It appeared that maybe the same patient was

7    going to other physicians, presumably physicians, nurse

8    practitioners -- I don't know.  At least according to

9    some of the testimony, this type of combination of what

10   your client was prescribing in conjunction with what else

11   was being prescribed was not a good combination.

12   Apparently, it could've been a dangerous -- could have

13   led to further problems.

14           **MR. FERGUSON:**  Sure.

15           **THE COURT:**  So even though that one incident

16   where that woman, I'm assuming, giving you the benefit of

17   the doubt, that was, in fact, what that was -- I couldn't

18   tell -- but when he turned the folder and apparently had

19   that CSMD.

20           But there were other instances where there

21   seemed to be some -- you know, medication was being

22   prescribed that really, again, was beyond what at least

23   what appeared from the testimony is good medical

24   practice.

25           **MR. FERGUSON:**  Well, what I would suggest to

1    the Court is what the Court has heard is that there are

2    warnings associated with certain drug therapies, that

3    there is no standard of care, but there are

4    considerations that healthcare providers have to take

5    and/or notices, warnings, in which they need to be aware

6    of and pay attention to when they're making their

7    healthcare decisions on what an individual patient, based

8    on that individual patient's needs, what medications to

9    prescribe.

10          Ms. Seabolt is the one -- we were talking

11   about -- she tried to keep saying that there was this

12   "we," this "we," this standard.  And ultimately what we

13   find out is there's not a standard.  It's just -- it's

14   best if you do it that way.  Nobody -- she has not

15   testified that it was required, including the very fact

16   that either you have the situation, if there were

17   multiple physicians, then if it was required, then all of

18   those other physicians were pulling CSMDs -- and there's

19   been no testimony that they found anything inappropriate

20   about the prescriptions -- or they simply weren't pulling

21   CSMDs because it's not necessary each and every time you

22   do it, but it's a good indicator long-term to make sure

23   you're not dealing with patient shopping or drug

24   addiction.

25          There are other things that are done such as

1    the contract, the drug screens, the pill count, which

2    there's been testimony Mr. Young was doing that.  There's

3    been different testimony about how often or frequent it

4    was.  But there's clearly been testimony about it was

5    being done.  There's clearly been testimony that he fired

6    patients that he felt, or the nurse was firing them, that

7    they felt was not complying either with the contract or

8    were drug seekers.

9         So in the industry there are different ways in

10   which physicians come to that realization or knowledge.

11   CSMD is just but one tool in that arsenal to try to stop

12   or slow down drug addicts that are doctor shopping.

13        We've had testimony that obviously drug

14   addicts lie in order to get drugs.  They will go to the

15   emergency room and make up stories about falling down

16   stairs.  There's all kind of ways in which drug addicts

17   will get drugs if they want to.

18        What we don't have in this hearing is anyone

19   who's come into court and said, I was buying my drugs

20   from Jeff Young.  What we don't have is -- and

21   specifically we don't have any evidence that there was

22   any drug diversion.

23        The numbers in which the government likes to

24   parade out, the 800,000, is actually lower than what

25   would have been expected if the numbers Your Honor has

1    heard -- and based on the reporting that he was seeing --

2    about 25 percent of his patients were receiving opioids.

3    And the most common prescription is between three and

4    four a day over the course of a year, those numbers.  So

5    it's not -- it's a large number.  But it's not

6    necessarily an unreasonable number.

7              And at this point we have no indication, other

8    than just blanket allegations, that he's a drug dealer

9    and you should just treat him like any other drug dealer

10   even though he wears a white coat.  There's simply been

11   no evidence of that.

12             This is a situation in which the State of

13   Tennessee has fully investigated it.  And with their

14   understanding that they have to protect this community,

15   to protect the integrity of the entire medical community,

16   they did nothing more than what Magistrate York did in

17   this case, which was to find that those restrictions were

18   proper, and that they allowed and protected the safety of

19   the community, and that if at any time or any reason he

20   violated that order with the Board of Nursing, then he

21   also would therefore be in violation of his release

22   conditions.

