**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | Cr. No.: 1:19-cr-10040-JDB |
| ) | |
| **vs.** ) | |
| ) | |
| **JEFFREY YOUNG.** ) | |
| ) | |
| **Defendant.** ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS**

The Government, through the undersigned counsel, responds to the Defendant's objections to the Magistrate Judge's Order denying release ("Order") (Dkts. 158 & 162) due to the outbreak of COVID-19 as follows:

**Procedural History**

Defendant Jeffrey Young was a nurse practitioner indicted in April 2019 for signing prescriptions for controlled substances outside the scope of a legitimate medical practice, in exchange for cash and sexual favors from his purported patients, and in the course of cultivating notoriety associated with his online persona, the "Rock Doc."[1] The Indictment alleges he used his license and his position of public trust to provide large quantities of narcotics and other controlled substances to residents of West Tennessee who did not

---

[1] The April 15, 2019 Indictment charged Young with multiple counts giving rise to a statutory presumption in favor of pretrial detention, *see* 18 U.S.C. § 3142(e)(3)(A). All told, Young is charged with one count of conspiracy to distribute controlled substances in violation of Title 21, United States Code, Section 846; and several individual counts of unlawful distribution in violation of Title 21, United States Code Section 841, including six counts of distribution to a pregnant woman and seven additional counts of unlawful distribution. He was also charged with one count of maintaining a drug premises in violation of Title 21 U.S.C. § 856(a)(1).

need them. He ignored numerous admonitions from the Tennessee Board of Nursing over the course of more than a dozen investigations by that agency into allegations ranging from overprescribing, to online threats of violence against former patients and industry peers, to alcohol use, and to having sex with his patients.

On November 8, 2018, he signed a Consent Order with the Tennessee Board of Nursing setting out allegations including the Board's observation that the Defendant "prescribed controlled substances to some patients without seeing the patients for office visits and without documenting the prescriptions in the patients' records" and prescribing dangerous combinations of medications known to be used by addicts to increase their high, including opioids, benzodiazepines, and muscle relaxants (the "Board Order"). Through this Board Order, Young's nursing license was restricted for two years. During that time, he could practice only in Tennessee, and he was prohibited from prescribing Schedule II controlled substances and many – but not all – Schedule III controlled substances. At his detention hearing in April 2019, the Defendant (through counsel) represented to Magistrate Judge York that the Board Order mitigated Young's risk of harm to the community, and that the Defendant's "current practice" was "mostly cosmetic." On that basis, Judge York released the defendant on a $5,000 unsecured bond.

Contrary to the Defendant's representations, however, in the six months between signing the Board Order and his arrest in April 2019, the Defendant prescribed more than 15,000 pills of lower-schedule controlled substances (Schedule IV and V) to approximately 200 patients. In particular, he favored those with street-value. He prescribed more than 2,000 doses of gabapentin (used to increase the high from opioids), more than 1,000 doses of zolpidem tartrate (sold commercially as Ambien), more than

5,000 doses of the benzodiazepine clonazepam (Klonopin – in the same family as Xanax and Valium, and also used in combination with opioids to increase the high), and more than 500 doses of the lower-potency opioid tramadol (Ultram). He prescribed a number of these drugs to patients who were obtaining Schedule II opioid prescriptions from another source.

In addition—perhaps the "cosmetic" part of his practice—in that same six-month period, the Defendant prescribed more than 4,600 doses of phentermine, which are sold as diet pills but have street value as "speed."

The government requested a hearing before the Court to present those facts and others that illuminated the Defendant's persistent risk to his community despite the Board Order.[2] Over the course of a two-day hearing in May 2019, the government showed how the Board Order—which only restricted Young's power to prescribe the strongest opioids—was *not* enough to stop Young from prescribing controlled substances with abuse potential and street value. More importantly, the hearing showed that outside the exam room, Young is just as dangerous. The United States presented a video of an apparent sexual assault of a semi-conscious woman filmed by his friend "Uncle Kevin" Phillips, Transcript of Detention Hearing, Day No. 2 at 150:12-15, and a Board investigator's testimony about fearing for her life after Young threatened her, Transcript of Detention Hearing, Day No. 1 at 118:2-21.

