IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                    No. 1:19-cr-10040-JDB-1

JEFFREY W. YOUNG, JR.,

    Defendant.
_____

ORDER DENYING DEFENDANT'S APPEAL OF MAGISTRATE JUDGE'S ORDER ON
RELEASE TO HOME CONFINEMENT
_____

*INTRODUCTION*

In an order entered March 25, 2020, United States Magistrate Judge Jon A. York denied the emergency motion of the Defendant, Jeffrey W. Young, Jr., for release to home confinement in this matter. (Docket Entry ("D.E.") 158.) Pending before the Court is Defendant's appeal of the magistrate judge's order, as amended (D.E. 162), to which the Government has responded (D.E. 164).

*BACKGROUND*

In April 2019, as part of a coordinated effort by United States Attorneys and the Department of Justice Appalachian Regional Prescription Opioid Strike Force to fight the opioid crisis, indictments were brought against several medical doctors and nurse practitioners in West Tennessee. https://www.justice.gov/usao-wdtn/pr/us-attorney-dunavant-along-federal-state-and-local-partners-continue-efforts-combat (last visited May 17, 2020). Young is a nurse practitioner who operated and part-owned a clinic in Jackson, Tennessee. In an indictment dated April 15,

2019,[1] he was charged with conspiracy to unlawfully distribute and dispense controlled substances in violation of 21 U.S.C. § 846, unlawfully distributing and dispensing controlled substances to a pregnant woman in contravention of 21 U.S.C. §§ 841(a)(1) and 861(f), unlawfully distributing and dispensing controlled substances in violation of § 841(a)(1), and maintaining a drug-involved premises in violation of 21 U.S.C. § 856(a)(1).  (D.E. 4.)  According to the indictment, Young, through his clinic, issued prescriptions for controlled substances, including Schedule II controlled substances Oxycodone, Hydrocodone, and others, and Schedule IV controlled substances Alprazolam, Diazepam, Clonazepam, and others, outside the course of professional practice and without a legitimate medical purpose.  The motivation for these activities, according to the Government, was often to obtain money, status, notoriety, and sexual favors.

  The indictment outlined the following alleged behavior on the part of Defendant.  Young promoted his practice under the motto "work hard, play harder" and branded himself as the "Rock Doc" in accordance with his affinity for the rock 'n roll lifestyle.  He treated patients while intoxicated with alcohol, marijuana, and other substances; freely prescribed controlled substances to friends and family; and promoted the use of illicit drugs, including marijuana.  Young used his power to prescribe controlled substances to promote a television pilot and podcast and to have sex with women, including those who were his patients.  He ignored state guidelines for prescribing substances as well as the inherent risks associated with dispensing highly addictive drugs, independently and in combination.  The Defendant prescribed Hydrocodone, Oxycodone, and Alprazolam to a pregnant patient for no legitimate medical purpose, after which her child was born addicted to opioids with Fetal Abstinence Syndrome.

---

[1]Also named in the indictment were medical doctors Alexander Alperovich and Andrew Rudin, who acted as supervising physicians for the Defendant.

A pretrial services report filed April 18, 2019, indicated that Young, who was forty-five years old at the time of the report, underwent a kidney transplant in 1992 and had since taken daily antirejection medication. (D.E. 23.) His criminal history consisted of charges of battery/domestic violence in 2011, which was nolle prossed in 2012, and simple assault in 2016. The latter charge involved the assault of a woman resulting in bruising to her back, side, thighs, forearms, and buttocks. The disposition of this charge was unknown.

At a detention hearing conducted the same day, Judge York heard testimony from DEA Special Agent John Tankersley and received documentary evidence on behalf of the Defendant in the form of a November 2018 Tennessee Health Related Boards agreed order in which Young's nursing license was restricted for two years. During that period, he was prohibited from prescribing certain substances. It was represented to the magistrate judge that the order mitigated Defendant's risk of harm to the community and that his current practice was "mostly cosmetic." On that basis, Judge York released Defendant on a $5,000 unsecured bond with conditions. (D.E. 26-28.)

