UNREDACTED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

---

UNITED STATES OF AMERICA )
)
VS )NO.1:19-cr-10040
)JACKSON, TENNESSEE
)
ALEXANDER ALPEROVICH, )
JEFFREY W. YOUNG, JR., and
ANDREW RUDIN

---

REPORT DATE

MAY 21, 2020

BEFORE THE HONORABLE J. DANIEL BREEN,

UNITED STATES DISTRICT JUDGE

KRISTI HEASLEY, RPR
OFFICIAL COURT REPORTER
U.S. COURTHOUSE, SUITE 450
111 SOUTH HIGHLAND AVENUE
JACKSON, TENNESSEE 38301

APPEARANCES

FOR THE UNITED STATES:

KATHERINE PAYERLE, ESQ.
U.S. DEPT OF JUSTICE
1400 New York Avenue NW
Washington, DC 20530

FOR THE DEFENDANT ALPEROVICH:

STEPHEN ROSS JOHNSON, ESQ.
RITCHIE DILLARD DAVIES & JOHNSON
606 West Main Street
Suite 300
Knoxville, TN 37902

FOR THE DEFENDANT YOUNG:

CLAIBORNE HAMBRICK FERGUSON, ESQ.
CLAIBORNE FERGUSON LAW FIRM
294 Washington Avenue
Memphis, TN 38103

FOR THE DEFENDANT RUDIN:

NISHAY K. SANAN, ESQ.
ATTORNEY AT LAW
53 W. Jackson, Suite 1424
Chicago, IL 60604

EXAMINATION INDEX

NO TESTIMONY OFFERED

EXHIBITS

NO EXHIBITS MARKED

THE COURT: All right. This is in the matter of U.S. versus Jeffrey Young, Dr. Alperovich and Dr. Rudin, 19-10040. We're here for a report date.

Just to give you a little bit of an update on kind of where we are as far as the courthouse is concerned. We are closed until the end of this month. We will -- as it stands, we will be opening in limited fashion on June 1st. Kind of a Phase I opening.

It does not entail jury trials yet. It's going to be more or less probably for matters like possibly some sentencings, change of pleas, initial appearances, things of that nature, but no trials yet. We're working on that; although, an official, I guess, protocol has not been established yet.

So all I can tell you right now is the court is working on it. And hopefully we'll have something relatively soon, but we don't have it yet.

But let's turn to this matter. Mr. Ferguson, just as an update, I think maybe your associate was here the last time that we did have a report date. You weren't here. And I, frankly, failed to make inquiry about the pending motion for change of venue in this matter, which I believe you had filed.

Is that still a matter that you wish to request? Or what is the status of that situation, sir?

MR. FERGUSON: It is, Your Honor, especially in light of the previous ruling by the Court this week that actually referenced social media postings, in that there are somehow pictures and photos of Mr. Young being distributed from the Madison County folks who have taken a interest and shine into making sure that he goes to jail.

Not really sure how they were able to get their hands on surveillance footage, what appears to be surveillance footage from the Federal Detention Facility. But it was just recently posted on one of the local websites that stirs up interest in this case that's located mostly in Madison County.

So I would --

THE COURT: I think actually -- I think -- if I may interrupt you.

I think actually the government may have attached that photograph to their brief in opposition to your client's request for --

MR. FERGUSON: If they did --

THE COURT: -- release.

MR. FERGUSON: -- somebody took it and put it online in the Jackson community.

THE COURT: I don't know. But I think that's where it came from originally. At least from my

standpoint.

MR. FERGUSON: Okay. Well, it's still a matter of public interest, and it's still generating substantial online discussion to the point where it's unfair.

THE COURT: Ms. Payerle, are you the only AUSA on here today, or is there other -- I don't think there is anybody else.

MS. PAYERLE: No, Your Honor, I'm the only one. We had read your order to say that only one of us should show up. So that's me.

THE COURT: Okay. I just wanted to make sure.

MS. PAYERLE: Yes, sir. Yes, sir.

THE COURT: We haven't met in a while, so -- on this case, simply because of your problems with the pandemic. But what -- I really have forgot.

But what is the government's position regarding a request for a change of venue?

MS. PAYERLE: Your Honor, the government doesn't oppose it and will leave it to the Court's wisdom.

THE COURT: Okay. Again, just simply because it's been a passage of time, I'll ask again.

Counsel for Dr. Alperovich. Is that

Mr. Ross Johnson?

MR. JOHNSON: Mr. Johnson.

THE COURT: Mr. Johnson. Okay. Mr. Johnson, what is the position -- I apologize.

What is your client's position in that matter?

MR. JOHNSON: Well, Mr. Massey and I, who also represents Dr. Alperovich, have conferred. And we are close to making a final recommendation to our client about that. We need to talk to him a little bit more about that issue.

