No. 19-5692

# United States Court of Appeals
## for the Sixth Circuit

───────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

JEFFREY YOUNG, JR.,

*Defendant-Appellant*.

───────────

On Appeal from the United States District Court
for the Western District of Tennessee
No. 1:19-cr-10040 (Breen, J.)

───────────

BRIEF FOR PLAINTIFF-APPELLEE UNITED STATES

───────────

D. MICHAEL DUNAVANT
United States Attorney
Western District of Tennessee

BRIAN A. BENCZKOWSKI
Assistant Attorney General

MATTHEW S. MINER
Deputy Assistant Attorney General

JOANNA K. W. BOWMAN
Attorney Advisor
ANDREW PENNEBAKER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, DC 20005
(202) 307-1462
joanna.bowman@usdoj.gov

# TABLE OF CONTENTS

Table of Authorities ........................................................................................ iii

Statement Regarding Oral Argument ........................................................... v

Statement of Jurisdiction ............................................................................. 1

Statement of the Issue ................................................................................. 1

Statement of the Case ................................................................................. 1

   A. Background ........................................................................................ 1

   B. Magistrate Judge Proceedings ......................................................... 2

   C. District Court Proceedings ................................................................ 5

Summary of the Argument ........................................................................... 6

Argument ...................................................................................................... 7

   A. Standard of Review .......................................................................... 7

   B. The District Court Correctly Determined That Young Should Be
      Detained Prior To Trial ...................................................................... 7

      1. Nature and Circumstance of the Offense ..................................... 9

      2. Weight of the Evidence ............................................................... 11

      3. History and Characteristics of Defendant ................................... 13

      4. Danger to the Community ............................................................ 15

   C. Young's Contention That The District Court Was Required To Defer To
      The Board Lacks Merit ...................................................................... 24

Conclusion ..................................................................................................29

Certificate of Compliance .........................................................................30

Designation of Relevant District Court Documents ................................31

Certificate of Service ................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Gonzales v. Oregon*, 546 U.S. 243 (2006)...............................................................25

*Gonzales v. Raich*, 545 U.S. 1 (2005)....................................................................25

*United States v. Hare*, 873 F.2d 796 (5th Cir. 1989)..........................................2, 9

*United States v. Hefner*, 2019 WL 612704 (E.D. Tenn. Feb. 13, 2019) ........... 21-22

*United States v. Hinton*, 113 F. App'x 76 (6th Cir. 2004)....................................2, 9

*United States v. Marcrum*, 953 F. Supp. 2d 877 (W.D. Tenn. 2013),
    *aff'd* Case No. 13-6008 (6th Cir. Nov. 1, 2013)................................... 11, 24

*United States v. Oliveira*, 238 F. Supp. 3d 165 (D. Mass. 2017) ...........................25

*United States v. Phillips*, 2018 WL 5304116 (W.D. Tenn. Oct. 25, 2018).............25

*United State v. Quartermaine*, 913 F.2d 910 (11th Cir. 1990)...............................20

*United States v. Romans,* 2000 WL 658042 (6th Cir. May 9, 2000) .....................24

*United States v. Scales,* 464 F.2d 371 (6th Cir. 1972) ...........................................26

*United States v. Stone*, 608 F.3d 939 (6th Cir. 2010) ................................. 4, 7-9, 11

*United States v. Villegas,* 2011 WL 1135018 (E.D. Tenn. Mar. 25, 2011).......24-25

*United States v. Williams*, 948 F. Supp. 692 (E.D. Mich. 1996)..............................9

**Statutes and Regulations**

18 U.S.C. § 3142(e) .............................................................................................2, 6

18 U.S.C. § 3142(e)(1)...........................................................................................7

18 U.S.C. § 3142(e)(3)................................................................................2, 7

18 U.S.C. § 3142(e)(3)(A) ................................................................................7

18 U.S.C. § 3142(g) ................................................................................8

18 U.S.C. § 3142(g)(3)................................................................................14

18 U.S.C. § 3145 ................................................................................1

18 U.S.C. § 3145(a) ................................................................................24-25

21 U.S.C. § 801 *et seq.*................................................................................3

21 U.S.C. § 841(a)(1)................................................................................1-2, 8-9

21 U.S.C. § 846................................................................................1, 9

21 U.S.C. § 856(a)(1)................................................................................1-2, 9

21 U.S.C. § 861(f)................................................................................1-2, 8-9

28 U.S.C. § 1291 ................................................................................1

21 C.F.R. § 1308 *et seq.*................................................................................3

## STATEMENT REGARDING ORAL ARGUMENT

There are no novel questions of law raised by Appellant Jeffrey Young, nor has Young identified clear error in any finding of fact by the district court. This Court can and should decide the case on the parties' briefs and the record.

## STATEMENT OF JURISDICTION

The Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3145.

## STATEMENT OF THE ISSUE

Whether the district court clearly erred in finding that Young should be detained pending trial based on extensive evidence that he is a danger to the community.

## STATEMENT OF THE CASE

### A.  Background

A federal grand jury has charged Young with conspiracy to possess controlled substances with the intent to distribute them, in violation of 21 U.S.C. § 846; six counts of unlawful distribution of controlled substances to a pregnant woman, in violation of 21 U.S.C. §§ 841(a)(1) and 861(f); seven counts of unlawfully distributing and dispensing controlled substances, in violation of 21 U.S.C. § 841(a)(1); and maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1). *See* RE 3 (Indictment) at ¶¶ 18-40 and 4-1 (Notice of Penalties) at 1-2.[1] The Indictment details how Young, a licensed nurse practitioner, used his medical practice ("Preventagenix") to distribute drugs for illicit use, sometimes in exchange

---

[1] Citations are to the Record Entry Number, followed by a description of the document in the first instance and then the Page ID number and line number, as appropriate, *see, e.g.*, RE 3 (Indictment) at ¶ 25 or RE 85 (April 17, 2019 Transcript of Detention Hearing) at 26:14 – 28:17.

