```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
2                      WESTERN DIVISION

3     _____
                                     )
      UNITED STATES OF AMERICA,       )
4                                     )
            Plaintiff,                )
5                                     )
      VS.                             ) NO. 1:19-cr-10040-JTF-1
6                                     )
                                      )
7     JEFFREY W. YOUNG, JR,           )
                                      )
8           Defendant.                )
      _____
9


10


11            TRANSCRIPT OF JURY TRIAL PROCEEDINGS


12                        BEFORE THE


13            HONORABLE JOHN T. FOWLKES, JR.


14                     March 28, 2023


15


16


17


18                     MORNING SESSION


19


20


21


22


23


24              LASHAWN MARSHALL, RPR
                OFFICIAL COURT REPORTER
             167 N. MAIN STREET - SUITE 242
25             MEMPHIS, TENNESSEE  38103
```

*UNREDACTED TRANSCRIPT*

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF:

 4                    MS. KATHERINE PAYERLE
                      MR. ANDREW PENNEBAKER
 5                    Assistant United States Attorneys
                      UNITED STATES DEPARTMENT OF JUSTICE
 6                    FRAUD SECTION
                      1400 New York Avenue, NW
 7                    Washington, DC  20530

 8

 9   FOR THE DEFENDANT:

10                    MR. CLAIBORNE H. FERGUSON
                      MR. RAMON DAMAS
11                    Attorneys at Law
                      CLAIBORNE FERGUSON LAW FIRM, P.A.
12                    294 Washington Avenue
                      Memphis, Tennessee  38103
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **W I T N E S S   I N D E X**

2

3    **HEATHER GOSLEE**

                                                    **PAGE**
4
           DIRECT BY MR. PENNEBAKER                    9
5          CROSS BY MR. FERGUSON                      43
           DIRECT BY MR. PENNEBAKER                   61
6          CROSS BY MR. FERGUSON                      68

7

8    **KRISTIE GUTGSELL**
                                                    **PAGE**

9          DIRECT BY MS. PAYERLE                     73
           CONTINUED DIRECT BY MS. PAYERLE          114

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*UNREDACTED TRANSCRIPT*

1                           **E X H I B I T   I N D E X**

2        MARKED                                                        PAGE

3        EXHIBIT NO. 1                                               17

4        EXHIBIT NO. 2                                               25

5        EXHIBIT NO. 3                                               30

6        EXHIBIT NO. 4                                               32

7        EXHIBIT NO. 5                                               38

8        EXHIBIT NO. 6                                               65

9        EXHIBIT NO. 7                                               75

10       EXHIBIT NO. 8                                               77

11       EXHIBIT NO. 9                                               81

12       EXHIBIT NO. 10                                              95

13       EXHIBIT NO. 11                                             102

14       EXHIBIT NO. 12                                             105

15       EXHIBIT NO. 13                                             126

16       EXHIBIT NO. 14                                             131

17       EXHIBIT NO. 15                                             133

18       EXHIBIT NO. 16                                             134

19       EXHIBIT NO. 17                                             136

20       EXHIBIT NO. 18                                             141

21       EXHIBIT NO. 19                                             143

22

23

24

25

```
 1                         TUESDAY

 2                      MARCH 28, 2023

 3

 4              * * * * * * * * * * * * * * * * * * * * * * * *

 5

 6         THE COURT:  Okay.  Good morning, everyone.

 7         MS. PAYERLE:  Good morning, Your Honor.

 8         MR. FERGUSON:  Good morning, Your Honor.

 9         THE COURT:  Any issues we need to deal with

10    before we bring in the jury?

11         MS. PAYERLE:  Only one, Your Honor, Mr. Herrin

12    advised me to raise with you.

13              We looked at the proposed jury instructions.

14         THE COURT:  Okay.

15         MS. PAYERLE:  They were filed last evening.  The

16    one thing the government would just like to put on the

17    Court's radar is that any elements of the crimes alleged,

18    there was a lot of language about finding that somebody

19    aided and abetted the defendant or that the defendant

20    aided and abetted.  And the government hasn't -- I mean,

21    we have charged aiding and abetting in the indictment,

22    but it really -- the case is that the defendant did the

23    distribution and maybe have been -- would've been, on

24    some occasions, aided and abetted.

25              And so we would just ask for the Court's
```

1    consideration of jury instructions that just sort of set

2    forth the elements, minus the aiding and abetting

3    language, just that the defendant distributed the drug

4    knowing that it was unlawful, that kind of thing.  And I

5    think we did submit instructions to that effect, and we

6    would just -- we'd just ask, for sort of simplicity's

7    sake, that the Court consider those alternate

8    instructions.

9         THE COURT:  We will have a full jury instruction

10   conference where we'll go over all of that, but I'll keep

11   that in mind.

12        **MS. PAYERLE:**  Thank you.

13        **THE COURT:**  That actually simplifies things

14   quite a bit to be able to eliminate all the language and

15   definitions applying to aiders and abettors.

16        **MS. PAYERLE:**  Thank you, Your Honor.

17        **THE COURT:**  I'll keep that in mind.

18        **MS. PAYERLE:**  Appreciate it.  Thank you, sir.

19        **THE COURT:**  Okay.  Assuming that's done, I think

20   we're ready for the jury.  Bring in the jury, please.

21        (Jury in at 9:17 a.m.)

22        **THE COURT:**  All right.  Good morning, ladies and

23   gentlemen.

24        **THE JURY:**  Good morning.

25        **THE COURT:**  I see most of you have adjusted to

```
 1   the changing temperatures here in the courtroom.  Easier
 2   to take off a sweater or a jacket than to be cold when
 3   you really need it, so keep that up.  It's an old
 4   building, and this is the way it is, kind of up and down.
 5           I think we're ready to go ahead and proceed with
 6   the proof in the case.  I think all the preliminaries
 7   have been done, and now we're ready to get into the --
 8   the testimony, the evidence.
 9           I'm going to turn to the government and ask if
10   you would please -- to call your first witness.
11           MR. PENNEBAKER:  Thank you, Your Honor.
12           THE COURT:  Mr. Pennebaker?
13           MR. PENNEBAKER:  Yes, Your Honor.  The
14   government calls Heather Goslee.
15           THE COURT:  All right.  Step forward right up
16   here.  Okay.  You're fine right there.
17           If you would, please raise your right hand to
18   receive the oath.
19           (The witness was duly sworn.)
20           THE WITNESS:  I swear.
21           THE COURT:  Have a seat right here, if you
22   would, please.
23           (The witness complies with the request.)
24           MR. PENNEBAKER:  And Your Honor, apologies for
25   doing this after a witness has been sworn in, but the
```

1    government would like to invoke the rule.

2         **THE COURT:**  Okay.  The rule has been called for,

3    so both sides, you will need to sequester your witnesses

4    accordingly.

5         **MR. PENNEBAKER:**  Thank you, Your Honor.

1                        **HEATHER GOSLEE,**

2   having been first duly sworn, was examined and testified

3   as follows:

4                      **DIRECT EXAMINATION**

5   **BY MR. PENNEBAKER:**

6   Q.    Good morning, Ms. Goslee.

7   A.    Good morning.

8   Q.    Will you state your name for the record, please.

9   A.    Heather Goslee.

10  Q.    And spell your last name for the court reporter.

11  A.    G-O-S-L-E-E.

12  Q.    Ms. Goslee, what do you do for a living today?

13  A.    I'm a certified pharmacy technician.

14  Q.    Whereabouts?

15  A.    In Walgreens.  At Walgreens in Milan, Tennessee.

16  Q.    Do you know a nurse practitioner named Jeffrey

17  Young?

18  A.    I do.

19  Q.    Do you see him here in the courtroom today?

20  A.    I do.

21  Q.    Can you identify him by an article of clothing that

22  he's wearing?

23  A.    Navy blue sports jacket.

24  Q.    Okay.  How do you know Mr. Young?

25  A.    I was his office manager at Preventagenix.

*TESTIMONY OF HEATHER GOSLEE*

1    Q.    So you're familiar with Preventagenix.  Where is

2    that?

3    A.    Preventagenix is located in -- it was located in

4    North Jackson.

5    Q.    Do you remember the exact address?

6    A.    Murray Guard Drive, I believe.

7    Q.    That's good enough.  Thank you very much.

8          What was Mr. Young's role at Preventagenix?

9    A.    He was the owner and nurse practitioner.

10   Q.    Is it fair to say he was in charge there, too?

11   A.    Yes, sir.

12   Q.    Day to day?

13   A.    Yes, sir.

14   Q.    And you mentioned that your role was office

15   manager, correct?

16   A.    Yes, sir.

17   Q.    What duties did you have as Mr. Young's office

18   manager at Preventagenix?

19   A.    My daily duties were to -- I did the billing.  We

20   had billing company.  I would send all of the fee

21   tickets.  After Jeff would review them, I'd send them to

22   the company for us to get reimbursed.  I handled the

23   payroll, paid the bills, made sure we were staffed, made

24   sure that everything was set up for the clinic, did the

25   ordering.

1   Q.    Did you help Mr. Young out in his personal affairs,

2   too?

3   A.    I did.

4   Q.    Did he have a name for you?

5   A.    Number one biotch (phonetic).

6   Q.    And why do you think he called you that?

7   A.    We were friends.

8   Q.    You were doing a lot for him at the time, correct?

9   A.    I was.

10  Q.    All right.  During what time frame around did you

11  work as the office manager?

12  A.    I started in September of 2014.

13  Q.    When did you leave?

14  A.    August of 2015.

15  Q.    Okay.  In September of 2014, is that when

16  Preventagenix opened?

17  A.    It is.

18  Q.    What did you -- what was your -- how did you find

19  out about that job?

20  A.    Jeff was a fill-in nurse practitioner for a

21  previous clinic that we worked at, and I went along with

22  him to his new clinic.

23  Q.    When you went along with him to his new clinic, did

24  he have tattoos?

25  A.    He did.

1    Q.    Would you describe him, at that time, as a

2    conventional-looking or -speaking practitioner?

3    A.    Yes.

4    Q.    Why did you follow him to Preventagenix?

5    A.    He asked me to.  He trusted me with a lot of things

6    and believed that we would work well together.

7    Q.    What was it about him that told you that that was a

8    good move for you?

9    A.    I believed in him.

10   Q.    Did you believe that he was a good clinician?

11   A.    I believe he was a good clinician, yes.

12   Q.    Did you have experience as an office manager when

13   you started?  Did you have much experience?

14   A.    Not much at all.

15   Q.    What kind of clinic was Preventagenix when it

16   opened?

17   A.    Family medicine.  And we wanted to see a lot of

18   heart- and stroke-prevention patients.

19   Q.    Was that sort of the deal as it was described to

20   you by the defendant when you went with him?

21   A.    Correct.

22   Q.    Did that change at some point?

23   A.    It did.

24   Q.    And tell the jury how that changed.

25   A.    I was concerned when I started seeing a lot of

1    prescriptions -- overwriting, in my opinion, of

2    controlled substances, and it bothered me and . . .

3    Q.    You mentioned that you left around August of 2015?

4    A.    Yes, sir.

5    Q.    Why did you leave?

6    A.    We had a big argument.  We had opened up another

7    clinic downtown, and we had a big argument over the --

8    over texts and over the phone, and he fired me.

9    Q.    Okay.  I want to talk more about that change

10   between when Preventagenix opened and when you left.

11          Was there a change in the number of patients that

12   would come in every day?

13   A.    Yes, sir.

14   Q.    And describe that change to the jury, please.

15   A.    In the beginning, we saw probably 15 to 25 patients

16   a day.  Towards the end, when I left, we were seeing, I'd

17   say, 40 to 55 a day.

18   Q.    Was there a change in the type of patients that

19   were coming in?  And just remembering that you're under

20   oath; you don't need to be polite.

21   A.    Yes, sir.  They were, in my words, I'll say

22   trashier, smell -- smell bad like they'd been rolling

23   around in cigarettes and just not the -- not the type

24   that was coming in at the beginning.

25   Q.    What was that type?

1   A.    Had your older, 50s -- 40s-to-60s patients.  In the

2   end, you were seeing a lot more younger people, 20s to

3   40s.

4   Q.    At the end, you mean?

5   A.    Yes, sir.

6   Q.    Now, in the beginning, you mentioned that it was a

7   cardiology and family practice focus, right?

8   A.    Yes, sir.

9   Q.    Can you tell the jury a little bit more about why

10  that cardiology piece was part of the equation?

11  A.    Jeff has a -- had a good background in cardiology.

12  He worked in a cardiology clinic, and he went to several

13  meetings and places and did speaking for heart and stroke

14  prevention, so he wanted to focus on that, along with

15  family medicine.

16  Q.    Before Preventagenix, did he have a good reputation

17  as a cardiology nurse practitioner specialist in Jackson?

18  A.    I believe so.

19  Q.    Can you describe the changes in prescriptions from

20  the beginning with the family cardiology to the end?

21  What did that change in prescriptions look like and the

22  defendant's prescribing?

23  A.    Can you repeat the question?

24  Q.    Yes.  Terrible question.

25        Did Mr. Young's prescribing change over time?

1    A.    I believe so.

2          I was concerned.  At one point, we were giving too

3    many of what's called a controlled substance, narcotics,

4    when they would come in for smaller, not heart and

5    health.  But there was a lot of pain management going

6    out, and with my background in pharmacy, I just thought

7    it was a lot, so I addressed it with him.

8    Q.    When -- when the prescribing changed to a lot of

9    pain management going out, in the waiting room, did you

10   see people with walkers and wheelchairs, people who

11   looked like they were impaired in their mobility?

12   A.    And my office was on the other side of the

13   building, so I did not see a lot of patients.  But the

14   patients that I did see when I would go to the front

15   reception area, I did not.  No.

16   Q.    Okay.  And I'd like you, if you will, to describe

17   to the jury whether there was a change in Mr. Young

18   during that time personally.

19   A.    Change?

20   Q.    Just a change in how Mr. Young -- a change in his

21   demeanor, a change in his lifestyle.

22   A.    Jeff always had the motto of "work hard, play

23   harder."  He liked to party.

24         As far as demeanor?

25   Q.    Toward you.

1   A.    Toward me, I mean, I thought at the beginning, Jeff

2   and I had a really good relationship.  I thought he

3   trusted me to take -- you know, to help with the clinic.

4   Towards the end, he didn't agree.  He -- I was not the

5   doctor, and I was told that several times, and I

6   understand that.  But coming from a pharmacy background,

7   I had concerns.  I would get calls from the pharmacists

8   about the prescriptions being written and would have to

9   address it to him.

10  Q.    I'm going to show you a text message exchange.

11  It's marked for identification as Government's 221.

12        Do you recognize that?

13        **MR. PENNEBAKER:**  Not to publish to the jury just

14  yet.  Thank you.

15        Oh, it won't --

16        **CASE MANAGER:**  Correct, it's not broadcasting.

17        **MR. PENNEBAKER:**  Okay.  That's not a problem.

18        (A document was passed to the witness.)

19  **BY MR. PENNEBAKER:**

20  Q.    I'll hand you --

21  A.    Okay.

22  Q.    -- what's been so marked.

23  A.    Yes.

24  Q.    Is that something you recognize?

25  A.    I do.

1          **MR. PENNEBAKER:**  Your Honor, the government

2     would offer what will -- what is marked as Government's

3     221, but we'll offer as Exhibit 1.

4          **THE COURT:**  Excuse me.  All right.  How many

5     pages?  Just the one?

6          **MR. PENNEBAKER:**  It is probably five pages,

7     six -- five or six.

8          **THE COURT:**  I need to know what it is.  Is it an

9     e-mail chain?

10         **MR. PENNEBAKER:**  It's a text message chain, Your

11    Honor.

12         **THE COURT:**  Text message exchange.

13         Okay.  As I said before, Mr. Ferguson, if you

14    have any objection to any of this, please let me know.

15         **MR. FERGUSON:**  I will, Your Honor.  I don't

16    expect any, but if I do, I'll jump up.

17         **THE COURT:**  We'll go ahead and receive the

18    documents.  It will be Exhibit Number 1 to the witness'

19    testimony, a five-page document.

20         (The above-mentioned item was marked as

21    Exhibit No. 1.)

22         **MR. PENNEBAKER:**  And Your Honor, I apologize.  I

23    didn't ask to approach the witness.  Do you want me to do

24    that?

25         **THE COURT:**  You don't have to ask.

1          **MR. PENNEBAKER:**  Okay.  Thank you, Your Honor.

2              And Ms. Silverberg, if you would, please,

3    publish to the jury the first page of that exhibit.

4    **BY MR. PENNEBAKER:**

5    Q.    So Ms. Goslee, is -- who's in the blue, and who's

6    in the green here?

7    A.    I'm in the blue, and Jeff is in the green.

8    Q.    Okay.  So you read your messages, and I'll read

9    Jeff's; is that all right?

10   A.    Yes, sir.

11         **THE COURT:**  Can you increase the size?  My eyes

12   are not that good.  I can't read the -- I'll just be

13   honest with you; I can't read.

14         **MR. PENNEBAKER:**  Can everybody see that okay

15   now?

16         **THE JURY:**  Yes.

17         **MR. PENNEBAKER:**  Okay.  Judge, is that all

18   right?

19         **THE COURT:**  Go ahead.

20         **MR. PENNEBAKER:**  Little more?  We can -- we can

21   zoom in on the first two, and then go to the --

22         **THE COURT:**  That's all right.  That's fine.

23   They can read it, and that's what's important.

24         **MR. PENNEBAKER:**  Okay.

25         **THE JURY:**  Oh, now.

1          **MR. PENNEBAKER:**  Technology.  Going to get

2    there.

3    **BY MR. PENNEBAKER:**

4    Q.    All right.  Go ahead, Ms. Goslee.

5    A.    "Where are you?"

6    Q.    "My house with Kate."

7    A.    "We need to talk seriously tomorrow.  I'm not happy

8    about all of this C2 prescriptions."

9    Q.    Okay.  Do you see the date there, Ms. Goslee?

10   A.    February 5, 2015.

11   Q.    And that's about six months before you left?

12   A.    Yes, sir.

13   Q.    You mentioned a little bit about this already.  I'm

14   not sure that we talked specifically about the C2.  What

15   is a C2?

16   A.    C2 is a controlled substance, for example

17   hydrocodone; Percocet, known as oxycodone, Oxytocin.

18   They're our lock-up drugs.  They're potentially abusive

19   medications for pain.

20   Q.    All right.  Thank you.

21         And why weren't you happy about the C2s?

22   A.    I was getting a lot of calls from the pharmacy

23   questioning the amount being written, and the pharmacists

24   were concerned that I was there and seeing that they were

25   going out.

1        **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

2   to the second page, please, and zoom in on that top part.

3   **BY MR. PENNEBAKER:**

4   Q.    And go ahead and keep reading, Ms. Goslee.

5   A.    Okay.

6         "And you told her you didn't know I canceled it?"

7   Q.    "Nope.  Explained to her about the multiple

8   prescription.  So" -- oh, go ahead.

