1

```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TENNESSEE
 2                       EASTERN DIVISION

 3   _____
                                    |
 4   UNITED STATES OF AMERICA,      |
                                    |
 5            Plaintiff,            |
                                    |
 6   vs.                            |   NO. 19-CR-10040
                                    |
 7   JEFFREY W. YOUNG, JR.,         |
                                    |
 8            Defendant.            |
 9   _____
```

10

11

12

13                 TRANSCRIPT OF THE JURY TRIAL

14            BEFORE THE HONORABLE JOHN T. FOWLKES

15                     AFTERNOON SESSION

16

17

18                          TUESDAY

19                     MARCH 28, 2023

20

21

22

23                 TINA DuBOSE GIBSON, RPR
                     OFFICIAL REPORTER
                FOURTH FLOOR FEDERAL BUILDING
24               MEMPHIS, TENNESSEE 38103

25

UNREDACTED TRANSCRIPT

2

1                A P P E A R A N C E S

2

3       Appearing on behalf of the Government:

4            KATHERINE PAYERLE
             ANDREW PENNEBAKER
5            United States Department of Justice
             Fraud Section
6            1400 New York Avenue, NW
             Washington, DC 20530
7            (202) 341-4227
             katherine.payerle@usdoj.gov
8            andrew.pennebaker@usdoj.gov

9

        Appearing on behalf of the Defendant:
10
             CLAIBORNE H. FERGUSON
11           RAMON DAMAS
             The Claiborne Ferguson Law Firm, PA
12           294 Washington Avenue
             Memphis, Tennessee 38103
13           (901) 529-6400
             claiborne@midsouthcriminaldefense.com
14           ramon@midsouthcriminaldefense.com

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

3

# W I T N E S S   I N D E X

<u>PAGE</u>

<u>**WITNESSES:**</u>

**KRISTIE GUTGSELL**
CONTINUED DIRECT EXAMINATION BY MS. PAYERLE.   7
CROSS-EXAMINATION BY MR. FERGUSON..........  10
REDIRECT EXAMINATION BY MS. PAYERLE........  26
**HOPE ARMENT**
DIRECT EXAMINATION BY MR. PENNEBAKER.......  31
CROSS-EXAMINATION BY MR. FERGUSON..........  65
**DANIEL ROGERS**
DIRECT EXAMINATION BY MS. PAYERLE..........  88
**KATIE TRIPP**
DIRECT EXAMINATION BY MS. PAYERLE.......... 103

**UNREDACTED TRANSCRIPT**

4

# **E X H I B I T S**

| No. | Description | Marked |
|---|---|---|
| 20 | Facebook post by Jeff Young about one of his patients...................................... | 7 |
| 21 | Intake form of Hope Rogers..................... | 34 |
| 22 | 2014-2015 Hope Rogers prescriptions............ | 42 |
| 23 | Facebook Messages between Jeff Young and Hope Rogers........................................ | 53 |
| 24 | Photograph of Baby A.......................... | 85 |
| 25 | Patient record for Andy Azbill................ | 93 |
| 26 | 2016 prescription for Katie Crowder........... | 107 |
| 27 | Facebook Messenger Message between Katie Crowder and Jeffrey Young..................... | 108 |
| 28 | Audio Recording File .001, UC's third visit.... | 112 |
| 29 | Audio Recording File .006, UC's interaction with Young, third visit...................... | 112 |
| 30 | Audio Recording File .002 UC's interaction with staff, fourth visit..................... | 112 |
| 31 | Audio Recording File .004, UC's interaction with Young, fifth visit...................... | 112 |
| 32 | Audio Recording File .004, UC's interaction with Young, sixth visit...................... | 112 |
| 33 | Audio Recording File 6.20 to 18:00, UCs' interactions with Young, Seventh visit........ | 112 |
| 34 | Prescription for Katie Crowder and receipt..... | 118 |
| 35 | Fentanyl patch prescription for Katie Crowder.. | 121 |
| 36 | Lortab prescription for Katie Crowder.......... | 125 |
| 37 | Lortab prescription for Katie Crowder.......... | 127 |

```
 1                    TUESDAY

 2                  MARCH 28, 2023

 3             -----------------------

 4

 5          THE COURT:  Anything before we bring in the

 6   jurors?

 7          MS. PAYERLE:  I'll have the witness retake the

 8   stand.

 9          THE COURT:  Yes.

10          MS. PAYERLE:  Thank you.

11          THE COURT:  Mr. Herrin passed forward to me a

12   witness list.

13          MS. PAYERLE:  Yes, Judge.

14          THE COURT:  I appreciate seeing this.  Fourteen

15   is better than 40.

16          MS. PAYERLE:  Yes, Your Honor.  It dawned on me

17   that the names that I read at the very beginning and you've

18   heard people say the names of other people, including

19   patients, and so those are names that would be said in trial

20   but not necessarily people that we were going to call to

21   testify.  So I think I understand the miscommunication.

22          THE COURT:  Okay.  I believe we're ready for the

23   jury.  Bring them in, please.

24                  (Jury in at 1:39 p.m.)

25          THE COURT:  Okay.  Everyone, I hope you enjoyed
```

UNREDACTED TRANSCRIPT

6

1    lunch.  And we're ready to proceed at this time so I'm going

2    to turn it back over to the Government.

3              MS. PAYERLE:  Thank you, Your Honor.

**EXAMINATION OF KRISTIE GUTGSELL**                    7

1                      CONTINUED DIRECT EXAMINATION

2    BY MS. PAYERLE:

3      Q.   Ms. Gutgsell, I have only a few more questions for

4    you.  I'd like to show you -- were you Mr. Young's friend on

5    Facebook?

6      A.   Yes, ma'am.

7      Q.   You saw a lot of his Facebook posts?

8      A.   Yes, ma'am.

9      Q.   I'm going to show you a one-page document we marked

10   908.  Is this a post by Jeff Young about one of his patients?

11     A.   Yes, ma'am.

12             MS. PAYERLE:  All right.  The Government will

13   move to admit.

14             THE COURT:  That would be Exhibit No. 20.

15               (Exhibit 20 marked and received.)

16             MS. PAYERLE:  Let's go ahead and publish

17   Exhibit 20 to the jury, if you would.

18   BY MS. PAYERLE:

19     Q.   Ms. Gutgsell, do you see at the top of the post that

20   says:  Six months clean today.  So proud of Aaron Beaver --

21   with some numbers in there -- love you, dude.  You and your

22   story inspires and humbles me.  If you are out there and

23   think there's no hope, please contact us at PREVENTAGENIX and

24   let us help facilitate your recovery and get your life back?

25     A.   Yes, ma'am.

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                                          8

1    Q.   And do you see where Jeff Young writes below:  This is

2    why I do what I do every day?

3    A.   Yes, ma'am.

4    Q.   And he says:  This is why I put up with all the

5    bullshit and heat?

6    A.   Yes, ma'am.

7    Q.   He says:  This story right here is why I put myself

8    out there on social media.  Aaron Beaver and I would never

9    had met had there not been controversial Facebook posts about

10   myself addressing addiction as a disease.

11        Do you see that?

12   A.   Yes, ma'am.

13   Q.   Can you -- did you know Aaron Beaver?

14   A.   I did.

15   Q.   Can you tell the story about how Aaron Beaver came to

16   be -- just the very beginning of that story, how he came to

17   be a patient at PREVENTAGENIX?

18   A.   It goes back to where Jeff had posted on Facebook

19   about if you need help with addiction, please contact me.

20   And he either contacted myself or Jeff.  I don't remember

21   which way it went.

22   Q.   And he became a patient at PREVENTAGENIX?

23   A.   Yes, ma'am.

24   Q.   And was it documented in his patient file that he was

25   suffering from addiction?

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                                   9

1   A.   Yes, ma'am.

2   Q.   To opioids?

3   A.   Yes, ma'am.

4   Q.   Did Jeff Young at some point begin prescribing opioids

5   to Aaron Beaver?

6   A.   Yes, ma'am.

7   Q.   And do you remember what the name of that drug was?

8   A.   No.

9   Q.   Okay.

10   A.   I don't, no.

11   Q.   Thank you.  Ms. Gutgsell, is it fair to say that

12   you -- and I think this is just based on what you've

13   testified --

14          MS. PAYERLE:  We can take the exhibit down.

15   BY MS. PAYERLE:

16   Q.   That working at PREVENTAGENIX was a volatile

17   experience for you?

18   A.   Yes, ma'am.

19   Q.   Tell the jury, if you would, please, why did you stay

20   for so long?

21   A.   It -- if you don't stay on Jeff's team and you do

22   things against Jeff, he goes after you, whether it be through

23   social media, through his friends.  Publicly on Facebook, he

24   would just embarrass you and just tell stories and talk about

25   you and harass you and he did that -- I watched it numerous

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                          10

1   times, and I didn't want to be a part of that embarrassment.

2                   MS. PAYERLE:  Your Honor, if I may have just one

3   moment, please.

4                   THE COURT:  Okay.

5                   MS. PAYERLE:  Thank you, Your Honor.  At this

6   time, we pass the witness.

7                   THE COURT:  All right.  Thank you.

8                   And, Mr. Ferguson, is there any cross?

9                           CROSS-EXAMINATION

10  BY MR. FERGUSON:

11    Q.   Good afternoon.

12    A.   Yes, sir.  Good afternoon.

13    Q.   I've been corrected twice over talking over the

14  witness, so I'm going to try hard not to overtalk you.

15    A.   Okay.

16    Q.   When did you start with Mr. Young?

17    A.   It was August, 2015.

18    Q.   And was that after Ms. Goslee had left?

19    A.   Yes, sir.

20    Q.   And you were friends with Ms. Goslee?

21    A.   Yes, sir.

22    Q.   And she recommended the job to you?

23    A.   No, she did not.

24    Q.   She just told you about it or --

25    A.   No.  She -- I had become friends with Jeff at this

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                                      11

1   point too.

2   Q.   That makes sense.  And part of your job was to

3   schedule all of the appointments and the healthcare

4   providers?

5   A.   No, that was not.  I didn't -- I scheduled patients

6   sometimes, but we had receptionists that scheduled most of

7   those appointments.

8   Q.   Okay.  I'm going to pass this to you.  Did you see

9   this already?

10  A.   Yes, sir, I believe this is the same one.

11  Q.   It's Exhibit 8 already admitted.  This was the

12  schedule that the Government was talking to you about?

13  A.   Yes, sir.

14  Q.   Did you prepare this?

15  A.   No.  This is what you can print off from the computer

16  when the -- when a patient calls for an appointment.  You put

17  it in the computer, and then you can print, like, the master

18  list, which is what this is.

19  Q.   Okay.  Well, I just want to zoom in here a little bit

20  over here on this far side on the right where it says

21  "comments"?

22  A.   Yes, sir.

23  Q.   You were saying that the one-month follow-ups mean

24  what?

25  A.   Typically, those patients are coming in for controlled

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                                    12

1    substances, and they have to come in monthly.

2      Q.   Do they have to be controlled substances to be a

3    one-month follow-up?

4      A.   That's what these appointments were.

5      Q.   Okay.  And what is this?

6      A.   Echo.

7      Q.   Did Jeff do echoes?

8      A.   He did not.

9      Q.   By echo, do you mean echocardiogram?

10     A.   Yes, sir.

11     Q.   There was another provider in the clinic that did

12   echoes?

13     A.   Yes, sir, on certain days.

14     Q.   Certain days?

15     A.   Not every day.

16     Q.   And you've got:  Fasting labs, echoes, follow-up.

17   There's a lot of stuff going on here on a day-to-day basis;

18   is that correct?

19     A.   Yes, sir.  There's a lot of patients.

20     Q.   And for the majority, it's all insurance payments

21   except for -- what does private pay mean?  Is that cash?

22     A.   Yes, sir.

23     Q.   Okay.  So you have private pay, commercial insurance

24   is insurance, Medicare is insurance, BlueCare, private

25   insurance, private insurance.  There's a lot of -- I think

**EXAMINATION OF KRISTIE GUTGSELL**                                    13

1    you were saying there was a lot of people paying cash, but it

2    looks like there's only a handful of cash payments on this

3    day.

4        A.   On this day.

5        Q.   That's pretty typical for a day?

6        A.   Not necessarily.  Each day varies.

7        Q.   Okay.  And then when you have these things that say,

8    like, new patient, wants to see April.  Who is April?

9        A.   April was another provider that came, I believe, two

10   days a week.

11       Q.   Okay.  So to be fair, on what's been marked as

12   Exhibit 8, there's at least another person doing echoes, and

13   then there's April, who was another nurse practitioner also

14   in the office on this day; is that correct?

15       A.   If it says echo next to the patient, they would be

16   seen for an echo only, correct.

17       Q.   And then April was another nurse practitioner?

18       A.   Yes.  She was only there a couple of days a week.

19       Q.   And follow-up, Daniel, see patient drug screen?

20       A.   Correct.

21       Q.   Who is Daniel?

22       A.   Daniel was another employee.

23       Q.   Okay.  And so this other employee is now doing the

24   drug screens on this patient here?

25       A.   No.  More than likely, what that meant was Daniel

UNREDACTED TRANSCRIPT

1    needed to see the patient because of the patient's drug

2    screen, and if Daniel was being told to come in, it was

3    because of a drug screen -- the patient had failed the drug

4    screen.

5    Q.    This being somebody had followed up with a drug

6    screen, and the patient needed counseling?

7    A.    It's two different things, actually.

8    Q.    Okay.

9    A.    So the follow-up would be the patient was there for

10   medication.

11   Q.    Correct.

12   A.    And also Daniel needed to talk to the patient about

13   their drug screen.

14   Q.    Yes, ma'am.  So -- but on the chart or on this -- I'm

15   not sure what the sheet is called.  What do you call the

16   sheet?  Just the appointment list?

17   A.    Yes, like, a master list.

18   Q.    Master list?

19   A.    Yes, sir.

20   Q.    There's a notation on here that this person is coming

21   in for a follow-up, and Daniel needs to see them about their

22   drug screen --

23   A.    Correct.

24   Q.    -- to counsel them about their drug screen?

25   A.    Right.  That's right.  Yes, sir.

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                          15

1    Q.   Okay.  This is not saying that this person is the only

2    person getting a drug screen this day?

3    A.   Right.  That's just talk to the patient about the drug

4    screen.

5    Q.   And there's a number of people that come in, bloody

6    stool, no energy, felt real bad, a new patient.  I guess,

7    this new PCP, is that primary care physician?

8    A.   Yes, sir, that's what that means.

9    Q.   Does that mean that Mr. Young is going to become the

10   PCP?

11   A.   More than likely, yes, sir.

12   Q.   Okay.  They're in need of a primary care physician?

13   A.   Correct.  Yes, sir.

14   Q.   Is it called primary care physician even if he's not a

15   physician?  Is it just in the business you called it a PCP?

16   A.   PCP, yes, sir.

17   Q.   All right.  It just means the person who is the

18   general person to kind of keep up with their health?

19   A.   Correct.  Yes, sir.

20   Q.   Somebody has another follow-up, and it's also --

21   apparently, they had needed to have some more testing done

22   that day?

23   A.   Yes, sir.

24   Q.   Okay.  One month follow-up and see Kristie for sleep

25   study?

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                                16

1    A.    Correct.

2    Q.    Who is Kristie?

3    A.    That's me.

4    Q.    And what are you doing with the sleep study?

5    A.    Jeff had sleep study machines in his office, and it

6    was where we could show the patient how to use the machine so

7    they could bring it home with them to get a sleep study done.

8    Q.    Okay.  Is that a legitimate medical procedure?

9    A.    It is, yes, sir.

10   Q.    Okay.  And it's kind of in the course and scope of

11   what a healthcare provider would provide for their patients?

12   A.    Correct.  Yes, sir.

13   Q.    Thyroid panel, that's within the normal scope and

14   course of what a medical provider would provide for their

15   patients?

16   A.    Well, what that thyroid panel draw means, that's a

17   blood test, so the phlebotomist would have drawn that panel,

18   yes, sir.

19   Q.    But it's ordered, and somebody in the office does it,

20   and it's sent out --

21   A.    Right.

22   Q.    -- there's an analysis done, it comes back in, and

23   Jeff would read it and make medical decisions based on it?

24   A.    Yes, you're correct.

25   Q.    Did you have problems with Jeff -- Mr. Young, and his

1   not wanting to fire people who had failed drug screens for

2   marijuana?

3       A.   Ask me that again.

4       Q.   Was there a problem with people would fail a drug

5   screen for marijuana and Jeff would unfire them?

6       A.   Marijuana wasn't even on our drug screen.

7       Q.   Okay.  Y'all just didn't even test for that, did you?

8       A.   No, sir.

9       Q.   Can you test for it?  I don't know.

10      A.   I'm assuming you can, but he didn't have it on his

11  screening.

12      Q.   Okay.  Would it be fair to say he would not have been

13  concerned about it because he was a pro-marijuana advocate?

14      A.   Correct.

15      Q.   He felt that it was a -- it was just as good as

16  medical drugs, medical prescriptions for treating certain

17  symptoms?

18      A.   That's what he believed, yes, sir.

19      Q.   And since that time, many states have grown to accept

20  that as part of the medicine prescription regimen for people?

21  It's a dumb way of saying Mississippi and Arkansas have

22  medical marijuana?

23      A.   I don't know that.  I don't keep up with that.

24      Q.   Okay.  You talked about back-door patients?

25      A.   Yes, sir.

**EXAMINATION OF KRISTIE GUTGSELL**                                    18

1    Q.   Your concern about back-door patients was, you didn't

2    think they were being charted correctly or that they were

3    getting drugs they didn't need?  What's the issue with back

4    door, the VIP back door?  What's the concern there?

5    A.   Okay.  So back-door patients and VIP patients are two

6    totally different things.

7    Q.   VIP, people paid extra to have more personal

8    connection to Jeff.  He still would see them as patients.

9    The back-door were kind of like his special people?

10   A.   Correct.  Some of those patients didn't have charts at

11   all.

12   Q.   Some of those people were including his attorney that

13   was handling his divorce at that time?

14   A.   Yeah, he was actually a back-door patient as well.

15   Q.   Mr. Donahoe would come and go and meet with Jeff

16   while -- and this was while Jeff was going through this

17   divorce with Dawn?

18   A.   And get prescriptions and injections and shots as

19   well.

20   Q.   Okay.  Did Jeff ever receive -- as far as you know,

21   without maybe disclosing what the attorney-client

22   conversation was, was there -- during this time at the back

23   door that discussions were held about either Jeff's divorce

24   or whether or not the practice was being run correctly?

