```
1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TENNESSEE
2                           WESTERN DIVISION
3    _____
                                    )
     UNITED STATES OF AMERICA,       )
4                                    )
          Plaintiff,                 )
5                                    )
     VS.                             ) NO. 1:19-cr-10040-JTF-1
6                                    )
                                     )
7    JEFFREY W. YOUNG, JR,           )
                                     )
8          Defendant.                )
     _____
9
```

10

           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11
                     BEFORE THE
12
           HONORABLE JOHN T. FOWLKES, JR.
13
                  March 29, 2023
14

15

16

17
                   MORNING SESSION
18

19

20

21

22

23
                 LASHAWN MARSHALL, RPR
24               OFFICIAL COURT REPORTER
              167 N. MAIN STREET - SUITE 242
25             MEMPHIS, TENNESSEE  38103


*UNREDACTED TRANSCRIPT*

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4                    MS. KATHERINE PAYERLE
                     MR. ANDREW PENNEBAKER
5                    Assistant United States Attorneys
                     UNITED STATES DEPARTMENT OF JUSTICE
6                    FRAUD SECTION
                     1400 New York Avenue, NW
7                    Washington, DC  20530

8

9    FOR THE DEFENDANT:

10                   MR. CLAIBORNE H. FERGUSON
                     MR. RAMON DAMAS
11                   Attorneys at Law
                     CLAIBORNE FERGUSON LAW FIRM, P.A.
12                   294 Washington Avenue
                     Memphis, Tennessee  38103
13

14

15

16

17

18

19

20

21

22

23

24

25
```

*UNREDACTED TRANSCRIPT*

1                    **W I T N E S S   I N D E X**

2

3    **KATIE TRIPP**
                                                    **PAGE**
4
          CONTINUED DIRECT BY MS. PAYERLE          10
5         CROSS BY MR. DAMAS                        17

6    **ALEXANDER ALPEROVICH**
                                                    **PAGE**
7
          DIRECT BY MS. PAYERLE                     26
8         CROSS BY MR. FERGUSON                     64
          REDIRECT BY MS. PAYERLE                   77
9         RECROSS BY MR. FERGUSON                   79

10   **TRICIA STANSELL**
                                                    **PAGE**
11
          DIRECT BY MR. PENNEBAKER                  82
12        CROSS BY MR. FERGUSON                     92

13   **NATALIE SEABOLT**
                                                    **PAGE**
14
          DIRECT BY MS. PAYERLE                    104

15

16

17

18

19

20

21

22

23

24

25

1                      E X H I B I T   I N D E X

2        MARKED                                                PAGE

3        EXHIBIT NO. 38                                          13

4        EXHIBIT NO. 39                                          13

5        EXHIBIT NO. 40                                          75

6        EXHIBIT NO. 41                                         113

7        EXHIBIT NO. 42                                         120

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              WEDNESDAY

 2                           MARCH 29, 2023

 3

 4                    ************************

 5

 6          THE COURT:  Okay.  Good morning, everyone.  I

 7   think we're just about ready to get back to the trial.

 8   Before we do that, just a minor matter that I want to go

 9   ahead and put on the record.  One of our jurors, Marcie

10   Draper, who I believe is in Seat Number 7, wrote a note;

11   gave it to our court security officer who gave it to me

12   about a contact with a court reporter.  Just want to read

13   it into the record.  I don't think anything -- I don't

14   think there's anything that we need to follow up.  She

15   handled as we have directed.

16          And I'll just read it into the record:  Judge

17   Fowlkes, this morning I parked next to a women, and we

18   talked -- I'm sorry -- walked together to the federal

19   building.  She disclosed to me that she was a reporter

20   from Jackson.  Before that, she asked me my name, and I

21   told her.  Then she told me she was a reporter.

22   Conversation stopped by me.  She does not know anything

23   but my name.

24          And it's signed Marcie Draper.  Any comments

25   from either side?
```

*UNREDACTED TRANSCRIPT*

```
 1              MS. PAYERLE:  No, Your Honor, not from the
 2   government.
 3              MR. FERGUSON:  I would just -- if she was
 4   talking to a reporter, I would just like if she would say
 5   on the record that she didn't disclose any information in
 6   the case.  I don't think it's -- really matters, but it
 7   does seem like it could be something that in the future
 8   might need to have some record of in case it became an
 9   issue.
10              THE COURT:  That's why I'm putting it on the
11   record now.  When she's brought in, I'm going to tell her
12   thank you for giving us the note.  She's indicated that
13   she didn't disclose anything about the case, just her
14   name, and then I'll just quickly follow up with that.
15              MR. FERGUSON:  That sounds great.  We'd
16   appreciate that, Your Honor.
17              THE COURT:  All right.
18              MR. FERGUSON:  Thank you.
19              THE COURT:  Anything else before get back to the
20   jury?
21              MR. FERGUSON:  No, Your Honor.
22              MS. PAYERLE:  No, Your Honor.
23              THE COURT:  All right.  And I think we need our
24   witness to come back forward, if you would, please.
25              (The witness complies with the request.)
```

*UNREDACTED TRANSCRIPT*

1           **THE COURT:**  Is it Tripp or Scott?

2           **THE WITNESS:**  Tripp.

3           **THE COURT:**  Okay.  Go ahead and take a seat

4   here, if you would.

5           (The witness complies with the request.)

6           **THE COURT:**  And bring in the jurors.

7           (Jury in at 9:33 a.m.)

8           **THE COURT:**  Okay.  Ladies and gentlemen, hope

9   you had a good evening last night.  You're recharged and

10  ready to go.  All right.

11          Before we get back to the proof, I think you see

12  our witness is in place and ready to go.  Just a brief

13  matter I want to discuss with Ms. Draper.

14          Ms. Draper?

15          **THE JUROR:**  Yes, sir.

16          **THE COURT:**  Okay.  You wrote a note about

17  contact with a court reporter.  I don't think she's

18  working on this case.

19          **THE JUROR:**  Okay.

20          **THE COURT:**  Okay.  We have the two.  Of course,

21  we have Ms. Marshall who's here and then another one that

22  comes in, in the afternoon.  But the -- the note that you

23  gave me indicates that, really, y'all were just

24  exchanging names, and there was no discussion about what

25  you were doing or anything like that.

*UNREDACTED TRANSCRIPT*

1      **THE JUROR:**  No, sir.  As soon as this person

2  disclosed that they were a reporter from Jackson.

3      **THE COURT:**  Yes.

4      **THE JUROR:**  And all -- and all that I said was

5  my name.

6      **THE COURT:**  Okay.  Did you have the juror

7  sticker on when you were walking in?

8      **THE JUROR:**  I did not.

9      **THE COURT:**  Okay.  But you've got it on now?

10      **THE JUROR:**  Yes.  Correct.

11      **THE COURT:**  All right.  Well, appreciate it.

12      **THE JUROR:**  Just wanted to be up front and . . .

13      **THE COURT:**  Okay.  I don't think it's going to

14  influence your decision one way or the other.

15      **THE JUROR:**  No.

16      **THE COURT:**  There was basically no

17  communication?

18      **THE JUROR:**  Correct.

19      **THE COURT:**  Appreciate you letting me know.

20  Thank you.

21      **THE JUROR:**  You're welcome.

22      **THE COURT:**  All right.

23      **MR. PENNEBAKER:**  And Your Honor, just to make

24  that the -- that the record is clear, Your Honor said a

25  court reporter.  It sounds like it's a media reporter --

1          **THE JUROR:**  Correct.

2          **MR. PENNEBAKER:**  -- from Jackson, Tennessee, and

3   I wanted to --

4          **THE COURT:**  I did say court reporter, and it

5   says here she was a reporter from Jackson, Tennessee.

6          It wasn't a court reporter, then?

7          **THE JUROR:**  No.  No.

8          **THE COURT:**  Okay.  But a --

9          **THE JUROR:**  Not that I believe.

10          **THE COURT:**  -- a newspaper or media reporter?

11          **THE JUROR:**  Her exact words were a reporter from

12   Jackson.

13          **THE COURT:**  Okay.  After that?

14          **THE JUROR:**  I didn't ask her any questions.

15          **THE COURT:**  All right.  And so that individual

16   doesn't even know whether you're a -- on a jury?

17          **THE JUROR:**  No.

18          **THE COURT:**  Okay.  Thank you.

19          **MR. PENNEBAKER:**  Thank you, Your Honor.

20          **THE COURT:**  All right.

21          **MR. FERGUSON:**  Thank you.

22          **THE COURT:**  That being said, unless there's

23   anything else on that, let's go ahead and proceed.

24          Government, you may proceed.

25          **MS. PAYERLE:**  Thank you, Judge.

*UNREDACTED TRANSCRIPT*

1          **KATIE TRIPP,**

2    having been PREVIOUSLY duly sworn, was examined and

3    testified as follows:

4          **CONTINUED DIRECT EXAMINATION**

5    **BY MS. PAYERLE:**

6    Q.    Okay.  Good morning, Ms. Tripp.

7    A.    Good morning.

8    Q.    Okay.  At the end of the day yesterday, we had

9    watched a video in which you and an undercover going by

10   the name of Christina Norton were in a doctor visit or a

11   patient visit with Mr. Young.

12   A.    Uh-huh.

13   Q.    And I have a few questions about that video.

14         During the video, Ms. Norton referenced tabs.  What

15   are tabs?

16   A.    Lortabs.

17   Q.    And where is that word "tabs" used?

18   A.    Street.  Street lingo.

19   Q.    Okay.  And in the -- we saw in the video Mr. Young

20   touch, I believe, somebody.  Who was that?  Was that you

21   or Ms. Norton?

22   A.    Ms. Norton.

23   Q.    And did she, during that touching exchange, wince

24   or express any sort of facial expression to indicate that

25   she was feeling pain when he touched her?

1   A.    No, she did not.

2   Q.    At any time during that visit, did either one of

3   you kind of put on facial expressions or limp in a way

4   that you would indicate that you were feeling or

5   experiencing pain?

6   A.    No.

7   Q.    And, in fact, at the beginning of the video, I

8   think somebody stood up and walked across the room.  Who

9   was that?

10  A.    Christina.  She was in his seat.

11  Q.    Okay.  And so when she stood up from his seat and

12  moved to the other seat, did she move normally?

13  A.    Correct, she did.

14  Q.    All right.  Did Mr. Young react to this use -- her

15  use of street lingo for Lortabs?

16  A.    He understood what she meant.

17  Q.    Okay.  But did he react in any other way?

18  A.    No.

19  Q.    Ms. Norton also discussed that she, quote, smoked

20  some to relieve the symptoms.  Did Mr. Young advise

21  against this?

22  A.    No.

23  Q.    Did Mr. Young, at that time or at all -- well,

24  during the video, Mr. Young invites the two of you to a

25  party at his house.  Do you remember that?

```
 1   A.    Yes.

 2   Q.    At any time did he tell you that if you attend his

 3   party, you shouldn't drink alcohol while taking the drugs

 4   that he's prescribed you?

 5   A.    Can you repeat that?

 6   Q.    Yeah, that was a terrible question.  Sorry.

 7         At any time did he warn you, hey, you know, if you

 8   come to my party, because I've prescribed you these

 9   drugs, you shouldn't drink any alcohol at all?

10   A.    No, he did not.

11   Q.    Okay.  Did he, in fact, tell you you should fit in

12   at the party?

13   A.    Yes.

14   Q.    Okay.  I'm going to -- and did you and Ms. Norton

15   both get a prescription for -- and I'm using "Ms. Norton"

16   understanding that's her undercover name, right?

17   A.    Correct.

18   Q.    Okay.  Did you and Ms. Norton both get a

19   prescription from Mr. Young at this visit?

20   A.    Yes, we did.

21   Q.    Okay.  I'm going to show you, I believe, two

22   exhibits.  The first one -- see, is -- Okay.  Here we go.

23   It's a one-page exhibit with two prescriptions made out

24   to Katie Crowder.  Is that the prescription you received?

25             (A document was passed to the witness.)
```

1    A.    Yes, it is.

2              **MS. PAYERLE:**  Move to admit, Your Honor.

3              **THE COURT:**  We'll go ahead and receive it.

4    Exhibit, should be 38.

5              (The above-mentioned item was marked as

6    Exhibit No. 38.)

7    **BY MS. PAYERLE:**

8    Q.    And the second document I'm going to show you is

9    two pages.  Is this the prescription and an order for

10   imaging that Ms. Norton received?

11             (A document was passed to the witness.)

12   A.    Yes, it is.

13             **MS. PAYERLE:**  Okay.  Move to admit.

14             **THE COURT:**  That'll be 39.

15             (The above-mentioned item was marked as

16   Exhibit No. 39.)

17             **MS. PAYERLE:**  Okay.  Let's first put up --

18   actually either one of them.  Either -- let's see -- 1128

19   or 11 (indiscernible).

20             **THE COURT REPORTER:**  Excuse me?

21             **MS. PAYERLE:**  1128 or 1128-A.

22             Okay.  And I believe we're looking at -- what

23   are the two numbers?  38 and 39?

24             **CASE MANAGER:**  Correct.

25             **MS. PAYERLE:**  I believe we're looking at 38.

1    BY MS. PAYERLE:

2    Q.    Okay.  What are we looking at here at Exhibit 38?

3    A.    Prescriptions that was written to me.

4    Q.    And what were those prescriptions for?

5    A.    Lortab, 90 for 30 days, and fentanyl patches, 75

6    micrograms.

7    Q.    Okay.  A pack of 10; is that right?

8    A.    Yes.

9    Q.    And is there a receipt on this page as well?

10   A.    Yes.

11   Q.    And did you pay cash for that visit?

12   A.    I did.

13   Q.    And then there's another appointment.  It says

14   November 15th at 1:00.  So you also set up the next

15   follow-up appointment?

16   A.    Correct.

17   Q.    At any point during this visit, sort of when you

18   were setting up the next appointment, did -- was there an

19   irregularity with the way that either you or Ms. Norton

20   was categorized as patients?

21   A.    Yes, there was.

22   Q.    Could you explain that to the jury?

23   A.    Sure.  So I was listed as a pain patient at the

24   clinic.  Christina Norton, when she was in there --

25   there's a threshold that they had to, I guess, abide by.

1  You can only have a certain amount of pain patients

2  versus weight loss patients.  And if you're over, I think

3  it's 50 percent, you're considered a pain clinic.  So he

4  was not considered a pain clinic at that time, nor did,

5  you know, want to be.  There's regulations and laws

6  involved with that.  So he put her as a weight loss

7  patient.

8  Q.    Did she receive any weight loss drugs during your

9  visit?

10  A.    She did not.

11  Q.    What is -- is she overweight?

12  A.    Not at all.

13  Q.    Okay.

14        **MS. PAYERLE:**  Let me take a look, if we could,

15  Ms. Silverberg, at Exhibit 38, which is 11 --

16        **MS. SILVERBERG:**  This is the -- okay.  It's 39.

17        **MS. PAYERLE:**  Oh, it's 39.  Okay.  1128-A.

18  **BY MS. PAYERLE:**

19  Q.    And what are we looking at here?  This is the first

20  page.  Is that an order for an imaging of some kind?

21  A.    It is.

22  Q.    Did Mr. Young ask Christina Norton to get imaging

23  or to order her imaging?

24  A.    Yes.

25  Q.    Okay.  And let's back out of that and look at the

1  second page.

2          **MS. SILVERBERG:**  Still going.

3          **MS. PAYERLE:**  Wait one second.  It will

4  cooperate with us.

5          There they are.

6  **BY MS. PAYERLE:**

7  Q.    All right.  And what are we looking at here?

8  A.    Christina Norton's prescriptions for oxycodone, and

9  I guess that looks like baclofen.

10  Q.    All right.  Okay.

11          **MS. PAYERLE:**  Thank you.  You can pull that

12  down.

13  **BY MS. PAYERLE:**

14  Q.    Okay.  Now, we've gone through, I believe, five --

15  well, six -- maybe six or seven office visits that you

16  had with Mr. Young.  And so I want to ask you some

17  questions collectively about all five of these visits,

18  okay, just to make sure we're clear.

