1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

_____
                                    |
UNITED STATES OF AMERICA,           |
                                    |
            Plaintiff,              |
                                    |
vs.                                 |   NO. 19-CR-10040
                                    |
JEFFREY W. YOUNG, JR.,              |
                                    |
            Defendant.              |
_____

TRANSCRIPT OF THE JURY TRIAL

BEFORE THE HONORABLE JOHN T. FOWLKES

AFTERNOON SESSION

WEDNESDAY

MARCH 29, 2023

TINA DuBOSE GIBSON, RPR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

**UNREDACTED TRANSCRIPT**

1              A P P E A R A N C E S

2

3        Appearing on behalf of the Government:

4              KATHERINE PAYERLE
               ANDREW PENNEBAKER
5              United States Department of Justice
               Fraud Section
6              1400 New York Avenue, NW
               Washington, DC 20530
7              (202) 341-4227
               katherine.payerle@usdoj.gov
8              andrew.pennebaker@usdoj.gov

9

        Appearing on behalf of the Defendant:
10
               CLAIBORNE H. FERGUSON
11             RAMON DAMAS
               The Claiborne Ferguson Law Firm, PA
12             294 Washington Avenue
               Memphis, Tennessee 38103
13             (901) 529-6400
               claiborne@midsouthcriminaldefense.com
14             ramon@midsouthcriminaldefense.com

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

3

1                    **W I T N E S S   I N D E X**

2                                                            <u>PAGE</u>

3    **WITNESSES**:

4        **NATALIE SEABOLT**
               CONTINUED DIRECT EXAMINATION BY MS. PAYERLE.   5
5              CROSS-EXAMINATION BY MR. FERGUSON..........   19
         **SHIRLEY PICKERING**
6              DIRECT EXAMINATION BY MR. PENNEBAKER.......   24
               CROSS-EXAMINATION BY MR. FERGUSON..........   65
7        **KRISTINA ST. LAURENT**
               DIRECT EXAMINATION BY MS. PAYERLE..........   68
8              CROSS-EXAMINATION BY MR. DAMAS.............   80
               REDIRECT EXAMINATION BY MS. PAYERLE........   86
9        **DEMARCUS SCALES**
               DIRECT EXAMINATION BY MR. PENNEBAKER.......   89

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    **UNREDACTED  TRANSCRIPT**

1                          **E X H I B I T S**

2

        <u>Exhibit No.</u>                                          <u>Marked</u>
3
        Exhibit 43.......................................    6
4       Exhibit 44.......................................   11
        Exhibit 45.......................................   12
5       Exhibit 46.......................................   13
        Exhibit 47.......................................   17
6       Exhibit 48.......................................   32
        Exhibit 49.......................................   32
7       Exhibit 50.......................................   32
        Exhibit 51.......................................   32
8       Exhibit 52.......................................   32
        Exhibit 53.......................................   32
9       Exhibit 54.......................................   32
        Exhibit 55.......................................   32
10      Exhibit 56.......................................   32
        Exhibit 57.......................................   32
11      Exhibit 58.......................................   32
        Exhibit 59.......................................   32
12      Exhibit 60.......................................   32
        Exhibit 61.......................................   32
13      Exhibit 62.......................................   32
        Exhibit 63.......................................   32
14      Exhibit 64.......................................   32
        Exhibit 65.......................................   32
15      Exhibit 66.......................................   56
        Exhibit 67.......................................   60
16      Exhibit 68.......................................   62
        Exhibit 69.......................................   65
17      Exhibit 70.......................................   74
        Exhibit 71.......................................   76
18      Exhibit 72.......................................   85
        Exhibit 73.......................................   86
19      Exhibit 74.......................................   91
        Exhibit 75.......................................   94
20      Exhibit 76.......................................  107
        Exhibit 77.......................................  121
21      Exhibit 78.......................................  127

22

23

24

25

                        **UNREDACTED  TRANSCRIPT**

```
 1                        WEDNESDAY

 2                     MARCH 29, 2023

 3                ----------------------

 4

 5            THE COURT:  Okay.  Anything before we bring in

 6   the jurors?  Are we good to go?

 7            MR. FERGUSON:  We're good.

 8            MS. PAYERLE:  Yes.

 9            THE COURT:  And we need the witness.

10            MS. PAYERLE:  I'll get the witness.

11            THE COURT:  Okay.  Bring in the jurors, please.

12                  (Jury in at 1:35 p.m.)

13            THE COURT:  Okay.  Ladies and gentlemen, I think

14   we're ready to proceed at this time.  I think the Government

15   was still questioning Ms. Seabolt.

16            MS. PAYERLE:  Yes.  Thank you, Your Honor.

17            THE COURT:  You may continue.

18                  CONTINUED DIRECT EXAMINATION

19   BY MS. PAYERLE:

20    Q.   Good afternoon.

21    A.   Good afternoon.

22    Q.   Okay.  Ms. Seabolt.  All right.  So we had just, at

23   the break, finished talking about prescription monitoring

24   database data?

25    A.   Correct.
```

**UNREDACTED TRANSCRIPT**

1    Q.   All right.  And so now, we're going to turn to the

2    Medicaid database.  And did some of -- I guess, did some of

3    Jeff Young's patients accept -- or have Medicaid?

4    A.   Yes.

5    Q.   All right.  And did you take a look at the data

6    generated by Medicaid for visits or prescriptions or other

7    things associated with Mr. Young?

8    A.   Yes.

9    Q.   All right.  Let's see here.  Let's take a look at --

10   I'm going to show you this exhibit.  It's a one-page exhibit.

11   We've marked it 310.  This is a summary of voluminous

12   Medicaid data that you described.

13   A.   Yes, it is.

14             MS. PAYERLE:  We move to admit.

15             THE COURT:  We'll go ahead and receive it.  It

16   will be marked as Exhibit Number 43.

17             (Exhibit 43 marked and received.)

18   BY MS. PAYERLE:

19   Q.   All right.  Can you explain to the jury -- there's a

20   lot of stuff on this page.

21             MS. PAYERLE:  So let's maybe blow up just the top

22   down to the two From dates.  Sorry, the very top all the way

23   up.  And except if we could back out and blow up the top just

24   down to there.  There we go.  That's great.

25   BY MS. PAYERLE:

**UNREDACTED TRANSCRIPT**

1    Q.   Okay.  So just -- I guess explain to us -- this says

2    TennCare Top Count Summary All Categories.  What does that

3    mean?

4    A.   What that means is that for each of the categories

5    that are listed in this report, that they took out the top

6    amounts for whatever that category was for patients that Jeff

7    Young treated.

8    Q.   Okay.  And by took out, you mean presented on this

9    chart?

10   A.   Yes.  They took them out and put them in order of

11   occurrences.

12   Q.   Okay.  And this says here Procedure Codes.  What does

13   that mean?

14   A.   So a procedure code would be something -- it would be

15   a code that one of the -- it would be a CPT code, which is --

16   CPT stands for current procedural terminology.  And what that

17   means is that it's another code that is assigned to any sort

18   of a procedure treatment that is provided by a provider for a

19   patient.

20   Q.   So it tells Medicaid what the provider, in this case,

21   Mr. Young, did?

22   A.   Correct.

23   Q.   Okay.  And then you've got a date range, 1/2/2015 to

24   2/27/2018.  Is that sort of the date range of data that was

25   pulled in this?

**UNREDACTED TRANSCRIPT**

1    A.    Yes, anything that was generated during those two

2    dates is on this report.

3             MS. PAYERLE:  Okay.  Let's back up.  Okay.  So

4    let's see here in the very top line under Grand Totals.  Can

5    we blow up, let's say, here to here all the way across?

6    BY MS. PAYERLE:

7    Q.    All right.  And in the very top line, I'm looking at

8    this one under Grand Totals, what is that line?

9    A.    So the first number is 10,230, and that is the number

10   of claims that Jeff Young submitted for Medicaid patients

11   during this said time period.

12   Q.    And these two columns over here, one says Amount

13   Billed, the other says Amount Paid, what are they?

14   A.    So the amount billed is the amount of money that he

15   billed for the procedures or the services that he provided,

16   and the amount paid is the amount of money that was

17   reimbursed to him for those services.

18   Q.    And could those be things like office visits?

19   A.    Yes.

20   Q.    Okay.  So what amount did Jeff Young bill for Medicaid

21   services during this time period?

22   A.    So he billed $4,179,401.06.

23   Q.    And how much did Medicaid pay him for office services

24   during this time period?

25   A.    Over half a million.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF NATALIE SEABOLT*                                              9

1   Q.   All right.

2              MS. PAYERLE:   Let's back out of that.   Let's blow

3   up the part down here that says Diagnostic Codes.

4   BY MS. PAYERLE:

5   Q.   What is a diagnostic code?

6   A.   So the diagnostic code is what we were talking about

7   earlier, that's an ICD-9 code.   And that's the diagnostic

8   code that represents in the data what the patient has been

9   diagnosed with or the illness that the provider is treating,

10  that -- that he thinks requires the treatment he's providing.

11  Q.   So who enters the diagnosis code into the Medicaid

12  database?

13  A.   The provider, the nurse practitioner or doctor.

14  Q.   Okay.   And they do that at the time that they're

15  making the claim for payment?

16  A.   Correct.

17  Q.   All right.   What -- what -- just read the top two, I

18  guess, diagnosis codes that Jeff Young, during this time,

19  told Medicaid he was seeing Medicaid patients for?

20  A.   So his top two diagnoses that he submitted for his

21  Medicaid patients were other long-term current drug therapy

22  and lower back pain.

23  Q.   And how many of these top ten diagnosis codes relate

24  to pain or the use of drugs?

25  A.   There's five -- there's four, I'm sorry.

**UNREDACTED TRANSCRIPT**

1    Q.    Okay.  So there's long-term drug therapy.  Is the next

2    one low back pain?  I'll take that off.

3    A.    Yeah, low back pain, chronic pain syndrome.

4    Q.    How about the next one?

5    A.    Encounter for long-term use of other medications.  And

6    then you could also include the very bottom one, which is

7    issues with the lumbosacral area.

8    Q.    And if you also add in illnesses for which he might be

9    prescribing benzodiazepines, like anxiety, for example?

10   A.    Then you would add that anxiety disorder, unspecified.

11   Q.    Okay.  And so when we talk about pain, drug use, and

12   anxiety as all diagnoses for -- involving controlled

13   substances, would that be accurate?

14   A.    Yes.

15   Q.    All right.  About -- you've done -- I think you've

16   already done this math.  About what percentage of his patient

17   population did he claim to Medicaid had a diagnosis code

18   involving those kinds of problems?

19   A.    Eighty-four percent.

20   Q.    Let's come on out of that prescription -- or that

21   exhibit.

22         All right.  When a provider submits a claim to

23   Medicaid, do they provide demographic information about the

24   beneficiary or the patient that they are treating?

25   A.    Can you repeat the question?

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF NATALIE SEABOLT*                                        11

1   Q.   Sure.  When a provider submits a claim to Medicaid for

2   payment, do they provide or does Medicaid have, in some way,

3   demographic information about the patient they are treating?

4   A.   When they register for Medicaid, that demographic

5   information is saved specific to that patient.

6   Q.   Okay.  So Medicaid is -- Medicaid can track the

7   demographics of the patients that Jeff Young treated through

8   Medicaid?

9   A.   Correct.

10  Q.   Okay.  I'm going to show you an exhibit that's been

11  marked by us as 305.  Is this another summary chart relating

12  to the demographics of Mr. Young's Medicaid patients?

13  A.   Yes.

14            MS. PAYERLE:  Move to admit.

15            THE COURT:  We'll go head and receive Exhibit 44.

16              (Exhibit 44 marked and received.)

17            MS. PAYERLE:  Let's put 44 on the screen, please.

18  Thank you.

19  BY MS. PAYERLE:

20  Q.   All right.  What are we looking at here, Ms. Seabolt?

21  A.   So this is a breakdown gender-wise of any TennCare

22  patient that Jeff Young prescribed a controlled -- at least

23  one controlled substance prescription to between the ages of

24  18 and 40 years old.

25  Q.   And what do we see of the patients -- of the 18- to

**UNREDACTED TRANSCRIPT**

1    40-year-old patients to whom Jeffrey Young prescribed at

2    least one controlled substance during this time period, what

3    percentage of those patients are female?

4      A.   Between 2014 and 2017, 81 percent of those patients

5    were female.

6      Q.   In that age range.  And what about the male patients

7    in the 18- to 40-year-old category.

8      A.   There was 19 percent.

9      Q.   All right.  I'm going to show you another two-page

10   document that we've labeled 308.  This is another summary of

11   demographic information taken from the Medicaid database.

12     A.   Yes.

13             MS. PAYERLE:  Move to admit.

14             THE COURT:  It will be 45.

15                (Exhibit 45 marked and received.)

16             MS. PAYERLE:  Please put page 2 -- that's fine --

17   page 1 of 45 up on that screen there.

18   BY MS. PAYERLE:

19     Q.   Okay.  Is this a slightly different chart?

20     A.   Yes, so this is looking at all the Medicaid patients

21   that Jeff Young treated during the time period of July 2014

22   to January of 2017.  The pink area shows how many of those

23   female patients received a controlled substance prescription.

24     Q.   All right.  So the big circle is all patients?

25     A.   Yes, ma'am.

1    Q.   And the -- so 79 percent -- .65 percent of Jeff

2    Young's female patients during this time received a

3    controlled substance prescription?

4    A.   Female Medicaid patients, yes.

5    Q.   Female Medicaid patients.  Thank you.  That's a good

6    correction.  And let's go to the second page.  What

7    percentage of Jeff Young's male Medicaid patients received a

8    controlled substance prescription?

9    A.   Seventy-four percent.

10   Q.   Okay.  So to be clear, Ms. Seabolt, not all of Jeff

11   Young's patients did receive controlled substances?

12   A.   Correct.

13   Q.   But whether they were male or female, nearly -- about

14   75 percent of them did?

15   A.   Correct.

16   Q.   Okay.  Let's take a look at Exhibit -- we're calling

17   it 306.  It's a one-page document.  Is this a further

18   breakdown of patient demographics of Mr. Young's Medicaid

19   patients?

20   A.   Yes.

21            MS. PAYERLE:  Move to admit.

22            THE COURT:  That will be Number 46.

23            (Exhibit 46 marked and received.)

24            MS. PAYERLE:  Okay.  Please put 46 up on the

25   screen.

**UNREDACTED TRANSCRIPT**

1   BY MS. PAYERLE:

2      Q.   Okay.  Ms. Seabolt, this chart is a little bit more

3   complicated, but I want to walk through it slowly.  So go

4   ahead and describe, if you can, at a high level what we're

5   looking at?

6      A.   Okay.  So this is looking at all the TennCare patients

7   that Jeffrey Young prescribed at least one controlled

8   substance to.

9      Q.   So we're just narrowing into just patients to whom he

10  prescribed the controlled substances?

11     A.   Correct.  So looking at that 78 percent of females and

12  the -- whatever the percentage was of males, adding all that

13  together.

14     Q.   Okay.  And then breaking it down further?

15     A.   Correct.

16     Q.   All right.  And how did you break that down?

17     A.   So we broke it down by male and female, which is

18  indicated by the pink and the blue in the bars, and then we

19  also broke it down into age groups under 18, 18 to 21, 21 to

20  30, 30s, 40s.

21     Q.   Ms. Seabolt, I'm sorry, I'm getting distress signals

22  from the court reporter.

23     A.   Okay.

24     Q.   I'm going to ask you to slow down just a little bit.

25     A.   Yeah, yeah, sure.

**UNREDACTED TRANSCRIPT**

1    Q.    Thank you so much.

2    A.    So, first, the breakdown is by gender, so the male is

3    indicated by the blue part of the bar for each age group, and

4    the pink is indicated for the females in each age group.  And

5    then all -- and this was also breaking down by the age group

6    of the males and the females together.

7    Q.    All right.  So very first bar --

8              MS. PAYERLE:  If we could just actually blow up

9    this first bar down this one here just to focus on that for a

10   minute.

11   BY MS. PAYERLE:

12   Q.    So for patients -- for the controlled substance

13   patients under 18 -- this is all Medicaid patients, right?

14   A.    Correct.

15   Q.    Okay.  So for the controlled substance Medicaid

16   patients under 18, what percentage of those controlled

17   substance patients were male versus female?

18   A.    Forty-five percent of the patients were female and 55

19   percent were male.

20   Q.    All right.  And just to be clear, by the way, what --

21   generally speaking, which controlled substance were the kind

22   of kids under 18 getting?

23   A.    So, typically speaking, kids under 18, their

24   controlled substances would usually be ADHD medications for

25   attention deficit.

1    Q.   And we'll just -- you and I are going to help each

2    other to talk a little more slowly because I do it too.

3    We'll back off of that a little bit.

4         And let's go -- let's just kind of look through.  So

5    in the 18- to 21-year-old category, when the age jumps

6    from -- to 18- to 21-year-old, about what -- and, actually,

7    we may have to back out of the blowups to see the lines.

8    About what percentage of Jeff Young's 18- to 21-year-old

9    controlled substance recipients, Medicaid patients, were

10   female?

11   A.   Eighty percent.

12   Q.   And then look at the age 21 to 30.  If you look at

13   Jeff Young's patients who received controlled substances who

14   were age 21 to 30, what percentage of those patients were

15   female?

16   A.   Eight-five percent.

17   Q.   Okay.  And if the patient's age passed 30 for each

18   decade, what happens to that percentage of female patients?

19   A.   It tends to decrease by 10 percent.

20   Q.   Until we get to patients in their 60s and then

21   patients in their 60s who are getting controlled substances,

22   what is the percentage?

23   A.   It's a 50/50 split between the two genders.

24   Q.   All right.

25            MS. PAYERLE:  We can go ahead and pull that down.

**UNREDACTED TRANSCRIPT**

1   BY MS. PAYERLE:

2      Q.   Let's look, if we can, at what we've marked 307, it's

3   a one-page document.  I think for this one, this is another

4   CSMD summary?

5      A.   Yes, ma'am.

6      Q.   All right.

7               MS. PAYERLE:  Move to admit, please.

8               THE COURT:  That will be 47.

9                 (Exhibit 47 marked and received.)

10              MS. PAYERLE:  And we have 47 up on the screen.

11  BY MS. PAYERLE:

12     Q.   Is this another summary of the controlled substances

13  monitoring data?

14     A.   Yes, it is.

15     Q.   And so this is -- this is, again, prescription

16  information for just controlled substances regardless of

17  whether the patient had Medicaid; is that right?

