1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TENNESSEE
2              WESTERN DIVISION

3    _____
                                  )
     UNITED STATES OF AMERICA,     )
4                                  )
          Plaintiff,               )
5                                  )
     VS.                           ) NO. 1:19-cr-10040-JTF-1
6                                  )
                                   )
7    JEFFREY W. YOUNG, JR,         )
                                   )
8         Defendant.               )
     _____


9


10


          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11

              BEFORE THE
12

          HONORABLE JOHN T. FOWLKES, JR.
13

              March 30, 2023
14


15


16


17

              MORNING SESSION
18


19


20


21


22


23

          LASHAWN MARSHALL, RPR
24         OFFICIAL COURT REPORTER
          167 N. MAIN STREET - SUITE 242
25         MEMPHIS, TENNESSEE  38103


                UNREDACTED TRANSCRIPT

1                        **A P P E A R A N C E S**

2

3    **FOR THE PLAINTIFF:**

4                    MS. KATHERINE PAYERLE
                     MR. ANDREW PENNEBAKER
5                    Assistant United States Attorneys
                     UNITED STATES DEPARTMENT OF JUSTICE
6                    FRAUD SECTION
                     1400 New York Avenue, NW
7                    Washington, DC  20530

8

9    **FOR THE DEFENDANT:**

10                   MR. CLAIBORNE H. FERGUSON
                     MR. RAMON DAMAS
11                   Attorneys at Law
                     CLAIBORNE FERGUSON LAW FIRM, P.A.
12                   294 Washington Avenue
                     Memphis, Tennessee  38103

13

14

15   **ALSO PRESENT:**

16                   MS. STEPHANIE SILVERBERG
                     Senior Paralegal
17                   UNITED STATES DEPARTMENT OF JUSTICE
                     FRAUD SECTION

18

19

20

21

22

23

24

25

*UNREDACTED TRANSCRIPT*

1
# W I T N E S S   I N D E X

2

3      **SPECIAL AGENT DEMARCUS SCALES**

                                                        **PAGE**
4
            CONTINUED DIRECT BY MR. PENNEBAKER          10
5           CROSS BY MR. DAMAS                          78
            REDIRECT BY MR. PENNEBAKER                  88
6

7      **TRICIA AULTMAN, M.D.**

                                                        **PAGE**
8
            DIRECT BY MS. PAYERLE                       95
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **E X H I B I T   I N D E X**

2        <u>**MARKED**</u>                                                   <u>**PAGE**</u>

3        EXHIBIT NO. 80                                              21

4        EXHIBIT NO. 81                                              24

5        EXHIBIT NO. 82                                              26

6        EXHIBIT NO. 83                                              30

7        EXHIBIT NO. 84                                              40

8        EXHIBIT NO. 85                                              46

9        EXHIBIT NO. 86                                              49

10       EXHIBIT NO. 87                                              52

11       EXHIBIT NO. 88                                              57

12       EXHIBIT NO. 89                                              59

13       EXHIBIT NO. 90                                              63

14       EXHIBIT NO. 91                                              68

15       EXHIBIT NO. 92                                              77

16       EXHIBIT NO. 93                                              82

17       EXHIBIT NO. 94                                              84

18       EXHIBIT NO. 95                                              85

19       EXHIBIT NO. 96                                              92

20       EXHIBIT NO. 97                                              92

21

22

23

24

25

```
1                        THURSDAY

2                     MARCH 30, 2023

3

4             ***********************

5

6        THE COURT:  All right.  Good morning, everyone.

7        MR. FERGUSON:  Good morning.

8        MS. PAYERLE:  Good morning.

9        THE COURT:  Mr. Richmond, are all the jurors

10   here?

11        COURT SECURITY OFFICER:  Yes, sir.

12        THE COURT:  Okay.  I understand there's a matter

13   that, I think, the government wants to take up with me.

14   What's the situation?

15        MS. PAYERLE:  Yes, Your Honor.  We've come to

16   you with both a problem and a solution, which I hope

17   you'll find acceptable.

18        THE COURT:  Solution.

19        MS. PAYERLE:  So as the Court will recall

20   yesterday, there was significant confusion about the

21   video that was ultimately entered into evidence as

22   Exhibit 73.

23        THE COURT:  Okay.

24        MS. PAYERLE:  I think you saw that I had some

25   doubts about whether it was the right one.  And in the
```

1    middle of trial, sort of from what we could see at

2    counsel table, I sort of talked myself out of those

3    doubts, but they never quite went away.  And so last

4    night, I double checked the original files, only to find

5    out that the doubts were, in fact, well founded.

6         The video that we entered is actually still good

7    evidence.  It's just that it took place one month later

8    than the witness testified.  It took place in December of

9    2016.  It involved the same witness.  It involved Jeffrey

10   Young.  The facts were as we saw them, but it just took

11   place in December rather than November of 2016.

12   However, there was a visit in November of 2016.

13        All of that testimony about that visit was

14   accurate, so the only thing that she needs to -- that we

15   need to correct is the date of the video that we watched.

16   And, I believe, on cross, it was elicited that she had

17   the recollection there were two total visits.  This video

18   having -- she's now -- the witness has now reviewed it.

19   She understands that there was three total visits.  This

20   was eight years ago.  She's worked hundreds of cases

21   since then.  She just had a lapse in memory.

22        So if the Court would permit, the solution that

23   I've already run by Mr. Ferguson -- and I think he's in

24   agreement with -- is to enter -- we have the witness

25   here, so she could come back and testify, be subject to

1    cross, or one possibility is we could enter into a

2    stipulation, which I can hand up to the Court to read.

3           **THE COURT:**  Yeah, I'd like to take a look at it,

4    please.

5           **MS. PAYERLE:**  Okay.

6           **THE COURT:**  You're in agreement with this,

7    Mr. Ferguson?

8           **MR. FERGUSON:**  I am.  It makes perfect sense to

9    fix it this way.  It's not necessarily material, but it

10   helps the jury understand the cross-examination.

11          **THE COURT:**  Couple things.  First, how do you

12   propose that we communicate the stipulation to the jury?

13   Pass all three possibilities; I've read them.  Sometimes

14   the lawyers want me to read them; I don't have any

15   problem with that.  Sometimes the government; sometimes

16   defense will.  Makes no difference to me.

17          **MS. PAYERLE:**  Judge, if you'd like to read it

18   or -- of course, I'm happy to.  I own that it was my

19   mistake, so I'm happy to sort of own up to it.  Or if the

20   Court wants to read it, that's also fine.

21          **THE COURT:**  I don't particularly want to read

22   it, so you can do that.

23          Also, there's a blank in here for the exhibit

24   number.  I'd like you to take care of that.

25          And I would also like to get another page, get

1    everyone to stipulate who's stipulating to it to sign.

2    Okay.  Signature blocks for government, defense, also for

3    your client, Mr. Ferguson.

4            **MR. FERGUSON:**  Yes, Your Honor.

5            **THE COURT:**  All right.  If you can just staple

6    that onto this, I think we'll be good to go.

7            **MS. PAYERLE:**  Thank you, Your Honor.

8            So in terms of logistics, I think what we

9    propose, then, is that -- could we continue with the

10   testimony of the witness that's on the stand, and that'll

11   give us time to create the paperwork?

12           **THE COURT:**  Right.

13           **MS. PAYERLE:**  And then there would still be

14   blank for the exhibit number because we don't know.  This

15   will be a new exhibit, and we don't know where in time it

16   will fall, so we can just write in that exhibit number?

17           **THE COURT:**  Not a problem.

18           **MS. PAYERLE:**  Okay.  Yes, sir.  So then we will

19   do this after the current witness is finished.

20           And with the Court's, and I suppose Defendant's

21   permission, we'd like to release Kristina St. Laurent

22   this morning.

23           **THE COURT:**  That's fine.

24           **MS. PAYERLE:**  Thank you.  Thank you, Judge.

25           **THE COURT:**  Okay.  And need to bring the witness

1   back up.

2        **MS. PAYERLE:**  Oh, do we?

3        **MR. PENNEBAKER:**  No, no.  I think he's talking

4   about --

5        **MS. PAYERLE:**  Oh, this witness.  I'm sorry.

6        **THE COURT:**  The witness who's testifying.

7        **MS. PAYERLE:**  Yes, Your Honor.  Sorry.

8        (The witness complies with the request.)

9        **THE COURT:**  Was this a copy of the stipulation

10  just for me, or do you need it back.

11       **MS. PAYERLE:**  No, Your Honor.  That's for you.

12  Thank you.

13       **THE COURT:**  All right.  And bring in the jurors.

14       (Jury in at 9:09 a.m.)

15       **THE COURT:**  All right.  Good morning, everyone.

16       **THE JURY:**  Good morning.

17       **THE COURT:**  Y'all had a restful evening last

18  night.  We're ready to go ahead and proceed.  I think we

19  were hearing testimony from Special Agent Scales, so

20  we're going to continue with that at this time.

21       Mr. Pennebaker?

22       **MR. PENNEBAKER:**  Thank you, Judge.

23

24

25

1              **SPECIAL AGENT DEMARCUS SCALES,**

2    having been PREVIOUSLY duly sworn, was examined and

3    testified as follows:

4                   **CONTINUED DIRECT EXAMINATION**

5    **BY MR. PENNEBAKER:**

6    Q.    Good morning, Special Agent Scales.

7    A.    Good morning.

8    Q.    Yesterday, where we left off, we were going to talk

9    about an exhibit summary for a patient named Whitney

10   Henley, which is in a folder marked for identification as

11   Government's 823.

12            (A document was passed to the witness.)

13   **BY MR. PENNEBAKER:**

14   Q.    Do you recognize that?

15   A.    Yes.

16   Q.    Okay.

17            **MR. PENNEBAKER:**  The government would offer into

18   evidence what's been previously marked as 823 and is

19   now --

20            **THE COURT:**  That will be Exhibit 79?

21            **CASE MANAGER:**  Yes, sir.

22            **MR. PENNEBAKER:**  79.  Thank you, Your Honor.

23            (The above-mentioned item was marked as

24   Exhibit No. 79.)

25            **MR. PENNEBAKER:**  Ms. Silverberg, if we could

*UNREDACTED TRANSCRIPT*

 1  just go ahead and zoom in on "we should meet" on Page 1,

 2  please.

 3  **BY MR. PENNEBAKER:**

 4  Q.    Special Agent Scales, is this a series of Facebook

 5  messages in April 2016?

 6  A.    Yes.

 7  Q.    Okay.  So we'll continue.  I'll read for the

 8  defendant, and you'll read for the witness, if that's all

 9  right.

10  A.    Yes, sir.

11  Q.    Excuse me, not the witness, the -- the other

12  individual.

13        "We should meet."

14  A.    "What's up?"

15  Q.    "I see you all the time and wonder why we don't

16  know each other.  Are you really in Kentucky?"

17  A.    "Where on Facebook?  And no, I'm in Tennessee."

18  Q.    "Yes, and mug shots.  You sent me a friend request

19  a while ago, and we have mutual friends.  So I was just

20  wondering, because you looked like someone I should

21  know."

22        Special Agent Scales, what is "mug shots"?

23  A.    After somebody has been arrested, you'll typically

24  take a mug shot.

25  Q.    And is there a website that displays those?

1   A.    There are.

2   Q.    Okay.

3         **MR. PENNEBAKER:**  So Ms. Silverberg, heading down

4   to "I got a referral."

5   **BY MR. PENNEBAKER:**

6   Q.    Go ahead, Special Agent Scales.

7   A.    "I got a referral to chronic pain management, but

8   need a doc."

9   Q.    "I'm the guy they refer to as the Rock Doc."

10  A.    "So can you do it?  And why that, plus I like it,

11  tats."

12  Q.    "Well, I need a crazy, hot girl that likes to have

13  fun."

14  A.    "LOL.  I'm a nut."

15  Q.    "So am I, and really outside the box, so you would

16  be perfect."

17         **MR. PENNEBAKER:**  All right.  And Ms. Silverberg,

18  if we could go to "how old are you?"

19  **BY MR. PENNEBAKER:**

20  Q.    "How old are you?"

21  A.    "23.  What about you?"

22  Q.    "Perfect.  My last girlfriend was 25.  I'm 42.  I

23  only date in the 20s."

24  A.    "LOL.  I need a car, ha, ha, ha, ha."

25  Q.    "Ha, ha, ha, ha."

1   A.    "Ha, ha."

2   Q.    "Well, I guess that could happen.  I could be your

3   sugar daddy if you play it right."

4         **MR. PENNEBAKER:**  And then if we can go, please,

5   Ms. Silverberg, to Page 2.  "I go to Dr. Eze."

6   **BY MR. PENNEBAKER:**

7   Q.    All right.  Go ahead, Special Agent Scales.

8   A.    "I go to Dr. Eze, but only doc I can get in for

9   pain pills is over an hour away.  I already get Xanax."

10  Q.    Now, Special Agent Scales, does going an hour a

11  away for pain pills have any investigative significance?

12  A.    Why would you be traveling long distances for pain

13  pills?

14  Q.    Okay.  So the Defendant responds:  "All right, sexy

15  ass, but you have my digits."

16  A.    "Somebody stole my script.  I need some.  Okay."

17  Q.    "Pain management in Tennessee has become a

18  nightmare.  Text me later."

19        Special Agent Scales, is there any investigative

20  significance to somebody stealing my script and asking

21  for some more?

22  A.    Yes.  She's -- she's asking for more scripts.

23  Q.    Is that a red flag?

24  A.    Yes.

25        **MR. PENNEBAKER:**  And if we could go a little

1    further down on the page, please, Ms. Silverberg.  "It

2    means I ain't cheap."

3            **MS. SILVERBERG:**  I'm just trying to find it.  If

4    you go to the next page.

5            **MR. PENNEBAKER:**  It might be on the next page.

6    Apologies.  Try 4.

7            **MS. SILVERBERG:**  Say that again.  Oh, 4.

8            **MR. PENNEBAKER:**  Oh, there it is in the middle.

9            **MS. SILVERBERG:**  Keep going?

10           **MR. PENNEBAKER:**  Right -- right here.

11           **MS. SILVERBERG:**  Oh, I see.  Sorry.

12   **BY MR. PENNEBAKER:**

13   Q.    Okay.  Can you start at "I don't trick"?

14   A.    "I don't trick, but yes, I need help:  money,

15   clothes, et cetera, and drugs like percs and weed, if

16   possible."

17   Q.    What is "trick"?

18   A.    I guess a way you could -- somebody spending --

19   spending money on an individual.

20   Q.    Okay.  So drugs like percs and weed -- do you know

21   what percs are?

22   A.    Percocet.

23   Q.    A Schedule II controlled substance that a nurse

24   practitioner could prescribe?

25   A.    Yes.

1   Q.    "I have women I don't have to pay for," says the

2   defendant.

3   A.    "Obviously.  I already knew that, but I'm

4   different."

5   Q.    "Then what makes you different?"

6   A.    "Religion."

7   Q.    All right.  And --

8   A.    "To be honest."

9   Q.    Oh, okay.  "To be honest."

10         **MR. PENNEBAKER:**  And Ms. Silverberg, if you

11   could go down to "my daddy."

12         **MS. SILVERBERG:**  "My daddy"?

13         **MR. PENNEBAKER:**  You were doing it right.

14         **MS. SILVERBERG:**  Oh, okay.

15   **BY MR. PENNEBAKER:**

16   Q.    So Special Agent Scales, you said "to be honest,"

17   and Jeff Young says "TBH" and then --

18   A.    "To be honest."

19   Q.    -- she said "to be honest."

20         Jeff Young says:  "My daddy's a preacher.  I don't

21   need any more religion.  I need a hot babe that likes to

22   get down."

23   A.    "And I need a hot doctor to help me out."

24   Q.    "Are you good in bed?"

25   A.    "Yeah, but I have -- I've talked to you -- you

1    about it."

2    Q.    "Talk is cheap."

3    A.    "And Whitney ain't."

4    Q.    "Laughing out loud.  Send me some sexy pics."

5         **MR. PENNEBAKER:**  All right.  If we could go to

6    Page 7, please, Ms. Silverberg.  And could you zoom in on

7    the prescriptions there?

8    **BY MR. PENNEBAKER:**

9    Q.    Special Agent Scales, are these two prescriptions

10   issued on June 22, 2016?

11   A.    They are.

12   Q.    After Ms. Henley has told the defendant that she

13   needs drugs like percs and weed?

14   A.    Correct.

15   Q.    And what opioid does Percocet have in it?

16   A.    Oxycodone.

17   Q.    All right.  So what does she get from the defendant

18   on 6/22/16?

19   A.    Oxycodone.

20   Q.    In addition to alprazolam, right?

21   A.    Correct.

22   Q.    Do you know if that's a dangerous combination?

23   A.    It is.

24        **MR. PENNEBAKER:**  Now, if we could go to the

25   three lines above that.  Actually, yeah, let's go to the

1   three lines above that.

