1

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      EASTERN DIVISION

 3   _____
                                 |
 4   UNITED STATES OF AMERICA,    |
                                  |
 5              Plaintiff,        |
                                  |
 6   vs.                          |   NO. 19-CR-10040
                                  |
 7   JEFFREY W. YOUNG, JR.,       |
                                  |
 8              Defendant.        |
                                  |
 9   _____

10

11

12

13          TRANSCRIPT OF THE JURY TRIAL

14       BEFORE THE HONORABLE JOHN T. FOWLKES

15              AFTERNOON SESSION

16

17

18                   THURSDAY

19               MARCH 31, 2023

20

21

22

23           TINA DuBOSE GIBSON, RPR
                OFFICIAL REPORTER
           FOURTH FLOOR FEDERAL BUILDING
24          MEMPHIS, TENNESSEE 38103

25
```

**UNREDACTED TRANSCRIPT**

1                  A P P E A R A N C E S

2

3       Appearing on behalf of the Government:

4           KATHERINE PAYERLE
            ANDREW PENNEBAKER
5           United States Department of Justice
            Fraud Section
6           1400 New York Avenue, NW
            Washington, DC 20530
7           (202) 341-4227
            katherine.payerle@usdoj.gov
8           andrew.pennebaker@usdoj.gov

9

        Appearing on behalf of the Defendant:
10
            CLAIBORNE H. FERGUSON
11          RAMON DAMAS
            The Claiborne Ferguson Law Firm, PA
12          294 Washington Avenue
            Memphis, Tennessee 38103
13          (901) 529-6400
            claiborne@midsouthcriminaldefense.com
14          ramon@midsouthcriminaldefense.com

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

3

# W I T N E S S   I N D E X

PAGE

**WITNESSES:**

    **TRICIA AULTMAN, M.D.**
          CONTINUED DIRECT EXAMINATION BY MS. PAYERLE.   7
          CROSS-EXAMINATION BY MR. FERGUSON..........  59
          REDIRECT EXAMINATION BY MS. PAYERLE........  79
    **JEFFREY W. YOUNG, JR.**
          DIRECT EXAMINATION BY MR. FERGUSON.........  95

**UNREDACTED TRANSCRIPT**

# **E X H I B I T S**

No.                                                              Marked

Exhibit 98........................................... 35
Exhibit 99........................................... 38
Exhibit 100.......................................... 52
Exhibit 101.......................................... 60

1                       THURSDAY

2                    MARCH 31, 2023

3              ----------------------

4

5            THE COURT:  Okay.  Before we bring in the jury,

6    let me turn to Mr. Ferguson.  What's the situation?

7            MR. FERGUSON:  Your Honor, I have spoken to

8    Mr. Young over the break.  We discussed our plan on how to

9    proceed after the Government rests, and we will be putting on

10   no proof.

11           THE COURT:  No proof?

12           MR. FERGUSON:  That is correct.

13           THE COURT:  Okay.

14           MR. FERGUSON:  Including Mr. Young.

15           THE COURT:  I understand.  And we'll put this

16   colloquy on the record after we finish with the Government's

17   witness.

18           MR. FERGUSON:  Yes, Your Honor.

19           THE COURT:  Okay.  Thank you.

20           We need the witness.

21           MS. PAYERLE:  Yes, sir.

22           THE COURT:  Dr. Aultman hanging out in the hall,

23   huh?  How do you spell that?

24           MS. PAYERLE:  I did it, again, didn't I?

25           THE WITNESS:  A-U-L-T-M-A-N.

**UNREDACTED TRANSCRIPT**

1            THE COURT:  Thank you.  Bring in the jury,

2   please.

3                    (Jury in at 1:30 p.m.)

4            THE COURT:  Okay.  Ladies and gentlemen, we're

5   ready to proceed at this time.  I hope you enjoyed lunch.

6   I'm going to turn it back over to the Government to continue

7   direct.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

```
 1                    CONTINUED DIRECT EXAMINATION

 2   BY MS. PAYERLE:

 3    Q.    Okay.  Welcome back.  Dr. Aultman, good afternoon.

 4   Okay.  Just before the break, we were talking about the

 5   concept of continuity of care and the importance of making an

 6   individual determination for the client -- or to the patient,

 7   pardon me; is that right?

 8    A.    Yes, ma'am.

 9    Q.    Okay.  At this time, I'd like to introduce, or,

10   actually, just put up for the jury Exhibit 21.

11          Dr. Aultman, Exhibit 21, which is already admitted,

12   will appear on your screen in front of you momentarily.  Now,

13   is this a patient record for Hope Rogers, which you have

14   reviewed in connection with this case?

15    A.    Yes, ma'am.

16          MS. PAYERLE:  Excuse me.  Could we please go to

17   page 74 of this document.

18   BY MS. PAYERLE:

19    Q.    All right.  Dr. Aultman, could you orient the jury to

20   what -- are you going to be testifying about a few, not very

21   many, but just a few of these documents that look like this?

22    A.    Yes, ma'am.

23    Q.    All right.  Could you orient the jury to what kind of

24   a document this is within the patient file.

