```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
 2                      WESTERN DIVISION
   _____
 3                                  )
   UNITED STATES OF AMERICA,        )
 4                                  )
          Plaintiff,                )
 5                                  )
   VS.                              ) NO. 1:19-cr-10040-JTF-1
 6                                  )
                                    )
 7  JEFFREY W. YOUNG, JR,           )
                                    )
 8          Defendant.              )
   _____
 9
```

```
10
11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
11                          BEFORE THE
12
                  HONORABLE JOHN T. FOWLKES, JR.
13
                        March 31, 2023
14
15
16
17
                        MORNING SESSION
18
19
20
21
22
23
                      LASHAWN MARSHALL, RPR
24                    OFFICIAL COURT REPORTER
                  167 N. MAIN STREET - SUITE 242
25                 MEMPHIS, TENNESSEE  38103
```

*UNREDACTED TRANSCRIPT*

1                  **A P P E A R A N C E S**

2

3    **FOR THE PLAINTIFF:**

4                    MS. KATHERINE PAYERLE
                     MR. ANDREW PENNEBAKER
5                    Assistant United States Attorneys
                     UNITED STATES DEPARTMENT OF JUSTICE
6                    FRAUD SECTION
                     1400 New York Avenue, NW
7                    Washington, DC  20530

8

9    **FOR THE DEFENDANT:**

10                   MR. CLAIBORNE H. FERGUSON
                     MR. RAMON DAMAS
11                   Attorneys at Law
                     CLAIBORNE FERGUSON LAW FIRM, P.A.
12                   294 Washington Avenue
                     Memphis, Tennessee  38103
13

14

15

16

17

18

19

20

21

22

23

24

25

*UNREDACTED TRANSCRIPT*

```
 1                          FRIDAY
 2                      MARCH 31, 2023
 3
 4              ************************
 5
 6          THE COURT:  Okay.  Good morning, everyone.
 7          MR. PENNEBAKER:  Good morning.  Your Honor.
 8          THE COURT:  I think everyone's got a copy of the
 9   latest version of the closing instructions.  Hope y'all
10   have made all the changes that we discussed yesterday,
11   and my understanding is there are a few more edits that
12   we have to do.
13          So Mr. Pennebaker, I'm assuming you'll let me
14   know.
15          MR. PENNEBAKER:  Yes, Your Honor.  Starting on
16   Page 16.
17          THE COURT:  All right.  Go ahead.
18          MR. PENNEBAKER.  In one and two -- and this is a
19   minor point.  It's -- the text says a practitioner acting
20   within the normal course.  We suggest changing it to
21   usual only because the term is later defined as the usual
22   course.
23          THE COURT:  All right.  Go ahead.
24          MR. PENNEBAKER:  In addition, Judge, the second
25   element, the defendant -- that the defendant, knowing
```

*UNREDACTED TRANSCRIPT*

1   that such prescriptions would not be, as opposed to were

2   not.

3           THE COURT:  Okay.  Got that one.

4           MR. PENNEBAKER:  And moving on.  The -- on

5   Page 18, Your Honor, there's an instruction that

6   hydrocodone, oxycodone, and fentanyl are controlled

7   substances.

8           THE COURT:  Uh-huh.

9           MR. PENNEBAKER:  The indictment charges

10  specifically those drugs, but the antecedent qualifier is

11  including Adderall, which we've heard a lot in this trial

12  as a Schedule II controlled substance as well, and so we

13  would ask that it be included in the definition of

14  controlled substances.

15          THE COURT:  Any objection to that, Mr. Ferguson?

16          MR. FERGUSON:  Is that in the indictment?

17          MR. PENNEBAKER:  The word is not specifically

18  used, but it's conspiracy to distribute Schedule II

19  controlled substances, including -- it lists the opioids,

20  but it doesn't list Adderall in the manner and means.  It

21  talks all about, you know, distributing other controlled

22  drugs like Adderall and carisoprodol and alprazolam,

23  et cetera.

24          MR. FERGUSON:  If I may just have a moment to

25  look at the indictment real quick and see, find the

 1   language.

 2              **THE COURT:**  Sure.

 3              **MR. PENNEBAKER:**  Yeah.  And Adderall is also

 4   dextroamphetamine.

 5              **MR. FERGUSON:**  Count 1 says mixtures and

 6   substances contained as a detectable amount of Schedule

 7   II controlled substance, including hydrocodone,

 8   oxycodone, and fentanyl.

 9              I'm going to object, but I understand their

10   point on it's -- it's the clause that follows Schedule

11   II, but I'd ask the Court to only instruct on the

12   specifics that are included in the indictment.

13              **THE COURT:**  Is that included in the manner and

14   means, or is that the actual count?

15              **MR. FERGUSON:**  I'm reading the actual count.  It

16   says Count 1.  It's Paragraph 19:  From in and about July

17   2014, intentionally combined -- conspired to knowingly,

18   intentionally, unlawfully distribute, dispense Schedule

19   II controlled substances, including.

20              So it's Schedule II controlled substances comma

21   including, and they list the three, but it's actually --

22   that is language in Count 1.

23              **THE COURT:**  Would you be asking that Adderall be

24   added at all the other locations in the instructions?

25              **MR. PENNEBAKER:**  It would just be the first

```
 1    count, Your Honor, because of the conspiracy.

 2         THE COURT:  I'm not going to include it.  We're

 3    going to go with the specifics that are in there.  It's

 4    going to be hydrocodone, oxycodone, and fentanyl.

 5         MR. PENNEBAKER:  Thank you, Your Honor.

 6         THE COURT:  Sure.

 7         MR. PENNEBAKER:  So moving on to Page 20, the

 8    good faith instruction.

 9         THE COURT:  Go ahead.

10         THE COURT REPORTER:  I'm sorry?

11         THE COURT:  Good faith instruction on Page 20.

12         MR. PENNEBAKER:  After doing some further

13    research on this issue, the government would ask that

14    recklessness be removed for a couple of reasons:  One is

15    that the deliberate ignorance instruction includes a

16    sentence at the end that is carelessness, negligence, or

17    foolishness on the defendant's part is not the same as

18    knowledge and would not be enough to convict, which

19    covers the terrain that this addition covers.

20         In addition, the recklessness is often defined

21    as a conscious disregard of a high probability of the

22    actus reus occurring.  And so that's exactly what

23    deliberate ignorance is.  And deliberate ignorance is

24    specifically identified as a -- as an appropriate means

25    upon which to convict.  So we would be fine with
```

1  including that sentence about carelessness, negligence,

2  and reckless -- carelessness, negligence, and foolishness

3  are not sufficient to convict twice:  once in the good

4  faith instruction and once in the deliberate ignorance

5  instruction, just so --

6          **THE COURT:**  Okay.  Mr. Ferguson?

7          **MR. FERGUSON:**  Well, I'm thinking in terms of

8  the specific mens rea that we have in our criminal code,

9  and so we're looking at what it takes under the Ruan

10  decision.  It's got to be intentional or knowing, which

11  takes out the other two elements that are typical in a

12  criminal case, which is recklessness and negligence.

13          I think that the sentence that you have in there

14  is correct, and I think it should remain in there.  I

15  think that there's a difference between recklessness and

16  deliberate indifference.  There's -- the deliberate

17  indifference is turning a blind eye.  It's not

18  necessarily the same as the mens rea of intentional,

19  knowing, reckless, and negligence, so I'd ask that it

20  remain in there, especially in light of the fact that the

21  second sentence that the government talks about,

22  carelessness, negligence, and foolishness, there's -- it

23  doesn't seem to be the argument that it's incorrect, just

24  that they seem to suggest it's already been said once.

25  Why say it twice?

1          I think it's appropriate where it is, and when

2     it's spoken to the jury, to fully evaluate -- put them on

3     notice as to what their burden of proof is.

4          **THE COURT:**  But their argument is with regard to

5     recklessness at -- in essence, is a reckless disregard,

6     and so recklessness could -- say that again,

7     Mr. Pennebaker.

8          **MR. PENNEBAKER:**  Yes, Your Honor.  The

9     recklessness is often defined as a conscious disregard of

10    a high probability that an act is going to result in the

11    criminal form of the behavior.  And actually, post Ruan,

12    we -- the Department of Justice has taken the position,

13    for a number of reasons, that deliberate ignorance does

14    survive the Ruan decision.  There's nothing in Ruan that

15    addresses, on point, that deliberate ignorance can't

16    satisfy the mens rea requirement post Ruan.

17         Ruan really is a, you know, subjective intent

18    versus "objective act, reasonable person" distinction.

19    And so a -- recklessness involves that subjective

20    disregard; Ruan does not touch that.

21         And as far as I'm aware, there's no case

22    anywhere that -- and defense hasn't cited one that says

23    that recklessness is no longer sufficient, I mean, at

24    least in the -- in the iteration of recklessness that is

25    deliberate ignorance.  But that's -- that doesn't survive

*UNREDACTED TRANSCRIPT*

1    Ruan.  I haven't seen that in a case, Judge, and I don't

2    know that defense has cited one.

3            **THE COURT:**  Yes, sir?

4            **MR. FERGUSON:**  It's an interesting argument, and

5    it highlights the fact that if the government is going to

6    say that recklessness -- that the sentence negligence and

7    recklessness are not sufficient to convict, then I need

8    to object, then, to the deliberate indifference

9    instruction, because if they're -- if they're saying that

10   they believe recklessness is what Ruan said -- and the

11   Supreme Court spoke very clearly, that it's intentional

12   or knowing, meaning they excluded all other mens rea.

13   And if they're saying recklessness is the same thing as

14   deliberate indifference, I'm -- right now I'm objecting

15   to the jury instruction, deliberate indifference, which

16   if they're arguing that's recklessness, then that's not

17   the right jury instruction for this case.  Supreme Court

18   said recklessness and negligence are not sufficient, and

19   if they're not sufficient, they should not be instructed

20   to this jury.  So --

21           **THE COURT:**  You said the Supreme Court basically

22   ruled that recklessness was insufficient?

23           **MR. FERGUSON:**  If they say the -- that the mens

24   rea for this case, when it comes to licensed

25   professionals, is knowing or intentional -- by that

1    statement, that that's the element, that's the mens rea

2    element -- then they've excluded all other mens rea

3    elements, which negligence and recklessness are out.  If

4    the government's position is recklessness and deliberate

5    indifference are the same thing, then I'm only left with

6    the -- only thing I can do is object to the jury

7    instruction of deliberate indifference.

8             **THE COURT:**  I understand.

9             How do you respond to that, Mr. Pennebaker, that

10   basically it is a knowing and intentional crime; doesn't

11   go further to deal with recklessness?  And understand

12   what you're saying about recklessness is defined many

13   times as.

14            **MR. PENNEBAKER:**  Right.  So just a basic fact of

15   criminal law, that deliberate ignorance is -- does meet

16   the knowing and intentional mens rea requirement of just

17   about every crime.  I mean, I think that's what -- that

18   wasn't even -- whether or not deliberate ignorance --

19   because deliberate ignorance is a conscious disregard.

20   It -- literally, it goes inside of the mind of the

21   defendant.

22            **THE COURT:**  I don't have any problem with

23   deliberate ignorance and why it's in there, and I think

24   it's appropriate to leave it in there, but would it

25   extend to reckless behavior?

*UNREDACTED TRANSCRIPT*

1          **MR. PENNEBAKER:**  Well -- and Your Honor, I think

2    there's a strong argument for just keeping the words as

3    they are, without this addition, because there's not

4    really any confusion about whether or not -- I mean, the

5    jury doesn't know the legal term "recklessness."  They do

6    know "foolishness"; they do know "carelessness"; they do

7    know "negligence."

8          **THE COURT:**  But that's not the issue, either,

9    because I could give them a definition for recklessness.

10         **MR. PENNEBAKER:**  Your Honor, I just -- I think

11   that this -- this is -- this is more confusing than

12   helpful, and I don't think that adding an additional --

13         **THE COURT:**  Confusing to the jurors or to me?

14         **MR. PENNEBAKER:**  I mean, confusing to everyone,

15   because the -- there's a -- so that the -- the way that

16   the instructions are laid out now, deliberate ignorance

17   specifically excludes negligence, carelessness,

18   foolishness as a -- as a satisfactory basis, when -- when

19   the jury considers whether deliberate ignorance is -- can

20   be a substitute on the facts of this case.