23             That's a very powerful deterrent in this

24   matter, a very powerful safety feature in this matter

25   because unlike others that are involved in this case,

1    Mr. Young not only would have pretrial services that's

2    evaluating him, but he also has the entire power of the

3    State of Tennessee at the disposal of the Board of

4    Nursing to conduct these investigations.

5           He's required to submit his CSMD prescribing

6    data to the Board every 90 days and has done that twice,

7    and clearly there's been nothing that they've indicated

8    that was inappropriate.  He's very limited in his MEDs or

9    MEEs in which he can prescribe to any patient.

10          Those were put in place for two reasons, one,

11   to protect the community; and two, to be an automatic

12   trigger.  If he exceeds those, then he's in violation of

13   his order, and the Board can then take additional steps.

14          They obviously can't lock him up.  They could

15   refer him out for criminal prosecution if they thought it

16   was criminal.  Throughout the entire investigation, I

17   cannot, cannot fathom any reason that the government can

18   suggest to this Court why they would put Mr. Young back

19   out and to allow him to continue to see his patients, the

20   patients and citizens of Madison County, if they truly

21   believed he was diverting drugs or was selling drugs, and

22   it's simply not the case in this.

23          He has rebutted the presumption.  The Board

24   establishes -- and that's their job -- established what

25   is the best safety plan in this matter.  If the Court

1   would affirm -- I guess, it's actually de novo -- follow

2   the previous holding in this matter and set the Board of

3   Nursing order as part of the conditions of release, then

4   again, that's absolute certainty that either he complies

5   in the safety of community, or if he does not comply with

6   the simplest issue in it, then he would be not only in

7   violation of the consent order, he would be in violation

8   of his release conditions.

9        There's a lot of allegations.  There's a lot

10   of dirt being thrown.  And there's a lot of people on

11   both sides who are stirring and have been stirring this

12   up for a long time.  But there's been little to no proof

13   that within the last two years, ever since -- basically

14   since the DEA raided the first clinic -- that anything

15   similar or like or any additional allegations have

16   arisen.

17        He obviously has taken that issue seriously.

18   Obviously, he knew about it.  We've had to come here --

19   and, I think, it was in front of Your Honor -- and file a

20   motion to return his property along the way.

21        So he is compliant.  He is following the

22   rules.  As far as we know, from the time he was released,

23   he has not had any problems.  I talked to pretrial.  And,

24   I think, if they didn't give a new order -- I don't think

25   they've prepared a new order, and it was because they

REDACTED TRANSCRIPT

1    said nothing had changed as far as they were concerned

2    with their recommendation to the Court about that

3    Mr. Young should be released.

4             I'm going to ask the Court to take that into

5    consideration that it's pretrial's recommendation that he

6    be released, he continues on with counseling as needed,

7    and we will have a time to go through his discovery and

8    effectively present Mr. Young's defense at a later time.

9             And because of the complexity of this case and

10   the fact that it's three terabytes, I believe, of data --

11   it's 150,000 records -- it also makes it very difficult

12   to go through that many records with someone that is

13   incarcerated.

14            I know that's not necessarily the standard

15   here.  I'm just suggesting that we know what pretrial's

16   recommendation is.  We know what the magistrate held.

17   Nothing has changed.  All these allegations were -- and

18   that's all they are, are allegations.  They're not

19   anything of substantive proof.  And so I'd ask the Court

20   to accept those recommendations.

21            **THE COURT:**  Thank you, sir.

22            Anything further, Mr. Knutson?

23            **MR. KNUTSON:**  Your Honor, just a few things.

24            **THE COURT:**  Come up here if you don't mind.

25   My court reporter has to take it down, and I need to hear

REDACTED TRANSCRIPT

329

1    you.  Thank you, sir.

2          **MR. KNUTSON:**  This is sort of the same

3    argument that Judge York heard, this hiding behind the

4    medical board.  And that's why we spent so much time with

5    Ms. Pickering to show what had been done with the medical

6    board, all of that information that they had.  And one of

7    the witnesses testified that there was a recommendation

8    that they take away his license.  So Judge York didn't

9    know about that.