Some of the other evidence presented to the Court at the hearing about Young's danger to the community included:

---

[2] This Board Order and corresponding restriction would, in any event, expire this November.

- Testimony about an interview with a former Preventagenix office manager who stated that there were "at least 50 females that have or still do trade sex with Young for prescriptions," some without patient charts, who "come in during office hours and after hours," with "[s]ometimes as many as three females a day coming to see Young." Transcript of Detention Hearing, Day No. 2 at 120:5 – 121:4.

- A recording of a witness statement where the witness stated that—after he had been disciplined by the nursing board for overprescribing at his clinic Preventagenix—Young continued to have sex with his patients at his new clinic Genexis. *Id.* at 143:8-22.

- Testimony and social media posts showing that Young prescribed to addicts he knew were in rehabilitation programs. *See, e.g.*, RE 97 (Transcript of Detention Hearing, Day No. 2) at 113:1-10; *id.* at 116:13-15 (patient's husband pleading with Young that his wife "talked about suicide the other night as she was coming off [medication Young prescribed]" and asserting: "You've given her enough to kill a horse as many as she's eating. And there's nothing wrong with her . . ."); *id.* at 117:1-14 (man expressing to Young concern "that his mother ha[d] been overprescribed"); and *id.* at 118:3-4 (Preventagenix employee reported to investigators that she "told Young that her mother was an addict, yet he prescribed medication to her anyway").

- Postings on social media accounts where Young threatened people who questioned his medical practice. Specifically, witness Barry Cooper, the director of a local drug rehabilitation facility, testified that Young threatened him on social media after Cooper had questioned Young's prescribing practices. *Id. at* 187-88. Cooper testified regarding a social media posting by Young directed at Cooper which stated , "…this guy would be the first to call the police if we tried to settle it like men. You know his type. All caps pussy." *Id. at* 187:25-188:1-2.

- Testimony from Texas Bureau of Investigation Nurse Practitioner Natalie Seabolt outlining that Young continued to issue dangerous prescriptions even after he had been disciplined by the nursing board for overprescribing. Although restricted from prescribing Schedule II controlled substances by the TMB, Young prescribed benzodiazepines and muscle relaxers, Schedule IV controlled substances, to patients who were also receiving Schedule II opioids from other doctors. *Id.* at 226:2-6.  Seabolt testified, and it is widely known in the medical community, that such a combination increases the risk for respiratory depression. *Id.* at 233:1-5.

4

The United States further presented evidence that even Court-ordered conditions of release would not prevent Young from behaving as he pleased. As set forth above, the Defendant utterly disregarded the Nursing Board's multiple admonitions after dozens of investigations over the years; and (at best) walked a thin line with respect to the ultimate Board Order restricting his license. He also has a history of violating orders of the court. In May 2018, the Chancery Court of Tennessee presiding over his divorce found the Defendant in contempt (including instances of "willful contempt") of nearly a dozen separate conditions of the divorce, including (1) failing to pay child support; (2) allowing his child's health insurance to lapse and failing to pay non-covered medical expenses as ordered by the court; (3) failing to pay his child's tuition; and (4) concealing money from his ex-wife, including a failure to pay taxes. After an evidentiary hearing in the divorce matter, at which the Defendant provided testimony, the Court did "not find Mr. Young to be credible." (Exhibit F at 11). The Court found that "Mr. Young is concealing his income and that he has the ability to pay the amounts owed and that he has willfully violated the Orders of the Court and the terms of the [Marriage Dissolution Agreement.]" (Id.).

Following the May bond hearing, on the record, the Court reviewed the Bail Reform Act factors, *infra*, and "[a]fter hearing statements from witnesses and arguments of counsel, the Court found sufficient evidence to revoke the defendant's bond." (Doc. 81). The Defendant appealed that decision to the Sixth Circuit, which affirmed.