After further investigation into his practices, however, the Government, on May 2, 2019, moved to revoke Young's bond, claiming that, even on a restricted license, he continued to prescribe addictive substances to drug-seekers. (D.E. 58.) On May 13 and 20, 2019, this Court conducted a hearing on the motion (D.E. 74, 79), during which it received voluminous testimony of, among other things, numerous social media postings by the Defendant containing threats to and harassment of various individuals, including patients, and photographs of himself in an intoxicated condition; intimidation of state investigators; so-called "curbside consults" in which Young prescribed controlled substances to individuals with whom he did not have a client-provider relationship; Defendant's encouragement to patients to use marijuana; his sexual activities with

3

female patients in exchange for prescriptions for controlled substances; allegations by a woman who claimed he raped her at a party at his home; a video of Defendant having sex with a semi-conscious female who appeared to be under the influence of drugs or alcohol; Young obtaining information concerning various individuals and ongoing matters from law enforcement officers to whom he was prescribing controlled substances; and Defendant holding a gun to his head and threatening suicide.  The Court revoked bond, finding that, based on the danger posed to the community by Defendant as evidenced by the foregoing, there were no conditions or combination of conditions that would assure the safety of the community by his continued release.  (D.E. 81, 97.)  The Sixth Circuit affirmed the Court's order on appeal.  (D.E. 131.)

On March 12, 2020, Defendant filed his emergency motion for release to home confinement in light of the risks associated with COVID-19.  (D.E. 152.)  In January 2020, the World Health Organization ("WHO") advised of the detection of a novel coronavirus in Wuhan City, Hubei Province, China.  https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200121-sitrep-1-2019-ncov.pdf?sfvrsn=20a99c10_4 (last visited May 11, 2020).  On March 11, 2020, the WHO declared the disease, by then labeled COVID-19, a global pandemic.  https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10 (last visited May 11, 2020).  Two days later, President Donald J. Trump issued a proclamation stating that the COVID-19 outbreak constituted a national emergency.  Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

In his motion, Young argued that his immunosuppressive antirejection drug therapy placed him at increased risk of complications or death should he contract the virus.  The Government opposed the relief sought.  (D.E. 153.)  As the Defendant had raised new issues not considered by the magistrate judge in his initial detention hearing, the undersigned, on March 20, 2020, referred

the request to Judge York for consideration. (D.E. 154.) The magistrate judge, after conducting a hearing by telephone on March 25, 2020 (D.E. 157), issued an order denying the motion (D.E. 158). The instant appeal followed.

## *ARGUMENTS OF THE PARTIES AND ANALYSIS*

The Bail Reform Act (the "Act"), 18 U.S.C. § 3141 *et seq.,* governs the release or detention of a defendant pending trial. Section 3145(b) of the Act permits a person ordered detained by a magistrate judge to file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the detention order. 18 U.S.C. § 3145(b). The district court's review under § 3145(b) is de novo. *United States v. Palazzola*, Case No. 19-20235, 2020 WL 1984116, at *1 (E.D. Mich. Apr. 27, 2020); *United States v. Davis*, No. 2:19-CR-00196-1-JRG-CRW, 2020 WL 1977219, at *2 (E.D. Tenn. Apr. 24, 2020); *United States v. Shelton*, Criminal Action No. 3:19-cr-14, 2020 WL 1815941, at *2 (W.D. Ky. Apr. 9, 2020). "A de novo review requires the district court to give fresh consideration to the issues before it." *Davis*, 2020 WL 1977219, at *2 (quoting *United States v. Raddatz*, 447 U.S. 667, 675 (1980)) (internal quotation marks omitted). "[T]he court is free to use in its analysis any evidence or reasons relied on by the magistrate judge, but it may also hear additional evidence and rely on its own reasons." *United States v. Lee*, Civil Action No. ELH-19-159, 2020 WL 1974881, at *5 (D. Md. Apr. 24, 2020) (internal quotation marks omitted). The Act is silent on the issue of whether a hearing is required on an appeal of a detention order, but "there is ample authority for the conclusion that the [district court] may decide the motion on the filings (including proffers offered by counsel) as opposed to a hearing." *United States v. Hearns*, Case No. 1:20-CR-110, 2020 WL 1493747, at *3 (N.D. Ohio Mar. 27, 2020). The Court will determine the instant appeal on the filings without a hearing.