Because, obviously, he's a well-respected cardiologist in the Jackson area. And his situation is a bit different than Mr. Young's. But we want to have just a little bit more time, Your Honor, to confer with our client.

And if you could give us perhaps a week or at most two weeks to file a notice with the Court on our position concerning the venue change.

THE COURT: What about Dr. Rudin's counsel? Is that Mr. Sanan?

MR. SANAN: Yes, Judge. Judge, we previously joined in the motion by Mr. Ferguson, and we still stand by that.

THE COURT: Okay. I apologize. Like I

said, it's been a while since we actually gathered and I just could not recall. So I appreciate reminding me of that.

Mr. Johnson, I'll give you a week. Obviously, we have plenty of time to give that consideration, so I think a week would be more than sufficient for that purpose.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: Presently the case is set in September, on the September 14th. To be blunt about it, I don't know how else I can say, I don't know even -- even if the Court granted the motion, I don't know whether it could go on that date or not. I don't know whether we'll be in a position to actually proceed to trial on that date, Mr. Ferguson and the other counsel. It's just unclear at this time.

Again, I know there is some support being done by a committee of my colleagues to try to establish protocols and things of that nature. But as you might image, you know, it's difficult, simply because of the -- we're trying to kind of coordinate working with the local health authorities and things of that nature. But we haven't set up any specific protocols yet. And so that's kind of where we are.

We can keep the date on that at that point

to see where we're going to be. But I can't guarantee you. I know that doesn't give anybody here on the, in the Skype, doesn't give you any solace about not knowing exactly where we're going to be going. But I just can't tell you.

We could put it off longer, but that may not be something everybody at least at this point is agreeable to. But by the same token, I can't guarantee that date is going to go.

MR. FERGUSON: Your Honor, if I may.

THE COURT: Yes, sir.

MR. FERGUSON: This is Mr. Ferguson for Mr. Young.

Obviously, this lockdown has been very difficult for us to prepare, since we've had no ability to communicate with him. And Mason just last week got one, I believe it's one, maybe more, iPads that are limited and having to be shared between panel attorneys and the Federal Public Defender's Office.

Most of the material that has been sent to Mr. Young has been in digital form. And because of the lockdown, because he's housed in K pod, because he's a high risk detainee, he has no access, at least for the last, I don't know, six weeks, two months, whatever it's been, has had no access.

A majority of the material has been digitized. This is a very, very extensive -- has a very extensive amount of documents and material that have to be gone through with Mr. Young.

So I know that he is feeling quite anxious about that. And I definitely agree with him. I join in with his angst at the difficulty of this lockdown at the facility has caused for he and I to meaningfully concur over his trial strategic. So I understand.

And having been setting a lot of trials in the western section, they are piling up fast. I know they're trying to give priority to in-custody clients. Obviously, one of those cases where Mr. Young's ability to assist counsel is probably much more important than it would be say in the normal run of the mill Title III drug conspiracy case, where it's either you're right on the street or you're on the pole camera or you're not.

This is a very nuanced form of a drug case that requires he and I to have adequate ability to have private attorney-client communication.

I say that, not asking for anything, I'm just saying that. I hear the Court saying that it's concerned about being able to keep that date. Depending on when we get people off lockdown at Mason, I'm not feeling real comfortable with that date either.

So I just wanted to go ahead and say that now while we're all together. Kind of let the group know that that's our issue right now.

THE COURT: Yes, sir.

MR. FERGUSON: Thank you, Judge.

THE COURT: Any other defense counsel wish to weigh in?

MR. JOHNSON: I would like to weigh in, Your Honor, on behalf of Dr. Alperovich.

I have severe concerns about this case being able to be tried in September, even in the absence of the pandemic situation that we're in right now.

And the fact that we're in a pandemic situation, and the Court is having to deal with those issues, just piles on top of some of the other things that we're having to deal with right now in this case.

We filed a, some discovery requests that's in the record. There is a fairly significant amount, I believe, of additional discovery materials that are still in the process of being produced.

If the Court will recall, when we had the report date back in November, which is the last time we were all together, one of the issues was all of the materials that were taken out of Mr. Young's clinic, which is the medical practice that's at issue in this

entire case, the electronic materials that were taken out and seized pursuant to search warrant. And those had not been produced yet. And the government was in the process of producing those to us in November.

We received those in December, and then received some supplemental materials after that, to include some cell phone images. And those are detailed in the discovery letter that's in the record for the Court.

And the government produced those materials in sort of the raw extraction form, without a way for to us review those absent manipulating it in some way or getting software to manipulate --

THE COURT: Mr. Johnson, excuse me just a second.