1

for sex, money, or notoriety, and in an attempt to promote a television reality show. RE 3 at ¶¶ 21-25.

The charges against Young place him in a category of offenders that "Congress has determined . . . pose a special risk of flight and dangerousness to society" if they are released on bond pretrial, and who therefore are presumptively subject to pretrial detention. *United States v. Hinton*, 113 F. App'x 76, 78 (6th Cir. 2004) (citing *United States v. Hare*, 873 F.2d 796, 798-799 (5th Cir. 1989) (internal quotations omitted)). Under 18 U.S.C. § 3142(e), there is a rebuttable presumption "that no condition or combination of conditions" of pretrial release "will reasonably assure the appearance" of the defendant at trial or "the safety of the community" when a defendant is charged with a violation of the Controlled Substances Act that carries "a maximum term of imprisonment of ten years or more." 18 U.S.C. § 3142(e)(3)(A). Among other penalties, Young faces up to 40 years of imprisonment on each count of illegally distributing controlled substances to a pregnant woman. 21 U.S.C. §§ 841(a)(1) and 861(f).

## B. Magistrate Judge Proceedings

At Young's initial detention hearing before a magistrate judge, defense counsel argued for Young's release based on evidence that, in November 2018, Young had agreed to an order issued by the Tennessee Department of Health (the "Board") that restricted Young's nursing license for (among other things)

2

"prescribing narcotics and other controlled substances in amounts and/or for durations that were not medically necessary, advisable**,** or justified for a diagnosed condition."[2] *See generally* RE 85 (April 17, 2019 Transcript of Detention Hearing). Young argued to the magistrate judge that the Board's order established that the Board had already considered his dangerousness to the community and had determined that stripping Young of his ability to prescribe Schedule II and most Schedule III drugs[3] would neutralize any dangerousness he may once have posed to the community. *Id.* at 28:22 − 29:4.

In response, the government called as a witness John Tankersley, a DEA agent with 21 years of law enforcement experience. Agent Tankersley testified that the DEA learned in its investigation of Young that female patients "were coming in [the] front door [and] back door" of Young's medical practice and were "going straight to his [Young's] office, where they were trading sex for prescribed drugs, scheduled

---

[2] Young did not admit fault in the order, but he conceded in the order that the Board's evidence would show that "from at least August 2013 to at least November 2016, [Young] provided treatment that included prescribing narcotics and other controlled substances in amounts and/or for durations that were not medically necessary, advisable**,** or justified for a diagnosed condition." Young Br. Ex. A at ¶¶ 5.

[3] The Controlled Substances Act and its implementing regulations set forth which drugs and other substances are defined by law as "controlled substances," and assign those controlled substances to one of five Schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. *See* 21 U.S.C. § 801 *et seq.*; 21 C.F.R. § 1308 *et seq.*

drugs." *Id.* at 17:2-5. Tankersley elaborated that "he [Young] would show pictures [of this sexual activity] to the other employees at his office," *id.* at 17:14-15, and recounted how investigators recovered cell phone video of a "young woman that Mr. Young was having sex with that appeared to be lifeless, motionless, eyes closed," *id.* at 19:10-12.

After Tankersley testified, the government provided the magistrate judge with additional information by attorney proffer. *See United States v. Stone*, 608 F.3d 939, 948-949 (6th Cir. 2010) (explaining that "a bail hearing by proffer is acceptable under the law and at the discretion of the . . . court"). The government stressed that the Board's November 2018 order did not address allegations that Young had sex with patients; prescribed dangerous drugs to a pregnant woman; videotaped sex with an apparently unconscious woman; had a history of violent behavior towards women; abused drugs and alcohol; and had threatened to kill himself in the past, making him a danger to himself and to others. *See* RE 85 at 26:14 – 28:17.

Defense counsel responded that, "I don't believe he [counsel for the government] was in the room with us [defense counsel, Young, and representatives of the Board] when we were discussions [sic] what the board reviewed." *Id.* at 28:22-24. Defense counsel represented that "*[e]very bit of that was discussed at the Board of Nursing*." *Id.* at 29:3-4 (emphasis added).

The magistrate judge concluded that Young was not a flight risk, but noted that his assessment of Young's danger to the community was "a much closer call." *Id.* at 31:20. The magistrate judge acknowledged that Young's behavior alleged in the Indictment was "quite disturbing." *Id.* at 31:22. Nonetheless, the magistrate judge denied the government's motion to detain Young, reasoning that concerns about Young's dangerousness were allayed "based upon the agreed order that the Board of Nursing has entered into in this case . . . ." *Id.* at 31:24 – 32:2. The magistrate judge gave "credit to the Board of Nursing," noting that "after their investigation, they found that these were adequate restrictions to place upon Mr. Young to protect the public from him in his capacity as a healthcare provider." *Id.* at 32:3-7.

## C. District Court Proceedings

The government filed a motion with the district court to revoke Young's bond and requested an evidentiary hearing. RE 58. The district court granted the government's motion and heard evidence in the form of testimony from six witnesses and thousands of pages of documents from both parties over the better part of two days. *See* RE 59 and 79 *et seq.* (minute entries and filings from detention hearing before the district court).