9   A.    "You need to listen to me."

10  Q.    And then it looks like there's an attachment that's

11  being sent.

12        **MR. PENNEBAKER:**  Go ahead to Page 3,

13  Ms. Silverberg.

14  **BY MR. PENNEBAKER:**

15  Q.    "I handle my shit."

16  A.    "You know damn well she doesn't need all that

17  shit."

18  Q.    "I didn't know about all the other shit."

19        **MR. PENNEBAKER:**  And Ms. Silverberg, if you

20  would just leave that there.

21  **BY MR. PENNEBAKER:**

22  Q.    Ms. Goslee, what did you mean when you said "she

23  doesn't need all that shit"?

24  A.    All of the narcotics.

25  Q.    Okay.

1        **MR. PENNEBAKER:**  Go ahead, Ms. Silverberg.

2    A.    "You know she's a doper.  By the way, the

3    pharmacist informed me she would be at the clinic in the

4    morning."

5    **BY MR. PENNEBAKER:**

6    Q.    What's a doper?

7    A.    Someone that takes a lot of medication.

8    Q.    Is that someone that abuses medication?

9    A.    Yes, abuses.

10   Q.    Why are you telling the defendant you know she's a

11   doper?

12   A.    Because I was concerned for him.  I knew he knew

13   that she was a doper, and I didn't want him writing her

14   prescriptions for that kind of stuff.

15   Q.    Were you worried about getting in trouble?

16   A.    I was.  I was worried about him getting in trouble.

17   Q.    So by the time of this text message exchange, was

18   the change in the patient population and what was going

19   on at Preventagenix -- was that in full swing by this

20   time?

21   A.    Not in full swing.

22   Q.    Had it -- had the change started sufficiently so

23   that you felt the need to warn him?

24   A.    I would say starting, yes.

25   Q.    Was it the first time you ever warned him?

1    A.    I don't recall this being the first time.

2    Q.    Thank you.

3          **MR. PENNEBAKER:**  So Ms. Silverberg, if we could

4    go to the next page, please.

5    **BY MR. PENNEBAKER:**

6    Q.    And just that first message, Ms. Goslee.

7    A.    "I don't know.  She's your friend."

8    Q.    Was she the only friend he was prescribing to at

9    this point C2s, that you know of?

10   A.    No, sir.

11         **MR. PENNEBAKER:**  You can take it.  Thank you.

12   **BY MR. PENNEBAKER:**

13   Q.    Tell the jury a few of the other -- or if there are

14   more than one, who the other friends that he was

15   prescribing to that you're aware of at this time.

16   A.    Friends, co-workers?

17   Q.    Sure.

18   A.    You want me to name names?

19   Q.    Yes, please.

20   A.    Daphne; he prescribed for myself; Daniel Rogers;

21   Alicia Ferra (phonetic).  Those were some of the people

22   that we worked with.

23   Q.    Who was his best friend at the time?

24   A.    Kevin Phillips.

25   Q.    And was he prescribing to Mr. Phillips also?

1   A.   I'm not 100 percent on that.

2   Q.   Okay.  And you mentioned Daphne.  Who was that?

3   A.   His girlfriend.

4   Q.   Was Daphne also an employee?

5   A.   She was.

6   Q.   Was she also getting prescriptions?

7   A.   She was.

8   Q.   Now, how do you know what Mr. Young prescribed to

9   Daphne?

10   A.   I would get the charts in the back at the end of

11   the day, and we made copies of the prescriptions, the

12   controlled prescriptions, to put in the chart to know

13   what he was writing.

14   Q.   Where in the clinic did she work?

15   A.   She was the front receptionist.

16   Q.   How long did she work in that position?

17   A.   I want to say about four months.  I'm not 100

18   percent on the timing because this was eight years ago,

19   but I want to say about four months.

20   Q.   Would you see her in the clinic most days?

21   A.   Yes.

22   Q.   And during that time, did you see her moving around

23   like she was in pain?

24   A.   No.

25   Q.   Did you see her wearing a back brace or any kind of

1   a neck brace, any --

2   A.    No, sir.

3   Q.    -- medical -- durable medical equipment or anything

4   like that?

5   A.    No, sir.

6   Q.    Was Jeff Young -- did you ever hear her complain

7   about pain?

8   A.    I did not.

9   Q.    Was Jeff Young also involved in a sexual

10  relationship with Daphne?

11  A.    He was.

12  Q.    Did he bring that relationship into the office?

13  A.    I recall one morning I came into work.  My office

14  was right beside Jeff's.  And I go into Jeff's office

15  every morning to get the charts where he had signed the

16  night before so I could send them off, and I noticed

17  there was two boob marks on the desk.  And it just

18  infuriated me.  It flew all over me.

19  Q.    Why did that infuriate you?

20  A.    Because it was a place of business; it was a

21  clinic.

22  Q.    I'm going to hand you what's been marked for

23  identification as Government's 614.

24        (A document was passed to the witness.)

25  **BY MR. PENNEBAKER:**

1  Q.    Is that a picture of Mr. Young's office?

2  A.    It is.

3        **MR. PENNEBAKER:**  Your Honor, I would offer

4  what's -- we're going to mark as Government's Exhibit 2

5  into evidence.

6        **THE COURT:**  Okay.  That will be marked as

7  Exhibit 2.  It's just one photo or multiple?

8        **MR. PENNEBAKER:**  Yes, Your Honor, it's just one.

9        **THE COURT:**  Okay.  That's fine.  Photograph of

10  the office will be received.

11        (The above-mentioned item was marked as

12  Exhibit No. 2.)

13        **MR. PENNEBAKER:**  And Ms. Silverberg, will you

14  publish, please?

15  **BY MR. PENNEBAKER:**

16  Q.    And Ms. Goslee, just because the jury hasn't been

17  inside the building, is that Mr. Young's office that

18  you're talking about?

19  A.    It is.

20  Q.    And is that the desk that you're talking about?

21  A.    That's the desk.

22  Q.    Was there anything else about the state of affairs

23  on that desk that made you think that?

24  A.    Well, the morning I walked in -- where the charts

25  are on the front of the desk, they were knocked out of

1  the way, and that's where the marks were on the table.

2  Q.    Okay.  Did you confront him about this?

3  A.    I did.

4  Q.    What did you say?

5  A.    I can -- I don't want to -- I asked him what the

6  hell he was doing in his office having sex.

7  Q.    What did he tell you?

8  A.    He laughed.

9  Q.    And you mentioned earlier that Jeff Young was

10  prescribing to employees other than Daphne at this point?

11  A.    Yes.

12  Q.    And you mentioned that he was prescribing

13  medications to you?

14  A.    He did.

15  Q.    Would you tell the jury the list of medications

16  that he was prescribing to you at this time?

17  A.    I had a prescription for Adderall.  I had a

18  prescription for Ambien, which is sleep medicine.  I had

19  a prescription for phentermine, which is for weight loss;

20  for Xanax, which is an opioid; and clonazepam.

21  Q.    Were these medications prescribed in the context of

22  an ordinary office visit?

23  A.    No.

24  Q.    Describe how they came to be prescribed.

25  A.    I would go to Jeff and tell him I was having some

1    trouble focusing, because I did do his personal business,

2    along with the clinic.  And I was having an issue

3    focusing; that's where Adderall came in.  Was overweight

4    at the time; that's where the phentermine came in.  I was

5    stressed out; that's where the Ambien came in at night,

6    try to help me sleep.  And I'm an anxious person anyway;

7    that's where the Xanax came in.

8    Q.    Are you on all those medications today?

9    A.    No.  I'm on one.

10   Q.    Okay.  So you think you needed all that stuff?

11   A.    I didn't.

12   Q.    Are you a doctor?

13   A.    No, I'm not.

14   Q.    When you go to your doctor, does your doctor

15   usually write you whatever you ask for?

16   A.    No.

17   Q.    And I just want to clarify one thing.  I want to

18   make sure that the record is clear.  You had mentioned

19   Xanax, and I think you had mentioned in the context of

20   the opioids.

21   A.    Yes, sir.

22   Q.    Xanax is not an opioid, right?

23   A.    No.  It's a benzodiazepine.

24   Q.    Used for -- to treat anxiety?

25   A.    To treat anxiety.

1    Q.    Did Jeff Young ever turn you down for anything you

2    asked him for?

3    A.    No.

4    Q.    To your knowledge, did he ever turn down any of the

5    employees for anything that they asked for?

6    A.    Not to my knowledge.

7    Q.    Did you ever observe any of the other employees at

8    Preventagenix in an office visit with Jeff Young before

9    they got a controlled drug prescription from him?

10   A.    I did not.

11   Q.    Let's go back to when you left Preventagenix.  And

12   I think you mentioned that that was in August of 2015?

13   A.    2015.

14   Q.    From the earlier exchange we saw at

15   Government's 1 -- at the time that you left, were you

16   continuing to get calls from pharmacies of the kind you

17   were describing in Government's 1?

18   A.    Every day.

19   Q.    Did you continue to raise those concerns to

20   Mr. Young?

21   A.    I did.

22   Q.    What was his reaction?

23   A.    That he was the -- he was the nurse practitioner,

24   and he was the boss.

25   Q.    Would -- were his -- was his reaction always the

1    same?

2    A.    Usually.  He knew what he was doing.

3    Q.    Describe his temperament when you would talk about

4    your concerns.

5    A.    Repeat that.

6    Q.    Describe his temperament.  Like, was he calm; was

7    he animated?

8    A.    I believe he told me what I wanted to hear, and he

9    would -- sometimes he would get a little agitated that I

10   was asking him the -- you know, telling him that they

11   were calling and asking me questions.

12   Q.    Were your concerns having an impact on the way that

13   he was doing business at Preventagenix?

14   A.    I was concerned.  I was concerned for him.

15   Q.    Did you sharing those concerns change anything

16   about what he was doing at Preventagenix?

17   A.    No.

18   Q.    All right.  Ms. Goslee, I'm going to show you

19   what's been marked for identification as

20   Government's 223.  Do you recognize that?

21         (A document was passed to the witness.)

22   A.    I do.

23   **BY MR. PENNEBAKER:**

24   Q.    And what is that, that single page?

25   A.    It's a text message between Jeff and myself.

1    Q.    Okay.

2          **MR. PENNEBAKER:**  Your Honor, we would offer

3    what's been marked for identification as Government's 223

4    as Government's Exhibit 3.

5          **THE COURT:**  All right.  We'll go ahead and

6    receive it as Exhibit 3.

7          **MR. PENNEBAKER:**  Thank you, Your Honor.

8          And Ms. Silverberg, if you would, please publish

9    it for the jury.

10         (The above-mentioned item was marked as

11   Exhibit No. 3.)

12   **BY MR. PENNEBAKER:**

13   Q.    So Ms. Goslee, who's in the blue, and who's in the

14   gray?

15   A.    I'm in the blue, and Jeff is in gray.

16   Q.    Okay.  So we'll do the same thing.  I'll be Jeff,

17   and you be you.

18   A.    "We have to talk tomorrow.  I've had two calls

19   tonight about your prescription writing."

20   Q.    "I'll call you now."

21   A.    "My parents are here."

22   Q.    "Okay.  Just with 54 patients, not sure when we can

23   talk."

24   A.    "I said we will.  You get a lunch."

25   Q.    Okay.  And do you remember about when this exchange

1   took place, because there's no date on this particular

2   exhibit?  Do you remember that?

3   A.    I don't recall the exact date.  I don't recall the

4   exact date.

5   Q.    Do you remember the month, like how -- how close it

6   was to the time that you left?

7   A.    I want to say June or -- June or July.

8   Q.    Okay.  So that's about a month before you left?

9   A.    Yes.

10  Q.    Five months after the last --

11  A.    Yes.

12  Q.    -- Government's 1?

13  A.    Yes.

14  Q.    And I want to show you --

15       **MR. PENNEBAKER:**  And you can take that down,

16  Ms. Silverberg.  Thank you.

17  **BY MR. PENNEBAKER:**

18  Q.    I want to show you what's been marked for

19  identification as Government's 917.

20            (A document was passed to the witness.)

21  **BY MR. PENNEBAKER:**

22  Q.    Do you recognize that?

23  A.    I do.

24       **MR. PENNEBAKER:**  And Your Honor, the government

25  would offer what's been marked as 917 as Government's 4.

1          **THE COURT:**  What is it?

2          **MR. PENNEBAKER:**  It is a single page.  Looks

3  like an excerpt from Facebook --

4          **THE WITNESS:**  Yes.

5          **MR. PENNEBAKER:**  -- exchange.

6          **THE COURT:**  Okay.  We'll go ahead and receive

7  it, document showing a Facebook entry, I guess it is.

8          (The above-mentioned item was marked as

9  Exhibit No. 4.)

10          **MR. PENNEBAKER:**  And Ms. Silverberg, if you

11  would publish, please.

12  **BY MR. PENNEBAKER:**

13  Q.    What does Jeff Young say there at the top?

14  A.    "Go to CVS.  Walgreens is the worst about

15  profiling.  I wrote the GD script.  If they don't want to

16  fill it, take your business elsewhere."

17  Q.    Did Mr. Young ever -- did Mr. Young ever share with

18  you why he thought these pharmacies weren't filling his

19  prescriptions?

20  A.    Repeat the question.

21  Q.    Did Mr. Young ever share with you his thoughts

22  about why Walgreens wouldn't fill his prescriptions?

23  A.    His thoughts?

24  Q.    Like, did he ever convey to you what he thought

25  about why this was happening to him?

1   A.    They felt he -- he thought that they were profiling

2   him.

3   Q.    Okay.  And explain that a little bit more.  What

4   is -- what is profiling?

5   A.    As walking -- working in a pharmacy, you see a lot

6   of doctors' prescriptions come in every day.  And when

7   you see a lot coming from the same prescriber of these

8   type drugs, it throws a flag.

9   Q.    Okay.  Do you think -- so did you understand that's

10  what Mr. Young meant by "profiling," or did he mean

11  something else?

12  A.    I believe that's what he meant.

13  Q.    Okay.

14  A.    Walgreens -- Walgreens doesn't profile, but we have

15  a "what we have to go by."  Good faith dispensing is what

16  it's called.

17  Q.    Okay.

18  A.    If you're on a opioid or benzodiazepine and muscle

19  relaxer, it's like a -- they call it a cocktail

20  combination.

21  Q.    All right.

22         **MR. PENNEBAKER:**  And you can take that down,

23  Ms. Silverberg.  Thank you.

24  **BY MR. PENNEBAKER:**

25  Q.    You mentioned you shared your concerns with

 1    Mr. Young about his prescribing of controlled substances,

 2    right?

 3    A.    Yes, sir.

 4    Q.    Did you ever share with him concerns of others that

 5    you'd heard?

 6          In other words, were there others at Preventagenix

 7    who were coming to you with concerns similar to the ones

 8    that you had?

 9    A.    Yes.

10          **MR. FERGUSON:**  I object to hearsay.

11          **THE COURT:**  You have to lay a better foundation

12    for that.  At this point, it's sustained.

13          **MR. PENNEBAKER:**  Okay.  Thank you, Your Honor.

14    **BY MR. PENNEBAKER:**

15    Q.    Did you talk to Mr. Young about the concerns of

16    others in addition to your own concerns?

17    A.    I did.

18    Q.    What concerns of others did you share with him?

19          **MR. FERGUSON:**  Still object to hearsay.

20          **MR. PENNEBAKER:**  It's not offered for the truth,

21    Your Honor.  It's offered for the effect that it had on

22    Mr. Young and for his -- for the purpose of demonstrating

23    his knowledge.

24          **MR. FERGUSON:**  I think the -- excuse me.

25          **THE COURT:**  Go ahead.

1          **MR. FERGUSON:**  The actual statements.  If the

2    actual statements come in, they're hearsay.  If she says,

3    just generally, I spoke to him and this is what he did, I

4    don't have an objection to what that question is.

5          **THE COURT:**  It's the -- what they're telling me,

6    that it's not offered for the truth of it.  Really, it's

7    for the impact that it had on -- on Mr. Young and his

8    response to that.  So with that in mind, I'm going to go

9    ahead and overrule the objection.

10         **MR. FERGUSON:**  Obviously I'd ask for an

11   explanation to the jury on the -- how to take that

12   evidence.

13         **THE COURT:**  All right.  Normally, many times

14   when people talk with others, it's hearsay.  Sometimes we

15   can allow that testimony in.  It's not going to prove the

16   truth of what those individuals said to the witness.  But

17   the witness communicated certain things to Mr. Young and

18   apparently got some response back to him.  That's the

19   only reason that I'm allowing this, so keep that in mind.

20   It's not for the truth of what the witness is about to

21   testify to but the impact that it had on Mr. Young and

22   possible response.

23         You may proceed.

24         **MR. PENNEBAKER:**  Thank you, Your Honor.

25   **BY MR. PENNEBAKER:**

*TESTIMONY OF HEATHER GOSLEE*

1    Q.    So you -- you mentioned that you shared with him

2    the concerns of others.  Were some of these others that

3    you told him about employees of Preventagenix?

4    A.    Yes.

5    Q.    And what happened to those employees after you

6    shared those concerns?

7          What happened to those employees after you shared

8    those concerns, in terms of their job at Preventagenix?

9    A.    In February, I had to fire one, and then I fired

10   one in August, right before I left.

11   Q.    What was your -- did -- why did you fire them?

12   A.    I was told to by Jeff.

13         One of the other employees also worked at Walgreens

14   part-time.  She was getting calls, too.  So she was a

15   receptionist, so she would come to my office, voice her

16   concerns.

17   Q.    And you would share those with Mr. Young?

18   A.    Yes.

19   Q.    And then ultimately you were asked by Mr. Young to

20   fire that individual?

21   A.    I was.

22   Q.    During this time in late 2015, right around the

23   time that you left, did Jeff Young blame others besides

24   pharmacies for getting in the way of his prescribing?

25   A.    Repeat that for me.

1    Q.    Sure.

2          During this time, did Jeff Young blame others for

3    some of the things -- some of the -- for example, for

4    pharmacies cutting him off?  Did he blame others, besides

5    himself, for pharmacies cutting him off?

6    A.    I misunderstand the question.

7          Blaming others?

8    Q.    Blaming others.  Like, did he -- did he accept that

9    his prescribing was the reason that he was having

10   pharmacies like Walgreens cut him off, or did he think

11   that there was some other reason that pharmacies were

12   cutting him off?

13   A.    I believe that he knew that he was overwriting.  I

14   had discussed it with him multiple times.  I was just

15   there to help him.  I was just there to help him keep his

16   license, and I knew he was being watched.

17   Q.    You said you knew he was being watched.  Explain

18   that.

19   A.    I come from a family of law enforcement.  The DEA

20   was involved.  The pharmacists would get -- well, the

21   pharmacists at Walgreens would refuse to fill the

22   prescription because they had concerns and would say they

23   were turning him over to the DEA.  That concerned me.

24   Q.    Do you know what a witch-hunt is?

25   A.    No.

1   Q.    You've never heard the term "witch-hunt"?

2   A.    I mean, I've heard of it, but I don't know what it

3   is.