25   A.   Was that talked about?

UNREDACTED TRANSCRIPT

**EXAMINATION OF KRISTIE GUTGSELL**                        19

1    Q.    Yeah.

2    A.    Yes, sir.

3    Q.    Jeff was receiving legal advice at this time?

4    A.    Jeff had friends that were attorneys as well, yes.

5    Q.    And that would come to the back door?

6    A.    Yes.

7    Q.    And would see the -- be able to be inside the clinic

8    during this time?

9    A.    Yes, sir.

10   Q.    Okay.  When you first started working there to the

11   time of the -- you and I call it -- the raid.  The Government

12   called it the legally executed search warrant on the premises

13   of PREVENTAGENIX.  The raid --

14   A.    Yes, sir.

15   Q.    -- did Jeff's behavior, I think you described it as,

16   spiralled?

17   A.    It had spiralled.

18   Q.    It had gone really bad?

19   A.    It had, yes, sir.

20   Q.    Did you see that -- did his interaction -- that's a

21   terrible way to ask that.  Let me ask you a good question --

22   A.    Okay.

23   Q.    -- just a second to figure out how to ask you.

24   A.    Yes, sir.

25   Q.    Was some of it in relation to the divorce, the stress

1    of his divorce?

2      A.   It was, yes, sir.

3      Q.   It was really bad, wasn't it?

4      A.   It was terrible.

5      Q.   I mean, they were going after each other?

6      A.   Nonstop.

7      Q.   Each of them were giving it as good as they were

8    getting it?

9      A.   Yes, sir.

10     Q.   On social media, in person, through third parties, it

11   got hard?

12     A.   Yes, sir.

13     Q.   It affected the job?

14     A.   Yes, sir.

15     Q.   It affected Jeff?

16     A.   It did.

17     Q.   It -- maybe use the word -- broke him?

18     A.   I could say that too, yes, sir.

19     Q.   It was ugly?

20     A.   It was.

21     Q.   Did you know Jeff before you started working with him

22   previously as a nurse practitioner?

23     A.   I knew of him.  I didn't know him on a friendly basis.

24     Q.   You knew of his reputation within the community as a

25   good healthcare provider?

**EXAMINATION OF KRISTIE GUTGSELL**                                21

1    A.    No, not even so much that.  He became very vocal as

2    his divorce, everybody saw him on Facebook.

3    Q.    Jackson is small?

4    A.    Small town, yes.

5    Q.    It's a hundred thousand people, but it's a small town?

6    A.    Everybody knows everybody, yes, sir.

7    Q.    And there's this thing called Topics.

8    A.    Uh, yes.

9    Q.    We don't use Topics a lot in Shelby County.  What is

10   Topics?

11   A.    Topics was horrible.  It's where you could post -- it

12   was online, and you could post anonymously.  And you could

13   say whatever you wanted to say, and it was completely

14   anonymous.  It didn't matter what was said.

15   Q.    Everything as bad as Facebook and every other social

16   media is, this was an anonymous platform where people got

17   away with just slandering each other?

18   A.    It was terrible.  Yes, sir.

19   Q.    And posting things they should not have been posting?

20   A.    Correct.

21   Q.    Pictures?

22   A.    Correct.

23   Q.    Health records?

24   A.    I don't remember that, but it wouldn't surprise me.

25   Q.    Okay.  And Jeff kind of went to battle on that too,

UNREDACTED TRANSCRIPT

1  didn't he?

2   A.   Yes.  He posted on Topics as well.

3   Q.   You talked about, I think it was Ben Elston or maybe

4  his dad being Jeff's bodyguard.  Why would Jeff need a

5  bodyguard?

6   A.   It's Ben Elston.  His dad did come to the clinic as

7  well.

8   Q.   Did he need a bodyguard, or was this just something in

9  Jeff's head that made him more popular and cool?

10   A.   Probably the popularity.  I didn't go out with him so

11  I don't know what threats he received when he was out.  I

12  think maybe he felt more comfortable with a big guy beside

13  him.

14   Q.   When we talk about haters, based on what you saw going

15  on and through social media, there was as much hate being

16  given as received.  There were haters, were there not?

17   A.   Yes, sir, there was.

18   Q.   And as he's falling apart, as he's spiralling through

19  this divorce, did he begin to come into the clinic either

20  drinking or drunk?

21   A.   That happened the entire time I worked for him.

22   Q.   Did it get worse as you worked for him?

23   A.   There were periods of time that were worse than

24  others.  So things could be okay for a couple of weeks, and

25  then for a couple of weeks be horrible; and then be okay

1    again for a couple of weeks and then be horrible again.

2        Q.   He just kind of cycled in and out?

3        A.   He did.

4        Q.   Did he cycle in and out of this Doc Rock persona?  Was

5    it something that kind of came and went too?

6        A.   The whole time that I was around him, once that

7    started up, he kept that persona the whole time.

8        Q.   He -- not only did he keep it, he tried to promote it?

9        A.   He did, yes, sir.

10       Q.   And I think you said even to the point of paying

11   people to come in and film --

12       A.   -- a reality show, yes, sir.

13       Q.   Was it called a pilot, trying to shop it around for

14   TV?

15       A.   I think that's what it was, yes, sir.

16       Q.   He thought a lot of himself, didn't he?

17       A.   He did.

18       Q.   And I think you said in his mind he didn't think he

19   was doing anything wrong?

20       A.   Correct.

21       Q.   I was looking at the text messaging between you and

22   Mr. Young when you were testifying when he was sitting there

23   with Dr. Alperovich?

24       A.   Alperovich.

25       Q.   Dr. Al?

1   A.   Dr. Al, yes, that's easier.

2   Q.   Did I notice that it started, like, about 5 p.m. in

3   the afternoon and went to about one o'clock in the morning?

4   A.   Mine and Jeff's text messages probably did.

5   Q.   And that last one was, like, he's just leaving or I'm

6   just getting done or something?

7   A.   I didn't look at the time, but if that's what it says,

8   it could have been that late.

9   Q.   Because Dr. Al went through each file that was given

10  to him, and I think part of that Jeff told you was page by

11  page?

12  A.   Correct.  That's what he said, uh-huh.

13  Q.   And did you get those files back?

14  A.   They were there in the office.  They never left the

15  office.

16  Q.   Was there anything, during that review, that you're

17  aware of where there was an indication that something --

18  after Jeff talked to him, because in the text message it

19  says:  I had to explain to him everything, I had to go

20  through the PMPs and explain my reasoning, explain my medical

21  diagnosis.  Any of those files get flagged for not to do that

22  again?

23  A.   Not that I'm aware of, no.

24  Q.   It wasn't really a gracious way to fire you, was it?

25  A.   Do what?

**EXAMINATION OF KRISTIE GUTGSELL**                    25

1    Q.   I said that wasn't a really gracious way to fire you.

2  Did he just fire you by text message?

3    A.   No.  He didn't fire me.  I quit.

4    Q.   That's right.  You quit.  And he told the people he

5  fired you.

6    A.   Correct.

7    Q.   Did he spit Vodka on you?

8    A.   He did.

9    Q.   And you testified he thought he was more qualified

10  than other doctors?

11   A.   Yes.

12   Q.   Did he think he was the smartest person in the room?

13   A.   Yes.

14   Q.   Did he think anyone could tell him how to practice

15  medicine?

16   A.   No.

17   Q.   Did he think the way he was practicing medicine was

18  the right way for him to practice medicine?

19   A.   That's what he believed, yes, sir.

20   Q.   Thank you.

21          MR. FERGUSON:  That's all I have, Judge.

22          THE COURT:  Thank you.

23          Any redirect?

24          MS. PAYERLE:  Yes, Your Honor.

25

1                           REDIRECT EXAMINATION

2    BY MS. PAYERLE:

3      Q.    I think Mr. Ferguson just asked you if Mr. Young

4    believed that he was infallible?

5      A.    Correct.  Yes, ma'am.

6      Q.    And you said that in his own mind he believed he was?

7      A.    Correct.  Yes, ma'am.

8      Q.    Did -- when the medical board asked Mr. Young to see

9    his files, how he was treating these patients, did he just

10   hand them over as they were in his clinic?

11     A.    No, ma'am.

12     Q.    What did he do?

13     A.    He -- he went through the charts to make sure

14   documentation was done, and if it wasn't, he would do it.

15   And if the overseeing physician hadn't signed the chart, he

16   would stamp the name, the doctor's name.

17     Q.    Is it fair to say that Mr. Young understood that he

18   needed to cover up what he was actually doing when the

19   medical board came to investigate?

20           MR. FERGUSON:  I'm going to object to the form of

21   the question.

22           THE COURT:  Sustain.

23   BY MS. PAYERLE:

24     Q.    Did Mr. Young tell you why he was doing that?

25     A.    Because there was a correct way to do it and a wrong

**EXAMINATION OF KRISTIE GUTGSELL**                                    27

1    way to do it.

2        Q.    And had he done it the correct way?

3        A.    No, ma'am.

4        Q.    You talked a little bit about Topics, and I believe

5    you testified that it was anonymous?

6        A.    Yes, ma'am.

7        Q.    Did Mr. Young post anything about you on Topics?

8        A.    He did, after I quit.

9        Q.    And what did he say about you on Topics?

10       A.    Talked about daddy issues, which I had privately told

11   him things about when I was growing up, and he let the whole

12   world know.  And about my weight, all my insecurities.

13       Q.    You were asked about his attitude toward marijuana and

14   whether he believed that it was good at treating illnesses;

15   do you remember that?

16       A.    Yes, ma'am.

17       Q.    Did Mr. Young, for as long as you knew him, ever tell

18   a patient, you know, you can just smoke marijuana instead of

19   taking all of these opioids I'm giving you?

20       A.    Yes.

21       Q.    And did he, nonetheless, continue to prescribe opioids

22   to patients?

23       A.    He did.  Yes, ma'am.

24       Q.    I'm going to show you again Exhibit 8 and address

25   something that Mr. Ferguson went over here.  Under

**EXAMINATION OF KRISTIE GUTGSELL**                              28

1    appointment type, there's private insurance.  There's UHCTN

2    care.  Is that TennCare?

3    A.   Yes, ma'am.

4    Q.   Is that state Medicaid?

5    A.   Yes, ma'am.  So is BlueCare.

6    Q.   And there's also BlueCare?  So, for example, this

7    patient, Christina Powers, she's a BlueCare patient?

8    A.   Correct.

9    Q.   She's a Medicaid patient?

10   A.   Correct.

11   Q.   And she's there for controlled substances?

12   A.   Yes, ma'am.

13   Q.   And so that means Medicaid paid -- did Mr. Young bill

14   Medicaid?

15   A.   He did.  Yes, ma'am.

16   Q.   And what about Medicare?

17   A.   He billed them as well.  Yes, ma'am.

18   Q.   And so if a patient came in on a one-month follow-up,

19   for example, Medicare, Mr. Young would bill Medicare for that

20   patient's visit?

21   A.   Correct.  And also Amerigroup is TennCare as well.

22   Q.   Amerigroup is TennCare as well, so anywhere it says

23   Amerigroup, BlueCare or TennCare --

24   A.   Or Medicaid or Medicare, yes, ma'am --

25   Q.   Jeff Young was billing Medicaid or Medicare for a

**EXAMINATION OF KRISTIE GUTGSELL**                                29

1  patient visit for those controlled substance patients; is

2  that right?

3    A.   Yes, ma'am.

4    Q.   Just one moment, please.

5    A.   Yes, ma'am.

6           MS. PAYERLE:  That will be all for the

7  Government.  Thank you.

8           THE COURT:  All right.  Thank you.

9           Recross?

10           MR. FERGUSON:  No, thank you, Your Honor.

11  Appreciate it.

12           THE COURT:  All right.  And, Ms. Gutgsell --

13           THE WITNESS:  Gutgsell.

14           THE COURT:  I messed that up.  I'm sorry.  You

15  can step down.  You're excused.

16           THE WITNESS:  Thank you so much.

17           MS. PAYERLE:  Your Honor, the Government would

18  release this witness from the subpoena if there's no

19  objection?

20           MR. FERGUSON:  No.

21           THE COURT:  Thank you.

22           Call your next witness, if you would, please.

23           MR. PENNEBAKER:  Your Honor, the Government calls

24  Hope Rogers.

25           THE COURT:  I'm sorry?  Say it again.

UNREDACTED TRANSCRIPT

1          MR. PENNEBAKER:  Hope Rogers, Your Honor.

2          THE COURT:  Okay.  Oh, they're not down.  Okay.

3    We're going to take a brief recess.  I think you can tell the

4    next witness is in custody.  Okay.  They're not down yet, so

5    we're going to go ahead and excuse you to the jury room.

6    We'll call you back when the witness has arrived.  Leave your

7    notebooks.  Don't discuss.  Take a few minutes in the jury

8    room.

9                    (Jury out at 2:07 p.m.)

10         THE COURT:  All right.  We'll be in recess.

11       (A recess was taken from 2:07 p.m. to 2:13 p.m.)

12         THE COURT:  Mr. Pennebaker, are you ready?

13         MR. PENNEBAKER:  Yes, sir.

14         THE COURT:  Okay.  Bring in the jury, please.

15                   (Jury in at 2:13 p.m.)

16         THE COURT:  Okay.  Folks, I think we're ready to

17   go ahead and proceed at this time with the witness.

18         You're already standing, so if you would please

19   face me and raise your right hand to receive the oath.

20

21

22

23

24

25

1      **HOPE ARMENT**,

2   called as a witness on behalf of the Government, having been

3   first duly sworn, testified as follows:

4                            DIRECT EXAMINATION

5   BY MR. PENNEBAKER:

6      Q.    Good afternoon.  Would you please introduce yourself

7   to the jury.

8      A.    My name is Hope Arment.

9      Q.    And did you previously go by another name?

10     A.    Yes, Hope Rogers.

11     Q.    Are you currently incarcerated, Ms. Rogers --

12  Ms. Arment, excuse me?

13     A.    I am currently incarcerated.  Yes, sir.

14     Q.    And just tell the jury briefly why are you

15  incarcerated?

16     A.    I had relapsed, and during my relapse, I had stolen

17  some vehicles.  Eventually, all of that caught up to me, and

18  I've been incarcerated for the last four years.

19     Q.    Are you in recovery today from drug addiction?

20     A.    I am.

21     Q.    Tell the jury what you were addicted to.

22     A.    I was addicted to opioids and meth, and I have been

23  sober for a little bit over four years now.

24     Q.    Okay.  Do you know Jeff Young?

25     A.    I do.

**EXAMINATION OF HOPE ARMENT**                                            32

1    Q.   Do you see him in court today?

2    A.   Yes.

3    Q.   Would you identify him?

4    A.   He's over there.

5    Q.   By an article of his clothing.

6    A.   Gray tie, goatee, beard.

7    Q.   Got it.

8         MR. PENNEBAKER:  If the record could reflect that

9    the witness has identified the defendant.

10        THE COURT:  The record will reflect it.

11   BY MR. PENNEBAKER:

12   Q.   How do you know Jeff Young?

13   A.   He was my doctor.

14   Q.   How did you come to be Jeff Young's patient?

15   A.   I was going to a different doctor, Thomas McDonald,

16   and he took over the hospital in Lexington.  So he was -- his

17   protege was taking over.  I didn't like her bedside manner.

18   And my mother and I started looking for a different doctor.

19   My cousin then, Eddie Davis, told us about Jeff, that he was

20   a good doctor.  He listened to what you had going on.  And

21   that's the kind of person that me and my mom needed, so

22   that's where we went to.  He also kind of let us know, you

23   know, you won't have any problems switching over your pain

24   management coming to him.

25   Q.   Okay.  A couple of follow-up questions about that, did

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    33

1    you say your mother?

2      A.   Yes, my mother.

3      Q.   And did she also have addiction issues?

4      A.   She still does, yes, sir.  She's been off of them for

5    a while, but she got really bad on pills, yes.

6      Q.   Okay.  And you also mentioned that your cousin, Eddie,

7    told you that there was a doctor who would listen; is that

8    right?

9      A.   Yes.

10     Q.   And you said that you and your mom both needed that?

11     A.   Yes.  Because at my age with the health issues that I

12   had at the time and have now, it's actually hard to find

13   somebody to take you serious in the medical field.  They

14   don't want to listen.  So whenever, you know -- that's kind

15   of what you want is a doctor that's going to listen to you.

16     Q.   And you were hopeful that that would be the case with

17   Mr. Young?

18     A.   Yes.  And it was.

19     Q.   It was --

20     A.   Yes.

21     Q.   -- throughout your treatment?

22     A.   No.  At the beginning, it was.  More towards the end,

23   we didn't really talk whenever I went in.  I just kind of got

24   my medicine and left.  But at the beginning, yes, he was very

25   attentive.  I have carpal tunnel in both hands.  He made sure

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    34

1   that that was taken care of.  We did injections in it, which

2   I will start back up whenever I get out of incarceration.  I

3   haven't been able to do that.  But, you know, he was

4   attentive to make sure that I was feeling better physically.

5   And at the time, I thought that my medicine was making me

6   feel better, but in reality, my medicine was actually making

7   me worse.

8   Q.   Okay.  And, Ms. Arment, I'm going to hand you a record

9   from your patient file.  Do you recognize that?

10  A.   Yes.

11  Q.   Is that an information sheet you filled out when you

12  first went to PREVENTAGENIX?

13  A.   Yeah.

14        MR. PENNEBAKER:  Your Honor, what has been marked

15  for identification as Government's 419, just one page of it,

16  page 3.  Well, actually, it's a front and back page.  So

17  pages 3 and 4, which is an information sheet.

18        THE COURT:  That was the intake form that you

19  filled out when you initially went to Mr. Young?

20        THE WITNESS:  Yes, sir.  It's like the one that

21  they give you as soon as you walk in the door.

22        THE COURT:  All right.  Thanks.  We'll receive

23  it.  That will be Exhibit 21.

24        MR. PENNEBAKER:  Thank you, Your Honor.

25            (Exhibit 21 marked and received.)

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    35

1   BY MR. PENNEBAKER:

2     Q.   And if we could zoom in on the top third, please.

3   Ms. Arment, do you see the date on this document, the top

4   left-hand corner --

5     A.   Yes.

6     Q.   -- what does that say?

7     A.   November 20, 2014.

8     Q.   Is that consistent, in your memory, with when you

9   first went to see Mr. Young?

10    A.   Yes, that would have been right after me and my

11  ex-fiance separated, and my tailbone had been broken.  So,

12  yeah, that would have been in 2014.

13    Q.   Okay.  So this is -- when you go in to see him, this

14  is when he is actually listening to what you're saying?

15    A.   Uh-huh, yes, sir.

16    Q.   And that changed later?

17         Okay.

18              MR. PENNEBAKER:  And you can go ahead and put

19  that down.

20  BY MR. PENNEBAKER:

21    Q.   Throughout your time as a patient of Jeff Young's,

22  what all -- what kind of medication did he prescribe you?