19          In any of these five visits, did Mr. Young or

20  anybody at the clinic ask you if you had any history of

21  substance abuse issues?

22  A.    No.

23  Q.    Did Mr. Young or his staff suggest to you any

24  alternatives to opioids, like Motrin or ibuprofen or some

25  other pharmaceutical solution to your pain?

```
 1   A.    No.

 2   Q.    Did he suggest physical therapy or exercise as a

 3   remedy to your pain?

 4   A.    No.

 5   Q.    Did he suggest that you should consult with a pain

 6   management specialist, rather, when he gave you two kinds

 7   of opioids?

 8   A.    No.

 9   Q.    And he did give you two kinds of opioids?

10   A.    Correct.

11   Q.    In these five visits, did Mr. Young or any of his

12   staff perform a physical examination of you?

13   A.    No.

14   Q.    Given the sort of increasing doses of opioids he

15   gave you, did he ever warn you of the dangers of

16   dependence or addiction on these drugs?

17   A.    No.

18         MS. PAYERLE:  Just a moment, please.

19         Your Honor, we pass the witness.

20         THE COURT:  All right.  Thank you.

21         Mr. Ferguson, any cross?

22         MR. FERGUSON:  Mr. Damas will be doing it.

23         THE COURT:  Mr. Damas, you may proceed.

24                     CROSS-EXAMINATION

25   BY MR. DAMAS:
```

1    Q.    Good morning, Ms. Tripp.

2    A.    Good morning.

3    Q.    How are you?

4    A.    Good.

5    Q.    Just a few questions.

6          So let's go back to your very first visit at

7    Preventagenix.  I believe that happened on May 4th of

8    2016; is that correct?

9    A.    It was either April or May.

10   Q.    And at that first, that's --

11   A.    Well, for first visit where I was seen as a patient

12   was in May, yes.

13   Q.    And that's when you met with Ms. Downing

14   (phonetic) --

15   A.    Correct.

16   Q.    -- correct?  Right.

17         Do you remember during that first visit filling

18   out -- and I believe you testified to this, that you

19   filled out, like, an intake sheet and the normal

20   procedural things --

21   A.    Normal paperwork, that's correct.

22   Q.    -- that you do for the paperwork.

23         Do you remember telling them that one of the

24   reasons you were there was you were having lower back

25   pain?

1    A.    Yes.

2    Q.    And you remember that the reason you were having

3    lower back, you explained to them, was because you had

4    been waitressing for several years, and you believe that

5    was the cause of your lower back pain?

6    A.    Yes.

7    Q.    And when you met with Ms. Downing, I believe you

8    just testified that nobody at Preventagenix gave you any

9    sort of plan or treatment options that did not include

10   opioids; is that correct?

11   A.    That involved Jeff Young.

12   Q.    Well, Jeff Young is the owner and operator of

13   Preventagenix, correct?

14   A.    Uh-huh.

15   Q.    And anything that happens in his clinic, that's

16   imputed to him, correct?

17   A.    Correct.

18   Q.    And so, in fact, on May 4th of 2016, after you had

19   met with Ms. Downing, they had prescribed to you

20   non-opioids to treat your back pain, correct?

21   A.    Correct, tramadol.

22   Q.    Tramadol and, like, I believe a muscle relaxer,

23   correct?

24   A.    Correct.

25   Q.    And after that visit, that's when you contact

1    Mr. Young through Facebook and essentially tell him you

2    didn't like the bedside manner, and you wanted to see him

3    personally?

4    A.    Correct.

5    Q.    Correct?

6          And it's at the second visit Mr. Young comes and

7    see you.  And I believe it's shown on the video; he has

8    his file in his hands?

9    A.    I believe so.

10   Q.    Correct?

11         And you have no reason to disbelieve that he didn't

12   review that file before meeting with you?

13   A.    I'm not sure.

14   Q.    And he talked to you, and he asked you, you're

15   having low back pain, correct?

16   A.    I believe the first words out of his mouth was, "So

17   the tramadol didn't work out for you?"

18   Q.    And that would indicate that he had reviewed your

19   file?

20   A.    Or that he was referring to the Facebook message

21   that I had sent him saying that the medication didn't

22   work.

23   Q.    And --

24   A.    And that I didn't feel it.

25   Q.    He wouldn't know what the medication was unless he

1    reviewed your file, right?

2    A.    That's correct.

3    Q.    Correct.

4          And so he asked you, the medication's not working.

5    And that's when you indicate to him that you didn't take

6    it because you couldn't afford it?

7    A.    That's correct.

8    Q.    Correct?

9          And you, in fact, told him, I've taken something

10   else that has helped.  Can I try that?

11   A.    Correct.

12   Q.    Correct?

13         And that's when he prescribes the opioid.  You have

14   a conversation about what was working for you, and he --

15   he makes that judgment to prescribe you that medication,

16   correct?

17   A.    Yes.  I told him that I had tried it before, and I

18   knew I wasn't supposed to, but I did.

19   Q.    Okay.  And he told you you needed to get him a copy

20   of your MRI?

21   A.    Yes.  Asked if I had one.

22   Q.    Okay.  Now, I believe you testified yesterday that

23   this was all part of the sheriff's office investigation

24   into Mr. Young.  Or what started the investigation?

25   A.    I'm not sure.  I wasn't the case agent.  I was

 1   called to work undercover for the case.

 2   Q.    Okay.  Do you remember why specifically you were

 3   chosen to work the case?

 4   A.    No.  I was just told they needed a female

 5   undercover.

 6   Q.    A female undercover?

 7   A.    Uh-huh.

 8   Q.    Did they explain to you at any -- at any point that

 9   the reason they needed a female undercover was because

10   you matched descriptions of what you'd consider

11   Mr. Young's type?

12   A.    I wouldn't say matched descriptions, more or less

13   just the clientele that frequented the clinic.

14   Q.    Young, female, attractive, correct?

15   A.    Those words were never used when asked if I wanted

16   to be the undercover.  They just said they needed a

17   female undercover.

18   Q.    Okay.  You just testified that Mr. Young invited

19   you to his Halloween party, correct?

20   A.    It was a conversation, and it was implied, Come on

21   over.

22   Q.    Did he --

23   A.    Not a formal invite, if that's what you're asking.

24   Q.    Did he ever give you an address or a date for the

25   party?

1    A.    No.  Well, day of the party, yes, Halloween.

2    Q.    Is it possible that Halloween parties are held on

3    days not on Halloween?

4    A.    True.

5    Q.    But he didn't tell you specifically it's happening

6    on Halloween?

7    A.    He did not.

8    Q.    Okay.  We've talked about five visits, but there

9    was more visits than that, correct?

10   A.    A few.

11   Q.    During any of these visits, did Mr. Young ever

12   attempt to have sex with you?

13   A.    No.

14   Q.    Did he ever proposition having a sexual

15   relationship of any kind --

16   A.    No.

17   Q.    -- with you?

18        Did he ever proposition sex or any type of

19   relationship with Ms. Norton?

20   A.    No.

21   Q.    No.

22        **MR. DAMAS:**  That is all.  Thank you, Your Honor.

23        **THE COURT:**  Thank you.

24        Is there any redirect?

25        **MS. PAYERLE:**  No, Your Honor.

1              **THE COURT:**  Okay.  Ms. Tripp, thank you very

2      much.  You can step down.  You're excused.

3              **THE WITNESS:**  Thank you.

4              (Witness excused)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  And if you would, please call your

2     next witness.

3          **MS. PAYERLE:**  Thank you.  The United States

4     calls Dr. Alexander Alperovich.

5          **THE COURT:**  All right.  Good morning.  I need

6     for you to come forward.

7          Okay.  You're good right there.

8          If you would, please, raise your right hand to

9     receive the oath.

10          (The witness was duly sworn.)

11          **THE WITNESS:**  Yes, I do.

12          **THE COURT:**  Be seated right here, if you would,

13     please.

14

15

16

17

18

19

20

21

22

23

24

25

*UNREDACTED TRANSCRIPT*

1              **ALEXANDER ALPEROVICH,**

2    having been first duly sworn, was examined and testified

3    as follows:

4                   **DIRECT EXAMINATION**

5    **BY MS. PAYERLE:**

6    Q.    Good morning, Doctor?

7    A.    Good morning.

8    Q.    Would you please introduce yourself to the jury,

9    your name and your current occupation?

10   A.    I'm Alexander Alperovich.  I'm a cardiologist.

11            **THE COURT:**  Okay.  Going to need for you to move

12   that microphone over just a little bit and --

13            **THE WITNESS:**  My name is Alexander Alperovich,

14   and I'm a cardiologist.

15            **THE COURT:**  Spell that last name for us, please.

16            **THE WITNESS:**  A-L-P-E-R-O-V-I-C-H.

17   **BY MS. PAYERLE:**

18   Q.    And Dr. Alperovich, do you know the defendant

19   Mr. Jeffrey Young?

20   A.    I do.

21   Q.    What was your professional relationship with

22   Mr. Young in the early part of 2016?

23   A.    I was his supervising physician.

24   Q.    And could you explain to the jury what you mean by

25   a "supervising physician"?

1    A.    I was hired by Jeff Young to do the supervision of

2    his medical practice, which means reviewing the charts

3    for the appropriateness of treatment of his patients or

4    the diagnostic workup, appropriateness of prescriptions,

5    and that documentation is proper.

6    Q.    And did -- why did Mr. Young need a supervising

7    physician?

8    A.    According to the Tennessee state laws, nurse

9    practitioners have to have a supervising physician to

10   supervise their practice.

11   Q.    But even with supervision or, I guess, with

12   supervision, can nurse practitioners prescribe controlled

13   substances?

14   A.    Nurse practitioner can prescribe controlled

15   substances independently; however, the supervising

16   physician has to review them and sign for the chart every

17   30 days and be aware every 10 days.

18   Q.    All right.  So I like to kind of rewind and talk

19   about the beginning of when you first sort of started

20   considering becoming Mr. Young's supervising physician.

21   When was that?

22   A.    It was in October of 2015, early November of 2015.

23   Q.    And how did you get -- kind of linked up with

24   Mr. Young?

25   A.    I knew Mr. Young prior, from his previous practice.

1    And the -- his office manager at the time, Kristie

2    Gutgsell, was my neighbor near the house, and she was

3    friends with my wife.  Our kids played together.  And

4    that's -- Kristie asked my wife if I'm interested to

5    supervise Mr. Young.

6    Q.    And you said you're a cardiologist.  Do you have

7    any other specialties besides cardiology?

8    A.    For the last 20-something years, I'm practicing

9    only cardiology.

10   Q.    Only cardiology.

11         So have you ever practiced as a pain management

12   specialist?

13   A.    I never specifically practiced pain management.

14   Q.    Okay.  Were you an internist for a while?

15   A.    I was an internist for a while.  The first part of

16   my medical career in the Soviet Union I was internist.

17   And then the United States, I went internal medicine

18   residency and got board certified in internal medicine.

19   Q.    But never pain management?

20   A.    Never pain management.

21   Q.    Okay.  What was your first -- can you remember the

22   first conversation -- describe how it took place with

23   Mr. Young in which you sort of discussed what it is that

24   you would be doing.  In other words, what it is that you

25   could expect from being his supervising physician.  When

1   was that?

2   A.    We met for the dinner in Memphis, and the -- at

3   that time, my wife and his girlfriend was there, too.

4   And during the dinner we talked about the -- his practice

5   and what the expectations are.  And --

6   Q.    If I can ask you, sorry.  You said Mr. Young

7   brought a girlfriend?

8   A.    Yes.

9   Q.    And what -- what did she look like?

10        I mean, how old was she?

11  A.    I think she was about late 20s, tall, attractive

12  human -- a woman, I'm sorry -- and the -- she didn't

13  participate much in conversation.  I think she had too

14  many drinks that night.

15  Q.    Okay.  And during that conversation, did Mr. Young

16  tell you anything about what kind of practice he was

17  running at Preventagenix?

18  A.    From his conversation with me, I understood that

19  his practice was focused on the -- a lot of cardiology,

20  preventive cardiology, and with some family practice

21  medicine.

22        A lot of patients -- he was -- prior to that, he

23  was working in the other well-known cardiologist in town

24  as his nurse practitioner for many years and had a large

25  patient base who apparently, as I understood from his

1    conversation, followed him.  And he was taking care of

2    the cardiovascular needs and also had some family

3    practice -- general family practice medicine, which

4    includes common colds and school exams, evaluations and

5    stuff like that, and whatever comes along with that,

6    maybe occasional pain management.  But more or less, kind

7    of a family practice.

8    Q.    When you say preventative cardiology, can you

9    explain to the jury, kind of day in and day out, what

10   does a preventative cardiology practice -- what did that

11   mean to you when you heard preventative cardiology?

12   A.    Preventive cardiology means that patients who have

13   risk factors for coronary disease or other cardiac

14   disease, require management or who had already cardiac

15   event like heart attacks, require aggressive management

16   of the risk factors.  It's like high cholesterol,

17   diabetes, high blood pressure, tobacco smoking,

18   behavioral changes, the -- in order to prevent future

19   events.  Weight control and stuff like that.  So the --

20   that's the preventive part of a cardiology.

21   Q.    And so when Mr. Young told you that half of his

22   clinic was devoted to preventative cardiology, what kind

23   of medicines would you -- did you expect that he would be

24   prescribing in that heading?

25   A.    I would envision that the -- be cholesterol

1    lowering medications, blood pressure medications,

2    diabetes medications, maybe weight management

3    medications, sometimes blood thinners, that type of --

4    Q.    You said blood thinners?

5    A.    Yeah.

6    Q.    Okay.  And what about the tests that you would

7    expect him to order in a sort of half-preventative

8    cardiology practice?  What kind of tests would he be

9    ordering?

10   A.    We do blood testing.  Sometimes we'll call

11   functional testing, ultrasound of the heart,

12   echocardiography, stress test, maybe read the monitoring

13   devices, stuff like that.

14   Q.    And then as a -- sort of in the preventative

15   cardiology practice, what would be your -- what was your

16   expectation about sort of the -- your business interest?

17   What would you get out of working with Mr. Young doing

18   the preventative cardiology practice?

19   A.    Well, this patients -- and many times things

20   develop, and they need a high level of care.  They need

21   specialized testing, either noninvasive like ultrasound

22   or invasive, going to the cath lab and doing invasive

23   evaluation, or maybe further workup and referring to

24   surgical colleagues to do the open heart and stuff like

25   that.  So for this role, then cardiologist comes in.

*TESTIMONY OF ALEXANDER ALPEROVICH*                                              32

1          From my side, I felt that some patients who need

2     this type of work could be better addressed by somebody

3     experienced in managing risk factors like cholesterol and

4     educational activities and the type control of the

5     abnormalities in the blood.

6     Q.    And so was it you hope that Mr. Young, if he came

7     across a -- sort of a "higher level of care" patient,

8     that he would refer those to you, a cardiologist?

9     A.    Yes, indeed.

10    Q.    Okay.  And that would generate business for your

11    clinic?

12    A.    Right.  It would increase my volume of patient I

13    see and make me busy, and obviously there was business

14    interest in it.

15    Q.    Okay.  And would it be possible, for example, to do

16    the cardiovascular preventative medicine that Mr. Young

17    described to you at that first dinner?  Would it be

18    possible to do that kind of medicine without ever

19    prescribing a controlled substance?

20    A.    Absolutely.

21    Q.    Are these blood thinners, cholesterol medicine,

22    diabetes medicine -- are these drugs that you just

23    described to the jury for preventative cardiology, or are

24    those controlled substances?

25    A.    They're prescribed and require prescription, but

1    they're not controlled, no.

2    Q.    Okay.  So there's a distinction?

3    A.    Right.

4    Q.    Okay.  Okay.  So that was half of what he told you

5    he was doing?

6    A.    Right.

7    Q.    The other half he told you was family medicine?

8    A.    Right.

9    Q.    And can you describe to the jury what you

10   understood him to mean when he said he was running a

11   family medicine practice?