18     A.   Correct.

19     Q.   All right.  And this could be cash pay patients,

20  private insurance patients, Medicare whatever?

21     A.   Anyone that had a prescription filled that would have

22  to be submitted to the CSMD data.

23     Q.   Controlled substances?

24     A.   Yes.

25     Q.   Got it.  All right.  So what does this chart on the

**UNREDACTED TRANSCRIPT**

1   left do?

2     A.   So the chart on the left looks like the number of

3   prescriptions that were prescribed starting in July of 2014

4   on a monthly basis, all the way through June of 2016 of

5   controlled substances.

6     Q.   And on the right, what do we see?

7     A.   On the right, it has the number of prescriptions for

8   each of those months, and it also has the number of pills

9   that those prescriptions provided.

10    Q.   Okay.  And that's the right column of the chart.  And

11  then what's the picture on the right here with the bars?

12    A.   It's a bar graph pictorial of the increase in the

13  prescribing practices of Jeff Young over that time period.

14    Q.   And, generally speaking, what do we see happening in

15  kind of late 2014, early 2015?

16    A.   We see a gradual increase over the beginning to middle

17  part of 2015, and then we start to see incremental increases

18  that are larger up to the point of February of 2016.

19    Q.   And was February of 2016 the peak?

20    A.   Yes.

21    Q.   So just to put some numbers on this, and to orient the

22  jury, in two thousand -- in the full -- to give it a full

23  12-month period, in the full year of 2015, what was the total

24  quantity of pills, controlled substance pills, that Jeff

25  Young prescribed that year?

*EXAMINATION OF NATALIE SEABOLT*                                    19

1   A.   710,957.

2   Q.   So these are the totals.  Am I circling them for 2015,

3   the whole year?

4   A.   Yes.

5   Q.   All right.  And how many prescriptions did he write

6   that year for controlled substances that were filled in

7   Tennessee?

8   A.   10,275.

9   Q.   In the last, what is it, six months of 2014, what is

10  the -- well, I just -- what is the total number of pills that

11  Jeff Young prescribed backing up into 2014?

12  A.   19,739, and that was for a six-month period.

13  Q.   And let's compare that to the six-month period of the

14  first six months of 2016; what was the total there?

15  A.   571,959.

16  Q.   How many controlled substances pills did Jeffrey Young

17  prescribe from his clinic in Jackson, Tennessee, that were

18  filled in Tennessee during this two-year period?

19  A.   1,302,654.

20          MS. PAYERLE:  The Government passes the witness.

21          THE COURT:  All right.  Mr. Ferguson?

22          MR. FERGUSON:  Thank you, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. FERGUSON:

25  Q.   How are you, Ms. Seabolt?

**UNREDACTED TRANSCRIPT**

1   A.   I'm good.  How are you?

2   Q.   The numbers you've been giving the jury today, those

3   are -- especially there at the end when you were talking

4   about pill counts?

5   A.   Yes, sir.

6   Q.   Those graphs we were seeing were not related to the

7   number of patients he was seeing during those months; it was

8   related to how many pills he was prescribing during those

9   months?

10  A.   Correct.

11  Q.   Did you ever compare the number of patients that he

12  was seeing on a day-to-day basis in his practice versus the

13  rise and increase in the number of prescriptions he was

14  giving out?

15  A.   No.  I was not asked to do that.

16  Q.   If he had, say, 5, 10, 15 patients a day versus 50, 60

17  patients a day, the 50, 60, you would expect to see more

18  prescriptions being written?

19  A.   I could expect more prescriptions to be written but

20  not necessarily for controlled substances.

21  Q.   Sure you could.  If he's got ten patients and he's

22  writing 10 percent of those patients, that's two people.  If

23  he's got 50, he's writing 10 percent, that's ten.  Ten is

24  bigger than two, correct?

25  A.   It is, but I don't necessarily know that it would need

1    more controlled substance prescriptions.

2      Q.   Sure it would.  If you're writing to the same

3    population but you're increasing your numbers of those same

4    populations --

5                 THE COURT:  Mr. Ferguson.

6                 MR. FERGUSON:  Yes, Your Honor.

7                 THE COURT:  Excuse me.

8                 MS. PAYERLE:  Asked and answered, Judge.

9                 THE COURT:  That's overruled.  Go ahead.

10   BY MR. FERGUSON:

11     Q.   Two different population sizes, 10 people, 50 people,

12   same population, same percentage of the people needing

13   prescriptions for chronic pain, your pill counts go up,

14   correct?  That's the way the math works.

15     A.   But he also saw patients for other conditions that

16   were not -- that had nothing to do with needing a controlled

17   prescription.

18     Q.   That's not what the Government is trying to say.

19   They're trying to say he's prescribing drugs.  So you're

20   saying he's prescribing to people that literally need, that

21   have a medical necessity.

22     A.   I'm saying that your math does not make sense to me.

23     Q.   Okay.  So you're the person that they bring in here to

24   tell about math, but that math doesn't make sense to you?

25     A.   You're trying to describe proportion, but it doesn't

**UNREDACTED TRANSCRIPT**

1  make sense to me what you're saying.

2    Q.  No, I'm trying to describe percentages of a

3  population.  If you have a population and you take 10 people

4  out of the population and 10 percent or 20 percent on pain

5  medication, or you take 50 people out of that same

6  population, same percentage need drug populations, your pill

7  count goes up.  It's simple math.  It's like eighth grade

8  math, right?  Yes or no?

9    A.  Yes.

10    Q.  Yes.  That's correct.  If his counts go up, his pill

11  counts go up, correct?

12    A.  For all prescriptions, yes.

13    Q.  For the controlled substances also, right?

14    A.  If those are the patients he is seeing, yes.

15    Q.  If he's seeing patients and he's writing prescriptions

16  and his numbers go up, the pill count goes up, correct?

17    A.  If those prescriptions are for controlled substances,

18  yes.

19    Q.  All right.

20          MR. FERGUSON:  That's all I have, Judge.

21          THE COURT:  Thank you.  Redirect?

22          MS. PAYERLE:  No, Your Honor.

23          THE COURT:  Okay, Ms. Seabolt.  Thank you very

24  much.  You can step down.  You're excused.

25          Call your next witness.

**UNREDACTED TRANSCRIPT**

1          MR. PENNEBAKER:  Your Honor, the Government calls

2  Investigator Shirley Pickering.

3          THE COURT:  I need you to step right around here

4  to the front.  All right.  Don't be afraid.  All right.

5  You're good right there.  If you would, please, raise your

6  right hand.

7          (The witness was sworn.)

8          THE COURT:  Be seated here, please.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1              **SHIRLEY PICKERING,**

2   called as a witness on behalf of the Government, having been

3   first duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5   BY MR. PENNEBAKER:

6     Q.    Good afternoon, Investigator Pickering.  Would you

7   please introduce yourself for the jury.

8     A.    I'm Shirley Pickering.  I'm one of the investigators

9   for health-related boards for the State of Tennessee.

10             THE COURT:  Spell your last name if you would,

11  please.

12             THE WITNESS:  P-I-C-K-E-R-I-N-G.

13  BY MR. PENNEBAKER:

14    Q.    And, Investigator Pickering, where do you work?

15    A.    I work out of the satellite office in Jackson,

16  Tennessee.

17    Q.    Can you describe your job duties, briefly?

18    A.    I investigate complaints or allegations about

19  healthcare providers.  Those are assigned to us through our

20  Central Office in Nashville.

21    Q.    Okay.  What kinds of allegations do you investigate?

22    A.    There's a wide range of the types of allegations.

23  Just some examples might be neglect, malpractice.  It could

24  be legal charges.  It could be failure to follow the rules

25  regarding their need for supervision by a collaborative

1    physician.  It could be overprescribing.  There's just a

2    large, large variety of the types of allegations that come to

3    us.

4        Q.   And when you say that you use "they" when they're

5    overprescribing --

6        A.   That would be the provider.

7        Q.   The provider.  And what kinds of providers do you

8    investigate?

9        A.   We investigate all providers from all the boards other

10   than the EMS and the pharmacy boards.  They have a separate

11   group of investigators.

12       Q.   Okay.  What medical training do you have,

13   Ms. Pickering?

14       A.   I've been a registered nurse since 1987.  I've worked

15   in a wide variety of healthcare settings from psychiatric to

16   home health.  I've worked the med-surg at a large state

17   psychiatric facility.  I've worked children's clinics in

18   terms of orthopedic surgical clinics.  I've worked ENT.  I've

19   done genetics.  I've done plastic surgery clinics.  I've been

20   the training coordinator for different programs.  Just a wide

21   variety of different things.

22       Q.   Okay.  How long have you been an investigator for the

23   state?

24       A.   I think I began in 2007.

25       Q.   Okay.  Have you ever personally investigated the nurse

```
 1    practitioner sitting at defense counsel, Mr. Jeff Young?

 2    A.   Yes, sir.

 3    Q.   Have you done so in connection with more than one

 4    matter?

 5    A.   Yes, sir.

 6    Q.   And just quickly, I want to ask you about, you brought

 7    a -- what looks like a folio with you up onto the stand

 8    today.

 9    A.   Yes.

10    Q.   Could you tell the jury what that is.

11    A.   The case that I'm talking about today, actually, I

12    completed investigating that in, I believe it was June

13    of 2016, and submitted my report at that time.  And that's

14    been almost seven years.  So I brought my report, hopefully,

15    so that I could refer to it.  I want to be sure that I'm

16    giving you correct answers and that I'm not mistaking

17    something because of the failure of memory.

18    Q.   Sure.  And I'm glad that you mentioned a failure of

19    memory because there are special rules that apply under

20    settings like the ones that we're in.  I'm just going to ask

21    that you only use what's in that folio if your memory is not

22    serving you.  If you knew something at one time, can't

23    remember it today, but it might refresh your recollection to

24    look in your reports, but please don't read off of the

25    reports to answer any of my questions.  Is that okay?
```

**UNREDACTED TRANSCRIPT**

1    A.    Yes, sir.

2    Q.    Is that --

3    A.    Yes.

4    Q.    All clear and everything?

5    A.    Yes.

6    Q.    Okay.  Thank you.

7    A.    Is it okay if I use --

8    Q.    If you refer to it only -- I would just ask that you

9  only refer to it if you don't remember.

10   A.    Yes, sir.

11   Q.    But you once knew.

12   A.    Okay.

13   Q.    And you're looking to refresh your recollection.

14 Thank you.

15         As an investigator, what is your role in investigating

16 providers?

17   A.    I review what the allegations that are sent to us are,

18 and then each case is a stand-alone case.  One case may

19 require a certain number of items.  Another may require

20 something totally different.  It really depends upon what the

21 specific allegations were.

22   Q.    Okay.  And you say when a case is referred to us.  Do

23 you -- and the other investigators that you work with, do you

24 all decide what to investigate or does that come from

25 somewhere else?

1    A.   No, sir, that comes to us.  The allegations come to

2    us.  We don't have any determination of that.

3    Q.   Is it a case that every time a complaint comes in, the

4    allegation comes in to you to investigate or is that a

5    decision that's made by somebody else too?

6    A.   It's reviewed by Central Office and then if they deem

7    that it should be investigated, it comes out to the field to

8    one of us, the field investigators.

9    Q.   So, basically, the investigation hatches in Nashville

10   and then if Nashville, at the Central Office, determines that

11   the complaint or the claim or whatever it is should be

12   investigated, it's referred to you in Jackson if that's where

13   the provider is?

14   A.   Yes, sir, just wherever the provider is.

15   Q.   Got it.  How about on the other end of the

16   investigation?  What is your final work product that you

17   generate in an investigation?

18   A.   The investigative report.

19   Q.   And then a -- what happens with that investigative

20   report?

21   A.   We forward the report and all attached -- any

22   attachments.  That would go directly to our Central Office.

23   It's reviewed there by Board consultants, Office of General

24   Counsel.  And then they make a determination whether there's

25   any substantiation to the allegation or not.

**UNREDACTED TRANSCRIPT**

1    Q.   Okay.  And I just want to be really clear about this

2    particular matter or any of the matters involving Mr. Young.

3    Did you -- were you involved in making the determination

4    about what happened as, you know, if there were any

5    sanctions, if there was anything that, you know, discipline

6    on his license or anything like that, were you involved in

7    deciding whether and how much of that there ought to be?

8    A.   No, sir, that's outside my scope.  I simply gather

9    data.  I gather information.  That's my role.

10   Q.   Okay.  Thank you.

11        Did you ever interview the defendant in the course of

12   your investigations?

13   A.   Yes, sir.

14   Q.   Is it important that practitioners tell you the truth

15   when they answer your questions?

16   A.   Yes, sir.

17   Q.   Is it important for your -- the mission of your agency

18   that they answer truthfully?

19   A.   Yes, sir.

20   Q.   What is the mission of your agency?

21   A.   Our overall mission is to protect the safety and the

22   welfare of the citizens of Tennessee.

23   Q.   Okay.  I want to turn to an interview you did with the

24   defendant on May 6, 2016, and this is what's been marked for

25   identification as Government's 606.  Have you listened to

**UNREDACTED TRANSCRIPT**

1    recording -- the recording of that interview?

2     A.   Yes.

3              MR. PENNEBAKER:  Your Honor, the Government would

4    offer Government's 606 and the 606 sub exhibits, which are --

5    is a CD with the recording of the interview on May 16, 2016,

6    with Ms. Pickering and -- Investigator Pickering and the

7    defendant.

8              MR. FERGUSON:  May I have just a moment?

9              THE COURT:  Sure.

10      (Conference between Mr. Ferguson and Mr. Pennebaker.)

11             MR. FERGUSON:  No objection.

12             THE COURT:  All right.  How long is it?

13             MR. PENNEBAKER:  How long is the interview?

14             THE COURT:  Yes.

15             MR. PENNEBAKER:  The interview itself is probably

16   an hour and 45 minutes, but we've designated clips that are

17   each probably around 30 seconds, give or take a minute.

18             THE COURT:  All right.  Let's go ahead and

19   proceed.  So you're introducing the entire interview or just

20   the clips?

21             MR. PENNEBAKER:  I intend to introduce just the

22   clips, Your Honor.  I want to make sure that I don't state

23   something on the record where the entire interview is on

24   there.

25             So, Your Honor, as a matter of fact, we have

1    Government's -- what's been marked for identification as

2    Government's 606A through U, each of which is a sub -- is a

3    clip from that single interview that I just mentioned.  So I

4    don't know if the Court would rather I introduce these one by

5    one.  That's probably easier so that we don't have to stand

6    here while they all get stickered, but is it okay just from

7    this point forward that I say the Government would offer

8    606A, which is a clip from the interview, et cetera?

9               THE COURT:  That's not a problem.  But what you

10   have there, is it a disk or are we talking about documents?

11              MR. PENNEBAKER:  These are disks.

12              THE COURT:  Okay.

13              MR. PENNEBAKER:  Each one.  So each clip, it has

14   its own disk.

15              THE COURT:  Okay.  And you want to mark them

16   individually?

17              MR. PENNEBAKER:  Or if the Court is amenable to

18   whatever exhibit number we're on and we can do A, B, C, D, E,

19   F, G, H, I, J, K, all the way to U like we've got it here.

20              THE COURT:  We'll go ahead and mark them

21   individually.

22              MR. PENNEBAKER:  Thank you, Your Honor.  And I

23   can just go ahead and hand all of these up because I'm not

24   going to need the handwritten notes.  And just for the

25   record, I and O are intentionally left blank.  Since we're

1    getting renumbered anyway, I just wanted to make sure.

2              THE COURT:  All right.  Okay.

3              (Exhibits 48 - 65 marked and received.)

4    BY MR. PENNEBAKER:

5    Q.   Investigator Pickering, do you remember the

6    allegations that you were investigating when you spoke to the

7    defendant in May 2016?

8    A.   I recall there being an allegation of failure to

9    comply with the required supervision by a collaborative

10   assistant -- I mean, a collaborative physician.  And I recall

11   there being allegations of either inappropriate or excessive

12   prescribing of controlled substances.  I think those are the

13   ones that I recall mainly.  I think there were some others,

14   but I recall those two.

15   Q.   Okay.  And did you discuss those allegations with the

16   defendant?

17   A.   Yes, sir.

18   Q.   Let's start with the supervising physician

19   allegations.  And the jury has heard about Tennessee law

20   requiring a nurse practitioner to have a supervising

21   physician.  Is that consistent with your understanding of the

22   law in Tennessee?

23   A.   Yes.

24   Q.   And as far as the Board is concerned, what is the

25   function of a supervising physician?

1    A.   They are to be physically onsite at least once every

2    30 days.  They are to be available at other times if there's

3    any question or any issue that arises.  They are to review at

4    a minimum 20 percent of all the overall records of the agency

5    and to sign those after review.  And they are to review and

6    sign 100 percent of all the charts having a controlled

7    substance prescription.

8    Q.   So I want to play a portion of your May 2016 interview

9    now.  It's clip 606A in what the Government designated as --

10   would that be -- do we have an exhibit number for that yet?

11                  THE COURT:  Number 48.

12                  MR. PENNEBAKER:  This will be Government's 48.

13                       (The audio was played.)

14                  MR. PENNEBAKER:  And if we could then play what I

15   think will be Government's -- or what will be Exhibit 49,

16   which is what was designated Government's 606B.

17                       (The audio was played.)

18                  MR. PENNEBAKER:  And then if we could play

19   Exhibit 50, which is clip 606C, previously designated.

20                       (The audio was played.)

21                  MR. PENNEBAKER:  And then the last on the

22   supervising physician topic, if we could play what's

23   previously marked as 606D, Exhibit 51.

24                       (The audio was played.)

25   BY MR. PENNEBAKER:

**UNREDACTED TRANSCRIPT**

1   Q.   Investigator Pickering, did you find evidence that

2   contrary to the defendant's statement on the recording, a

3   supervising physician did not review a hundred percent of the

4   charts of the controlled substance drug patients at

5   PREVENTAGENIX?

6   A.   Yes.

7   Q.   How did your review differ from the defendant's

8   assessment?

9   A.   My review reflected that there were charts that did

10  not have a supervising physician signature on those charts.

11  Also there was no way to verify that 100 percent of the

12  controlled substance charts were being monitored or reviewed

13  by a collaborative physician.   There was no system in place

14  to verify that, that all of them would be.

15  Q.   Okay.

16  A.   Also in terms of the collaborative physician, I did

17  note there was a break in coverage.