2   **BY MR. PENNEBAKER:**

3   Q.    Now, the PMP data, the CSMD data doesn't have a

4   time stamp on it, but the CSMD data we were just looking

5   at was at June 22nd, right?

6   A.    Correct.

7   Q.    And these three messages are from June 22nd in the

8   evening, at around 7:00 p.m., correct?

9   A.    Correct.

10  Q.    Okay.  So what does Ms. Henley say to the

11  defendant?

12  A.    "How many of these you want me" -- is that "throw

13  you"?

14  Q.    Uh-huh.

15  A.    It's cut off.

16        "I'm trying to sell some.  Do you know anybody?  I

17  need to get my son's stuff and new clothes and stuff for

18  when we go party, LOL."

19  Q.    All right.

20        **MR. PENNEBAKER:**  And Ms. Silverberg, if you

21  would zoom into the four entries below the prescription,

22  please.

23  **BY MR. PENNEBAKER:**

24  Q.    "What?  I don't do that," says the -- says Jeff

25  Young.

1        "I will not be able to write you anything further.

2    You told me you needed them for your multiple car

3    accidents.  Not cool.  You will be discharged as a

4    patient."

5        Do you see that this?

6    A.    Yes.

7            **MR. PENNEBAKER:**  So then Ms. Silverberg, if he

8    could go down to the part of the page that says "we still

9    friends, though, right?"  That's on Page 8.  I'm sorry.

10           **MS. SILVERBERG:**  Oh, sorry.

11   **BY MR. PENNEBAKER:**

12   Q.    All right.  Go ahead, Special Agent Scales.

13   A.    "We still friends, though, right?  I'd why -- why

14   you're being a dick to me; you have no reason to.  I've

15   took up for you to so many people, it's ridiculous.  You

16   said we can hang out whenever.  I just wanted to be

17   friends with you, nothing more.  I know you wrote me what

18   you did because of feds, so there's no reason to

19   discharge me or not be my friends."

20       And she corrected herself with "friend."

21       "I'm one of the best friends you could ever have.

22   You're hurting my feelings, and my feelings don't get

23   hurt.  I'm sorry for trying to bring drama into -- I'm

24   sorry, not trying to bring drama into your life, but I

25   love you as a a friend, Jeff, and I love your whole

 1   family.  So all I ask for is to be respected by you."

 2   Q.    "You crossed the line asking me to sell pills."

 3   A.    "Okay.  And I also told you in your office I will

 4   look out for you.  I didn't cross the line then.  I mean,

 5   you smoke weed.  You got roxies you give out around --

 6   out around your house, so how did I cross the line when

 7   you were the one being cool with shit like that?"

 8   Q.    Okay.  So you got roxies you give out around your

 9   house.  "Roxy," is that a street name for oxycodone?

10   A.    It is.

11         **MR. PENNEBAKER:**  If we could go, please, to

12   Page 9, Ms. Silverberg, and then to "I straight."

13   **BY MR. PENNEBAKER:**

14   Q.    And go ahead, Special Agent Scales.

15   A.    "I straight snorted a roxy 15 you gave to your

16   peoples right in front of you, in your kitchen, plus

17   smoked weed there.  So I -- I'd -- why you being so petty

18   towards me when I'm cool -- cool as a fuck, and it ain't

19   my fault.  I didn't know you would get mad to save your

20   own ass when you're -- when you party hard.  And you told

21   me at the club it's cool; you are being watched, but it

22   was cool for me to come back.

23         I talked to Kristie before I left.  She wanted to

24   talk to me, and she said she was going to talk to you

25   when she gets back from lunch.  I'm begging you.  I have

1   no other doctor to go -- doc to go to.  I promise you

2   won't have any more problems out of me.  I'm not selling

3   anything.  I won't.  Please, Jeff.  I don't beg, and I

4   didn't mean it when I said what I -- what?  I got to have

5   sex with you?  But seriously, I'm having panic attacks

6   and shit.  Please get me back in.  I didn't have sex with

7   your friend either, if that's why you didn't want me back

8   today."

9   Q.   Okay.  And then if you could go down to "I ain't."

10  A.   "I ain't -- the "I ain't reporting"?

11  Q.   Uh-huh.  Yes, sir.

12  A.   "I ain't calling the -- I ain't -- I ain't calling

13  a reporting shit.  I ain't getting you in trouble, but

14  you're fucking treating me like I'm a fucking threat to

15  you and your job, when I'm not.  But you know you're

16  crooked and so -- and so is some of the people in your

17  office.  So, I mean, what the fuck?  I like everybody

18  there, except the guy nurse.  Fuck it.  I hate you.  I'll

19  call and report this shit because you fucked me."

20  Q.   All right.  That's enough.  Thank you, sir.

21        **MR. PENNEBAKER:**  And that's all we need from

22  that exhibit, Ms. Silverberg.  Thank you.

23  **BY MR. PENNEBAKER:**

24  Q.   Special Agent Scales, do you remember reviewing a

25  an exhibit involving someone named Tina Powers?

1    A.    Yes.

2    Q.    And is this that summary?

3          (A document was passed to the witness.)

4    A.    Yes.

5          **MR. PENNEBAKER:**  The government would offer into

6    evidence Exhibit 813 previously marked, which now will be

7    Government's 80, Your Honor.

8          **THE COURT:**  Okay.  We'll receive it.

9    Exhibit 80.

10         (The above-mentioned item was marked as

11   Exhibit No. 80.)

12         MR. PENNEBAKER:  All right.  If we could go to

13   Page 2, please, and then zoom in at "I accept."

14   **BY MR. PENNEBAKER:**

15   Q.    Is Tina Powers a -- somebody who gets prescriptions

16   for controlled drugs from the defendant?

17   A.    Yes.

18   Q.    Okay.  So I -- the defendant says here:  "I accept

19   pics for my birthday."

20         And what is that a picture of?

21   A.    Pictures of Ms. Powers in nude.

22   Q.    And then the defendant says:  "Damn, where are you

23   now?"

24         And then what happens after that?

25   A.    She sends another nude.

 1            **MR. PENNEBAKER:**  If we could go to Page 5,

 2    please, and zoom in at "I need to."

 3            **MS. SILVERBERG:**  Where?  Sorry.  What did you

 4    say, Drew?

 5            **MR. PENNEBAKER:**  "I need to."  Maybe it's Page 6

 6    or Page 3.  I'm sorry.

 7            **THE WITNESS:**  It was the previous page.

 8            **MR. PENNEBAKER:**  Oh, okay.  Excuse me.  Page --

 9    **BY MR. PENNEBAKER:**

10    Q.   So there's -- by the way, Special Agent Scales, on

11    Page 3, we see a prescription entry there.  What --

12    what's that?

13    A.    Hydrocodone.

14    Q.    Okay.

15            **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

16    go to Page 4.  And this is, I believe --

17            **MS. SILVERBERG:**  I think it's the next page.

18            Oh, there it is.  I found it.  Sorry.

19            **MR. PENNEBAKER:**  No problem.

20    **BY MR. PENNEBAKER:**

21    Q.    So at the top, Mr. Young says:  "I need to fuck."

22    A.    "Me, too."

23    Q.    "I have frustrations to work out.  It would be

24    violent."

25    A.    "Thank God I'm going to have to come see you

*UNREDACTED TRANSCRIPT*

 1    tomorrow."

 2    Q.    "Please see -- I'll see you in my private office."

 3    A.    "I'll try my best.  I promise.  I need it."

 4    Q.    "Me, too.  Make it happen, baby."

 5    A.    "Mm."

 6    Q.    Okay.

 7          **MR. PENNEBAKER:**  That's -- I think we're done

 8    with that one, Ms. Silverberg.

 9    **BY MR. PENNEBAKER:**

10    Q.    After that exchange, does Ms. Powers get another

11    prescription for hydrocodone?

12    A.    Yes.

13    Q.    Does she actually get a prescription for

14    hydrocodone from the defendant every month until the

15    clinic closes?

16    A.    Yes.

17          **MR. PENNEBAKER:**  If we could go to --

18    **BY MR. PENNEBAKER:**

19    Q.    Have you reviewed a summary exhibit for an

20    individual named Shantell?

21    A.    Yes.

22    Q.    I'm showing you what's been previously marked as

23    Government's 609 or 809.  Is that the exhibit you're

24    talking about?

25    A.    Yes.

1          **MR. PENNEBAKER:**  Your Honor, I would offer the

2     summary exhibit of Shantell Davis as Exhibit 81.

3          **THE COURT:**  Okay.

4          **MR. PENNEBAKER:**  Thank you.

5          (The above-mentioned item was marked as

6     Exhibit No. 81.)

7          **MR. PENNEBAKER:**  And Ms. Silverberg, if you

8     could publish Page 12 of this exhibit, and zoom into the

9     prescription, please.

10          **MS. SILVERBERG:**  Just the prescription?

11          **MR. PENNEBAKER:**  Yes.

12     **BY MR. PENNEBAKER:**

13     Q.   All right.  So on March 9, 2015, does Ms. Davis get

14     a prescription from the defendant for Percocet, 45 count?

15     A.   Yes.

16          **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

17     to Page 19, please, and zoom into that prescription.

18     **BY MR. PENNEBAKER:**

19     Q.   And on March 16, 2015, does Ms. Davis get a

20     prescription for clonazepam, 1 milligram, 90 count?

21     A.   Yes.

22     Q.   Is clonazepam a benzodiazepine like Xanax?

23     A.   It is.

24     Q.   Okay.

25          **THE COURT:**  Excuse me.  You've made reference to

*UNREDACTED TRANSCRIPT*

1   Ms. Davis?

2              **MR. PENNEBAKER:**  Yes.

3              **THE COURT:**  Is it Shantell Davis?

4              **MR. PENNEBAKER:**  Yes, Your Honor.

5              **THE COURT:**  When you hand it up to him, you just

6   said "Shantell."

7              **MR. PENNEBAKER:**  Yes, Your Honor.  This is

8   Shantell Davis.

9              **THE COURT:**  Go ahead.

10             **MR. PENNEBAKER:**  If we could go to Page 23,

11  Ms. Silverberg.  Zoom in on "I just got home."

12  **BY MR. PENNEBAKER:**

13  Q.    All right.  If you could start at the top message,

14  please, sir.

15  A.    "I just got home.  I got so fucked up and did blow

16  for the first time in 13 years last night."

17  Q.    What is "blow"?

18  A.    I'm not a hundred percent sure.  Either heroin or

19  cocaine.

20  Q.    Okay.  "It's all good.  You survived."

21  A.    "LOL.  Have you recovered from last night?"

22  Q.    "I'm back at the emporium actually."

23  A.    "Seriously?  I really wish you were giving me a

24  congratulations fuck it -- fuck right now."

25  Q.    "Me, too."

 1            **MR. PENNEBAKER:**  All right.  And that's all

 2   we're going to look at from that one, Ms. Silverberg.

 3   Thank you.

 4   **BY MR. PENNEBAKER:**

 5   Q.    All right.  Have you looked at a summary exhibit

 6   involving a patient named -- or, well, an individual

 7   receiving prescriptions from the defendant named Tiffany

 8   Webb?

 9   A.    Yes.

10   Q.    Is this that summary exhibit?

11   A.    Yes.

12   Q.    And it's been previously marked as Government's

13   one -- 810.

14            **MR. PENNEBAKER:**  And I'd offer it now, Your

15   Honor, the summary exhibit of Tiffany Webb, as

16   Exhibit 82.

17            **THE COURT:**  Uh-huh.

18            **MR. PENNEBAKER:**  Thank you, Your Honor.

19            (The above-mentioned item was marked as

20   Exhibit No. 82.)

21            **MR. PENNEBAKER:**  And if I could use the ELMO,

22   please, and I'll hand it up to you.

23            **MS. SILVERBERG:**  Drew, I can move it that way

24   and do it.

25            **MR. PENNEBAKER:**  Oh, you can do it?

1          **MS. SILVERBERG:**  I can do it.

2          **MR. PENNEBAKER:**  I got you.  I don't need the

3    ELMO.

4          **MS. SILVERBERG:**  It's loading.

5          **MR. PENNEBAKER:**  All right.  And if we could go

6    to the November 26, 2015.

7    **BY MR. PENNEBAKER:**

8    Q.    Have you seen, in your review of the Facebook

9    account, the search warrant return from the Facebook

10   account, Special Agent Scales, that this is another

11   individual who sent nude pictures to the defendant that

12   just aren't present on this summary?

13   A.    Yes.

14   Q.    Okay.  And did some of those nude pictures get

15   exchanged in November 2015?

16   A.    Yes.

17         **MR. PENNEBAKER:**  And Ms. Silverberg, if you

18   could zoom in on the prescriptions right there.

19         Yes.  Thank you.

20   **BY MR. PENNEBAKER:**

21   Q.    Is that in October and November prescriptions for

22   alprazolam, 1 milligram; and hydrocodone, 10, 325?

23   A.    Correct.

24         **MR. PENNEBAKER:**  Could we please go to the next

25   page, Ms. Silverberg, and if you could zoom in on that,

1    the prescriptions, all the ones that you can see there at

2    the top.  Thank you.

3    **BY MR. PENNEBAKER:**

4    Q.    And now we've got -- it looks like on December 3rd,

5    we've got oxycodone and carisoprodol.  Do you see that?

6    A.    Correct.

7    Q.    In December, we get alprazolam, oxycodone, and

8    diazepam.  Is that two benzodiazepines in the same month?

9    A.    Yes.

10   Q.    And I believe that the first opioid prescription we

11   saw was for hydrocodone, 10 milligram; now we're on

12   oxycodone, 10 milligram?

13   A.    The first one --

14   Q.    The one we looked at on the last page.

15   A.    Okay.  Yes.

16   Q.    So is that -- is it fair to say that the defendant

17   is increasing the strength of the opioids that are being

18   prescribed over time?

19   A.    Correct.

20   Q.    So Special Agent Scales, are these the only women

21   that you and other investigators identified that are

22   exchanging explicit messages with the defendant while

23   they're receiving prescriptions for opioids and other

24   controlled drugs from the defendant?

25   A.    No, sir.

 1   Q.    Are there just a couple more?

 2   A.    No, sir.

 3   Q.    Are there more than a dozen more?

 4   A.    Yes.

 5   Q.    Are there dozens more?

 6   A.    Potentially.

 7   Q.    Okay.  Did you also look at the instant messaging

 8   and the prescription monitoring data for an individual

 9   named Ben Elston?

10   A.    I did.

11   Q.    Now, is that the individual that we heard Mr. Young

12   refer to as his bodyguard?

13   A.    Yes.

14   Q.    And I'm going to hand you what's been previously

15   marked as Government's 805, and I want you to tell me if

16   this is a summary of instant messages and PMP with

17   Mr. Elston.

18   A.    Yes.

19         **MR. PENNEBAKER:**  Your Honor, the government

20   would offer what's been previously referenced as

21   Government's 805 as Exhibit 83.

22         **THE COURT:**  Okay.  We'll go ahead and receive

23   it.

24         **MR. PENNEBAKER:**  Thank you.

25         (The above-mentioned item was marked as

 1   Exhibit No. 83.)

 2         **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

 3   go ahead and zoom in at the first -- the top of the first

 4   page.  Yes.

 5   **BY MR. PENNEBAKER:**

 6   Q.    And go ahead.  Is that -- is that a prescription

 7   for oxycodone up there at the top for 90?

 8   A.    It is.

 9   Q.    And the date is September 25, 2014?

10   A.    Correct.

11   Q.    So you can go ahead and start reading for

12   Mr. Elston.

13   A.    "4/2/77, Walgreens, 664-8892.  Thanks, Brother, I

14   owe you."

15   Q.    Is that Mr. Elston giving the defendant his

16   identifiers?

17   A.    Yes.

18   Q.    Birth date, phone number?

19   A.    Yes.

20   Q.    Okay.  "Prescription is ready."

21   A.    "Thanks, Brother.  If you ever need me, I got your

22   six, man.  Thanks for helping me out."

23   Q.    "My pleasure, Bro.  You in my family now."

24   A.    "Roger that.  You're in mine."

25   Q.    "Winky, tougue sticking out" emoji.

1      And then is there another prescription for

2   clonazepam on October 1, 2014, that goes to Mr. Elston,

3   120 count?

4   A.    Yes.

5   Q.    What is "I got your six"?

6   A.    Meaning that I got your back.

7          **MR. PENNEBAKER:**  If we could go to Page 2,

8   please, Ms. Silverberg, and zoom in at "okay, he'll

9   make."

10  **BY MR. PENNEBAKER:**

11  Q.    Will you start at "call me later"?

12  A.    "Call me later, if you want, and fill me in on your

13  ex messing with you, if you feel comfortable doing that,

14  and let me see if I can help you with that problem.  Only

15  if you want.  Our conversation with be completely

16  classified."

17  Q.    "It's a McNairy County issue for now.  If it gets

18  transferred here, I'll be in touch."