25    A.    So in this practice's medical records, all of the new
```

**UNREDACTED TRANSCRIPT**

1   patient visits were in pink, which was actually nice.  It was

2   easier for me to scroll to find the first visit because there

3   was a lot of pages of a lot of files.

4        So you see here, it has a patient name and

5   demographics on top and then their chief complaint, which is,

6   you know, why are you here, kind of thing.  And then after

7   that is review of systems.  And a review of systems is when a

8   doctor goes through and is trying to ask you if there is

9   anything else wrong, like starting really head to toe, like,

10   headaches, visual changes, blurry vision, and then your ears.

11   Do you have allergies, runny nose, ear infections, sore

12   throat, thyroid problems?

13        So you kind of go head to toe and then you can see

14   they circled the sinus there.  And then it looks like they're

15   going through some medical history there and listing her

16   allergies.  There's a place to document her shots, and then

17   there's a second page usually to the initial patient visit.

18            MS. PAYERLE:  Let's go ahead and flip to the next

19   page.  There we go.

20            THE WITNESS:  So on the top, the intake tech or

21   nurse or office staff has put in their active medications

22   right there.  Their surgical history, medical history,

23   personal history, and then you can see there, there's a small

24   place -- can I point on this?  Can I write on it?

25   BY MS. PAYERLE:

1    Q.   You might -- no --

2              MS. PAYERLE:  Can she --

3    BY MS. PAYERLE:

4    Q.   Oh, great.  You can use your finger.

5    A.   So right here where, I guess, circle it.  That is

6    where Mr. Young would document his exam.  I think that word

7    is exam from looking at enough of the records, and then you

8    can see also there's a typed area where you can write part of

9    the physical exam with the vital signs.

10   Q.   And then --

11             THE COURT:  Could you mark that again, please.

12             THE WITNESS:  I have to press on?

13             MS. PAYERLE:  Yes, maybe on the right there.

14             THE WITNESS:  The pencil didn't work.

15             THE COURT:  It's not working; usually you can.

16             MS. PAYERLE:  Oh, there it goes.

17             THE COURT:  Oh, there we go.

18             THE WITNESS:  That looks like on all the records

19   where Mr. Young starts to document his exam.  And a physician

20   or a nurse practitioner's exam is basically a bunch of

21   abbreviations, which makes sense to me, but probably not

22   anyone else.  So the first word there "test", and it says

23   CTA, which means clear to auscultation.  The heart exam,

24   right there.  The next one is RRR, which means regular rate

25   rhythm.  The next one is abdomen, soft and not tender, and

1    extremities over here.  It says the typical wording is no

2    clubbing, cyanosis, or edema.  And then the neurologic exam,

3    he writes is grossly -- I don't know if that's normal.  I'm

4    not sure what that word is.

5    BY MS. PAYERLE:

6      Q.   Okay.  Before getting into more specifics, I think I

7    just want to address one thing you said, which is, there

8    were, in cases, a lot of pages in these records; is that

9    right?

10     A.   Yes.

11     Q.   Did that correspond -- I mean, did you see within

12   those pages that this sort of meant that he was doing

13   extremely thorough, careful, detailed work?

14     A.   No.  There was a lot of pages, but not a lot of

15   information.

16     Q.   Okay.  And the information that was there, would you

17   say it was mostly -- well, first of all, you know, how is his

18   handwriting?

19     A.   It's difficult to read.  I mean, I'm a doctor.  I'm

20   pretty good at that.  We used to all, you know, have

21   handwritten charts, and I had a partner that was horrific,

22   but it is still difficult for me to read even kind of knowing

23   what I'm looking for.

24     Q.   And setting aside just issues of handwriting or

25   clarity in terms of organization, I want to focus on just the

1    substance of what you could understand.  Was it -- did it

2    always, like, make sense from a medical perspective?

3      A.    You know, most of the time it didn't make sense, and I

4    spent a lot of time in the records, and they're scanned in

5    kind of reverse chronological order.  So the first step was

6    going through and trying to find the first visit and then

7    trying to figure out what, you know, happened in that visit.

8    And sometimes that meant I had to go through way back in the

9    chart and look at the prescription monitoring program, which

10   is like a printout of what patients -- what the medicines

11   that were prescribed that day from a controlled substance

12   standpoint.

13     Q.    And why did you have to -- why did you have to look at

14   the prescription monitoring sheet to figure out what he had

15   prescribed?  Wasn't it just in his notes?

16     A.    It wasn't always in the notes.  And this one, for

17   example, it is, and I can read it, but it wasn't always in

18   the note, and it wasn't always readable.  And then the urine

19   drug screens and other thing were also scanned in, in a

20   different area of the chart.  So there was just a lot of

21   scrolling and back and forth.  It was very time-consuming.

22     Q.    And I want to get back to just kind of setting aside

23   just the mechanical kind of handwriting and organization

24   issues.  In terms of the substance of the charts, can you

25   talk to the jury a little bit more about the effort to just,

**UNREDACTED TRANSCRIPT**

1    like, figure out what he was doing?

2       A.   It's very difficult to figure out and to make sense of

3    kind of the train of thought.  So, for example, in this

4    chart, he gives the impression that she has carpal tunnel

5    syndrome, lower back pain, anxiety, endometriosis, ulcerative

6    colitis, and inflammatory bowel disease.  But if you go back

7    to the history on the previous page, like, there's no talking

8    about any of that other than kind of a list of previous

9    problems.  None of that's, you know, discussed.  There's no

10   questions, like, how long have you had it, who diagnosed it,

11   you know, where were you tested?  So it's very scant in terms

12   of telling anything about how he got to the impression and

13   plan.

14      Q.   And, in fact, talking specifically about Ms. Rogers,

15   you know, which hand does she have carpal tunnel syndrome in

16   allegedly?

17      A.   It looks like the right to me, the R right here.

18      Q.   And did you find anything else in the file that would

19   call into question this diagnosis?

20      A.   Eventually, he gets -- well, he never does a physical

21   exam or documents a test for carpal tunnel, which is easy.

22   You just bend the person's hand back and you kind of tap

23   right there, and if they have carpal tunnel, it hurts.  But

24   he does get kind of an electro kind of diagnostic test called

25   an EMG, a muscle test.  And it was actually negative, and she

1   didn't have carpal tunnel syndrome.

2      Q.   All right.  And let's talk about ulcerative colitis.

3   That's in there.  Did you see anything in the record to

4   suggest anything about that, that she allegedly has?

5      A.   He never documented anything about it other than its

6   existence according to whatever history was taken here.  But

7   when I reviewed her ob-gyn records and stuff that were in his

8   chart, I believe that she had had a colonoscopy.  It was

9   normal, so she didn't have ulcerative colitis.

10     Q.   So she did haven't that either?

11     A.   No.

12     Q.   And what about ulcerative colitis and irritable bowel

13  syndrome, talk about the interaction of those two.

14     A.   So ulcer- -- irritable bowel syndrome can be just

15  abdominal pain with either constipation or diarrhea.

16  Ulcerative colitis is a much more serious illness in terms of

17  the need for medication.  So it may be that she had a lot of

18  abdominal pain with diarrhea and then someone said, oh, you

19  must have colitis, but she really didn't.

20     Q.   She didn't.  Okay.  Is it normal to have irritable

21  bowel syndrome and ulcerative colitis at the same time?

22     A.   No, you would -- you would just -- if you have

23  ulcerative colitis, you would not say that she had irritable

24  bowel syndrome.

25     Q.   Okay.  And under -- right under that CTS, is that LBP?

**UNREDACTED TRANSCRIPT**

1    A.    Yes, ma'am.

2    Q.    And what is that an abbreviation for?

3    A.    Lower back pain.

4    Q.    Okay.  What does it say next to lower back pain?

5    A.    In parentheses, broken tailbone.

6    Q.    And do -- I think we had a little information about

7    how long ago that was in the chart.  Do you remember what

8    that was?

9    A.    It was on the previous page, and I believe it was pain

10   6 out of 10 that had been going on for quite a while.

11   Q.    Okay.  And about how long --

12   A.    Two-and-a-half months, if you see right there.

13   Q.    There we go.  So is that normal?

14   A.    Probably not.  Usually, tailbone stuff heals up pretty

15   good, especially in a young, active 32-year-old person.

16   Q.    So if somebody presented --

17              MS. PAYERLE:  Let's go back down.

18   BY MS. PAYERLE:

19   Q.    So if somebody presented with a broken tailbone

20   complaint of lower back pain after two-and-a-half months, if

21   your goal is to get to a diagnosis and help the patient, what

22   would you do?

23   A.    Well, I think -- I think lower back is a different

24   place than your tailbone anyway.  So I think you have to

25   clarify, like, where you're actually hurting.  He did

**UNREDACTED TRANSCRIPT**

1  document a normal neurological exam, but really, it starts

2  with the history, right?  Like, there's no history of,

3  like -- like, I don't know how he got from broken tailbone to

4  lower back pain because those are two different places.

5     Q.   Okay.  And then the last one there is -- up here,

6  what's that word?

7     A.   That's endometriosis.

8     Q.   Okay.  And did you see any -- well, first of all, what

9  is endometriosis?

10     A.   So endometriosis is anytime you have the growth of

11  uterine tissue outside the uterus.

12     Q.   Did you see anything in her chart that would call that

13  diagnosis into question?

14     A.   Usually, people with endometriosis have a difficult

15  time getting pregnant, and she was pregnant, eventually, in

16  the course of her time here in the clinic.

17     Q.   Okay.  So would any of these diagnoses -- first of

18  all, so when you were talking about having a hard time making

19  sense of many of his charts, is this the kind of thing that

20  you're talking about?

21     A.   Exactly.  There was sort of no investigation.  Then

22  all of a sudden, there was a diagnosis listed under the

23  impression.

24     Q.   Okay.  And were there times when the impressions were

25  contradictory to each other, contradictory to other things in

1   the record, didn't make sense in the context of the patient,

2   things like that?

3     A.   Yeah, they would just kind of show up or be very

4   vague, like, lower back pain really isn't a diagnosis.  It's

5   more of a complaint, right?  You need to know why do they

6   have lower back pain.

7     Q.   And is that kind of what you were testifying about

8   earlier; it could be cancer, or it could be kidney stones?

9     A.   Exactly.

10    Q.   All right.  All right.  So now we've got these

11  impressions or these potential diagnoses.  Underneath the

12  potential diagnoses for Hope Rogers, what was Mr. Young's

13  plan that he wrote down?

14    A.   So in line with, I guess, a normal, healthy physical

15  exam kind of plan, he orders labs, which is, number one, a

16  blood count, a CMP, which is like a metabolic panel, a kidney

17  function and stuff, a lipid panel.  You could argue, probably

18  in her age, is not indicated because she's child-bearing age,

19  and you're not going to treat her anyway.  And a thyroid

20  panel, which is definitely indicated in someone her age.

21    Q.   Okay.  So that's the panel at the top?

22    A.   Yeah, that's the number one plan, and that's like a

23  laboratory panel.

24    Q.   And then what's the second thing he said he was going

25  to do?

1    A.    Number two, it says, DC, which means discontinue

2  Tylenol 3, which is Tylenol with codeine.

3    Q.    And is codeine -- and what is codeine?

4    A.    Codeine is a very mild opioid.  It's often a first

5  line choice for acute pain.

6    Q.    But when you say mild, in MMEs, do you know if it's

7  more or less potent than morphine?

8    A.    I believe codeine is less potent than morphine.

9    Q.    So it would have an MME of something less than one?

10   A.    Yes, ma'am.

11   Q.    Okay.  And what does he do in number 3?

12   A.    In number 3, he -- it says, arrow up, increase

13  Klonopin and then it's one milligram TID.  TID means three

14  times a day.

15   Q.    And could you tell the jury, you know, sort of what

16  kind of a dose of Klonopin is that?  Is that an introductory,

17  medium, high dose?

18   A.    That's at least a medium-ish dose, maybe higher.  And

19  there's no indication, you know, why he increased the dose.

20  Now, it does say above here that she was taking it three

21  times a day, but she was only getting 60 at a time, and I

22  think he increased it so that she would have it 90.

23   Q.    Okay.  But even that note about three times a day is

24  also contradictory?

25   A.    Right.

*EXAMINATION OF TRICIA AULTMAN, M.D.*                                18

1  Q.   Not clear what she was getting?

2  A.   No.  It's not clear.  You would have to look at the

3  PMP and compare it to see what she actually had before.

4  Q.   All right.  And what's the next line there?  What did

5  he give her?

6  A.   Number 4 is HCD, which is an abbreviation for

7  hydrocodone, 7.5 milligrams, and TID is three times a day.

8  Q.   So is that a low, medium, high dose of hydrocodone?

9  A.   It's not the lowest dose.  It's not medium, but low

10  medium.  How is that?

11  Q.   Okay.  So in this case, he discontinued a very low

12  level opioid, codeine, and he began hydrocodone, and he

13  increased Klonopin.  Is that the drug scenario?

14  A.   Yes, ma'am.  So, really, with no clear reason that I

15  can understand, he's increased her opioid dose on the first

16  visit and increased the benzodiazepine dose as well.

17  Q.   So would it be the case -- maybe this is obvious.  But

18  did Mr. Young in this case, with Hope Rogers, just sort of do

19  what the last doctor was doing?

20  A.   He actually did a little more.  Yeah.  He just kind of

21  picked up.  He -- there's no evidence he did his own

22  investigation, and Klonopin and benzodiazepines aren't the

23  first choice of medicine for anxiety anyway.

24  Q.   Did he actually discontinue what the last doctor was

25  doing, that codeine?

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF TRICIA AULTMAN, M.D.*                              19

1    A.   He did.  He stopped the Tylenol 3, and he started

2    something stronger.

3    Q.   Right.  He started her on hydrocodone for the first

4    time?

5    A.   Yes, ma'am.

6    Q.   Okay.  And let's move down -- oh, I want to ask you

7    one other thing.  If a patient comes in with a bunch of

8    complaints like this that are contradictory, don't make

9    sense, things like that, could that, itself, be a symptom

10   that a doctor such take into account in formulating a

11   diagnosis?

12   A.   Yes, sometimes if things don't make sense, it kind of

13   always raises a red flag that maybe they are just abusing the

14   medicine, and they're coming up with kind of common

15   complaints.  There are certain things -- certain complaints

16   that people will say that they have that they think will

17   yield them the controlled substance that they want.

18   Q.   And what about -- is there anything about Ms. Rogers'

19   demographics that would create even a higher alert?

20   A.   Right.  So women are more likely to abuse prescription

21   drugs than men, and young people more likely than old.  So

22   she's, like, right in the demographic where you have to be

23   very careful.

24   Q.   Let's take a look at page 59 of this same exhibit.

25   All right.  What are we looking at, at page 59?  First of

**UNREDACTED TRANSCRIPT**

1  all, what kind of a document is this?

2  A.   So this is a follow-up note from February 11th for the

3  same patient.

4  Q.   And what is that -- so what's the follow-up note, I

5  guess?

6  A.   This means it's not the history and physical.  It's

7  just a note that's coming in for a follow-up of the same kind

8  of problems you already presented with.

9  Q.   And what does -- what shows up here in the nurse's

10  note, what is that?

11  A.   So the chief complaint is:  Patient CO, complained of,

12  wrist pain in right arm, needs a shot, patient just found out

13  she is pregnant.

14  Q.   All right.  So, actually, I do want to go back briefly

15  to -- well, no, we'll just keep on rolling.  All right.  This

16  is in February of 2015.  What is the patient on here?

17  A.   So at some point, already, he's gone from hydrocodone

18  7.5 milligrams to Percocet 7.5 milligrams.

19  Q.   And is that more potent?  Is that another increase, I

20  guess?

21  A.   Yes, ma'am, oxycodone is 1.5 times as strong as

22  hydrocodone.

23  Q.   And then what do we see kind of down here in this

24  chart?  Maybe we can pull that up.

25  A.   Yeah, it's pretty small.  But there's a line -- the

1  typed line at the top says physical exam and the check mark

2  means examined and normal.  So basically what he's indicated

3  is that he's examined this patient in entirety, her eyes,

4  ears, throat, neck, a breast exam, a pelvic exam, the whole

5  thing, and it's all normal.

6   Q.   Based on what you know about this patient, is that

7  likely?

8   A.   No, number one, she's pregnant, right?  And so even at

9  early pregnancy, there would be changes you would recognize

10  on a pelvic exam.

11   Q.   If a patient were pregnant and taking Percocet, in the

12  ordinary course of professional practice, what would you do?

13   A.   So opioids are not -- are not a drug of choice in

14  pregnancy in any way.  They're supposed to be used only if

15  absolutely necessary.  And so the standard of care, if

16  someone is on opioids, is to switch them to either methadone

17  or Suboxone, and then there's a couple of reasons for that.

18  It's safer for the mom, and it's safer for the baby.  And

19  babies, when they're born to a mom that's on opioids, have

20  neonatal abstinence syndrome, which is basically withdrawal

21  in the newborn.  And if you switch them to methadone or

22  Suboxone, there's less severe withdrawal for the baby as

23  well.

24   Q.   And is Suboxone often used to treat addiction?

25   A.   It is.

*EXAMINATION OF TRICIA AULTMAN, M.D.*                                    22

1    Q.   Is it also known as buprenorphine?

2    A.   Suboxone has buprenorphine with Narcan in it,

3    naloxone, yes, ma'am.

4    Q.   Okay.  So let's take a look at -- I'm going to see if

5    I can grab one of these exhibits here.

6         I'd like to take a look at Exhibit 22.

7              MS. PAYERLE:  And let's page down one more, one

8    more, one more, and one more.  Okay.  Stop there.  Give me a

9    second.  Let's go down, I'm sorry, one more.  And one more.

10   One more.  One more.  There we go.  That's page 17.

11   BY MS. PAYERLE:

12   Q.   Let's take a look at page 17 of this Exhibit 22.  What

13   do we see here?  We see -- what is this prescription for, for

14   Hope Rogers dated March 5, 2015?

15   A.   So it's for Percocet, which is basically oxycodone

16   with Tylenol, 7.5 milligrams of oxycodone with 325 milligrams

17   of Tylenol, quantity of 90.  And then on the bottom, it says

18   SIG and one by mouth three times a day.

19   Q.   Did you see anything at all in Ms. Rogers' chart that

20   would indicate that this prescription for Percocet or

21   oxycodone was written within the ordinary course of

22   professional practice for a legitimate medical purpose?

23   A.   No, and she was pregnant, and it would be

24   contraindicated, to be honest.

25   Q.   In fact -- explain to the jury what you mean when you

**UNREDACTED TRANSCRIPT**

1  say indicated and contraindicated?

2   A.   So indicated means there's a medical reason to

3  prescribe something.  And contraindicated means that there's

4  not a medical reason to prescribe something.  Opioids fall

5  into a class, and they rate pregnancy drugs in a certain

6  class, and they're not in a class that you should prescribe

7  unless you really, really, really have a good reason.

8   Q.   All right.  Let's take a look -- okay.  Now, let's

9  note the date of this prescription is March 5, 2015, and how

10  many days' supply is this?

11   A.   So if you're taking it three times a day and it's 90

12  pills, it's 30 days.

13   Q.   So for March 5, 2015, she has a 30-day supply.  Let's

14  take a look at page 9 of the same exhibit.  And what do we

15  have here?

16   A.   This is a prescription for hydrocodone or Lortab,

17  7.5 milligrams with 325 milligrams of Tylenol to take three

18  times a day, quantity of 90.  And it was written only about

19  20 days or a couple of weeks after the previous prescription.

20  So now she's on two opioids during pregnancy, and if she's

21  taking them at the same time, it's a lot of Tylenol as well.

22   Q.   And explain to the jury what you mean by the Tylenol

23  problem.

24   A.   I mean, Tylenol is a pregnancy Class B, so it's

25  probably okay, but it's -- you still have to be so careful in

**EXAMINATION OF TRICIA AULTMAN, M.D.**                    24

1  pregnancy because we can't do good studies on pregnant women,