21         Everywhere else in the jury charge it says, in

22   order to convict the defendant, you must find that the

23   defendant knowingly and intentionally.  Right?  So

24   that's -- it's not unclear as to what the mens rea is.

25   It's just that there's a carve-out for deliberate

1   ignorance, just like there is a carve-out for good faith.

2   And those -- I mean, those -- both of those instructions

3   thoroughly define and thoroughly go into -- they're just

4   not -- it doesn't -- the negligence and recklessness

5   language that the defendant proposes is not additive to

6   what's already a very clear jury instruction.

7        **THE COURT:**  One last time, Mr. Ferguson, and

8   I'll go ahead and rule on it.  I think I know what I'm

9   going to do with this.

10        **MR. FERGUSON:**  I've --

11        **THE COURT:**  No.

12        **MR. FERGUSON:**  Sorry.

13        **THE COURT:**  What I need to hear from you about

14   is allegedly what they're saying.  The way the drugs were

15   distributed, it is almost in a reckless manner.  Do you

16   understand what I'm saying?

17        **MR. FERGUSON:**  Yes, sir.

18        **THE COURT:**  So why should recklessness be

19   included in good faith, in the good faith instruction?

20        **MR. FERGUSON:**  Because reckless is a mens rea

21   that the Supreme Court specifically found is not

22   adequate.  The Supreme Court was very -- I mean, it's

23   absolutely crystal clear.  They weren't clear about a lot

24   of things, but they're crystal clear about what the

25   intent element is:  knowing or intentional, which

 1    excludes any other mens rea.

 2          If we don't -- if we don't have a jury

 3    instruction that puts the jury on notice that those other

 4    men reas have been exclude, then they're not getting a

 5    full and fair jury instruction as to what the law is now

 6    after Ruan.

 7          **MR. PENNEBAKER:**   Your Honor, very, very briefly.

 8    I would like to see where the Ruan decision says the word

 9    "reckless" anywhere.  I don't think it's in there.  It

10    just is not in there, and it's -- because -- and if it

11    were in there, that would undercut all of the deliberate

12    ignorance instructions across the United States of

13    America because deliberate ignorance is a -- in the Venn

14    diagram, deliberate ignorance falls wholly inside of

15    reckless.  So that -- I mean, there's just not a blunt

16    instrument like that that says reckless is not sufficient

17    for this crime.

18          It's -- there's a -- when there is a conscious

19    disregard -- when the defendant understands the risk that

20    he might be prescribing to an addict and does it anyway,

21    right, that is -- and that is -- he doesn't want the

22    result.  He doesn't want that to be an addict.  He

23    doesn't -- you know, he's not wanting to harm the patient

24    specifically, like a "knowing and intentional" type of

25    harm would be, but he is aware of the high likelihood

1   that this is an addict and this is an outside-the-scope

2   prescription.  He says, I don't care; I'm doing it

3   anyway.

4           That's absolutely a crime.  That's reckless.

5       **MR. FERGUSON:**  And that's not knowing and

6   intentional.  And that's what this is; it's a knowing and

7   intentional crime.

8       **THE COURT:**  But I think it is knowing and

9   intentional.  When you disregard everything that you know

10  as far as a medical practice is concerned and you go

11  ahead and prescribe these dangerous drugs, I think that

12  is knowing and intentional.

13      **MR. FERGUSON:**  But you're going in the wrong

14  direction.  We know that knowing and intentional also

15  includes reckless.  Reckless doesn't include knowing and

16  intentional.  So the fact that it's not knowing and

17  intentional, that contains all the other lower mens reas,

18  but it doesn't work the opposite direction.  Government's

19  getting an opposite-direction instruction, which is

20  inappropriate.

21      **THE COURT:**  I'm going to take a few minutes.

22  And Mr. Ferguson, I'm going to give you an opportunity to

23  find --

24      **MR. FERGUSON:**  Oh, I didn't bring --

25      **THE COURT:**  I'm sorry?

1      **MR. FERGUSON:**  I didn't bring my computer; I'm

2    so sorry.  I can try it on my phone, but Ruan is so new,

3    that there's --

4      **THE COURT:**  I know that.

5      **MR. FERGUSON:**  -- there's really -- there's no

6    real help for Your Honor.  You'd have to look at the law

7    and apply -- what, basically, the Supreme Court has

8    placed before this court is -- at this point, it's

9    knowing and intentional.

10      **THE COURT:**  Knowing and intentional is fully

11   developed throughout the other instructions that I'm

12   going to give.  You've indicated before that basically

13   Ruan eliminates this recklessness; that's what I'm

14   concerned with.  If there is language that can be

15   construed in -- from Ruan to eliminate recklessness as a

16   consideration, that's what I was going to give you an

17   opportunity to do.

18      **MR. FERGUSON:**  It's so new that we're cutting

19   new ground here.  And I think that's why we have to --

20   have to really look at the Supreme Court and take into

21   consideration what it specifically said, and what it

22   specifically said excludes recklessness and negligence by

23   the very fact that they were very specific about what the

24   mens rea was and it excluded.

25            And I know the government's saying, well, they

```
 1    didn't say that.  Well, they did say that.  When you say

 2    it's intentional, you are saying it's not reckless and

 3    negligence.  It's -- because they -- they -- the whole

 4    case is raising the standard of the mens rea, not

 5    lowering the mens rea.

 6          MR. PENNEBAKER:  Your Honor, if I may -- if I

 7    may just respond to that very briefly.  Looking at the

 8    good faith instruction that the defendant proposed that

 9    is -- the government has said, hey, that's fine if we

10    want to do that.  There's -- this isn't a pattern

11    instruction or anything, but this -- I just want to read

12    from this instruction where this is already covered,

13    which is good faith is not merely a practitioner's

14    sincere intention towards the people who come to see him,

15    but, rather, it involves his sincerity in attempting to

16    conduct himself in accordance with the standard of

17    medical practice generally recognized and accepted in the

18    state of Tennessee, an honest effort to prescribe

19    substances for a patient's condition in accordance with

20    the standard medical practice.

21          So that is -- that addresses the subjective

22    intent of the defendant.  It's saying -- and that really

23    is -- it's a -- it's not -- it doesn't go all the way to

24    just knowing and intentionally:  I know and intend to

25    issue outside the scope.
```

1    It's that there's a sincere effort being made.

2  In other words, the defendant is not being reckless in

3  prescribing these drugs.  And, again, the government's

4  not asking for an instruction that recklessness is

5  sufficient, because that's what deliberate ignorance --

6  deliberate ignorance carves out.  If you're not going to

7  find knowing and intentional, there is one means in which

8  you can find this substitute mens rea, and that is this

9  conscious disregard of a high likelihood that the result

10  of your conduct will be the thing that we don't want.

11    But to, then, just throw this blanket

12  "recklessness" term in there when -- if we instruct that

13  recklessness is not sufficient and then the very next

14  instruction is a form of recklessness, I mean, you're

15  basically say you can't conclude based on recklessness,

16  but then the next instruction says, but you don't have to

17  find knowing and intentional if you find he was reckless

18  in this way.

19    I mean, it's just -- it's incredibly confusing,

20  and it's -- I mean, it really -- when the defendant is

21  asking for a whole cloth instruction that is antithetical

22  to anything on the books right now that any of us can

23  point to and there's only this argument about Ruan going

24  down this knowing and intentional path that doesn't

25  address deliberate ignorance, it just -- why not stick

1   with what we know works instead of confusing the issue

2   for the jury and for, frankly, all of us?  I mean, I

3   don't -- I don't understand how those two, the good faith

4   and the deliberate ignorance instruction, would cohere if

5   we blanketed recklessness like that.

6           **THE COURT:**  I understand.

7           Yes, sir?

8           **MR. FERGUSON:**  Sticking to what we've always

9   done is what got us in front of the Supreme Court with

10  Ruan in the first place.  The Supreme Court heard the

11  case that used to be subjective good -- subjective

12  intent.  Now it's objective, and it's intentional and

13  knowing.  I mean, it's as simple as that.  And it needs

14  to be in there, and the deliberate indifference needs to

15  come out.

16          **MR. PENNEBAKER:**  To resolve the circuit split on

17  that issue that doesn't exist here.

18          **THE COURT:**  I'm going to grant the government's

19  request with regard to recklessness.  I understand the

20  Court of Appeals.  Assuming there are convictions, the

21  Court of Appeals will have an opportunity to take a look

22  at this in several months.

23          We do have negligence included, Mr. Ferguson.

24          **MR. FERGUSON:**  Okay.

25          **THE COURT:**  I don't know if you want

1    carelessness and foolishness added there.

2           **MR. FERGUSON:**  Let me . . .

3           **THE COURT:**  Similar to what's in the deliberate

4    ignorance.

5           **MR. FERGUSON:**  If you would, Your Honor, please.

6           **THE COURT:**  All right.  I'll go ahead and add

7    those in there.

8           And of course, I believe you are now objecting

9    to the deliberate ignorance instruction; is that correct?

10          **MR. FERGUSON:**  I made the objection, yes, and

11   I'm still -- I'm maintaining that objection, using the

12   same argument.

13          **THE COURT:**  Okay.  I understand.  Same.

14          But I will add, and it'll read negligence,

15   carelessness, or foolishness are not sufficient to

16   convict.

17          Okay.  Again, this is for you to decide.  That's

18   what we'll end up going with.

19          Okay.  What's next, Mr. Pennebaker?

20          **MR. PENNEBAKER:**  On Page 22, Your Honor.

21          **THE COURT:**  Okay.

22          **MR. PENNEBAKER:**  The second line in

23   Subparagraph 3, a substance without a legitimate medical

24   purpose outside the usual course, just for the same

25   reason as earlier.

```
 1              And I believe the same word needs to be inserted
 2  in the -- on the last line of the paragraph, starting
 3  with Count 8 through Count 14.
 4         THE COURT:  Where was that last one?
 5         MR. PENNEBAKER:  The last line of the paragraph
 6  in the middle of the page 22, beginning Count 8 through
 7  Count 14.
 8         THE COURT:  Outside of the course of
 9  professional?
10         MR. PENNEBAKER:  Of the usual course, yes, Your
11  Honor.  "Usual" should be inserted in between -- outside
12  of the "and the course."
13         THE COURT:  And so Subparagraph 3, outside the
14  usual course --
15         MR. PENNEBAKER:  Of professional practice.
16         THE COURT:  So it was okay the way it was; is
17  that what you're saying?  Maybe I'm misunderstanding.
18         MR. FERGUSON:  If I can direct the Court,
19  it's -- in the middle of the page, it says -- starting
20  where it says Count 8 through Count 14.
21         THE COURT:  Right.
22         MR. FERGUSON:  The last line of that long
23  four-line sentence, I think he's asking for -- where it
24  says outside the course of professional practice --
25         MR. PENNEBAKER:  Outside --
```

1          **MR. FERGUSON:**  -- he's asking for outside the

2   usual course.

3          **MR. PENNEBAKER:**  And then also in Line 3, that

4   the defendant knowingly and intentionally distributed the

5   substance without a legitimate medical purpose and

6   outside the usual --

7          **THE COURT REPORTER:**  I'm sorry; say that again.

8          **MR. PENNEBAKER:**  Okay.  At Line 3, that the

9   defendant knowingly and intentionally distributed the

10  substance without a legitimate medical purpose, outside

11  the usual course of professional practice.

12         **THE COURT:**  Okay.  Maybe I -- you don't have an

13  updated one.  Mine says "usual."

14         **MR. PENNEBAKER:**  Oh.

15         **MR. FERGUSON:**  Mine says "usual."

16         **MR. PENNEBAKER:**  Mine -- on Page 22?

17         **MR. FERGUSON:**  The very last sentence on

18  Page 22.

19         **THE COURT:**  The last.

20         **MR. PENNEBAKER:**  It's the -- it's the -- oh, I'm

21  sorry.  There's two Subparagraph 3s; that's what the

22  confusion is.  The very first Subparagraph 3 up at the

23  top.

24         **THE COURT:**  Oh, okay.  I thought you -- you had

25  said at the bottom.

1            **MR. PENNEBAKER:**  I apologize.

2            **THE COURT:**  No problem.

3            Okay.  Top of the page, Subparagraph 3, medical

4    purpose outside the usual course of professional

5    practice.

6            We can do that.

7            Okay.  Go ahead.

8            **MR. PENNEBAKER:**  Page 23, the fourth line down

9    from the top of the page has the same omission.

10           **THE COURT:**  Okay.  Got it.

11           **MR. PENNEBAKER:**  And then --

12           **THE COURT:**  The usual course?