10         And even though they did a good investigation

11   with all that information they had and with that

12   determination, he admits to that second board order --

13   what he admits to is he prescribed medically unnecessary

14   drugs.

15         **MR. FERGUSON:**  I am going to object to that

16   because that was a mischaracterization both in their

17   filings in this matter and their characterizations.

18         **MR. KNUTSON:**  He admitted that the evidence

19   would show --

20         **MR. FERGUSON:**  Actually, he said while

21   respondent neither admits nor denies the following

22   allegations, for purposes of settling this matter -- it's

23   on page 3, stipulations of fact.  And if we need to

24   reopen the proof, I can show the Court the emails between

25   the attorneys where this language was specifically

                        REDACTED TRANSCRIPT

1    requested on our behalf so the government wouldn't get up

2    here and say this.

3         **THE COURT:**  Well, it's a little unclear to me,

4    Mr. Ferguson.  On page 5 it talks about grounds for

5    discipline.  It says your client acknowledges the facts

6    presented, and the findings of fact are sufficient to

7    establish that he may have violated the following

8    statutes and rules.  But then he comes on and says the

9    facts stipulated in paragraphs four through 16 constitute

10   a violation -- I mean, he stipulates to them.  It seems

11   to me that he is admitting that they are true.

12        **MR. FERGUSON:**  If you'll notice the very first

13   line of that:  While respondent neither admits nor denies

14   the allegations --

15        **THE COURT:**  Well, that's why I'm saying it's a

16   little unclear, to be frank with you.

17        **MR. FERGUSON:**  That was as clear as we could

18   make mud and that was put --

19        **THE COURT:**  I wasn't part of that negotiation.

20   Obviously, you did a good job for your client.  I'm not

21   chastising you.  I'm just saying that it's just unclear.

22   When somebody says they stipulate to something, at least

23   in my parlance, it means they admit to it.

24        **MR. FERGUSON:**  In criminal, yeah, I

25   understand, Your Honor.  Again, the language was specific

REDACTED TRANSCRIPT

1    in there from us, and there was no admission.

2        **MR. KNUTSON:**   Well, and certainly the medical

3    board said that he was prescribing medically unnecessary

4    medications.   He was prescribing dangerous combinations

5    of opioids and benzodiazepines.   Now, they knew that

6    since 2016.   And the standard that you have to prove in

7    these medical cases where it's a doctor is that it's

8    either medically unnecessary or outside the course of

9    professional conduct.

10       So the medical board at the time knew it was

11   medically unnecessary.   But for some reason knowing that

12   that's a felony when you prescribe that amount of

13   opioids -- and I think they used the word

14   "overprescribe."   When you overprescribe that, that means

15   you're committing a felony.

16       So I have no understanding why when they

17   believe he's committing a felony they're just going to

18   take away a Schedule II.   I believe, that's a deficiency.

19       Now, so the other part of that is outside the

20   course of professional conduct, he keeps saying that

21   there's hearsay upon hearsay.   Well.   The documents --

22   his Facebook messages speak for themselves.   I mean, it's

23   him talking about having sex with these women, baiting

24   these women in through his Botox and through Percocet and

25   all these other opioids.   That's his words.

1    I mean, we didn't have to do this double

2    hearsay thing, although there was some of that.  But most

3    of it is based upon just hard evidence.  Follow the

4    evidence.  Do a search warrant on Facebook, and that's

5    what we found.

6    And then you just follow that up with the

7    prescriptions that he prescribed.  It's a pretty easy

8    deal.  I asked Mr. Chew, "Did we also get the medical

9    files?"  "Yeah, we got medical files of some of those

10   people, too."  But mainly it was proven by, well, he's

11   prescribing them.

12   And it's just so insidious when you look at

13   just the power of a medical professional.  Everyone has

14   got respect for doctors.  Everyone wants to do what the

15   doctor says.  And he uses that power whether he can

16   prescribe or not, but he uses that power to manipulate

17   women for his own sexual gratification.  I don't know how

18   you change that.