The Defendant was among the first defendants in the country to file a motion for release in light of the COVID-19 pandemic, citing the fact that he is on immunosuppression therapy due to a kidney transplant, claiming that remaining detained is a "death sentence," and again arguing that because he would no longer prescribe

5

controlled substances, he is not a danger to the community. Magistrate Judge York denied the motion. The Defendant filed the instant objections seeking reconsideration.

**Legal Standard**

Local Rule 72.1(g)(1) permits a district judge to reconsider a pretrial matter "where it has been shown that the magistrate judge['s] order is clearly erroneous or contrary to law." *Id.*[3] As for the detention decision at issue in this case, the law is as follows:

> Subject to rebuttal by the defendant, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community, if the judicial officer finds that there is probable cause to believe that the person committed, inter alia, –
>
> (A)   an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801, et seq.).

18 U.S.C. § 3142(e)(3)(A).

The Bail Reform Act sets forth the factors courts shall consider when determining whether "there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(g).  These factors include:

> (1)   the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2)   the weight of the evidence against the person;
>
> (3)   the history and characteristics of the person, including –
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse,

---

[3] Section 3145(b) may be an alternative basis for getting before the Article III judge, but even considering the issue *de novo,* the defendant should remain detained.

6

criminal history, and record concerning appearance at court proceedings; and

    (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, state, or local law; and

    (4)    the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Subsection (i) provides that "a judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." *Id.* § 3142(i).

### **Argument**

The crux of the Defendant's argument is that the Magistrate Judge failed to appreciate the danger to the Defendant posed by COVID-19 at the West Tennessee Detention Facility (the "Facility") where he is being housed (Doc. 156-1 to 156-4). In support of his argument to the Magistrate Judge, the Defendant attached four unsworn declarations (not affidavits as they are characterized in his motion), which constitute the Defendant's only evidentiary showing. The United States first generally addresses some of the factual and legal issues related to the Defendant's requested relief, and then specifically addresses the objections raised in his "Amended Appeal." (Doc. 162).

1. *Detention Remains Appropriate, Even in Light of the Pandemic.*

First, the Defendant's argument does not address the legal standard governing conditions of release pre-trial. The rebuttable presumption applies in this case. Defendant

Young is charged with a conspiracy to distribute controlled substances that carries a maximum sentence of twenty years. 21 U.S.C. § 841.

Neither should this Court re-open an already robust detention hearing record, but should instead rely upon its previous ruling. At least one Court in this jurisdiction has found that "the advent of the COVID-19 Pandemic does not have a 'material bearing' on this court's previous determination that [a defendant] should be detained and does [not] warrant changing the court's previous determination." Order, *United States v. Fields*, Case No. 2:15-cr-20216 (W.D. Tenn. April 6, 2020), R. 86, PageID 152. Likewise, here, none of the factors for consideration has changed since the Defendant was detained. To be sure, the Court may consider the "person's…physical and mental condition." 18 U.S.C. § 3142(g)(3)(a). However, the Defendant's condition has not changed since the initial hearing; he was taking immunosuppressants when he was remanded. There has always been the potential for the spread of infectious disease in a detention facility. Yet, despite the proliferation of influenza, colds, sinus infections, and other common ailments to which his immunosuppression allegedly makes him vulnerable, the Defendant has not asked to be placed in medical isolation. In light of the present pandemic, however, on its own initiative, the Facility segregated the Defendant into a protected cell block as explained below.

Neither is COVID-19 "another compelling reason" to release this Defendant under Section 3142(i). As set forth below, there is no reason to believe this Defendant is at more risk inside the Facility. COVID-19 is also spreading rapidly *outside* prison walls where the weight of the evidence demonstrates the Defendant is prone to engage in alcohol and drug use, as well as prolific sexual activity with multiple partners. These partners include

8

(purported) patients at his (purported) primary care clinic; demonstrating little regard for his alleged susceptibility to infectious disease.