In denying release based on COVID-19, Judge York concluded that Young had failed to demonstrate how his medical condition and the spread of the disease would alleviate the specific concerns of the undersigned which formed the basis for the May 2019 bond revocation. Specifically, he found that, although Defendant's condition might reduce the likelihood that he would leave the home of his father, at which he planned to reside if released, it would not preclude him from engaging in threatening behavior by way of social media platforms and other electronic means. Judge York also took note of the Government's description of the precautions taken at West Tennessee Detention Facility in Mason, Tennessee ("WTDF"), where Young was housed, regarding COVID-19 and the fact that no cases of the disease had yet been confirmed at the facility.

On appeal, Defendant questions the ability of WTDF to contain the virus and challenges the denial of release to home confinement pending trial as a "death sentence." He also submits that the disease and its potential effect on his compromised immune system should he become infected constitute compelling reasons for release under 18 U.S.C. § 3142(i).

Young's concerns about WTDF's ability to deal with the threat it currently faces are not unfounded. Courts have recognized that "prisoners with chronic medical problems face serious risks to their health during this pandemic." *United States v. McGlory*, 2:17-cr-20489, 2020 WL 1905719, at *2 (E.D. Mich. Apr. 17, 2020) (quoting *Basank v. Decker*, No. 20 Civ. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020)) (internal quotation marks omitted). It is also without doubt that "correctional facilities are in general ill-suited to prevent outbreaks and mitigate their spread." *Lee*, 2020 WL 1974881, at *7. The Centers for Disease Control and Prevention has identified certain groups that are at higher risk for severe illness from the novel coronavirus, including those over the age of sixty-five; those living in nursing homes or long-term care facilities; and anyone suffering from underlying medical conditions including chronic lung

6

disease, moderate to severe asthma, serious heart conditions, severe obesity, diabetes, chronic kidney disease with dialysis treatment, and liver disease, as well as those who are immunocompromised. https://www.cdc.gov/coronavirus/2019-ncov/faq.html#Higher-Risk (last visited May 11, 2020). Thus, as a kidney transplant recipient taking immunosuppressant drugs, Young appears to fall into the higher risk category.

While there may have been no confirmed cases of the coronavirus at WTDF at the time of the hearing before Judge York, that is no longer the case. COVID-19 has breached WTDF. According to the United States Marshal Service ("USMS"), there are now multiple confirmed cases of the disease at the facility. However, "the mere presence of the virus, even in a detention setting, does not automatically translate to the release of a person accused." *United States v. Ford*, Case No. 2:20-CR-51, 2020 WL 1921209, at *6 (S.D. Ohio Apr. 21, 2020) (quoting *United States v. Andrewsh*, No. 5-19-mj-0087, 2020 WL 1904473, at *6 (M.D. Penn. Apr. 17, 2020); *United States v. Williams*, No. PWG-19-8, 2020 WL 1643662, at *2 (D. Md. Apr. 2, 2020)); *see also Lee*, 2020 WL 1974881, at *8 ("Simply put, the coronavirus is not tantamount to a 'get out of jail free' card.").

Defendant draws the Court's attention to four declarations of medical professionals in Connecticut, Maryland, New York, and Washington, in which they opined generically on the dangers of COVID-19 to prison populations. The declarations are of little assistance to the Court in this case, however. None reflect that the declarants had examined Young or even know who he is, or that they had ever so much as darkened the door of WTDF. *See Ford*, 2020 WL 1921209, at *1 (court found declaration from California doctor "who has absolutely no connection to this case generically opining on the risk of COVID-19 transmission in jails" irrelevant to case before it, as she did "not aver that she has ever set foot in, or performed specific research on, the Jackson

7

Pike facility where Mr. Ford is being detained"). Indeed, some of the declarations specifically address immigration detention facilities in New York and Washington State.