Is Mr. Young -- I don't see him. Mr. Young, are you still on the -- can you hear me, sir?

MR. JOHNSON: I think we lost him.

THE COURT: I think we have lost him. Sonya, can you check to see...

THE CLERK: Yes, sir. Give me just a moment, please.

THE COURT: Yes, sir. I just happened to look up, Mr. Johnson. If you will hold your thought there just a second.

MR. JOHNSON: I will.

THE COURT: Technology can be a wonderful thing, when it works.

(Pause in Proceedings.)

THE COURT: Are you having any luck?

THE CLERK: No, sir. I'm dialing into the facility now and no one is answering.

(Pause in Proceedings.)

THE CLERK: Judge Breen, I just had an officer answer the phone and said he would go to the room where Mr. Young is located and do a reconnection. It will take just a couple of minutes.

THE COURT: Okay.

FEMALE VOICE: Judge Breen, we are back on at Mason. I apologize for that. Our connection went down.

THE COURT: Okay. We're not getting any -- is Mr. Young there?

DEFENDANT YOUNG: Yes, sir.

THE CLERK: We don't have video on him yet.

THE COURT: We don't have video.

FEMALE VOICE: It's showing our picture on this side.

MR. SANAN: Judge, this is Mr. Sanan. I

can actually see Mr. Young.

MR. JOHNSON: I can too, Your Honor.

THE COURT: Okay.

MS. PAYERLE: I can as well.

THE CLERK: Ask Mr. Young to speak, please.

DEFENDANT YOUNG: Yes, ma'am. I'm here.

THE COURT: Okay.

DEFENDANT YOUNG: Can you hear me now?

THE COURT: We can hear you. There he is.

MS. PAYERLE: I believe, Your Honor, if I may, there is a little pin icon in the top right corner of the picture. And if click that, you should be able keep him up there.

THE COURT: There he is. He's on now. We've got him. All right.

Mr. Johnson, you were discussing about the discovery, some electronic discovery I believe. So hopefully you can pick up where you left off.

MR. JOHNSON: Thank you, Your Honor. Yes, sir. I'll pick up where I left off.

So the bottom line is those materials were provided in raw format or native format, and were not produced in a format where they had already been processed for searching.

And so we had a discovery conference that we organized with counsel for the government to discuss through some of these things. There were still certain items that had not been produced.

For example, we still, until just a few weeks ago, did not have the search warrant applications for the clinic that's at issue in this case. And we received a supplemental discovery production from the government, to include some of the cell phone materials.

I'll give you an example. One of which is the cell phone of the office manager for Mr. Young at the PreventaGenix Clinic, Ms. Christy Gutzgell (phonetic). But we got those. And I believe those materials, particularly salient for my client.

And then are awaiting production from the government of government's processed version of the electronic materials seized out of the clinic. And the processed version is, in essence, a breaking open of the raw image files that were copied from the electronic materials. And so that way the material can be viewed and reviewed.

But something else the government is in the process of doing is giving us an e-discovery load file. Because we found out that what the government is doing -- and they apparently may have already created it.

But they have created an e-discovery database in this case so they can search through these materials.

We are in the process, if we do not resolve these issues among the parties, we are in the process of having to raise some of these issues with the Court. I'm not raising them right now, but I am letting the Court know that that could be forthcoming.

Another example is the government made expert disclosures in April, and has made some supplemental disclosures concerning the experts. And I have some concerns about the completeness of those disclosures under the rules.

And once again, if we cannot resolve those issues among the parties, then we'll have to address those with the Court.

I think a significant issue is going to be, if the government a year after indictment, or close to a year after indictment, is in the process of databasing these materials, then that creates a real concern for us to have equal access and ability to review the materials consistent with Rule 16.1 and the e-discovery principles that can apply in criminal cases of this nature.

So I'm really just bringing that to the Court's attention so we can think a little bit about

scheduling here. And so if we are getting ready to get the raw materials that from my count are from at least 15 different electronic devices that were seized out of this medical clinic, I don't know how I can go through all of that, and the phones that were imaged, and perform the necessary defense function of following up on any leads concerning those materials, integrating those materials into the defense theory, determining what we would use, what we would not use, all of the critical functions of defense in the case, and much less prepare for and conduct any hearings, and to include pre-trial motions that are resultant from those materials.

And we are at the end of May now, closing in on the end of May, so effectively that's June, July and August, 3 months, if I had the materials now, and I don't have them yet, to get ready for a complex trial, that from our client's perspective turns on a lot of medical judgment, medical supervision issues, and what he was told and what he was not told and what he was provided and not provided.