The government put on hours of testimony from the Board's lead investigator on the Young matter and from other witnesses as well as presented voluminous

documentary evidence that corroborated the government's proffer to the magistrate judge on Young's dangerousness and showed that defense counsel was incorrect when he represented to the magistrate judge that "every bit of [the government's] evidence" discussed at the prior detention hearing had been considered by the Board when it entered into the Agreed Order. *See* Argument, Section C, *infra*.

At the conclusion of all of the evidence, the district court determined that Young is a danger to the community, with or without his prescription pad. Accordingly, the court ordered Young detained pending trial.

## SUMMARY OF THE ARGUMENT

Under 18 U.S.C. § 3142(e), Young is subject to a presumption of pretrial detention. The district court's decision to detain him is consistent with that presumption and is supported by extensive evidence at Young's detention hearing. That evidence includes testimony, video, and documents—including Young's own statements—that establish his penchant for threats and violence, especially against women; his widespread practice of inducing female patients to have sex with him in exchange for prescribing dangerous and medically unnecessary narcotics; his continued distribution of dangerous drugs even after the Board took away some of his prescribing privileges; his efforts to intimidate a state investigator; and even video of what appeared to be Young's sexual assault of a semi-conscious woman. *See* Argument, Sections B(1)-(4), *infra*.

Young's assertion that the district court was required to defer to the Board in assessing whether restrictions on his nursing license were sufficient to protect the public is unsupported by law or logic. The district court's decision should be affirmed.

## ARGUMENT

### A. Standard Of Review

In reviewing a decision to detain a defendant pretrial, this Court reviews the district court's factual findings for clear error and reviews "mixed questions of law and fact—including the ultimate question whether detention is warranted—de novo." *Stone*, 608 F.3d at 945.

### B. The District Court Correctly Determined That Young Should Be Detained Prior To Trial

Whether a defendant should be detained without bond pending trial turns on whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making that determination, a court must presume that a defendant is "particularly dangerous," *Stone*, 608 F.3d at 945—and thus should be detained pending trial—if he has been charged with certain offenses. *See* 18 U.S.C. § 3142(e)(3). Those offenses include controlled substance offenses that carry maximum penalties of ten or more years of imprisonment. *Id.* § 3142(e)(3)(A). Young has been charged with such offenses in this case, and the

presumption in favor of detention therefore applies. *See* RE 4-1 (showing that each of the Indictment's six counts under 21 U.S.C. §§ 841(a)(1) and 861(f) against Young for prescribing controlled substances to a pregnant woman carries "a term of imprisonment for twice the maximum punishment otherwise authorized," or 40 years).

In rebutting this presumption, the defendant bears the burden of producing evidence that he does not pose a danger to the community or a risk of flight. *Stone*, 608 F.3d at 945. If he satisfies that burden, the Government must then demonstrate danger or flight risk by clear and convincing evidence, though the presumption "remains a factor to be considered among those weighed by the district court." *Id.* (citation omitted). When deciding whether pretrial detention is warranted, a court must consider the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

The district court conducted an extensive evidentiary hearing in this case and, after thoroughly considering the evidence, determined that no conditions of release could ensure the safety of the community while Young awaits trial. That conclusion finds overwhelming support in the evidence, and it should not be disturbed.

### 1. Nature and Circumstances of the Offense

This factor contemplates the nature and circumstances of the offense charged in the Indictment, "including whether the offense . . . involves a . . . controlled substance . . . ." *Stone*, 608 F.3d at 946. Even when rebutted, the presumption informs this element because it "represents the belief of Congress that in the majority of serious Controlled Substance Act offenses, there is an increased risk of flight or danger to the community, and in particular, the danger that the defendant will resume drug trafficking activities while released." *United States v. Williams*, 948 F. Supp. 692, 693 (E.D. Mich. 1996) (citing *Hare*, 873 F.2d at 798); *accord Hinton*, 113 F. App'x at 78 ("Congress has determined that drug offenders pose a special risk of flight and dangerousness to society.") (citation omitted).

The Indictment charges Young with conspiring to distribute, controlled substances in violation of 21 U.S.C. § 846; six counts of unlawful distribution of controlled substances to a pregnant woman, in violation of 21 U.S.C. §§ 841(a)(1) and 861(f); seven counts of unlawfully distributing and dispensing controlled substances, in violation of 21 U.S.C. § 841(a)(1); and maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1). *See* RE 3 (Indictment) & 4.1 (Penalty Notice). Each of the six counts charging illegally prescribing to a pregnant woman carries a 40-year statutory maximum. *See id.*; 21 U.S.C. §§ 841(a)(1) and 861(f). The Indictment also alleges—and the district court heard from witnesses—that in

the course of committing those crimes, Young used his prescription-writing authority and his position of trust to extract sex from patients as he illegally prescribed drugs in dangerous combinations, including to addicts he knew were in rehabilitation programs. *See, e.g.*, RE 97 (May 20, 2019 Transcript of Detention Hearing) at 113:1 – 115:7; *see also id.* at 116:13-15 (patient's husband pleading with Young that his wife "talked about suicide the other night as she was coming off [medication Young prescribed]" and asserting: "You've given her enough to kill a horse as many as she's eating. And there's nothing wrong with her . . ."); *id.* at 117:1-14 (man expressing to Young concern "that his mother ha[d] been overprescribed"); and *id.* at 118:3-4 (Preventagenix employee reported to investigators that she "told Young that her mother was an addict, yet he prescribed medication to her anyway").