4   Q.    Okay.  Did you ever use -- hear the defendant use

5   that phrase?

6   A.    Witch-hunt?  Not that I recall.

7   Q.    Okay.  Ms. Goslee, I'm going to hand you what's

8   been marked for identification as Government's 222.  And

9   this is a seven-page text thread.

10          (A document was passed to the witness.)

11  **BY MR. PENNEBAKER:**

12  Q.    Do you recognize that?

13  A.    I need my readers.

14        I do.  I recognize it.

15  Q.    Thank you.  I'll take it back from you and put it

16  up on the screen after I offer it into evidence.

17        **MR. PENNEBAKER:**  Your Honor, if I could offer

18  this as Number 5 of the Government's evidence.

19        **THE COURT:**  That will be Number 5, a text

20  exchange.

21        **MR. PENNEBAKER:**  A text exchange, seven pages.

22        (The above-mentioned item was marked as

23  Exhibit No. 5.)

24        **MR. PENNEBAKER:**  And Ms. Silverberg, if you

25  would publish, please.

*UNREDACTED TRANSCRIPT*

1    **BY MR. PENNEBAKER:**

2    Q.    All right.  If we could zoom in on that top one.

3          Ms. Goslee, is this a message that you wrote?

4    A.    It is.

5    Q.    What's the date?

6    A.    August the 6th, 2015.

7    Q.    What do you say in that text message?

8    A.    "I'm going to say this once.  If anyone has a

9    problem with me or how I handle things at the clinic, you

10   need to come to me.  Apparently we have a snake in the

11   group, and I want you to know who the pot stirrer is.

12   You can text me individually or group."

13   Q.    Do you recall what you would have meant by pot --

14   do you recall what you meant by "pot stirrer"?

15   A.    This was about a week before I left.

16   Q.    Who's on -- who is this exchange with, by the way?

17   A.    It's our whole -- it's our whole clinic, group

18   chat.

19   Q.    Okay.

20   A.    It's the medical assistants, the lab, and the

21   receptionist.

22   Q.    Okay.

23          **MR. PENNEBAKER:**  And Ms. Silverberg, if you

24   would, please go to the second page of that exhibit, and

25   zoom in on the top line.

1    BY MR. PENNEBAKER:

2    Q.    Ms. Goslee, will you read that top line?

3    A.    "Effective immediately, Heather Goslee is no longer

4    office manager at Preventagenix.  If anyone else had a

5    problem with the company and the way its run, I except

6    your resignations by tomorrow morning as well."

7    Q.    Who wrote that text message?

8    A.    Jeff.

9    Q.    What -- what was he telling the employees of the

10   clinic and you?

11   A.    That I'd been fired.

12          MR. PENNEBAKER:  Ms. Silverberg, if we could go

13   to the next page, please, and zoom in on the top.

14   BY MR. PENNEBAKER:

15   Q.    And would you please read that message?

16   A.    "I'm serious as a fucking heart attack, and you

17   know how serious I take heart health.  I'm done fucking

18   around.  We have too much good to do.  The kindergarten

19   bullshit and people forgetting who is in charge is over."

20   Q.    Okay.

21          MR. PENNEBAKER:  And Ms. Silverberg, if you

22   could go to the next message, please.

23   BY MR. PENNEBAKER:

24   Q.    And read that, please, Ms. Goslee.

25   A.    "I want a meeting with everyone in my office at

 1    7:45 a.m., except Heather."

 2    Q.    And this is still the defendant talking?

 3    A.    Yes.

 4    Q.    By the way, the date on these last couple of

 5    exchanges we've been reading, what's that date?

 6    A.    August the 9th, 2015.

 7    Q.    Okay.

 8          **MR. PENNEBAKER:**  And Ms. Silverberg, if you

 9    could go to Page 4, please, and zoom in on the first one.

10    **BY MR. PENNEBAKER:**

11    Q.    So he's just said "except Heather," and then you

12    reply?

13    A.    "Because you can't face me?"

14          **MR. PENNEBAKER:**  And then next message, please,

15    Ms. Silverberg.

16    **BY MR. PENNEBAKER:**

17    Q.    Go ahead, Ms. Goslee.

18    A.    "I had enough of you over the telephone.  Just no.

19    Threatening to have your daddy come up and whip my ass."

20    Q.    I think you mentioned this already, but what line

21    of work is your father in?

22    A.    He was Tennessee Highway Patrol.

23    Q.    Okay.  And why do you think he would've been -- why

24    were you telling Jeff that your daddy was going to whip

25    his ass?

1    A.    Well, because he was cussing me out over the phone.

2    Q.    Any other reason?

3    A.    No.  I'm a daddy's girl, and that just came out of

4    my mouth.

5    Q.    Okay.

6          **MR. PENNEBAKER:**  If we could go to Page 5,

7    please, Ms. Silverberg.  Zoom in on the first one.  Thank

8    you.

9    **BY MR. PENNEBAKER:**

10   Q.    Go ahead and read, Ms. Goslee.

11   A.    "Just now.  I have enough.  I've seen enough.  I

12   have heard enough.  I have never been spoken to by

13   someone that works for me in the manner I was just talked

14   to."

15   Q.    Okay.

16         **MR. PENNEBAKER:**  And Ms. Silverberg, if you

17   could go to the next one.

18   A.    I said:  "Neither have I."

19         **MR. PENNEBAKER:**  And if we could go to Page 6,

20   please, Ms. Silverberg.

21   **BY MR. PENNEBAKER:**

22   Q.    Mr. Young responds?

23   A.    "I'm the goddamn boss."

24         **MR. PENNEBAKER:**  And if we could go to the next

25   message, please, Ms. Silverberg.

1    A.    I said: "I know you are.  I just want you to

2    listen to me."

3            **MR. PENNEBAKER:**  And if we can pull that down,

4    please, Ms. Silverberg.

5    **BY MR. PENNEBAKER:**

6    Q.    Ms. Goslee, I'll just state for the record that you

7    are -- you seem upset.  And if -- I'm sorry to have you

8    say yes when you're nodding but just for the record.

9    A.    It just brings back a lot of memories.

10   Q.    It brings back a lot of memories?

11   A.    (Nodding head up and down.)

12   Q.    Why do those memories make you upset?

13   A.    Like I said in the beginning, when we first opened

14   this clinic, it could have been huge.  It could have been

15   huge for the town, the heart and the stroke prevention.

16   Jeff is very smart.  And then towards the end, I just saw

17   it spiraling down, and it hurt me.  And it hurts to know

18   that this is where we're at.

19           **MR. PENNEBAKER:**  Thank you, Your Honor.  Pass

20   the witness.

21           **THE COURT:**  Thank you.

22           And Mr. Ferguson, is there any cross?

23           **MR. FERGUSON:**  Thank you, Your Honor.

24                       **CROSS-EXAMINATION**

25   **BY MR. FERGUSON:**

1   Q.    Good morning.

2   A.    Good morning.

3   Q.    It hurts because you like Jeff?

4   A.    I did.

5   Q.    How long have you known him?

6   A.    I met Jeff in May of 2014.

7   Q.    And how did you come to meet him?  At -- is it with

8   Briley's?

9   A.    It was a clinic out south.  He was filling in for a

10  nurse practitioner.

11  Q.    And that nurse practitioner wasn't working right

12  then because of what reason?

13  A.    He was sent to rehab.

14  Q.    For doing drugs?

15  A.    Yes.

16  Q.    And Jeff was brought in to cover that clinic, and

17  that's where you met him?

18  A.    He was.

19  Q.    And had you heard of or did you know of Jeff Young

20  before then?

21  A.    I did not.

22  Q.    You got to know him?

23  A.    I did.

24  Q.    And you found him to be a very competent

25  practitioner?

1    A.    Yes.

2    Q.    Fair to say he cared about his patients?

3    A.    He did.

4    Q.    And he was doing good work?

5    A.    He was.

6    Q.    Good enough work that he had a plan to open his own

7    clinic?

8    A.    He did.

9    Q.    And he told you about it?

10   A.    Yes, sir.

11   Q.    And told you what his idea was for this clinic?

12   A.    Yes, sir.

13   Q.    And what was that idea?

14   A.    To open a clinic, focusing in the heart and stroke

15   prevention.  He did a lot of -- like I said, he did -- he

16   went a lot and spoke about the heart.  He's very smart.

17   Q.    And he had a lot of background in cardiology,

18   cardiac nurse practitioner work?

19   A.    He did.

20   Q.    Were you familiar with him setting up Skyline

21   clinic, one of the cardiology clinics in Jackson?  Is

22   that something you were aware of?

23   A.    No.

24   Q.    Okay.  You were under the impression the idea was

25   to go open up a clinic and do family medicine and

 1  cardiovascular health?

 2  A.    Yes, sir.

 3  Q.    With an idea -- with the name Preventagenix was

 4  because it was preventive medicine, trying to help people

 5  stay well, not only take care of people who were sick?

 6  A.    Correct.

 7  Q.    And you liked that idea?

 8  A.    I did.

 9  Q.    Why?

10  A.    It just interested me.

11  Q.    You left your job that you had to go work for Jeff

12  Young?

13  A.    Yes.  I kept any pharmacy license, and I did leave

14  my job.

15  Q.    You had a -- you had a job that was secure; it was

16  up and running, been running for a while, and you left to

17  go start out on this new venture with Jeff?

18  A.    I did.

19  Q.    It was risky?

20  A.    It was.

21  Q.    But you were willing to take a risk with him?

22  A.    I did.

23  Q.    Because you believed in him?

24  A.    I did.

25  Q.    And the person Jeff was in 2014 when you started

*TESTIMONY OF HEATHER GOSLEE*                                                        47

```
 1   this, you felt that person could make this work?

 2   A.    In 2014, I did.

 3   Q.    End of 2014, 2015, something happened that started

 4   to change Jeff; is that correct?

 5   A.    Yes, sir.

 6   Q.    What happened?

 7   A.    We started -- well, he wanted to start opening more

 8   clinics.  We were trying to open one in another small

 9   town, and we opened one downtown Jackson.  And in my

10   opinion, I just thought it was going too, too fast.

11   Q.    He was expanding way too fast?

12   A.    In my opinion, yes.

13   Q.    Were you aware he was also going through a very

14   contentious divorce at that time?

15   A.    I was.

16   Q.    And that divorce was, would you say, consuming a

17   lot of his attention?

18   A.    It did.

19   Q.    And did -- really kind of put the -- I don't know

20   what word to use, especially in a courtroom.  Kind of put

21   the zap on it. didn't it?

22   A.    I'm sorry; repeat.

23   Q.    Kind of -- kind of hit him up here in the head a

24   little bit, didn't it?

25   A.    Yeah.  She was a lot.
```

*TESTIMONY OF HEATHER GOSLEE*

1    Q.    They were a lot; would that be fair to say?

2    A.    They.

3    Q.    Jeff and Dawn, his ex-wife or soon to be ex-wife,

4    they were going back and forth with each other?

5    A.    Yes.

6    Q.    And it got real ugly?

7    A.    Yes.

8    Q.    Would you say he became distracted based on the

9    time and effort he was putting into fighting with his

10   ex-wife?

11   A.    Yes.

12   Q.    And it was becoming consuming of who he was?

13   A.    Yes.

14   Q.    And during that time period, you began to see

15   changes within Jeff?

16   A.    I saw changes.

17   Q.    He began to take on this persona of the Rock Doc.

18   Was that new at that time?  Was that something you had

19   seen up to this point?

20   A.    That was at the very end.

21   Q.    Okay.  So you were there when he started to take on

22   this persona of the Rock Doc?

23   A.    Like I said, I left in August.  It was in the end.

24   Q.    Tell me what you mean by "the end."  I'm not --

25   A.    August.

```
 1   Q.    Okay.  So --

 2   A.    When I left.

 3   Q.    So when you left, that's when it first kind of came

 4   to a head?

 5   A.    Yes.

 6   Q.    Okay.

 7   A.    Mid -- mid summer.

 8   Q.    Concerned you?

 9   A.    It did.

10   Q.    Not really necessarily appropriate for a nurse

11   practitioner to be running around like -- posting on

12   social media, I'm the Rock Doc, and this is --

13   A.    I tried to -- I tried to steer him away from social

14   media, but Jeff's going to do what Jeff wants to do.

15   Q.    He likes to be -- at that point, especially, he was

16   liking the attention?

17   A.    Yes, sir.

18   Q.    Do you think that that, to some extent, was also a

19   way to get back at his ex-wife to prove that he hadn't

20   lost -- that he was -- he was popular, and people -- and

21   women, especially, loved him?  You don't see how that was

22   targeted towards his wife?

23   A.    I don't see if it was targeted towards her.  He

24   tried to forget about her, but --

25   Q.    Or maybe as a response to the loss he was feeling?
```

1   A.    Could've been.

2   Q.    It was your opinion -- I think you said that he was

3   overprescribing controlled substances?

4   A.    Yes, sir.

5   Q.    You would address that with him, and he would --

6   air quotes -- for the record, air quotes -- he would

7   remind you who the practitioner was?

8   A.    Correct.

9   Q.    But you're a pharmacy tech?

10  A.    Yes, sir.

11  Q.    You have training in this?

12  A.    Since 1995.

13  Q.    And you were trying to help him?

14  A.    I was.

15  Q.    And his -- every time his -- not every time, but

16  the majority of the time, his response was, I know what

17  I'm doing; I'm the whatever.  What did he call -- he

18  didn't call himself a doctor.  What -- I'm the --

19  A.    Nurse practitioner.

20  Q.    I'm the nurse practitioner; I'm the one with the

21  training?

22  A.    Correct.

23  Q.    Okay.  And he does have training, right?  That's --

24  that's additional training on top of being a nurse.  He's

25  a nurse practitioner, and he's gone and gotten his

1    master's?

2    A.    Correct.

3    Q.    And under the rules of Tennessee, he's able to

4    prescribe medications?

5    A.    He is.

6    Q.    Including these C2s, these Schedule II drugs?

7    A.    He is.

8    Q.    Do -- was the first clinic that opened, was it the

9    downtown clinic, or was is it the -- is it Trezevant?

10   A.    Trezevant, but it -- it wasn't there very long.

11   Q.    Okay.  And that was kind of his plan, to, like,

12   just start expanding as quickly as he could into

13   different locations?

14   A.    Correct.

15   Q.    Do you think he was taking care of the Jackson

16   facility well enough to be expanding at this time?

17   A.    I thought we had it good at the North Jackson

18   clinic.  We were seeing a lot of patients.  I just

19   thought it was a little too soon to start spreading out

20   that much.

21   Q.    Think it was going to spread him too thin?

22   A.    I believe so.

23   Q.    Draw his attention away from what he should have

24   been doing?

25   A.    Yes.

1   Q.     Taking care of the patients at the Jackson

2   location?

3   A.     Yes, for heart and health, heart and stroke.

4   Q.     The part that you went over with him to help set

5   up?

6   A.     Yes.

7   Q.     During the course of your stay down there, I think

8   you testified that his patient count began to grow at a

9   tremendous rate?

10   A.     Towards the middle and end of the summer, yes, sir.

11   Q.     And as this patient numbers grew, he was -- then

12   started to take less and less time with each patient?

13   A.     My office, like I had said earlier, was on the

14   other side.  I didn't see the patients, unless I happened

15   to walk over there.  But, you know, I knew.  I had a

16   chart of who would come in each day, so the patient load

17   did get a little higher.

18   Q.     If he's seeing 55 patients a day, you know he's not

19   taking the same amount of time as if it was 15?

20   A.     No.

21   Q.     When the numbers started to go up -- kind of a

22   weird question.  And, again, you may not know because of

23   where you were.  You said that the clientele changed.

24   They became younger.  I think you used the word "trashy,"

25   if I remember correctly -- I may have written it down

1    wrong -- and smelled bad.

2        When the -- when the clientele started to change

3    from the older clientele to the younger, trashier,

4    smelly, was -- did the patients come first or the

5    prescribing that made you uncomfortable happen first?

6    A.    The prescribing was what my number one concern was.

7    Q.    But you weren't seeing how the patient load changed

8    in the -- in the office or in the -- what do you call

9    that side?

10       You're -- you're in the office, and he's in the

11   clinical side?

12   A.    Correct, yes.

13   Q.    You weren't watching the clinical side change; you

14   just saw the numbers change?

15   A.    I saw the numbers change.  I would have the front

16   office staff -- they would come and talk to me.

17   Q.    Had you had any dealings with Ms. -- Nurse

18   Practitioner Petway?  P-E -- I think it's P-E-T-W-A-Y

19   somewhere in there.

20   A.    Yes.  Jeff hired her to run the downtown clinic in

21   Jackson.

22   Q.    Were you aware of what her clientele was like?

23   A.    Yes.

24   Q.    Was it more younger and people getting

25   prescriptions for pain medications?

1    A.    I'm not aware.  I know that she worked at a down --

2    at a clinic in -- in East Jackson, is all I really knew

3    about her.

4    Q.    She was working at the downtown satellite office?

5    A.    Yes, sir.

6    Q.    When she left, do you know if her patients are the

7    ones that came into the -- I think it was sometimes

8    referred to as the mother ship, the main Preventagenix

9    clinic, the day --

10   A.    Her patients never came, to my knowledge, to the

11   Jackson -- the North Jackson.

12   Q.    When she was fired, let go, or quit, did those

13   patients then continue to stay with Mr. --

14   A.    I wasn't there, so I don't know.

15   Q.    Thank you.  I didn't -- that's good timing.  I

16   appreciate that.

17         If you -- you did the billing, would you have known

18   how many prescriptions Petway was writing?

19   A.    I don't know much about Petway.  Petway was hired a

20   month before I left.

21   Q.    Okay.  Jeff prescribed you medications?

22   A.    He did.

23   Q.    You would -- as somebody that's in the healthcare

24   profession, you would tell him what you thought you

25   needed and what the reason for it was, and if he agreed

1    to it -- sounds like every time -- he would write you

2    prescriptions for it?

3    A.    Now, I would tell him my issues, if I was having

4    trouble sleeping or if I was having trouble focusing, and

5    I would ask him to recommend something.  He would write

6    it.

7    Q.    And that was based on your description of your

8    symptoms and --

9    A.    Correct.

10   Q.    And he was prescribing you medication that was

11   related to the symptoms that you relayed to him?

12   A.    Yes.  He would come in my office; we would talk.

13   This is when we would talk, after clinic.

14   Q.    But currently, you're now only on one of those

15   medications?

16   A.    Yes.

17   Q.    We're talking a difference of seven years has gone

18   by?

19   A.    Eight.

20   Q.    Eight years has gone by.  You no longer need those

21   medications, do you?

22   A.    I have to have one.

23   Q.    Fair enough.  You still have to have one of them,

24   don't you?

25   A.    I do.

*TESTIMONY OF HEATHER GOSLEE*

1  Q.   And that was one of the drugs Mr. Young was

2  prescribing to you?

3  A.   He's not the original prescriber, but yes, he did

4  prescribe it to me.