23    A.   I took Ambien, Lortab, 10-milligram, Percocet,

24  10-milligram, plain, 1-milligram Xanax and Seroquel.

25    Q.   Okay.

**EXAMINATION OF HOPE ARMENT**                                    36

1    A.   I can't think of the rest of them, but it would have

2    been, like, a seasonal thing, like, if I had sinuses or

3    something like that.  But it wasn't very often that I had to

4    have that stuff.

5    Q.   Did you ever get cough syrup with codeine?

6    A.   Yeah, that would have been, like, a seasonal thing.

7    When my sinuses act up, I have a really bad bout with my

8    lungs and my chest.  So, yes.

9    Q.   Okay.  Are you taking any of those medications today?

10   A.   No, I'm not.

11   Q.   Are you planning on trying to get back on them when

12   you get out?

13   A.   No.  I never will.

14   Q.   And why is that?

15   A.   Because I lost everything with this relapse, and -- I

16   mean, kids, home, freedom.  At the end of the day, nothing is

17   worth that.  And I can take care of my own body by eating

18   right and doing what I need to do, like vitamins and stuff.

19   I'm sorry.  I'm so nervous.

20   Q.   That's okay.  You're doing fine.  It's totally fine.

21   Take your time.  And if you need me to clarify any questions

22   or ask something again, I can do that.

23   A.   Okay.  Sorry.

24   Q.   Don't forget to breathe.

25   A.   I'm trying to.

**EXAMINATION OF HOPE ARMENT**                                    37

1    Q.    Yeah.  You're doing good.

2          Okay.  So does your family have a history of

3    addiction?

4    A.    Yes.  My grandmother and grandfather were both

5    alcoholics, my mother struggled with addiction my whole life,

6    and my brother and sister are both addicts.

7    Q.    And did you tell Jeff Young about that history?

8    A.    I can't recall, honestly, whether I talked about that

9    or not.

10    Q.    Were you and Jeff Young Facebook friends?

11    A.    We were Facebook friends.  And on my Facebook, you

12    could see before the life that I led, and then you could see

13    clearly, I guess, when mine kind of took a turn by my posts

14    and stuff.  But not everybody, I guess, pays really close

15    attention to that kind of stuff.  So, I mean, we were

16    Facebook friends, though.

17    Q.    And at the time that you started seeing Jeff Young,

18    did you identify as sober when you started to see him?

19    A.    I came to him from another doctor, so I was already

20    getting prescriptions.  But, I mean, I wasn't using, per se.

21    So, no, I don't think I'd say sober, but you would have been

22    able to look at me and tell I definitely was not on hard

23    drugs.

24    Q.    So you said that the doctor treating you before Jeff

25    Young was named McDonald?

1    A.    Yes, Thomas McDonald.  I actually went to pain

2    management through him and -- but it was different.

3    Q.    How so?

4    A.    Every month you got a pill count, you got random drug

5    tests.  Like, he knew about my drug addiction.  Like, he had

6    asked those questions because he kind of knew about my family

7    history, I guess.  But he asked at the beginning before I

8    started the pain management:  Do you have any problems with

9    addiction or have had in the past.  I told him yes.  So he

10   would actually, like, call me in for random drug tests and

11   things of that nature to keep me -- I guess, keep me

12   accountable.

13   Q.    You had some accountability with Dr. McDonald?

14   A.    Yeah.

15   Q.    Did you have any kind of accountability like that with

16   Jeff Young?

17   A.    He did do random drug tests when we would go into the

18   office.  It wasn't like Dr. McDonald.  Starting out it wasn't

19   every month, but then eventually, he did start doing it every

20   month.

21   Q.    And I'm glad you mentioned the drug tests because do

22   you remember how you did on those?

23   A.    Well, typically, I passed them because, normally, I

24   was not taking the drug tests correctly.  Either I was having

25   someone to pee for me and carrying it in, or I was adding the

**EXAMINATION OF HOPE ARMENT**                                    39

1    medicine in the bathroom.  So --

2    Q.    You add the medicine in the bathroom, would you tell

3    the jury a little bit more about what you --

4    A.    Crush up a piece of the pill and put it in the

5    medicine, which later when they changed their drug tests, it

6    did show that my medicine was not metabolized in my system.

7    Q.    So it came back as an aberrant drug test, a failed

8    drug test?

9    A.    Yes.  That would have been, like, I had my daughter in

10   September.  That would have been probably late 2015.  I had

11   her in August.  I'm sorry.  I don't know where I got

12   September.  I had her in August.  And it would have been

13   probably, like, late that year that that happened.

14   Q.    And I want to get back to your daughter in a minute.

15   Just one follow-up question about that.  When that aberrant

16   drug test happened, you're saying that the drug test didn't

17   show the metabolites, which you got flagged for, by the

18   company that was doing the test?

19   A.    Right.  And Daniel, the nurse, called me into the

20   room, told me that they could no longer see me, and I flipped

21   and was, like, no, you get Jeff in here.  This was complete

22   crap.  And Jeff came in and looked at it and just told him to

23   put me in a room.  And then I didn't hear anything else about

24   those drug tests.

25   Q.    Okay.  So -- and you got to keep seeing Jeff Young

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                       40

1    even after that --

2    A.    Yeah.  Because that would have been the end of 2015,

3    and I was there up until he was served.  So that was the

4    following year.

5    Q.    Okay.  One last question about Dr. McDonald versus

6    Jeff Young:  With Dr. McDonald, were you taking the

7    medication that you were being prescribed as it was supposed

8    to be taken according to the prescription?

9    A.    I was.  I was taking my medicine like it was supposed

10   to be because I knew that he was going to count them; and so,

11   therefore, I didn't get carried away with it.

12          Whereas, there at the end, I was literally having to

13   roll over and grab three pills off of my night stand to get

14   out of bed every day.

15   Q.    And at the end, you mean when you were being treated

16   by Mr. Young?

17   A.    Yes, sir.

18   Q.    Okay.  I want to shift gears a little bit.  You

19   mentioned your daughter.  What is her name?

20   A.    A.A.

21   Q.    Okay.  A.A.  so when did you find out that you were

22   pregnant with A.?

23   A.    I found out I was pregnant with A., it would have been

24   January or February of 2015 because I did not find out I was

25   pregnant with her until after my first trimester.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                         41

1    Q.    Okay.  Now, by this time, you're under Jeff Young's

2    care?

3    A.    I am.

4    Q.    Had you become active in your addiction again by this

5    time?

6    A.    By that time, I was -- my dosage had went up on my

7    pills.  My amount had went up on my pills, and I had a little

8    bit more freedom with them.  So, yes, I would definitely say

9    that my addiction was active at that time.

10   Q.    Okay.  And what outward signs of active addiction were

11   you exhibiting at that time?

12   A.    Well, I mean, I pretty much didn't want to function

13   during the day without having my medicine, and I would just

14   blame it on the aches and pains of the ailments that I have.

15   But hindsight is 20/20.  That was actually me -- like, there

16   was times at the end of the month that I was physically going

17   through withdrawals, and it was almost every month that I

18   dealt with that.

19   Q.    Okay.  And I'm going to ask you a few more questions,

20   but before I do that, would you take a look at these?  Are

21   those prescriptions that the defendant wrote you over the

22   course of your treatment?  And take your time.

23   A.    Yes, these are the first ones.  These are the first

24   ones -- or the second ones, because the first ones would have

25   been in November.  Yeah.  Because he hasn't gone up on them

1    yet.

2              MR. PENNEBAKER:  So this is going to be a

3    compilation exhibit from what's been marked as Government's

4    419, a couple of pages out of Government's 419 that I'll read

5    off as I get to them, Your Honor.  And then there are

6    prescriptions in what's been marked Government's 500, the 500

7    series.  And so this is a compilation of those prescriptions

8    to Ms. Arment in chronological order, probably about 20, 25

9    pages.  And I'd offer this in evidence at this time, Judge.

10             THE WITNESS:  Okay.  I was fixing to say it

11   doesn't look right because the milligrams are wrong, but then

12   the milligrams change right here.

13             THE COURT:  Can you identify those as scripts

14   that were given to you?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Let's go ahead and receive it.  It

17   will be Exhibit No. 22.  How many pages was it?

18             MR. PENNEBAKER:  I'm estimating here, Judge.  I'd

19   say it's about 20, maybe 25.

20             THE COURT:  Okay.

21             (Exhibit 22 marked and received.)

22   BY MR. PENNEBAKER:

23    Q.   Ms. Arment, when you found out that you were pregnant

24   with A., did you go see an obstetrician?

25    A.   I did.  I went and saw Dr. Armie Walker in Jackson,

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                             43

1   Tennessee, who also referred me to Dr. Hoeldke, who is a

2   high-risk doctor.  And I continued going to Jeff for my pain

3   management.  So all three of them were actually over me

4   during my time -- during my pregnancy.

5   Q.   Did you tell Jeff Young that you were pregnant with

6   A.?

7   A.   Yes.

8   Q.   How soon after you found out?

9   A.   I told Jeff the first time that I went whenever I

10  found out, which would have been, like, Februaryish.  I'm not

11  real sure.  2015.

12  Q.   Okay.  And did Jeff Young ever tell you about the

13  risks of being on opioids while you were pregnant?

14  A.   I don't recall having a conversation about that.  I,

15  actually, sitting here before you, don't know the risks of

16  what it does to a fetus to be addicted to opioids or Xanax.

17  Q.   Okay.

18  A.   I still don't know what those risks are.

19  Q.   And that was going to be my next question:  Did Jeff

20  Young tell you what the risks to the fetus of taking Xanax

21  were?

22  A.   No.  But I'm not a hundred percent positive, but I'm

23  really close to it that A. didn't have Xanax in her system

24  when she was born because I wasn't taking my Xanax.

25  Q.   Okay.  And have you ever had a conversation with

UNREDACTED TRANSCRIPT

1    either of the other providers at any time about what the

2    risks were even if you don't remember what they said now?

3      A.   I don't recall.  I know Dr. Hoeldke was telling me

4    that he wanted me to kind of branch out and look into going

5    to see, like, my GI doctor and stuff.  And in my mind, I was,

6    like, that's not going to help my situation because I'm

7    pregnant.  You can't put me to sleep to do a colonoscopy, and

8    I just talked myself out of that one.

9      Q.   Okay.  And so you went to Dr. Hoeldke with stomach

10   issues while you were pregnant; is that the deal?

11     A.   Yes.  I was sick.  I was really sick.  I couldn't hold

12   anything down, and I was there for my monthly checkup, and I

13   was throwing up.  I had diarrhea.  I was super sick, and I

14   couldn't understand why.  And so Dr. Hoeldke told me I was

15   going to have to go to the emergency room.  And I was, like,

16   I'm not going down there to sit for hours in the emergency

17   room.  I have an appointment at my doctor's office after

18   this, so I went to the doctor, and I told Jeff what was going

19   on.  And he gave me a shot of Phenergan in the office and a

20   little -- a script of Phenergan to take home with me to keep

21   me from throwing up.  And then I got my regular prescription

22   for my medicines.

23     Q.   So looking back on it now, like you said, 20/20

24   hindsight, do you think you had something that was wrong with

25   your digestive tract, or was it something else?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                      45

1    A.   No.   I think I was having withdrawals because I had

2    been out of my medicine for about a week.   And, like I said

3    just a minute ago, unfortunately, there for a long while it

4    was about every month that I was feeling like that.   And I

5    really never had been through withdrawals, so I didn't really

6    know what they were.

7    Q.   Okay.   So if we could go to 509.0005, please.   And

8    this is -- that's what it says at the bottom of the page.

9    This is Government's 22.   This is the one we just entered.

10   So this is Government's 22.   I'm not sure which page of 22

11   for the record, but it does say 509.0005 at the bottom.

12        So this is a prescription that you received from the

13   defendant?

14   A.   Yes, sir.

15             THE COURT:   Could you blow that up a little,

16   please?   Much better.   Thank you.

17   BY MR. PENNEBAKER:

18   Q.   So this is on March 5, 2015.   So this is about a month

19   after you found out -- or after you found out, slash, told

20   Jeff Young you were pregnant?

21   A.   Yes, sir.

22   Q.   Now, is that Percocet, number 90, is that supposed to

23   be a 30-day supply?

24   A.   That is a 30-day supply, yeah.

25   Q.   Okay.   So if we could now go to 500 -- same exhibit,

**EXAMINATION OF HOPE ARMENT**                                    46

1  at the bottom of the page, it says 500.0009.  So this is --

2  that last one we saw was March 5 of 2015, correct?

3  A.   Yes.

4  Q.   This is March 25 of 2015, correct?

5  A.   It is.

6  Q.   So that's 20 days later?

7  A.   Right.

8  Q.   And you're getting a prescription for a different

9  opioid medication.  This time it's hydrocodone, correct?

10  A.   Yes, sir.

11  Q.   And that's the number 90?

12  A.   Yes, sir.  It's another 30-day supply.

13  Q.   Okay.  And is this the consult where Dr. Hoeldke had

14  suggested that you go either to the hospital, see the GI

15  specialist, and you were going through withdrawal?

16  A.   I have no idea.  No, I don't know --

17  Q.   It has been a bit --

18  A.   -- it had to have been around in there because that

19  happened pretty quick.  Like -- I was, like, six months --

20  five or six months pregnant whenever that happened, that

21  episode.  But -- yeah.

22  Q.   Okay.  I know it's been a long time.

23  A.   It has been.

24  Q.   But this is before that 30-day period you're getting

25  another prescription for a different opioid?

**EXAMINATION OF HOPE ARMENT**                                    47

1      A.    Yes, sir.

2      Q.    Is it fair to say that when you get this prescription

3    or March 25, 2015, you needed the prescription to avoid

4    withdrawals?

5      A.    I would say so, but I don't know if it was filled at

6    that time.

7      Q.    Okay.

8      A.    I can't speak on that exactly because I'm not sure.

9    Sometimes I would get my prescription a little early, but I

10   wouldn't fill it until it was time to get it filled.

11     Q.    Okay.

12     A.    But I can't tell by this whether they filled it or

13   not.

14     Q.    Okay.  Looking back, did you need this prescription at

15   the time other than to avoid withdrawals?

16     A.    I mean, I had pregnant woman aches and pains, the

17   normal stuff, stuff that I should have been enjoying and

18   remembering and holding on to.

19     Q.    So prescribing -- or the maintenance on these pain

20   meds for that kind of stuff deprived you of that part of your

21   pregnancy?

22     A.    Yeah.

23          MR. PENNEBAKER:  Ms. Silverberg, if we could go

24   to 503.001 for the record, it's the same Exhibit 22.  That's

25   marked at the bottom.  Maybe it's 0001 -- 503.0001.  That's

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                              48

1   what it says on the bottom.

2   BY MR. PENNEBAKER:

3     Q.   All right.  Ms. Arment, do you see the prescription up

4   there at the top?

5     A.   Yes, sir.

6     Q.   And it's April 23, 2015?

7     A.   Uh-huh, yes, sir.

8     Q.   Lortab, 120 count.  So the -- looks like 7.5 over 325.

9   Do you know what that means?

10    A.   7.5-milligram hydrocodone and 325 milligrams of

11  TYLENOL\acetaminophen.

12    Q.   So is it fair to say that's the same strength of

13  hydrocodone as the last prescription, with upping the number

14  of them to 120?

15    A.   Yeah.  It went from three times a day to four times a

16  day.

17    Q.   Okay.  Do you recognize the signature at the bottom of

18  that prescription?

19    A.   Yes, sir.

20    Q.   And whose is that?

21    A.   Jeff Young's.

22    Q.   So at this time, did you need that medication for

23  anything other than to avoid withdrawal?

24    A.   Like I said, normal aches and pains of being a

25  pregnant woman.  In my mind -- I don't know.  Like, I know

UNREDACTED TRANSCRIPT

1   now that the brain, when you are going through withdrawals,

2   it kind of fires off sensory to make you feel like you're in

3   a lot more pain than what you're actually in.  And I feel

4   like that's what I was going through.

5       Q.   Do you think that if a care provider you had been

6   seeing had said, I'll wean you off of this, you would have

7   said:  No, I'm not going to do that?

8       A.   I would have probably tried to fight it because I felt

9   like I had to have it.  But, I mean, if it was someone that I

10  listened to and someone that I considered like a friend,

11  then, yeah, I probably would have.

12      Q.   Someone like Jeff Young?

13      A.   Yeah.

14      Q.   But that never happened, did it?

15      A.   No.  I had a run-in -- he had gotten really busy.  I

16  got tired of waiting in the lobby so long.  And I had been

17  going there for a long time so it -- I went to a different

18  doctor.  And when I had the accident where I got the DUI with

19  my daughter in the car, she actually stopped seeing me and

20  offered me rehab on the spot.  But, I mean, I didn't really

21  know her like that, and I had just started going to her so I

22  didn't have a relationship established where I felt

23  comfortable with her saying that to me.  So I actually left

24  and went back to Jeff.

25      Q.   And that's later.  This is after A. was born, correct?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    50

1   A.   Yes.

2   Q.   Okay.  So if we can, please -- well, actually -- we

3   can switch on back, and that's 503.0001.  I just want to go

4   back there for one second.  If we can go to the bottom

5   prescription, please.

6   A.   This is the -- this is the one where I went to Jeff,

7   and I was sick that day.  It was not in 3/25.  It was 4/23.

8   Q.   Got you.  So 4/23 you would have been sick this day?

9   A.   Yes.

10  Q.   And so you get Phenergan in that bottom prescription.

11  We just talked about the 120 Lortab, which is hydrocodone.

12  Up at the top, right underneath RX, it says Xanax,

13  1 milligram?

14  A.   Yes, sir.

15            MR. PENNEBAKER:  Okay.  If we can, let's go to

16  Government's 22.  At the bottom it's marked 504.0002.

17  BY MR. PENNEBAKER:

18  Q.   What's the date on that prescription?

19  A.   5/20.

20  Q.   So that's May 20th of 2015, Lortab 7.5/325, number

21  120, right?

22  A.   Yes, sir.

23  Q.   And at this time, you were still pregnant with A.?

24  A.   Yes, sir.

25  Q.   And the defendant knows this?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                        51

1          MR. PENNEBAKER:  Underneath, if we can go to that

2    second prescription, please.

3    BY MR. PENNEBAKER:

4     Q.   We've got the same date, a prescription for Xanax,

5    another 90 of those, correct?

6     A.   Yes, sir.

7     Q.   Okay.

8          MR. PENNEBAKER:  And then if we can go to

9    505.0001, still Government's 22.

10   BY MR. PENNEBAKER:

11    Q.   Is that a prescription for Lortab 120 again, June 19,

12   2015?