12   A.    As I understood, family medicine would be --

13   address issues like chronic lung disease, maybe some

14   gastroenterologist stuff like peptic (indiscernible) --

15          **THE COURT REPORTER:**  Like what?

16   A.    Peptic ulcer disease, for example.

17   **BY MS. PAYERLE:**

18   Q.    Peptic ulcer; is that --

19   A.    Right.

20   Q.    Okay.

21   A.    I'm sorry.

22   Q.    That's okay.

23   A.    It's my accent, I guess.

24          I gastroesophageal reflux disease.  I mean, was an

25   example I'm saying.  And requiring management, follow-up.

1    It could be some also pains, joint pains, back pains, and

2    stuff like that, school physicals for the kids or the --

3    some young adults, some vaccinations or whatever people

4    need, maybe Pap smears for women, some women health,

5    like, stuff, you know, pelvic pains and stuff, arthritis.

6    That's kind of I envision.

7    Q.   Did you feel that your previous experience as an

8    internist would allow you to be a good supervisor for the

9    family practice side?

10   A.   Right.

11   Q.   Okay.  Given what he told you at dinner, did you

12   come away with some sense of what percentage of his

13   practice was devoted to prescribing narcotics?

14   A.   As I understood, it was some part but a very small

15   part of the practice which would require controlled

16   substance management.

17   Q.   Okay.  And that was at the end of 2015 you had this

18   dinner; is that right?

19   A.   Right, in November of 2015.

20   Q.   So as a result of this conversation with Mr. Young,

21   did you agree to be his supervising physician?

22   A.   Right.  I agreed, with one caveat:  that I have to

23   check with my attorney.  Can I do it?

24   Q.   Okay.

25   A.   And given the fact that information is at least how

1   we practice or -- so it's cardiovascular medicine.

2   Because in -- I understood at the time that I'm not

3   family practitioner, and if it's completely do with

4   family practice, I will stay away from that.

5   Q.    Okay.  And so did you, at some point, try to

6   formalize this agreement with a contract?

7   A.    Right, I did.

8   Q.    How long did it take?

9         I guess, were there any delays in getting this

10  contract formalized?

11  A.    Oh, it took me probably three weeks, four weeks to

12  get the contract in my hands.

13  Q.    Okay.  And how about to get Mr. Young's signature

14  on it?  How long did that take?  Is that -- is that what

15  you're saying?

16  A.    No.  His signature took some delay of some -- I

17  don't know what the reason was.  Until mid January he

18  didn't sign the contract.

19  Q.    Okay.  So you were asking him to, and he didn't?

20  A.    Right.

21  Q.    I see.

22        Okay.  So in mid January, he signs the contract.

23  Did -- when was the first time you had a chance to sort

24  of look under the hood at Preventagenix, to actually see

25  what he was doing there?

1   A.    First time I was in his clinic was in beginning of

2   February of 2016.

3   Q.    Of 2016.

4         And when you got to his clinic, did the reality

5   match his pitch to you at dinner that it was mostly a

6   cardiology and family medicine practice?

7   A.    No, it did not.

8   Q.    Before you went to the clinic to look at his charts

9   in February, had you heard any rumors or learned anything

10  kind of through the grapevine about Mr. Young's

11  prescribing?

12  A.    I got a couple of notices that people told me that

13  somebody sent an e-mail to their office.

14        **MR. DAMAS:**  Object to hearsay at this time.

15        **MS. PAYERLE:**  And --

16        **THE COURT:**  Need to lay a better foundation of

17  what we're talking about and that -- whether or not

18  there's any hearsay, we'll be able to rule on that.

19        **MS. PAYERLE:**  Will do, Your Honor.

20  **BY MS. PAYERLE:**

21  Q.    Actually -- and so before you tell me what you

22  heard, you said you did hear rumors?

23  A.    Right.

24  Q.    Did you address those rumors to Mr. Young?  Did

25  you -- did you tell -- ask him about those rumors?

1   A.    I did not ask him.

2   Q.    You did not ask him.  Okay.  So I'm sorry.  Then

3   I'll move on.

4         When you -- so you went to his office in February

5   of 2016.  And when you -- I guess describe for us that

6   visit.  When did you go, and who was there?

7   A.    It was the beginning of first week of February.  I

8   went to his office.  It was after hours, sometime after

9   5:00, right around there.  And the -- he was there.  And

10  there were the charts waiting for me.  And I was in his

11  office reviewing the charts, and he was nearby.

12  Q.    And what did you -- sort of, did you have a general

13  impression of the charts?  Was there anything that struck

14  you immediately?

15  A.    It did.  There were -- there were the

16  handwriting -- handwritten charts in the physician part,

17  the -- the provider part.  The -- extremely brief, like

18  parts of a complaints or history of present illness.  It

19  was -- that's a normal parts of the chart.  They were

20  abbreviated to a couple words.  Physical exams were many

21  times just a cross through the preprinted normal --

22            **THE COURT REPORTER:  Cross?**

23  A.    Preprinted form, like a template.

24  **BY MS. PAYERLE:**

25  Q.    Preprinted, I think.

1   A.    Preprinted, yeah

2   Q.    Preprinted template --

3   A.    Right.

4   Q.    -- form?

5         Okay.  And it was, you said, crossed through?

6   A.    Right, like normal.

7   Q.    Okay.  So I see.  There was a line through?

8   A.    Right.

9   Q.    Like these are all normal?

10  A.    Yes.

11  Q.    And did that strike you as strange?

12  A.    Yes.

13  Q.    And why was that?

14  A.    Well, it's not normally how we do the charts.

15  The -- usually these -- certain verbiage has to be put in

16  and the explaining why I decided to do this diagnostic

17  workup or prescribe this certain medication.  And it has

18  to flow.  It has to coincide that -- for example, I'll

19  take the -- on a simple part, let's say I take an inhaler

20  because I'm wheezing.  So I have to describe the wheezing

21  in the heart, wheezing in the lungs.  So I give you an

22  inhaler, and you have a history of asthma.  That's an

23  example.

24  Q.    And that's -- so that's true even for asthma

25  medicine --

*UNREDACTED TRANSCRIPT*

*TESTIMONY OF ALEXANDER ALPEROVICH*

1   A.    Absolutely.

2   Q.    -- or any kind of prescription?

3   A.    Yes, indeed.

4   Q.    Okay.  Did you -- about what percentage of the

5   patients you looked at that day were, in fact,

6   prescribed -- had Mr. Young prescribed controlled

7   substances to?

8   A.    Well, the -- most of the charts.  Probably a couple

9   only which were not controlled.

10  Q.    And did that surprise you?

11  A.    It did.

12  Q.    Why was that?

13  A.    Because our conversation, when we met, was -- give

14  me a very different impression.  And the -- I felt like

15  I'm kind of a switch and bait.

16  Q.    Bait, switch maybe.

17  A.    Bait and switch.

18  Q.    Okay.  And actually one other question:  Did --

19  when you got there, did he offer you anything?

20  A.    He actually offered me a drink, yes.

21  Q.    Okay.  Did you take it?

22  A.    No.

23  Q.    All right.  About how many charts did you review on

24  that visit?

25  A.    Somewhere around 50, I guess.

1   Q.    Okay.  Once you got passed your surprise that --

2   this was around 50, you said?

3   A.    Right.

4   Q.    Once you got passed your surprise that this was

5   mostly controlled substances he was prescribing, what was

6   your impression of sort of reorient yourself to now you

7   know he's prescribing controlled substances?  In that

8   context, what was your impression of the charts now

9   knowing they were controlled substances?

10  A.    Well, the controlled substances are very regulated,

11  and there are certain rules to -- needs to be followed.

12  And -- and I felt it definitely doesn't fit that.  And

13  the -- so when I was reviewing, I asked those questions.

14  Q.    And actually before we even get to those questions,

15  did you question him about why there were so many

16  controlled substance charts?

17  A.    I did.

18  Q.    And what did he say?

19  A.    The explanation was that this is mandatory to sign

20  a hundred percent of the controlled substances.  And

21  overall, I have to review 20 percent of total charts.  So

22  this hundred percent of controlled substances would

23  satisfy the requirement of a 20 percent of a total

24  charts.

25  Q.    Okay.  So essentially, if my math is correct, he

1   was -- he was telling you that still less -- sort of 20

2   percent of his business was controlled substances; is

3   that right?

4   A.    Basically.

5   Q.    Okay.  And -- and then so you're -- now you're

6   reviewing what you believe to be about a fifth of his --

7   his kind of prescribing.  And -- and he told you it's a

8   hundred percent of his charts.

9        So tell the jury, I guess, what surprised you about

10  the controlled substances' piece of this prescribing.

11  What -- did anything stand out in those charts?

12  A.    The -- first there were brief descriptions of the

13  patients' complaints in the history of present illness.

14  Many times were no supporting documentation of the

15  testing proving that they have some kind of illness which

16  requiring controlled substances.

17  Q.    And if I can stop you and ask you to describe to

18  the jury, what is -- what do you mean when you say

19  "history of present illness"?  What is that in sort of

20  medical terms?

21  A.    History of present illness essentially describes,

22  usually chronologically, the -- how illness started, what

23  symptoms were done, noticed, what kind of workup was

24  done.  For example, had a motor vehicle accident two

25  years ago, broke my back, was in the hospital, had a

1    surgery.  This imaging was done, and I've seen doctor

2    so-and-so in the past.

3         That's a history of present illness.

4         And I have residual injury.  My leg is not working

5    right or something of this nature, paralysis or whatever.

6    So that's -- fits history of present illness.  Then

7    the -- so that's supposed to be in the chart.

8         And then along with the what we call social

9    history:  Is the patient a drinker, smoker, using street

10   drugs; lives in the community, nursing home or whatever

11   they live.

12        And then review of systems, which is -- puts in

13   other systems.  Let's say patient has also concurrent --

14   chronic pulmonary disease, chronic obstructive pulmonary

15   disease.  Psychiatric illness or whatever, you mention

16   it.

17        And then the physical exam, and physical exam has

18   to address those issues.  If I'm -- example, have

19   weakness in my left leg, it has to write that my left leg

20   is -- strengths is lower, or it's sensitivity impaired or

21   something of this nature.  Reflexes not present.

22        The -- and then goes your impression and the plan.

23   And the plan has to describe that I'm planning to do this

24   and this test, obtain all records, the plan to initiate

25   that kind of therapy, which could be medications,

1    physical therapy, or whatever you like.

2        And the follow-up and the counseling.  That, I

3    counseled the patient about the dangers of the controlled

4    substance, for example.

5    Q.   And did you -- did you see deficiencies in all of

6    those areas in the chart?  Is that --

7    A.   In this part, yes.

8    Q.   Okay.

9    A.   As well as in other parts.

10       In the controlled substance world, you have to be

11   testing patients, and I saw inconsistencies in the urine

12   toxicology screen.  There were substances present which

13   his patient is not prescribed, or they had marijuana,

14   which is obviously not prescribed medication, but it's

15   controlled, Class 1.  And the -- those things not

16   supposed to be in the patients who taking controlled

17   substances.

18   Q.   Did -- did you consider the possibility that this

19   was just like a paperwork error, that maybe he was doing

20   more than he wrote down in the charts?

21   A.   I asked the question, and his explanation was that

22   it takes a lot of time, so I'm really keeping it brief.

23   I'm very business.  Just the most essential just to get

24   me moving.

25   Q.   Okay.  And did you tell him any concerns about, for

1    example, the contradictory toxicology screens or other

2    issues with your -- with his prescribing?  Did you have a

3    conversation about that with him?

4    A.    Yes, and I was explained that he's really not that

5    strict about marijuana users.  He thinks that it's not a

6    big deal.  And the -- about other substances, he said

7    that I give one-time warning shot, explain that he not

8    supposed to be; otherwise, I'm going to discharge you

9    from the clinic.  And he will let patients stay in the

10   practice after that warning.  And if they again fail,

11   then he will discharge them.

12   Q.    So that's one of kind of protocol he told you about

13   to guard against the dangers.

14          Did he tell you he had other protocols to guard

15   against the dangers of controlled substances for his

16   patients?  Any other practices?

17   A.    No.  I don't remember those.

18   Q.    Did he tell you anything about how often he started

19   the patients on controlled substances?

20   A.    How often?

21   Q.    Yeah, like whether he started patients on

22   controlled substances or whether they came from someplace

23   else, that kind of thing.

24   A.    He mentioned to me that usually, he is not the one

25   who starts the patients.  He -- a lot of patients coming

1   from other practices already been on the controlled

2   substances, and he would just continue prescribing that.

3   Those patients being worked up somewhere else or in the

4   care of some pain management specialist, and they

5   switching practices, coming to him.  And many times,

6   there were evidence that they come from practice of

7   doctor so-and-so.  Sometimes there was not.

8   Q.     Did you ask him, in those cases, why the patients

9   weren't still seeing the previous doctor?

10  A.     I did.

11  Q.     And what was the answer?

12  A.     The answer was that we're more humane.  We caring

13  about the patient.  And many times, they get in a

14  conflict with another providers, and they need somebody

15  to manage their pain, whatever painful disorder they

16  have.

17  Q.     What do you mean, the patients get in a conflict

18  with their previous provider?  Conflict over what?

19  A.     Well, the conflict could be that they were not

20  complying with the protocols where the practices had.  It

21  could be noncompliant with the -- abstaining from other

22  substances.

23  Q.     In other words, the -- they had a conflict -- the

24  patient had a conflict over abstaining from other

25  substances?  Is that what you said?

1    A.    Like marijuana, for example, or taking what not

2    prescribed.  If it's prescribed oxycodone and they took

3    Percocet, so -- and it flags in the urine tox screen,

4    other practices will fire.

5    Q.    Other practices would fire the patient?

6    A.    Right.

7    Q.    I see.

8          And then they came to Mr. Young?

9    A.    Right.

10   Q.    Did you notice anything in the charts about sort of

11   increasing doses or the -- the sort of rate at which he

12   was -- let's use the word "titrating" or increasing

13   doses.

14   A.    Yeah.  He was what we call titrating, increasing

15   doses of medications.  If patient -- based on patient

16   complaints of, Oh, I have a -- still a lot of pain.  So

17   he would increase the dose or sometimes add another

18   component to that.  For example, if patient on opioid, he

19   would made -- add some benzo or -- which is also

20   controlled.  And stating that, oh, patient is on anxiety.

21   There's no evaluation for anxiety, no scale, no

22   diagnostic workup.  Just letting the medication do --

23   control the symptoms, I guess.

24   Q.    And did he give you an explanation for why he was

25   writing drugs for anxiety or pain without the kind of

1   diagnostic process to diagnose the anxiety?

2   A.    He didn't really explain that part, no.

3   Q.    Okay.  When he was giving -- when Mr. Young was

4   giving you these explanations about what you were seeing

5   in his charts, did he come across -- how did he come

6   across to you?

7   A.    He's very friendly, and he understands.  And when I

8   raise those questions, he said, yes, I'm following

9   protocols, very careful about those.  I'm well aware of

10  those.

11  Q.    Did he ever come across as sort of emotionally --

12  to you when you were -- when he was explaining this

13  stuff, did he ever come across to you as emotionally

14  distraught about it?

15  A.    No.

16  Q.    Did he ever -- ever give the impression that he

17  didn't really know what the protocols were?

18  A.    Not really.

19  Q.    Okay.  As you walked away from the clinic that

20  night, what was sort of your feeling in your gut about

21  it?

22  A.    It was not an easy feeling.  I felt like -- excuse

23  my language -- but neck-deep shit.  So I cannot move, and

24  it's what I got myself into.

25  Q.    Okay.  Did you ever, as his supervising physician,

1    give him instructions about something he should do to

2    improve his practices at the clinic?