18  Q.   And I want to get to that as well.   I want to ask you

19  one more question about the system.   You said that -- you

20  talked about reviewing charts.   How did you get charts from

21  PREVENTAGENIX?

22  A.   I requested them on an official form that we utilize

23  and -- on our letterhead.   I provided a copy of the statute,

24  63-1-117, that allows them to provide us with the medical

25  record.   It's not violating HIPAA.   And then we -- I picked

1   up those records.  We have them notarized by the office, by

2   Mr. Young or by his -- whoever he designates that they are --

3   they are a complete record, nothing has been removed from it,

4   nothing has been added to it.

5       Q.   Did you review all the charts at PREVENTAGENIX?

6       A.   No.

7       Q.   How many would you say, give or take?

8       A.   I requested 25.  They were only able to locate 23 of

9   the 25.

10      Q.   Okay.  And same question I asked you earlier about:

11  Is it important that a -- somebody that you're interviewing

12  tells you the truth.  Is it important that those charts are

13  the actual charts and not something that has been added to

14  after the request is put in?

15      A.   Oh, yes, sir.

16      Q.   Why is that?

17      A.   We have to be able to document appropriately and

18  truthfully the care that was provided to be able to give that

19  data to the individuals who are reviewing the records.

20      Q.   And so you're counting on that -- those charts being

21  subpoenaed.  They weren't -- they weren't altered for the

22  purpose of presentation to you?

23      A.   Yes.  We depend upon them not being altered in any

24  way.

25      Q.   Okay.  So now I want to go back to the gap that you're

1   talking about where you said that there were gaps in

2   supervision.  Can you explain that?

3     A.   I'm going to refer for the dates to be sure that I

4   have the dates correct if that's okay.

5     Q.   If you wouldn't mind just, you know, reading first to

6   refresh your recollection.

7     A.   Okay.

8     Q.   And then if you want to -- if it does refresh your

9   recollection, going ahead and letting me know.

10    A.   Okay.  Thank you.

11                   (Brief pause. )

12              THE WITNESS:  Okay.  It does.  Yes, sir, it did

13   help me to refresh as far as the time frame.

14              In reviewing interviews that I conducted with the

15   collaborative physicians' sworn statements that they provided

16   to me and then documentation from the advanced billing that

17   was utilized by PREVENTAGENIX, it did reflect that Mr. Young

18   worked for a period of time between October of 2015 and

19   December of 2015 without collaborative physician supervision.

20   BY MR. PENNEBAKER:

21    Q.   Okay.  And when you investigated whether or not each

22   of PREVENTAGENIX's supervising physicians were coming to

23   PREVENTAGENIX every 30 days at least, to review charts, did

24   what you reviewed and your conversations with these

25   supervising physicians -- was that consistent?

1    A.    No, sir.

2    Q.    And can you tell the jury what about it was

3    inconsistent?  And you can just tell that at a high level.

4    A.    They were not consistently going to the clinic every

5    30 days to review and sign the charts.  They could not tell

6    me that they had signed 20 percent of the overall charts or

7    100 percent of the controlled substance charts.  They could

8    only tell me that they signed the ones that were put before

9    them, but they did not have any system to be able to verify

10   with me that those were the numbers, the minimum of

11   20 percent, and then the 100 percent of the controlled

12   substance charts.

13   Q.    Who did they tell you you ought to ask if you wanted

14   to know whether what they were looking at was 100 percent of

15   the controlled substance and 20 percent of the overall?

16   A.    That I would have to ask the practice.

17   Q.    Okay.  You mentioned inappropriate and/or excessive

18   prescribing.  Before we get there, I want to talk generally

19   about -- or before we get to the part of the interview that

20   deals with that, I want to talk about what you're looking for

21   when you are investigating something like excessive or

22   inappropriate prescribing of controlled drugs?

23   A.    Again, every case is unique and so what we look at --

24   look for in one case may be a little bit different; but,

25   generally, what we start looking at, we would look at the

1   controlled substance monitoring database for the prescribing

2   physician as to what he has prescribed under his DEA

3   registration number for controlled substances.  And we would

4   look at individual -- the patient -- each individual patient,

5   what was prescribed, the dosage, the quantity, the length of

6   time, whether they were filled early, whether they would have

7   any type of interaction with other controlled substances,

8   possible interactions with other controlled substances that

9   are listed on that CSMD.

10          We would also, in some circumstances, then go back and

11  compare that with that individual patient's CSMD, which would

12  tell you what the patient received and check to see if there

13  were controlled substances being prescribed by additional

14  providers or whether that patient was utilizing different

15  pharmacies, multiple pharmacies.

16          And we looked to see if the patient's receiving

17  multiple controls or if they're receiving controls --

18  narcotics in conjunction with other drugs.  Say they're

19  getting an opioid and they're getting a muscle relaxer and

20  they're getting an anti-anxiety drug.  They're getting a

21  medication for sleep, to see if they're getting additional

22  medications that may have an interaction or may increase the

23  possibility of an interaction or overdose.

24  Q.   Do you have a name for those kinds of approximations

25  of whether or not the prescribing is nontherapeutic or

1    inappropriate or excessive?  Are those called red flags?

2        A.    Yes.

3        Q.    So you're looking for those as red flags?

4        A.    We also look -- we do ask for patient records.  We

5    look in the record to see if there are diagnoses that would

6    warrant that type of medication, what the diagnoses is.  We

7    would also see if there are comorbidities, or there are other

8    diagnoses they are being treated for.  We would look to see

9    if there -- say there is a diagnosis of pain, we would look

10   to see are there testing results in the chart, are there lab

11   results, are there X-rays or MRIs or whatever would be

12   appropriate to be able to diagnose or say, yes, definitely

13   there's an issue there.

14       We look to see if the patient has been seen by a

15   previous provider.  If so, are there records there that tell

16   you what happened with the previous providers.  Has that

17   patient been referred out for any testing or for any sort of

18   consultation?  If so, are there records there reflecting the

19   results?  We look at to see if there are medications for

20   pain, how long have they been prescribed, was something that

21   was non-narcotic prescribed before it?  Did they start at a

22   lower level and move up?  If the patient has been on the

23   medication for an extended period of time, do we look to see

24   if there's been any effort to titrate or lower the dosage or

25   wean them off.  Was there a referral to other specialties,

1   whether it be neurology or other treatments such as physical

2   therapy or those sorts of things.

3          We look to see has education been provided to that

4   patient in terms of the -- you know, the possible side

5   effects of these narcotic medications or to combinations of

6   medications.  Patient safety, you know, the possibility of

7   addiction, those issues.  We look to see if there are any

8   sorts of documentation regarding monitoring these patients

9   for addiction, monitoring them for overusage, or monitoring

10  them for possible diversion or that sort of thing.

11         Are there urine drug screens?  Are there pill counts?

12  What are the results?  If there are results that are

13  inconsistent, then what actions were taken?  Are there

14  contracts if they're getting opioids?  Are there opioid

15  contract agreements saying that this what is expected of you

16  and this is what will happen if you don't meet these

17  expectations?  So we look for a lot of different things in

18  those charts, and then we simply note whether they're there

19  or not.

20  Q.   Okay.  Thank you.

21         MR. PENNEBAKER:  So I would offer -- now we're on

22  52, correct?

23  BY MR. PENNEBAKER:

24  Q.   Investigator Pickering, I will now play for you the

25  Government's 606S as previously marked, which will be

EXAMINATION OF SHIRLEY PICKERING

1   Exhibit 52.

2                 (The audio was played.)

3   BY MR. PENNEBAKER:

4    Q.   And I'm sorry that was hard to hear.  Your question,

5   it sounded like, was:  Do you have any additional training in

6   addiction medicine or pain management and his response --

7    A.   Was no, he did not.

8    Q.   Okay.  Why is that something that you were asking him?

9    A.   Typically, when someone is treating patients with pain

10   management or if they have patients that may come in with

11   addiction problems or they're on controlled substances and

12   they're monitoring for possible addiction, you know, if you

13   have a fairly large number of your population that's coming

14   in for that type of treatment, then we ask, well, do you have

15   additional training in pain management?  Do you have

16   additional training in addiction medicine?  That's something

17   we typically ask those people.

18    Q.   And that training is available for nurse

19   practitioners?

20    A.   To my knowledge, yes, sir.

21    Q.   Okay.

22         MR. PENNEBAKER:  Okay.  If we can, please,

23   Ms. Silverberg, play 606E as previously designated, which is

24   going to be Exhibit 53 now.

25               (The audio was played.)

**UNREDACTED TRANSCRIPT**

1    BY MR. PENNEBAKER:

2      Q.    Investigator Pickering, we heard initial history is

3    taken, physician exam, imaging, a patient history, recent

4    imaging considered, maybe a referral to physical therapy,

5    maybe a referral to a pain specialist.  Would that be a

6    pretty reasonable intake process for a new prospective pain

7    patient?

8      A.    It sounds like it would be reasonable.  That's what I

9    would usually see in these types of charts.

10     Q.    Okay.  Did you actually see that progression in the 25

11   charts that you -- well, the 23, I suppose, charts that you

12   reviewed?

13     A.    In the 23 charts I reviewed, no, I did not see that

14   consistently.

15     Q.    And if it's okay, I'd like to break it down.  So the

16   patient histories that you saw in these charts of patients

17   receiving narcotic opiate pain medications for chronic pain,

18   what did that history look like?

19     A.    Of course, I don't recall the specific histories for

20   each chart, but overall, they were fairly limited in much of

21   the chart, not a comprehensive type of history, I didn't see

22   recorded in some of the charts.

23     Q.    Was that pretty much true whether the patient was

24   getting tramadol, which is a weaker opioid medication, or

25   fentanyl, which is a much stronger opioid medication?

**UNREDACTED TRANSCRIPT**

1    A.    It was fairly consistent regardless of what the

2    medication was.

3    Q.    Okay.  And is that typical of a legitimate pain

4    practice?

5    A.    I would say in the charts that I reviewed, no.

6    Q.    Okay.  What about the documentation of physical

7    assessments in the charts that you reviewed, just generally?

8    A.    Generally, again, there were usually physical

9    assessments there, but again, fairly limited in the scope of

10   what it described.

11   Q.    Okay.  And when you say that there were physical

12   assessments there, what kind of physical assessments would

13   you be --

14   A.    There would be, I think to the best of my recall,

15   maybe a checklist.  But as far as just an overall assessment,

16   I don't recall there being very consistent, good physical

17   assessments.

18   Q.    Okay.  And the imaging that Mr. Young told you that he

19   would move to after those two things, did you see a lot of

20   imaging studies or imaging records in the patient files?

21   A.    Not consistently.

22   Q.    What about referrals to physical therapy, did you see

23   a lot of that?

24   A.    No, sir.

25   Q.    Did you see a lot of -- did you see much or even any

1    other modalities used to treat supposed chronic pain save

2    opioids?  Terrible question.  Let me ask that one more time.

3    I'm sorry.  Did you see alternative modalities being used to

4    treat pain other than medication?

5    A.    I did see a couple of referrals, maybe to neuro; but

6    in terms of like physical therapy, you know, whatever, heat

7    and cold, whatever, just examples like that, I don't recall

8    seeing a lot of that.

9    Q.    Okay.  Referrals to pain specialists, how about that?

10   A.    I saw, I think, a couple of referrals to pain

11   specialists, but then there was no follow-up afterwards.  I

12   think in one chart the patient came back to him, but I don't

13   see consistent follow-up.  If there's a referral, then

14   there's nothing after that.  And the patients I did ask did

15   they continue to see you also and did you prescribe after

16   that, and he did say yes.

17   Q.    Okay.  Is that an issue in your mind?  Is that a red

18   flag?

19   A.    Typically, it would be.

20   Q.    Why is that?

21   A.    Patients usually who go to pain specialists, typically

22   they don't come back.  They're treated by pain specialists

23   whether it be with procedures or medication.  I don't see a

24   lot of them going back to their referring provider.

25             MR. PENNEBAKER:  If we could, please -- we're on

1    54, okay.  If we could, please, play what's been previously

2    marked as Government's 606U and will be Exhibit 54.

3                         (The audio was played.)

4    BY MR. PENNEBAKER:

5      Q.    Did you -- were you able to confirm that PREVENTAGENIX

6    had stopped accepting new pain patients three months before

7    this interview?

8      A.    No, I could not confirm that.

9      Q.    You had to take the defendant's word for it?

10     A.    Yes, sir.

11     Q.    But his representation to you was we're not accepting

12   any new pain patients as of three months before May --

13     A.    Yes, sir.

14     Q.    -- 2016?

15     A.    That's what he told me, yes, sir.

16     Q.    And you relied on that representation in putting

17   together your report?

18     A.    Yes.

19           MR. PENNEBAKER:  If we could, please, play which

20   was previously marked as 606F, which will be Exhibit 55.

21                         (The audio was played.)

22   BY MR. PENNEBAKER:

23     Q.    Okay.  Can you tell the jury what a non-narcotic

24   analgesic is?

25     A.    It's a medication that's prescribed for pain that does

1    not contain a narcotic.

2    Q.    So what is the significance, the investigative

3    significance to you, if a practitioner treating pain starts

4    with a non-narcotic analgesic?

5    A.    Typically starting with a non-narcotic analgesic is

6    your first step.  There are fewer side effects in terms of

7    like worrying about respiratory depression and that sort of

8    thing.  But it's a progressive thing.  If it's able to be

9    controlled with a non-narcotic, then you don't have to move

10   up to something that's stronger.  And so that's one of the

11   reasons we ask that, did you try this before you tried this.

12   Q.    And so that was the right answer, if you will, was it

13   not?

14   A.    Yes.

15   Q.    Did you then see evidence that that was the

16   progression happening in the PREVENTAGENIX charts that you

17   reviewed?

18   A.    Not consistently.  And I did see a couple of notations

19   that said they were on a non-narcotic prescription before

20   they came here, and they said that it didn't work.  But I

21   didn't see those records from that previous provider to be

22   able to substantiate that.  So, you know, that notation might

23   be there in one or two charts, but I could never -- I could

24   not substantiate because I did not have the previous records.

25   Q.    Okay.  So, for example, if someone came in -- well,

```
 1   I'm going to strike that question.

 2                  MR. PENNEBAKER:  So if we could please play

 3   clips -- what's been marked as -- or previously designated

 4   606H and will be Exhibit 56.

 5                        (The audio was played.)

 6   BY MR. PENNEBAKER:

 7   Q.    Would hydrocodone and fentanyl be an example of two

 8   narcotic prescriptions for pain at the same time?

 9   A.    Yes, sir.

10   Q.    So if the rule at the practice is no patient gets two

11   narcotic medications for pain at the same time, that

12   combination, you would need to go see a pain specialist

13   first?

14   A.    According to what he said on tape, yes.

15   Q.    Is that a pretty good practice in your view as an

16   investigator?  Would that be a pretty good practice having

17   anybody that's going to receive two narcotic pain medications

18   go see a pain specialist?

19   A.    Yes, sir.

20   Q.    Why is that?

21   A.    Because they've been trained specifically in that type

22   of field as to what can be done, what should be done, what

23   sorts of precautions need to be taken, what they need to

24   monitor for, what the patient needs to tell them, what they

25   need to check on, signs of diversion.  It's just a safer way
```

1  of practicing, I think.

2   Q.   Is it -- can two -- can being prescribed two narcotics

3  for pain at the same time be a dangerous combination?

4   A.   It can be.

5           MR. PENNEBAKER:  Could I, please, get what's

6  previously been designated 606G, Government 606G, which I

7  think will now be 56 -- 57 excuse me.  I'm doing my best

8  here.

9               (The audio was played.)

10 BY MR. PENNEBAKER:

11  Q.   Okay.  Would it be true -- would it be an accurate

12 representation of the PREVENTAGENIX charts that you reviewed

13 that before prescribing something like morphine or stronger,

14 the patient would always be referred out to a pain

15 specialist?

16  A.   No.

17  Q.   Is fentanyl stronger than morphine?

18  A.   Fentanyl is an extremely strong drug, yes, sir.

19  Q.   Okay.  So fentanyl would definitely be over that line?

20  A.   Yes, sir.  I think fentanyl is -- yes.

21  Q.   And you're -- it seems like you have something else to

22 say about that?

23  A.   No.

24  Q.   Thank you, Ms. Pickering -- Investigator Pickering.

25 Sorry.

1           MR. PENNEBAKER:  Okay.  If we could, please, play

2    now what's been previously designated Government 606J, which

3    will be Exhibit 58.

4                     (The audio was played.)

5    BY MR. PENNEBAKER:

6    Q.   Investigator Pickering, in the charts from

7    PREVENTAGENIX that you reviewed, did you see a lot of chronic

8    pain patients that had gone to a pain specialist and been

9    deemed untreatable with any treatment other than medication

10   and then being subsequently referred back to PREVENTAGENIX

11   to -- for medication maintenance with a PCP?

12   A.   No.

13   Q.   Did you see any examples of that?

14   A.   I saw no records from pain clinics reflecting that

15   they had been sent back, that they were not treatable at pain

16   clinics.  The records I was provided, I did not see that

17   documentation in there.

18   Q.   Now, did you see documentation of Mr. Young continuing

19   the prescription regimen that a patient had been on someplace

20   else?

21   A.   Yes.

22   Q.   When you saw that, was that someplace else a pain

23   specialist, a pain doctor much of the time?

24   A.   No.

25   Q.   What kinds of prescribers was he continuing those

1   regimens on?

2   A.   To the best of my recall, they were other family

3   clinics, family providers, internists, yes.

4   Q.   Without a pain certification or anything like that?

5   A.   Yes, sir.

6   Q.   Did you see any evidence in the charts that you

7   received from PREVENTAGENIX that these patients were

8   untreatable by any other means other than medication?

9   A.   I think I recall seeing that documentation by

10  Mr. Young, but I did not see it reflected in any previous

11  records where they had been seen before or any pain clinic

12  records where they had gone to and -- it was not successful.

13  I did not see those records.

14  Q.   Would you expect to find a lot of individuals falling

15  into that category younger than 40?

16  A.   No, sir.

17  Q.   Why not?

18  A.   Typically, those individuals can be treated by those

19  types of interventions or by pain clinics.  That's one of the

20  red flags if you see patients at a relatively young age who

21  are being treated chronically with controlled substances for

22  pain.

23  Q.   You mentioned that you saw notes where patients were

24  being referred to maybe a pain specialist or neuro or

25  something like that, no follow-up documentation?

**UNREDACTED TRANSCRIPT**

1    A.   Correct.

2    Q.   Do you remember that?

3    A.   Yes.

4    Q.   Did you see in those charts that the defendant would

5    continue to prescribe Schedule II drugs to patients that have

6    those kinds of referrals in their charts?