19  A.    "We've got powerful friends there, too.  Dawanna

20  Pusser is like a second mom to me, and she's a powerful

21  woman.  Just let me know.  I got this."

22          **MR. PENNEBAKER:**  All right.  And if we can go to

23  Page 5, please, Ms. Silverberg.  And "Ben, my ex is

24  dating."

25  **BY MR. PENNEBAKER:**

1    Q.    "Ben," says Jeff Young.

2          "My ex is dating Jeff Shepard with the JPD.  Dawn

3    has been having him doing background checks on all my

4    friends and trying to start shit.  Can you get him a

5    message and tell him to stay the fuck out of my business?

6    I don't care if he fucks my ex.  He just needs to know

7    that she's a psycho bitch and that everything she says

8    about me is her side.  I can give a fuck who she dates,

9    but using his position to get in my business is

10   unacceptable.  Also, the Montoya brothers have been

11   causing me some problems, Jonathan and Michael.  We may

12   need to deal with that shit, too.  I've had your six; I

13   need you to have mine."

14         You see all that?

15   A.    Yes, sir.

16   Q.    You're in law enforcement.  Is it appropriate for a

17   member of the public to have a member of law enforcement

18   run backgrounds?

19   A.    It is not.

20         **MR. PENNEBAKER:**  Okay.  If we can please go to

21   "I'm on it."

22   **BY MR. PENNEBAKER:**

23   Q.    Go ahead, Special Agent Scales, please.

24   A.    "I'm on it.  I can definitely deal with the Montoya

25   brothers first thing when I get back Tuesday.  I'll

1   get -- I'll get Dad on Jeff ASAP.  Jeff can't do shit

2   anyway because it's a conflict of interest, but we'll

3   definitely let him know the situation.  And if they want

4   to push this situation, then we'll push back harder.

5   Just keep doing the right thing, and I got the rest of

6   it.  No problem.  No problem, Brother.  I got Shepard

7   taken care of.  Just give me a call when you -- when you

8   break free, and I'll explain everything.  I'll take care

9   of Jonathan and Michael with a phone call.  These boys

10  aren't big enough to do shit.  I got this; I promise."

11  Q.    "Thanks.  Call you in a minute.  I just landed in

12  LA."

13  A.    "Call me tonight or tomorrow, if you want.  I

14  talked to Jonathan, and I don't think you'll have any

15  more problems with him."

16          **MR. PENNEBAKER:**  Okay.  And if we could go to

17  Page 6, please, Ms. Silverberg, and "he ain't worth it."

18  **BY MR. PENNEBAKER:**

19  Q.    Go ahead, Special Agent Scales.

20  A.    "He ain't worth it.  He'll run away; I promise.

21  I'll -- I'll handle it, or I'll have his ass locked up."

22  Q.    "Handle my six, Bro.  I'm depending on you.  I want

23  that shit taken down."

24  A.    "Handled it."

25  Q.    All right.

1          **MR. PENNEBAKER:**  And then Page 7, please, and

2     then zoom in at "I'm trusting you."  Thank you.

3     **BY MR. PENNEBAKER:**

4     Q.    All right.  And so Mr. Young says "I'm trusting

5     you" on October 20, 2014, and then what happens?

6     A.    He's -- he wrote Mr. Elston a prescription the next

7     day for hydrocodone.

8     Q.    And then two days later, what happens?

9     A.    He writes him another prescription for oxycodone.

10    Q.    Are those two Schedule II narcotic opioid drugs at

11    the same time?

12    A.    They are.

13          **MR. PENNEBAKER:**  All right.  If you would please

14    go to Page 8, Ms. Silverberg.  And there you go.  Thank

15    you.

16    **BY MR. PENNEBAKER:**

17    Q.    So after getting another prescription -- oh, that's

18    a -- so Jerry Elston, is that Ben Elston's father?

19    A.    It is.

20    Q.    So let's just start with Mr. Young saying "that's

21    who's causing me all this misery."

22    A.    "I know.  I don't care about going to jail.  I've

23    been in 10 times' worse places.  I'd rather see him get

24    humiliated or lose his job.  You call it, though.  If you

25    want me to beat the fuck out of him, I'll do it.  He

1   ain't shit; I promise.  I'd hit him once, and it'd be

2   over."

3   Q.    "The course of action I'd suggest is a course of

4   action I can't suggest.  LOL.  I wish he'd lose his

5   fucking job for being such a pussy.  I want him

6   humiliated and lose his job.  LOL.  Sounds awesome."

7   A.    "I don't give a fuck, Brother.  I can blame it on

8   PTSD."

9   Q.    "Ha, ha, ha, ha."

10          **MR. PENNEBAKER:**  All right.  If we can go to

11   Page 10, please, and zoom in at the three prescriptions

12   on November 21st through 24th, all the way down to

13   November 28th.

14   **BY MR. PENNEBAKER:**

15   Q.    So on November 21st to 24th, do we have the

16   defendant writing Ben Elston two prescriptions -- one is

17   those is Jerry in the middle -- but Ben Elston

18   prescriptions for dextroamphetamine and hydrocodone?

19   A.    Yes.

20   Q.    So starting right under that:  "Can you meet me at

21   Walgreens, LOL, at 6:00 p.m.?"

22   A.    "Yeah, no problem.  Just write me 10-milligram

23   hydros.  I don't have enough money for the Percocet.

24   I'll see you at 6:00 at Walgreens, like 40 or 60 of

25   them."

1    Q.     And the defendant says:  "K."

2    A.     "Thanks.  In the Tahoe by the front door."

3    Q.     "Got to drop my daughter, then I will be there."

4    A.     "K."

5    Q.     Okay.

6          **MR. PENNEBAKER:**  If we can go to Page 15,

7    please, Ms. Silverberg, and zoom in at "hey, son

8    number two."

9    **BY MR. PENNEBAKER:**

10   Q.     All right.  Go ahead.

11   A.     "Hey, son -- hey, son number two, this is Jerry,

12   Ben's dad.  Ben is going to come pick up my prescription

13   of hydros around 9:30.  Will you give me the 10

14   milligrams instead of the 7.5?  I'm going to be gone for

15   a week, and my Crohn's disease has been acting up.  If

16   you would leave those up front, he'll come and get them.

17   I've got to be on the road by 10:00, and I'm trying to

18   get packed.  Thank you, sir.  If you -- if I don't have

19   time to get them filled here, I can get it filled

20   anywhere in Tennessee, can't I?"

21   Q.     "Yes."

22   A.     "Okay.  Thanks.  And Ben will be there in about an

23   hour.  Sixty will be plenty also.  Hey, Brother, I'll be

24   there in 20 minutes, if you -- if you'll stick that up

25   front."

1    Q.    "It's already there."

2          And then what happens after that?

3    A.    Jerry is -- Jerry Elston is written a prescription

4    for hydrocodone, same day.

5    Q.    10 milligrams, and it looks like another one for

6    oxycodone a few days later.  And Ben Elston is written a

7    hydrocodone prescription on the 13th of January?

8    A.    Correct.

9    Q.    What is the investigative significance of Jerry

10   Elston allegedly texting the defendant from Ben Elston's

11   phone and then claiming, as Jerry, not to be able to get

12   over to the office to pick them up because he's packing?

13   A.    It's a red flag because, one, he's not seeing the

14   provider himself, and, two, he's essentially told him

15   what he wants, and he's getting prescribed that.

16   Q.    Okay.  Is it possible that it could be Ben Elston

17   pretending to be his dad from his own phone?

18   A.    It's very possible.

19          **MR. PENNEBAKER:**  If we could go, please, to

20   Page 31.  And if we could zoom in on the two

21   prescriptions:  3/28 and 4/1.  And then just underneath

22   there, "hey, Bro."

23   **BY MR. PENNEBAKER:**

24   Q.    All right.  Now we're in 2016, correct?

25   A.    Yes.

 1   Q.    Looks like a couple of prescriptions for Mr. Elston

 2   on March 28th and April 1st for hydrocodone and

 3   dextroamphetamine, correct?

 4   A.    Correct.

 5   Q.    All right.  So underneath that, Jeff Young, a

 6   couple of days after that second prescription, writes:

 7   "Hey, Bro, Ethan Owen had the cops come to my house last

 8   night during my after party.  Tell that fuck to stay away

 9   from me and my property."

10         **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

11   go to the next page, please, and zoom in on the top.

12   **BY MR. PENNEBAKER:**

13   Q.    Go ahead, Special Agent Scales.

14   A.    "I handled that around 2:00 p.m. this afternoon.

15   You're late."

16         I don't know if you can call that, like, a

17   rock-and-roll emoji.

18   Q.    "Let Ethan know I'll sue his ass for slander if I

19   hear anything like that come out of his fucking mouth

20   ever again.  Talk to him today already.  Brothers for

21   life."

22   A.    "Damn right."

23         **MR. PENNEBAKER:**  And if we could go to -- down

24   to the -- closer to the bottom of the page, "your boy

25   Ethan."

1   **BY MR. PENNEBAKER:**

2   Q.    Go ahead, Special Agent Scales.

3   A.    "Your boy Ethan just called Tommy begging him to

4   ask me not to beat his ass.  I told Tommy you were

5   family, and if Ethan ever did some dumb shit like that

6   again, there would be no -- no more warnings.  Anyways,

7   he -- anyways, Ethan is very, very sorry and has seen the

8   error of his ways.  Hey, when I come by this morning and

9   get tours (phonetic) script, can I get a Rocephin shot to

10  get -- Rocephin shot to see if it'll help my eye?  I've

11  got another stye, and I -- and looked like somebody done

12  tore off and whooped my ass, LOL."

13  Q.    And then are there more prescriptions or controlled

14  drugs after that?

15  A.    There are.

16  Q.    Do you have a summary exhibit there that -- where

17  you -- there's -- where you've totaled the amount of

18  controlled drug pills prescribed to Ben and Jerry Elston

19  during the time that Mr. Elston and Mr. Young were having

20  these exchanges?

21  A.    Yes.

22  Q.    What is the total count of controlled drug pills

23  during that time?

24  A.    10,241.

25  Q.    What kinds of drugs are in there?

1    A.    As far as just listing them out?

2    Q.    Well, just -- I mean, we've talked about

3    hydrocodone, dextroamphetamine.

4    A.    Virtussin.

5    Q.    Is that a cough syrup with codeine?

6    A.    It is.

7    Q.    Is it fair to say that there are benzodiazepines,

8    stimulants, opioids?

9    A.    Yes.

10   Q.    Okay.  I think we can move on.

11         Did you also look at a -- or is this a summary

12   exhibit of an individual named -- Jay Green's

13   communications with the defendant and also PMP?

14         (A document was passed to the witness.)

15   A.    Yes.

16   **BY MR. PENNEBAKER:**

17   Q.    And it's been previously marked as Government's

18   808.

19         **MR. PENNEBAKER:**  And Your Honor, I'd offer it

20   into evidence as Exhibit 84.

21         **MS. SILVERBERG:**  84.

22         **MR. PENNEBAKER:**  84.

23         (The above-mentioned item was marked as

24   Exhibit No. 84.)

25         **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

1   go to Page 1.  Just zoom in at the top.

2   **BY MR. PENNEBAKER:**

3   Q.    And it looks like Mr. Green says:  "Jeff, I need

4   help.  Ron is my cousin.  I've been off for a couple

5   months now for an injury.  Let me know if you can get me

6   in before Wednesday.  I supposed to go back to work.

7   Jackson Clinic won't give me any pain -- anything for

8   pain, and I've spent a shit ton of money there.  Need

9   help fast."

10        On that same day or on the next day -- excuse me --

11  you can see above it.  On the next day, does Mr. Young

12  prescribe Jay Green hydrocodone with acetaminophen?

13  A.    Yes.

14  Q.    Okay.  By the way, Special Agent Scales, do you

15  know who Jay Green is?

16  A.    It was another individual that they spoke of as

17  being one of his bodyguards.

18  Q.    Is -- was Jay Green in law enforcement in another

19  town?

20  A.    He was.

21  Q.    All right.

22            **MR. PENNEBAKER:**  So if we could go to Page 5,

23  please, Ms. Silverberg.

24            **MS. SILVERBERG:**  Sorry.  It's loading.

25            **MR. PENNEBAKER:**  If we need to go to the ELMO, I

*UNREDACTED TRANSCRIPT*

1    can use that.

2             **MS. SILVERBERG:**  Oh, Drew, it's back up.

3             **MR. PENNEBAKER:**  It's back up?

4             **MS. SILVERBERG:**  Yeah.  Sorry.  I had to

5    disconnect.

6             **MR. PENNEBAKER:**  Thank you.

7             If we could zoom into the -- basically the

8    bottom third.

9    **BY MR. PENNEBAKER:**

10   Q.    All right.  And so on February 10, 2016, Special

11   Agent Scales, do we see Jeff Young tell Jay Green, in law

12   enforcement, I need you find this fucker?

13   A.    Yes.

14   Q.    What does Jay Green say?

15   A.    "Give me a few."

16   Q.    Sorry.  Up at the top.

17   A.    "What's going on with him?"

18   Q.    "He's threatening me."

19   A.    "Give me a few."

20   Q.    "I want to file charges.  He started again on me

21   today, and now he's threatening my office."

22            And then is that a picture of Jeff Young showing

23   Mr. Green what he perceives to be a threatening message?

24   A.    Yes.

25            **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

1  go to the top of Page 6, please.

2          So I'm sorry.  The bottom half of Page 6.

3          **MS. SILVERBERG:**  Down here?

4          **MR. PENNEBAKER:**  Uh-huh.

5  **BY MR. PENNEBAKER:**

6  Q.    So Jeff Young says: "Justice Sample."

7  A.    "I can get my dispatcher to get his info, but

8  charges will have to be filed through JPD since that is

9  where the incident took place.  Let me read through

10 this."

11 Q.    "I need his info, and I will file charges, if

12 you -- I think you can or if you think I can."

13 A.    "Yeah, you can.  Renee has to know who it is for --

14 who it is for, though.  Trying not to tell her because

15 y'all have had words before, LOL.  Renee Mullins is my

16 dispatcher, laugh out loud."

17 Q.    "Words?  Over what?  Tell her it's for you,

18 fucker."

19 A.    "Not a clue.  I did.  She saw a post one day and

20 asked if I was friends -- if I was friends" -- I believe

21 that's 'with you' -- "I said, hell, yeah, I am.  She

22 looking get up tonight.  It's already done."

23 Q.    Okay.  That's good.

24         **MR. PENNEBAKER:**  If we can go, please,

25 Ms. Silverberg, to Page 10.  Thank you.

1   BY MR. PENNEBAKER:

2   Q.    Is this Mr. Green sending the defendant photographs

3   of a residence?

4   A.    It is.

5        **MR. PENNEBAKER:**  And after that, if we can zoom

6   in.  Yeah, that's perfect.  Just to everything before

7   video.

8        **MS. SILVERBERG:**  Where?

9        **MR. PENNEBAKER:**  Go down to the end of "can dig

10  deeper later."

11       **MS. SILVERBERG:**  Oh, okay.

12  BY MR. PENNEBAKER:

13  Q.    All right.  So it looks like Mr. Green sends

14  another picture, and what does he say?

15  A.    "Last known address.  License still shows Milan;

16  Facebook shows Gibson."

17  Q.    "Nice."

18  A.    "I suggest police report.  Or if we have to take

19  care of it, we can.  Can dig deeper later, but involves

20  going into -- going to his work, et cetera."

21       **MR. PENNEBAKER:**  Ms. Silverberg, do you have a

22  CD of 808?  I mean 808-A.

23       And Your Honor, I'd offer into -- this --

24  actually, Ms. Silverberg, can we go ahead and blow up the

25  bottom half or maybe the next -- the next entry.

1           **MS. SILVERBERG:**  Just a sec.  This one?

2           **MR. PENNEBAKER:**  Uh-huh.

3    **BY MR. PENNEBAKER:**

4    Q.   And so that next entry after "can dig deeper

5    later," it says "Jay Green to Jeff Young."

6         You can see that there's a blank spot in there, and

7    that's a description, right, of what we're about to see

8    on what's been previously identified as 808-A?

9           **MR. PENNEBAKER:**  Your Honor, I'd offer what's

10   been previously marked as 808-A into evidence as

11   Exhibit 85.

12          **THE COURT:**  Denied at this point.  The witness

13   hadn't identified it.

14   **BY MR. PENNEBAKER:**

15   Q.   Special Agent Scales, I'm not sure if you have seen

16   that video?  Is that correct, that -- have you seen that

17   video at 808-A?

18   A.   I have not.

19   Q.   Okay.  Just trying to think if there's another way

20   that -- I guess we'll --

21          **MR. PENNEBAKER:**  I'll withdraw that offer, Your

22   Honor.

23   **BY MR. PENNEBAKER:**

24   Q.   And just one additional question about this summary

25   exhibit:  Did Mr. Young prescribe Mr. Green opioids?