2  right?  It's not ethical.  So you can't give some pregnant

3  woman a drug and another pregnant woman not and see what

4  happens.  So the studies are all information we gain from

5  what people report after they've had the baby which, of

6  course, is not reliable all the time.

7            MS. PAYERLE:  All right.  I've located the hard

8  copy of this.  So I think it will be a little easier.  Let's

9  move down one more page.  Well, I thought I had it.

10           All right.  I'm just going to use the Elmo.

11  There we go.

12  BY MS. PAYERLE:

13  Q.   All right.  Let's take a look at these prescriptions

14  dated -- what's the date; do you see?

15  A.   April 23rd.

16  Q.   All right.  So what -- what did Mr. Young prescribe to

17  Hope Rogers on April 23, 2015?

18  A.   The top prescription is for Lortab 7.5, 325, and now

19  instead of 90, it's 120.  So it's an increase in dose.  And

20  then the bottom prescription is Xanax or alprazolam,

21  1 milligram three times a day, quantity of 90.  And then the

22  Phenergan is a medicine for nausea, but it's not a controlled

23  substance.  And the very bottom is ProAir, which is an

24  inhaler for asthma.

25  Q.   All right.  So for this -- actually, I don't remember

1  if I asked you, Doctor, for the March 25th prescription that

2  we just saw, was that prescription for hydrocodone within the

3  course of professional practice for a legitimate medical

4  purpose?

5  A.    No, ma'am, especially because she was pregnant.

6  Q.    And how about this one for Lortab?

7  A.    Absolutely not.  Now he's increasing it.  He's putting

8  both the patient at risk increase for overdose.  He's putting

9  the child at risk for worsening neonatal abstinence syndrome,

10  which is kind of ugly, to be honest.

11  Q.    Well, go ahead and describe for the jury what is

12  neonatal abstinence syndrome look like?

13  A.    When a baby is born with neonatal abstinence, the

14  first, maybe day or two, may be okay and they are monitoring

15  it, and then they have to move it to the special nursery.

16  And they can have seizures, tremors, they're irritable, they

17  don't eat well, they don't sleep well, they're difficult to

18  feed, and developmentally, they're usually behind the other

19  babies for at least a year, and then they tend to catch up.

20  But it's not a pretty thing and results in long hospital

21  stays for the babies.

22  Q.    What about the Xanax?

23  A.    Same.  So benzodiazepines are actually Class D in

24  pregnancy, which is -- there's absolutely no indication to

25  prescribe a benzodiazepine in the first trimester of

 1  pregnancy for any reason ever.  There have been studies that

 2  show that the babies can have heart defects, and they can

 3  also have cleft palate and other kind of facial defects.  And

 4  so there really is no indication of prescribed

 5  benzodiazepines in the first trimester of pregnancy.  The

 6  first trimester being when all the organs are being formed.

 7    Q.  All right.

 8         MS. PAYERLE:  Let's take a look at -- go back to

 9  Exhibit 21.  And that means, sorry, we have to switch back.

10  Exhibit 21 at page 98.

11         MS. SILVERBERG:  Page 98?

12         MS. PAYERLE:  98.

13  BY MS. PAYERLE:

14    Q.  We were just talking about a prescription for -- where

15  he increased Lortab and added Xanax on April 23, 2015, and I

16  apologize.  We're just going to move on to the next

17  prescription.

18         MS. PAYERLE:  We can take that down.  All right.

19  Let's go back to this.  And can we go back.  I'm sorry.  I'm

20  going to have to be moving back and forth.

21  BY MS. PAYERLE:

22    Q.  All right.  Let's go to the next prescription in May.

23  What is this on May 20, 2015?

24    A.  It's Lortab 7.5 to take four times a day, and the

25  lower one is Xanax, 1 milligram for three times a day.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF TRICIA AULTMAN, M.D.*                              27

1    Q.   All right.  And, again, Dr. Aultman, were these

2    prescriptions, either one of them, written in the ordinary

3    course of professional practice for a legitimate medical

4    purpose?

5    A.   No, and they were dangerous for the patient and the

6    baby.

7    Q.   For the same reasons we discussed already?

8    A.   Yes, ma'am.

9    Q.   Okay.  And these were in May.  Here we go.  These were

10   in May of 2015; is that right?

11   A.   Yes, ma'am.

12            MS. PAYERLE:  All right.  Now let's take a look,

13   sorry.  We can go back to 419 to Exhibit 21 and take a look

14   at page 118.

15            THE WITNESS:  Okay.

16   BY MS. PAYERLE:

17   Q.   All right.  Are you familiar with this kind of

18   document in the patient record?

19   A.   Yes, ma'am.

20   Q.   And is this document a toxicology report for Hope

21   Rogers?

22   A.   Yes, ma'am.

23   Q.   Tell the jury just about this kind of document, how it

24   would figure into your analysis.

25   A.   Right.  So at the top, this is kind of demographic

1   information:  her name, her date of birth, and it's urine.

2   And then the important part to look at is right there, the

3   medications.  So that's the medications that you're supposed

4   to see in her urine.  And then they just -- the validity,

5   this is to make sure that someone is not bringing fake urine.

6   And then the results are at the bottom.

7   Q.   What were the results of Hope Rogers' drug screen on

8   April 29, 2015, which was, I guess, what, like, the week

9   before the -- or a couple of weeks before the last

10  prescription was written?

11  A.   Yes, ma'am.  So she was supposed to be on alprazolam

12  and hydrocodone, and you can see that she does have

13  hydrocodone in her system, which is appropriate.

14  Hydromorphone is what hydrocodone is metabolized to, so that

15  is appropriate as well.  But she also has oxycodone in her

16  system, and she's not prescribed that.

17  Q.   How much oxycodone does she have in her system?

18  A.   It's -- it lists as very high.

19  Q.   And is that a red flag itself?

20  A.   It is a red flag that she's taking -- she's getting it

21  from somewhere.  She doesn't have a prescription and it's a

22  lot, and she's pregnant.

23  Q.   Is there another reason that there might be kind of

24  off the charts amounts of a drug in somebody's system?

25  A.   Yes.  Sometimes if they're trying to fake a drug

1  screen, if they might save one pill or keep one back and then

2  they spike their urine with it.  Sometimes you can tell by if

3  they check the metabolites.  Like, if there was oxycodone

4  present but then there was no oxymorphone, that might be an

5  indication that it wasn't real.

6      Q.   And we might see an example sort of specifically

7  there.  Here, where do you see that it's, like, a lot, sort

8  of a lot of oxycodone?  How can you tell?

9      A.   So the upper limit of normal on this is 500, and it

10  says greater than 500.  So the range here is 20 to 500.  So

11  that's a lot.

12            MS. PAYERLE:  All right.  Let's go back to the

13  Elmo.  And let me get rid of these little marks.

14  BY MS. PAYERLE:

15      Q.   And what are we looking at here at Exhibit 22?

16      A.   This is a prescription for hydrocodone 7.5 with 325

17  milligrams of Tylenol.  It says at the bottom SIG 1 PO QID,

18  which is four times a day.

19      Q.   And is that an increase in terms of potency or

20  quantity since the May 20th prescription?

21      A.   I think it was.  I think it was 90 to 120.

22      Q.   Or was it -- let's see.  I want to make sure we got

23  that right.  We may not.

24      A.   It was increased from her initial prescription, I know

25  that.  It was the same.

1    Q.   It was the same there?  So that wasn't an increase.

2    All right.  And then let's go back to the trial directory.

3    The patient chart, Exhibit 21, and look at Exhibit 113, or

4    sorry, page 113 of that exhibit.  And what do we see here?

5    A.   So this is another urine drug screen, and she is

6    supposed to be on Xanax and hydrocodone.  And you can see

7    here that her hydrocodone level is very, very high, and the

8    metabolite is hydromorphone, which is also really, really

9    high.

10    Q.   And does that mean anything in particular to you?

11    A.   Yeah, it's concerning that she's taking more than

12    prescribed and she's pregnant, and it's dangerous for her and

13    the child.

14    Q.   And do you see a stamp there in the middle?

15    A.   It says, we'll discuss these at your next office

16    visit.

17    Q.   Did you come to recognize that signature?

18    A.   Yes.

19    Q.   Whose is that?

20    A.   That is Jeffrey Young.

21    Q.   All right.  Let's take a look then at -- and so I

22    think the prescription we just saw written on June 19, 2015,

23    so after this drug screen came back, was that prescription

24    written within the ordinary course of professional practice

25    for a legitimate medical purpose?

1   A.    No.  And the appropriate thing to do would be to put

2   her on Suboxone or methadone or refer her to someone that

3   would because she's got a problem.

4   Q.    So at this point, you're convinced?

5   A.    Absolutely.

6   Q.    And how long ago in our conversation were you

7   convinced?

8   A.    From the -- I mean, I've reviewed these a lot and in a

9   pregnant person, there's just -- it's absolutely inexcusable

10  to prescribe these kinds of medicines.

11  Q.    And is this -- when I ask usual course of professional

12  practice for a legitimate medical purpose in Hope Rogers'

13  case, I mean, that's legal jargon.  Can I ask you, is it even

14  close?

15  A.    It's really not.  And he's really harming this person,

16  right?  Because she is at risk if she's on opioids for a

17  preterm delivery, for a stillbirth, for a low birth weight

18  baby, and for overdose.  And the baby is at risk for, you

19  know, dying in utero and such.  And so it's not just bad

20  medicine, it's harmful.  He's really hurting these people and

21  could have had a very bad outcome.

22  Q.    Let's take a look now at what we have on the Elmo.

23  And is this -- do we have here what -- what is this

24  prescription on what date?

25  A.    This is a prescription for Percocet 7.5 with 325 of

1   Tylenol written on July 17.

2   Q.   And is this an increase from the last one?

3   A.   It's an increase from hydrocodone, yes, ma'am.

4   Q.   Okay.  And is this prescription, given the context

5   that we've been discussing, was this written in the ordinary

6   course of professional practice for a legitimate medical

7   purpose?

8   A.   Absolutely not.

9   Q.   All right.  Let's take a look at what happens to

10  Ms. Rogers post pregnancy.  And take a look back at the

11  patient chart at page -- let's see, Exhibit 21 at page 108.

12       All right.  Is this after Ms. Rogers delivers her

13  baby?

14  A.   It looks like it was October, so, yes.

15  Q.   All right.  And what do we see here on this toxicology

16  scene?

17  A.   So at this time, she's supposed to be taking

18  alprazolam and Percocet, which is oxycodone with

19  acetaminophen, and it looks like the Xanax was detected.  So

20  she's taking it appropriately although the concentration is

21  very high.  And she's taking the oxycodone.  You can see

22  there.  So she's taking that although, again, the

23  concentration is rather high of the oxycodone.  But she also

24  has hydrocodone in her -- she has hydrocodone in her system,

25  which she's not supposed to be taking, right?  So it

1   shouldn't be there.

2         But then the curious thing about the Xanax or the

3   alprazolam is that the Xanax is positive, but the metabolite

4   is negative, right?  And so there's no way that that can

5   happen if it's a real true sample, right?  Because your body

6   is always going to be metabolizing it.  So with the Xanax,

7   anyway, it looks like she probably spiked her urine with it

8   and that's why it's positive for Xanax, but it doesn't have

9   the metabolite that your body would naturally make.  It would

10  come out in your urine.

11  Q.   Okay.  And I want to see if we can -- maybe we can

12  blow up this summary of qualitative results part here.  And

13  if you could just teach the jury kind of what -- what you

14  were seeing in terms of high concentration, no metabolites?

15  A.   Okay.  So the Xanax she was taking, so it's positive

16  in her urine, which is consistent with her prescription.  But

17  it, naturally in your body, alprazolam is metabolized to

18  hydroalprazolam, hydroxyalprazolam.  So if you're truly

19  taking the Xanax, this should be positive here too.  You

20  should have metabolite in your urine, and there's none, which

21  is indicating that she's probably spiking her urine with a

22  pill that she's kept left over.

23  Q.   And, again, we have a very -- it seems like a very

24  high level of oxycodone as well; is that right?

25  A.   It's a very high level of oxycodone.  If you see the

 1  upper range of normal is 2500, and then again, the

 2  hydrocodone is present, and she's not prescribed that.

 3     Q.   Let's take a look at page 103 of the same patient

 4  record.  And look at -- the date is January 17, 2016.

 5             MS. PAYERLE:  And let's blow up the bottom two

 6  boxes here.  There we go.  Now, let's go ahead and blow up

 7  both boxes.  Thank you.

 8  BY MS. PAYERLE:

 9     Q.   Okay.  What does this -- this particular test result

10  says under notes that caught your attention?

11     A.   Right.  So this one, they actually say, hey, pay

12  attention, the drug is positive, but there's no metabolite,

13  which is not normal.  That's not consistent with how a drug

14  would show up in your urinalysis if you put it in your mouth

15  and it came out in your urine.  So the Xanax is

16  metabolized -- sorry, the alprazolam is metabolized to

17  hydroxyalprazolam, and there's no metabolites.  And the same

18  with the oxycodone to the oxymorphone.

19     Q.   So what does that indicate happened here?

20     A.   That she was spiking her urine with medication.

21     Q.   Would any prescriptions written to her during this

22  time be consistent with the ordinary course of professional

23  practice for a legitimate medical purpose?

24     A.   Definitely not.  She's clearly abusing, diverting,

25  selling, doing something with her medicine, but she's not

1   taking it in the prescribed manner.

2                    MS. PAYERLE:  Okay.  Let's pull this down.

3   BY MS. PAYERLE:

4     Q.   I'm going to show you -- the jury has heard about a

5   patient named Aaron Beaver, and so I'm going to show you his

6   medical record.  It's a 59-page document.  I promise we won't

7   go through all 59 pages.

8     A.   Okay.

9     Q.   I that -- do you recognize that?

10    A.   Yes, ma'am.

11                   MS. PAYERLE:  We move to admit.

12                   THE COURT:  Okay.  We'll go ahead and receive the

13   documents.  I believe the Exhibit Number 98.

14                   (Exhibit 98 marked and received.)

15                   THE COURT:  What is the patient's name again?

16                   MS. PAYERLE:  Aaron Beaver.  B-E-A-V-E-R.

17   BY MS. PAYERLE:

18    Q.   Let's take a look at page 39 of what is now Exhibit

19   98.  What did you see here that struck you?

20    A.   So this is the intake visit or the new patient visit

21   for Mr. Beaver, and he's very honest.  He says that he's

22   addicted to heroin, morphine, and that, you know, he's in,

23   basically, a crisis.  He wants to use, and he's having

24   withdrawal symptoms.

25    Q.   At that point, would any prescriptions of opioids,

**UNREDACTED TRANSCRIPT**

1  other than addiction medication, be within the course of

2  professional practice for a legitimate medical purpose for

3  Aaron Beaver?

4  A.   Absolutely not.

5  Q.   Let's take a look at page 30 of this patient file.

6  And do we have, at page 30, a -- another visit by Aaron

7  Beaver on 10/10?  Oh, it looks like it was canceled?

8  A.   No, it looks like the 9/21 was struck through as

9  canceled, but maybe he was there on 10/10, I think.

10  Q.   Okay.  The next page, sorry.

11  A.   It's what it looks like.

12  Q.   And under Plan, did Mr. Young prescribe anything to

13  Aaron Beaver on that date?

14  A.   Yes, ma'am.  It looks like he gave him a shot.  From

15  what I figured out, this is a combination of steroids and

16  anti-inflammatory medicine.  And then he prescribes Dilaudid,

17  which is a high potency opioid.  It's about four times as

18  strong as morphine, so basically, it's about 8 milligrams of

19  morphine three times a day.

20  Q.   Would Aaron Beaver's back pain, under the

21  circumstances with what -- in which he presented to Mr. Young

22  as addicted and struggling with addiction, would this

23  prescription be within the course of professional practice

24  for a legitimate medical purpose?

25  A.   No, it's actually just really tragic.  They've just

**UNREDACTED TRANSCRIPT**

1   put in the hands of an addict a very addictive substance, and

2   he's been clean, we think, since, you know, maybe a couple --

3   maybe eight months, six months, hard to know from the chart.

4   But so you've just basically given him a ticket to go right

5   back down the path, which is really tragic.

6      Q.   Let's go to page 28 of the same patient file.   And

7   this is 2 milligrams of Dilaudid; is that right?

8      A.   Yes, ma'am.

9      Q.   What's the date for 28?

10     A.   This date is October 12, so just a couple of days

11  later.

12     Q.   And let's go to the next page.   What happens here?

13     A.   So at the next visit, which is just two days later,

14  he's doubled the dose of Dilaudid and given a quantity of 15.

15  So the patient has already used up, you know, a supply, which

16  should have been, if it was just an acute episode, it's gone,

17  and now he's giving him more and a higher dose.

18     Q.   Is anything about this legitimate medicine?

19     A.   Definitely not.

20          MS. PAYERLE:   We can pull that down.

21  BY MS. PAYERLE:

22     Q.   Okay.   As we go on to the next patient, I want you

23  to -- I just want to clarify something.   We already are

24  talking about a mouthful, the usual course of professional

25  practice for legitimate medical purpose.   When we're talking

1   about the usual course of professional practice here, are you

2   talking about for this -- for the State of Tennessee, for

3   where we are?

4       A.   Yes.

5       Q.   And does it differ much from anywhere else?

6       A.   No, ma'am.  The rules and regulations in most state

7   medical boards are very similar.

8       Q.   But, you know, would it -- and I guess -- I guess

9   there's a question of from what we've observed, would this be

10  the usual course of professional practice anywhere?

11      A.   No, ma'am.

12      Q.   Okay.  But it is also not in the State of Tennessee;

13  is that right?

14      A.   Definitely not.

15      Q.   Okay.  Let me show you what we've marked as 404.  This

16  is a 54-page document.  Is this a medical file for a patient

17  who's listed there as Katie Crowder?

18      A.   Yes, ma'am.

19              MS. PAYERLE:  The Government moves to admit.

20              THE COURT:  That will be Number 99.

21          (Exhibit 99 marked and received.)

22  BY MS. PAYERLE:

23      Q.   And, Dr. Aultman, in the course of working on this

24  case, did you learn that Katie Crowder was actually an

25  undercover name for an officer working on an operation?

**UNREDACTED TRANSCRIPT**

1    A.   Yes, ma'am.

2    Q.   But there's a patient record for her that was

3    recovered and sent to you?

4    A.   Yes, ma'am.

5    Q.   All right.  Let's take a look at page 9 of Exhibit 99.

6    What is page 9?

7    A.   So this is a Tennessee prescription monitoring program

8    printout, and it's what you check in the office to see if

9    your patient is getting a prescription anywhere else.  At the

10   time, you just check in the State of Tennessee.  Now you can

11   actually check multiple states, which is really convenient.

12   And so you can see, it's kind of reverse chronological order,

13   but you can see there is June and then through September

14   of 2016.

15   Q.   And let's go to the next page just to see where the

16   end is.  Was that June entry the first entry on her PMP?

17   A.   Yes, ma'am.

18   Q.   And who are the -- are there any other prescribers

19   besides Jeffrey Young listed for this person?

20   A.   No, the prescribers are just him right there.

21   Q.   All right.  Let's go back up to the front page.  So

22   who was the first person to prescribe Katie Crowder opioids

23   of any kind in the State of Tennessee?

24   A.   Jeff Young on June the 6th, he gave her hydrocodone,

25   5 milligrams, a quantity of 60 so, like, twice a day.

**UNREDACTED TRANSCRIPT**

1   Q.   So here was he just picking up what some other doctor

2   was doing, or was he --

3   A.   I don't think so.  I think it was -- she was opioid

4   naive, according to our printout and according to her

5   history.

6   Q.   And could you explain to the jury what opioid naive

7   means.

8   A.   That means you've never taken opioids before.

9   Q.   Could you explain what the impact of an opioid on an

10  opioid naive person is.

11  A.   So 5 milligrams twice a day is a pretty healthy dose.

12  I mean, that's definitely a good acute pain pain relief dose

13  but for acute pain, you wouldn't need it for the whole month.

14  Q.   All right.  And so the quantity is high?

15  A.   So the MME for that is 10 MME a day.

16  Q.   Now, do you watch some videos where you could see

17  Mr. Young in action interacting with the patient known as

18  Katie Crowder?

19  A.   Yes, ma'am, I watched the videos.

20  Q.   Okay.  And do you remember the -- in the sort of first

21  video with Mr. Young, she said that she didn't fill an

22  earlier tramadol prescription?

23  A.   Correct.

24  Q.   All right.  What's your opinion about that?

25  A.   So if you lay out a plan of care for a patient and