13           **MR. PENNEBAKER:**  Yes, sir.  Yes, Your Honor.

14           Subparagraph 2, I think there should be -- it

15   says that the defendant did so for the purpose of

16   unlawfully dispensing or a controlled substance.  I think

17   it should be distributing or dispensing a controlled

18   substance.

19           **MR. FERGUSON:**  Your Honor, I think it may have

20   just said distributing, because the indictment

21   suggests -- well, you said dispensing.

22           **THE COURT:**  Dispensing is in there.

23           **MR. FERGUSON:**  The Count 15 alleges just --

24   well, if I can read, and I may not be able to; I don't

25   have my glasses on.  I think it only alleges

1    distributing, but they were all -- either way.

2            **MR. PENNEBAKER:**  It does.  It does.

3            Okay.  So then -- yeah, then it should just be

4    distributing.

5            **THE COURT:**  So we take out dispensing,

6    unlawfully distributing.

7            It says "or" there.

8            **MR. FERGUSON:**  Take that out, too.

9            **THE COURT:**  Yeah, I'm going to take that out as

10   well.

11           **MR. FERGUSON:**  Thank you.

12           **THE COURT:**  Okay.  Anything else?

13           **MR. PENNEBAKER:**  Then the next -- the bolded for

14   the purpose of distributing a controlled substance --

15   just because it's a defined term, I think unlawfully

16   needs to be inserted before distributing.

17           **THE COURT:**  Okay.

18           **MR. PENNEBAKER:**  There was one other thing on an

19   earlier page that I missed, Judge, and that is the old

20   accomplice instruction, which is on Page 8.

21           **THE COURT:**  Go ahead.

22           **MR. PENNEBAKER:**  For the record -- and I don't

23   think that this is material here, but just for the

24   Court's information, Gutgsell is spelled G-U-T-G-S-E-L-L.

25   We would not insist that --

 1          **THE COURT:**  Not a problem.  Spell it again.

 2          **MR. PENNEBAKER:**  It's G-U-T-S-G-E-L-L.

 3          **THE COURT:**  Okay.  We'll make the change

 4  throughout.

 5          **MR. PENNEBAKER:**  And then the last sentence of

 6  the first paragraph of that testimony of an accomplice

 7  that only references Dr. Alperovich, the because of his

 8  cooperation and testimony, Dr. Alperovich hopes, I think

 9  it should be Dr. Alperovich and Ms. Gutgsell because of

10  their.

11          **THE COURT:**  How long ago did she plead, and does

12  she have a sentencing hearing pending?  See, none of that

13  came out.  I don't know.

14          **MR. PENNEBAKER:**  She does have a sentencing

15  hearing pending, and I think she pled within the last

16  two --

17          **MS. PAYERLE:**  To three years.

18          **MR. PENNEBAKER:**  Two, three years.  I think it

19  was --

20          **THE COURT:**  Would have brought that out a little

21  more clearly during the trial, but what's done is done.

22          So basically on the spelling, I put in an

23  extra T.?

24          **MR. FERGUSON:**  Yes, sir.

25          **THE COURT:**  Okay.

 1          **MR. PENNEBAKER:**  And the S and the G are

 2   flipped.

 3          **THE COURT:**  I thought she spelled it when she

 4   got up there.

 5          Okay.  Well, I'll adjust that language

 6   accordingly.

 7          **MR. PENNEBAKER:**  Oh, actually, Judge, I'm sorry.

 8   It's actually spelled both ways in here.  There's -- I'll

 9   stop.  It's -- it never ceases to confound any of us.

10          **THE COURT:**  And I'll add Ms. Gutgsell in that

11   last sentence.

12          Because of their corporation?

13          **MR. PENNEBAKER:**  Yes, Your Honor.

14          **THE COURT:**  They hope to receive.

15          Okay.

16          **MR. PENNEBAKER:**  And that's it from the

17   government, Your Honor.

18          **THE COURT:**  Okay.  Thank you.

19          Mr. Ferguson?

20          **MR. FERGUSON:**  I'm good.

21          **THE COURT:**  Okay.

22          **MR. FERGUSON:**  Yes, sir.

23          **THE COURT:**  All right.  My clerk was listening

24   in.  She'll make all those changes for the final copy

25   that will go to the jury.  I don't know if y'all want

```
 1   additional hard copy or just have them sent to you

 2   electronically.

 3             MR. FERGUSON:  I would take a hard copy, if I

 4   could.

 5             THE COURT:  Okay.

 6             MR. PENNEBAKER:  We'll take --

 7             THE COURT:  Before or after closing?

 8             MR. FERGUSON:  Before I argue.

 9             THE COURT:  Okay.  Then we'll take a brief

10   recess.  We'll go ahead and get those copies out to

11   everyone.

12             All right.  Okay.  Recess.

13             (Recess at 10:05 a.m. until 10:27 a.m.)

14             THE COURT:  Okay.  I'm assuming we're ready for

15   the jury?

16             MR. FERGUSON:  Yes.

17             MR. PENNEBAKER:  Yes, Your Honor.

18             THE COURT:  Okay.  Bring them in, please.

19             (Jury in at 10:28 a.m.)

20             THE COURT:  Okay.  Folks, last push at this

21   time.  We've worked through everything now, and so we're

22   ready to go ahead and proceed with the closing arguments.

23             Remember early in the case, I told you that the

24   government would argue first.  Defense will have a full

25   opportunity to argue.  And assuming they do, the
```

1    government will have the last -- what we call the

2    rebuttal argument, that being because they had that

3    burden of proof.

4           I've got the jury instructions, so I'm ready to

5    go, once we conclude the arguments in the case.  And then

6    it will be up to you, however long deliberations are

7    going to take.  Okay.  Let's go ahead and get to it.

8           So I'm going to turn to the government.  You may

9    proceed.

10          **MS. PAYERLE:**  Thank you, Your Honor.

11          All right.  Well, good morning, ladies and

12   gentlemen.  It's been an action-packed week, and now it

13   is time to tie it all together and to show you what the

14   government believes this evidence amounts to, to give you

15   a framework for sorting through it, and then to get you

16   to the important work of deciding this case.

17          We started -- Mr. Pennebaker here started with

18   sex, fame, money, and that's where we've ended up.

19   You've seen, in the videos, in the "Sail Away with the

20   Rock Doc" advertisement, in the texts and the testimony,

21   that the defendant Jeffrey Young -- he was obsessed with

22   these things, desperate for people to pay attention to

23   him.

24          He might have done anything to be the womanizer,

25   the rock star, the big fish in the small pond, but it

1    turns out he only had to do one thing:  prescribe.  He

2    had to pick up his pen and his prescription pad and

3    prescribe drugs, and not just any drugs, the most

4    dangerous and addictive drugs that are legal to

5    prescribe.

6         He wanted everyone's attention:  beautiful

7    women, rock stars, club owners, tattoo artists, everyone

8    who was anyone.  But he quickly learned it was not his

9    winning personality or his tattoos that got their

10   attention, it was the pills.

11        To his so-called fans, the thing that made

12   Jeffrey Young special was that he had the powerful to get

13   them drugs.  He had the powerful to get them high.  And

14   if you want more detail on this, I do encourage you to

15   page through those text message summaries that Special

16   Agent Scales went over.  There's a lot of them in

17   evidence, about 20, more than just the highlights that he

18   covered on the stand.  And you'll see over and over again

19   how Jeff Young used that power of the prescription to get

20   what he wanted.

21        You'll see this kind of barter system that I'm

22   talking about.  And I want to just walk through one

23   example of how this played out so that you can see it and

24   the rest of them for yourself.  So we're going to take a

25   closer look at Exhibit 76 and the story, if you will, of

1   Cyndal Story.

2          In the first few pages -- I won't go through

3   them here, but you can read about how a man named

4   Jonathan Morris is playing matchmaker.  He tells Young

5   that she's cool, that she hasn't gotten laid in a while,

6   and he'd let it slip that her ex was abusive.  They plan

7   a double date to set them up:  dinner, followed by a

8   night in Jeff Young's hot tub.  Cyndal flakes.  Jeff

9   Young and Jonathan Morris agree, bullet dodged.  Jeff

10  Young even says, quote, well, her loss.  I can tell by

11  her response that she wasn't that in to me.

12          But on Page 4 of that exhibit, we finally see

13  here Jeff Young and Cyndal Story connect.  He asks for a

14  date.  She agrees, but first, she's going to meet him at

15  his clinic.  Jonathan goes with her, and they're both

16  texting Jeff Young from the waiting room.  You'll see the

17  end of text messages, the chatter about the front desk.

18          So on this -- on this slide that you're looking

19  at, Jeff Young sends this text to Cyndal Story:  This

20  could get interesting, with a little devil emoji.

21          And then you'll see the grayed-out spot there

22  where he prescribes her drugs, a pretty modest dose of

23  hydrocodone, about 5 milligrams, and a little bit of

24  Xanax.  And this, folks, is how the negotiation begins.

25          You'll read through and see how, over the next

 1    couple of months, they keep each other on the hook:  Jeff

 2    to see how much attention he can get from Cyndal and

 3    Cyndal to see how many powerful drugs she can get from

 4    Jeff.

 5            Let's look at a few days later.  Cyndal reaches

 6    out and asks for a favor.  Hydrocodone is just not

 7    helping at all.  She wants Percocet, 10 milligrams.

 8            You learned in this trial that Percocet is

 9    oxycodone, and it's 1.5 times stronger than hydrocodone,

10    and she wants 10 milligrams of it, not the 5 he initially

11    prescribed.

12            And also look here.  She doesn't want to see

13    him.  She has to work.  She has her kids.  Some excuses.

14    She's not interested.  She asks if she can send Jonathan

15    over to pick up a prescription.  Jeff Young responds by

16    playing hard to get:  Sorry.  State rights say I can't

17    write anything within 30 days.  You have to be seen in

18    the office.

19            He adds:  It's bullshit, but it's the law.

20            Well, maybe it's the law, but it's certainly not

21    Jeff Young's practice.

22            Looking at the other text messages in the

23    exhibits from about 74 to 92, to his buddies Chad Newsom,

24    Ben Elston, and others, he prescribes outside the office

25    all the time.  But a women, Cyndal Story, she has to come

1   see him.

2          Ms. Story pushes back:  Is there nothing you can

3   do without me coming in?

4          Jeff Young holds firm:  Unfortunately.

5          If she wants her drugs, she comes into the

6   office, and he's not even shy about why.

7          Same day, same conversation.

8          I'll let you-all read it.

9          And later:  I just need you to open up and

10  actually keep a date for once.  That would keep -- be a

11  decent start.

12         The next day, Ms. Story capitulates, goes into

13  the office, and Jeff Young prescribes exactly what she

14  asked for, Percocet, 10 milligrams.  Even though he

15  claimed he can't prescribe, quote, anything within 30

16  days, he made an exception for her here, prescribing

17  another 90 opioid pills only seven days after this

18  negotiation began.

19         A few weeks go by.  Cyndal Story apologizes:

20  Golly, I wasn't in touch.

21         She has a sob story.

22         Jeff Young asks:  Let me know if I can do

23  anything to help.

24         And surprise, there is.

25         I have an appointment with you next Monday, but

1    could you see me sooner?

2         She wants to be seen a week early, and Jeff

3    Young agrees.

4         Now, I won't put them all up here, but you will

5    see in the subsequent text messages that he prescribes

6    her something, but she can't get it filled.  She tries

7    another pharmacy.  It still doesn't work.

8         Jeff Young says:  We've exceeded the state limit

9    for any controlled.

10        But yet, sometime the next day, he prescribes

11   her 91-milligram Xanax.  And then, again, radio silence,

12   until she writes back.  She's got a whole plan about how

13   he can get her more drugs.  She's getting pushier and

14   pushier:  Just give me another one of the percs per day

15   and then would still be less milligrams.  Please do four

16   10s a day instead of three.

17        Oh, and then she -- at the bottom there, she

18   remembers.  She still has that one-week-from-Monday

19   appointment on the 8th.  Can she come in then?

20        Jeff does his part:  Sure.  Come see me.

21        And on August 8th, she leaves for a prescription

22   for oxy 20s, now double the dose of oxy from the last

23   time.  And they got rid of that pesky acetaminophen.

24   We're now on to pure oxy.

25        You'll see in the text messages that Jeff,

1    again, has to intervene at the pharmacy, again, to be

2    sure they fill.  But he does intervene, and they do.  And

3    guess what?  Radio silence until she needs them again.