19   The medical board certainly didn't address it.

20   They didn't say anything about this sex or whatever else.

21   They knew something about it.  But they like say, well,

22   maybe we can do this or that.  I don't know why they

23   wouldn't address that.  Maybe it's because they didn't

24   have the search warrant evidence that we did.  But we had

25   a lot more than they did.  Maybe it's because they didn't

REDACTED TRANSCRIPT

1    have that video.

2           I would hope that if the medical board knew
3    about that video and read those countless Facebook
4    messages and everything else that there's no way, because
5    how can it be within the course of professional practice
6    for you to say here's a picture of my penis, here's this
7    and that, then he's prescribing at the same amount of
8    time.  Some of them are like, hey, bring your script pad,
9    Doc.  How can anybody argue that that's in the course of
10   professional practice?

11          So, yeah, he's trying to hide, again, behind
12   the medical board's decision.  But that's why we spent so
13   much time on it today is because Judge York didn't have
14   the advantage to see what really went on and all the
15   other evidence they didn't have.

16          And so there's no reason, it just would be
17   illogical for them to hide behind that because he is
18   obviously a danger.  He started beating his wife in 2011.
19   He still can prescribe today.  And I didn't understand
20   why he keeps saying nothing has happened in the last two
21   years.  That's why we put the evidence on of that
22   employee in that interview in his new clinic, Genexis,
23   where he's still having sex with his patients.  I mean,
24   that's a pretty big deal.

25          And, then, I'd like to finish with just

1   some of the people beyond the prescribing and beyond

2   the other stuff who just felt intimidated by him.

3   Shirley Pickering said she was intimidated by him.

4   Barry Cooper said he was intimidated by him.  And then I

5   would like to read Exhibits 22 and 23, which were

6   admitted into evidence but nobody spoke about.

7            If we can have the screen put back.

8            This is a Facebook message.  And it starts --

9   if we could read the top of it, it starts with

10  XXXXXX XXXXXX saying:  No, let's talk real shit.  How

11  about you hitting on my wife in your office, bitch.

12           We've heard that before.

13           Jeff Young says:  Get your bitch under control

14  before something bad happens.  I have people I can

15  control.

16           **THE COURT:**  "I can't control."

17           **MR. KNUTSON:**  I can't control.

18           I take that as a threat.  But, I think, if we

19  continue with that text message you can see the next part

20  of it.  And, I think, it's the second page.  That last

21  part of that:  Get your drunk ass husband under control

22  before something bad happens to him.

23           So that's somebody, a guy -- he was hitting on

24  the guy's wife and he said something to him.  What does

25  he say?  Something bad -- you know, get him under control

REDACTED TRANSCRIPT

1    before something bad happens to him.

2              And there's one more Facebook message:  Dude,

3    you should really back the fuck off before you lose all

4    the business you have.  I carry a much bigger stick in

5    this town than you.  I can assure you that.  I'm still

6    deciding whether to sue you for slander.

7              That's how he handles that stuff.  And then

8    you look at what he did with his former patient.  If we

9    can get the Elmo.  This is his former patient.  I

10   believe, it's XXXXXXXX XXXXXX.  He does a posting,

11   bullying posting, regarding his patient where he's

12   standing over and says:  This cunt talks about how I

13   won't prescribe her narcotics.

14             That's how he treats his patients, and that's

15   how he treats people.  So the thing is, is beyond the

16   prescribing and beyond all that other, beyond just being

17   a doctor, that's just how he responds to people.

18             And you consider the power that he has not

19   only as a doctor but for some reason his power goes

20   beyond -- he's got this Uncle Kevin guy.  But he's got

21   two police officers who he's able to convince to violate

22   their duty and look people up.

23             For some reason -- and it must be a part of

24   this "Rock Doc" thing -- he's got the charisma and the

25   power and the connections to manipulate two local police

1    officers.  And that's why we brought you that evidence.

2            There's no conditions that can control that

3    but to detain him.  Thank you.