Moreover, in a recorded call from the Facility to his father on March 22, 2020, the Defendant previewed his intention to engage in even more risky behavior if released. He expressed his frustration that so many doctors were "locked up" when they could be out treating patients with COVID-19. His father observes, "but you wouldn't need to be treatin' it anyway." The Defendant responded that he'd have "PPE" (personal protective equipment) and he'd "much rather die, you know, fightin' the front lines" than "locked in with it."[4] Exhibit E, attached.

Meanwhile, the Bureau of Prisons and the Facility (where Defendant is being housed) have taken measures in response to the recent spread of COVID-19. Of particular relevance to the Defendant, high risk inmates who have not been exposed to the virus were identified and segregated to a single housing unit together. The Defendant was moved to this cell block on or about March 26, 2020. Dedicated corrections officers serve that unit; the same three to six officers are always assigned to that single cell block, and repeat shift after shift. Access to this cell block is otherwise limited. The assigned officers are also equipped with PPE, including N-95 masks, which they don upon entering the segregated cell block. More detail about these procedures are set forth in Exhibit A and B, attached.

However, the Defendant does not even take advantage of the measures in place to protect him. Inmates in his protected cell block were issued masks, but as shown

---

[4] An even more disturbing aspect of this call is the Defendant's stated intention to continue practicing medicine generally, which was a substantial component of his risk to the community in the first place.

below, the Defendant wears his mask only intermittently, and does not observe social distancing recommendations. The following screenshot is from video surveillance inside the Facility:



*4/13/2020, 1:43:23 PM The Defendant is on the right, less than six feet away from another inmate not wearing a mask.*

In addition, if an inmate must be further medically isolated, the West Tennessee Detention Facility is equipped with a medical isolation unit. The medical isolation unit consists of two "negative pressure" medical isolation cells.  This is important because in one declaration submitted by the Defendant, Dr. Jaimie Meyer admits that "specialized negative pressure rooms" are an exception to her opinion that "isolation….is an ineffective way to prevent transmission of the virus." Dr. Meyer notes that such negative pressure rooms are "rarely in medical units if available at all." But they *are indeed* available at this Facility.

In further contrast to the Defendant's representation in his hearing before Judge York, inmates in medical isolation are not housed together with potentially-infected inmates. Instead, they are housed alone in a cell that has four walls and a solid door that closes, with only a flap to pass through a tray of food, which is handled by a specially-assigned correctional officer.  Inmates in medical isolation are allowed contact only with

10

medical professionals equipped with PPE, who dispense medication. According to the Facility, the inmate would never have to leave that cell, and would be isolated from all other inmates and staff. Although these limited resources may not necessarily be available to someone who is otherwise healthy, medical isolation would be available if it became appropriate for the Defendant.

Finally, even apart from the segregation cell block and isolation units, the Bureau of Prisons is implementing modified operations to maximize social distancing in its facilities, including staggering meal and recreation times in order to limit congregate gatherings.[5] For its part, the Facility where the Defendant is housed has taken the following additional measures to minimize the threat of COVID-19 (Exhibits B and D):

- Social visits are suspended.

- All inmate internal movement is suspended, with a few exceptions one of which is movement for medical reasons.

- Legal visits are suspended, but case-by-case approval are allowed.  If approved for an in-person visit, the attorney will undergo advanced health screening.

- Official staff travel is suspended.

- Contractor access is suspended, except for contractors performing essential functions.  Essential contractors will undergo advanced health screening.

- Enhanced health screening of staff will be implemented.

- All newly-arriving inmates are screened for COVID-19 exposure risk factors and symptoms.  Asymptomatic inmates with exposure risk factors are quarantined.  Symptomatic inmates with exposure risk factors will be isolated and tested for COVID-19.

---

[5]Federal Bureau of Prisons, BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp.

- The Facility has taken measures to promote good health habits, conduct environmental cleaning of "high touch" areas, create social distance between people, and provide ongoing infection control education (E.g., Exhibit C).