Returning to the facility at hand, the WTDF has taken numerous steps to mitigate risks to inmates and staff. The Court has been advised by the USMS that over 500 inmates and all staff at WTDF have been tested. All units at the facility have begun operating on a quarantine plan; specific protocols for staff/inmate screening, cleaning, and distancing of inmates have been put in place; and visitation, programming, and all but essential outsider access have been curtailed. With respect to Young in particular, the Government states in its response to the appeal that WTDF officials moved him into a segregated cell block for high risk inmates on or about March 26, 2020, prior to the date on which confirmed cases appeared at the facility, where heightened protective protocols were followed, including the provision of masks to inmates.

However, it does not appear the Defendant is making an effort to keep himself safe in this environment, notwithstanding his alleged fear of infection. In a screenshot taken from a prison video surveillance camera dated April 13, 2020, Young can be seen standing in the open doorway of a cell, without a mask, looking toward another inmate some two or three feet away who is walking in his direction, also maskless.

In addition to considering the situation inside the detention facility, the Court is likewise cognizant of the consequences of Defendant's presence outside the WTDF should he be released to home confinement. It may well be that Young has already been exposed to COVID-19 during his detention. While he has offered no information concerning the age or health conditions of his father, the Court assumes he is over the age of sixty-five, which places him in a higher-risk category as well. Releasing Defendant to his residence would place him, as well as anyone with

whom he comes into contact, at risk of contracting the virus. *See id.* at *7 (court noted concern that defendant's aunt, with whom he planned to live on release, could contract the disease).

Further, the limited resources of pretrial services are already strained because of the current conditions. As the *Ford* court observed,

> [s]upervising a high-risk offender out in the community will place pretrial services officers at a heightened risk of contracting the virus. Ford seeks release at a time when Pretrial Services Officers across the country are teleworking in shifts and seeking to minimize physical contact with defendants to reduce the risk of viral transmissions. The court finds this is a significant disadvantage when seeking to monitor defendants requiring intense supervision, as Ford would require.

*Id.* (quoting *Andrewsh*, 2020 WL 1904473, at *31) (brackets omitted).

Moreover, it appears to the Court that Young, if released from WTDF, has no intention of remaining confined at his father's home. Pursuant to an audio recording of a telephone call between Defendant and the elder Young during his detention, the following exchange occurred:

| Father: | Yeah, well you wouldn't need to be treatin' it [COVID-19] anyway. |
|---|---|
| Defendant: | Well, but, I mean, at least I'd have [personal protective equipment ("PPE")], and I'd much rather die, you know fightin' the front lines, like you know being the eighteen year old kid, World War Two, beggin' to go to war. |
| Father: | Right, right. |
| Defendant: | You know, much rather die, you know, out there fightin' it, than, you know, dyin' locked in with it. |

(D.E. 164-5 at PageID 2566.) A defendant unable to comply with conditions of release poses potential risks, not only to pretrial services officers, but to "law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties . . . and others if that individual is taken back into custody." *Ford*, 2020 WL 1921209, at *7.

As noted above, Defendant also argues that his medical condition constitutes a "compelling reason" for his pretrial release under 18 U.S.C. § 3142(i). The statute permits the court to order

9

"temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).  Section 3142(i) "presumes that a [c]ourt has already determined that the defendant must be detained pending trial . . . but permits a subsequent order for release to the 'custody of a United States marshal or another appropriate person' for the two limited reasons of defense preparation or other compelling reason." *United States v. Brown*, Criminal Action No. 3:19-CR-00131-GNS, 2020 WL 1914818, at *2 (W.D. Ky. Apr. 20, 2020).