So for those reasons, Judge, I have real concerns about us being able to even keep that September date on the calendar. And I would suggest -- it could be helpful in managing this case if knowing what still has to be done -- perhaps if we picked a realistic date and

maybe -- everything is uncertain given the pandemic, but maybe we can try to pick something that factors in some of that uncertainty.

THE COURT: Ms. Payerle, I would like to hear from you.

Obviously, this concerns the Court that we're at this juncture, and possibly some of the matters that should be turned over have not either been or maybe not be in a format that's somehow usable.

What does the government say?

MS. PAYERLE: Judge, I'm happy to address every one of those issues that Mr. Johnson raised.

I'm in a little bit of an acquired position, because he hasn't raised them in any kind of Motion to Compel or a brief yet. So we haven't had the chance, obviously, to brief them. But I suppose to sort of take them one by one.

The Court set us a deadline last November to do our expert disclosures in April. We did that. We believe we have complied with Rule 16.

We had a discussion with Mr. Johnson a couple of weeks later. He said, hey, I have some concerns. We might want some more information about some of your experts.

I said, Mr. Johnson, if you would like to

ask me more information about the experts, if there is something you feel you're missing, if there is more information I can provide you, you know, let me know. I have not heard from him, so I'm unaware of what additional information he feels he's entitled to.

From our perspective, our expert disclosures are complete. And I'll either await his phone call or a brief so that I can, you know, respond, or provide the information if he wants it.

As to the electronic discovery, we did brief that in December. When discovery -- when computers are taken out of the practice, they're taken as image files. Those files can be read in their sort of native format by most sort of litigation support operations of which a firm as prestigious as Mr. Johnson's surely has a relationship. And it is the easiest way to review those computers, because there is no mixing of those files.

In other words, you can plug in a computer image into a FTK viewer -- I believe they're even available on line -- and you can search through the computer as the user had it in their own system. Now that's what we gave them first thing in December after our meeting in November.

At the end of April, the last week of April, so four months later, we got a letter, the one

that Mr. Johnson filed with the Court, saying, we don't want it in that format, we want it in a different format. We can't read that format.

So we all got on the phone. And I said, okay, well, you know, we are just now, we, the government, are just now in the process of actually getting that and only that into a database.

To answer Mr. Johnson's questions for the second time, I've already answered it for him, we are not databasing anything else, only that. So we are putting that stuff in a database. And so I offered then to give it to him in that format. That databasing process was finished a couple of weeks ago.

There is queue in our litigation support area in the queue. We put them at the top of the list for priority to produce. They've given us, in the new format they've given us some drives to put that stuff on.

But, Judge, in the meantime, because it's now in a database format that I can review, I've done some searches. And I believe that under Rule 16 -- not only have we already given it to them in a readable format, but under Rule 16 I think there is truly only a few dozen documents that would even be discoverable.

So the documents that we're providing them, these many, many computers worth of documents, is

mostly junk e-mails, image files, and other things that have absolutely nothing to with this case, now that we've had a chance to kind of search it and narrow down the scope of it.

And so I have offered -- and, in fact, I told Mr. Johnson that and Mr. Sanan that as recently as this morning. I said, look, I just don't think there is a lot in here that you guys are even entitled to.

So one of the ways that we can short circuit any of this is for me to simply comply with Rule 16, and do my diligence in the database, and give them the relatively small universe of documents that I think is even tangentally connected to this case. And that would, for example, eliminate the tens of thousands of e-mails from vendors like Toys R Us or WebMD -- these are the blasts that people get on their work e-mails a lot -- and constitute the vast majority of the information in those databases.

So I'm happy to do that as well. We could get that to them relatively quickly. Rule 16 does not require us to give them an open file, it requires us to give them information related to their defense. And I'm happy to do that.

I do not believe that this stuff that we've already produced and that we're now reproducing in

a new format is even really mostly relevant to the case. So that's as far as that goes.

As far as the -- so in other words, Judge, I'm basically saying that the discovery situation is not nearly as dire as Mr. Johnson is making it out to be. We have met and conferred productively on many occasions.

As far as I'm aware, all of the issues are resolved, except for this one small issue of how do I turn over a couple of dozen documents out of these computers that are going to be relevant to their defense? Whether they want the whole database of junk e-mails or whether they would prefer that I just pull out the ones that are relevant.

Mr. Sanan and I actually have a call next week where we're going to brainstorm ways to narrow that universe. He's going to give me some search terms. And maybe we can just find a way to just give him what he wants out the database in a way that he can use it.

I have made the same offer to Mr. Johnson. I'm happy to do it with him as well.

But the point is, there really -- I mean, there really isn't anything of substance that hasn't been turned over at all in one form or another. And all we're doing now is working diligently to get them documents in the format that they want them.

There are two categories of discovery that are remaining. And those categories are, number one, discovery that is in the process of being created. And I'll give you an example.