The district court also heard testimony from a medical professional who offered a scathing critique of undercover footage of Young's simultaneous "treatment" of two female officers. That footage showed Young prescribe the officers—one of whom Young had never met—the powerful narcotics fentanyl and oxycodone, as he casually invited them to a Halloween party at his house and discussed getting drunk with his coworkers. *Id.* at 210:14 – 211:12. It did not seem to bother Young that the undercover officer whom Young had never met told him that she had never had an x-ray or an MRI and that oxycodone and marijuana were what "worked." *Id.* at 215:7-21. Young did not inquire about the source of the

oxycodone that "worked"; instead, he boasted that he is a member of the pro-marijuana organization NORML, and that marijuana use was fine by him. *Id.* at 216:2-17. The district court also heard evidence that, from July 2014 to January 2017, Young prescribed approximately 800,000 Schedule II opioid pills (mostly Hydrocodone and Oxycodone) and 600,000 Schedule IV benzodiazepine pills (mostly Alprazolam). *See id.* at 113:2-13.

"[D]rug trafficking is a serious offense that, in itself, poses a danger to the community." *Stone*, 608 F.3d at 947 n.6 (collecting Sixth Circuit cases affirming pretrial detention orders for drug dealers); *accord United States v. Marcrum*, 953 F. Supp. 2d 877, 883 (W.D. Tenn. 2013) ("Because this case involves the distribution of a controlled-substance analogue, the nature and circumstances of this case weigh in favor of detention."), *aff'd* Case No. 13-6008 (6th Cir. Nov. 1, 2013). Therefore, this factor weighed in favor of detention.

## 2. Weight of the Evidence

The weight-of-the-evidence factor "goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *Stone*, 608 F.3d at 948. In concluding that "this factor probably weighs against Mr. Young's continued release," RE 97 at 338:7-8, the district court explained that

> [t]he Court has heard over the last couple of days, today and last Monday, a number of witnesses and evidence that would indicate that Mr. Young has, in fact, made statements, has conducted himself in a manner that would seem, to me, that he has actually threatened people.

> There's photographs indicating that he may have inflicted injuries on other individuals at times. And he has made fairly strong statements about other individuals that have disagreed with him or attempted to in any way impact his business or his activities.
>
> …
>
> And there's still some indication both of Facebook and text messages that do appear to indicate his propensity for violence or some type of acts of retribution or whatever.

*Id.* at 337:13 – 338:6.

Young does not take issue with the government's evidence, cited by the district court, of his propensity for bullying and threats. Nor could he: Young's venue of choice for threatening and bullying is online forums and social media, and the district court was privy to numerous instances of Young exhibiting these tendencies in his own words, as described in further detail below.

Instead, Young highlights evidence of what he calls "good business practices," presented through the testimony of a single Young employee, Ms. Wright. Young Br. at 9. The district court did not make an express finding on Wright's credibility, but it would have been justified in concluding that her credibility was minimal.

For example, Wright—who worked for Young at Preventagenix—said on direct examination that she had never seen Young do anything that would suggest he was a danger to his patients. RE 97 at 267:4-12. But she was unable to explain on cross examination why the employees joked on an all-office group text about it being "tap-that-ass-Tuesday" for Young again, *id.* at 273:15 – 274:25, or why, as an

12

unlicensed medical assistant, she was making decisions about which powerful opioids to prescribe Young's patients "because Jeff didn't write," *id.* at 276:5 – 277:5, or why she was prescribed drugs by Young that contributed to her own hospitalization for an overdose in 2016, *id.* at 282:10 –283:12.

Young also relies on the testimony of his therapist, Ms. Plunk, who opined based on her treatment of him that Young was not a danger to the community. Again, the district court did not enter findings on Ms. Plunk's credibility, but the government established that Ms. Plunk felt that she "owed him [Young]" for helping her start her private practice, *id.* at 297:21 – 298:4; that Ms. Plunk was a patient of Young's and vice versa, *id.* at 299:16 – 301:10; and that she was unaware, prior to the hearing, that Young exchanged sex for prescriptions, *id.* at 303:15 – 305:12.

In light of the evidence the government presented on dangerousness, discussed in more detail below, and the lack of credibility of Young's witnesses, the district court properly concluded that the weight of the Government's evidence cut against Young.

### 3. History and Characteristics of Defendant

In considering the history and characteristics of the defendant, a court should consider the following:

(A)      the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or

alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)     whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.

18 U.S.C. § 3142(g)(3).

On this factor, the district court concluded that

[t]here has been some involvement with the criminal justice system, not any convictions, of course. But there have been some activities in which the proof has presented that Mr. Young again has had some issues. Some of it may have been related to his mental capacity or some use of alcohol.
 There has been testimony that indicates he presently seems to be in a fairly decent mental state. Be that as it may, he does have a history again of some outbursts and other indications about his saying things to others and threatening them and posting matters. Certainly, I've already mentioned the video that was shown and some of the activities that Mr. Young was involved, particularly the one certainly -- it was difficult to watch. But in my opinion, the relationship, the sexual relationship Mr. Young was apparently having with the woman that appeared, to me, to be at least semi-conscious if not fully under some type of circumstance that she was not in complete control of her faculties, that obviously is certainly a problem from the Court's standpoint.
 Again, it's a close question in terms of his other aspects, but I still think that that particular factor, that history and characteristic, does indicate that his background and some of his actions have proven to be of concern to the Court during the course of these events.

RE 97 at 338:9–339:11.

Somehow, Young derives from the district court's pronouncement above that on this factor, "previous domestic abuse is the one factor the Court weighed heavily

against" Young. Young Br. at 10. Young then proceeds to attack the domestic-abuse straw man he set up by invoking Ms. Wright's testimony to the effect that in one instance, Young's ex-spouse was the real aggressor. *Id.* at 10-11.

Again, Wright's testimony was not credible; even if it had been, Young's ex-spouse's alleged propensity for domestic violence does nothing to mitigate the government's evidence that Young is a serial intimidator and sexual predator, either of which, standing alone, would justify a court in detaining Young prior to trial.