5  Q.   What we call continuity of care.  You came in,

6  already had somebody prescribing it to you.  He continued

7  to --

8  A.   He refilled it.

9  Q.   And you're still getting refills?

10  A.   I still take it.

11  Q.   You've referred your family to Mr. Young?

12  A.   I did.

13  Q.   And they saw Mr. Young and were treated by

14  Mr. Young?

15  A.   They were.

16  Q.   And they were treated, as far as you're concerned,

17  appropriately and well?

18  A.   At the time, they were.

19  Q.   When you started as the office manager, you had

20  never worked as an office manager in a clinic before?

21  A.   Only like two months at the South Jackson location.

22  Q.   One of the questions in this case may came up.  It

23  will be the percentage of files that were reviewed by the

24  preceptor or the -- the doctor who oversees nurse

25  practitioners.

1    A.    Yeah, I -- like I said, I wasn't really -- I didn't

2    know much about being an office manager, so I don't know

3    that -- how many that they had to review.  So I -- I did

4    not know the percentage that they had to review, if it

5    was a controlled substance written.

6    Q.    To be -- not putting words in your mouth.  You tell

7    me if I'm wrong.

8          To be more specific, you didn't know, at the time

9    when you started, that any chart that prescribed

10   Class 2 -- or opioids, narcotics, 100 percent of those

11   files had to be reviewed by the preceptor?

12   A.    I did not know that.

13   Q.    You thought it was just the general 20 percent have

14   to be reviewed?

15   A.    Yes, sir.

16   Q.    Within the practice, were some patients fired for

17   things such -- I saw you glance.  Me, too.

18         If patients were being prescribed Schedule II

19   narcotics, would there be drug screens?

20   A.    We did do toxicologies.  Yes, drug screens.

21   Q.    And if -- there are certain ways in which those

22   drug screens are used to try to help a provider determine

23   whether or not that patient is abusing or misusing those

24   drugs; is that correct?  That's the --

25   A.    Repeat that for me.

1    Q.    What's the purpose of the drug screen?

2    A.    To make sure that they're taking the medicine that

3    they've been prescribed.  If it's not in their system, we

4    know that they're not using that medication for

5    themselves.

6    Q.    That's where you get into the -- you become

7    suspicious of what's called diversion; is that right?

8    That they're not taking it; they're getting the

9    prescription; they're selling it?

10   A.    Could be.

11   Q.    And they come back in, and they don't have it in

12   their system --

13   A.    Right.

14   Q.    -- you want to start asking them questions why they

15   don't have it in the system?

16   A.    Correct.

17   Q.    Now, they may be taking it wrong, like doubling up

18   their dose, been out for a week, or they could be selling

19   their pills out on the street; is that correct?

20   A.    Correct.

21   Q.    So also if they come in and they, like, do a drug

22   screen and they're all hot for cocaine and LSD and

23   benzodiazepines that haven't been prescribed and don't

24   show up on any of the prescribing records, that's a red

25   flag?

1   A.     It is a red flag.

2   Q.     Jeff had a little unusual opinion of marijuana when

3   it came to drug screens, didn't he?

4   A.     He did.

5   Q.     What was Jeff's opinion of marijuana?

6   A.     He wasn't concerned with marijuana.

7   Q.     He was in favor of marijuana being used as

8   medicine, medicinal marijuana, like Mississippi and

9   Arkansas have?

10  A.     He wanted it passed, yes.

11  Q.     He felt, in his professional opinion, that

12  marijuana should be scheduled as a prescription drug that

13  practitioners should be able to prescribe to patients?

14  A.     I'm not sure about that.  I just know he like

15  marijuana.

16  Q.     He -- if somebody tested positive for marijuana in

17  a drug screen, would he what's called fire them from the

18  clinic?

19  A.     No, sir.

20  Q.     If they tested positive for hard drugs -- LSD,

21  cocaine -- were those patients fired?

22  A.     They should have been.

23  Q.     Should have been.

24         Okay.  And sometimes the office would do that?

25  A.     Yes.  I wasn't in charge of that.

1    Q.    Okay.

2    A.    Screen is bright.

3    Q.    It's really bright.

4          Let's see.  Just a few more, if I may.

5          Where do you live?

6          You say that you tried to help Jeff out?

7    A.    I believe I did.

8    Q.    But he didn't listen to you, did he?

9    A.    He didn't.

10   Q.    He kept telling you that he was -- that he was

11   the -- he was the -- he was the medical person?

12   A.    Correct.

13   Q.    And he was prescribing the medications he thought

14   was appropriate?

15   A.    Correct.

16   Q.    You disagreed with him?

17   A.    I did.

18   Q.    He had a different opinion?

19   A.    Yes.

20   Q.    The reason why you were tearing up there at the end

21   is because you hate where we are today?

22   A.    Like I said, this was eight years ago.  We had fun

23   at the clinic in the beginning.  It was -- it was -- he

24   could have been a great clinic.  And --

25   Q.    Great clinician?

1   A.    In the beginning, yes.

2        I don't know what happened after I left.  I was cut

3   off from all of that, so a lot of this is new to me, too.

4        **MR. FERGUSON:**  I appreciate you being here.

5   Thank you for your testimony.

6        **THE WITNESS:**  Thank you.

7        **THE COURT:**  Thank you, Mr. Ferguson.

8        **MR. FERGUSON:**  Thank you, Your Honor.

9        **THE COURT:**  Mr. Pennebaker, any redirect?

10       **MR. PENNEBAKER:**  Very briefly, Judge.

11       **THE COURT:**  Go ahead.

12                        **DIRECT EXAMINATION**

13  **BY MR. PENNEBAKER:**

14  Q.    Ms. Goslee?

15  A.    Yes, sir.

16  Q.    You said that you were -- after you left, you were

17  cut off?

18  A.    I received letters, cease and desist, not to

19  contact the office staff.  They didn't want to hear from

20  me.

21  Q.    So you weren't hearing from -- directly from people

22  at the clinic anymore or at least not from the defendant?

23  A.    No.  I received a letter:  Do not communicate.

24       I did receive a couple of text messages stating

25  that his office staff did not want to have anything to do

1    with me, speak to me, and my husband had to get involved

2    and tell him to stop.

3    Q.    Ms. Goslee, I'm going to hand you what's been

4    marked for identification as Government's 224.

5    A.    Yes.

6    Q.    Do you recognize that?

7          (A document was passed to the witness.)

8    A.    I do.

9          **MR. PENNEBAKER:**  Your Honor, the government

10   offers --

11         **THE COURT:**  What is it?

12         **MR. PENNEBAKER:**  -- 6, which is a --

13         **THE WITNESS:**  E-mail.

14         **MR. PENNEBAKER:**  An e-mail.

15         **THE COURT:**  Okay.  Just have the witness

16   identify what she's looking at so that I can write down

17   what the exhibit is.

18         **MR. PENNEBAKER:**  Will do, Judge.  Thank you.

19         So the government offers Government 6, which is

20   an e-mail from a pharmacy manager to Richard Denton.

21         **MR. FERGUSON:**  I'm going to object to this one.

22   Can we sidebar real quick?

23         **THE COURT:**  Sure.

24         (Bench conference on the record, with

25   Mr. Ferguson and Mr. Pennebaker only, out of the hearing

1   of the jury.)

2          **MR. FERGUSON:**  It's -- if I'm understanding

3   correctly -- and tell me -- obviously tell me.  I hate

4   being wrong, so I like to be corrected as fast --

5          **MR. PENNEBAKER:**  No.

6          **MR. FERGUSON:**  It's not from either Jeff or

7   Ms. Goslee, and so I don't think either one of them can

8   authenticate this.  But the real question is, I think

9   this is outside the scope of my cross also.  So I'm

10  just -- I'm not -- I expect this to come in.  I

11  just . . .

12         **THE COURT:**  So the objection is beyond the scope

13  of purpose of redirect?

14         **MR. PENNEBAKER:**  So the -- she just said that

15  she hadn't heard anything afterwards.  So the testimony

16  got into what she heard about the clinic after she left,

17  and so this is when she was working at Walgreens after

18  she left Preventagenix.  This was an --

19         **MR. FERGUSON:**  This is -- this is when she was

20  working at Walgreens?

21         **MS. PAYERLE:**  Correct.

22         **MR. FERGUSON:**  And she got this through --

23         **MR. PENNEBAKER:**  Yes.

24         **MR. FERGUSON:**  -- her employment?

25         **MR. PENNEBAKER:**  Yes.

1          **MR. FERGUSON:**  Okay.  So she has personal

2    knowledge?

3          **MR. PENNEBAKER:**  She has personal knowledge of

4    it.

5          **MR. FERGUSON:**  I still think it's outside the

6    scope, but that makes me feel a little bit better about

7    why it's attempting to come in from this witness.

8          **THE COURT:**  How does it relate to the cross?

9          **MR. PENNEBAKER:**  Just because at the end of her

10   testimony, she said that after she left, she didn't hear

11   anything further.  And so this was just to say you did

12   hear some things further, which were, when you worked at

13   Walgreens, they were still concerned about his

14   prescribing even during the time after you left.

15         **THE COURT:**  I'll overrule the objection --

16         **MR. FERGUSON:**  Thank you, Your Honor.

17         **THE COURT:**  -- based on the final question.

18         **MR. PENNEBAKER:**  Thank you, Your Honor.

19         (Bench conference concludes, and the proceedings

20   continue as follows:)

21         MR. PENNEBAKER:  So the government offers

22   Government's Exhibit 6, Your Honor.

23         **THE COURT:**  We'll go ahead and receive it,

24   e-mail that, I think, the witness received after the time

25   when she left the clinic.

1           **MR. PENNEBAKER:**  Yes, Your Honor.

2                Ms. Silverberg, if we could publish.

3                (The above-mentioned item was marked as

4    Exhibit No. 6.)

5    **BY MR. PENNEBAKER:**

6    Q.    Ms. Goslee?

7    A.    Yes, sir.

8    Q.    What are we looking at here?

9    A.    This is an e-mail from a pharmacy manager to our

10   district manager.

11   Q.    Okay.  And this is something -- where did you go

12   after you left Preventagenix?

13   A.    I went back to Walgreens.

14   Q.    And is this something that you received as an

15   employee of Walgreens after you left Preventagenix?

16   A.    Yes, sir.

17   Q.    Will you read the body of the e-mail down there,

18   starting at "hey"?

19   A.    "You might want to send out a blanket e-mail to all

20   area pharmacies.  The office of Preventagenix no longer

21   has a supervising physician at this time.  This includes

22   Jeff Young, Nurse Practitioner, and Britney Petway, Nurse

23   Practitioner.  I have spoke with that office and both

24   doctors that they told me were precepting, and both

25   doctors say they are no longer supervising those nurse

*TESTIMONY OF HEATHER GOSLEE*

1    practitioners.  So at this time, all prescriptions being

2    wrote are invalid, according to state and federal law."

3    Q.    Okay.  And you can stop there.

4          How long did you work at Walgreens after this?

5    A.    I'm still at Walgreens.

6    Q.    And so did you continue -- did -- through your

7    employment with Walgreens, did you continue to get

8    information about concerns about Preventagenix until it

9    closed in 2017?

10   A.    At one point, we were -- we could not fill a

11   controlled substance at all from Jeff.

12   Q.    Now, Mr. Ferguson asked you a couple of questions I

13   want to follow up on very shortly.

14         He asked you about your family receiving treatment

15   from Mr. Young?

16   A.    Yes, sir.

17   Q.    In the beginning, you were happy to have them see

18   him?

19   A.    Absolutely.

20   Q.    What about at the end?

21   A.    Not so much.

22   Q.    I think you were asked about drug screens?

23   A.    Yes, sir.

24   Q.    And marijuana?

25   A.    Yes, sir.

1   Q.    Do -- did Preventagenix screen patients or

2   administer drug screens to patients that were not

3   receiving controlled substances?

4   A.    They should have been.

5   Q.    I'm sorry.  That was a terrible question.

6   A.    Okay.

7   Q.    Let me try to ask it one more time.

8         Why would a patient get a drug screen at

9   Preventagenix?

10  A.    Your main "look at" is to make sure they're not

11  doctor shopping.

12  Q.    And so is it fair to say that it would be the

13  patients on controlled substances that would get those,

14  or would all patients get them?

15  A.    Well, definitely patients on controlled substances.

16  Q.    Okay.  Would patients getting blood pressure

17  medication get a urine drug screen, if nothing --

18  A.    No.

19  Q.    Okay.  So --

20  A.    Now, if they were prescribed *a* benzo or a opioid,

21  they would have a drug screen.

22  Q.    Okay.  And you were asked about Mr. Young's views

23  on marijuana?

24  A.    Yes.

25  Q.    Would that come up in the context of people testing

1  positive for marijuana on drug screens?

2  A.    Yes.

3  Q.    But if they were getting drug screens, they were

4  getting controlled pharmaceutical drugs also, right?

5  A.    Yes.

6  Q.    So is it fair to say Mr. Young wasn't treating

7  with -- people with marijuana as an alternative

8  medication to these --

9  A.    No.

10 Q.    -- powerful narcotic medications?

11 A.    No.

12 Q.    It was just, I'm okay if you do this, too?

13 A.    Marijuana was -- he wouldn't flag the -- for us to

14 fire them, he wouldn't flag it if it was marijuana.

15         **MR. PENNEBAKER:**  No further questions, Judge.

16         **THE COURT:**  Any recross based on that?

17         **MR. FERGUSON:**  Just one question.

18         **THE COURT:**  All right.

19                   **CROSS-EXAMINATION**

20 BY MR. FERGUSON:

21 Q.    I'm going to show you -- well, I'm going to try to

22 show you.  But tell you what.  Let me just hand it to

23 you, if I may.

24 A.    Yes, sir.

25 Q.    Exhibit 6, the e-mail that you just read that came

1   in to Walgreens.

2   A.   Yes, sir.

3   Q.   One of the things that -- the only thing that

4   wasn't read, the government didn't ask you about, is the

5   last sentence.  Says that they've contacted the clinic,

6   and the clinic's going to get a new doctor.  And that's

7   in relation to the fact that he had to have a physician

8   preceptor?

9   A.   This says:  "The office is supposed to be calling

10  me with a new supervising physician."

11  Q.   Okay.  And so once that new supervising physician

12  was obtained, Walgreens was going to continue to write

13  prescriptions for these clinics?

14  A.   For several months, we did not fill -- fill

15  controlled prescriptions for Jeff.

16  Q.   But then continued?

17  A.   When we -- when we got the say-so.

18  Q.   And because he had received the new preceptor?

19  A.   I don't think it was because --

20  Q.   You know why?

21  A.   I don't know why, but --

22  Q.   They --

23  A.   We were told do not fill controlled substances, and

24  we --

25  Q.   And you stopped?

1    A.    We have to lis*ten to higher, uh-huh, yeah.*

2    Q.    And then you started again?

3    A.    At some point.

4    Q.    All right.  Thank you.

5          **THE COURT:**  Okay.  Ms. Goslee, thank you very

6    much.  You can step down.

7          **THE WITNESS:**  Thank you, sir.

8          **THE COURT:**  You're excused.

9          **MR. PENNEBAKER:**  And Your Honor, just a small

10   housekeeping matter.  If Mr. Ferguson is unopposed to

11   releasing --

12         **THE COURT:**  I'm sorry?

13         **MR. PENNEBAKER:**  If Mr. Ferguson is unopposed to

14   releasing Ms. Goslee so that she can stay in the

15   courtroom and listen to some of the testimony, I'd just

16   ask that we can be able to do that.

17         **MR. FERGUSON:**  No objection.

18         **THE COURT:**  Did you subpoena her?

19         **MR. FERGUSON:**  No, I didn't, but I was --

20         **THE COURT:**  Okay.

21         **MR. FERGUSON:**  And I'm -- she's answered

22   everything I need, so --

23         **THE COURT:**  Thank you.

24         You're excused.

25         **MR. PENNEBAKER:**  Thank you, Judge.

1                    (Witness excused)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       **THE COURT:**  How is everyone doing?  Anybody need

2  a break right now?  Everybody good to go?  Okay.

3       If you would, please call your next witness.

4       **MS. PAYERLE:**  Thank you, Your Honor.  The

5  government calls Kristie Gutgsell to the stand.

6       **THE COURT:**  Step around here to the front.

7       **THE WITNESS:**  Yes, sir.

8       **THE COURT:**  Okay.  You're good right there.  And

9  if you would, please raise your right hand.

10      (The witness was duly sworn.)

11      **THE WITNESS:**  Yes, sir.

12      THE COURT:  Be seated here, please.

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **KRISTIE GUTGSELL,**

2   having been first duly sworn, was examined and testified

3   as follows:

4              **DIRECT EXAMINATION**

5   **BY MS. PAYERLE:**

6   Q.   Good morning, Ms. Gutgsell.

7   A.   Good morning.

8   Q.   Would you please just introduce yourself to the

9   jury, your name and what city you live in.

10  A.    Kristie Gutgsell.  And I live in Henderson,

11  Tennessee.

12  Q.   And --

13           **THE COURT:**  Excuse me.  Could you spell that

14  last name?

15           **THE WITNESS:**  Sure.  It's G-U-T-G-S-E-L-L.

16           **THE COURT:**  Thank you.

17           **MS. PAYERLE:**  I understand that T is silent.

18  Sorry.

19           **THE WITNESS:**  That's right.

20  **BY MS. PAYERLE:**

21  Q.   Okay.  Now, Ms. Gutgsell, do you know the defendant

22  Jeffrey Young?

23  A.   I do.

24  Q.   Okay.  And could you identify him somewhere in the

25  courtroom today based on where he's sitting and something

 1    he's wearing?

 2    A.    He's sitting right there, and he has on glasses and

 3    a suit.

 4    Q.    Okay.

 5          **MS. PAYERLE:**  May the record reflect that the

 6    witness has identified the defendant in the courtroom?

 7          **THE COURT:**  The record will reflect the witness

 8    has pointed out and identified the defendant.

 9    **BY MS. PAYERLE:**

10    Q.    How do you know Mr. Young?

11    A.    I worked for him as his office manager.

12    Q.    And where was that?

13    A.    In Jackson, Tennessee.

14    Q.    Is that Madison County?

15    A.    Yes, ma'am.

16    Q.    What -- what was Preventagenix?

17    A.    It was a medical clinic.

18    Q.    Okay.

19          **MS. PAYERLE:**  I'm going to show the witness a

20    series of photographs.  I believe it's 12 pages.  If I

21    may approach, Your Honor.

22          **THE COURT:**  Go ahead.

23          **MR. PENNEBAKER:**  That's been premarked

24    Government's 601.

25    **BY MS. PAYERLE:**

1   Q.    And ask you to page through them and see if these

2   are photographs of various locations at Preventagenix.

3                (A document was passed to the witness.)

4   **BY MS. PAYERLE:**

5   Q.    Okay.

6   A.    Yes, ma'am, that's the clinic.

7   Q.    Thank you very much.

8   A.    Yes, ma'am.

9            **MR. PENNEBAKER:**  Your Honor, I'd like to

10  introduce into evidence the 12 pages that are located at

11  Government's 601, marked Page 8 through 19.  Actually be

12  11 pages.  My math is wrong.