13    A.   Yes, sir.

14    Q.   And you're still pregnant at this time?

15    A.   Yes, sir.

16         MR. PENNEBAKER:  If we can, please, go to

17   Government's 506.0001, and this is still Exhibit 22.

18         THE WITNESS:  Yes.

19   BY MR. PENNEBAKER:

20    Q.   Now this is a -- it looks like a different

21   handwriting?

22    A.   It is.

23    Q.   What -- can you -- let the jury know what's going on

24   in this prescription?

25    A.   Okay.  That was the lady that worked for him downtown,

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                           52

1   Petway or whatever her name is.  I went to her because Jeff

2   was busy, and I couldn't get in.  So I went downtown, and she

3   did not want to write me my medicine, and we had it out in

4   the office.  And she just told me she wasn't comfortable

5   writing me medicine, and I told her to call Jeff because this

6   prescription was actually supposed to be for when I got ready

7   to have my baby.  And I needed the medicine because I was

8   having surgery.  I was actually having a surgical procedure

9   done.

10          So she called -- I guess she called Jeff, and she

11  wrote it, but there was something wrong with it.  This looks

12  right, but there's something wrong with it.  Something got

13  changed.  I can't remember if it was the quantity or what

14  because I had sent Jeff a message on Messenger and told him

15  that I needed to come and see him because she had messed

16  something up on my prescription.

17  Q.   Okay.  And for all of those prescriptions that we just

18  saw, that we haven't already talked about, same question:

19  Are those prescriptions that you needed for anything other

20  than to avoid withdrawal?

21  A.   I mean, I function every day.  I'm actually a welder

22  for Kubota, and I use my hands every day.  And I don't take

23  any narcotic pain medicine.  I don't take hardly even any

24  ibuprofen, actually.

25  Q.   And has anything about your condition changed?  Like,

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    53

1    were you worse off back then?  Did you have some crippling

2    ailment that you don't have now or anything like that?

3        A.   No.  I actually am worse now than I was then.  It's

4    harder to use my hands now because I'm not getting the

5    treatment that I need, but I get up every morning at four

6    o'clock in the morning and go and do a 12-hour shift, and I

7    function as a normal, functioning human being.

8        Q.   Okay.  I'm going to hand you two pages of text

9    messages between you and Jeff Young or Facebook messages

10   between you and Jeff Young.  I just want to make sure you

11   recognize it.

12       A.   Yes, I recognize them.

13       Q.   Okay.

14             MR. PENNEBAKER:  Your Honor, we offer these two

15   pages as Government's -- well as Exhibit 23.

16             THE COURT:  Okay.  We'll go ahead and receive it

17   as Exhibit 23.

18                 (Exhibit 23 marked and received.)

19   BY MR. PENNEBAKER:

20       Q.   And if we could zoom in on that bottom one, actually.

21   So this is the -- this is in July, 2015, and this is

22   before -- it was about a month before you had A., correct?

23       A.   Yes.  It was exactly almost a month before I had A.

24       Q.   Okay.  And you say to the defendant:  Can this OB call

25   you.  I'm being discharged from the hospital, and she needs

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                      54

1    your permission to write any of the Tramadol for the

2    breakthrough pain.  I have nothing to fall back on at home

3    and don't see you until the 17th.  I asked her to contact you

4    about it because of my contract.

5         What did you mean by that?

6    A.   Because at that point, there had been a contract given

7    to us saying that we would adhere to the pain management

8    contract.  We would not have anybody writing us prescriptions

9    besides him.  We would not fail our drug tests.  That sort of

10   thing.

11   Q.   Was one of the terms of the pain contract that you

12   would only use the medications as prescribed?

13   A.   Yes, that was one of them.

14            MR. PENNEBAKER:  So if we could go back,

15   Ms. Silverberg, to 505.0001.

16   BY MR. PENNEBAKER:

17   Q.   That message we were just looking at, it says that was

18   on July 5?

19   A.   Uh-huh.

20   Q.   And this prescription was written on June 19, correct?

21   A.   Right.

22   Q.   So you have 120 Lortab that are -- that have been

23   written for you on this prescription, and is it fair to say

24   that you were out of this prescription by the time you went

25   into the hospital because you had nothing to fall back on?

UNREDACTED TRANSCRIPT

1    A.    Yes, sir.  But I didn't take all of those pills.

2    Q.    Okay.  Do you want to tell the jury what you mean by

3    that?

4    A.    I don't want to get in trouble.  I was selling some of

5    my pills especially when I was pregnant because I wasn't

6    taking all of them, especially the Xanaxes.  But the Lortabs,

7    I would keep quite a few of those to sustain me.  However, I

8    would sell a lot of them, and then by the end of the month, I

9    was having to buy off the street to sustain me to get me by

10   until I got my prescription again.

11   Q.    Or you would go through withdrawal?

12   A.    Or I would go through withdrawal.

13         MR. PENNEBAKER:  Ms. Silverberg, can we go back

14   to the exhibit we were just looking at, 23, and the top of

15   the second page, please.

16   BY MR. PENNEBAKER:

17   Q.    And you say here, and this is August 1, 2015, a few

18   days before you have A., correct?

19   A.    Yes.

20   Q.    Don't have any other way to ask you this, but when I

21   asked you if you would come to the hospital when I have the

22   baby, not just to see us but also to take care of making sure

23   I have my meds when I leave, is that a possibility, or do I

24   need to move my appointment up to before the 14th to make

25   sure when I have them -- or I can have them when I come home.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                              56

1        And then you say:  Trying to get my birth plan in

2    action.  I do want you to come see her when she's born.

3    You've taken awesome care of me through this whole process,

4    and I consider you not only my doctor but also my -- and it

5    cuts off but that looks like that's --

6    A.   -- friend.

7    Q.   -- friend?

8    A.   It's abbreviation for friend.

9    Q.   Okay.  So you're getting ready to have this child, and

10   you're contacting Jeff Young.  What are you worried about?

11   A.   Not having my medicine.

12   Q.   Do you know at this point how much pain you're going

13   to be in, or is this just you anticipating -- you just don't

14   want to be stuck in the hospital kicking --

15   A.   Yeah.  I knew I was having the procedure.  I knew what

16   a similar procedure felt like, and it was not comfortable,

17   and I was not willing to be in that much pain.

18   Q.   Okay.

19             MR. PENNEBAKER:  And you can take that down,

20   Ms. Silverberg.  Thank you.

21   BY MR. PENNEBAKER:

22   Q.   I think you mentioned that you were experiencing

23   withdrawals even with the medication that Jeff Young was

24   prescribing you?

25   A.   Yes.

**EXAMINATION OF HOPE ARMENT**                                57

1    Q.   Can you tell the jury what it felt like to be pregnant

2    and having withdrawals?

3    A.   It was awful.  I was a high-risk pregnancy, and, like,

4    my tailbone had recently been broken.  And every time she

5    shifted, it would kind of make it crack a little bit more.

6    The withdrawals made the pain that I was going through a lot

7    more unbearable.  I was sick, throwing up sick.  As you know,

8    being pregnant, you're already sick, but I was projectile

9    puking, like, hardly able to get to the toilet in time before

10   I would -- yeah.  I couldn't work.  It was bad.

11   Q.   How much did you weigh in your pregnancy?  Do you

12   remember?

13   A.   I don't, but I know it wasn't a lot.  I want to say I

14   weighed about what I weigh now when I had her.

15   Q.   Okay.  When was A. born?

16   A.   She was born on August the 10th.

17   Q.   2015?

18   A.   Uh-huh.

19   Q.   Was she born with opioids in her system?

20   A.   She was.

21   Q.   Did she have to spend time in the NICU?

22   A.   Yes.

23   Q.   Did you ever talk to Jeff Young about that?

24   A.   Sure.  I told him after I got out that she was in the

25   NICU for two weeks.  She wasn't in there the whole time for

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    58

1   opioids, though.  She was in there because she had MRSA that

2   she contracted that because she had opioids in her system and

3   had to be put in the NICU.  She got it from the NICU.

4       Q.   How is she doing today?

5       A.   She's wonderful.

6       Q.   Okay.  So Jeff never tried to -- Jeff Young never

7   tried to warn you -- wean you off before A. was born?

8       A.   No, he didn't, and neither did my OB or Hoeldke.

9       Q.   Who was prescribing those?

10      A.   Jeff Young.

11      Q.   Okay.  And do you know whether either of those other

12  providers talked to him or tried to --

13      A.   You know, I don't know because Dr. Walker really has

14  been involved in my family.  She -- like, she has worked on

15  my mom, my sister.  And I would think that if anybody would

16  have made contact, it would have been them two making

17  contact.  But, honestly, I don't think any of my doctors made

18  contact with each other.

19      Q.   Okay.  But you don't know one way or the other?

20      A.   I don't.

21      Q.   Okay.

22      A.   I can't say for sure.

23      Q.   I think you mentioned earlier that when you were

24  failing drug tests that -- you know, crushing up pills to try

25  to have that in your system, that that was after A. was born?

1    A.    No.  That was while I was pregnant with A.

2    Q.    And after?

3    A.    And after.

4    Q.    Okay.

5    A.    The failed drug tests that were shown to me were from

6    April of 2015, and that would have been during the time that

7    I was pregnant with A.  I think it was April, May, June and

8    July, as a matter of fact.  It was four months of them.

9    Q.    Okay.

10   A.    And -- yeah.

11   Q.    And when you say that was shown, Jeff Young never

12   showed you those drug tests?

13   A.    No.  There were other people that got fired from

14   getting -- I mean, it was going on all over Tennessee.  But,

15   like, we would go in and wait in the waiting room, and then

16   Daniel would call you back, like, you were getting triaged.

17   And he would tell you that this is what happened and then

18   have you sign some paperwork.

19   Q.    Got it.  Got it.  And you mentioned that you

20   eventually quit seeing the defendant, and I think you said

21   that it was getting too busy in the waiting room?

22   A.    Yeah, it was.  Like, me and my mom, we had been going

23   to Jeff for a long time.  We referred a lot of people to Jeff

24   over the course of the time that we had been going there.  We

25   kind of built a rapport with him.  He felt like a friend.

**EXAMINATION OF HOPE ARMENT**                                        60

1  But there towards the end, it was like we were just a number

2  in a waiting room.  And so it got way too busy.  There was

3  too much.

4     Q.   What did it look like in the waiting room?  What was

5  it like in there?

6     A.   Like, I would be there sitting for hours, and there

7  was this new VIP special going on where people could pay cash

8  and come in through the side door and be seen immediately and

9  then leave, and then leave all of us that have been sitting

10 in the waiting room still sitting there for hours.  And it

11 would be elbow to elbow in the waiting room.

12    Q.   Okay.  Did you ever tell Jeff Young that you were

13 abusing drugs?

14    A.   No.

15    Q.   Did you signal to him that you were in other ways?

16    A.   No.  But if you look at my Facebook page, you, as a

17 person from the outside, would be able to see the

18 deterioration in me over -- like, from the time I had A.

19 until my children were taken away, I withered away to

20 nothing.

21    Q.   And it was while you were under the care of Jeff

22 Young?

23    A.   Right.  And that was before I relapsed on meth.  This

24 was completely opioid based.  And if I didn't have my

25 medicine, I freaked out.

**EXAMINATION OF HOPE ARMENT**                                    61

1   Q.   I actually want to ask you about it because you said

2   "relapsed on meth."  Were you taking meth when you were

3   seeing Jeff Young as a patient?

4   A.   No.  No.  I wouldn't because whenever I started seeing

5   Jeff, he explained, he was, like, you're getting drug tests.

6   Weed is not that big of a deal, but don't have nothing else

7   in your system.  And you better have your meds in your

8   system, but don't have nothing else in your system.  And I

9   never did.  Like, I legit didn't.

10          And then I had left his practice and was going to the

11   other doctor, and I don't really know.  Just one day I was

12   tired.  I didn't have any pain pills, and I didn't go see her

13   for a couple of weeks so I got high.  And I was off to the

14   races.  I got a DUI with my daughter in the back seat and

15   lost my children.  Meredith stopped giving me my medicine.  I

16   went to Quinco to try to get my medicine.  They wouldn't give

17   me my medicine.

18          So I went to Jeff, and he actually wrote my medicine,

19   but then I couldn't get it filled.  So I busted in his office

20   one night after work because I was, like, oh, my God, my

21   medicine.  Looking back it's so petty the way that I was, but

22   I was really that strung out on them that I really needed

23   them.  And I didn't want to keep using meth.  So I felt like

24   if I had the other one, then I wouldn't need that one.  And

25   it's just been a disaster.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                              62

1    Q.   So when he wrote you that prescription when you -- so

2    just to make sure I got those events right.  So you are

3    seeing Jeff Young.  You leave that practice.  You go -- you

4    start to see Meredith.  Meredith Weeks is the name of the

5    other practitioner.  And then after you get a DUI, did you

6    tell Weeks about this, or did she find out somehow?

7    A.   Weeks is from my hometown.  She found out about it,

8    but not just that.  My posts on Facebook were livid.  I was

9    literally having a nervous breakdown and everybody around me

10   knew that I was losing it.  Like, I was losing it.  I sat in

11   the middle of my living room floor with my kids' stuff around

12   me for two weeks.  I didn't eat.  I didn't sleep, nothing.

13   Complete nervous breakdown.

14   Q.   When you went back to Jeff after that and he wrote you

15   the prescription --

16        MR. PENNEBAKER:  If we can call up Government's

17   419.  Well, this is going to be Exhibit 22, but it's page

18   419.0125.

19   BY MR. PENNEBAKER:

20   Q.   Would that have been the date?

21   A.   Give me just a second.  I lost my kids on 10/18.  This

22   prescription, I feel like, would have been November.

23   Maybe -- maybe December.  But I'm thinking --

24   Q.   So you come into his office after hours freaking out,

25   and then after that happens, he still writes you -- looks

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                           63

1   like Depakote and this one has Xanax -- and if we can go to

2   the --

3   A.   No, sir.

4   Q.   Oh.

5   A.   I came into his office that day, and he had written

6   one of them that day.  And I couldn't get it filled because

7   another provider the month before had written it for four

8   times a day, but it was actually not enough to even get me

9   through two weeks.  And so he wrote the other prescription so

10  that maybe the insurance would approve it because it wouldn't

11  approve the other one.  And he told me that I would not be

12  able to get my oxycodone filled until the 30 days was up.

13  Thirty days didn't happen because I'm pretty sure, like, a

14  day or two after that is when they came in on him.

15  Q.   That's when there was a search warrant at

16  PREVENTAGENIX, and it closed down?

17  A.   Yes.  And then no pharmacy would touch that

18  prescription.

19  Q.   Okay.  So you mentioned that there were a lot of

20  consequences from the spiral that happened after you started

21  seeing Jeff Young, correct?

22  A.   Yes, sir.

23  Q.   And what happened with your kids?

24  A.   They were removed from my custody.  One of them got

25  adopted.  She's 21 now.  The other two live with their dads.

**EXAMINATION OF HOPE ARMENT**                                            64

1  Q.   Okay.  And you've been incarcerated.  Are you close to

2  getting out?

3  A.   I am.  Whenever I get back to Georgia, I'll be within

4  ten days of freedom.

5  Q.   Are you planning to do things differently when you get

6  out?

7  A.   I am.  I completed welding school at Northwest Georgia

8  Tech.  So I'm a certified welder across the United States.

9  I'm going to continue that career.  I'm going to get my kids

10  back as soon as I get out.  I'm going to get a hair and nail

11  follicle test because they can test me from root to end.  I'm

12  clean.  I have been clean for over four years.  I'm -- I'm

13  ready to live my life.

14  Q.   Were you optimistic about the future as the

15  defendant's patient?

16  A.   I mean, I didn't really know what the next day held.

17  Q.   Are you optimistic --

18  A.   Do you know what I mean?

19  Q.   Yeah.  But I wanted to just contrast, are you

20  optimistic about the future today?

21  A.   Yeah, nothing can hold me back.  I have certifications

22  and everything from forklifting to welding.  I've done

23  everything that the state will offer an inmate, and I'm just

24  ready to get out there.  I'm married and ready to be a wife

25  and mom and do normal stuff.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                                    65

1  Q.   Awesome.

2           MR. PENNEBAKER:  Pass the witness.

3           THE COURT:  Thank you.

4           Mr. Ferguson, cross?

5           MR. FERGUSON:  Thank you, Your Honor.

6                     CROSS-EXAMINATION

7  BY MR. FERGUSON:

8  Q.   Good afternoon, Ms. Arment.

9  A.   Arment.

10  Q.   Arment?

11  A.   Yes, sir.

12  Q.   I'll try to get that correct.  I promise you I will

13  mess it up, and it's not a slight to you.  It's reflective of

14  me.

15  A.   You are not the only one, I assure you.

16  Q.   Thank you.  I'll try real hard.

17       One of the things I didn't understand -- two things.

18  When you came to see Jeff Young, what was your medical

19  conditions?  What were the problems?

20  A.   Okay.  I have Crohn's disease.  I have ulcerative

21  colitis.  I have a fractured tailbone that has never repaired

22  itself properly.  My lower back is messed up from spinal taps

23  from having children, and I have carpal tunnel in both hands.

24  Q.   Is that fair to say all of that is fairly painful?

25  A.   It is.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    66

1    Q.   And is that why you were being seen by a pain

2  specialist before you came to Mr. Young?

3    A.   Yes, sir.  My ex-fiance had actually just broken my

4  tailbone when I started going to see Dr. Thomas McDonald, and

5  that's why I started was because I needed to continue care

6  besides an emergency room doctor.

7    Q.   Okay.  Was it the broken tailbone that started you

8  into the pain management side of the medicine?

9    A.   It was that and my Crohn's.

10   Q.   Okay.  The tailbone injury, was -- I'm not trying to

11 pry, but was that like a fight, traumatic injury or something

12 of that nature?

13   A.   Yes, sir, he picked me up and threw me.

14   Q.   Okay.  Sorry about that.

15   A.   Oh, it's okay.

16   Q.   When you left -- why did you leave the pain management

17 specialist?

18   A.   Dr. McDonald took over the hospital in Lexington, and

19 his coworker was taking over, and I didn't really like her.

20 She wasn't very nice.

21   Q.   Did you know her?  I mean, had you been around her

22 before or would you have just seen her once?

23   A.   I had been around her for about six or eight months

24 working with him when he wasn't there, and I didn't like her

25 demeanor or bedside manner.  She was kind of rude.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                                67

1    Q.    How long did you see this doctor, pain specialist?

2    A.    Dr. McDonald, I saw him for, like, two years.

3    Q.    And had you seen anyone before him for your pain

4    management?

5    A.    No, sir.

6    Q.    Had you been prescribed any other medication for pain

7    before him?