3    A.    I talked to him.  I said that need to have

4    protocols.  We agreed upon the -- there's a textbook

5    which is for nurse practitioners, that this protocol

6    would follow, but that we need to have more detail charts

7    and enforce those practices so the people to be fired, if

8    they not following protocol and fail tests, urine tox

9    screen or the blood tox screen.  Also, I urge him to get

10   the electronic medical records that could get access to

11   every chart, that -- and we talked about it, its

12   importance of the compliance of the regulations in the

13   state.

14   Q.    And so how would -- how would electronic medical

15   records give you easier access to his charts?  Just

16   explain for the jury what -- how that would work.

17   A.    First of all, I can do -- you see all the charts,

18   every patient, the searchable database.  You can see who

19   was scheduled to come, who showed up.  Any prescription

20   you do, entered in the electronic chart.  Supposed to be

21   entered in the electronic chart.  The -- also I have a

22   distance access.  I can access distance from anywhere,

23   from my office, for example, anytime.  And electronic

24   records also offer the templates, which is you have to

25   fill out in order to prescribe certain substances.  They

1    build in there.  For example, you give the assessment of

2    the potential of the addiction.  So a template built in,

3    you just check, check, and move on, but you do the

4    important part.

5    Q.    And would electronic medical records have made it

6    easier for you to supervise him?

7    A.    Absolutely.

8    Q.    Did he ever tell you if he was -- like where he was

9    in the process of getting the EMRs, the electronic

10   medical records?

11   A.    He told me that he was talking to a couple of

12   vendors and evaluating the software.  It comes with

13   expense; I understand that part, but that he's committed

14   to bring it in.  There's some -- essentially within a

15   month, I understood.

16   Q.    And did he bring it in within a month?

17   A.    No, he did not.

18   Q.    How about the next month?

19   A.    No, he did not.

20   Q.    How about the month after that?

21   A.    No, he did not.

22   Q.    All right.  Shortly after you sort of left the

23   clinic with that feeling you described, did someone from

24   the medical board of Tennessee come and ask you

25   questions?

1    A.     Yes.

2    Q.     Okay.  Describe that to the jury.

3    A.     There was the inspector, investigator from the

4    Tennessee Board of Medical Examiners who came -- who

5    called me, I think, a day before and came to my office to

6    talk about his practice that -- she told me they part of

7    her routine in the investigative process, the practices

8    they employ.

9              **THE COURT REPORTER:**  Excuse me?  Practicing

10   what?

11   A.     Investigative practices they employ with the

12   medical board.  And they want to talk about his practice,

13   my supervision role of his practice.

14   **BY MS. PAYERLE:**

15   Q.     And did -- did you -- what did you tell them?

16   A.     I told them that I am -- I was a supervising

17   physician and that I was seeing a hundred percent of

18   charts for the patients who are prescribed controlled

19   substances.  And I told her that I'm seeing his -- coming

20   to his practice every 30 days, every month.

21   Q.     Was that -- was that true?

22   A.     It was not true.

23   Q.     Why -- why did you lie to the medical board

24   examiner?

25   A.     I was afraid that I didn't do my job, and I

1    understood the seriousness of that.  And I thought that

2    it's going to get me in trouble and can impair my ability

3    to practice, to suspend my license, not able to make a

4    living to provide for my family.

5    Q.    Looking back, if you could have done things

6    differently in that moment when the board asked you that

7    question, would you -- would you have?

8    A.    Oh, I regret the decision.  I would definitely be

9    honest and told them because that was a lie.  And I think

10   it was my -- one of the biggest mistakes of my life.

11   Q.    During that time in your life, in February of 2016,

12   was there anything going on in your -- in your personal

13   life?

14   A.    Yes, it was.  The -- of course the end of December,

15   there was a Christmas holiday, so my office was closed,

16   his closed.  And it was my family, and my wife was very

17   pregnant at the time, so I was definitely occupied with

18   my family issues and preparing for the new baby to come,

19   on top of running very busy practice, taking calls and so

20   forth.  And then we had a baby born in end of January,

21   25th of January and the -- and so on top of two other

22   toddlers I had in the house.  So my family life was

23   pretty hectic at the time, pretty chaotic.

24   Q.    Did you have any marital problems during this time?

25   A.    We had some marital problems as well.  Yes, there

1    was a lot of tension going on the -- so my head was not

2    in the right place.

3    Q.    Despite these problems in your marriage, have you,

4    nonetheless, taken responsibility for your role in

5    letting Mr. Young continue to prescribe controlled

6    substances essentially without supervision?

7    A.    I did, yes.

8    Q.    And how have you taken responsibility for your role

9    in this?

10   A.    Well, I didn't pay attention, and I was very lousy

11   supervising.

12   Q.    And have you pled guilty to a crime?

13   A.    I did.

14   Q.    And has that guilty plea had an impact on your

15   life?

16   A.    Huge impact on my life.  It's -- my professional

17   life is huge impact.  I lost my practice, had to close it

18   and claim bankruptcy.  Tremendous financial hardships.

19   In family life, it puts a lot of hardship and tension,

20   and the -- affected me professionally.

21   Q.    And are you -- are you testifying today as part of

22   the cooperation agreement connected to that plea?

23   A.    Yes, I am.

24   Q.    Do you hope to get a benefit at sentencing because

25   you've taken responsibility and cooperated?

*TESTIMONY OF ALEXANDER ALPEROVICH*                                    53

1    A.    I do.

2    Q.    Okay.  So let's get back to your sort of timeline

3    here.

4          Now you've talked to the medical board.  You've

5    lied.  You've -- at this point, you had not yet sort of

6    been charged with that, but you lied to the medical

7    board.

8          Did you take any action to sort of deal with the

9    situation?

10         So the medical board -- you haven't told the

11   medical board, but did you talk to Mr. Young, for

12   example?

13   A.    I did talk to Mr. Young.  The -- the -- I called

14   him in March when I was -- I became aware of his social

15   media -- I don't know how to call it -- performance, I

16   guess, some stupidity and stuff he was saying and

17   blashing (phonetic) on other providers in the area and

18   being drunk and doing all the inappropriate statements

19   or -- and the -- I called him up, and I told -- talked to

20   him.  I said this is inappropriate.  As a provider, you

21   don't do those things.  There's certain expectations in

22   the community.  And this is the huge megaphone.

23   Community is not big.  Everybody knows everybody.  It

24   affects you; it affects me.  And the -- it doesn't need

25   to be happening at all.  You have to stop.

1          I also asked about the medical records, electronic

2    medical records at the time and were there -- going with

3    a practice of my concern about his prescribing a lot of

4    controlled substances, and I don't feel that I'm suited

5    for that.  And if that direction he wants to take, then

6    he needs to look with somebody else because it's not my

7    area of expertise.

8    Q.    But did -- you said this was in March.  Did you

9    actually quit in March?

10   A.    I did not quit in March.

11   Q.    Okay.  And how did he respond to your kind of

12   admonition that he act more professionally on social

13   media and get electronic medical records?  What did he

14   tell you?

15   A.    The answer was that that's his -- part of his

16   marketing strategy, that he's very liked in the

17   community.  People -- he's extremely busy as a result of

18   his proper marketing, I guess, scandalous marketing,

19   that -- he also told me that the -- about other

20   providers.  He will try to keep it down because one of

21   the providers was practicing in my practice.  And then he

22   mentioned that he wants to expand more into the pain

23   management, so to speak, and planning to take some kind

24   of a training and suggested for me to go.

25   Q.    What kind of training did he suggest that the two

1    of you go to?

2    A.    Well, these are professional meetings which you can

3    take to get additional education about proper

4    prescription, proper workup, all the legal obligations

5    you have when you do this type of work, diagnostic

6    workups and whatever is necessary to be -- you know, to

7    practice efficiently.

8    Q.    Okay.  So he was talking about that in March, you

9    said?

10   A.    Yeah.

11   Q.    And you mentioned a prescriber at your office.  You

12   said it was part of his kind of marketing strategy to

13   attack somebody in your office; is that right?

14   A.    Right.  A nurse practitioner, Jake -- Japeth Durham

15   was working in my practice at the time, and the --

16   Q.    And that's -- sorry.  That's J-A-P-E-T-H?

17   A.    Right.

18   Q.    Japeth?

19   A.    Durham, D-U-R-H-A-M.

20   Q.    Thank you.

21   A.    And the -- he went off at him because he believed

22   that he's supporting his archenemy, another nurse

23   practitioner Michael Briley.

24   Q.    Okay.  Michael Briley was his archenemy?

25   A.    Yes.

1   Q.    Okay.

2   A.    Apparently.

3         For him and the -- so -- and he blasted with all

4   the profanities and the stuff, being drunk on the

5   YouTube.

6   Q.    Okay.  Did he ever, during this conversation, tell

7   you that he was acting this way on social media because

8   he was unhinged as a result of his own marital issues?

9   A.    No, he didn't mention it to me.

10  Q.    And speaking of which, you mentioned that, I think,

11  had your own marital issues?

12  A.    At that time, my marital issues got worst, and we

13  actually separated, with my wife and --

14  Q.    Did -- do your own marital issues excuse you from

15  the crime that you committed at that time?

16  A.    Not at all.

17  Q.    Did you go back after this and still review medical

18  records at his office at some later time?

19  A.    I did one more time.  It was the beginning of June.

20  Q.    And at the beginning of June -- so your

21  conversation we just discussed was in March; is that

22  right?

23  A.    Right.

24  Q.    By the beginning of June, did he report to you that

25  he had taken this additional training that he was talking

1    about?

2    A.     No, he did not.

3    Q.     Did he have a electronic medical record system that

4    you were talking about?

5    A.     No, he did not.

6    Q.     Did he show you a whole pile of preventative

7    cardiology patients at that meeting in June?

8    A.     No, he did not.  He was not there, actually.

9    Q.     Okay.  Did you review records?

10   A.     I reviewed records.

11   Q.     And what kind of records?  What kind of drugs was

12   he prescribing in the records you reviewed?

13   A.     There were -- with maybe a couple of exceptions, I

14   don't remember how many charts.  It's all controlled, and

15   it was opioids, benzodiazepines, anxiety medications,

16   antidepressants, stuff like that.

17   Q.     Why was there a gap between March and June where

18   you didn't visit the clinic?  What was -- what was going

19   on?

20   A.     The -- there was a couple of things going:  One of,

21   of course, the -- I was very busy with my practice.  But

22   on top of it, I had this young family, three children,

23   problems with my wife, so my head was not in the right

24   place.

25          On top of it, when I tried to schedule the meetings

1    with him, even though Kristie was very accommodating, but

2    some other reason -- in other words, I couldn't come

3    because he had birthday of his child or he had to run out

4    and -- oh, I was on call, and I was called into the

5    hospital, and I had to cancel.  So I was scheduled,

6    just -- would -- seems couldn't find the time.

7    Q.    And if he had implemented electronic medical

8    records, would you have need -- would you have needed to

9    coordinate schedules like that?

10   A.    No, I wouldn't.

11   Q.    Did you -- I mean, so you went to the clinic.  When

12   did you finally quit?

13   A.    Finally, on June 8th, I gave the letter to his

14   office manager.

15   Q.    And was that the day you were there reviewing

16   records?

17   A.    Right.

18   Q.    Okay.

19   A.    And she asked me specifically give it to her, not

20   to him directly.

21   Q.    Did she tell you why she was saying that?

22   A.    She said that he could get unhinged, and she just

23   doesn't know what the heck he's going to do.

24   Q.    Okay.  Let's take a look.  If we could publish

25   court exhibit 14 already in evidence.  It's our 202 at

*TESTIMONY OF ALEXANDER ALPEROVICH*                                59

1   Page 2.

2        And I'm going to take you back to -- you said

3   June -- let's go to the next page, Page 3.

4        So June 9th, you said you resigned?

5   A.   Right.

6   Q.   And these are text messages from that day, June --

7   did you say June 9th?  You said -- I think you said a

8   different day.

9   A.   I thought June 8th, but --

10  Q.   You might have said June 8th.

11       Okay.  So were you at the clinic on June 8th?  Is

12  that 12 -- 12 seconds?  I don't know.  Maybe we --

13  A.   I was, on June 8th, in the clinic, I believe.

14  Q.   Okay.  And then you texted her the next morning on

15  June 9th?  Is that what we're seeing?  Good morning?

16  A.   Yeah.  Good morning, this is -- I think Kristie had

17  text me.

18  Q.   Is that the morning after you were looking at

19  records?

20  A.   I believe so.

21  Q.   Okay.

22       **MS. PAYERLE:**  Yeah.  Thank you.  Let's make sure

23  those dates are clear.

24       Okay.  So let's blow up the text beginning with

25  "good morning" on June 9th, next morning.

*UNREDACTED TRANSCRIPT*

 1          **MS. SILVERBERG:**  Do you want all the way down?

 2          **MS. PAYERLE:**  No.  Just -- actually, just the

 3   text of the message is fine, so we can get it visible.

 4          Appreciate everybody paying close attention.

 5   **BY MS. PAYERLE:**

 6   Q.    Go ahead.  What did you say?

 7   A.    "Good morning.  I'm not telling" --

 8   Q.    Sorry.  What did -- that's Kristie.  That's Ms. --

 9   A.    It's Kris, yeah.

10   Q.    Okay.

11   A.    So she's saying -- you want me to read it?

12   Q.    Yes, please.

13   A.    "Good morning.  I'm not telling Jeff about your

14   resigning until this afternoon when the other NP comes

15   in.  Please don't say anything to him this morning about

16   it."

17   Q.    Okay.  And because I messed up the dates earlier, I

18   want to make sure.  On June 8th, you handed her the

19   letter, and on the morning of June 9th, this exchange

20   took place?

21   A.    Yeah.  Because I think I talked to her and said I

22   call him in the morning and tell him about it.  And

23   that's what this concern, I believe, is coming in.

24   Q.    I see.

25          **MS. PAYERLE:**  Okay.  Let's back out of that, and

*UNREDACTED TRANSCRIPT*

1   blow up the next two text messages.  Those two, yes.

2   Thank you.

3   **BY MS. PAYERLE:**

4   Q.    This is you saying:  "I was going" -- well, go

5   ahead and read you.

6   A.    "I was going to call him.  Why is it a concern?"

7   Q.    And Ms. Gutgsell says:  "He's a loose cannon.  I

8   don't want patients to suffer this morning.  At least

9   when April gets there, she can see the patients."

10          What were you sort of thinking at this point?

11  A.    He's crazy.

12  Q.    Doctor, at the height of your marital difficulties,

13  if one of your nurse practitioners quit, would that throw

14  you so off balance that your patients would suffer?

15  A.    It wouldn't throw me off balance.  I know it

16  concerns, but other than that, it's just what you do.

17  Q.    But did eventually the word get back to Mr. Young

18  that you had quit?

19  A.    Oh, I believe so.

20  Q.    And have you spoken to him since?

21  A.    No, I did not speak with him.

22  Q.    Okay.

23          **MS. PAYERLE:**  Just one moment, please.

24          Pass the witness, Your Honor.

25

```
 1           THE COURT:  All right.  Why don't we take a
 2    break for just a few minutes, and then we'll come back
 3    and deal with the cross.
 4           Okay.  Remember, leave your notebooks.  Don't
 5    discuss the case, and just take a break for 15, 20
 6    minutes, I'll get back to you.  I'll go ahead and excuse
 7    you to the jury room.
 8           And Doctor, don't discuss your testimony with
 9    anyone over the break.  Okay?
10           THE WITNESS:  Okay.
11           THE COURT:  All right.
12           THE WITNESS:  Can I go to the restroom, too?
13           THE COURT:  Yes.  Yes.  I can step down.
14           (Jury out at 10:44 a.m.)
15           (The witness complies with the request.)
16           THE COURT:  Okay.  I'm just curious:  Who's
17    going to deal with cross of the doctor?
18           MR. FERGUSON:  (Raises hand).
19           THE COURT:  We'll pick that up in about 15, 20
20    minutes.  We'll be in recess.
21           (Recess at 10:44 a.m. until 11:05 a.m.)
22           THE COURT:  Okay.  Anything before we bring the
23    jury back in?
24           MR. FERGUSON:  No, Your Honor.
25           THE COURT:  Okay.  Return to the stand, if you
```

 1   would, please.