7    A.   Yes.

8    Q.   And you may have mentioned this.  I'm sorry if I

9    missed it.  But did you find any patients coming back or

10   patients with referrals in their charts where whatever that

11   referral was, was reflected in subsequent visits with

12   Mr. Young?

13   A.   I did not.

14   Q.   Okay.

15            MR. PENNEBAKER:  If we can, please, play what's

16   been previously designated Government 606K, now 59.

17                 (The audio was played.)

18   BY MR. PENNEBAKER:

19   Q.   What are pill counts?

20   A.   Typically, you would have the patient come in.  You

21   count the number of pills they have remaining in their

22   bottle.  You compare them against when the prescription was

23   filled and determine whether or not they're taking them

24   appropriately, if they have the appropriate number left in

25   the bottle.

**UNREDACTED TRANSCRIPT**

1   Q.   Is that kind of like an accountability mechanism?

2   A.   Yes.

3   Q.   Did you find any evidence of pill counts happening in

4   the PREVENTAGENIX records you looked at?

5   A.   I did not find documentation of it.

6          MR. PENNEBAKER:  If we could, please,

7   Ms. Silverberg, play what's been previously designated

8   Government's 606L, which will be Exhibit 60.

9                  (The audio was played.)

10  BY MR. PENNEBAKER:

11  Q.   Did you find any evidence in the PREVENTAGENIX charts

12  that Mr. Young or anyone else at PREVENTAGENIX was educating

13  patients about drug addiction?

14  A.   I did not see any documentation of that.

15  Q.   Why is that important?

16  A.   It is important for a patient to know what the

17  possible effects are of the medication that they're

18  receiving, and one of the possible effects of controlled

19  substances is addiction.  They need to be aware of that.

20         MR. PENNEBAKER:  If we could, please, play 606N

21  previously designated, which will be Exhibit 61.

22                  (The audio was played.)

23  BY MR. PENNEBAKER:

24  Q.   And we hear, again, I used the form modalities

25  earlier.  Can you tell the jury, just summarize what

**UNREDACTED TRANSCRIPT**

1    modalities refers to?

2      A.   It's a type of treatment other than medication for

3    whatever ailment or illness that you're treating for.  It

4    would be things such as physical therapy.  It would be maybe

5    a TENS unit that you would order for someone.  You might --

6    exercise therapy based on patients -- chiropractic.  Just

7    different types of therapy that might help them to avoid

8    utilizing the stronger medications.

9      Q.   And acupuncture being one of those too?

10     A.   Yes.

11     Q.   Do you encounter providers that simply don't know that

12   these kinds of things are appropriate treatments for pain?

13     A.   Not typically, no.

14     Q.   Have you encountered providers that are just unaware

15   of these kind of best practices?

16     A.   Not the ones I have dealt with.

17     Q.   Fair to say that Mr. Young seemed to you to be

18   comfortable with best practices in this regard?

19     A.   Yes, sir.

20          MR. PENNEBAKER:  If we can now go to, please,

21   what's been previously marked as 606M because I think that

22   last one was N, which will be 62, or Exhibit 62.

23               (The audio was played.)

24   BY MR. PENNEBAKER:

25     Q.   So is it a good practice to have something in place, a

1   system, like, if I have to titrate your pain medicine more

2   than twice, I'm going to need to refer you to a specialist?

3   A.   Yes, sir.

4   Q.   That's a -- that would be considered a good practice?

5   A.   Yes, sir.

6   Q.   Did you find any evidence of that in the PREVENTAGENIX

7   records?

8   A.   No, sir.

9           MR. PENNEBAKER:  If we could, please, play 606 --

10  what's been previously designated 606P, like Paul, and this

11  will be Exhibit 63.  Thank you.

12                  (The audio was played.)

13  BY MR. PENNEBAKER:

14  Q.   Did you find any evidence in PREVENTAGENIX's files

15  that before Mr. Young would prescribe Schedule II stimulants

16  like Adderall for ADHD that that form we heard mentioned --

17  do you know what that form is?

18  A.   Yes.

19  Q.   Did you find any evidence of that in the PREVENTAGENIX

20  records?

21  A.   Not consistently, I did not find those forms.

22  Q.   Okay.

23          MR. PENNEBAKER:  If we could go to 606Q, which is

24  going to be Exhibit 64.

25                  (The audio was played.)

1  BY MR. PENNEBAKER:

2    Q.   Why is it a red flag if a provider sees patients after

3  the clinic is closed?

4    A.   Many times there's not other staff available there at

5  the clinic, so there's not the usual oversight.  Again, you

6  have to ask why are you seeing them after those established

7  hours.  And is this a common thing for them.  But there are

8  some red flags in seeing patients after established clinic

9  hours, unless it's an emergency status.

10   Q.   And so when -- if Mr. Young tells you unequivocally,

11  no, I don't do that, do you have any way to figure out

12  whether he's telling you the truth?

13   A.   No, sir, I would accept him at his word that that's

14  the case.

15             MR. PENNEBAKER:  If we could play 606V, please,

16  which is going to be Exhibit 65.

17                  (The audio was played.)

18  BY MR. PENNEBAKER:

19   Q.   Is Xanax a controlled medication?

20   A.   Yes, sir.

21   Q.   Is it addictive?

22   A.   Yes, sir.

23   Q.   Is it frequently abused?

24   A.   Yes, sir.

25   Q.   Is it part of a cocktail called the holy trinity where

1    someone is prescribing a muscle relaxer, a benzodiazepine,

2    like Xanax, and an opioid?

3    A.    Yes, sir.

4    Q.    Does it have street value?

5    A.    Yes, sir.

6    Q.    So your question about how long Xanax would be used,

7    why did you ask that question?

8    A.    Again, for a variety of reasons.  You know, if it's

9    being used for a long period of time, you know, have they

10   been referred to a mental health specialist to maybe be able

11   to get to the root of the problem and maybe able to wean or

12   titrate off.

13       Again, you know, you worry when somebody has been on

14   something for a long time also for the addiction

15   possibilities.  You worry about in terms of side effects.

16   And are they combining them with other drugs, what's going on

17   that they require this for a long period of time, and is it

18   well documented why that they're requiring it.

19   Q.    And so the -- did you see a lot of documentation about

20   patients being prescribed Xanax for long periods of time, why

21   that might be taking place at PREVENTAGENIX?

22   A.    No, I did not.

23            MR. PENNEBAKER:  If we could, please, play 606R,

24   which is going to be Exhibit 66.

25            (Exhibit 66 marked and received.)

1               (The audio was played.)

2   BY MR. PENNEBAKER:

3    Q.    Okay.  To unpack that a little bit, alprazolam, I

4   think you mentioned, was the number one drug prescribed by

5   Mr. Young?

6    A.    Of the controlled substances, yes, sir.

7    Q.    Is alprazolam the same thing as the Xanax that

8   Mr. Young said in the previous recording, I don't like to

9   prescribe because it's more addictive than Klonopin and

10  longer half life and all that?

11   A.    My understanding, yes, sir.

12   Q.    Or excuse me, a shorter half life, right?

13   A.    Shorter, yes, sir.

14   Q.    But yet there it is as his number one?

15   A.    Yes, sir.

16   Q.    And then the next was hydrocodone?

17   A.    Yes, sir.

18   Q.    You've got oxycodone, amphetamine, Soma, or

19  Carisoprodol, all of those are in the top list that you had.

20  Did Mr. Young seem surprised by that?

21   A.    No, sir.

22   Q.    Is there anything unusual about that list of top drugs

23  as an investigator?

24   A.    Just in my experience as an investigator, it does seem

25  like a large number of controlled substances for that number

**UNREDACTED TRANSCRIPT**

1    of patients.  And to be a family practice provider rather

2    than a pain specialist, particularly so.

3    Q.   How about with the amphetamine, is ADHD -- is that a

4    family practice-type diagnosis usually?

5    A.   It can be.  I did not -- I think he said something

6    about testing.  I did not find the testing results in the

7    records that I reviewed.

8    Q.   Did you find a lot of psych evaluations for things

9    like Xanax and Klonopin?

10   A.   No, sir, I did not.

11   Q.   Did you find any?

12   A.   I don't recall finding any.

13   Q.   Now, that wasn't the first or last time that you and

14   others at the Board interviewed Mr. Young, correct?

15   A.   Correct.

16           MR. PENNEBAKER:  And, Your Honor, I would, in

17   case I didn't do it clearly before, I certainly didn't do it

18   artfully before, I would move in exhibits --

19           MS. PAYERLE:  They're --

20           MR. PENNEBAKER:  Okay.  Great.  I just want to

21   make sure for the record that we've got all of the exhibits

22   that I just went through and moved in.

23           CASE MANAGER:  I went through.  I didn't realize

24   you were going to go out of order based on yours.  I would

25   have to go back and renumber, but it looks like I'm missing

*EXAMINATION OF SHIRLEY PICKERING*                              59

1   as far as A through U, missing B, I, and O.

2               MS. PAYERLE:  We deleted I and O.

3               CASE MANAGER:  And what about B?

4               MR. PENNEBAKER:  I think B, I did -- I think we

5   did play B.

6               MS. SILVERBERG:  We did play B.  He has it.

7               CASE MANAGER:  It goes from A to C.

8               MR. PENNEBAKER:  That's very impressive that you

9   got all of that.

10              MS. SILVERBERG:  You don't have it there in your

11  stack?

12              MR. PENNEBAKER:  That is possible.  I have V

13  here.

14              CASE MANAGER:  All right.  Then I'll need V.

15  That is 65.

16              MR. PENNEBAKER:  So we can give it to you after

17  the break.  Thank you.

18              THE COURT:  That's what we'll do.  They will all

19  be admitted.  Double-check the numbers, and make sure it's

20  straight at our break.

21              MR. PENNEBAKER:  We will, Your Honor.  Thank you.

22  BY MR. PENNEBAKER:

23    Q.   Okay.  So Investigator Pickering, have you reviewed a

24  recording of an interview with the defendant conducted by

25  Brandy Blare at the defendant's GeneXis clinic in 2018?

**UNREDACTED TRANSCRIPT**

1    A.   Yes, sir.

2            MR. PENNEBAKER:  And, Your Honor, I would offer

3    what's previously been marked as Government's 613A as

4    Exhibit 67.

5            THE COURT:  67.  The next one will be 67.

6            (Exhibit 67 marked and received.)

7                (The audio was played.)

8            MR. FERGUSON:  The defense doesn't have any

9    objection if they just ask Ms. Pickering what the statement

10   was and the answer.  I mean, I'm perfectly fine.  If she

11   knows, she's heard it before, I would assume she would know

12   what the question and answer were.  We have no objection.

13           MR. PENNEBAKER:  Thank you.

14           MR. FERGUSON:  No, that's fine.

15   BY MR. PENNEBAKER:

16   Q.   Ms. Pickering -- or Investigator Pickering, do you --

17   what did you hear in that recording?

18   A.    In the recording, I heard a relationship with and then

19   the name is -- was -- you know, you could not hear the name

20   and he said no.

21   Q.   Was there an investigation into whether or not

22   Mr. Young had a sexual relationship with a patient at

23   PREVENTAGENIX named Courtney Howell Taylor?

24   A.   Yes, sir.

25           MR. PENNEBAKER:  And could we just one more time

**UNREDACTED TRANSCRIPT**

1   play that recording?

2              MR. FERGUSON:  Your Honor, the defense would

3   stipulate the question and answer appears to be:  Did

4   Mr. Young have sexual relations, consensual or unconsensual,

5   with Ms. Courtney Howell, and the answer was no.  I think if

6   the jury gets back there and wants to listen to it again in a

7   different recording situation, they can hear it.  I can hear

8   it.  And we'll stipulate as long as the Government also says

9   that that's what it says.  That's what it is.

10             MR. PENNEBAKER:  I think there's a subsequent

11  question never, and then an answer never, or something like

12  that.

13             MR. FERGUSON:  We're fine with that, Your Honor.

14  We'll stipulate to that.  If we need to put it in writing for

15  the jury, whatever is convenient for the Court.

16             THE COURT:  Thank you, Mr. Ferguson.

17             MR. FERGUSON:  You're welcome.

18             THE COURT:  What was the name of the individual

19  again, Courtney --

20             MR. PENNEBAKER:  Howell Taylor.

21             THE COURT:  Howell Taylor.

22             MR. PENNEBAKER:  H-O-W-E-L-L, T-A-Y-L-O-R.

23  BY MR. PENNEBAKER:

24   Q.   And, Investigator Pickering, why would it be of

25  interest to the Board that a provider was having sex with a

**UNREDACTED TRANSCRIPT**

1   patient?

2     A.    Providers, it falls, I believe, basically, under the

3   ethics that providers are not to have sexual relationships

4   with their patients.

5     Q.    Okay.  And, Investigator Pickering, do you recall

6   another interview that you did with the defendant where you

7   were investigating a patient named Michael Yancey?  And I

8   don't -- I want to be just clear that I'm just asking you at

9   this point about whether you were investigating the file --

10  or whether you were investigating the defendant's treatment

11  of that patient?

12    A.    Yes.

13    Q.    Okay.  I'm going to play you a -- an excerpt from that

14  interview.

15          MR. PENNEBAKER:  It's been previously designated

16  Government 607A.  And that would be Exhibit 67 -- 68.  So,

17  Your Honor, the Government would offer -- Exhibit 68 into

18  evidence.

19          THE COURT:  Okay.  Go ahead.

20            (Exhibit 68 marked and received.)

21              (The audio was played.)

22  BY MR. PENNEBAKER:

23    Q.    Investigator Pickering, your first name is Shirley,

24  correct?

25    A.    Yes.

1    Q.    What -- were you all talking about a patient before

2    the last part of that discussion?

3    A.    Yes.

4    Q.    Had you asked anything to the defendant, Mr. Young,

5    about your reputation in the tabloids?

6    A.    No.

7    Q.    Were you particularly aware of a reputation that you

8    or the Board had in the tabloids in Jackson?

9    A.    I had heard some things.  I hadn't delved into them.

10   Q.    What did you take that statement to mean, asking you

11   whether you were aware that people mentioned you by name in

12   the tabloids?

13   A.    I felt, in a way -- I felt that it was a little bit of

14   an intimidation tactic, yes.

15   Q.    Why did you feel that way?

16   A.    It had nothing to do with what we were discussing, the

17   fact that he had to tell me specifically that I was mentioned

18   by my name.  It actually -- it just did not feel like an

19   appropriate response.

20   Q.    Had you ever investigated threats or HIPAA

21   violation-type disclosures online involving the defendant?

22   A.    I believe so, yes.

23   Q.    Did -- did that contribute to your impression?

24   A.    Yes.

25   Q.    Could you say a little bit more about that.

*EXAMINATION OF SHIRLEY PICKERING*                                64

1    A.   In reviewing those types of data that you referred to,

2    I noted a number of times when there were threats made or

3    threatening statements made by Mr. Young or friends of

4    Mr. Young or patients of Mr. Young.  And so that statement

5    then made to me did feel a bit like it was meant to be

6    intimidating.  Whether it was or not, that's how it felt.

7    Q.   Was that the only time during that particular

8    interview that your reputation in the tabloids was mentioned

9    by Mr. Young?

10   A.   There was a prior mention by Mr. Young that my name

11   and my information was on the Internet.

12   Q.   Are you aware of a -- a recorded interview that was

13   conducted by phone with Mr. Young by another investigator

14   with the Board in the 2018-2019 time frame?

15   A.   If you could provide the investigator's name?

16   Q.   It is not Ms. Blare, Investigator Blare.  It is --

17   A.   Ms. Hopper?

18   Q.   No.

19   A.   I'm the supervisor in the office.  It would have been

20   Ms. Hopper, Ms. Jones . . .

21   Q.   I think it was Ms. Jones.

22   A.   Ms. Jones.  She -- to my recall, Ms. Jones did do an

23   investigation.

24   Q.   As a supervisor in the office, would you have reviewed

25   investigative files of the investigators that might have been

**UNREDACTED TRANSCRIPT**

1  working on an investigation into Mr. Young?

2    A.   I would not have reviewed their files, but I would

3  have discussed the cases with them.

4    Q.   Would you have listened to interviews, given your

5  history of investigating Mr. Young?

6    A.   Yes, I probably would have, yes.

7    Q.   Okay.

8         MR. PENNEBAKER:  Your Honor, the Government would

9  offer Government's 605A, previously designated, which is now

10  going to be 69.

11        THE COURT:  69, yes.

12        (Exhibit 69 marked and received.)

13  BY MR. PENNEBAKER:

14    Q.   Investigator Pickering, were you ever in any of the

15  investigations that you or the others at the Board were

16  involved in, were you ever doing the bidding of Dawn Cox

17  Young?

18    A.   No, sir.

19        MR. PENNEBAKER:  I'll pass the witness.  Thank

20  you.

21        THE COURT:  And, Mr. Ferguson, any cross?

22        MR. FERGUSON:  Thank you, Your Honor.

23                    CROSS-EXAMINATION

24  BY MR. FERGUSON:

25    Q.   How many of Mr. Young's records did you review?

*EXAMINATION OF SHIRLEY PICKERING*                                66

1    A.    Twenty-three.

2    Q.    And how many of Mr. Young's ex-wives did you speak to?

3    A.    I believe one.

4    Q.    Would that be Dawn?

5    A.    I believe so, yes, sir.

6              MR. FERGUSON:  That's all I have, Your Honor.

7    Thank you.

8              THE COURT:  Any redirect?

9              MR. PENNEBAKER:  No, Your Honor.

10             THE COURT:  Okay.  Investigator Pickering, thank

11   you very much for coming down.  You can step down.

12             We're going to go ahead and take our afternoon

13   break right now.  We're coming down to about 3:30, and then

14   I'll deal with the next witness in just a few minutes.

15             Always the same, leave your notebooks and don't

16   discuss, no independent investigations.  Why don't you go

17   ahead and retire to the jury room.

18                  (Jury out at 3:20 p.m.)

19             THE COURT:  We'll be in recess.

20        (A recess was taken from 3:21 p.m. to 3:47 p.m.)

21             THE COURT:  All right.  Anything before we get

22   back to the jury?

23             MR. PENNEBAKER:  No, Your Honor.

24             MR. FERGUSON:  No, Your Honor.

25             THE COURT:  All right.  Bring them in, please.

**UNREDACTED TRANSCRIPT**

1                    (Jury in at 3:48 p.m.)

2              THE COURT:  I want to make sure everybody is

3    here.  There we go.  I think we're ready to proceed at this

4    time.  Call your next witness.