1    A.    Yes.

2    Q.    And did he continue to prescribe Mr. Young opioids

3    after this exchange about locating this individual and

4    taking care of this problem?

5    A.    Yes.

6    Q.    All right.  Okay.  Have you reviewed a summary of

7    messages and CSMD data for an individual named Will

8    Stone?

9    A.    Yes.

10   Q.    And is that what's previously been marked as

11   Government's 822?

12         (A document was passed to the witness.)

13   A.    Yes.

14         **MR. PENNEBAKER:**  All right.  Your Honor, the

15   government would offer this exhibit, which is a summary

16   of Will Stone's CSMD, SMS, and MMS as Exhibit 75.

17         **THE COURT:**  85.

18         **MR. PENNEBAKER:**  85, excuse me.

19         **THE COURT:**  We'll receive it.

20         (The above-mentioned item was marked as

21   Exhibit No. 85.)

22         **MR. PENNEBAKER:**  Thank you, Your Honor.

23         All right.  And Ms. Silverberg, if we can go to

24   the July 2015 prescriptions and the couple entries

25   underneath those.

1      **MS. SILVERBERG:**  Oh, sorry.  Five.

2   **BY MR. PENNEBAKER:**

3   Q.    So in July 2015, do we see this individual, William

4   Stone, get three prescriptions for hydrocodone from the

5   defendant?

6   A.    Yes.

7   Q.    And if you look on the left-hand corner, what is

8   Mr. Stone identified as in the defendant's phone?

9   A.    Can you repeat that?

10  Q.    On the left-hand side of the screen, what is

11  Mr. Stone -- how is Mr. Stone identified in the

12  defendant's phone?

13  A.    "Will Stone sheriff department."

14  Q.    Okay.  So what does Deputy Stone say there on

15  7/22/2015?

16  A.    "You are the man.  I am looking into this bill for

17  you.  I will get with you in a day or so."

18      **MR. PENNEBAKER:**  And if we could go to Page 2 of

19  that exhibit, please, Ms. Silverberg, and zoom in to

20  "need to call in a favor."

21  **BY MR. PENNEBAKER:**

22  Q.    Jeff Young, there, says:  "Need to call in a favor,

23  Brother.  Can you contact me when you get time?"

24      That's an 7/21/2015, so July 21, 2015.

25  A.    Correct.

1    Q.    And then after that, Jeff Young writes a

2    prescription for phentermine, and Ms. -- yep, thank you.

3    If we could blow that up.

4         So looks like from August to December, Deputy Stone

5    gets phentermine, hydrocodone, AndroGel, hydrocodone, and

6    Belviq.  So is it fair to say that the defendant

7    continues to prescribe for Deputy Stone for some time

8    after that?

9    A.    Correct.

10   Q.    And these are controlled drugs that are being

11   prescribed?

12   A.    Correct.

13   Q.    If we could, please, now go to -- have you seen a

14   summary exhibit 816-A and -B involving an individual

15   named Lydia Spencer?

16   A.    Yes.

17              **THE COURT:**  What was that first name?

18              **MR. PENNEBAKER:**  Lydia, Your Honor.

19              So here is one, and here's the other.  You're

20   looking at A, and this is B.

21              (Documents were passed to the witness.)

22   **BY MR. PENNEBAKER:**

23   Q.    Are those the exhibits you recognize?

24   A.    Yes.

25   Q.    Thank you.

1          **MR. PENNEBAKER:**  And I can actually just enter

2     this or offer this as a single exhibit.  It is a summary

3     exhibit of communications with the defendant.  Actually,

4     the -- to be -- to be precise, the exhibit is -- the

5     first page is communications between Lydia Spencer and

6     the office manager at Preventagenix, Kristie Gutgsell.

7     The second page is additional text messages between those

8     two individuals and then a group text involving

9     individuals in the Preventagenix clinic.  And then the

10    third and fourth page are CSMD data for Lydia Spencer,

11    Your Honor.  And I'd offer these as government's -- or as

12    Exhibit 86.

13          **THE COURT:**  Okay.  We'll receive them.  86.

14          **MR. PENNEBAKER:**  Thank you, Your Honor.

15          (The above-mentioned items were marked as

16    Exhibit No. 86.)

17          **MR. PENNEBAKER:**  All right.  If we could pull up

18    that first page.

19          Oh, I better use the ELMO.

20          **MS. SILVERBERG:**  Sorry.

21          **MR. PENNEBAKER:**  That's okay.  I can -- I'll

22    just do this one like this.

23    **BY MR. PENNEBAKER:**

24    Q.   Okay.  So what are we looking at here, Special

25    Agent Scales?

*TESTIMONY OF SPECIAL AGENT DEMARCUS SCALES*                    50

1   A.    Text -- a screenshot of a message from Lydia

2   Spencer and Mr. Young.

3   Q.    Or this -- I think this is actually Kristie

4   Gutgsell --

5   A.    I'm sorry.

6   Q.    -- the office manager we heard from earlier.

7         Does that sound, right?

8   A.    Yes.  Yes.

9   Q.    Okay.  So does Kristie Gutgsell say:  "Any chance

10  you can get your husband to check and see if Jeff has a

11  warrant in Madison County that got transferred from

12  Shelby County?  Rumor is he does, sad face."

13        And Ms. Spencer says?

14  A.    "Yes, ma'am."

15  Q.    And then Ms. Gutgsell says:  "Thanks so much."

16        On the second page, we have Ms. Spencer in that

17  first entry.  Would you read that, please?

18  A.    "It is not entered into the NCIC, National Crime

19  Information Center, as of now.  So if somebody were to

20  run him or his tag in Jackson, it would not show up that

21  he had a warrant.  Brian said he will check again in the

22  morning when he gets to work and see if it has been

23  entered.  He advised that he can go turn himself in and

24  get it taken care of before somebody like Briley, for

25  instance, around here gets wind of it, and it hits the

1    news and runs rampant and spreads like wildfire.  If

2    Brian sees it come across NCIC, he will let him know

3    ASAP."

4    Q.    And is Brian in law enforcement?

5    A.    Yes.

6    Q.    Is it appropriate for Brian to be checking NCIC to

7    see if the defendant has warrants to warn the defendant?

8    A.    No, it is not.

9    Q.    Okay.  And this is a -- we're now on Page 3.  Is

10   this Ms. Spencer's PMP data?

11   A.    It is.

12   Q.    And are those all prescriptions written by the

13   defendant?

14   A.    Yes.

15   Q.    For control drugs, including Schedule II

16   stimulants?

17   A.    Correct.

18   Q.    Benzodiazepines?

19   A.    Yes.

20   Q.    And a sleep aid?

21   A.    Yes.

22   Q.    And after this information is conveyed, that orange

23   highlighted message, is that a group chat involving the

24   defendant and other people at the Preventagenix clinic?

25   A.    It is.

1    Q.    And it's a message from the office manager, Kristie

2    Gutgsell, to the rest of these employees, correct?

3    A.    Correct.

4    Q.    And what does she say?

5    A.    "Next time Lydia Spencer wants a hydration, it's no

6    charge.  Please put it -- put in the computer, too."

7    Q.    All right.  Just a couple more.

8          Have you looked -- have you reviewed messages and

9    data related to an individual named Keith Moffit?

10   A.    Yes.

11   Q.    And is there -- is this a summary exhibit of

12   that -- those messages and data previously marked as

13   Government's 811?

14   A.    Yes.

15   Q.    All right.

16         **MR. PENNEBAKER:**  Your Honor, I'd offer this into

17   evidence as Exhibit 87.

18         **THE COURT:**  87.

19         (The above-mentioned item was marked as

20   Exhibit No. 87.)

21         **MR. PENNEBAKER:**  And Ms. Silverberg, if -- when

22   you get there, if you could just zoom into the top of

23   Page 1.  There you go.  Perfect.

24   **BY MR. PENNEBAKER:**

25   Q.    Are these prescriptions for Keith Moffit spanning

1    April 2015 to October of 2015?

2    A.    Correct.

3    Q.    What is the first entry there?

4    A.    A hydrocodone.

5    Q.    And that's a 7.5, 325, which is 7.5 milligrams of

6    hydrocodone and 325 milligrams of --

7    A.    Tylenol.

8    Q.    Right?

9    A.    Yes.

10   Q.    And 120 count.

11         There's also an alprazolam 1-milligram

12   prescription, correct?

13   A.    Yes.

14   Q.    The next month, does the defendant up the strength

15   of the drug both in terms of the milligrams and in terms

16   of the drug itself to oxycodone?

17   A.    He does.

18   Q.    And now we're taking the acetaminophen out of the

19   picture, correct?

20   A.    Yes.

21   Q.    The following month, in June, do we up the

22   oxycodone again?

23   A.    We do.

24   Q.    To 20 milligrams this time, correct?

25   A.    Yes, sir.

1   Q.    And the alprazolam to 2 milligrams?

2   A.    Yes, sir.

3   Q.    So then we pretty consistently stay at that duo --

4   A.    Yes.

5   Q.    -- correct?

6         **MR. PENNEBAKER:**  If we could go to the middle of

7   the same page, Ms. Silverberg.

8   **BY MR. PENNEBAKER:**

9   Q.    All right.  What does Keith Moffit say to the

10  defendant here on November 9th?

11  A.    "You name a time you free, and me -- me, you, and

12  our wives can step out, LOL.  What's up, boss?  I'm up

13  front trying to get my VIP on.  Come help me."

14  Q.    All right.  And then below that, do you see on

15  11/12/2015 we get a oxycodone 30-milligram table and an

16  alprazolam 2-milligram tablet, 120 of each?

17  A.    Yes.

18  Q.    And oxycodone, 30 milligram.  He's gone up again,

19  right?

20  A.    Correct.

21  Q.    All right.

22        **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

23  to the bottom of the page.

24  **BY MR. PENNEBAKER:**

25  Q.    All right.  What does he -- what does Mr. Moffit

1    say at the -- in that first entry on December 7th?

2    A.    "Hey, Bud, I'm VIP down there and -- and

3    appointment is Friday.  But Boss wants me -- wants to

4    hit -- Boss wants to head back to Nashville before then.

5    Can you get my meds filled today and no drug test, Boss?"

6    Q.    "How early is it?  That's a state-law thing."

7    A.    "Four days.  Or can you let me know if I got to

8    take one?  What's the word, Boss?  Can you slip me past

9    DT" -- abbreviation for 'drug test' -- "one more month?

10   Help a player out."

11   Q.    Okay.  So here we've got an indication that it's

12   early and that we need to slip past the drug test, right?

13   A.    Correct.

14   Q.    And on that same date, what do we see happen?

15   A.    He's prescribed oxycodone and alprazolam.

16   Q.    What is the law enforcement or the investigative

17   significance of allowing someone to slip past a drug

18   test?

19   A.    He's not testing him to see if he's even taking his

20   medications.

21   Q.    Or maybe if he's taking something else, right?

22   A.    Correct.

23        **MR. PENNEBAKER:**  If we could go to Page 4,

24   please, Ms. Silverberg, and zoom in at the top, gray to

25   gray.  Thank you.

1    **BY MR. PENNEBAKER:**

2    Q.    So we get a oxycodone 30-milligram prescription on

3    September 7, 2016, correct?

4    A.    Correct.

5    Q.    And then about a month later, what happens?

6    A.    He receives another prescription for oxycodone.

7    Q.    What is the -- what does he text the defendant

8    before that?  Or, well, send him a Facebook message, I

9    guess.

10   A.    "What's up, Buddy?  Hey, need you to be me a favor

11   between me and you, Boss Man.  Me and my ol' lady will be

12   coming with Chris and Crystal to witness the -- to

13   witness the marriage, and I was going to see if you would

14   write my ol' lady one script off the charts, Bro.  'Cause

15   her back and shit is fucked up bad, and all the docs she

16   has tried won't write her xans or oxies.  She was there

17   with you and got discharged for failing a drug test when

18   she brought piss and trying to cover up weed smoke.  If

19   you could write her them this one time, it would be

20   greatly" -- I'm assuming that's "appreciated."

21   Q.    And thank you, Special Agent Scales.  I just wanted

22   to clarify something because I think you might have

23   misread in the middle there.

24         I think you said "won't write her xans or oxies."

25   I think it says "xans and oxies."

1   A.    Xans and oxies.

2   Q.    But after this "can you write my wife a

3   prescription off the books," does the defendant continue

4   to prescribe to the individual making that request?

5   A.    Yes.

6   Q.    All right.  Did you review messages and PMP data

7   for an individual named Bartlett?

8   A.    Yes.

9   Q.    And is that Scott Bartlett?

10  A.    It is.

11  Q.    And I'm going to hand you what has been previously

12  marked as Government's -- well, what's been previously

13  marked as Government's 821-A.

14          (A document was passed to the witness.)

15  **BY MR. PENNEBAKER:**

16  Q.    And do you recognize that as a text exchange -- as

17  the text exchange between the defendant and Mr. Bartlett?

18  A.    Yes.

19          **MR. PENNEBAKER:**  Your Honor, I'd offer

20  exhibit -- I'd offer this text exchange between Scott

21  Bartlett and the defendant as Exhibit 88.

22          (The above-mentioned item was marked as

23  Exhibit No. 88.)

24          **MR. PENNEBAKER:**  Ms. Silverberg, if we could

25  please go to Page 4, top half.

1    BY MR. PENNEBAKER:

2    Q.    Special Agent Scales, would you read from "how do I

3    handle"?

4    A.    "How do I handle getting the Adderall refilled?"

5    Q.    "Can you come by my office and get a prescription?"

6    A.    "Well, I live in Memphis.  I suppose I can make the

7    trek."

8    Q.    "I really need to establish a chart on you.  We'll

9    bring you through the VIP entrance and out."

10          **MR. PENNEBAKER:**  And Ms. Silverberg, before

11   we -- before we move on --

12   BY MR. PENNEBAKER:

13   Q.    Special Agent Scales, have you -- in reviewing this

14   messaging context, is it clear that the defendant had

15   previously written a prescription for Adderall to

16   Mr. Bartlett?

17   A.    Yes.

18          **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

19   down to the bottom half.

20   BY MR. PENNEBAKER:

21   Q.    So what does Mr. Bartlett say?

22   A.    "Okay.  Bud, my car is in Louisville, so I'm going

23   to have to rent a car for a while.  I'm home anyway.

24   I'll come up next week."

25   Q.    "That's the way the Grizz executives do it and my

1    other high-end clients.  We have a discreetness policy."

2         Special Agent Scales, Adderall is a Schedule II

3    controlled drug, correct?

4    A.   Correct.

5              **MR. PENNEBAKER:**  If we could go to Page 5 and

6    zoom into the top half.

7    **BY MR. PENNEBAKER:**

8    Q.   What does Mr. Bartlett say about the discreetness

9    policy?

10   A.   "I can dig that."

11   Q.   "Then I can postdate you three months' worth."

12   A.   "I can certainly dig that, too."

13   Q.   All right.  Have you reviewed messages and PMP data

14   for an individual named Doug Keeton?

15   A.   Yes.

16   Q.   And is that what I'm handing you that's been

17   previously marked as Government's 819?

18             (A document was passed to the witness.)

19   A.   Yes.

20             **MR. PENNEBAKER:**  Your Honor, offer -- I offer

21   into evidence Exhibit 81.  Oh, 89?

22             **THE COURT:**  89.

23             **MR. PENNEBAKER:**  89.

24             (The above-mentioned item was marked as

25   Exhibit No. 89.)

1       **MR. PENNEBAKER:**  Wow, I was off.

2          **THE COURT:**  How many more of these do you have?

3       **MR. PENNEBAKER:**  Just a couple, Your Honor.

4   **BY MR. PENNEBAKER:**

5   Q.   So Special Agent Scales, is Mr. Keeton the

6   individual who owns Slide & Ride where the defendant

7   liked to party?

8   A.   Yes.

9       **MR. PENNEBAKER:**  If we could go to Page 1,

10  please, Ms. Silverberg.

11  **BY MR. PENNEBAKER:**

12  Q.   Are these prescriptions for Xanax that the

13  defendant is prescribing Mr. Keeton?

14  A.   Correct.

15      **MR. PENNEBAKER:**  And if he could please go to

16  Page 2.

17  **BY MR. PENNEBAKER:**

18  Q.   All right.  If you would read for Mr. Keeton.

19  A.   "Hey, this is Doug Keeton.  Sorry about my dumb-ass

20  wife -- I mean dumb-ass ex-wife acting like she did in my

21  club.  But don't worry.  She is banned forever.  But next

22  time y'all decide to come back, just text me, and I will

23  save the VIP booth for y'all and give y'all your own

24  server so you don't have to wait on a drink.  Plus,

25  always text me so you don't have to wait in line outside,

 1   and maybe one night we can get my limo out, and I'll

 2   carry y'all to Martin, to my club there.  That way, we

 3   can party at both booths -- both clubs.  But I apologize

 4   for last night.  And I chew my security guards' ass out

 5   and told them when you're in -- when you're in there,

 6   nobody gets around y'all unless y'all want them to."