```
 1   they don't want to follow it, then you don't have any trust,

 2   right?  And so that's not a good relationship from the

 3   beginning.  And it would be a sign to me that they just want

 4   an opioid, that they're fishing.

 5   Q.   In that video, she says she's gotten a hydrocodone

 6   before from a friend.  Do you have any opinions about that?

 7   A.   That's a common thing that people say, unfortunately,

 8   and I usually try and remind them, you know, that's illegal,

 9   right, to take someone else's medication.  And it's also a

10   sign that she's fishing or shopping for a specific

11   medication.

12   Q.   And in the video, did you hear Mr. Young tell her,

13   hey, you probably shouldn't just take drugs from other

14   people?

15   A.   I did not hear him say that.

16   Q.   Let's look at page 46 in this medical record.  And is

17   this the sort of intake form that corresponds to that date?

18   A.   Yes, this is the follow-up visit, and he says here,

19   has taken hydrocodone in the past.

20   Q.   Does he say that she had taken it, like, from a

21   friend?

22   A.   No, he just says she's taken it.

23   Q.   So the chart isn't complete with respect to that bit

24   of information?

25   A.   No, it's not a complete history for sure.
```

1    Q.   And, in fact, he had information that he didn't put in

2    the chart?

3    A.   Exactly.

4    Q.   Does he document that it -- that he told her any risks

5    of taking pills?

6    A.   It doesn't document either here or on the next page

7    that goes with the visit that he counseled her in any way

8    about the risk of starting opioid therapy.

9    Q.   And you saw the video.  Did he counsel her?

10   A.   No, ma'am.

11   Q.   All right.  But what's interesting here is in this box

12   below.

13             MS. PAYERLE:  Ms. Silverberg, if you could blow

14   that up.

15   BY MS. PAYERLE:

16   Q.   Remind the jury, what does this line here under

17   Normal, what does that indicate that -- that Mr. Young is

18   saying that he did?

19   A.   So this is the review of systems part that we talked

20   about where you basically go head to toe and say, do you have

21   blurry vision, double vision, can you see anything, do you

22   have throat pain, neck pain, and you go through every organ

23   system, and he clearly didn't do that on the videos.

24   Q.   But he documented that he had?

25   A.   He did.

1    Q.   Okay.  If Mr. Young was practicing in the ordinary

2    course of professional practice, what would he have done with

3    the information that Katie Crowder was opioid naive but had

4    taken hydrocodone from a friend and didn't fill her tramadol

5    prescription?

6    A.   So sort of what would I do if I were the physician in

7    that position?

8    Q.   What would be the ordinary course of professional

9    practice?

10   A.   Right.  So you would counsel the patient.  You would

11   talk to them and document it in the chart and say, hey, like,

12   I think you may have a problem here, let's talk about this.

13   It's okay if you have a problem.  I can help you with that,

14   but we need to be honest and have a trusting relationship if

15   you want me to help you.  And I definitely wouldn't prescribe

16   opioids.

17   Q.   Do you remember, in this visit, when Mr. Young asked

18   for an MRI to put in the chart, you know, just because he

19   needs the piece of paper?

20   A.   Yes, ma'am.

21   Q.   Did you have any opinions about that?

22   A.   That's a very common thing that I see when I'm

23   reviewing records for things that are not appropriate is they

24   think if you just put stuff in there, if I just have an X-ray

25   or a piece of paper that says I have an MRI, it will make it

1  look like I tried.

2    Q.   And in the video, she said the radiologist told her

3  nothing was wrong.  Does that change your -- do anything to

4  your opinion about the appropriateness of this prescription?

5    A.   No.  Well, I mean, it makes it worse, I guess.  So we

6  know she didn't really have back pain because she didn't

7  really have back pain.

8    Q.   At the very least, the MRI doesn't demonstrate any

9  problem?

10    A.   Yes, ma'am.

11    Q.   And after learning the MRI didn't demonstrate any

12  problem, did he then follow up with, hey, maybe we should get

13  different testing to figure out what's actually wrong with

14  you?

15    A.   He did not.

16    Q.   Let's take a look at page 45 of this exhibit.  The

17  prescription he wrote for her, is this prescription that

18  we're looking at within the course of professional practice

19  for a legitimate medical purpose in the State of Tennessee?

20    A.   No, ma'am, it's not.

21    Q.   In the next video in July of 2016, Ms. Crowder tells

22  him that the pain is worse at night when she lies down.  Do

23  you remember that?

24    A.   Yes, ma'am.

25    Q.   Do you have any opinions about that?

*EXAMINATION OF TRICIA AULTMAN, M.D.*                                    45

1    A.   That's kind of -- it kind of contradicts what most

2    people have when they have low back pain.  Usually, it's

3    worse when they're moving around, and it's better with rest.

4    Q.   And let's say -- let's look at page 41 of this

5    exhibit.  What do you see here in the chief complaint?

6              MS. PAYERLE:  Let's blow up this chief complaint

7    down to current medications.  Keep going, keep going, stop.

8              THE WITNESS:  So, basically, it says, patient's

9    here for follow-up and requesting refills, has a history of

10   low back pain, states that the hydrocodone wears off too

11   soon, can she try something else.  And it looks like he

12   wrote, having breakthrough pain.  And it looks like he's

13   trying to draw a pain scale, and it looks like maybe he wrote

14   9 or 7, 7 out of 10.

15   BY MS. PAYERLE:

16   Q.   Seven, okay.  And then --

17             MS. PAYERLE:  Let's back out of that.

18   BY MS. PAYERLE:  And do you --

19             MS. PAYERLE:  Let's go to the next page.

20   BY MS. PAYERLE:

21   Q.   What does -- what does Mr. Young do on this visit?

22   What does he prescribe her?

23   A.   So he adds a fentanyl patch at 50 micrograms.

24   Q.   Explain to the jury what your -- explain to the jury,

25   I guess, what went through your mind when you saw that?

**UNREDACTED TRANSCRIPT**

1   A.   It's really actually, like, unbelievable.  There's no

2   medical indication to give a fentanyl patch at 50 micrograms

3   or any fentanyl patch to a healthy 20- or 30-year-old that

4   has what you think is musculoskeletal pain.  Her MME, before

5   this visit, was two Lortabs a day, right?  So it was an MME

6   of 10; 5 plus 5 is 10.  The MME of a 50 microgram patch is

7   120.

8        So he has taken her from 10 to 120 milligrams of

9   morphine and, essentially, if this young woman, who is small

10  anyway, put this patch on, she would be dead.  Like, she

11  wouldn't be back.  Like, she would just fall asleep, stop

12  breathing, and she would die because you just cannot use

13  fentanyl in that manner.  It's not how it was meant to be

14  used.

15  Q.   Dr. Aultman, were either of these prescriptions,

16  either the fentanyl that we see here, the hydrocodone we saw

17  earlier, or the hydrocodone that were written in this visit

18  prescribed within the ordinary course of professional

19  practice for a legitimate medical purpose in the State of

20  Tennessee?

21  A.   No, ma'am.

22  Q.   And she, I believe, goes back in August?

23       MS. PAYERLE:  Let's take a look at page 34.

24  Sorry.  All right.  So let's go to 37.

25  BY MS. PAYERLE:

**EXAMINATION OF TRICIA AULTMAN, M.D.**                                    47

1    Q.   You see here that there's a documented pain range of 5

2    out of 10.  Do you see that?

3    A.   Yes, ma'am.

4    Q.   And what else was written here?

5    A.   Looks like it says, doing better on fentanyl patch.

6    Q.   Again, does Mr. Young mark as though he has completely

7    examined her, all systems?

8    A.   Yeah, he marks through that he's questioned all the

9    systems, and they're negative.

10   Q.   And did he do that in the video?

11   A.   No, ma'am.

12   Q.   All right.

13        Ms. PAYERLE:  Let's go to the next page.  Go to

14   the next one, sorry.  There's a weird blank.  Just go to the

15   next one.

16        MS. SILVERBERG:  This is it.

17        MS. PAYERLE:  Oh, that's it.  I'm sorry.  You've

18   got it.  Thank you.

19   BY MS. PAYERLE:

20   Q.   All right.  What happens here with respect to her

21   prescriptions?

22   A.   So, you know, he actually increases the fentanyl from

23   50 to 75.  And just to give an example, the last patient I

24   had with a 75-microgram fentanyl patch, she was, like, a

25   34-year-old in the hospital with cervical cancer that had

**UNREDACTED TRANSCRIPT**

1   spread throughout her organs and her bowels had ruptured.

2   And we were trying to get her home so she could spend some

3   time with her kids, and we didn't want her to have to keep

4   taking medicine.  But, like, that's an appropriate use of

5   fentanyl is just a horrific, horrible cancer that is, like,

6   killing somebody, and they need to have a little bit of time

7   with their family at home without being in pain.

8       Q.   And if he prescribed her fentanyl and hydrocodone on

9   this visit as well, would those prescriptions be in the

10  ordinary course of professional practice for a legitimate

11  medical purpose in Tennessee?

12      A.   Absolutely not.

13      Q.   And, actually, let's take a look at page 36.  Page 36.

14  Sorry.  Is that -- is that the prescription?

15      A.   Yes, ma'am.

16      Q.   Next, do you remember a visit in which there were two

17  women that came to Mr. Young's office?

18      A.   Yes, ma'am.

19      Q.   And he was talking about a Halloween party?

20      A.   Yes, ma'am.

21      Q.   All right.  Tell the jury your impressions of that

22  visit.

23      A.   So I think, like, all the video visits, the actual

24  medical conversation is almost nothing.  Right.  There's a

25  significant portion of time discussing other things.  And

it's okay to discuss other things.  You know, my patients

know about my kids and all kind of stuff, but you have to

also remain professional, and you also have to do an

appropriate history and physical, which were not done.

Q.   And let's take a look at page 26 of the patient

record.  Also, before I move on, though, was it -- like, is

it normal for two girlfriends to show up together at a

doctor's visit both looking for pain drugs?

A.   No.  Seeing a husband, wife, or a couple together or

parent-child is pretty normal, but friends is kind of not

typical at all, and suspect.

Q.   Okay.  And then did you remember the other undercover

officer mentioning something about landing -- falling and

landing on her lower back?

A.   Yes, ma'am.

Q.   Okay.  What were your thoughts on that explanation of

why she had pain?

A.   I think it's really tricky to fall and land on your

lower back unless you land on something.  It's just a really

weird history that should have prompted further questioning,

like, what do you mean, like, how do you land on your lower

back, unless it's like landing on a curb or, I don't know,

something.

Q.   Were the prescriptions that were written in this video

within the course of professional practice for legitimate

1    medical purpose in the State of Tennessee?

2      A.    No, ma'am.

3      Q.    And that is in October of 2016 to Katie Crowder.

4            All right.   And then also at that visit, was an

5    undercover Kristina Norton, and she was the one we were

6    talking about landing on her lower back?

7      A.    Yes, ma'am.

8      Q.    Okay.   Were the prescriptions written to Kristina

9    Norton who were written -- sorry, for legitimate medical

10   purpose in the ordinary course of professional practice in

11   the State of Tennessee?

12     A.    No, ma'am.   In fact, she just said that she took some

13   Percocet, I think, from her mom, and then that was what she

14   was prescribed.

15     Q.    So was Mr. Young continuing care from another

16   physician?

17     A.    No.

18     Q.    During the video, she says, I've taken some tabs and

19   sometimes I turn to smoking.   What do -- what are tabs?   Do

20   you know?

21     A.    I think tab usually refers to a Lortab.

22     Q.    Would it raise a red flag if a patient told you they

23   took tabs?

24     A.    Yeah, a patient talking in kind of street lingo about

25   medication is always concerning.

1   Q.   Let's take a look at -- all right.  In the next visit,

2   you saw, I believe, Kristina Norton went back by herself.

3           MS. PAYERLE:  Can we look at Exhibit 70?  And I

4   don't know what our number is.  That's it.  Yeah.

5   BY MS. PAYERLE:

6   Q.   Okay.  What are looking at here?

7   A.   This is -- appears to be a copy of -- let's see, right

8   here, an X-ray of her lumbar spine, which is the very low

9   part of your back, and it says two or three views, which is

10  the common way that it's done.  And then the history is back

11  pain, and then this is kind of the radiologist stuff, so to

12  speak.  And then this is -- the impression is basically the

13  result, and it says, no acute osseous, which means bony

14  findings.

15  Q.   What does that mean?

16  A.   It, basically, is a normal X-ray.  She was a little

17  constipated right here.  That's all.

18  Q.   And was there anything on that X-ray that would

19  suggest that a prescription for oxycodone 10 milligrams would

20  be within the course of professional practice for a

21  legitimate medical purpose?

22  A.   Absolutely not.

23           MS. PAYERLE:  Let's take a look at page 71.  Or

24  sorry, Exhibit 71.  Let's go to the next page.  There it is.

25  BY MS. PAYERLE:

**UNREDACTED TRANSCRIPT**

1   Q.   Okay.  At the top of the screen there, this is a

2   receipt.  Do you see where there was an oxycodone

3   10 milligrams prescription written by Jeff Young to Kristina

4   Norton?

5   A.   Yes, ma'am.

6   Q.   Okay.  So is that your opinion about this prescription

7   that it was not appropriate?

8   A.   Yes, ma'am.

9           MS. PAYERLE:  All right.  We have seen --

10   actually, let me -- let me just do -- I'm going to do one

11   more, Judge, and I promise it's the last one.

12   BY MS. PAYERLE:

13   Q.   I'm going to show you a document that we've marked

14   413.  And it is 61 pages.  And it's a patient record for a

15   patient named Daphne Montoya.

16   A.   Okay.

17   Q.   And are you familiar with this document?

18   A.   Yes.

19           MS. PAYERLE:  Move to admit.

20           THE COURT:  100.

21           (Exhibit 100 marked and received.)

22   BY MS. PAYERLE:

23   Q.   Let's take a look at page 53 of Exhibit 100.  In

24   Daphne Montoya's file, did you find this document?

25   A.   Yes, ma'am.

1    Q.   All right.  Explain to the jury -- I mean, you can

2    read it if you want, but explain to the jury if you want to

3    summarize what was happening here?

4    A.   Okay.  So the telephone notes that they took at

5    various times were usually on a yellow piece of paper.  They

6    kind of looked like this.  And so there was a problem with --

7    it says, Jeff's Schedule II narcotics.  And if you just read

8    through, it says, the patient here, Daphne Joyner Montoya,

9    filled oxycodone 10 four times a day, quantity of 120, and

10   she paid cash under her name Daphne Joyner.  But then Daphne

11   Montoya filled oxycodone, the same basic prescription, and

12   she was using her insurance.  So, basically, the person is

13   using maiden/married name, paying one with cash, using her

14   insurance for the other one to get double the quantity of

15   medicine.

16   Q.   And would that -- were both of those written by Jeff

17   Young?

18   A.   Yes, ma'am.

19   Q.   So one in one name, Daphne Joyner, and the other was

20   written in the other name, Daphne Montoya?

21   A.   Yes, ma'am.

22   Q.   Is there any red flags here?

23   A.   It's completely inappropriate.  I don't know how else

24   to say it, it's wrong.  It's not right.  It's putting a

25   patient in a position where they easily could abuse or sell

**UNREDACTED TRANSCRIPT**

1   the medication.  Oxycodone has a huge street value.  That's a

2   pretty tight little income if you're selling that every day.

3   There's just a lot of wrong things about it.

4   Q.   What would be the appropriate way -- if Mr. Young were

5   actually practicing medicine, what would be the appropriate

6   way to deal with this?

7   A.   So, you know, you want to say, oh, I just fired a

8   patient.  But you'd bring them in, you'd say, look, I know

9   you're doing this.  You obviously have a problem or you're

10   selling it and you just need to come clean and tell me.

11   Like, if you need help, if you're addicted to this stuff, we

12   can do that, but you can't just keep going as you are as if

13   nothing happened.

14   Q.   Would it be appropriate medical practice to engage in

15   a sexual relationship with this patient?

16   A.   No, ma'am.

17   Q.   What if you also hired this patient as your front desk

18   employee; would that be appropriate way to deal with this?

19   A.   No, ma'am.

20   Q.   Does the fact that -- would the fact --

21   hypothetically, if Mr. Young had employed this Daphne

22   Montoya, was engaged in a sexual relationship with her and

23   was writing her prescriptions under two different names,

24   would that make it better or worse?

25   A.   That definitely makes it worse.

**UNREDACTED TRANSCRIPT**

1    Q.   Okay.  Generally -- and we can -- let me put that

2    down.  I have some just general questions about some patients

3    that you may have looked at without, you know, slogging

4    through the records.  Did you review a record for a gentleman

5    named Jay Green, who was a police officer listed on his

6    intake form?

7    A.   Yes, ma'am.  He had some kind of foot pain and maybe a

8    fracture.

9    Q.   How would a fentanyl patch impact the ability of a

10    police officer to do his job safely?

11    A.   A fentanyl patch would not be indicated to be used in

12    anyone that had any kind of firearm and especially not for

13    foot pain.  It's completely inappropriate.

14    Q.   Did you find that -- did you form an opinion as to the

15    prescriptions written for Jay Green?

16    A.   They were not written in the unusual course of medical

17    practice for legitimate medical purpose.

18    Q.   In the State of Tennessee?

19    A.   In the State of Tennessee.

20    Q.   All right.  And how about a patient, Tricia Stansell;

21    do you remember reviewing her file?

22    A.   I do.

23    Q.   Were there any prescriptions written to Tricia

24    Stansell in the ordinary course of professional practice for

25    a legitimate medical purpose in the State of Tennessee?

**UNREDACTED TRANSCRIPT**

1    A.    No, ma'am, there were not.

2    Q.    How about Keith Moffit, were there any prescriptions

3    written to Keith Moffit in that -- that meet the standard I

4    just said?

5    A.    No, ma'am.

6    Q.    And how about Bethany Pusser?

7    A.    No, ma'am.

8    Q.    Not her either?  How about Cyndal Story?

9    A.    No, ma'am.  And she actually had all kind of stuff in

10   her initial drug screen that when she was addressed about it,

11   she actually laughed.

12   Q.    She laughed?

13   A.    She laughed.