4    And it goes on like this for a few months.  The stakes

5    keep getting raised by either side:  Jeff looking for

6    more attention; Ms. Story looking for more drugs.

7          So here, we have Ms. Story:  Can I ask a favor?

8    I have an appointment next Monday.  I want to come in

9    this week instead.

10         Jeff Young asks for naked pictures.

11         The next month, Ms. Story needs to come in early

12    again, and then also she thinks she has a sore throat.

13         Jeff Young responds with innuendo, and all the

14    while, Jeff Young is getting warnings.

15         Cyndal's ex-boyfriend says:  Jeff, you always

16    been cool as a fan, but my girl for eight years is an

17    addictive person.  Cyndal Story.  You write her any more

18    scripts, you're going to kill her, man.  She talked about

19    suicide the other night because she was coming off.

20    You're giving her enough to kill a horse, as many as she

21    is eating, and there's nothing wrong with her.  Thanks.

22    And, again, do not contact her on messenger and do not

23    write her any more stupid scripts.

24         Later she [sic] says he's -- she's running

25    around selling them like some kind of drug dealer and

1   then runs out trying to buy them from everyone she can,

2   and it's driving me crazy.

3          What does Jeff Young do?  He prescribes again

4   and again, and not just any drugs but what Dr. Tricia

5   Aultman pointed out are very high doses of oxy,

6   oxycodone, and Xanax, 20-milligram pure oxy pills with a

7   very high street value.  One milligram times 90 Xanax is,

8   again, a lot of pills, again, with a high street value.

9          Until finally the negotiation comes to a head.

10  Up until now, Cyndal Story has kept Jeff Young at a

11  distance, but no longer.  The fact is, knowing that she

12  was an addict and a drug dealer didn't matter to Jeff

13  Young.  He was more bothered by the fact that she wasn't

14  putting out, and he decides he wants his payoff.

15         You can read for yourself there's one more last

16  negotiation.  Cyndal needs another favor, another early

17  appointment.  Stomach bug.

18         Now, after the testimony in this case, we can

19  all understand that she's just in withdrawal.  Jeff Young

20  has her where he wants her.  She's in withdrawal.  She's

21  in pain.  She needs those drugs, and he tells her what

22  she needs to do to get them.

23         The negotiation continues for a while.  She

24  wants a first date.  He, quote, calls bullshit.

25         Folks, as you read through this in the jury

1    room, you'll see that she manages to put him off again

2    until after Christmas.  She says:  I'm busy.  I got

3    plans.  I need to go till after Christmas.

4           Jeff is skeptical.  He tells her, quote, I'll

5    believe it when I feel it.

6           But he decides to take the chance.  He pushes

7    here to commit to the after-Christmas date.  She does,

8    and they say it's a deal.  She gets her oxycodone, plus a

9    little extra, some tramadol.  But then you see there's

10   nothing else.  It looks like Cyndal Story didn't keep her

11   date after all, and Jeff Young stopped prescribing.

12          I'm highlighting this exchange between Jeff

13   Young and Cyndal Story, or people connected to her, as an

14   example of a clear sex-for-drugs exchange, but there are

15   plenty of other negotiations between Jeff Young and his

16   special friends that unfold in much this way, and those

17   are in the exhibits.

18          So in the interest of expediency, we didn't read

19   through them all in trial, but they're there.  And if you

20   need or want more details about these relationships, look

21   at Exhibit 74 through 79, and they'll be available to you

22   as evidence.

23          Now, I'd like to zoom back out for a moment and

24   get back to your job, which is reaching a verdict.  I

25   want to talk about how this behavior translates into the

1    crimes that are charged in the indictment.  Of course

2    you've seen plenty of evidence that Jeff Young was

3    playing an elaborate game of make-believe.  He pretended

4    he was cool; he pretended he was famous; he even

5    pretended he was a musician.  But lots of people delude

6    themselves a least a little bit to follow their dreams.

7    This case isn't about that.  The crime here is that he

8    pretended he was practicing medicine, but the drugs that

9    he was prescribing were very, very real.

10         You see, he rented this building and built this

11   business, Preventagenix, on a business model.

12         Daniel Rogers:  He was a quick witness, but he

13   told you the business model of Preventagenix was bringing

14   people in who wanted narcotics because they would come

15   back every month.

16         Jeff Young was so far outside the scope of

17   professional practice, that once law enforcement closed

18   his doors, there was no one out there -- almost no

19   one would prescribe to his patients.

20         Tricia Stansell, his former patient, told you

21   that when Preventagenix's door closed with the law

22   enforcement action, she couldn't find anyone else to give

23   her prescriptions, and so she turned to street drugs.

24   You'll remember she told you it was that situation that

25   finally made her realize that she was hopelessly

1  addicted.  Why didn't she know it before?  Because the

2  man that she believed to be her medical provider never

3  told her, never helped her with it, didn't even tell her

4  that the fentanyl he was prescribing her was an opioid.

5  You might remember her story about shutting herself in

6  her room for five days with nothing but a bible and a

7  television and hoping she didn't die.  That is the

8  position that Jeff Young put her in.

9       But while Preventagenix was still in operation,

10  folks, people came from all over Tennessee to get drugs

11  from him, from Memphis, Nashville, Madison, Lauderdale,

12  Carroll, and Benton, from Fayette, Tipton, Haywood,

13  Chester, and Decatur Counties and beyond.

14       Kristie Gutgsell, the office manager, and Daniel

15  Rogers told you that the people who wanted controlled

16  substances came back month after month for the one-month

17  follow-ups you saw in Exhibit 8.  We're going to see that

18  later.  And you saw that these folks had insurance, which

19  Jeff Young billed.

20       Natalie Seabolt.  Nurse Natalie Seabolt:  You

21  remember she showed you the charts and the data?  She

22  told you that Medicaid is a taxpayer-funded healthcare

23  program.  These people weren't getting healthcare; they

24  were getting drugs.  No matter.  Jeff Young was billing

25  Medicaid for it anyway.  He billed Medicaid to the tune

1    of about $4 million.

2            And the business model worked.  In the two-year

3    period charged in the indictment, Jeffrey Young at his

4    clinic Preventagenix provide -- excuse me -- prescribed

5    more than 1.3 million controlled substances into his

6    community, increasing his prescriptions and his patient

7    populations month after month, and pulling in more than a

8    half million dollars in Medicaid money alone, plus

9    whatever he collected in cash and other insurance.

10            But ladies and gentlemen, even if it happens in

11   a pretty building, dealing drugs is still illegal.  It's

12   illegal for everyone, even people with a pen and a

13   stethoscope.  And that is why we're all here.

14            You have one job today, and that's to fill out

15   this form, the verdict form.  It doesn't actually look --

16   the formatting is a little different, but it contains --

17   it looks like this; I've got it here.  But it contains

18   all the information, and you might just be able to see

19   that a little bit better on the screen.

20            This verdict form here that I'm going to show

21   you, it has 15 questions on it -- okay? -- one for each

22   crime that Jeffrey Young is charged with.  And you have

23   to decide whether the government has proven these crimes

24   beyond a reasonable doubt.

25            So as expeditiously as possible, my job right

1    now is to take you through this form, to explain to you

2    why the evidence leads, beyond any reasonable doubt, to a

3    checkmark next to guilty on each of these counts.

4          So let's dive into Count 1, conspiracy to

5    distribute controlled substances.  All right.  Put away

6    your tinfoil hats and talk of conspiracy theories.

7    Conspiracy is a real thing in the law, and it boils down

8    to an agreement.  If Jeff Young agreed with one or more

9    people to distribute these controlled substances

10   unlawfully, then he's guilty of Count 1.

11         Well, when I say "unlawfully," what do I mean?

12   It's the second bullet on this slide.  You'll probably

13   remember that mouthful I had to keep saying over and over

14   again with Dr. Aultman:  A prescription for narcotics is

15   an unlawful prescription or prescription for controlled

16   substances is an unlawful prescription if it's issued not

17   for a legitimate purpose by a practitioner acting within

18   the usual course of professional practice in the state of

19   Tennessee.

20         So put more simply -- and I'll use the shorthand

21   throughout the closing so I don't have to keep saying

22   that over and over again -- when he wrote the

23   prescriptions he was writing, he was supplying drugs to

24   dealers and addicts, not practicing medicine.

25         So what about the term "agreement" at the first

```
 1   bullet point there?  Well, the thing is -- Jeff Young --
 2   he couldn't do this alone.  He needed the assistance of
 3   office managers.  Kristie Gutgsell told you that she
 4   signed on to help Jeff Young, understanding what he was
 5   doing was wrong.  She gave him money to keep his clinic
 6   open.  She -- she helped him day to day.  Dr. Alperovich
 7   lied to the medical board, and Dr. Rudin, if you remember
 8   him from early in the trial -- he didn't testify, but he
 9   was talked about -- Jeff Young's buddy, he stayed in
10   Chicago -- he was -- served at -- as the sort of last
11   supervising physician through most of 2016, cashing his
12   check while Jeff prescribed.
13          And the judge will need -- will instruct you.
14   These people didn't need to sort of sit down and enter
15   into a contract to engage in illegal drug dealing or sit
16   in a back room and, you know, conspire to commit a crime.
17   They -- criminal organizations rarely sort of formalize
18   these things.
19          Conspiracies happen through action.  People know
20   and understand what is going on in this conspiracy.  They
21   understand that there is illegal activity taking place,
22   and they help each other.  They join; they agree to join;
23   they work together to an unlawful purpose.
24          Okay.  That's Count 1, conspiracy.
25          Now we're going to count -- skip all the way to
```

1    Count 15, which is at the end of your verdict form, and

2    this is a crime that someone commits when they knowingly

3    open, lease, or maintain a place, like the Preventagenix

4    clinic, for the purpose of distributing a controlled

5    substance.

6         So the fact that Jeff Young here had a fancy

7    building doesn't actually make the drug dealing any

8    better; it's actually a separate crime.  And it was.  He

9    used that building to bring patients in the door, to

10   collect cash from them, to give them the drug test that

11   he ignored but that he used to paper the file.  He used

12   the back door of that building to welcome in the likes of

13   Ben Elston, Jay Green, or any one of the dozens of women

14   that he was sleeping with or trying to sleep with.

15        Kristie Gutgsell told you that 80 percent of the

16   patients, the people that walked in and out of those

17   doors at Preventagenix, were getting controlled substance

18   prescriptions.  And even for the so-called regular

19   patients, the ones that weren't beautiful or famous.

20        Daniel Rogers:  You remember him?  He told

21   you -- he told you about Jeff Young's business motto:

22   Paying patients make the money.  Pain patients pay, and

23   they show up every month.

24        Two different witnesses told you around 80

25   percent of Jeff Young's business at Preventagenix was

*UNREDACTED TRANSCRIPT*

1   based on his controlled substance prescriptions.  And

2   every time they'd walk in the door, Jeff Young would bill

3   their insurance.  And that's Count 15.

4        So we've talked about Count 1 and Count 15, the

5   first and last counts:  conspiracy and maintaining a drug

6   premises.  That kind of covers a range of dates, which

7   you'll see in the indictment:  2014 to 2017.

8        But in addition to these overarching counts, the

9   indictment charges him with 13 specific instances of

10  illegal prescribing for which the evidence proves that he

11  is guilty, and these are Counts 2 through 14.  And you'll

12  be asked to reach a verdict on each of these counts as

13  well.

14       So the first six of those counts, Numbers 2

15  through 7, have an extra element.  So the -- in other

16  words -- so for 2 through 14, we're talking about

17  distribution.  And what you have to find there -- what

18  the government must prove beyond a reasonable doubt is

19  that the defendant in these cases knowingly, on those

20  instances, or intentionally distributed oxycodone and

21  hydrocodone, knowing, at the time of the distribution,

22  that it was controlled and knowingly or intentionally

23  distributing it without a legitimate medical purpose

24  outside the course of professional -- the usual course of

25  professional practice.  Okay.  So for each of those,

1   that's what the -- that's what the government must prove

2   beyond a reasonable doubt.

3          For Counts 2 through 7, there is an extra

4   element, and that is because those counts charge

5   Mr. Young with individual distributions to a pregnant

6   woman, Hope Rogers.  And so for those counts, you also

7   have to find that the defendant knew that Hope Rogers was

8   pregnant.  So because Counts 2 through 7 deal

9   specifically with Hope Rogers, I want to spend a little

10  bit of time on her.