4            **THE COURT:**  All right.  This matter is before

5    the Court on de novo review from the decision of

6    Magistrate Judge John York, which granted bond to

7    Mr. Young.

8            The Court has conducted a lengthy hearing both

9    a week ago Monday and today.  It is now 6:20.  We've been

10   going all day on this one and certainly a good part of

11   half a day previously.

12           Of course, there is a presumption that the

13   government has raised for the type of offense which

14   Mr. Young has been charged, which is not significantly

15   difficult to overcome I think based upon what has been

16   presented, that Mr. Young has overcome that presumption.

17           However, the government still has the burden

18   of -- persuasion remains with the government to establish

19   that Mr. Young does pose a danger or is a flight risk.  I

20   don't think there's really an indication that Mr. Young

21   is a flight risk.  So the question now comes before the

22   Court dealing with does he pose a danger to the

23   community.

24           Again, the nature and circumstances of the

25   offense in the Court's mind does raise a rebuttal

                     REDACTED TRANSCRIPT

1    presumption in favor of detention under 18, USC,

2    Section 3142(e)3, again, which can be overcome, but it

3    does involve the distribution of controlled substances.

4              There is certainly -- a grand jury has

5    returned an indictment.  So there's probable cause to

6    believe that the defendant committed the offense.  Of

7    course, that's not trial.  It's simply probable cause

8    establishment, the grand jury's determination.

9              The next factor the Court is to consider is

10   the weight of the evidence, which goes to the -- the fact

11   goes to the weight of the evidence, the dangerousness,

12   not the weight of the evidence of the defendant's guilt.

13             The Court has heard over the last couple of

14   days, today and last Monday, a number of witnesses and

15   evidence that would indicate that Mr. Young has, in fact,

16   made statements, has conducted himself in a manner that

17   would seem, to me, that he has actually threatened

18   people.

19             There's photographs indicating that he may

20   have inflicted injuries on other individuals at times.

21   And he has made fairly strong statements about other

22   individuals that have disagreed with him or attempted to

23   in any way impact his business or his activities.

24             Fortunately, he hasn't acted on that anytime

25   soon.  Of course, he's been under bond and federal

1 charges at this point.  Certainly prior to that time,

2 during the time when the indictment, the accusations

3 against him, there was that.  And there's still some

4 indication both of Facebook and text messages that do

5 appear to indicate his propensity for violence or some

6 type of acts of retribution or whatever.  I think that

7 factor probably weighs against Mr. Young's continued

8 release.

9           History and characteristics of the defendant.

10 There has been some involvement with the criminal justice

11 system, not any convictions, of course.  But there have

12 been some activities in which the proof has presented

13 that Mr. Young again has had some issues.  Some of it may

14 have been related to his mental capacity or some use of

15 alcohol.

16           There has been testimony that indicates he

17 presently seems to be in a fairly decent mental state.

18 Be that as it may, he does have a history again of some

19 outbursts and other indications about his saying things

20 to others and threatening them and posting matters.

21           Certainly, I've already mentioned the video

22 that was shown and some of the activities that Mr. Young

23 was involved, particularly the one certainly -- it was

24 difficult to watch.  But in my opinion, the relationship,

25 the sexual relationship Mr. Young was apparently having

REDACTED TRANSCRIPT

1  with the woman that appeared, to me, to be at least

2  semi-conscious if not fully under some type of

3  circumstance that she was not in complete control of her

4  faculties, that obviously is certainly a problem from the

5  Court's standpoint.

6          Again, it's a close question in terms of his

7  other aspects, but I still think that that particular

8  factor, that history and characteristic, does indicate

9  that his background and some of his actions have proven

10  to be of concern to the Court during the course of these

11  events.

12          And finally, the danger to the community that

13  Mr. Young poses by his continued release, whether or not

14  there are any conditions or combination of conditions

15  that can be imposed to protect the safety of the

16  community, considering all the evidence the Court has

17  heard over these last couple days, the Court concludes

18  that, again, based upon review of all the testimony here

19  that there are no conditions, combination of conditions,

20  that would assure the safety of the community by

21  Mr. Young's continued release.  The Court is going to

22  find that he should be detained pending the trial of this

23  case.