None of the four unsworn statements submitted by the Defendant addresses any specific condition at the Facility or any of the measures the Facility has taken. Instead, these statements were apparently created for a different defendant in a different case, and speak to general conditions at immigration detention facilities in another state; not the Facility at issue here. The Declaration of Dr. Greifinger relates to immigration detention facilities and opines that the risk of "infectious spread" is heightened in such facilities because "[p]eople live in close quarters and cannot achieve the 'social distancing' needed to effectively prevent the spread of COVID-19." The Declaration of Dr. Stern notes that the "increased danger" for the spread of COVID-19 is related to "congregate environments, i.e., places where people live and sleep in close proximity. (Dec. Stern ¶7). But, as reflected in the bullets above, BOP accounts for that. The Declaration of Dr. Beyrer notes that "overcrowding, population density, insufficient ventilation, shared toilet, shower, and eating environments and limits on hygiene and personal protective equipment" are features of detention facilities that can "heighten risks for exposure." (Dec. Breyer ¶ 14). Again, the Facility's measures – including quarantine blocks and state-of-the-art isolation cells – specifically account for those issues.

Therefore, the Magistrate's Order was not clearly erroneous.

2. *The Defendant's Objections Lack Merit.*

Based on the foregoing, there is no reason for the Court to supplant the measures BOP and the Executive Branch are taking to deal with this issue, particularly when the Defendant has not exhausted remedies (both procedural and medical) available to him

presently through those channels. In addition, the Defendant's specific objections are addressed in turn below:

1. The Order was not clearly erroneous with respect to the lack of COVID-19 cases. At the time of the Order, there were no confirmed cases. At the present time, there are confirmed cases, but each of them appeared *after* the Defendant and other immunosuppressed inmates were segregated as explained above.[6] Regardless, the fact that the disease exists at the Facility does not change the analysis under the Bail Reform Act for the reasons set forth in the Order and above.

2. The Order was not clearly erroneous in its statement that the Facility was taking steps to prevent the risk of infection. As explained above, the Facility is taking extensive measures to prevent the risk of infection; but the Defendant is failing to do his part to remain safe. The Defendant also argues that the "affidavits" in the record support the notion that the Facilities' measures are futile. The unsworn declarations in the record are inapposite for the reasons set forth above.

3. The Defendant's assessment of the law in this area is also incorrect. The "vast weight" of cases across the country (or even in this district) *have not* released inmates due solely to COVID-19. *See, e.g.,* Order, *United States v. Isbell*, Case No. 1:20-cr-10002 (W.D. Tenn. March 20, 2020), R. 31, PageID 80 (denying

---

[6] The undersigned has recently learned that testing materials are in limited supply, so it is possible that there are more cases than the testing allows the Facility to confirm. However, anyone showing symptoms is segregated and tested, and there have been no symptoms in the segregated units where the Defendant is housed.

13

defendant's motion for reconsideration of his order of detention—despite the defendant's health issues of diabetes, COPD, congestive heart failure, and bullous lung disease, because the § 3142(g) factors remained the same and because the Facility has taken various precautions to prevent the spread of COVID-19); Order, *United States v. Fields*, Case No. 2:15-cr-20216 (W.D. Tenn. April 6, 2020), R. 86 (Denying release); see also *United States v. Porter*, No. 19-20115, 2020 WL 1847988, at *4 (E.D. Mich. Apr. 13, 2020) (Denying Defendant's Motion, acknowledging ".[m]any other district courts also have recently considered arguments citing the COVID-19 epidemic as a basis for pre-trial release" and noting that "the risk of contracting COVID-19 is not the sole determinant of whether detention is appropriate." (internal citation and quotation omitted) (citing, e.g., *United States v. Woods*, 4:19-cr-20112 (E.D. Mich. March 28, 2020) (ECF # 258 at 9) ("the COVID-19 pandemic cannot be the sole basis for releasing a defendant from custody pending trial; the Court must still consider the Section 3142(g) factors."); *United States v. Gileno*, 3:19-cr-00161 (D. Conn. March 19, 2020) (ECF # 28) (denying motion to amend sentence to allow for early release where defendant had not "shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic ... or that the facility is specifically unable to adequately treat" him.)