Some district courts in this Circuit have utilized a four-part test to determine whether COVID-19 qualifies as a "compelling reason" for release:

(1) the original grounds for the defendant's pretrial detention;

(2) the specificity of the defendant's stated COVID-19 concerns;

(3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant; and

(4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others.

*Palazzola*, 2020 WL 1984116, at *2; *United States v. Turner*, 5:19-CR-00037-TBR-4, 2020 WL 1943024, at *2 (W.D. Ky. Apr. 22, 2020); *Ford*, 2020 WL 1921209, at *5-6.  The burden of demonstrating a compelling reason under subsection (i) falls on the defendant.  *Brown*, 2020 WL 1914818, at *2.  While this test is not binding on the undersigned, it does provide some guidance to the Court.

With respect to the first factor, this Court detained Defendant based upon its finding, in light of significant evidence, that he was a danger to the community, which was upheld by the

10

Sixth Circuit. In the instant appeal, the Defendant offers nothing to suggest that COVID-19 lessens that danger. This factor weighs in favor of continued detention.

As for the second, Young has raised specific concerns posed to him by the pandemic, namely, his compromised immune system. In addition, as noted above, there are now cases of the virus at WTDF. While these facts would appear to cause this factor to lean toward release, the Court may also consider the measures in place at the facility of detention to mitigate the risk of exposure. *United States v. Chandler*, No. 3:19-CR-160-TAV-HBG, 2020 WL 2188637, at *6 (E.D. Tenn. May 5, 2020). In addition to those outlined above, the Government advises the Court that the WTDF is equipped with a medical isolation unit which consists of two negative pressure medical isolation cells. Such cells are limited to one inmate and have a solid door that closes and a flap through which a specially assigned officer can pass a food tray. Medically isolated inmates have contact only with medical professionals equipped with PPE who dispense medication. The Government further informs the Court that Defendant has not requested placement in the medical isolation unit. Although Young unquestionably has a heightened risk of serious complications should he contract the virus, he has not established how the measures now in place and available at the WTDF are insufficient to mitigate his chances of exposure.

The third factor also weighs in favor of detention. "In the context of COVID-19, . . . the proposed temporary release plan should be tailored to mitigate the defendant's overall COVID-19 risks, not exacerbate them." *Brown*, 2020 WL 1914818, at *5. Defendant has not proposed any release plan, much less one tailored to mitigate any risk to him caused by the pandemic. Indeed, he is just as likely, if not more so, to contract the disease if he goes out and "fights" it as he told his father he would if released than he would under the protocols instituted at WTDF. *See id.* (third factor weighed against release where defendant failed to provide a release plan "other than

11

seeking release on bond" or to "articulate how his release will mitigate any risk to him posed by the COVID-19 pandemic because he would be at risk of exposure while free on bond as well"); *see also Palazzola*, 2020 WL 1984116, at *3 (factor favored continued detention where court found that he "may very well end up in more danger of exposure -- and exposing others -- than if he were to remain in jail").

The fourth factor also favors continued detention. In considering this factor, it is appropriate to consider the likelihood that the defendant's proposed release plan would increase COVID-19 risks to others, particularly if the defendant is likely to violate conditions of release. *Chandler*, 2020 WL 2188637, at *7. Young's statement to his father about going out and fighting the disease comes back to haunt him here as well. Fighting the disease would necessitate being in contact with those infected, which would endanger his father. Considering that Young has chosen to not wear a mask or practice social distancing consistently in jail, the Court has no reason to assume he would follow protective measures on the outside where he would not be subject to constant monitoring. *See id.* ("Moreover, the Court notes that Defendant Chandler has not taken advantage of protective measures available to him at the jail, such as wearing a mask.").

Thus, the § 3142(i) factors weigh against placing Defendant on pretrial release. Moreover, he has offered nothing to the Court to show that he does not remain a serious danger to the community. The appeal is, therefore, DENIED. Defendant shall be detained pending trial.

IT IS SO ORDERED this 18th day of May 2020.

s/ J. DANIEL BREEN<br>
UNITED STATES DISTRICT JUDGE