THE COURT REPORTER: Ms. Payerle, Ms. Payerle, hang on. Are you guys all getting feedback or is it just me?

MS. PAYERLE: I am a little bit.

MR. JOHNSON: We are getting significant feedback.

THE COURT REPORTER: If you can just slow down a little bit, please. And go ahead, and we will try it again.

MS. PAYERLE: Okay. One category of discovery that will be ongoing on a rolling basis, for frankly as long as we are still awaiting trial, is Mr. Young's calls from the facility. So as long as he continues to make those, we will continue to produce that to the defense. So that's one category of discovery that we be ongoing as long as we're still awaiting trial and as long as that discovery keeps being created. Similarly, if any of the defendants post essays or blogs or things like that in the future, those are things that we may find and then we would produce.

A second category is the physical drug

exhibits that were collected in the search. I've made all counsel aware that those exhibits, the actual drugs -- or not in the search, but that were collected in course of the investigation -- those are being held in a lab I believe in Miami, but somewhere in Florida. And those can be made available to counsel for their inspection, but not until 90 days before trial just because that's how that evidence moves around the country. So I can't get that to them until 90 days before trial. And I have made them aware of that.

So in other words, Your Honor, besides from the two categories of evidence, the drugs exhibits 90 days before trial, and the ongoing yet to be produced, I believe we've really reached the end of our Rule 16 obligations, and we've done it exactly in line with the Court's deadline of about mid April, which we set in anticipation of a September trial date.

So I do think -- and I would like the opportunity, obviously, if Mr. Johnson has sort of specific complaints, to respond in written format to give the Court a good sense of that timeline. But, you know, I just, I don't think discovery issues should hold up this trial.

And if the pandemic does, it does. But, you know, the discovery issues are non-issues.

THE COURT: Okay. Mr. Johnson, do you wish to say anything else?

MR. JOHNSON: I would. First of all, we set the September trial date in anticipation of the government having to us by, I believe it was early December, all of the materials that were seized out of PreventaGenix, out of the clinic.

And candidly, if the government thought that these materials were important enough to seize out of the clinic, then we maintain that they're important enough for us to be able to review and to use, and to see what they are under Rule 16's provisions under material to the preparation of the defense.

And so the -- and so the Court inquired about that deadline. And the government agreed they would have those materials to us by early December. They made a production in December that included a number of different things. And it did include these materials that were unbroken out from their native format.

And absent contracting with an e-discovery company to break them out, to process them, to database them -- many of us have been involved in e-discovery cases before. To do that with this item of materials would cost tens of thousands of dollars in one instance. As opposed to the government, that may have -- and that

does have actually. It's public record that they have this. Has a contract with, an ongoing contract with a couple of different -- I think three different e-discovery hosting companies.

So we then got a supplemental production, and we were continuing to work on all the other materials that we had already been receiving in the case, from the government on March 17 that included some cell phone materials. And once we got in there, we figured out that those were in native format as well and we couldn't open them.

And so endeavored -- because all the materials that have been produced to us are not produced with any sort of detailed index of what we're getting. Some of the production letters from government are a little bit more detailed than others. But oftentimes it will have, for example, you know, we're producing documents 10,500,000 through 11,000,750. And that's really what we get.

And so the letter that we filed back with the government on April 22nd was our effort to really detail what we have been provided. And every time we do that we discover that there are things that we had requested that hadn't been provided, such as the search warrants, yet. And so it has put a tremendous burden on

us just to figure out what we had been provided.

And so that trial date was set with the understanding that we would get these materials in December and be able to use them in December. We don't have them in a usable format yet. I anticipate we're going to get them.

And I can appreciate the fact that counsel for the government has these, you know, 15, 16 computers and other items imaged or databased now, and that they can search through them. And I did get an e-mail from Ms. Payerle about an hour before this hearing, hour and a half before this hearing, offering to do specific searches for me if I gave her search terms to look at. And said she would search for Dr. Alperovich's name in particular, and gave me some examples of things that had come up.

And I can appreciate that they have that capability. But just under the basic rules of e-discovery, and the principles of Rule 16.1, we need to have that capability. Otherwise, we slow things down.

And like I said, I'm telling the Court about this issue from the perspective of timing. I am going to endeavor on all the issues that I have raised to see if we can get this taken care of among the parties.

But I'm letting the Court know there may

come a time very quickly that I'm going to raise this issue with the Court. For example, of either the government giving us access to their discovery database, which Courts have ordered before, or the government giving us a database, producing a database for the defense. That way they have produced the discovery in a searchable format that is consistent with the format that they are already using. And I think those are the core principles surrounding e-discovery in criminal cases.

So I'm just telling the Court that stuff with respect to timing.