It was not clear error for the district court to credit the government's evidence over the self-serving evidence from Young's former employee.

### 4. Danger to the Community

It was far from clear error for the district court to find that, "considering all the evidence the Court has heard over these last couple days, the Court concludes that, again, based upon review of all the testimony here that there are no conditions, [or] combination of conditions, that would assure the safety of the community by Mr. Young's continued release." RE 97 at 339:16-21. Indeed, based on the evidence described in detail below, the district court reached the only reasonable conclusion.

Young challenges the district court's finding of dangerousness on three grounds, none of which has merit:

*First,* Young contends that the Board's November 2018 order preventing him from using his nursing license to prescribe controlled substances was sufficient to

ensure the safety of the community. He contends that the Board conducted a "much more extensive investigation of the same issues" than the government did, and that the district court should therefore have deferred to the Board. Young Br. at 11.

The record makes clear that Young is wrong about the extent of the Board's investigation relative to that of the government. The government provided Board Investigator Shirley Pickering with materials it received from the Tennessee Office of the Attorney General in response to a subpoena for all Board records related to Young. Investigator Pickering was asked in painstaking detail about these records, and she repeatedly acknowledged that Board investigators were not asked to look into every complaint the Health Department received:

> **Q**: Are there complaints in there, in the evidence that -- or the materials that I provided to you that you weren't asked to investigate?
> **Investigator Pickering**: There appear to be some allegations or complaints that were forwarded to our central office in Nashville that we do not have investigative files on.

RE 99 (May 13, 2019 Transcript of Detention Hearing) at 29:6-11; *see, e.g.*, *id.* at 75:1-4 (April 2016 complaint filed but not investigated, alleging that Young and a local drug rep were "obviously intoxicated and drawing graphic, obscene and lude [sic] pictures of three other local nurse practitioners who were labeled and referenced by name"); *id.* at 78:7 − 81:7 (discussing an anonymous letter attaching proof that Young was overprescribing dangerous narcotics to one of his employees, which was never investigated by the Board); *id.* at 123:10-25 (email reporting to Investigator

Pickering some threats that the victim suspected were orchestrated by Young, which Pickering forwarded to the Board but which were not investigated).

Not only did the Board fail to investigate a number of complaints made to it about Young; the Board never possessed the evidence that law enforcement agents acquired via search warrant—*i.e.*, the "worst of the worst" that the district court heard, as summarized below. That included Ms. Pickering's chilling account of her personal experience with Young in the community, including threats he made to her directly:

> **Q [reading from one of Ms. Pickering's investigative reports]:** Mr. Young reported that Investigator Pickering had been personally named in the tabloids, so they knew what was going on. . . . What did you take that to mean?
>
> **A.** Honestly, I felt it was a form of intimidation.
>
> **Q.** Okay. Are you used to being intimidated when you interview people?
>
> **A.** No, sir.
>
> **Q.** And . . . after you have essentially [confronted him with a document contradicting his prior statement in an interview] . . . would you read what you wrote there? . . .
>
> **A.** Mr. Young again asked this investigator if she knew that she was mentioned personally in local tabloids. Told this investigator that she had been named particularly and that she was mentioned in those tabloids as Ms. Shirley. I did not comment on this question by Mr. Young.
>
> **Q.** Ms. Pickering, how did you feel after the second time that he reminds you that people know who you are and calls you by Ms. Shirley?
>
> **A:** I was disturbed by that and I did feel a little bit -- very uncomfortable.
>
> **Q.** And did you feel so uncomfortable, in fact, that you started to carry a weapon on you, a gun, that you had not carried on you prior to this interview?

**A.** I did have a gun at my home, yes, that I did.

**Q.** Okay. And was that a result of the feeling that you had when you left this interview, or like the cumulative effect of some of other things that started to happen to you at this time?

**A.** That, along with things that were posted on social media, some of the behaviors exhibited by Mr. Young. It was a cumulative effect of things. Yes, I was fearful.

**Q.** Okay. And did you get -- have you gotten a sense from the other investigators about how they feel as far as their personal security when it comes to Mr. Young and investigating cases into him?

**A.** My investigators have come to me and they have expressed concerns for their safety. They have expressed that people have told them they are fearful, when they try to interview individuals, that they are fearful of Mr. Young, or people that know Mr. Young.

. . .

**Q.** And, Ms. Pickering, I'm sorry to ask you this, because it's a personal question, but it's relevant. Do you feel safe with Mr. Young being out there and knowing that you have testified today?

**A.** I am very nervous about it, honestly. Not only about Mr. Young, but about people that Mr. Young may know.

**Q.** Right.

**A.** I am concerned, yes.

**Q.** Have you seen gang ups of Mr. Young's, I sometimes call them the Rock Doc disciples or his, the people that associate with him and defend all of his actions, have you seen gang ups on witnesses --

**A.** I have seen multiple media postings where that has happened, yes.

**Q.** Okay. And does that include, for example, Mr. Young's ex-wife, an image appearing of her nude on line that was attributed to either him or his, people he's affiliated with?

**A.** Yes, sir. . . .

RE 99 at 116:23–120:17.

*Second*, Young claims that he has "has never been charged or even investigated for the several allegations against him" that the government "used . . . to revoke his release." Young Br. at 11. This claim is groundless, given that the Board formally investigated him no fewer than 13 times from 2015 to the date of his

18

Indictment, RE 99 at 133:5-15, and that the DEA and the Tennessee Bureau of Investigation ("TBI"), among other entities, were investigating his criminal conduct for most of that time as well, RE 97 at 112:10-14 (Agent John Chew testifying that TBI began investigating Young in July 2016).