13           **THE COURT:**  **Eleven**, I'm assuming, pages with

14  photos of the clinic; is that correct?

15           **MS. PAYERLE:**  Yes, Your Honor.

16           **THE COURT:**  We'll go ahead and receive.  Be

17  collective Exhibit Number 7.

18                (The above-mentioned item was marked as

19  Exhibit No. 7.)

20  **BY MS. PAYERLE:**

21  Q.    And let's just take a look at the page that we

22  internally marked as 11 and publish to the jury.  Thank

23  you.

24           And what are we looking at here?  Is that the front

25  of Preventagenix?

1   A.   It is.  It's the outside of the front of the

2   clinic.

3   Q.   Okay.  We can take that down.

4        How long, Ms. Gutgsell, were you the office manager

5   there?

6   A.   I started in August of 2015, and I quit in January

7   of 2017.

8   Q.   And did you replace somebody as the office manager?

9   A.   I did.

10  Q.   Who was that?

11  A.   Heather Goslee.

12  Q.   As the office manager, what were your jobs?

13  Describe generally.

14  A.   I was in charge of paying different bills for the

15  clinic, making sure that the schedule -- excuse me.

16  Q.   That's okay.  Take your time.

17  A.   That the schedule was ready for the day, that the

18  employees were ready for the day, that Jeff was ready to

19  work for the day.

20  Q.   And I just saw you hesitate a moment.  Are you --

21  are you a little nervous?

22  A.   Just a little bit, yeah.

23  Q.   Why is that?

24  A.   It's -- this has been a very difficult time.

25  Q.   Okay.  You said you were in charge of the schedule

1    for the day.

2         At this time, I'd like to show you a document that

3    the government has marked Exhibit 703.

4              **MS. PAYERLE:**  I just need to find it in my stack

5    here, Your Honor.  I apologize.

6              I'm going to seek assistance of those more

7    organized than I.

8    **BY MS. PAYERLE:**

9    Q.   Show you 703.  It's a five-page document.

10         Is this a schedule, an example of a schedule for

11   the day for patients that you just talked about?

12              (A document was passed to the witness.)

13   A.   Yes, ma'am.

14              **MS. PAYERLE:**  All right.  The government moves

15   to admit.

16              **THE COURT:**  We'll receive it.  Exhibit

17   Number 8.

18              (The above-mentioned item was marked as

19   Exhibit No. 8.)

20              **MS. PAYERLE:**  Be number -- is that 8?  Thank

21   you.

22   **BY MS. PAYERLE:**

23   Q.   All right.  Let's go ahead and publish Exhibit 8.

24         All right.  Just kind of describe to the jury what

25   we're looking at here as an example document.

1   A.    So this would be basically all the patients for the

2   day.  It would be their -- their appointment time, their

3   name, and then what their chart number was in the system,

4   their telephone number, who the provider was, which was

5   Jeff, what type of insurance they had.  And then in the

6   comments was typically what they were there for.

7   Q.    All right.  Let's go ahead and just blow up, so the

8   jury can see, maybe the top third of the page.

9        You see on the right there are several patients

10  where the description is one-month follow-up.  What were

11  those patients coming in to get?

12  A.    Most of those patients would be coming in to get a

13  controlled prescription.

14  Q.    Why -- why would it be labeled one-month follow-up?

15  A.    Because they came in monthly to get those

16  controlled prescriptions.

17  Q.    And every time they came in the door, did the

18  clinic bill for an office visit to their insurance?

19  A.    Yes, ma'am.

20  Q.    And if they didn't have insurance, how would the

21  clinic get paid?

22  A.    They would pay out of their own pocket.

23  Q.    And what was that?  Do you remember what that cost?

24  A.    There were different prices for whether it was an

25  established patient, a new patient, or if they had to

1    take a drug screen or not.  It would be right around a

2    150, $175, if I remember correctly, depending on a drug

3    screen or if they were established or not.

4    Q.   Okay.

5         **MS. PAYERLE:**  And Ms. Silverberg, if we could

6    just blow up, so they can see the rest of this page, the

7    middle third and then the bottom third.

8              This is all for one day.

9              And then let's go to the next page and let the

10   jury take a look at that second page of that same day.

11             Okay.  Back out and take -- look at the bottom

12   half.

13   **BY MS. PAYERLE:**

14   Q.   Ms. Gutgsell, is this the typical number of

15   patients that Mr. Young would see on a day, this sort of

16   full- to two-page list?

17   A.   Yes, ma'am.

18   Q.   And about a typical kind of distribution of the

19   number of one-month follow-up patients versus other

20   issues?

21   A.   Correct.  Yes, ma'am.

22   Q.   All right.  Next up, I'd like to show you what's

23   been marked Exhibit 602.

24             **THE COURT:**  Before we get to that, what was the

25   date of this schedule?

 1          **MS. PAYERLE:**  Thank you.

 2          **THE COURT:**  Are you able to see?

 3          **MS. PAYERLE:**  Oh, I'm sorry.  Let's go back to

 4    Page 1, and blow up the very top there.

 5          **THE WITNESS:**  The date of this is actually 1/11

 6    of 2017.

 7          **MS. PAYERLE:**  Okay.  That's January 11th.  Thank

 8    you.

 9          **THE COURT:**  Do you know the number of patients

10    that day?  If you don't know, that's fine.

11          **THE WITNESS:**  I don't know.  No, sir, I don't

12    know.

13          THE COURT:  That's fine.

14          **MS. PAYERLE:**  All right.  Ms. Silverberg, we can

15    put that down.

16    **BY MS. PAYERLE:**

17    Q.   And I'm going to show you exhibit -- what's been

18    marked as 602, and this is a one-page exhibit.  It's the

19    floor plan with some edits you'll tell the jury about at

20    Preventagenix?

21    A.   Correct.

22          **MS. PAYERLE:**  Move to admit, Your Honor.

23          **THE COURT:**  We'll go ahead and receive it, floor

24    plan of the clinic.

25          (The above-mentioned item was marked as

1   Exhibit No. 9.)

2           THE COURT:  That'll be Number 9.

3           **MS. PAYERLE:**  And would you publish,

4   Ms. Silverberg, Exhibit 602.

5   **BY MS. PAYERLE:**

6   Q.   All right.  So you've just seen a list, or you've

7   just talked about a list of patients that were on the

8   schedule.  So focusing specifically on the list of

9   patients that were sort of officially scheduled at the

10  clinic, would you describe for the jury where they would

11  come into the clinic on this floor plan?

12  A.   Okay.  So typically where it says "main entrance,"

13  that was the front door.  And then they would walk in and

14  go to the right, which is Suite B.  And then there's an

15  area right there where it says "patient seating."  That's

16  where patients would come in and seat.  And then the

17  desk, that's where they would check in with the

18  receptionist.

19  Q.   Okay.  And then if they were called back to be seen

20  by Mr. Young, where would they go?

21  A.   Okay.  So if you see to the right of where it says

22  "office staff desk," there's a door.  Yes, ma'am, right

23  there.

24  Q.   I circled it.  There we go.  Okay.

25  A.   So they would go through that door, and that would

```
 1    take you to the back part where the patient rooms, the
 2    lab, the triage area and all that is.
 3    Q.    Okay.  The patient rooms.
 4          Okay.  And could you describe for the jury sort of
 5    what the waiting room looked like in terms of the
 6    patients who were there during the time that you worked
 7    at Preventagenix?
 8    A.    Like as far as what the patients looked like?
 9    Q.    Yes.  And was it empty or full, that kind of thing.
10    A.    It was always full.
11          The -- the patients, a lot of them looked as if
12    they had issues.
13    Q.    Okay.  And, of course, you're under oath, and so
14    now is not the time to be polite.  If you could just
15    describe to the jury more specifically what you observed
16    with Mr. Young's patients.
17    A.    As if they were strung out.
18    Q.    Okay.  Now, where was -- where was your office on
19    this map?
20    A.    Okay.  So if you look back at the main entrance,
21    that area right there is kind of like a common area as
22    you walk in the front door.  And if you go to the left,
23    that would be the business side.  And my office -- you go
24    through that door, and my office was -- Jeff's office was
25    in the very end.
```

```
 1    Q.    Here?

 2    A.    No, other -- the other end.

 3    Q.    All right.  Over here somewhere?

 4    A.    Down by where it says "door," all the way at the

 5    end of the corner.

 6    Q.    So over here?

 7    A.    Yes.  And then mine would be right in front of his.

 8    Q.    Right here?

 9    A.    No.

10    Q.    No?

11    A.    On top, I guess I should say.  Sorry.

12    Q.    Okay.

13    A.    And then the files would be farther down, like in

14    the third room.

15    Q.    Okay.  Now, you talked about this sort of -- the

16    process for the patients that we saw on that list.  Did

17    everybody who was getting prescriptions from Jeffrey

18    Young go -- go through the waiting room and wait to get

19    called back?

20    A.    No, ma'am.

21    Q.    Explain briefly what you mean by that.

22    A.    Jeff had a lot of friends and a lot of people that

23    would come in through -- if you see in the back where it

24    says "lab," there's -- there is a back door beside the

25    lab that's not on this piece of paper.
```

1   Q.    And actually while you're talking about that, can

2   we please publish for the jury Exhibit -- I believe

3   it's 7 and our internal page marking 16.

4         Maybe a different page.  That will be Page 9 of

5   Exhibit 7.  And what are we looking at here?

6   A.    That is the actual back door of the clinic.

7   Q.    Okay.  And so let's go back to the floor plan at

8   Exhibit 9.

9         So you said some patients came in through that back

10  door.  Were there other ways that people who were getting

11  prescriptions came into the clinic to see Mr. Young?

12  A.    Sure.  Some would come in the main entrance and go

13  to the left, like where my office is and his office was.

14  Some would still walk into the main patient area, and

15  they were recognized by the -- the receptionist, and they

16  would get up, because that door that is right there in

17  the regular patient seating was always locked.  Yes,

18  correct.  And the receptionist would recognize them as

19  being one of Jeff's friends.  And they would just,

20  without questions asked, get up and go and lock the door,

21  and they would just walk back there.

22  Q.    Okay.  So these -- these people who bypassed the

23  normal patient procedure, I know you've described they'd

24  come into the office through various ways.  But just for

25  simplicity, can we sort of call them back-door patients?

1  A.     Sure.  Sure.

2  Q.     Okay.  And can you also describe -- was there a

3  category of patients called VIPs at the clinic?

4  A.     Yes.

5  Q.     Okay.

6  A.     That's different.

7  Q.     They're different.  Okay.

8  A.     Yes.

9  Q.     Can you explain to the jury who VIPs were?

10  A.     Jeff had a system set up that if you paid, I

11  believe it was a thousand dollars, that was for a year of

12  what he called like a concierge service to where they

13  would get private access to him, whether it'd be Facebook

14  Messenger, telephone calls, not having to wait in the

15  waiting room.  They would always get to get called back

16  first.  Those were the VIP patients.

17  Q.     And did that -- did that program really take off,

18  that thousand dollars a year to get special access to

19  Jeffrey Young?

20  A.     When I was there, no, it didn't.  I didn't know

21  many patients that were a part of that.

22  Q.     But you did have people with special access, these

23  back-door patients who weren't paying special premiums?

24  A.     Correct.  Those are two different types of

25  patients.

1    Q.    All right.  Can you name the names of these --

2    let's call them back-door patients that would come in to

3    see Mr. Young?

4    A.    Sure.  Like Ben Elston, Daphne Joyner, Alexandria

5    Gray.

6    Q.    Were there any people that have fame or sort of

7    notoriety in some way?

8    A.    Oh, yes.  He was -- he was friends with a lot of

9    musicians, rock stars, popular groups.

10   Q.    About how many times a week did you see back-door

11   patients come in to see Mr. Young and bypass these normal

12   doctor's office procedures?

13   A.    Well, it happened on a daily basis, so it was

14   several times a day.  So if I had to classify, like, for

15   a week, I would say at least 10 times, 10 people a week.

16   Q.    And over the time that you were there, can you

17   estimate the number of these sort of back-door patients,

18   the total number of people that came in, in alternate

19   ways through the clinic?

20   A.    Oh, well, considering I worked there for a little

21   over a year, I would have to say it was well over a

22   hundred different people.

23   Q.    All right.  Let's talk a little bit about these

24   people.  Can you put them in sort of a categories?  Was

25   there anything that they had in common?

1  A.    I mean, I guess some of the people did have

2  different things in common.

3  Q.    Okay.  Let's -- first of all, were they men and

4  women?

5  A.    They were both.  Yes, men and women.

6  Q.    Okay.  So who were the men?  Like, what did they

7  have in common?

8  A.    Most of the men were musicians, buddies that Jeff

9  had that, you know, he either grew up with or played

10  music with.

11  Q.    Okay.  And did the women have anything in common?

12  A.    Most of them were pretty women who were either

13  sleeping with Jeff or attracted to Jeff or Jeff was

14  attracted to.

15  Q.    And let's start with the women, if we could.

16  Can -- can you sort of estimate the quantity of women who

17  were part of this back-door group of a hundred that

18  you're talking about?

19  A.    Probably more than half were women.

20  Q.    And how did you know that he was sleeping with them

21  or trying to sleep with them or vice versa?

22  A.    He bragged about it, and you could also hear it.

23  Q.    What do you mean by "hear it"?

24  A.    He would have sex with them during the working day

25  in his office.

1  Q.    And where were you that you could hear?

2  A.    In my office.

3  Q.    So right next door?

4  A.    Correct.

5  Q.    What specifically, if you could tell the jury,

6  would he say when he was bragging about it?

7  A.    There was tap-that-ass Tuesday, tap-that-ass

8  Thursday.  There was -- he was going to have a nooner,

9  which was during lunch hour.

10       He would, after he was done, put his fingers in my

11  face for me to smell.

12  Q.    And pardon me, but for the -- for jurors who might

13  not know, when you say "tap that ass," what is -- is that

14  slang?

15  A.    For he's going to have sex with these people.

16  Q.    Can you name some of these women that were in this

17  sort of back-door category who you knew he was sleeping

18  with?

19  A.    Sure.  Courtney Howell, Anastasia Brown, Daphne

20  Joyner.

21  Q.    Sorry.  Was it Anastasia Brown?

22  A.    Uh-huh.

23  Q.    Okay.  And Daphne Joyner.  Do you know if she

24  worked at the clinic?

25  A.    She did.

1   Q.    Okay.  Was she also known as Daphne Montoya?

2   A.    She was, yes, ma'am.

3   Q.    Okay.  Now, you mentioned the name Courtney Howell.

4   Did you witness an incident regarding Courtney Howell?

5   A.    I did.

6   Q.    Could you tell the jury about that, please?

7   A.    She was a patient as well as a person that Jeff had

8   sex with on a -- many occasions.

9         One time she came in on the business side and went

10  back to his office, which was right next to mine, and he

11  came back there.  They talked.  She had a drink.  And

12  then later, once he was done with patients, he came in,

13  shut the door, had sex with her, because I could hear it,

14  and then left to go see patients again.  And when I left

15  my office, I looked over, and she was asleep on his

16  couch.

17  Q.    Did you see what condition she was in?  When she

18  first came in the office, how did she look?

19  A.    She was fine.

20  Q.    And did you ever see her sometime between the time

21  that she was fine and the time that she was asleep?

22  A.    Yes.

23  Q.    And what was that sort of intermediate period like?

24  A.    Like she was having a hard time holding her head

25  up.  Thought she was sleepy.  You know, something was

1  going on with her.

2  Q.    Was Mr. Young prescribing controlled substances to

3  Courtney Howell?

4  A.    Yes, ma'am.

5  Q.    And how do you know that?

6  A.    There's a thing called PMP that you can pull to

7  see.  It was something that the receptionist would do on

8  a daily basis before the patients come in to see their

9  different controlled prescriptions.  And then Jeff would,

10  most of the time, chart it and -- in their charts.

11  Q.    Okay.  And just because we haven't heard the term

12  yet, can you just describe for the jury what the PMP is?

13  A.    Yes.

14  Q.    By the way, is it also called a CSMD?

15  A.    Yes.

16  Q.    Okay.  Same document?

17  A.    Same thing.

18  Q.    Okay.

19  A.    It's the same thing.  Basically it's a database

20  that physicians have access to, and it's supposed to help

21  you see -- if they're getting a controlled substance from

22  any doctor, it will show that.  And -- and you're

23  supposed to check to make sure people aren't doctor

24  shopping or getting overprescribed or getting, you know,

25  different medications on a monthly basis.  It was -- it

1    was something that we did, that the receptionist did on a

2    daily basis.  They would pull that and put it on the

3    front of the chart.

4    Q.    And so through looking at the PMP, you could see

5    the prescriptions that Mr. Young was writing to various

6    people?

7    A.    Correct.

8    Q.    Okay.  I guess, do you have anything to share about

9    other women that fall into this category of back-door

10   patients?

11   A.    Most all of those women were receiving controlled

12   substances as well.

13   Q.    Okay.  You also mentioned -- let's talk more about

14   the men who were coming in the back door.

15         Can you name a few of -- I think you mentioned a

16   gentleman named Ben Elston?

17   A.    I did, yes, ma'am.

18   Q.    Did you know somebody named Jay Green?

19   A.    Yes, ma'am, I do.

20   Q.    Did he fall into that category?

21   A.    He did.

22   Q.    What did Jay Green do for a living?

23   A.    I believe he was a police officer for another

24   county, not Madison County.  I don't remember which one.

25   Q.    And did Mr. Young ever ask any favors of Jay Green?

1    A.    He did.

2    Q.    And explain what kind of things he would ask Jay

3    Green to do for him.

4    A.    He -- besides being his bodyguard, he went out with

5    Jeff a lot and acted as his bodyguard.  But he -- since

6    he was a police officer, he was able to look up different

7    things.  You know, if Jeff had a warrant or anybody filed

8    anything against him, Jay was able to look up in whatever

9    database to see if anything like that had happened.

10   Q.    And did Mr. Young prescribe controlled substances

11   to Jay Green?

12   A.    I do not know.

13   Q.    Okay.  Was there another police officer named

14   Bryant whom he -- with whom he was friends?

15   A.    Brian Spencer?

16   Q.    Is he a police officer?

17   A.    Yes, ma'am.

18   Q.    Okay.  Were they -- was he friends with Mr. Young?

19   A.    Yes.

20   Q.    All right.  And was -- was Brian or somebody Brian

21   was related to getting prescriptions from Mr. Young?

22   A.    His wife Lydia.

23   Q.    And did Mr. Young ever ask Brian to look up

24   information?

25   A.    Yes.

1   Q.    Okay.  What kind of information?

2   A.    The same thing, to see if -- if warrants were filed

3   or if his -- if Jeff's ex-wife had filed any kind of, you

4   know, harassment against him.  She threatened that often

5   with him, and so he wanted to know if she did, in fact,

6   follow through with what she said.