8    A.    Just as needed.

9    Q.    What do you mean by that?

10   A.    Like if I had went to the hospital for an injury or

11   something to that effect, but, no.

12   Q.    Not for managing your chronic pain?

13   A.    Correct.

14   Q.    Okay.  So no doctor before the pain management had you

15   on any kind of long-term opioid or pain medication

16   management?

17   A.    Right.  And, also, as I said before, I was -- I had

18   relapsed.  But before I relapsed, I was sober for 12 years.

19   So I was really careful as to what, you know, what I took.

20   Q.    All right.  You keep using these numbers of years --

21   A.    Yeah.

22   Q.    -- and I should know the answer to this because it's

23   real easy for me to look up, and I'm so sorry two questions

24   to never ask a woman:  How old are you?

25   A.    I just turned 41 two weeks ago.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    68

1    Q.    Okay.  I didn't know that.  I would have not have

2    guessed that.  I was trying to figure out where 12 years went

3    to.

4    A.    Yeah.

5    Q.    So somewhere in your past you had previously been

6    addicted to drugs?

7    A.    I had been, yes, sir.

8    Q.    At what age and what drug?

9    A.    I started using when I was 13, and I got sober when I

10   was 25 from meth and opiates.

11   Q.    Okay.  So you had had a bout of addiction previously?

12   A.    I had.

13   Q.    Okay.  Is that why when you were needing to be treated

14   for pain, you went to a pain management specialist?

15   A.    It was getting to the point where if you weren't in

16   the pain management specialist, you weren't being seen about

17   pain regardless of how severe or nonsevere that it was.  So I

18   had to get in with a doctor that dealt with pain management,

19   yes.

20   Q.    During this time period, it had become very difficult

21   for you to find a physician or a medical provider that would

22   touch pain medication?

23   A.    Correct.

24   Q.    For fear of getting in trouble?

25   A.    Right.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                          69

1    Q.   You found this doctor.  He made -- he spoke to you

2    about your illness?

3    A.   Yeah.  Dr. -- well, Dr. Thomas McDonald is -- I call

4    him Dr. House.  He is that kind of doctor.  He -- I didn't

5    realize that I had shingles on my face.  And all my life

6    everybody has been telling me it was different, and one look

7    at it, and he knew what it was.  So he did talk to me about

8    my different ailments, and we worked on some natural stuff as

9    well as pain medicine.

10   Q.   Did Dr. House do any testing to see if you had

11   Crohn's?

12   A.   I actually went to Dr. Salder, who is my GI

13   specialist.

14   Q.   You came to Dr. House and said you'd previously been

15   diagnosed?

16   A.   Dr. McDonald, yes, sir.

17   Q.   I'm sorry.  See, you said House, and I'm watching that

18   series, and I'm not sure how you like him because I'm

19   surprised.  It's been a while since I've seen it.

20        Dr. McDonald, you came in and said, hey, I've been

21   diagnosed with Crohn's?

22   A.   Correct.

23   Q.   He didn't do the testing to see if you had Crohn's?

24   A.   No.  He sent me because I was having problems.  And

25   everybody -- like, I had a colonoscopy done here at the med

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                     70

1    years ago, and they perforated my colon.  We never found out

2    anything.  So they diagnosed with me irritable bowel, which

3    basically means there's something wrong with your colon, but

4    we don't know what it is.

5    Q.   Right.

6    A.   And I have precancer polyps.  So I have to be seen

7    regularly.  So he recommended I go to Dr. Salder because

8    Dr. Salder is a tri-state recommended GI specialist, and he's

9    the best -- one of the best in the industry.  So I went to

10   him because I was very gun shy after I almost bled to death.

11   Q.   So he's the doctor that diagnosed you with Crohn's and

12   you see him --

13   A.   Right.

14   Q.   -- also for your --

15   A.   Ulcerative colitis.

16   Q.   -- ulcerative colitis?

17        And was there any testing done on your lower-back

18   pain?

19   A.   No.  I think that I had done the chiropractor thing,

20   but no testing was done on my lower back besides what was

21   done at the time of the injury.

22   Q.   He diagnosed it, based again, on what you told him?

23   A.   Right.  He had the x-rays and the MRI and all that

24   stuff.  He had all of that.

25   Q.   Where did he get those from?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                            71

1    A.    He got them from the hospital in Michigan where it all

2    happened.  I signed a release.  He had them sent.

3    Q.    Was this during a pregnancy?

4    A.    No.

5    Q.    I thought you said it was -- injections?

6    A.    No.  The injections are in my hands.

7    Q.    Got you.  So when you left Dr. McDonald, did he have

8    you prescribed hydrocodone, acetaminophen, the Lortabs and

9    also to clonazepam?

10   A.    Klonopin.

11   Q.    Klonopin?

12   A.    Yes.

13   Q.    Okay.  And then that would be also what Jeff Young

14   prescribed to you first?

15   A.    Yes.  And we changed the Klonopin because the Klonopin

16   does not work very well for my anxiety, and the Xanax did.  I

17   mean, they -- some medicines are good medicines when they're

18   used properly.  I just can't use them properly.  But that

19   particular one, I needed to be on Xanax at that stage.

20   Q.    Very fair to say that the drugs themselves are not

21   bad, the way that they're used or abused can be bad?

22   A.    Right.  And, like, I was going through a divorce, and

23   I was seeing my mom, just got back out in the real world.

24   And then, boom, a couple of months later, we found out that I

25   was pregnant.  But at that point, that's what was going on.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                      72

1    Just got out of a divorce and all that stuff.

2    Q.   Okay.  So was it with consultation with Mr. Young that

3    you changed to Xanax?

4    A.   Yes.

5    Q.   You explained to him you weren't having any real

6    success with the drugs you were that prescribed?

7    A.   Right.

8    Q.   He maintained the same -- at this point the same dose

9    level of the Lortab but changed out your, I guess, that's

10   benzodiazepine --

11   A.   Right.

12   Q.   -- to a different one that you felt would be more

13   beneficial to you?

14   A.   Right.

15   Q.   And did you tell him you were receiving benefits from

16   it, that it was helpful, more helpful?

17   A.   I'm sure that I did.  After the first -- like, I took

18   Hailey to him, my oldest daughter.  I took her once or twice

19   before it started getting, like -- I guess, monotonous as I

20   would just go in, and I would get my prescription and leave.

21   And so whenever the lack of -- I don't know what you would

22   call it -- was lost, I stopped taking Hailey there because my

23   daughter was also struggling with some anxiety-type issues

24   from me being in an abusive relationship and getting out of

25   it and stuff.

1    Q.   Did at some point, when you would come in each month,

2    the visit just got shorter and shorter?  As it seems, you

3    were just there to get your prescription filled.  He would

4    ask you is everything okay, is the medication still working?

5    A.   Right.  I would go in.  I would get weighed by the

6    nurses and stuff, triaged.  I would wait in the waiting room,

7    and then I would be put into a room.  He would actually come

8    in and ask if everything was all right.  He would, you know,

9    find out what prescriptions I needed refilled.  And then he

10   would do a checkup.  He would listen to my heart, my lungs,

11   and everything, to make sure that that was stuff was okay.

12   Q.   Do you know if your record from Dr. McDonald, your

13   medical record was transferred in to Mr. Young's --

14   A.   I have no idea.  I signed for it to be.

15   Q.   Okay.  And that would have contained all the records

16   of your testing previously?

17   A.   Correct.  I would think so.  I don't know.  I don't

18   work in that field.

19   Q.   If -- well, fair enough.  We'll leave it there.

20        When you came in and you had gone to see some other

21   medical providers and you were trying to explain to them that

22   you had -- you were just sick, you were just nauseous,

23   throwing up, you didn't get any -- they didn't really do

24   anything for you, did they?

25   A.   I'm sorry, what are you referring to?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                  74

1   Q.   At some point, you got a prescription for, was it,

2   Phenergan?

3   A.   Phenergan from Jeff?

4   Q.   Yes.

5   A.   Yes, sir.  That was when I was pregnant with A.  I

6   had -- like I said, I was really sick.  I went to

7   Dr. Hoeldke, but Dr. Hoeldke is a high-risk doctor.  He

8   doesn't do that type of stuff in his office.  So he was

9   referring me downstairs to the emergency room, and I was not

10  going to go wait in the emergency room.  Plus, I had to go to

11  Jeff's office anyway to get my prescriptions, so I went to

12  Jeff.  And Jeff treated it in the office because he was my

13  doctor.  I went to see all three of my doctors on the same

14  day every month.

15  Q.   So it was kind of, you went to them, you told them

16  your symptoms, said that you had been to Dr. Hoeldke, and he

17  wanted to send you to the ER.  And then based on your

18  complaint, Jeff wrote you a prescription for basically

19  antinausea medicine?

20  A.   Right.  He gave me a shot of it in the office and

21  wrote me a prescription for it to go home with me.

22  Q.   Did it make you better?

23  A.   I mean, the shot made me stop throwing up.

24  Q.   Okay.

25  A.   And I left and got my prescription filled.  So I

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    75

1    ultimately felt better, regardless.

2        Q.   Oh, good point because at this point you were --

3        A.   I was having --

4        Q.   -- not taking your medication correctly?

5        A.   I was not taking my medicine correctly.  So when I

6    took my medicine, it was like --

7        Q.   -- relief?

8        A.   Yeah.

9        Q.   Did you tell -- I keep saying Jeff.  Did you tell

10   Mr. Young you weren't taking your medication correctly?

11       A.   I didn't.

12       Q.   You didn't want to tell him, did you?

13       A.   No.

14       Q.   Because you were afraid if you did, he would cut you

15   off?

16       A.   Well, it was that, and it was kind of a humiliation

17   thing of I had slipped.

18       Q.   Okay.  That's fair enough because you had been through

19   it once before?

20       A.   Right.

21       Q.   And you knew that even though you had come out of a

22   pain specialist who was prescribing you basically the same

23   medication, you had slipped into that from the person who

24   needs medication to the person who's abusing medication and

25   taking too much?

**EXAMINATION OF HOPE ARMENT**                                          76

1    A.    Right.

2    Q.    And because of that, the shame, you wouldn't tell

3    Mr. Young?

4    A.    Right.  I wouldn't tell him, and, you know, when the

5    drug tests came back, that was an all-points bulletin, red

6    flag, ding, ding, ding, ding, ding, something is wrong, she's

7    not taking her medicine like she's supposed to.  And the way

8    I looked at it was, if he's my doctor or my friend, he would

9    see that something is going on.  And, clearly, it's not as

10   bad as other people are telling me it is if he's not saying

11   anything about it.

12   Q.    You were faking some of those urine screens, weren't

13   you?

14   A.    I'm sorry?

15   Q.    Were you faking your urine screens?

16   A.    Yes.  Because I didn't have it in my system, so I

17   would save just a piece of the pill.  That way I could take

18   the rest of the pills, and it was either taking them or

19   selling them.

20   Q.    Okay.  Okay.  Your high-risk OB, Dr. Hoeldke --

21   A.    Correct.

22   Q.    -- did he ask you what medications you were on?

23   A.    He did ask me what medications I was on.  And when I

24   told him, he recommended that I get off of them.

25   Q.    Did you do that?

**EXAMINATION OF HOPE ARMENT**                                            77

1    A.   I did not.  I told him that I was going to continue to

2    take my medicine because I was not going to be miserable in

3    pain and that he could consult with Jeff.  Jeff could consult

4    with him, whatever they needed to do, but I was not at a

5    point where I could just stop.

6    Q.   But he explained to you what the possible dangers were

7    if you continued to use those drugs?

8    A.   He did not.  As I said before, I have never fully

9    understood or been told what opioids or Xanax do to an

10   infant.

11   Q.   Dr. Hoeldke, the high-risk OB didn't tell you why --

12   A.   He didn't.

13   Q.   -- he was trying to tell you to not take them?

14   A.   He didn't.  He actually leaned towards the Crohn's

15   disease.  He was, like, you know, I really think this is

16   making you worse.  I think that it's making you have

17   constipation, and it's making your Crohn's worse.  And that's

18   kind of the route that he took with it.

19   Q.   No warning from your high-risk OB?

20   A.   No.

21   Q.   Okay.  Had you ever used that physician before?

22   A.   No.  But my sister had, and she actually did use

23   Dr. Hoeldke when she was high-risk pain management as well.

24   Q.   What made you high risk?  You're not diabetic.  You're

25   not overweight.

**EXAMINATION OF HOPE ARMENT**                                    78

1    A.    Because I was on pain management.

2    Q.    So you specifically went to him because of the pain

3    management?

4    A.    Correct.

5    Q.    Okay.

6    A.    And he monitored the development of my child's brain,

7    her body, her body weight, her body mass, her heart.  So he

8    would look at her every month to make sure that she was okay.

9    Q.    And he was following her because of the fact that you

10   were coming through a pain management and then with -- with

11   Jeff Young having your pain managed through opioids and pain

12   pills?

13   A.    Correct.

14   Q.    Okay.  Okay.  And so was he also responsible for the

15   delivery of your baby?

16   A.    No.  Dr. Armie Walker was the -- she didn't deliver A.

17   It was one of her colleagues that delivered her, but she

18   performed my surgery after.

19   Q.    Who referred you to Dr. Hoeldke?  Was it Dr. Walker?

20   A.    Dr. Walker.

21   Q.    So Dr. Walker knew you were on these medications?

22   A.    Correct.

23   Q.    So Dr. Walker knew you were on these medications and

24   you told her you were going to stay on these, then referred

25   you to a high-risk OB just to follow you to keep you and your

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    79

1    baby safe?

2       A.   Correct.

3       Q.   Okay.  And did any of them explain to you -- I already

4    asked you this.  Did -- your child was born with medication

5    in her system?

6       A.   Yes.

7       Q.   You were still having -- you had gotten a prescription

8    several months before from Jeff that was your last

9    prescription in, like, June or something?

10      A.   No, sir.  My last prescription was in July.

11      Q.   And what was that prescription for?

12      A.   120, I think.

13      Q.   Do you remember what drug it was for?

14      A.   Percocet, 7.5s.  Brittany wrote it, and it was messed

15   up.  I want to say that it was -- the number of them was

16   messed up or something, but I went by the office the next

17   day, and it was corrected.

18      Q.   Okay.

19      A.   Because I had sent him a message.

20      Q.   All right.  That's my confusion.  It's not written by

21   Jeff Young.  It would show up --

22      A.   Right.

23      Q.   -- Ms. Petway under her prescription?

24      A.   Correct.

25      Q.   Okay.  Percocet?

1    A.    Yes, sir.

2    Q.    Okay.  But if I understood your testimony, that was

3    supposed to be -- what you told Jeff was that that was a

4    prescription for you to have your medication once you gave

5    birth?

6    A.    Right.  See, okay, that's been a long time ago, so

7    give me just a second.

8    Q.    Sure.  You can take your time.

9    A.    I normally set my doctors' appointments up at the same

10   time each month because I went to all three doctors, but I

11   didn't only go to the doctor.  Me and my mom usually would go

12   to the doctor on the same day and -- but when she moved out,

13   we got -- it was distanced, and we weren't on the same page,

14   like, our timeline.  But I want to say that I filled those

15   pills, and those pills were to last me through my birth of A.

16   And I went into labor early or something.  I don't know,

17   something crazy.  But I did get them filled when I was in the

18   hospital.

19        I got a prescription filled when I was in the

20   hospital, but I don't think it was that prescription.  That

21   prescription I filled the day that I left the doctor's

22   office, but it was supposed to last me until I had A.  But I

23   want to say Dr. Walker wrote me a few hydrocodones because I

24   was already written Percocets as a breakthrough because I had

25   just had surgery.

**EXAMINATION OF HOPE ARMENT**                                            81

1  Q.   Dr. Walker, your OB --

2  A.   Right.

3  Q.   -- wrote you a prescription --

4  A.   Right.

5  Q.   -- before or after the birth?

6  A.   That would be after the birth.

7  Q.   Okay.  For the pain control of the surgery?

8  A.   Correct.  And I didn't have the surgery for two days.

9  It was two days after the birth, and then I was at the

10 hospital for two weeks with A.  And then I would have went

11 back to Jeff and got my next prescription.

12 Q.   Were you -- did Dr. Walker or Dr. Hoeldke tell you

13 that if you continued on opioids, pain medication, throughout

14 your pregnancy that there was a protocol in which the child

15 would need to be observed for a couple of days after birth to

16 make sure --

17 A.   No, nobody told me that.  Actually, I woke up in the

18 middle of the night.  I had just had surgery.  They gave me

19 an Ambien because I couldn't rest.  A. had been in my room

20 for the last three nights, and everything was just fine.  And

21 whenever I took her blanket off, she shivered a little bit.

22 But I -- my other two children did the exact same thing so I

23 thought nothing of it.

24      Well, they took her to the nursery that night so that

25 I could rest, and the doctors in the nursery saw her do it

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    82

1   and put her into the NICU while I was asleep and woke me up

2   to let me know that that's where she was at.  And they had

3   already started the morphine at that point.

4   Q.   Okay.  But without asking you?

5   A.   Right.  They did not ask me because it was already

6   documented in my chart that I was a --

7   Q.   High risk because of --

8   A.   -- that I was a pain patient.

9   Q.   Pain patient.  So if your chart, it said you were a

10  pain patient so that they would be aware to be observant and

11  then take the appropriate response should they need to?

12  A.   Correct.

13  Q.   And it was your understanding that was the correct

14  medical response in this situation?  They were prepared for

15  it?

16  A.   I feel like it was a little -- I feel like they jumped

17  the gun a little bit, but that's just my personal opinion.

18  And that was the NICU doctor's opinion that night in the --

19  when I came down there.  I was, like, what did she get even

20  put down here for because I don't understand.  But then once

21  she was there, they swabbed her nose, and she had MRSA.  So

22  then she had to be weaned off the morphine that they put her

23  on as well as fight MRSA.

24  Q.   You don't think she needed to be put on morphine?

25  A.   I did not see signs or symptoms.  I have three

1  children.  My other two children, when you take their clothes

2  off to change their diaper and they are a newborn baby, you

3  unswaddle them, they are going to shiver a little bit in a

4  hospital.  It's cold.  And that's what I thought was going on

5  with A.  Now, I'm not a physician.  I can't say that she

6  wasn't having withdrawals, and there were opiates in her

7  system.  So she could have been.  But I feel like they

8  shouldn't have took my child and put her on a stronger opiate

9  without my permission, no.

10    Q.  And then the MRSA, when you're talking about MRSA,

11  you're talking about a bacterial infection?

12    A.  I'm not sure what MRSA actually is, but MRSA lives in

13  the nose.  It's contracted with babies through their nasal

14  passage.  Pretty much anybody that's had any kind of

15  amputation or transplant or anything like that, they can't be

16  around the child.  So she had to be isolated.  We had to wear

17  MRSA gear.  I couldn't even hold my child like I wanted to

18  because she was in the NICU.