 2           (The witness complies with the request.)

 3           **THE COURT:**  Bring in the jurors.

 4           (Jury in at 11:05 a.m.)

 5           **THE COURT:**  All right.  Folks, we're ready for

 6   our push to lunch time, so I'm going turn it -- oh, I

 7   believe, Mr. Ferguson on cross.

 8           **MR. FERGUSON:**  Yes, sir.

 9           **THE COURT:**  You may proceed.

10           **MR. FERGUSON:**  Thank you, Your Honor.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*TESTIMONY OF ALEXANDER ALPEROVICH*

1              **CROSS-EXAMINATION**

2    **BY MR. FERGUSON:**

3    Q.    Good morning, Dr. Alperovich.

4    A.    Good morning.

5    Q.    I just have a few questions for you, not much

6    today.  How long have you been practicing medicine?

7    A.    A little less than 30 years.

8    Q.    Little less than 30 years?

9    A.    Yes, sir.

10   Q.    And does that also include your time in Soviet

11   Union?

12   A.    With the Soviet Union, probably more.

13   Q.    Okay.  And --

14   A.    35.

15   Q.    35?

16   A.    (Nodding head up and down.)

17   Q.    Okay.  And how many times have you supervised nurse

18   practitioners?

19   A.    I supervised nurse practitioners in my practice for

20   quite a while.

21   Q.    Have you supervised nurse practitioners that were

22   outside your practice before?

23   A.    I once was sign up to supervise one of the nurse

24   practitioners, but I didn't do any work.  I didn't do

25   actual supervision.  And Jeff Young was my first I really

1    had to do the direct supervision.

2    Q.    Okay.  Was there a reason why, on the first one,

3    you didn't do any supervision?  Just you never got --

4    A.    No.  He used somebody else.

5    Q.    Okay.  So it's not that you failed to do your job

6    on that one; it was just that you never actually

7    undertook the job?

8    A.    Right.

9    Q.    Okay.  So Jeff Young would then be the first nurse

10   practitioner outside of your practice that you were

11   responsible for supervising?

12   A.    That's true.

13   Q.    And you were aware of the policies and procedures

14   that specifically apply to you when it comes to

15   supervising nurse practitioners?

16   A.    I'm aware.

17   Q.    You were aware at the time you were supervising

18   Jeff Young?

19   A.    I was much less aware at that time.

20   Q.    You've become painfully aware since that time what

21   the requirements are?

22   A.    That's correct.

23   Q.    Painfully aware because at some point you were

24   indicted, along with Mr. Young, and accused of conspiring

25   with Mr. Young to distribute opioids within this

 1   community?

 2   A.   Well --

 3   Q.   Give me a yes or no to that.  I'll let you explain

 4   it.  But you were indicted along with Jeff Young --

 5   A.   I was indicted.

 6   Q.   -- for the distribution of narcotics?

 7   A.   Yes, I was indicted.

 8   Q.   Would you like to explain that, or is that okay; we

 9   leave it at that?  Because that's the answer to my

10   question.

11        You were -- you were charged at one time?

12   A.   Yes, I was.

13   Q.   And did you ever enter into an agreement, rather

14   verbally or nonverbally, with Mr. Young to distribute

15   opioids into this community?

16   A.   As --

17   Q.   Illegally distribute.

18   A.   Legally --

19   Q.   Illegally -- illegally distribute opioids?

20   A.   No.

21   Q.   Was it ever your intent for you to be part of a

22   conspiracy to illegally distribute narcotics?

23        **MS. PAYERLE:**  Your Honor, we'd object to the

24   extent it calls for a legal conclusion.

25        **THE COURT:**  Sustained.

1    **BY MR. FERGUSON:**

2    Q.    What was your agreement with Jeff Young?

3    A.    My agreement was to be a supervising physician for

4    his independent practice.

5    Q.    So that he could legally practice as a nurse

6    practitioner under the rules of Tennessee?

7    A.    That's correct.

8    Q.    And under the rules of Tennessee and the rules of

9    the nurse practitioners in Tennessee, he needed an M.D.,

10   a medical doctor, to take on that supervising role?

11   A.    That's correct.

12   Q.    And you entered into a contract to undertake that

13   responsibility?

14   A.    Yes, I did.

15   Q.    And because of that, you eventually were indicted,

16   along with Mr. Young, in a -- I know you've told the jury

17   you've entered a guilty plea, but that's in a different

18   case, with a case number, correct?

19   A.    I didn't understand the question.

20   Q.    I'm concerned you may not, and that's my fault

21   maybe, so let me -- you entered into an information plea

22   with the government?

23   A.    Yes, I did.

24   Q.    And that was to a different charge than conspiracy;

25   that was to providing false statements in the course of

```
 1   your medical practice?

 2   A.    Yes, I did.

 3   Q.    And as part of that agreement, you understand that

 4   you entered into what's called a plea agreement with the

 5   government?

 6   A.    Yes, I did.

 7   Q.    And part of that plea agreement was that you would

 8   give testimony.  If they requested it, you would come

 9   into court and testify in this matter?

10   A.    That's correct.

11   Q.    It's your understanding that part of that agreement

12   is that they want you to testify truthfully?

13   A.    That's correct.

14   Q.    The person who gets to determine whether or not you

15   testified truthfully is the government who entered into

16   that agreement with you?

17   A.    I don't understand the question.

18   Q.    All right.  That's fine.

19         As -- well, it's your understanding that the

20   indictment alleging you -- alleging that you engaged in

21   conspiracy will eventually be dismissed?

22   A.    That's my understanding.

23   Q.    You visited Mr. Young's office how many times?

24   A.    Twice.

25   Q.    Okay.  And so if I understand correctly, you
```

1    were -- the original agreement for you to supervise

2    Mr. Young was sometime in December of 2015?

3    A.    Right.  In November of 2015, we met and discussed

4    about it.  That's when the decision was made.

5    Q.    Okay.  And then was it -- it wasn't until maybe

6    February that Mr. Young got the signed contract back to

7    you?

8    A.    Middle of January he signed the contract, of 2016.

9    Q.    And so between December 2015 and this June of 2016,

10   you only visited his office twice to review files?

11   A.    That's correct.

12   Q.    And you were supposed to be there every 30 days?

13   A.    That's correct.

14   Q.    Were you aware of the requirement that you needed

15   to review 100 percent of patient files that contained

16   narcotic prescriptions?

17   A.    I was.

18   Q.    And did -- who got you the files?  Who prepared the

19   files for you to review?

20   A.    The communications mostly was done with his office

21   manager.

22   Q.    Is that Kristie?

23   A.    Kristie.

24         And she would be the one who, I understand, was in

25   charge of preparing.  I don't know who physically was

1    preparing that.

2    Q.    Okay.  But she was the one you were communicating

3    with about making those arrangements?

4    A.    That's correct.

5    Q.    The first time you went to Mr. Young's office, did

6    you review the files with Mr. Young?

7    A.    That's true.

8    Q.    And did it take multiple hours to go through the

9    files?

10   A.    Yes.

11   Q.    Would that be because you were very methodical In

12   your evaluation of each of those files?  Very thorough in

13   your review?

14   A.    I tried to be as thorough as I could.

15   Q.    And did you -- if you had concerns or questions,

16   did you address those with Mr. Young?

17   A.    Yes.

18   Q.    If you had concerns, would those concerns possibly

19   have been about his treatment decisions?  For example,

20   his use of drugs?

21   A.    Could be one of the concerns.

22   Q.    Okay.  And you would address that with him.  Would

23   he give you an explanation of why he made that choice?

24   A.    He would.

25   Q.    Did it seem to you to be medically reasonable

1    decision making?

2    A.    It was reasonable at times.

3    Q.    It was reasonable enough that it didn't, at that

4    point, raise any alarms with you that he was illegally

5    dispensing drugs.  Because you're signing off on these

6    files, remember?

7    A.    Right.

8    Q.    And you're not signing off on these files knowing

9    that he's intentionally distributing drugs because that

10   would be conspiracy, correct?

11   A.    That part is correct, but at the time when I was

12   reviewing the charts, my concern was, Is it indicated; is

13   it follow the protocols?  I was not weighing the

14   legalities at the time I was doing that.

15   Q.    But you're looking at the medical necessity and

16   reasonableness of it?

17   A.    Right.

18   Q.    And you were signing off on these as medically

19   necessary and reasonable?

20   A.    Correct.

21   Q.    After a consultation with Mr. Young about why he

22   was making the decisions he was making?

23   A.    That's correct.

24   Q.    Would it be fair to say that a physician has a far

25   superior training in medicine than a nurse and a nurse

1    practitioner?

2    A.    It is fair.

3    Q.    That the amount of the schooling that you as a

4    medical doctor go through is much greater than what a

5    nurse and nurse practitioner would go through?

6    A.    That's correct.

7    Q.    That the amount of time after receiving your

8    medical degree, the years in which you have to go through

9    residency and specialization is unique to the medical

10   field and to the field of an M.D.?

11   A.    Yes, it is.

12   Q.    And that's your understanding of why you, as an

13   M.D., are responsible for overseeing the nurse

14   practitioners as they provide healthcare to our

15   communities?

16   A.    That's understandable.

17   Q.    I'm not sure I heard you correctly.  I -- I'm hard

18   of hearing, and as you've already pointed out, you have a

19   little bit of an accent.

20         Did you say that you would see pain patients who

21   had already been prescribed pain medication that were

22   coming into his office?

23   A.    That's what Mr. Young told me, yes.

24   Q.    And so that's what's call continuity of care?

25   A.    Yes.

1    Q.    So that if somebody who was on pain medication

2    comes into your clinic, you don't want to spiral them off

3    their pain medications so that they go seeking illegal

4    drugs?

5    A.    That's true.

6    Q.    You want to continue the care as they've already

7    been prescribed so that it protects themselves from

8    that -- that event?

9    A.    You try to continue it, yes.

10   Q.    I have one last couple little questions for you.

11         Looking through the discovery in this case, it

12   looks like maybe in around May 5th of 2016, you prepared

13   a letter terminating or attempting to terminate your

14   preceptor, your oversight of Mr. Young, but then the text

15   messages from Kristie Gutgsell are in June.  Do you know

16   why there's such a delay between when you wrote the

17   letter and the e-mails with Kristie?

18   A.    The -- I had concerns.  The -- and a couple of

19   reasons.  One reason was that . . .

20   Q.    I'm asking about the delay between you writing it.

21   A.    Yeah.  I hesitated a little bit because I didn't

22   know how he was going to react and what his reaction's

23   going to be.

24   Q.    Right.

25   A.    That -- seeing what he was doing on the social

1    media, having that big megaphones with the ears of a lot

2    of people in Jackson, which is small community, and

3    medical community, even smaller.  That could affect my

4    ability to see patients, and -- and produce very negative

5    ways to my practice and reduce my ability to make the

6    living.  And that was a major concern.  The -- and the --

7    we attempted to deliver the letter, but -- was sent

8    certified, but somehow it's -- I never heard back.

9    Q.    I guess maybe I missed it.

10        In your direct testimony, your -- you practice in

11   Jackson?

12   A.    Right.

13   Q.    And because it was such a small community and

14   because of the social media -- call a firestorm or the

15   stuff that was going on on social media, that caused you

16   concerns that you might get some spillover from that into

17   your practice?

18   A.    I don't think it's spillover.  I would be the

19   target.

20   Q.    Okay.  And so that's why, in your letter when you

21   were terminating your preceptorship, you -- well, let me

22   ask you:  Did you write this, or did an attorney wrote

23   this?

24   A.    This attorney wrote this letter.

25   Q.    It's got your signature on it or purports to be

1    your signature.  Did you -- did you review it and adopt

2    it and sign it?

3    A.    Right.  I asked an attorney to prepare the letter,

4    and then attorney backed out because of a conflict of

5    interest.  But he said, You can use my letter; be fine.

6         **MR. FERGUSON:**  May I approach, Your Honor, and

7    let him --

8         **THE COURT:**  Go ahead.

9    **BY MR. FERGUSON:**

10   Q.    I just want to ask you, Doctor.  Is that the letter

11   that was prepared?  Has your signature down here at the

12   bottom, and this is -- accurately reflects what you would

13   have sent to Mr. Young's practice?

14        (A document was passed to the witness.)

15   A.    Yes, it is my letter.

16        **MR. FERGUSON:**  I'd ask that to be made the -- or

17   marked the next exhibit, Your Honor.

18        **THE COURT:**  I believe that's Number 40.  We'll

19   go ahead and receive it.

20        (The above-mentioned item was marked as

21   Exhibit No. 40.)

22   **BY MR. FERGUSON:**

23   Q.    And because of the concern about becoming the

24   target -- you see the last paragraph, that there's kind

25   of a "I promise not to say anything, if you don't promise

1    to say anything about me" kind of statement?

2    A.    Right.

3    Q.    And that was in concern that -- that he would start

4    saying things, bad things about you?

5    A.    That's correct.

6    Q.    All right.  You didn't want to be, as the word in

7    the letter says -- you didn't want to be defamed, libel,

8    slandered?

9    A.    Right.

10   Q.    Okay.  But you did -- it's dated May 5th.  You did

11   send that certified on or around May 5th?

12   A.    Sometime later.  I don't remember exactly.

13   Q.    And then some -- almost 30 days later, does Kristie

14   then start talking to you about not wanting to tell Jeff

15   because he could be a loose cannon?

16   A.    Right.

17   Q.    But by that -- by this point, 30 days has gone by.

18   And from what -- from your understanding from what

19   Kristie's texting you, Jeff doesn't have a clue that

20   you've terminated your preceptor or have sent the letter

21   in attempting to terminate your preceptorship?

22   A.    That's correct.

23   Q.    She knew about it?

24   A.    She did.

25   Q.    But Jeff didn't know about it?

1    A.    That's my understanding.

2    Q.    All right.

3          **MR. FERGUSON:**  That's all I have, Your Honor.

4          **THE COURT:**  Thank you.

5          Is there any redirect?

6          **MS. PAYERLE:**  Yes, Your Honor.

7          **THE COURT:**  All right.

8                        **REDIRECT EXAMINATION**

9    **BY MS. PAYERLE:**

10   Q.    Dr. Alperovich, when you began practicing with

11   Mr. Young, did you make it clear to him that you weren't

12   a pain medicine practitioner?

13   A.    Yes, I made it clear.

14   Q.    And when you went to visit him at his clinic and

15   reviewed his charts, I believe you testified that you

16   asked him questions about why he was doing what he was

17   doing; is that right?

18   A.    I did ask.

19   Q.    And he gave you some explanations?

20   A.    That's correct.

21   Q.    Did you believe his explanations?

22   A.    I believed it at the time.

23   Q.    If -- and you testified about what some of those

24   explanations were.  But let me ask you.  If you had known

25   that he, for example, wasn't discharging patients with

1    inappropriate blood tests, even though he said he was

2    doing that, would you have maybe behaved differently?

3    A.    Yes, I would.

4    Q.    If you learned that he wasn't counseling patients

5    about addiction like he said he was, might you have

6    behaved differently?

7    A.    Yes, I would.

8    Q.    Mr. Ferguson talked to you about continuity of

9    care.  Are doctors obligated to make their own judgment

10   about treatment and necessity?

11   A.    Yes, absolutely.

12   Q.    If Mr. Young had explained to you that he was

13   increasing opioid prescriptions for people that showed

14   signs of addiction, would you have maybe done things

15   differently?

16   A.    I would.

17   Q.    If Mr. Young had told you that he had no intention

18   of getting an electronic medical record system, might you

19   have done things differently?

20   A.    Yes, I would.

21   Q.    Even though you got a lot of misinformation from

22   Mr. Young, as you sit here today, how would you grade

23   your sort of supervision of him?

24   A.    In a letters, F.

25   Q.    F.  You did a poor job?

1    A.    Right, poor job.

2    Q.    And did the fact that you did such a poor job

3    supervising him allow Mr. Young to continue prescribing

4    opioids?