5              MS. PAYERLE:  Thank you, Your Honor.  The United

6    States calls Kristina St. Laurent.

7              THE COURT:  All right.

8              Step forward right up here.  Okay.  You're fine

9    right there.  If you would, please, raise your right hand.

10                  (The witness was sworn.)

11             THE COURT:  Be seated right here, please.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1                        <u>**KRISTINA ST. LAURENT**</u>,

2    called as a witness on behalf of the Government, having been

3    first duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5    BY MS. PAYERLE:

6        Q.   Good afternoon.

7        A.   Good afternoon.

8        Q.   Ms. St. Laurent, would you please -- I'm sorry.  It's

9    Special Agent St. Laurent now, isn't it?

10       A.   It is.

11       Q.   Excellent.  Would you please introduce yourself to the

12   jury?

13       A.   Ladies and gentlemen, my name is Kristina St. Laurent.

14   I'm a law enforcement officer of 11 years and a TBI agent of

15   about two months.

16       Q.   Congratulations.

17       A.   Thank you.

18       Q.   Okay.  So what is your, I guess, current occupation --

19               THE COURT:  Excuse me.  Y'all never do this, but

20   would you spell your last name, please?

21               MS. PAYERLE:  Oh, I apologize.

22               THE COURT:  I always do that.

23               THE WITNESS:  Sure.  It is S-T, period,

24   L-A-U-R-E-N-T.

25               THE COURT:  Thank you.

1        MS. PAYERLE:  I'll make a big note of that, Your

2   Honor.

3   BY MS. PAYERLE:

4     Q.   All right.  So what is your current position at TBI?

5     A.   Special agent over drugs and narcotics.

6     Q.   And before you got this job at TBI, what was your

7   position?

8     A.   Detective.

9     Q.   And where was that?

10    A.   Greenville City Police Department in upper east

11  Tennessee.

12    Q.   Were you in the -- when you were in that position,

13  were you involved in the investigation into Jeffrey Young and

14  his clinic PREVENTAGENIX?

15    A.   During that time, I was a patrol officer on the road.

16    Q.   That's on the road for also Greenville City Police?

17    A.   Yes, ma'am.

18    Q.   All right.  And were you involved in the investigation

19  into Jeffrey Young?

20    A.   Yes, ma'am.

21    Q.   Could you describe your role in that investigation?

22    A.   During that investigation, I worked in an undercover

23  capacity on two occasions.

24    Q.   And what did you do in your undercover capacity for

25  the investigation?

1    A.    Myself and another undercover officer arrived at the

2    clinic on both occasions and obtained prescriptions, narcotic

3    prescriptions, from Mr. Young.

4    Q.    Where was Mr. Young's practice located?

5    A.    Jackson, Tennessee.

6    Q.    And as part of your role as an undercover, did you

7    adopt a fake identity?

8    A.    I did.

9    Q.    And what was her name?

10   A.    Kristina Norton.

11   Q.    And did your undercover have a fake driver's license?

12   A.    Yes.

13   Q.    With a fake birthday?

14   A.    Yes.

15   Q.    All right.  How old was Kristina Norton?

16   A.    I believe, 28.

17   Q.    All right.  Was that close to your age at the time?

18   A.    It was.  I believe I was 31 at the time of the

19   operation.

20   Q.    Where did the, sort of, undercover person, Kristina

21   Norton, live according to her driver's license?

22   A.    Greenville, Tennessee.

23   Q.    And how far away in driving is Greenville, Tennessee

24   from Jackson approximately?

25   A.    I would just approximate, seven hours -- six hours,

 1    seven hours.

 2    Q.    When you went to PREVENTAGENIX as Kristina Norton, how

 3    did you pay for your visits?

 4    A.    I paid in cash.

 5    Q.    Okay.  Now, the jury has already seen some visits, and

 6    I believe it was one involving you.  It was one of your

 7    visits on October 11, 2016?

 8    A.    It was.

 9    Q.    And were you with an undercover whose identity was

10    Katie Crowder?

11    A.    I was.

12    Q.    All right.  During that visit or the subsequent one,

13    did you or Ms. Crowder kind of move around like you were in

14    pain?

15    A.    No.

16    Q.    During that first visit, did Mr. Young touch you in an

17    examination?

18    A.    I believe it was the first visit, yes.

19    Q.    All right.  And when he touched you -- now, to be

20    clear, it wasn't sexual in nature?

21    A.    No, not at all.

22    Q.    Okay.  Did he -- what exactly was he doing when he

23    touched you?  Like, how did he touch you?

24    A.    I was standing with my back facing him, and he was

25    feeling my lower lumbar area with his -- both hands.

**UNREDACTED TRANSCRIPT**

1    Q.   And when he touched you, did you wince or pretend to

2    be in any kind of pain?

3    A.   No, ma'am.

4    Q.   Were you able to stand up and sit down in his office

5    easily?

6    A.   Yes, ma'am.

7    Q.   Okay.  And you received a prescription on that visit?

8    A.   I did.

9    Q.   All right.  Because the jury has sort of already seen

10   that, we're going to skip to the next visit, your second

11   visit.

12   A.   Sure.

13   Q.   Did you return to Mr. Young's clinic in November

14   of 2016?

15   A.   I did.

16   Q.   And is that clip -- that's something that you've seen

17   before, the recording of that visit?

18   A.   It is.

19   Q.   Were you the one holding the recording device?

20   A.   That, I can't recall.

21   Q.   Okay.

22           MS. PAYERLE:  The Government moves to admit what

23   we've marked 1132, and it's a video recording of the November

24   15, 2016 visit.

25           THE COURT:  Okay.  We'll go ahead and receive it.

**UNREDACTED TRANSCRIPT**

1    I believe that will be Number 70.

2                     (Exhibit 70 marked and withdrawn.)

3                     MS. PAYERLE:  Let's go ahead and play for the

4    jury, Exhibit 70.

5                         (The video was played.)

6                     MS. PAYERLE:  I'm sorry.  Let's pause that.

7                     Actually, if the Government can withdraw Exhibit

8    70.

9                     THE COURT:  Yes, it will be withdrawn.

10                     MS. PAYERLE:  Okay.  Thank you.

11   BY MS. PAYERLE:

12    Q.   All right.  During that visit with Mr. Young, did he

13   ask you anything specific about your pain level, if you

14   recall?

15    A.   No, I don't remember him mentioning it at all.

16    Q.   Okay.  And at that time that you went in, were you --

17   had he -- I'm sorry.  In the prior visit, had he prescribed

18   you oxycodone?

19    A.   He had.

20    Q.   All right.  And had he ordered an MRI?

21    A.   He had.

22    Q.   All right.  I'm going to show you a two-page document

23   that we've marked 1134.  Is that a copy of an MRI report?

24    A.   It is.

25    Q.   Two pages?

*EXAMINATION OF KRISTINA ST. LAURENT*                    74

```
 1      A.    It is.

 2      Q.    Thank you.

 3            MS. PAYERLE:  Move to admit.  I believe this

 4   would be Exhibit 70.

 5            THE COURT:  This is Exhibit No. 70, yes.

 6            (Exhibit 70 marked and received.)

 7            MS. PAYERLE:  All right.  Let's go ahead and put

 8   the new exhibit up here, which is 1134.

 9   BY MS. PAYERLE:

10      Q.    All right.  Ms. Norton -- I'm sorry.  You're

11   Ms. St. Laurent -- your character is Ms. Norton.

12            MS. PAYERLE:  Let's blow up from here to here all

13   the way across, if we could.

14   BY MS. PAYERLE:

15      Q.    Is this a copy of an MRI report for Kristina Norton?

16      A.    It is.

17      Q.    And did you give this report to Mr. Young, or did

18   somebody fax it to him?

19      A.    That I'm not certain of.

20      Q.    You're not certain.

21            MS. PAYERLE:  Okay.  Let's back out, actually, of

22   this report.  And let's look -- open this part here.

23   BY MS. PAYERLE:

24      Q.    And do you see where the annotation says:  Fax results

25   to Jeff Young?
```

**UNREDACTED TRANSCRIPT**

```
 1    A.    Yes.

 2    Q.    And does that help you refresh --

 3    A.    Yes, it does.

 4    Q.    All right.  Great.

 5          MS. PAYERLE:  Okay.  So let's back out of this,

 6    and take a look at the test results section there.

 7    BY MS. PAYERLE:

 8    Q.    What did this MRI report tell Mr. Young about the

 9    state of your back?

10    A.    It stated that there were no issues with my disk, my

11    lumbar disks, and that there was a slight curvature of the

12    spine.

13    Q.    Did you ever -- is this actually true of you?  I mean,

14    is this an MRI of you?

15    A.    This is actually taken of me, yes.

16    Q.    Okay.  And so the slight curvature of the spine, did

17    you ever figure out what that was?

18    A.    What the doctor told me, there was -- that it is a

19    mild case of scoliosis.

20    Q.    Did you ever know you had it?

21    A.    No, I didn't.

22    Q.    Had it ever caused you any pain?

23    A.    No, it hasn't.

24    Q.    All right.  And, otherwise, it says:  No significant

25    disk height loss.
```

**UNREDACTED TRANSCRIPT**

```
 1              Do you see that?

 2     A.   I do.

 3     Q.   And it says:  The osseous mineralization is normal.

 4              Do you see that?

 5     A.   I do.

 6     Q.   And no acute osseous findings.

 7              Do you see that?

 8     A.   I do.

 9     Q.   Did Mr. Young ever go over with you what any of this

10  meant?

11     A.   No.

12     Q.   At the end of this visit, did you get a -- did you get

13  a prescription?

14     A.   I did.

15     Q.   And did you fill that prescription?

16     A.   I did.

17     Q.   All right.  I'm going to show you a two-page document

18  called 1133, and is this a receipt for that prescription you

19  filled?

20     A.   It is.

21     Q.   All right.

22              MS. PAYERLE:  Move to admit.

23              THE COURT:  That will be Number 71.

24               (Exhibit 71 marked and received.)

25              MS. PAYERLE:  Let's go ahead and pull up 71.
```

1    BY MS. PAYERLE:

2       Q.   Is that the front page of the receipt?

3       A.   It is.

4       Q.   How much did that prescription cost you?

5       A.   $135.

6            MS. PAYERLE:  Let's go to the next page.  Could

7    we just blow up the top up here?

8    BY MS. PAYERLE:

9       Q.   What was the prescription for?

10      A.   Oxycodone, 10-milligram.

11      Q.   And who was the prescriber over here?

12      A.   Jeff Young.

13      Q.   Did there come a time when he -- when a staff member

14   sort of signed you in as a patient or signed you up as a

15   patient in his clinic under a certain category?

16      A.   I believe that was the first visit.  There was some

17   question as to how I would be classified as a patient there

18   being seen with the other undercover agent, and I was

19   classified as a weight-loss patient.

20      Q.   Have you ever had any issues with your weight?

21      A.   No, ma'am.

22      Q.   Have you ever been told you need to lose weight?

23      A.   No, ma'am.

24      Q.   Did Jeff Young ever treat you for weight loss?

25      A.   No, ma'am.

**UNREDACTED TRANSCRIPT**

1    Q.   At either of the two visits, did Mr. Young ever try to

2    get to the root of whatever was causing the pain that you

3    told him you had?

4    A.   Aside from ordering the MRI, no, ma'am.

5    Q.   And then once the MRI came back normal, did he ever

6    discuss that?

7    A.   No.

8    Q.   Can you give the jury an overall impression, your

9    impression of your time with Mr. Young in those two visits?

10   A.   Both of the times that I was there, it was extremely

11   informal.  A lot of the conversation centered around

12   marijuana legalization and his activities outside of the

13   office -- excuse me -- personal activities.  Just not typical

14   for a doctor's office that I have ever been to before in that

15   sense.

16   Q.   Did he invite you to a party?

17   A.   He did.

18   Q.   Did he ever tell you, during either of the visits,

19   that if you take these drugs, you probably shouldn't drink

20   alcohol at his party?

21   A.   No.

22   Q.   Did he or anybody at his staff, during either of your

23   visits, ever ask you about your history of addiction?

24   A.   Not that I recall, no.

25   Q.   And I don't mean to imply.  You don't have a history

1    of addiction; is that true?

2       A.   That's correct.  I do not.

3       Q.   But nobody ever asked if you did?

4       A.   Not that I can recall, no.

5       Q.   Okay.

6              MR. PAYERLE:  Just one moment, please.

7                        (Brief pause.)

8              MS. PAYERLE:  It appears our videos have gremlins

9    in them here, so we are going to try one more time to see if

10   we've got the right video.

11             THE COURT:  Okay.

12             MS. PAYERLE:  I apologize.

13             Okay.  Your Honor, we're just not able to figure

14   it out.  So with that, I believe we'll pass the witness.

15             Thank you very much.

16             THE WITNESS:  Thank you.

17             THE COURT:  All right.  Thank you.

18             Okay.  And defense, that will be Mr. Damas?

19             MR. DAMAS:  Yes, Your Honor.

20             THE COURT:  You may proceed.

21             MS. PAYERLE:  Oh, you've got to wait for cross.

22             THE WITNESS:  Oh, I'm sorry.  I apologize, Your

23   Honor.

24             MS. PAYERLE:  It's the end of the day gremlins.

25

*EXAMINATION OF KRISTINA ST. LAURENT*                    80

```
 1                          CROSS-EXAMINATION
 2  BY MR. DAMAS:
 3     Q.    Good afternoon.  I promise I will be quick.
 4     A.    Good afternoon.  I apologize for that.
 5     Q.    It will not take very long.
 6           All right.  So you saw Mr. Young on three occasions;
 7  is that correct?
 8     A.    Two.
 9     Q.    Two?
10     A.    Yes, sir.
11     Q.    Are you sure about that?  I thought you saw him the
12  first time would have been in October.  Then you had a second
13  visit in November and then possibly a third in December.
14  Does that sound --
15     A.    I don't recall.  I think -- we were supposed to
16  schedule every month, but I'm fairly certain I only went
17  twice.
18     Q.    Okay.  That's fine.  But the first time was when you
19  went with the other undercover agent, Ms. Katie Crowder?
20     A.    Yes, that's correct.
21     Q.    And do you remember on that occasion filling out an
22  intake form?
23     A.    I seem to recall filling out some paperwork, but I
24  don't remember what it was.
25     Q.    And do you recall filling out on that paperwork that
```

1    you were having pain from a fall that you suffered years ago,

2    was the reason you were coming to see him?

3    A.   I don't remember what was on that paperwork.  I'm so

4    sorry.

5    Q.   If I was to show it to you, would it refresh your

6    recollection?

7    A.   Yes, absolutely.

8    Q.   Give me one second then.  Sorry about that.

9           MR. DAMAS:  If I may approach, Your Honor?

10          THE COURT:  Go ahead.

11   BY MR. DAMAS:

12   Q.   On that one, that's when you're listing your list of

13   symptoms.  Do you remember filling out anxiety and muscle

14   pain?

15          THE REPORTER:  I'm sorry?  Anxiety and?

16          MR. DAMAS:  Muscle pain.

17          THE WITNESS:  The form does look vaguely

18   familiar, but to say 100 percent that I made those check

19   marks --

20   BY MR. DAMAS:

21   Q.   Let me get you the first page of that document --

22   A.   Yes, please.

23   Q.   Here is the first page of that.

24   A.   Thank you.

25   Q.   Is that your handwriting?

**UNREDACTED TRANSCRIPT**

1    A.   Yes, sir, it is.

2    Q.   And the first page, page 1 of 2?

3    A.   There are two pages here, yes.

4    Q.   Okay.  And do you remember filling out an intake form,

5    and if you would have checked that, that's what you would

6    have said at that time?

7    A.   Yes.

8    Q.   Okay.  During your conversation with Mr. Young, do you

9    recall telling him that the reason you were having muscle

10   pain is because you fell years ago?

11   A.   Yes.

12   Q.   And that your pain was, on a scale from one to ten, it

13   was an eight out of ten?

14   A.   I don't recall using the number scale, but I do

15   remember telling him it was from a fall.

16   Q.   Okay.  And you told him you had never had X-rays

17   prior?  One of the reasons he asked you to get X-rays is

18   because you had never had X-rays done before?

19   A.   I don't remember if I ever told him I didn't have

20   X-rays before.

21   Q.   Okay.  Are you familiar with what a PMP is?

22   A.   Yes.

23   Q.   Okay.  Obviously, Kristina Norton is not a real

24   person, correct?

25   A.   Correct.

**UNREDACTED TRANSCRIPT**

1   Q.   Do you have an explanation as to why a PMP for

2   Kristina Norton would have come back with a history of

3   prescriptions?

4   A.   Yes.  That was a prior used undercover identity.

5   Q.   Okay.  And so on the prior use undercover identity,

6   you had collected opioids and narcotics and went and filled

7   them out?

8   A.   That's correct.

9   Q.   Okay.  So part of the reason when you're in this

10  initial consultation with Mr. Young, he tells you:  Oh, I've

11  seen that you've been on oxycodone before.  I'm just going to

12  start you back up.

13  A.   I remember him asking me what I had used to treat the

14  pain in the past before, and then I told him oxycodone and

15  some other drugs.

16  Q.   And while he's talking to you, he's looking at a file;

17  is that correct?

18  A.   I can't recall if he was looking at a file or not.

19  I'm sorry.

20  Q.   But the PMP would show that you've used this before

21  and you -- you used this identity before to get prescriptions

22  from another provider?

23  A.   It would show that that information tied to that

24  identity has received prescriptions for that, yes.

25  Q.   Okay.  And you verified to Mr. Young that you had used

**UNREDACTED TRANSCRIPT**

 1 | these prescriptions before to treat your back pain?

 2 | A.   Yes.

 3 | Q.   Okay.  Do you remember after -- at the end of the

 4 | consultation, you entering into an opioid pain management

 5 | agreement with Mr. Young?

 6 | A.   I don't recall that, no.  I'm sorry.

 7 |            MR. DAMAS:  If I may approach?

 8 |            THE WITNESS:  Yes, please.

 9 |            Yes, that's my handwriting and my initials.

10 | BY MR. DAMAS:

11 | Q.   And that is a contract for how to use the opioids --

12 | A.   It is.

13 | Q.   -- that he's prescribing you?

14 | A.   It is.

15 | Q.   All right.

16 |            MR. DAMAS:  Your Honor, if I may move both of

17 | these as a collective exhibit.  It should be number --

18 |            THE COURT:  72 is next, but what do you have

19 | there?

20 |            MR. DAMAS:  I have the original intake form that

21 | she filled out and the opiate contract that she agreed to.