 7   Q.    "Thanks, Bro.  She and my ex could be twins."

 8         **MR. PENNEBAKER:**  If we could go to Page 7,

 9   please, Ms. Silverberg, and zoom in "you getting out

10   tonight."

11   **BY MR. PENNEBAKER:**

12   Q.    All right.  Special Agent Scales, if you want to

13   start at "you getting out tonight?"

14   A.    "You getting out tonight?"

15   Q.    "Yes, sir.  I'll be at Slide & Ride about 11:30."

16   A.    "All right.  I'll try to be there by then at

17   red" --

18   Q.    Go ahead.

19   A.    "All right.  I'll try to be there by then.  At

20   Redbone's now."

21   Q.    And I actually started you at the wrong "you

22   getting out tonight."  The one I was asking you -- trying

23   to ask you to read, inartfully, was the one on the 9th.

24         So this is June 9, 2016, right?

25   A.    "You getting out tonight?"

1   Q.    "Not tonight."

2   A.    "Damn, I'm ready to turn it up.  If you change your

3   mind, holler."

4   Q.    "Sorry.  Have weight loss clinic tonight and my son

5   after that.  Rain check."

6   A.    "Got you.  I'll be ready for a lake trip soon."

7   Q.    Okay.  And then do we add a new type of controlled

8   drug after that conversation:  dextroamphetamine?

9   A.    We do.

10  Q.    So that's a couple days later.

11        Okay.  And I'm going to -- have you reviewed -- did

12  you review data and messages involving an individual

13  named Chad Newsom?

14  A.    Yes.

15  Q.    Okay.  And I'm going to hand you what's been

16  previously marked as Government's 818.

17            (A document was passed to the witness.)

18  **BY MR. PENNEBAKER:**

19  Q.    Is this a summary of a PMP, CSMD, and message

20  between the defendant and Chad Newsom?

21  A.    It is.

22        **MR. PENNEBAKER:**  Government would offer this as

23  Exhibit 90, Your Honor.

24        **THE COURT:**  Okay.  We'll receive it.

25            (The above-mentioned item was marked as

1   Exhibit No. 90.)

2          **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

3   go ahead and go to Page 1.

4          **MS. SILVERBERG:**  This way?

5          **MR. PENNEBAKER:**  Sorry.  That's the next one I'm

6   was going to introduce.

7          So it looks like, actually, I misspoke.  That's

8   not Government's 818.  That's Government's 818-B, which

9   is still Exhibit 90.

10  **BY MR. PENNEBAKER:**

11  Q.   What types of controlled medications is the

12  defendant prescribing Mr. Newsom from around November

13  2014 to March 2015?

14  A.    Tramadol, carisoprodol, and hydrocodone and

15  dextroamp.

16  Q.   So the hydrocodone stronger than tramadol?

17  A.    Yes.

18  Q.   All right.  And so we're on hydrocodone here in

19  April -- in March 2015; fair to say?

20  A.    Yes.

21          **MR. PENNEBAKER:**  If we could go to Page 4 at the

22  bottom.  Blow up "oh, wow."

23  **BY MR. PENNEBAKER:**

24  Q.   So go ahead and, Special Agent Scales, read for

25  Mr. Newsom.

1   A.    "Oh, wow, laugh out loud.  Just wanted to let you

2   know that Xanax seems to be helping out -- helping a lot.

3   I wanted to talk to you sometime about my back pain meds.

4   I've been reading about them, and I had a couple

5   questions whenever you have the time."

6   Q.    So we've also added Xanax by this time?

7   A.    Yes.

8         **MR. PENNEBAKER:**  If we could go to the top of

9   the next page to "I need to stay."

10  A.    "I need to" --

11  **BY MR. PENNEBAKER:**

12  Q.    Go ahead.

13  A.    "I need to stay off the enter -- internet, LOL, but

14  all of the Tylenol is making a little nervous.  I've been

15  reading about a couple other options without all the

16  Tylenol.  Going to see what you thought of them."

17        **MR. PENNEBAKER:**  Okay.  And if we could go to

18  Page 6, about the fourth line.  There you go.

19  **BY MR. PENNEBAKER:**

20  Q.    And can you start at "have"?

21  A.    "Have you heard of something like roxicolin

22  (phonetic) or something?  The internet said it's a

23  similar pain med with no Tylenol?"

24  Q.    "OxyContin?"

25  A.    "I don't know.  I thought it started with an R.  It

1   said they are smaller and last longer."

2   Q.    "We have options.  'Roxy' is the street name."

3   A.    "LOL, that's what I get for doing medical research

4   online."  Laugh emojis.

5   Q.    Okay.  So is roxy stronger than hydrocodone?

6   A.    It is.

7   Q.    What's the investigative significance of referring

8   to the drug, in this context, as roxy?

9   A.    Typically a patient's not going to refer to a pain

10   med by a street name.

11   Q.    If it's for legitimate purposes?

12   A.    Correct.

13   Q.    All right.  So this is on April 20, correct?

14   A.    Yes.

15       **MR. PENNEBAKER:**  And if we could go to Page 7,

16   the six lines at the bottom.

17   **BY MR. PENNEBAKER:**

18   Q.    And if you want to start at the top of that

19   cull-out, Special Agent Scales.

20   A.    "Hey, Brother, I'm out running around.  If you have

21   a minute, I'll run by."

22   Q.    "I'm in a meeting until 1:30."

23   A.    "Word.  I'll holler back in a bit.  Got a little

24   something for you for the holiday."

25   Q.    Now, hang on just a minute.  Is April the 20th or

1   4/20, is that -- is that a holiday?

2   A.    They -- 4/20, it can be known as, like, a

3   cannabis -- cannabis celebration day.

4   Q.    Okay.  So it's kind of an unofficial holiday?

5   A.    Right.

6   Q.    Okay.  So Mr. Young says:  "Awesome.  Happy

7   holiday."

8   A.    "F yeah, Buddy.  I just pulled up at the clinic.

9   No rush, of course.  I just have time to kill.  By the

10  way, go easy with that shatter, very potent, best I've

11  had."

12  Q.    What is shatter?

13  A.    It is a form of cannabis.

14  Q.    Is it a concentrated form of cannabis?

15  A.    It is.

16        **MR. PENNEBAKER:**  All right.  So if we could go

17  to Page 9, please, Ms. Silverberg, and if we could cull

18  out "I consider you family."  All the way down to the

19  "oxycodone."

20  **BY MR. PENNEBAKER:**

21  Q.    So all of this that's going on, it's still April

22  20th, correct?

23  A.    Correct.

24  Q.    Same day that Mr. Newsom says "I been looking on

25  the internet, and there's this thing called roxy"?

```
 1   A.    Correct.

 2   Q.    Same day that Mr. Newsom gives Mr. Young the

 3   shatter?

 4   A.    Correct.

 5   Q.    So then Jeff Young says here:  "I consider you

 6   family, fucker."

 7   A.    "Same here, man, for reals."

 8   Q.    "For reals."

 9         And then Mr. Young prescribes what?

10   A.    Oxycodone.

11   Q.    Is that the very drug that Mr. Newsom was asking

12   for by name based on internet research?

13   A.    It is.

14   Q.    And have you reviewed the patient file that was

15   taken from Preventagenix for Mr. Newsom?

16   A.    I have.

17   Q.    And have you compared that patient file to the PMP?

18   A.    Yes.

19   Q.    Or the CSMD data?

20   A.    Yes.

21   Q.    Have you -- is this a summary exhibit of that

22   comparison?

23   A.    It is.

24         MR. PENNEBAKER:  And it's previously marked as

25   818-A.  I'll offer it as Exhibit 91.
```

1            **THE COURT:**  Say again, what it's a comparison

2    of.

3            **MR. PENNEBAKER:**  The patient chart for

4    Mr. Newsom and the CSMD data for Mr. Newsom.

5            **THE COURT:**  Be 91.

6            (The above-mentioned item was marked as

7    Exhibit No. 91.)

8            **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

9    go ahead and put that up.

10   **BY MR. PENNEBAKER:**

11   Q.    Can you let the jury know what's happening in this

12   summary exhibit?

13   A.    So similar to how we put together the text messages

14   with the PMP, this is the patient file along with the

15   PMP.  And the ones in yellow have -- the ones in yellow

16   don't have a doctors visit with it.

17   Q.    Don't have a corresponding office with it on the

18   day?

19   A.    Correct.

20   Q.    And so we were just at April 20, 2015, right?

21   A.    Yes.

22   Q.    So what do we see there?

23   A.    We see that he got prescriptions for hydrocodone on

24   May the 8th and May the 11th and as well as may -- April

25   20th.

1    Q.    So he got hydrocodone on the 8th; he got, looks

2    like, dextroamphetamine on the 11th, and oxycodone on the

3    20th, which is the one that we were just talking about,

4    correct?

5    A.    Correct.

6           **MR. PENNEBAKER:**  And if you could zoom out,

7    please, Ms. Silverberg, and cull out the three entries in

8    white before that one that we just looked at.

9    **BY MR. PENNEBAKER:**

10   Q.    So looks like five days later, Mr. Newsom had

11   gotten a couple of other -- or excuse me.  Five days

12   earlier, on the 15th, Mr. Newsom had gotten a couple of

13   prescriptions:  one for dextroamphetamine and one for

14   1-milligram Xanax; is that right?

15   A.    Correct.

16   Q.    And so we do have an office visit on that date, the

17   15th.  Looks like a reason given for the visit is tension

18   in pelvic floor, right?

19   A.    Correct.

20   Q.    And then what's that "VIP" signify over there on

21   the right?

22   A.    He's part of his VIP program.

23   Q.    And so does that mean that there wasn't any money

24   exchanged for the office visit?

25   A.    Correct.

1          **MR. PENNEBAKER:**  If we could, please,

2      Ms. Silverberg -- let's see here.

3              If we could go back to the summary exhibit

4      involving Ms. Story.  And I forget.  Which one is that?

5              All right.  If we could go to Government's 76,

6      which is formerly 807.

7          **MS. SILVERBERG:**  I think it's 76.

8          **MR. PENNEBAKER:**  Did I say 806?

9          **MS. SILVERBERG:**  Oh, I thought you said --

10         **MR. PENNEBAKER:**  Yeah, yeah.  If we could go to

11     76 at Page 8, I think.  Yep.  And if we could zoom in,

12     starting at "what did I write you?"

13     **BY MR. PENNEBAKER:**

14     Q.    All right.  So in this exhibit involving Cyndal

15     Story, Jeff Young says, on July 18, 2016:  "What did I

16     write you?"

17            And does Ms. Story say?

18     A.    "You wrote me 5-milligram hydros," sad face.

19     Q.    And then what does she say?

20     A.    "Seriously.  I can't take something in between

21     taking those."

22     Q.    And then Mr. Young says:  "How many did I write?

23     And also, you have to be seen in the office for a

24     Schedule II narcotic.  It's bullshit, but it's the law,"

25     right?

 1   A.     Correct.

 2          **MR. PENNEBAKER:**  So could we go back to -- is

 3   it 91?

 4          So that was in July of 2016.  If we go to the

 5   second page of this exhibit, please, Ms. Silverberg.  And

 6   if we can zoom into everything.  There you go.  Perfect.

 7          **MS. SILVERBERG:**  Just this one?

 8          **MR. PENNEBAKER:**  All -- go all the way down.

 9   **BY MR. PENNEBAKER:**

10   Q.     How many prescriptions for hydrocodone -- which is

11   a Schedule II narcotic, correct?

12   A.     Correct.

13   Q.     -- happen after that text message where Mr. Young

14   acknowledges that it's the law that you have to have an

15   office visit for one of those drugs?

16   A.     Three.

17   Q.     By no means the only ones in this exhibit, correct?

18   A.     Correct.

19   Q.     Okay.

20          **MR. PENNEBAKER:**  Now, if we could go back to

21   Exhibit 90.

22          **MS. SILVERBERG:**  This one?

23          **MR. PENNEBAKER:**  Yes.  And if we could go to

24   Page 9, please, first four lines after the oxycodone

25   script.

1    BY MR. PENNEBAKER:

2    Q.    Would you start reading at "Brie's little sister"?

3    A.    "Brie's little sister killed herself tonight.  Can

4    pregnant people have Xanax?  She is tore up, dude."

5    Q.    "Oh, my God.  How far along is she?"

6    A.    "Yeah, we are in shock.  19 weeks."

7    Q.    "No.  It would harm the baby."

8          MR. PENNEBAKER:  And if we could go, please,

9    Ms. Silverberg, to -- yes -- to the tenth page, top four

10   lines.

11   BY MR. PENNEBAKER:

12   Q.    Go ahead, Special Agent Scales.

13   A.    "It's fucking crazy, dude.  Thank you, though."

14   Q.    "She can take BuSpar.  Stop by tomorrow and pick up

15   a script.  She's going to need it over the next few

16   weeks."

17         MR. PENNEBAKER:  And then if we could go down

18   to -- yep, right there in the middle.

19   BY MR. PENNEBAKER:

20   Q.    What does he say?

21   A.    "Cool.  We will come by tomorrow.  I just don't

22   want her all stressed during the pregnancy."

23   Q.    "Exactly.  That's worse than her taking something.

24   But Xanax is a definite no."

25         So will you tell me the date right then, Special

1    Agent Scales?

2    A.    4/23/2015.

3    Q.    April 23, 2015?

4    A.    Correct.

5    Q.    And do you remember earlier; we heard testimony

6    from a woman named Hope Rogers, right?

7    A.    Correct.

8    Q.    And did you also look at a summary, or did you also

9    review data, Facebook messages, and CSMD data for

10   Ms. Rogers?

11   A.    I did.

12        **THE COURT:**  Hold on.  We're going to go ahead

13   and take a break right now.  Okay.  We'll pick it up

14   after our break.

15        **MR. PENNEBAKER:**  Thank you, Your Honor.

16

17

18

19

20

21

22

23

24

25

 1          **THE COURT:**  All right.  Take a break, ladies and

 2     gentlemen.  Leave your notebooks in the chair, and don't

 3     discuss.  15, 20 minutes, we'll get back to you.  We'll

 4     go ahead and excuse you to the jury room.

 5          (Jury out at 10:34 a.m.)

 6          **THE COURT:**  You can step down.  Don't discuss,

 7     your testimony with anyone.

 8          **THE WITNESS:**  Yes, sir.

 9          (The witness complies with the request.)

10          **THE COURT:**  Mr. Pennebaker, I've asked you a

11     couple of times; you give me the same answer every time.

12     How many more?

13          **MR. PENNEBAKER:**  This is the last new exhibit

14     that I'm going to introduce.  I would imagine I have

15     maybe five minutes left with this witness.

16          **THE COURT:**  All right.  I appreciate it.

17          **MR. PENNEBAKER:**  Thank you.

18          **THE COURT:**  I've been really patient about all

19     the minute details that you're going through.  Sometimes

20     it's just good lawyering, during closing arguments, to

21     deal with all these details.  But I've been patient.

22     We've gone through 20 of these now.

23          **MR. PENNEBAKER:**  Yes, Your Honor.

24          **THE COURT:**  All right.  We'll be in recess.

25          (Recess at 10:35 a.m. until 11:13 a.m.)

1          **THE COURT:**  Okay.  Just one brief thing before

2     we bring the jury in:  Government, the indication was

3     that there was one additional witness after Special Agent

4     Scales.  Is that still the case?

5          **MS. PAYERLE:**  Yes, Your Honor.

6          **THE COURT:**  Okay.  I just need to start making

7     inquiry of the defense, whether there's going to be

8     witnesses and then also your client's decision, of

9     course.

10          **MR. FERGUSON:**  We were hoping that the next

11     witness will take us through the lunch break.  We'll

12     spend that time --

13          **THE COURT:**  Probably will.

14          **MR. FERGUSON:**  I would think so.

15          And after lunch, we would be able to answer that

16     probably a little better for you, Your Honor.  I don't

17     expect there to be much, if any, evidence on our side.

18          **THE COURT:**  Okay.  That's --

19          **MR. FERGUSON:**  But I do -- I do need that time

20     to spend time with my client for lunch.

21          **THE COURT:**  I know he has to make a decision,

22     and you need time to talk with him about it.

23          **MR. FERGUSON:**  Right.

24          **THE COURT:**  But what about other witnesses?

25          **MR. FERGUSON:**  I don't -- no, there won't be

1   any.

2            **THE COURT:**  Okay.  Appreciate it.  That's what I

3   need to know.

4            All right.  And then after we finish with

5   Special Agent Scales, I'd like to go ahead and deal with

6   the stipulation, get it marked into evidence --

7            **MS. PAYERLE:**  Thank you, Your Honor.

8            **THE COURT:**  -- before we take the last witness.