14   Q.    And what would -- how would a practitioner, who was

15   actually practicing medicine, deal with that?

16   A.    Again, you would bring them in and say, you obviously

17   have a problem.  I can help you, but you have to be honest.

18   Q.    Would you continue trying to -- would a practitioner

19   continue trying to have sex with Cyndal Story under those

20   circumstances?

21   A.    Probably not, no.

22   Q.    All right.  How about Amy Sanders?

23   A.    No, nothing was written for legitimate medical purpose

24   in the usual course of professional practice in the State of

25   Tennessee.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF TRICIA AULTMAN, M.D.*                                    57

1    Q.   Okay.  Now, I've asked you about specific -- some

2    specific patients.  We've gone through specific charts.  Were

3    these examples you identified, were they in this case one

4    offs or did you see these patterns repeated throughout your

5    review?

6    A.   The patterns were definitely repeated over and over

7    and over, and I think I reviewed well over 20 charts.

8    Q.   And in those, were you able to see any examples to

9    suggest that Jeffrey Young was prescribing opioids in the

10   course of professional practice for the State of Tennessee?

11   A.   No, ma'am.

12             MS. PAYERLE:  Just one moment, please, if I

13   could.

14   BY MS. PAYERLE:

15   Q.   Okay.  Just one more quick series of questions:  Sort

16   of bad things sometimes happen in the personal lives of

17   doctors like yourself?

18   A.   Yes, ma'am.

19   Q.   So they have people die and divorces and things that

20   happen all the time, right?

21   A.   Yes, ma'am.

22   Q.   When something bad happens to a medical professional

23   that impacts their judgment or their ability to practice

24   medicine, what are their obligations in the ordinary course

25   of professional practice?

**UNREDACTED TRANSCRIPT**

1    A.   Their obligations are to get help.  And I know in

2   Tennessee and in most states, they have a method to get that.

3   They don't want practitioners out there depressed, suicidal,

4   you know, having alcohol problems.  There's a method to get

5   help that's relatively confidential.

6         In Tennessee, there's -- the Tennessee medical

7   federation, I think, has a place you call and they set you up

8   with a peer, and then everything that happens with that peer

9   is private as long as they feel like you're still practicing

10   safe medicine.  And it's not reportable to medical boards, so

11   you won't lose your license, all that kind of stuff.  They've

12   come a long way in those kind of accommodations for impaired

13   physicians.

14    Q.   Hypothetically, if Mr. Young was, at the time of these

15   prescriptions, going through something traumatic, like a

16   divorce, does that somehow make any of these prescriptions

17   legitimate?

18    A.   No, ma'am.

19    Q.   Okay.

20         MS. PAYERLE:  All right.  The Government passes

21   the witness.

22         THE COURT:  Thank you.  Before we do cross, I

23   think we'll go ahead and take a break.  We've been going for

24   about an hour-and-a-half or so.  Okay.

25         MR. FERGUSON:  I was going to ask, I need some

**EXAMINATION OF TRICIA AULTMAN, M.D.**                              59

1  time to get the exhibits together too.

2           THE COURT:  Okay.  We're going to take an

3  afternoon break, ladies and gentlemen of the jury.  You've

4  heard quite a bit more testimony.  We'll pick this up in

5  about 20 minutes or so.  Okay.  Leave your notebooks and

6  don't discuss.  Don't discuss the testimony over the break.

7                    (Jury out at 2:44 p.m.)

8           THE COURT:  Okay.  See everyone in about 20

9  minutes.

10      (A recess was taken from 2:45 p.m. to 3:15 p.m.)

11           THE COURT:  Okay.  Unless there's anything else,

12  are we ready?

13           MR. FERGUSON:  We're ready.

14           THE COURT:  Bring them in, please.

15                    (Jury in at 3:15 p.m.)

16           THE COURT:  Okay.  Folks, I think we're ready to

17  push forward.  So just have a seat.

18           I think it's time for cross, Mr. Ferguson?

19           MR. FERGUSON:  Thank you, Your Honor.

20                      CROSS-EXAMINATION

21  BY MR. FERGUSON:

22    Q.   Good to see you again.  I'm going to pass forward some

23  documents to you and have you take a look at them.  You

24  previously testified that you had reviewed Hope Rogers'

25  records?

**UNREDACTED TRANSCRIPT**

1          THE COURT:  Is that an exhibit?

2          MR. FERGUSON:  It is not.

3          THE WITNESS:  Yes, sir.

4          MR. FERGUSON:  Your Honor, I ask that this be

5   made the next exhibit.  It's Hope Rogers' patient file.

6          THE COURT:  Patient file, and that will be 101.

7          (Exhibit 101 marked and received.)

8   BY MR. FERGUSON:

9   Q.   I don't have much for you today.  I'm going to try to

10  be quick, but I hopefully will get through it pretty fast.

11  A.   Okay.

12  Q.   Start off with a bad question.  How much are you

13  getting paid in this case?

14  A.   I've gotten paid, like, a lot of money, more than

15  probably my parents could have ever imagined.  I started

16  doing this 20 years ago, and it was a way for me to make

17  extra money while my kids were little.  They were asleep, and

18  almost never involved going to trial.

19  Q.   Right.

20  A.   Most expert witnesses make about $500 an hour.  I used

21  to charge less.  One of the district attorneys a long time

22  ago said you look cheap.  You have to charge more to be kind

23  of on par with the rest of them.  And, undoubtedly, it's been

24  insane the amount of money that I never thought I would be

25  doing.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF TRICIA AULTMAN, M.D.*                    61

1    Q.   Do you make more money serving as an expert witness

2  than you do as a hospitalist?

3    A.   Oh, definitely not.

4    Q.   Definitely not?

5    A.   No.  No, no.

6    Q.   In this case, you've already received about 44,000?

7    A.   I think over the course of seven years, it's probably

8  about that.

9    Q.   And I think you're contracted up to about 110 or

10  something?

11   A.   Yeah, I don't think I'll get anywhere near that.  They

12  always way overestimate.

13   Q.   Okay.  And to be fair, you're getting paid to be here

14  today?

15   A.   Yes, sir.

16   Q.   You got paid to review these records?

17   A.   Yes, sir.

18   Q.   It's a job.  It's a real job, and it's something

19  that's -- it's perfectly legal to do that?

20   A.   Yes, sir.

21   Q.   Okay.  So just on this one case, you're over $40,000?

22   A.   I'm taking your word for it.  I would have to pull my

23  tax records for the last seven years, but that's probably

24  about right.

25   Q.   Okay.  Opioids are used to treat pain, correct?

**UNREDACTED TRANSCRIPT**

1    A.   Yes, sir.

2    Q.   I'm sorry.  I talked over you, and I didn't get a bad

3  look.  I'll try it again.

4         Opioids are used to treat pain?

5    A.   Yes, sir.

6    Q.   And, typically, or almost all times, you have to have

7  a prescription to get opioids?

8    A.   Yes, sir.

9    Q.   And in order to prescribe opioids, you have to be

10  licensed by the state as a medical or healthcare

11  professional?

12   A.   Yes.

13   Q.   And the states typically are the ones that are

14  responsible for overseeing licensed medical providers within

15  the state?

16   A.   Right.

17   Q.   If a -- somebody from the Tennessee Board of Nursing,

18  an investigator came in to speak to the jury, that would be

19  typically the first line of the people who oversee nurses?

20   A.   Yes.

21   Q.   You -- I want to go -- really, I just want to talk a

22  lot about Hope Rogers.

23   A.   Okay.

24   Q.   There's some real issues here.  Hope Rogers, there was

25  prescribing of the hydrocodone and Xanax?

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF TRICIA AULTMAN, M.D.**                    63

1    A.    It was hydrocodone and Xanax and oxycodone too.

2    Q.    Okay.  And Xanax, you say, is really counter -- it's

3    not what you want to be prescribing a pregnant woman?

4    A.    Right.  In terms of pregnancy class, A, B, C, D, X,

5    it's a D.

6    Q.    Okay.  Tell me what those mean.  I heard you saying

7    that, but it never really -- never really told me what that

8    meant.

9    A.    Right.  Pregnancy Class A, there's no problems to take

10   in humans.  There's very few medicines in that class.  Like,

11   a few vitamins, thyroid medicine and stool softeners.

12   Q.    All right.

13   A.    Class B is that there are no known problems I think in

14   animal studies, so probably safe:  Tylenol, prenatal

15   vitamins, some blood pressure medicines.

16         And C is that there's probably some animal studies

17   that shows that you shouldn't use them, and there's not good

18   human data.  And so C is where opioids fall.

19         And D is animal studies definitely show harm, and

20   there's probably harm in human studies, and you really

21   shouldn't use Class D.

22         Class X is, for example, like thalidomide and other

23   medicines that are a hundred percent we know will cause

24   something bad to happen to the infant.

25   Q.    That last one you said, that was the one in the '50s,

**UNREDACTED TRANSCRIPT**

1  '60s that caused babies to be born deformed?

2     A.    Exactly.  It's the one that caused the limb

3  malformations and shortened arms.

4     Q.    Unfortunately, growing up we would have referred to

5  them as flipper babies.  I mean, that's a horrible word.  We

6  don't say it --

7     A.    Yes, sir.

8     Q.    That was the awful --

9     A.    Probably politically incorrect these days.

10    Q.    It is.  There's a lot that is, but different

11 generations.

12    A.    Yes.

13    Q.    So D is -- it has a real potential of being harmful,

14 but it's not counter -- it's not just a flat out no.  There

15 has to be some medical reason, and there has to be a real

16 serious review of the situation?

17    A.    Correct.  There has to be a very serious indication

18 that will show the benefit outweighs the risk.  And in my

19 research on benzodiazepines, there just isn't.  And the one I

20 read from the American College of Obstetrics and Gynecology,

21 it says there's really no indication to use benzodiazepines

22 in pregnancy.

23    Q.    Which one has the black box warning?

24    A.    So the benzodiazepines, when used with opioids, has a

25 black box warning.

1    Q.   And I've seen that.  I don't know where it went to.

2    It was around here somewhere.  Let's tell the jury what that

3    means.  A black box warning is on the medication itself or on

4    the paperwork you get with it.  There is a literal black box,

5    like, glaring at you that says:  Warning, this could be a

6    dangerous combination, you must take special care with it,

7    and, please, if you can, find some other alternative?

8    A.   Right.  So it's there for benzodiazepines and opioids

9    in combination.  And the black boxes are also on other kinds

10   of medicines that can have significant side effects.

11   Q.   And the black box for the combination of opioids and

12   benzodiazepines, specifically, states that the risk is called

13   neonatal -- what's the babies born with?

14   A.   Well, the black box warning is not for neonatal

15   abstinence syndrome.  The black box warning is an overall

16   warning for all opioids and benzos because of the risk of

17   oversedation.

18   Q.   Have you read it in a while?  Have you looked at in a

19   while?

20   A.   The black box on those, probably sometime in the last

21   couple of months, but not recently, no.

22   Q.   Do you remember it saying if you're going to take it

23   in combination, you need to be, at least, prepared for that

24   outcome, and have a high-risk OB on board?

25   A.   There's definitely -- if you're taking opioids and

1    benzodiazepines, there definitely needs to be a high-risk

2    obstetrician or they call them a maternal-fetal medicine

3    onboard and ready, so that you see them before, and then when

4    you deliver, they're aware of the situation and can handle

5    the infant.

6        Q.   And that's, in your opinion, would be the only safe

7    way to handle something like that -- not safe way.  That's

8    the only way you could handle that if it had to be done?

9        A.   Handle what exactly?

10       Q.   If somebody had to be on both those drugs and was

11   pregnant, under the -- your professional opinion and the

12   black box warning, you must have neonatal or some specialist

13   on board to take care of the baby during delivery?

14       A.   No.  The appropriate thing to do would be for you to

15   change them to Suboxone or methadone, or find someone that

16   could, as well as have someone from maternal-fetal medicine

17   see you while you're still pregnant.

18       Q.   Okay.  But, again, the black box warning, it indicates

19   if it's going to be done, if it had to be done, if it

20   accidentally got done, however it got done, have a high-risk

21   OB on board?

22       A.   Yes.

23       Q.   Do you have any opinion on what the maximum number of

24   patients a day a healthcare provider should see?

25       A.   So most of the studies I've read recently show that

1   the average healthcare provider sees, in primary care, is

2   usually around 30.  That depends.  Internal medicine are

3   going to be less because your patients are older and sicker.

4   Family practice, you have those young kids that are easy, you

5   know, the cough/cold kind of thing, so it might be a little

6   bit more.

7   Q.   Sixty would not be within the range of what a normal

8   healthcare provider should be seeing in a day?

9   A.   Not independently, no, sir.

10   Q.   Okay.  You would not be able to provide them the

11   quality and level of care that would be necessary in order to

12   meet the standard of care?

13   A.   No.

14   Q.   And when we talk about the standard of care, have you

15   ever testified in civil cases before, or is it just criminal

16   cases?

17   A.   I have given a deposition in a civil case.  It went to

18   trial, and I was not needed.

19   Q.   Okay.  And in that case, were you asked to also

20   testify as to kind of the standard of care within that

21   profession?

22   A.   Yes, it was a standard of care for hospital medicine,

23   and I was with the defense of the physician.

24   Q.   Suboxone, tell me again what two drugs that was?  You

25   said two different things.

**UNREDACTED TRANSCRIPT**

1    A.   So it's naloxone, which is Narcan, and buprenorphine,

2    which is --

3    Q.   Say that one again?

4    A.   Buprenorphine.

5    Q.   Spell it if you can.

6    A.   Spelling is not my forte, B-U-P-R-E-N-O-R-P-H-I-N-E.

7    Close?

8    Q.   Buprenorphine?

9    A.   Buprenorphine, yes, sir.

10   Q.   Buprenorphine?

11   A.   How about just Suboxone?

12   Q.   Suboxone?

13   A.   There you go.

14   Q.   I don't want to talk about the other drug.  I just

15   want to talk about that drug.  Is that drug -- is it

16   prescribed by itself at times?

17   A.   It is prescribed.  So buprenorphine was released to

18   help with opioid addiction and withdrawal.  The problem was

19   that by itself it could still be injected and abused.  So

20   they added Narcan to it, and when they added Narcan to it,

21   you could still use it, they call sublingually under your

22   tongue, but you can't inject it any more.  That was a way to

23   make it abuse deterrent.  But buprenorphine, yes, sir, is

24   used for addiction treatment.

25   Q.   And is buprenorphine, if it's not Suboxone -- well, if

**UNREDACTED TRANSCRIPT**

1   it is Suboxone, would it say buprenorphine and --

2   A.   -- naloxone.

3   Q.   -- naloxone in the PMP, or would it just show the

4   opioid?

5   A.   No, I think it should say both on the PMP.

6   Q.   Okay.  So if it's just by itself, then that's not

7   Suboxone, that's just the opioid?

8   A.   Correct.

9   Q.   Okay.  You told the jury it's common for people to

10  take other people's medications.  You're not happy with that,

11  but you agree that that's somewhat common within the field?

12  A.   It unfortunately does happen.  Shouldn't, but it does.

13  Q.   Husband takes wife's medicines, boyfriend, girlfriend.

14  If you have access to it, you say, hey, let me try that back

15  pain medication to see if it works for me?

16  A.   I suppose it does happen, yes, sir.

17  Q.   Okay.  The Government asked you a little bit about --

18  or you were talking a little bit about why it's so important

19  for doctors that are having problems, either personal or

20  mental or drugs, to seek help.  Why -- again, why is that?

21  A.   So the medical boards have learned through the years

22  that just punishing people for their addiction, whether it's

23  alcohol, drugs or mental health issues, it just doesn't work,

24  right?  You just take their license away, and what that does

25  is scares people away from treatment.  So it's much more

1  kinder, gentler medical board in general for all the states,

2  and they want you to come to them and say, hey, I'm hurting,

3  I need help.  And they're able to do that without you losing

4  your license or being affected.

5     Q.   It's a risk when somebody has one of those problems

6  that they're going to make mistakes in their practice?

7     A.   Yes, sir.

8     Q.   That they're going to overlook things that they

9  normally wouldn't overlook?

10    A.   Yes, sir, I would imagine.

11    Q.   That practices are run into the ground every day by

12 doctors who are mentally ill or have drug or alcohol

13 problems?

14    A.   I think that's an overgeneralization, but I'm sure it

15 happens.  I don't know about every day.

16    Q.   Okay.  Fair enough.  You've seen it happen before?

17    A.   Yes, sir.

18    Q.   Patients get hurt when it happens?

19    A.   Usually, yes, sir.

20    Q.   I'm going to pass back up Exhibit 101 to you.  I just

21 want to ask you a couple of questions about it.  Will you

22 just turn to the last page you have in there.  Let's make

23 sure we have the same number of pages.  At the very bottom,

24 do you see -- it may not be on there.  Just tell me if it

25 is -- GX419281?

 1    A.   It's 282 on mine.

 2    Q.   It is.  I didn't turn the page over.  So you're

 3  holding a 282-page document?

 4    A.   Yes, sir.

 5    Q.   And the records kept within this clinic for Hope

 6  Rogers is almost 300 pages?

 7    A.   Yes, sir.

 8    Q.   And if you go back to the beginning around page 3 or

 9  4, there's an information sheet.  It's the pink sheet.  It

10  asks about insurance, secondary insurance, the normal stuff

11  that you'd expect to see in a patient's file.

12    A.   Yes, sir.

13    Q.   And that would be normal within the realm of a clinic.

14  You would expect to see this.  You would expect to have a

15  file, and you would expect to see this paperwork at the

16  beginning?

17    A.   Yes, sir.

18    Q.   There at page 5, 6, there's authorization to disclose

19  protected healthcare records or information?

20    A.   Yes.

21    Q.   Common to expect to see that in a file?

22    A.   Yes.

23    Q.   Flipping the page over a couple, there's -- they took

24  copies of her insurance, took copies of her driver's license,

25  again, all pretty standard within the field of medicine to