11         This is Hope Rogers; you may remember her.  She

12  was the witness who was in custody.  She testified in her

13  red jumpsuit, and she's the one who was pregnant when

14  Jeff Young prescribed her Xanax, alongside oxycodone and

15  hydrocodone, in ever increasing doses, so many, that

16  [REDACTED], her daughter, was born with opioids in her

17  system and spent days in the NICU.

18         Counts 2 through 7 accuse Jeffrey Young of

19  prescribing -- so what we're going to do now is just turn

20  to those counts, let you see what they are.  So the way

21  this is structured is each count is associated with an

22  approximate date of the distribution, plus the drug that

23  was distributed.  And for each of those counts, there's a

24  line on your verdict form where you have to indicate

25  guilty or not guilty or in this case -- yep, indicate or

 1   maybe circle; in some way, indicate.

 2        All right.  Let's take a look at Hope Rogers.

 3   All right.  Let's start at the beginning.  For this,

 4   we'll be looking at -- this is Exhibit 101 and

 5   Exhibit 122.  Those are the exhibits you'll have with

 6   you.  101 is the entire patient file, and all the

 7   prescriptions compiled together are at Exhibit 22.

 8        So walking in the door, Tricia Aultman walked

 9   through her patient file and showed how painfully obvious

10   it was that she was a drug seeker.  Her diagnoses didn't

11   make sense; they contradicted her records.  They

12   contradicted each other, but that didn't matter.  Jeff

13   Young discontinued her codeine, that DC Tylenol 3, and he

14   put her on hydrocodone and Klonopin.  At this point, Hope

15   Rogers is not pregnant yet, but Jeff Young is already

16   over the line.

17        Dr. Tricia Aultman told you that putting her on

18   a powerful opioid at this point made absolutely no sense

19   from a medical perspective.  There was nothing in her

20   file to suggest a legitimate medical purpose for these

21   drugs.  And by the way, Hope Rogers, herself, told you

22   that.  These conditions haven't changed.  Her body hasn't

23   change.  She still has some pain in her wrists, but she's

24   been off the drugs for years.  She says:  I definitely

25   didn't need them.

1       What was actually wrong with Hope Rogers,

2   according to both Tricia Aultman, who's never met her,

3   and Hope Rogers, herself, was that she was addicted from

4   the -- to the medication, a fact that was painfully

5   obvious from the very beginning.  But Jeffrey Young

6   described anyway because these prescriptions gave him

7   access to a new, devoted, young, attractive, new patient.

8       Count 2 is the prescriptions from March 5th, a

9   couple months later.  Now, what information does Jeffrey

10  Young have?  Well, at her February visit, she's just told

11  him that she found out she was pregnant, so now he's

12  prescribing this already unlawful Percocet that has no

13  medical purpose to a woman that he knows is pregnant.

14  And that is why he's guilty of Count 2.

15      At Count 3, on March 25, just 20 days later, he

16  has even more information.  She's vomiting

17  uncontrollably.  She has blood in her bowel movements,

18  diarrhea.  These are all symptoms of withdrawal.  So what

19  does he do?  He switches her to hydrocodone.  After all,

20  it's been less than 30 days since her last visit, so

21  she's going to have a hard time filling a prescription

22  from a Percocet.

23      Tricia Aultman explained that this early

24  prescription by 10 days effectively upped her dose

25  because she's still got 10 days, in theory, of her

1    Percocet prescription left.  So if she were taking these

2    pills, as Jeff Young prescribed them, for this 10 days,

3    she's on six pills a day:  three of hydrocodone and three

4    of oxycodone.  No matter.  Jeff Young's now switching her

5    drugs just to avoid her getting flagged at the

6    pharmacies, and he keeps prescribing.

7           A month later, Jeff Young has even more

8    information.  You see, Hope Rogers has failed her drug

9    screen.  She's taking more drugs than Jeff Young is

10   prescribing.

11          By now, you'll recognize Jeff Young's

12   handwriting on this document.  I don't know what it says,

13   but you'll recognize the handwriting.  He's seen this

14   document.  He doesn't care.

15          On her April 23rd patient note, there's another

16   reminder in the chart that she's pregnant, and that

17   brings us to Count 4.

18          On April 23rd, Jeff Young not only prescribes

19   more inappropriate hydrocodone, but he adds Xanax.

20   That's April 23, 2015.  April 23, 2015.  On that date,

21   he's also texting with his friend Chad Newsom who says:

22   Brie's little sister killed herself last night.  Can

23   pregnant people have Xanax?  She's tore up, dude.

24          Jeff Young writes:  No.  It would harm the baby.

25          He pushes back.

*UNREDACTED TRANSCRIPT*

1    It's going to be tough the next few weeks.

2  Let's go ahead and get her on something.

3    Jeff Young writes back:  Exactly.  That's worse

4  for her than taking something, but Xanax is a definite

5  no.

6    But here's Hope Rogers' patient chart at

7  Preventagenix another -- a month later, a reminder she's

8  pregnant, with Xanax still listed as one of her

9  medications.

10    And Count 5 is the prescription on May 20th.  By

11  this time, it's clear from her drug screens that she's

12  spiking her urine, scraping a piece of her pill into it.

13  Jeff Young knows he needs to talk to her about it, says

14  so on that chart, but he prescribes more hydrocodone.

15  This time, upping her dose to 120 pills, now four a day,

16  and of course more Xanax.

17    Count 6, a month later.  Here, it's Jeff Young

18  who writes on her patient chart that she's pregnant --

19  you see his handwriting there? -- and again ratchets up

20  the drugs.  Now she also has Percocet just before the

21  baby is born.  At this point, there is no question this

22  child will be born with opioids in her system; Jeff Young

23  has made sure of that.

24    And on July 17th -- you heard Hope Rogers

25  testify that she has a tough time getting this last

1    prescription out of Britney Petway, who's Jeff Young's

2    employee, but she got Jeff Young on the phone, Britney

3    Petway did, and Hope Rogers walked out with the

4    prescription.  Now, Dr. Aultman told you that this

5    prescription, like all the other, was well outside the

6    scope of anything resembling medicine.

7         But, also, Jeff Young has even more information

8    because she's -- because Hope Rogers has been in a

9    hospital for -- maybe that's the preterm labor.  And she

10   calls -- and she texts Jeff Young.  She says:  I have

11   nothing to fall back on.

12        This is just a couple of weeks, and she's

13   already finished her last 30-day supply?

14        But Jeff Young kept prescribing.

15        After Hope Rogers had the baby, the problematic

16   drug screens kept coming in over and over and over again,

17   but Jeff Young kept prescribing.

18        You heard from -- for yourself -- how Hope

19   Rogers left Jeff Young's clinic during this time because

20   it was too crowded and the wait was too long.  She got a

21   DUI.  She couldn't get the drugs elsewhere, and so she

22   had to come back.  Guess what?  Jeff Young kept

23   prescribing.

24        Folks, this concludes our story about Hope

25   Rogers and the counts related to her.  There can be no

1   doubt that Jeff Young knew that Hope Rogers was pregnant.

2   He knew that these prescriptions were absolutely outside

3   the usual course of professional practice and not for any

4   legitimate medical purpose.  He wandered between

5   hydrocodone and oxycodone, twice upped her dose while she

6   was carrying a baby, prescribed Xanax on the very day she

7   texted -- he texted his friend that Xanax would harm a

8   baby, ignored inconsistent drug screens, gave her early

9   refills.  And you heard how crossing paths with Jeff

10   Young impacted Hope Rogers' life forever.  So on these

11   counts, 2 through 7, we ask that you return a verdict,

12   the only verdict consistent with the evidence, which is a

13   verdict of guilty.

14          And so let's move on to Counts 8 through 14.

15   Counts 8 through 14 cover the undercover operations in

16   this case.  The videos, which I'm not going to replay

17   here, you'll remember them.  But they're at exhibits, for

18   your notes -- those who are taking them -- are Exhibits

19   28 through 33, plus 73, if you want to watch those videos

20   again.

21          Counts 8 through 12 are the distributions to

22   Katie Tripp.  You heard her testify today [sic].  The

23   K.S. refers to a previous married name, but we're talking

24   about Katie Tripp who was the first undercover officer

25   you heard from.  And you remember she went in undercover

1    as Katie Crowder.

2         On her first official visit to the clinic in

3    May, she saw someone other than Jeff Young who prescribed

4    her tramadol, which was a level of opioids.  That's not

5    on this chart.  And in Exhibit 28, you saw the first

6    visit on June 7, 2016, in which she actually saw Jeff

7    Young.  You saw, in Exhibit 28, a video of her paying

8    cash.  And in Exhibit 29, you saw the entire interaction

9    between Katie Tripp and Jeff Young on that visit.

10        Beyond her claims that she was a waitress and

11   with back pain, Jeff Young knew nothing about her pain.

12   He made no attempts whatsoever to diagnose it.  He didn't

13   warn her of any risks.  She told him she hadn't bothered

14   to fill the tramadol.  She'd once gotten some hydrocodone

15   from a friend, and it seemed to work.  She had once

16   gotten an MRI, but it didn't really show anything, and

17   she didn't know where it was, and Jeff Young told her to

18   bring it in so he could paper the file.  He was very

19   explicit:  Just give it to me; I need something in the

20   file.

21        This all took about two minutes.

22        And then for the next six minutes of this visit,

23   he tried to impress her with his reality TV show.  And

24   then he wrote a prescription for hydrocodone, which

25   Tricia Aultman -- Dr. Aultman -- told you had absolutely

1    no basis in real medicine.

2              On the second visit, patient, quote, Katie

3    Crowder, goes back and asks for fentanyl because it,

4    quote, worked for a friend.  She still doesn't have that

5    MRI.  Jeff Young says, sure, and jumps her immediately to

6    a 50-microgram patch of fentanyl, which Tricia Aultman --

7    Dr. Aultman -- says that's what she uses to treat cancer

8    patients to keep them comfortable at the end of their

9    lives.

10             The undercover officer asks Jeff Young if she

11   could take the hydrocodone and the fentanyl that he

12   prescribed together.  Jeff Young said it was no problem.

13   That was way off base.  According to Dr. Aultman, if she

14   had taken those drugs together, as prescribed by Jeffrey

15   Young -- including the fentanyl patches -- she could have

16   died.

17             Count 10.  Katie Crowder and Mr. Young have

18   another visit on or about 8/16.  Much shorter.  She says

19   she likes the fentanyl, but she still feels pain.  And so

20   without any further questions or counseling, Mr. Young,

21   again, ups the fentanyl to 75 micrograms.  This is

22   unthinkable, said Dr. Aultman.

23             On Count 11, on or about 9/13/2016, she comes

24   back.  It's a quick visit.

25             Let's see here.  Which one are we at?

1          Count 11.  She comes back, and it's a quick

2    visit.  It's at Exhibit 32.  And she's still kind of in

3    pain, and so Jeff Young ratchets up he Lortab, so she's

4    now on a deadly dose of fentanyl and more hydrocodone.

5          And you heard her in the video, folks.  She's

6    not altered; she's not slurring; she's not moving around

7    like she's in pain.  She's perky; she's happy; she's

8    comfortable.  She's very clearly not taking these very

9    strong drugs that Jeffrey Young is prescribing to her,

10   these very strong, high street-value drugs that Jeffrey

11   Young is prescribing to her, but Jeffrey Young keeps

12   prescribing them.

13         Now, Counts 12 and 13 are for the same visit,

14   the one in October 2016.  You can remember the October

15   visit because he's inviting them to the Halloween party,

16   the big, raging Halloween party where people are swinging

17   from chandeliers.  There's two undercovers at this visit,

18   that's why there's two counts:  Katie Crowder and

19   Kristina St. Laurent, the KSL that's going to be in the

20   indictment.  Kristina St. Laurent:  She's undercover as

21   Christina Norton, so you heard from her as well.

22         Jeff Young flirts a little.  He explains how

23   he's trying to make marijuana legal.  He brags about

24   insider knowledge.  He invites them to his rager of a

25   Halloween party.  And by the way, he doesn't suggest that

1   they not drink alcohol while on all of these drugs.

2   Quite the opposite.  He says, you know, you should come;

3   you should fit in.

4          Christina Norton asks for, quote, tabs, which is

5   the street term for Lortabs.  Jeff Young does kind of a

6   cursory exam, which Tricia Aultman told you was

7   absolutely nowhere near anything that would be

8   appropriate to diagnose her back pain.