24          We'll go ahead and set a release -- excuse me,

25  a report date.  I know, of course, Mr. Ferguson indicates

1    there's a substantial amount of evidence that needs to be

2    viewed, and certainly I'm fulling understanding of that.

3            We can set this report date out for a period

4    of time, Mr. Ferguson, whatever you feel like would be

5    appropriate, so you can have a chance to review the

6    information that's been presented by the government.

7            **MR. FERGUSON:**  I believe, it's about 120,000

8    pages.

9            **THE COURT:**  Honestly, I don't know.

10           **MR. FERGUSON:**  Do you know the number of

11   pages?

12           **MR. KNUTSON:**  I'm sorry, Your Honor, I don't

13   have the number of pages, but there is a lot of

14   discovery.

15           **THE COURT:**  Did you say 90 days?  Would that

16   be -- at least at this point and see where we are.

17           **MR. FERGUSON:**  Yes, at least 90 days.  Let's

18   see where we are.

19           **THE COURT:**  Okay.  Let's find a date 90 days

20   out, please.

21           **THE CLERK:**  Wednesday -- Tuesday -- I'm sorry.

22   Wednesday, October 14th.

23           **THE COURT:**  No, August 14th.

24           **THE CLERK:**  August 14th.

25           **THE COURT:**  Is that satisfactory?

                    REDACTED TRANSCRIPT

341

1              **MR. FERGUSON:**  Sounds good.

2              **THE COURT:**  August 14th.  At what time?

3              **THE CLERK:**  At 9:00.

4              **MR. KNUTSON:**  Your Honor, is that the trial

5       date?

6              **THE COURT:**  No, no, that's to be a report

7       date.  He's got a number of documents he's got to look

8       at.  Hopefully, we'll have a better idea and opportunity

9       to kind of gauge where this case is going and how much

10      further time he may need to prepare.

11             We do have two other defendants.  I don't know

12      whether -- did we set another report date for either one

13      of those gentlemen?

14             **THE CLERK:**  I'll check.

15             **THE COURT:**  We're not tagged up with those

16      gentlemen yet, but I know that one is from New York and

17      the other one is here in Jackson.

18             **THE CLERK:**  June 12th, one at 9:15 and one at

19      1:15 on June 12th.

20             **THE COURT:**  I, frankly, think that's going to

21      be a date -- Mr. Ferguson, let me say, I haven't had an

22      opportunity to review everything.  What we may need to do

23      is pair up when -- I'll meet with them on June 12th.

24      I'll just pair them up in August, because I have a

25      feeling they're in the same situation you are,

                    REDACTED TRANSCRIPT

1    Mr. Ferguson.  They're going to need a sufficient amount

2    of time to prepare.  So let's do that.

3              **MR. FERGUSON:**  Yes, sir.

4              **THE COURT:**  We'll give you June 12th.

5              You'll be August 14th at 9:00.

6              Time will be excluded based on the need for

7    preparation.

8              Anything further from the government this

9    afternoon?

10             **MR. KNUTSON:**  No, Your Honor.

11             **THE COURT:**  Anything else from the defendant?

12             **MR. FERGUSON:**  No, Your Honor.  Thank you.

13             **THE COURT:**  We'll be adjourned.  Thank you.

14             **THE CLERK:**  All rise, please.  This Honorable

15   United States District Court now stands adjourned.

16             (Proceedings concluded at 6:38 p.m.)

17   I, Cathy Best, certify that the foregoing is a true and
     correct copy of the transcript filed with the clerk of
18   court on July 10, 2019, and incorporating redactions of
     personal identifiers requested by the following attorneys
19   of record: Andrew Pennebaker, Esq., and Claiborne H.
     Ferguson, Esq., in accordance with Judicial Conference
20   Policy.

21   */s/ Cathy Best*            August 27, 2019
     Official Court Reporter

22

23

24

25

                    REDACTED TRANSCRIPT