4. Even if this Court were to consider the "compelling reason" criteria set forth in 18 U.S.C. § 3142(i), the scenario here does not qualify for all of the reasons set forth above.

5. Defendant argues that his case is distinguishable from *Martin, supra*, because Martin had an extensive criminal history and previously violated his release. But Defendant Young has an extensive history of violent behavior (*e.g.*, the "rape video" cited by the Defendant himself, and threats to himself and others), the long-term white-coat drug dealing described in the Indictment and expounded upon at the detention hearing before the Court, and disregard for court orders (*e.g.*, Young's history of civil contempt in Family Law court, *see* Transcript of Detention Hearing, Day No. 1 at 136:3-16 & Gov. Ex. T) and Board admonitions and orders, as described above. Those reasons, which informed the Court's original decision to detain him, remain intact.

6. Attorney General Barr's guidelines to reduce the prison population was directed at the Bureau of Prisons – not the Department of Justice or the Courts – and provides that the BOP ought to make its own efforts to determine which inmates should be released.[7]

---

[7] The inmate-by-inmate decision about who to release in response to the COVID-19 crisis rests principally with the Bureau of Prisons. As one court in this district has noted, "while Congress has passed legislation in response to the COVID-19 pandemic, Congress has not, as of yet, specifically authorized the judiciary to release 'high risk' detained or otherwise confront the potential issue." Order, *United States v. Isbell*, Case No. 1:20-cr-10002 (W.D. Tenn. March 20, 2020), R. 31, PageID 80 (denying defendant's motion for reconsideration of his order of detention—despite the defendant's health issues of diabetes, COPD, congestive heart failure, and bullous lung disease, *see* Mot. (W.D. Tenn. Case No. 1:20-cr-10002), R. 23, PageID 40—because the § 3142(g) factors remained the same and because the Facility has taken various precautions to prevent the spread of COVID-19). Finally, the segregation and disease prevention measures discussed herein are more likely to protect the Defendant from COVID-19 than his own likely behavior if released.

7.  The Magistrate Judge was not clearly erroneous in his application of the Bail Reform Act to this case. Attorney General Barr's guidelines did not change the Bail Reform Act or adjust the power of the judiciary.

8.  The Magistrate Judge was not clearly erroneous in considering the Defendant's history of making physical threats through media such as Facebook in declining to release him. The government is not seeking a "death sentence out of this indictment." (Dkt. 162 at 3.) Instead, it is seeking the continued detention of an inmate with a history of disregarding court orders, harming the public, and engaging in criminal activity that carries a rebuttable presumption of detention.

9.  The Magistrate Judge was not clearly erroneous in considering the precautions that the Facility has taken to prevent the spread of COVID-19 in its facility. Those precautions are listed here, and directly address the concerns raised by the Defendant in his attached declarations.

10. The Magistrate Judge's conclusion (at the time of his Order) that "there has been no proof that COVID-19 has been confirmed at the facility" was entirely factually correct and the Defendant presents no evidence to the contrary.

**<u>Conclusion</u>**

In sum, the fact that a new virus exists in the world is not grounds for the release of every prisoner in the United States with a preexisting condition. The Defendant has not shown that his case is meaningfully distinct from the rest of that population; he has not pursued remedies available to him through the appropriate channels described above; and he has not shown that the Magistrate Judge's decision was clearly erroneous.

Therefore, his motion for release should be DENIED.

Respectfully submitted,

<u>/s/ Katherine Payerle</u>
Katherine Payerle
Trial Attorney
U.S. Department of Justice
(202) 341-4227
<u>Katherine.payerle@usdoj.gov</u>

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was electronically filed through ECF on April 24, 2020.

                                         */s/ Katherine Payerle*
                                         Katherine Payerle
                                         Trial Attorney