THE COURT: Well, let me just make a comment. It sounds as if, obviously, there is some disagreement on the format and the manner in which it has been produced that may or may not be totally correct, it may be completely correct. I don't know.

But I would -- it sounds to me like you all have had conversations, have been talking. And it seems to me that before -- you know, if you can't get it resolved, the only thing I can suggest to you is file a motion. Let me see what you are -- then the government will have the opportunity to respond.

Because, I mean, it's great to us talk about it in this circumstance. But it's very difficult when we are just going on and saying, well, I've got this

problem, I've got this problem. And maybe some of it hasn't been related to the other side, or maybe it hasn't been answered by the other side, or something of that nature, at least orally.

And the only way I'm going to be able to rule on it is by written document. I can't make a decision today about in whose favor or against whom I should make a ruling, if I was even asked to. But I'm not. I'm not going to do that today. There is too many moving parts here for me to make that determination.

So all I can say is you need to talk. And then if you can't get it resolved, file a motion and I'll try to take care of it. Okay.

MR. JOHNSON: We will do so.

THE COURT: Mr. Sanan, if I'm pronouncing that correctly. I apologize if I'm mispronouncing it.

What is your position regarding the trial date as it presently stands?

MR. SANAN: Judge, I agree with Mr. Ferguson and Mr. Johnson that in all likelihood this trial may not be able to go that day. My biggest concern is getting this case back on a schedule where all the parties are available to try it.

I know I've had several trials already rescheduled. The ones that were all set for June, July,

have all been getting kicked into the end of the year and early next year already. I know Mr. Ferguson's client is currently in custody.

And given that, I think if we are going to reset this, I think those discussions should start shortly to make sure the parties are all available, given the length of this trial, the complexity of this trial, and just get a date, if it's not going to be a September date, on the books, so we're not being pushed further out into next year.

That's the concern I have, is getting this thing, a set date that we hope can go, given the uncertainty of the pandemic.

THE COURT: Well, I have been setting trials, not as lengthy as this one, but other cases that -- and as you can image, timing, space, and everything else all plays into this. And, of course, your schedules are such too.

Ms. Pettigrew, I guess I'll ask you. If this case, number one, is going to be moved to Memphis, that presents another issue, because we're talking about facilities there.

There is a whole set of issues that I've heard some of the Memphis judges talk about. And so -- I'm not going to get into that with you, but that's just

to let you know. That's one issue.

And then, of course, just everybody's calendar with what we've got.

Ms. Pettigrew, you've got my calendar there. What does it look like?

THE CLERK: How far advanced do you want me to look first?

THE COURT: Well, I mean, this case is presently set for a two week time period. I'm assuming that is still -- or is that still the opinion that it's going to take about two weeks to try?

Ms. Payerle, is that your belief?

MS. PAYERLE: Yes, Your Honor. And again, I'll just -- I don't think it's nearly as complicated a case as my counterparts in the defense believe it is, so they may have a different opinion. But I can't imagine it going longer than two weeks.

THE COURT: Mr. Ferguson. Mr. Ferguson, I can't hear you. I'm sorry.

MR. FERGUSON: I'm sorry. That was my fault. I looked down and realized I was on mute.

I am hoping two weeks.

THE COURT: Mr. Johnson.

MR. JOHNSON: I'm going to be surprised if we get done with the government's proof in two weeks,

much less defense proof. I think the last time we were talking about this in November, if I recall correctly, the -- I think we all anticipated this could go maybe even into three weeks. And the Court, if I recall correctly, was kind of looking at picking a date with hoping for two weeks and planning for three.

MR. SANAN: Judge, that was my understanding also, that this was going to shoot into that, potentially shoot into that third week. And so when we scheduled it, I had actually blocked off all three weeks.

THE COURT: Okay. Well, your memory is better than mine. I apologize for that.

So, Ms. Pettigrew, we're probably talking about next year, just to be blunt about it, January or February.

MR. FERGUSON: Your Honor, I think I have reset probably six or seven Federal trials in the last 10 days. Just looking at my calendar, I'm probably going to be the one that holds us up. So I thought maybe I would throw a date out there.

THE COURT: All right.

MR. FERGUSON: I hate to say this, but February 15th for three weeks.

MR. SANAN: Judge, my problem is I just

rescheduled a three week trial for January 25th, and that's in Chicago. Which that will put me into probably mid to late February at the earliest.

MR. FERGUSON: Oh, wow.

MS. PAYERLE: Judge, again, from my perspective, you know, the government is, obviously, flexible. But I think this is part of the -- this is the other reason that I might ask the Court to consider, at least for the time being, keeping that September trial date. Because we did work mightily last November. And I believe that was the earliest we all could find on our schedules last November was this two to three week period in September. And with just the difficulty of, you know, busy, competent lawyers trying to find a date, we would urge that if at all possible we just hang on to that.