The district court heard extensive evidence about the fruits of those investigations, both from Investigator Pickering and Agent Chew from TBI. Some of what was presented from the law-enforcement side included:

- Testimony about an interview with a former Preventagenix office manager who stated that there were "at least 50 females that have or still do trade sex with Young for prescriptions," some without patient charts, who "come in during office hours and after hours," with "[s]ometimes as many as three females a day coming to see Young." RE 97 at 120:5 – 121:4.

- Testimony about an interview with a former Preventagenix employee who stated that Young "would show employees new pics on his cell phone of girls he had sex with" and "would brag about having sex at lunchtime with girls" for whom he "likely" wrote prescriptions. *Id.* at 121:10-14.

- Testimony recounting an interview with yet another former employee who told investigators that "Young would go to his office and have sex with those females, and then the females would leave with a prescription." The same employee remembered a female patient telling him that she was at Young's house one night for a party and Young and a friend gave her oxycodone. *Id.* at 122:1-5.

- A Facebook message from a female patient who remarked, "When we are somewhere I can do what I want and be as loud and destructive as we want, things will be better and different. Thank you for taking care of me, not just the sex and satisfaction but the Soma too." *Id.* at 123:4-8.

- Young messaging a female patient to "come in for a check-up" and "wear a short skirt and no panties." *Id.* at 128:20-25.

- Young receiving a message from a prospective female patient who complains that "I am in shitty health and about to jump off a bridge. . . . I've heard you are pretty good at being a doctor. LOL. A real one." Young responds, "I'm good at everything. I accept all insurance. Will be glad to take the balance out of your ass. I will be open to you anytime. I mean, feel free to send me pics anytime." The prospective patient again returns to the seriousness of her condition: "Well, to me, it's an emergency because I am nearly out of meds and feel horrible and helpless." *Id.* at 135:12-21. After Young apparently has established a sexual relationship with the same patient, messages between the two make clear he has prescribed her Xanax, oxycodone, and fentanyl, a drug usually reserved for terminally ill patients. *Id.* at 139:8-23.

- A litany of messages between Young and female patients trading sex for prescriptions for Schedule IV drugs like carisoprodol (Soma) and benzodiazepines (*e.g.*, Xanax), both of which Young was still prescribing at the time of his arrest. *See, e.g.*, *id.* at 134:1-12. In fact, in spite of having been prescribed fentanyl, the patient in the previous example continued receiving Xanax, a drug used to treat anxiety, from Young—who is not a psychiatrist—up through the time of his arrest. *Id.* at 141:1-5.

- Testimony about an interview with a former employee of Genexis, the practice Young operated at the time of his arrest in 2019, reporting that Young continued to have sex with patients at the office and brag to employees about it. *Id.* at 143:8 – 144:6.

- Testimony about Young's history of assaulting his ex-wife, and photographs of her injuries from a 2011 police report. *Id.* at 144:10 – 145:6. *Cf. United States v. Quartermaine*, 913 F.2d 910, 917 (11th Cir. 1990) ("A willingness to strike loved ones offers probative evidence of a tendency to violence and dangerousness toward others.").

- Testimony about reports to law enforcement by victims of actual or attempted sexual assault by Young, RE 97 at 145:19 – 147:6 (two accounts), and Young messaging with a friend about being accused

of rape by a different woman, though it is unclear whether this instance was ever reported, *id.* at 147:16 – 148:6.

- The cell phone video, discussed above, of apparently non-consensual sexual activity with an "unidentified female [who] was semiconscious, appeared to be under the influence of drug and/or alcohol," in which Young "motions for . . . whoever is recording the video to come closer" in an effort to "direct[]" the video. *Id.* at 150:5 – 151:14.

- A message where Young is confronted by a man whose wife was apparently the target of Young's advances (in Young's office), to which Young responds "Get your bitch under control before something bad happens. I have people I [can't] control," and then later says to the wife in question, "Get your drunk ass husband under control before something bad happens to him." *Id.* at 334:4-22.

- Cell phone captures showing Young directing police-officer patients to perform illegal acts for him, including directing one to "find this fucker," provide him criminal history and "anything and everything" else the officer can, *id.* at 153:4-12, and another who Young's office manager directs to check on Young's warrants and, finding none, the officer responds he will continue to check and report any that pop up "ASAP," *id.* at 155:8 – 156:17.

- A cell phone capture where Young is pictured with a gun to his head while threatening via message to commit suicide. *Id.* at 157:8 – 158:7.

In addition to all of those incidents (and many others), the district court observed that it was particularly troubled by a matter Young entirely elides in his brief: the footage of Young having sex with a semi-conscious woman: "What was concerning to the Court is when I watched that video and looked at that woman's eyes, she didn't look like she was with it. Her eyes were closed. She looked to be in pretty rough shape." RE 97 at 318:6-9. Other district courts in the Sixth Circuit have recognized that a "pattern of [sexual] assault presents a serious danger." *See, e.g.,*

21

*United States v. Hefner*, 2019 WL 612704, at *8 (E.D. Tenn. Feb. 13, 2019) (stressing in rejecting proposed release with conditions that the defendant was convicted of assaulting a woman 15 years earlier, that he was the subject of two active protection orders, and that he was facing assault charges in state court).

As the government showed, Young has a long history of sexual harassment, threats, and violence, including threats to potential witnesses in this case, that demonstrates his continuing danger to the community.