7   Q.    And then you also mentioned that -- that Jay Green

8   would serve as a bodyguard.  Did he have anybody else who

9   he would call his bodyguard?

10  A.    Ben Elston as well.

11  Q.    Okay.  And did he tell you -- did he tell you why

12  he needed a bodyguard?

13  A.    Jeff, as he would like to say, had a lot of haters,

14  and he thought that he needed protection from these men.

15  Q.    And did they -- did they bodyguard him at the

16  clinic or in other places?

17  A.    Like the clubs or any establishments that Jeff

18  would go to where it was more of a drinking atmosphere,

19  anything like that.

20  Q.    Did Jay Green and Ben Elston drink with him?

21  A.    Yes.

22  Q.    Okay.  And was he prescribing to Ben Elston as

23  well?

24  A.    Yes.

25  Q.    What about rock stars or people who were famous?

1   Was there anybody like that in his orbit --

2   A.    Yes.

3   Q.    -- that came in through the back door?

4   A.    Yes.

5   Q.    Do you know any names?

6   A.    Scott Bartlett.

7   Q.    Do you remember why Scott Bartlett was famous?

8   A.    He was in or is in a band.  And I don't know the

9   name of it right now.  Maybe can tell you in a few

10  minutes.

11  Q.    Yeah, if you think of it, let us know.

12  A.    Sure.

13  Q.    And let's get back to Ben Elston, though, one of

14  his -- one of his bodyguards.

15        **MS. PAYERLE:**  At this time, Your Honor, the

16  government is going to show the witness -- checking on

17  the page count here.  It's a 364-page document.  We will

18  not discuss each page, I promise, which --

19  **BY MS. PAYERLE:**

20  Q.    Is this Ben Elston's patient file that was kept at

21  Preventagenix?

22        (A document was passed to the witness.)

23  A.    Yes, ma'am.

24        **MS. PAYERLE:**  Okay.  At this time, the

25  government moves to admit Ben Elston's patient file.

1          **THE COURT:**  Go ahead and receive it

2    collectively.  It will be Exhibit 10.

3               (The above-mentioned item was marked as

4    Exhibit No. 10.)

5          **MS. PAYERLE:**  And this is Exhibit 10.

6    **BY MS. PAYERLE:**

7    Q.    Let's take a look at Exhibit 10.

8          Publish just Page 199, if we could.

9          First, I'd like to just familiarize the jury with

10   this kind of document.  Are these -- is this kind of

11   document found throughout patient files at Preventagenix?

12   A.    Yes, ma'am.  These are toxicology reports.

13   Q.    All right.  And let's just zoom in to the top half

14   to sort of get oriented.

15         And the top half here, we have the patient's name.

16   And who's that?

17   A.    Ben Elston.

18   Q.    And the requesting physician, who's that?

19   A.    Jeff Young.

20   Q.    The patient's date of birth.  And on the right, the

21   date that the -- says "date collected"?

22   A.    Correct.  Okay.  His date of birth is 4/2 of '77,

23   and then the date collected is 11/17/2015.

24   Q.    What was collected?

25   A.    His urine.

1    Q.    Okay.  And then 11/20/2015, is that the date that

2    you received the report at Preventagenix?

3    A.    Correct.  That's when it came back to

4    Preventagenix.

5    Q.    All right.  Specimen type is urine.  And then under

6    "medications," there's three listed:  amphetamine,

7    carisoprodol, and hydrocodone.  Do you see that?

8    A.    Yes, ma'am.

9    Q.    And what did -- what did those indicate?

10   A.    That indicated the medications that Jeff prescribed

11   him.

12   Q.    Okay.  And then let's back out of that and look at

13   the bottom half, the summary of quantitative results

14   there.

15         Okay.  What are we looking at at here?

16   A.    Okay.  So on the first column, it says "drug name."

17   That is what drugs were in his system, in his urine.

18   Q.    Is that sort of the drugs they were testing for?

19   A.    No.  That was everything that was in his system.

20   Q.    Okay.  But then under --

21   A.    Oh, yes.  I see what you're saying.  Everything

22   that -- yes, I understand now.  I'm sorry.

23         Yes.  Everything that they tested for and then the

24   results show, you know, detected or not detected.

25   Q.    Okay.  So the ones that say "detected," to you that

1   meant it was in his system, and "not detected" means it

2   wasn't in his system?

3   A.    Correct.

4   Q.    And then under "outcome," there's "consistent" and

5   "inconsistent."  What does that mean?  The next column,

6   "outcome, consistent and inconsistent."

7   A.    Okay.  So basically it said that amphetamine was

8   detected in his system, and that's consistent with what

9   Jeff prescribed.

10  Q.    Okay.  And then let's look at an inconsistent, so

11  carisoprodol?

12  A.    Is not -- excuse me -- not detected, which makes

13  that inconsistent because Jeff does prescribe him that

14  drug, but it was not in his system, so therefore, it

15  makes it an inconsistent outcome.

16  Q.    All right.  And was there anything on this screen

17  that particularly concerned you?  And actually let me

18  back up because I want to lay some foundation for this.

19  Let me back up.

20        **MS. PAYERLE:**  Back out of that, if you wouldn't

21  mind.

22        No, I'm sorry.

23        **MS. SILVERBERG:**  Sorry.  Sorry.

24        **MS. PAYERLE:**  Yeah.  Okay.  You got it?  I give

25  terrible instructions.

1    **BY MS. PAYERLE:**

2    Q.    Whose handwriting is there at the bottom?

3    A.    That is my handwriting.

4    Q.    Okay.  And you said -- what did you write there at

5    the bottom?

6    A.    "Counseled patient and offered rehab.  Patient

7    stated he didn't have a problem."

8    Q.    Why did you counsel this patient?

9    A.    Because he failed his drug screen for other drugs

10   that Jeff did not prescribe to him.

11   Q.    Okay.  So let's go ahead and blow up the middle

12   piece again there.

13         And what's benzoylecgonine?  What did that mean to

14   you?

15   A.    I believe that to be cocaine.

16   Q.    And then what other drugs?  Like morphine,

17   nordiazepam, oxazepam, temazepam, what was the problem

18   with those?

19   A.    Those are also drugs that Jeff did not prescribe

20   him.

21   Q.    But they were detected in his system?

22   A.    Yes, ma'am.

23   Q.    And hydrocodone and hydromorphone?

24   A.    Hydrocodone was in his system, and Jeff prescribed

25   it.  And then the hydromorphone is a metabolite, I

1    believe, of the hydrocodone.

2    Q.    Okay.  So there's a lot of drugs in his system, and

3    you counseled him.  You offered him to get rehab, and he

4    said --

5    A.    He didn't have a problem.

6    Q.    Said he didn't have a problem.

7          Why -- why were you counseling him?  I mean, in

8    other words, was that part of your job sometimes?

9    A.    It became part of my job, especially when it was

10   friends of Jeff's, to try to get rid of patients like

11   that, that he was continually writing controlled

12   prescriptions to, even though they were consistently

13   failing drug screens.

14   Q.    And did you believe Ben Elston fell into that

15   category?

16   A.    He did, yes, ma'am.

17   Q.    What happened after you tried to get rid of Ben

18   Elston?

19   A.    Jeff would just write him the prescription anyway

20   after office hours, at home, meet him in the parking lot,

21   whatever.  However he did it, he would still get the

22   prescriptions.

23   Q.    Did you talk to Mr. Young about this encounter you

24   had with Ben Elston?

25   A.    I don't remember this specific time, but there

 1  was -- I don't know if it was this time or another time

 2  that I spoke with Jeff about it, but it -- I have spoke

 3  with Jeff about it many times.

 4  Q.   And specifically you've talked to Jeff Young about

 5  Ben Elston failing drug screens?

 6  A.   Correct.

 7  Q.   And what was Mr. Young's reaction?

 8  A.   He wasn't surprised, and it was just a fleeting

 9  thought for him.  He didn't really care one way or the

10  other.

11  Q.   Did it happen with some regularity that you or the

12  staff would try to dismiss patients for one reason or

13  another, and Mr. Young would continue prescribing to them

14  or allow them to return?

15  A.   Yes, often.  That happened often.

16  Q.   And can you think of some examples of that?

17  A.   Well, right here with Ben Elston.

18  Q.   Anybody else you can think of?

19  A.   Yes, ma'am.

20  Q.   All right.  Go ahead and name names.

21  A.   Tricia Stansell; Bethany Pusser.  I can't name just

22  right off the top of my head, but there are several.  If

23  I can look at a list, I can point them out to you.

24  Q.   Okay.

25  A.   I'm sorry.

1   Q.    That's okay.

2         Now, you testified that some of these kind of

3   back-door patients were locally famous or connected

4   people, like rock stars, musicians, things like that?

5   A.    Correct.

6   Q.    Can you tell the jury a little bit about

7   Mr. Young's attitude toward fame for himself?

8   A.    He craved fame.  He needed fame.  He believed that

9   he was famous.  He wanted to get fame any way that he

10  possibly could.  He wanted to be the center of attention.

11  He was the center of attention very often, whether it

12  hurt people or not.

13  Q.    I'm going to show you another exhibit, a one-page

14  exhibit marked -- and we can take this down.  Thank

15  you -- marked 603.

16         (A document was passed to the witness.)

17  **BY MS. PAYERLE:**

18  Q.    Do you recognize this as a -- an advertisement that

19  Mr. Young posted?

20  A.    I do.

21  Q.    Okay.

22         **MS. PAYERLE:**  Move to admit, Your Honor.

23         **THE COURT:**  We'll go ahead and receive it.  It's

24  a one-page document.  It will be Number 11.

25         (The above-mentioned item was marked as

```
 1   Exhibit No. 11.)

 2           MS. PAYERLE:  And let's publish 603 -- or

 3   sorry -- Number 11, please.  Exhibit 11.

 4   BY MS. PAYERLE:

 5   Q.    Ms. Gutgsell, where did you -- where did you see

 6   this advertisement posted?

 7   A.    Facebook.

 8   Q.    And it says "sail away with the Rock Doc."

 9         Whose photo is that in the picture?

10   A.    That's Jeff Young.

11   Q.    And who is the Rock Doc?

12   A.    That was also Jeff Young.

13   Q.    Okay.  Tell the jury about the Rock Doc.

14   A.    I'm not real sure how he got that name, but he --

15   he went by the "Rock Doc" every chance that he got, but

16   he's not a doctor.

17   Q.    And did he ever try to publicize that image in some

18   way or create some kind of media content?

19   A.    Daily.

20   Q.    Did there come a time when he became interested in

21   a reality TV show?

22   A.    Yes, ma'am.

23   Q.    Tell the jury about that.

24   A.    He hired a producer and a film guy to come in and

25   record his life, from the time he woke up until the time
```

 1   he went to bed, for a week, and wanted to start a -- like

 2   a reality show, and he called it "Rock Doc."

 3   Q.   And did, in fact, people create this show for him?

 4   A.   It was on YouTube.  So besides being anywhere and

 5   besides YouTube, I'm not sure of, but it was recorded and

 6   published on YouTube.

 7   Q.   And did you see a trailer for this show on YouTube?

 8   A.   I have.

 9        **MS. PAYERLE:**  And I -- the government has a -- I

10   believe has a clip on a CD labeled Document 608, so we

11   would move to enter that into evidence as well.

12        **MR. FERGUSON:**  I do have a question on this, if

13   we could sidebar.

14        **MS. PAYERLE:**  Yes.

15        (Bench conference on the record, with

16   Mr. Ferguson and Ms. Payerle only, out of the hearing of

17   the jury.)

18        **MR. FERGUSON:**  Is it the whole -- it's the whole

19   thing?

20        **MS. PAYERLE:**  Not the whole episode.  It's like

21   a three-minute trailer.

22        **MR. FERGUSON:**  I would --

23        **MS. PAYERLE:**  It's the -- it's like a trailer

24   for the show.

25        **MR. FERGUSON:**  I think the whole exhibit needs

1    to be shown and not just pieces and parts.

2         **MS. PAYERLE:**  Well, I mean, it is the whole --

3    it is -- it was -- it was a trailer that he published on

4    YouTube as a piece.

5         **MR. FERGUSON:**  Okay.

6         **MS. PAYERLE:**  So it's like the whole trailer.

7         **MR. FERGUSON:**  Okay.

8         **MS. PAYERLE:**  So he published a -- like a

9    25-minute episode, but then he published like a

10   three-minute preview of --

11        **MR. FERGUSON:**  We're going to play a 25-minute

12   episode?

13        **MS. PAYERLE:**  I wasn't going to, but I -- not

14   right now.  Her -- because she's just testified she

15   saw -- I mean, the trailer's three minutes, and it's a --

16   it's a piece --

17        **MR. FERGUSON:**  We'll come back to it.  I'm okay

18   right now.  I just want to make sure what I was about to

19   say because this --

20        **THE COURT:**  All right.  Let's get on with it.

21        **MS. PAYERLE:**  It's a complete trailer.

22        **THE COURT:**  Three minutes.

23        **MR. FERGUSON:**  I'm trying to make objections

24   around the jury.

25        **THE COURT:**  I appreciate it.  Thanks.

1        **MR. FERGUSON:**  Thank you.

2        **MS. PAYERLE:**  Thanks.

3            (Bench conference concludes, and the proceedings

4    continue as follows:)

5        MS. PAYERLE:  Okay.  Government moves to admit

6    the sort of three thirty -- it might be

7    three-minutes-and-30-second-or-so trailer for the Rock

8    Doc TV show.

9        **THE COURT:**  I'm assuming the witness has seen it

10   before because she hasn't identified anything.

11       **MS. PAYERLE:**  Right.  She has, Your Honor.  I

12   described it to her, and she said she'd seen it.

13       THE COURT:  Go ahead.

14       **MS. PAYERLE:**  Okay.  Let's go ahead and play.

15   And I believe -- do we have this as a CD?

16       **MS. SILVERBERG:**  No, I have it right here.  Oh,

17   yeah, he -- the CD's there for him.

18       **MS. PAYERLE:**  All right.  Let's go ahead and

19   play.

20           (The above-mentioned item was marked as

21   Exhibit No. 12.)

22           (An audio-video recording was played.)

23   **BY MS. PAYERLE:**

24   Q.   Okay.  I'm going to stop it.  We will play the

25   whole thing.  I just want to stop at certain parts and

*TESTIMONY OF KRISTIE GUTGSELL*

1    ask you questions.

2         Here he says the clinic had a heavy focus on

3    preventative medicine.

4         In reality, what percentage of patients would you

5    estimate were just there to get controlled substances

6    month after month?

7    A.    I would say well over half, 70 percent.

8    Q.    And what percentage of those patients actually paid

9    cash out of pocket for those appointments?

10   A.    25 to 30 percent.

11   Q.    Did -- taking the group of those cash-pay patients,

12   did cash-pay patients ever come in for sort of what's

13   called ordinary preventative medicine, or did the

14   cash-pay patients always just get controlled substances?

15   A.    So there were some that came in for various things

16   that were not controlled substances, not -- not very many

17   at all, though.

18   Q.    So I guess just to clarify, the majority of

19   cash-pay patients were there for controlled substances?

20   A.    Yes, ma'am.

21        **MS. PAYERLE:**  Okay.  Let's keep playing.

22        (An audio-video recording was played.)

23   **BY MS. PAYERLE:**

24   Q.    Okay.  Did Mr. Young talk about his image a lot?

25   A.    Yes.

1    Q.    The way he looked?

2    A.    Yes.

3    Q.    And tell the jury about that.

4    A.    He -- he liked the fact that he didn't look like a

5    typical provider with his tattoos and his, you know, hat

6    on backwards and didn't wear the typical white coat.  He

7    was, you know, someone just like the gentleman said, that

8    should be in the front line of a rock band.

9    Q.    Okay.  Let's keep going.

10              (An audio-video recording was played.)

11   **BY MS. PAYERLE:**

12   Q.    Did Mr. Young go on this local Jackson radio show a

13   lot?

14   A.    He did.  He had to pay to be on that.  It was for

15   advertising.

16   Q.    Okay.

17              **MS. PAYERLE:**  Let's keep going.

18              (An audio-video recording was played.)

19   **BY MS. PAYERLE:**

20   Q.    Who is -- who is this gentleman here?

21   A.    That's Scott Bartlett.

22   Q.    Okay.  He was the rock star you were talking about?

23   A.    Correct.

24   Q.    Okay.

25              **MS. PAYERLE:**  Let's keep going.

*UNREDACTED TRANSCRIPT*

1          (An audio-video recording was played.)

2   **BY MS. PAYERLE:**

3   Q.    Where -- where were they sitting?

4   A.    That's in Jeff's office.

5   Q.    Okay.

6          **MS. PAYERLE:**  Let's keep going.

7          (An audio-video recording was played.)

8   **BY MS. PAYERLE:**

9   Q.    That gentleman we just saw talking earlier saying

10  there's a lot going on there, who is that?

11  A.    Kevin Phillips, Jeff's best friend that he refer to

12  as Uncle Kevin.

13  Q.    Okay.  Did he have another nickname besides Uncle

14  Kevin?

15  A.    Puffy K.

16         **MS. PAYERLE:**  And let's keep on going to the

17  end.  Thanks.

18         (An audio-video recording was played.)

19         MS. PAYERLE:  Okay.

20         **THE COURT:**  About how much longer with this

21  witness?

22         **MS. PAYERLE:**  Maybe another hour, Your Honor.

23         THE COURT:  An hour?  We'll go ahead and take

24  our morning break at this time.

25         **MS. PAYERLE:**  Yes, sir.  Thank you.

1    **THE COURT:**  Y'all have heard some proof now, but

2  don't discuss the case amongst yourselves or allow anyone

3  to discuss it with you while we take our break.  And

4  remember, no independent investigations.  Okay.  So I'm

5  going to go ahead and excuse you to the jury room.

6  Fifteen, twenty minutes or so, and we'll get back to it.

7    (Jury out at 11:15 a.m.)

8    **THE COURT:**  And Ms. Gutgsell, remember over the

9  break, don't discuss your testimony with anyone.

10    **THE WITNESS:**  Yes, sir.  Thank you.

11    **THE COURT:**  You can step down.

12    **THE WITNESS:**  Yes, sir.  Thank you.

13    (The witness complies with the request.)

14    **THE COURT:**  Okay.  We'll be in recess.

15    **MS. PAYERLE:**  Thank you.

16    (Recess at 11:16 a.m. until 11:40 a.m.)

17    **THE COURT:**  Anything from either side before we

18  bring in the jury?

19    **MS. PAYERLE:**  No, Your Honor.

20    **MR. FERGUSON:**  No, Your Honor.

21    **THE COURT:**  I do just have a couple of small

22  things.

23    With this witness, as well as with the prior

24  witness, each of the government's lawyer has reminded

25  them that they're under oath.  It didn't seem like they

1    were having -- you were having any question -- any

2    problems with the answers or anything, so I'm just

3    inquiring why y'all do that.