19              MR. FERGUSON:  May I approach, Your Honor?

20              THE COURT:  Yes.

21  BY MR. FERGUSON:

22    Q.  I just want to show you the Government's

23  Exhibit 814.3.  It hasn't been marked yet.  It's the third

24  page to the Government's Exhibit 23.

25              THE COURT:  Got you.

**EXAMINATION OF HOPE ARMENT**                                      84

1   BY MR. FERGUSON:

2    Q.   Can you identify that pretty thing right there?

3    A.   That's my daughter.

4    Q.   And can you tell me what day that was taken on?

5    A.   That was August the 10th.

6           THE COURT:  Hold on just one moment.

7           MR. PENNEBAKER:  We actually didn't introduce

8    that.

9           MR. FERGUSON:  I'm doing it right now.

10          MR. PENNEBAKER:  Okay.

11  BY MR. FERGUSON:

12   Q.   Who is that pretty thing?

13   A.   That's A.

14   Q.   Can you tell me what day that photo was taken?

15   A.   That was August the 10th.  The top one is A. I'm

16   holding.

17   Q.   Okay.  So how many days after the delivery of your

18   child is this?

19   A.   That was the day of the delivery of my child.  It was

20   just posted a couple of days later.  I dressed her up in

21   every outfit I had.

22          MR. FERGUSON:  I'll ask to introduce that as the

23   next exhibit, Your Honor.

24          THE COURT:  We'll go ahead and receive it.  That

25   will be 24.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                          85

1                    (Exhibit 24 marked and received.)

2                    MR. FERGUSON:  Give me just a second to put it up

3    for the jury.

4    BY MR. FERGUSON:

5     Q.    This is the birthday?

6     A.    That's the day she was born, yes.

7     Q.    Is that you?

8     A.    Yeah.

9     Q.    And who is the young man there?

10    A.    That's my son.

11    Q.    Good looking baby.  Who is that?

12    A.    That's A.

13    Q.    Same day?

14    A.    Same day.  She still had the bow on her head.  Same

15   day.

16    Q.    All right.  You sent Jeff a text that day, didn't you?

17    A.    Yes.

18    Q.    Were you wanting to get back to his office because you

19   were on medication?

20    A.    I mean, at that point, that particular message, just I

21   wanted him to see A.  I wanted the world to see A.  And

22   there's actually a picture of Jeff holding A.

23    Q.    Okay.  She's healthy now?

24    A.    She is very healthy now.  Very smart.

25    Q.    She was from what you can tell healthy?

UNREDACTED TRANSCRIPT

1    A.    She was a normal child --

2    Q.    Okay.

3    A.    -- but, I mean, again --

4    Q.    Not a doctor?

5    A.    Not a doctor.

6    Q.    I understand.  You're a mama.

7    A.    Yeah.

8    Q.    Thank you.

9    A.    You're welcome.

10            MR. PENNEBAKER:  Nothing from the Government,

11   Your Honor.

12            THE COURT:  Okay.  All right.  Ms. Rogers or is

13   it Arment?

14            THE WITNESS:  Arment.

15            THE COURT:  I think we're done, so you're

16   excused.  You may step down.

17            THE WITNESS:  Okay.  Thank you.

18            THE COURT:  We've been going for a couple of

19   hours, so I think I'm ready for a break.  I don't know if

20   y'all are or not.  So we'll take about 15 or 20 minutes.  The

21   rules are always the same.  Don't discuss the case amongst

22   yourselves or allow anyone to discuss it with you.  Leave

23   your notebooks in your chairs.  They'll be there when you

24   come back.  I'll go ahead and excuse you to the jury room.

25                    (Jury out at 3:36 p.m.)

                    UNREDACTED TRANSCRIPT

87

1          THE COURT:  Okay.  We'll be in recess.

2     (A recess was taken from 3:37 p.m. to 4:07 p.m.)

3          THE COURT:  Any issues before we bring in the

4  jurors?

5          MR. FERGUSON:  No, Your Honor.

6          THE COURT:  No?  Okay.  Bring them in, please.

7               (Jury in at 4:08 p.m.)

8          THE COURT:  Okay.  A little warmer in here now?

9  All right.  I hope it doesn't keep continuing to rise.  We'll

10 see.  At any rate, I think we're ready to go ahead and

11 proceed.  We finished with the witness.  I'll return to the

12 Government.  Who will be -- call your next witness.

13         MS. PAYERLE:  Thank you, Your Honor.  The United

14 States calls Daniel Rogers.

15         THE COURT:  All right.  Sir, if you would step

16 right up here to the front.  Ok.  You're good right there.

17 And if you would, please raise your right hand to receive the

18 oath.

19              (The witness was sworn.)

20         THE COURT:  Be seated right here.

21

22

23

24

25

1                       **DANIEL ROGERS**,

2    called as a witness on behalf of the Government, having been

3    first duly sworn, testified as follows:

4                            DIRECT EXAMINATION

5    BY MS. PAYERLE:

6      Q.   Good afternoon, Mr. Rogers.

7      A.   Hey, good afternoon.

8      Q.   One just quick thing.  First of all, go ahead and

9    introduce yourself to the jury.  Just your name, your job,

10   and where you live, what city?

11     A.   Okay.  Daniel Rogers.  I'm sales manager, excuse me,

12   at Rogers Hydrant Service.  I live in Dresden, Tennessee.

13               THE COURT:  Would you spell your name, please.

14               THE WITNESS:  Oh, yes, sir.  D-A-N-I-E-L,

15   R-O-G-E-R-S.

16   BY MS. PAYERLE:

17     Q.   And, Mr. Rogers, just to clear something up, we've

18   heard from another witness named Hope Rogers.  Are you any

19   relation to a Hope Rogers?

20     A.   No, ma'am.

21     Q.   Okay.  Have you ever worked at Jeff Young's clinic

22   PREVENTAGENIX?

23     A.   Yes, ma'am.

24     Q.   And when did you work there?

25     A.   From 2014 to 2017.

**EXAMINATION OF DANIEL ROGERS**                                                89

1    Q.   And what was your job at PREVENTAGENIX?

2    A.   Work up the patients, like a medical assistant.

3    Q.   And did you, in that job, write information in their

4    patient records sometimes?

5    A.   Yes, ma'am.

6    Q.   And did you interact with drug screens or toxicity

7    screens?

8    A.   Yes, ma'am.

9    Q.   And did you sometimes talk to patients about the

10   results of those tox scenes?

11   A.   Yes, ma'am.

12   Q.   While you were at PREVENTAGENIX, about what percentage

13   of the patients would you estimate were seen for controlled

14   substances?

15   A.   Ballpark, 80 percent.

16   Q.   Did Jeff Young ever talk to you about any business

17   reasons for seeing controlled substance patients?

18   A.   It was worded that they're going to get them

19   somewhere, might as well be here.

20   Q.   And did controlled substance patients help or assist

21   the business in any way?

22   A.   Can you repeat the question.

23   Q.   Sure.  That was a terrible question.  Did the

24   controlled substances patients make up a big part of the

25   business model?

**EXAMINATION OF DANIEL ROGERS**                                        90

1    A.    Oh, yes, ma'am.

2    Q.    And why was that?

3    A.    I guess to -- when the clinic was started, that's what

4    came, and we had to keep the patients coming back, I guess.

5    Q.    And when was the clinic started?

6    A.    2014, I don't remember the month, though.

7    Q.    And how often did controlled substance patients have

8    to come in?

9    A.    Monthly.

10   Q.    And then did Mr. Young bill for office visits every

11   time a patient came in?

12   A.    I assume so.

13   Q.    I'm sorry.  That wasn't your area?

14   A.    No.

15   Q.    Okay.  I'm sorry.  I didn't -- that's all right then.

16   Then you don't know.  That's the answer.

17         And did you -- how about patients who came in for a

18   cold, did they come in once a month?

19   A.    No.  For sickness, no.

20   Q.    And how about people who were just getting like a

21   physical, would they come in once a month?

22   A.    No.

23   Q.    Okay.  The controlled substance patients, they did?

24   A.    Yes, ma'am.

25   Q.    Did you or your coworkers -- well, let's talk about

UNREDACTED TRANSCRIPT

**EXAMINATION OF DANIEL ROGERS**                                    91

 1  you.  Did you ever raise concerns to Mr. Young about the

 2  number of controlled substance patients at his office?

 3     A.   Yes.

 4     Q.   And what kind of concerns did you raise?

 5     A.   Just the amount and what a lot of people were getting.

 6  I had a brother on hospice that wasn't getting some of the

 7  drugs that they were getting.

 8     Q.   What kind of drugs were those?

 9     A.   Pain medication -- pain medication, I'm sorry.

10     Q.   Okay.  About how many patients would you see in a day

11  at PREVENTAGENIX?

12     A.   Some days, it would be up to a hundred.

13     Q.   The clinic, was it part of your job to talk to the

14  patients?

15     A.   Yes, ma'am.

16     Q.   And, you know, you said that a lot of them were seeing

17  Mr. Young to get drugs or controlled substances?  Would they

18  come in point blank and say they needed drugs?

19     A.   Not point blank.

20     Q.   How did that look?  What were --

21     A.   It would be like I've got back pain, shoulder pain,

22  some kind of body ache.

23     Q.   Did some people sometimes specifically ask for drugs

24  by name?

25     A.   There would be nicknames.

**EXAMINATION OF DANIEL ROGERS**                                    92

1    Q.    Okay.  What kind of nicknames?

2    A.    Oxycodone was referred to as Roxies, and then

3    2-milligram Xanax -- excuse me, 2-milligram Xanax would be

4    called bars.

5    Q.    And had you heard those names before for those drugs,

6    like, for example, when your brother was on hospice?

7    A.    No.

8    Q.    You said that urine drug tests, sort of talking to

9    patients about their urine drug screens was part of your job?

10   A.    Yes, ma'am.

11   Q.    What was the reason for urine drug screening at

12   PREVENTAGENIX?

13   A.    To make sure the patient was compliant with what they

14   were being written.

15   Q.    And describe a little bit for the jury what that

16   means.  And how could you tell from a urine drug screen

17   whether a patient was compliant?

18   A.    They would have a urine drug screen, and in it we want

19   to make sure, like, if they were written a hydrocodone, we

20   want to make sure hydrocodone was in the drug screen.  And if

21   it wasn't, it means they ran out, weren't taking it, and also

22   check for elicit drugs and other prescription drugs that

23   weren't prescribed to them.

24   Q.    So are you familiar with a patient named Andy Azbill?

25   A.    Yes, ma'am.

UNREDACTED TRANSCRIPT

**EXAMINATION OF DANIEL ROGERS**                                        93

1   Q.   Okay.  I'm handing you a 438 pages in it that I

2   promise we will not go through page by page.  It's marked

3   Government 401.  Is this the patient record for Andy Azbill

4   from PREVENTAGENIX?

5   A.   Yes, ma'am, it is.

6              MS. PAYERLE:  Move to have it admitted.

7              THE COURT:  We will go ahead and receive it, 438

8   pages, Exhibit Number 25.

9              MS. PAYERLE:  And I do promise we are not going

10  to go through every page.  Not even close.

11              (Exhibit 25 marked and received.)

12              THE COURT:  Now, we'll have access to all the

13  documents and everything else, all the exhibits when you are

14  in the jury room deliberating.  You will be able to peruse

15  the 438 pages.

16              MS. PAYERLE:  I just want to make sure it's

17  complete, Judge.  All right.

18              THE COURT:  Excuse me, what was that patient's

19  name again?

20              MS. PAYERLE:  Andy Azbill, it's A-Z-B-I-L-L.

21              THE COURT:  Thank you.

22              MS. PAYERLE:  And may we publish Exhibit 401 at

23  page 166.  Sorry, it's Exhibit -- what's our court exhibit

24  number?

25              CASE MANAGER:  25.

UNREDACTED TRANSCRIPT

1            THE COURT:  That will be 25.

2            MS. PAYERLE:  So that will be Exhibit Number 25

3   at page 166.  Okay.  We just need to put that up on the

4   screen if we could.  Thanks, Mr. Herrin.

5   BY MS. PAYERLE:

6   Q.   All right.  Just -- you know, the jury has seen a form

7   a little like this before, but let's blow up the top, say,

8   two-thirds of the screen.  Down to -- below -- keep going

9   down, down, down.  Stop there.  Go ahead.  All right.  So is

10  this a drug toxicology report for Andy Azbill?

11  A.   Yes, it is.

12  Q.   And it was generated on 10/27/2016 on the top right

13  corner?

14  A.   Yes, ma'am.

15  Q.   And what medications was Andy Azbill prescribed

16  according to this form there at the top?

17  A.   Hydrocodone and Soma.

18  Q.   And then in the box under Summary of Qualitative

19  Results, was hydrocodone and oxymorphone detected also in his

20  system?

21  A.   Yes, ma'am.

22  Q.   And what did that mean as somebody that was charged

23  with keeping an eye on these and counseling patients?

24  A.   It shouldn't be in there.  If you go by the drug test,

25  it says he had hydrocodone prescribed, but oxycodone showed

UNREDACTED TRANSCRIPT

**EXAMINATION OF DANIEL ROGERS**                                    95

1    up.

2       Q.   All right.  And let's look in that same exhibit at

3    page 180.  This is for 8/24/2016?

4       A.   Yes.

5       Q.   And let's blow up, I guess, sort of both charts there.

6    There we go, up to there.  And in this case, is it the same

7    thing, hydrocodone, hydromorphone detected in his system?

8       A.   Yes.

9       Q.   And then what do you see below, below with oxycodone

10   and oxymorphone?

11      A.   It shows hydrocodone popping up and then the Soma.

12      Q.   Okay.  And are oxycodone and oxymorphone in his

13   system --

14      A.   No, ma'am.

15      Q.   -- down at the bottom?

16      A.   No, ma'am.

17      Q.   Okay.  And is that inconsistent?

18      A.   Yes.

19      Q.   Why is that?

20      A.   Well, he was written on this date.  Said he had

21   Percocet, so it should have been in his system and it wasn't.

22      Q.   But some other drug was?

23      A.   Yes, ma'am.

24      Q.   Okay.  Let's look at the same exhibit, page 205.  On

25   this page, there's some handwriting.  Let's go ahead and blow

UNREDACTED TRANSCRIPT

**EXAMINATION OF DANIEL ROGERS**                                    96

1    up all the way to the handwriting.  Whose handwriting is

2    that?

3        A.    Jeff.

4        Q.    That's Jeff Young?

5        A.    Yes, ma'am, Jeff Young.

6        Q.    Okay.  Tell the jury what's going on in this

7    prescription or this -- sorry, this tox screen in terms of

8    the results.

9        A.    Okay.  The reason I guess that Andy gave was that

10   there was an old prescription, the bottom left said old RX,

11   RX meaning prescription.  And then it says was on TID, which

12   means three times a day and ran out.

13       Q.    Okay.  And you see lorazepam.  Does that say "no RX

14   for" next to it?

15       A.    Yes, ma'am.

16       Q.    But it's detected in his system and that's

17   inconsistent?

18       A.    Yes, ma'am.

19       Q.    And the same thing with oxycodone, oxymorphone,

20   detected, but that's inconsistent?

21       A.    Yes, ma'am.

22       Q.    Now, do you see here where there's oxycodone and

23   oxymorphone of greater -- in that second column, greater than

24   2500 there?

25       A.    Yes.

UNREDACTED TRANSCRIPT

**EXAMINATION OF DANIEL ROGERS**                                    97

1    Q.    Did you know what that meant?

2    A.    No, ma'am.

3    Q.    Did Mr. Young ever tell you to look out for that?

4    A.    No, ma'am.

5    Q.    That sort of where the amount is higher than the top

6    range in that right corner.  Did you ever talk to a patient

7    or counsel them because they had too much of a drug in their

8    system?

9    A.    No.

10   Q.    Did Mr. Young -- actually, just a moment.

11         Let's go to page 222, if we could, of that same

12   exhibit.  And, again, whose handwriting is down at the

13   bottom?

14   A.    Jeff Young.

15   Q.    All right.  And, again, do we see inconsistent drug

16   test results?

17   A.    Yes.

18   Q.    And do we see more than 2500, whatever that means, of

19   oxycodone and oxymorphone?

20   A.    Yes.  Yes, ma'am.

21   Q.    When you gave drug screens at the clinic, were there

22   any controls to make sure the patients didn't take drugs into

23   the bathroom with them?

24   A.    Like a protocol?

25   Q.    Right.

**EXAMINATION OF DANIEL ROGERS**                                    98

1    A.    No, there was no protocol.

2    Q.    So, for example, a patient could have taken pieces of

3    a pill in with them and scraped it into their urine?

4    A.    Yes, ma'am.

5    Q.    And nobody would have known at PREVENTAGENIX?

6    A.    No, ma'am.

7    Q.    Were they allowed to take anything into the bathroom

8    they wanted?  Any purses or bags, things like that?

9    A.    We never stopped them from taking . . .

10    Q.    Okay.  Did Mr. Young have -- or follow any consistent

11    policy as patients came up with an inconsistent drug screen

12    like this?

13    A.    It varied patient to -- excuse me, it varied patient

14    to patient.

15    Q.    Okay.

16          MS. PAYERLE:  Let's go ahead and pull this down.

17    Talk more about that.

18    BY MS. PAYERLE:

19    Q.    What did you mean by varied patient to patient?  What

20    he did with inconsistent drug screens?

21    A.    It mattered who it was that failed the drug screen.

22    Q.    And so for whom -- who would he let get by or for whom

23    would he continue prescribing even without a drug screen?

24    A.    Friends.

25    Q.    Did you ever try to, like, fire or dismiss his friends

**EXAMINATION OF DANIEL ROGERS**                                    99

1  as patients from the clinic?

2     A.   Yes, ma'am.

3     Q.   And can you give us an example?

4     A.   Ben Elston failed multiple drug tests, and it was like

5  he was untouchable.

6     Q.   Did you ever tell Ben Elston he wasn't welcome back at

7  the clinic?

8     A.   No.

9     Q.   Did you ever tell Mr. Young that he was failing drug

10 tests?

11    A.   Yes.

12    Q.   And what happened?

13    A.   Couldn't fire him.

14    Q.   Okay.  Who said that?

15    A.   Jeff Young.

16    Q.   About how often would you try to dismiss or fire

17 patients from the clinic because of dirty drug screens?

18    A.   Every chance I got.

19    Q.   And did you ever have any negative repercussions from

20 doing that?

21    A.   From the patient or --

22    Q.   Anybody?

23    A.   Yes, ma'am.

24    Q.   Can you explain to the jury what those were?

25    A.   Like, some patients threatened to blow my house up,

 1  talked bad to me.  Threatened to whoop my butt, you know,

 2  just your normal Jerry Springer stuff.