5    A.    I'm sorry.  Could you repeat again?

6    Q.    Sure.  Did the fact that you sort of weren't

7    actively supervising him and your lies to the medical

8    board, did those allow Mr. Young to continue prescribing

9    opioids?

10   A.    I believe so.

11   Q.    And is that why you pled guilty to the crime you

12   pled guilty to?

13   A.    That's exactly why.

14        **MS. PAYERLE:**  Just one moment, please, if you

15   don't mind.

16        No further questions, Your Honor.

17        **THE COURT:**  Thank you.

18        Recross based on that?

19        **MR. FERGUSON:**  Based on that, just one question,

20   one small topic.

21                      **RECROSS-EXAMINATION**

22   **BY MR. FERGUSON:**

23   Q.    Government asked you about individual medical

24   decision making, does -- did Mr. Young have a duty to

25   make an independent medical decision of new patients

1    coming in?

2         Would it be fair to say that one of the things that

3    healthcare providers look at when they're making those

4    individual decisions of a patient is to see what other

5    healthcare providers have done in the past for them?

6    A.    It's a part of decision making, yes.

7    Q.    Yes.  Thank you.

8              **MR. FERGUSON:**  That's all I have, Judge.

9              **THE COURT:**  All right.  Thank you.

10             Doctor, thank you very much.  You can step down.

11   You're excused.

12             **THE WITNESS:**  Thank you, Your Honor.

13             (Witness excused)

14             **MS. PAYERLE:**  Over -- I think around this way.

15             **THE COURT:**  Yeah, around this way.  There you

16   go.

17

18

19

20

21

22

23

24

25

1          **THE COURT:**  Ms. Payerle and Mr. Pennebaker, call

2    your next witness, please.

3          **MR. PENNEBAKER:**  The government calls Tricia

4    Stansell, Your Honor.

5          **THE COURT:**  Need you to come around here to the

6    front, please.

7          (The witness complies with the request.)

8          **THE COURT:**  Okay.  You're good right there.  If

9    you would, please raise your right hand to receive the

10   oath.

11         (The witness was duly sworn.)

12         **THE WITNESS:**  I do.

13         **THE COURT:**  The jacket there, you want to leave

14   it on the front row.  Okay.  And be seated right here,

15   please.

16

17

18

19

20

21

22

23

24

25

1                              **TRICIA STANSELL,**

2    having been first duly sworn, was examined and testified

3    as follows:

4                          **DIRECT EXAMINATION**

5    **BY MR. PENNEBAKER:**

6    Q.    Good morning, Ms. Stansell.

7    A.    Good morning.

8    Q.    Would you please state your name for the record.

9    A.    Tricia Stansell.

10   Q.    And could you spell your last name?

11   A.    S-T-A-N-S-E-L-L.

12   Q.    Do you know the defendant Jeff Young over here?

13   A.    I do.

14   Q.    How do you know him?

15   A.    He was my medical provider.

16   Q.    What season of your life were you in when you were

17   Jeff Young's patient?

18   A.    An addicted season.

19   Q.    Did his treatment help you get well, or did it keep

20   you sick?

21   A.    No.  I stayed sick.

22   Q.    Around when do you think you started to see

23   Mr. Young?

24   A.    Sometime around 2015.

25   Q.    Okay.  How did you find out about him?  How did you

1    learn about him?

2    A.    My daughter worked for him.

3    Q.    Okay.  And what's your daughter's name?

4    A.    Tessa James.

5    Q.    Did you have a lot of issues when you first went to

6    see Mr. Young?

7    A.    I did.

8    Q.    Did you want help with those issues?

9    A.    I did.

10   Q.    Did you get help with those issues?

11   A.    I did not.

12   Q.    What did you get instead?

13   A.    Masking with prescriptions.

14   Q.    Okay.  Had you seen other medical providers before

15   the defendant?

16   A.    I have.

17   Q.    About how many doctors do you think you saw in the

18   calendar year before you came into Mr. Young's clinic?

19   A.    A lot.  I have no idea.

20   Q.    Would 10 sound like a reasonable estimate?

21   A.    Sure.  Yes.

22   Q.    And those would be 10 providers that you got

23   prescriptions for controlled drugs from?

24   A.    Yes.

25   Q.    Did any of them cut you off from the medication

1    that they -- that you were getting from them?

2    A.    I have been cut off in the past, yes.

3    Q.    And will you tell the jury just a little bit about

4    what you mean when you say you've been cut off?

5    A.    I was getting prescriptions on the side and other

6    things than what were prescribed to me, so I would fail

7    drug tests.  Or I would get from multiple providers, and

8    they would cut me off because it would show up that I'd

9    gotten from other providers.

10   Q.    Why were you going to multiple providers?

11   A.    To the root, to get more pills just to make it

12   through another day.

13   Q.    But did you tell Mr. Young that you had been fired

14   by other doctors or providers?

15   A.    No.

16   Q.    Did he ask?

17   A.    No.

18   Q.    How are you doing today?

19   A.    I'm doing awesome.

20   Q.    What controlled drugs are you taking?

21   A.    Zero.  I don't take any prescription medicines.

22   Q.    Okay.

23   A.    I went to a holistic approach to life.

24   Q.    Is that sort of like a -- describe that holistic

25   approach to life.

1    A.    You want my testimony, my story?  Is that what

2    you're asking?

3    Q.    Only because we're in court and I -- I'm not

4    supposed to ask you questions that call for a narrative

5    answer, I'm going to say no, and let me ask a better

6    question.  Is that all right?

7    A.    Okay.

8    Q.    Because I do, but we're in this formal setting.

9    A.    Right.  Right.

10   Q.    Let me actually just move on, and I want to come

11   back to that in a minute.

12   A.    Okay.

13   Q.    What drugs did the defendant prescribe you while

14   you were seeing him?

15   A.    Oxycodone, fentanyl patch, thyroid medicine,

16   Cymbalta when my mother passed away.  Lyrica.  Those are

17   the ones I primarily remember.

18   Q.    Okay.  Over time -- first, let me ask you this:

19   When you first went in to see him, did you get a

20   prescription for a powerful opioid right away?

21   A.    I'm not sure if I did on the very first visit, but

22   that's quite possible, yes, on that very first one.

23   Q.    It's been --

24   A.    If not, it was the second one.

25   Q.    It's been a long time, right?

1    A.    Yes, sir, it has.

2    Q.    Do you remember Mr. Young talking to you about

3    alternative means of treating the ailments that you came

4    in with?

5    A.    No.

6    Q.    Was it pretty much pain medication right away?

7    A.    That would be a fair statement, yes.

8    Q.    Over time, did Mr. Young increase or keep steady or

9    decrease the amount of opioids that you were taking?

10   A.    No.  It was an increase.

11   Q.    Okay.  Did you know, by this time that you went to

12   see Mr. Young, what you needed to say to get -- to be

13   more likely to get a prescription for opioid medication?

14   A.    Yes.

15   Q.    Compared to the 10 doctors who prescribed to you in

16   the year before Mr. Young, was it easier or harder to get

17   the drugs you wanted from the defendant?

18   A.    I would say that it was easier.

19   Q.    Why would you say that?

20   A.    Just because there wasn't a lot of communication.

21   Other doctors would pry and ask a lot more and send on a

22   lot more testing --

23   Q.    Okay.

24   A.    -- than what I did.

25   Q.    Did you ever get any testing from the defendant?

1  A.    I might have went with him for -- I had some blood

2  work done.  I don't know if that was just my thyroid or

3  not, being that long ago.  I think I might have went for

4  an MRI, one; maybe not.  Everything back then is like

5  looking through fog.

6  Q.    Okay.

7  A.    Just I was high all the time.

8  Q.    Did anybody in your life notice that you were high

9  all the time?

10 A.    Sure.

11 Q.    Can you tell the jury a little bit about that?

12 A.    I almost lost my marriage because of it.  It was --

13 I needed to choose what I wanted.  My daughter was

14 beginning to say that things were going to have to change

15 or I wasn't going to get to watch my grandchildren.  My

16 young boys, they were young at the time, teenagers, they

17 were noticing it and were on me because I had mama's

18 boys, so it was highly noticeable, I imagine.  To me it

19 wasn't noticeable.  Seem like it was to everybody else,

20 though.

21 Q.    Right, including your teenage boys?

22 A.    Right.

23 Q.    Would you nod off in inappropriate places and

24 things like that, like kind of slump or --

25 A.    That's a possibility.  I don't know.  I knew I did

1    at home.

2    Q.    Right.

3    A.    Like everybody else would be watching or carry on,

4    and once I sat and got relaxed, I was out.

5    Q.    Right.

6          How did fentanyl come into the mix?

7    A.    I just was still struggling with some pain that

8    just continue get to the root of what was causing it.

9    And he said he could not go up any more on the oxycodone

10   I was taking, but he could prescribe something to go

11   along with it.

12         So in the beginning, a patch until I went to the

13   pharmacy.  I wasn't really aware that the patch --

14   because I've had patches in the past that were like

15   anti-inflammatories and stuff.  So I really wasn't aware

16   that it was another control thing.  But when I got it, I

17   took it.  I put it on.

18   Q.    Sure.

19         Wait a minute.  So are you saying that when the

20   defendant prescribed you fentanyl, he didn't tell you

21   what it was or what the side effects might be?

22   A.    No.  I wasn't aware of what fentanyl was.  No.

23   Q.    He didn't tell you that it was a super powerful

24   opioid, that it was addictive?  He didn't tell you how to

25   use it?

1    A.    No.

2    Q.    Did he tell you where to put it on your body?

3    A.    Not that I recall.

4    Q.    He just said, I'm adding this?

5    A.    He just said, I can add something, but I can't give

6    you any more oxycodone.

7    Q.    When the doctors said -- at that time in your life,

8    when a doctor or a medical provider said I can add

9    something that was a pill or a patch or whatever, did you

10   ever say no or can we try something else?

11   A.    No, I didn't.

12   Q.    Was that part of the reason that you stayed with

13   Jeff, is that that was the kind of relationship that

14   y'all had?

15   A.    Sure.  That's fair to say.

16   Q.    How did Mr. Young handle urine drug screens

17   compared to other providers?

18   A.    I took them, but I never -- I should have failed

19   some, I would assume, because I knew I was getting stuff

20   on the side that was different, but it was never brought

21   up.  I was never dismissed.

22   Q.    Let me ask you this:  Does your -- do you remember

23   Mr. Young ever discussing the results of any test or

24   treatment or anything like that with you?

25   A.    No, I don't ever recall one.

1   Q.    In your mind, did Mr. Young ever do anything to try

2   to find out what was really going on with you?

3   A.    No.  I mean, I just trusted what he was

4   prescribing.  I just wanted to make it another day.

5   Q.    How have opioids impacted your life generally?

6   A.    How did they, or how have they?

7   Q.    Yes, ma'am.

8   A.    Well, it was like a living hell.

9   Q.    Can you explain what you mean by that?

10  A.    It was like a tornado cycle.  Like it just never

11  stopped.  If you didn't have them, you were sick, but you

12  were still hurting, and you still needed to make it

13  through another day.  You still had family to take care

14  of.  You still wanted to be the housewife and the mom.

15  You still wanted that good life.  But if you didn't have

16  them to keep going, then you were violently sick.

17  Q.    And when you say "violently sick," are you talking

18  about being in withdrawal?

19  A.    Yes.

20  Q.    And can you tell the jury what that was like for

21  you to experience?

22  A.    The withdrawal process happened in 2018.  I had

23  done buried my mom, and I had -- was taking care of a

24  sick mother-in-law and a sick father-in-law, and I had

25  determined that this was not going to be the life of my

1   children.  And so I went to my bedroom, and I closed the

2   door with a Holy Bible and with TBN, which is Christian

3   television.  I stayed in there for four days without

4   coming out.  It was -- meaning violently sick, the

5   shakes, throwing up consistently, constant diarrhea,

6   scared to turn the light off, that I was going to die, so

7   Christian TV stayed on.

8        I remember a breakthrough moment being Louie

9   Giglio.  He was doing a series that week on "Goliath Must

10  Fall," so I studied the scriptures.  I held on, and I

11  believe in every bit of what I was hearing until Day 5

12  when I decided I was going to come out weak, tired, and

13  slowly start eating just fruit and do it naturally way

14  and trusted everything that I heard while I was laying in

15  that dark room.

16  Q.   So you basically pulled yourself back from the

17  abyss --

18  A.   I did.

19  Q.   -- without the help of --

20  A.   I did.

21  Q.   -- Mr. Young, of course, because by that time, what

22  had happened with you going to see him?  By 2018.

23  A.   Oh, he -- his clinic was shut down by then.

24  Q.   What did you do after that?

25  A.   Well, in between that and when I made the choice

 1  for myself, I would get them from people I knew.

 2  Q.    Would any -- so you didn't know where to go to get

 3  them from another medical provider?

 4  A.    No.  I went -- I was trying to remember this.  I

 5  believe I had went to one other provider, and that just

 6  was the same old thing.  I even -- I asked about Suboxone

 7  then because I seen the little pamphlet in there, but my

 8  insurance didn't cover it.  And that's when I knew I had

 9  to choose something for myself.

10  Q.    Okay.  How did your husband and your kids feel

11  about you going to see the defendant?

12  A.    They wanted me to get away.

13          **MR. PENNEBAKER:**  Pass the witness.  Thank you.

14          **THE COURT:**  Thank you.

15          And Mr. Ferguson, anything?

16                      **CROSS-EXAMINATION**

17  **BY MR. FERGUSON:**

18  Q.    Good morning.

19  A.    Good morning.

20  Q.    You, at some point, began seeing Jeff Young because

21  your daughter worked at his clinic?

22  A.    Yeah, she worked upstairs.

23  Q.    Okay.  So you were referred to Mr. Young by your

24  family member?

25  A.    Correct.

1    Q.    And by this point, you had already seen at least 10

2    other healthcare providers?

3    A.    Yes.

4    Q.    And was -- fair to say, each one of those

5    healthcare providers continued you on pain medications?

6    A.    Not everyone, but most, yes.

7    Q.    Well, if they would stop, then you would move to

8    the next one?

9    A.    That's correct.

10   Q.    Okay.  And -- and all of these doctors -- at some

11   point, at least one of them told you that the -- of the

12   risks of your prescriptions?

13   A.    Yes.

14   Q.    So you were --

15   A.    Not the oxycodone.

16   Q.    So you were aware of the dangers or the risks or

17   whatever the term might be of the drugs that you were

18   taking?

19   A.    That's correct.  The oxycodone and hydrocodone, I

20   was.

21   Q.    And each time that you would move from one doctor

22   to the next, they would continue a kind of -- we say a

23   continuity of your care and continue you on the same

24   medications?

25   A.    That's correct.

1   Q.    And when you -- when you transferred over to

2   Mr. Young, he continued you on the same medications at

3   the beginning?

4   A.    That's correct.

5   Q.    All right.  And how long were you a patient of

6   Mr. Young's?

7   A.    I would estimate a year maybe.

8   Q.    Okay.  So you may have seen him maybe 10, 12 times?

9   A.    That, or maybe a little more.

10  Q.    Okay.  And you presented to him with a complaint of

11  chronic pain from -- is it hip and knee problems?

12  A.    That's correct.

13  Q.    And, in fact, you had had knee surgery in the past?

14  A.    Yes, that's correct.

15  Q.    And that's what began your taking of these

16  painkillers?

17  A.    Yes.

18  Q.    The pain of the surgery from your knee?

19  A.    Yes.

20  Q.    You took urine screens while you were a patient of

21  Dr. Young?  Excuse me.  Of Mr. Young's?

22  A.    Yes.

23  Q.    And you never failed or told that you had failed

24  any of those drug screens?

25  A.    No, I was never told.

1    Q.    Okay.  And as far as you know what you've been

2    told, you didn't fail one of those drug screens?

3    A.    I -- that's correct.

4    Q.    Were you smoking marijuana?

5    A.    I did.  Well, no, I was not smoking marijuana.  I

6    did go to Seattle and --

7    Q.    Where was it was legal?

8    A.    Where it was legal.  And yes, I did.  Yes, I did in

9    Seattle.

10   Q.    Were you taking other drugs outside of the

11   prescriptions during this time?