22 |            THE COURT:  Are those all together?

23 |            MR. DAMAS:  Yes.  I can do it as one collective.

24 | I can do it separate, whichever is easier.

25 |            THE COURT:  However you want to do it.  We'll

```
 1   make it a collective Exhibit No. 72.

 2                 (Exhibit 72 marked and received.)

 3   BY MR. DAMAS:

 4     Q.   During the visits that you had with Mr. Young, I know

 5   you testified that there was discussions about a party.  Did

 6   he ever formally invite you to that party?

 7     A.   I recall him welcoming us to come and advising us to

 8   just blend in with the crowd.

 9     Q.   Did he give you a specific date that it was going to

10   happen?

11     A.   Halloween.

12     Q.   Can Halloween parties happen on dates that are not

13   Halloween?

14     A.   They can.

15     Q.   Okay.  Did he give you a specific address to go to?

16     A.   He didn't.

17     Q.   Okay.  So it was more just making conversation?

18     A.   It could have been.

19     Q.   Okay.  At any time in any of your visits, did

20   Mr. Young ever proposition you to have sexual relations with

21   him?

22     A.   No, he didn't.

23     Q.   Did he ever attempt to have sexual relations with you?

24     A.   No, he didn't.

25     Q.   In any capacity?
```

**UNREDACTED TRANSCRIPT**

1   A.   No, he didn't.

2              MR. DAMAS:  No further questions, Your Honor.

3   Thank you.

4              THE COURT:  Thank you.

5              Any redirect?

6              MS. PAYERLE:  Yes, Your Honor.  If the Court

7   would permit -- perhaps, the defense would prefer this.  I

8   believe I was wrong about being wrong and that the video that

9   we admitted actually was the correct video.  So if it's okay

10  we can play that in redirect.

11             THE COURT:  All right.  You omitted before, and

12  you have it together now?  Actually, you had it together --

13             MS. PAYERLE:  I had it.  It turns out I was wrong

14  about being wrong.

15             THE COURT:  We will go ahead and admit it.  I

16  believe it is Number 73 now.

17             (Exhibit 73 marked and received.)

18             MS. PAYERLE:  Thank you very much.  So let's go

19  ahead and play 73, if we could, please.

20                  (The video was played.)

21                  REDIRECT EXAMINATION

22  BY MS. PAYERLE:

23   Q.   All right.  Ms. St. Laurent, did Mr. Young give you

24  the impression that he was, like, overwhelmed, without any

25  time to talk to you?

1    A.    No, ma'am.

2    Q.    Did he have time to talk about politics?

3    A.    We did discuss politics, yes, ma'am.

4    Q.    And marijuana?

5    A.    Yes, ma'am.

6    Q.    How about his Facebook spoofs, did he have time to

7    discuss that?

8    A.    They were mentioned, yes.

9    Q.    And how about, sort of, his contacts on the inside,

10   did he talk to you about a lot of those?

11   A.    He did.

12   Q.    And the background scene that he was involved in?

13   A.    He did.

14   Q.    During this entire video, when he had time to talk

15   about those things, did he ask you anything beyond one

16   question about your pain?

17   A.    No, ma'am.

18   Q.    Did he ask whether it had improved or gotten worse?

19   A.    No.

20   Q.    The quality of it?

21   A.    No.

22           MS. PAYERLE:  Okay.  Nothing further, Your Honor.

23   Thank you for the --

24           THE COURT:  Mr. Damas, anything?

25           MR. DAMAS:  No, Your Honor.

**UNREDACTED TRANSCRIPT**

88

1              THE COURT:  Okay.  Ms. St. Laurent, now you can

2    step down.

3              THE WITNESS:  Thank you, Your Honor.

4              THE COURT:  Government, if you would, please,

5    call your next witness.

6              MR. PENNEBAKER:  Your Honor, the United States

7    calls Special Agent Demarcus Scales.

8              THE COURT:  Okay.  Step forward, if you would,

9    please, and raise your right hand and receive the oath.

10             (The witness was sworn.)

11             THE COURT:  Be seated here.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1        **DEMARCUS SCALES**,

2  called as a witness on behalf of the Government, having been

3  first duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5  BY MR. PENNEBAKER:

6    Q.   Good afternoon, Special Agent Scales.  Would you state

7  and spell your name for the record, please.

8    A.   Demarcus Scales.  Scales, S-C-A-L-E-S.

9    Q.   Okay.  Special Agent Scales, where do you work?

10   A.   The Tennessee Bureau of Investigation.

11   Q.   What do you do for them?

12   A.   I'm a criminal investigator special agent.

13   Q.   Okay.  What does a criminal investigator special agent

14 do?

15   A.   I'm assigned to the Medicaid fraud control division

16 investigating provider fraud as well as abuse, neglect and

17 financial exploitation of the elderly as well as individuals

18 with developmental disabilities with the nexus -- a TennCare

19 nexus.

20   Q.   Have you worked on a case involving the defendant,

21 Jeffrey Young?

22   A.   Yes.

23   Q.   Have you looked at the CSMD data for the prescriptions

24 that the defendant wrote?

25   A.   Yes.

*EXAMINATION OF DEMARCUS SCALES*                                    90

 1    Q.   Have you reviewed evidence from search warrants

 2   executed on the defendant's Facebook account?

 3    A.   Yes.

 4    Q.   How about his iPad?

 5    A.   Yes.

 6    Q.   How about his phone?

 7    A.   Yes.

 8    Q.   Have you reviewed search warrant evidence from his

 9   house?

10    A.   Yes.

11    Q.   And from his office PREVENTAGENIX?

12    A.   Yes.

13    Q.   Have you reviewed the Government's exhibits in the

14   800s as we've designated them?

15    A.   Yes.

16    Q.   And none of those have been admitted into evidence,

17   although you heard earlier that there were three pages of

18   Hope Rogers' summary exhibit that were admitted previously.

19   Do you remember that?

20    A.   Yes.

21    Q.   Okay.  Let me hand you what's been previously marked

22   for identification as Government's 803.  And do you recognize

23   that to be a compilation summary exhibit involving Adrienne

24   McKenzie?

25    A.   Yes.

**UNREDACTED TRANSCRIPT**

1          MR. PENNEBAKER:  Your Honor, the Government moves

2    to admit what will be Exhibit 74.

3          THE COURT:  It will be Number 74.

4          MR. PENNEBAKER:  Thank you, Your Honor.

5           (Exhibit 74 marked and received.)

6          MR. PENNEBAKER:  And, Ms. Silverberg, if you

7    would publish, please -- go to page 3.

8          Thank you.  Okay.  So we're going to go to page 3

9    of Exhibit 74.  Let's see how it goes.

10   BY MR. PENNEBAKER:

11    Q.   All right.  Okay.  Special Agent Scales, can you tell

12   the jury how this exhibit works?

13    A.   So what this is, it's a combination of the text

14   messages and Facebook.  For example, this one is Adrienne

15   McKenzie and Mr. Young.  So this is going to be their text

16   message thread as well as it could potentially have Facebook

17   along with it and -- what you've heard of as the CSMD or PMP

18   data.  And what we've done is we've put it in order where you

19   can -- we would cross reference it initially.  But now it's

20   in a somewhat chronological order where you can just read

21   along with it.

22    Q.   Okay.  So the source of each entry in this

23   spreadsheet, is that what's over there on the right-hand

24   column, the far right column that says SMS and PMP on there?

25    A.   Yes.

1    Q.   So just while we're getting oriented to these

2    exhibits, because we're going to look at a few of these,

3    right?

4    A.   Yes.

5    Q.   While we're getting oriented, can you tell the jury

6    what an SMS is?

7    A.   That would be a text messages.

8    Q.   And how about an MMS?

9    A.   That would be a video, picture, a jif or gif or

10   however you pronounce it.

11   Q.   How about what -- what's the entry for Facebook?

12   A.   FB.

13   Q.   And how about that PMP, is that also CSMD?

14   A.   Yes, sir.

15   Q.   So I think the last thing that we need to decrypt here

16   is the shading of these cells.  Can you tell the jury what

17   the difference between the gray and the white is?

18   A.   So the white is going to be the messages, whether it's

19   Facebook text messages or a picture or a video.  The gray is

20   going to be the PMP or CSMD data.

21   Q.   Okay.  Special Agent Scales, I am going to -- well, do

22   you recall hearing that clip that was kind of garbled and

23   that we stipulated was the defendant answering a question

24   that Ms. Pickering -- or that -- excuse me -- Investigator

25   Blair asked about whether or not the defendant had had a

**UNREDACTED TRANSCRIPT**

```
 1    sexual relationship with a woman named Courtney Howell
 2    Taylor?
 3     A.   Yes.
 4     Q.   And do you remember his response:  No.
 5          And then she asked:  Never?
 6          And he says:  Never.
 7     A.   Yes.
 8     Q.   And that's Government 613A, right?
 9     A.   Yes.
10             MR. PENNEBAKER:  Which was then marked as --
11             MS. SILVERBERG:  -- 67.
12             MR. PENNEBAKER:  -- Exhibit 67.
13    BY MR. PENNEBAKER:
14     Q.   All of that seem square so far?
15     A.   Yes.
16     Q.   Okay.  Give me a chance.  I'll fail you.
17          All right.  Let's go -- actually, let me hand you
18    first what has been marked for identification as Government's
19    806.  Is this a summary exhibit like the one that we just
20    looked at but for an individual named Courtney Howell Taylor?
21     A.   Yes.
22             MR. PENNEBAKER:  Okay.  The Government moves to
23    admit exhibit -- well, what's previously been marked as 806
24    as Exhibit 75.
25             THE COURT:  I don't know about all those
```

**UNREDACTED TRANSCRIPT**

```
 1    identification numbers.  We'll introduce it.  It will be
 2    Exhibit 75.
 3                   (Exhibit 75 marked and received.)
 4            MR. PENNEBAKER:  Thank you, Your Honor.  I'm glad
 5    I don't have to jumble that any further.
 6            And if we could call up, please, Ms. Silverberg,
 7    page 1.
 8    BY MR. PENNEBAKER:
 9      Q.   All right.  So at the top you see that it says this is
10    our CSMD, SMS, MMS, Facebook summary, right?
11      A.   Yes.
12      Q.   And what's the date in that first message?
13      A.   7/25/2015.
14      Q.   All right.  We have a -- it looks like we have three
15    prescriptions on this slide, correct?
16      A.   Yes.
17      Q.   And those come after a photograph of an individual,
18    right?
19      A.   Yes.
20      Q.   So what are those three prescriptions for?
21      A.   Alprazolam, tramadol and diazepam.
22      Q.   Two benzodiazepines and an opioid?
23      A.   Yes.
24            MR. PENNEBAKER:  All right.  Ms. Silverberg, if
25    we could go to page 2, please, and let's zoom in on the first
```

**UNREDACTED TRANSCRIPT**

 1 | six lines or so.

 2 | BY MR. PENNEBAKER:

 3 |   Q.   So this is -- these are Facebook messages it says on

 4 | the right-hand column, correct?

 5 |   A.   Yes.

 6 |   Q.   So as we're going through these, if it's all right

 7 | with you, I'll read the part of the defendant, and you can

 8 | read the part of the other participant in the conversation.

 9 | Is that all right?

10 |   A.   Yes, sir.

11 |   Q.   You don't have much of a choice.

12 |        Okay.  So on June 8, 2016, does the defendant say:  We

13 | could have a great time if you're discreet?

14 |   A.   Yes.

15 |   Q.   And then what does Ms. Taylor say?

16 |   A.   Well, duh, I am married to a wonderful man.  Just

17 | curious and bad.  LOL.

18 |   Q.   Well, I'm down if you want to explore more.  My office

19 | is hot too.  Need to just take my pants off.

20 |        Do you see all that?

21 |   A.   Yes.

22 |        MR. PENNEBAKER:  Could we, please,

23 | Ms. Silverberg, go to page 5?  And if you could zoom in.

24 | There you go.  Perfect.

25 | BY MR. PENNEBAKER:

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                    96

1    Q.   And these are now text messages on a phone, correct?

2    A.   Yes.

3    Q.   So if you want to start by reading Ms. Howell's part.

4    A.   So did you like today?  Did I get better from

5    yesterday?

6    Q.   Baby, it was phenomenal.  I love fucking you.

7    A.   Good, because I do not want to stop any time soon.

8    Q.   Don't ever -- oh, yeah, that's her.

9    A.   Don't ever be shy to tell me if I need to work on

10   anything.

11   Q.   Okay.  What is the investigative value in this

12   exchange, Special Agent Scales?

13   A.   These conversations contradict what was said in the

14   video with Mr. Young and the investigator.

15   Q.   Mr. Young lied to the investigator about sex with

16   Ms. Howell?

17   A.   Yes.

18   Q.   Was Jeff Young prescribing to Courtney Howell at the

19   time?

20   A.   Yes.

21          MR. PENNEBAKER:  If we can go to that first

22   prescription.  I believe it's page 12.  Perfect.  Okay.

23   BY MR. PENNEBAKER:

24   Q.   So do you see two prescriptions on this page?

25   A.   Yes.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                    97

1    Q.    And what are those prescriptions for?

2    A.    Diazepam and hydrocodone.

3    Q.    Okay.  So one is a benzodiazepine, and one is an

4    opioid, correct?

5    A.    Correct.

6              MR. PENNEBAKER:  If we could go to page 7,

7    please.  If we could zoom in on the bottom third.  Perfect.

8    BY MR. PENNEBAKER:

9    Q.    If you could start reading, Special Agent Scales, at:

10   Don't tease me.

11   A.    Don't tease me and not deliver.  If I ever want to

12   stop by your office, what is your drink of choice, and, no,

13   it will not be happening tomorrow.  I am too booked up.

14   Coffee, what kind?  Slush, teas, etc?

15   Q.    Vodka.

16   A.    So if I come by one day next week, bring Vodka.

17   What's your preference of Vodka?  I'm a whiskey, beer type.

18   Q.    If?  When you come by, damn right.

19         What is the investigative significance of that?

20   A.    He's having -- he's mentioned that now he likes to

21   have alcohol in his office --

22   Q.    Okay.

23   A.    -- drinking while he's at his office.

24              MR. PENNEBAKER:  Okay.  If we could go, please,

25   to page 9, and if you would zoom in on the bottom third,

**UNREDACTED TRANSCRIPT**

 1  please.

 2  BY MR. PENNEBAKER:

 3     Q.   And if you would start with the top message, Special

 4  Agent Scales.

 5     A.   Yes, you going to let me have it today.

 6     Q.   And then you can skip the next two lines.

 7     A.   Just wanted you to know you killed my back.  Working

 8  on my last clients about an hour to an hour and half left.

 9  Want to see me or no?

10     Q.   Sorry, in a meeting.  I want to see you so bad.

11            MR. PENNEBAKER:  And if we could go to the next

12  page, please.  Zoom in at the top.

13  BY MR. PENNEBAKER:

14     Q.   I love it when you can feel the next day that you've

15  been with me, back pain and pussy tender.

16     A.   So I have about 45 minutes left.  Want to have a

17  meeting?  Done.  Have a sitter until 7:30.

18     Q.   I have my son.  I'd love to, but I can't.

19     A.   But on a real note, why is my back so jacked?  I have

20  taken all kinds of stuff.  It will not ease.  Ugh.

21            MR. PENNEBAKER:  And, then, Ms. Silverberg, if we

22  could just grab the next two or three lines.

23  BY MR. PENNEBAKER:

24     Q.   And do you see where the defendant says:  Your back is

25  jacked because I fucked the shit out of you?

**UNREDACTED TRANSCRIPT**

1   A.   Yes.

2   Q.   Okay.  And if we could go, please, to -- does he

3   prescribe controlled substances to Ms. Howell after this

4   conversation?

5   A.   Yes.

6              MR. PENNEBAKER:  If we could go ahead,

7   Ms. Silverberg, and go to page 50, and if we could, once you

8   get there, blow up the middle third of the page, please.

9   BY MR. PENNEBAKER:

10  Q.   Okay.  So I'll start:  We need to step back and access

11  our relationship -- which do you understand that to be assess

12  our relationship?

13  A.   Yes, sir.

14  Q.   -- you act like you're my wife or something.

15  A.   We need to talk ASAP, if that's okay.  I know I'm

16  crazy medically from what you say.  Did you tell Jonathan

17  anything because I'm being asked to pack up my shit and -- I

18  believe that's supposed to be leave, not when you leave.

19  Q.   What -- who is Jonathan?

20  A.   Her husband.

21  Q.   And how do you know that?

22  A.   From the other text messages.

23  Q.   Is Jonathan also a patient of the defendant's?

24  A.   Yes, he is.

25  Q.   What is he being treated for?

**UNREDACTED TRANSCRIPT**

```
1    A.    He -- I believe he had cancer.

2    Q.    So then the defendant says:  No.  I guess I didn't

3    tell -- tell Jonathan anything.

4          And then Ms. Howell says --

5    A.    -- liar.

6    Q.    He texted me last night after getting your phone.  He

7    doesn't know who I am.

8    A.    Then why did he say that I'm obsessed with you and

9    psychiatric help?  I'm sure I'm not the only patient you have

10   fucked, huh?

11          MR. PENNEBAKER:  And then, Ms. Silverberg, if you

12   could pull up the rest of that page.

13   BY MR. PENNEBAKER:

14   Q.    So go ahead, Special Agent Scales.

15   A.    Everything good luck, Bro.  Your world is about to get

16   fucked by me.  Telling me to leave you alone.  Oh, I will,

17   but, legally, I bet this would not look good for your career,

18   FYI.  I saved everything, especially your compliments.

19   Q.    You need help.

20          Right?

21   A.    Yes.

22   Q.    This will be my last text ever.  Don't ever threaten

23   me or my business.  All I did was try to help you.

24          Is that right?

25   A.    Yes.
```

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                    101

1    Q.   And, Special Agent Scales, I have a Redwell here of

2    demonstratives that I'm going to leave with you.

3              MR. PENNEBAKER:  And, Your Honor, we're not going

4    to offer these into evidence because they're just summing up

5    the pills prescribed in another exhibit.  I've discussed this

6    with Mr. Ferguson.  I don't think he has any objections.

7    We're just going to use them as demonstratives.

8              THE COURT:  All right.  Go ahead.

9              MR. PENNEBAKER:  Could we please publish the

10   summary of Ms. Taylor.

11   BY MR. PENNEBAKER:

12   Q.   Special Agent Scales, I don't think we need to publish

13   this one necessarily, but do you have it in front of you, the

14   summary about Ms. Howell?