9            **MS. PAYERLE:**  And maybe we play the video at

10  that time as well?

11           **THE COURT:**  Yes.

12           **MS. PAYERLE:**  Okay.  Thank you.

13           **THE COURT:**  Go ahead and deal with that.

14           **MS. PAYERLE:**  Thank you, sir.

15           **THE COURT:**  All right.  Bring them in, please.

16           (Jury in at 11:14 a.m.)

17           **THE COURT:**  You may be seated.

18           (The witness complies with the request.)

19           **THE COURT:**  All right.  Folks, I think we're

20  ready for the final push before our lunch break.

21           I'll just turn it back over to Mr. Pennebaker.

22  If you would, please, you may proceed.

23           **MR. PENNEBAKER:**  Thank you, Judge.

24           Mr. Herrin, if I could just get the ELMO.

25

*UNREDACTED TRANSCRIPT*

**BY MR. PENNEBAKER:**

1  Q.   Special Agent Scales, I think we were just talking

2  about the messages and data for Hope Rogers we heard

3  testify earlier.  Is what's previously been marked as

4  Government's 814 the complete, unredacted version of that

5  summary?

6         (A document was passed to the witness.)

7  A.   Yes.

8  **BY MR. PENNEBAKER:**

9  Q.   And we saw three pages of it introduced earlier,

10 but this is the whole exhibit?

11 A.   Correct.

12        **MR. PENNEBAKER:**  Your Honor, the government

13 offers the Hope Rogers summary as Exhibit 92.

14        **THE COURT:**  All right.  Go ahead and receive it.

15        (The above-mentioned item was marked as

16 Exhibit No. 92.)

17 **BY MR. PENNEBAKER:**

18 Q.   Special Agent Scales, you may recall seeing

19 Exhibit 24 earlier, correct?

20 A.   Yes, sir.

21 Q.   And would you please read the last entry that Hope

22 Rogers writes to Jeff Young?

23 A.   "I'm so excited for you to meet A.  Here are a few

24 pictures.  When we get out and head home, if it's a day

 1    you're at the office, I'll bring her by to meet you.

 2    Thank you for taking care of me and helping me stay

 3    healthy during my pregnancy.  You're the best, Jeff."

 4    Q.    What's the date?

 5    A.    August 13, 2015.

 6    Q.    So have you reviewed the PMP data for Ms. Rogers

 7    involving Jeff Young's prescribing while she was

 8    pregnant?

 9    A.    Yes.

10    Q.    How many prescriptions for Xanax were there between

11    when the defendant told Mr. Newsom that's a definite no

12    for pregnant woman and this date?

13    A.    Four.

14    Q.    How many total Xanax pills did the defendant

15    prescribe Hope Rogers between the date of that warning to

16    Mr. Newsom and August 13, 2015?

17    A.    360.

18              **MR. PENNEBAKER:**  Pass the witness, Your Honor.

19              **THE COURT:**  All right.  Thank you.

20              And Mr. Damas?

21          **MR. DAMAS:**  Thank you, Your Honor.

22              **THE COURT:**  You may proceed.

23                        **CROSS-EXAMINATION**

24    BY MR. DAMAS:

25    Q.    Good morning, Special Agent Scales.

1   A.    Good morning.

2   Q.    It's been a long morning.

3   A.    It has.

4   Q.    So you've testified you were the one that created

5   all of these summaries, these exhibit summaries, right?

6   A.    I didn't testify to creating them.

7   Q.    You reviewed the informations that led to the

8   creation of the documents, right?

9   A.    Correct.

10   Q.    So you reviewed the text messages, the PMP data,

11   and Facebook message and -- you know.

12   A.    Correct.

13   Q.    Depending on each exhibit, there's a little bit

14   variance between each one, right?

15   A.    What do you mean?

16   Q.    Sometimes there's Facebook messages; sometimes it's

17   texts?

18   A.    Right.  They're in order of -- they might have been

19   going back and forth between text message and Facebook,

20   and you just added them in.

21   Q.    And you cross-referenced all of that information

22   and kind of made it into timeline that's easy to read?

23   A.    We, yes.

24   Q.    Because otherwise, cell phone data information is,

25   like, incredibly difficult and jumbled, and it's all over

 1   the place?

 2   A.    Correct.

 3   Q.    Correct.

 4         Okay.  And part of the -- one of the things you

 5   were cross-referencing was the PMP data for the specific

 6   patients that we've been talking about all morning?

 7   A.    Correct.

 8   Q.    Do you know if you included all of the PMP data

 9   when cross-referencing that?

10   A.    Yes.

11   Q.    Okay.  So if we can take a look at -- before get

12   there, including PMP data in relation to continuation of

13   care?

14         Specifically, did you include PMP data in these

15   summaries when these patients had been given -- been

16   receiving these prescriptions prior to being under the

17   care of Mr. Young?

18   A.    It's going to be -- when we do PMP data, we do it

19   for -- are you asking specifically for this -- these

20   charts?

21   Q.    For -- and what might help, let's look at what's

22   been previously labeled Exhibit Number 78.  And I'm going

23   to just use this ELMO; it's going to be easier.

24         Number 78.  So right here, you started off the

25   summary with June 30th of 2016?

1   A.    Correct.

2   Q.    Right.  So my question to you is, were there any

3   other PMP entries for Ms. Amy Sanders prior to June 30th

4   of 2016?

5   A.    I would have to see the PMP data to . . .

6          **MR. DAMAS:**  If I may approach?

7          **THE COURT:**  Good ahead.

8   **BY MR. DAMAS:**

9   Q.    Do you recognize that?

10  A.    This is a -- is this a full PMP?

11  Q.    It's not the full PMP.  It's just -- it's

12  specifically relating to the time period around June 30,

13  2016.

14         But do you recognize what that document is?

15  A.    Yes.  Yes.

16  Q.    Yes?

17  A.    (Nodding head up and down.)

18  Q.    What is that?

19  A.    This is a CSMD.

20         **THE COURT:**  I couldn't hear you.  What did you

21  say?

22         **THE WITNESS:**  A CSMD or a P -- PMP.

23  **BY MR. DAMAS:**

24  Q.    The same -- same --

25  A.    Same difference.

1  Q.    I used it interchangeably.

2        But who's it for?

3  A.    Amy Sanders.

4  Q.    Amy Sanders.

5        Did you happen to get a chance to -- if there was

6  any other narcotics given to Ms. Sanders by a different

7  provider prior to June 30, 2016?

8  A.    Yes.

9  Q.    Thank you.

10       **MR. DAMAS:**  I move to admit, Your Honor.

11       **THE COURT:**  What do we have here?  How do you

12 describe the document?

13       **MR. DAMAS:**  This would be Amy Sanders' PMP data,

14 I guess.

15       **THE COURT:**  Okay.  We'll go ahead and receive

16 it.  That will be Number 93.

17       (The above-mentioned item was marked as

18 Exhibit No. 93.)

19 **BY MR. DAMAS:**

20 Q.    So as we can see, Special Agent Scales, you started

21 off the summary with June 30, 2016, prescription given to

22 Ms. Sanders by Jeff Young.  But there's also other

23 prescriptions for narcotics from other providers prior to

24 that, correct?

25 A.    Correct.

1   Q.    Is there any reason why that wasn't included in the

2   summaries?

3   A.    Because these are specific examples showing that

4   Jeff Young was prescribing to her.

5   Q.    You don't think it's relevant to show that she was

6   already receiving care prior to coming up with Jeff Young

7   and he's just continuing that care once he comes into --

8   once she comes under his care?

9   A.    We have the burden of proving and that he was

10  distributing drugs.

11  Q.    But it is relevant?

12  A.    Not to what we're trying to --

13  Q.    Okay.

14  A.    -- prove.

15  Q.    All right.  Let me just ask you this:  Is it

16  possible that you left out that kind of information on

17  other patients as well?

18  A.    It is possible, because it's only for Jeff Young.

19  Q.    So let's go to Cyndal Story.  Cyndal Story.  That's

20  previously marked Exhibit 76, Page 8.

21        All right.  And I'm going to hand this up to you.

22  Let me know if you recognize what this is.

23            (A document was passed to the witness.)

24  A.    Another CSMD, and at this time, for Cyndal Story.

25  **BY MR. DAMAS:**

1    Q.    For Cyndal Story.

2           **MR. DAMAS:**  I move to admit, Your Honor, PMP

3    data for Cyndal Story.

4           **THE COURT:**  We'll receive it.  It will be

5    Number 94.

6           (The above-mentioned item was marked as

7    Exhibit No. 94.)

8    **BY MR. DAMAS:**

9    Q.    All right.  So on this previously marked exhibit,

10   this is the first instance that Jeff Young prescribes

11   alprazolam and hydrocodone to Ms. Story; is that correct?

12   A.    Correct.

13   Q.    Okay.  And we can take a look at Ms. Story's PMP.

14   She had been receiving those types of medications prior

15   to coming under the care of Mr. Young; is that correct?

16   A.    Correct.

17   Q.    So continuation of care --

18   A.    Correct.

19   Q.    -- right?

20         And that was left out from the summaries, correct?

21   A.    Correct.

22   Q.    Okay.  And you said the reason you're leaving out

23   this information is because it's not relevant to your

24   case?

25   A.    We specifically stated that these PMPs were from

1    Jeff Young's prescribing, and those -- a prescriber

2    that's not Jeff Young is not being specific examples to

3    the crime we investigated.

4    Q.    Because -- once again, because it's not relevant to

5    your case, to your burden of proof, right?

6    A.    Correct.

7    Q.    But it is relevant as to whether Mr. Young was

8    continuing the care of prior -- prior prescribings,

9    patients?

10   A.    Not necessarily.

11   Q.    Okay.  Let's go to Ben Elston, Mr. Young's

12   bodyguard.  Previously Exhibit 83.

13         You recognize what this is?

14              (A document was passed to the witness.)

15   A.    Another PIP or CSMD.

16   **BY MR. DAMAS:**

17   Q.    For Mr. Ben Elston?

18   A.    Yes, sir.

19         **MR. DAMAS:**  Move to admit, Your Honor.

20         **THE COURT:**  95.

21         (The above-mentioned item was marked as

22   Exhibit No. 95.)

23   **BY MR. DAMAS:**

24   Q.    So for Mr. Elston, the first time Mr. Young gives

25   him a prescription is September 25, 2014?

1  A.    Correct.

2  Q.    And just quickly looking at his PMP data, prior to

3  2014, he's also receiving that type of medication from

4  other prescribers, correct?

5  A.    Correct.

6  Q.    And once again, the reason you left this out is

7  because it's not relevant to the case you were trying to

8  prove --

9  A.    Correct.

10  Q.    -- correct?

11        I know you did it with Mr. Chad Newsom.  You looked

12  at whether there was a clinical visit or not.  Did you do

13  that for the rest of these?

14  A.    Yes.

15  Q.    Were you able to verify that many times, most of

16  the time, these were in relation to an office visit?

17  A.    Can you repeat that question?

18  Q.    Were you able to verify that a lot of these

19  prescriptions are being prescribed after an office visit

20  was conducted?

21  A.    Yes.

22  Q.    Okay.  And I can go through and show the instances

23  of each time where the PMP wasn't completely shown here,

24  but just last one:  Mr. Jay Green.  I believe he was

25  previously marked Exhibit 84.

1          Is -- did you include, in Mr. Jay Green's summary

2     regarding his PMP, when he was receiving prescriptions

3     for opioids at the same time from other prescribers when

4     he didn't see Mr. Young?

5     A.    Are you saying in the --

6     Q.    In the time -- in the relevant time frame of this

7     summary?

8     A.    If it didn't have anything to do with Jeff Young,

9     it was not put into --

10    Q.    So it wasn't -- it wasn't included.

11          Okay.  I seem to recall -- it might have been

12    yesterday -- testimony over Ms. Daphne Montoya.  It might

13    have been this morning, honestly.  It's just been two

14    very long days.

15          You testified to the fact that Ms. Montoya was

16    using an alias.  Daphne Joyner versus Daphne Montoya?

17    A.    Correct.

18    Q.    Do you have any information as to whether or not

19    that's really just the difference between somebody's

20    maiden name and somebody's married name?

21    A.    Yeah, it'd still be an alias.

22    Q.    Okay.  And you don't know -- did you get any

23    information that during that relevant time period where

24    both names were being used of whether or not she was

25    going through a divorce?

1    A.    I'm not sure.

2    Q.    Would that explain why the two different names?

3    A.    Say that -- can you repeat that question?

4    Q.    With her -- with her going through a divorce during

5    that time period, would that explain?

6    A.    It's possible.

7    Q.    Okay.

8          **MR. DAMAS:**  No further questions, Your Honor.

9          **THE COURT:**  All right.  Thank you.

10         Any redirect?

11         **MR. PENNEBAKER:**  Just one question or two, Your

12   Honor.

13                    **REDIRECT EXAMINATION**

14   **BY MR. PENNEBAKER:**

15   Q.    Special Agent Scales, are we looking at

16   Exhibit Number 95 again?

17   A.    Yes.

18   Q.    Mr. Elston's CSMD data?

19   A.    Yes, sir.

20   Q.    And it looks like the first prescription from the

21   defendant is the oxycodone, 325, 7.5 on 9/25 of 2014?

22   A.    Yes.

23   Q.    And, indeed, you see that he is not the first

24   person to prescribe controlled drugs to Mr. Elston, is

25   he?

1   A.    No.

2   Q.    It looks like there are a few other providers, even

3   just during this short time frame, about a month.

4   Between August 12th and September 12th of 2014?

5   A.    Correct.

6   Q.    Buprenorphine is used to treat heroin and methadone

7   addiction, isn't it?

8   A.    Yes.

9         **MR. PENNEBAKER:**  No further questions, Judge.

10        **THE COURT:**  Recross based on that, Mr. Damas?

11        **MR. DAMAS:**  No, Your Honor.

12        **THE COURT:**  All right.  Thank you.

13        Special Agent Scales, thank you very much.  You

14   can step down.

15        (The witness complies with the request.)

16

17

18

19

20

21

22

23

24

25

1      **THE COURT:**  Before we take the next witness,

2    ladies and gentlemen, there's a small matter that we need

3    to take up.

4         Yesterday, I think there was some confusion

5    about one of the video recordings purportedly of the

6    defendant in this case, confusion about whether we had

7    the right one with regard to the government.  Well, they

8    did a search last night, and I think an error was made.

9    Going to let the government explain, in more detail, the

10   error that was located.  And then what we're going to do

11   is proceed by way of a stipulation.  A stipulation is an

12   agreement between the parties.  When an issue comes up

13   that everyone agrees to, there's no controversy about it,

14   then a piece of evidence can be admitted by way of

15   agreement or stipulation.  But I'm going to turn it over

16   to the government.

17        Explain the error that was found and how you

18   propose to deal with it.

19      **MS. PAYERLE:**  Thank you, Your Honor.

20        As you might have seen yesterday in court, we

21   had some confusion about the undercover video that was

22   played for the witness.  And with the little nagging

23   doubts in our minds, we went back and looked.  And it

24   turned out that the witness had testified that the video

25   was from November of 2016, when, in reality, the video

1    was from just one month later, in December.  It was still

2    the witness; it was still the defendant.  It was just one

3    month later.  So there is a video from November of 2016,

4    which the defense and the Court have agreed to allow us

5    to receive it into evidence and to deal with the matter

6    by stipulation, which I can read at this time, Your

7    Honor.

8              **THE COURT:**  Go ahead.

9              **MS. PAYERLE:**  Thank you.

10             The government and the defendant agree to the

11   following:  Yesterday in court there was some confusion

12   as to an audio-visual recording that the government

13   introduced as Exhibit 73.  This stipulation is meant to

14   address that confusion.

15             The witness, Kristina St. Laurent, had three

16   office visits with the defendant Jeff Young.  These took

17   place on October 11, 2016, November 16, 2016, and

18   December 14, 2016.  The audio-visual recording admitted

19   as Exhibit 33 was for October 11, 2016, but the

20   audio-visual recording admitted as 73 took place on

21   December 14, 2016, not November 2016, as the witness

22   yesterday testified.  The office visit from November 2016

23   is depicted in an audio-visual recording that the

24   Court -- I believe we will move to admit and the Court

25   will accept as exhibit -- what is the next number?

1          **THE COURT:**  The stipulation, we're going to

2     introduce that.  That will be Number 96.

3          **MS. PAYERLE:**  Thank you.

4          (The above-mentioned item was marked as

5     Exhibit No. 96.)

6          **THE COURT:**  And the recording, the video will

7     be 97.

8          **MS. PAYERLE:**  Oh, 97 is the video.  I

9     understand.

10         (The above-mentioned item was marked as

11    Exhibit No. 97.)

12         **MS. PAYERLE:**  97, which will now be shown to the

13    jury.