```
 1   put that in the record?
 2       A.   Yes.
 3       Q.   And then it just starts going through.  And you have
 4   your -- I guess these are called -- well, what would you call
 5   the forms at page 12 when it has the patient name and the
 6   date and date of birth at the top?  Is that a -- well, what
 7   do you call it?
 8       A.   It's called a progress note.
 9       Q.   Progress note.  And there should be one of these for
10   each time the patient comes in to visit with Mr. Young?
11       A.   Yes, sir.
12       Q.   Again, pretty standard in the industry to keep up with
13   your records like this?
14       A.   Right.
15       Q.   They're not the best records?  They're not really
16   thorough?
17       A.   No.
18       Q.   And, again, that's your opinion?
19       A.   Yes, sir.
20       Q.   Now, flipping through to page 36, what is that?
21       A.   Page 36 is a CT scan of the head that was done of Hope
22   Rogers on December 30, 2014.
23       Q.   And it was done at the regional hospital of Jackson.
24   That's what we call a referral; is that correct?
25            Or let me back up.  It was done at the regional
```

**UNREDACTED TRANSCRIPT**

1    hospital of Jackson?

2       A.    Yes.

3       Q.    Okay.  And it's normal within the course of a medical

4    practitioner, especially maybe family practitioner, that if

5    they need testing done, if they want a CT done, they don't

6    have a CT in the back office, do they?

7       A.    Sometimes, but --

8       Q.    Family nurse practitioner?

9       A.    Sometimes they do.  Sometimes they have an MRI in the

10   parking lot.  But, normally, they go -- it's a financial --

11   it's a money-making industry, radiology.

12      Q.    Millions of dollars to have one of those, isn't it?

13      A.    Yes, sir.  But, normally, they just go down to the

14   local hospital with a prescription or a faxed order.

15      Q.    Right.  And so you're not surprised to see something

16   like this in a healthcare record that they needed some CT

17   scans done, so they sent them out to go get them done?

18      A.    Yes.

19      Q.    Let's go to -- let's go to 98.  Do you have it?

20      A.    Yes, sir.

21      Q.    Okay.  This is the one I think -- I think they asked

22   you questions about this or ones similar to this.  Now, this

23   is -- the collection date is 4/13/2016, long after the birth

24   of her child in August of 2015, and it's got two inconsistent

25   tests that have been marked in yellow.  And if I understand

 1   correctly, your testimony was -- the warning there is that

 2   those are the metabolites.  Had they consumed the pill, the

 3   body would have broken it down so you want to see the drug

 4   itself and the metabolite showing that it's in the body?

 5   A.    Yes, sir.

 6   Q.    Okay.  So the two inconsistents for the metabolites is

 7   what causes you concern?

 8   A.    Right.

 9   Q.    And you believe and it would be your professional

10   opinion that a provider, if they see this, should take notice

11   and take warning of this?

12   A.    Right.  I don't know any other biologic way that it

13   could happen that you would not have the metabolite in your

14   system --

15   Q.    Right.

16   A.    -- but it would be in your urine.  And if you thought

17   it was a lab error, you could just repeat it.

18   Q.    If Hope Rogers had testified that at some point after

19   the birth of her baby, she began to sell her medication,

20   would this be consistent with her selling her medication?

21   A.    It would be, and then maybe holding one back for the

22   test.

23   Q.    And, again, it is in the records that you reviewed?

24   A.    Yes, sir.

25   Q.    And you see down here it appears that at some point

1  she was counseled or asked questions about this testing?

2  A.   Yes, sir.

3  Q.   And she denied it.  And the -- one of the

4  recommendations from the toxicology lab was to recollect or

5  retest the sample; is that correct?

6  A.   Yes, sir.

7  Q.   Any idea what that is right there?

8  A.   It's a list of dates.  I don't know what he's trying

9  to indicate, if it was previous drug tests or what.

10  Q.   Okay.  And so witnessed by -- and these are two

11  females, and this is a female patient.  Would you -- if you

12  had a concern that they were breaking pills off and spiking

13  their urine, if you will, you would have maybe your female

14  staff observe the next urine sample?

15           MS. PAYERLE:  Objection, Your Honor.  This is

16  very speculative.

17           MR. FERGUSON:  I'll rephrase.

18  BY MR. FERGUSON:

19  Q.   Is it normal, within the field of urine screens within

20  the medical profession, that you don't let somebody go into

21  the bathroom and pee alone because they can spike it?  If you

22  have concerns about that, you would ask for a witness sample?

23  A.   Sometimes you do have somebody witness the sample

24  because they can spike the urine or bring in urine from home

25  that's somebody else's, but it's not clear to me that they

1   witnessed her urinating or they witnessed her denying that

2   she took the medicine.

3       Q.   All right.  If you're concerned about fake pee

4   results, fake testing, what's the protocol?  What's the

5   standard in the field?

6       A.   I mean, I think I would call them in on a surprise,

7   say, like, not on their regular scheduled appointment.  Call

8   them in and say, hey, we need a sample today.  And if they're

9   taking their medicine as prescribed every day, then it would

10  be positive for the medicine and the metabolites.

11      Q.   Would it also be within the standard of care to have

12  the observed samples?

13      A.   You could, yes, sir.

14      Q.   Okay.  You say that you have great concern over the

15  hydrocodone and the alprazolam, correct?

16      A.   Yes, sir.

17      Q.   Can you explain to this jury why, I don't know, about

18  three months before she gave birth, the hospital in Jackson

19  was prescribing her hydrocodone along -- knowing that she was

20  on Xanax?

21      A.   I can't explain that, no, sir.  I know at one point

22  she did have an admission for some preterm labor.  I'm not

23  sure if that correlated with the prescriptions you're talking

24  about.

25      Q.   I'm going to show you page 52 in that exhibit.  It

**UNREDACTED TRANSCRIPT**

1  says that Jackson medical admitted by her doctor, Armie

2  Walker, given Demerol and hydrocodone.  You were able to

3  verify that, were you not?

4    A.   I read through the hospital medical records, and she

5  was given those in the hospital, yes, sir.

6    Q.   And you also see it at page 183 -- wow, I'm so

7  horrible these days -- 183.  And, again, you can see that --

8  let me blow it up.  Dr. Walker gives her 30 hydrocodone

9  pills, which has a MED, is that the daily MED?  What is that,

10 MEE and MED?

11   A.   Yes, the morphine milligram equivalent or morphine

12 equivalent dose.

13   Q.   He prescribes her 112.5 MEDs in the hospital while

14 she's pregnant?

15   A.   That doesn't make sense to me because it looks like

16 here she's getting hydrocodone 7.5 milligrams, a quantity of

17 30.  It doesn't make sense that he wrote it for two days.

18 Nobody is going to take 15 hydrocodone with that much Tylenol

19 a day.  So that's why the MED doesn't look right.

20   Q.   I agree with you.  Nobody takes it -- takes that much

21 in two days, do they?

22   A.   No, sir.  Well, they do, but it's not good.

23   Q.   No doctor is prescribing that much?

24   A.   No, sir.

25   Q.   Okay.  Thirty pills is probably more between 10 and 15

1  days, if she's taking two to three a day?

2     A.   I would think so.

3     Q.   Which would drop this down probably by half or more?

4     A.   Oh, way less.  So if she took three a day, it would be

5  7.5 times three, I don't know, 20 something, 23, 24.

6     Q.   Here's where she's taking, looks like, four a day.

7  And it's only 30?

8     A.   Thirty, yes, sir.

9     Q.   So -- but, again, her OB in the hospital is

10  prescribing her the medication that you're saying is outside

11  the normal scope and course of medical treatment?

12     A.   Right.  I think the only caveat to her OB prescribing

13  that is the situation surrounding her admission was preterm

14  labor, and if he thought the benefit outweighed the risk of

15  further labor.  I can't really speak for him.  I'm sorry.

16     Q.   Right.  All you can do is verify that Mr. Young wasn't

17  the only medical professional prescribing her these drugs

18  that you've just told the jury that no one prescribes?

19     A.   No, I said no one would prescribe benzodiazepines for

20  sure.  Opioids only in -- if you absolutely had to.

21     Q.   When you were reading over these records, did you read

22  over the records of her high-risk OB?

23     A.   Yes, sir, I did.

24     Q.   So you were aware she had a high-risk OB?

25     A.   She did, and it was a very thorough note.

1    Q.   Why didn't you tell the jury she had a high-risk OB?

2    A.   Because she was on opioids and benzodiazepines, and

3    the baby was at risk for neonatal abstinence syndrome.

4    Q.   Right.  But you didn't tell the jury that?

5    A.   I don't know if we talked about it.

6    Q.   Did you tell the jury just a few minutes ago when the

7    Government was asking you questions that she had received the

8    same -- similar drugs from another doctor at the same time

9    that you're testifying here today while you're getting paid

10   against Mr. Young?

11   A.   Her OB only prescribed 30 hydrocodone one time and

12   he -- the OB never prescribed benzodiazepines, so there's a

13   difference between the duration and the medications that were

14   given.

15   Q.   And in the records you reviewed, they knew she was on

16   benzodiazepines?

17   A.   They did.

18   Q.   So he prescribed hydrocodone knowing she was on Xanax,

19   correct?

20   A.   Yes.

21   Q.   Thank you.

22             THE COURT:  Thank you, Mr. Ferguson.

23             Any redirect?

24             MS. PAYERLE:  Yes, Your Honor.

25

**UNREDACTED TRANSCRIPT**