9          Katie Crowder walks out with more hydrocodone

10  and fentanyl, and Christina Norton, who Jeff Young was

11  seeing for the first time, gets oxycodone, 10 milligrams,

12  three times a day.

13         And at Count 14, Tricia -- Christina Norton goes

14  back in.  Somebody has faxed Jeff Young a completely

15  normal MRI for her, which says -- which he says in the

16  video he's never looked at.  In fact, ironically,

17  according to Dr. Aultman, the only thing wrong with her

18  in this MRI is that she's a little bit constipated.  You

19  also learned that opioids make you constipated.  Anyway,

20  he says in the video he's never looked at it, but he

21  prescribes her more drugs.  Dr. Aultman told you none of

22  these prescriptions make any medical sense; they're not

23  even close.

24         And if you watch the videos, you'll see that the

25  interactions are not medicine.  They're much more in line

1   with Jeffrey Young's pattern of bringing young,

2   attractive women back to his clinic over and over again,

3   giving them more and more drugs, grooming them, if you

4   will.

5            A quick word about the dates:  I know you've all

6   been paying very close attention to these dates and

7   details, which we really appreciate.  You'll see in the

8   indictment two of the dates on these counts don't quite

9   match up.  It's a -- they say, maybe, six, and it's 16 or

10   something like that.  There is a jury instruction for

11   that.

12            You'll note, then, the indictment charges

13   offenses were committed on or about certain dates.  The

14   government doesn't have to prove the crimes happened on

15   an exact date.  We have to prove the crimes happened

16   reasonably close to those dates.  You'll see there's no

17   issue with that.  And we've made it through all the

18   counts.

19            So the last thing that you need to know is that

20   for each of these counts, it will be important that you

21   find Jeff Young committed these crimes knowingly or

22   intentionally, that if he didn't realize he was

23   committing any kind of crime, had a completely innocent

24   intent, was negligent or careless, that he can't be found

25   guilty.

1          So we have to do a little bit of diving into his

2    mind.  We have to figure out if he understood that he was

3    acting illegally.  And you'll get a lot of instructions

4    on what that means:  knowing and intentionally.  But

5    there is evidence of that, too, in spate, that he knew

6    what he was doing was wrong, and he continued to do it

7    anyway.

8          So you have this instruction.  We, in the law,

9    did -- they don't teach us mind reading in law school.

10   We don't have crystal balls where we can figure out

11   what's in people's minds.  And there's just really --

12   it's really hard to prove a defendant's -- you can't do

13   it because nobody can read another person's mind.  We

14   still haven't figured out how to do that.  But their

15   state of mind can be proved indirectly from the

16   surrounding circumstances, things like what the defendant

17   said, what the defendant did, how the defendant acted,

18   and other facts and circumstances in evidence that show

19   you what was in the defendant's mind.  So just think

20   about the evidence through that lens in this case.

21          Jeff Young is prescribing drugs to help a player

22   out, to lure women for sex, to impress a VIP, to trade

23   for marijuana and tattoos, to keep a bodyguard around,

24   for access to party with rock stars, to get VIP access to

25   clubs, to get police information about his enemies and

1    about himself.

2         You saw how Jeffrey Young groomed women to draw

3    them into his practice.  And although he didn't make

4    sexual advances on the undercovers, you can watch the

5    videos.  He was flirty, friendly; invited them to a

6    raging party at his house.  You can see he let them come

7    together, a couple of girls together, each driving from

8    wildly different parts of the state, all to get

9    controlled substances.

10        You saw his M.O. in his text messages, keep them

11   coming back.  Once they're hooked, ask for what he wants.

12   You saw that in the video.

13        And folks, he's a medical professional.  He is a

14   smart and previously well-respected nurse practitioner.

15   And Dr. Aultman told you these prescriptions weren't even

16   close.

17        Folks, this was blatant drug dealing, and Jeff

18   Young knew it, and we know he knew it because he lied to

19   cover it up.  People don't lie to cover up perfectly

20   acceptable behavior, but Jeff Young lied.  He lied to

21   three different investigators at the medical board when

22   they interviewed him.  He papered files.  He got a stamp

23   so he could forge a signature from his supervising

24   physician.  He lied about having sex with Courtney

25   Howell.  He told them he never put people on more than

1  one opioid.  He said he hated prescribing Xanax, and he

2  never had a break in his supervision.  He told them he

3  consistently did exams; he fired patients if they came

4  back with multiple inconsistent drug screens regularly;

5  he did this and so on.  And you saw in the evidence how

6  it contradicts statement after statement after statement.

7         And speaking of supervisors, he lied to

8  Dr. Alperovich saying he was operating a cardiovascular

9  prevention and family medicine clinic.  He wasn't.  He

10  lied about getting electronic medical records and about

11  discharging patients who had tested positive for drugs.

12  He even lied in little ways to his friends and supporters

13  or if -- telling them the filming company came to him,

14  for example, when, in fact, he paid them -- right? -- to

15  produce his reality show.  But worst of all, he lied to

16  his patients.

17         There's a -- there's a -- I'm going to --

18  there's an old proverb here, and it's that you can't --

19  you can't hide fire by wrapping it in paper.  Maybe that

20  paper, you know, covers up the fire for a second, but

21  then the fire burns right through.  Paper spreads the

22  fire.  The paper makes the fire worse.

23         Jeff Young tried to hide his unlawful

24  prescribing literally by wrapping it in paper, by

25  creating false medical records that made it look like he

1   was practicing medicine when he clearly was not, and that

2   paper just spread the fire.  Because of that paper, all

3   the trappings of the medical clinic, you know, people

4   trusted him because he said he was -- he said he was

5   their medical care provider.  And that just made the

6   problem worse.

7          These patients believed they were getting

8   medical care, when, in reality, they were getting used

9   for their insurance, for their money, for their access,

10  and for their bodies.

11         And that brings us to the true tragedy of this

12  case, which is the regret of what could have been.  You

13  see, Jeff Young might have been a good practitioner, and

14  there were plenty of sick people in Jackson that wanted

15  and needed real medical care.  You heard from two of

16  them:  Tricia Stansell and Hope Rogers.

17         And he even had a good concept, like a guy you

18  could relate to, who listened, who paid attention to the

19  real issues, who treated the whole problem.  He

20  understood that's what medical care was.  That's what he

21  told people he was doing.  That's proof that he knew --

22  that he knew what medical care was and should be.

23         Hope Rogers needed care.  She testified to you

24  she was an addict.  She was a victim of abuse.  She'd

25  gotten cut off from pain meds after a DUI.  And she had a

*UNREDACTED TRANSCRIPT*

1    good relationship with Jeff Young.  Hope Rogers testified

2    that if there was anyone on the planet that could have

3    talked her into rehab, that person was the defendant,

4    Jeffrey Young.  But instead, he just gave her more drugs.

5         She testified she, quote, go in, get your

6    prescription, and leave, she explained.  And not just

7    her.  Patients were elbow to elbow, she said, in the

8    waiting room.

9         Jeff Young was not an unconventional provider

10   with a special touch any more than he was a rap star.  He

11   wasn't listening to find out what was wrong with his

12   patients.  He wasn't treating their conditions.  He was

13   letting them down; he was making them worse; he was

14   dealing drugs.  And so we ask that you return verdicts

15   consistent with that evidence:  guilty on all counts.

16        **THE COURT:**  Thank you.

17        And for the defense, Mr. Ferguson, you may

18   proceed.

19        **MR. FERGUSON:**  Thank you, Your Honor.

20        Broken, playing a character, but he was always a

21   practitioner.  Now, you may not think he was a good

22   practitioner, and you might not agree with his decision

23   making, but at all times in this case, Jeff Young was

24   operating under the license given to him by the state of

25   Tennessee to be a nurse practitioner, to make medical

1    decisions, and to prescribe medications.

2          Government's right.  You heard, at some point in

3    his life, Jeff Young was highly respected.  He's smart.

4    He knew what he was doing, and he had the world at his

5    feet as a nurse practitioner, as a good nurse

6    practitioner, as a smart nurse practitioner.  But what do

7    you know happened?

8          So many times we see this.  Even their own

9    expert talked about why it's so important for medical

10   providers to take care of themselves and to seek help

11   when they are going through hard times, depression,

12   drugs, or alcohol.  He got into a horrible divorce, and

13   it spiraled him out of control.  That's what Ms. Goslee

14   told you, the first witness in this case, is that she

15   knew Jeff, and she watched him spiral.

16         But there's an additional problem with Jeff

17   Young's spiraling out of control through the divorce.

18   That's -- the second part of this is taking on the

19   persona of the Rock Doc.  Be popular?  To be famous?  Or

20   to hide the pain and the trauma that he's going through,

21   to hide that under this ridiculous, ridiculous character:

22   come sail away with me, the Rock Doc, the rapper, with

23   Puffy K, his buddy, by his side?  It's all signs and

24   symptoms of the problems that were in his head because of

25   what he was going through and because he was out of

1    control.

2         Third part of that:  You've heard testimony from

3    Ms. Goslee and Ms. -- Ms. Gutgsell that he was expanding

4    his practice too quickly, in this mantic state of the

5    Rock Doc.  People that he communicated with and connect

6    with, he, all of a sudden -- on top of everything that's

7    going on his life that's got him out of control -- that

8    he wants to expand a practice down to downtown Jackson,

9    the downtown office, and another one to what?  It was

10   Trezevant or wherever in Tennessee.  And he's expanding

11   at a rate that, at one point -- and I think the testimony

12   was he was seeing up to a hundred.

13         After those two shut down, everybody

14   consolidates back to the mother ship, up to a hundred

15   people a day, in that mantic state he's in of the Rock

16   Doc, that he's going to do it all himself.  He's trying

17   to see a hundred patients a day, when Dr. Aultman told

18   you it's 25, 30 max.  He's seeing three times the number

19   of patients that it's even possible.

20         You think he's doing a full exam on a hundred

21   people, or is it just he's going into the room, listening

22   to their complaint, writing a prescription, moving on to

23   the next patient, trying to hit that 50, 60, hundred

24   patients a day?

25         See, the problem here for the government is Jeff

1    Young -- they have to prove to you beyond a reasonable

2    doubt, and that reasonable doubt is that they have to

3    convince you that he was intentionally going above and

4    beyond his license.  And it's very specific language in

5    the jury instructions, that it has to be without a

6    legitimate medical purpose and outside the course of

7    professional practice, that -- I asked Dr. Aultman what

8    are opioids for.  Treating pain.  What was he doing?  He

9    was hearing the complaint of pain and prescribing

10   opioids.  That's the medical purpose of the drugs in

11   which we're here for today.

12            Outside the course of professional practice.

13   Where was he doing this?  He was doing this at his

14   professional practice because he's a nurse practitioner

15   with a clinic, and he's running through those patients:

16   Oh, you have back pain.  Let's try this.  I'll see you in

17   a month.  You tell me how it works for you.  Oh, it

18   didn't work for you?  Well, here, let's try this one

19   until we can find what works for you.

20            What did he tell a nursing board?  I'll titrate

21   it.  I will only titrate it twice, meaning he starts out

22   with a prescription, changes it, changes it.  He even

23   told the nurse -- or the nursing board that that's his

24   practice:  We'll start you out on something.  Come back

25   in and tell me how it works, and we'll go from there.

1    That's within his practice.  That's not

2    intentionally becoming a drug dealer.  That may be, quite

3    frankly, being a bad practitioner, and there's jury

4    instructions that we'll talk about in a few minutes about

5    that.  Because the jury instructions this Court's going

6    to give you will tell you that carelessness, negligence

7    is not sufficient to convict on any charges in this case.

8    This is not a malpractice case.  This is not a negligence

9    case.  This is not he was careless.  This is he intended;

10   he's out of control.  He's seeing hundreds of patients a

11   day.  He's spiraling.

12       The proof was his divorce attorney Mr. Donahoe

13   was there on a weekly basis.  He's one of those back-door

14   patients.  But he's there to discuss the divorce.  And

15   you heard it was ugly.  I think the -- I think the word

16   was the wife was giving it as good as she was getting it.

17   And they were getting it and giving it to each other, and

18   it was all over social media.  I think it was -- Topix, I

19   think, was what they were referring to they use in

20   Jackson.  Facebook.

21       So intentional, knowing, it's not here in this

22   case, ladies and gentlemen.