THE COURT: Well, the problem we have is we have this elephant in the room that, as Mr. Ferguson has already mentioned, it puts him behind the eight ball. It's nothing I can do about it. Nothing you can do about it.

And, frankly, you know, if the flare-up hit in the fall, what is that going to do with the plans that we, the Court, might be making as far as trying to reopen for trials? And that could just throw it -- I'm not trying to be a doomsday, I'm just saying that it's a

possibility.

I, frankly, don't see it going -- based on what I'm hearing today, I don't see it going in September. That's just -- you know, back in November we weren't talking about any of the issues which brings us in this format today. You all would have been here live if we weren't in the circumstances we are today.

So there has been a sea change, I'll have to say, between last November and now. You know, I think it probably would behoove me, the Court, to go ahead and try to get something more firm, with the understanding that there are all these logistics problems. And hopefully the parties can resolve some of their issues with discovery.

But, Mr. Johnson, you said your case in Chicago starts when? When is that going to start?

MR. SANAN: Judge, it's my case, Mr. Sanan. Starting --

THE COURT: Oh, I'm sorry. I apologize. I'm sorry, Mr. Sanan.

MR. SANAN: It starts January 25th.

THE COURT: Okay. All right.

MR. SANAN: And it's anticipated about two to three weeks.

Judge, the other issue I want to bring up,

though, is before we set this date, wouldn't we want to wait to see what happens with the change of venue issue?

Because if we set a date, or we try to get a date on today, and you then reach out to the Memphis courthouse, they may put a wretch into it.

MR. FERGUSON: If I may respond to that?

THE COURT: Who is talking?

MR. FERGUSON: This is Mr. Ferguson.

THE COURT: I'm sorry. I couldn't see your -- I'm looking at five different people on the screen, six people, and trying to --

MR. FERGUSON: Absolutely understand.

THE COURT: Go ahead.

MR. FERGUSON: Again, as I said, the last 10 days we've been rescheduling everything over here. So I have a pretty good feeling of where -- it's been about two days. And the last one I set was two weeks into January, 1st of January, and we had not yet rolled any of mine over into February or March.

So I think if we grab a March date, maybe March 8th or 15th, I think we could be able to -- in all likelihood, I think we would be able to find one of the courtrooms over there. We may end up in one of the -- well, not magistrate courtrooms. But there is a Division 7 upstairs that I think Judge McCalla sometimes uses.

THE COURT: That would not -- for this case that would not be tolerable for anybody.

MR. FERGUSON: Okay.

THE COURT: It really -- I'm not being facetious. It would not work at all for this case.

MR. FERGUSON: Too many people?

THE COURT: Yes, sir.

MR. FERGUSON: Okay. All right.

THE COURT: So we would have to have -- you know, we would have to have -- what we could do, to pick up on your and somebody else's suggestion, go ahead and let's get a tentative -- not tentative, but a date, maybe get the first part of March. And then let me confer with some of the judges over in Memphis and make sure that's a doable.

Like you said, with this much advanced notice, it seems to me that would be, it would be doable.

MR. SANAN: Judge, I'm available on the March 15th date that Mr. Ferguson recommended.

THE COURT: Who is that?

MR. SANAN: This is Mr. Sanan.

THE COURT: Okay, Mr. Sanan. Anyone else? Mr. Johnson?

MR. JOHNSON: Did you say -- I'm sorry, Judge, Mr. Ferguson cut off and so did Mr. Sanan.

Did you say March 15th?

THE COURT: Right.

MR. JOHNSON: That's fine for me and fine for Mr. Massey as well, Judge.

THE COURT: Ms. Payerle.

MS. PAYERLE: Just a minute. It seems I've got my calendar in the wrong year. Hang on.

March 15, 2021?

THE COURT: Yes, ma'am.

MS. PAYERLE: And it would be -- are we blocking off three weeks just in case Mr. Johnson's dreams come true?

THE COURT: Based on what I'm hearing.

MR. JOHNSON: I have other, I have other dreams that I hope come true.

MS. PAYERLE: Okay. I believe I can do that. That's just fine for me, Your Honor.

THE COURT: Mr. Ferguson?

MR. FERGUSON: Yes, Your Honor, that would be fine.

THE COURT: Okay. All right. Let's -- that's a Monday. Start March 15th. I will tell -- when I talk to the Court, I will ask for three weeks so that if it's rolled into a third week we would not have a problem with that hopefully.

Well, while we're talking about discovery. I'm hearing different versions of people's positions here. We need to have a cut off date. I know there was probably one already established. But now that we have moved the trial, we need to have a definite cut off date.