*Third*, Young attacks the testimony of one of the government's witnesses, Natalie Seabolt, a nurse who investigates overprescribing as part of her job duties as a consultant with the Medicaid Fraud Control Unit at the Tennessee Bureau of Investigation. Ms. Seabolt has a doctorate in nursing practice and practiced as a nurse for several years before embarking on her career path assisting law enforcement. RE 97 at 199:17 – 200:15. In this case, Ms. Seabolt reviewed medical records acquired from the search warrant executed at Young's Preventagenix practice, prescription data from Tennessee's controlled substance monitoring database ("CSMD"),[4] and, for Young's more recent practice (called "Genexis"), the CSMD "footprint," which is a log of a provider's history checking the CSMD. *Id.* at 201:15 – 202:22.

---

[4] The CSMD is a database into which pharmacies are required to log prescriptions for controlled substances that they fill.

22

From these sources of information, Ms. Seabolt offered an analysis of Young's prescribing trends at Preventagenix, Genexis before the Board issued its order, and Genexis after the Board issued its order.

Ms. Seabolt observed from the CSMD the following general trends:

- At Preventagenix, Young "continuous[ly] prescribe[ed] on a monthly basis for a lot of patients of opioids, benzodiazepines, muscle relaxers, stimulants at some times, and also sleep aids." *Id.* at 204:11-16.
- After the DEA raid on Preventagenix, Young's opioid prescribing plummeted and his amphetamine (Schedule II) and benzodiazepine (Schedule IV) prescribing spiked. *Id.* at 207:5-10.
- After the Board's November 2018 order, Young continued to prescribe benzodiazepines and pivoted to a Schedule IV opioid, Stadol. *Id.* at 207:14-21.

Ms. Seabolt also testified about her concern that Young continued to prescribe benzodiazepines to former Preventagenix patients who not long ago had received a potentially lethal, often-abused opioid-benzodiazepine cocktail directly from Young, particularly when Young's footprint in the CSMD reflected that he was not checking the database to determine whether those patients were receiving opioids from another provider or doctor shopping. RE 97 at 219:23 – 220:7. In fact, Ms. Seabolt explained, the CSMD revealed that many of Young's benzodiazepine patients at Genexis *were* receiving controlled substances from other doctors. *See, e.g.*, *id.* at 224:14-20 and 226:7-16 (reflecting that one such patient was prescribed benzodiazepines by Young even after Young's arrest in this case).

23

Ultimately, the district court did not hone in on Ms. Seabolt's testimony in explaining its reasons for detention. But even if it had leaned heavily on Ms. Seabolt's testimony, doing so would been well within its discretion, and certainly would not have been clear error. In the end, Ms. Seabolt's testimony only further demonstrated that Young was dangerous. Under those circumstances, the district court did not clearly err in finding that Young was likely to pose a danger to the community if he was released pending trial.

## C. Young's Contention That The District Court Was Required To Defer To The Board Lacks Merit

Young contends that, regardless of the evidence, the district court erred when it failed to defer to the findings made by the Board and to the magistrate judge's decision, which was based on those findings. Young does not muster a single legal authority in support of this claim, and the government knows of none.

Although the bail statute is silent on whether deference should be afforded to a magistrate judge's ruling on detention, *see* 18 U.S.C. § 3145(a), district courts in the Sixth Circuit uniformly agree that they must "engage in the same analysis, with the same options . . . as the magistrate judge." *See, e.g.*, *Marcrum*, 953 F. Supp. 2d at 880 (citing *United States v. Villegas,* 2011 WL 1135018, at *4 (E.D. Tenn. Mar. 25, 2011)); *see also United States v. Romans,* 2000 WL 658042, at *1 (6th Cir. May

9, 2000) (affirming district court's reversal of magistrate judge's detention order that district court reviewed *de novo*).[5]

Nor does any authority support the notion that a federal district court must defer to findings made by a state agency in determining whether certain limitations on a defendant's ability to prescribe controlled substances are adequate to protect the public from harm. *See, e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 269-270 (2006) (finding "ampl[e] support [for] the conclusion that *Congress* regulates medical practice insofar as it bars doctors from using their prescription-writing powers as a means to engage in illicit drug dealing and trafficking as conventionally understood") (emphasis added); *cf. Gonzales v. Raich*, 545 U.S. 1, 29-30 (2005)

_____

[5] Young also complains about the government presenting "new" evidence at the hearing before the district court, but he stops short of claiming that was error. Indeed, it is well settled that when considering a motion for revocation of a magistrate judge's order for release under 18 U.S.C. § 3145(a), the district court regularly receives evidence and hears arguments from counsel in addition to what was considered by the magistrate judge. *See United States v. Phillips*, 2018 WL 5304116, at *1-4; (W.D. Tenn. Oct. 25, 2018) (district court hearing additional evidence and testimony than that was presented before magistrate judge); *Villegas*, 2011 WL 1135018, at * 4 (district court heard argument, "most of which reiterated the argument before [the magistrate judge]"); *United States v. Oliveira*, 238 F. Supp. 3d 165, 167 (D. Mass. Feb. 24 2017) (holding that as part of district court's *de novo* review, "the Court may reject the magistrate judge's fact finding and start the hearing anew . . . and hear additional facts and argument"); *cf. United States v. Hayden*, 759 F.3d 842, 846 (8th Cir. 2014) (explaining in the context of a suppression hearing that "28 U.S.C. § 636(b)(1) provides that a district court, in conducting de novo review of a magistrate judge's report and recommendation, . . . may also receive further evidence . . . .").

(holding that state law regulating sale of controlled substances did not control application of federal law); *United States v. Scales,* 464 F.2d 371, 375 (6th Cir. 1972) (explaining Congress's power under the Commerce Clause to regulate illegal activities involving controlled substances). As such, the district court was under no obligation to defer to fact findings or conclusions by the Board.