4         **MS. PAYERLE:**  Judge, it was just that with the

5    line of questioning, the witness had seemed to express

6    some concern about sort of describing patients in a way

7    that was candid because it seemed impolite to use the

8    words that they, I think, felt they wanted to use to

9    describe those folks.  And so I think it was just a

10   matter of kind of helping the witness understand that

11   they wouldn't be viewed as impolite and that because of

12   the oath that they've taken, they're really required to

13   speak candid about the perception.

14        So in both cases, I think it was because the

15   witness had expressed, earlier, some hesitation about

16   kind of being -- using the words that they used to

17   described these patients.  I think it's just a product of

18   being kind of play people.

19        **THE COURT:**  Well, I'll appreciate it if y'all

20   would not refer to their oath anymore, unless you're

21   having difficulty with the witness.

22        **MS. PAYERLE:**  Yes, Your Honor.

23        **THE COURT:**  They didn't express any, so just

24   tell the witness go ahead and answer candidly.

25        **MS. PAYERLE:**  Yes, sir.

*UNREDACTED TRANSCRIPT*

1          **THE COURT:**  If there's a problem, then we'll

2     deal with that.

3          And the other thing is at the rate we're going

4     with these witnesses, I think we'll be here through the

5     month of April.

6          **MS. PAYERLE:**  Well, I don't think so, Judge,

7     respectfully.  There are some witnesses at the beginning

8     that are going to take a while because they have to

9     establish -- for example, the jury has never seen these

10    toxicology reports before, and the jury doesn't know what

11    a PMP is and some of the basics.  And so these things,

12    when they're woven in, just kind of take a while.

13          These witnesses were key insiders within the

14    office that saw a lot of things, and there's just a lot

15    of topics to cover.  But I think the Court will see that,

16    as the week progresses, the witnesses will get shorter

17    and shorter and shorter.  And, you know, there will be

18    some longer witnesses because there's just a lot of

19    evidence and documents in the case, but we are trying to

20    move through it as expeditiously as possible.

21          **THE COURT:**  I appreciate that.  But just keep in

22    mind that -- the word you just used is foremost:

23    expeditiously.

24          **MS. PAYERLE:**  Yes, Judge.

25          **THE COURT:**  Okay.  All right.

1           **MS. PAYERLE:**  Thank you.

2           **THE COURT:**  Mr. Ferguson, anything?

3           **MR. FERGUSON:**  No, Your Honor.

4           **THE COURT:**  All right.  Let's bring in the

5    jurors, please.

6               (Jury in at 11:43 a.m.)

7           **THE COURT:**  You may proceed.

8           **THE WITNESS:**  Thank you.

9           **THE COURT:**  Okay.  Folks, we're about ready to

10   get started.  One little note:  Mr. Richmond communicated

11   to me it's kind of cold in here right now, as did

12   Mr. Herrin.  In fact, when I came back in from my

13   chambers, it seemed like the temperature's gone down

14   about 10 degrees.

15          **THE JURY:**  It's a little chilly.

16          THE COURT:  It's a little cool; that's right.

17              But I kind of told y'all yesterday, it's an old

18   building, and this happens.  Mr. Herrin is calling GSA --

19   they maintain the building -- and asked them to adjust

20   it.  Well, sometimes when they adjust it, it will go from

21   like it is right now up to about 85.  So hopefully we can

22   find a happy median.  Congress won't approve us a new

23   building or anything like that, so we have to bear with

24   it.  So be patient with us.

25              All right.  I think we are ready now to go ahead

1    and proceed with the questioning of this -- this witness.

2              Ms. Payerle?

3              **MS. PAYERLE:**  Thank you, Your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CONTINUED DIRECT EXAMINATION**

4    **BY MS. PAYERLE:**

5    Q.    Ms. Gutgsell, when we left off, we were watching

6    Mr. Young's trailer on YouTube.  And he ended it by

7    saying "Preventagenix is an experience."  And so I want

8    to talk to you a little bit about the experience of

9    working at Preventagenix.

10        What was the kind of atmosphere like working there?

11   A.    It could vary from day to day.  It was -- there was

12   always rock music playing loud.  There -- most of the

13   time, we were happy and like a family.  We all loved each

14   other very much.  Everybody, you know, cheered each other

15   on, but, you know, some days were harder than others.

16   Q.    And we'll get into some of the harder days in a

17   moment.

18        I want to ask you.  Did Mr. Young prescribe

19   controlled substances to his employees while you were

20   working there?

21   A.    He did.

22   Q.    And can you just, just so we have it on the record,

23   name those employees?

24   A.    Carla Wright, Daniel Rogers, Katie Lindsey, Chelsea

25   Carroll, Alexis -- I don't know her last name right

*UNREDACTED TRANSCRIPT*

1    now -- Tessa James, Madison Wooley.  There were several.

2    Q.    Okay.  Did somebody named Dottie Deforest work

3    there?

4    A.    Dottie, yes.

5    Q.    What about Rebecca McGowen (phonetic)?

6    A.    Yes.

7    Q.    How about the Cortina Stewart?

8    A.    She worked in the lab.  She wasn't employed by

9    Jeff, but she worked in the clinic, yes.

10   Q.    And I believe you testified Daphne Montoya.  Did

11   she work there?

12   A.    She worked before I came there and then for a

13   couple of weeks when I was there.

14   Q.    Okay.  Were you -- did he prescribe controlled

15   substances to you?

16   A.    He did.

17   Q.    Explain to the jury about that.

18   A.    He prescribed me Xanax, one milligram, three times

19   a day.  I took Xanax from a previous provider before I

20   started working for Jeff -- excuse me; I'm sorry -- but I

21   was only prescribed .25 milligrams once or twice a day,

22   and he raised it to one milligram three times a day.

23   Q.    Did he ever do an evaluation or diagnose you

24   through a diagnosis process for anxiety?

25   A.    No.

1   Q.    Did he increase the dose slowly or immediately?

2   A.    Immediately.

3   Q.    Did he drug test you?

4   A.    We had been drug tested throughout the time we

5   worked there, but in order to get Xanax from him, no.  He

6   didn't ever order any of us to be drug tested.

7   Q.    And did he warn you of the risks of addiction?

8   A.    No.

9   Q.    Ms. Gutgsell, did you become addicted to Xanax

10  while you worked at Preventagenix?

11  A.    Yes, ma'am.

12  Q.    Aside to the Xanax addiction, were there any --

13  first of all, how did that Xanax addiction impact your

14  life?

15  A.    It basically kept me numb from reality.  I didn't

16  understand that I was addicted to them at the time.  It

17  helped me mask things that were important that I

18  should've paid better attention to.

19  Q.    And what were some of those things?

20  A.    Working in the environment that I was working in,

21  the toxic environment, the very -- just the day-to-day

22  operations that were wrong.

23  Q.    And you said that -- that you were working in a

24  day-to-day environment with a -- sort of the situation

25  was wrong.  Did you aid in that situation, sort of

1    creating that situation?

2    A.    I did.  I helped Jeff keep the clinic open.

3    Q.    And have you taken responsibility for your actions

4    in keeping Preventagenix open and for the distributions

5    of drugs that occurred there?

6    A.    I have.

7    Q.    And explain to the jury what you've done to take

8    responsibility.

9    A.    This is very hard, so forgive me, but I also,

10   throughout this process, was charged with aiding and

11   abetting Jeff in prescribing controlled substances, which

12   I did help him do by keeping the clinic open, loaning him

13   money to be able to pay employees, keep the doors open.

14   He couldn't have done that if I didn't help him.

15   Q.    Did you plead guilty to that crime?

16   A.    I did.

17   Q.    As part of that guilty plea, Ms. Gutgsell, did you

18   enter into a cooperation agreement with the government?

19   A.    I did.

20   Q.    And is your testimony today part of that agreement?

21   A.    Yes, ma'am.

22   Q.    Through your testimony today, do you hope to obtain

23   a benefit?

24   A.    Sure.

25   Q.    Okay.  And how are you, I guess -- aside from the

1   Xanax addiction and the guilty plea, were there other

2   impacts to your life in terms of the experience of

3   working at Preventagenix?

4   A.   Oh, of course.  Financially, it's been a huge

5   struggle, you know.  I had to hire an attorney.

6   Q.   Did you lend Mr. Young any money?

7   A.   I did.

8   Q.   Did you ever get it back?

9   A.   I did not.

10  Q.   How much was it?

11  A.   Right at $20,000.

12  Q.   How about personally?  Did your interactions with

13  Mr. Young lead to any personal consequences for you?

14  A.   It did.  I mean, I was -- I was harassed

15  constantly.  I was in fear and terrified of him and his

16  people.  I suffer from anxiety, depression, PTSD.

17  Q.   And why were you so afraid of him?

18  A.   Because you're either for Jeff or against Jeff, and

19  if you were not for him, there was no neutral ground with

20  him.  If you weren't for him, you were automatically, in

21  his eyes, against him, and he would make your life a

22  living hell.

23  Q.   What -- what did he do?  What do you mean make it a

24  living hell?

25  A.   You know, he would just attack through himself,

1    through his people, through social media, through -- I'm

2    sorry -- through social media, through anything and any

3    way.  I was followed.  I was harassed.  I was scared to

4    go to the grocery store.  I was scared for my son to be

5    out in public with me because I never knew what was going

6    to happen next.

7    Q.    Just to be clear, though, were you ever -- you

8    were never physically attacked, is that right, by

9    Mr. Young?

10   A.    Oh, yes.

11   Q.    Okay.  And actually, go ahead and tell the jury

12   that story.

13   A.    Jeff tended to get drunk often.  He would come into

14   work still drunk from the night before, get drunk after

15   clinic.  And telling Jeff something that was difficult --

16   if something, you know, happened, he would fly off into a

17   rage, would get drunk.  He's spit vodka at me.  He's

18   kicked me.  He's screamed at me.  He's then turned around

19   and made me feel guilty as to I'm the only one that can

20   help him; I'm the only one that can save him.  I'm the

21   only one -- he would kill himself if it wasn't for me.

22         It was very -- an emotional abuse.  It wasn't

23   always just, you know, attacking.  Sometimes it was, you

24   know, him telling me how much he relied on me and how

25   much help -- he couldn't do it without me.

*TESTIMONY OF KRISTIE GUTGSELL*                                              120

1   Q.    So is it fair to say he was sometimes very kind to

2   you?

3   A.    Oh, yes.  Absolutely.

4   Q.    Okay.  In the context of your guilty plea, did you

5   take responsibility for two patients in particular --

6   A.    I did.

7   Q.    -- who were prescribed drugs by Mr. Young?

8   A.    Yes, ma'am.

9   Q.    Okay.  And who are those folks?

10  A.    Tricia Stansell and Bethany Pusser.

11  Q.    Can you tell the jury about Tricia Stansell?

12  A.    Tricia is -- she was actually the mother of Tessa

13  James who worked for us as well.

14  Q.    And what -- why did you take responsibility for

15  aiding and abetting prescriptions to Tricia Stansell?

16  A.    Because Tessa had told me that her mother was an

17  addict, recovering addict, had -- you know, had problems

18  with controlled substances before, and I knew that before

19  her coming into the clinic and Jeff prescribing her

20  medication.

21  Q.    And did you tell Mr. Young what you knew about

22  Tricia Stansell?

23  A.    I did.

24  Q.    And what was his reaction?

25  A.    He didn't care.

1   Q.    How about Bethany Pusser?  Who was she?

2   A.    She was someone that reached out on Facebook.  I

3   can't remember if she reached out to me or Jeff.  But --

4   and Jeff would post on Facebook, you know, if you have an

5   addiction problem, contact me; I can help.  And through

6   that post, he did -- she did contact one of us.  And she

7   came into the clinic to get help with her addiction

8   issues.

9   Q.    Did Jeff Young have any addiction counselors on

10  staff?

11  A.    No.

12  Q.    Did he run a methadone program?

13  A.    No.

14  Q.    To your knowledge, did he take any classes or

15  special training for treating addiction medicine?

16  A.    Not that I'm aware of.  No, ma'am.

17  Q.    Okay.  Did -- did Jeff Young, for a while, sort of

18  start decreasing the medicine that Bethany Pusser was on?

19  A.    He did.  At some point in time in the beginning, he

20  was prescribing her the controlled substances that she

21  was abusing and was -- he was trying to wean her down

22  from those drugs.

23  Q.    Did that ever change?

24  A.    Yes.  Then he -- she started dating his best friend

25  Kevin, and then he just started writing her more --

1  different drugs.

2  Q.    And what different drugs?  Do you know?

3  A.    I know she got Adderall and I believe Klonopin or

4  something like that, like a Xanax or a Klonopin or

5  something to help relax.

6  Q.    And did -- and when you say -- sorry.

7        For the record, when you say "Kevin," did you mean

8  Kevin Phillips, the person we were talking about earlier?

9  A.    Yes, ma'am.

10  Q.    Uncle Kevin?

11  A.    Uncle Kevin, yes, ma'am.

12  Q.    Beyond the patients that you were -- you've just

13  talked about, did you ever question or confront Mr. Young

14  about his behavior of reinstatement of other patients,

15  things like that?

16  A.    Yes.

17  Q.    And how would he respond?

18  A.    Most of time he would give an explanation of why he

19  didn't care and he was the -- he was the doctor; he was

20  the provider; he knew what was best.

21  Q.    Did you ever confront him about prescribing to

22  somebody who was pregnant?

23  A.    She was -- the person that I'm thinking of, she was

24  pregnant and getting a Nubain shot, an injection, which

25  is a controlled substance.

1   Q.    What was her name?

2   A.    Alex Gray.

3   Q.    Okay.  And what did Mr. Young say when you

4   confronted her -- confronted him?

5   A.    That it doesn't affect the baby, that drug doesn't

6   affect the baby.

7   Q.    Okay.  Did you become aware of the requirement that

8   the clinic find a supervising physician, like a doctor to

9   oversee Nurse Practitioner Young's work?

10  A.    Yes, ma'am.

11  Q.    During the time that you were there, did Mr. Young

12  always have a supervising physician to look over his

13  work?

14  A.    No, ma'am.

15  Q.    How did he handle that in the paperwork?

16  A.    He would -- he never -- if a medical doctor had

17  quit as overseeing physician, he never changed any of the

18  documentation as far as, like, on the prescription pad.

19  He just left who was there previously, until he was able

20  to find another overseeing physician, and then we would

21  order new prescription pads and put the correct name on

22  there.  So there were times that we were basically just

23  going off the old preceptor's name.

24  Q.    And "preceptor" is a word you're using

25  interchangeably with "supervising physician"?

*TESTIMONY OF KRISTIE GUTGSELL* 124

1   A.    Yes, ma'am.  I'm sorry.

2   Q.    No, that's just fine.

3         How many supervising physicians did Mr. Young go

4   through during the time that you were at Preventagenix?

5   You can name them if it helps to remember.

6   A.    Okay.  When I came on board, it was Charles Alston,

7   and he quit shortly after I started working there.  Then

8   it was Dr. Yogesh for approximately two weeks.  Then it

9   was Dr. Alperovich.  I don't know exactly how long he

10  was -- several months that he was involved.  And then at

11  the end was Dr. Rudin.

12  Q.    When you say "at the end," what made -- sort of

13  what was the end?  When did that happen?  What was the

14  end of things?

15  A.    For me, the end was January 11th, when the raid

16  happened.

17  Q.    Okay.  And by "raid," you mean a lawfully executed

18  search warrant at the premises of Preventagenix?

19  A.    Correct.

20  Q.    Okay.  What was -- let's talk about -- you say

21  Dr. Yogesh quit within a couple of weeks.  After that,

22  there was somebody named Dr. Alperovich?

23  A.    Yes, ma'am.

24  Q.    What was the arrangement with Dr. Alperovich?  What

25  was his job, and what was he going to get for it?

1    A.   He got paid $1,500 a month, and he was supposed to

2    come in and -- once a month -- and review medical charts

3    of patients that Jeff saw.

4    Q.   And did you say how much he would get paid for

5    that?  I'm sorry.

6    A.   1,500 a month.

7    Q.   Okay.

8    A.   I believe it was 1,500.

9    Q.   And Dr. Alperovich come to review patient records

10   in February of 2016?

11   A.   Yes, ma'am, I believe so.

12   Q.   All right.  I'm going to show you what's been

13   marked Government's 201.  It is a three-page document.

14        Are these text messages between you and Mr. Young

15   during the time that Dr. Alperovich was reviewing patient

16   charts?

17            (A document was passed to the witness.)

18   A.   Yes, ma'am.

19            **MS. PAYERLE:**  Okay.  Government moves to admit.

20            Go ahead and take a look.

21            **THE WITNESS:**  Yeah, just . . .

22            **THE COURT:**  We'll go ahead and receive it.  It

23   will be Number 13.

24            **THE WITNESS:**  Thank you.

25            **MS. PAYERLE:**  Thank you.

 1          Let's go ahead and publish Number 13, please.

 2          (The above-mentioned item was marked as

 3   Exhibit No. 13.)

 4   **BY MS. PAYERLE:**

 5   Q.   All right.  So we're going to start on Page 1.  And

 6   who is on the right there, and who is on the left of

 7   these text messages?

 8   A.   On the right, it says "Joshua's mommy," which is

 9   me.

10   Q.   Who's on the left?

11   A.   Jeff Young, which is the defendant.

12   Q.   All right.  How about we read through -- you be

13   you, and I'll be Mr. Young.

14   A.   "Okay.  Did you talk to him in person?"

15   Q.   "Yep.  He shouldn't charge $1,500 for one clinic."

16   A.   "He only sign charts once.  He will need to come

17   back before the month is over to sign again."

18   Q.   Okay.  Let's go down to the next slide.

19        "Especially if we are paying $3,000."

20        What -- why was it 3,000 instead of 1,500?

21   A.   At the time, Jeff had two clinics:  One was

22   Preventagenix out north on Murray Guard Drive, and then

23   he had a downtown clinic in Jackson as well that a

24   nurse -- a different nurse practitioner was at.

25   Q.   Okay.  And then Mr. Young says:  "I'm having to

1   hold his hand and explain every patient."

2       What was happening in real time while you were

3   texting Mr. Young about this?

4   A.   Dr. Alperovich was actually in Jeff's office going

5   through the different charts that were pulled for him to

6   review, and Jeff was having to explain to him each page

7   as far as -- Jeff's handwriting is hard to read, first of

8   all -- but explaining what he wrote and what the

9   different drug tests, toxicology reports meant, the

10  different -- why he prescribed what he prescribed.

11  Q.   He says:  "This is a disaster, painful."

12      Let's keep going to the next page, if we could.

13      And what did you say?

14  A.   "Oh, dear Jesus, WTF for?"

15  Q.   He says:  "I'm still here.  He's going over every

16  PMP."

17      Go ahead.

18  A.   "Be sure to show his ass all the patients we fire.

19  Oh, my God, did Katie pull a lot of pain patients out for

20  him."

21  Q.   Mr. Young says "evidently," and then let's see what

22  you respond.

23  A.   I said "fuck."

24  Q.   And then he says:  "I will show him."

25      Okay.  So could you describe Mr. Young's -- first

1    of all, what was this interaction about pulling the pain

2    patients?  Why were you and he upset that Dr. Alperovich

3    was seeing the pain patients?