 3      Q.   Well, you said you did it every chance you got.  Why

 4  is that?

 5      A.   I want to get rid of it.  I thought the -- I thought

 6  we were better than that and wanted to get the drug seekers

 7  out of there.

 8      Q.   Did it ever work, your efforts?

 9      A.   No, it was like cutting kudzu.

10      Q.   What do you mean by that?

11      A.   You cut one leaf off, and two grew back.

12      Q.   All right.  You said it was part of your job to sort

13  of talk to people about the drug tests.  What did that --

14  what did that entail as kind of counseling?  You have a

15  patient that maybe has a problematic drug test.  What did

16  that counseling process entail?

17      A.   If they were written a prescription, I would ask them

18  if they had been taking -- and it varied what it showed.

19  But, like, if the medication wasn't in their system, I would

20  ask, were they written this, and they'd say, yes.  And I

21  would ask, why is it not in your system, and the go-to for

22  any failed test was either, I ran out, or it was an old

23  prescription.

24      Q.   These were common excuses?

25      A.   Yes, yes, majority of the time.

**EXAMINATION OF DANIEL ROGERS**                                      101

1    Q.   Okay.  And did Mr. Young -- did you tell Mr. Young

2    about these failed prescriptions?

3    A.   Yeah, I would write notes.  Especially, like, on some

4    that's got so much because I can't remember everything, so

5    I'd have to write it down, and then I'd go and talk to him

6    about it.

7    Q.   Did Mr. Young ever train you in how to spot signs of

8    addiction?

9    A.   No.

10   Q.   Did he ever train you in sort of how to counsel

11   somebody that might be suffering from addiction?

12   A.   No, ma'am.

13   Q.   Did he ever encourage you to get that kind of

14   training?

15   A.   No, ma'am.

16   Q.   To your knowledge, was there an addiction counselor at

17   the clinic?

18   A.   Not that I'm aware of.

19   Q.   Did Mr. Young encourage his employees to refer

20   patients who seem to be suffering from addiction to rehabs?

21   A.   Not that I'm aware of.

22   Q.   Mr. Rogers, if -- you know, if this was like kudzu,

23   this is such a problematic clinic, why did you stay so long?

24   A.   I was going through a really, really difficult time in

25   my life.  I was -- I had filed for divorce, and I had two

**EXAMINATION OF DANIEL ROGERS**
<span>102</span>

1   children in diapers, and I had to show steady income to get

2   my kids.  And I would do anything for my two children, three

3   children.

4    Q.   All right.

5            MS. PAYERLE:  Pass the witness, Your Honor.

6            THE COURT:  All right.  Thank you.

7            And Mr. Ferguson?

8            MR. FERGUSON:  Yes, sir, may I have just one

9   moment?

10           THE COURT:  Sure.

11                  (Brief pause.)

12           MR. FERGUSON:  Your Honor, we don't have any

13   questions for this witness.

14           THE COURT:  All right.  Thank you, Mr. Rogers.

15   Thank you very much.  You can step down.

16           THE WITNESS:  Thank you, sir.

17           THE COURT:  Government, if you would, please,

18   call your next witness.

19           MS. PAYERLE:  Yes, Your Honor.  The United States

20   calls Katie Tripp.

21           THE COURT:  Come right around here to the front,

22   please.  Okay.  You're good right there.  If you would,

23   please, raise your right hand to receive the oath.

24                  (The witness was sworn.)

25           THE COURT:  Be seated right here, please.

**EXAMINATION OF KATIE TRIPP**                                        103

1              **<u>KATIE TRIPP</u>**,

2   called as a witness on behalf of the Government, having been

3   first duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5   BY MS. PAYERLE:

6     Q.   Okay.  Good afternoon, Ms. Tripp.

7     A.   Yes.

8     Q.   Please introduce yourself to the jury, just your name,

9   and also what your name was formerly at the time of this

10  case.

11    A.   Yes, it's Kaitlyn Tripp.  It was formerly Kaitlyn

12  Scott.

13             THE COURT:  Would you spell your last name for

14  the record, please.

15             THE WITNESS:  Yes, it's T-R-I-P-P.

16  BY MS. PAYERLE:

17    Q.   And what is your current job, just generally?

18    A.   I work for a company called Chainalysis.  We help

19  investigators understand block chain activity involving

20  currency.

21    Q.   And before you did that, did you actually work -- did

22  you work in law enforcement?

23    A.   Yes, I did.

24    Q.   And who did you work for?

25    A.   The Dickson County Sheriff's Office.

**EXAMINATION OF KATIE TRIPP**                                    104

1    Q.   At some point while you were at the Dickson County

2    Sheriff's Office, did you become part of an investigation

3    regarding Jeffrey Young?

4    A.   Yes, I did.

5    Q.   Would you describe your role to the jury in that

6    investigation.

7    A.   Sure.  So I worked patrol for about five years with

8    the sheriff's office, and then they assigned me to the DEA

9    out of Nashville to work undercover for doctor cases.

10   Q.   And so did you work undercover in the investigation of

11   Mr. Young?

12   A.   Yes, I did.

13   Q.   And what did you do as an undercover officer in the

14   investigation?

15   A.   Yes, so we just went into doctors' offices to see if

16   providers were safely prescribing medication.  We received

17   accusations, and we go and investigate those accusations.

18   Q.   And did you go to Mr. Young's clinic, PREVENTAGENIX,

19   in Jackson, Tennessee?

20   A.   Yes, I did.

21   Q.   As part of your role as an undercover, did you adopt a

22   fake identity?

23   A.   I did.

24   Q.   And what was your sort of fake identity name?

25   A.   Katie Crowder.

**EXAMINATION OF KATIE TRIPP**                                    105

1    Q.    And did your undercover have a fake driver's license?

2    A.    Yes.

3    Q.    And according to the driver's license, was Katie

4    Crowder 28 years old?

5    A.    Yes.

6    Q.    All right.  And where did Katie Crowder live?

7    A.    Charlotte, Tennessee.

8              THE COURT:  How do you spell Crowder?

9              THE WITNESS:  C-R-O-W-D-E-R.

10             THE COURT:  Thank you.

11             THE WITNESS:  Uh-huh.

12   BY MS. PAYERLE:

13   Q.    All right.  Did you visit -- I think we're just going

14   to march through these.  Do you visit Jeff Young's clinic

15   about eight times?

16   A.    Yes.

17   Q.    And was one of those times on June 7, 2016?

18   A.    Yes.

19   Q.    All right.  So let's give the jury some context.  You

20   did go to Jeff Young's clinic on June 7, 2016.  But had you

21   gone to the clinic before that time?

22   A.    Yes, I had.

23   Q.    All right.  And describe to the jury the time you went

24   before.

25   A.    I went two other times, I believe, with another

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                     106

1   undercover.  We went there.  She had a scheduled appointment,

2   so I went alongside her to see if I could get an appointment

3   as well.

4       Q.   And on -- and was that in April of 2016?

5       A.   Yes.

6       Q.   All right.  And did you -- did you -- you went with a

7   partner.  Did you get a prescription at that visit?

8       A.   No.

9       Q.   And did you set up an appointment for May of that same

10  year?

11      A.   I did.

12      Q.   And at that appointment, did you actually see Jeff

13  Young in May?

14      A.   No, not in May.

15      Q.   All right.  Did you get a prescription, though, from

16  the other provider you saw?

17      A.   Yes.

18      Q.   And I am going to show you -- just a moment.

19           All right.  I'm going to show you, Ms. Tripp, a

20  one-page document previously marked Government's 1107.  Are

21  we looking at that prescription you received in May?

22      A.   Yes.

23      Q.   All right.

24                MS. PAYERLE:  Move to admit, Your Honor.

25                THE COURT:  We'll receive it, a script you

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                    107

1   received in May of 2016?

2               THE WITNESS:  Yes, sir.

3               THE COURT:  Okay.  It will be Exhibit 26.

4               (Exhibit 26 marked and received.)

5               MS. PAYERLE:  Let's pull up Exhibit 26, 1107.

6   BY MS. PAYERLE:

7   Q.   So this prescription, just to be clear, was not

8   written by Mr. Young; is that right?

9   A.   Correct, it was not.

10  Q.   And what was written for you?

11  A.   Baclofen.  I think, tramadol.  I can't remember the

12  other.

13  Q.   Okay.

14  A.   I can't read the other either.

15  Q.   Below the prescription, that would be Klonopin?

16  A.   It looks like it, yes, ma'am.

17  Q.   I can blow it up there.  What do you think?

18  A.   Yes.

19  Q.   So below this prescription is a receipt.  How did you

20  pay for this office visit in May?

21  A.   With cash.

22  Q.   So you didn't, on this visit, see Mr. Young, so what

23  did you do next?

24  A.   I wasn't able to see him even though that's when I

25  scheduled the appointment was for Jeff Young.  I was

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                    108

1  scheduled an appointment with April Downing.

2   Q.   Okay.  Did you do anything next to ensure that you

3  would see Jeff Young on June -- when you set up your next

4  appointment?

5   A.   I did.  I created a Facebook -- an undercover Facebook

6  account and messaged Jeff Young directly.

7   Q.   All right.  Let's take a look at Document 1109.  Yes,

8  there we go.  Okay.  I'm going to show you a two-page exhibit

9  that's been marked 1109.  Is this a message to Mr. Young from

10  that Facebook account?

11   A.   Yes.

12   Q.   And his response on the next page?

13   A.   Uh-huh.

14   Q.   Okay.

15   A.   Yes.

16          MS. PAYERLE:  Move to admit that exhibit.

17          THE COURT:  That will be Number 27.

18           (Exhibit 27 marked and received.)

19          MS. PAYERLE:  And let's put 1109, now Exhibit 27

20  on the screen.  Thank you.

21  BY MS. PAYERLE:

22   Q.   All right.  What did you message Mr. Young on

23  Facebook?

24   A.   I just let him know that I was in his office last week

25  for an appointment, and I thought I was going to be able to

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                          109

1   see him instead of April Downing.  I was going to see if he

2   could help me out with better medications that I felt would

3   actually help.

4   Q.   And did he respond to your message?

5   A.   Yes.

6   Q.   Go ahead and look at page 2 of that same document.

7   What did he tell you to do?

8   A.   Asked when I was coming back and when I did, just tell

9   them that I only wanted to see him and only him.

10  Q.   All right.  And is there -- there's another message,

11  but it looks like it's several months later; is that right?

12  A.   That's correct.

13  Q.   So we'll get to that in a minute.  But for this

14  appointment, did you then see Mr. Young in June of 2016?

15  A.   Yes, I did.

16  Q.   And to orient the jury, were you accompanied by

17  anybody at that visit?

18  A.   No.

19  Q.   And how did you pay for that visit?

20  A.   Cash, as well.

21  Q.   Okay.

22         MS. PAYERLE:  Your Honor, at this time, the

23  Government would like to play a clip, Exhibit 1111 that we've

24  premarked.

25  BY MS. PAYERLE:

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                    110

1    Q.   And I'll ask, Ms. Tripp, have you taken a look at all

2    the clips that we're going to play --

3    A.   Yes.

4    Q.   -- in this testimony?

5    A.   Yes.

6    Q.   Okay.

7             MS. PAYERLE:  So we would ask the Court to admit

8    clip 1111.

9             THE COURT:  Okay.  How many clips are we talking

10   about?

11            MS. PAYERLE:  There are one -- they're each of

12   them very, you know, a few minutes.  And, actually, maybe we

13   can just admit them all at this point, if that would be

14   easier.

15            THE COURT:  It probably would.

16            MS. PAYERLE:  Okay.

17            THE COURT:  When you say clips, what do you mean?

18            MS. PAYERLE:  I just mean videos.

19            THE COURT:  Okay.

20            MS. PAYERLE:  All right.  So it will be our

21   Document 1112.  I've got to move through them here, 1116 -- I

22   apologize, Your Honor.  If I may have just a moment to

23   consult at counsel table.

24            THE COURT:  Sure.

25            MS. PAYERLE:  There seems to be a little mix-up

1    here.

2              THE COURT:  Go ahead.

3              MS. PAYERLE:  Okay.  Thank you.  Your Honor, I'm

4    sorry, I believe there's just -- we have a little paperwork

5    mix-up that may cause some inefficiencies.  And if we could

6    have just five minutes to kind of resolve it.  I apologize to

7    the Court.  I just think if we could have just a moment to

8    resolve it, this would go a little more quickly.

9              THE COURT:  Okay.  Folks, I'm going to excuse you

10   into the jury room.  They just need a few minutes to work out

11   some problems with their presentation.  It won't take long.

12   Like I say, about five, ten minutes, we'll get back to you.

13   Leave your notebooks and don't discuss.

14              And, Ms. Tripp, don't discuss your testimony with

15   anyone over the break.  You can step down.

16              (Jury out at 4:39 p.m.)

17              THE COURT:  We'll be in recess.

18        (A recess was taken from 4:40 p.m. to 4:44 p.m.)

19              (Jury in at 4:44 p.m.)

20              THE COURT:  Okay.  I believe the Government is

21   ready to proceed right now.

22              MS. PAYERLE:  Thank you.

23   BY MS. PAYERLE:

24    Q.   All right.  So we've streamlined a little bit, and I

25   think we are ready to move a little faster.  So did you see,

**EXAMINATION OF KATIE TRIPP**                                            112

1   in preparation for today, the clips at 1111 -- Government's

2   premarked documents 1111, 1112, 1116, 1118, 1124, and 1129?

3       A.   Yes.

4       Q.   Okay.  And the Government would move to admit -- no,

5   sorry.  Are these recordings that you made of visits that you

6   made to PREVENTAGENIX while you were working undercover?

7       A.   Yes.

8       Q.   All right.

9               MS. PAYERLE:  The Government would move to admit.

10              THE COURT:  It will be collectively Exhibit

11  Number 28.  I believe it's six video clips.

12              MS. PAYERLE:  Judge, could we have them admitted

13  as separate exhibits just for ease of reference --

14              THE COURT:  Okay.

15              MS. PAYERLE:  -- as we go through them?

16              THE COURT:  All right.  That's fine.

17              MS. PAYERLE:  And so they are Exhibits 29 --

18  what did we start --

19              THE COURT:  It will be 28 through however many

20  you have.

21          (Exhibits 28 through 33 marked and received.)

22              MS. PAYERLE:  Okay.  Through 33.

23  BY MS. PAYERLE:

24      Q.   All right.  So when you went into the clinic, did you

25  have a camera with you that was recording?

                         UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                              113

1    A.   I did.

2    Q.   And where was that camera?

3    A.   I was holding it.

4    Q.   You were holding it.  Okay.  And you said you paid

5    cash, I believe?

6    A.   That's correct.

7    Q.   All right.  Let's look at the clip that's now

8    Exhibit 28.  It's 1111.  I'll have you watch.  Is it the

9    entrance to the clinic?

10   A.   Yes, ma'am.

11                   (The video was played.)

12   BY MS. PAYERLE:

13   Q.   Okay.  And is that you paying cash at the front desk?

14   A.   Yes, ma'am.

15   Q.   Did anyone at the desk express any surprise that you

16   were paying in cash?

17   A.   No, not at the desk.

18   Q.   Anywhere in the clinic?

19   A.   In the back, I believe they mentioned something about

20   it.

21   Q.   Okay.  Do you remember what they said?

22   A.   No, not off the top of my head.

23   Q.   Okay.  Can you describe what the waiting room was like

24   on these visits?

25   A.   It varied, but for the most part, it was full of

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                      114

1  patients waiting, and we could wait anywhere from an hour to

2  two hours to be seen.

3  Q.   At some point on this visit in June, did you go and

4  see Jeff Young?

5  A.   Yes, I did.

6  Q.   And before you got to an exam room, kind of describe

7  the process that you went through before getting to the exam

8  room.

9  A.   Sure.  So we would wait in the waiting room to be

10 called back for triage.  Then they would do -- sometimes a

11 urine analysis.  They would do blood pressure, ask questions

12 why we're there and what we were needing to be seen for.  And

13 then if there was a room available, we would go into the room

14 or we would go back into the waiting room out front.

15 Q.   Okay.  At Exhibit 1112, is that your exhibit, which is

16 now Exhibit 29?  Is that a recording of you in the waiting

17 room?

18 A.   Yes.

19 Q.   Okay.

20         MS. PAYERLE:  Let's play Exhibit 29, which was

21 our 1112.

22               (The video was played.)

23         MS. PAYERLE:  We'll stop there.

24 BY MS. PAYERLE:

25 Q.   Was that -- who just came into the room there?

**EXAMINATION OF KATIE TRIPP**                                    115

1    A.   Jeff Young.

2    Q.   And is the male voice for the rest of the recording

3    belonging to Jeff Young?

4    A.   That's correct.

5              MS. PAYERLE:  Okay.  So keep going.

6                   (The video was played.)

7    BY MS. PAYERLE:

8    Q.   Okay.  So here, explain what you were saying about the

9    tramadol and the money.

10   A.   Yes, so just letting him know I didn't even fill the

11   prescription for the tramadol.  I didn't think that it was

12   going to work with the pain.  Then what was your other

13   question, the money?

14   Q.   You said -- yeah, did anybody ask you how you were

15   able to pay $90 cash for this appointment if you didn't have

16   the money to fill your tramadol?

17   A.   No.

18   Q.   All right.

19              MS. PAYERLE:  Let's see what happens next.

20                   (The video was played.)

21   BY MS. PAYERLE:

22   Q.   Why did you tell him that you took hydrocodone that a

23   friend gave you?

24   A.   Just to see if he would see that it's a red flag at

25   all to be receiving hydrocodone illegally.

1    Q.   Did you -- do you know what a CSMD or a PMP is?

2    A.   Yes.

3    Q.   Was there a CSMD or a PMP that reported any previously

4  prescribed controlled substances for undercover Katie

5  Crowder?

6    A.   No.

7    Q.   Okay.  So if he had pulled your PMP -- or wait, if he

8  had pulled Katie Crowder's PMP or CSMD, what would it have

9  shown?

10   A.   Nothing.

11   Q.   That is that you had never had an opioid prescribed

12 before?

13   A.   Correct.

14   Q.   Okay.

15        MS. PAYERLE:  Let's keep rolling and see what

16 happens next.

17             (The video was played.)

18 BY MS. PAYERLE:

19   Q.   Let's note the time stamp.  At what point in this

20 visit did you ask him about his trailer?

21   A.   Shortly into the visit.

22   Q.   So about -- was it about 2 minutes and 20 seconds?

23   A.   That sounds about right.

24   Q.   Okay.

25        MS. PAYERLE:  Let's keep playing.

UNREDACTED TRANSCRIPT

1            (The video was played.)