12   A.    Yes.

13   Q.    Okay.  What kind of drugs?

14   A.    The -- just more pain medicine.

15   Q.    The same that you were prescribed?

16   A.    Right.

17   Q.    Just more of it?

18   A.    Right.

19   Q.    Okay.  Do you remember that Mr. -- yeah, Mr. Young

20   did order a CAT scan for you?

21   A.    That -- that could be.  I said MRI.  It might have

22   been a CAT scan.

23   Q.    Okay.  Do you remember back in -- well, let me ask

24   you this:  Do you remember back in 2019, almost -- was

25   that four years ago, five years, four years ago?

1          Do you remember being interviewed by a taskforce

2   officer, Mark Gray, and Attorney Pennebaker?

3   A.     I do.

4   Q.     Okay.  And if you had told them back then he did

5   order and you obtained a CAT scan, that would have been a

6   true statement?

7   A.     Yes.

8   Q.     Your memory was better four years ago than it is

9   today?

10  A.     Is it better four years ago?

11  Q.     Is your memory -- you're having -- seems like

12  you -- whether it's an MRI or a CAT scan, if you told

13  them four years ago it was a CAT scan, you were ordered

14  it and you went and took it, that would have been a

15  truthful statement, correct?

16  A.     If I told them, sure.

17         **THE COURT:**  Hold on just a minute.

18         Yes?

19         **MR. PENNEBAKER:**  Your Honor, I'm going to object

20  because this is -- he's not impeaching her.  She agreed

21  that she had a CAT scan.

22         **THE COURT:**  I think there's a little confusion.

23  I'm going to overrule the objection.

24         **MR. FERGUSON:**  And I don't --

25  **BY MR. FERGUSON:**

1    Q.    It's just the confusion.  I just want to make sure

2    of what you told Mr. Pennebaker four years ago.

3          You would -- you would have told him the truth?

4    A.    I would have told him the truth, yes.

5    Q.    And if you told him again if it was a CAT scan,

6    you -- you were prescribed it, you went and took it, that

7    was a truthful statement?

8    A.    Correct.

9    Q.    Okay.  I'm not trying to trick you.  You're giving

10   me that look.  I'm not --

11   A.    No.  I'm -- I understand.

12   Q.    Okay.

13   A.    It's just that remembering that far ago and

14   today -- it's much easier to remember today.

15   Everything -- the drugs were still slowly getting out of

16   my system.

17   Q.    That's what I assumed.

18   A.    So --

19   Q.    I didn't think you were lying to Mr. Pennebaker.  I

20   just thought maybe memory kind of change over time, or

21   who really remembers the difference between a CAT scan

22   and an MRI?  But you're -- that's fine.

23         After Mr. Young's office was raided, did pretty

24   much the Jackson community know about that raid?

25   A.    I would say sure, because it was on the news.

1  Q.    All over the news all day, every day, right?

2  A.    Right.

3  Q.    And because of that, then you went to go seek

4  additional care from other physicians or other healthcare

5  providers?

6  A.    No.  After him, there was just one that I ever went

7  to see.

8  Q.    Okay.  So just one.  You went to that person, and

9  they would not continue prescribing you the drugs that

10 you had been receiving all these 10 -- seven, eight, nine

11 years?

12 A.    No.

13 Q.    He just -- he said he wouldn't do it?

14 A.    No.

15 Q.    Are you saying -- I'm asking a bad question, then,

16 because I don't know what your --

17 A.    Right, because I don't --

18 Q.    Did --

19 A.    I miss --

20 Q.    You went to go see -- you went and tried to find

21 another provider.  Yes?

22 A.    Correct.

23 Q.    When you did find another provider -- yes?

24 A.    Yes.

25 Q.    And that provider wrote you prescriptions?

1    A.    They wrote some, but at that time, we're talking --

2    what year are you talking?  2018 or 2019?

3    Q.    Well, it would've been right after --

4    A.    Or twenty -- see, 2016, 2017, I wasn't -- I

5    wouldn't know.  I can give you a definitive answer, from

6    2018 on, about anything once I got off.

7          I do remember seeing a couple of other providers

8    because I was still, at that time, on thyroid medicine.

9    I don't even take thyroid medicine anymore.  I have not

10   been to a doctor since 2018.

11   Q.    Well, let me ask you.  Do you remember -- when you

12   were talking to Mr. Pennebaker back four years ago -- to

13   questions that you quit seeing Young when the clinic was

14   raided?  You started seeing another medical provider, and

15   the other medical provider discontinued your pain

16   medications, so you began to self-medicate with whatever

17   pain meds you could obtain outside a medical provider?

18          **MR. PENNEBAKER:**  Your Honor, he's reading off of

19   a memorandum of an interview, it seems, and this is -- I

20   didn't even hear a question, I don't think, but that is

21   improper.

22          **THE COURT:**  Overruled.

23          **MR. FERGUSON:**  Thank you, Your Honor.

24   BY MR. FERGUSON:

25   Q.    You remember answering that to the question of what

*UNREDACTED TRANSCRIPT*

1    happened after you left Jeff Young's office?

2    A.    Do I remember it?

3    Q.    Yes.

4    A.    Four years ago?  Not like that.  I don't remember.

5    Q.    Was it truthful statement that you gave

6    Mr. Pennebaker back then?

7    A.    I'm sure it would have been.  I didn't want to get

8    in trouble for telling a lie back then, so I would have

9    to say sure.

10   Q.    Right.  So what it appears happened is you went,

11   tried to find another healthcare providers.  They cut you

12   off cold turkey, and you went seeking drugs illegally; is

13   that a fair statement?

14   A.    Sure.

15   Q.    And because of -- because of that, did your

16   addiction just spiral out of control?

17   A.    No.

18   Q.    You got better going out looking for illegal drugs?

19   A.    Actually, yes, because I had done made up the

20   determination that I was going to lose my family if I did

21   not set and just do just enough to get by till making the

22   choice.  Actually I did.  I got better because I used

23   less.  I did not have the money to be buying the

24   resources and then spiral out of control then.

25   Q.    So you're not one of the ones who went out and

1    started taking, like, heroin and fentanyl?

2    A.    No.

3    Q.    Okay.

4    A.    No, I have never had -- no.

5    Q.    Okay.

6    A.    Never.

7    Q.    All right.  So you just stuck to what you'd been --

8    you were trying to find what you had already been

9    prescribed?

10   A.    Right.

11   Q.    You didn't -- you didn't ramp it up to hard --

12   A.    No, I did not.

13   Q.    Okay.  Good.

14         All right.  You're doing better today?

15   A.    I'm doing amazing today.

16   Q.    You look like it.

17   A.    Thank you.

18   Q.    I appreciate it.  I appreciate your time here.

19   Thank you for answering my questions.

20   A.    Yes, sir.  Thank you.

21         **THE COURT:**  Thank you.

22         Any redirect?

23         **MR. PENNEBAKER:**  No, Your Honor.

24         **THE COURT:**  Okay.  Ms. Stansell, is that right?

25         **THE WITNESS:**  Yes, sir.

1          **THE COURT:**  Thank you very much for your

2    testimony.  You can step down.  You're excused.

3          **THE WITNESS:**  Thank you.

4          (Witness excused)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     THE COURT:   Government, if you would please --

2  we're getting close to the lunch hour, but go ahead and

3  call your next witness, and we'll get started.

4     MS. PAYERLE:   Your Honor, the government would

5  call Natalie Seabolt.

6     THE COURT:   All right.   Step right up to the

7  front, please.

8     (The witness complies with the request.)

9     THE COURT:   Okay.   You're good right there.

10  Need to place you under oath, so if you would, please

11  raise your right hand.

12     (The witness was duly sworn.)

13     THE WITNESS:   I do.

14     THE COURT:   Be seated here, please.

15

16

17

18

19

20

21

22

23

24

25

1                          **NATALIE SEABOLT,**

2   having been first duly sworn, was examined and testified

3   as follows:

4                      **DIRECT EXAMINATION**

5   **BY MS. PAYERLE:**

6   Q.    Okay.  Good morning still for a few more minutes.

7   A.    Good morning.

8   Q.    Would you please introduce yourself to the jury?

9   A.    Sure.  My name is Natalie Seabolt.  I am a nursing

10  professor at University of Tennessee Health Science

11  Center here in Memphis.  And I'm also a nurse

12  practitioner at Le Bonheur Children's here in Memphis.

13  Q.    And can you tell the jury what a degrees you have?

14  A.    Yeah.

15          **THE COURT:**  Before you do that, can you spell

16  your last name, please?

17          **THE WITNESS:**  Yes, sir.  It's S-E-A-B-O-L-T.

18          **THE COURT:**  Thank you.  Go ahead.

19  A.    So my educational background, I have a Bachelor's

20  of Science in human environmental sciences from the

21  University of Arkansas in Fayetteville in 2005.  I'm

22  sorry.  In 19 -- I'm sorry, in 2003.  I have a Master's

23  of Science in nursing from Vanderbilt University College

24  of Nursing in Nashville, Tennessee; that was in 2007.

25  And I have a Doctor of Nursing Practice from the

*TESTIMONY OF NATALIE SEABOLT*                                                                105

1    University of Tennessee Health Science Center, and that

2    was in 2018.

3    **BY MS. PAYERLE:**

4    Q.    And aside from practicing as a nurse practitioner

5    at Le Bonheur and a professor at -- where are you

6    professor?

7    A.    University of Tennessee Health Science Center here

8    in Memphis.

9    Q.    Okay.  Do you also do some consulting work for the

10   government?

11   A.    Yes, ma'am.

12   Q.    And are -- have we paid you to consult in this

13   case?

14   A.    Yes, you have.

15   Q.    All right.  Now, before your current job -- sorry.

16   Let me ask.  How long have you worked as a nurse

17   practitioner?

18   A.    I've actually been a nurse practitioner -- well, I

19   graduated as a nurse practitioner 16 years ago.

20   Q.    All right.  And you're currently practicing

21   actually as a nurse practitioner?

22   A.    Yes.

23   Q.    And you're teaching?

24   A.    Yes.

25   Q.    What do you teach?

1    A.    I actually teach at the doctorate and master's

2    level for pediatric nursing.

3    Q.    And before you had your current job, did you have a

4    different job that actually allowed you or involved you

5    in investigating Jeffrey Young?

6    A.    Yes.  So I was a forensic nurse investigator for

7    the Tennessee Bureau of Investigation for six years.

8    Q.    And as a forensic nurse investigator for the

9    Tennessee Bureau of Investigation, what did you do?

10   A.    I analyzed medical charts and other data.

11   Q.    And when you were analyzing medical charts and data

12   for the TBI, was one of the cases you kind of analyzed

13   that information for, was it the case of Jeffrey Young

14   and Preventagenix?

15   A.    Yes, it was.

16   Q.    And then after you left TBI, did you kind of

17   continue to work in a consulting basis on the case?

18   A.    Yes, I did.

19   Q.    All right.  And are you here to testify about your

20   analysis of that data that you did in connection with

21   this case?

22   A.    Yes, ma'am.

23   Q.    Let's talk a little bit about the kinds of data

24   that you analyzed.  So when you say "data," what -- what

25   are you talking about?

1   A.    So the Tennessee Bureau of Investigation unit that

2   I worked in was Medicaid Fraud Control Unit, and so I

3   analyzed data that was produced regarding Jeffrey Young

4   or another provider that was generated when a patient

5   used their Medicaid insurance for a healthcare service

6   such as an office visit or a prescription or a diagnostic

7   test.

8   Q.    So if a patient goes into, say, a nurse

9   practitioner's office and that patient has Medicaid, what

10  kind of data might be collected kind of as a result of

11  that office visit?

12        First of all, who would -- who would generate that

13  data?

14  A.    So the data is generated when the provider -- when

15  the provider bills for his services, regardless of

16  whether that's a pharmacist or a nurse practitioner or a

17  physician or any other kind of therapist.  And so that

18  data is actually generated and goes into the Medicaid

19  system.

20  Q.    So if a nurse practitioner bills Medicaid,

21  Tennessee Medicaid, for an office visit, what information

22  is recorded that becomes a part of that data?

23  A.    Besides the fact that it's all the patient data of

24  the person who that claim was filed on behalf of, it also

25  would include diagnosis data; it would also include the

1    level of service of the office visit; and it can also

2    include other things such as diagnostic testing.

3    Q.    And -- and tell us, just briefly, what -- just so

4    we know, what is Medicaid?

5    A.    So Medicaid is a federal health insurance program.

6    And in the state of Tennessee, Medicaid is paid for by --

7    it's 72 percent federal funding from taxes, and it's 28

8    percent Tennessee state tax money.

9    Q.    So if a provider bills Medicaid and Medicaid pays

10   them, that's where the money comes from to pay?

11   A.    Yes, ma'am.

12   Q.    And did Jeff Young, through Preventagenix, bill

13   Medicaid for patient visits?

14   A.    Yes.

15   Q.    Okay.  In addition -- well, let's talk actually --

16   we'll talk more about that data in a minute.

17         Did you -- separately from the Medicaid billing

18   data for Medicaid patients specifically, did you also

19   have access to data that focused on any controlled

20   substance that Jeffrey Young provided?

21   A.    Yes.  So I was -- yes.  So as part of my job, I

22   also did an assessment of CSMD reports, which is reports

23   that are generated from the Controlled Substance

24   Monitoring Database.  And what that is, is that is a

25   state-based database, digital database, that information

1   is generated when a pharmacist or pharmacy staff fill a

2   prescription.

3   Q.    And that's regardless of whether the patient has

4   Medicaid or some other insurance?

5   A.    Correct.

6   Q.    Okay.  And that's, you said, called CSMD data?

7   A.    Yes.

8   Q.    Is it also sometimes called PMP data?

9   A.    Yes.

10  Q.    Okay.  Those two phrases are used in -- we've heard

11  them both throughout the trial so --

12  A.    Yes.

13  Q.    Okay.  And who -- let's start with this controlled

14  substances database.  That's just -- only controlled

15  substances' prescriptions are entered into that database;

16  is that right?

17  A.    Correct

18  Q.    So like blood pressure medication, heart

19  medication, things like birth control, would those --

20  even though they're required to be a prescription, would

21  those be entered into the controlled substances database?

22  A.    No.  The Controlled Substance Monitoring Database

23  is a database that was created.  The controlled substance

24  database only records controlled substances that are

25  identified by the DEA as needing to be monitored for

*TESTIMONY OF NATALIE SEABOLT*

 1   their manufacturing, distribution, and their possession.

 2   Q.    And who actually enters -- how does that data about

 3   who's getting controlled substances and who prescribe

 4   them, how is that actually entered into the database?

 5   A.    It's entered by the pharmacy staff, whether it's

 6   the pharmacist or a pharmacy tech that actually dispenses

 7   the medication.

 8   Q.    So patient walks in, medication dispensed, pharmacy

 9   enters the information in the database?

10   A.    Yes.

11   Q.    All right.  You said it only covers controlled

12   substances when a pharmacy or -- dispenses a controlled

13   substance.

14        First of all -- oh, and sorry, one more question.

15        When the pharmacy enters that information about the

16   controlled substance, do they also enter the identity of

17   the -- of the person who wrote the prescription?

18   A.    Yes.  It's -- it is actually digitally tied to who

19   the prescriber was.

20   Q.    Okay.  So you would be able to see the drugs

21   prescribed by a particular physician or nurse

22   practitioner by looking in that database?

23   A.    Correct.

24   Q.    Got it.

25        All right.  So you said it covers controlled

*UNREDACTED TRANSCRIPT*

1    substances.  Would you tell the jury what is a controlled

2    substance?

3    A.     So a controlled substance is a medication or drug

4    that has been deemed as needing to be monitored for the

5    manufacturing, distribution, and possession of.  And it's

6    typically -- it's typically medications that are highly

7    addictive or have a high -- high potential for abuse.