15   A.   Yes.

16   Q.   And how many total controlled substance pills was she

17   prescribed in the, roughly, three-month period that she was

18   seeing the defendant?

19   A.   Six hundred and ninety.

20   Q.   Six hundred and ninety pills?

21   A.   Yes.

22   Q.   What types of drugs was she receiving?

23   A.   Diazepam, hydrocodone, tramadol.

24   Q.   Okay.

25             MR. PENNEBAKER:  And if we could go, please --

1   actually, let me hand you -- oh, if we could go to

2   Exhibit 74.  Go back there.  And we'll just go to the first

3   page, and if you could zoom in on the top, please.

4   BY MR. PENNEBAKER:

5    Q.   What's the date of that first exchange up there at the

6   top or that first message up there at the top, Special Agent

7   Scales?

8    A.   12/7/2016.

9    Q.   So December 7, 2016.

10        Would you mind reading the first two entries, please?

11   A.   I can pay you on the 15th when I come see you for my

12   appointment, but tomorrow is a challenge.  Thank you for

13   working with me.

14        Just wanted you to know that I wasn't a woof, woof.

15   You are agreeing to meet me at nine.

16   Q.   And would you read the next entry?

17   A.   Here is who to expect.  I won't be a scary-looking

18   person in the morning.

19   Q.   And then Jeff Young says:  I expect less clothes.

20        Right?

21   A.   Yes.

22   Q.   Is this an exchange that suggests to you that these

23   are people that would be meeting in person for the first

24   time?

25   A.   Yes.

1   Q.   And do you recall the portion of the interview between

2   Investigator Pickering and the defendant, that May, 2016,

3   interview, where the defendant says:   I stopped taking pain

4   patients three months ago?

5   A.   Yes.

6   Q.   So that's about the -- the three months ago is about

7   nine months before this first entry, right?

8   A.   Correct.

9   Q.   Does Adrienne McKenzie end up receiving prescription

10  for controlled drugs from the defendant?

11  A.   Yes.

12        MR. PENNEBAKER:   Let's go, please, to page 2,

13  Ms. Silverberg, and let's go zoom in right there, please.

14  BY MR. PENNEBAKER:

15  Q.   So do you see there where Ms. McKenzie writes:   Jeff,

16  I need a favor?

17  A.   Yes.

18        MR. PENNEBAKER:   And then if you would zoom out,

19  please.

20  BY MR. PENNEBAKER:

21  Q.   Are those three prescriptions -- there's not a date on

22  here.  But are those three prescriptions that are issued that

23  same day based on your review of the CSMD?

24  A.   I believe so.

25  Q.   And, yeah, if you want to check one of those

**UNREDACTED TRANSCRIPT**

1    summaries.

2        A.   Yes.

3        Q.   Okay.  So after she says, I need a favor, she receives

4    a prescription.  What are those three drugs?

5        A.   It's alprazolam, dextro and hydrocodone.

6        Q.   So a benzodiazepine for anxiety, a stimulant for

7    attention disorders and an opioid?

8        A.   Yes.

9        Q.   Now, going down to the middle:  I recently severely

10   sprained my ankle and broke two toes.  Not even my primary

11   will prescribe me an opiate.

12            Do you see that?

13       A.   Yes.

14       Q.   And then she says:  I have been calling your office

15   for days trying to get a return phone call.  I understand

16   you're a busy man.  No worries.  But I am unfortunately on

17   probation.  I bought five hydros from a girl to relieve --

18   and it cuts off.  What is the investigative significance of

19   that?

20       A.   It's a red flag to me.  One, because she's on

21   probation.  She's informed him as a physician that she's

22   bought five hydros, essentially, off the street and that her

23   primary care won't write her opiates.

24       Q.   Okay.

25            MR. PENNEBAKER:  If we could go to page 3, the

**UNREDACTED TRANSCRIPT**

1    first sentence.  Okay.  So if we could blow up that first

2    sentence there.  Perfect.  Thank you, Ms. Silverberg.

3    BY MR. PENNEBAKER:

4      Q.   All right.  And so she says:  Sorry to send message

5    during bidnass [sic] hours.  Get back to me whenever.  No

6    rush.  By the way, I owe you one.  My PO meeting went

7    beautifully.

8           Do you see that?

9      A.   Yes.

10     Q.   Smiley face, is that what's after that?

11     A.   Yes.

12           MR. PENNEBAKER:  Then if we can go to page 5,

13   please.  It might be page 4, Ms. Silverberg.  Sorry.

14   BY MR. FERGUSON:

15     Q.   Do you see where it says:  Sorry I caught you on a bad

16   day yesterday?

17     A.   Yes.

18     Q.   If you could go ahead and read from there.

19     A.   Hopefully, today I can make my payment and get what I

20   need to show documentation, slash, scripts before my

21   appointment with the PO.  She is a stickler.

22     Q.   What do you -- what is documentation, slash, scripts?

23     A.   Her prescription or information pertaining to her

24   prescription for her probation office.

25     Q.   What is your -- what is the investigative significance

**UNREDACTED TRANSCRIPT**

1 | of these discussions?

2 | A.   She's asked for a favor, which was to get scripts for

3 | her PO meetings.  And she's already stated that her PO

4 | meeting went successfully or great or however she worded it,

5 | meaning, that he did give her those scripts that -- for her

6 | to get by.

7 | Q.   And is that -- did she admit to taking hydrocodone

8 | when she couldn't get a prescription for it somewhere else?

9 | A.   Correct.

10 | Q.   So what is the --

11 |          MR. PENNEBAKER:  Let's go to page 7, please, and

12 | will you please, Ms. Silverberg, go to LOL, LOL, LOL.

13 |          MS. SILVERBERG:  Just that one?

14 |          MR. PENNEBAKER:  Just that one.  Actually, that

15 | one and the next one, please.  Thank you.

16 | BY MR. PENNEBAKER:

17 | Q.   All right.  If you would please read her entry.

18 | A.   LOL, LOL, LOL, I bet she puts the moves on you first,

19 | LOL.  I do owe you one for sure for helping keep me out of

20 | jail.  I spaced the other day and meant to get you to reup my

21 | hydros.  You keep being a good doctor to me, and I bet we

22 | could play doctor one day.  It's got to be on an off season

23 | with the guy so it's totally legal in my brain.  That happens

24 | from time to time.  I'll make sure to let you know when that

25 | slot opens up.  You better know how to keep a secret.  Paul

 1   could never know because G and him are friends.

 2   Q.   And then does the defendant say:  I keep shit on the

 3   DL?

 4   A.   Yes.

 5   Q.   This is a couple of days before the search warrants

 6   are executed at PREVENTAGENIX and the other places we talked

 7   about earlier, correct?

 8   A.   Correct.

 9   Q.   And do you recall how many pills of controlled

10   substances -- bless you -- the defendant prescribed to

11   Adrienne McKenzie in the month or so that she saw him?

12   A.   I believe 263.

13   Q.   Okay.  All right.  I'm going to hand you what's been

14   marked for identification as Government's 807.  Is this a

15   summary exhibit that involves three individuals, Jonathan

16   Morris, Cyndal Story and Steven Williams?

17   A.   Yes.

18   Q.   Thank you.

19            MR. PENNEBAKER:  Your Honor, we would offer this

20   as Exhibit 76.

21            THE COURT:  Okay.  Received.  It will be No. 76.

22              (Exhibit 76 marked and received.)

23            MR. PENNEBAKER:  Thank you, Judge.

24            And if we could publish page 3, please.  If you

25   could zoom in on the top half, please.  That's good.

**UNREDACTED TRANSCRIPT**

***EXAMINATION OF DEMARCUS SCALES*** <span>108</span>

 1   BY MR. PENNEBAKER:

 2     Q.   All right.  Jonathan Morris says:  Okay, I've got you

 3   a date Saturday night, my wife, myself, you and Cyndal.  She

 4   knows a little about you and all the good shit I told her.  I

 5   told her we would keep it on the DL since Lexington is such a

 6   small town.  This is her.

 7          And then the defendant says:  Cute.

 8          Do you see all that?

 9     A.   Yes.

10     Q.   And then Mr. Morris says:  Yeah, she's cool.  28, I

11   think.

12          And then down below the defendant asks:  What's her

13   last name?

14          And Mr. Morris states:  Story.

15          Looks likes there's another picture sent, and then the

16   defendant says:  Sold.

17          Do you see that?

18     A.   Yes.

19     Q.   All right.

20             MR. PENNEBAKER:  Can we, Ms. Silverberg, go ahead

21   and go to page 6, please?  Thank you.  That's perfect.

22   BY MR. PENNEBAKER:

23     Q.   All right.  And if you want to read for Mr. Morris.

24     A.   I'm so fucking pissed right now.  We have been sitting

25   here ready for two hours waiting on her, and she wasn't

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                    109

1    answering.  She finally text Kristina back with some lame

2    excuse about her sister's house was broken into.  I know she

3    is just going back to that douche bag.  Fuck it.  Bullet

4    dodged.  I guess now we need to try and set you up with her

5    sister.  She's prettier anyway.

6        Q.  Okay.

7             MR. PENNEBAKER:  And, Ms. Silverberg, will you

8    please zoom out of there, and go down to the bottom half.

9    BY MR. PENNEBAKER:

10       Q.  And go ahead and pick up for Mr. Morris, please,

11   Special Agent Scales.

12       A.  Honestly, bullet dodged.  I had a feeling she was

13   going to go back to her ex.  Battered-spouse syndrome like a

14   motherfucker.

15       Q.  And you can stop there.

16            MR. PENNEBAKER:  Can we then go ahead and go

17   to --

18   BY MR. PENNEBAKER:

19       Q.  Special Agent Scales, does that stop the defendant

20   from eventually interacting with Ms. Story?

21       A.  No.

22       Q.  Okay.

23            MR. PENNEBAKER:  Could we go to page 7, please?

24   So if we could zoom into, I just got here.  That's perfect.

25   Just the whole bottom.  Yeah, that's perfect.

**UNREDACTED TRANSCRIPT**

1  BY MR. PENNEBAKER:

2    Q.   So now we've got someone named Cyndal.  Is that Cyndal

3  Story?

4    A.   Yes.

5    Q.   Is that someone that the defendant prescribes

6  controlled drugs to?

7    A.   Yes.

8    Q.   Would you go ahead and read that top line?

9    A.   I just got here.  Dang, you're busy.  These girls up

10  here are rude too.

11   Q.   And then it looks like Mr. Morris is also texting with

12  the defendant at the time:  Sitting here with Cyndal.  Sounds

13  like that date is happening, huh?

14        And then the defendant says:  Maybe.  Sorry.

15        Right?

16   A.   Yes.

17   Q.   Okay.

18        MR. PENNEBAKER:  So if we could zoom out of

19  there, please, and then go to the next page.  And it is going

20  to be page 8.  Maybe it's page 9.  Sorry.  Okay.  It must be

21  page 8.  Apologies.  Great.  If we could just -- yeah, zoom

22  in on the top half.  There you go.  That's perfect.

23  BY MR. PENNEBAKER:

24   Q.   All right.  So Mr. Morris then says:  We're sitting

25  here talking to her.  Says we can go on a double date.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                      111

1       And then do you see right above that what looks to be

2   the PMP entry --

3   A.    Yes.

4   Q.    -- that the defendant says to Cyndal:  This could get

5   interesting.

6       And then what's that a picture of?

7   A.    A demon emoji or an emoji with horns.

8   Q.    Okay.  So after that, what do we see?  Do we see a

9   couple of prescriptions?

10  A.    Yes.

11  Q.    What are those for?

12  A.    Alprazolam and hydrocodone.

13  Q.    And alprazolam is a benzodiazepine.  Hydrocodone is an

14  opioid.  Correct?

15  A.    Yes.

16  Q.    So this date for this hydrocodone and the

17  benzodiazepine, this is in July of 2016, is it not?

18  A.    Correct.

19  Q.    So that's actually a month after the interview where

20  the defendant told the Board that PREVENTAGENIX wasn't seeing

21  any new pain patients, right?

22  A.    Correct.

23  Q.    What is hydrocodone used to treat?  Hydrocodone, what

24  is it used to treat?

25  A.    Pain.

**UNREDACTED TRANSCRIPT**

1            MR. PENNEBAKER:  So a couple of lines down on the

2    same page, if we could call out:  Hey, doll.  Maybe a little

3    bit above that.  I'm sorry, Ms. Silverberg.  Perfect.

4    BY MR. PENNEBAKER:

5    Q.   Okay.  So up at the top, do you want to read for us,

6    Cyndal?

7    A.   Hey, I have a favor to ask.  The pain med you gave me

8    last time is just not helping at all.  Kristina said her and

9    Jonathan were coming up there today.  Is there any way you

10   could give me something else and them pick it up for me.  I'm

11   running the office by myself this week, and I can barely even

12   take lunch break, and I'm hurting so bad.  My mom gave me

13   some 10-milligram Percocet over the weekend that she had left

14   from a surgery, and it helped ten times better.

15   Q.   What's the investigative significance of that?

16   A.   She's taking her -- it's her mother's Percocet.

17   Q.   It's not prescribed to her?

18   A.   Correct.

19   Q.   Is she asking for that medication here?

20   A.   She is.

21   Q.   Then she says:  Hey, doll, below.

22        And then the defendant says:  Per state regs, nothing

23   else can be written within a 30-day period.

24        Do you see that?

25   A.   Yes, I do.

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                   113

1    Q.   Then he asks:  What did I write you?

2    A.   And he -- she responded:  5-milligram hydros.

3    Q.   Is than an emoji outside?

4    A.   Yes, a sad face.

5    Q.   Okay.  A sad face.  And then what's the next entry?

6    A.   Seriously, I can't take something in between taking

7    those?

8    Q.   How many did I write, and, also, you have to be seen

9    in the office for a Schedule II narcotic!  It's bullshit, but

10   it's the law.

11        Do you see that?

12   A.   Yes.

13   Q.   What does Cyndal say?

14   A.   Ninety.  And, seriously, that's bullshit.  I'm running

15   the office by myself and can't even take lunch.

16   Q.   And the defendant says:  I know.  It's redic.

17        Right?

18   A.   Yes.

19        MR. FERGUSON:  Let's go to page 10, please, and

20   if we could zoom in on the top.  From the top to where the --

21   well, right there.  Thank you.

22   BY MR. PENNEBAKER:

23   Q.   Okay.  What does Ms. Story receive in the PMP entry?

24   A.   Are we talking about --

25   Q.   On this date, yeah, 7/19.

**UNREDACTED TRANSCRIPT**

1     A.   Oxycodone.

2     Q.   And that's oxycodone 10/325, are those also called

3  Percocets?

4     A.   Yes.

5     Q.   Is that the same drug that she described having taken

6  from her mom?

7     A.   Correct.

8     Q.   What was she prescribed by the defendant before that?

9     A.   Hydros, hydrocodone.

10    Q.   Is oxycodone stronger than hydrocodone?

11    A.   Yes.

12    Q.   So is she basically getting what she was asking for

13  here?

14    A.   Correct.

15    Q.   And what happens above that?  I'll start reading for

16  the defendant where it says:  And you can come as early as

17  you want.

18    A.   That sounds good.  I'm a good listener and some would

19  say I talk way too much.  LOL.  I enjoy good conversation.

20  Smiley face.  Ba, ha, ha, ha.  Come -- snuck that one right

21  in.  LMAO.  Dang, yeah, I know, opened the door again.

22    Q.   And the defendant says:  I just need you to open up

23  and actually keep a date for once.  That would be a decent

24  start.

25         And then there's another emoji.  What's that?

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                    115

1   A.   It looks like a wink eye with a tongue sticking out.

2   Q.   Well done.

3        MR. PENNEBAKER:  So can we go to page 14, please?

4   All right.  Can we zoom in with the -- well, can we go all

5   the way up to the first gray.

6        MS. SILVERBERG:  Right here?

7        MR. FERGUSON:  Yes.  Perfect.

8   BY MR. PENNEBAKER:

9   Q.   All right.  On 8/8/2016, what do we see?

10  A.   He's written her a prescription for oxycodone again.

11  Q.   So this time it's oxycodone HCL 20-milligrams.  Is

12  that stronger than Percocet?

13  A.   Yes.

14  Q.   Does it include the acetaminophen or Tylenol that

15  Percocet does?

16  A.   No.

17  Q.   Are those often diverted, have high street value?

18  A.   Yes.

19  Q.   So the defendant says:  Happy birthday.

20       And then Cyndal Story says:  Thanks for the birthday

21  wishes.

22       And then here comes an individual named Steven

23  Williams, right?

24  A.   Yes.

25  Q.   And one of you go ahead, please, and read what he

**UNREDACTED TRANSCRIPT**

 1   says.

 2   A.   Jeff, you've always been cool as a fan, but my girl

 3   for eight years is -- that is an addictive person, Cyndal

 4   Story.  You write her any more scripts, you going to kill

 5   her, man.  She talked about suicide the other night because

 6   she was coming off.  You giving her enough to kill a horse as

 7   many as she is eating, and there is nothing wrong with her.

 8   Thanks.  And, again, do not contact her on Messenger, and do

 9   not write her any more stupid scripts.

10   Q.   Okay.  So that was on August 28th, and then on

11   September 2nd, what happens?

12   A.   He writes her alprazolam, oxycodone, Virtussin, and

13   oxycodone again.  I'm sorry -- that was --

14   Q.   Looks like, maybe the 20th --

15   A.   I'm sorry, that was, yeah --

16   Q.   -- right?

17   A.   -- the 20th.  I'm sorry.

18   Q.   So he does not stop prescribing after receiving that

19   note from Mr. Williams?

20   A.   No.

21   Q.   Does he keep prescribing after that?

22   A.   Yes.

23            MR. FERGUSON:  If we could please go to page 50,

24   and if we could blow up -- yeah.  Perfect.

25            MS. SILVERBERG:  Sorry.

**UNREDACTED TRANSCRIPT**

1  BY MR. PENNEBAKER:

2  Q.   Okay.  So on September 28th, does he prescribe another

3  prescription for Xanax?

4  A.   Yes.

5  Q.   If you would read what Mr. Williams says on the 4th of

6  October, 2016.

7  A.   Jeff, I've asked you nicely a while back to wean

8  Cyndal off or cut her off completely because she's running

9  around here selling them like some kind of drug dealer and

10  then runs out.  Is trying to buy them all from everybody she

11  can and is driving me crazy.  I know you thought you liked

12  her and all that kind of shit, but, man, give me a break.