14         The parties stipulate that yesterday's witness'

15    testimony contrary to these facts was a result of a

16    simple mistake by the government and was not purposeful

17    in any respect.  Upon discovery of the error regarding

18    the date of the video, the government immediately came

19    forward to correct it.

20         And Your Honor, I'll represent this stipulation

21    is signed by all parties.

22         **THE COURT:**  Okay.  When you say all parties,

23    just -- Mr. Ferguson, I believe you've read it, agree

24    with it, and then signed it?

25         **MR. FERGUSON:**  I've read, agreed, and signed it,

1  Your Honor.

2      **THE COURT:**  Okay.  And I think your client has

3  also signed it?

4      **MR. FERGUSON:**  He has, Your Honor.

5      **THE COURT:**  All right.  Okay.  We'll go ahead

6  and receive the stipulation into evidence.  As I said,

7  that will be Exhibit Number 96.

8      Again, ladies and gentlemen, it's an agreement

9  between the parties, and that way, we avoid calling

10  additional witnesses to come back in and kind of

11  straighten it out.  I'll have a more in-depth instruction

12  on how to handle stipulations when I give the final

13  instructions at the end.  Okay?

14      **THE JURY:**  (Nodding head up and down.)

15      **THE COURT:**  All right.  Let's go ahead and

16  proceed with showing a video.  I think it's for November,

17  and that's Exhibit Number 97.

18      **MS. PAYERLE:**  Thank you, Your Honor.

19      (An audio-video recording was played.)

20      **THE COURT:**  Okay.  Thank you.

21      Now, if you would, please call your next

22  witness.

23      **MS. PAYERLE:**  Thank you, Your Honor.

24      The government calls Dr. Tricia Aultman.

25      **THE COURT:**  All right.  Be right there.  If you

1      would, please raise your right hand and receive the oath.

2                (The witness was duly sworn.)

3                **THE WITNESS:**  I do.

4                **THE COURT:**  Be seated here, please.

5                (The witness complies with the request.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **TRICIA AULTMAN, M.D.,**

2     having been first duly sworn, was examined and testified

3     as follows:

4                    **DIRECT EXAMINATION**

5     **BY MS. PAYERLE:**

6     Q.    Good morning, Dr. Aultman.

7     A.    Good morning.

8     Q.    Will you please introduce yourself to the jury,

9     your name, your job.

10    A.    Okay.  My name is Tricia Aultman.  I'm an internal

11    medicine doctor in Gulfport, Mississippi.  I work

12    currently as a hospitalist, so I see patients only in the

13    hospital.  I've previously had a clinic and done both as

14    well.

15    Q.    How long have you been practicing medicine?

16    A.    I graduated from medical school in 1996, and I

17    finished my training in 1999.

18    Q.    And do you -- could you describe for the jury your

19    experience prescribing controlled substances?

20    A.    It's definitely something I do every day, rounding

21    in the hospital.  We have a really sick cancer ward, and

22    when I'm on there, it's -- it's a daily thing.

23    Q.    And how about -- could you describe to the jury

24    your experience running a clinic?

25    A.    I did for many years.  Back before there were

1    hospitalists, you used to go to the hospital, and then

2    you would go to the clinic, and then you'd go back to the

3    hospital.  I did it.  I owned my own clinic for a while,

4    and I was also employed by a hospital for a while.

5    Q.    And you said you were in internal medicine; is that

6    right?

7    A.    Yes, ma'am.

8    Q.    Can you describe for the jury what internal

9    medicine is?

10   A.    So internal medicine is a doctor for an adult.  So

11   a family practice, you see all ages, and internal

12   medicine is usually over 15 or wherever you're kind of

13   comfortable.

14   Q.    But is it a -- is it a -- sort of, do you

15   concentrate on a particular part of the body, or is it a

16   general care kind of job?

17   A.    No, it's a total care of an adult patient.

18   Q.    And how about your experience working with nurse

19   practitioners?  Could you describe that to the jury?

20   A.    We have nurse practitioners that we work with every

21   day in our group.

22   Q.    Have you ever testified for the government before

23   in cases involving prescriptions for controlled

24   substances?

25   A.    Yes, ma'am.

1    Q.    And in particular in cases involving prescriptions

2    for controlled substances in a family practice setting?

3    A.    Yes, ma'am.

4          **MS. PAYERLE:**  At this time, Your Honor, the

5    government moves to qualify Dr. Aultman in the field of

6    internal medicine, including the professional practice

7    and legitimate medical purpose of prescribing opioids,

8    benzodiazepines, and other controlled substances.

9          **THE COURT:**  That's a mouthful.

10         **MS. PAYERLE:**  Yes, sir.

11         **THE COURT:**  Mr. Ferguson, anything on that?

12         **MR. FERGUSON:**  No.  We've met before.  She's

13   been a witness previously, and we would also accept her

14   as an expert.

15         **THE COURT:**  All right.  Thank you.

16         Ladies and gentlemen, we are going to receive

17   Dr. Aultman as an opinion or expert witness in the field.

18   Ladies and gentlemen, what this means is -- used to call

19   them expert witnesses.  Now they're called opinion

20   witnesses.  Because of training, experience, things like

21   that, education, this allows this witness to be able to

22   give opinions on the certain areas relative to the area

23   that she's being held out as an opinion or expert

24   witness.  I have an instruction for you on how to handle

25   opinion or expert testimony at the end of the case, but

1    this witness will be allowed to give opinions.

2              You may proceed.

3              **MS. PAYERLE:**  Thank you, Your Honor.

4    **BY MS. PAYERLE:**

5    Q.    Dr. Aultman, in preparing for your testimony today,

6    did you review patient records that were collected from

7    Mr. Young's clinic?

8    A.    I did.

9    Q.    And did you also review videos showing -- showing

10   the defendant interacting with patients?

11   A.    Yes, ma'am.

12   Q.    And distributing controlled substance

13   prescriptions?

14   A.    Yes, ma'am.

15   Q.    Focusing on opioid prescriptions, can you tell the

16   jury your opinion about whether, in anything you

17   reviewed, you saw Mr. Young distributing opioids in the

18   ordinary course of professional practice for a legitimate

19   medical purpose?

20   A.    No, I did not.  I feel like it was way outside what

21   a legitimate medical visit would be.

22   Q.    And we will talk more about sort of what that means

23   in a moment.  But how about some benzodiazepines like

24   Xanax and Klonopin?  Can you tell the jury your opinion,

25   generally, about Mr. Young's distribution of those

*TESTIMONY OF TRICIA AULTMAN, M.D.*                                          99

1   substances based on what you reviewed?

2   A.    I feel like they were used -- over used and used

3   for indications that weren't necessary and used in

4   combination with opioids, which is dangerous because when

5   you take those medicines together, it can actually cause

6   increased sleepiness.  And there's actually a "black box"

7   warning on those now, which means you shouldn't prescribe

8   them together.

9   Q.    And so in those cases, which, again, we'll describe

10  in more detail later, was Mr. Young distributing

11  benzodiazepines in the ordinary course of professional

12  practice for a legitimate medical purpose?

13  A.    No, ma'am.

14  Q.    And then did you also see him prescribing other

15  controlled substances like Adderall or muscle relaxants?

16  A.    Yes, ma'am.

17  Q.    And could you describe your opinions about his

18  prescriptions of Adderall and muscle relaxants?

19  A.    In regards to Adderall, there was never a history

20  taken for attention deficit disorder.  There was, you

21  know, no questioning of the person, like, when were you

22  diagnosed as a child?  How long have you taken this

23  medication?  It was basically just, you know, said that

24  they have ADD, and the medicine was given.  It was also

25  sometimes given to patients that had high blood pressure

1    or heart problems, which can be dangerous.  And the

2    muscle relaxants, again, in combination with opioids or

3    benzodiazepines, can cause excessive sedation.

4    Q.    Now, I want to dive into the basis of those

5    opinions, but first address his records generally.

6          If you had to sort of grade the quality of

7    Mr. Young's professional practice in terms of his medical

8    record-keeping skills, A to F, how would you grade him?

9    A.    I would say F.

10   Q.    Okay.  And now -- but if he had -- if those records

11   had been pristine and organized but contained the same

12   information, would that change your opinion?

13   A.    No.

14   Q.    Even if they had been sort of more fully papered,

15   would that have changed your opinion?

16   A.    It would not change my opinion about the

17   prescriptions being written inappropriately.

18   Q.    All right.  So let's set a baseline for your

19   opinion about -- I'm going to take that long phrase, the

20   legitimate medical purpose of opioids in the course of

21   professional practice.  It's just a long phrase, so I

22   want to break it in two.

23   A.    Yes, ma'am.

24   Q.    Let's start with the legitimate medical purpose of

25   opioids.

1           Do opioids, benzodiazepines, and Adderall and other

2    controlled substances have legitimate medical purposes?

3    A.    Yes.  Absolutely.

4    Q.    All right.  Let's start with opioids.  Can you give

5    the jury some examples of, first of all, some of the

6    opioid drugs that Mr. Young was prescribing?

7    A.    So he was prescribing hydrocodone and hydrocodone

8    with Tylenol, which is commonly known as Lortab or Norco,

9    some older Vicodin.  He was prescribing oxycodone

10   which -- alone and with Tylenol, which is commonly known

11   as Percocet.  He was also prescribing fentanyl patches.

12   Q.    Okay.  And how about hydromorphone.  Was he

13   prescribing the --

14   A.    Yes, there was some hydromorphone as well.

15   Q.    All right.  And is there -- in terms of the

16   strength of these drugs, the jury's heard some testimony

17   about --

18           **THE COURT REPORTER:**  Excuse me.  Slow down,

19   please.

20           **MS. PAYERLE:**  Oh, I'm so sorry.  Thank you.

21   **BY MS. PAYERLE:**

22   Q.    The jury has heard some testimony about what --

23   what some of these drugs are stronger than others.  Can

24   you explain how the strength of an opioid is measured

25   against each other?

 1    A.    So there is a -- a grading scale called a morphine

 2    milligram equivalent, and what that means is that they

 3    compare everything to one milligram of morphine.  So

 4    hydrocodone is the same, so it's a one for one.  So

 5    5 milligrams of hydrogone (phonetic) is 5 milligrams of

 6    morphine.  Oxycodone is one and a half times, so 10

 7    milligrams of oxycodone is 15 milligrams of morphine.  A

 8    fentanyl patch is strong.  A 25-microgram patch is the

 9    same as 60 milligrams of morphine.  And they're measured

10    in milligrams of morphine per day.

11         It's hard sometimes to calculate it all, but

12    there's -- you know, calculators online now makes it

13    really easy.  You just plug in the drugs that they're

14    taking, and you can calculate out how much it equates to

15    in morphine.

16    Q.    And can you give us kind of a sense of how many

17    MMEs or milligram -- sorry -- morphine milligram

18    equivalents -- can you give you sense of, like, the --

19    put some numbers on that, you know, where it's normal,

20    what a new patient gets, what a tolerant patient gets,

21    things like that?

22    A.    Right.  So a new patient, probably 10 to 15 is

23    plenty.  People, over time, develop tolerance, and

24    sometimes you do you have to go up on that.  Definitely

25    over 90 starts to increase the risk of overdose and

1    oversedation, hospitalizations related to that.  So 90 is

2    sort of a general cutoff for when things start to get a

3    lot more dangerous.

4    Q.    And you're talking about 90 --

5    A.    Morphine milligram equivalents per day, yes, ma'am.

6    Q.    So let's talk about the purpose of opioids.  What

7    is the legitimate medical purpose of these opioid drugs

8    that you're describing?

9    A.    So they're used for pain relief.

10   Q.    Any kind of pain relief?

11   A.    They're used -- useful for acute pain.  So when you

12   have, like, an injury right away, opioids are good for

13   that, short-term, you know, three to five days a week or

14   less.  They're good for post-surgical pain.  Obviously

15   gets something cut on, you're going to need pain relief,

16   either IV or by mouth, for a while.

17         Opioids actually, for chronic pain, have been

18   studied a lot, and they really don't help.  They really

19   cause more problems than benefits.

20   Q.    When you say "chronic pain" and -- could you

21   compare that to what you mean by acute pain?  Just

22   familiarize the jury.

23   A.    Right.  So acute pain is like probably maybe less

24   than, depending on the definition you look at, 30 days,

25   and chronic pain is six weeks to three months, and you're

1   still having pain or longer than what you would expect

2   for something to get healed.

3   Q.    And you said that there's been studies done showing

4   opioids aren't really appropriate or helpful for chronic

5   pain.  Can you kind of tell the jury when, in time -- you

6   know, what year or so those studies became pretty widely

7   understood and accepted in the medical community?

8   A.    I think it was the -- it was definitely, I would

9   say, around 2010 probably.  There was enough evidence to

10  prove that by then.

11  Q.    And when you say that opioids make chronic pain

12  worse, that's kind of counterintuitive.  Can you explain

13  how opioids make chronic pain worse?

14  A.    So sometimes what happens when you take opioids for

15  a long time is you become overly sensitive, so any

16  normal, maybe, brush or, you know, hit your hand on a

17  table becomes extraordinary painful.  And so instead of

18  actually get pain relief, you actually become

19  oversensitive to pain.  And the side effects of opioids

20  are, you know, significant.  They cause oversedation;

21  they're habit forming; they cause terrible constipation;

22  they cause nausea, vomiting.

23  Q.    What do you mean by "habit forming"?

24  A.    So even if you don't want to become addicted to an

25  opioid, if you take it long enough, eventually it won't

1   work at the same dose.  You'll need an increase dose.  We

2   see this in cancer patients who have chronic, severe pain

3   for a very long time, that eventually you have to

4   increase the dose to get pain relief.

5   Q.    And does -- is -- are there any consequences of

6   becoming dependent on opioids?  What -- what are the

7   risks of that?

8   A.    So if you take opioids every day, eventually if you

9   don't take them, you won't feel normal.  You'll have

10  withdrawal, which can be shaking; it can be chills; it

11  can be, like, goose flesh or goose bumps, nausea,

12  vomiting, diarrhea, and basically like an all-over pain.

13  So eventually you're taking it just to avoid having a

14  withdrawal.

15  Q.    And does that happen with everybody who takes

16  opioids for a certain amount of time?

17  A.    I mean -- so everybody will develop a tolerance.

18  So tolerance is something that happens in everybody,

19  whether you want it or not, when it just means that you

20  may need more medicine to get the same relief.

21        Dependence and misuse is different.  That means you

22  start to do things that are inappropriate in order to

23  continue to get the medication that you need.  That may

24  be, you know, crimes; it may be ignoring your family,

25  quitting your job, stealing from people, whatever it is,

1    and that's when it becomes a bad use of the medication.

2    Q.    And do we call that -- I mean, is that what

3    addiction is?

4    A.    Yes, ma'am.

5    Q.    Okay.  Aside from addiction and dependence, those

6    are two different things, right?

7          Physical dependence, and then addiction is the

8    acting out?

9    A.    Right.

10   Q.    Okay.  Aside from addiction and dependence, what

11   other risks are there of prescribing opioids?

12   A.    To the patient or the -- to the --

13   Q.    To the patient.

14   A.    Yeah.  So the risk of addiction, dependence, if,

15   for example, someone who takes a lot of opioids gets

16   hospitalized for another reason, it's really, really

17   difficult to control their pain.  That's probably the

18   biggest thing that I see, that people that take a lot of

19   medicine and then they have surgery and, you know, you

20   get the call and they're just horrifically in pain

21   because they haven't had their normal daily medicine, and

22   we're giving them a usual dose, which is not helping at

23   all.

24   Q.    And what about risks of overdose or respiratory

25   issues, things like that?

*UNREDACTED TRANSCRIPT*

*TESTIMONY OF TRICIA AULTMAN, M.D.*                                      107

1   A.    So definitely risk of overdose, especially when you

2   get over 90 morphine milligram equivalents or MME,

3   especially when given with benzodiazepines, particularly

4   in someone who's overweight and may have sleep apnea or

5   may have some other medical issue, whether it be lungs

6   or heart, that would contribute to that.

7   Q.    And why -- why does the risk of overdose increase

8   if you combine the opioids with the benzodiazepines, as

9   you just said?

10  A.    It just causes excessive sedation, more than what

11  you would get if you took either one alone.  When you put

12  them together, it's kind of -- it's kind multiplicative

13  or adds on.

14  Q.    Does it also -- when you add them together, does it

15  also increase the high of both of them if that -- if

16  you're a person in whom it causes a high?

17  A.    It does.  And it's known to be abused, the opioids

18  in combination with benzodiazepines and sometimes in

19  combination with one of the muscle relaxers as well.

20  Q.    Okay.  Let's talk for a minute about fentanyl.

21  Could you describe for the jury -- give them a sense of

22  the strength of fentanyl as compared to the other opioids

23  we've been talking about.