```
 1                        REDIRECT EXAMINATION

 2   BY MS. PAYERLE:

 3     Q.   Dr. Aultman, can you think of a legitimate medical

 4   reason why a doctor may prescribe hydrocodone for a couple of

 5   days while a patient in preterm labor is in the hospital?

 6     A.   Right.  If you think whatever pain they're having --

 7   it wasn't clear to me from the records, because I don't think

 8   I have those records.  I reviewed her hospital delivery

 9   records.  I'm not sure if I actually knew why she was in the

10   hospital.  But if you thought that the benefit outweighed the

11   risk for a brief period of time, opioids are probably

12   indicated at that point.  And I think it was also further

13   along in the pregnancy, which makes it much less dangerous

14   than the first trimester, which is the beginning of the

15   pregnancy when all the organs are being formed.

16     Q.   So does the fact that a doctor may have prescribed

17   Hope Rogers hydrocodone for a very short period of time while

18   she was in the hospital for preterm labor change your opinion

19   about whether Mr. Young's ongoing and increasing

20   prescriptions of hydrocodone alongside Xanax were for a

21   legitimate medical purpose and within the course of

22   professional conduct?

23     A.   It does not change my opinion.

24             MS. PAYERLE:  Nothing further.

25             THE COURT:  Thank you.
```

**UNREDACTED TRANSCRIPT**

1          Mr. Ferguson, anything further?

2          MR. FERGUSON:  No, I don't think so.  Thank you.

3          THE COURT:  All right.  You're quick on the draw

4  there, but you are excused.  Thank you.

5          Government, if you would, please, call your next

6  witness.

7          MS. PAYERLE:  Your Honor, at this time the

8  Government rests.

9          THE COURT:  Okay.  Thank you.  I think you heard

10  the Government rests its case as far as in chief is

11  concerned.  That alerts me that some issues I have to take up

12  with the lawyers.  It's going to take a little longer than us

13  just going to side-bar like we've been doing.  What that

14  means is I'm going to have to send you to the jury room for a

15  short time before we can proceed with the trial.  Okay?

16          I'll take care of those things and get back to

17  you just as quickly as possible.  Leave the notebooks.  Don't

18  discuss, and I'm going to go ahead and excuse you to the jury

19  room.

20              (Jury out at 3:46 p.m.)

21          THE COURT:  All right.  Are there any motions?

22          MR. FERGUSON:  There are, Your Honor.  It's going

23  to take me just a moment to pull up the indictment.  I want

24  to have it in front of me when I walk through.

25          THE COURT:  Do you need a few minutes?

1          MR. FERGUSON:  It just takes me about 30 seconds,

2     probably.

3          THE COURT:  Okay.

4          MR. FERGUSON:  Yes, please.  It's either that or

5     try to dig through all the paperwork to find it.

6          THE COURT:  We're not in recess.  Y'all can be

7     seated.

8          MR. FERGUSON:  Your Honor, if I may.

9          THE COURT:  Go ahead.

10          MR. FERGUSON:  Thank you.  On behalf of Jeffrey

11     Young, at this time, defense makes a motion for judgment of

12     acquittal on the indictment.  There's some specific issues in

13     which the Government's proof is lacking such that this case

14     should not be -- should not move forward at this point.

15          Count 1, obviously, charges a conspiracy in this

16     count.  One of the key -- obviously, the number one feature

17     of conspiracy is an agreement between two or more people to

18     do something that's illegal.  The case here, originally,

19     while I understand it, says -- it doesn't say known or

20     unknown.  It just says that defendants Jeffrey Young,

21     Alexander Alperovich and Andrew Rudin did knowingly and

22     intentionally combine, conspire, confederate and agree --

23     here it is -- with each other and others unknown -- there it

24     is.  I knew it was in there somewhere -- to distribute

25     Schedule II substances.  I haven't heard any proof of

 1   conspiracy or agreement among anyone.  In fact --

 2              THE COURT:  Among what was it?

 3              MR. FERGUSON:  Among anyone.

 4              THE COURT:  Oh, anyone.

 5              MR. FERGUSON:  Of course, they always throw in

 6   the language known and unknown.  It's always kind of wait to

 7   see who shows up to court to testify.  Well, out of the three

 8   named people, Jeff Young didn't testify, nor is there any

 9   proof in any of his many statements that he had made some

10   agreement with other people to sell or prescribe these drugs

11   to the patients.

12              And that's one of the things we have to keep in

13   mind here is that the patients are -- in the state's case,

14   they're the target of this conspiracy.  They're not the

15   coconspirators.  They're the target to sell them and to

16   prescribe them the medication to addict them to keep them

17   coming in so that other people can make money off the

18   practice and that -- and in their words, the illegal drug

19   sales.

20              Dr. Alperovich was very clear, and I was very

21   specific to ask him was it -- was it your understanding --

22   was it your intent, your agreement -- did you two have an

23   agreement to sell drugs, to prescribe drugs?  And he said no.

24              There's been no testimony from Dr. Rudin.  And

25   there's been nobody who has come in and said that there was a

**UNREDACTED TRANSCRIPT**

1    conspiracy.

2            Even when Kristie Gutgsell came in, she was asked

3    had she pled guilty to something, and she said, yes, but she

4    did not -- there was no questioning of her as to what the --

5    what the agreement was, if there was an agreement, was

6    Mr. Young part of that agreement.  Just that she had pled

7    guilty and was awaiting sentencing.

8            So as far as the conspiracy goes, there's been no

9    testimony to support a conspiracy in this case.

10           In the second through, I think it's Count 7, that

11   is the dispensing to Hope Rogers and not for a legitimate

12   medical purpose.  The proof has been that she was a patient.

13   She was being seen by him.  He was treating her and

14   prescribing her medication while at the office.  There's no

15   allegation that he was trying to sleep with her, and that's

16   not part of Counts 2 through 7.  The proof has been to this

17   point and, again, through the Government's last witness that

18   there were other physicians prescribing her hydrocodone.

19           And so if it's -- apparently, there are other

20   physicians prescribing her the same medication that they're

21   trying to say was somehow outside the normal scope and course

22   of the medical professional within a medical setting, then I

23   don't think that that's adequate proof to present Counts 2

24   through 7 to the jury.

25           Eight through 14, again, those are the two

1   undercover officers.  So -- and in the indictment they have

2   patient in quotes because they weren't patients.  They were

3   undercover officers.  Again, the testimony has been they came

4   into the office.  They made complaints of pain.  The

5   prescriptions -- again, the experts testified that opioids

6   are to treat pain.  They complained of pain.  They were given

7   prescriptions for pain and that that would be consistent.

8   It's been on video.  It's, obviously, in his office.  It's

9   within the normal course and scope of his practice.  He was

10   licensed when he did it.  He interviewed them.

11          While it might have been pathetically short and

12   underwhelming by all accounts, it was still:  What are you

13   here for, what are your symptoms, what's helped you in the

14   past, let's start and try this.  There was testimony from

15   Mr. Young through the nursing board that he was asked what do

16   you do if it doesn't work.  I can titrate up to twice.  And I

17   believe -- I think on both these cases, they were only

18   titrated twice.

19          But, again, it's consistent with what he said

20   that was his means and manner of treating pain within his

21   clinic.  And nothing in it indicates that, again, that the

22   prescriptions were for anything outside the normal course and

23   scope of his practice.  If for some reason these officers --

24   that's why we were very keyed in to ask them:  Did he ask you

25   for sex, did he try to have sex with you.  Obviously, that

1    makes it a very -- it would be very damaging to us if that

2    had been the outcome or that had been the -- his

3    conversations with them.  That would, obviously, be something

4    the Government would be able to hang their hat on saying the

5    reasoning for these prescriptions was for something other

6    than to treat the complaint, that it was to bribe them, if

7    you will, into sex.  That's not what happened here.  He had

8    the -- there was nothing that indicated he was doing anything

9    other than meeting with them, investigating their claims of

10   pain and prescribing medication as he thought was

11   appropriate.

12           Based on that, I think -- and, I guess, with all

13   of those, naturally, 15 would fall, which is holding out a --

14   maintaining a drug involved premise and that just naturally

15   would fall if the other falls.  So I'd ask Your Honor to

16   enter a judgment of acquittal on these cases.

17           THE COURT:  Thank you.

18           Government, who will it be?  Mr. Pennebaker?

19           MR. PENNEBAKER:  Yes, Your Honor.  Briefly.

20           The argument about the insufficient evidence of

21   conspiracy in Count 1, starting with the three individuals

22   that are named in the indictment, Ms. Gutgsell was -- I'm

23   sorry.  I'm just making sure I go back to the top of the

24   indictment here.  So you have a -- Dr. Alperovich testifying

25   that he couldn't have done -- that Mr. Young couldn't have

 1  done what he did without Dr. Alperovich supervising the

 2  practice.  So that's evidence of a conspiracy with

 3  Dr. Alperovich that's sufficient at least to go to the jury

 4  as a disputed fact, a question of fact.

 5          There are other individuals, Dr. Alston, one of

 6  the precepting physicians early on in the practice that

 7  Ms. Gutgsell testified he oversaw the practice of the clinic.

 8  He signed records.  The records at that time as the

 9  Government's expert testified were abysmal just like they

10  were the entire time.  That's evidence of a conspiratorial

11  agreement between that precepting physician, who was getting

12  paid for precepting, and the defendant.

13          Dr. Rudin, the perfect preceptor that we had

14  evidence on.  There's conspiracy evidence in the record as

15  far as that individual is concerned.  And then, in addition,

16  the Government's 800 series, there are indicia that Mr. Young

17  is prescribing to some of these patients after determining,

18  after finding out, after seeing red flags that they're

19  selling their pills.

20          So, again, that goes beyond a patient/physician

21  relationship and into a conspiring with someone else to

22  facilitate the ultimate distribution of those drugs for

23  purposes other than medical practice.  So that's the

24  Government's response to the motion to dismiss Count 1.

25          THE COURT:  Before we go on to the other counts,

**UNREDACTED TRANSCRIPT**

1   tell me again proof in the record with Dr. Rudin.

2            MR. PENNEBAKER:  Dr. Rudin was the perfect

3   preceptor that I believe Ms. Gutgsell testified.  We saw some

4   text messages between Mr. Young and Ms. Gutgsell where

5   Ms. Gutgsell talks about how hard Dr. Rudin is to track down

6   to get him to sign records, to get him to see -- you know, to

7   perform his supervisory function in the practice.  And

8   Mr. Young responds to Ms. Gutgsell's frustration with the

9   phrase "the perfect preceptor," which is an allusion to the

10  fact that he's basically nonexistent, just covering, signing

11  for the practice, allowing the defendant to continue to do

12  his -- to do his diversion with drugs.

13            There was also testimony that Dr. Rudin was a

14  friend, that he lived in Chicago, that he never came to the

15  clinic, that he took a thousand dollars for covering for the

16  practice, basically.

17            THE COURT:  And so that supports the conspiracy

18  agreement?

19            MR. PENNEBAKER:  Yes, Your Honor.

20            THE COURT:  Okay.  Go ahead.

21            MR. PENNEBAKER:  The arguments about the

22  dispensing to Ms. Rogers, we've got specific opinions in the

23  record from the Government on the issue of whether or not

24  those prescriptions that are charged in the indictment were

25  issued outside the scope of professional practice without a

1    legitimate medical purpose, and the expert concluded that,

2    yes, each one of them was issued outside the scope.  We've

3    also got the patient testifying she didn't need those drugs.

4    In addition to other evidence that suggested that it's

5    outside the scope.  There's a lot of it.  So I won't go over

6    it all, Your Honor.

7              Then the counts involving the undercover, I

8    believe that the expert testified as to one of those

9    prescriptions -- no, no, as to one of them that had the

10   undercover actually taken the drugs, that she would have been

11   killed.  I think that's probably sufficient to meet the

12   burden to show that the prescription there was outside the

13   scope.  The expert also opined that each one of those

14   prescriptions was issued outside the scope.

15             The jury saw the consults and there's been

16   testimony from Shirley Pickering, from the Government's

17   expert, and even Mr. Young on the recordings of medical

18   boards seems to acknowledge that these things were the scope

19   of professional practice claiming that he did these things

20   and contrast that with the video of the undercovers that

21   showed, basically, that he did none of them.  So all of that

22   is evidence that supports a conviction on any of those

23   counts.

24             Then the drug involved premises, the Government

25   established through multiple witnesses that Mr. Young owned

1  and maintained that premises, that he was -- that he was

2  paying the rent there.  That Ms. Goslee, I know, testified

3  that he was the owner and the operator.  We even heard him

4  say on the Rock Doc TV that -- you know, sort of saying, hey,

5  this is my place.  I'm the owner, president, et cetera, of

6  PREVENTAGENIX.

7              THE COURT:  All right.  Thank you.

8              Mr. Ferguson, anything further?

9              MR. FERGUSON:  No, Your Honor.  I've made my

10  points.  Thank you.

11              THE COURT:  Okay.  Well, my job in dealing with

12  these motions, I have to determine whether a reasonable jury

13  viewing the evidence in the light most favorable to the

14  Government could find the defendant guilty beyond a

15  reasonable doubt.  I don't make any comments or anything

16  about credibility, and I'm not really weighing the evidence.

17  The real question is in the light most favorable to the

18  Government, are there really jury issues; and my finding is

19  that for all the counts, there are decisions that the jury is

20  going to ultimately have to make.

21              As for the conspiracy, things Mr. Pennebaker

22  makes with regard to Rudin are true.  The testimony came in

23  through the testimony.  I can't remember her name, but she

24  was the office manager that he was, as it turned out in the

25  communications, was said to be the perfect preceptor.  Never

1   showed up, little or no review of the records.  That does

2   support a conclusion of a -- an agreement between two or more

3   people, Rudin and, of course, Mr. Young.  Now, of course, the

4   agreement doesn't have to be formal or written or anything

5   like that, but it does indicate that relationship.

6           Also, Dr. Alperovich -- I'm probably

7   mispronouncing that -- testified that they entered into an

8   agreement, a written agreement, if I'm not mistaken.  I know

9   it wasn't introduced into evidence.  He said early on he

10  didn't think anything would be wrong with it; but y'all

11  correct me if I'm wrong, he reviewed the documents the first

12  time he went there.  He saw that they were inadequate, bad.

13  He should have stopped it at that time, but he did not.

14          So the jury will have to determine when the

15  conspiracy came into being, but there are definitely facts,

16  testimony from witnesses that indicate that there's an

17  agreement to do this.  And, of course, the defendant,

18  Mr. Young, couldn't do this without having the doctors'

19  oversight, even though for some periods of time, he did.  He

20  used the stamp and continued to do it in those times when no

21  doctor was available.  But there are indications in the

22  record -- of course, the jury will ultimately make the

23  decision that there is an agreement between the defendant and

24  at least one other person to commit the crimes.

25          Counts 2 through 7, Rogers being pregnant at the

 1  time, the last witness was unequivocal that the way the --

 2  Ms. Rogers was treated was definitely outside the course of

 3  professional practice.  The testimony about the scripts that

 4  were given to Rogers specifically while she was pregnant, was

 5  outside that scope, and it could lead to criminal

 6  responsibility.

 7          So, again, based upon the evidence and looking at

 8  it in the light most favorable to the Government, there are

 9  issues that the jury is going to ultimately make, and so the

10  motion in that regard is also denied.

11          And, similarly, the undercover officers who

12  testified, we saw the videos, scripts were given to them.

13  Again, the last witness indicated that reviewing all of that,

14  again, the medical treatment and issuance of the

15  prescriptions was outside that course of professional

16  practice, at least for the State of Tennessee.

17          Again, the jury is just going to have to make the

18  final decision.  They viewed all the evidence, as I did,

19  while it was coming in.  And I -- but on all the counts --

20  and I agree with you, Mr. Ferguson, Count 15 rides with the

21  other counts.  And so the jury, in viewing all the evidence

22  in the light most favorable, there are issues that the jury

23  could return verdicts of guilty on.  And so for those

24  reasons, the motion is denied.

25          MR. FERGUSON:  Your Honor, if I may.  I just want

1  to make sure it's clear on the record.  The agreement between

2  my client and Dr. Alperovich that's been mentioned in this

3  trial was the supervision agreement, the legal document

4  detailing that there was a contractual relationship between

5  the doctor to be the preceptor of Mr. Young.

6            THE COURT:  Was that document introduced?  I

7  didn't think it was.  Maybe I'm wrong.

8            MR. FERGUSON:  I don't think it ever got in.

9            THE COURT:  I know there was testimony about it,

10 but I don't think anyone ever introduced it.

11           MR. FERGUSON:  Well, I wasn't expecting it to be

12 brought up in the motion of judgment for acquittal either.

13 That's the agreement was a preceptor agreement.  Clearly,

14 there wasn't a written agreement to distribute Schedule II

15 drugs.

16           THE COURT:  Right.  I didn't think it was an

17 agreement to distribute the drugs, but there was an agreement

18 between the two.  It started, at least, with that document;

19 but I also focus in when the doctor went there that first

20 time, saw the charts, the records.  And I think he said he

21 should have put a stop to it at that time, or at least talked

22 with your client about it but chose not to.  That was the

23 worst decision, of course, he said in his life, and it cost

24 him.  That all, taken together, indicates an agreement to --

25 you know, to issue these scripts as the way they were.

**UNREDACTED TRANSCRIPT**

1              MR. FERGUSON:  I was just -- I didn't want there

2    to be any argument that there was a written agreement to be

3    distributing Schedule II drugs illegally.

4              THE COURT:  No.  No.  But there was testimony

5    about an agreement that they both -- a written agreement that

6    they entered into.

7              MR. FERGUSON:  Yes, Your Honor.

8              THE COURT:  Okay.  I'm assuming, Mr. Ferguson, no

9    change, there will be no proof from the defense?

10             MR. FERGUSON:  That's correct, Your Honor.  I

11   thank you for the time to review it further with my client.

12             THE COURT:  Yeah, we need to put it on the

13   record.

14             MR. FERGUSON:  Do you want him to be on the

15   stand?

16             THE COURT:  Yes, please.  Have him come up, if

17   you would, please.  And before you get there, I need to place

18   you under oath.  So if you would, please, raise your right

19   hand.

20

21

22

23

24

25

1            **JEFFREY W. YOUNG, JR.**,

2  called on behalf of the Defense, having been first duly

3  sworn, testified as follows:

4                   DIRECT EXAMINATION

5  BY MR. FERGUSON:

6    Q.   Would you please state and spell your name for the

7  record.

8    A.   Jeffrey Walter Young, Jr., J-E-F-F-R-E-Y.

9    Q.   Y-O-U-N-G?

10   A.   Y-O-U-N-G.

11   Q.   Mr. Young, how long have I been representing you on

12  this case?

13   A.   Since 2017.

14   Q.   And since this is, I think, a 2019 indictment, that

15  means that I was also representing you in front of the

16  Tennessee Nursing Board on these matters?

17   A.   Correct.

18   Q.   And we've had multiple hearings or multiple

19  negotiations and ongoing litigation with the nursing board.

20  You've been arrested on this case.  We had lengthy bond

21  hearings that lasted over multiple days.  There's thousands,

22  tens of thousands of records.  You've sat through your trial;

23  and at this point, as we've discussed with you, this is where

24  we make a decision whether or not you testify.

25          That decision has to be made by you.  Only you can

 1   make that decision.  No one else can make that decision for

 2   you.  Do you understand all of that?

 3   A.   I understand.

 4   Q.   We've talked about it as of late.  Just a few minutes

 5   ago, we sat with you again and discussed it?

 6   A.   Correct.

 7   Q.   And we answered your questions?