23       The government put on Ms. Gutgsell.  Can't spell

24   her name.  She discussed with you Dr. Alperovich and that

25   he actually came in and reviewed the records.  Jeff sat

 1     down with him.  And you've heard from him also; he

 2     testified.  And that he had questions about Jeff's

 3     prescribing habits and that Jeff explained to him why he

 4     did what he did and that, to him, to the physician, the

 5     doctor, the M.D., it made sense.  He signed off on the

 6     jackets.  Problem was it just took a long time because he

 7     was going through each file individually with Mr. Young.

 8           Now, at some point, he decided that he didn't

 9     want to continue to be a preceptor because he was afraid

10     of the prescribing habits.  He never stopped them.  He

11     never reported Jeff.  He never called the police, never

12     called the nursing board.  He just said, I'm

13     uncomfortable going forward with this agreement.

14           The problem with that is he had already told

15     Jeff -- he had already signed off on those files, again,

16     because Jeff has to have an M.D. sign off on those files

17     telling him that everything's okay.  And that's what he

18     got from Dr. Alperovich, until he said, I'm

19     uncomfortable; I think you're overprescribing.

20           But -- and then what do we find out from

21     Ms. Gutgsell?  Jeff thinks he was smarter than anyone

22     else.  And why would Jeff think he's smarter than anyone

23     else?  Because at this point he's out of control.  Again,

24     spiraling.  He's the smartest person in the room.  He

25     knows everything.  He knows what's best for the patients,

1    his patients, which means he's not intentionally trying

2    to give them illegal drugs.  It's his good faith belief

3    that he's helping people.  No matter what any other

4    doctor says, Jeff Young thought he was helping people,

5    wanted to help people.

6              I mean, if you want to be a drug dealer, can you

7    think of an easier way to be a drug dealer than trying to

8    see a hundred patients a day?  Just go down to the

9    border, buy the drugs, bring them back, sell them on the

10   street corner.  As the government's told, they're really

11   expensive.  But instead, you're running a full-service

12   healthcare clinic with multiple employees, hundreds of

13   patients a day, a billing department, a referral

14   department, nurses, X-ray, and everything else in there.

15   You're having to pay payroll; you're having to pay rent;

16   you're having to pay insurance, malpractice, license.

17   It's a really expensive way to become a drug dealer.

18             I found it interesting that Dr. Alperovich, who,

19   at some point, was the indicted co-conspirator and is now

20   not indicted or is not -- is not -- well, actually he's

21   not the conspirator because what did I ask him?  Do you

22   have an agreement with Jeff?

23             Again, you'll get the jury instructions.  Look

24   at them carefully.  What is a conspiracy?  It's an

25   agreement; that's it.  It's not -- it's not the illegal

 1    acts.  The illegal acts are separate crimes.  Selling

 2    drugs to a pregnant woman, that's a separate crime.

 3    Selling the drugs to an undercover officer, that's a

 4    separate crime.  Conspiracy is a crime.  It's not what we

 5    call -- we call them substantive acts, the substantive

 6    acts are the selling, the drug sales.  But the

 7    conspiracy -- the conspiracy itself is a crime, and

 8    conspiracy is that agreement.  When two people agree to

 9    break the law, it's that agreement among the two people.

10    That's the crime; that's the conspiracy.  The government

11    has to put on proof that Jeff conspired with one or more

12    persons.  Well, Dr. Al very clearly said, no.  Nope, no

13    agreement.

14            And Dr. Rudin hasn't testified.

15            And the government hasn't put on any proof of

16    any agreement among any parties with Jeff.  That's the

17    conspiracy charge; that's Count 1, where there is no

18    proof of any agreement.  And the government will tell

19    you, and I'll tell you; it can be -- it can be spoken

20    or -- unspoken or spoken.  It can be in writing or not in

21    writing, but it's got to be an agreement.  There's got to

22    be proof that two or more people agreed, and in this

23    case, it's to distribute drugs to the patients.

24            Nobody's come in here and testified that they

25    were a co-conspirator.  Not a single person have said

1   that they were a co-conspirator.

2           Counts 2 through 7 with Hope Rogers -- or now

3   it's Arment because I think she told us was her last

4   name.  But Hope Rogers in the indictment, that's the

5   illegal dispensing of narcotics to a pregnant woman.

6   That one was interesting.

7           I want to talk to you about what we learned

8   while we were in trial with that.  I know we did the --

9   Defense didn't put on any proof, and I know I didn't ask

10   a lot of questions.  But I hope that when I did ask

11   questions, they were very pointed and that they were

12   illustrative or illustrate the problems with the

13   government's case.  I didn't want to beat around the

14   bush.  There are certain huge problems within this case.

15           And Hope Rogers.  She came to Jeff already

16   prescribed hydrocodone.  She was already on pain

17   medication before she came to Jeff.  How many times did

18   we have to ask?  Because the government didn't put it on,

19   and they didn't tell you.  We had to put it on so that

20   you would know because I would think you would want to

21   know this, when it's your duty to determine my client's

22   guilt or innocence.  Wouldn't you have liked to have

23   known that they were already on pain medication before

24   they came to see Mr. Young?

25           I know we -- there was some talk about

 1    continuity of care, but that's exactly what we're talking

 2    about here.  If you go and you leave one doctor and you

 3    go to the next doctor and you're on medication, you kind

 4    of expect that that prescription continues.  I agree with

 5    Dr. Aultman.  You still have to do a -- an independent

 6    evaluation, but part of that independent evaluation is

 7    looking to see what other doctors have done.  What?  You

 8    expect your doctor -- I'm on heart medication.  I go see

 9    another doctor, and he goes, oh, you don't need that

10    heart medication.  I'm going to go find another doctor.

11    But when you're on hydrocodone and you go to see another

12    doctor to establish that doctor as your primary care

13    physician, you're going to be prescribed the same

14    medication.

15         So Hope Rogers started out on the same

16    medication that she was already on.

17         The government put up, just a few seconds ago,

18    the second critical, critical piece of evidence that they

19    didn't tell you about.  We had to ask the question.

20    Dr. Aultman, if you're saying you can't give hydrocodone,

21    you shouldn't give hydrocodone and Xanax in combination

22    with each other when you're pregnant, why is her OB

23    prescribing her hydrocodone at the hospital while she's

24    pregnant?

25         Because she's on hydrocodone.  When she's in

1   pain, that's what doctors prescribed her.  Her own OB

2   prescribed her the same drugs that the government wants

3   to try to convince you was illegal.  But you know that

4   Dr. Walker -- it's in the notes.  You just saw it again

5   on the board, and we put it on in the cross-examination.

6   Dr. Walker, at the ER in Jackson, prescribed her

7   hydrocodone, the same drug.  Well, he didn't prescribe

8   her Xanax.  Well, he knew she was on Xanax because it's

9   on the PMP.

10          More importantly, Dr. Aultman.  I know we're

11  talking about a black box warning.  Again, completely

12  left out.  They -- the government told you about the

13  black box warning, but they didn't tell you that, in

14  times, it might be necessary to prescribe those drugs for

15  pregnant women, and if you do, the standard of care would

16  be to do what?  High-risk OB.

17          What did Hope Rogers tell you she had?  A

18  high-risk OB because her medical doctors, not her nurse

19  practitioner -- her medical doctors knew what she was on

20  and knew to take the steps necessary in order to make

21  sure, as she told you, she had a healthy, beautiful baby

22  girl.

23          And you got to see the photos of her at birth.

24  Child wasn't injured.  She received the medical care

25  that, in Jeff Young's opinion, medical opinion, was

1   reasonable and necessary and that had two other -- at

2   least two other physicians who were aware of it, one of

3   them who was also prescribing the exact same drug.

4   There's absolutely no basis in this evidence for Counts 2

5   through 7.  There's just no way, unless you sit here and

6   say Dr. Walker was prescribing her drugs illegally.

7          The final counts with the two undercover

8   officers, again, complaining of pain, saying they had

9   tried other medications.  Dr. Aultman said, well, you

10  know, yeah, it's unfortunate, but patients really do come

11  in and say, well, I tried, you know, somebody else's

12  medication, and it worked.  And I -- you know, I probably

13  should tell them that that's illegal, and you can get --

14  but -- but that happens.  That's fairly common.  We know

15  that's common.  We've all done that.

16         Wife has a prescription bottle, doesn't use it

17  all, Flexeril or some muscle relaxant.  And you're like,

18  oh, I hurt my back working out in the yard; I'll take one

19  of these.  We all do it.  And we go to the doctor, and

20  what do we do?  Well, you know, I tried my wife's

21  Flexeril, and it really helped.  We get the prescription.

22  That's all it takes.

23         These two young ladies -- and I submit to you

24  the proof is -- or at least the circumstantial evidence

25  is they picked women with the hopes that they were going

1    to somehow get it on tape Jeff trying to flirt or hit up

2    these women.  He didn't.  The most he did was, hey, I'm

3    having a Halloween party; you should check it out.  And

4    that was the extent of it.  No exchange of phone numbers,

5    no address, no date.

6         But they came in with their own individual

7    complaints, which is what patients do.  They come in;

8    they have symptoms; they have complaints.  You've seen,

9    and you can look at them in the back there.  Have a full

10   file, records that had been written up, blood pressures.

11        So they've done -- they come in; they check in;

12   they're seen by somebody in the clinic to do the workup,

13   which is, well, let's go get on the scale; let's take

14   your blood pressure.  What are your problems?  Let me

15   write down -- anything I need to tell the doctor today,

16   why you're here?

17        And then what happens?  Jeff Young walks in the

18   room.  Hey, I understand you have lower back pain, da,

19   da, da.  You're -- in fact, the St. Lawrence (phonetic),

20   the second CI, actually had a PMP.  And when you see Jeff

21   going through the files, the PMP had been in the file, so

22   he would have known that she was currently being

23   prescribed the medication, that another physician had

24   prescribed her that medication, and, again, continuing

25   that line of care.

1          Now, again, you don't have to like his

2    prescribing.  You don't even have to like him.  I mean,

3    that's -- this is not - this is not a "like or dislike

4    Jeff Young" kind of moment.  This is whether or not what

5    he was doing was illegally outside the course and scope

6    of his usual practice, dispensing and becoming a drug

7    dealer, going beyond his license and taking on that role

8    as the drug dealer.

9          No.  He's seeing patients, again, rushed, not

10   putting the time into it because it's absolutely

11   impossible to spend the appropriate amount of time with

12   the patients with that caseload.  Listening to the

13   symptoms, asking them what helped, what didn't help.

14   Well, let's try something else.  I'll see you back in a

15   month; we'll see how that works.  Too strong?  Too weak?

16   About right?  Okay.  Good.  Let's just keep it there.

17   That's being a -- that's being a healthcare professional.

18   That's in his practice.  He's not intentional.

19          Count 1.  There's no agreement.

20          Hope Rogers:  Absolutely fine.  Had two doctors

21   on it doing the exact same thing.  Everything was being

22   handled professionally.

23          Undercovers:  At worst -- at worst, maybe just

24   carelessness, if you think it was wrong.  That's if you

25   think it's wrong.

1      Carelessness:  Maybe if somebody had gotten

2  injured, it might be a negligence claim, a malpractice

3  claim, but it's not a drug dealer claim.  It's not.  It's

4  not a crime.

5      Again, healthcare providers:  We're talking

6  about how we treat our healthcare providers.  It's not

7  that they prescribed drugs.  They're supposed to

8  prescribe drugs.  That's what their job is it to do.

9  They have a license from the DEA to prescribe drugs.  It

10  has to be so far beyond the scope of that license that

11  they've completely disregarded their entire practice of

12  medicine.  It cannot be for a medical reason.  It's got

13  to be outside of the scope.

14      It's not your job to shut his practice down.

15  It's not your job to claim that he's negligent or that he

16  committed malpractice.  Your job is to determine whether

17  or not the government has proven that he's become a drug

18  dealer.  You don't have to like him.  You don't have to

19  agree with him.  Look, you don't even have to feel sorry

20  for him, if you think he was out there and purposely

21  became this buffoon of a character with his horrible

22  rapping and hanging out with women.

23      Speaking of the women, I'll leave you with this:

24  The government talks a lot about his use of the

25  prescription pad and sex.  I agree with that.  I would,

1  too, if I were a prosecutor.  I'd do everything I could

2  to tie those two together, right?  Well, he was

3  prescribing drugs for sex.  Oh, I'd go for that.  That's

4  all we would talk about.  We wouldn't talk about anything

5  else.  No Hope Rogers, no undercover agents.  Here's the

6  problem.