You all give me suggestions of what you want.

Mr. Johnson, if you want to start.

MR. JOHNSON: Your Honor, I was -- I'm sorry. I didn't mean to overtalk.

THE COURT: Go ahead. You're not.

MR. JOHNSON: My suggestion is -- and we actually got a transcript of the report date from back in November, just because it had been a little bit and we wanted to figure out what we had all talked about before.

And one of the things that we had discussed doing before, and the Court had suggested, was that the parties confer on, and see if we can come up with an agreed scheduling order for the Court, in a case like this and given the complexity.

And we had made some initial steps. Me and Ms. Payerle had e-mailed back and forth, I think, a draft, and some thoughts on the draft. And then the pandemic hit. And so -- and we been focused on some of these other issues.

So my suggestion to the Court is that if the Court will give us perhaps a couple of weeks maybe to see if we can come up with agreement on a schedule for discovery deadlines and for other deadlines in the case. And then perhaps we can get with the Court's chambers on the Court's availability for things like motion hearings and Daubert hearings.

THE COURT: That's fine --

MR. JOHNSON: That's my suggestion, Your Honor.

THE COURT: I think that's fine with me, if everybody else is okay with that. I hear no objections.

MR. FERGUSON: Yes, Your Honor.

MS. PAYERLE: That's fine --

THE COURT: Okay. Let's do that. Let's do that.

So two weeks. This is the 21st, so whatever two weeks from today -- June -- is that June? Yeah. Would be June 4th or 3rd. I don't know what day that is. June 4th. Have something to me by June 4th.

MR. FERGUSON: Yes, Your Honor.

THE COURT: Okay. You all just get together and iron that out, and I'll take a look at it. Okay.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: All right. Then what else -- well, as far as -- I think, based upon my -- what everybody's position here is, I think -- I know Mr. Johnson said he wanted to talk a little bit more with his client.

But, Mr. Johnson, I frankly think that the motion to move this to Memphis is probably well taken.

Now if you still want to argue with me about it, I'll be glad to hear from you. But I really think it's probably the best for all concerned.

MR. JOHNSON: And, Your Honor, I just want to -- candidly, Mr. Massey and I have conferred about that, and I believe that we're in agreement. And we have had some discussions back and forth with our client.

And we just -- and I understand what the Court, the Court's likely ruling on that motion. And to the extent that we feel like we need to lodge any objection in the record, or to just put in the record that we consent to it, we'll do that within the next week.

THE COURT: Okay.

MR. JOHNSON: I think -- we are -- Mr. Massey and I are in agreement, we just need to confer with our client about that.

THE COURT: Okay. That's fine. All right.

What else do we need to take up at this point? We can set another -- if you want another interim report date to discuss anything other matters, we can do that. That may be taken care of by the proposed scheduling order. But I'm available to talk with you at any time.

If you want set up another Skype hearing or just want to get with me and -- well, either we're going to set something up or I'll wait to hear from you on your scheduling order, whatever you want to do.

What is your thoughts?

MS. PAYERLE: Your Honor, I'm optimistic we can all come to an agreement on the scheduling order. To the extent that we can't for some reason, what process would you like us to follow? Should we just tell the chambers or --

THE COURT: Yeah. Just check with chambers and I'll set something up for you.

MS. PAYERLE: Okay.

THE COURT: Okay. All right. Let's do that.

MS. PAYERLE: Thank you, Judge.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: Mr. Ferguson, anything else you want to bring up at this point, sir?

MR. FERGUSON: No, Your Honor. Thank you very much.

THE COURT: Mr. Sanan?

MR. SANAN: No, Your Honor. Thank you.

THE COURT: And I think I've covered Mr. Johnson and Ms. Payerle.

MS. PAYERLE: Yes, sir. Thank you.

THE COURT: All right. Okay. Thank you all. All right.

I will let you go this afternoon and wait to hear from you on the proposed scheduling order. Okay.

MS. PAYERLE: Thank you, Judge.

THE COURT: Thank you all.

(End of Proceedings.)

I, Kristi Heasley, do hereby certify that the foregoing 43 pages are, to the best of my knowledge, skill and ability, a true and accurate unredacted transcript from my stenotype notes in the matter of:

UNITED STATES OF AMERICA

| | |
|---|---|
| | ) |
| VS | )NO.1:19-cr-10040 |
| | )JACKSON, TENNESSEE |
| | ) |
| ALEXANDER ALPEROVICH,<br>JEFFREY W. YOUNG, JR., and<br>ANDREW RUDIN | ) |

Dated this 26th day of May, 2020.

/s/ Kristi Heasley

--------------------------------

Kristi Heasley, RPR
Official Court Reporter
United States District Court
Western District of Tennessee
Eastern Division