Even if some deference to the Board were generally appropriate, however, it would not have applied in this in this case, for two reasons.

*First*, contrary to defense counsel's representation to the magistrate judge that "[e]very bit of" the government's evidence on detention was "discussed at the Board of Nursing," RE 85 at 29:3-4, the Board did not see and hear some of the most disturbing evidence of dangerousness because the Board did not possess it. *Compare generally* RE 99 at 22-136 (testimony of Board Investigator Shirley Pickering reviewing every report generated by the Board in Young's case), *with* RE 97 at 111:1 – 172:23 (testimony of TBI Agent Chew discussing search warrant evidence and other evidence obtained by law enforcement in the course of their investigation) *and with id.* at 199-254 (testimony of Ms. Seabolt establishing ongoing dangerousness of Young's practice even after his license was restricted by the Board in the November 2018 order).

Nor could the November 2018 order have contemplated evidence from the two Board investigations that postdated it. *See* RE 99 at 128:19 – 129:25 (discussing

26

2019 Board investigation into allegations of "inappropriate sexual contact with patients" that resulted in Young receiving a warning); *id.* at 130:18-25 (same investigation, noting that employee at Young's current practice "heard Mr. Young having sex with patients in the exam room and occasionally in his private office on multiple occasions," and reported that Young admitted to staff that he had sex with patients); *id.* at 133:11 – 135:20 (discussing allegation in separate post-order investigation that Young violated HIPAA by acquiring patient information for use in a friend's divorce proceeding).

*Second*, the government demonstrated—through what Young concedes was extensive testimony from Investigator Pickering about documents that were in the Board's possession at the time it entered into the November 2018 order—that the Board's decision to restrict Young's license instead of taking it away was contrary to the great weight of the evidence in that matter. Had the district court been obligated explicitly to assess the Board's action, the court would have had ample reason to conclude that it was inadequate.[6]

---

[6] *See, e.g.*, Tennessean, *The Rock Doc: 5 Revelations from the Sex-for-Pills Investigation* (Aug. 11, 2019), *available at* https://www.tennessean.com/story/news/health/2019/08/12/rock-doc-nurse-practitioner-jeffrey-young-opioids-for-sex-investigaton/1858749001/ (last visited Sept. 18, 2019) (enumerating findings from the publication's investigation into the Board's handling of the Young complaints and criticizing the Board for (among other things) "permitt[ing] Young to continue prescribing non-opioid drugs such as Xanax and Valium" despite having received complaints that Young (1) was "selling

Under those circumstances, Young has demonstrated no basis on which this Court should question the district court's conclusion—reached after an extensive evidentiary hearing—that Young is likely to be dangerous whether or not the Board allows him to prescribe certain controlled substances. The district court's detention ruling is supported by the evidence and is consistent with the statutory presumption in favor of pretrial detention in cases of this sort. It should be affirmed.

---

testosterone injections [a Schedule III drug that the November 2018 order allowed Young to continue to prescribe] to teenage football players," (2) had posted online content including a video "in which Young pretends to determine a woman's age and attractiveness by smelling her underwear," and (3) "had sex with some of his patients at his clinic").

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

D. MICHAEL DUNAVANT
United States Attorney
Western District of Tennessee

BRIAN A. BENCZKOWSKI
Assistant Attorney General

MATTHEW S. MINER
Deputy Assistant Attorney General

JOANNA K. W. BOWMAN
Attorney Advisor
ANDREW PENNEBAKER
Trial Attorney
Criminal Division, Fraud Section
U.S. Department of Justice
1400 New York Ave., N.W.
Washington, DC 20005
(202) 307-1462
joanna.bowman@usdoj.gov

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation provided in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because, excluding the parts of the brief exempted by Rule 32(f), the brief contains 7,315 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirement of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

/s/ Joanna K. W. Bowman
Attorney Advisor
U.S Department of Justice
Criminal Division, Fraud Section

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Appellee, pursuant to Sixth Circuit Rules 28(c) & 30(b), hereby designates the following filings in the District Court's record as entries that are relevant to this appeal:

| DESCRIPTION OF ENTRY | DATE | RECORD ENTRY # | PAGE ID #'s |
|---|---|---|---|
| Indictment | 04/15/2019 | 3 | ¶¶ 18-40 |
| Indictment (Notice of Penalties) | 04/15/2019 | 4.1 | N/A |
| Government's Motion to Revoke Bond and Request for Evidentiary Hearing | 05/02/2019 | 58 | N/A |
| Minute Entry Granting Government Request for Hearing | 05/03/2019 | 59 | N/A |
| Transcript of Detention Hearing Before the Magistrate | 04/17/2019 | 85 | 17, 19, 26-29, 31-32 |
| Transcript of Detention Hearing Before the District Court, Day 2 | 05/20/2019 | 97 | 111-172, 112-113, 116-123, 128, 134-135, 138-139, 141-158, 199-254, 210-11, 215-216, 219-226, 267, 273-277, 282-283, 297-305, 318, 334, 337-339 |

| Transcript of Detention Hearing Before the District Court, Day 1 | 05/13/2019 | 99 | 22-136, 29, 75, 78-81, 116-120, 123, 128-135 |
|---|---|---|---|

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Brief for Plaintiff-Appellee United States was served upon counsel for Defendant-Appellant,

Clairborne Hambrick Ferguson
The Clairborne Ferguson Law Firm
294 Washington Ave.
Memphis, TN 38103

by filing with the Court's CM/ECF system this date: September 23, 2019.

/s/ Joanna K. W. Bowman
Attorney Advisor
U.S Department of Justice
Criminal Division, Fraud Section