4    A.    Because there are so many of them, and -- and he

5    didn't want Dr. Alperovich to realize how many pain

6    patients he was seeing.

7    Q.    Did Mr. Young talk to you about his attitude

8    generally toward the requirement that he have a

9    supervising physician?

10   A.    He didn't like the idea of having one.  He felt as

11   if he was more qualified than most medical doctors and

12   didn't need anybody's recommendation or -- or anything.

13   He thought he could handle it himself.

14   Q.    All right.  At the bottom, it says:  "We need what

15   you discussed."

16         Let's go to the next page.

17         That's Mr. Young saying that.  And at the top, what

18   did you respond?

19   A.    "I've talked to Corey about it, and he's actually

20   going to do what I talked about, so none of our -- none

21   of us are implicated.  LOL."

22   Q.    So what is -- what are you talking about here?

23   A.    My ex-husband Corey was -- we were talking about

24   getting a stamp with Dr. Alperovich's name to stamp his

25   name on the charts instead of physically showing

1    Dr. Alperovich the charts.

2    Q.    And who was going to do that stamping?

3    A.    Corey was.

4    Q.    And that's so that none of you were implicated?

5    A.    Correct.

6    Q.    And Mr. Young knew about this plan?

7    A.    Yes.

8    Q.    Was Dr. Alperovich the only supervising physician

9    that you thought about or actually did get a stamp with

10   his name?

11   A.    I don't believe that we ever got the stamp for

12   Dr. Alperovich.  There was a stamp there, before I

13   started working there, for Dr. Alston.

14   Q.    And did you ever see Jeff Young using Dr. Alston's

15   stamp?

16   A.    Yes.

17   Q.    Okay.  Describe the circumstances under which he

18   was stamping Dr. Alston's name.

19   A.    There ever several different times that the board

20   of nursing sent out a list of patients that they wanted

21   to -- they were doing an investigation of Jeff, the board

22   of nursing.  And they were wanting to see different

23   patient charts, several, several, several patient charts.

24   And we would get the receptionist to pull the charts, and

25   I would go through the charts looking at different things

1   to see when the last time a supervising physician had

2   actually been in and reviewed this chart, if they'd ever

3   reviewed the chart; flag different things if I thought

4   Jeff needed to look at them.  And he would go through

5   those charts and add more stuff, add more documentation

6   to the charts and use Dr. Alston's stamp to stamp the

7   chart as if Dr. Alston was there and signed the chart.

8   That was required of -- a physician was required to

9   actually sign a hundred percent of pain patient charts, a

10  hundred percent.

11  Q.    So this -- so he was making it look to the medical

12  board as though that had happened?

13  A.    Correct.

14  Q.    I see.

15        Did you -- did there come a time when

16  Dr. Alperovich also quit?

17  A.    Yes, ma'am.

18  Q.    All right.  I'm going to show you a document that

19  is seven pages.  It's internally marked as 202.

20        (A document was passed to the witness.)

21  **BY MS. PAYERLE:**

22  Q.    Are these text messages with you around the time

23  that Dr. Alperovich quit?

24  A.    Yes, ma'am.

25        **MS. PAYERLE:**  Okay.  Move to admit.

1        **THE COURT:**  We'll go ahead and receive it, seven

2    pages of texts.

3        **MS. PAYERLE:**  Thank you.

4        **THE COURT:**  Exhibit Number 14.

5        (The above-mentioned item was marked as

6    Exhibit No. 14.)

7        **MS. PAYERLE:**  Let's go ahead and publish

8    Exhibit 14, please.

9        Okay.  So let's fast forward.  Go ahead and flip

10    to the next page.  Flip to the next page, to be

11    expeditious.

12        Oh, back up.

13        **MS. SILVERBERG:**  Oh, sorry.

14        **MS. PAYERLE:**  There we go.  Sorry.

15    **BY MS. PAYERLE:**

16    Q.    Okay.  Let's -- let's blow up the top half of this

17    page down to, I think, like here, let's say.  There we

18    go.

19        All right.  Is this a series of text messages

20    between you and Dr. Alperovich?

21    A.    Yes, ma'am.

22    Q.    And is this in June -- on June 9th of 2016, the

23    column --

24    A.    Yes, ma'am.  Yes, ma'am.

25    Q.    Okay.  What do you -- what do you say to him on

1   that day?

2   A.    I sent a message to him that said:  "Good morning.

3   I'm not telling Jeff about you resigning until this

4   afternoon when the other NP" -- which is nurse

5   practitioner -- "comes in.  Please don't say anything to

6   him this morning about it."

7   Q.    Dr. Alperovich says:  "I was going to call him.

8   Why is it a concern?

9         And what did you say?

10  A.    "He's a loose cannon.  I don't want patients to

11  suffer this morning.  At least when April gets here, she

12  can see the patients."

13  Q.    Okay.  Why -- I guess, what was your concern about

14  Jeffrey Young and telling him that Dr. Alperovich had

15  quit that day?

16  A.    I knew that he would become irate and start

17  drinking and --

18  Q.    And did he?

19  A.    He did.

20  Q.    And have you already told the jury what happened on

21  that day?

22  A.    Yes.  That's the day that he spit vodka and kicked

23  me.

24  Q.    After you lost Dr. Alperovich, how long was it

25  before you found another supervising physician?

1    A.    It was at least 30 days, if not longer.

2    Q.    And let's take a look at a nine-page document the

3    government's labeled 205.

4          (A document was passed to the witness.)

5    **BY MS. PAYERLE:**

6    Q.    And is this a series of e-mails with a man named

7    Andrew Rudin and documents attached?

8    A.    Yes, ma'am.

9    Q.    And who is Andrew Rudin?

10   A.    He was the final overseeing doctor, overseeing

11   physician.

12         **MS. PAYERLE:**  Move to admit, Your Honor.

13         THE COURT:  We'll go ahead and receive them.

14         **MS. PAYERLE:**  Thank you.

15         **THE COURT:**  Nine pages, exhibit 15.

16         (The above-mentioned item was marked as

17   Exhibit No. 15.)

18         **MS. PAYERLE:**  Let's go ahead and publish

19   Exhibit 15.

20   **BY MS. PAYERLE:**

21   Q.    Let's show -- let's go ahead and flip down a page.

22         Is this a contract that you helped sort of

23   facilitate between Jeff Young and Andrew Rudin?

24   A.    Yes, ma'am.

25   Q.    On Page 3, at the bottom half, I think, starting at

 1    J, K, and L -- keep going all the way down.  There we go.

 2         Did Mr. Rudin, in this contract, agree to review

 3    and sign patient charts, visit the campus of

 4    Preventagenix clinic, and do the other things indicated

 5    here?

 6    A.    Yes, ma'am.

 7    Q.    Did he ever, to your knowledge, visit

 8    Preventagenix?

 9    A.    No, he never did.

10    Q.    All right.  At this point, I'm going to show you --

11    I'm going to show you what's been internally marked as

12    Government's 204.  It's just one page.  It's a single

13    text message.

14         (A document was passed to the witness.)

15    A.    Yes, ma'am.

16    **BY MS. PAYERLE:**

17    Q.    And is that a text message about Dr. Rudin?

18    A.    Yes, ma'am.

19    Q.    And is it to you?  Sorry.  From you?

20    A.    It's from me, yes, ma'am.

21    Q.    Okay.

22         **MS. PAYERLE:**  Move to admit, Your Honor.

23         **THE COURT:**  Go ahead and receive the text.  That

24    will be Exhibit 16.

25         (The above-mentioned item was marked as

1    Exhibit No. 16.)

2    **BY MS. PAYERLE:**

3    Q.    Who was Dr. Rudin to Mr. Young?

4    A.    He was a friend of -- they were each other's

5    friend.

6    Q.    They're friends.

7          And where did Dr. Rudin live at the time?

8    A.    I believe in Chicago.  It was definitely not

9    Tennessee.  It was somewhere like Chicago or somewhere in

10   that area.

11   Q.    Okay.  And I think I asked you this.  Did he ever,

12   to your knowledge, visit Preventagenix?

13   A.    No, ma'am.

14   Q.    I'm going to show you -- let's go ahead and pull

15   up -- what was 204, the last exhibit we just --

16          **MS. SILVERBERG:**  16.

17          **MS. PAYERLE:**  16.  Okay.  Let's pull up 16.

18   **BY MS. PAYERLE:**

19   Q.    And what did you text Tessa James there?

20   A.    It says:  "Do we have a "Dr. Rudin" stamp in yet?"

21   Q.    Was the plan also to get a stamp for Dr. Rudin's

22   signature?

23   A.    Correct.  Yes, ma'am.

24   Q.    To be used in the same way as the prior stamps we

25   talked about?

1    A.    Not only that, but also it was common to stamp a

2    doctor's signature on certain different orders that they

3    necessarily didn't have to sign in person, but --

4    Q.    Okay.

5    A.    -- primarily for the charts.

6    Q.    I'm going to show you -- and as quickly as I can

7    here -- some further text messages with Mr. Young and a

8    four-page document labeled Government's 216.

9          (A document was passed to the witness.)

10   **BY MS. PAYERLE:**

11   Q.    Are these text messages between you and Mr. Young

12   about Dr. Rudin?

13   A.    Yes, ma'am.

14         **MS. PAYERLE:**  Move to admit.

15         **THE COURT:**  Be 17.

16         (The above-mentioned item was marked as

17   Exhibit No. 17.)

18         **MS. PAYERLE:**  Thank you.

19         Let's go ahead and publish Exhibit 17, please.

20   **BY MS. PAYERLE:**

21   Q.    Ms. Gutgsell, was it easy or difficult to get

22   Dr. Rudin to pay attention to the clinic or to do his

23   job?

24   A.    It was very difficult.

25   Q.    All right.  Let's start -- these start actually at

1   the bottom, so let's go through -- all the way to the --

2   kind of the last of these.  These start at the bottom and

3   go back up.

4           **MS. PAYERLE:**  So Ms. Silverberg, if you could

5   just stroll to the last page of the exhibit.

6   **BY MS. PAYERLE:**

7   Q.   Okay.  And they start with a text message from you,

8   so let's go blow up the top three texts, like the

9   whole -- the whole part there in writing.

10          We'll start with -- you be you; I'll be Mr. Young,

11  and start at the bottom.

12  A.   "Did you get the signed contract to Nashville

13  attorney?"

14  Q.   "Yes.  Meeting with him in Nashville, Friday,

15  February the 13th."

16  A.   "Good.  What time?"

17  Q.   Okay.  Let's back out of that and go to the second

18  page and blow it up, please.

19          "The 13th is a Monday.  Sorry.  It's January,

20  Friday the 13th," says Mr. Young.

21          What do you say?

22  A.   "Okay.  Good.  I'm going to have to fly you to

23  Chicago soon.  Pick a weekend.  I need tons of stuff

24  signed by Rudin again.  It's impossible to get him to

25  sign and mail back."

*TESTIMONY OF KRISTIE GUTGSELL*

1   Q.    Mr. Young says:  "Okay."

2        Let's go to the first -- or the next page up.  What

3   do you say?

4   A.    "I can fly you for free from Jackson.  I'll give

5   you enough cash from Preventagenix.  Rich will never

6   know."

7   Q.    Who's Rich?

8   A.    He was one of the owners.

9   Q.    Okay.  Mr. Young says:  "Perfect."

10       You say?

11   A.    "I'll plan with Rudin when a good time for -- when

12   is good for him, unless you want to."

13   Q.    (Indiscernible).

14           **THE COURT REPORTER:  Excuse me.  What did you**

15   **say?**

16   **BY MS. PAYERLE:**

17   Q.    "You can?"

18       Let's go to the top.

19       Mr. Young says:  "You know my schedule better than

20   I."

21   A.    "He's so difficult to nail down on anything."

22   Q.    Mr. Young says:  "Yeah, the perfect preceptor."

23       Did he ever talk to you about why Mr. Rudin or

24   Dr. Rudin was the perfect preceptor?

25   A.    Because he wasn't ever in the clinic, wasn't

1   breathing down Jeff's neck, wasn't asking questions.  He

2   didn't care what was going on either.

3   Q.    And did Dr. Rudin ever sign any charts for the

4   clinic?

5   A.    He -- he never came to the office to sign any

6   charts, but I did mail him charts for him to review and

7   sign.

8   Q.    Did you mail him complete charts?

9   A.    No.  I would just mail him the page that I needed

10  him to sign.

11  Q.    Okay.  And did he sign and send those back?

12  A.    He did.

13  Q.    And did Mr. Young pay Dr. Rudin his thousand

14  dollars for a month?

15  A.    He did.

16  Q.    Ms. Gutgsell, who hired and fired people at

17  Preventagenix during the time that you were there?

18  A.    Jeff or I did.

19  Q.    Okay.  And who made the decision ultimately about

20  who got hired and fired?

21  A.    Jeff.

22  Q.    Did he pay the rent for Preventagenix out of a

23  Preventagenix account?

24  A.    He did.  I wrote the check, he signed it, and I

25  mailed it.

1    Q.    Okay.  And did he lease or maintain the Murray

2    Guard property for anything else besides the medical

3    practice that we've been discussing?  Like, was there

4    anything else going on there besides the medical practice

5    Preventagenix?

6    A.    Well, like, he would have different Botox parties

7    or art parties or just regular parties in general.

8    Q.    But related to the medical practice or unrelated?

9    A.    Unrelated.

10   Q.    Okay.  Was Preventagenix primarily a medical

11   clinic?

12   A.    Yes, ma'am.

13   Q.    Okay.  You testified about sort of your -- how you

14   took responsibility for your role in Preventagenix.  For

15   as long as you've known him, did Jeff Young ever take

16   responsibility for his part?

17   A.    He has never taken responsibility.

18   Q.    Has he blamed others?

19   A.    Yes, ma'am.

20   Q.    Can you tell the jury who -- who he's blamed for

21   his troubles over the years?

22   A.    He's blamed me.  He's blamed his ex-wife.  He's

23   blamed the last office manager before me.  He's blamed

24   the government.  He's blamed everyone but himself.

25   Q.    Let's take a look at what's been premarked as

1    Exhibit 711.  It's a one-page document.

2              (A document was passed to the witness.)

3    **BY MS. PAYERLE:**

4    Q.    A letter from Humana?

5    A.    Yes, ma'am.

6    Q.    Dated December 22, 2016, and addressed to Jeff

7    Young?

8    A.    Yes, ma'am.

9              **MS. PAYERLE:**  Move to admit, Your Honor.

10             **THE COURT:**  That will be Number 18, the letter.

11             (The above-mentioned item was marked as

12   Exhibit No. 18.)

13             **MS. PAYERLE:**  Number 18.  And let's go ahead and

14   publish.

15   **BY MS. PAYERLE:**

16   Q.    Now, is this a letter from an insurance company?

17   A.    Yes, ma'am.  Humana.

18   Q.    Let's take a look at the top two paragraphs.  It

19   says:  "You have been" -- the second paragraph there

20   says:  "You have been identified as being within the top

21   one percent of opioid prescribers, excluding

22   oncologists."

23         And he encloses a report.  Do you see that?

24   A.    Yes, ma'am.

25   Q.    Let's back out a little bit or back out to the --

1    Okay.  There's handwriting on this letter.  Whose

2    handwriting is that?

3    A.    That is Jeff's.

4    Q.    Was this letter an example of kind of people

5    questioning his methods?

6    A.    Yes, ma'am.  There was different letters about

7    the -- that were about the same thing.

8    Q.    Who else were questioning, at this time, the amount

9    of prescribing that he was doing?

10   A.    Other insurance companies.  He was being

11   investigated by the board of nursing as well.

12   Q.    And did he ever express his belief that somebody

13   was behind all of this?

14   A.    Yes.  He -- there's the conspiracy theories

15   between, you know, another nurse practitioner in town

16   named John Michael Briley; he was behind it, his ex-wife

17   Dawn, the government, his haters.

18   Q.    Okay.  You mentioned haters.  At this time, have

19   you ever seen a video posted on YouTube about Uncle Kevin

20   talking about Mr. Young and his haters?

21   A.    Yes, ma'am.

22   Q.    Okay.

23         **MS. PAYERLE:**  At this time, Your Honor, the

24   government would admit that video as -- it's marked 609.

25         **THE COURT:**  Okay.  Video.  It will be Exhibit

1    Number 19.  How long is it?

2            **MS. PAYERLE:**  I believe it's only 30 seconds

3    maybe.

4            It's two minutes and 30 seconds.

5            **THE COURT:**  Go ahead.

6            **MS. PAYERLE:**  Thank you, Your Honor.

7            (The above-mentioned item was marked as

8    Exhibit No. 19.)

9            (An audio-video recording was played.)

10           MS. PAYERLE:  I'll take that down.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          **THE COURT:**  I think this is a good place for us

4     to break for lunch.

5          **MS. PAYERLE:**  Okay.  Your Honor, that's fine.

6          **THE COURT:**  All right.  Ladies and gentlemen,

7     your lunch is waiting for you in the jury room back

8     there, so going to take a little time for you to go ahead

9     and enjoy lunch.

10          Let's see.  I'm going to look at that clock.

11     It's almost 12:30, so we'll pick this up at 1:30.  Go

12     ahead and enjoy.  Remember my admonitions about, you

13     know, independent investigations, things like that.

14     Don't discuss the case.  I may have mentioned before, you

15     need to leave your notebooks in your chairs there.  They

16     will be there when you come back in.  Okay.

17          Let's go ahead and break for lunch.

18          (Jury out at 12:23 p.m.)

19          **THE COURT:**  Remember don't discuss your

20     testimony over the lunch break.  Okay?

21          **THE WITNESS:**  Yes, sir.  Thank you.

22          **THE COURT:**  You can step down.

23          (The witness complies with the request.)

24          **THE COURT:**  Okay.  We'll be in recess.

25          **MS. PAYERLE:**  Judge, whatever it's worth, I only

*UNREDACTED TRANSCRIPT*

1    have one question, just to your earlier --

2            **THE COURT:**  I'm sorry?

3            **MS. PAYERLE:**  I only have one more question, to

4    your earlier concern.  We've been cutting a fair amount.

5            **THE COURT:**  Appreciate it.  Thank you.  We'll be

6    in recess.

7            (The morning session concluded at 12:24 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*UNREDACTED TRANSCRIPT*

1          **C E R T I F I C A T E**

2

3

4          I, LASHAWN MARSHALL, RPR, LCR, do hereby
   certify that the foregoing 145 pages are, to the best of
5   my knowledge, skill, and abilities, a true and accurate
   transcript from my stenotype notes of the Jury Trial
6   proceedings on the 28th day of March, 2023, in the matter
   of:

7

8

9

10

11   United States of America

12   vs.

13   Jeffrey W. Young, Jr.

14

15   Dated this 28th day of March, 2023

16

17

18

19

20

21

22

23                         S/Lashawn Marshall
                         Lashawn Marshall, RPR, LCR
24                         Official Court Reporter
                         United States District Court
25                         Western District of Tennessee

*UNREDACTED TRANSCRIPT*