2  BY MS. PAYERLE:

3    Q.   Did you see -- do you see a piece of paper in his

4  hand, that small piece of paper?

5    A.   Yes.

6    Q.   What's that?

7    A.   A prescription.

8    Q.   Okay.

9            MS. PAYERLE:  Let's keep going.

10            (The video was played.)

11  BY MS. PAYERLE:

12    Q.   Okay.  For this visit, was that all you saw of

13  Mr. Young?

14    A.   Yes.

15    Q.   He asked you if you had an MRI and he asked you -- and

16  what did you tell him for the jury?

17    A.   I said, yes, that I did.

18    Q.   And did you give him any description of what it

19  showed?

20    A.   I told him everything looked fine or looked okay.

21    Q.   Did he write you a prescription anyway?

22    A.   Yes.

23    Q.   Let's take a look at -- do I have it here, 1113.  I'm

24  going to show you a one-page document that's been marked

25  1113.  Is that a prescription?

**EXAMINATION OF KATIE TRIPP**                                      118

1    A.   Yes.

2              MS. PAYERLE:  Move to admit, Your Honor.

3              THE COURT:  We'll go ahead and admit.  It will be

4    34.

5              (Exhibit 34 marked and received.)

6              MS. PAYERLE:  Let's go ahead and publish

7    Exhibit 34, which is our Document 1113.

8    BY MS. PAYERLE:

9    Q.   Okay.  Ms. Crowder, excuse me, calling you by the

10   wrong name.  Ms. Tripp?

11   A.   Yes.

12   Q.   Is this the prescription that was written to your

13   undercover identity, Katie Crowder, following -- or during, I

14   guess, that office visit?

15   A.   Yes, it is.

16   Q.   Okay.  That we just saw.  During this appointment, did

17   Mr. Young ever try to address your pain with something other

18   than an opioid?

19   A.   No, he did not.

20   Q.   Did he ask you what your pain felt like, like was it

21   shooting or stabbing, for example?

22   A.   No.

23   Q.   How severe it was or when?

24   A.   No.

25   Q.   Did he ask you if you sustained some kind of injury

**EXAMINATION OF KATIE TRIPP**                                    119

1   that might explain it?

2      A.   No.

3      Q.   During this exam total time, did he talk to you more

4   about your health or more about his trailer?

5      A.   His trailer.

6      Q.   And, I guess, did you -- you walked in here today to

7   take the stand, did you move any differently around him, show

8   signs of pain, wince, anything like that?  Did you move

9   differently than you did here today in court?

10     A.   No, I did not.

11     Q.   Okay.  Let's take a look now.  Did you then go back to

12  the visit -- or excuse me, go back for another visit at the

13  clinic on July 12, 2016?

14     A.   Yes.

15     Q.   And did you see Mr. Young on that visit?

16     A.   I did.

17     Q.   All right.  Let's take a look at Exhibit 30, which is

18  our internal 1116.  It's another video.  This was, again, in

19  the exam room.

20                    (The video was played.)

21  BY MS. PAYERLE:

22     Q.   All right.  Ms. Tripp, at about a minute 25 of this

23  video, you asked for a fentanyl patch.  What's that?

24     A.   It is fentanyl that is inside of a patch that you put

25  on your body.

1    Q.   And you asked if it was okay to take both fentanyl and

2    hydrocodone at the same time?

3    A.   I did.

4    Q.   What did Mr. Young say?

5    A.   Yes.

6    Q.   Did he give you any warnings about the dangers of

7    addiction or dependence on opioids?

8    A.   No.

9    Q.   And had he asked you about your prior experience with

10   opioids?

11   A.   No.

12   Q.   Did Mr. Young or any member of his staff explain what

13   you were supposed to do with the fentanyl patches?

14   A.   No.

15   Q.   Like, for example, where you put them on your body?

16   A.   No.

17   Q.   Before prescribing you fentanyl and hydrocodone at the

18   same time, did Mr. Young or his staff talk to you about a

19   nonopioid painkiller?

20   A.   No.

21   Q.   Did he or any of them at any time suggest physical

22   therapy or exercise?

23   A.   No.

24   Q.   He said he'd give you a 50-microgram patch of

25   fentanyl.  Is that the lowest dose of fentanyl available?

**EXAMINATION OF KATIE TRIPP**                               121

1    A.    25 is.

2    Q.    And on this visit, did you bring that MRI image that

3    you said you'd bring?

4    A.    I did not.

5    Q.    All right.  Let's take a look at -- I have it here.

6    I'm going to show you a one-page document we've marked 1115.

7    That would be the prescriptions you received on that visit?

8    A.    Yes, it is.

9              MS. PAYERLE:  Move to admit, Your Honor.

10             THE COURT:  Okay.  That will be 35.

11             (Exhibit 35 marked and received.)

12             MS. PAYERLE:  And let's go ahead and publish 35,

13   Exhibit 35.  Okay.  What are we -- let's blow up the top

14   there if we can so the jury can see.

15   BY MS. PAYERLE:

16   Q.    All right.  What did Mr. Young, in fact, prescribe you

17   on that visit?

18   A.    Hydrocodone and fentanyl.

19   Q.    Oh, pardon me.

20   A.    No, you're fine.

21   Q.    So let's take a look at this.  On the left, you said

22   hydrocodone.  What's it called there?

23   A.    Lortab.

24   Q.    And what is the five --

25   A.    5 milligrams three times a day, I believe.

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                      122

1    Q.   So it's 5 milligrams of hydrocodone --

2    A.   Two a day, sorry.

3    Q.   Yeah, okay.  And that's a number 60 in a circle and

4    that means --

5    A.   Quantity.

6    Q.   So 60 pills?

7    A.   Yes.

8    Q.   Okay.  And that would be two pills a day for 30 days?

9    A.   Correct.

10   Q.   I see.  Okay.  It's just math.  All right.  In the

11   next prescription that he wrote you that day, it says

12   fentanyl patch 50 micrograms number, that is, quantity 10.

13   Do you see that?

14   A.   Yes, I do.

15   Q.   Okay.  And that's 10 patches?

16   A.   Yes, ma'am.

17   Q.   Okay.  But they go on every three days?

18   A.   Change them out every three days is what he said.

19   Q.   So that's also 30 days' worth of fentanyl?

20   A.   Right.

21   Q.   All right.  And did you come -- did you go back in

22   August of 2016?

23   A.   Yes, I did.

24   Q.   And did you pay cash again?

25   A.   I did.

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                    123

1    Q.   And did you eventually see Mr. Young again?

2    A.   I did.

3    Q.   Same process as before?

4    A.   Yes, ma'am.

5    Q.   All right.  Let's take a look at what is now

6    Exhibit 31, which is our 1118.

7              MS. PAYERLE:  And may have I have a brief sidebar

8    to alert the Court of something?

9              THE COURT:  Okay.

10                  (At sidebar on the record.)

11             MS. PAYERLE:  Sorry, Judge.  I realized we had

12   put some subtitles on this because there's parts it's hard to

13   hear and so we wouldn't mind instructions saying that the

14   transcript is not the evidence, that the video is the

15   evidence.

16             THE COURT:  Okay.  I can do that.  The transcript

17   is on the video there.

18             MS. PAYERLE:  Right, subtitles on the video.

19             THE COURT:  Okay.

20             MR. FERGUSON:  What's the instruction, that they

21   are to take -- to hear what they hear and not rely upon the

22   transcript?

23             MS. PAYERLE:  Right.

24             MR. FERGUSON:  That's fine.

25             THE COURT:  Okay.

UNREDACTED TRANSCRIPT

1        MR. FERGUSON:  Thank you, Judge.

2             (End of discussion at sidebar.)

3        THE COURT:  Ladies and gentlemen, it has been

4   brought to my attention that this video -- I don't know if

5   there are any others like this.

6        MS. PAYERLE:  There's maybe one other video.

7        THE COURT:  Okay.  You may see some subtitles

8   down there consistent with what's -- at least allegedly

9   consistent to what's being said.  You can read those if you

10  want, but the evidence is what you hear, the exchange between

11  with whomever is on the video, so keep that in mind as we go

12  along.  The evidence is the actual video communications

13  therein.  Any subtitles may be used to help you understand

14  it, but it is not the evidence.  Okay?

15        MS. PAYERLE:  Judge, there are two more videos

16  with subtitles.  Okay.  So all right.  Let's go ahead and

17  play this exhibit.

18             (The video was played.)

19  BY MS. PAYERLE:

20   Q.   Okay.  Ms. Tripp, beyond that two or so minutes, did

21  you have any further discussion with Mr. Young about your

22  medical care at that visit?

23   A.   No.

24   Q.   And in the end, did he increase your dose of fentanyl?

25   A.   Yes.

**EXAMINATION OF KATIE TRIPP**                              125

1    Q.   And so he didn't explain any risks?

2    A.   No.

3    Q.   Okay.  Had you yet at this point brought in your MRI?

4    A.   No.

5    Q.   Did you ever bring in an MRI?

6    A.   No.

7    Q.   Okay.  In the video, he asked you if you didn't notice

8    a big effect -- sorry.  You told him you didn't notice a big

9    effect of taking the hydrocodone.  Did he ask you if you had

10   taken all of it?

11   A.   No.

12            THE COURT:  All right.  Let's take a look.  I'm

13   going to show you what we've marked as Exhibit 1120.  It's a

14   one-page document.

15   BY MS. PAYERLE:

16   Q.   Is this the prescription you received at that visit?

17   A.   Yes.

18   Q.   Are these the prescriptions, I should say?

19   A.   Yes.

20            MS. PAYERLE:  Move to admit, Your Honor.

21            THE COURT:  That will be 36.

22            (Exhibit 36 marked and received.)

23            MS. PAYERLE:  All right.  And let's go ahead and

24   publish Exhibit 36 and blow that up.  Thank you very much,

25   Ms. Silverberg.

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                     126

1    BY MS. PAYERLE:

2       Q.   And on the left, is this Lortab again, 60 pills?

3       A.   Yes.

4       Q.   And on the right, a fentanyl patch, and what's been

5    scratched out and rewritten there?

6       A.   The 50 micrograms, he increased it to 75.

7       Q.   All right.  And did you go back in September of 2016?

8       A.   Yes, I did.

9       Q.   Did you pay cash for that visit too?

10      A.   I did.

11      Q.   Let's play what's now Exhibit 32, our internal 1124.

12                   (The video was played.)

13   BY MS. PAYERLE:

14      Q.   All right.  Ms. Tripp, did Mr. Young increase your

15   medications again --

16      A.   Yes.

17      Q.   -- on this visit?

18      A.   Yes.

19      Q.   All right.  And I'm getting predictable here.  I'm

20   going to show you what we've marked 1123, a one-page

21   document, two prescriptions.  Are those prescriptions he gave

22   you?

23      A.   Yes, ma'am.

24                   MS. PAYERLE:  And next exhibit?

25                   THE COURT:  That will be 37.

UNREDACTED TRANSCRIPT

**EXAMINATION OF KATIE TRIPP**                                    127

1          (Exhibit 37 marked and received.)

2          MS. PAYERLE:  Let's go ahead and publish 37 to

3   the jury.  Thanks.  And blow them up.

4   BY MS. PAYERLE:

5   Q.   The pane on the left, is that the fentanyl patch still

6   at 75 micrograms?

7   A.   Yes, ma'am.

8   Q.   And on the right, is that Lortab 5?

9   A.   Yes, ma'am.

10  Q.   What's been crossed out and what's replaced?

11  A.   He increased it from 60 to 90 count.

12  Q.   And that's 60 to 90 pills?

13  A.   Yes.

14  Q.   Okay.  All right.  At some point after this September

15  2016 visit, did you message Mr. Young again on that Facebook

16  account that you created?

17  A.   Yes, I did.

18  Q.   All right.  And we're going to go back to Exhibit 27,

19  which was our internal 1109 and look at the second page if

20  there's a second page.  Is that -- is that the message you

21  sent after this visit?

22  A.   Yes, it is.

23  Q.   Okay.  And what did you say in this message to

24  Mr. Young?  You can just read it.

25  A.   Yes.  Hey, I have an appointment with you on

UNREDACTED TRANSCRIPT

 1   October 11th.  I have a girlfriend that wants to see you.

 2   Can she come with me to my appointment?

 3       Q.   And before writing this message to Mr. Young, had you

 4   ever brought a girlfriend with you on a doctor's appointment?

 5       A.   No, I did not.

 6       Q.   What was Mr. Young's response?

 7       A.   Sure.

 8       Q.   All right.  And did you, in fact, go on October 11th

 9   to visit Mr. Young?

10       A.   Yes, I did.

11       Q.   And to the great relief of all of us, is this the last

12   visit involving you?

13       A.   No.

14       Q.   Okay.  But is it the last one we're going to talk

15   about today?

16       A.   Yes.

17       Q.   All right.  That's a good point.  All right.  And did

18   you actually bring another undercover law enforcement agent

19   with you posing as your friend?

20       A.   I did.

21       Q.   All right.  And what was the undercover identity of

22   your law enforcement partner?

23       A.   Kristina Norton.

24       Q.   And it's been a while.  Do you remember her name in

25   real life?

**EXAMINATION OF KATIE TRIPP**
                                                        129

1    A.   Kristina St. Laurent.

2    Q.   And was she also sort of a young woman in her 20s?

3    A.   Yes.

4    Q.   All right.  By the way, I think you said that you --

5    when you first went to fill out paperwork, you said you were

6    from Charlotte, Tennessee; is that right?

7    A.   Yes.

8    Q.   And that's what your ID -- your fake ID represented?

9    A.   Yes.

10   Q.   How far is Charlotte -- how far was that drive from

11   Charlotte, Tennessee, to Jackson?

12   A.   I can't remember off the top of my head, but it was

13   two hours.  I mean, it was a long drive.

14   Q.   Okay.  Has -- did anybody ever ask you why you were

15   coming from nearly two hours away to get controlled

16   substances?

17   A.   I don't believe they asked, more or less just made a

18   comment that that seems to be a common thing for that clinic,

19   that people would drive from all over to come there.

20   Q.   All right.  Did you then have a visit with Mr. Young

21   at this appointment in September?

22   A.   Yes.

23   Q.   And did you and Ms. Norton both pay separately for an

24   appointment with Mr. Young?

25   A.   We did.

1    Q.   Did she pay more than you being her first visit?

2    A.   I believe so, yes.

3    Q.   But you sat in the room together with them?

4    A.   Correct.

5    Q.   All right.  Let's go ahead and play what is now

6    Exhibit 33, it's our internal 1129.  Is this a video from

7    that visit?

8    A.   Yes.

9    Q.   Okay.

10                    (The video was played.)

11   BY MS. PAYERLE:

12   Q.   All right.

13             JUROR:  You said September.  That was October.

14             MR. FERGUSON:  That's right.  The report on the

15   investigation is wrong.

16             THE COURT:  That's what I show, October.

17             MS. PAYERLE:  You show October.  I'm sorry.  What

18   are we looking at?

19             JUROR:  That last video, you said it was

20   September, but we had already seen September.

21             MS. PAYERLE:  I said September, and I should have

22   said October.  I apologize.  Thank you.  I really do

23   appreciate you paying such close attention.  It's getting to

24   the end of the day, and I think my brain is tired.  Thank you

25   so much.  Yes, October.

**EXAMINATION OF KATIE TRIPP**                                    131

1    BY MS. PAYERLE:

2      Q.   That was the October visit for the record?

3      A.   Yes, it was.

4      Q.   Thank you so much.  All right.

5                  MS. PAYERLE:  All right.  Judge, do we want to --

6                  THE COURT:  I was just waiting to see if there

7    are any scripts related to this visit and then we're going to

8    go ahead and break for the evening.

9                  MS. PAYERLE:  Yes, let me put my fingers on those

10   if I can.  Well, there are, Judge, but I'm having a hard time

11   locating them in this pile today.  Would it be possible if we

12   started tomorrow with them?

13                 THE COURT:  Okay.  We'll pick it up in the

14   morning.

15                 MS. PAYERLE:  Thank you, Judge.

16                 THE COURT:  Let me go ahead and close for today,

17   ladies and gentlemen, for quite a bit of proof.  So remember

18   my instructions.  It's more important at this time now that

19   you've heard a lot of locations about clinics and people

20   coming through and things like that.  Don't discuss the case

21   when your families hit you tonight.  Don't discuss it with

22   anyone or allow anyone to discuss it with you.  Remember, no

23   local news because of, you know, some of the -- sometimes

24   things are sensationalized.

25                 We'll pick this up at -- well, I'll say nine

UNREDACTED TRANSCRIPT

| | |
|---|---|
| 1 | o'clock.  We'll probably get started at 9:15.  I just have |
| 2 | one small report in another case I'm having to deal with.  So |
| 3 | try to be in the court -- in the jury room again at nine |
| 4 | o'clock, and we'll pick it up probably around 9:15.  Okay? |
| 5 | Leave your notebooks and don't discuss, and I'll |
| 6 | see you in the morning.  I'm going to go ahead and excuse |
| 7 | you.  Yeah, leave your notebooks here.  Leave them in your |
| 8 | chair. |
| 9 | Are you a law enforcement officer now? |
| 10 | THE WITNESS:  No, sir. |
| 11 | THE COURT:  Ms. Tripp, if you would, please |
| 12 | remember, don't discuss your testimony with anyone overnight. |
| 13 | THE WITNESS:  Yes, sir. |
| 14 | THE COURT:  See you tomorrow.  You can step down. |
| 15 | THE WITNESS:  Thank you. |
| 16 | (Jury out at 5:34 p.m.) |
| 17 | THE COURT:  All right.  We're going to go ahead |
| 18 | and adjourn for the evening.  Give the jurors a few minutes |
| 19 | to clear, if you would, please. |
| 20 | MS. PAYERLE:  If I could advise the Court, part |
| 21 | of the reason for the confusion is we're actually moving a |
| 22 | little faster than we thought we would, just to keep |
| 23 | everybody up to speed on scheduling. |
| 24 | THE COURT:  All right.  That sounds good. |
| 25 | MS. PAYERLE:  Thank you. |

UNREDACTED TRANSCRIPT

1           THE COURT:  Let's go ahead and adjourn for today.

2           (Adjournment.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

134

# C E R T I F I C A T E

I, TINA DuBOSE GIBSON, do hereby certify that the foregoing 133 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the trial held on the 28th day of March, 2023, in the matter of:


UNITED STATES OF AMERICA

vs.

JEFFREY W. YOUNG, JR.


Dated this 29th day of March, 2023.




                    S/Tina DuBose Gibson
                    _____
                    TINA DuBOSE GIBSON, RPR
                    Official Court Reporter
                    United States District Court
                    Western District of Tennessee



UNREDACTED TRANSCRIPT