8    Q.     Are there schedules, different kind of categories

9    of controlled substances?

10   A.     Yes.

11   Q.     And --

12   A.     So --

13   Q.     -- numbered?

14   A.     Yes.  So the scheduling of medications -- all

15   medications are scheduled.  But the scheduling of

16   medications -- they're divided into numerical groups, and

17   those numerical groups, I through V, are based on the

18   potential for them to be addictive, the potential for

19   them to cause physical dependence, and also really to

20   their accepted medical use.

21   Q.     What is a -- give us some -- or give an example of

22   a Schedule I control drug.

23   A.     So Schedule I -- Schedule I drugs are chemical

24   substances, are considered to be -- have the highest

25   potential for the abuse and to be the -- have the highest

*TESTIMONY OF NATALIE SEABOLT*

1   potential for being physically -- causing physical

2   dependency and don't usually have a ton of -- or a lot of

3   accepted medical use, and so one example would be heroin.

4   Q.    Okay.  And a Schedule II drug, are those -- is

5   that -- do some schedule -- so you said Schedule I drugs

6   do -- they have any medical use?

7   A.    They are used sometimes for research purposes.

8   Q.    Okay.  But aside from research purposes, are

9   Schedule I drugs generally not used for medicine?

10  A.    Not very often, no.

11  Q.    Okay.  So are Schedule II drugs the sort of highest

12  level of drugs that are sometimes used for medicine?

13  A.    Correct.

14  Q.    All right.  What is a Schedule II drug?

15  A.    So a Schedule II will have a little bit less risk

16  of the -- a little bit less risk of dependency and a

17  little bit less risk of abuse, and they -- but they have

18  a higher accepted medical use.

19  Q.    All right.  And what are some many examples of

20  Schedule II drugs?

21  A.    Most of -- most of the narcotics such as

22  hydrocodone and Lortab are in that group.

23  Q.    All right.  Now, I want to get into some of this

24  data.

25        Now, did you review the CSMD data with respect to

*TESTIMONY OF NATALIE SEABOLT*                                                  113

1    the prescribing practices of Mr. Young?

2    A.    I did.

3    Q.    And did you summarize -- is that data -- there's a

4    lot of information in that data?

5    A.    Yes, ma'am.

6    Q.    Did you summarize that data into some summary

7    charts or exhibits that we can talk about today?

8    A.    Yes, because I was asked to.

9    Q.    Okay.  And at this time, I'm going to show you a

10   one-page document that we've marked 311.

11         (A document was passed to the witness.)

12   **BY MS. PAYERLE:**

13   Q.    Is this one of those summaries of the CSMD data?

14   A.    It is.

15         **MS. PAYERLE:**  Move to admit.

16         **THE COURT:**  We'll go ahead and receive the

17   summary.  That will be Exhibit 41.  Just one page.

18         (The above-mentioned item was marked as

19   Exhibit No. 41.)

20         **MS. PAYERLE:**  And if we could, please publish 41

21   to the jury.

22   **BY MS. PAYERLE:**

23   Q.    All right.  What are we looking at in Exhibit 41?

24   A.    So for this report, what I did is I actually took

25   the three -- the three categories of opioids,

1    benzodiazepines, and muscle relaxers, and I did a summary

2    of any of those medications that had 50 prescriptions or

3    more that were listed in the CSMD as being prescribed by

4    Jeff Young between January of 2015 and June 14th of 2016.

5    Q.    Okay.  So I realize Mr. Young's name isn't actually

6    on this piece of paper, but this does relate only to the

7    prescriptions that were written by Jeffrey Young; is that

8    right?

9    A.    Yes.  Yes.

10   Q.    Okay.  So let's take a look at these dates.  In the

11   top kind of blue box there, you have a list of opioids.

12   What are those?

13         First of all, what is an opioid?

14   A.    So opioid is a medication or drug that contains

15   either natural or synthetic chemical substances that are

16   similar to opium.

17   Q.    And what is -- just to give the jury an example,

18   what is an Schedule I substance that is similar to

19   opioid?

20   A.    Heroin.

21   Q.    All right.  So are these opioids all chemically

22   similar in some way to heroin actually?

23   A.    They're chemically related, yes.

24   Q.    All right.  So let's go through and talk about

25   them.

*TESTIMONY OF NATALIE SEABOLT*                                          115

1          In what order are they listed?

2    A.    So I listed them in the order of the number of

3    prescriptions for that particular drug and based on the

4    number of pills that were dispensed.

5    Q.    And how many of these opioid drugs -- there's five

6    of them listed.  How many of them are in that -- that

7    Schedule II?

8    A.    Four of the five.

9    Q.    Which four?

10   A.    The hydrocodone, the oxycodone, morphine sulfate,

11   and hydromorphone.

12   Q.    And tramadol, is that an opioid?

13   A.    It is, but it's a Schedule IV.

14   Q.    Okay.  Can you tell the jury, quickly, if these --

15   let's go one by one.

16         Does hydrocodone have, like, brand names, more

17   common names associated with it?

18   A.    Yes.  So hydrocodone is known by the brand name of

19   Lortab or Vicodin.

20   Q.    Okay.  And is Norco also hydrocodone?

21   A.    Yes.

22   Q.    All right.  And let's take a look at oxycodone.  Is

23   there a brand name associated with oxycodone?

24   A.    Yes.  So typically, the oxycodone brand names are

25   OxyContin, Percocet, and Lorcet.

1    Q.    Okay.  What about tramadol?

2    A.    Tramadol is known as Ultram.

3    Q.    What about morphine sulfate?

4    A.    Morphine sulfate, the brand name is Kadian.

5    Q.    Okay.  And how about hydromorphone?

6    A.    Dilaudid.

7    Q.    Dilaudid.  Okay.

8    A.    Uh-huh.

9    Q.    And D-I-L-A-U-D-I-D, I believe; is that right?

10   Dilaudid.  Okay.

11   A.    Yeah, I think so.

12   Q.    All right.  We won't give you any more spelling

13   tests today.

14         Okay.  So how -- I guess, how many hydrocodone

15   pills did Mr. Young -- just to get the jury oriented --

16   did Mr. Young prescribe between January 1, 2015, and

17   February 14, 2016?

18   A.    His prescribing led to the dispense of 284,583.

19   Q.    And by the way, this CSMD that you reviewed to get

20   this data, what geographical area does it cover?

21   A.    It covers Tennessee.

22   Q.    So if a patient went to, say, Arkansas or

23   Mississippi to fill a prescription, or Alabama, to fill a

24   prescription, would it show up in this data?

25   A.    No.

1  Q.   Okay.  So I guess in the state of Tennessee, then,

2  how many oxycodone pills did --

3  A.   So --

4        (Indiscernible cross-talk was had.)

5  **BY MS. PAYERLE:**

6  Q.   -- did --

7        **THE COURT REPORTER:**  What was the last part?

8        **THE COURT:**  Y'all are talking over each other.

9  She can't get it.

10       **MS. PAYERLE:**  I apologize.

11 **BY MS. PAYERLE:**

12 Q.   How many oxycodone pills did he prescribe?

13      Thank you.

14 A.   He prescribed 190,172.

15 Q.   Okay.  And the jury can read the rest of the

16 numbers.

17      Let's move down to the second category of

18 benzodiazepines.  Did I say that right?

19      What schedule or -- well, first of all, what are

20 benzodiazepines?

21 A.   So benzodiazepines are -- they're called analoxics

22 (phonetic), and basically they are to help with anxiety.

23 Q.   And what schedule are they?

24 A.   They are Schedule IV.

25 Q.   And the top one there, what's that?

*TESTIMONY OF NATALIE SEABOLT*

1   A.    Alprazolam is the same thing as Xanax.

2   Q.    And the next one?

3   A.    Clonazepam is Klonopin.

4   Q.    And the next one?

5   A.    Diazepam is a Valium.

6   Q.    And lorazepam?

7   A.    And lorazepam is Ativan.

8   Q.    Okay.  And just for -- by way of comparison and

9   example, how many Xanax did -- or alprazolam did

10  Mr. Young prescribe between January 1, 2015, to June 14,

11  2016, in the state of Tennessee?

12  A.    There was over 300,000 pills dispensed under his

13  prescriptions.

14  Q.    Okay.  And the category you put there are muscle

15  relaxers?

16  A.    Yes.

17  Q.    What is the muscle relaxer listed?

18  A.    Carisoprodol, which is Soma.

19  Q.    Soma?

20  A.    Uh-huh.

21  Q.    Okay.  And what schedule is that?

22  A.    That is a Schedule IV.

23  Q.    Why have you put a chart together of these three

24  categories of drugs?

25  A.    Because these are the three medications that make

1    up "The Holy Trinity."

2    Q.    And describe what you mean by that.

3    A.    So "The Holy Trinity" is a term that has been put

4    together by the DEA that describes using these three

5    medications simultaneously together which increases their

6    risk of adverse effects but also increases the high that

7    you get from opioids.

8    Q.    So can you -- do you know the word "potentiator"?

9    A.    Yes.

10   Q.    And what is a potentiator?

11   A.    So a potentiator is a drug that you can take in

12   conjunction with another drug that increases the intended

13   effects for the first drug.  So for example,

14   benzodiazepines taken with opioids actually potentiates

15   the new receptor action with opioids, but that also -- it

16   also a raises the risk for adverse effects such as

17   respiratory depression.

18   Q.    And by "respiratory depression," what do you mean?

19   A.    Slowing of breathing or stopping breathing.

20   Q.    And how about if you add muscle relaxers to the

21   mix?

22   A.    Then it just further potentiates the issue.

23   Q.    Okay.  In your review of the data, did you see any

24   patterns where Mr. Young was prescribing that combination

25   or some -- some combination of opioids and

*TESTIMONY OF NATALIE SEABOLT*                                                120

1   benzodiazepines to the same people?

2   A.    Yes.

3   Q.    And was that -- was that frequent or infrequent?

4   A.    It occurred on a frequent basis.

5   Q.    Okay.  The next thing I'd like to show you is a

6   one-page exhibit.  We've marked it as 309.

7            (A document was passed to the witness.)

8   **BY MS. PAYERLE:**

9   Q.    Which is a map?

10  A.    Yes.

11  Q.    And is this a summary chart that you also -- that

12  was also created from the CSMD?

13  A.    Yes.

14  Q.    Okay.

15           **MS. PAYERLE:**  I move to admit.

16           **THE COURT:**  We'll receive the map, and that will

17  be Exhibit 42.

18           (The above-mentioned item was marked as

19  Exhibit No. 42.)

20           **MS. PAYERLE:**  42.  Thank you.

21  Let's pull up 42, if we may.

22  **BY MS. PAYERLE:**

23  Q.    Okay.  Ms. Seabolt, what is this map that we're

24  looking at here?

25  A.    So this is a map.  It's called a heat map, and what

*UNREDACTED TRANSCRIPT*

1    it does is for each dot that is on this map, that is

2    representation of a patient who filled a prescription in

3    Tennessee that was prescribed by -- by Jeff Young for a

4    controlled substance.

5    Q.    Okay.  So they filled it in Tennessee, but what --

6    what -- so there's this guy out here in Arkansas

7    that's -- so this isn't where they filled it.  What is

8    it?

9    A.    No.  This is where their home address is that's

10   registered to their insurance.

11   Q.    And so why -- why are we looking at their home

12   address?  What is -- what's the investigative purpose of

13   something like this?

14   A.    Well, there's a -- there's a few of them.  The

15   first thing is that their -- their registration has this

16   as their home address, signed for each patient.  But the

17   other concern about the map looking like this is that we

18   have patients that are coming from far away, four and a

19   half hours or more, to see a nurse practitioner in

20   Jackson, Tennessee.

21   Q.    So let's actually zoom in on the map, if we can,

22   just taking kind of from Nashville west, in Tennessee,

23   kind of the western half of Tennessee.  Keep going.

24   There you go.  Right there.  Thank you.

25         All right.  So the green dot in the middle that's

1    kind of covered over by red, what is that?

2    A.    That is Jackson.

3    Q.    Okay.  And there's all these dots to the bottom

4    left of the screen, and they're covering over a word.

5    What's that word they're covering over?

6    A.    Memphis.

7    Q.    All right.  So what do those dots of people living

8    in Memphis mean?

9    A.    That -- that represents that they're people that

10   were living in Memphis as their home address that were

11   traveling to Jackson to see Jeff Young.

12   Q.    And you're -- you're a nurse practitioner at

13   Le Bonheur in Memphis; is that right?

14   A.    That's correct.

15   Q.    Is it fair to say there are doctors in Memphis?

16   A.    There's actually three major medical systems here

17   in Memphis and multiple providers that are pain

18   specialists.

19   Q.    Okay.  But these people were driving to Jackson to

20   see Mr. Young?

21   A.    Yes.

22   Q.    And then let's see the words in the top -- sort of

23   right here under the read dots?

24   A.    Nashville.

25   Q.    What's that city?  That's Nashville?

1   A.      Uh-huh.

2   Q.      Doctors in Nashville?

3   A.      There are actually four major medical systems and

4   dozens of pain providers.

5   Q.      But these folks who are living there are driving to

6   Jackson?

7   A.      Correct, to see a family nurse practitioner.

8   Q.      Did you ever see this kind of driving when

9   somebody's going to see a -- like a specialist or an

10  exotic specialist?

11  A.      Yes.  If you are going to see a specialist, I mean,

12  I would imagine that long trips are not unusual.

13  However, the fact is the patients were passing -- passing

14  major cities that had multiple medical systems and lots

15  of providers that are pain management to go see Jeff

16  Young.

17  Q.      Okay.  Just one moment, please.

18          All right.  Okay.  That is our discussion of the

19  CSMD or the prescription data that you reviewed.

20  A.      Yes, ma'am.

21  Q.      Now I'd like to turn back to the Medicaid data.

22  A.      Okay.

23  Q.      And so you were able to see, in the Medicaid

24  data --

25

```
 1              THE COURT:  Excuse me.

 2          MS. PAYERLE:  Oh, yes.

 3              THE COURT:  We're going to go ahead and break

 4   for lunch.

 5          MS. PAYERLE:  Oh, great.  Perfect.

 6              THE COURT:  It seems like a good time right now.

 7          MS. PAYERLE:  Perfect.

 8              THE COURT:  Okay.

 9          MS. PAYERLE:  Thank you.

10              THE COURT:  So we're going to take our lunch

11   break right now, ladies and gentlemen.  It's about 12:15,

12   so we will pick this back up.  We'll make it 1:30, 1:30.

13   Okay.  Your lunch is in the jury room, I believe, so it's

14   waiting for you back there.  Enjoy your lunch and take a

15   break and all.  Leave notebooks in the chair, and

16   remember, don't discuss the case with anyone or allow

17   anyone to discuss it with you.  We'll pick this up at

18   1:30.

19          (Jury out at 12:16 p.m.)

20              THE COURT:  Ms. Seabolt, you can step down.

21              THE WITNESS:  Thank you.

22              THE COURT:  Don't discuss your testimony with

23   anyone over the break.

24              THE WITNESS:  Yes, sir.

25          (The witness complies with the request.)
```

1        **THE COURT:**  Okay.  We'll be in recess.

2        (The morning session concluded at 12:16 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*UNREDACTED TRANSCRIPT*

1                      **C E R T I F I C A T E**

2

3

4          I, LASHAWN MARSHALL, RPR, LCR, do hereby
   certify that the foregoing 125 pages are, to the best of
5   my knowledge, skill, and abilities, a true and accurate
   transcript from my stenotype notes of the Jury Trial
6   proceedings on the 29th day of March, 2023, in the matter
   of:

7

8

9

10

11   United States of America

12   vs.

13   Jeffrey W. Young, Jr.

14

15   Dated this 29th day of March, 2023

16

17

18

19

20

21

22

23                          _S/Lashawn Marshall_
                        Lashawn Marshall, RPR, LCR
24                       Official Court Reporter
                        United States District Court
25                       Western District of Tennessee

*UNREDACTED TRANSCRIPT*