13  You're going to get in trouble.  We can get in trouble -- we

14  can get in trouble.  She about to lose her kid because her

15  baby daddy knows someone that she sells to, and he's turned

16  it into the law.  His -- and the text cuts off or the e-mail.

17  Q.   And then it looks like Jeff Young accepts a friend

18  request or some sort of a request, and then Jeff Young says:

19  You are requesting a violation of HIPAA.  One more text from

20  you and you will find yourself in jail.

21      Is that right?

22  A.   Correct.

23          MR. FERGUSON:  And then if we could, please, go

24  to page 16.  Perfect.

25  BY MR. PENNEBAKER:

**UNREDACTED TRANSCRIPT**

1    Q.   So does that stop the defendant from prescribing?

2    A.   No, it doesn't.

3    Q.   And so Cyndal says:  Thanks, Rock Doc.  And they have

4    this exchange.

5         And then so in October and November, what happens?

6    A.   He prescribes on the -- October 26 alprazolam.

7    There's three prescriptions for alprazolam, one for oxycodone

8    on the 26th, and then in November 28th, another prescription

9    for oxycodone.

10   Q.   And is that three alprazolams prescribed on the 26th,

11   is that consistent with a prescription for alprazolam that

12   has two refills on it?

13   A.   Can I state that -- can you repeat that?

14   Q.   The way that that appears in the PMP with three

15   different prescriptions for 90 alprazolam on the same day, is

16   that because there's a -- two refills in addition to the

17   first prescription?

18   A.   Correct.

19   Q.   Okay.

20        MR. PENNEBAKER:  If we could back out of there,

21   please.  So then let's blow up the bottom half.

22   BY MR. PENNEBAKER:

23   Q.   And so Cyndal says here -- now, after 11/28 is the

24   last prescription for oxy that we saw, right?

25   A.   Yes.

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                    119

1    Q.   And so on 12/21, Cyndal sends Young a message -- Jeff

2    Young a message:  How have things been going?  Y'all's news

3    report had me cracking up.

4         And what does he respond?

5    A.   He responds that she needs to suck his cock.

6    Q.   Are you kidding, she says.  And then she says:  Why?

7    I think you might fall in love.  How about you take me out to

8    dinner once, and let's see where it goes from there.  Cat got

9    your tongue.

10        And then what does he say?

11   A.   No.  Just calling bullshit.  You wouldn't go.

12   Q.   And then she says:  I'm not.  You say when and let's

13   go.  Things aren't the way they used to be.  My situation has

14   changed in the last few months.

15             MR. PENNEBAKER:  If we could go to the next page,

16   please, Ms. Silverberg, and then if we could zoom into the

17   bottom half.

18   BY MR. PENNEBAKER:

19   Q.   So then starting at Jeff Young saying:  I've heard it

20   all before, will believe it when I feel it.

21        What does she say?

22   A.   Ha, ha.  I told you things have changed, LOL.  They

23   did months ago.  Then you were tied down, and I'm not that

24   kind of girl.

25   Q.   Then -- oh, Jeff says:  Yeah, yeah, yeah.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                    120

1    A.    I'll prove it to you.

2    Q.    Deal.

3    A.    Good.

4    Q.    And then what happens that day, literally?

5    A.    She receives a prescription for oxycodone and

6    tramadol.

7    Q.    Okay.

8          MR. PENNEBAKER:  And we can pull that down,

9    Ms. Silverberg.

10   BY MR. PENNEBAKER:

11   Q.    And do you have, on one of the summaries, the total

12   number of pills that Mr. Young prescribed to Cyndal Story

13   during that, approximately, six-month period?  It's not in

14   there?  Okay.  Does around 1500 sound right?  Does that sound

15   about right?

16   A.    I would need to see the --

17   Q.    Okay.

18   A.    -- the data.

19   Q.    All right.  Now, Special Agent Scales, in addition to

20   those three women, was the defendant prescribing to any other

21   women that he was sleeping with?

22   A.    Yes.

23   Q.    Okay.  Let's look at a few of those.  Do you recall

24   hearing testimony about Daphne Joyner, the girlfriend, slash,

25   employee, slash, person receiving prescriptions?

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                121

1    A.   Yes.

2    Q.   Did we find messages between her and the defendant

3    relating to prescribing?

4    A.   Yes.

5    Q.   So I'm going to hand you Government's -- what's been

6    marked as Government's 812.  Do you recognize that as a

7    summary like the one we've been talking about for Ms. Joyner?

8    A.   Yes.

9             MR. PENNEBAKER:  Your Honor, the Government would

10   offer this as Exhibit 77.

11            THE COURT:  Okay.  We'll receive it.

12            (Exhibit 77 marked and received.)

13            MR. PENNEBAKER:  Thank you, Your Honor.

14            THE COURT:  You don't need to thank me.  Just go

15   ahead.

16            MR. PENNEBAKER:  If we could, please, call up the

17   first page.

18   BY MR. PENNEBAKER:

19   Q.   What's the date of the top prescription up there,

20   Special Agent Scales?

21   A.   September 23, 2014.

22   Q.   And it looks like the first prescription is a -- an

23   amphetamine, and then the second prescription is hydrocodone

24   acetaminophen, correct?

25   A.   Correct.

**UNREDACTED TRANSCRIPT**

**_EXAMINATION OF DEMARCUS SCALES_**                    122

1    Q.   What does Ms. Joyner say to the defendant on October

2    the 10th, 2014?

3    A.   Babe, can you write me something for pain meds?  I

4    just took my last one.

5    Q.   And he says:  Yes.

6         And what does she say?

7    A.   Thank you.

8              MR. FERGUSON:  Ms. Silverberg, if we could zoom

9    into the middle of that exhibit, just kind of like the middle

10   third.  That's great.

11   BY MR. FERGUSON:

12   Q.   So I want to point you, Special Agent Scales, to about

13   four lines down there.  You see Daphne Montoya?

14   A.   Yes.

15   Q.   Is Montoya one of the last names that are used by

16   Daphne Montoya or Daphne Joyner?

17   A.   Yes.

18   Q.   And you see there on April 16, 2015, Ms. Montoya gets

19   a prescription for what?

20   A.   Oxycodone.

21   Q.   And how many pills does she get over there at the

22   right?

23   A.   One hundred and twenty.

24   Q.   So then on April -- or on May 8, 2015, Daphne Joyner

25   gets what?

**UNREDACTED TRANSCRIPT**

1   A.   Oxycodone 10-milligram with also a quantity of 120.

2   Q.   Okay.  And then we have -- do we have another

3   prescription for oxycodone 120 after that?

4   A.   Yes.

5   Q.   When does that happen?

6   A.   That would be May 8, 2015.

7   Q.   Okay.  Is there also one on June 2nd?

8   A.   I'm sorry, yes, I was looking at the wrong one.

9   Q.   All right.  Okay.  So 120 count of an opioid like

10  that, based on -- is that -- is there a significance of that

11  number from an investigative standpoint?

12  A.   Can you repeat the question?

13  Q.   Sure.  So is 120 a -- typically a 30-day supply of

14  something like an oxycodone 10-milligram tablet?

15  A.   For one person, not two.  Or she -- it looks like --

16  it appears to be an alias.  So she's gotten two

17  prescriptions --

18  Q.   Got it.

19  A.   -- or three prescriptions within a two-month period.

20  Q.   And what's the investigative significance of that?

21  A.   She's been overprescribed.

22  Q.   And you're not a doctor, of course --

23  A.   Correct.

24  Q.   -- but just in your investigations, people getting

25  prescriptions under different aliases, is that a red flag?

**UNREDACTED TRANSCRIPT**

1    A.   It is.

2             MR. PENNEBAKER:  All right.  And then if we could

3    go to the bottom of --

4    BY MR. PENNEBAKER:

5    Q.   So, Special Agent Scales, before we move on, is

6    everything in this summary and the other summary, is this all

7    from the defendant's prescription pad?  In other words, this

8    is -- these are -- this is CSMD from prescriptions that the

9    defendant has written, right?

10   A.   Yes.

11   Q.   So the defendant is -- these -- the prescriptions we

12   were just talking about are attributable to the defendant?

13   A.   Correct.

14   Q.   So that down there at the bottom of the page, does

15   Jeff Young say:  Come see me tomorrow?

16   A.   Yes, he does.

17            MR. FERGUSON:  And could we go to the next page,

18   please, and if we could blow up the top half.

19   BY MR. PENNEBAKER:

20   Q.   If you would read, please, the top entry for

21   December 2nd, 2015?

22   A.   Hey, can me and spare bear come by?  I need to get

23   refills and want to see if you think she needs anything for

24   this horrible cough she has.

25   Q.   And he responds:  Sure, babe.

**UNREDACTED TRANSCRIPT**

1          Right?

2     A.    Correct.

3     Q.    And does Ms. Montoya get prescriptions on that same

4  day?

5     A.    Yes, she does.

6     Q.    And then it looks like a couple of weeks later, does

7  she get additional prescriptions?

8     A.    Yes.

9     Q.    And are these prescriptions in this block right here

10 all of which were in December, are these all Schedule II

11 drugs?

12    A.    Yes.

13    Q.    On the 22nd, would you read what Ms. Joyner Montoya

14 says?

15    A.    Ha, ha, that's okay.  Do you mind if I come by and get

16 a script like you did last time for my teeth.  I think it was

17 Lortabs or something 10-milligram.  I can be getting it

18 filled, and I'm going to get my toes done while I'm waiting

19 on you to get off.

20    Q.    And then he says:  Sure.

21          Right?

22    A.    Yes.

23    Q.    And what's the very next prescription that she

24 receives?

25    A.    Hydrocodone.

**UNREDACTED TRANSCRIPT**

1    Q.   And that's Lortab, right, the same thing she's asking

2    for by name?

3    A.   Yes.

4              MR. PENNEBAKER:  If we could zoom out of there,

5    please, and then the bottom half.  Thank you.

6    BY MR. PENNEBAKER:

7    Q.   So what does Ms. Joyner Montoya say there on

8    February 16, 2016?

9    A.   Can I get my refill for Lortab when I get back from

10   work?

11   Q.   And then the defendant says:  What time?

12        And what does she say?

13   A.   I'm fixing to leave Memphis.  I'll have to get Angel

14   off the bus at four and come straight there.

15   Q.   And then the defendant says:  Okay, lover.

16        Right?

17   A.   Correct.

18   Q.   So how far from Jackson, approximately, is Memphis?

19   A.   It's over an hour, hour, 15.  Just depends on where

20   you're going.

21   Q.   Do you know about how many nurse practitioners you

22   could get to before you got to Jackson if you're coming from

23   Memphis?

24   A.   I do not, but I know that it's quite a few.

25   Q.   Okay.

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                    127

1    A.    Several.

2    Q.    Does the defendant continue to prescribed for

3    Ms. Joyner Montoya?

4    A.    Yes.

5    Q.    I'm not going to ask you to do any more math, but

6    suffice it to say that it's multiple additional

7    prescriptions?

8    A.    Correct.

9    Q.    All right.  So now I'm going to hand you what has been

10   marked previously as Government's 804.  Do you recognize this

11   as a summary exhibit for a patient named Amy Sanders?

12   A.    Yes.

13             MR. PENNEBAKER:  And, Your Honor, we would offer

14   this as Exhibit 78.

15             THE COURT:  We'll receive it as 78.

16             (Exhibit 78 marked and received.)

17             MR. PENNEBAKER:  Ms. Silverberg, could we please

18   pull up the first page of that exhibit?  Okay.  Can we,

19   please, go to -- blow up the top third of the page.  Thank

20   you.

21   BY MR. FERGUSON:

22   Q.    All right.  So is that the defendant up at the top

23   there, July 23, 2016, again, after taking no more new pain

24   patients, right?

25   A.    Correct.

**UNREDACTED TRANSCRIPT**

1    Q.   And does the defendant say:  Amy, is the Rock Doc -- I

2    guess, this is the Rock Doc?

3    A.   Yes.

4    Q.   And then he says:  We're doing a shoot at the old

5    Bolivar mental hospital.  A very sexy Mr. Hyde, James Bond

6    style shoot in formal wear with me and then a few bloody

7    Dr. Jekyll shots in, like, bikini nurse wear versus lingerie.

8         Do you see that?

9    A.   Yes.

10   Q.   Have any pic I can put together for a profile and get

11   to the photographer?

12        Do you see that?

13   A.   Yes.

14   Q.   And then what does Amy Sanders respond?

15   A.   Did you get the pics.  I'll send better ones when I

16   get service.

17   Q.   By the way, up at the top there, it looks like

18   June 30, 2016.  What do we see there?

19   A.   A prescription for oxycodone, 30-milligram.

20   Q.   And that's 120?

21   A.   Yes.

22   Q.   And are you -- would you -- do you know some of the --

23   are you trained about some of the medical purposes for

24   oxycodone, 30 milligrams?  Like, do you know what that's

25   typically used to treat?  And if you don't, just --

**UNREDACTED TRANSCRIPT**

1    A.    No.

2    Q.    Okay.  But that's, like, three Percocets, right, the

3    10/325s?  So if we could -- and then it looks like there's

4    some back and forth here, correct?  And then it looks like

5    we're sending explicit pictures by 7/24/2016; is that fair?

6    A.    Correct.

7    Q.    And by this time, she's already gotten that

8    prescription for oxycodone 30-milligrams, right?

9    A.    Yes.

10              MR. FERGUSON:  If we could go to page 8.  I'm

11   sorry.  Page 2.  Man, that's small.  And if you could just

12   zoom in on that.  There, perfect.  Maybe it would be better

13   if I could grab this just because it's a little hard to see.

14   I'm sorry.  Let's go back to the first page, please,

15   Ms. Silverberg, and probably bottom five lines.

16   BY MR. PENNEBAKER:

17   Q.    So Ms. Sanders says down there at the bottom:  Between

18   you and me, my habits -- between you and my habits, I have to

19   stay on the run.

20              And then Jeff Young says:  Understand.

21              Right?

22   A.    Yes.

23   Q.    If we could go now -- and that first prescription is

24   for oxycodone, correct?

25   A.    Correct.

**UNREDACTED TRANSCRIPT**

1           MR. FERGUSON:  So now if we could go to page 7,

2     please.  I can go to the Elmo.  Okay.

3     BY MR. FERGUSON:

4      Q.   All right.  So, here, we see Ms. Sanders says:  Just

5     waking up, running behind and waiting to see if my friend is

6     going to drive me.  Can't wait to see you again.  I hope you

7     weren't disappointed yesterday.  Just believe me, when we are

8     somewhere I can do what I want and be as loud and destructive

9     as we want, things will be better and different.  Thank you

10    for taking care of me, not with just the sex and satisfaction

11    but the Soma too.  It helps better than any other out there.

12    I wrote a post about you.  Check it out.  And at least like

13    it and comment or no one will take me -- and it cuts off.

14          Right?

15     A.   Correct.

16     Q.   Actually, that was page 7.  So on page 4 the same

17    exhibit, what does she say there at the top?

18     A.   Doc, you seriously going to have to put me back on

19    Soma, my muscle relaxers.  This shit is getting old.  All --

20    in all I got you some new pics when I get back and get a

21    bath.  I'll send you some and hope you're having a great

22    night.  PS, watch your video again.  I must say I just had to

23    take a 30-minute break and stop the aching.  I do taste so

24    sweet.

25     Q.   The essence of discreetness.

1          What does she say?

2     A.    Ah, I know no other way.  I hope you too know no other

3     way.  #loyalty.

4     Q.    #loyally, #silence, #pleasure.

5          So is that Ms. Sanders requesting Soma by name?

6     A.    Yes.

7     Q.    And then we see here on the 29th -- and, again, it was

8     oxycodone first.  The very next prescription she gets after

9     requesting Soma by name, what's added in there?

10    A.    Carisoprodol.

11    Q.    Which is?

12    A.    Soma.

13    Q.    Does the defendant continue to exchange explicit

14    images with Ms. Sanders after that?

15    A.    Yes.

16    Q.    Does the defendant repeatedly continue to prescribe

17    Ms. Sanders both oxycodone 30-milligram and Soma 30-milligram

18    after that?

19    A.    Yes.

20    Q.    With the last such prescription taking place on what

21    date?

22    A.    12/28/2016.

23    Q.    Is that about a week or so before the clinic gets shut

24    down?

25    A.    Yes.

**UNREDACTED TRANSCRIPT**

**_EXAMINATION OF DEMARCUS SCALES_**                    132

1   Q.   And I've just been advised that I said Soma 30, and it

2   should be Soma 350-milligrams.  Apologies.

3        All right.  Did you review some exchanges involving an

4   individual named Whitney Henley?

5                THE COURT:  I think we're going to go ahead and

6   break for the evening now.  It's right at 5:30.  So we're

7   going to go ahead and break, and we'll pick this up at nine

8   o'clock tomorrow.

9                Ladies and gentlemen, the instruction is always

10  the same, but, please, follow them.  Leave your notebooks in

11  the chair.  Don't discuss the case with anyone.  You've heard

12  quite a bit of proof now.  We've cleared everything else for

13  tomorrow, so we can start right at nine o'clock.  I'll go

14  ahead and excuse you for the evening.

15               Special Agent Scales, like always, don't discuss

16  your testimony with anyone.

17               THE WITNESS:  Yes, sir.

18                    (Jury out at 5:32 p.m.)

19               THE COURT:  Mr. Pennebaker, how much longer?  Oh,

20  wait until the door is shut.

21               MR. PENNEBAKER:  Judge, I may have an hour with

22  this witness.  And then we have --

23               MS. PAYERLE:  I think we only have one more

24  witness.

25               THE COURT:  All right.  Thanks.  We'll be up at

**UNREDACTED TRANSCRIPT**

133

1    nine o'clock tomorrow morning.  Let's go ahead and adjourn

2    court.

3                MR. PENNEBAKER:  It might be an hour and a half,

4    Your Honor.  I just want to make sure I'm not

5    underestimating.

6                THE COURT:  All right.

7                (Adjournment.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1                        **C E R T I F I C A T E**

2

3

4            I, TINA DuBOSE GIBSON, do hereby certify that the

5    foregoing 133 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the trial held on the 29th day of

8    March, 2023, in the matter of:

9

10

11   UNITED STATES OF AMERICA

12   vs.

13   JEFFREY W. YOUNG, JR.

14

15   Dated this 30th day of March, 2023.

16

17

18

19                        S/Tina DuBose Gibson

20                        _____
                          TINA DuBOSE GIBSON, RPR
21                        Official Court Reporter
                          United States District Court
22                        Western District of Tennessee

23

24

25

                        **UNREDACTED TRANSCRIPT**