24  A.    So fentanyl, like we talked about earlier, when

25  used in a patch is indicated for use in people that have

1    been on opioids at 16 -- I'm sorry; 6-0 -- 60 morphine

2    milligram equivalents of some opioid a day for at least a

3    week.  In other words, it's not for someone who's never

4    taken opioids before, and it's not for someone who's on a

5    small dose of opioids.  It's indicated for people who

6    have taken at least 60 MME for a week.

7         Probably the biggest use in the hospitals -- two

8    things:  One is in cancer pain.  It provides a continuous

9    release of pain for people that have things like invasion

10   of organs or bones or something that's extraordinarily

11   painful.

12        It's also used sometimes with our cardiothoracic or

13   our heart surgeons.  They put it on in the operating room

14   at a low dose.  And then the person's going to be in the

15   ICU for several days.  They can be easily monitored.  So

16   although those people are naived opioids, they're going

17   to be monitored in a ICU setting.

18   Q.   Even though it's a patch -- you don't swallow a

19   pill -- is it still as dangerous as any other opioid?

20   A.   It's actually -- it perhaps is more dangerous

21   because it has a slow onset.  So you could put the patch

22   on, and then by the time you go to sleep, its effects are

23   getting into your bloodstream.  And so it's a heightened

24   effect by then, and it's significantly stronger than

25   other opioids that are commonly taken.  Like a

*TESTIMONY OF TRICIA AULTMAN, M.D.*                                          109

1   25-microgram patch is equal to 60 morphine milligram

2   equivalents.  A 50-microgram patch is equal to 120

3   morphine milligram equivalents.

4   Q.    Okay.  Now, is it a legitimate medical purpose of

5   opioids to feed or create an addiction to them in your

6   patient?

7   A.    No.  It's actually harmful.

8   Q.    Is it a legitimate medical purpose of opioids to

9   get somebody through kind of get somebody through

10  withdrawals or detox indefinitely?

11  A.    No.  They're -- there's definitely ways to do that,

12  and, you know, continuing to prescribe different doses of

13  opioids is not the way.

14  Q.    And did you see Mr. Young doing that in this case?

15  A.    He did.

16  Q.    Okay.  Is it -- and these may be just completely

17  obvious, but is it a legitimate medical purpose of

18  opioids to induce someone to have sex with the person

19  prescribing the drugs?

20  A.    No, ma'am.

21  Q.    Or to create a reputation for being unconventional?

22  A.    No, ma'am.

23  Q.    Or to pay somebody back for being a friend or for

24  their loyalty?

25  A.    No, ma'am.

1    Q.    What about to get in good with a famous member of a

2    band?

3    A.    No, ma'am.

4    Q.    No.  Okay.

5          Let's talk about benzodiazepines next.  Can you

6    give an example of some benzodiazepines?

7    A.    So common names for benzodiazepines are Valium,

8    Ativan, Xanax, and Klonopin.

9    Q.    And those are brand names?

10   A.    Yes, ma'am.

11   Q.    And what are the -- sort of the drug names for

12   those the brands?

13   A.    So diazepam, lorazepam, oxazepam, alprazolam.  I

14   think we got them all.  And --

15           (Indiscernible cross-talk was had.)

16           **THE COURT REPORTER:**  One second.

17           **THE COURT:**  Y'all were talking over each other.

18           **MS. PAYERLE:**  I know.  I'm sorry.

19           **THE COURT:**  She can't get it down.

20   A.    Clonazepam.  And yes, most of the benzodiazepines

21   have a "pam" at the end.

22   **BY MS. PAYERLE:**

23   Q.    Okay.  You -- you testified you've prescribed these

24   drugs in the context of a family practice.  How often?

25   A.    That's difficult to answer.  I think you definitely

1   have to have an indication for it.  Probably the most

2   common way I would prescribe them is in an older person

3   that has restless legs.  If you use a really low dose of

4   Klonopin, that usually works.

5       Benzodiazepines don't work for anxiety disorder.

6   They're just not indicated.  It doesn't help.  There's

7   other drugs that are better for that.  You can use them

8   for panic attacks.  Like a good example, I had a patient

9   who couldn't drive over the bridge to get to her

10  grandkids in New Orleans.  But if she took a teeny-tiny

11  dose, she was able to drive through.  So I maybe

12  prescribed her five a year.

13      Same with airplane flights.  That was another,

14  probably, indication I would use it in my private

15  practice.

16  Q.   And you said you'd give them a teeny-tiny dose.

17  Let's talk for a minute about dosing.

18      For benzodiazepines, what is the kind of

19  introductory, if a doctor decides that a benzodiazepine

20  is appropriate?

21  A.   So probably for a Xanax, it would be .25.  For

22  Ativan, .5.  For Valium, probably 2 milligrams.

23  Q.   Okay.  So Xanax -- just to do some math, a Xanax

24  1-milligram pill is like four times the introductory

25  dose --

```
 1   A.    Yes, ma'am.

 2   Q.    -- of Xanax?

 3         Okay.  And do you know what the highest dose pill

 4   of Xanax available is?

 5   A.    I think they make 2-milligram pills.  I'm not sure

 6   if they make anything higher.

 7   Q.    All right.  And then what about with OxyContin?

 8   What are the kind of dose levels for -- or oxycodone;

 9   sorry.  What are the kind of dose levels for oxycodone?

10   A.    So oxycodone, like an introductory dose of Percocet

11   for acute pain, would be 5 milligrams.  You can do 2.5 as

12   well, if it's small person with, like, no tolerance and a

13   mild pain.

14   Q.    And so what -- what dosages do oxycodone pills go

15   up to?  Do you know?

16   A.    Oxycodone itself, I think, probably goes at least

17   to 20.  OxyContin, the longer acting, goes up much

18   higher.

19   Q.    Okay.  And if you were -- if you saw somebody was

20   prescribed an oxycodone or oxy 30 milligram -- well,

21   maybe we'll just look at it later.  We'll take a look --

22   A.    Yes.

23   Q.    -- when you have an example.

24   A.    I think they go up higher.

25   Q.    Okay.
```

*TESTIMONY OF TRICIA AULTMAN, M.D.*                                    113

1   A.    It's just not used very frequently because if you

2   get to a higher dose of oxycodone, the use, you should be

3   using the long-acting formulation instead.

4   Q.    I see.  The long-acting formulation.

5   A.    Yes, ma'am.

6   Q.    Explain the difference there between the longer

7   acting and short acting.

8   A.    So the idea behind the long acting is that you

9   don't have breakthrough pain, that you can take it every

10  12 hours.  It's sort of easier for someone's lifestyle if

11  you're working or certainly easier on the nursing staff

12  to dose something twice a day than every four or six

13  hours.

14  Q.    And does it just sort of slowly absorb?  How does

15  it work?

16  A.    Right.  So I don't know the biochemistry of it, but

17  I know that they're meant to be long acting.  And part of

18  the long-acting thing is also an abuse deterrent, that

19  they're more difficult to abuse.  Of course there's

20  always a way around that, I think, but . . .

21  Q.    And you said you've been in charge of a clinic?

22  A.    Yes, ma'am.

23  Q.    To how many of your employees, when you were in

24  charge of a clinic, did you prescribe monthly doses of

25  Xanax?

```
 1   A.    None.

 2   Q.    And how about Adderall?

 3   A.    No, ma'am.

 4   Q.    All right.  Speaking of Adderall -- and actually,

 5   can you give the jury your opinion about whether it would

 6   be appropriate to do so?

 7   A.    To prescribe to your employees?

 8   Q.    Yes, to prescribe to most or all out of your

 9   employees.

10   A.    No, I think it's very difficult to maintain

11   professional relationship if you're seeing somebody for a

12   substance that could be a -- potentially abused.  I think

13   it'd be really hard to be unbiased and fair as an

14   employer and the doctor.

15   Q.    And can you explain to the jury why it's so

16   important, with controlled substances specifically, to

17   have that distance or that professional relationship with

18   the people to whom you're prescribing?

19   A.    I think you have to be very careful when you're

20   prescribing a controlled substance, that you're doing it

21   honestly and that you're not doing it because you feel

22   bad for somebody or you don't want them to be angry with

23   you or you don't want them to be disappointed in any way.

24   You have to be doing it for a legitimate medical reason.

25   Q.    Is it harder to do that if you have personal
```

1  involvement with the person?

2  A.    Yes, it'd definitely be harder to distance

3  yourself.

4  Q.    All right.  Let's talk about Adderall quickly.

5  What is the legitimate medical purpose of Adderall?

6  A.    It's used for attention deficit hyperactivity

7  disorder.  Sometimes it's used in people that have

8  chronic sleep apnea and sleep disorders to take in the

9  morning.

10  Q.    And how do you determine whether somebody has --

11  let's take attention deficit disorder?

12  A.    So attention deficit sorter (as heard), the

13  definition at least back in the 2014-'16-'18 time era,

14  you had to have a pretty specific set of symptoms that

15  the psychiatry board lays out, and you have to have those

16  symptoms -- like five out of six or five out of ten

17  symptoms present every day for six months.

18      So when you diagnose, you have to be very careful

19  to take a history.  And there are definitely check-off

20  sheets you could get off the internet and check off.  You

21  know, they have six out of ten or whatnot.  Also, just

22  ask them, you know, did you have ADD as a kid, and how

23  was it treated, and how long did you take medicine, and

24  what did it do for you?

25  Q.    And if -- is this form you're talking about, it's a

1   test that's just a form?

2   A.    You can do that.  You can also send someone for

3   psychologic testing, which is pretty involved.  I think

4   it's a lot more common to do that in kids.

5   Q.    And does Adderall have risks associated with it?

6   A.    It does.  So it can cause elevated blood pressure;

7   it can cause a rapid heartbeat or tachycardia; it can

8   cause weight loss, shakiness, jitteriness, weight loss.

9   Q.    And is, in fact, it's sometimes prescribed for

10  purposes of weight loss or abused for that purpose?

11  A.    It's abused for that purpose.  It's not a

12  legitimate medical indication to use it.

13  Q.    All right.  Let's talk about the professional

14  practice.  So we talked about legitimate medical

15  purposes.  Now we're getting into the professional

16  practice or the ordinary course of professional practice

17  of prescribing these drugs.

18        When you talk about sort of the practice of

19  medicine generally, what -- what does that discipline

20  refer to?  What set of steps and sciences does that

21  discipline refer to?

22  A.    So the practice of medicine is using your skills

23  and a history taking and examination and ordering things

24  together to come to a diagnosis to treat the patient and

25  most importantly to do so without causing any harm.

1    Q.    What does it mean to diagnose a patient?

2    A.    So "diagnose" means to find the cause of the

3    illness.  What's the underlying disorder?

4    Q.    And it sounds silly, but why do you need to do

5    that?

6    A.    You need to find a diagnosis for two reasons,

7    really:  One is so you know what you're treating.  You

8    have to know what you're treating to know how to treat

9    it, right?  So back pain can be kidney stones, ovarian

10   cysts, uterine fibroids, pregnancy.  It can be a lot

11   things, so you have to know what you're treating.

12        And the second reason that you need a diagnosis is

13   so you don't miss something.  You don't ever want to miss

14   something horrible that someone has because you weren't

15   thorough when you worked it up.

16   Q.    And can you give an example of that kind of a

17   scenario?

18   A.    Yeah.  Actually, I was a third-year resident, and

19   it sticks with me well because I was young and

20   impressionable.  But I was called to the ER to admit a

21   patient, and I was on the cancer service.  And the story

22   was that this guy had come to the ER every Friday after

23   work.  He was a construction worker.  Every Friday, he

24   complained of back pain, and someone in the ER would say,

25   you know, just give him some Lortab and just he'll go

1   away.  And then somebody finally said, you know what?

2   Let's scan this guy and see what's wrong with him, and we

3   can tell him, you know, there's nothing wrong with you.

4   You have a pill problem.

5        And so lo and behold, they scan this guy.  He had

6   an enormous lymphoma, which is a tumor that was pressing

7   on all kinds of things.  And I had to admit him for sort

8   of urgent chemotherapy.  So that's why it's important to

9   go do an investigation so you don't miss something.

10  Q.    And through that diagnosis, were you able to treat

11  the cancer rather than give him pills?

12  A.    Yes, ma'am.

13  Q.    What does the process of finding a diagnosis look

14  like?

15  A.    So in the clinic or --

16  Q.    Uh-huh, in a clinic.

17  A.    Right.  So it's -- it compose of, first you got to

18  talk to the patient, right?  Sometimes it's -- so surveys

19  you have to fill out with a lot of questions.  Those have

20  become really popular.  But ultimately, the physician and

21  the provider has to take a history.  So you ask what

22  symptoms do you have; how long have they been there?  Is

23  there anything make them better, make them worse?  And

24  then you go through their past medical history.  So what

25  other problems you have?  Hypertension, diabetes,

```
 1   coronary disease.
 2        Then you go through their social history:  Do you
 3   smoke?  Do you drink?  Do you have any history of drug
 4   abuse?  Is there abuse in your family?  Have you ever
 5   been sexually abused?  And then a family history is, you
 6   know, basically your parents, brothers, sisters.  Then
 7   you do a physical examination.  You may actually, you
 8   know, also order tests or labs or review older labs or
 9   tests.  And then finally you kind of pull everything
10   together in an assessment and plan.  An assessment is
11   basically your diagnosis and then the plan to treat it.
12   Q.   I'm going to ask you about something called
13   continuity of care.  Is it within the scope of
14   professional to just prescribe whatever the last doctor
15   prescribed and call it a day?
16   A.   No.  You're actually under no obligation to
17   continue the therapy that somebody else was giving.  you
18   have to make your own independent evaluation.
19   Q.   So what does the phrase "continuity of care"
20   actually refer to?
21   A.   Continuity of care refers to a patient that comes
22   to me, and they may have hypertension, and I need to
23   continue that medication in a way of good treatment, if
24   it's the best thing for them.  Let's intervene if I feel
25   like something else needs to be added.
```

*UNREDACTED TRANSCRIPT*

1  Q.    So if it turned out that patient did not, in fact,

2  have hypertension in your opinion, would it be right to

3  continue the care?

4  A.    No, ma'am.

5  Q.    Have you ever heard of doctor shopping in a

6  controlled substance context?

7  A.    Yes, ma'am.

8  Q.    What is doctor shopping?

9  A.    So doctor shopping is when a patient goes from

10  various ERs or urgent cares or primary care practices to

11  try to obtain opioids or benzodiazepines or other desired

12  drugs.

13  Q.    So with controlled substances, is it more important

14  or less important than in the case of high blood pressure

15  to make an independent evaluation of whether the patient

16  in front of you needs opioids from you, the doctor?

17  A.    It's way more important.

18  Q.    Describe why for some --

19  A.    It's a controlled substance.  It's dangerous.

20  There's laws regarding its use.

21  Q.    Okay.

22           **MS. PAYERLE:**  I may have just a moment.

23           Okay.  At this time, Your Honor, I'd like to

24  show the witness Exhibit 21, which is already in

25  evidence.

*TESTIMONY OF TRICIA AULTMAN, M.D.*                                                                121

1          **THE COURT:**  This may be -- excuse me.  This may

2    be a good time to go ahead and break for lunch.

3          **MS. PAYERLE:**  Absolutely.  It's perfect timing.

4    Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Ladies and gentlemen, we're going to

2    go ahead and break for lunch at this time.  It's about

3    12:15, so we'll pick this up at 1:30.  Your lunch is

4    already in there waiting for you.  Please enjoy it.  It's

5    a long break.  And as I said, we'll pick it up at 1:30.

6    Leave your notebooks, don't discuss, and I'll see you

7    after lunch.

8          (Jury out at 12:14 p.m.)

9          THE COURT:  Dr. Aultman, don't discuss your

10   testimony with anyone over the break.

11         THE WITNESS:  Yes, sir.

12         THE COURT:  You can step down.

13         THE WITNESS:  Okay.

14         (The witness complies with the request.)

15         THE COURT:  Okay.  I'll see everyone at 1:30,

16   maybe a few minutes before, because I need to hear

17   further, if you have an update for me about defense

18   proof.

19         MR. FERGUSON:  I'll check on that right now.

20         THE COURT:  Appreciate it.  Thank you.

21         MR. FERGUSON:  Yes, sir.

22

23         (The morning session concluded at 12:15 p.m.)

24

25

*UNREDACTED TRANSCRIPT*

1           **C E R T I F I C A T E**

2

3

4           I, LASHAWN MARSHALL, RPR, LCR, do hereby
    certify that the foregoing 122 pages are, to the best of
5   my knowledge, skill, and abilities, a true and accurate
    transcript from my stenotype notes of the Jury Trial
6   proceedings on the 30th day of March, 2023, in the matter
    of:

7

8

9

10

11  United States of America

12  vs.

13  Jeffrey W. Young, Jr.

14
    Dated this 30th day of March, 2023
15

16

17

18

19

20

21

22

23          _S/Lashawn Marshall_
            Lashawn Marshall, RPR, LCR
24          Official Court Reporter
            United States District Court
25          Western District of Tennessee


*UNREDACTED TRANSCRIPT*