 8   A.   Correct.

 9   Q.   We discussed the evidence?

10   A.   Correct.

11   Q.   We went over the risks and benefits of you testifying?

12   A.   Correct.

13   Q.   Even up to the point at the beginning of trial in voir

14   dire, I spoke to the jury about the possibility of you not

15   testifying?

16   A.   Correct.

17   Q.   Or the possibility of you testifying, correct?

18   A.   Correct.

19   Q.   All right.  You understand if you decide to testify,

20   this Court will instruct the jury to treat your testimony

21   like any other witness?

22   A.   Correct.

23   Q.   You also understand that one of the risks is that the

24   Government gets to cross-examine you and there's -- at times

25   it can be very dangerous opening the door to other facts or

 1  evidence coming in that have not yet been presented as

 2  evidence?

 3     A.   Correct.

 4     Q.   And based on your understanding of the situation and

 5  the facts and evidence, the counsel that Mr. Damas and I have

 6  given you, have you made a decision of whether or not you

 7  wish to testify?

 8     A.   Yes, sir.

 9     Q.   What is your decision?

10     A.   I'm choosing not to testify.

11     Q.   Is that your own decision?

12     A.   Yes, sir.

13     Q.   Freely and voluntarily made?

14     A.   Yes, sir.

15     Q.   No threats or pressure?

16     A.   Not at all.

17     Q.   All right.  What that means is we're going to sit

18  down.  The jury will be brought back in.  The judge will ask

19  me if the defense wishes to put on any proof.  I'll stand up

20  and say we elect not to put on any proof.  Rest our case.

21  And after that, the case is over for all practical purposes.

22     A.   Correct.

23     Q.   Okay.

24             MR. FERGUSON:  That's all I have, Your Honor.

25             THE COURT:  All right.  Thank you.

1              Mr. Young, I just want to focus in on the last

2    thing.  This is your decision that you're making; is that

3    right?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Of course, you've heard all the

6    testimony, and you're probably the most familiar with this

7    whole case than anyone else.  You understand the case from

8    beginning to end, and you've discussed it thoroughly with

9    Mr. Ferguson, both your lawyers, actually?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  I didn't realize that he was with you

12   even before the indictment was returned.

13             THE WITNESS:  Yes, sir.

14             THE COURT:  Both he and you are very familiar

15   with everything that happened in this case?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  Okay.  As I think you know, it can't

18   be his decision.  It can't be a decision where, well, my

19   lawyer told me not to testify, and if I found out X, Y, Z, I

20   would have testified.  That's why I spend so much time with

21   you and Mr. Ferguson spent time with you, that you are fully

22   familiar with everything that happened in this case.  Is that

23   right?

24             THE WITNESS:  Yes, sir.  Thank you, Your Honor.

25             THE COURT:  Okay.  And you've discussed it

**UNREDACTED TRANSCRIPT**

 1  thoroughly.  But whose decision is this?

 2              THE WITNESS:  This is mine.

 3              THE COURT:  Okay.  No threats, no pressure?

 4              THE WITNESS:  Mine and mine alone.

 5              THE COURT:  Okay.  Your own free will?

 6              THE WITNESS:  Yes, sir.

 7              THE COURT:  And you're comfortable with your

 8  decision?

 9              THE WITNESS:  I am.

10              THE COURT:  All right.  Thank you.  You can step

11  down.

12              THE WITNESS:  Thank you.

13              THE COURT:  Thank you.

14       Okay.  I'm going to bring the jury in.  And as

15  you said, I'm going to turn to you and ask if there's any

16  proof.  Of course, you'll rest in front of them.  I'll excuse

17  them for the evening, and then I'd like to talk for a short

18  time on jury instructions.

19              MR. FERGUSON:  Yes, Your Honor.

20              THE COURT:  Okay.  All right.  Bring them in,

21  please.

22                   (Jury in at 4:13 p.m.)

23              THE COURT:  All right.  Folks, I worked through

24  all those issues that I spoke about, and I think when y'all

25  stepped out, the Government had rested its case.  So we're

**UNREDACTED TRANSCRIPT**

1   going to turn to the defense now.

2               Mr. Ferguson?

3               MR. FERGUSON:  Your Honor, and ladies and

4   gentlemen, on behalf of Jeffrey Young, we elect not to put on

5   any proof.  We rest.

6               THE COURT:  All right.  Thank you, Mr. Ferguson.

7               That being said, that means that you've heard all

8   the proof that you're going to hear in the case.  For you,

9   the next step is going to be the closing arguments and then

10  final instructions that I will give you.  But because the

11  defense rests, that means there are more issues that I have

12  to take up with the lawyers, and I have to do that outside of

13  your presence.  I'm not going to make you sit back there in

14  the jury room for another hour, hour and a half while we're

15  in here arguing.  So what I mean is I'm going to go ahead and

16  excuse you for the day.

17              We'll still be here working.  There are several

18  things we need to take care of in order to prepare for

19  tomorrow.  I'd like you back in the jury room and ready to go

20  at 9:30 tomorrow morning.  We're going to get together at

21  nine o'clock to deal with any final issues, but at 9:30 is

22  when we'll pick this up.  And as I said, it will be the

23  closing arguments and statements of the lawyers.  Okay.

24              All right.  Yes, sir?

25              JUROR:  Closing arguments, that's when you're

**UNREDACTED TRANSCRIPT**

 1    going to give us, like, the instructions as far as --

 2              THE COURT:  Yes.  The way it will work is they

 3    will give their arguments, and then after all that is done,

 4    I'll give you the written instructions that will apply to

 5    this case.  One of the things we'll be dealing with is I'll

 6    be going over the instructions with the lawyers.  They know

 7    what I'm going to instruct.  Okay.  And sometimes they

 8    even -- because they know it and have a copy of the

 9    instructions, sometimes they use the language that I am going

10    to give to you as part of their arguments.  So that's one of

11    the things we'll be dealing with this evening and sometime

12    tomorrow morning.

13              But when you come back, it will be the arguments,

14    and then it's another time when I have to read those

15    instructions to you.  You'll have those in the back when you

16    deliberate.  Okay.

17              All right.  Leave your notebooks in the chair

18    again.  Remember the rules this evening.  Don't discuss;

19    local news, you know, things like that; no independent

20    investigations.  And I'll see y'all at 9:30 tomorrow.

21                   (Jury out at 4:15 p.m.)

22              THE COURT:  In just a moment we'll take a recess.

23    I've kind of been tinkering with the instructions as the

24    trial has proceeded.  I know I get a little antsy about how

25    long it takes to put on witnesses, but we finished the proof

**UNREDACTED TRANSCRIPT**

1   a lot faster than I thought we would.  I guess I'll put it

2   like that.  So you see a smiling judge up here.  But I'll

3   check and see.  Like I say, my clerk has been working on the

4   instructions.  What I normally do is have a hard copy for

5   each of the lawyers, give you an opportunity to read them.

6              Inquiry, y'all discussed the instructions before,

7   or have you?  I don't know.

8              MS. PAYERLE:  Did we discuss them back in

9   October?  I don't remember.  I don't know that we have in

10  this setting yet.

11             THE COURT:  Okay.

12             MR. FERGUSON:  If we did, I don't remember it.

13             THE COURT:  All right.  Well, I used -- I think

14  yours was shorter.  You were more interested in intent.

15             MR. FERGUSON:  Yes, I had only submitted

16  something in regards to the good-faith defense and the

17  ruling, instruction --

18             THE COURT:  Right.  You'll see all that in there.

19  I used -- as far as elements of the offense, I used a lot of

20  that from the Government's submission but we'll see.  I want

21  y'all to take a look at the adequacy.  Of course, both sides

22  have an opportunity to discuss with me, you know, deletions,

23  additions, anything like that.  So, hopefully, I have a hard

24  copy for you, hopefully, in about 15 minutes or so.

25             MR. FERGUSON:  Yes, sir.

**UNREDACTED TRANSCRIPT**

1           THE COURT:  All right.  We'll be in recess.

2       (A recess was taken from 4:17 p.m. to 5:35 p.m.)

3           THE COURT:  Okay.  I think one of my folks

4  brought out a draft of the instructions for everyone to

5  review.  So why don't we just go ahead and get to it.  I'll

6  ask both sides if they have a request for, you know,

7  admissions, deletions, things like that.

8           We'll start with the Government.

9           MR. PENNEBAKER:  Your Honor, just a few things.

10           THE COURT:  Sure.

11           MR. PENNEBAKER:  And if it's okay, I'll just go

12  page by page with it.

13           THE COURT:  That works.

14           MR. PENNEBAKER:  This is a -- for page 8,

15  testimony of an accomplice.

16           THE COURT:  Okay.

17           MR. PENNEBAKER:  I've got the language tinkered

18  with, if the Court wants my edits, or I can just convey to

19  the Court that we think that Kristie Gutgsell ought to be in

20  there as well as Dr. Alperovich in the accomplice

21  instruction, just because the -- all the stuff about entering

22  into a cooperation agreement with the Government and enter

23  pleas to lesser charges.

24           THE COURT:  Did she testify to all of that?

25           MR. PENNEBAKER:  Yes, Your Honor.

**UNREDACTED TRANSCRIPT**

104

1           THE COURT:  A cooperation agreement and all?

2           MR. PENNEBAKER:  Yes, Your Honor.

3           MS. PAYERLE:  It was in the middle of her

4  testimony, but she did.

5           THE COURT:  And her guilty plea, I'm assuming,

6  was related to this?

7           MR. PENNEBAKER:  Yes, Your Honor.

8           THE COURT:  It must have been state charges; is

9  that right?

10           MR. PENNEBAKER:  No.  It was actually she pled to

11  an information in Judge Breen's --

12           THE COURT:  It was Judge Breen who handled it

13  before.

14           MR. PENNEBAKER:  Yes.

15           MS. PAYERLE:  She pled guilty to aiding and

16  abetting Mr. Young's distributions to, I believe, two

17  specific patients that she testified about in this case.

18           THE COURT:  Her testimony, it was brief, but I

19  didn't know all that.

20           MS. PAYERLE:  Kristie Gutgsell.  She was the long

21  witness on the first day, the second witness in the case.

22           THE COURT:  I remember her.

23           MS. PAYERLE:  Oh, you do?  Sorry.

24           THE COURT:  But I was unaware that she pled

25  guilty to an information in federal court.  Yeah, we'll

**UNREDACTED TRANSCRIPT**

1   include her in the accomplice, and I'll adjust the language

2   accordingly.

3               MR. PENNEBAKER:  Sounds good, Judge.  Thank you.

4               THE COURT:  Hold on just a second.  Okay.  Go

5   ahead.

6               MR. PENNEBAKER:  On page 10, Your Honor, there is

7   an instruction for statement by defendant.

8               THE COURT:  Yes.

9               MR. PENNEBAKER:  The -- I believe that the

10  statement by the defendant rule about not being able to

11  convict solely upon an uncorroborated statement or admission

12  really goes toward confessions, and I have spoke with defense

13  counsel about this.  We both think that it would be fair to

14  say that the nursing board interview -- and I think that's

15  really what this instruction is getting at is the statement

16  made during the nursing board interview.  That does cross the

17  line into a Crawford statement.  The Government would agree

18  with that.  But the -- some of the surreptitious recordings

19  like the undercover video, some of the text messages that

20  really aren't testimonial, we would say would not fall

21  within --

22              THE COURT:  I didn't think they would.  Are you

23  asking me to just take this out?

24              MR. PENNEBAKER:  Your Honor, we're just asking

25  that we maybe add after the defendant made statements in that

**UNREDACTED TRANSCRIPT**

1  first line, so you heard evidence that the defendant made

2  statements.  I would -- we would suggest adding to the

3  nursing board during interviews conducted by that agency.

4           And then --

5           THE COURT:  Nursing board . . .

6           MR. PENNEBAKER:  -- during interviews conducted

7  by that agency.

8           THE COURT:  Okay.

9           MR. PENNEBAKER:  And then the last -- the second

10 paragraph, last sentence, it ends, statement or admission.

11 And we would suggest:  Adding to the nursing board.

12          THE COURT:  That last sentence, is that what

13 you're talking about?

14          MR. PENNEBAKER:  Yes, Your Honor:  You may not

15 convict the defendant solely upon his own uncorroborated

16 statement or admission to the nursing board.

17          THE COURT:  Okay.  All right.  Go ahead.

18          MR. PENNEBAKER:  I'll go out on a limb, Judge,

19 and say that, just for --

20          THE COURT:  Excuse me, before I do that, I should

21 ask:  Mr. Ferguson, are you in agreement to that?

22          MR. FERGUSON:  I am.

23          THE COURT:  Okay, I interrupted you.  Go ahead.

24          MR. PENNEBAKER:  Just for the sake of expediency,

25 I don't believe that identification is contested, and so we

**UNREDACTED TRANSCRIPT**

1    would just have that --

2              THE COURT:  I always put identification.

3              MR. PENNEBAKER:  That's all I needed to hear,

4    Judge.

5              THE COURT:  Okay.

6              MR. PENNEBAKER:  Understood.

7              And then on page 18, Your Honor --

8              THE COURT:  Okay.

9              MR. PENNEBAKER:  -- about four lines from the

10   bottom, it starts:  Field in which . . .

11             THE COURT:  Okay.

12             MR. PENNEBAKER:  We would suggest -- the

13   Government would suggest adding:  State and field, like

14   capital S State.

15             THE COURT:  Instead of field, put in the state?

16             MR. PENNEBAKER:  We would suggest just adding the

17   State of Tennessee and the field in which . . .

18             THE COURT:  Okay.  Standards in the State of

19   Tennessee?

20             MR. PENNEBAKER:  Yes, Your Honor.

21             THE COURT:  The world "field," leave it in there?

22             MR. PENNEBAKER:  And field -- the State of

23   Tennessee and field in which, because it's the, you know,

24   family practice.

25             THE COURT:  Okay.

**UNREDACTED TRANSCRIPT**

1          MR. PENNEBAKER:  And then a similar edit of 19,

2     Your Honor.

3          THE COURT:  Okay.

4          MR. PENNEBAKER:  Usual course of professional

5     practice instruction.

6          THE COURT:  Okay.

7          MR. PENNEBAKER:  After -- on the fifth line down,

8     after substances --

9          THE COURT:  Okay.

10          MR. PENNEBAKER:  Just to add:  In the State of

11     Tennessee.

12          THE COURT:  Substances in the State of Tennessee?

13          MR. PENNEBAKER:  Yes, Your Honor.

14          THE COURT:  Describing controlled substances.

15          Okay.  Go ahead.

16          MR. PENNEBAKER:  On page 20, under the good-faith

17     instruction.

18          THE COURT:  Okay.

19          MR. PENNEBAKER:  About halfway through, there's

20     the word "recognize" on the left-hand side of the page.

21          THE COURT:  I see it.

22          MR. PENNEBAKER:  And accepted in the -- and then

23     instead of country, the State of Tennessee.

24          THE COURT:  Okay.  No problem.

25          MR. PENNEBAKER:  And then three lines down on the

**UNREDACTED TRANSCRIPT**

1   far left, there's another instance of country.

2          THE COURT:  You know, in one of my drafts, I took

3   that out.

4          MR. PENNEBAKER:  We understand.  This is the

5   story of our life, Your Honor.  It's something in the water.

6          THE COURT:  Yeah, I worked last night and did all

7   this and deleted it, and I think that was one of the

8   things -- anyway, go ahead.

9          MR. PENNEBAKER:  There is -- this is

10  inconsequential utterly, but at the end of that instruction,

11  there's an errant quotation, last line right before

12  deliberate ignorance, unauthorized manner, end quote.

13  There's no open.

14         THE COURT:  Oh, yeah, there's no open quote.

15  We'll just strike out that quote mark there.

16         MR. PENNEBAKER:  Yes, Your Honor.

17         THE COURT:  That's a gremlin.

18         MR. PENNEBAKER:  This one, I think is important.

19  On page 22 . . .

20         THE COURT:  Go ahead.

21         MR. PENNEBAKER:  We have at the top, the third

22  element has that the defendant knowingly and intentionally

23  distributed outside the scope.  But then on Count 8 to 14,

24  the third element does not contain knowingly and

25  intentionally, and we believe that it should.

**UNREDACTED TRANSCRIPT**

1          THE COURT:  Oh, okay.  Yes, it should.  That's on

2     oversight.  So at the bottom of page 22 at No. 3, that the

3     defendant knowingly and intentionally distributed.

4          MR. PENNEBAKER:  Yes, Your Honor.

5          THE COURT:  Go ahead.

6          MR. PENNEBAKER:  And then, Judge, on page 26.

7          THE COURT:  All right.

8          MR. PENNEBAKER:  We're at the verdict form.

9          THE COURT:  Okay.

10          MR. PENNEBAKER:  The substantive Counts 2 through

11     14 are charged in the indictment as on or about counts.  And

12     we would ask that --

13          THE COURT:  "For about" be added?

14          MR. PENNEBAKER:  "For about" be added to those.

15          THE COURT:  Okay.

16          MR. PENNEBAKER:  The only other thing, and it's

17     on page 26, is that I believe there is an extra one before

18     the five in March 15.  It's charged in the indictment as

19     March 5.

20          THE COURT:  That should be March 5 rather than

21     15?

22          MR. PENNEBAKER:  Yes, Your Honor.

23          THE COURT:  Okay.  And that's in Count 2.  Okay.

24          MR. PENNEBAKER:  And that's all we have.

25          THE COURT:  All right.  Thank you.

**UNREDACTED TRANSCRIPT**

1        MR. PENNEBAKER:  Thank you.

2        THE COURT:  Mr. Ferguson?

3        MR. FERGUSON:  Your Honor, at the bottom of 20.

4        THE COURT:  Hold on just a second.

5        MR. FERGUSON:  The good-faith instruction.

6        THE COURT:  Yes.  Just a second.  Okay.  Go

7   ahead.

8        MR. FERGUSON:  Right after the quotation mark

9   that shouldn't be there, we would ask that the Court add:

10  Negligent or recklessness is not sufficient to convict.

11  However, I do -- generally would say that on page 17, the

12  definition of knowing, willfully and intentionally is defined

13  and means voluntarily and not because of mistake and

14  accident.  Of course, mistake and accident are reckless and

15  negligent.  So it is defined basically on page 17.  I just

16  ask that that be added to make it more clear in the

17  good-faith instruction.

18       THE COURT:  Do y'all have any problem with that?

19       MR. PENNEBAKER:  Judge, if we didn't have a

20  deliberate ignorance instruction in there, we might be a

21  little testy about reckless, but given that we do, no

22  objection.

23       THE COURT:  Okay.  Just give me the language one

24  more time so I make sure we get it.

25       MR. FERGUSON:  Right where that parentheses is,

**UNREDACTED TRANSCRIPT**

1  negligent or recklessness is not sufficient to convict or

2  however -- I guess, would be -- it wouldn't be however.  Just

3  negligence and recklessness is not sufficient to convict.

4              THE COURT:  And that will go right after the

5  unauthorized manner.

6              MR. FERGUSON:  Yes, please.

7              THE COURT:  Okay.  Okay.  I'll make that

8  addition.

9              MR. FERGUSON:  Thank you, Judge.

10             MR. PENNEBAKER:  If we -- just talking with my

11 cocounsel, if we could have this evening and -- just to

12 reserve maybe a little bit of additional argument.  We would

13 like to look at the case law on recklessness just to make

14 sure that we're not doing something by agreeing to --

15             THE COURT:  That's why I'm bringing y'all back

16 tomorrow morning before the jury.

17             MR. PENNEBAKER:  Thank you, Judge.

18             THE COURT:  That's what always happens overnight.

19 You don't have anything else to do, so you start looking at

20 the instructions.  You know, y'all be here at nine, jurors at

21 9:30.  Okay?

22             MR. PENNEBAKER:  Thank you, Your Honor.

23             MR. FERGUSON:  Nine o'clock?

24             THE COURT:  Yeah, y'all will be here at nine, and

25 the jurors will be here at 9:30.

**UNREDACTED TRANSCRIPT**

1          MR. FERGUSON:  Okay.

2          THE COURT:  Anything else, Mr. Ferguson?

3          MR. FERGUSON:  No, Your Honor.  Thank you.

4          THE COURT:  Okay.

5          MR. PENNEBAKER:  No.

6          THE COURT:  All right.  Well, I think we're done

7    for the evening.  I'll make these changes.  We'll have final

8    discussion tomorrow morning before we begin the arguments.

9    Unless there's anything else?  Okay.  Let's go ahead and

10   adjourn for the evening.

11          (Adjournment.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

114

1                  **C E R T I F I C A T E**

2

3

4          I, TINA DuBOSE GIBSON, do hereby certify that the

5     foregoing 113 pages are, to the best of my knowledge, skill

6     and abilities, a true and accurate transcript from my

7     stenotype notes of the trial hearing held on the 30th day of

8     March, 2023, in the matter of:

9

10    UNITED STATES OF AMERICA

11    vs.

12    JEFFREY W. YOUNG, JR.

13

14    Dated this 31st day of March, 2023.

15

16

17

18                        S/Tina DuBose Gibson

19                        _____
                          TINA DuBOSE GIBSON, RPR
20                        Official Court Reporter
                          United States District Court
                          Western District of Tennessee

21

22

23

24

25