7        They didn't charge him with a single count of

8  writing prescription to a woman he had sex with, not one.

9  It's not charged.  They didn't put on a single woman who

10  said, oh, yeah, I was only having sex with Jeff Young

11  because he was writing me prescriptions.  Not one.  Not a

12  single witness.

13        You'll see in the indictment, when you take it

14  back there -- and it's -- the indictment's long, and I'm

15  going to be real honest with you, there's a lot of paper

16  in this case, but do look at the indictment.  The

17  indictment does allege that he was using his prescription

18  pad for sex, but it's in the conspiracy count.  And he's

19  not charged in the conspiracy count with using his

20  prescription pad for sex.  It's saying that part of the

21  criminal agreement between him and someone else, part of

22  that was for this purpose.

23        If you find that he was or if you believe that

24  he was using his prescription pad for sex, there's no

25  count in the indictment because Count 1, you must first

1    determine if there was an agreement between Jeff Young

2    and somebody else for him use the prescription pad to

3    have sex.  So it's not there.  It's in the conspiracy,

4    and there is no conspiracy.

5         I didn't write the indictment, but it's you that

6    have to follow the indictment.  There are no substantive

7    counts in this indictment based on that allegation.  It's

8    within and contained within the conspiracy count, and the

9    conspiracy count, I believe you'll find, is not supported

10   by the proof.

11        Ladies and gentlemen, it's been a remarkably

12   quicker trial than I expected.  I really appreciate that

13   y'all have sat through this.  The days have been long.

14   You have more work to do.

15        On behalf of Jeff Young, we thank you and

16   appreciate your time.  I'm asking that when you go and

17   deliberate, you look at the indictment; you look at the

18   counts, and you return the verdict that this proof

19   requires.

20        And, again, this proof was based on the

21   government's witness telling you that they put on the

22   evidence -- they didn't put on evidence that wasn't

23   relevant to what they were trying to prove.  I believe

24   that through our cross-examination we have been able to

25   show you that there is other proof to this case that will

1    and provide you facts and circumstances to acquit

2    Mr. Young of all counts in this case.

3           Their forty-, fifty-thousand-dollar expert

4    witness proved to you that Hope Rogers was treated

5    appropriately and had the proper care with a high-risk

6    OB.  No conspiracy.  Nothing in this case that rises

7    above carelessness.

8           The jury instructions the Court gives you, when

9    it talks about -- when it talks about what your duty is

10   to the proof -- gives you a good faith instruction in

11   your jury instructions.  And at the bottom, please note

12   negligence and carelessness, foolishness are not

13   sufficient to convict.

14          Return the verdict of not guilty.  Return the

15   verdict of not guilty.

16          Thank you, ladies and gentlemen.

17          **THE COURT:**  Thank you, Mr. Ferguson.

18          We'll finish.

19          **MR. FERGUSON:**  Thank you, Your Honor.

20          **MS. PAYERLE:**  Thank you, Your Honor.

21          Okay.  Good afternoon.  I'm going to be very

22   brief.  My job here is just to address some of the things

23   that Mr. Ferguson just told you.

24          The framework for doing that is probably best

25   explained in the jury instructions about reasonable

1    doubt, just to give you some framework.  It's very useful

2    instruction, and it says while the government's burden of

3    proof is a strict or heavy burden, it is not necessary

4    that the defendant's guilt be proved beyond all possible

5    doubt.  It's only required that the government's proof

6    exclude any reasonable doubt.

7         Possible doubts or doubts based purely on

8    speculation are not reasonable doubt.  A reasonable doubt

9    is a real doubt, a doubt that is based on reason and

10   common sense after careful and impartial consideration of

11   all the evidence.

12        You-all are here.  We have this jury system

13   because you bring something to this courtroom that is so

14   much more important than any of the law degrees or

15   special training or medical licenses or anything that are

16   sitting here, and that is your common sense.  That's what

17   you bring, and that is why it's so important that you

18   exercise it when we're thinking about the defenses.

19        So I'm going to just quickly run through them

20   and sort of view them just through the lens of common

21   sense.  So the first is just that there's been no

22   conspiracy; there's been no agreement.

23        As we all talked about, through the lens of

24   common sense, criminals don't get together in dark rooms

25   and conspire with tinfoil hats to commit crimes and put

*UNREDACTED TRANSCRIPT*

1    that in writing and sign a contract and so forth.  What

2    they do is they help each other through actions.

3            So Kristie Gutgsell, the office manager,

4    testified that she pled guilty to agreeing to help Jeff

5    Young in his criminal purpose.  She said:  I helped Jeff

6    prescribe controlled substances by keeping the clinic

7    open, loaning money to pay employees, keeping the door

8    open.  He couldn't have done that if I didn't help him

9            And she pled guilty to aiding and abetting.

10           Dr. Alperovich:  Although, he didn't sort of cop

11   to the exact words of conspiracy, again, people rarely

12   do, but they said -- he said:  I pretended to be his

13   supervisor.

14           He said he lied to the nursing board when they

15   investigated.  He said he signed charts he knew to be

16   problematic.  And he, too, admitted that Mr. Young

17   couldn't have done it without him.

18           And Dr. Rudin:  You heard about him.  He's the

19   last preceptor through the last half of 2016.  Jeff

20   Young's buddy who lived in Chicago, who never set foot in

21   the clinic, let Jeff Young use his name as supervising

22   physician.  And for that reasons -- reason -- in a text

23   with Kristie Gutgsell at Exhibit 17, Jeff Young calls

24   him, quote, the perfect preceptor.

25           Jeff Young needed these people.  He needed these

1   people.  These are just three.  You may find others that

2   you have heard from or heard about.  But the evidence was

3   that Jeff Young needed people to help him, to agree with

4   him, to under -- they all saw.  They all understood what

5   he was doing here.  And they agreed with him, and they

6   helped him, and that's sufficient for a conspiracy.

7          The second thing you heard Mr. Ferguson say is

8   that he was broken and overwhelmed.  Let's take a look at

9   whether that matches up through a lens of reasonableness

10  with the evidence.

11         The fact is, folks, you got to meet Jeff Young

12  during this period of time in his life because you saw

13  him on video, and you saw him -- and you heard his voice

14  in the recordings with Shirley Pickering.  So you can

15  actually see him and hear him for yourself during this

16  time.  You heard him on the video with Katie Crowder and

17  Christina Norton.  He was cool; he was calm; and he was

18  collected.  He was excited about his TV show.  He was

19  laughing.

20         You heard him in his interview with Board

21  Investigator Shirley Pickering lying with ice in his

22  veins, perfectly coherent about what the rules were and

23  lying smoothly that he was following them.

24         You heard from Daniel Rogers.  Mr. Young said:

25  Pain's the plan.  We're going to get people in here month

*UNREDACTED TRANSCRIPT*

 1   after month.  That's where the money is.

 2         And you heard that when Dr. Alperovich called

 3   him in March of 2016 to say, hey, what's all this

 4   internet nonsense?

 5         What did Jeff Young say?  Did he say, gosh, I'm

 6   just so overwhelmed by my marriage that I can't help

 7   myself, my divorce?

 8         He said -- he said:  This is my marketing

 9   strategy.  This is how I'm getting people into the

10   clinic.  It's working.

11         Jeff Young knew what he was doing.  He

12   understand -- he understood that controlled substances

13   were the way to get what he wanted.

14         And Mr. Ferguson told you that, you know, he was

15   just a bad practitioner.

16         This is really where your common sense is going

17   to come into play, folks.  There's lots of drugs that

18   doctors can prescribe:  birth control, diabetes

19   medication, blood pressure, heart meds.  It's not like he

20   was just writing those prescriptions because he didn't

21   have time to spend with his patients.  It's not like it

22   takes any longer to write a prescription for birth

23   control or heart meds.  It's no accident he was

24   prescribing controlled substances, addictive drugs.

25         Cyndal Story was selling those drugs.  Whitney

1   Henley was doing drugs at his house.  You can see that in

2   the text messages.  Keith Moffit needed to get past

3   detox.  You think Amy Sanders would've been sleeping with

4   him if he was prescribing her all the heart medication

5   she wanted?

6         And that brings me to the role of sex for drugs

7   in the indictment.  Mr. Ferguson said that if -- there's

8   no count about sex for drugs.  Okay.  Common sense again,

9   folks.  He also said there's no evidence that Mr. Young

10  understood what he was doing was wrong, and that is the

11  evidence.  The evidence -- everybody understands it's

12  wrong to trade sex for drugs, and he understood that,

13  too.  Right?

14        So that's part of the evidence, that he

15  understood.

16        Look, I'm not prescribing these right.  I'm

17  abusing my prescription pad.  I'm putting these drugs

18  into the community:  That's what you can use to re-anchor

19  yourself when you're thinking about, what did Mr. Young

20  think while he was doing all of this?

21        And then last, I want to talk quickly about

22  continuity of care.  Katie Crowder wasn't getting

23  continuous care.  She'd never had an opioid before in her

24  life.  Remember the undercover?  She had a perfectly

25  clean PMP.  Dr. Aultman said she was opioid naive, and he

1   prescribed her hydrocodone and fentanyl in her first,

2   like, three visits.

3          With Hope Rogers -- again, I want you to view

4   this through the lens of common sense.  Mr. Ferguson, I

5   believe, said that because her OB/GYN, while she was in

6   the hospital for preterm labor, prescribed her three

7   days' worth of hydrocodone to take in the hospital --

8   Mr. Ferguson said this was, I believe, two docs doing the

9   exact same thing.  That's not the exact same thing as

10   what Jeff Young was doing.  You guys saw that for

11   yourselves.

12          Through the lens of common sense, prescribing

13   somebody some pain medications while they're in the

14   hospital under the -- you know, where they can be

15   examined, where they can be monitored, where they can

16   evaluate that person's level of pain and the

17   appropriateness of it is not the same as prescribing them

18   30, 90, 120 pills of hydros -- hydrocodones month after

19   month, next to a Xanax prescription, with no actual

20   diagnosis to explain why you're doing it.  It simply

21   isn't the same thing.

22          And so we ask that you bring your common sense

23   to bear on these questions.  The evidence is exactly what

24   it looks like.  Jeff Young absolutely understood what he

25   was doing was wrong.  He did it over and over again.  He

1  did it for years, and that's why we stand by our request

2  that you bring back a verdict of guilty on all counts.

3  Thank you very much.

4          **THE COURT:**  All right.  Thank you very much.

5          I think you've heard all of the proof, and

6  you've heard all the arguments now.  Now it's my fun task

7  to read the instructions to you.  First, I need to ask if

8  anyone needs a break before we do this.

9          **THE JURY:**  I do.

10         **THE COURT:**  Okay.  I figured I'd get at least

11  one.  And we're getting close to the noon hour.  Probably

12  in the next 10 minutes or so, your lunch is going to be

13  ready for you.  So it's going to take me about 30, 40

14  minutes to read this.  I think we're going to go ahead,

15  and I'll read this to you after lunch, after the lunch

16  break.

17         We're a few minutes before noon, so we will pick

18  this up at -- we'll just make it right at 1:00, 1:00.

19  That way -- and then I'll be ready to give this to you,

20  and then the jury can begin your deliberations.

21         Not quite ready yet as far as the notes are

22  concerned; still leave them in your chairs.  Don't

23  discuss.  We're almost done.  And I'm going to go ahead

24  and excuse you into the jury room for break and then also

25  for lunch.

*UNREDACTED TRANSCRIPT*

1          (Jury out at 11:51 a.m.)

2          **THE COURT:**  Okay.  We'll be down for a little

3   over an hour.  See everyone at 1:00, and we will conclude

4   at that time, let the jury start deliberating.

5

6          (The morning session concluded at 11:51 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **C E R T I F I C A T E**

2

3

              I, LASHAWN MARSHALL, RPR, LCR, do hereby
4   certify that the foregoing 84 pages are, to the best of
    my knowledge, skill, and abilities, a true and accurate
5   transcript from my stenotype notes of the Jury Trial
    proceedings on the 31st day of March, 2023, in the matter
6   of:

7

8

9

10

    United States of America
11
    vs.
12
    Jeffrey W. Young, Jr
13

14
    Dated this 2nd day of April, 2023
15

16

17

18

19

20

21

22

23              _S/Lashawn Marshall_
                Lashawn Marshall, RPR, LCR
24              Official Court Reporter
                United States District Court
25              Western District of Tennessee

*UNREDACTED TRANSCRIPT*