```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TENNESSEE
                      WESTERN DIVISION
   _____
                                   )
   UNITED STATES OF AMERICA,        )
                                    )
          Plaintiff,                )
                                    )
   VS.                              )  NO. 1:19-cr-10040-JTF-1
                                    )
                                    )
   JEFFREY W. YOUNG, JR,            )
                                    )
          Defendant.                )
   _____



              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

                         BEFORE THE

              HONORABLE JOHN T. FOWLKES, JR.

                      March 28, 2023




                      MORNING SESSION
```

```
                    LASHAWN MARSHALL, RPR
                    OFFICIAL COURT REPORTER
                 167 N. MAIN STREET - SUITE 242
                  MEMPHIS, TENNESSEE  38103
```

*UNREDACTED TRANSCRIPT*

1          **A P P E A R A N C E S**

2

3    **FOR THE PLAINTIFF:**

4                    MS. KATHERINE PAYERLE
                     MR. ANDREW PENNEBAKER
5                    Assistant United States Attorneys
                     UNITED STATES DEPARTMENT OF JUSTICE
6                    FRAUD SECTION
                     1400 New York Avenue, NW
7                    Washington, DC  20530

8

9    **FOR THE DEFENDANT:**

10                   MR. CLAIBORNE H. FERGUSON
                     MR. RAMON DAMAS
11                   Attorneys at Law
                     CLAIBORNE FERGUSON LAW FIRM, P.A.
12                   294 Washington Avenue
                     Memphis, Tennessee  38103

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **W I T N E S S   I N D E X**

2

3    **HEATHER GOSLEE**

                                                      **PAGE**

4

         DIRECT BY MR. PENNEBAKER                      9
5        CROSS BY MR. FERGUSON                         43
         DIRECT BY MR. PENNEBAKER                      61
6        CROSS BY MR. FERGUSON                         68

7

     **KRISTIE GUTGSELL**
8                                                      **PAGE**

9        DIRECT BY MS. PAYERLE                         73
         CONTINUED DIRECT BY MS. PAYERLE               114

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                          **KRISTIE GUTGSELL,**

 2    having been first duly sworn, was examined and testified

 3    as follows:

 4                        **DIRECT EXAMINATION**

 5    **BY MS. PAYERLE:**

 6    Q.    Good morning, Ms. Gutgsell.

 7    A.    Good morning.

 8    Q.    Would you please just introduce yourself to the

 9    jury, your name and what city you live in.

10    A.    Kristie Gutgsell.  And I live in Henderson,

11    Tennessee.

12    Q.    And --

13          **THE COURT:**  Excuse me.  Could you spell that

14    last name?

15          **THE WITNESS:**  Sure.  It's G-U-T-G-S-E-L-L.

16          **THE COURT:**  Thank you.

17          **MS. PAYERLE:**  I understand that T is silent.

18    Sorry.

19          **THE WITNESS:**  That's right.

20    **BY MS. PAYERLE:**

21    Q.    Okay.  Now, Ms. Gutgsell, do you know the defendant

22    Jeffrey Young?

23    A.    I do.

24    Q.    Okay.  And could you identify him somewhere in the

25    courtroom today based on where he's sitting and something

1    he's wearing?

2    A.    He's sitting right there, and he has on glasses and

3    a suit.

4    Q.    Okay.

5         **MS. PAYERLE:**  May the record reflect that the

6    witness has identified the defendant in the courtroom?

7         **THE COURT:**  The record will reflect the witness

8    has pointed out and identified the defendant.

9    **BY MS. PAYERLE:**

10   Q.    How do you know Mr. Young?

11   A.    I worked for him as his office manager.

12   Q.    And where was that?

13   A.    In Jackson, Tennessee.

14   Q.    Is that Madison County?

15   A.    Yes, ma'am.

16   Q.    What -- what was Preventagenix?

17   A.    It was a medical clinic.

18   Q.    Okay.

19        **MS. PAYERLE:**  I'm going to show the witness a

20   series of photographs.  I believe it's 12 pages.  If I

21   may approach, Your Honor.

22        **THE COURT:**  Go ahead.

23        **MR. PENNEBAKER:**  That's been premarked

24   Government's 601.

25   **BY MS. PAYERLE:**

1    Q.    And ask you to page through them and see if these

2    are photographs of various locations at Preventagenix.

3              (A document was passed to the witness.)

4    **BY MS. PAYERLE:**

5    Q.    Okay.

6    A.    Yes, ma'am, that's the clinic.

7    Q.    Thank you very much.

8    A.    Yes, ma'am.

9         **MR. PENNEBAKER:**  Your Honor, I'd like to

10   introduce into evidence the 12 pages that are located at

11   Government's 601, marked Page 8 through 19.  Actually be

12   11 pages.  My math is wrong.

13        **THE COURT:  Eleven,** I'm assuming, pages with

14   photos of the clinic; is that correct?

15        **MS. PAYERLE:**  Yes, Your Honor.

16        **THE COURT:**  We'll go ahead and receive.  Be

17   collective Exhibit Number 7.

18             (The above-mentioned item was marked as

19   Exhibit No. 7.)

20   **BY MS. PAYERLE:**

21   Q.    And let's just take a look at the page that we

22   internally marked as 11 and publish to the jury.  Thank

23   you.

24        And what are we looking at here?  Is that the front

25   of Preventagenix?

 1  A.    It is.  It's the outside of the front of the

 2  clinic.

 3  Q.    Okay.  We can take that down.

 4        How long, Ms. Gutgsell, were you the office manager

 5  there?

 6  A.    I started in August of 2015, and I quit in January

 7  of 2017.

 8  Q.    And did you replace somebody as the office manager?

 9  A.    I did.

10  Q.    Who was that?

11  A.    Heather Goslee.

12  Q.    As the office manager, what were your jobs?

13  Describe generally.

14  A.    I was in charge of paying different bills for the

15  clinic, making sure that the schedule -- excuse me.

16  Q.    That's okay.  Take your time.

17  A.    That the schedule was ready for the day, that the

18  employees were ready for the day, that Jeff was ready to

19  work for the day.

20  Q.    And I just saw you hesitate a moment.  Are you --

21  are you a little nervous?

22  A.    Just a little bit, yeah.

23  Q.    Why is that?

24  A.    It's -- this has been a very difficult time.

25  Q.    Okay.  You said you were in charge of the schedule

1    for the day.

2        At this time, I'd like to show you a document that

3    the government has marked Exhibit 703.

4        **MS. PAYERLE:**  I just need to find it in my stack

5    here, Your Honor.  I apologize.

6        I'm going to seek assistance of those more

7    organized than I.

8    **BY MS. PAYERLE:**

9    Q.   Show you 703.  It's a five-page document.

10       Is this a schedule, an example of a schedule for

11   the day for patients that you just talked about?

12       (A document was passed to the witness.)

13   A.   Yes, ma'am.

14       **MS. PAYERLE:**  All right.  The government moves

15   to admit.

16       **THE COURT:**  We'll receive it.  Exhibit

17   Number 8.

18       (The above-mentioned item was marked as

19   Exhibit No. 8.)

20       **MS. PAYERLE:**  Be number -- is that 8?  Thank

21   you.

22   **BY MS. PAYERLE:**

23   Q.   All right.  Let's go ahead and publish Exhibit 8.

24       All right.  Just kind of describe to the jury what

25   we're looking at here as an example document.

1   A.    So this would be basically all the patients for the

2   day.  It would be their -- their appointment time, their

3   name, and then what their chart number was in the system,

4   their telephone number, who the provider was, which was

5   Jeff, what type of insurance they had.  And then in the

6   comments was typically what they were there for.

7   Q.    All right.  Let's go ahead and just blow up, so the

8   jury can see, maybe the top third of the page.

9         You see on the right there are several patients

10  where the description is one-month follow-up.  What were

11  those patients coming in to get?

12  A.    Most of those patients would be coming in to get a

13  controlled prescription.

14  Q.    Why -- why would it be labeled one-month follow-up?

15  A.    Because they came in monthly to get those

16  controlled prescriptions.

17  Q.    And every time they came in the door, did the

18  clinic bill for an office visit to their insurance?

19  A.    Yes, ma'am.

20  Q.    And if they didn't have insurance, how would the

21  clinic get paid?

22  A.    They would pay out of their own pocket.

23  Q.    And what was that?  Do you remember what that cost?

24  A.    There were different prices for whether it was an

25  established patient, a new patient, or if they had to

 1   take a drug screen or not.  It would be right around a

 2   150, $175, if I remember correctly, depending on a drug

 3   screen or if they were established or not.

 4   Q.    Okay.

 5        **MS. PAYERLE:**  And Ms. Silverberg, if we could

 6   just blow up, so they can see the rest of this page, the

 7   middle third and then the bottom third.

 8            This is all for one day.

 9            And then let's go to the next page and let the

10   jury take a look at that second page of that same day.

11            Okay.  Back out and take -- look at the bottom

12   half.

13   **BY MS. PAYERLE:**

14   Q.    Ms. Gutgsell, is this the typical number of

15   patients that Mr. Young would see on a day, this sort of

16   full- to two-page list?

17   A.    Yes, ma'am.

18   Q.    And about a typical kind of distribution of the

19   number of one-month follow-up patients versus other

20   issues?

21   A.    Correct.  Yes, ma'am.

22   Q.    All right.  Next up, I'd like to show you what's

23   been marked Exhibit 602.

24        **THE COURT:**  Before we get to that, what was the

25   date of this schedule?

1          **MS. PAYERLE:**  Thank you.

2          **THE COURT:**  Are you able to see?

3          **MS. PAYERLE:**  Oh, I'm sorry.  Let's go back to

4    Page 1, and blow up the very top there.

5          **THE WITNESS:**  The date of this is actually 1/11

6    of 2017.

7          **MS. PAYERLE:**  Okay.  That's January 11th.  Thank

8    you.

9          **THE COURT:**  Do you know the number of patients

10   that day?  If you don't know, that's fine.

11         **THE WITNESS:**  I don't know.  No, sir, I don't

12   know.

13         THE COURT:  That's fine.

14         **MS. PAYERLE:**  All right.  Ms. Silverberg, we can

15   put that down.

16   **BY MS. PAYERLE:**

17   Q.   And I'm going to show you exhibit -- what's been

18   marked as 602, and this is a one-page exhibit.  It's the

19   floor plan with some edits you'll tell the jury about at

20   Preventagenix?

21   A.    Correct.

22         **MS. PAYERLE:**  Move to admit, Your Honor.

23         **THE COURT:**  We'll go ahead and receive it, floor

24   plan of the clinic.

25              (The above-mentioned item was marked as

1    Exhibit No. 9.)

2            THE COURT:  That'll be Number 9.

3            **MS. PAYERLE:**  And would you publish,

4    Ms. Silverberg, Exhibit 602.

5    **BY MS. PAYERLE:**

6    Q.    All right.  So you've just seen a list, or you've

7    just talked about a list of patients that were on the

8    schedule.  So focusing specifically on the list of

9    patients that were sort of officially scheduled at the

10   clinic, would you describe for the jury where they would

11   come into the clinic on this floor plan?

12   A.    Okay.  So typically where it says "main entrance,"

13   that was the front door.  And then they would walk in and

14   go to the right, which is Suite B.  And then there's an

15   area right there where it says "patient seating."  That's

16   where patients would come in and seat.  And then the

17   desk, that's where they would check in with the

18   receptionist.

19   Q.    Okay.  And then if they were called back to be seen

20   by Mr. Young, where would they go?

21   A.    Okay.  So if you see to the right of where it says

22   "office staff desk," there's a door.  Yes, ma'am, right

23   there.

24   Q.    I circled it.  There we go.  Okay.

25   A.    So they would go through that door, and that would

 1  take you to the back part where the patient rooms, the

 2  lab, the triage area and all that is.

 3  Q.    Okay.  The patient rooms.

 4        Okay.  And could you describe for the jury sort of

 5  what the waiting room looked like in terms of the

 6  patients who were there during the time that you worked

 7  at Preventagenix?

 8  A.    Like as far as what the patients looked like?

 9  Q.    Yes.  And was it empty or full, that kind of thing.

10  A.    It was always full.

11        The -- the patients, a lot of them looked as if

12  they had issues.

13  Q.    Okay.  And, of course, you're under oath, and so

14  now is not the time to be polite.  If you could just

15  describe to the jury more specifically what you observed

16  with Mr. Young's patients.

17  A.    As if they were strung out.

18  Q.    Okay.  Now, where was -- where was your office on

19  this map?

20  A.    Okay.  So if you look back at the main entrance,

21  that area right there is kind of like a common area as

22  you walk in the front door.  And if you go to the left,

23  that would be the business side.  And my office -- you go

24  through that door, and my office was -- Jeff's office was

25  in the very end.

1    Q.    Here?

2    A.    No, other -- the other end.

3    Q.    All right.  Over here somewhere?

4    A.    Down by where it says "door," all the way at the

5    end of the corner.

6    Q.    So over here?

7    A.    Yes.  And then mine would be right in front of his.

8    Q.    Right here?

9    A.    No.

10   Q.    No?

11   A.    On top, I guess I should say.  Sorry.

12   Q.    Okay.

13   A.    And then the files would be farther down, like in

14   the third room.

15   Q.    Okay.  Now, you talked about this sort of -- the

16   process for the patients that we saw on that list.  Did

17   everybody who was getting prescriptions from Jeffrey

18   Young go -- go through the waiting room and wait to get

19   called back?

20   A.    No, ma'am.

21   Q.    Explain briefly what you mean by that.

22   A.    Jeff had a lot of friends and a lot of people that

23   would come in through -- if you see in the back where it

24   says "lab," there's -- there is a back door beside the

25   lab that's not on this piece of paper.

1   Q.    And actually while you're talking about that, can

2   we please publish for the jury Exhibit -- I believe

3   it's 7 and our internal page marking 16.

4         Maybe a different page.  That will be Page 9 of

5   Exhibit 7.  And what are we looking at here?

6   A.    That is the actual back door of the clinic.

7   Q.    Okay.  And so let's go back to the floor plan at

8   Exhibit 9.

9         So you said some patients came in through that back

10  door.  Were there other ways that people who were getting

11  prescriptions came into the clinic to see Mr. Young?

12  A.    Sure.  Some would come in the main entrance and go

13  to the left, like where my office is and his office was.

14  Some would still walk into the main patient area, and

15  they were recognized by the -- the receptionist, and they

16  would get up, because that door that is right there in

17  the regular patient seating was always locked.  Yes,

18  correct.  And the receptionist would recognize them as

19  being one of Jeff's friends.  And they would just,

20  without questions asked, get up and go and lock the door,

21  and they would just walk back there.

22  Q.    Okay.  So these -- these people who bypassed the

23  normal patient procedure, I know you've described they'd

24  come into the office through various ways.  But just for

25  simplicity, can we sort of call them back-door patients?

 1   A.    Sure.  Sure.

 2   Q.    Okay.  And can you also describe -- was there a

 3   category of patients called VIPs at the clinic?

 4   A.    Yes.

 5   Q.    Okay.

 6   A.    That's different.

 7   Q.    They're different.  Okay.

 8   A.    Yes.

 9   Q.    Can you explain to the jury who VIPs were?

10   A.    Jeff had a system set up that if you paid, I

11   believe it was a thousand dollars, that was for a year of

12   what he called like a concierge service to where they

13   would get private access to him, whether it'd be Facebook

14   Messenger, telephone calls, not having to wait in the

15   waiting room.  They would always get to get called back

16   first.  Those were the VIP patients.

17   Q.    And did that -- did that program really take off,

18   that thousand dollars a year to get special access to

19   Jeffrey Young?

20   A.    When I was there, no, it didn't.  I didn't know

21   many patients that were a part of that.

22   Q.    But you did have people with special access, these

23   back-door patients who weren't paying special premiums?

24   A.    Correct.  Those are two different types of

25   patients.

1    Q.    All right.  Can you name the names of these --

2    let's call them back-door patients that would come in to

3    see Mr. Young?

4    A.    Sure.  Like Ben Elston, Daphne Joyner, Alexandria

5    Gray.

6    Q.    Were there any people that have fame or sort of

7    notoriety in some way?

8    A.    Oh, yes.  He was -- he was friends with a lot of

9    musicians, rock stars, popular groups.

10   Q.    About how many times a week did you see back-door

11   patients come in to see Mr. Young and bypass these normal

12   doctor's office procedures?

13   A.    Well, it happened on a daily basis, so it was

14   several times a day.  So if I had to classify, like, for

15   a week, I would say at least 10 times, 10 people a week.

16   Q.    And over the time that you were there, can you

17   estimate the number of these sort of back-door patients,

18   the total number of people that came in, in alternate

19   ways through the clinic?

20   A.    Oh, well, considering I worked there for a little

21   over a year, I would have to say it was well over a

22   hundred different people.

23   Q.    All right.  Let's talk a little bit about these

24   people.  Can you put them in sort of a categories?  Was

25   there anything that they had in common?

1  A.    I mean, I guess some of the people did have

2  different things in common.

3  Q.    Okay.  Let's -- first of all, were they men and

4  women?

5  A.    They were both.  Yes, men and women.

6  Q.    Okay.  So who were the men?  Like, what did they

7  have in common?

8  A.    Most of the men were musicians, buddies that Jeff

9  had that, you know, he either grew up with or played

10 music with.

11 Q.    Okay.  And did the women have anything in common?

12 A.    Most of them were pretty women who were either

13 sleeping with Jeff or attracted to Jeff or Jeff was

14 attracted to.

15 Q.    And let's start with the women, if we could.

16 Can -- can you sort of estimate the quantity of women who

17 were part of this back-door group of a hundred that

18 you're talking about?

19 A.    Probably more than half were women.

20 Q.    And how did you know that he was sleeping with them

21 or trying to sleep with them or vice versa?

22 A.    He bragged about it, and you could also hear it.

23 Q.    What do you mean by "hear it"?

24 A.    He would have sex with them during the working day

25 in his office.

1    Q.    And where were you that you could hear?

2    A.    In my office.

3    Q.    So right next door?

4    A.    Correct.

5    Q.    What specifically, if you could tell the jury,

6    would he say when he was bragging about it?

7    A.    There was tap-that-ass Tuesday, tap-that-ass

8    Thursday.  There was -- he was going to have a nooner,

9    which was during lunch hour.

10         He would, after he was done, put his fingers in my

11   face for me to smell.

12   Q.    And pardon me, but for the -- for jurors who might

13   not know, when you say "tap that ass," what is -- is that

14   slang?

15   A.    For he's going to have sex with these people.

16   Q.    Can you name some of these women that were in this

17   sort of back-door category who you knew he was sleeping

18   with?

19   A.    Sure.  Courtney Howell, Anastasia Brown, Daphne

20   Joyner.

21   Q.    Sorry.  Was it Anastasia Brown?

22   A.    Uh-huh.

23   Q.    Okay.  And Daphne Joyner.  Do you know if she

24   worked at the clinic?

25   A.    She did.

 1   Q.    Okay.  Was she also known as Daphne Montoya?

 2   A.    She was, yes, ma'am.

 3   Q.    Okay.  Now, you mentioned the name Courtney Howell.

 4   Did you witness an incident regarding Courtney Howell?

 5   A.    I did.

 6   Q.    Could you tell the jury about that, please?

 7   A.    She was a patient as well as a person that Jeff had

 8   sex with on a -- many occasions.

 9         One time she came in on the business side and went

10   back to his office, which was right next to mine, and he

11   came back there.  They talked.  She had a drink.  And

12   then later, once he was done with patients, he came in,

13   shut the door, had sex with her, because I could hear it,

14   and then left to go see patients again.  And when I left

15   my office, I looked over, and she was asleep on his

16   couch.

17   Q.    Did you see what condition she was in?  When she

18   first came in the office, how did she look?

19   A.    She was fine.

20   Q.    And did you ever see her sometime between the time

21   that she was fine and the time that she was asleep?

22   A.    Yes.

23   Q.    And what was that sort of intermediate period like?

24   A.    Like she was having a hard time holding her head

25   up.  Thought she was sleepy.  You know, something was

1    going on with her.

2    Q.    Was Mr. Young prescribing controlled substances to

3    Courtney Howell?

4    A.    Yes, ma'am.

5    Q.    And how do you know that?

6    A.    There's a thing called PMP that you can pull to

7    see.  It was something that the receptionist would do on

8    a daily basis before the patients come in to see their

9    different controlled prescriptions.  And then Jeff would,

10   most of the time, chart it and -- in their charts.

11   Q.    Okay.  And just because we haven't heard the term

12   yet, can you just describe for the jury what the PMP is?

13   A.    Yes.

14   Q.    By the way, is it also called a CSMD?

15   A.    Yes.

16   Q.    Okay.  Same document?

17   A.    Same thing.

18   Q.    Okay.

19   A.    It's the same thing.  Basically it's a database

20   that physicians have access to, and it's supposed to help

21   you see -- if they're getting a controlled substance from

22   any doctor, it will show that.  And -- and you're

23   supposed to check to make sure people aren't doctor

24   shopping or getting overprescribed or getting, you know,

25   different medications on a monthly basis.  It was -- it

1    was something that we did, that the receptionist did on a

2    daily basis.  They would pull that and put it on the

3    front of the chart.

4    Q.    And so through looking at the PMP, you could see

5    the prescriptions that Mr. Young was writing to various

6    people?

7    A.    Correct.

8    Q.    Okay.  I guess, do you have anything to share about

9    other women that fall into this category of back-door

10   patients?

11   A.    Most all of those women were receiving controlled

12   substances as well.

13   Q.    Okay.  You also mentioned -- let's talk more about

14   the men who were coming in the back door.

15         Can you name a few of -- I think you mentioned a

16   gentleman named Ben Elston?

17   A.    I did, yes, ma'am.

18   Q.    Did you know somebody named Jay Green?

19   A.    Yes, ma'am, I do.

20   Q.    Did he fall into that category?

21   A.    He did.

22   Q.    What did Jay Green do for a living?

23   A.    I believe he was a police officer for another

24   county, not Madison County.  I don't remember which one.

25   Q.    And did Mr. Young ever ask any favors of Jay Green?

1   A.    He did.

2   Q.    And explain what kind of things he would ask Jay

3   Green to do for him.

4   A.    He -- besides being his bodyguard, he went out with

5   Jeff a lot and acted as his bodyguard.  But he -- since

6   he was a police officer, he was able to look up different

7   things.  You know, if Jeff had a warrant or anybody filed

8   anything against him, Jay was able to look up in whatever

9   database to see if anything like that had happened.

10  Q.    And did Mr. Young prescribe controlled substances

11  to Jay Green?

12  A.    I do not know.

13  Q.    Okay.  Was there another police officer named

14  Bryant whom he -- with whom he was friends?

15  A.    Brian Spencer?

16  Q.    Is he a police officer?

17  A.    Yes, ma'am.

18  Q.    Okay.  Were they -- was he friends with Mr. Young?

19  A.    Yes.

20  Q.    All right.  And was -- was Brian or somebody Brian

21  was related to getting prescriptions from Mr. Young?

22  A.    His wife Lydia.

23  Q.    And did Mr. Young ever ask Brian to look up

24  information?

25  A.    Yes.

1   Q.    Okay.  What kind of information?

2   A.    The same thing, to see if -- if warrants were filed

3   or if his -- if Jeff's ex-wife had filed any kind of, you

4   know, harassment against him.  She threatened that often

5   with him, and so he wanted to know if she did, in fact,

6   follow through with what she said.

7   Q.    And then you also mentioned that -- that Jay Green

8   would serve as a bodyguard.  Did he have anybody else who

9   he would call his bodyguard?

10  A.    Ben Elston as well.

11  Q.    Okay.  And did he tell you -- did he tell you why

12  he needed a bodyguard?

13  A.    Jeff, as he would like to say, had a lot of haters,

14  and he thought that he needed protection from these men.

15  Q.    And did they -- did they bodyguard him at the

16  clinic or in other places?

17  A.    Like the clubs or any establishments that Jeff

18  would go to where it was more of a drinking atmosphere,

19  anything like that.

20  Q.    Did Jay Green and Ben Elston drink with him?

21  A.    Yes.

22  Q.    Okay.  And was he prescribing to Ben Elston as

23  well?

24  A.    Yes.

25  Q.    What about rock stars or people who were famous?

 1   Was there anybody like that in his orbit --

 2   A.    Yes.

 3   Q.    -- that came in through the back door?

 4   A.    Yes.

 5   Q.    Do you know any names?

 6   A.    Scott Bartlett.

 7   Q.    Do you remember why Scott Bartlett was famous?

 8   A.    He was in or is in a band.  And I don't know the

 9   name of it right now.  Maybe can tell you in a few

10   minutes.

11   Q.    Yeah, if you think of it, let us know.

12   A.    Sure.

13   Q.    And let's get back to Ben Elston, though, one of

14   his -- one of his bodyguards.

15         **MS. PAYERLE:**  At this time, Your Honor, the

16   government is going to show the witness -- checking on

17   the page count here.  It's a 364-page document.  We will

18   not discuss each page, I promise, which --

19   **BY MS. PAYERLE:**

20   Q.    Is this Ben Elston's patient file that was kept at

21   Preventagenix?

22         (A document was passed to the witness.)

23   A.    Yes, ma'am.

24         **MS. PAYERLE:**  Okay.  At this time, the

25   government moves to admit Ben Elston's patient file.

1              **THE COURT:**  Go ahead and receive it

2    collectively.  It will be Exhibit 10.

3              (The above-mentioned item was marked as

4    Exhibit No. 10.)

5              **MS. PAYERLE:**  And this is Exhibit 10.

6    **BY MS. PAYERLE:**

7    Q.    Let's take a look at Exhibit 10.

8          Publish just Page 199, if we could.

9          First, I'd like to just familiarize the jury with

10   this kind of document.  Are these -- is this kind of

11   document found throughout patient files at Preventagenix?

12   A.    Yes, ma'am.  These are toxicology reports.

13   Q.    All right.  And let's just zoom in to the top half

14   to sort of get oriented.

15         And the top half here, we have the patient's name.

16   And who's that?

17   A.    Ben Elston.

18   Q.    And the requesting physician, who's that?

19   A.    Jeff Young.

20   Q.    The patient's date of birth.  And on the right, the

21   date that the -- says "date collected"?

22   A.    Correct.  Okay.  His date of birth is ████ '77,

23   and then the date collected is 11/17/2015.

24   Q.    What was collected?

25   A.    His urine.

1  Q.    Okay.  And then 11/20/2015, is that the date that

2  you received the report at Preventagenix?

3  A.    Correct.  That's when it came back to

4  Preventagenix.

5  Q.    All right.  Specimen type is urine.  And then under

6  "medications," there's three listed:  amphetamine,

7  carisoprodol, and hydrocodone.  Do you see that?

8  A.    Yes, ma'am.

9  Q.    And what did -- what did those indicate?

10  A.    That indicated the medications that Jeff prescribed

11  him.

12  Q.    Okay.  And then let's back out of that and look at

13  the bottom half, the summary of quantitative results

14  there.

15        Okay.  What are we looking at at here?

16  A.    Okay.  So on the first column, it says "drug name."

17  That is what drugs were in his system, in his urine.

18  Q.    Is that sort of the drugs they were testing for?

19  A.    No.  That was everything that was in his system.

20  Q.    Okay.  But then under --

21  A.    Oh, yes.  I see what you're saying.  Everything

22  that -- yes, I understand now.  I'm sorry.

23        Yes.  Everything that they tested for and then the

24  results show, you know, detected or not detected.

25  Q.    Okay.  So the ones that say "detected," to you that

1    meant it was in his system, and "not detected" means it

2    wasn't in his system?

3    A.    Correct.

4    Q.    And then under "outcome," there's "consistent" and

5    "inconsistent."  What does that mean?  The next column,

6    "outcome, consistent and inconsistent."

7    A.    Okay.  So basically it said that amphetamine was

8    detected in his system, and that's consistent with what

9    Jeff prescribed.

10   Q.    Okay.  And then let's look at an inconsistent, so

11   carisoprodol?

12   A.    Is not -- excuse me -- not detected, which makes

13   that inconsistent because Jeff does prescribe him that

14   drug, but it was not in his system, so therefore, it

15   makes it an inconsistent outcome.

16   Q.    All right.  And was there anything on this screen

17   that particularly concerned you?  And actually let me

18   back up because I want to lay some foundation for this.

19   Let me back up.

20         **MS. PAYERLE:**  Back out of that, if you wouldn't

21   mind.

22         No, I'm sorry.

23         **MS. SILVERBERG:**  Sorry.  Sorry.

24         **MS. PAYERLE:**  Yeah.  Okay.  You got it?  I give

25   terrible instructions.

1   **BY MS. PAYERLE:**

2   Q.    Whose handwriting is there at the bottom?

3   A.    That is my handwriting.

4   Q.    Okay.  And you said -- what did you write there at

5   the bottom?

6   A.    "Counseled patient and offered rehab.  Patient

7   stated he didn't have a problem."

8   Q.    Why did you counsel this patient?

9   A.    Because he failed his drug screen for other drugs

10  that Jeff did not prescribe to him.

11  Q.    Okay.  So let's go ahead and blow up the middle

12  piece again there.

13        And what's benzoylecgonine?  What did that mean to

14  you?

15  A.    I believe that to be cocaine.

16  Q.    And then what other drugs?  Like morphine,

17  nordiazepam, oxazepam, temazepam, what was the problem

18  with those?

19  A.    Those are also drugs that Jeff did not prescribe

20  him.

21  Q.    But they were detected in his system?

22  A.    Yes, ma'am.

23  Q.    And hydrocodone and hydromorphone?

24  A.    Hydrocodone was in his system, and Jeff prescribed

25  it.  And then the hydromorphone is a metabolite, I

1    believe, of the hydrocodone.

2    Q.    Okay.  So there's a lot of drugs in his system, and

3    you counseled him.  You offered him to get rehab, and he

4    said --

5    A.    He didn't have a problem.

6    Q.    Said he didn't have a problem.

7          Why -- why were you counseling him?  I mean, in

8    other words, was that part of your job sometimes?

9    A.    It became part of my job, especially when it was

10   friends of Jeff's, to try to get rid of patients like

11   that, that he was continually writing controlled

12   prescriptions to, even though they were consistently

13   failing drug screens.

14   Q.    And did you believe Ben Elston fell into that

15   category?

16   A.    He did, yes, ma'am.

17   Q.    What happened after you tried to get rid of Ben

18   Elston?

19   A.    Jeff would just write him the prescription anyway

20   after office hours, at home, meet him in the parking lot,

21   whatever.  However he did it, he would still get the

22   prescriptions.

23   Q.    Did you talk to Mr. Young about this encounter you

24   had with Ben Elston?

25   A.    I don't remember this specific time, but there

1  was -- I don't know if it was this time or another time

2  that I spoke with Jeff about it, but it -- I have spoke

3  with Jeff about it many times.

4  Q.    And specifically you've talked to Jeff Young about

5  Ben Elston failing drug screens?

6  A.    Correct.

7  Q.    And what was Mr. Young's reaction?

8  A.    He wasn't surprised, and it was just a fleeting

9  thought for him.  He didn't really care one way or the

10  other.

11  Q.    Did it happen with some regularity that you or the

12  staff would try to dismiss patients for one reason or

13  another, and Mr. Young would continue prescribing to them

14  or allow them to return?

15  A.    Yes, often.  That happened often.

16  Q.    And can you think of some examples of that?

17  A.    Well, right here with Ben Elston.

18  Q.    Anybody else you can think of?

19  A.    Yes, ma'am.

20  Q.    All right.  Go ahead and name names.

21  A.    Tricia Stansell; Bethany Pusser.  I can't name just

22  right off the top of my head, but there are several.  If

23  I can look at a list, I can point them out to you.

24  Q.    Okay.

25  A.    I'm sorry.

1  Q.    That's okay.

2        Now, you testified that some of these kind of

3  back-door patients were locally famous or connected

4  people, like rock stars, musicians, things like that?

5  A.    Correct.

6  Q.    Can you tell the jury a little bit about

7  Mr. Young's attitude toward fame for himself?

8  A.    He craved fame.  He needed fame.  He believed that

9  he was famous.  He wanted to get fame any way that he

10  possibly could.  He wanted to be the center of attention.

11  He was the center of attention very often, whether it

12  hurt people or not.

13  Q.    I'm going to show you another exhibit, a one-page

14  exhibit marked -- and we can take this down.  Thank

15  you -- marked 603.

16          (A document was passed to the witness.)

17  **BY MS. PAYERLE:**

18  Q.    Do you recognize this as a -- an advertisement that

19  Mr. Young posted?

20  A.    I do.

21  Q.    Okay.

22          **MS. PAYERLE:**  Move to admit, Your Honor.

23          **THE COURT:**  We'll go ahead and receive it.  It's

24  a one-page document.  It will be Number 11.

25          (The above-mentioned item was marked as

1   Exhibit No. 11.)

2          **MS. PAYERLE:**  And let's publish 603 -- or

3   sorry -- Number 11, please.  Exhibit 11.

4   **BY MS. PAYERLE:**

5   Q.    Ms. Gutgsell, where did you -- where did you see

6   this advertisement posted?

7   A.    Facebook.

8   Q.    And it says "sail away with the Rock Doc."

9         Whose photo is that in the picture?

10  A.    That's Jeff Young.

11  Q.    And who is the Rock Doc?

12  A.    That was also Jeff Young.

13  Q.    Okay.  Tell the jury about the Rock Doc.

14  A.    I'm not real sure how he got that name, but he --

15  he went by the "Rock Doc" every chance that he got, but

16  he's not a doctor.

17  Q.    And did he ever try to publicize that image in some

18  way or create some kind of media content?

19  A.    Daily.

20  Q.    Did there come a time when he became interested in

21  a reality TV show?

22  A.    Yes, ma'am.

23  Q.    Tell the jury about that.

24  A.    He hired a producer and a film guy to come in and

25  record his life, from the time he woke up until the time

1    he went to bed, for a week, and wanted to start a -- like

2    a reality show, and he called it "Rock Doc."

3    Q.    And did, in fact, people create this show for him?

4    A.    It was on YouTube.  So besides being anywhere and

5    besides YouTube, I'm not sure of, but it was recorded and

6    published on YouTube.

7    Q.    And did you see a trailer for this show on YouTube?

8    A.    I have.

9          **MS. PAYERLE:**  And I -- the government has a -- I

10   believe has a clip on a CD labeled Document 608, so we

11   would move to enter that into evidence as well.

12         **MR. FERGUSON:**  I do have a question on this, if

13   we could sidebar.

14         **MS. PAYERLE:**  Yes.

15         (Bench conference on the record, with

16   Mr. Ferguson and Ms. Payerle only, out of the hearing of

17   the jury.)

18         **MR. FERGUSON:**  Is it the whole -- it's the whole

19   thing?

20         **MS. PAYERLE:**  Not the whole episode.  It's like

21   a three-minute trailer.

22         **MR. FERGUSON:**  I would --

23         **MS. PAYERLE:**  It's the -- it's like a trailer

24   for the show.

25         **MR. FERGUSON:**  I think the whole exhibit needs

1  to be shown and not just pieces and parts.

2          **MS. PAYERLE:**  Well, I mean, it is the whole --

3  it is -- it was -- it was a trailer that he published on

4  YouTube as a piece.

5          **MR. FERGUSON:**  Okay.

6          **MS. PAYERLE:**  So it's like the whole trailer.

7          **MR. FERGUSON:**  Okay.

8          **MS. PAYERLE:**  So he published a -- like a

9  25-minute episode, but then he published like a

10  three-minute preview of --

11          **MR. FERGUSON:**  We're going to play a 25-minute

12  episode?

13          **MS. PAYERLE:**  I wasn't going to, but I -- not

14  right now.  Her -- because she's just testified she

15  saw -- I mean, the trailer's three minutes, and it's a --

16  it's a piece --

17          **MR. FERGUSON:**  We'll come back to it.  I'm okay

18  right now.  I just want to make sure what I was about to

19  say because this --

20          **THE COURT:**  All right.  Let's get on with it.

21          **MS. PAYERLE:**  It's a complete trailer.

22          **THE COURT:**  Three minutes.

23          **MR. FERGUSON:**  I'm trying to make objections

24  around the jury.

25          **THE COURT:**  I appreciate it.  Thanks.

1          **MR. FERGUSON:**  Thank you.

2          **MS. PAYERLE:**  Thanks.

3          (Bench conference concludes, and the proceedings

4   continue as follows:)

5          MS. PAYERLE:  Okay.  Government moves to admit

6   the sort of three thirty -- it might be

7   three-minutes-and-30-second-or-so trailer for the Rock

8   Doc TV show.

9          **THE COURT:**  I'm assuming the witness has seen it

10  before because she hasn't identified anything.

11         **MS. PAYERLE:**  Right.  She has, Your Honor.  I

12  described it to her, and she said she'd seen it.

13         THE COURT:  Go ahead.

14         **MS. PAYERLE:**  Okay.  Let's go ahead and play.

15  And I believe -- do we have this as a CD?

16         **MS. SILVERBERG:**  No, I have it right here.  Oh,

17  yeah, he -- the CD's there for him.

18         **MS. PAYERLE:**  All right.  Let's go ahead and

19  play.

20         (The above-mentioned item was marked as

21  Exhibit No. 12.)

22         (An audio-video recording was played.)

23  **BY MS. PAYERLE:**

24  Q.   Okay.  I'm going to stop it.  We will play the

25  whole thing.  I just want to stop at certain parts and

1    ask you questions.

2          Here he says the clinic had a heavy focus on

3    preventative medicine.

4          In reality, what percentage of patients would you

5    estimate were just there to get controlled substances

6    month after month?

7    A.    I would say well over half, 70 percent.

8    Q.    And what percentage of those patients actually paid

9    cash out of pocket for those appointments?

10   A.    25 to 30 percent.

11   Q.    Did -- taking the group of those cash-pay patients,

12   did cash-pay patients ever come in for sort of what's

13   called ordinary preventative medicine, or did the

14   cash-pay patients always just get controlled substances?

15   A.    So there were some that came in for various things

16   that were not controlled substances, not -- not very many

17   at all, though.

18   Q.    So I guess just to clarify, the majority of

19   cash-pay patients were there for controlled substances?

20   A.    Yes, ma'am.

21          **MS. PAYERLE:**  Okay.  Let's keep playing.

22          (An audio-video recording was played.)

23   **BY MS. PAYERLE:**

24   Q.    Okay.  Did Mr. Young talk about his image a lot?

25   A.    Yes.

1    Q.    The way he looked?

2    A.    Yes.

3    Q.    And tell the jury about that.

4    A.    He -- he liked the fact that he didn't look like a

5    typical provider with his tattoos and his, you know, hat

6    on backwards and didn't wear the typical white coat.  He

7    was, you know, someone just like the gentleman said, that

8    should be in the front line of a rock band.

9    Q.    Okay.  Let's keep going.

10              (An audio-video recording was played.)

11   **BY MS. PAYERLE:**

12   Q.    Did Mr. Young go on this local Jackson radio show a

13   lot?

14   A.    He did.  He had to pay to be on that.  It was for

15   advertising.

16   Q.    Okay.

17             **MS. PAYERLE:**  Let's keep going.

18              (An audio-video recording was played.)

19   **BY MS. PAYERLE:**

20   Q.    Who is -- who is this gentleman here?

21   A.    That's Scott Bartlett.

22   Q.    Okay.  He was the rock star you were talking about?

23   A.    Correct.

24   Q.    Okay.

25             **MS. PAYERLE:**  Let's keep going.

 1            (An audio-video recording was played.)

 2    **BY MS. PAYERLE:**

 3    Q.    Where -- where were they sitting?

 4    A.    That's in Jeff's office.

 5    Q.    Okay.

 6            **MS. PAYERLE:**  Let's keep going.

 7            (An audio-video recording was played.)

 8    **BY MS. PAYERLE:**

 9    Q.    That gentleman we just saw talking earlier saying

10    there's a lot going on there, who is that?

11    A.    Kevin Phillips, Jeff's best friend that he refer to

12    as Uncle Kevin.

13    Q.    Okay.  Did he have another nickname besides Uncle

14    Kevin?

15    A.    Puffy K.

16            **MS. PAYERLE:**  And let's keep on going to the

17    end.  Thanks.

18            (An audio-video recording was played.)

19            MS. PAYERLE:  Okay.

20            **THE COURT:**  About how much longer with this

21    witness?

22            **MS. PAYERLE:**  Maybe another hour, Your Honor.

23            THE COURT:  An hour?  We'll go ahead and take

24    our morning break at this time.

25            **MS. PAYERLE:**  Yes, sir.  Thank you.

 1                THE COURT:  Y'all have heard some proof now, but

 2     don't discuss the case amongst yourselves or allow anyone

 3     to discuss it with you while we take our break.  And

 4     remember, no independent investigations.  Okay.  So I'm

 5     going to go ahead and excuse you to the jury room.

 6     Fifteen, twenty minutes or so, and we'll get back to it.

 7                (Jury out at 11:15 a.m.)

 8                THE COURT:  And Ms. Gutgsell, remember over the

 9     break, don't discuss your testimony with anyone.

10                THE WITNESS:  Yes, sir.  Thank you.

11                THE COURT:  You can step down.

12                THE WITNESS:  Yes, sir.  Thank you.

13                (The witness complies with the request.)

14                THE COURT:  Okay.  We'll be in recess.

15                MS. PAYERLE:  Thank you.

16                (Recess at 11:16 a.m. until 11:40 a.m.)

17                THE COURT:  Anything from either side before we

18     bring in the jury?

19                MS. PAYERLE:  No, Your Honor.

20                MR. FERGUSON:  No, Your Honor.

21                THE COURT:  I do just have a couple of small

22     things.

23                With this witness, as well as with the prior

24     witness, each of the government's lawyer has reminded

25     them that they're under oath.  It didn't seem like they

1  were having -- you were having any question -- any

2  problems with the answers or anything, so I'm just

3  inquiring why y'all do that.

4     **MS. PAYERLE:**  Judge, it was just that with the

5  line of questioning, the witness had seemed to express

6  some concern about sort of describing patients in a way

7  that was candid because it seemed impolite to use the

8  words that they, I think, felt they wanted to use to

9  describe those folks.  And so I think it was just a

10  matter of kind of helping the witness understand that

11  they wouldn't be viewed as impolite and that because of

12  the oath that they've taken, they're really required to

13  speak candid about the perception.

14      So in both cases, I think it was because the

15  witness had expressed, earlier, some hesitation about

16  kind of being -- using the words that they used to

17  described these patients.  I think it's just a product of

18  being kind of play people.

19     **THE COURT:**  Well, I'll appreciate it if y'all

20  would not refer to their oath anymore, unless you're

21  having difficulty with the witness.

22     **MS. PAYERLE:**  Yes, Your Honor.

23     **THE COURT:**  They didn't express any, so just

24  tell the witness go ahead and answer candidly.

25     **MS. PAYERLE:**  Yes, sir.

*UNREDACTED TRANSCRIPT*

1          **THE COURT:**  If there's a problem, then we'll

2    deal with that.

3          And the other thing is at the rate we're going

4    with these witnesses, I think we'll be here through the

5    month of April.

6          **MS. PAYERLE:**  Well, I don't think so, Judge,

7    respectfully.  There are some witnesses at the beginning

8    that are going to take a while because they have to

9    establish -- for example, the jury has never seen these

10   toxicology reports before, and the jury doesn't know what

11   a PMP is and some of the basics.  And so these things,

12   when they're woven in, just kind of take a while.

13         These witnesses were key insiders within the

14   office that saw a lot of things, and there's just a lot

15   of topics to cover.  But I think the Court will see that,

16   as the week progresses, the witnesses will get shorter

17   and shorter and shorter.  And, you know, there will be

18   some longer witnesses because there's just a lot of

19   evidence and documents in the case, but we are trying to

20   move through it as expeditiously as possible.

21         **THE COURT:**  I appreciate that.  But just keep in

22   mind that -- the word you just used is foremost:

23   expeditiously.

24         **MS. PAYERLE:**  Yes, Judge.

25         **THE COURT:**  Okay.  All right.

```
1            MS. PAYERLE:  Thank you.

2            THE COURT:  Mr. Ferguson, anything?

3            MR. FERGUSON:  No, Your Honor.

4            THE COURT:  All right.  Let's bring in the

5     jurors, please.

6                 (Jury in at 11:43 a.m.)

7            THE COURT:  You may proceed.

8            THE WITNESS:  Thank you.

9            THE COURT:  Okay.  Folks, we're about ready to

10    get started.  One little note:  Mr. Richmond communicated

11    to me it's kind of cold in here right now, as did

12    Mr. Herrin.  In fact, when I came back in from my

13    chambers, it seemed like the temperature's gone down

14    about 10 degrees.

15           THE JURY:  It's a little chilly.

16           THE COURT:  It's a little cool; that's right.

17                But I kind of told y'all yesterday, it's an old

18    building, and this happens.  Mr. Herrin is calling GSA --

19    they maintain the building -- and asked them to adjust

20    it.  Well, sometimes when they adjust it, it will go from

21    like it is right now up to about 85.  So hopefully we can

22    find a happy median.  Congress won't approve us a new

23    building or anything like that, so we have to bear with

24    it.  So be patient with us.

25                All right.  I think we are ready now to go ahead
```

1    and proceed with the questioning of this -- this witness.

2            Ms. Payerle?

3            **MS. PAYERLE:**   Thank you, Your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CONTINUED DIRECT EXAMINATION**

4    **BY MS. PAYERLE:**

5    Q.    Ms. Gutgsell, when we left off, we were watching

6    Mr. Young's trailer on YouTube.  And he ended it by

7    saying "Preventagenix is an experience."  And so I want

8    to talk to you a little bit about the experience of

9    working at Preventagenix.

10        What was the kind of atmosphere like working there?

11   A.    It could vary from day to day.  It was -- there was

12   always rock music playing loud.  There -- most of the

13   time, we were happy and like a family.  We all loved each

14   other very much.  Everybody, you know, cheered each other

15   on, but, you know, some days were harder than others.

16   Q.    And we'll get into some of the harder days in a

17   moment.

18        I want to ask you.  Did Mr. Young prescribe

19   controlled substances to his employees while you were

20   working there?

21   A.    He did.

22   Q.    And can you just, just so we have it on the record,

23   name those employees?

24   A.    Carla Wright, Daniel Rogers, Katie Lindsey, Chelsea

25   Carroll, Alexis -- I don't know her last name right

1    now -- Tessa James, Madison Wooley.  There were several.

2    Q.    Okay.  Did somebody named Dottie Deforest work

3    there?

4    A.    Dottie, yes.

5    Q.    What about Rebecca McGowen (phonetic)?

6    A.    Yes.

7    Q.    How about the Cortina Stewart?

8    A.    She worked in the lab.  She wasn't employed by

9    Jeff, but she worked in the clinic, yes.

10   Q.    And I believe you testified Daphne Montoya.  Did

11   she work there?

12   A.    She worked before I came there and then for a

13   couple of weeks when I was there.

14   Q.    Okay.  Were you -- did he prescribe controlled

15   substances to you?

16   A.    He did.

17   Q.    Explain to the jury about that.

18   A.    He prescribed me Xanax, one milligram, three times

19   a day.  I took Xanax from a previous provider before I

20   started working for Jeff -- excuse me; I'm sorry -- but I

21   was only prescribed .25 milligrams once or twice a day,

22   and he raised it to one milligram three times a day.

23   Q.    Did he ever do an evaluation or diagnose you

24   through a diagnosis process for anxiety?

25   A.    No.

1  Q.    Did he increase the dose slowly or immediately?

2  A.    Immediately.

3  Q.    Did he drug test you?

4  A.    We had been drug tested throughout the time we

5  worked there, but in order to get Xanax from him, no.  He

6  didn't ever order any of us to be drug tested.

7  Q.    And did he warn you of the risks of addiction?

8  A.    No.

9  Q.    Ms. Gutgsell, did you become addicted to Xanax

10  while you worked at Preventagenix?

11  A.    Yes, ma'am.

12  Q.    Aside to the Xanax addiction, were there any --

13  first of all, how did that Xanax addiction impact your

14  life?

15  A.    It basically kept me numb from reality.  I didn't

16  understand that I was addicted to them at the time.  It

17  helped me mask things that were important that I

18  should've paid better attention to.

19  Q.    And what were some of those things?

20  A.    Working in the environment that I was working in,

21  the toxic environment, the very -- just the day-to-day

22  operations that were wrong.

23  Q.    And you said that -- that you were working in a

24  day-to-day environment with a -- sort of the situation

25  was wrong.  Did you aid in that situation, sort of

1   creating that situation?

2   A.    I did.  I helped Jeff keep the clinic open.

3   Q.    And have you taken responsibility for your actions

4   in keeping Preventagenix open and for the distributions

5   of drugs that occurred there?

6   A.    I have.

7   Q.    And explain to the jury what you've done to take

8   responsibility.

9   A.    This is very hard, so forgive me, but I also,

10  throughout this process, was charged with aiding and

11  abetting Jeff in prescribing controlled substances, which

12  I did help him do by keeping the clinic open, loaning him

13  money to be able to pay employees, keep the doors open.

14  He couldn't have done that if I didn't help him.

15  Q.    Did you plead guilty to that crime?

16  A.    I did.

17  Q.    As part of that guilty plea, Ms. Gutgsell, did you

18  enter into a cooperation agreement with the government?

19  A.    I did.

20  Q.    And is your testimony today part of that agreement?

21  A.    Yes, ma'am.

22  Q.    Through your testimony today, do you hope to obtain

23  a benefit?

24  A.    Sure.

25  Q.    Okay.  And how are you, I guess -- aside from the

1  Xanax addiction and the guilty plea, were there other

2  impacts to your life in terms of the experience of

3  working at Preventagenix?

4  A.    Oh, of course.  Financially, it's been a huge

5  struggle, you know.  I had to hire an attorney.

6  Q.    Did you lend Mr. Young any money?

7  A.    I did.

8  Q.    Did you ever get it back?

9  A.    I did not.

10  Q.    How much was it?

11  A.    Right at $20,000.

12  Q.    How about personally?  Did your interactions with

13  Mr. Young lead to any personal consequences for you?

14  A.    It did.  I mean, I was -- I was harassed

15  constantly.  I was in fear and terrified of him and his

16  people.  I suffer from anxiety, depression, PTSD.

17  Q.    And why were you so afraid of him?

18  A.    Because you're either for Jeff or against Jeff, and

19  if you were not for him, there was no neutral ground with

20  him.  If you weren't for him, you were automatically, in

21  his eyes, against him, and he would make your life a

22  living hell.

23  Q.    What -- what did he do?  What do you mean make it a

24  living hell?

25  A.    You know, he would just attack through himself,

1    through his people, through social media, through -- I'm

2    sorry -- through social media, through anything and any

3    way.  I was followed.  I was harassed.  I was scared to

4    go to the grocery store.  I was scared for my son to be

5    out in public with me because I never knew what was going

6    to happen next.

7    Q.    Just to be clear, though, were you ever -- you

8    were never physically attacked, is that right, by

9    Mr. Young?

10   A.    Oh, yes.

11   Q.    Okay.  And actually, go ahead and tell the jury

12   that story.

13   A.    Jeff tended to get drunk often.  He would come into

14   work still drunk from the night before, get drunk after

15   clinic.  And telling Jeff something that was difficult --

16   if something, you know, happened, he would fly off into a

17   rage, would get drunk.  He's spit vodka at me.  He's

18   kicked me.  He's screamed at me.  He's then turned around

19   and made me feel guilty as to I'm the only one that can

20   help him; I'm the only one that can save him.  I'm the

21   only one -- he would kill himself if it wasn't for me.

22         It was very -- an emotional abuse.  It wasn't

23   always just, you know, attacking.  Sometimes it was, you

24   know, him telling me how much he relied on me and how

25   much help -- he couldn't do it without me.

1    Q.    So is it fair to say he was sometimes very kind to

2    you?

3    A.    Oh, yes.  Absolutely.

4    Q.    Okay.  In the context of your guilty plea, did you

5    take responsibility for two patients in particular --

6    A.    I did.

7    Q.    -- who were prescribed drugs by Mr. Young?

8    A.    Yes, ma'am.

9    Q.    Okay.  And who are those folks?

10   A.    Tricia Stansell and Bethany Pusser.

11   Q.    Can you tell the jury about Tricia Stansell?

12   A.    Tricia is -- she was actually the mother of Tessa

13   James who worked for us as well.

14   Q.    And what -- why did you take responsibility for

15   aiding and abetting prescriptions to Tricia Stansell?

16   A.    Because Tessa had told me that her mother was an

17   addict, recovering addict, had -- you know, had problems

18   with controlled substances before, and I knew that before

19   her coming into the clinic and Jeff prescribing her

20   medication.

21   Q.    And did you tell Mr. Young what you knew about

22   Tricia Stansell?

23   A.    I did.

24   Q.    And what was his reaction?

25   A.    He didn't care.

1   Q.    How about Bethany Pusser?  Who was she?

2   A.    She was someone that reached out on Facebook.  I

3   can't remember if she reached out to me or Jeff.  But --

4   and Jeff would post on Facebook, you know, if you have an

5   addiction problem, contact me; I can help.  And through

6   that post, he did -- she did contact one of us.  And she

7   came into the clinic to get help with her addiction

8   issues.

9   Q.    Did Jeff Young have any addiction counselors on

10  staff?

11  A.    No.

12  Q.    Did he run a methadone program?

13  A.    No.

14  Q.    To your knowledge, did he take any classes or

15  special training for treating addiction medicine?

16  A.    Not that I'm aware of.  No, ma'am.

17  Q.    Okay.  Did -- did Jeff Young, for a while, sort of

18  start decreasing the medicine that Bethany Pusser was on?

19  A.    He did.  At some point in time in the beginning, he

20  was prescribing her the controlled substances that she

21  was abusing and was -- he was trying to wean her down

22  from those drugs.

23  Q.    Did that ever change?

24  A.    Yes.  Then he -- she started dating his best friend

25  Kevin, and then he just started writing her more --

1   different drugs.

2   Q.    And what different drugs?  Do you know?

3   A.    I know she got Adderall and I believe Klonopin or

4   something like that, like a Xanax or a Klonopin or

5   something to help relax.

6   Q.    And did -- and when you say -- sorry.

7         For the record, when you say "Kevin," did you mean

8   Kevin Phillips, the person we were talking about earlier?

9   A.    Yes, ma'am.

10  Q.    Uncle Kevin?

11  A.    Uncle Kevin, yes, ma'am.

12  Q.    Beyond the patients that you were -- you've just

13  talked about, did you ever question or confront Mr. Young

14  about his behavior of reinstatement of other patients,

15  things like that?

16  A.    Yes.

17  Q.    And how would he respond?

18  A.    Most of time he would give an explanation of why he

19  didn't care and he was the -- he was the doctor; he was

20  the provider; he knew what was best.

21  Q.    Did you ever confront him about prescribing to

22  somebody who was pregnant?

23  A.    She was -- the person that I'm thinking of, she was

24  pregnant and getting a Nubain shot, an injection, which

25  is a controlled substance.

1    Q.    What was her name?

2    A.    Alex Gray.

3    Q.    Okay.  And what did Mr. Young say when you

4    confronted her -- confronted him?

5    A.    That it doesn't affect the baby, that drug doesn't

6    affect the baby.

7    Q.    Okay.  Did you become aware of the requirement that

8    the clinic find a supervising physician, like a doctor to

9    oversee Nurse Practitioner Young's work?

10   A.    Yes, ma'am.

11   Q.    During the time that you were there, did Mr. Young

12   always have a supervising physician to look over his

13   work?

14   A.    No, ma'am.

15   Q.    How did he handle that in the paperwork?

16   A.    He would -- he never -- if a medical doctor had

17   quit as overseeing physician, he never changed any of the

18   documentation as far as, like, on the prescription pad.

19   He just left who was there previously, until he was able

20   to find another overseeing physician, and then we would

21   order new prescription pads and put the correct name on

22   there.  So there were times that we were basically just

23   going off the old preceptor's name.

24   Q.    And "preceptor" is a word you're using

25   interchangeably with "supervising physician"?

1    A.    Yes, ma'am.  I'm sorry.

2    Q.    No, that's just fine.

3          How many supervising physicians did Mr. Young go

4    through during the time that you were at Preventagenix?

5    You can name them if it helps to remember.

6    A.    Okay.  When I came on board, it was Charles Alston,

7    and he quit shortly after I started working there.  Then

8    it was Dr. Yogesh for approximately two weeks.  Then it

9    was Dr. Alperovich.  I don't know exactly how long he

10   was -- several months that he was involved.  And then at

11   the end was Dr. Rudin.

12   Q.    When you say "at the end," what made -- sort of

13   what was the end?  When did that happen?  What was the

14   end of things?

15   A.    For me, the end was January 11th, when the raid

16   happened.

17   Q.    Okay.  And by "raid," you mean a lawfully executed

18   search warrant at the premises of Preventagenix?

19   A.    Correct.

20   Q.    Okay.  What was -- let's talk about -- you say

21   Dr. Yogesh quit within a couple of weeks.  After that,

22   there was somebody named Dr. Alperovich?

23   A.    Yes, ma'am.

24   Q.    What was the arrangement with Dr. Alperovich?  What

25   was his job, and what was he going to get for it?

 1   A.    He got paid $1,500 a month, and he was supposed to

 2   come in and -- once a month -- and review medical charts

 3   of patients that Jeff saw.

 4   Q.    And did you say how much he would get paid for

 5   that?  I'm sorry.

 6   A.    1,500 a month.

 7   Q.    Okay.

 8   A.    I believe it was 1,500.

 9   Q.    And Dr. Alperovich come to review patient records

10   in February of 2016?

11   A.    Yes, ma'am, I believe so.

12   Q.    All right.  I'm going to show you what's been

13   marked Government's 201.  It is a three-page document.

14         Are these text messages between you and Mr. Young

15   during the time that Dr. Alperovich was reviewing patient

16   charts?

17             (A document was passed to the witness.)

18   A.    Yes, ma'am.

19         **MS. PAYERLE:**  Okay.  Government moves to admit.

20         Go ahead and take a look.

21         **THE WITNESS:**  Yeah, just . . .

22         **THE COURT:**  We'll go ahead and receive it.  It

23   will be Number 13.

24         **THE WITNESS:**  Thank you.

25         **MS. PAYERLE:**  Thank you.

1           Let's go ahead and publish Number 13, please.

2           (The above-mentioned item was marked as

3    Exhibit No. 13.)

4    **BY MS. PAYERLE:**

5    Q.    All right.  So we're going to start on Page 1.  And

6    who is on the right there, and who is on the left of

7    these text messages?

8    A.    On the right, it says "Joshua's mommy," which is

9    me.

10   Q.    Who's on the left?

11   A.    Jeff Young, which is the defendant.

12   Q.    All right.  How about we read through -- you be

13   you, and I'll be Mr. Young.

14   A.    "Okay.  Did you talk to him in person?"

15   Q.    "Yep.  He shouldn't charge $1,500 for one clinic."

16   A.    "He only sign charts once.  He will need to come

17   back before the month is over to sign again."

18   Q.    Okay.  Let's go down to the next slide.

19         "Especially if we are paying $3,000."

20         What -- why was it 3,000 instead of 1,500?

21   A.    At the time, Jeff had two clinics:  One was

22   Preventagenix out north on Murray Guard Drive, and then

23   he had a downtown clinic in Jackson as well that a

24   nurse -- a different nurse practitioner was at.

25   Q.    Okay.  And then Mr. Young says:  "I'm having to

1   hold his hand and explain every patient."

2       What was happening in real time while you were

3   texting Mr. Young about this?

4   A.   Dr. Alperovich was actually in Jeff's office going

5   through the different charts that were pulled for him to

6   review, and Jeff was having to explain to him each page

7   as far as -- Jeff's handwriting is hard to read, first of

8   all -- but explaining what he wrote and what the

9   different drug tests, toxicology reports meant, the

10  different -- why he prescribed what he prescribed.

11  Q.   He says:  "This is a disaster, painful."

12       Let's keep going to the next page, if we could.

13       And what did you say?

14  A.   "Oh, dear Jesus, WTF for?"

15  Q.   He says:  "I'm still here.  He's going over every

16  PMP."

17       Go ahead.

18  A.   "Be sure to show his ass all the patients we fire.

19  Oh, my God, did Katie pull a lot of pain patients out for

20  him."

21  Q.   Mr. Young says "evidently," and then let's see what

22  you respond.

23  A.   I said "fuck."

24  Q.   And then he says:  "I will show him."

25       Okay.  So could you describe Mr. Young's -- first

1    of all, what was this interaction about pulling the pain

2    patients?  Why were you and he upset that Dr. Alperovich

3    was seeing the pain patients?

4    A.    Because there are so many of them, and -- and he

5    didn't want Dr. Alperovich to realize how many pain

6    patients he was seeing.

7    Q.    Did Mr. Young talk to you about his attitude

8    generally toward the requirement that he have a

9    supervising physician?

10   A.    He didn't like the idea of having one.  He felt as

11   if he was more qualified than most medical doctors and

12   didn't need anybody's recommendation or -- or anything.

13   He thought he could handle it himself.

14   Q.    All right.  At the bottom, it says:  "We need what

15   you discussed."

16         Let's go to the next page.

17         That's Mr. Young saying that.  And at the top, what

18   did you respond?

19   A.    "I've talked to Corey about it, and he's actually

20   going to do what I talked about, so none of our -- none

21   of us are implicated.  LOL."

22   Q.    So what is -- what are you talking about here?

23   A.    My ex-husband Corey was -- we were talking about

24   getting a stamp with Dr. Alperovich's name to stamp his

25   name on the charts instead of physically showing

1    Dr. Alperovich the charts.

2    Q.    And who was going to do that stamping?

3    A.    Corey was.

4    Q.    And that's so that none of you were implicated?

5    A.    Correct.

6    Q.    And Mr. Young knew about this plan?

7    A.    Yes.

8    Q.    Was Dr. Alperovich the only supervising physician

9    that you thought about or actually did get a stamp with

10   his name?

11   A.    I don't believe that we ever got the stamp for

12   Dr. Alperovich.  There was a stamp there, before I

13   started working there, for Dr. Alston.

14   Q.    And did you ever see Jeff Young using Dr. Alston's

15   stamp?

16   A.    Yes.

17   Q.    Okay.  Describe the circumstances under which he

18   was stamping Dr. Alston's name.

19   A.    There ever several different times that the board

20   of nursing sent out a list of patients that they wanted

21   to -- they were doing an investigation of Jeff, the board

22   of nursing.  And they were wanting to see different

23   patient charts, several, several, several patient charts.

24   And we would get the receptionist to pull the charts, and

25   I would go through the charts looking at different things

1    to see when the last time a supervising physician had

2    actually been in and reviewed this chart, if they'd ever

3    reviewed the chart; flag different things if I thought

4    Jeff needed to look at them.  And he would go through

5    those charts and add more stuff, add more documentation

6    to the charts and use Dr. Alston's stamp to stamp the

7    chart as if Dr. Alston was there and signed the chart.

8    That was required of -- a physician was required to

9    actually sign a hundred percent of pain patient charts, a

10   hundred percent.

11   Q.    So this -- so he was making it look to the medical

12   board as though that had happened?

13   A.    Correct.

14   Q.    I see.

15         Did you -- did there come a time when

16   Dr. Alperovich also quit?

17   A.    Yes, ma'am.

18   Q.    All right.  I'm going to show you a document that

19   is seven pages.  It's internally marked as 202.

20              (A document was passed to the witness.)

21   **BY MS. PAYERLE:**

22   Q.    Are these text messages with you around the time

23   that Dr. Alperovich quit?

24   A.    Yes, ma'am.

25              **MS. PAYERLE:**  Okay.  Move to admit.

1          **THE COURT:**  We'll go ahead and receive it, seven

2    pages of texts.

3          **MS. PAYERLE:**  Thank you.

4          **THE COURT:**  Exhibit Number 14.

5          (The above-mentioned item was marked as

6    Exhibit No. 14.)

7          **MS. PAYERLE:**  Let's go ahead and publish

8    Exhibit 14, please.

9          Okay.  So let's fast forward.  Go ahead and flip

10   to the next page.  Flip to the next page, to be

11   expeditious.

12         Oh, back up.

13         **MS. SILVERBERG:**  Oh, sorry.

14         **MS. PAYERLE:**  There we go.  Sorry.

15   **BY MS. PAYERLE:**

16   Q.   Okay.  Let's -- let's blow up the top half of this

17   page down to, I think, like here, let's say.  There we

18   go.

19         All right.  Is this a series of text messages

20   between you and Dr. Alperovich?

21   A.   Yes, ma'am.

22   Q.   And is this in June -- on June 9th of 2016, the

23   column --

24   A.   Yes, ma'am.  Yes, ma'am.

25   Q.   Okay.  What do you -- what do you say to him on

1    that day?

2    A.    I sent a message to him that said:  "Good morning.

3    I'm not telling Jeff about you resigning until this

4    afternoon when the other NP" -- which is nurse

5    practitioner -- "comes in.  Please don't say anything to

6    him this morning about it."

7    Q.    Dr. Alperovich says:  "I was going to call him.

8    Why is it a concern?

9          And what did you say?

10   A.    "He's a loose cannon.  I don't want patients to

11   suffer this morning.  At least when April gets here, she

12   can see the patients."

13   Q.    Okay.  Why -- I guess, what was your concern about

14   Jeffrey Young and telling him that Dr. Alperovich had

15   quit that day?

16   A.    I knew that he would become irate and start

17   drinking and --

18   Q.    And did he?

19   A.    He did.

20   Q.    And have you already told the jury what happened on

21   that day?

22   A.    Yes.  That's the day that he spit vodka and kicked

23   me.

24   Q.    After you lost Dr. Alperovich, how long was it

25   before you found another supervising physician?

1    A.    It was at least 30 days, if not longer.

2    Q.    And let's take a look at a nine-page document the

3    government's labeled 205.

4          (A document was passed to the witness.)

5    **BY MS. PAYERLE:**

6    Q.    And is this a series of e-mails with a man named

7    Andrew Rudin and documents attached?

8    A.    Yes, ma'am.

9    Q.    And who is Andrew Rudin?

10   A.    He was the final overseeing doctor, overseeing

11   physician.

12         **MS. PAYERLE:**  Move to admit, Your Honor.

13         THE COURT:  We'll go ahead and receive them.

14         **MS. PAYERLE:**  Thank you.

15         **THE COURT:**  Nine pages, exhibit 15.

16         (The above-mentioned item was marked as

17   Exhibit No. 15.)

18         **MS. PAYERLE:**  Let's go ahead and publish

19   Exhibit 15.

20   **BY MS. PAYERLE:**

21   Q.    Let's show -- let's go ahead and flip down a page.

22         Is this a contract that you helped sort of

23   facilitate between Jeff Young and Andrew Rudin?

24   A.    Yes, ma'am.

25   Q.    On Page 3, at the bottom half, I think, starting at

 1   J, K, and L -- keep going all the way down.  There we go.

 2        Did Mr. Rudin, in this contract, agree to review

 3   and sign patient charts, visit the campus of

 4   Preventagenix clinic, and do the other things indicated

 5   here?

 6   A.   Yes, ma'am.

 7   Q.   Did he ever, to your knowledge, visit

 8   Preventagenix?

 9   A.   No, he never did.

10   Q.   All right.  At this point, I'm going to show you --

11   I'm going to show you what's been internally marked as

12   Government's 204.  It's just one page.  It's a single

13   text message.

14        (A document was passed to the witness.)

15   A.   Yes, ma'am.

16   **BY MS. PAYERLE:**

17   Q.   And is that a text message about Dr. Rudin?

18   A.   Yes, ma'am.

19   Q.   And is it to you?  Sorry.  From you?

20   A.   It's from me, yes, ma'am.

21   Q.   Okay.

22        **MS. PAYERLE:**  Move to admit, Your Honor.

23        **THE COURT:**  Go ahead and receive the text.  That

24   will be Exhibit 16.

25        (The above-mentioned item was marked as

1    Exhibit No. 16.)

2    **BY MS. PAYERLE:**

3    Q.    Who was Dr. Rudin to Mr. Young?

4    A.    He was a friend of -- they were each other's

5    friend.

6    Q.    They're friends.

7          And where did Dr. Rudin live at the time?

8    A.    I believe in Chicago.  It was definitely not

9    Tennessee.  It was somewhere like Chicago or somewhere in

10   that area.

11   Q.    Okay.  And I think I asked you this.  Did he ever,

12   to your knowledge, visit Preventagenix?

13   A.    No, ma'am.

14   Q.    I'm going to show you -- let's go ahead and pull

15   up -- what was 204, the last exhibit we just --

16        **MS. SILVERBERG:**  16.

17        **MS. PAYERLE:**  16.  Okay.  Let's pull up 16.

18   **BY MS. PAYERLE:**

19   Q.    And what did you text Tessa James there?

20   A.    It says:  "Do we have a "Dr. Rudin" stamp in yet?"

21   Q.    Was the plan also to get a stamp for Dr. Rudin's

22   signature?

23   A.    Correct.  Yes, ma'am.

24   Q.    To be used in the same way as the prior stamps we

25   talked about?

1    A.    Not only that, but also it was common to stamp a

2    doctor's signature on certain different orders that they

3    necessarily didn't have to sign in person, but --

4    Q.    Okay.

5    A.    -- primarily for the charts.

6    Q.    I'm going to show you -- and as quickly as I can

7    here -- some further text messages with Mr. Young and a

8    four-page document labeled Government's 216.

9              (A document was passed to the witness.)

10   **BY MS. PAYERLE:**

11   Q.    Are these text messages between you and Mr. Young

12   about Dr. Rudin?

13   A.    Yes, ma'am.

14             **MS. PAYERLE:**  Move to admit.

15             **THE COURT:**  Be 17.

16             (The above-mentioned item was marked as

17   Exhibit No. 17.)

18             **MS. PAYERLE:**  Thank you.

19             Let's go ahead and publish Exhibit 17, please.

20   **BY MS. PAYERLE:**

21   Q.    Ms. Gutgsell, was it easy or difficult to get

22   Dr. Rudin to pay attention to the clinic or to do his

23   job?

24   A.    It was very difficult.

25   Q.    All right.  Let's start -- these start actually at

1   the bottom, so let's go through -- all the way to the --

2   kind of the last of these.  These start at the bottom and

3   go back up.

4          **MS. PAYERLE:**  So Ms. Silverberg, if you could

5   just stroll to the last page of the exhibit.

6   **BY MS. PAYERLE:**

7   Q.   Okay.  And they start with a text message from you,

8   so let's go blow up the top three texts, like the

9   whole -- the whole part there in writing.

10         We'll start with -- you be you; I'll be Mr. Young,

11   and start at the bottom.

12   A.   "Did you get the signed contract to Nashville

13   attorney?"

14   Q.   "Yes.  Meeting with him in Nashville, Friday,

15   February the 13th."

16   A.   "Good.  What time?"

17   Q.   Okay.  Let's back out of that and go to the second

18   page and blow it up, please.

19         "The 13th is a Monday.  Sorry.  It's January,

20   Friday the 13th," says Mr. Young.

21         What do you say?

22   A.   "Okay.  Good.  I'm going to have to fly you to

23   Chicago soon.  Pick a weekend.  I need tons of stuff

24   signed by Rudin again.  It's impossible to get him to

25   sign and mail back."

1    Q.    Mr. Young says: "Okay."

2          Let's go to the first -- or the next page up.  What

3    do you say?

4    A.    "I can fly you for free from Jackson.  I'll give

5    you enough cash from Preventagenix.  Rich will never

6    know."

7    Q.    Who's Rich?

8    A.    He was one of the owners.

9    Q.    Okay.  Mr. Young says: "Perfect."

10         You say?

11   A.    "I'll plan with Rudin when a good time for -- when

12   is good for him, unless you want to."

13   Q.    (Indiscernible).

14         **THE COURT REPORTER:  Excuse me.  What did you**

15   **say?**

16   **BY MS. PAYERLE:**

17   Q.    "You can?"

18         Let's go to the top.

19         Mr. Young says:  "You know my schedule better than

20   I."

21   A.    "He's so difficult to nail down on anything."

22   Q.    Mr. Young says:  "Yeah, the perfect preceptor."

23         Did he ever talk to you about why Mr. Rudin or

24   Dr. Rudin was the perfect preceptor?

25   A.    Because he wasn't ever in the clinic, wasn't

 1   breathing down Jeff's neck, wasn't asking questions.  He

 2   didn't care what was going on either.

 3   Q.    And did Dr. Rudin ever sign any charts for the

 4   clinic?

 5   A.    He -- he never came to the office to sign any

 6   charts, but I did mail him charts for him to review and

 7   sign.

 8   Q.    Did you mail him complete charts?

 9   A.    No.  I would just mail him the page that I needed

10   him to sign.

11   Q.    Okay.  And did he sign and send those back?

12   A.    He did.

13   Q.    And did Mr. Young pay Dr. Rudin his thousand

14   dollars for a month?

15   A.    He did.

16   Q.    Ms. Gutgsell, who hired and fired people at

17   Preventagenix during the time that you were there?

18   A.    Jeff or I did.

19   Q.    Okay.  And who made the decision ultimately about

20   who got hired and fired?

21   A.    Jeff.

22   Q.    Did he pay the rent for Preventagenix out of a

23   Preventagenix account?

24   A.    He did.  I wrote the check, he signed it, and I

25   mailed it.

1   Q.    Okay.  And did he lease or maintain the Murray

2   Guard property for anything else besides the medical

3   practice that we've been discussing?  Like, was there

4   anything else going on there besides the medical practice

5   Preventagenix?

6   A.    Well, like, he would have different Botox parties

7   or art parties or just regular parties in general.

8   Q.    But related to the medical practice or unrelated?

9   A.    Unrelated.

10   Q.    Okay.  Was Preventagenix primarily a medical

11   clinic?

12   A.    Yes, ma'am.

13   Q.    Okay.  You testified about sort of your -- how you

14   took responsibility for your role in Preventagenix.  For

15   as long as you've known him, did Jeff Young ever take

16   responsibility for his part?

17   A.    He has never taken responsibility.

18   Q.    Has he blamed others?

19   A.    Yes, ma'am.

20   Q.    Can you tell the jury who -- who he's blamed for

21   his troubles over the years?

22   A.    He's blamed me.  He's blamed his ex-wife.  He's

23   blamed the last office manager before me.  He's blamed

24   the government.  He's blamed everyone but himself.

25   Q.    Let's take a look at what's been premarked as

1    Exhibit 711.  It's a one-page document.

2              (A document was passed to the witness.)

3    **BY MS. PAYERLE:**

4    Q.    A letter from Humana?

5    A.    Yes, ma'am.

6    Q.    Dated December 22, 2016, and addressed to Jeff

7    Young?

8    A.    Yes, ma'am.

9              **MS. PAYERLE:**  Move to admit, Your Honor.

10             **THE COURT:**  That will be Number 18, the letter.

11             (The above-mentioned item was marked as

12   Exhibit No. 18.)

13             **MS. PAYERLE:**  Number 18.  And let's go ahead and

14   publish.

15   **BY MS. PAYERLE:**

16   Q.    Now, is this a letter from an insurance company?

17   A.    Yes, ma'am.  Humana.

18   Q.    Let's take a look at the top two paragraphs.  It

19   says:  "You have been" -- the second paragraph there

20   says:  "You have been identified as being within the top

21   one percent of opioid prescribers, excluding

22   oncologists."

23         And he encloses a report.  Do you see that?

24   A.    Yes, ma'am.

25   Q.    Let's back out a little bit or back out to the --

1   Okay.  There's handwriting on this letter.  Whose

2   handwriting is that?

3   A.    That is Jeff's.

4   Q.    Was this letter an example of kind of people

5   questioning his methods?

6   A.    Yes, ma'am.  There was different letters about

7   the -- that were about the same thing.

8   Q.    Who else were questioning, at this time, the amount

9   of prescribing that he was doing?

10  A.    Other insurance companies.  He was being

11  investigated by the board of nursing as well.

12  Q.    And did he ever express his belief that somebody

13  was behind all of this?

14  A.    Yes.  He -- there's the conspiracy theories

15  between, you know, another nurse practitioner in town

16  named John Michael Briley; he was behind it, his ex-wife

17  Dawn, the government, his haters.

18  Q.    Okay.  You mentioned haters.  At this time, have

19  you ever seen a video posted on YouTube about Uncle Kevin

20  talking about Mr. Young and his haters?

21  A.    Yes, ma'am.

22  Q.    Okay.

23         **MS. PAYERLE:**  At this time, Your Honor, the

24  government would admit that video as -- it's marked 609.

25         **THE COURT:**  Okay.  Video.  It will be Exhibit

1   Number 19.  How long is it?

2          **MS. PAYERLE:**  I believe it's only 30 seconds

3   maybe.

4          It's two minutes and 30 seconds.

5          **THE COURT:**  Go ahead.

6          **MS. PAYERLE:**  Thank you, Your Honor.

7          (The above-mentioned item was marked as

8   Exhibit No. 19.)

9          (An audio-video recording was played.)

10          MS. PAYERLE:  I'll take that down.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3          **THE COURT:**  I think this is a good place for us

4     to break for lunch.

5          **MS. PAYERLE:**  Okay.  Your Honor, that's fine.

6          **THE COURT:**  All right.  Ladies and gentlemen,

7     your lunch is waiting for you in the jury room back

8     there, so going to take a little time for you to go ahead

9     and enjoy lunch.

10          Let's see.  I'm going to look at that clock.

11     It's almost 12:30, so we'll pick this up at 1:30.  Go

12     ahead and enjoy.  Remember my admonitions about, you

13     know, independent investigations, things like that.

14     Don't discuss the case.  I may have mentioned before, you

15     need to leave your notebooks in your chairs there.  They

16     will be there when you come back in.  Okay.

17          Let's go ahead and break for lunch.

18          (Jury out at 12:23 p.m.)

19          **THE COURT:**  Remember don't discuss your

20     testimony over the lunch break.  Okay?

21          **THE WITNESS:**  Yes, sir.  Thank you.

22          **THE COURT:**  You can step down.

23          (The witness complies with the request.)

24          **THE COURT:**  Okay.  We'll be in recess.

25          **MS. PAYERLE:**  Judge, whatever it's worth, I only

*UNREDACTED TRANSCRIPT*

```
 1    have one question, just to your earlier --

 2              THE COURT:  I'm sorry?

 3              MS. PAYERLE:  I only have one more question, to

 4    your earlier concern.  We've been cutting a fair amount.

 5              THE COURT:  Appreciate it.  Thank you.  We'll be

 6    in recess.

 7              (The morning session concluded at 12:24 p.m.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **C E R T I F I C A T E**

2

3

4          I, LASHAWN MARSHALL, RPR, LCR, do hereby
     certify that the foregoing 145 pages are, to the best of
5    my knowledge, skill, and abilities, a true and accurate
     transcript from my stenotype notes of the Jury Trial
6    proceedings on the 28th day of March, 2023, in the matter
     of:

7

8

9

10

     United States of America
11
     vs.
12
     Jeffrey W. Young, Jr.
13

14
     Dated this 28th day of March, 2023
15

16

17

18

19

20

21

22

23                        S/Lashawn Marshall
                     Lashawn Marshall, RPR, LCR
24                   Official Court Reporter
                     United States District Court
25                   Western District of Tennessee


*UNREDACTED TRANSCRIPT*

**EXAMINATION OF KRISTIE GUTGSELL**                    7

1                        CONTINUED DIRECT EXAMINATION

2     BY MS. PAYERLE:

3       Q.   Ms. Gutgsell, I have only a few more questions for

4     you.  I'd like to show you -- were you Mr. Young's friend on

5     Facebook?

6       A.   Yes, ma'am.

7       Q.   You saw a lot of his Facebook posts?

8       A.   Yes, ma'am.

9       Q.   I'm going to show you a one-page document we marked

10    908.  Is this a post by Jeff Young about one of his patients?

11      A.   Yes, ma'am.

12              MS. PAYERLE:  All right.  The Government will

13    move to admit.

14              THE COURT:  That would be Exhibit No. 20.

15              (Exhibit 20 marked and received.)

16              MS. PAYERLE:  Let's go ahead and publish

17    Exhibit 20 to the jury, if you would.

18    BY MS. PAYERLE:

19      Q.   Ms. Gutgsell, do you see at the top of the post that

20    says:  Six months clean today.  So proud of Aaron Beaver --

21    with some numbers in there -- love you, dude.  You and your

22    story inspires and humbles me.  If you are out there and

23    think there's no hope, please contact us at PREVENTAGENIX and

24    let us help facilitate your recovery and get your life back?

25      A.   Yes, ma'am.

EXAMINATION OF KRISTIE GUTGSELL                    8

1    Q.    And do you see where Jeff Young writes below:  This is
2    why I do what I do every day?
3    A.    Yes, ma'am.
4    Q.    And he says:  This is why I put up with all the
5    bullshit and heat?
6    A.    Yes, ma'am.
7    Q.    He says:  This story right here is why I put myself
8    out there on social media.  Aaron Beaver and I would never
9    had met had there not been controversial Facebook posts about
10   myself addressing addiction as a disease.
11         Do you see that?
12   A.    Yes, ma'am.
13   Q.    Can you -- did you know Aaron Beaver?
14   A.    I did.
15   Q.    Can you tell the story about how Aaron Beaver came to
16   be -- just the very beginning of that story, how he came to
17   be a patient at PREVENTAGENIX?
18   A.    It goes back to where Jeff had posted on Facebook
19   about if you need help with addiction, please contact me.
20   And he either contacted myself or Jeff.  I don't remember
21   which way it went.
22   Q.    And he became a patient at PREVENTAGENIX?
23   A.    Yes, ma'am.
24   Q.    And was it documented in his patient file that he was
25   suffering from addiction?

**EXAMINATION OF KRISTIE GUTGSELL**                                    9

```
 1      A.    Yes, ma'am.

 2      Q.    To opioids?

 3      A.    Yes, ma'am.

 4      Q.    Did Jeff Young at some point begin prescribing opioids

 5   to Aaron Beaver?

 6      A.    Yes, ma'am.

 7      Q.    And do you remember what the name of that drug was?

 8      A.    No.

 9      Q.    Okay.

10      A.    I don't, no.

11      Q.    Thank you.  Ms. Gutgsell, is it fair to say that

12   you -- and I think this is just based on what you've

13   testified --

14            MS. PAYERLE:  We can take the exhibit down.

15   BY MS. PAYERLE:

16      Q.    That working at PREVENTAGENIX was a volatile

17   experience for you?

18      A.    Yes, ma'am.

19      Q.    Tell the jury, if you would, please, why did you stay

20   for so long?

21      A.    It -- if you don't stay on Jeff's team and you do

22   things against Jeff, he goes after you, whether it be through

23   social media, through his friends.  Publicly on Facebook, he

24   would just embarrass you and just tell stories and talk about

25   you and harass you and he did that -- I watched it numerous
```

**EXAMINATION OF KRISTIE GUTGSELL**                    10

 1  times, and I didn't want to be a part of that embarrassment.

 2          MS. PAYERLE:  Your Honor, if I may have just one

 3  moment, please.

 4          THE COURT:  Okay.

 5          MS. PAYERLE:  Thank you, Your Honor.  At this

 6  time, we pass the witness.

 7          THE COURT:  All right.  Thank you.

 8          And, Mr. Ferguson, is there any cross?

 9                  CROSS-EXAMINATION

10  BY MR. FERGUSON:

11    Q.   Good afternoon.

12    A.   Yes, sir.  Good afternoon.

13    Q.   I've been corrected twice over talking over the

14  witness, so I'm going to try hard not to overtalk you.

15    A.   Okay.

16    Q.   When did you start with Mr. Young?

17    A.   It was August, 2015.

18    Q.   And was that after Ms. Goslee had left?

19    A.   Yes, sir.

20    Q.   And you were friends with Ms. Goslee?

21    A.   Yes, sir.

22    Q.   And she recommended the job to you?

23    A.   No, she did not.

24    Q.   She just told you about it or --

25    A.   No.  She -- I had become friends with Jeff at this

**EXAMINATION OF KRISTIE GUTGSELL**                                    11

1   point too.

2   Q.    That makes sense.  And part of your job was to

3   schedule all of the appointments and the healthcare

4   providers?

5   A.    No, that was not.  I didn't -- I scheduled patients

6   sometimes, but we had receptionists that scheduled most of

7   those appointments.

8   Q.    Okay.  I'm going to pass this to you.  Did you see

9   this already?

10   A.    Yes, sir, I believe this is the same one.

11   Q.    It's Exhibit 8 already admitted.  This was the

12   schedule that the Government was talking to you about?

13   A.    Yes, sir.

14   Q.    Did you prepare this?

15   A.    No.  This is what you can print off from the computer

16   when the -- when a patient calls for an appointment.  You put

17   it in the computer, and then you can print, like, the master

18   list, which is what this is.

19   Q.    Okay.  Well, I just want to zoom in here a little bit

20   over here on this far side on the right where it says

21   "comments"?

22   A.    Yes, sir.

23   Q.    You were saying that the one-month follow-ups mean

24   what?

25   A.    Typically, those patients are coming in for controlled

1  substances, and they have to come in monthly.

2     Q.    Do they have to be controlled substances to be a

3  one-month follow-up?

4     A.    That's what these appointments were.

5     Q.    Okay.  And what is this?

6     A.    Echo.

7     Q.    Did Jeff do echoes?

8     A.    He did not.

9     Q.    By echo, do you mean echocardiogram?

10    A.    Yes, sir.

11    Q.    There was another provider in the clinic that did

12  echoes?

13    A.    Yes, sir, on certain days.

14    Q.    Certain days?

15    A.    Not every day.

16    Q.    And you've got:  Fasting labs, echoes, follow-up.

17  There's a lot of stuff going on here on a day-to-day basis;

18  is that correct?

19    A.    Yes, sir.  There's a lot of patients.

20    Q.    And for the majority, it's all insurance payments

21  except for -- what does private pay mean?  Is that cash?

22    A.    Yes, sir.

23    Q.    Okay.  So you have private pay, commercial insurance

24  is insurance, Medicare is insurance, BlueCare, private

25  insurance, private insurance.  There's a lot of -- I think

1   you were saying there was a lot of people paying cash, but it

2   looks like there's only a handful of cash payments on this

3   day.

4       A.    On this day.

5       Q.    That's pretty typical for a day?

6       A.    Not necessarily.  Each day varies.

7       Q.    Okay.  And then when you have these things that say,

8   like, new patient, wants to see April.  Who is April?

9       A.    April was another provider that came, I believe, two

10  days a week.

11      Q.    Okay.  So to be fair, on what's been marked as

12  Exhibit 8, there's at least another person doing echoes, and

13  then there's April, who was another nurse practitioner also

14  in the office on this day; is that correct?

15      A.    If it says echo next to the patient, they would be

16  seen for an echo only, correct.

17      Q.    And then April was another nurse practitioner?

18      A.    Yes.  She was only there a couple of days a week.

19      Q.    And follow-up, Daniel, see patient drug screen?

20      A.    Correct.

21      Q.    Who is Daniel?

22      A.    Daniel was another employee.

23      Q.    Okay.  And so this other employee is now doing the

24  drug screens on this patient here?

25      A.    No.  More than likely, what that meant was Daniel

1   needed to see the patient because of the patient's drug

2   screen, and if Daniel was being told to come in, it was

3   because of a drug screen -- the patient had failed the drug

4   screen.

5       Q.   This being somebody had followed up with a drug

6   screen, and the patient needed counseling?

7       A.   It's two different things, actually.

8       Q.   Okay.

9       A.   So the follow-up would be the patient was there for

10  medication.

11      Q.   Correct.

12      A.   And also Daniel needed to talk to the patient about

13  their drug screen.

14      Q.   Yes, ma'am.  So -- but on the chart or on this -- I'm

15  not sure what the sheet is called.  What do you call the

16  sheet?  Just the appointment list?

17      A.   Yes, like, a master list.

18      Q.   Master list?

19      A.   Yes, sir.

20      Q.   There's a notation on here that this person is coming

21  in for a follow-up, and Daniel needs to see them about their

22  drug screen --

23      A.   Correct.

24      Q.   -- to counsel them about their drug screen?

25      A.   Right.  That's right.  Yes, sir.

EXAMINATION OF KRISTIE GUTGSELL                              15

1    Q.    Okay.  This is not saying that this person is the only

2    person getting a drug screen this day?

3    A.    Right.  That's just talk to the patient about the drug

4    screen.

5    Q.    And there's a number of people that come in, bloody

6    stool, no energy, felt real bad, a new patient.  I guess,

7    this new PCP, is that primary care physician?

8    A.    Yes, sir, that's what that means.

9    Q.    Does that mean that Mr. Young is going to become the

10   PCP?

11   A.    More than likely, yes, sir.

12   Q.    Okay.  They're in need of a primary care physician?

13   A.    Correct.  Yes, sir.

14   Q.    Is it called primary care physician even if he's not a

15   physician?  Is it just in the business you called it a PCP?

16   A.    PCP, yes, sir.

17   Q.    All right.  It just means the person who is the

18   general person to kind of keep up with their health?

19   A.    Correct.  Yes, sir.

20   Q.    Somebody has another follow-up, and it's also --

21   apparently, they had needed to have some more testing done

22   that day?

23   A.    Yes, sir.

24   Q.    Okay.  One month follow-up and see Kristie for sleep

25   study?

EXAMINATION OF KRISTIE GUTGSELL                          16

1    A.   Correct.

2    Q.   Who is Kristie?

3    A.   That's me.

4    Q.   And what are you doing with the sleep study?

5    A.   Jeff had sleep study machines in his office, and it

6    was where we could show the patient how to use the machine so

7    they could bring it home with them to get a sleep study done.

8    Q.   Okay.  Is that a legitimate medical procedure?

9    A.   It is, yes, sir.

10   Q.   Okay.  And it's kind of in the course and scope of

11   what a healthcare provider would provide for their patients?

12   A.   Correct.  Yes, sir.

13   Q.   Thyroid panel, that's within the normal scope and

14   course of what a medical provider would provide for their

15   patients?

16   A.   Well, what that thyroid panel draw means, that's a

17   blood test, so the phlebotomist would have drawn that panel,

18   yes, sir.

19   Q.   But it's ordered, and somebody in the office does it,

20   and it's sent out --

21   A.   Right.

22   Q.   -- there's an analysis done, it comes back in, and

23   Jeff would read it and make medical decisions based on it?

24   A.   Yes, you're correct.

25   Q.   Did you have problems with Jeff -- Mr. Young, and his

**EXAMINATION OF KRISTIE GUTGSELL**                    17

1  not wanting to fire people who had failed drug screens for

2  marijuana?

3     A.   Ask me that again.

4     Q.   Was there a problem with people would fail a drug

5  screen for marijuana and Jeff would unfire them?

6     A.   Marijuana wasn't even on our drug screen.

7     Q.   Okay.  Y'all just didn't even test for that, did you?

8     A.   No, sir.

9     Q.   Can you test for it?  I don't know.

10    A.   I'm assuming you can, but he didn't have it on his

11 screening.

12    Q.   Okay.  Would it be fair to say he would not have been

13 concerned about it because he was a pro-marijuana advocate?

14    A.   Correct.

15    Q.   He felt that it was a -- it was just as good as

16 medical drugs, medical prescriptions for treating certain

17 symptoms?

18    A.   That's what he believed, yes, sir.

19    Q.   And since that time, many states have grown to accept

20 that as part of the medicine prescription regimen for people?

21 It's a dumb way of saying Mississippi and Arkansas have

22 medical marijuana?

23    A.   I don't know that.  I don't keep up with that.

24    Q.   Okay.  You talked about back-door patients?

25    A.   Yes, sir.

EXAMINATION OF KRISTIE GUTGSELL                    18

1    Q.   Your concern about back-door patients was, you didn't

2    think they were being charted correctly or that they were

3    getting drugs they didn't need?  What's the issue with back

4    door, the VIP back door?  What's the concern there?

5    A.   Okay.  So back-door patients and VIP patients are two

6    totally different things.

7    Q.   VIP, people paid extra to have more personal

8    connection to Jeff.  He still would see them as patients.

9    The back-door were kind of like his special people?

10   A.   Correct.  Some of those patients didn't have charts at

11   all.

12   Q.   Some of those people were including his attorney that

13   was handling his divorce at that time?

14   A.   Yeah, he was actually a back-door patient as well.

15   Q.   Mr. Donahoe would come and go and meet with Jeff

16   while -- and this was while Jeff was going through this

17   divorce with Dawn?

18   A.   And get prescriptions and injections and shots as

19   well.

20   Q.   Okay.  Did Jeff ever receive -- as far as you know,

21   without maybe disclosing what the attorney-client

22   conversation was, was there -- during this time at the back

23   door that discussions were held about either Jeff's divorce

24   or whether or not the practice was being run correctly?

25   A.   Was that talked about?

1    Q.   Yeah.

2    A.   Yes, sir.

3    Q.   Jeff was receiving legal advice at this time?

4    A.   Jeff had friends that were attorneys as well, yes.

5    Q.   And that would come to the back door?

6    A.   Yes.

7    Q.   And would see the -- be able to be inside the clinic

8    during this time?

9    A.   Yes, sir.

10   Q.   Okay.  When you first started working there to the

11   time of the -- you and I call it -- the raid.  The Government

12   called it the legally executed search warrant on the premises

13   of PREVENTAGENIX.  The raid --

14   A.   Yes, sir.

15   Q.   -- did Jeff's behavior, I think you described it as,

16   spiralled?

17   A.   It had spiralled.

18   Q.   It had gone really bad?

19   A.   It had, yes, sir.

20   Q.   Did you see that -- did his interaction -- that's a

21   terrible way to ask that.  Let me ask you a good question --

22   A.   Okay.

23   Q.   -- just a second to figure out how to ask you.

24   A.   Yes, sir.

25   Q.   Was some of it in relation to the divorce, the stress

**EXAMINATION OF KRISTIE GUTGSELL**                              20

1  of his divorce?

2      A.   It was, yes, sir.

3      Q.   It was really bad, wasn't it?

4      A.   It was terrible.

5      Q.   I mean, they were going after each other?

6      A.   Nonstop.

7      Q.   Each of them were giving it as good as they were

8  getting it?

9      A.   Yes, sir.

10     Q.   On social media, in person, through third parties, it

11 got hard?

12     A.   Yes, sir.

13     Q.   It affected the job?

14     A.   Yes, sir.

15     Q.   It affected Jeff?

16     A.   It did.

17     Q.   It -- maybe use the word -- broke him?

18     A.   I could say that too, yes, sir.

19     Q.   It was ugly?

20     A.   It was.

21     Q.   Did you know Jeff before you started working with him

22 previously as a nurse practitioner?

23     A.   I knew of him.  I didn't know him on a friendly basis.

24     Q.   You knew of his reputation within the community as a

25 good healthcare provider?

**EXAMINATION OF KRISTIE GUTGSELL**                    21

1    A.    No, not even so much that.  He became very vocal as

2    his divorce, everybody saw him on Facebook.

3    Q.    Jackson is small?

4    A.    Small town, yes.

5    Q.    It's a hundred thousand people, but it's a small town?

6    A.    Everybody knows everybody, yes, sir.

7    Q.    And there's this thing called Topics.

8    A.    Uh, yes.

9    Q.    We don't use Topics a lot in Shelby County.  What is

10   Topics?

11   A.    Topics was horrible.  It's where you could post -- it

12   was online, and you could post anonymously.  And you could

13   say whatever you wanted to say, and it was completely

14   anonymous.  It didn't matter what was said.

15   Q.    Everything as bad as Facebook and every other social

16   media is, this was an anonymous platform where people got

17   away with just slandering each other?

18   A.    It was terrible.  Yes, sir.

19   Q.    And posting things they should not have been posting?

20   A.    Correct.

21   Q.    Pictures?

22   A.    Correct.

23   Q.    Health records?

24   A.    I don't remember that, but it wouldn't surprise me.

25   Q.    Okay.  And Jeff kind of went to battle on that too,

1  didn't he?

2      A.   Yes.  He posted on Topics as well.

3      Q.   You talked about, I think it was Ben Elston or maybe

4  his dad being Jeff's bodyguard.  Why would Jeff need a

5  bodyguard?

6      A.   It's Ben Elston.  His dad did come to the clinic as

7  well.

8      Q.   Did he need a bodyguard, or was this just something in

9  Jeff's head that made him more popular and cool?

10     A.   Probably the popularity.  I didn't go out with him so

11  I don't know what threats he received when he was out.  I

12  think maybe he felt more comfortable with a big guy beside

13  him.

14     Q.   When we talk about haters, based on what you saw going

15  on and through social media, there was as much hate being

16  given as received.  There were haters, were there not?

17     A.   Yes, sir, there was.

18     Q.   And as he's falling apart, as he's spiralling through

19  this divorce, did he begin to come into the clinic either

20  drinking or drunk?

21     A.   That happened the entire time I worked for him.

22     Q.   Did it get worse as you worked for him?

23     A.   There were periods of time that were worse than

24  others.  So things could be okay for a couple of weeks, and

25  then for a couple of weeks be horrible; and then be okay

1  again for a couple of weeks and then be horrible again.

2   Q.   He just kind of cycled in and out?

3   A.   He did.

4   Q.   Did he cycle in and out of this Doc Rock persona?  Was

5  it something that kind of came and went too?

6   A.   The whole time that I was around him, once that

7  started up, he kept that persona the whole time.

8   Q.   He -- not only did he keep it, he tried to promote it?

9   A.   He did, yes, sir.

10   Q.   And I think you said even to the point of paying

11  people to come in and film --

12   A.   -- a reality show, yes, sir.

13   Q.   Was it called a pilot, trying to shop it around for

14  TV?

15   A.   I think that's what it was, yes, sir.

16   Q.   He thought a lot of himself, didn't he?

17   A.   He did.

18   Q.   And I think you said in his mind he didn't think he

19  was doing anything wrong?

20   A.   Correct.

21   Q.   I was looking at the text messaging between you and

22  Mr. Young when you were testifying when he was sitting there

23  with Dr. Alperovich?

24   A.   Alperovich.

25   Q.   Dr. Al?

**EXAMINATION OF KRISTIE GUTGSELL**                    24

1    A.    Dr. Al, yes, that's easier.

2    Q.    Did I notice that it started, like, about 5 p.m. in

3    the afternoon and went to about one o'clock in the morning?

4    A.    Mine and Jeff's text messages probably did.

5    Q.    And that last one was, like, he's just leaving or I'm

6    just getting done or something?

7    A.    I didn't look at the time, but if that's what it says,

8    it could have been that late.

9    Q.    Because Dr. Al went through each file that was given

10   to him, and I think part of that Jeff told you was page by

11   page?

12   A.    Correct.  That's what he said, uh-huh.

13   Q.    And did you get those files back?

14   A.    They were there in the office.  They never left the

15   office.

16   Q.    Was there anything, during that review, that you're

17   aware of where there was an indication that something --

18   after Jeff talked to him, because in the text message it

19   says:  I had to explain to him everything, I had to go

20   through the PMPs and explain my reasoning, explain my medical

21   diagnosis.  Any of those files get flagged for not to do that

22   again?

23   A.    Not that I'm aware of, no.

24   Q.    It wasn't really a gracious way to fire you, was it?

25   A.    Do what?

1    Q.    I said that wasn't a really gracious way to fire you.

2  Did he just fire you by text message?

3    A.    No.  He didn't fire me.  I quit.

4    Q.    That's right.  You quit.  And he told the people he

5  fired you.

6    A.    Correct.

7    Q.    Did he spit Vodka on you?

8    A.    He did.

9    Q.    And you testified he thought he was more qualified

10  than other doctors?

11    A.    Yes.

12    Q.    Did he think he was the smartest person in the room?

13    A.    Yes.

14    Q.    Did he think anyone could tell him how to practice

15  medicine?

16    A.    No.

17    Q.    Did he think the way he was practicing medicine was

18  the right way for him to practice medicine?

19    A.    That's what he believed, yes, sir.

20    Q.    Thank you.

21            MR. FERGUSON:  That's all I have, Judge.

22            THE COURT:  Thank you.

23            Any redirect?

24            MS. PAYERLE:  Yes, Your Honor.

25

**EXAMINATION OF KRISTIE GUTGSELL**        26

1                      REDIRECT EXAMINATION

2   BY MS. PAYERLE:

3    Q.    I think Mr. Ferguson just asked you if Mr. Young

4   believed that he was infallible?

5    A.    Correct. Yes, ma'am.

6    Q.    And you said that in his own mind he believed he was?

7    A.    Correct. Yes, ma'am.

8    Q.    Did -- when the medical board asked Mr. Young to see

9   his files, how he was treating these patients, did he just

10   hand them over as they were in his clinic?

11    A.    No, ma'am.

12    Q.    What did he do?

13    A.    He -- he went through the charts to make sure

14   documentation was done, and if it wasn't, he would do it.

15   And if the overseeing physician hadn't signed the chart, he

16   would stamp the name, the doctor's name.

17    Q.    Is it fair to say that Mr. Young understood that he

18   needed to cover up what he was actually doing when the

19   medical board came to investigate?

20           MR. FERGUSON: I'm going to object to the form of

21   the question.

22           THE COURT: Sustain.

23   BY MS. PAYERLE:

24    Q.    Did Mr. Young tell you why he was doing that?

25    A.    Because there was a correct way to do it and a wrong

Case 1:19-cr-00040-JTF   Document 3761   Filed 03/29/23   Page 98 of 343   PageID 34246

1                                    **HOPE ARMENT**,

2   called as a witness on behalf of the Government, having been

3   first duly sworn, testified as follows:

4                           DIRECT EXAMINATION

5   BY MR. PENNEBAKER:

6       Q.   Good afternoon.  Would you please introduce yourself

7   to the jury.

8       A.   My name is Hope Arment.

9       Q.   And did you previously go by another name?

10      A.   Yes, Hope Rogers.

11      Q.   Are you currently incarcerated, Ms. Rogers --

12  Ms. Arment, excuse me?

13      A.   I am currently incarcerated.  Yes, sir.

14      Q.   And just tell the jury briefly why are you

15  incarcerated?

16      A.   I had relapsed, and during my relapse, I had stolen

17  some vehicles.  Eventually, all of that caught up to me, and

18  I've been incarcerated for the last four years.

19      Q.   Are you in recovery today from drug addiction?

20      A.   I am.

21      Q.   Tell the jury what you were addicted to.

22      A.   I was addicted to opioids and meth, and I have been

23  sober for a little bit over four years now.

24      Q.   Okay.  Do you know Jeff Young?

25      A.   I do.

**EXAMINATION OF HOPE ARMENT**                                      32

1    Q.   Do you see him in court today?

2    A.   Yes.

3    Q.   Would you identify him?

4    A.   He's over there.

5    Q.   By an article of his clothing.

6    A.   Gray tie, goatee, beard.

7    Q.   Got it.

8              MR. PENNEBAKER:  If the record could reflect that

9    the witness has identified the defendant.

10             THE COURT:  The record will reflect it.

11   BY MR. PENNEBAKER:

12   Q.   How do you know Jeff Young?

13   A.   He was my doctor.

14   Q.   How did you come to be Jeff Young's patient?

15   A.   I was going to a different doctor, Thomas McDonald,

16   and he took over the hospital in Lexington.  So he was -- his

17   protege was taking over.  I didn't like her bedside manner.

18   And my mother and I started looking for a different doctor.

19   My cousin then, Eddie Davis, told us about Jeff, that he was

20   a good doctor.  He listened to what you had going on.  And

21   that's the kind of person that me and my mom needed, so

22   that's where we went to.  He also kind of let us know, you

23   know, you won't have any problems switching over your pain

24   management coming to him.

25   Q.   Okay.  A couple of follow-up questions about that, did

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    33

1    you say your mother?

2      A.    Yes, my mother.

3      Q.    And did she also have addiction issues?

4      A.    She still does, yes, sir.  She's been off of them for

5    a while, but she got really bad on pills, yes.

6      Q.    Okay.  And you also mentioned that your cousin, Eddie,

7    told you that there was a doctor who would listen; is that

8    right?

9      A.    Yes.

10     Q.    And you said that you and your mom both needed that?

11     A.    Yes.  Because at my age with the health issues that I

12   had at the time and have now, it's actually hard to find

13   somebody to take you serious in the medical field.  They

14   don't want to listen.  So whenever, you know -- that's kind

15   of what you want is a doctor that's going to listen to you.

16     Q.    And you were hopeful that that would be the case with

17   Mr. Young?

18     A.    Yes.  And it was.

19     Q.    It was --

20     A.    Yes.

21     Q.    -- throughout your treatment?

22     A.    No.  At the beginning, it was.  More towards the end,

23   we didn't really talk whenever I went in.  I just kind of got

24   my medicine and left.  But at the beginning, yes, he was very

25   attentive.  I have carpal tunnel in both hands.  He made sure

1    that that was taken care of.  We did injections in it, which

2    I will start back up whenever I get out of incarceration.  I

3    haven't been able to do that.  But, you know, he was

4    attentive to make sure that I was feeling better physically.

5    And at the time, I thought that my medicine was making me

6    feel better, but in reality, my medicine was actually making

7    me worse.

8      Q.   Okay.  And, Ms. Arment, I'm going to hand you a record

9    from your patient file.  Do you recognize that?

10     A.   Yes.

11     Q.   Is that an information sheet you filled out when you

12   first went to PREVENTAGENIX?

13     A.   Yeah.

14             MR. PENNEBAKER:  Your Honor, what has been marked

15   for identification as Government's 419, just one page of it,

16   page 3.  Well, actually, it's a front and back page.  So

17   pages 3 and 4, which is an information sheet.

18             THE COURT:  That was the intake form that you

19   filled out when you initially went to Mr. Young?

20             THE WITNESS:  Yes, sir.  It's like the one that

21   they give you as soon as you walk in the door.

22             THE COURT:  All right.  Thanks.  We'll receive

23   it.  That will be Exhibit 21.

24             MR. PENNEBAKER:  Thank you, Your Honor.

25                (Exhibit 21 marked and received.)

**EXAMINATION OF HOPE ARMENT** 35

1 BY MR. PENNEBAKER:

2 Q. And if we could zoom in on the top third, please.

3 Ms. Arment, do you see the date on this document, the top

4 left-hand corner --

5 A. Yes.

6 Q. -- what does that say?

7 A. November 20, 2014.

8 Q. Is that consistent, in your memory, with when you

9 first went to see Mr. Young?

10 A. Yes, that would have been right after me and my

11 ex-fiance separated, and my tailbone had been broken. So,

12 yeah, that would have been in 2014.

13 Q. Okay. So this is -- when you go in to see him, this

14 is when he is actually listening to what you're saying?

15 A. Uh-huh, yes, sir.

16 Q. And that changed later?

17 Okay.

18 MR. PENNEBAKER: And you can go ahead and put

19 that down.

20 BY MR. PENNEBAKER:

21 Q. Throughout your time as a patient of Jeff Young's,

22 what all -- what kind of medication did he prescribe you?

23 A. I took Ambien, Lortab, 10-milligram, Percocet,

24 10-milligram, plain, 1-milligram Xanax and Seroquel.

25 Q. Okay.

1    A.   I can't think of the rest of them, but it would have

2    been, like, a seasonal thing, like, if I had sinuses or

3    something like that.  But it wasn't very often that I had to

4    have that stuff.

5    Q.   Did you ever get cough syrup with codeine?

6    A.   Yeah, that would have been, like, a seasonal thing.

7    When my sinuses act up, I have a really bad bout with my

8    lungs and my chest.  So, yes.

9    Q.   Okay.  Are you taking any of those medications today?

10   A.   No, I'm not.

11   Q.   Are you planning on trying to get back on them when

12   you get out?

13   A.   No.  I never will.

14   Q.   And why is that?

15   A.   Because I lost everything with this relapse, and -- I

16   mean, kids, home, freedom.  At the end of the day, nothing is

17   worth that.  And I can take care of my own body by eating

18   right and doing what I need to do, like vitamins and stuff.

19   I'm sorry.  I'm so nervous.

20   Q.   That's okay.  You're doing fine.  It's totally fine.

21   Take your time.  And if you need me to clarify any questions

22   or ask something again, I can do that.

23   A.   Okay.  Sorry.

24   Q.   Don't forget to breathe.

25   A.   I'm trying to.

EXAMINATION OF HOPE ARMENT                                    37

1    Q.    Yeah.  You're doing good.

2          Okay.  So does your family have a history of

3    addiction?

4    A.    Yes.  My grandmother and grandfather were both

5    alcoholics, my mother struggled with addiction my whole life,

6    and my brother and sister are both addicts.

7    Q.    And did you tell Jeff Young about that history?

8    A.    I can't recall, honestly, whether I talked about that

9    or not.

10   Q.    Were you and Jeff Young Facebook friends?

11   A.    We were Facebook friends.  And on my Facebook, you

12   could see before the life that I led, and then you could see

13   clearly, I guess, when mine kind of took a turn by my posts

14   and stuff.  But not everybody, I guess, pays really close

15   attention to that kind of stuff.  So, I mean, we were

16   Facebook friends, though.

17   Q.    And at the time that you started seeing Jeff Young,

18   did you identify as sober when you started to see him?

19   A.    I came to him from another doctor, so I was already

20   getting prescriptions.  But, I mean, I wasn't using, per se.

21   So, no, I don't think I'd say sober, but you would have been

22   able to look at me and tell I definitely was not on hard

23   drugs.

24   Q.    So you said that the doctor treating you before Jeff

25   Young was named McDonald?

1  A.  Yes, Thomas McDonald.  I actually went to pain

2  management through him and -- but it was different.

3  Q.  How so?

4  A.  Every month you got a pill count, you got random drug

5  tests.  Like, he knew about my drug addiction.  Like, he had

6  asked those questions because he kind of knew about my family

7  history, I guess.  But he asked at the beginning before I

8  started the pain management:  Do you have any problems with

9  addiction or have had in the past.  I told him yes.  So he

10 would actually, like, call me in for random drug tests and

11 things of that nature to keep me -- I guess, keep me

12 accountable.

13 Q.  You had some accountability with Dr. McDonald?

14 A.  Yeah.

15 Q.  Did you have any kind of accountability like that with

16 Jeff Young?

17 A.  He did do random drug tests when we would go into the

18 office.  It wasn't like Dr. McDonald.  Starting out it wasn't

19 every month, but then eventually, he did start doing it every

20 month.

21 Q.  And I'm glad you mentioned the drug tests because do

22 you remember how you did on those?

23 A.  Well, typically, I passed them because, normally, I

24 was not taking the drug tests correctly.  Either I was having

25 someone to pee for me and carrying it in, or I was adding the

1   medicine in the bathroom.  So --

2   Q.   You add the medicine in the bathroom, would you tell

3   the jury a little bit more about what you --

4   A.   Crush up a piece of the pill and put it in the

5   medicine, which later when they changed their drug tests, it

6   did show that my medicine was not metabolized in my system.

7   Q.   So it came back as an aberrant drug test, a failed

8   drug test?

9   A.   Yes.  That would have been, like, I had my daughter in

10  ███████████.  That would have been probably late 2015.  I had

11  her in ██████.  I'm sorry.  I don't know where I got

12  ███████████.  I had her in ██████████.  And it would have been

13  probably, like, late that year that that happened.

14  Q.   And I want to get back to your daughter in a minute.

15  Just one follow-up question about that.  When that aberrant

16  drug test happened, you're saying that the drug test didn't

17  show the metabolites, which you got flagged for, by the

18  company that was doing the test?

19  A.   Right.  And Daniel, the nurse, called me into the

20  room, told me that they could no longer see me, and I flipped

21  and was, like, no, you get Jeff in here.  This was complete

22  crap.  And Jeff came in and looked at it and just told him to

23  put me in a room.  And then I didn't hear anything else about

24  those drug tests.

25  Q.   Okay.  So -- and you got to keep seeing Jeff Young

1  even after that --

2  A.    Yeah.  Because that would have been the end of 2015,

3  and I was there up until he was served.  So that was the

4  following year.

5  Q.    Okay.  One last question about Dr. McDonald versus

6  Jeff Young:  With Dr. McDonald, were you taking the

7  medication that you were being prescribed as it was supposed

8  to be taken according to the prescription?

9  A.    I was.  I was taking my medicine like it was supposed

10  to be because I knew that he was going to count them; and so,

11  therefore, I didn't get carried away with it.

12       Whereas, there at the end, I was literally having to

13  roll over and grab three pills off of my night stand to get

14  out of bed every day.

15  Q.    And at the end, you mean when you were being treated

16  by Mr. Young?

17  A.    Yes, sir.

18  Q.    Okay.  I want to shift gears a little bit.  You

19  mentioned your daughter.  What is her name?

20  A.    A.A.

21  Q.    Okay.  A.A.  so when did you find out that you were

22  pregnant with A.?

23  A.    I found out I was pregnant with A., it would have been

24  January or February of 2015 because I did not find out I was

25  pregnant with her until after my first trimester.

**EXAMINATION OF HOPE ARMENT**                                41

1   Q.   Okay.  Now, by this time, you're under Jeff Young's

2   care?

3   A.   I am.

4   Q.   Had you become active in your addiction again by this

5   time?

6   A.   By that time, I was -- my dosage had went up on my

7   pills.  My amount had went up on my pills, and I had a little

8   bit more freedom with them.  So, yes, I would definitely say

9   that my addiction was active at that time.

10   Q.   Okay.  And what outward signs of active addiction were

11   you exhibiting at that time?

12   A.   Well, I mean, I pretty much didn't want to function

13   during the day without having my medicine, and I would just

14   blame it on the aches and pains of the ailments that I have.

15   But hindsight is 20/20.  That was actually me -- like, there

16   was times at the end of the month that I was physically going

17   through withdrawals, and it was almost every month that I

18   dealt with that.

19   Q.   Okay.  And I'm going to ask you a few more questions,

20   but before I do that, would you take a look at these?  Are

21   those prescriptions that the defendant wrote you over the

22   course of your treatment?  And take your time.

23   A.   Yes, these are the first ones.  These are the first

24   ones -- or the second ones, because the first ones would have

25   been in November.  Yeah.  Because he hasn't gone up on them

**EXAMINATION OF HOPE ARMENT**                                    42

1  yet.

2              MR. PENNEBAKER:  So this is going to be a

3  compilation exhibit from what's been marked as Government's

4  419, a couple of pages out of Government's 419 that I'll read

5  off as I get to them, Your Honor.  And then there are

6  prescriptions in what's been marked Government's 500, the 500

7  series.  And so this is a compilation of those prescriptions

8  to Ms. Arment in chronological order, probably about 20, 25

9  pages.  And I'd offer this in evidence at this time, Judge.

10             THE WITNESS:  Okay.  I was fixing to say it

11  doesn't look right because the milligrams are wrong, but then

12  the milligrams change right here.

13             THE COURT:  Can you identify those as scripts

14  that were given to you?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Let's go ahead and receive it.  It

17  will be Exhibit No. 22.  How many pages was it?

18             MR. PENNEBAKER:  I'm estimating here, Judge.  I'd

19  say it's about 20, maybe 25.

20             THE COURT:  Okay.

21             (Exhibit 22 marked and received.)

22  BY MR. PENNEBAKER:

23   Q.   Ms. Arment, when you found out that you were pregnant

24  with A., did you go see an obstetrician?

25   A.   I did.  I went and saw Dr. Armie Walker in Jackson,

UNREDACTED TRANSCRIPT

1   Tennessee, who also referred me to Dr. Hoeldke, who is a

2   high-risk doctor.  And I continued going to Jeff for my pain

3   management.  So all three of them were actually over me

4   during my time -- during my pregnancy.

5       Q.   Did you tell Jeff Young that you were pregnant with

6   A.?

7       A.   Yes.

8       Q.   How soon after you found out?

9       A.   I told Jeff the first time that I went whenever I

10  found out, which would have been, like, Februaryish.  I'm not

11  real sure.  2015.

12      Q.   Okay.  And did Jeff Young ever tell you about the

13  risks of being on opioids while you were pregnant?

14      A.   I don't recall having a conversation about that.  I,

15  actually, sitting here before you, don't know the risks of

16  what it does to a fetus to be addicted to opioids or Xanax.

17      Q.   Okay.

18      A.   I still don't know what those risks are.

19      Q.   And that was going to be my next question:  Did Jeff

20  Young tell you what the risks to the fetus of taking Xanax

21  were?

22      A.   No.  But I'm not a hundred percent positive, but I'm

23  really close to it that A. didn't have Xanax in her system

24  when she was born because I wasn't taking my Xanax.

25      Q.   Okay.  And have you ever had a conversation with

1   either of the other providers at any time about what the

2   risks were even if you don't remember what they said now?

3     A.   I don't recall.  I know Dr. Hoeldke was telling me

4   that he wanted me to kind of branch out and look into going

5   to see, like, my GI doctor and stuff.  And in my mind, I was,

6   like, that's not going to help my situation because I'm

7   pregnant.  You can't put me to sleep to do a colonoscopy, and

8   I just talked myself out of that one.

9     Q.   Okay.  And so you went to Dr. Hoeldke with stomach

10  issues while you were pregnant; is that the deal?

11    A.   Yes.  I was sick.  I was really sick.  I couldn't hold

12  anything down, and I was there for my monthly checkup, and I

13  was throwing up.  I had diarrhea.  I was super sick, and I

14  couldn't understand why.  And so Dr. Hoeldke told me I was

15  going to have to go to the emergency room.  And I was, like,

16  I'm not going down there to sit for hours in the emergency

17  room.  I have an appointment at my doctor's office after

18  this, so I went to the doctor, and I told Jeff what was going

19  on.  And he gave me a shot of Phenergan in the office and a

20  little -- a script of Phenergan to take home with me to keep

21  me from throwing up.  And then I got my regular prescription

22  for my medicines.

23    Q.   So looking back on it now, like you said, 20/20

24  hindsight, do you think you had something that was wrong with

25  your digestive tract, or was it something else?

1   A.    No.   I think I was having withdrawals because I had

2   been out of my medicine for about a week.   And, like I said

3   just a minute ago, unfortunately, there for a long while it

4   was about every month that I was feeling like that.   And I

5   really never had been through withdrawals, so I didn't really

6   know what they were.

7   Q.    Okay.  So if we could go to 509.0005, please.   And

8   this is -- that's what it says at the bottom of the page.

9   This is Government's 22.   This is the one we just entered.

10  So this is Government's 22.   I'm not sure which page of 22

11  for the record, but it does say 509.0005 at the bottom.

12        So this is a prescription that you received from the

13  defendant?

14  A.    Yes, sir.

15            THE COURT:   Could you blow that up a little,

16  please?  Much better.   Thank you.

17  BY MR. PENNEBAKER:

18  Q.    So this is on March 5, 2015.   So this is about a month

19  after you found out -- or after you found out, slash, told

20  Jeff Young you were pregnant?

21  A.    Yes, sir.

22  Q.    Now, is that Percocet, number 90, is that supposed to

23  be a 30-day supply?

24  A.    That is a 30-day supply, yeah.

25  Q.    Okay.  So if we could now go to 500 -- same exhibit,

1    at the bottom of the page, it says 500.0009.  So this is --

2    that last one we saw was March 5 of 2015, correct?

3      A.   Yes.

4      Q.   This is March 25 of 2015, correct?

5      A.   It is.

6      Q.   So that's 20 days later?

7      A.   Right.

8      Q.   And you're getting a prescription for a different

9    opioid medication.  This time it's hydrocodone, correct?

10     A.   Yes, sir.

11     Q.   And that's the number 90?

12     A.   Yes, sir.  It's another 30-day supply.

13     Q.   Okay.  And is this the consult where Dr. Hoeldke had

14   suggested that you go either to the hospital, see the GI

15   specialist, and you were going through withdrawal?

16     A.   I have no idea.  No, I don't know --

17     Q.   It has been a bit --

18     A.   -- it had to have been around in there because that

19   happened pretty quick.  Like -- I was, like, six months --

20   five or six months pregnant whenever that happened, that

21   episode.  But -- yeah.

22     Q.   Okay.  I know it's been a long time.

23     A.   It has been.

24     Q.   But this is before that 30-day period you're getting

25   another prescription for a different opioid?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                       47

1    A.   Yes, sir.

2    Q.   Is it fair to say that when you get this prescription

3    or March 25, 2015, you needed the prescription to avoid

4    withdrawals?

5    A.   I would say so, but I don't know if it was filled at

6    that time.

7    Q.   Okay.

8    A.   I can't speak on that exactly because I'm not sure.

9    Sometimes I would get my prescription a little early, but I

10   wouldn't fill it until it was time to get it filled.

11   Q.   Okay.

12   A.   But I can't tell by this whether they filled it or

13   not.

14   Q.   Okay.  Looking back, did you need this prescription at

15   the time other than to avoid withdrawals?

16   A.   I mean, I had pregnant woman aches and pains, the

17   normal stuff, stuff that I should have been enjoying and

18   remembering and holding on to.

19   Q.   So prescribing -- or the maintenance on these pain

20   meds for that kind of stuff deprived you of that part of your

21   pregnancy?

22   A.   Yeah.

23        MR. PENNEBAKER:  Ms. Silverberg, if we could go

24   to 503.001 for the record, it's the same Exhibit 22.  That's

25   marked at the bottom.  Maybe it's 0001 -- 503.0001.  That's

1  what it says on the bottom.

2  BY MR. PENNEBAKER:

3      Q.    All right.  Ms. Arment, do you see the prescription up

4  there at the top?

5      A.    Yes, sir.

6      Q.    And it's April 23, 2015?

7      A.    Uh-huh, yes, sir.

8      Q.    Lortab, 120 count.  So the -- looks like 7.5 over 325.

9  Do you know what that means?

10     A.    7.5-milligram hydrocodone and 325 milligrams of

11 TYLENOL\acetaminophen.

12     Q.    So is it fair to say that's the same strength of

13 hydrocodone as the last prescription, with upping the number

14 of them to 120?

15     A.    Yeah.  It went from three times a day to four times a

16 day.

17     Q.    Okay.  Do you recognize the signature at the bottom of

18 that prescription?

19     A.    Yes, sir.

20     Q.    And whose is that?

21     A.    Jeff Young's.

22     Q.    So at this time, did you need that medication for

23 anything other than to avoid withdrawal?

24     A.    Like I said, normal aches and pains of being a

25 pregnant woman.  In my mind -- I don't know.  Like, I know

1  now that the brain, when you are going through withdrawals,

2  it kind of fires off sensory to make you feel like you're in

3  a lot more pain than what you're actually in. And I feel

4  like that's what I was going through.

5     Q. Do you think that if a care provider you had been

6  seeing had said, I'll wean you off of this, you would have

7  said: No, I'm not going to do that?

8     A. I would have probably tried to fight it because I felt

9  like I had to have it. But, I mean, if it was someone that I

10  listened to and someone that I considered like a friend,

11  then, yeah, I probably would have.

12     Q. Someone like Jeff Young?

13     A. Yeah.

14     Q. But that never happened, did it?

15     A. No. I had a run-in -- he had gotten really busy. I

16  got tired of waiting in the lobby so long. And I had been

17  going there for a long time so it -- I went to a different

18  doctor. And when I had the accident where I got the DUI with

19  my daughter in the car, she actually stopped seeing me and

20  offered me rehab on the spot. But, I mean, I didn't really

21  know her like that, and I had just started going to her so I

22  didn't have a relationship established where I felt

23  comfortable with her saying that to me. So I actually left

24  and went back to Jeff.

25     Q. And that's later. This is after A. was born, correct?

**EXAMINATION OF HOPE ARMENT**

1    A.   Yes.

2    Q.   Okay.  So if we can, please -- well, actually -- we

3  can switch on back, and that's 503.0001.  I just want to go

4  back there for one second.  If we can go to the bottom

5  prescription, please.

6    A.   This is the -- this is the one where I went to Jeff,

7  and I was sick that day.  It was not in 3/25.  It was 4/23.

8    Q.   Got you.  So 4/23 you would have been sick this day?

9    A.   Yes.

10   Q.   And so you get Phenergan in that bottom prescription.

11 We just talked about the 120 Lortab, which is hydrocodone.

12 Up at the top, right underneath RX, it says Xanax,

13 1 milligram?

14   A.   Yes, sir.

15        MR. PENNEBAKER:  Okay.  If we can, let's go to

16 Government's 22.  At the bottom it's marked 504.0002.

17 BY MR. PENNEBAKER:

18   Q.   What's the date on that prescription?

19   A.   5/20.

20   Q.   So that's May 20th of 2015, Lortab 7.5/325, number

21 120, right?

22   A.   Yes, sir.

23   Q.   And at this time, you were still pregnant with A.?

24   A.   Yes, sir.

25   Q.   And the defendant knows this?

51

1          MR. PENNEBAKER:  Underneath, if we can go to that

2    second prescription, please.

3    BY MR. PENNEBAKER:

4       Q.   We've got the same date, a prescription for Xanax,

5    another 90 of those, correct?

6       A.   Yes, sir.

7       Q.   Okay.

8          MR. PENNEBAKER:  And then if we can go to

9    505.0001, still Government's 22.

10   BY MR. PENNEBAKER:

11      Q.   Is that a prescription for Lortab 120 again, June 19,

12   2015?

13      A.   Yes, sir.

14      Q.   And you're still pregnant at this time?

15      A.   Yes, sir.

16          MR. PENNEBAKER:  If we can, please, go to

17   Government's 506.0001, and this is still Exhibit 22.

18          THE WITNESS:  Yes.

19   BY MR. PENNEBAKER:

20      Q.   Now this is a -- it looks like a different

21   handwriting?

22      A.   It is.

23      Q.   What -- can you -- let the jury know what's going on

24   in this prescription?

25      A.   Okay.  That was the lady that worked for him downtown,

1   Petway or whatever her name is.  I went to her because Jeff

2   was busy, and I couldn't get in.  So I went downtown, and she

3   did not want to write me my medicine, and we had it out in

4   the office.  And she just told me she wasn't comfortable

5   writing me medicine, and I told her to call Jeff because this

6   prescription was actually supposed to be for when I got ready

7   to have my baby.  And I needed the medicine because I was

8   having surgery.  I was actually having a surgical procedure

9   done.

10        So she called -- I guess she called Jeff, and she

11  wrote it, but there was something wrong with it.  This looks

12  right, but there's something wrong with it.  Something got

13  changed.  I can't remember if it was the quantity or what

14  because I had sent Jeff a message on Messenger and told him

15  that I needed to come and see him because she had messed

16  something up on my prescription.

17  Q.   Okay.  And for all of those prescriptions that we just

18  saw, that we haven't already talked about, same question:

19  Are those prescriptions that you needed for anything other

20  than to avoid withdrawal?

21  A.   I mean, I function every day.  I'm actually a welder

22  for Kubota, and I use my hands every day.  And I don't take

23  any narcotic pain medicine.  I don't take hardly even any

24  ibuprofen, actually.

25  Q.   And has anything about your condition changed?  Like,

1   were you worse off back then?  Did you have some crippling

2   ailment that you don't have now or anything like that?

3     A.   No.  I actually am worse now than I was then.  It's

4   harder to use my hands now because I'm not getting the

5   treatment that I need, but I get up every morning at four

6   o'clock in the morning and go and do a 12-hour shift, and I

7   function as a normal, functioning human being.

8     Q.   Okay.  I'm going to hand you two pages of text

9   messages between you and Jeff Young or Facebook messages

10  between you and Jeff Young.  I just want to make sure you

11  recognize it.

12    A.   Yes, I recognize them.

13    Q.   Okay.

14         MR. PENNEBAKER:  Your Honor, we offer these two

15  pages as Government's -- well as Exhibit 23.

16         THE COURT:  Okay.  We'll go ahead and receive it

17  as Exhibit 23.

18           (Exhibit 23 marked and received.)

19  BY MR. PENNEBAKER:

20    Q.   And if we could zoom in on that bottom one, actually.

21  So this is the -- this is in ███ 2015, and this is

22  before -- it was about a month before you had A., correct?

23    A.   Yes.  It was exactly almost a month before I had A.

24    Q.   Okay.  And you say to the defendant:  Can this OB call

25  you.  I'm being discharged from the hospital, and she needs

1    your permission to write any of the Tramadol for the

2    breakthrough pain.  I have nothing to fall back on at home

3    and don't see you until the 17th.  I asked her to contact you

4    about it because of my contract.

5         What did you mean by that?

6    A.   Because at that point, there had been a contract given

7    to us saying that we would adhere to the pain management

8    contract.  We would not have anybody writing us prescriptions

9    besides him.  We would not fail our drug tests.  That sort of

10   thing.

11   Q.   Was one of the terms of the pain contract that you

12   would only use the medications as prescribed?

13   A.   Yes, that was one of them.

14        MR. PENNEBAKER:  So if we could go back,

15   Ms. Silverberg, to 505.0001.

16   BY MR. PENNEBAKER:

17   Q.   That message we were just looking at, it says that was

18   on July 5?

19   A.   Uh-huh.

20   Q.   And this prescription was written on June 19, correct?

21   A.   Right.

22   Q.   So you have 120 Lortab that are -- that have been

23   written for you on this prescription, and is it fair to say

24   that you were out of this prescription by the time you went

25   into the hospital because you had nothing to fall back on?

1    A.    Yes, sir.  But I didn't take all of those pills.

2    Q.    Okay.  Do you want to tell the jury what you mean by

3    that?

4    A.    I don't want to get in trouble.  I was selling some of

5    my pills especially when I was pregnant because I wasn't

6    taking all of them, especially the Xanaxes.  But the Lortabs,

7    I would keep quite a few of those to sustain me.  However, I

8    would sell a lot of them, and then by the end of the month, I

9    was having to buy off the street to sustain me to get me by

10   until I got my prescription again.

11   Q.    Or you would go through withdrawal?

12   A.    Or I would go through withdrawal.

13           MR. PENNEBAKER:  Ms. Silverberg, can we go back

14   to the exhibit we were just looking at, 23, and the top of

15   the second page, please.

16   BY MR. PENNEBAKER:

17   Q.    And you say here, and this is ███████, 2015, a few

18   days before you have A., correct?

19   A.    Yes.

20   Q.    Don't have any other way to ask you this, but when I

21   asked you if you would come to the hospital when I have the

22   baby, not just to see us but also to take care of making sure

23   I have my meds when I leave, is that a possibility, or do I

24   need to move my appointment up to before the 14th to make

25   sure when I have them -- or I can have them when I come home.

**EXAMINATION OF HOPE ARMENT**                                    56

1        And then you say:  Trying to get my birth plan in
2    action.  I do want you to come see her when she's born.
3    You've taken awesome care of me through this whole process,
4    and I consider you not only my doctor but also my -- and it
5    cuts off but that looks like that's --
6    A.    -- friend.
7    Q.    -- friend?
8    A.    It's abbreviation for friend.
9    Q.    Okay.  So you're getting ready to have this child, and
10   you're contacting Jeff Young.  What are you worried about?
11   A.    Not having my medicine.
12   Q.    Do you know at this point how much pain you're going
13   to be in, or is this just you anticipating -- you just don't
14   want to be stuck in the hospital kicking --
15   A.    Yeah.  I knew I was having the procedure.  I knew what
16   a similar procedure felt like, and it was not comfortable,
17   and I was not willing to be in that much pain.
18   Q.    Okay.
19          MR. PENNEBAKER:  And you can take that down,
20   Ms. Silverberg.  Thank you.
21   BY MR. PENNEBAKER:
22   Q.    I think you mentioned that you were experiencing
23   withdrawals even with the medication that Jeff Young was
24   prescribing you?
25   A.    Yes.

1    Q.   Can you tell the jury what it felt like to be pregnant

2    and having withdrawals?

3    A.   It was awful.  I was a high-risk pregnancy, and, like,

4    my tailbone had recently been broken.  And every time she

5    shifted, it would kind of make it crack a little bit more.

6    The withdrawals made the pain that I was going through a lot

7    more unbearable.  I was sick, throwing up sick.  As you know,

8    being pregnant, you're already sick, but I was projectile

9    puking, like, hardly able to get to the toilet in time before

10   I would -- yeah.  I couldn't work.  It was bad.

11   Q.   How much did you weigh in your pregnancy?  Do you

12   remember?

13   A.   I don't, but I know it wasn't a lot.  I want to say I

14   weighed about what I weigh now when I had her.

15   Q.   Okay.  When was A. born?

16   A.   She was born on ███████████████.

17   Q.   2015?

18   A.   Uh-huh.

19   Q.   Was she born with opioids in her system?

20   A.   She was.

21   Q.   Did she have to spend time in the NICU?

22   A.   Yes.

23   Q.   Did you ever talk to Jeff Young about that?

24   A.   Sure.  I told him after I got out that she was in the

25   NICU for two weeks.  She wasn't in there the whole time for

1   opioids, though.  She was in there because she had MRSA that

2   she contracted that because she had opioids in her system and

3   had to be put in the NICU.  She got it from the NICU.

4   Q.   How is she doing today?

5   A.   She's wonderful.

6   Q.   Okay.  So Jeff never tried to -- Jeff Young never

7   tried to warn you -- wean you off before A. was born?

8   A.   No, he didn't, and neither did my OB or Hoeldke.

9   Q.   Who was prescribing those?

10  A.   Jeff Young.

11  Q.   Okay.  And do you know whether either of those other

12  providers talked to him or tried to --

13  A.   You know, I don't know because Dr. Walker really has

14  been involved in my family.  She -- like, she has worked on

15  my mom, my sister.  And I would think that if anybody would

16  have made contact, it would have been them two making

17  contact.  But, honestly, I don't think any of my doctors made

18  contact with each other.

19  Q.   Okay.  But you don't know one way or the other?

20  A.   I don't.

21  Q.   Okay.

22  A.   I can't say for sure.

23  Q.   I think you mentioned earlier that when you were

24  failing drug tests that -- you know, crushing up pills to try

25  to have that in your system, that that was after A. was born?

**EXAMINATION OF HOPE ARMENT**                                    59

1    A.    No.  That was while I was pregnant with A.

2    Q.    And after?

3    A.    And after.

4    Q.    Okay.

5    A.    The failed drug tests that were shown to me were from

6    April of 2015, and that would have been during the time that

7    I was pregnant with A.  I think it was April, May, June and

8    July, as a matter of fact.  It was four months of them.

9    Q.    Okay.

10   A.    And -- yeah.

11   Q.    And when you say that was shown, Jeff Young never

12   showed you those drug tests?

13   A.    No.  There were other people that got fired from

14   getting -- I mean, it was going on all over Tennessee.  But,

15   like, we would go in and wait in the waiting room, and then

16   Daniel would call you back, like, you were getting triaged.

17   And he would tell you that this is what happened and then

18   have you sign some paperwork.

19   Q.    Got it.  Got it.  And you mentioned that you

20   eventually quit seeing the defendant, and I think you said

21   that it was getting too busy in the waiting room?

22   A.    Yeah, it was.  Like, me and my mom, we had been going

23   to Jeff for a long time.  We referred a lot of people to Jeff

24   over the course of the time that we had been going there.  We

25   kind of built a rapport with him.  He felt like a friend.

1  But there towards the end, it was like we were just a number

2  in a waiting room.  And so it got way too busy.  There was

3  too much.

4  Q.  What did it look like in the waiting room?  What was

5  it like in there?

6  A.  Like, I would be there sitting for hours, and there

7  was this new VIP special going on where people could pay cash

8  and come in through the side door and be seen immediately and

9  then leave, and then leave all of us that have been sitting

10  in the waiting room still sitting there for hours.  And it

11  would be elbow to elbow in the waiting room.

12  Q.  Okay.  Did you ever tell Jeff Young that you were

13  abusing drugs?

14  A.  No.

15  Q.  Did you signal to him that you were in other ways?

16  A.  No.  But if you look at my Facebook page, you, as a

17  person from the outside, would be able to see the

18  deterioration in me over -- like, from the time I had A.

19  until my children were taken away, I withered away to

20  nothing.

21  Q.  And it was while you were under the care of Jeff

22  Young?

23  A.  Right.  And that was before I relapsed on meth.  This

24  was completely opioid based.  And if I didn't have my

25  medicine, I freaked out.

1   Q.   I actually want to ask you about it because you said

2   "relapsed on meth."  Were you taking meth when you were

3   seeing Jeff Young as a patient?

4   A.   No.  No.  I wouldn't because whenever I started seeing

5   Jeff, he explained, he was, like, you're getting drug tests.

6   Weed is not that big of a deal, but don't have nothing else

7   in your system.  And you better have your meds in your

8   system, but don't have nothing else in your system.  And I

9   never did.  Like, I legit didn't.

10          And then I had left his practice and was going to the

11  other doctor, and I don't really know.  Just one day I was

12  tired.  I didn't have any pain pills, and I didn't go see her

13  for a couple of weeks so I got high.  And I was off to the

14  races.  I got a DUI with my daughter in the back seat and

15  lost my children.  Meredith stopped giving me my medicine.  I

16  went to Quinco to try to get my medicine.  They wouldn't give

17  me my medicine.

18          So I went to Jeff, and he actually wrote my medicine,

19  but then I couldn't get it filled.  So I busted in his office

20  one night after work because I was, like, oh, my God, my

21  medicine.  Looking back it's so petty the way that I was, but

22  I was really that strung out on them that I really needed

23  them.  And I didn't want to keep using meth.  So I felt like

24  if I had the other one, then I wouldn't need that one.  And

25  it's just been a disaster.

1  Q.   So when he wrote you that prescription when you -- so

2  just to make sure I got those events right.  So you are

3  seeing Jeff Young.  You leave that practice.  You go -- you

4  start to see Meredith.  Meredith Weeks is the name of the

5  other practitioner.  And then after you get a DUI, did you

6  tell Weeks about this, or did she find out somehow?

7  A.   Weeks is from my hometown.  She found out about it,

8  but not just that.  My posts on Facebook were livid.  I was

9  literally having a nervous breakdown and everybody around me

10 knew that I was losing it.  Like, I was losing it.  I sat in

11 the middle of my living room floor with my kids' stuff around

12 me for two weeks.  I didn't eat.  I didn't sleep, nothing.

13 Complete nervous breakdown.

14 Q.   When you went back to Jeff after that and he wrote you

15 the prescription --

16       MR. PENNEBAKER:  If we can call up Government's

17 419.  Well, this is going to be Exhibit 22, but it's page

18 419.0125.

19 BY MR. PENNEBAKER:

20 Q.   Would that have been the date?

21 A.   Give me just a second.  I lost my kids on 10/18.  This

22 prescription, I feel like, would have been November.

23 Maybe -- maybe December.  But I'm thinking --

24 Q.   So you come into his office after hours freaking out,

25 and then after that happens, he still writes you -- looks

1   like Depakote and this one has Xanax -- and if we can go to

2   the --

3       A.   No, sir.

4       Q.   Oh.

5       A.   I came into his office that day, and he had written

6   one of them that day.  And I couldn't get it filled because

7   another provider the month before had written it for four

8   times a day, but it was actually not enough to even get me

9   through two weeks.  And so he wrote the other prescription so

10  that maybe the insurance would approve it because it wouldn't

11  approve the other one.  And he told me that I would not be

12  able to get my oxycodone filled until the 30 days was up.

13  Thirty days didn't happen because I'm pretty sure, like, a

14  day or two after that is when they came in on him.

15      Q.   That's when there was a search warrant at

16  PREVENTAGENIX, and it closed down?

17      A.   Yes.  And then no pharmacy would touch that

18  prescription.

19      Q.   Okay.  So you mentioned that there were a lot of

20  consequences from the spiral that happened after you started

21  seeing Jeff Young, correct?

22      A.   Yes, sir.

23      Q.   And what happened with your kids?

24      A.   They were removed from my custody.  One of them got

25  adopted.  She's 21 now.  The other two live with their dads.

1     Q.   Okay.  And you've been incarcerated.  Are you close to

2 getting out?

3     A.   I am.  Whenever I get back to Georgia, I'll be within

4 ten days of freedom.

5     Q.   Are you planning to do things differently when you get

6 out?

7     A.   I am.  I completed welding school at Northwest Georgia

8 Tech.  So I'm a certified welder across the United States.

9 I'm going to continue that career.  I'm going to get my kids

10 back as soon as I get out.  I'm going to get a hair and nail

11 follicle test because they can test me from root to end.  I'm

12 clean.  I have been clean for over four years.  I'm -- I'm

13 ready to live my life.

14     Q.   Were you optimistic about the future as the

15 defendant's patient?

16     A.   I mean, I didn't really know what the next day held.

17     Q.   Are you optimistic --

18     A.   Do you know what I mean?

19     Q.   Yeah.  But I wanted to just contrast, are you

20 optimistic about the future today?

21     A.   Yeah, nothing can hold me back.  I have certifications

22 and everything from forklifting to welding.  I've done

23 everything that the state will offer an inmate, and I'm just

24 ready to get out there.  I'm married and ready to be a wife

25 and mom and do normal stuff.

**EXAMINATION OF HOPE ARMENT**                                        65

1    Q.   Awesome.

2              MR. PENNEBAKER:  Pass the witness.

3              THE COURT:  Thank you.

4              Mr. Ferguson, cross?

5              MR. FERGUSON:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7    BY MR. FERGUSON:

8    Q.   Good afternoon, Ms. Arment.

9    A.   Arment.

10   Q.   Arment?

11   A.   Yes, sir.

12   Q.   I'll try to get that correct.  I promise you I will

13   mess it up, and it's not a slight to you.  It's reflective of

14   me.

15   A.   You are not the only one, I assure you.

16   Q.   Thank you.  I'll try real hard.

17         One of the things I didn't understand -- two things.

18   When you came to see Jeff Young, what was your medical

19   conditions?  What were the problems?

20   A.   Okay.  I have Crohn's disease.  I have ulcerative

21   colitis.  I have a fractured tailbone that has never repaired

22   itself properly.  My lower back is messed up from spinal taps

23   from having children, and I have carpal tunnel in both hands.

24   Q.   Is that fair to say all of that is fairly painful?

25   A.   It is.

**EXAMINATION OF HOPE ARMENT** 66

1    Q.    And is that why you were being seen by a pain

2    specialist before you came to Mr. Young?

3    A.    Yes, sir.  My ex-fiance had actually just broken my

4    tailbone when I started going to see Dr. Thomas McDonald, and

5    that's why I started was because I needed to continue care

6    besides an emergency room doctor.

7    Q.    Okay.  Was it the broken tailbone that started you

8    into the pain management side of the medicine?

9    A.    It was that and my Crohn's.

10    Q.    Okay.  The tailbone injury, was -- I'm not trying to

11    pry, but was that like a fight, traumatic injury or something

12    of that nature?

13    A.    Yes, sir, he picked me up and threw me.

14    Q.    Okay.  Sorry about that.

15    A.    Oh, it's okay.

16    Q.    When you left -- why did you leave the pain management

17    specialist?

18    A.    Dr. McDonald took over the hospital in Lexington, and

19    his coworker was taking over, and I didn't really like her.

20    She wasn't very nice.

21    Q.    Did you know her?  I mean, had you been around her

22    before or would you have just seen her once?

23    A.    I had been around her for about six or eight months

24    working with him when he wasn't there, and I didn't like her

25    demeanor or bedside manner.  She was kind of rude.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    67

1    Q.    How long did you see this doctor, pain specialist?

2    A.    Dr. McDonald, I saw him for, like, two years.

3    Q.    And had you seen anyone before him for your pain

4    management?

5    A.    No, sir.

6    Q.    Had you been prescribed any other medication for pain

7    before him?

8    A.    Just as needed.

9    Q.    What do you mean by that?

10   A.    Like if I had went to the hospital for an injury or

11   something to that effect, but, no.

12   Q.    Not for managing your chronic pain?

13   A.    Correct.

14   Q.    Okay.  So no doctor before the pain management had you

15   on any kind of long-term opioid or pain medication

16   management?

17   A.    Right.  And, also, as I said before, I was -- I had

18   relapsed.  But before I relapsed, I was sober for 12 years.

19   So I was really careful as to what, you know, what I took.

20   Q.    All right.  You keep using these numbers of years --

21   A.    Yeah.

22   Q.    -- and I should know the answer to this because it's

23   real easy for me to look up, and I'm so sorry two questions

24   to never ask a woman:  How old are you?

25   A.    I just turned 41 two weeks ago.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT** 68

1    Q.   Okay.  I didn't know that.  I would have not have

2    guessed that.  I was trying to figure out where 12 years went

3    to.

4    A.   Yeah.

5    Q.   So somewhere in your past you had previously been

6    addicted to drugs?

7    A.   I had been, yes, sir.

8    Q.   At what age and what drug?

9    A.   I started using when I was 13, and I got sober when I

10   was 25 from meth and opiates.

11   Q.   Okay.  So you had had a bout of addiction previously?

12   A.   I had.

13   Q.   Okay.  Is that why when you were needing to be treated

14   for pain, you went to a pain management specialist?

15   A.   It was getting to the point where if you weren't in

16   the pain management specialist, you weren't being seen about

17   pain regardless of how severe or nonsevere that it was.  So I

18   had to get in with a doctor that dealt with pain management,

19   yes.

20   Q.   During this time period, it had become very difficult

21   for you to find a physician or a medical provider that would

22   touch pain medication?

23   A.   Correct.

24   Q.   For fear of getting in trouble?

25   A.   Right.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT** 69

1    Q.   You found this doctor.  He made -- he spoke to you

2    about your illness?

3    A.   Yeah.  Dr. -- well, Dr. Thomas McDonald is -- I call

4    him Dr. House.  He is that kind of doctor.  He -- I didn't

5    realize that I had shingles on my face.  And all my life

6    everybody has been telling me it was different, and one look

7    at it, and he knew what it was.  So he did talk to me about

8    my different ailments, and we worked on some natural stuff as

9    well as pain medicine.

10   Q.   Did Dr. House do any testing to see if you had

11   Crohn's?

12   A.   I actually went to Dr. Salder, who is my GI

13   specialist.

14   Q.   You came to Dr. House and said you'd previously been

15   diagnosed?

16   A.   Dr. McDonald, yes, sir.

17   Q.   I'm sorry.  See, you said House, and I'm watching that

18   series, and I'm not sure how you like him because I'm

19   surprised.  It's been a while since I've seen it.

20       Dr. McDonald, you came in and said, hey, I've been

21   diagnosed with Crohn's?

22   A.   Correct.

23   Q.   He didn't do the testing to see if you had Crohn's?

24   A.   No.  He sent me because I was having problems.  And

25   everybody -- like, I had a colonoscopy done here at the med

UNREDACTED TRANSCRIPT

1   years ago, and they perforated my colon.  We never found out

2   anything.  So they diagnosed with me irritable bowel, which

3   basically means there's something wrong with your colon, but

4   we don't know what it is.

5       Q.   Right.

6       A.   And I have precancer polyps.  So I have to be seen

7   regularly.  So he recommended I go to Dr. Salder because

8   Dr. Salder is a tri-state recommended GI specialist, and he's

9   the best -- one of the best in the industry.  So I went to

10  him because I was very gun shy after I almost bled to death.

11      Q.   So he's the doctor that diagnosed you with Crohn's and

12  you see him --

13      A.   Right.

14      Q.   -- also for your --

15      A.   Ulcerative colitis.

16      Q.   -- ulcerative colitis?

17           And was there any testing done on your lower-back

18  pain?

19      A.   No.  I think that I had done the chiropractor thing,

20  but no testing was done on my lower back besides what was

21  done at the time of the injury.

22      Q.   He diagnosed it, based again, on what you told him?

23      A.   Right.  He had the x-rays and the MRI and all that

24  stuff.  He had all of that.

25      Q.   Where did he get those from?

1    A.   He got them from the hospital in Michigan where it all

2    happened.  I signed a release.  He had them sent.

3    Q.   Was this during a pregnancy?

4    A.   No.

5    Q.   I thought you said it was -- injections?

6    A.   No.  The injections are in my hands.

7    Q.   Got you.  So when you left Dr. McDonald, did he have

8    you prescribed hydrocodone, acetaminophen, the Lortabs and

9    also to clonazepam?

10   A.   Klonopin.

11   Q.   Klonopin?

12   A.   Yes.

13   Q.   Okay.  And then that would be also what Jeff Young

14   prescribed to you first?

15   A.   Yes.  And we changed the Klonopin because the Klonopin

16   does not work very well for my anxiety, and the Xanax did.  I

17   mean, they -- some medicines are good medicines when they're

18   used properly.  I just can't use them properly.  But that

19   particular one, I needed to be on Xanax at that stage.

20   Q.   Very fair to say that the drugs themselves are not

21   bad, the way that they're used or abused can be bad?

22   A.   Right.  And, like, I was going through a divorce, and

23   I was seeing my mom, just got back out in the real world.

24   And then, boom, a couple of months later, we found out that I

25   was pregnant.  But at that point, that's what was going on.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                    72

1   Just got out of a divorce and all that stuff.

2      Q.   Okay.  So was it with consultation with Mr. Young that

3   you changed to Xanax?

4      A.   Yes.

5      Q.   You explained to him you weren't having any real

6   success with the drugs you were that prescribed?

7      A.   Right.

8      Q.   He maintained the same -- at this point the same dose

9   level of the Lortab but changed out your, I guess, that's

10  benzodiazepine --

11     A.   Right.

12     Q.   -- to a different one that you felt would be more

13  beneficial to you?

14     A.   Right.

15     Q.   And did you tell him you were receiving benefits from

16  it, that it was helpful, more helpful?

17     A.    I'm sure that I did.  After the first -- like, I took

18  Hailey to him, my oldest daughter.  I took her once or twice

19  before it started getting, like -- I guess, monotonous as I

20  would just go in, and I would get my prescription and leave.

21  And so whenever the lack of -- I don't know what you would

22  call it -- was lost, I stopped taking Hailey there because my

23  daughter was also struggling with some anxiety-type issues

24  from me being in an abusive relationship and getting out of

25  it and stuff.

UNREDACTED TRANSCRIPT

1    Q.   Did at some point, when you would come in each month,

2    the visit just got shorter and shorter?  As it seems, you

3    were just there to get your prescription filled.  He would

4    ask you is everything okay, is the medication still working?

5    A.   Right.  I would go in.  I would get weighed by the

6    nurses and stuff, triaged.  I would wait in the waiting room,

7    and then I would be put into a room.  He would actually come

8    in and ask if everything was all right.  He would, you know,

9    find out what prescriptions I needed refilled.  And then he

10   would do a checkup.  He would listen to my heart, my lungs,

11   and everything, to make sure that that was stuff was okay.

12   Q.   Do you know if your record from Dr. McDonald, your

13   medical record was transferred in to Mr. Young's --

14   A.   I have no idea.  I signed for it to be.

15   Q.   Okay.  And that would have contained all the records

16   of your testing previously?

17   A.   Correct.  I would think so.  I don't know.  I don't

18   work in that field.

19   Q.   If -- well, fair enough.  We'll leave it there.

20        When you came in and you had gone to see some other

21   medical providers and you were trying to explain to them that

22   you had -- you were just sick, you were just nauseous,

23   throwing up, you didn't get any -- they didn't really do

24   anything for you, did they?

25   A.   I'm sorry, what are you referring to?

EXAMINATION OF HOPE ARMENT                                    74

1    Q.    At some point, you got a prescription for, was it,

2    Phenergan?

3    A.    Phenergan from Jeff?

4    Q.    Yes.

5    A.    Yes, sir.  That was when I was pregnant with A.  I

6    had -- like I said, I was really sick.  I went to

7    Dr. Hoeldke, but Dr. Hoeldke is a high-risk doctor.  He

8    doesn't do that type of stuff in his office.  So he was

9    referring me downstairs to the emergency room, and I was not

10   going to go wait in the emergency room.  Plus, I had to go to

11   Jeff's office anyway to get my prescriptions, so I went to

12   Jeff.  And Jeff treated it in the office because he was my

13   doctor.  I went to see all three of my doctors on the same

14   day every month.

15   Q.    So it was kind of, you went to them, you told them

16   your symptoms, said that you had been to Dr. Hoeldke, and he

17   wanted to send you to the ER.  And then based on your

18   complaint, Jeff wrote you a prescription for basically

19   antinausea medicine?

20   A.    Right.  He gave me a shot of it in the office and

21   wrote me a prescription for it to go home with me.

22   Q.    Did it make you better?

23   A.    I mean, the shot made me stop throwing up.

24   Q.    Okay.

25   A.    And I left and got my prescription filled.  So I

**EXAMINATION OF HOPE ARMENT**                                    75

 1   ultimately felt better, regardless.

 2       Q.   Oh, good point because at this point you were --

 3       A.   I was having --

 4       Q.   -- not taking your medication correctly?

 5       A.   I was not taking my medicine correctly.  So when I

 6   took my medicine, it was like --

 7       Q.   -- relief?

 8       A.   Yeah.

 9       Q.   Did you tell -- I keep saying Jeff.  Did you tell

10   Mr. Young you weren't taking your medication correctly?

11       A.   I didn't.

12       Q.   You didn't want to tell him, did you?

13       A.   No.

14       Q.   Because you were afraid if you did, he would cut you

15   off?

16       A.   Well, it was that, and it was kind of a humiliation

17   thing of I had slipped.

18       Q.   Okay.  That's fair enough because you had been through

19   it once before?

20       A.   Right.

21       Q.   And you knew that even though you had come out of a

22   pain specialist who was prescribing you basically the same

23   medication, you had slipped into that from the person who

24   needs medication to the person who's abusing medication and

25   taking too much?

**EXAMINATION OF HOPE ARMENT**                    76

1    A.    Right.

2    Q.    And because of that, the shame, you wouldn't tell

3  Mr. Young?

4    A.    Right.  I wouldn't tell him, and, you know, when the

5  drug tests came back, that was an all-points bulletin, red

6  flag, ding, ding, ding, ding, ding, something is wrong, she's

7  not taking her medicine like she's supposed to.  And the way

8  I looked at it was, if he's my doctor or my friend, he would

9  see that something is going on.  And, clearly, it's not as

10 bad as other people are telling me it is if he's not saying

11 anything about it.

12   Q.    You were faking some of those urine screens, weren't

13 you?

14   A.    I'm sorry?

15   Q.    Were you faking your urine screens?

16   A.    Yes.  Because I didn't have it in my system, so I

17 would save just a piece of the pill.  That way I could take

18 the rest of the pills, and it was either taking them or

19 selling them.

20   Q.    Okay.  Okay.  Your high-risk OB, Dr. Hoeldke --

21   A.    Correct.

22   Q.    -- did he ask you what medications you were on?

23   A.    He did ask me what medications I was on.  And when I

24 told him, he recommended that I get off of them.

25   Q.    Did you do that?

1    A.   I did not.  I told him that I was going to continue to

2   take my medicine because I was not going to be miserable in

3   pain and that he could consult with Jeff.  Jeff could consult

4   with him, whatever they needed to do, but I was not at a

5   point where I could just stop.

6    Q.   But he explained to you what the possible dangers were

7   if you continued to use those drugs?

8    A.   He did not.  As I said before, I have never fully

9   understood or been told what opioids or Xanax do to an

10  infant.

11   Q.   Dr. Hoeldke, the high-risk OB didn't tell you why --

12   A.   He didn't.

13   Q.   -- he was trying to tell you to not take them?

14   A.   He didn't.  He actually leaned towards the Crohn's

15  disease.  He was, like, you know, I really think this is

16  making you worse.  I think that it's making you have

17  constipation, and it's making your Crohn's worse.  And that's

18  kind of the route that he took with it.

19   Q.   No warning from your high-risk OB?

20   A.   No.

21   Q.   Okay.  Had you ever used that physician before?

22   A.   No.  But my sister had, and she actually did use

23  Dr. Hoeldke when she was high-risk pain management as well.

24   Q.   What made you high risk?  You're not diabetic.  You're

25  not overweight.

1    A.    Because I was on pain management.

2    Q.    So you specifically went to him because of the pain

3    management?

4    A.    Correct.

5    Q.    Okay.

6    A.    And he monitored the development of my child's brain,

7    her body, her body weight, her body mass, her heart.  So he

8    would look at her every month to make sure that she was okay.

9    Q.    And he was following her because of the fact that you

10   were coming through a pain management and then with -- with

11   Jeff Young having your pain managed through opioids and pain

12   pills?

13   A.    Correct.

14   Q.    Okay.  Okay.  And so was he also responsible for the

15   delivery of your baby?

16   A.    No.  Dr. Armie Walker was the -- she didn't deliver A.

17   It was one of her colleagues that delivered her, but she

18   performed my surgery after.

19   Q.    Who referred you to Dr. Hoeldke?  Was it Dr. Walker?

20   A.    Dr. Walker.

21   Q.    So Dr. Walker knew you were on these medications?

22   A.    Correct.

23   Q.    So Dr. Walker knew you were on these medications and

24   you told her you were going to stay on these, then referred

25   you to a high-risk OB just to follow you to keep you and your

**EXAMINATION OF HOPE ARMENT**                                    79

1    baby safe?

2      A.   Correct.

3      Q.   Okay.  And did any of them explain to you -- I already

4    asked you this.  Did -- your child was born with medication

5    in her system?

6      A.   Yes.

7      Q.   You were still having -- you had gotten a prescription

8    several months before from Jeff that was your last

9    prescription in, like, June or something?

10     A.   No, sir.  My last prescription was in July.

11     Q.   And what was that prescription for?

12     A.   120, I think.

13     Q.   Do you remember what drug it was for?

14     A.   Percocet, 7.5s.  Brittany wrote it, and it was messed

15   up.  I want to say that it was -- the number of them was

16   messed up or something, but I went by the office the next

17   day, and it was corrected.

18     Q.   Okay.

19     A.   Because I had sent him a message.

20     Q.   All right.  That's my confusion.  It's not written by

21   Jeff Young.  It would show up --

22     A.   Right.

23     Q.   -- Ms. Petway under her prescription?

24     A.   Correct.

25     Q.   Okay.  Percocet?

1    A.   Yes, sir.

2    Q.   Okay.  But if I understood your testimony, that was

3  supposed to be -- what you told Jeff was that that was a

4  prescription for you to have your medication once you gave

5  birth?

6    A.   Right.  See, okay, that's been a long time ago, so

7  give me just a second.

8    Q.   Sure.  You can take your time.

9    A.   I normally set my doctors' appointments up at the same

10  time each month because I went to all three doctors, but I

11  didn't only go to the doctor.  Me and my mom usually would go

12  to the doctor on the same day and -- but when she moved out,

13  we got -- it was distanced, and we weren't on the same page,

14  like, our timeline.  But I want to say that I filled those

15  pills, and those pills were to last me through my birth of A.

16  And I went into labor early or something.  I don't know,

17  something crazy.  But I did get them filled when I was in the

18  hospital.

19        I got a prescription filled when I was in the

20  hospital, but I don't think it was that prescription.  That

21  prescription I filled the day that I left the doctor's

22  office, but it was supposed to last me until I had A.  But I

23  want to say Dr. Walker wrote me a few hydrocodones because I

24  was already written Percocets as a breakthrough because I had

25  just had surgery.

**EXAMINATION OF HOPE ARMENT**                                     81

1    Q.    Dr. Walker, your OB --

2    A.    Right.

3    Q.    -- wrote you a prescription --

4    A.    Right.

5    Q.    -- before or after the birth?

6    A.    That would be after the birth.

7    Q.    Okay.  For the pain control of the surgery?

8    A.    Correct.  And I didn't have the surgery for two days.

9    It was two days after the birth, and then I was at the

10   hospital for two weeks with A.  And then I would have went

11   back to Jeff and got my next prescription.

12   Q.    Were you -- did Dr. Walker or Dr. Hoeldke tell you

13   that if you continued on opioids, pain medication, throughout

14   your pregnancy that there was a protocol in which the child

15   would need to be observed for a couple of days after birth to

16   make sure --

17   A.    No, nobody told me that.  Actually, I woke up in the

18   middle of the night.  I had just had surgery.  They gave me

19   an Ambien because I couldn't rest.  A. had been in my room

20   for the last three nights, and everything was just fine.  And

21   whenever I took her blanket off, she shivered a little bit.

22   But I -- my other two children did the exact same thing so I

23   thought nothing of it.

24         Well, they took her to the nursery that night so that

25   I could rest, and the doctors in the nursery saw her do it

1    and put her into the NICU while I was asleep and woke me up

2    to let me know that that's where she was at.  And they had

3    already started the morphine at that point.

4        Q.    Okay.  But without asking you?

5        A.    Right.  They did not ask me because it was already

6    documented in my chart that I was a --

7        Q.    High risk because of --

8        A.    -- that I was a pain patient.

9        Q.    Pain patient.  So if your chart, it said you were a

10   pain patient so that they would be aware to be observant and

11   then take the appropriate response should they need to?

12       A.    Correct.

13       Q.    And it was your understanding that was the correct

14   medical response in this situation?  They were prepared for

15   it?

16       A.    I feel like it was a little -- I feel like they jumped

17   the gun a little bit, but that's just my personal opinion.

18   And that was the NICU doctor's opinion that night in the --

19   when I came down there.  I was, like, what did she get even

20   put down here for because I don't understand.  But then once

21   she was there, they swabbed her nose, and she had MRSA.  So

22   then she had to be weaned off the morphine that they put her

23   on as well as fight MRSA.

24       Q.    You don't think she needed to be put on morphine?

25       A.    I did not see signs or symptoms.  I have three

1  children.  My other two children, when you take their clothes

2  off to change their diaper and they are a newborn baby, you

3  unswaddle them, they are going to shiver a little bit in a

4  hospital.  It's cold.  And that's what I thought was going on

5  with A.  Now, I'm not a physician.  I can't say that she

6  wasn't having withdrawals, and there were opiates in her

7  system.  So she could have been.  But I feel like they

8  shouldn't have took my child and put her on a stronger opiate

9  without my permission, no.

10  Q.  And then the MRSA, when you're talking about MRSA,

11  you're talking about a bacterial infection?

12  A.  I'm not sure what MRSA actually is, but MRSA lives in

13  the nose.  It's contracted with babies through their nasal

14  passage.  Pretty much anybody that's had any kind of

15  amputation or transplant or anything like that, they can't be

16  around the child.  So she had to be isolated.  We had to wear

17  MRSA gear.  I couldn't even hold my child like I wanted to

18  because she was in the NICU.

19               MR. FERGUSON:  May I approach, Your Honor?

20               THE COURT:  Yes.

21  BY MR. FERGUSON:

22  Q.  I just want to show you the Government's

23  Exhibit 814.3.  It hasn't been marked yet.  It's the third

24  page to the Government's Exhibit 23.

25               THE COURT:  Got you.

**EXAMINATION OF HOPE ARMENT** 84

1  BY MR. FERGUSON:

2   Q.   Can you identify that pretty thing right there?

3   A.   That's my daughter.

4   Q.   And can you tell me what day that was taken on?

5   A.   That was ███████████.

6        THE COURT:  Hold on just one moment.

7        MR. PENNEBAKER:  We actually didn't introduce

8  that.

9        MR. FERGUSON:  I'm doing it right now.

10       MR. PENNEBAKER:  Okay.

11  BY MR. FERGUSON:

12   Q.   Who is that pretty thing?

13   A.   That's A.

14   Q.   Can you tell me what day that photo was taken?

15   A.   That was ███████████.  The top one is A. I'm

16  holding.

17   Q.   Okay.  So how many days after the delivery of your

18  child is this?

19   A.   That was the day of the delivery of my child.  It was

20  just posted a couple of days later.  I dressed her up in

21  every outfit I had.

22       MR. FERGUSON:  I'll ask to introduce that as the

23  next exhibit, Your Honor.

24       THE COURT:  We'll go ahead and receive it.  That

25  will be 24.

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**                                            85

1              (Exhibit 24 marked and received.)

2              MR. FERGUSON:  Give me just a second to put it up

3     for the jury.

4     BY MR. FERGUSON:

5      Q.    This is the birthday?

6      A.    That's the day she was born, yes.

7      Q.    Is that you?

8      A.    Yeah.

9      Q.    And who is the young man there?

10     A.    That's my son.

11     Q.    Good looking baby.  Who is that?

12     A.    That's A.

13     Q.    Same day?

14     A.    Same day.  She still had the bow on her head.  Same

15     day.

16     Q.    All right.  You sent Jeff a text that day, didn't you?

17     A.    Yes.

18     Q.    Were you wanting to get back to his office because you

19     were on medication?

20     A.    I mean, at that point, that particular message, just I

21     wanted him to see A.  I wanted the world to see A.  And

22     there's actually a picture of Jeff holding A.

23     Q.    Okay.  She's healthy now?

24     A.    She is very healthy now.  Very smart.

25     Q.    She was from what you can tell healthy?

UNREDACTED TRANSCRIPT

**EXAMINATION OF HOPE ARMENT**  86

1   A.   She was a normal child --

2   Q.   Okay.

3   A.   -- but, I mean, again --

4   Q.   Not a doctor?

5   A.   Not a doctor.

6   Q.   I understand.  You're a mama.

7   A.   Yeah.

8   Q.   Thank you.

9   A.   You're welcome.

10          MR. PENNEBAKER:  Nothing from the Government,

11  Your Honor.

12          THE COURT:  Okay.  All right.  Ms. Rogers or is

13  it Arment?

14          THE WITNESS:  Arment.

15          THE COURT:  I think we're done, so you're

16  excused.  You may step down.

17          THE WITNESS:  Okay.  Thank you.

18          THE COURT:  We've been going for a couple of

19  hours, so I think I'm ready for a break.  I don't know if

20  y'all are or not.  So we'll take about 15 or 20 minutes.  The

21  rules are always the same.  Don't discuss the case amongst

22  yourselves or allow anyone to discuss it with you.  Leave

23  your notebooks in your chairs.  They'll be there when you

24  come back.  I'll go ahead and excuse you to the jury room.

25              (Jury out at 3:36 p.m.)

UNREDACTED TRANSCRIPT

1              **DEMARCUS SCALES**,

2   called as a witness on behalf of the Government, having been

3   first duly sworn, testified as follows:

4                        DIRECT EXAMINATION

5   BY MR. PENNEBAKER:

6   Q.   Good afternoon, Special Agent Scales.  Would you state

7   and spell your name for the record, please.

8   A.   Demarcus Scales.  Scales, S-C-A-L-E-S.

9   Q.   Okay.  Special Agent Scales, where do you work?

10  A.   The Tennessee Bureau of Investigation.

11  Q.   What do you do for them?

12  A.   I'm a criminal investigator special agent.

13  Q.   Okay.  What does a criminal investigator special agent

14  do?

15  A.   I'm assigned to the Medicaid fraud control division

16  investigating provider fraud as well as abuse, neglect and

17  financial exploitation of the elderly as well as individuals

18  with developmental disabilities with the nexus -- a TennCare

19  nexus.

20  Q.   Have you worked on a case involving the defendant,

21  Jeffrey Young?

22  A.   Yes.

23  Q.   Have you looked at the CSMD data for the prescriptions

24  that the defendant wrote?

25  A.   Yes.

1    Q.   Have you reviewed evidence from search warrants

2    executed on the defendant's Facebook account?

3    A.   Yes.

4    Q.   How about his iPad?

5    A.   Yes.

6    Q.   How about his phone?

7    A.   Yes.

8    Q.   Have you reviewed search warrant evidence from his

9    house?

10   A.   Yes.

11   Q.   And from his office PREVENTAGENIX?

12   A.   Yes.

13   Q.   Have you reviewed the Government's exhibits in the

14   800s as we've designated them?

15   A.   Yes.

16   Q.   And none of those have been admitted into evidence,

17   although you heard earlier that there were three pages of

18   Hope Rogers' summary exhibit that were admitted previously.

19   Do you remember that?

20   A.   Yes.

21   Q.   Okay.  Let me hand you what's been previously marked

22   for identification as Government's 803.  And do you recognize

23   that to be a compilation summary exhibit involving Adrienne

24   McKenzie?

25   A.   Yes.

```
 1            MR. PENNEBAKER:  Your Honor, the Government moves

 2   to admit what will be Exhibit 74.

 3            THE COURT:  It will be Number 74.

 4            MR. PENNEBAKER:  Thank you, Your Honor.

 5            (Exhibit 74 marked and received.)

 6            MR. PENNEBAKER:  And, Ms. Silverberg, if you

 7   would publish, please -- go to page 3.

 8            Thank you.  Okay.  So we're going to go to page 3

 9   of Exhibit 74.  Let's see how it goes.

10   BY MR. PENNEBAKER:

11    Q.   All right.  Okay.  Special Agent Scales, can you tell

12   the jury how this exhibit works?

13    A.   So what this is, it's a combination of the text

14   messages and Facebook.  For example, this one is Adrienne

15   McKenzie and Mr. Young.  So this is going to be their text

16   message thread as well as it could potentially have Facebook

17   along with it and -- what you've heard of as the CSMD or PMP

18   data.  And what we've done is we've put it in order where you

19   can -- we would cross reference it initially.  But now it's

20   in a somewhat chronological order where you can just read

21   along with it.

22    Q.   Okay.  So the source of each entry in this

23   spreadsheet, is that what's over there on the right-hand

24   column, the far right column that says SMS and PMP on there?

25    A.   Yes.
```

**UNREDACTED TRANSCRIPT**

1    Q.   So just while we're getting oriented to these

2    exhibits, because we're going to look at a few of these,

3    right?

4    A.   Yes.

5    Q.   While we're getting oriented, can you tell the jury

6    what an SMS is?

7    A.   That would be a text messages.

8    Q.   And how about an MMS?

9    A.   That would be a video, picture, a jif or gif or

10   however you pronounce it.

11   Q.   How about what -- what's the entry for Facebook?

12   A.   FB.

13   Q.   And how about that PMP, is that also CSMD?

14   A.   Yes, sir.

15   Q.   So I think the last thing that we need to decrypt here

16   is the shading of these cells.  Can you tell the jury what

17   the difference between the gray and the white is?

18   A.   So the white is going to be the messages, whether it's

19   Facebook text messages or a picture or a video.  The gray is

20   going to be the PMP or CSMD data.

21   Q.   Okay.  Special Agent Scales, I am going to -- well, do

22   you recall hearing that clip that was kind of garbled and

23   that we stipulated was the defendant answering a question

24   that Ms. Pickering -- or that -- excuse me -- Investigator

25   Blair asked about whether or not the defendant had had a

**UNREDACTED TRANSCRIPT**

 1   sexual relationship with a woman named Courtney Howell

 2   Taylor?

 3      A.   Yes.

 4      Q.   And do you remember his response:  No.

 5           And then she asked:  Never?

 6           And he says:  Never.

 7      A.   Yes.

 8      Q.   And that's Government 613A, right?

 9      A.   Yes.

10               MR. PENNEBAKER:  Which was then marked as --

11               MS. SILVERBERG:  -- 67.

12               MR. PENNEBAKER:  -- Exhibit 67.

13   BY MR. PENNEBAKER:

14      Q.   All of that seem square so far?

15      A.   Yes.

16      Q.   Okay.  Give me a chance.  I'll fail you.

17           All right.  Let's go -- actually, let me hand you

18   first what has been marked for identification as Government's

19   806.  Is this a summary exhibit like the one that we just

20   looked at but for an individual named Courtney Howell Taylor?

21      A.   Yes.

22               MR. PENNEBAKER:  Okay.  The Government moves to

23   admit exhibit -- well, what's previously been marked as 806

24   as Exhibit 75.

25               THE COURT:  I don't know about all those

 1  identification numbers.  We'll introduce it.  It will be
 2  Exhibit 75.
 3              (Exhibit 75 marked and received.)
 4              MR. PENNEBAKER:  Thank you, Your Honor.  I'm glad
 5  I don't have to jumble that any further.
 6              And if we could call up, please, Ms. Silverberg,
 7  page 1.
 8  BY MR. PENNEBAKER:
 9    Q.   All right.  So at the top you see that it says this is
10  our CSMD, SMS, MMS, Facebook summary, right?
11    A.   Yes.
12    Q.   And what's the date in that first message?
13    A.   7/25/2015.
14    Q.   All right.  We have a -- it looks like we have three
15  prescriptions on this slide, correct?
16    A.   Yes.
17    Q.   And those come after a photograph of an individual,
18  right?
19    A.   Yes.
20    Q.   So what are those three prescriptions for?
21    A.   Alprazolam, tramadol and diazepam.
22    Q.   Two benzodiazepines and an opioid?
23    A.   Yes.
24              MR. PENNEBAKER:  All right.  Ms. Silverberg, if
25  we could go to page 2, please, and let's zoom in on the first

 1  six lines or so.

 2  BY MR. PENNEBAKER:

 3    Q.   So this is -- these are Facebook messages it says on

 4  the right-hand column, correct?

 5    A.   Yes.

 6    Q.   So as we're going through these, if it's all right

 7  with you, I'll read the part of the defendant, and you can

 8  read the part of the other participant in the conversation.

 9  Is that all right?

10    A.   Yes, sir.

11    Q.   You don't have much of a choice.

12         Okay.  So on June 8, 2016, does the defendant say:  We

13  could have a great time if you're discreet?

14    A.   Yes.

15    Q.   And then what does Ms. Taylor say?

16    A.   Well, duh, I am married to a wonderful man.  Just

17  curious and bad.  LOL.

18    Q.   Well, I'm down if you want to explore more.  My office

19  is hot too.  Need to just take my pants off.

20         Do you see all that?

21    A.   Yes.

22         MR. PENNEBAKER:  Could we, please,

23  Ms. Silverberg, go to page 5?  And if you could zoom in.

24  There you go.  Perfect.

25  BY MR. PENNEBAKER:

**UNREDACTED TRANSCRIPT**

1    Q.   And these are now text messages on a phone, correct?

2    A.   Yes.

3    Q.   So if you want to start by reading Ms. Howell's part.

4    A.   So did you like today?  Did I get better from

5    yesterday?

6    Q.   Baby, it was phenomenal.  I love fucking you.

7    A.   Good, because I do not want to stop any time soon.

8    Q.   Don't ever -- oh, yeah, that's her.

9    A.   Don't ever be shy to tell me if I need to work on

10   anything.

11   Q.   Okay.  What is the investigative value in this

12   exchange, Special Agent Scales?

13   A.   These conversations contradict what was said in the

14   video with Mr. Young and the investigator.

15   Q.   Mr. Young lied to the investigator about sex with

16   Ms. Howell?

17   A.   Yes.

18   Q.   Was Jeff Young prescribing to Courtney Howell at the

19   time?

20   A.   Yes.

21          MR. PENNEBAKER:  If we can go to that first

22   prescription.  I believe it's page 12.  Perfect.  Okay.

23   BY MR. PENNEBAKER:

24   Q.   So do you see two prescriptions on this page?

25   A.   Yes.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                97

1    Q.   And what are those prescriptions for?

2    A.   Diazepam and hydrocodone.

3    Q.   Okay.  So one is a benzodiazepine, and one is an

4    opioid, correct?

5    A.   Correct.

6              MR. PENNEBAKER:  If we could go to page 7,

7    please.  If we could zoom in on the bottom third.  Perfect.

8    BY MR. PENNEBAKER:

9    Q.   If you could start reading, Special Agent Scales, at:

10   Don't tease me.

11   A.   Don't tease me and not deliver.  If I ever want to

12   stop by your office, what is your drink of choice, and, no,

13   it will not be happening tomorrow.  I am too booked up.

14   Coffee, what kind?  Slush, teas, etc?

15   Q.   Vodka.

16   A.   So if I come by one day next week, bring Vodka.

17   What's your preference of Vodka?  I'm a whiskey, beer type.

18   Q.   If?  When you come by, damn right.

19        What is the investigative significance of that?

20   A.   He's having -- he's mentioned that now he likes to

21   have alcohol in his office --

22   Q.   Okay.

23   A.   -- drinking while he's at his office.

24             MR. PENNEBAKER:  Okay.  If we could go, please,

25   to page 9, and if you would zoom in on the bottom third,

**UNREDACTED TRANSCRIPT**

 1 │ please.

 2 │ BY MR. PENNEBAKER:

 3 │   Q.   And if you would start with the top message, Special

 4 │ Agent Scales.

 5 │   A.   Yes, you going to let me have it today.

 6 │   Q.   And then you can skip the next two lines.

 7 │   A.   Just wanted you to know you killed my back.  Working

 8 │ on my last clients about an hour to an hour and half left.

 9 │ Want to see me or no?

10 │   Q.   Sorry, in a meeting.  I want to see you so bad.

11 │        MR. PENNEBAKER:  And if we could go to the next

12 │ page, please.  Zoom in at the top.

13 │ BY MR. PENNEBAKER:

14 │   Q.   I love it when you can feel the next day that you've

15 │ been with me, back pain and pussy tender.

16 │   A.   So I have about 45 minutes left.  Want to have a

17 │ meeting?  Done.  Have a sitter until 7:30.

18 │   Q.   I have my son.  I'd love to, but I can't.

19 │   A.   But on a real note, why is my back so jacked?  I have

20 │ taken all kinds of stuff.  It will not ease.  Ugh.

21 │        MR. PENNEBAKER:  And, then, Ms. Silverberg, if we

22 │ could just grab the next two or three lines.

23 │ BY MR. PENNEBAKER:

24 │   Q.   And do you see where the defendant says:  Your back is

25 │ jacked because I fucked the shit out of you?

**UNREDACTED TRANSCRIPT**

1    A.   Yes.

2    Q.   Okay.  And if we could go, please, to -- does he

3    prescribe controlled substances to Ms. Howell after this

4    conversation?

5    A.   Yes.

6              MR. PENNEBAKER:  If we could go ahead,

7    Ms. Silverberg, and go to page 50, and if we could, once you

8    get there, blow up the middle third of the page, please.

9    BY MR. PENNEBAKER:

10   Q.   Okay.  So I'll start:  We need to step back and access

11   our relationship -- which do you understand that to be assess

12   our relationship?

13   A.   Yes, sir.

14   Q.   -- you act like you're my wife or something.

15   A.   We need to talk ASAP, if that's okay.  I know I'm

16   crazy medically from what you say.  Did you tell Jonathan

17   anything because I'm being asked to pack up my shit and -- I

18   believe that's supposed to be leave, not when you leave.

19   Q.   What -- who is Jonathan?

20   A.   Her husband.

21   Q.   And how do you know that?

22   A.   From the other text messages.

23   Q.   Is Jonathan also a patient of the defendant's?

24   A.   Yes, he is.

25   Q.   What is he being treated for?

1    A.   He -- I believe he had cancer.

2    Q.   So then the defendant says:  No.  I guess I didn't

3  tell -- tell Jonathan anything.

4         And then Ms. Howell says --

5    A.   -- liar.

6    Q.   He texted me last night after getting your phone.  He

7  doesn't know who I am.

8    A.   Then why did he say that I'm obsessed with you and

9  psychiatric help?  I'm sure I'm not the only patient you have

10  fucked, huh?

11        MR. PENNEBAKER:  And then, Ms. Silverberg, if you

12  could pull up the rest of that page.

13  BY MR. PENNEBAKER:

14    Q.   So go ahead, Special Agent Scales.

15    A.   Everything good luck, Bro.  Your world is about to get

16  fucked by me.  Telling me to leave you alone.  Oh, I will,

17  but, legally, I bet this would not look good for your career,

18  FYI.  I saved everything, especially your compliments.

19    Q.   You need help.

20         Right?

21    A.   Yes.

22    Q.   This will be my last text ever.  Don't ever threaten

23  me or my business.  All I did was try to help you.

24         Is that right?

25    A.   Yes.

1    Q.   And, Special Agent Scales, I have a Redwell here of

2    demonstratives that I'm going to leave with you.

3              MR. PENNEBAKER:  And, Your Honor, we're not going

4    to offer these into evidence because they're just summing up

5    the pills prescribed in another exhibit.  I've discussed this

6    with Mr. Ferguson.  I don't think he has any objections.

7    We're just going to use them as demonstratives.

8              THE COURT:  All right.  Go ahead.

9              MR. PENNEBAKER:  Could we please publish the

10   summary of Ms. Taylor.

11   BY MR. PENNEBAKER:

12   Q.   Special Agent Scales, I don't think we need to publish

13   this one necessarily, but do you have it in front of you, the

14   summary about Ms. Howell?

15   A.   Yes.

16   Q.   And how many total controlled substance pills was she

17   prescribed in the, roughly, three-month period that she was

18   seeing the defendant?

19   A.   Six hundred and ninety.

20   Q.   Six hundred and ninety pills?

21   A.   Yes.

22   Q.   What types of drugs was she receiving?

23   A.   Diazepam, hydrocodone, tramadol.

24   Q.   Okay.

25             MR. PENNEBAKER:  And if we could go, please --

 1   actually, let me hand you -- oh, if we could go to

 2   Exhibit 74.  Go back there.  And we'll just go to the first

 3   page, and if you could zoom in on the top, please.

 4   BY MR. PENNEBAKER:

 5    Q.   What's the date of that first exchange up there at the

 6   top or that first message up there at the top, Special Agent

 7   Scales?

 8    A.   12/7/2016.

 9    Q.   So December 7, 2016.

10         Would you mind reading the first two entries, please?

11    A.   I can pay you on the 15th when I come see you for my

12   appointment, but tomorrow is a challenge.  Thank you for

13   working with me.

14         Just wanted you to know that I wasn't a woof, woof.

15   You are agreeing to meet me at nine.

16    Q.   And would you read the next entry?

17    A.   Here is who to expect.  I won't be a scary-looking

18   person in the morning.

19    Q.   And then Jeff Young says:  I expect less clothes.

20         Right?

21    A.   Yes.

22    Q.   Is this an exchange that suggests to you that these

23   are people that would be meeting in person for the first

24   time?

25    A.   Yes.

1    Q.    And do you recall the portion of the interview between

2    Investigator Pickering and the defendant, that May, 2016,

3    interview, where the defendant says:  I stopped taking pain

4    patients three months ago?

5    A.    Yes.

6    Q.    So that's about the -- the three months ago is about

7    nine months before this first entry, right?

8    A.    Correct.

9    Q.    Does Adrienne McKenzie end up receiving prescription

10   for controlled drugs from the defendant?

11   A.    Yes.

12         MR. PENNEBAKER:  Let's go, please, to page 2,

13   Ms. Silverberg, and let's go zoom in right there, please.

14   BY MR. PENNEBAKER:

15   Q.    So do you see there where Ms. McKenzie writes:  Jeff,

16   I need a favor?

17   A.    Yes.

18         MR. PENNEBAKER:  And then if you would zoom out,

19   please.

20   BY MR. PENNEBAKER:

21   Q.    Are those three prescriptions -- there's not a date on

22   here.  But are those three prescriptions that are issued that

23   same day based on your review of the CSMD?

24   A.    I believe so.

25   Q.    And, yeah, if you want to check one of those

**UNREDACTED TRANSCRIPT**

 1   summaries.

 2       A.   Yes.

 3       Q.   Okay.  So after she says, I need a favor, she receives

 4   a prescription.  What are those three drugs?

 5       A.   It's alprazolam, dextro and hydrocodone.

 6       Q.   So a benzodiazepine for anxiety, a stimulant for

 7   attention disorders and an opioid?

 8       A.   Yes.

 9       Q.   Now, going down to the middle:  I recently severely

10   sprained my ankle and broke two toes.  Not even my primary

11   will prescribe me an opiate.

12            Do you see that?

13       A.   Yes.

14       Q.   And then she says:  I have been calling your office

15   for days trying to get a return phone call.  I understand

16   you're a busy man.  No worries.  But I am unfortunately on

17   probation.  I bought five hydros from a girl to relieve --

18   and it cuts off.  What is the investigative significance of

19   that?

20       A.   It's a red flag to me.  One, because she's on

21   probation.  She's informed him as a physician that she's

22   bought five hydros, essentially, off the street and that her

23   primary care won't write her opiates.

24       Q.   Okay.

25            MR. PENNEBAKER:  If we could go to page 3, the

**UNREDACTED TRANSCRIPT**

1  first sentence.  Okay.  So if we could blow up that first

2  sentence there.  Perfect.  Thank you, Ms. Silverberg.

3  BY MR. PENNEBAKER:

4   Q.   All right.  And so she says:  Sorry to send message

5  during bidnass [sic] hours.  Get back to me whenever.  No

6  rush.  By the way, I owe you one.  My PO meeting went

7  beautifully.

8        Do you see that?

9   A.   Yes.

10   Q.   Smiley face, is that what's after that?

11   A.   Yes.

12        MR. PENNEBAKER:  Then if we can go to page 5,

13  please.  It might be page 4, Ms. Silverberg.  Sorry.

14  BY MR. FERGUSON:

15   Q.   Do you see where it says:  Sorry I caught you on a bad

16  day yesterday?

17   A.   Yes.

18   Q.   If you could go ahead and read from there.

19   A.   Hopefully, today I can make my payment and get what I

20  need to show documentation, slash, scripts before my

21  appointment with the PO.  She is a stickler.

22   Q.   What do you -- what is documentation, slash, scripts?

23   A.   Her prescription or information pertaining to her

24  prescription for her probation office.

25   Q.   What is your -- what is the investigative significance

1   of these discussions?

2     A.    She's asked for a favor, which was to get scripts for

3   her PO meetings.  And she's already stated that her PO

4   meeting went successfully or great or however she worded it,

5   meaning, that he did give her those scripts that -- for her

6   to get by.

7     Q.    And is that -- did she admit to taking hydrocodone

8   when she couldn't get a prescription for it somewhere else?

9     A.    Correct.

10    Q.    So what is the --

11          MR. PENNEBAKER:  Let's go to page 7, please, and

12  will you please, Ms. Silverberg, go to LOL, LOL, LOL.

13          MS. SILVERBERG:  Just that one?

14          MR. PENNEBAKER:  Just that one.  Actually, that

15  one and the next one, please.  Thank you.

16  BY MR. PENNEBAKER:

17    Q.    All right.  If you would please read her entry.

18    A.    LOL, LOL, LOL, I bet she puts the moves on you first,

19  LOL.  I do owe you one for sure for helping keep me out of

20  jail.  I spaced the other day and meant to get you to reup my

21  hydros.  You keep being a good doctor to me, and I bet we

22  could play doctor one day.  It's got to be on an off season

23  with the guy so it's totally legal in my brain.  That happens

24  from time to time.  I'll make sure to let you know when that

25  slot opens up.  You better know how to keep a secret.  Paul

 1   could never know because G and him are friends.

 2   Q.   And then does the defendant say:  I keep shit on the

 3   DL?

 4   A.   Yes.

 5   Q.   This is a couple of days before the search warrants

 6   are executed at PREVENTAGENIX and the other places we talked

 7   about earlier, correct?

 8   A.   Correct.

 9   Q.   And do you recall how many pills of controlled

10   substances -- bless you -- the defendant prescribed to

11   Adrienne McKenzie in the month or so that she saw him?

12   A.   I believe 263.

13   Q.   Okay.  All right.  I'm going to hand you what's been

14   marked for identification as Government's 807.  Is this a

15   summary exhibit that involves three individuals, Jonathan

16   Morris, Cyndal Story and Steven Williams?

17   A.   Yes.

18   Q.   Thank you.

19            MR. PENNEBAKER:  Your Honor, we would offer this

20   as Exhibit 76.

21            THE COURT:  Okay.  Received.  It will be No. 76.

22              (Exhibit 76 marked and received.)

23            MR. PENNEBAKER:  Thank you, Judge.

24            And if we could publish page 3, please.  If you

25   could zoom in on the top half, please.  That's good.

**UNREDACTED TRANSCRIPT**

 1  | BY MR. PENNEBAKER:

 2  | Q.   All right.  Jonathan Morris says:  Okay, I've got you

 3  | a date Saturday night, my wife, myself, you and Cyndal.  She

 4  | knows a little about you and all the good shit I told her.  I

 5  | told her we would keep it on the DL since Lexington is such a

 6  | small town.  This is her.

 7  | And then the defendant says:  Cute.

 8  | Do you see all that?

 9  | A.   Yes.

10  | Q.   And then Mr. Morris says:  Yeah, she's cool.  28, I

11  | think.

12  | And then down below the defendant asks:  What's her

13  | last name?

14  | And Mr. Morris states:  Story.

15  | Looks likes there's another picture sent, and then the

16  | defendant says:  Sold.

17  | Do you see that?

18  | A.   Yes.

19  | Q.   All right.

20  | MR. PENNEBAKER:  Can we, Ms. Silverberg, go ahead

21  | and go to page 6, please?  Thank you.  That's perfect.

22  | BY MR. PENNEBAKER:

23  | Q.   All right.  And if you want to read for Mr. Morris.

24  | A.   I'm so fucking pissed right now.  We have been sitting

25  | here ready for two hours waiting on her, and she wasn't

**UNREDACTED TRANSCRIPT**

 1  answering.  She finally text Kristina back with some lame

 2  excuse about her sister's house was broken into.  I know she

 3  is just going back to that douche bag.  Fuck it.  Bullet

 4  dodged.  I guess now we need to try and set you up with her

 5  sister.  She's prettier anyway.

 6      Q.  Okay.

 7          MR. PENNEBAKER:  And, Ms. Silverberg, will you

 8  please zoom out of there, and go down to the bottom half.

 9  BY MR. PENNEBAKER:

10      Q.  And go ahead and pick up for Mr. Morris, please,

11  Special Agent Scales.

12      A.  Honestly, bullet dodged.  I had a feeling she was

13  going to go back to her ex.  Battered-spouse syndrome like a

14  motherfucker.

15      Q.  And you can stop there.

16          MR. PENNEBAKER:  Can we then go ahead and go

17  to --

18  BY MR. PENNEBAKER:

19      Q.  Special Agent Scales, does that stop the defendant

20  from eventually interacting with Ms. Story?

21      A.  No.

22      Q.  Okay.

23          MR. PENNEBAKER:  Could we go to page 7, please?

24  So if we could zoom into, I just got here.  That's perfect.

25  Just the whole bottom.  Yeah, that's perfect.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                      110

1   BY MR. PENNEBAKER:

2   Q.   So now we've got someone named Cyndal.  Is that Cyndal

3   Story?

4   A.   Yes.

5   Q.   Is that someone that the defendant prescribes

6   controlled drugs to?

7   A.   Yes.

8   Q.   Would you go ahead and read that top line?

9   A.   I just got here.  Dang, you're busy.  These girls up

10  here are rude too.

11  Q.   And then it looks like Mr. Morris is also texting with

12  the defendant at the time:  Sitting here with Cyndal.  Sounds

13  like that date is happening, huh?

14       And then the defendant says:  Maybe.  Sorry.

15       Right?

16  A.   Yes.

17  Q.   Okay.

18       MR. PENNEBAKER:  So if we could zoom out of

19  there, please, and then go to the next page.  And it is going

20  to be page 8.  Maybe it's page 9.  Sorry.  Okay.  It must be

21  page 8.  Apologies.  Great.  If we could just -- yeah, zoom

22  in on the top half.  There you go.  That's perfect.

23  BY MR. PENNEBAKER:

24  Q.   All right.  So Mr. Morris then says:  We're sitting

25  here talking to her.  Says we can go on a double date.

**UNREDACTED TRANSCRIPT**

 1          And then do you see right above that what looks to be

 2   the PMP entry --

 3      A.   Yes.

 4      Q.   -- that the defendant says to Cyndal:  This could get

 5   interesting.

 6          And then what's that a picture of?

 7      A.   A demon emoji or an emoji with horns.

 8      Q.   Okay.  So after that, what do we see?  Do we see a

 9   couple of prescriptions?

10      A.   Yes.

11      Q.   What are those for?

12      A.   Alprazolam and hydrocodone.

13      Q.   And alprazolam is a benzodiazepine.  Hydrocodone is an

14   opioid.  Correct?

15      A.   Yes.

16      Q.   So this date for this hydrocodone and the

17   benzodiazepine, this is in July of 2016, is it not?

18      A.   Correct.

19      Q.   So that's actually a month after the interview where

20   the defendant told the Board that PREVENTAGENIX wasn't seeing

21   any new pain patients, right?

22      A.   Correct.

23      Q.   What is hydrocodone used to treat?  Hydrocodone, what

24   is it used to treat?

25      A.   Pain.

**UNREDACTED TRANSCRIPT**

1          MR. PENNEBAKER:  So a couple of lines down on the

2     same page, if we could call out:  Hey, doll.  Maybe a little

3     bit above that.  I'm sorry, Ms. Silverberg.  Perfect.

4     BY MR. PENNEBAKER:

5       Q.   Okay.  So up at the top, do you want to read for us,

6     Cyndal?

7       A.   Hey, I have a favor to ask.  The pain med you gave me

8     last time is just not helping at all.  Kristina said her and

9     Jonathan were coming up there today.  Is there any way you

10    could give me something else and them pick it up for me.  I'm

11    running the office by myself this week, and I can barely even

12    take lunch break, and I'm hurting so bad.  My mom gave me

13    some 10-milligram Percocet over the weekend that she had left

14    from a surgery, and it helped ten times better.

15      Q.   What's the investigative significance of that?

16      A.   She's taking her -- it's her mother's Percocet.

17      Q.   It's not prescribed to her?

18      A.   Correct.

19      Q.   Is she asking for that medication here?

20      A.   She is.

21      Q.   Then she says:  Hey, doll, below.

22           And then the defendant says:  Per state regs, nothing

23    else can be written within a 30-day period.

24           Do you see that?

25      A.   Yes, I do.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                                113

1    Q.   Then he asks:  What did I write you?

2    A.   And he -- she responded:  5-milligram hydros.

3    Q.   Is than an emoji outside?

4    A.   Yes, a sad face.

5    Q.   Okay.  A sad face.  And then what's the next entry?

6    A.   Seriously, I can't take something in between taking

7    those?

8    Q.   How many did I write, and, also, you have to be seen

9    in the office for a Schedule II narcotic!  It's bullshit, but

10   it's the law.

11        Do you see that?

12   A.   Yes.

13   Q.   What does Cyndal say?

14   A.   Ninety.  And, seriously, that's bullshit.  I'm running

15   the office by myself and can't even take lunch.

16   Q.   And the defendant says:  I know.  It's redic.

17        Right?

18   A.   Yes.

19        MR. FERGUSON:  Let's go to page 10, please, and

20   if we could zoom in on the top.  From the top to where the --

21   well, right there.  Thank you.

22   BY MR. PENNEBAKER:

23   Q.   Okay.  What does Ms. Story receive in the PMP entry?

24   A.   Are we talking about --

25   Q.   On this date, yeah, 7/19.

**UNREDACTED TRANSCRIPT**

1  A.  Oxycodone.

2  Q.  And that's oxycodone 10/325, are those also called

3  Percocets?

4  A.  Yes.

5  Q.  Is that the same drug that she described having taken

6  from her mom?

7  A.  Correct.

8  Q.  What was she prescribed by the defendant before that?

9  A.  Hydros, hydrocodone.

10  Q.  Is oxycodone stronger than hydrocodone?

11  A.  Yes.

12  Q.  So is she basically getting what she was asking for

13  here?

14  A.  Correct.

15  Q.  And what happens above that?  I'll start reading for

16  the defendant where it says:  And you can come as early as

17  you want.

18  A.  That sounds good.  I'm a good listener and some would

19  say I talk way too much.  LOL.  I enjoy good conversation.

20  Smiley face.  Ba, ha, ha, ha.  Come -- snuck that one right

21  in.  LMAO.  Dang, yeah, I know, opened the door again.

22  Q.  And the defendant says:  I just need you to open up

23  and actually keep a date for once.  That would be a decent

24  start.

25      And then there's another emoji.  What's that?

1    A.    It looks like a wink eye with a tongue sticking out.

2    Q.    Well done.

3          MR. PENNEBAKER:  So can we go to page 14, please?

4    All right.  Can we zoom in with the -- well, can we go all

5    the way up to the first gray.

6          MS. SILVERBERG:  Right here?

7          MR. FERGUSON:  Yes.  Perfect.

8    BY MR. PENNEBAKER:

9    Q.    All right.  On ████ 2016, what do we see?

10   A.    He's written her a prescription for oxycodone again.

11   Q.    So this time it's oxycodone HCL 20-milligrams.  Is

12   that stronger than Percocet?

13   A.    Yes.

14   Q.    Does it include the acetaminophen or Tylenol that

15   Percocet does?

16   A.    No.

17   Q.    Are those often diverted, have high street value?

18   A.    Yes.

19   Q.    So the defendant says:  Happy birthday.

20         And then Cyndal Story says:  Thanks for the birthday

21   wishes.

22         And then here comes an individual named Steven

23   Williams, right?

24   A.    Yes.

25   Q.    And one of you go ahead, please, and read what he

**UNREDACTED TRANSCRIPT**

1    says.

2      A.    Jeff, you've always been cool as a fan, but my girl

3    for eight years is -- that is an addictive person, Cyndal

4    Story.  You write her any more scripts, you going to kill

5    her, man.  She talked about suicide the other night because

6    she was coming off.  You giving her enough to kill a horse as

7    many as she is eating, and there is nothing wrong with her.

8    Thanks.  And, again, do not contact her on Messenger, and do

9    not write her any more stupid scripts.

10     Q.    Okay.  So that was on August 28th, and then on

11   September 2nd, what happens?

12     A.    He writes her alprazolam, oxycodone, Virtussin, and

13   oxycodone again.  I'm sorry -- that was --

14     Q.    Looks like, maybe the 20th --

15     A.    I'm sorry, that was, yeah --

16     Q.    -- right?

17     A.    -- the 20th.  I'm sorry.

18     Q.    So he does not stop prescribing after receiving that

19   note from Mr. Williams?

20     A.    No.

21     Q.    Does he keep prescribing after that?

22     A.    Yes.

23          MR. FERGUSON:  If we could please go to page 50,

24   and if we could blow up -- yeah.  Perfect.

25          MS. SILVERBERG:  Sorry.

**UNREDACTED TRANSCRIPT**

1   BY MR. PENNEBAKER:

2      Q.   Okay.  So on September 28th, does he prescribe another

3   prescription for Xanax?

4      A.   Yes.

5      Q.   If you would read what Mr. Williams says on the 4th of

6   October, 2016.

7      A.   Jeff, I've asked you nicely a while back to wean

8   Cyndal off or cut her off completely because she's running

9   around here selling them like some kind of drug dealer and

10  then runs out.  Is trying to buy them all from everybody she

11  can and is driving me crazy.  I know you thought you liked

12  her and all that kind of shit, but, man, give me a break.

13  You're going to get in trouble.  We can get in trouble -- we

14  can get in trouble.  She about to lose her kid because her

15  baby daddy knows someone that she sells to, and he's turned

16  it into the law.  His -- and the text cuts off or the e-mail.

17     Q.   And then it looks like Jeff Young accepts a friend

18  request or some sort of a request, and then Jeff Young says:

19  You are requesting a violation of HIPAA.  One more text from

20  you and you will find yourself in jail.

21          Is that right?

22     A.   Correct.

23          MR. FERGUSON:  And then if we could, please, go

24  to page 16.  Perfect.

25  BY MR. PENNEBAKER:

**UNREDACTED TRANSCRIPT**

1    Q.   So does that stop the defendant from prescribing?

2    A.   No, it doesn't.

3    Q.   And so Cyndal says:  Thanks, Rock Doc.  And they have

4    this exchange.

5         And then so in October and November, what happens?

6    A.   He prescribes on the -- October 26 alprazolam.

7    There's three prescriptions for alprazolam, one for oxycodone

8    on the 26th, and then in November 28th, another prescription

9    for oxycodone.

10   Q.   And is that three alprazolams prescribed on the 26th,

11   is that consistent with a prescription for alprazolam that

12   has two refills on it?

13   A.   Can I state that -- can you repeat that?

14   Q.   The way that that appears in the PMP with three

15   different prescriptions for 90 alprazolam on the same day, is

16   that because there's a -- two refills in addition to the

17   first prescription?

18   A.   Correct.

19   Q.   Okay.

20        MR. PENNEBAKER:  If we could back out of there,

21   please.  So then let's blow up the bottom half.

22   BY MR. PENNEBAKER:

23   Q.   And so Cyndal says here -- now, after 11/28 is the

24   last prescription for oxy that we saw, right?

25   A.   Yes.

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*

1    Q.   And so on 12/21, Cyndal sends Young a message -- Jeff

2    Young a message:  How have things been going?  Y'all's news

3    report had me cracking up.

4         And what does he respond?

5    A.   He responds that she needs to suck his cock.

6    Q.   Are you kidding, she says.  And then she says:  Why?

7    I think you might fall in love.  How about you take me out to

8    dinner once, and let's see where it goes from there.  Cat got

9    your tongue.

10        And then what does he say?

11   A.   No.  Just calling bullshit.  You wouldn't go.

12   Q.   And then she says:  I'm not.  You say when and let's

13   go.  Things aren't the way they used to be.  My situation has

14   changed in the last few months.

15            MR. PENNEBAKER:  If we could go to the next page,

16   please, Ms. Silverberg, and then if we could zoom into the

17   bottom half.

18   BY MR. PENNEBAKER:

19   Q.   So then starting at Jeff Young saying:  I've heard it

20   all before, will believe it when I feel it.

21        What does she say?

22   A.   Ha, ha.  I told you things have changed, LOL.  They

23   did months ago.  Then you were tied down, and I'm not that

24   kind of girl.

25   Q.   Then -- oh, Jeff says:  Yeah, yeah, yeah.

**UNREDACTED TRANSCRIPT**

1    A.   I'll prove it to you.

2    Q.   Deal.

3    A.   Good.

4    Q.   And then what happens that day, literally?

5    A.   She receives a prescription for oxycodone and

6    tramadol.

7    Q.   Okay.

8              MR. PENNEBAKER:  And we can pull that down,

9    Ms. Silverberg.

10   BY MR. PENNEBAKER:

11   Q.   And do you have, on one of the summaries, the total

12   number of pills that Mr. Young prescribed to Cyndal Story

13   during that, approximately, six-month period?  It's not in

14   there?  Okay.  Does around 1500 sound right?  Does that sound

15   about right?

16   A.   I would need to see the --

17   Q.   Okay.

18   A.   -- the data.

19   Q.   All right.  Now, Special Agent Scales, in addition to

20   those three women, was the defendant prescribing to any other

21   women that he was sleeping with?

22   A.   Yes.

23   Q.   Okay.  Let's look at a few of those.  Do you recall

24   hearing testimony about Daphne Joyner, the girlfriend, slash,

25   employee, slash, person receiving prescriptions?

1    A.    Yes.

2    Q.    Did we find messages between her and the defendant

3    relating to prescribing?

4    A.    Yes.

5    Q.    So I'm going to hand you Government's -- what's been

6    marked as Government's 812.  Do you recognize that as a

7    summary like the one we've been talking about for Ms. Joyner?

8    A.    Yes.

9            MR. PENNEBAKER:  Your Honor, the Government would

10   offer this as Exhibit 77.

11           THE COURT:  Okay.  We'll receive it.

12           (Exhibit 77 marked and received.)

13           MR. PENNEBAKER:  Thank you, Your Honor.

14           THE COURT:  You don't need to thank me.  Just go

15   ahead.

16           MR. PENNEBAKER:  If we could, please, call up the

17   first page.

18   BY MR. PENNEBAKER:

19   Q.    What's the date of the top prescription up there,

20   Special Agent Scales?

21   A.    September 23, 2014.

22   Q.    And it looks like the first prescription is a -- an

23   amphetamine, and then the second prescription is hydrocodone

24   acetaminophen, correct?

25   A.    Correct.

1    Q.   What does Ms. Joyner say to the defendant on October

2  the 10th, 2014?

3    A.   Babe, can you write me something for pain meds?  I

4  just took my last one.

5    Q.   And he says:  Yes.

6         And what does she say?

7    A.   Thank you.

8         MR. FERGUSON:  Ms. Silverberg, if we could zoom

9  into the middle of that exhibit, just kind of like the middle

10  third.  That's great.

11  BY MR. FERGUSON:

12    Q.   So I want to point you, Special Agent Scales, to about

13  four lines down there.  You see Daphne Montoya?

14    A.   Yes.

15    Q.   Is Montoya one of the last names that are used by

16  Daphne Montoya or Daphne Joyner?

17    A.   Yes.

18    Q.   And you see there on April 16, 2015, Ms. Montoya gets

19  a prescription for what?

20    A.   Oxycodone.

21    Q.   And how many pills does she get over there at the

22  right?

23    A.   One hundred and twenty.

24    Q.   So then on April -- or on May 8, 2015, Daphne Joyner

25  gets what?

**UNREDACTED TRANSCRIPT**

*EXAMINATION OF DEMARCUS SCALES*                    123

1    A.    Oxycodone 10-milligram with also a quantity of 120.

2    Q.    Okay.  And then we have -- do we have another

3    prescription for oxycodone 120 after that?

4    A.    Yes.

5    Q.    When does that happen?

6    A.    That would be May 8, 2015.

7    Q.    Okay.  Is there also one on June 2nd?

8    A.    I'm sorry, yes, I was looking at the wrong one.

9    Q.    All right.  Okay.  So 120 count of an opioid like

10   that, based on -- is that -- is there a significance of that

11   number from an investigative standpoint?

12   A.    Can you repeat the question?

13   Q.    Sure.  So is 120 a -- typically a 30-day supply of

14   something like an oxycodone 10-milligram tablet?

15   A.    For one person, not two.  Or she -- it looks like --

16   it appears to be an alias.  So she's gotten two

17   prescriptions --

18   Q.    Got it.

19   A.    -- or three prescriptions within a two-month period.

20   Q.    And what's the investigative significance of that?

21   A.    She's been overprescribed.

22   Q.    And you're not a doctor, of course --

23   A.    Correct.

24   Q.    -- but just in your investigations, people getting

25   prescriptions under different aliases, is that a red flag?

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                    124

1    A.    It is.

2          MR. PENNEBAKER:  All right.  And then if we could

3    go to the bottom of --

4    BY MR. PENNEBAKER:

5    Q.    So, Special Agent Scales, before we move on, is

6    everything in this summary and the other summary, is this all

7    from the defendant's prescription pad?  In other words, this

8    is -- these are -- this is CSMD from prescriptions that the

9    defendant has written, right?

10   A.    Yes.

11   Q.    So the defendant is -- these -- the prescriptions we

12   were just talking about are attributable to the defendant?

13   A.    Correct.

14   Q.    So that down there at the bottom of the page, does

15   Jeff Young say:  Come see me tomorrow?

16   A.    Yes, he does.

17         MR. FERGUSON:  And could we go to the next page,

18   please, and if we could blow up the top half.

19   BY MR. PENNEBAKER:

20   Q.    If you would read, please, the top entry for

21   December 2nd, 2015?

22   A.    Hey, can me and spare bear come by?  I need to get

23   refills and want to see if you think she needs anything for

24   this horrible cough she has.

25   Q.    And he responds:  Sure, babe.

**UNREDACTED TRANSCRIPT**

1          Right?

2     A.    Correct.

3     Q.    And does Ms. Montoya get prescriptions on that same

4     day?

5     A.    Yes, she does.

6     Q.    And then it looks like a couple of weeks later, does

7     she get additional prescriptions?

8     A.    Yes.

9     Q.    And are these prescriptions in this block right here

10    all of which were in December, are these all Schedule II

11    drugs?

12    A.    Yes.

13    Q.    On the 22nd, would you read what Ms. Joyner Montoya

14    says?

15    A.    Ha, ha, that's okay.  Do you mind if I come by and get

16    a script like you did last time for my teeth.  I think it was

17    Lortabs or something 10-milligram.  I can be getting it

18    filled, and I'm going to get my toes done while I'm waiting

19    on you to get off.

20    Q.    And then he says:  Sure.

21          Right?

22    A.    Yes.

23    Q.    And what's the very next prescription that she

24    receives?

25    A.    Hydrocodone.

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF DEMARCUS SCALES**                                    126

1    Q.    And that's Lortab, right, the same thing she's asking

2    for by name?

3    A.    Yes.

4          MR. PENNEBAKER:  If we could zoom out of there,

5    please, and then the bottom half.  Thank you.

6    BY MR. PENNEBAKER:

7    Q.    So what does Ms. Joyner Montoya say there on

8    February 16, 2016?

9    A.    Can I get my refill for Lortab when I get back from

10   work?

11   Q.    And then the defendant says:  What time?

12         And what does she say?

13   A.    I'm fixing to leave Memphis.  I'll have to get Angel

14   off the bus at four and come straight there.

15   Q.    And then the defendant says:  Okay, lover.

16         Right?

17   A.    Correct.

18   Q.    So how far from Jackson, approximately, is Memphis?

19   A.    It's over an hour, hour, 15.  Just depends on where

20   you're going.

21   Q.    Do you know about how many nurse practitioners you

22   could get to before you got to Jackson if you're coming from

23   Memphis?

24   A.    I do not, but I know that it's quite a few.

25   Q.    Okay.

**UNREDACTED TRANSCRIPT**

1    A.    Several.

2    Q.    Does the defendant continue to prescribed for

3  Ms. Joyner Montoya?

4    A.    Yes.

5    Q.    I'm not going to ask you to do any more math, but

6  suffice it to say that it's multiple additional

7  prescriptions?

8    A.    Correct.

9    Q.    All right.  So now I'm going to hand you what has been

10  marked previously as Government's 804.  Do you recognize this

11  as a summary exhibit for a patient named Amy Sanders?

12    A.    Yes.

13          MR. PENNEBAKER:  And, Your Honor, we would offer

14  this as Exhibit 78.

15          THE COURT:  We'll receive it as 78.

16          (Exhibit 78 marked and received.)

17          MR. PENNEBAKER:  Ms. Silverberg, could we please

18  pull up the first page of that exhibit?  Okay.  Can we,

19  please, go to -- blow up the top third of the page.  Thank

20  you.

21  BY MR. FERGUSON:

22    Q.    All right.  So is that the defendant up at the top

23  there, July 23, 2016, again, after taking no more new pain

24  patients, right?

25    A.    Correct.

1    Q.   And does the defendant say:  Amy, is the Rock Doc -- I

2    guess, this is the Rock Doc?

3    A.   Yes.

4    Q.   And then he says:  We're doing a shoot at the old

5    Bolivar mental hospital.  A very sexy Mr. Hyde, James Bond

6    style shoot in formal wear with me and then a few bloody

7    Dr. Jekyll shots in, like, bikini nurse wear versus lingerie.

8         Do you see that?

9    A.   Yes.

10   Q.   Have any pic I can put together for a profile and get

11   to the photographer?

12        Do you see that?

13   A.   Yes.

14   Q.   And then what does Amy Sanders respond?

15   A.   Did you get the pics.  I'll send better ones when I

16   get service.

17   Q.   By the way, up at the top there, it looks like

18   June 30, 2016.  What do we see there?

19   A.   A prescription for oxycodone, 30-milligram.

20   Q.   And that's 120?

21   A.   Yes.

22   Q.   And are you -- would you -- do you know some of the --

23   are you trained about some of the medical purposes for

24   oxycodone, 30 milligrams?  Like, do you know what that's

25   typically used to treat?  And if you don't, just --

1    A.   No.

2    Q.   Okay.  But that's, like, three Percocets, right, the

3   10/325s?  So if we could -- and then it looks like there's

4   some back and forth here, correct?  And then it looks like

5   we're sending explicit pictures by 7/24/2016; is that fair?

6    A.   Correct.

7    Q.   And by this time, she's already gotten that

8   prescription for oxycodone 30-milligrams, right?

9    A.   Yes.

10        MR. FERGUSON:  If we could go to page 8.  I'm

11   sorry.  Page 2.  Man, that's small.  And if you could just

12   zoom in on that.  There, perfect.  Maybe it would be better

13   if I could grab this just because it's a little hard to see.

14   I'm sorry.  Let's go back to the first page, please,

15   Ms. Silverberg, and probably bottom five lines.

16   BY MR. PENNEBAKER:

17    Q.   So Ms. Sanders says down there at the bottom:  Between

18   you and me, my habits -- between you and my habits, I have to

19   stay on the run.

20        And then Jeff Young says:  Understand.

21        Right?

22    A.   Yes.

23    Q.   If we could go now -- and that first prescription is

24   for oxycodone, correct?

25    A.   Correct.

**EXAMINATION OF DEMARCUS SCALES**                                    130

```
 1              MR. FERGUSON:  So now if we could go to page 7,

 2    please.  I can go to the Elmo.  Okay.

 3    BY MR. FERGUSON:

 4    Q.   All right.  So, here, we see Ms. Sanders says:  Just

 5    waking up, running behind and waiting to see if my friend is

 6    going to drive me.  Can't wait to see you again.  I hope you

 7    weren't disappointed yesterday.  Just believe me, when we are

 8    somewhere I can do what I want and be as loud and destructive

 9    as we want, things will be better and different.  Thank you

10    for taking care of me, not with just the sex and satisfaction

11    but the Soma too.  It helps better than any other out there.

12    I wrote a post about you.  Check it out.  And at least like

13    it and comment or no one will take me -- and it cuts off.

14              Right?

15    A.   Correct.

16    Q.   Actually, that was page 7.  So on page 4 the same

17    exhibit, what does she say there at the top?

18    A.   Doc, you seriously going to have to put me back on

19    Soma, my muscle relaxers.  This shit is getting old.  All --

20    in all I got you some new pics when I get back and get a

21    bath.  I'll send you some and hope you're having a great

22    night.  PS, watch your video again.  I must say I just had to

23    take a 30-minute break and stop the aching.  I do taste so

24    sweet.

25    Q.   The essence of discreetness.
```

**UNREDACTED TRANSCRIPT**

1          What does she say?

2     A.    Ah, I know no other way.  I hope you too know no other

3     way.  #loyalty.

4     Q.    #loyally, #silence, #pleasure.

5           So is that Ms. Sanders requesting Soma by name?

6     A.    Yes.

7     Q.    And then we see here on the 29th -- and, again, it was

8     oxycodone first.  The very next prescription she gets after

9     requesting Soma by name, what's added in there?

10    A.    Carisoprodol.

11    Q.    Which is?

12    A.    Soma.

13    Q.    Does the defendant continue to exchange explicit

14    images with Ms. Sanders after that?

15    A.    Yes.

16    Q.    Does the defendant repeatedly continue to prescribe

17    Ms. Sanders both oxycodone 30-milligram and Soma 30-milligram

18    after that?

19    A.    Yes.

20    Q.    With the last such prescription taking place on what

21    date?

22    A.    12/28/2016.

23    Q.    Is that about a week or so before the clinic gets shut

24    down?

25    A.    Yes.

*EXAMINATION OF DEMARCUS SCALES*                                    132

1    Q.   And I've just been advised that I said Soma 30, and it

2    should be Soma 350-milligrams.  Apologies.

3         All right.  Did you review some exchanges involving an

4    individual named Whitney Henley?

5                   THE COURT:  I think we're going to go ahead and

6    break for the evening now.  It's right at 5:30.  So we're

7    going to go ahead and break, and we'll pick this up at nine

8    o'clock tomorrow.

9                   Ladies and gentlemen, the instruction is always

10   the same, but, please, follow them.  Leave your notebooks in

11   the chair.  Don't discuss the case with anyone.  You've heard

12   quite a bit of proof now.  We've cleared everything else for

13   tomorrow, so we can start right at nine o'clock.  I'll go

14   ahead and excuse you for the evening.

15                  Special Agent Scales, like always, don't discuss

16   your testimony with anyone.

17                  THE WITNESS:  Yes, sir.

18                       (Jury out at 5:32 p.m.)

19                  THE COURT:  Mr. Pennebaker, how much longer?  Oh,

20   wait until the door is shut.

21                  MR. PENNEBAKER:  Judge, I may have an hour with

22   this witness.  And then we have --

23                  MS. PAYERLE:  I think we only have one more

24   witness.

25                  THE COURT:  All right.  Thanks.  We'll be up at

**UNREDACTED TRANSCRIPT**

 1                    **SPECIAL AGENT DEMARCUS SCALES,**

 2     having been PREVIOUSLY duly sworn, was examined and

 3     testified as follows:

 4                    **CONTINUED DIRECT EXAMINATION**

 5     **BY MR. PENNEBAKER:**

 6     Q.    Good morning, Special Agent Scales.

 7     A.    Good morning.

 8     Q.    Yesterday, where we left off, we were going to talk

 9     about an exhibit summary for a patient named Whitney

10     Henley, which is in a folder marked for identification as

11     Government's 823.

12              (A document was passed to the witness.)

13     **BY MR. PENNEBAKER:**

14     Q.    Do you recognize that?

15     A.    Yes.

16     Q.    Okay.

17              **MR. PENNEBAKER:**  The government would offer into

18     evidence what's been previously marked as 823 and is

19     now --

20              **THE COURT:**  That will be Exhibit 79?

21              **CASE MANAGER:**  Yes, sir.

22              **MR. PENNEBAKER:**  79.  Thank you, Your Honor.

23              (The above-mentioned item was marked as

24     Exhibit No. 79.)

25              **MR. PENNEBAKER:**  Ms. Silverberg, if we could

1    just go ahead and zoom in on "we should meet" on Page 1,

2    please.

3    **BY MR. PENNEBAKER:**

4    Q.    Special Agent Scales, is this a series of Facebook

5    messages in April 2016?

6    A.    Yes.

7    Q.    Okay.  So we'll continue.  I'll read for the

8    defendant, and you'll read for the witness, if that's all

9    right.

10    A.    Yes, sir.

11    Q.    Excuse me, not the witness, the -- the other

12    individual.

13          "We should meet."

14    A.    "What's up?"

15    Q.    "I see you all the time and wonder why we don't

16    know each other.  Are you really in Kentucky?"

17    A.    "Where on Facebook?  And no, I'm in Tennessee."

18    Q.    "Yes, and mug shots.  You sent me a friend request

19    a while ago, and we have mutual friends.  So I was just

20    wondering, because you looked like someone I should

21    know."

22          Special Agent Scales, what is "mug shots"?

23    A.    After somebody has been arrested, you'll typically

24    take a mug shot.

25    Q.    And is there a website that displays those?

1    A.    There are.

2    Q.    Okay.

3          **MR. PENNEBAKER:**  So Ms. Silverberg, heading down

4    to "I got a referral."

5    **BY MR. PENNEBAKER:**

6    Q.    Go ahead, Special Agent Scales.

7    A.    "I got a referral to chronic pain management, but

8    need a doc."

9    Q.    "I'm the guy they refer to as the Rock Doc."

10   A.    "So can you do it?  And why that, plus I like it,

11   tats."

12   Q.    "Well, I need a crazy, hot girl that likes to have

13   fun."

14   A.    "LOL.  I'm a nut."

15   Q.    "So am I, and really outside the box, so you would

16   be perfect."

17          **MR. PENNEBAKER:**  All right.  And Ms. Silverberg,

18   if we could go to "how old are you?"

19   **BY MR. PENNEBAKER:**

20   Q.    "How old are you?"

21   A.    "23.  What about you?"

22   Q.    "Perfect.  My last girlfriend was 25.  I'm 42.  I

23   only date in the 20s."

24   A.    "LOL.  I need a car, ha, ha, ha, ha."

25   Q.    "Ha, ha, ha, ha."

1   A.    "Ha, ha."

2   Q.    "Well, I guess that could happen.  I could be your

3   sugar daddy if you play it right."

4        **MR. PENNEBAKER:**  And then if we can go, please,

5   Ms. Silverberg, to Page 2.  "I go to Dr. Eze."

6   **BY MR. PENNEBAKER:**

7   Q.    All right.  Go ahead, Special Agent Scales.

8   A.    "I go to Dr. Eze, but only doc I can get in for

9   pain pills is over an hour away.  I already get Xanax."

10  Q.    Now, Special Agent Scales, does going an hour a

11  away for pain pills have any investigative significance?

12  A.    Why would you be traveling long distances for pain

13  pills?

14  Q.    Okay.  So the Defendant responds:  "All right, sexy

15  ass, but you have my digits."

16  A.    "Somebody stole my script.  I need some.  Okay."

17  Q.    "Pain management in Tennessee has become a

18  nightmare.  Text me later."

19       Special Agent Scales, is there any investigative

20  significance to somebody stealing my script and asking

21  for some more?

22  A.    Yes.  She's -- she's asking for more scripts.

23  Q.    Is that a red flag?

24  A.    Yes.

25       **MR. PENNEBAKER:**  And if we could go a little

1   further down on the page, please, Ms. Silverberg.  "It

2   means I ain't cheap."

3           **MS. SILVERBERG:**  I'm just trying to find it.  If

4   you go to the next page.

5           **MR. PENNEBAKER:**  It might be on the next page.

6   Apologies.  Try 4.

7           **MS. SILVERBERG:**  Say that again.  Oh, 4.

8           **MR. PENNEBAKER:**  Oh, there it is in the middle.

9           **MS. SILVERBERG:**  Keep going?

10          **MR. PENNEBAKER:**  Right -- right here.

11          **MS. SILVERBERG:**  Oh, I see.  Sorry.

12  **BY MR. PENNEBAKER:**

13  Q.    Okay.  Can you start at "I don't trick"?

14  A.    "I don't trick, but yes, I need help:  money,

15  clothes, et cetera, and drugs like percs and weed, if

16  possible."

17  Q.    What is "trick"?

18  A.    I guess a way you could -- somebody spending --

19  spending money on an individual.

20  Q.    Okay.  So drugs like percs and weed -- do you know

21  what percs are?

22  A.    Percocet.

23  Q.    A Schedule II controlled substance that a nurse

24  practitioner could prescribe?

25  A.    Yes.

 1   Q.    "I have women I don't have to pay for," says the

 2   defendant.

 3   A.    "Obviously.  I already knew that, but I'm

 4   different."

 5   Q.    "Then what makes you different?"

 6   A.    "Religion."

 7   Q.    All right.  And --

 8   A.    "To be honest."

 9   Q.    Oh, okay.  "To be honest."

10         **MR. PENNEBAKER:**  And Ms. Silverberg, if you

11   could go down to "my daddy."

12         **MS. SILVERBERG:**  "My daddy"?

13         **MR. PENNEBAKER:**  You were doing it right.

14         **MS. SILVERBERG:**  Oh, okay.

15   **BY MR. PENNEBAKER:**

16   Q.    So Special Agent Scales, you said "to be honest,"

17   and Jeff Young says "TBH" and then --

18   A.    "To be honest."

19   Q.    -- she said "to be honest."

20         Jeff Young says:  "My daddy's a preacher.  I don't

21   need any more religion.  I need a hot babe that likes to

22   get down."

23   A.    "And I need a hot doctor to help me out."

24   Q.    "Are you good in bed?"

25   A.    "Yeah, but I have -- I've talked to you -- you

1    about it."

2    Q.    "Talk is cheap."

3    A.    "And Whitney ain't."

4    Q.    "Laughing out loud.  Send me some sexy pics."

5          **MR. PENNEBAKER:**  All right.  If we could go to

6    Page 7, please, Ms. Silverberg.  And could you zoom in on

7    the prescriptions there?

8    **BY MR. PENNEBAKER:**

9    Q.    Special Agent Scales, are these two prescriptions

10   issued on June 22, 2016?

11   A.    They are.

12   Q.    After Ms. Henley has told the defendant that she

13   needs drugs like percs and weed?

14   A.    Correct.

15   Q.    And what opioid does Percocet have in it?

16   A.    Oxycodone.

17   Q.    All right.  So what does she get from the defendant

18   on 6/22/16?

19   A.    Oxycodone.

20   Q.    In addition to alprazolam, right?

21   A.    Correct.

22   Q.    Do you know if that's a dangerous combination?

23   A.    It is.

24         **MR. PENNEBAKER:**  Now, if we could go to the

25   three lines above that.  Actually, yeah, let's go to the

 1    three lines above that.

 2    **BY MR. PENNEBAKER:**

 3    Q.    Now, the PMP data, the CSMD data doesn't have a

 4    time stamp on it, but the CSMD data we were just looking

 5    at was at June 22nd, right?

 6    A.    Correct.

 7    Q.    And these three messages are from June 22nd in the

 8    evening, at around 7:00 p.m., correct?

 9    A.    Correct.

10    Q.    Okay.  So what does Ms. Henley say to the

11    defendant?

12    A.    "How many of these you want me" -- is that "throw

13    you"?

14    Q.    Uh-huh.

15    A.    It's cut off.

16          "I'm trying to sell some.  Do you know anybody?  I

17    need to get my son's stuff and new clothes and stuff for

18    when we go party, LOL."

19    Q.    All right.

20          **MR. PENNEBAKER:**  And Ms. Silverberg, if you

21    would zoom into the four entries below the prescription,

22    please.

23    **BY MR. PENNEBAKER:**

24    Q.    "What?  I don't do that," says the -- says Jeff

25    Young.

1        "I will not be able to write you anything further.

2   You told me you needed them for your multiple car

3   accidents.  Not cool.  You will be discharged as a

4   patient."

5        Do you see that this?

6   A.    Yes.

7        **MR. PENNEBAKER:**  So then Ms. Silverberg, if he

8   could go down to the part of the page that says "we still

9   friends, though, right?"  That's on Page 8.  I'm sorry.

10       **MS. SILVERBERG:**  Oh, sorry.

11  **BY MR. PENNEBAKER:**

12  Q.    All right.  Go ahead, Special Agent Scales.

13  A.    "We still friends, though, right?  I'd why -- why

14  you're being a dick to me; you have no reason to.  I've

15  took up for you to so many people, it's ridiculous.  You

16  said we can hang out whenever.  I just wanted to be

17  friends with you, nothing more.  I know you wrote me what

18  you did because of feds, so there's no reason to

19  discharge me or not be my friends."

20       And she corrected herself with "friend."

21       "I'm one of the best friends you could ever have.

22  You're hurting my feelings, and my feelings don't get

23  hurt.  I'm sorry for trying to bring drama into -- I'm

24  sorry, not trying to bring drama into your life, but I

25  love you as a a friend, Jeff, and I love your whole

 1    family.  So all I ask for is to be respected by you."

 2    Q.    "You crossed the line asking me to sell pills."

 3    A.    "Okay.  And I also told you in your office I will

 4    look out for you.  I didn't cross the line then.  I mean,

 5    you smoke weed.  You got roxies you give out around --

 6    out around your house, so how did I cross the line when

 7    you were the one being cool with shit like that?"

 8    Q.    Okay.  So you got roxies you give out around your

 9    house.  "Roxy," is that a street name for oxycodone?

10    A.    It is.

11         **MR. PENNEBAKER:**  If we could go, please, to

12    Page 9, Ms. Silverberg, and then to "I straight."

13    **BY MR. PENNEBAKER:**

14    Q.    And go ahead, Special Agent Scales.

15    A.    "I straight snorted a roxy 15 you gave to your

16    peoples right in front of you, in your kitchen, plus

17    smoked weed there.  So I -- I'd -- why you being so petty

18    towards me when I'm cool -- cool as a fuck, and it ain't

19    my fault.  I didn't know you would get mad to save your

20    own ass when you're -- when you party hard.  And you told

21    me at the club it's cool; you are being watched, but it

22    was cool for me to come back.

23         I talked to Kristie before I left.  She wanted to

24    talk to me, and she said she was going to talk to you

25    when she gets back from lunch.  I'm begging you.  I have

 1   no other doctor to go -- doc to go to.  I promise you

 2   won't have any more problems out of me.  I'm not selling

 3   anything.  I won't.  Please, Jeff.  I don't beg, and I

 4   didn't mean it when I said what I -- what?  I got to have

 5   sex with you?  But seriously, I'm having panic attacks

 6   and shit.  Please get me back in.  I didn't have sex with

 7   your friend either, if that's why you didn't want me back

 8   today."

 9   Q.    Okay.  And then if you could go down to "I ain't."

10   A.    "I ain't -- the "I ain't reporting"?

11   Q.    Uh-huh.  Yes, sir.

12   A.    "I ain't calling the -- I ain't -- I ain't calling

13   a reporting shit.  I ain't getting you in trouble, but

14   you're fucking treating me like I'm a fucking threat to

15   you and your job, when I'm not.  But you know you're

16   crooked and so -- and so is some of the people in your

17   office.  So, I mean, what the fuck?  I like everybody

18   there, except the guy nurse.  Fuck it.  I hate you.  I'll

19   call and report this shit because you fucked me."

20   Q.    All right.  That's enough.  Thank you, sir.

21         **MR. PENNEBAKER:**  And that's all we need from

22   that exhibit, Ms. Silverberg.  Thank you.

23   **BY MR. PENNEBAKER:**

24   Q.    Special Agent Scales, do you remember reviewing a

25   an exhibit involving someone named Tina Powers?

1    A.    Yes.

2    Q.    And is this that summary?

3          (A document was passed to the witness.)

4    A.    Yes.

5          **MR. PENNEBAKER:**  The government would offer into

6    evidence Exhibit 813 previously marked, which now will be

7    Government's 80, Your Honor.

8          **THE COURT:**  Okay.  We'll receive it.

9    Exhibit 80.

10         (The above-mentioned item was marked as

11   Exhibit No. 80.)

12         MR. PENNEBAKER:  All right.  If we could go to

13   Page 2, please, and then zoom in at "I accept."

14   **BY MR. PENNEBAKER:**

15   Q.    Is Tina Powers a -- somebody who gets prescriptions

16   for controlled drugs from the defendant?

17   A.    Yes.

18   Q.    Okay.  So I -- the defendant says here:  "I accept

19   pics for my birthday."

20         And what is that a picture of?

21   A.    Pictures of Ms. Powers in nude.

22   Q.    And then the defendant says:  "Damn, where are you

23   now?"

24         And then what happens after that?

25   A.    She sends another nude.

1    **MR. PENNEBAKER:** If we could go to Page 5,

2    please, and zoom in at "I need to."

3    **MS. SILVERBERG:** Where? Sorry. What did you

4    say, Drew?

5    **MR. PENNEBAKER:** "I need to." Maybe it's Page 6

6    or Page 3. I'm sorry.

7    **THE WITNESS:** It was the previous page.

8    **MR. PENNEBAKER:** Oh, okay. Excuse me. Page --

9    **BY MR. PENNEBAKER:**

10   Q.    So there's -- by the way, Special Agent Scales, on

11   Page 3, we see a prescription entry there. What --

12   what's that?

13   A.    Hydrocodone.

14   Q.    Okay.

15   **MR. PENNEBAKER:** And Ms. Silverberg, if we could

16   go to Page 4. And this is, I believe --

17   **MS. SILVERBERG:** I think it's the next page.

18   Oh, there it is. I found it. Sorry.

19   **MR. PENNEBAKER:** No problem.

20   **BY MR. PENNEBAKER:**

21   Q.    So at the top, Mr. Young says: "I need to fuck."

22   A.    "Me, too."

23   Q.    "I have frustrations to work out. It would be

24   violent."

25   A.    "Thank God I'm going to have to come see you

 1    tomorrow."

 2    Q.    "Please see -- I'll see you in my private office."

 3    A.    "I'll try my best.  I promise.  I need it."

 4    Q.    "Me, too.  Make it happen, baby."

 5    A.    "Mm."

 6    Q.    Okay.

 7          **MR. PENNEBAKER:**  That's -- I think we're done

 8    with that one, Ms. Silverberg.

 9    **BY MR. PENNEBAKER:**

10    Q.    After that exchange, does Ms. Powers get another

11    prescription for hydrocodone?

12    A.    Yes.

13    Q.    Does she actually get a prescription for

14    hydrocodone from the defendant every month until the

15    clinic closes?

16    A.    Yes.

17          **MR. PENNEBAKER:**  If we could go to --

18    **BY MR. PENNEBAKER:**

19    Q.    Have you reviewed a summary exhibit for an

20    individual named Shantell?

21    A.    Yes.

22    Q.    I'm showing you what's been previously marked as

23    Government's 609 or 809.  Is that the exhibit you're

24    talking about?

25    A.    Yes.

1     **MR. PENNEBAKER:**  Your Honor, I would offer the

2  summary exhibit of Shantell Davis as Exhibit 81.

3     **THE COURT:**  Okay.

4     **MR. PENNEBAKER:**  Thank you.

5     (The above-mentioned item was marked as

6  Exhibit No. 81.)

7     **MR. PENNEBAKER:**  And Ms. Silverberg, if you

8  could publish Page 12 of this exhibit, and zoom into the

9  prescription, please.

10     **MS. SILVERBERG:**  Just the prescription?

11     **MR. PENNEBAKER:**  Yes.

12  **BY MR. PENNEBAKER:**

13  Q.   All right.  So on March 9, 2015, does Ms. Davis get

14  a prescription from the defendant for Percocet, 45 count?

15  A.   Yes.

16     **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

17  to Page 19, please, and zoom into that prescription.

18  **BY MR. PENNEBAKER:**

19  Q.   And on March 16, 2015, does Ms. Davis get a

20  prescription for clonazepam, 1 milligram, 90 count?

21  A.   Yes.

22  Q.   Is clonazepam a benzodiazepine like Xanax?

23  A.   It is.

24  Q.   Okay.

25     **THE COURT:**  Excuse me.  You've made reference to

```
 1   Ms. Davis?

 2              MR. PENNEBAKER:  Yes.

 3              THE COURT:  Is it Shantell Davis?

 4              MR. PENNEBAKER:  Yes, Your Honor.

 5              THE COURT:  When you hand it up to him, you just

 6   said "Shantell."

 7              MR. PENNEBAKER:  Yes, Your Honor.  This is

 8   Shantell Davis.

 9              THE COURT:  Go ahead.

10              MR. PENNEBAKER:  If we could go to Page 23,

11   Ms. Silverberg.  Zoom in on "I just got home."

12   BY MR. PENNEBAKER:

13   Q.    All right.  If you could start at the top message,

14   please, sir.

15   A.    "I just got home.  I got so fucked up and did blow

16   for the first time in 13 years last night."

17   Q.    What is "blow"?

18   A.    I'm not a hundred percent sure.  Either heroin or

19   cocaine.

20   Q.    Okay.  "It's all good.  You survived."

21   A.    "LOL.  Have you recovered from last night?"

22   Q.    "I'm back at the emporium actually."

23   A.    "Seriously?  I really wish you were giving me a

24   congratulations fuck it -- fuck right now."

25   Q.    "Me, too."
```

1    **MR. PENNEBAKER:** All right. And that's all

2  we're going to look at from that one, Ms. Silverberg.

3  Thank you.

4  **BY MR. PENNEBAKER:**

5  Q.   All right. Have you looked at a summary exhibit

6  involving a patient named -- or, well, an individual

7  receiving prescriptions from the defendant named Tiffany

8  Webb?

9  A.   Yes.

10  Q.   Is this that summary exhibit?

11  A.   Yes.

12  Q.   And it's been previously marked as Government's

13  one -- 810.

14    **MR. PENNEBAKER:** And I'd offer it now, Your

15  Honor, the summary exhibit of Tiffany Webb, as

16  Exhibit 82.

17    **THE COURT:** Uh-huh.

18    **MR. PENNEBAKER:** Thank you, Your Honor.

19    (The above-mentioned item was marked as

20  Exhibit No. 82.)

21    **MR. PENNEBAKER:** And if I could use the ELMO,

22  please, and I'll hand it up to you.

23    **MS. SILVERBERG:** Drew, I can move it that way

24  and do it.

25    **MR. PENNEBAKER:** Oh, you can do it?

1      **MS. SILVERBERG:** I can do it.

2      **MR. PENNEBAKER:** I got you. I don't need the

3  ELMO.

4      **MS. SILVERBERG:** It's loading.

5      **MR. PENNEBAKER:** All right. And if we could go

6  to the November 26, 2015.

7  **BY MR. PENNEBAKER:**

8  Q.   Have you seen, in your review of the Facebook

9  account, the search warrant return from the Facebook

10 account, Special Agent Scales, that this is another

11 individual who sent nude pictures to the defendant that

12 just aren't present on this summary?

13 A.   Yes.

14 Q.   Okay. And did some of those nude pictures get

15 exchanged in November 2015?

16 A.   Yes.

17     **MR. PENNEBAKER:** And Ms. Silverberg, if you

18 could zoom in on the prescriptions right there.

19     Yes. Thank you.

20 **BY MR. PENNEBAKER:**

21 Q.   Is that in October and November prescriptions for

22 alprazolam, 1 milligram; and hydrocodone, 10, 325?

23 A.   Correct.

24     **MR. PENNEBAKER:** Could we please go to the next

25 page, Ms. Silverberg, and if you could zoom in on that,

 1    the prescriptions, all the ones that you can see there at

 2    the top.  Thank you.

 3    **BY MR. PENNEBAKER:**

 4    Q.    And now we've got -- it looks like on December 3rd,

 5    we've got oxycodone and carisoprodol.  Do you see that?

 6    A.    Correct.

 7    Q.    In December, we get alprazolam, oxycodone, and

 8    diazepam.  Is that two benzodiazepines in the same month?

 9    A.    Yes.

10    Q.    And I believe that the first opioid prescription we

11    saw was for hydrocodone, 10 milligram; now we're on

12    oxycodone, 10 milligram?

13    A.    The first one --

14    Q.    The one we looked at on the last page.

15    A.    Okay.  Yes.

16    Q.    So is that -- is it fair to say that the defendant

17    is increasing the strength of the opioids that are being

18    prescribed over time?

19    A.    Correct.

20    Q.    So Special Agent Scales, are these the only women

21    that you and other investigators identified that are

22    exchanging explicit messages with the defendant while

23    they're receiving prescriptions for opioids and other

24    controlled drugs from the defendant?

25    A.    No, sir.

1    Q.    Are there just a couple more?

2    A.    No, sir.

3    Q.    Are there more than a dozen more?

4    A.    Yes.

5    Q.    Are there dozens more?

6    A.    Potentially.

7    Q.    Okay.  Did you also look at the instant messaging

8    and the prescription monitoring data for an individual

9    named Ben Elston?

10   A.    I did.

11   Q.    Now, is that the individual that we heard Mr. Young

12   refer to as his bodyguard?

13   A.    Yes.

14   Q.    And I'm going to hand you what's been previously

15   marked as Government's 805, and I want you to tell me if

16   this is a summary of instant messages and PMP with

17   Mr. Elston.

18   A.    Yes.

19         **MR. PENNEBAKER:**  Your Honor, the government

20   would offer what's been previously referenced as

21   Government's 805 as Exhibit 83.

22         **THE COURT:**  Okay.  We'll go ahead and receive

23   it.

24         **MR. PENNEBAKER:**  Thank you.

25         (The above-mentioned item was marked as

1   Exhibit No. 83.)

2           **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

3   go ahead and zoom in at the first -- the top of the first

4   page.  Yes.

5   **BY MR. PENNEBAKER:**

6   Q.    And go ahead.  Is that -- is that a prescription

7   for oxycodone up there at the top for 90?

8   A.    It is.

9   Q.    And the date is September 25, 2014?

10  A.    Correct.

11  Q.    So you can go ahead and start reading for

12  Mr. Elston.

13  A.    "███████████████████████.  Thanks, Brother, I

14  owe you."

15  Q.    Is that Mr. Elston giving the defendant his

16  identifiers?

17  A.    Yes.

18  Q.    Birth date, phone number?

19  A.    Yes.

20  Q.    Okay.  "Prescription is ready."

21  A.    "Thanks, Brother.  If you ever need me, I got your

22  six, man.  Thanks for helping me out."

23  Q.    "My pleasure, Bro.  You in my family now."

24  A.    "Roger that.  You're in mine."

25  Q.    "Winky, tougue sticking out" emoji.

1    And then is there another prescription for

2  clonazepam on October 1, 2014, that goes to Mr. Elston,

3  120 count?

4  A.    Yes.

5  Q.    What is "I got your six"?

6  A.    Meaning that I got your back.

7        **MR. PENNEBAKER:**  If we could go to Page 2,

8  please, Ms. Silverberg, and zoom in at "okay, he'll

9  make."

10 **BY MR. PENNEBAKER:**

11 Q.    Will you start at "call me later"?

12 A.    "Call me later, if you want, and fill me in on your

13 ex messing with you, if you feel comfortable doing that,

14 and let me see if I can help you with that problem.  Only

15 if you want.  Our conversation with be completely

16 classified."

17 Q.    "It's a McNairy County issue for now.  If it gets

18 transferred here, I'll be in touch."

19 A.    "We've got powerful friends there, too.  Dawanna

20 Pusser is like a second mom to me, and she's a powerful

21 woman.  Just let me know.  I got this."

22        **MR. PENNEBAKER:**  All right.  And if we can go to

23 Page 5, please, Ms. Silverberg.  And "Ben, my ex is

24 dating."

25 **BY MR. PENNEBAKER:**

1    Q.    "Ben," says Jeff Young.

2          "My ex is dating Jeff Shepard with the JPD.  Dawn

3    has been having him doing background checks on all my

4    friends and trying to start shit.  Can you get him a

5    message and tell him to stay the fuck out of my business?

6    I don't care if he fucks my ex.  He just needs to know

7    that she's a psycho bitch and that everything she says

8    about me is her side.  I can give a fuck who she dates,

9    but using his position to get in my business is

10   unacceptable.  Also, the Montoya brothers have been

11   causing me some problems, Jonathan and Michael.  We may

12   need to deal with that shit, too.  I've had your six; I

13   need you to have mine."

14         You see all that?

15   A.    Yes, sir.

16   Q.    You're in law enforcement.  Is it appropriate for a

17   member of the public to have a member of law enforcement

18   run backgrounds?

19   A.    It is not.

20         **MR. PENNEBAKER:**  Okay.  If we can please go to

21   "I'm on it."

22   **BY MR. PENNEBAKER:**

23   Q.    Go ahead, Special Agent Scales, please.

24   A.    "I'm on it.  I can definitely deal with the Montoya

25   brothers first thing when I get back Tuesday.  I'll

1   get -- I'll get Dad on Jeff ASAP.  Jeff can't do shit

2   anyway because it's a conflict of interest, but we'll

3   definitely let him know the situation.  And if they want

4   to push this situation, then we'll push back harder.

5   Just keep doing the right thing, and I got the rest of

6   it.  No problem.  No problem, Brother.  I got Shepard

7   taken care of.  Just give me a call when you -- when you

8   break free, and I'll explain everything.  I'll take care

9   of Jonathan and Michael with a phone call.  These boys

10  aren't big enough to do shit.  I got this; I promise."

11  Q.    "Thanks.  Call you in a minute.  I just landed in

12  LA."

13  A.    "Call me tonight or tomorrow, if you want.  I

14  talked to Jonathan, and I don't think you'll have any

15  more problems with him."

16        **MR. PENNEBAKER:**  Okay.  And if we could go to

17  Page 6, please, Ms. Silverberg, and "he ain't worth it."

18  **BY MR. PENNEBAKER:**

19  Q.    Go ahead, Special Agent Scales.

20  A.    "He ain't worth it.  He'll run away; I promise.

21  I'll -- I'll handle it, or I'll have his ass locked up."

22  Q.    "Handle my six, Bro.  I'm depending on you.  I want

23  that shit taken down."

24  A.    "Handled it."

25  Q.    All right.

1     **MR. PENNEBAKER:** And then Page 7, please, and

2     then zoom in at "I'm trusting you." Thank you.

3     **BY MR. PENNEBAKER:**

4     Q.   All right. And so Mr. Young says "I'm trusting

5     you" on October 20, 2014, and then what happens?

6     A.   He's -- he wrote Mr. Elston a prescription the next

7     day for hydrocodone.

8     Q.   And then two days later, what happens?

9     A.   He writes him another prescription for oxycodone.

10    Q.   Are those two Schedule II narcotic opioid drugs at

11    the same time?

12    A.   They are.

13         **MR. PENNEBAKER:** All right. If you would please

14    go to Page 8, Ms. Silverberg. And there you go. Thank

15    you.

16    **BY MR. PENNEBAKER:**

17    Q.   So after getting another prescription -- oh, that's

18    a -- so Jerry Elston, is that Ben Elston's father?

19    A.   It is.

20    Q.   So let's just start with Mr. Young saying "that's

21    who's causing me all this misery."

22    A.   "I know. I don't care about going to jail. I've

23    been in 10 times' worse places. I'd rather see him get

24    humiliated or lose his job. You call it, though. If you

25    want me to beat the fuck out of him, I'll do it. He

1    ain't shit; I promise.  I'd hit him once, and it'd be

2    over."

3    Q.    "The course of action I'd suggest is a course of

4    action I can't suggest.  LOL.  I wish he'd lose his

5    fucking job for being such a pussy.  I want him

6    humiliated and lose his job.  LOL.  Sounds awesome."

7    A.    "I don't give a fuck, Brother.  I can blame it on

8    PTSD."

9    Q.    "Ha, ha, ha, ha."

10          **MR. PENNEBAKER:**  All right.  If we can go to

11   Page 10, please, and zoom in at the three prescriptions

12   on November 21st through 24th, all the way down to

13   November 28th.

14   **BY MR. PENNEBAKER:**

15   Q.    So on November 21st to 24th, do we have the

16   defendant writing Ben Elston two prescriptions -- one is

17   those is Jerry in the middle -- but Ben Elston

18   prescriptions for dextroamphetamine and hydrocodone?

19   A.    Yes.

20   Q.    So starting right under that:  "Can you meet me at

21   Walgreens, LOL, at 6:00 p.m.?"

22   A.    "Yeah, no problem.  Just write me 10-milligram

23   hydros.  I don't have enough money for the Percocet.

24   I'll see you at 6:00 at Walgreens, like 40 or 60 of

25   them."

1   Q.    And the defendant says:  "K."

2   A.    "Thanks.  In the Tahoe by the front door."

3   Q.    "Got to drop my daughter, then I will be there."

4   A.    "K."

5   Q.    Okay.

6        **MR. PENNEBAKER:**  If we can go to Page 15,

7   please, Ms. Silverberg, and zoom in at "hey, son

8   number two."

9   **BY MR. PENNEBAKER:**

10  Q.    All right.  Go ahead.

11  A.    "Hey, son -- hey, son number two, this is Jerry,

12  Ben's dad.  Ben is going to come pick up my prescription

13  of hydros around 9:30.  Will you give me the 10

14  milligrams instead of the 7.5?  I'm going to be gone for

15  a week, and my Crohn's disease has been acting up.  If

16  you would leave those up front, he'll come and get them.

17  I've got to be on the road by 10:00, and I'm trying to

18  get packed.  Thank you, sir.  If you -- if I don't have

19  time to get them filled here, I can get it filled

20  anywhere in Tennessee, can't I?"

21  Q.    "Yes."

22  A.    "Okay.  Thanks.  And Ben will be there in about an

23  hour.  Sixty will be plenty also.  Hey, Brother, I'll be

24  there in 20 minutes, if you -- if you'll stick that up

25  front."

1   Q.    "It's already there."

2         And then what happens after that?

3   A.    Jerry is -- Jerry Elston is written a prescription

4   for hydrocodone, same day.

5   Q.    10 milligrams, and it looks like another one for

6   oxycodone a few days later.  And Ben Elston is written a

7   hydrocodone prescription on the 13th of January?

8   A.    Correct.

9   Q.    What is the investigative significance of Jerry

10  Elston allegedly texting the defendant from Ben Elston's

11  phone and then claiming, as Jerry, not to be able to get

12  over to the office to pick them up because he's packing?

13  A.    It's a red flag because, one, he's not seeing the

14  provider himself, and, two, he's essentially told him

15  what he wants, and he's getting prescribed that.

16  Q.    Okay.  Is it possible that it could be Ben Elston

17  pretending to be his dad from his own phone?

18  A.    It's very possible.

19        **MR. PENNEBAKER:**  If we could go, please, to

20  Page 31.  And if we could zoom in on the two

21  prescriptions:  3/28 and 4/1.  And then just underneath

22  there, "hey, Bro."

23  **BY MR. PENNEBAKER:**

24  Q.    All right.  Now we're in 2016, correct?

25  A.    Yes.

1   Q.    Looks like a couple of prescriptions for Mr. Elston

2   on March 28th and April 1st for hydrocodone and

3   dextroamphetamine, correct?

4   A.    Correct.

5   Q.    All right.  So underneath that, Jeff Young, a

6   couple of days after that second prescription, writes:

7   "Hey, Bro, Ethan Owen had the cops come to my house last

8   night during my after party.  Tell that fuck to stay away

9   from me and my property."

10       **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

11  go to the next page, please, and zoom in on the top.

12  **BY MR. PENNEBAKER:**

13  Q.    Go ahead, Special Agent Scales.

14  A.    "I handled that around 2:00 p.m. this afternoon.

15  You're late."

16       I don't know if you can call that, like, a

17  rock-and-roll emoji.

18  Q.    "Let Ethan know I'll sue his ass for slander if I

19  hear anything like that come out of his fucking mouth

20  ever again.  Talk to him today already.  Brothers for

21  life."

22  A.    "Damn right."

23       **MR. PENNEBAKER:**  And if we could go to -- down

24  to the -- closer to the bottom of the page, "your boy

25  Ethan."

1    BY MR. PENNEBAKER:

2    Q.    Go ahead, Special Agent Scales.

3    A.    "Your boy Ethan just called Tommy begging him to

4    ask me not to beat his ass.  I told Tommy you were

5    family, and if Ethan ever did some dumb shit like that

6    again, there would be no -- no more warnings.  Anyways,

7    he -- anyways, Ethan is very, very sorry and has seen the

8    error of his ways.  Hey, when I come by this morning and

9    get tours (phonetic) script, can I get a Rocephin shot to

10   get -- Rocephin shot to see if it'll help my eye?  I've

11   got another stye, and I -- and looked like somebody done

12   tore off and whooped my ass, LOL."

13   Q.    And then are there more prescriptions or controlled

14   drugs after that?

15   A.    There are.

16   Q.    Do you have a summary exhibit there that -- where

17   you -- there's -- where you've totaled the amount of

18   controlled drug pills prescribed to Ben and Jerry Elston

19   during the time that Mr. Elston and Mr. Young were having

20   these exchanges?

21   A.    Yes.

22   Q.    What is the total count of controlled drug pills

23   during that time?

24   A.    10,241.

25   Q.    What kinds of drugs are in there?

1   A.    As far as just listing them out?

2   Q.    Well, just -- I mean, we've talked about

3   hydrocodone, dextroamphetamine.

4   A.    Virtussin.

5   Q.    Is that a cough syrup with codeine?

6   A.    It is.

7   Q.    Is it fair to say that there are benzodiazepines,

8   stimulants, opioids?

9   A.    Yes.

10  Q.    Okay.  I think we can move on.

11        Did you also look at a -- or is this a summary

12  exhibit of an individual named -- Jay Green's

13  communications with the defendant and also PMP?

14        (A document was passed to the witness.)

15  A.    Yes.

16  **BY MR. PENNEBAKER:**

17  Q.    And it's been previously marked as Government's

18  808.

19        **MR. PENNEBAKER:**  And Your Honor, I'd offer it

20  into evidence as Exhibit 84.

21        **MS. SILVERBERG:**  84.

22        **MR. PENNEBAKER:**  84.

23        (The above-mentioned item was marked as

24  Exhibit No. 84.)

25        **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

1  go to Page 1.  Just zoom in at the top.

2  **BY MR. PENNEBAKER:**

3  Q.    And it looks like Mr. Green says:  "Jeff, I need

4  help.  Ron is my cousin.  I've been off for a couple

5  months now for an injury.  Let me know if you can get me

6  in before Wednesday.  I supposed to go back to work.

7  Jackson Clinic won't give me any pain -- anything for

8  pain, and I've spent a shit ton of money there.  Need

9  help fast."

10       On that same day or on the next day -- excuse me --

11  you can see above it.  On the next day, does Mr. Young

12  prescribe Jay Green hydrocodone with acetaminophen?

13  A.    Yes.

14  Q.    Okay.  By the way, Special Agent Scales, do you

15  know who Jay Green is?

16  A.    It was another individual that they spoke of as

17  being one of his bodyguards.

18  Q.    Is -- was Jay Green in law enforcement in another

19  town?

20  A.    He was.

21  Q.    All right.

22       **MR. PENNEBAKER:**  So if we could go to Page 5,

23  please, Ms. Silverberg.

24       **MS. SILVERBERG:**  Sorry.  It's loading.

25       **MR. PENNEBAKER:**  If we need to go to the ELMO, I

 1    can use that.

 2              **MS. SILVERBERG:**  Oh, Drew, it's back up.

 3              **MR. PENNEBAKER:**  It's back up?

 4              **MS. SILVERBERG:**  Yeah.  Sorry.  I had to

 5    disconnect.

 6              **MR. PENNEBAKER:**  Thank you.

 7              If we could zoom into the -- basically the

 8    bottom third.

 9    **BY MR. PENNEBAKER:**

10    Q.    All right.  And so on February 10, 2016, Special

11    Agent Scales, do we see Jeff Young tell Jay Green, in law

12    enforcement, I need you find this fucker?

13    A.    Yes.

14    Q.    What does Jay Green say?

15    A.    "Give me a few."

16    Q.    Sorry.  Up at the top.

17    A.    "What's going on with him?"

18    Q.    "He's threatening me."

19    A.    "Give me a few."

20    Q.    "I want to file charges.  He started again on me

21    today, and now he's threatening my office."

22          And then is that a picture of Jeff Young showing

23    Mr. Green what he perceives to be a threatening message?

24    A.    Yes.

25              **MR. PENNEBAKER:**  And Ms. Silverberg, if we could

```
 1    go to the top of Page 6, please.
 2              So I'm sorry.  The bottom half of Page 6.
 3          MS. SILVERBERG:  Down here?
 4          MR. PENNEBAKER:  Uh-huh.
 5    BY MR. PENNEBAKER:
 6    Q.    So Jeff Young says:  "Justice Sample."
 7    A.    "I can get my dispatcher to get his info, but
 8    charges will have to be filed through JPD since that is
 9    where the incident took place.  Let me read through
10    this."
11    Q.    "I need his info, and I will file charges, if
12    you -- I think you can or if you think I can."
13    A.    "Yeah, you can.  Renee has to know who it is for --
14    who it is for, though.  Trying not to tell her because
15    y'all have had words before, LOL.  Renee Mullins is my
16    dispatcher, laugh out loud."
17    Q.    "Words?  Over what?  Tell her it's for you,
18    fucker."
19    A.    "Not a clue.  I did.  She saw a post one day and
20    asked if I was friends -- if I was friends" -- I believe
21    that's 'with you' -- "I said, hell, yeah, I am.  She
22    looking get up tonight.  It's already done."
23    Q.    Okay.  That's good.
24          MR. PENNEBAKER:  If we can go, please,
25    Ms. Silverberg, to Page 10.  Thank you.
```

1  BY MR. PENNEBAKER:

2  Q.    Is this Mr. Green sending the defendant photographs

3  of a residence?

4  A.    It is.

5        **MR. PENNEBAKER:**  And after that, if we can zoom

6  in.  Yeah, that's perfect.  Just to everything before

7  video.

8        **MS. SILVERBERG:**  Where?

9        **MR. PENNEBAKER:**  Go down to the end of "can dig

10 deeper later."

11       **MS. SILVERBERG:**  Oh, okay.

12 BY MR. PENNEBAKER:

13 Q.    All right.  So it looks like Mr. Green sends

14 another picture, and what does he say?

15 A.    "Last known address.  License still shows Milan;

16 Facebook shows Gibson."

17 Q.    "Nice."

18 A.    "I suggest police report.  Or if we have to take

19 care of it, we can.  Can dig deeper later, but involves

20 going into -- going to his work, et cetera."

21       **MR. PENNEBAKER:**  Ms. Silverberg, do you have a

22 CD of 808?  I mean 808-A.

23       And Your Honor, I'd offer into -- this --

24 actually, Ms. Silverberg, can we go ahead and blow up the

25 bottom half or maybe the next -- the next entry.

1    **MS. SILVERBERG:** Just a sec. This one?

2    **MR. PENNEBAKER:** Uh-huh.

3    **BY MR. PENNEBAKER:**

4    Q.   And so that next entry after "can dig deeper

5    later," it says "Jay Green to Jeff Young."

6         You can see that there's a blank spot in there, and

7    that's a description, right, of what we're about to see

8    on what's been previously identified as 808-A?

9         **MR. PENNEBAKER:** Your Honor, I'd offer what's

10   been previously marked as 808-A into evidence as

11   Exhibit 85.

12        **THE COURT:** Denied at this point. The witness

13   hadn't identified it.

14   **BY MR. PENNEBAKER:**

15   Q.   Special Agent Scales, I'm not sure if you have seen

16   that video? Is that correct, that -- have you seen that

17   video at 808-A?

18   A.   I have not.

19   Q.   Okay. Just trying to think if there's another way

20   that -- I guess we'll --

21        **MR. PENNEBAKER:** I'll withdraw that offer, Your

22   Honor.

23   **BY MR. PENNEBAKER:**

24   Q.   And just one additional question about this summary

25   exhibit: Did Mr. Young prescribe Mr. Green opioids?

 1    A.    Yes.

 2    Q.    And did he continue to prescribe Mr. Young opioids

 3    after this exchange about locating this individual and

 4    taking care of this problem?

 5    A.    Yes.

 6    Q.    All right.  Okay.  Have you reviewed a summary of

 7    messages and CSMD data for an individual named Will

 8    Stone?

 9    A.    Yes.

10    Q.    And is that what's previously been marked as

11    Government's 822?

12          (A document was passed to the witness.)

13    A.    Yes.

14          **MR. PENNEBAKER:**  All right.  Your Honor, the

15    government would offer this exhibit, which is a summary

16    of Will Stone's CSMD, SMS, and MMS as Exhibit 75.

17          **THE COURT:**  85.

18          **MR. PENNEBAKER:**  85, excuse me.

19          **THE COURT:**  We'll receive it.

20          (The above-mentioned item was marked as

21    Exhibit No. 85.)

22          **MR. PENNEBAKER:**  Thank you, Your Honor.

23          All right.  And Ms. Silverberg, if we can go to

24    the July 2015 prescriptions and the couple entries

25    underneath those.

1        **MS. SILVERBERG:**  Oh, sorry.  Five.

2   **BY MR. PENNEBAKER:**

3   Q.    So in July 2015, do we see this individual, William

4   Stone, get three prescriptions for hydrocodone from the

5   defendant?

6   A.    Yes.

7   Q.    And if you look on the left-hand corner, what is

8   Mr. Stone identified as in the defendant's phone?

9   A.    Can you repeat that?

10  Q.    On the left-hand side of the screen, what is

11  Mr. Stone -- how is Mr. Stone identified in the

12  defendant's phone?

13  A.    "Will Stone sheriff department."

14  Q.    Okay.  So what does Deputy Stone say there on

15  7/22/2015?

16  A.    "You are the man.  I am looking into this bill for

17  you.  I will get with you in a day or so."

18        **MR. PENNEBAKER:**  And if we could go to Page 2 of

19  that exhibit, please, Ms. Silverberg, and zoom in to

20  "need to call in a favor."

21  **BY MR. PENNEBAKER:**

22  Q.    Jeff Young, there, says:  "Need to call in a favor,

23  Brother.  Can you contact me when you get time?"

24        That's an 7/21/2015, so July 21, 2015.

25  A.    Correct.

1    Q.    And then after that, Jeff Young writes a

2    prescription for phentermine, and Ms. -- yep, thank you.

3    If we could blow that up.

4          So looks like from August to December, Deputy Stone

5    gets phentermine, hydrocodone, AndroGel, hydrocodone, and

6    Belviq.  So is it fair to say that the defendant

7    continues to prescribe for Deputy Stone for some time

8    after that?

9    A.    Correct.

10   Q.    And these are controlled drugs that are being

11   prescribed?

12   A.    Correct.

13   Q.    If we could, please, now go to -- have you seen a

14   summary exhibit 816-A and -B involving an individual

15   named Lydia Spencer?

16   A.    Yes.

17             **THE COURT:**  What was that first name?

18             **MR. PENNEBAKER:**  Lydia, Your Honor.

19             So here is one, and here's the other.  You're

20   looking at A, and this is B.

21             (Documents were passed to the witness.)

22   **BY MR. PENNEBAKER:**

23   Q.    Are those the exhibits you recognize?

24   A.    Yes.

25   Q.    Thank you.

1         **MR. PENNEBAKER:** And I can actually just enter

2 this or offer this as a single exhibit. It is a summary

3 exhibit of communications with the defendant. Actually,

4 the -- to be -- to be precise, the exhibit is -- the

5 first page is communications between Lydia Spencer and

6 the office manager at Preventagenix, Kristie Gutgsell.

7 The second page is additional text messages between those

8 two individuals and then a group text involving

9 individuals in the Preventagenix clinic. And then the

10 third and fourth page are CSMD data for Lydia Spencer,

11 Your Honor. And I'd offer these as government's -- or as

12 Exhibit 86.

13         **THE COURT:** Okay. We'll receive them. 86.

14         **MR. PENNEBAKER:** Thank you, Your Honor.

15         (The above-mentioned items were marked as

16 Exhibit No. 86.)

17         **MR. PENNEBAKER:** All right. If we could pull up

18 that first page.

19         Oh, I better use the ELMO.

20         **MS. SILVERBERG:** Sorry.

21         **MR. PENNEBAKER:** That's okay. I can -- I'll

22 just do this one like this.

23 **BY MR. PENNEBAKER:**

24 Q.   Okay. So what are we looking at here, Special

25 Agent Scales?

1   A.    Text -- a screenshot of a message from Lydia

2   Spencer and Mr. Young.

3   Q.    Or this -- I think this is actually Kristie

4   Gutgsell --

5   A.    I'm sorry.

6   Q.    -- the office manager we heard from earlier.

7         Does that sound, right?

8   A.    Yes.  Yes.

9   Q.    Okay.  So does Kristie Gutgsell say:  "Any chance

10  you can get your husband to check and see if Jeff has a

11  warrant in Madison County that got transferred from

12  Shelby County?  Rumor is he does, sad face."

13        And Ms. Spencer says?

14  A.    "Yes, ma'am."

15  Q.    And then Ms. Gutgsell says:  "Thanks so much."

16        On the second page, we have Ms. Spencer in that

17  first entry.  Would you read that, please?

18  A.    "It is not entered into the NCIC, National Crime

19  Information Center, as of now.  So if somebody were to

20  run him or his tag in Jackson, it would not show up that

21  he had a warrant.  Brian said he will check again in the

22  morning when he gets to work and see if it has been

23  entered.  He advised that he can go turn himself in and

24  get it taken care of before somebody like Briley, for

25  instance, around here gets wind of it, and it hits the

1    news and runs rampant and spreads like wildfire.  If

2    Brian sees it come across NCIC, he will let him know

3    ASAP."

4    Q.    And is Brian in law enforcement?

5    A.    Yes.

6    Q.    Is it appropriate for Brian to be checking NCIC to

7    see if the defendant has warrants to warn the defendant?

8    A.    No, it is not.

9    Q.    Okay.  And this is a -- we're now on Page 3.  Is

10   this Ms. Spencer's PMP data?

11   A.    It is.

12   Q.    And are those all prescriptions written by the

13   defendant?

14   A.    Yes.

15   Q.    For control drugs, including Schedule II

16   stimulants?

17   A.    Correct.

18   Q.    Benzodiazepines?

19   A.    Yes.

20   Q.    And a sleep aid?

21   A.    Yes.

22   Q.    And after this information is conveyed, that orange

23   highlighted message, is that a group chat involving the

24   defendant and other people at the Preventagenix clinic?

25   A.    It is.

 1   Q.    And it's a message from the office manager, Kristie

 2   Gutgsell, to the rest of these employees, correct?

 3   A.    Correct.

 4   Q.    And what does she say?

 5   A.    "Next time Lydia Spencer wants a hydration, it's no

 6   charge.  Please put it -- put in the computer, too."

 7   Q.    All right.  Just a couple more.

 8         Have you looked -- have you reviewed messages and

 9   data related to an individual named Keith Moffit?

10   A.    Yes.

11   Q.    And is there -- is this a summary exhibit of

12   that -- those messages and data previously marked as

13   Government's 811?

14   A.    Yes.

15   Q.    All right.

16         **MR. PENNEBAKER:**  Your Honor, I'd offer this into

17   evidence as Exhibit 87.

18         **THE COURT:**  87.

19         (The above-mentioned item was marked as

20   Exhibit No. 87.)

21         **MR. PENNEBAKER:**  And Ms. Silverberg, if -- when

22   you get there, if you could just zoom into the top of

23   Page 1.  There you go.  Perfect.

24   **BY MR. PENNEBAKER:**

25   Q.    Are these prescriptions for Keith Moffit spanning

 1  April 2015 to October of 2015?

 2  A.      Correct.

 3  Q.      What is the first entry there?

 4  A.      A hydrocodone.

 5  Q.      And that's a 7.5, 325, which is 7.5 milligrams of

 6  hydrocodone and 325 milligrams of --

 7  A.      Tylenol.

 8  Q.      Right?

 9  A.      Yes.

10  Q.      And 120 count.

11          There's also an alprazolam 1-milligram

12  prescription, correct?

13  A.      Yes.

14  Q.      The next month, does the defendant up the strength

15  of the drug both in terms of the milligrams and in terms

16  of the drug itself to oxycodone?

17  A.      He does.

18  Q.      And now we're taking the acetaminophen out of the

19  picture, correct?

20  A.      Yes.

21  Q.      The following month, in June, do we up the

22  oxycodone again?

23  A.      We do.

24  Q.      To 20 milligrams this time, correct?

25  A.      Yes, sir.

1  Q.    And the alprazolam to 2 milligrams?

2  A.    Yes, sir.

3  Q.    So then we pretty consistently stay at that duo --

4  A.    Yes.

5  Q.    -- correct?

6         **MR. PENNEBAKER:**  If we could go to the middle of

7  the same page, Ms. Silverberg.

8  **BY MR. PENNEBAKER:**

9  Q.    All right.  What does Keith Moffit say to the

10 defendant here on November 9th?

11 A.    "You name a time you free, and me -- me, you, and

12 our wives can step out, LOL.  What's up, boss?  I'm up

13 front trying to get my VIP on.  Come help me."

14 Q.    All right.  And then below that, do you see on

15 11/12/2015 we get a oxycodone 30-milligram table and an

16 alprazolam 2-milligram tablet, 120 of each?

17 A.    Yes.

18 Q.    And oxycodone, 30 milligram.  He's gone up again,

19 right?

20 A.    Correct.

21 Q.    All right.

22         **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

23 to the bottom of the page.

24 **BY MR. PENNEBAKER:**

25 Q.    All right.  What does he -- what does Mr. Moffit

1    say at the -- in that first entry on December 7th?

2    A.    "Hey, Bud, I'm VIP down there and -- and

3    appointment is Friday.  But Boss wants me -- wants to

4    hit -- Boss wants to head back to Nashville before then.

5    Can you get my meds filled today and no drug test, Boss?"

6    Q.    "How early is it?  That's a state-law thing."

7    A.    "Four days.  Or can you let me know if I got to

8    take one?  What's the word, Boss?  Can you slip me past

9    DT" -- abbreviation for 'drug test' -- "one more month?

10   Help a player out."

11   Q.    Okay.  So here we've got an indication that it's

12   early and that we need to slip past the drug test, right?

13   A.    Correct.

14   Q.    And on that same date, what do we see happen?

15   A.    He's prescribed oxycodone and alprazolam.

16   Q.    What is the law enforcement or the investigative

17   significance of allowing someone to slip past a drug

18   test?

19   A.    He's not testing him to see if he's even taking his

20   medications.

21   Q.    Or maybe if he's taking something else, right?

22   A.    Correct.

23           **MR. PENNEBAKER:**  If we could go to Page 4,

24   please, Ms. Silverberg, and zoom in at the top, gray to

25   gray.  Thank you.

1    **BY MR. PENNEBAKER:**

2    Q.    So we get a oxycodone 30-milligram prescription on

3    September 7, 2016, correct?

4    A.    Correct.

5    Q.    And then about a month later, what happens?

6    A.    He receives another prescription for oxycodone.

7    Q.    What is the -- what does he text the defendant

8    before that?  Or, well, send him a Facebook message, I

9    guess.

10   A.    "What's up, Buddy?  Hey, need you to be me a favor

11   between me and you, Boss Man.  Me and my ol' lady will be

12   coming with Chris and Crystal to witness the -- to

13   witness the marriage, and I was going to see if you would

14   write my ol' lady one script off the charts, Bro.  'Cause

15   her back and shit is fucked up bad, and all the docs she

16   has tried won't write her xans or oxies.  She was there

17   with you and got discharged for failing a drug test when

18   she brought piss and trying to cover up weed smoke.  If

19   you could write her them this one time, it would be

20   greatly" -- I'm assuming that's "appreciated."

21   Q.    And thank you, Special Agent Scales.  I just wanted

22   to clarify something because I think you might have

23   misread in the middle there.

24        I think you said "won't write her xans or oxies."

25   I think it says "xans and oxies."

1   A.    Xans and oxies.

2   Q.    But after this "can you write my wife a

3   prescription off the books," does the defendant continue

4   to prescribe to the individual making that request?

5   A.    Yes.

6   Q.    All right.  Did you review messages and PMP data

7   for an individual named Bartlett?

8   A.    Yes.

9   Q.    And is that Scott Bartlett?

10  A.    It is.

11  Q.    And I'm going to hand you what has been previously

12  marked as Government's -- well, what's been previously

13  marked as Government's 821-A.

14        (A document was passed to the witness.)

15  **BY MR. PENNEBAKER:**

16  Q.    And do you recognize that as a text exchange -- as

17  the text exchange between the defendant and Mr. Bartlett?

18  A.    Yes.

19        **MR. PENNEBAKER:**  Your Honor, I'd offer

20  exhibit -- I'd offer this text exchange between Scott

21  Bartlett and the defendant as Exhibit 88.

22        (The above-mentioned item was marked as

23  Exhibit No. 88.)

24        **MR. PENNEBAKER:**  Ms. Silverberg, if we could

25  please go to Page 4, top half.

1    **BY MR. PENNEBAKER:**

2    Q.    Special Agent Scales, would you read from "how do I

3    handle"?

4    A.    "How do I handle getting the Adderall refilled?"

5    Q.    "Can you come by my office and get a prescription?"

6    A.    "Well, I live in Memphis.  I suppose I can make the

7    trek."

8    Q.    "I really need to establish a chart on you.  We'll

9    bring you through the VIP entrance and out."

10         **MR. PENNEBAKER:**  And Ms. Silverberg, before

11   we -- before we move on --

12   **BY MR. PENNEBAKER:**

13   Q.    Special Agent Scales, have you -- in reviewing this

14   messaging context, is it clear that the defendant had

15   previously written a prescription for Adderall to

16   Mr. Bartlett?

17   A.    Yes.

18         **MR. PENNEBAKER:**  Ms. Silverberg, if we could go

19   down to the bottom half.

20   **BY MR. PENNEBAKER:**

21   Q.    So what does Mr. Bartlett say?

22   A.    "Okay.  Bud, my car is in Louisville, so I'm going

23   to have to rent a car for a while.  I'm home anyway.

24   I'll come up next week."

25   Q.    "That's the way the Grizz executives do it and my

CCaasse e4::1199--ccrr--1100004400--TTFFF   DDooccuummeenntt 882-31   FFiilleedd  0037//0165//2233   PPaaggee 259471  ooff  129333   PPaaggeeIIDD #34825

*TESTIMONY OF SPECIAL AGENT DEMARCUS SCALES*                     59

 1   other high-end clients.  We have a discreetness policy."

 2       Special Agent Scales, Adderall is a Schedule II

 3   controlled drug, correct?

 4   A.    Correct.

 5           **MR. PENNEBAKER:**  If we could go to Page 5 and

 6   zoom into the top half.

 7   **BY MR. PENNEBAKER:**

 8   Q.    What does Mr. Bartlett say about the discreetness

 9   policy?

10   A.    "I can dig that."

11   Q.    "Then I can postdate you three months' worth."

12   A.    "I can certainly dig that, too."

13   Q.    All right.  Have you reviewed messages and PMP data

14   for an individual named Doug Keeton?

15   A.    Yes.

16   Q.    And is that what I'm handing you that's been

17   previously marked as Government's 819?

18           (A document was passed to the witness.)

19   A.    Yes.

20           **MR. PENNEBAKER:**  Your Honor, offer -- I offer

21   into evidence Exhibit 81.  Oh, 89?

22           **THE COURT:**  89.

23           **MR. PENNEBAKER:**  89.

24           (The above-mentioned item was marked as

25   Exhibit No. 89.)

 1              **MR. PENNEBAKER:**  Wow, I was off.

 2              **THE COURT:**  How many more of these do you have?

 3              **MR. PENNEBAKER:**  Just a couple, Your Honor.

 4    **BY MR. PENNEBAKER:**

 5    Q.    So Special Agent Scales, is Mr. Keeton the

 6    individual who owns Slide & Ride where the defendant

 7    liked to party?

 8    A.    Yes.

 9              **MR. PENNEBAKER:**  If we could go to Page 1,

10    please, Ms. Silverberg.

11    **BY MR. PENNEBAKER:**

12    Q.    Are these prescriptions for Xanax that the

13    defendant is prescribing Mr. Keeton?

14    A.    Correct.

15              **MR. PENNEBAKER:**  And if he could please go to

16    Page 2.

17    **BY MR. PENNEBAKER:**

18    Q.    All right.  If you would read for Mr. Keeton.

19    A.    "Hey, this is Doug Keeton.  Sorry about my dumb-ass

20    wife -- I mean dumb-ass ex-wife acting like she did in my

21    club.  But don't worry.  She is banned forever.  But next

22    time y'all decide to come back, just text me, and I will

23    save the VIP booth for y'all and give y'all your own

24    server so you don't have to wait on a drink.  Plus,

25    always text me so you don't have to wait in line outside,

1   and maybe one night we can get my limo out, and I'll

2   carry y'all to Martin, to my club there.  That way, we

3   can party at both booths -- both clubs.  But I apologize

4   for last night.  And I chew my security guards' ass out

5   and told them when you're in -- when you're in there,

6   nobody gets around y'all unless y'all want them to."

7   Q.    "Thanks, Bro.  She and my ex could be twins."

8          **MR. PENNEBAKER:**  If we could go to Page 7,

9   please, Ms. Silverberg, and zoom in "you getting out

10  tonight."

11  **BY MR. PENNEBAKER:**

12  Q.    All right.  Special Agent Scales, if you want to

13  start at "you getting out tonight?"

14  A.    "You getting out tonight?"

15  Q.    "Yes, sir.  I'll be at Slide & Ride about 11:30."

16  A.    "All right.  I'll try to be there by then at

17  red" --

18  Q.    Go ahead.

19  A.    "All right.  I'll try to be there by then.  At

20  Redbone's now."

21  Q.    And I actually started you at the wrong "you

22  getting out tonight."  The one I was asking you -- trying

23  to ask you to read, inartfully, was the one on the 9th.

24          So this is June 9, 2016, right?

25  A.    "You getting out tonight?"

1    Q.    "Not tonight."

2    A.    "Damn, I'm ready to turn it up.  If you change your

3    mind, holler."

4    Q.    "Sorry.  Have weight loss clinic tonight and my son

5    after that.  Rain check."

6    A.    "Got you.  I'll be ready for a lake trip soon."

7    Q.    Okay.  And then do we add a new type of controlled

8    drug after that conversation:  dextroamphetamine?

9    A.    We do.

10   Q.    So that's a couple days later.

11         Okay.  And I'm going to -- have you reviewed -- did

12   you review data and messages involving an individual

13   named Chad Newsom?

14   A.    Yes.

15   Q.    Okay.  And I'm going to hand you what's been

16   previously marked as Government's 818.

17         (A document was passed to the witness.)

18   **BY MR. PENNEBAKER:**

19   Q.    Is this a summary of a PMP, CSMD, and message

20   between the defendant and Chad Newsom?

21   A.    It is.

22         **MR. PENNEBAKER:**  Government would offer this as

23   Exhibit 90, Your Honor.

24         **THE COURT:**  Okay.  We'll receive it.

25         (The above-mentioned item was marked as

1    Exhibit No. 90.)

2          **MR. PENNEBAKER:** And Ms. Silverberg, if we could

3    go ahead and go to Page 1.

4          **MS. SILVERBERG:** This way?

5          **MR. PENNEBAKER:** Sorry. That's the next one I'm

6    was going to introduce.

7          So it looks like, actually, I misspoke. That's

8    not Government's 818. That's Government's 818-B, which

9    is still Exhibit 90.

10   **BY MR. PENNEBAKER:**

11   Q.   What types of controlled medications is the

12   defendant prescribing Mr. Newsom from around November

13   2014 to March 2015?

14   A.   Tramadol, carisoprodol, and hydrocodone and

15   dextroamp.

16   Q.   So the hydrocodone stronger than tramadol?

17   A.   Yes.

18   Q.   All right. And so we're on hydrocodone here in

19   April -- in March 2015; fair to say?

20   A.   Yes.

21          **MR. PENNEBAKER:** If we could go to Page 4 at the

22   bottom. Blow up "oh, wow."

23   **BY MR. PENNEBAKER:**

24   Q.   So go ahead and, Special Agent Scales, read for

25   Mr. Newsom.

Case 4:19-cr-00040-TFF Document 828-1 Filed 07/05/23 Page 252 of 393 PageID 34430
TESTIMONY OF SPECIAL AGENT DEMARCUS SCALES

64

1 A. "Oh, wow, laugh out loud. Just wanted to let you

2 know that Xanax seems to be helping out -- helping a lot.

3 I wanted to talk to you sometime about my back pain meds.

4 I've been reading about them, and I had a couple

5 questions whenever you have the time."

6 Q. So we've also added Xanax by this time?

7 A. Yes.

8   **MR. PENNEBAKER:** If we could go to the top of

9 the next page to "I need to stay."

10 A. "I need to" --

11 **BY MR. PENNEBAKER:**

12 Q. Go ahead.

13 A. "I need to stay off the enter -- internet, LOL, but

14 all of the Tylenol is making a little nervous. I've been

15 reading about a couple other options without all the

16 Tylenol. Going to see what you thought of them."

17   **MR. PENNEBAKER:** Okay. And if we could go to

18 Page 6, about the fourth line. There you go.

19 **BY MR. PENNEBAKER:**

20 Q. And can you start at "have"?

21 A. "Have you heard of something like roxicolin

22 (phonetic) or something? The internet said it's a

23 similar pain med with no Tylenol?"

24 Q. "OxyContin?"

25 A. "I don't know. I thought it started with an R. It

 1   said they are smaller and last longer."

 2   Q.    "We have options.  'Roxy' is the street name."

 3   A.    "LOL, that's what I get for doing medical research

 4   online."  Laugh emojis.

 5   Q.    Okay.  So is roxy stronger than hydrocodone?

 6   A.    It is.

 7   Q.    What's the investigative significance of referring

 8   to the drug, in this context, as roxy?

 9   A.    Typically a patient's not going to refer to a pain

10   med by a street name.

11   Q.    If it's for legitimate purposes?

12   A.    Correct.

13   Q.    All right.  So this is on April 20, correct?

14   A.    Yes.

15         **MR. PENNEBAKER:**  And if we could go to Page 7,

16   the six lines at the bottom.

17   **BY MR. PENNEBAKER:**

18   Q.    And if you want to start at the top of that

19   cull-out, Special Agent Scales.

20   A.    "Hey, Brother, I'm out running around.  If you have

21   a minute, I'll run by."

22   Q.    "I'm in a meeting until 1:30."

23   A.    "Word.  I'll holler back in a bit.  Got a little

24   something for you for the holiday."

25   Q.    Now, hang on just a minute.  Is April the 20th or

1  4/20, is that -- is that a holiday?

2  A.    They -- 4/20, it can be known as, like, a

3  cannabis -- cannabis celebration day.

4  Q.    Okay.  So it's kind of an unofficial holiday?

5  A.    Right.

6  Q.    Okay.  So Mr. Young says:  "Awesome.  Happy

7  holiday."

8  A.    "F yeah, Buddy.  I just pulled up at the clinic.

9  No rush, of course.  I just have time to kill.  By the

10  way, go easy with that shatter, very potent, best I've

11  had."

12  Q.    What is shatter?

13  A.    It is a form of cannabis.

14  Q.    Is it a concentrated form of cannabis?

15  A.    It is.

16        MR. PENNEBAKER:  All right.  So if we could go

17  to Page 9, please, Ms. Silverberg, and if we could cull

18  out "I consider you family."  All the way down to the

19  "oxycodone."

20  BY MR. PENNEBAKER:

21  Q.    So all of this that's going on, it's still April

22  20th, correct?

23  A.    Correct.

24  Q.    Same day that Mr. Newsom says "I been looking on

25  the internet, and there's this thing called roxy"?

1    A.    Correct.

2    Q.    Same day that Mr. Newsom gives Mr. Young the

3    shatter?

4    A.    Correct.

5    Q.    So then Jeff Young says here:  "I consider you

6    family, fucker."

7    A.    "Same here, man, for reals."

8    Q.    "For reals."

9          And then Mr. Young prescribes what?

10   A.    Oxycodone.

11   Q.    Is that the very drug that Mr. Newsom was asking

12   for by name based on internet research?

13   A.    It is.

14   Q.    And have you reviewed the patient file that was

15   taken from Preventagenix for Mr. Newsom?

16   A.    I have.

17   Q.    And have you compared that patient file to the PMP?

18   A.    Yes.

19   Q.    Or the CSMD data?

20   A.    Yes.

21   Q.    Have you -- is this a summary exhibit of that

22   comparison?

23   A.    It is.

24         **MR. PENNEBAKER:**  And it's previously marked as

25   818-A.  I'll offer it as Exhibit 91.

```
 1                THE COURT:  Say again, what it's a comparison

 2     of.

 3                MR. PENNEBAKER:  The patient chart for

 4     Mr. Newsom and the CSMD data for Mr. Newsom.

 5                THE COURT:  Be 91.

 6                (The above-mentioned item was marked as

 7     Exhibit No. 91.)

 8                MR. PENNEBAKER:  And Ms. Silverberg, if we could

 9     go ahead and put that up.

10     BY MR. PENNEBAKER:

11     Q.    Can you let the jury know what's happening in this

12     summary exhibit?

13     A.    So similar to how we put together the text messages

14     with the PMP, this is the patient file along with the

15     PMP.  And the ones in yellow have -- the ones in yellow

16     don't have a doctors visit with it.

17     Q.    Don't have a corresponding office with it on the

18     day?

19     A.    Correct.

20     Q.    And so we were just at April 20, 2015, right?

21     A.    Yes.

22     Q.    So what do we see there?

23     A.    We see that he got prescriptions for hydrocodone on

24     May the 8th and May the 11th and as well as may -- April

25     20th.
```

1    Q.    So he got hydrocodone on the 8th; he got, looks

2    like, dextroamphetamine on the 11th, and oxycodone on the

3    20th, which is the one that we were just talking about,

4    correct?

5    A.    Correct.

6          **MR. PENNEBAKER:**  And if you could zoom out,

7    please, Ms. Silverberg, and cull out the three entries in

8    white before that one that we just looked at.

9    **BY MR. PENNEBAKER:**

10   Q.    So looks like five days later, Mr. Newsom had

11   gotten a couple of other -- or excuse me.  Five days

12   earlier, on the 15th, Mr. Newsom had gotten a couple of

13   prescriptions:  one for dextroamphetamine and one for

14   1-milligram Xanax; is that right?

15   A.    Correct.

16   Q.    And so we do have an office visit on that date, the

17   15th.  Looks like a reason given for the visit is tension

18   in pelvic floor, right?

19   A.    Correct.

20   Q.    And then what's that "VIP" signify over there on

21   the right?

22   A.    He's part of his VIP program.

23   Q.    And so does that mean that there wasn't any money

24   exchanged for the office visit?

25   A.    Correct.

 1              **MR. PENNEBAKER:**  If we could, please,

 2    Ms. Silverberg -- let's see here.

 3              If we could go back to the summary exhibit

 4    involving Ms. Story.  And I forget.  Which one is that?

 5              All right.  If we could go to Government's 76,

 6    which is formerly 807.

 7              **MS. SILVERBERG:**  I think it's 76.

 8              **MR. PENNEBAKER:**  Did I say 806?

 9              **MS. SILVERBERG:**  Oh, I thought you said --

10              **MR. PENNEBAKER:**  Yeah, yeah.  If we could go to

11    76 at Page 8, I think.  Yep.  And if we could zoom in,

12    starting at "what did I write you?"

13    **BY MR. PENNEBAKER:**

14    Q.    All right.  So in this exhibit involving Cyndal

15    Story, Jeff Young says, on July 18, 2016:  "What did I

16    write you?"

17              And does Ms. Story say?

18    A.    "You wrote me 5-milligram hydros," sad face.

19    Q.    And then what does she say?

20    A.    "Seriously.  I can't take something in between

21    taking those."

22    Q.    And then Mr. Young says:  "How many did I write?

23    And also, you have to be seen in the office for a

24    Schedule II narcotic.  It's bullshit, but it's the law,"

25    right?

1    A.    Correct.

2          **MR. PENNEBAKER:**  So could we go back to -- is

3    it 91?

4          So that was in July of 2016.  If we go to the

5    second page of this exhibit, please, Ms. Silverberg.  And

6    if we can zoom into everything.  There you go.  Perfect.

7          **MS. SILVERBERG:**  Just this one?

8          **MR. PENNEBAKER:**  All -- go all the way down.

9    **BY MR. PENNEBAKER:**

10   Q.    How many prescriptions for hydrocodone -- which is

11   a Schedule II narcotic, correct?

12   A.    Correct.

13   Q.    -- happen after that text message where Mr. Young

14   acknowledges that it's the law that you have to have an

15   office visit for one of those drugs?

16   A.    Three.

17   Q.    By no means the only ones in this exhibit, correct?

18   A.    Correct.

19   Q.    Okay.

20         **MR. PENNEBAKER:**  Now, if we could go back to

21   Exhibit 90.

22         **MS. SILVERBERG:**  This one?

23         **MR. PENNEBAKER:**  Yes.  And if we could go to

24   Page 9, please, first four lines after the oxycodone

25   script.

1    BY MR. PENNEBAKER:

2    Q.    Would you start reading at "Brie's little sister"?

3    A.    "Brie's little sister killed herself tonight.  Can

4    pregnant people have Xanax?  She is tore up, dude."

5    Q.    "Oh, my God.  How far along is she?"

6    A.    "Yeah, we are in shock.  19 weeks."

7    Q.    "No.  It would harm the baby."

8          **MR. PENNEBAKER:**  And if we could go, please,

9    Ms. Silverberg, to -- yes -- to the tenth page, top four

10   lines.

11   **BY MR. PENNEBAKER:**

12   Q.    Go ahead, Special Agent Scales.

13   A.    "It's fucking crazy, dude.  Thank you, though."

14   Q.    "She can take BuSpar.  Stop by tomorrow and pick up

15   a script.  She's going to need it over the next few

16   weeks."

17         **MR. PENNEBAKER:**  And then if we could go down

18   to -- yep, right there in the middle.

19   **BY MR. PENNEBAKER:**

20   Q.    What does he say?

21   A.    "Cool.  We will come by tomorrow.  I just don't

22   want her all stressed during the pregnancy."

23   Q.    "Exactly.  That's worse than her taking something.

24   But Xanax is a definite no."

25         So will you tell me the date right then, Special

1    Agent Scales?

2    A.    4/23/2015.

3    Q.    April 23, 2015?

4    A.    Correct.

5    Q.    And do you remember earlier; we heard testimony

6    from a woman named Hope Rogers, right?

7    A.    Correct.

8    Q.    And did you also look at a summary, or did you also

9    review data, Facebook messages, and CSMD data for

10   Ms. Rogers?

11   A.    I did.

12        **THE COURT:**  Hold on.  We're going to go ahead

13   and take a break right now.  Okay.  We'll pick it up

14   after our break.

15        **MR. PENNEBAKER:**  Thank you, Your Honor.

16

17

18

19

20

21

22

23

24

25

1    **THE COURT:** All right. Take a break, ladies and

2    gentlemen. Leave your notebooks in the chair, and don't

3    discuss. 15, 20 minutes, we'll get back to you. We'll

4    go ahead and excuse you to the jury room.

5        (Jury out at 10:34 a.m.)

6    **THE COURT:** You can step down. Don't discuss,

7    your testimony with anyone.

8        **THE WITNESS:** Yes, sir.

9        (The witness complies with the request.)

10   **THE COURT:** Mr. Pennebaker, I've asked you a

11   couple of times; you give me the same answer every time.

12   How many more?

13   **MR. PENNEBAKER:** This is the last new exhibit

14   that I'm going to introduce. I would imagine I have

15   maybe five minutes left with this witness.

16   **THE COURT:** All right. I appreciate it.

17   **MR. PENNEBAKER:** Thank you.

18   **THE COURT:** I've been really patient about all

19   the minute details that you're going through. Sometimes

20   it's just good lawyering, during closing arguments, to

21   deal with all these details. But I've been patient.

22   We've gone through 20 of these now.

23   **MR. PENNEBAKER:** Yes, Your Honor.

24   **THE COURT:** All right. We'll be in recess.

25       (Recess at 10:35 a.m. until 11:13 a.m.)

1    **THE COURT:**  Okay.  Just one brief thing before

2    we bring the jury in:  Government, the indication was

3    that there was one additional witness after Special Agent

4    Scales.  Is that still the case?

5    **MS. PAYERLE:**  Yes, Your Honor.

6    **THE COURT:**  Okay.  I just need to start making

7    inquiry of the defense, whether there's going to be

8    witnesses and then also your client's decision, of

9    course.

10   **MR. FERGUSON:**  We were hoping that the next

11   witness will take us through the lunch break.  We'll

12   spend that time --

13   **THE COURT:**  Probably will.

14   **MR. FERGUSON:**  I would think so.

15   And after lunch, we would be able to answer that

16   probably a little better for you, Your Honor.  I don't

17   expect there to be much, if any, evidence on our side.

18   **THE COURT:**  Okay.  That's --

19   **MR. FERGUSON:**  But I do -- I do need that time

20   to spend time with my client for lunch.

21   **THE COURT:**  I know he has to make a decision,

22   and you need time to talk with him about it.

23   **MR. FERGUSON:**  Right.

24   **THE COURT:**  But what about other witnesses?

25   **MR. FERGUSON:**  I don't -- no, there won't be

*UNREDACTED TRANSCRIPT*

1    any.

2           **THE COURT:**  Okay.  Appreciate it.  That's what I

3    need to know.

4           All right.  And then after we finish with

5    Special Agent Scales, I'd like to go ahead and deal with

6    the stipulation, get it marked into evidence --

7           **MS. PAYERLE:**  Thank you, Your Honor.

8           **THE COURT:**  -- before we take the last witness.

9           **MS. PAYERLE:**  And maybe we play the video at

10   that time as well?

11          **THE COURT:**  Yes.

12          **MS. PAYERLE:**  Okay.  Thank you.

13          **THE COURT:**  Go ahead and deal with that.

14          **MS. PAYERLE:**  Thank you, sir.

15          **THE COURT:**  All right.  Bring them in, please.

16          (Jury in at 11:14 a.m.)

17          **THE COURT:**  You may be seated.

18          (The witness complies with the request.)

19          **THE COURT:**  All right.  Folks, I think we're

20   ready for the final push before our lunch break.

21          I'll just turn it back over to Mr. Pennebaker.

22   If you would, please, you may proceed.

23          **MR. PENNEBAKER:**  Thank you, Judge.

24          Mr. Herrin, if I could just get the ELMO.

25

 1   **BY MR. PENNEBAKER:**

 2   Q.   Special Agent Scales, I think we were just talking

 3   about the messages and data for Hope Rogers we heard

 4   testify earlier.  Is what's previously been marked as

 5   Government's 814 the complete, unredacted version of that

 6   summary?

 7            (A document was passed to the witness.)

 8   A.   Yes.

 9   **BY MR. PENNEBAKER:**

10   Q.   And we saw three pages of it introduced earlier,

11   but this is the whole exhibit?

12   A.   Correct.

13            **MR. PENNEBAKER:**  Your Honor, the government

14   offers the Hope Rogers summary as Exhibit 92.

15            **THE COURT:**  All right.  Go ahead and receive it.

16            (The above-mentioned item was marked as

17   Exhibit No. 92.)

18   **BY MR. PENNEBAKER:**

19   Q.   Special Agent Scales, you may recall seeing

20   Exhibit 24 earlier, correct?

21   A.   Yes, sir.

22   Q.   And would you please read the last entry that Hope

23   Rogers writes to Jeff Young?

24   A.   "I'm so excited for you to meet A.  Here are a few

25   pictures.  When we get out and head home, if it's a day

1   you're at the office, I'll bring her by to meet you.

2   Thank you for taking care of me and helping me stay

3   healthy during my pregnancy.  You're the best, Jeff."

4   Q.    What's the date?

5   A.    ███████, 2015.

6   Q.    So have you reviewed the PMP data for Ms. Rogers

7   involving Jeff Young's prescribing while she was

8   pregnant?

9   A.    Yes.

10  Q.    How many prescriptions for Xanax were there between

11  when the defendant told Mr. Newsom that's a definite no

12  for pregnant woman and this date?

13  A.    Four.

14  Q.    How many total Xanax pills did the defendant

15  prescribe Hope Rogers between the date of that warning to

16  Mr. Newsom and ██████████ 2015?

17  A.    360.

18          **MR. PENNEBAKER:**  Pass the witness, Your Honor.

19          **THE COURT:**  All right.  Thank you.

20          And Mr. Damas?

21          **MR. DAMAS:**  Thank you, Your Honor.

22          **THE COURT:**  You may proceed.

23                          **CROSS-EXAMINATION**

24  **BY MR. DAMAS:**

25  Q.    Good morning, Special Agent Scales.

1    A.    Good morning.

2    Q.    It's been a long morning.

3    A.    It has.

4    Q.    So you've testified you were the one that created

5    all of these summaries, these exhibit summaries, right?

6    A.    I didn't testify to creating them.

7    Q.    You reviewed the informations that led to the

8    creation of the documents, right?

9    A.    Correct.

10   Q.    So you reviewed the text messages, the PMP data,

11   and Facebook message and -- you know.

12   A.    Correct.

13   Q.    Depending on each exhibit, there's a little bit

14   variance between each one, right?

15   A.    What do you mean?

16   Q.    Sometimes there's Facebook messages; sometimes it's

17   texts?

18   A.    Right.  They're in order of -- they might have been

19   going back and forth between text message and Facebook,

20   and you just added them in.

21   Q.    And you cross-referenced all of that information

22   and kind of made it into timeline that's easy to read?

23   A.    We, yes.

24   Q.    Because otherwise, cell phone data information is,

25   like, incredibly difficult and jumbled, and it's all over

1    the place?

2    A.    Correct.

3    Q.    Correct.

4          Okay.  And part of the -- one of the things you

5    were cross-referencing was the PMP data for the specific

6    patients that we've been talking about all morning?

7    A.    Correct.

8    Q.    Do you know if you included all of the PMP data

9    when cross-referencing that?

10   A.    Yes.

11   Q.    Okay.  So if we can take a look at -- before get

12   there, including PMP data in relation to continuation of

13   care?

14         Specifically, did you include PMP data in these

15   summaries when these patients had been given -- been

16   receiving these prescriptions prior to being under the

17   care of Mr. Young?

18   A.    It's going to be -- when we do PMP data, we do it

19   for -- are you asking specifically for this -- these

20   charts?

21   Q.    For -- and what might help, let's look at what's

22   been previously labeled Exhibit Number 78.  And I'm going

23   to just use this ELMO; it's going to be easier.

24         Number 78.  So right here, you started off the

25   summary with June 30th of 2016?

1    A.    Correct.

2    Q.    Right.  So my question to you is, were there any

3    other PMP entries for Ms. Amy Sanders prior to June 30th

4    of 2016?

5    A.    I would have to see the PMP data to . . .

6              **MR. DAMAS:**  If I may approach?

7              **THE COURT:**  Good ahead.

8    **BY MR. DAMAS:**

9    Q.    Do you recognize that?

10   A.    This is a -- is this a full PMP?

11   Q.    It's not the full PMP.  It's just -- it's

12   specifically relating to the time period around June 30,

13   2016.

14         But do you recognize what that document is?

15   A.    Yes.  Yes.

16   Q.    Yes?

17   A.    (Nodding head up and down.)

18   Q.    What is that?

19   A.    This is a CSMD.

20             **THE COURT:**  I couldn't hear you.  What did you

21   say?

22             **THE WITNESS:**  A CSMD or a P -- PMP.

23   **BY MR. DAMAS:**

24   Q.    The same -- same --

25   A.    Same difference.

1    Q.    I used it interchangeably.

2          But who's it for?

3    A.    Amy Sanders.

4    Q.    Amy Sanders.

5          Did you happen to get a chance to -- if there was

6    any other narcotics given to Ms. Sanders by a different

7    provider prior to June 30, 2016?

8    A.    Yes.

9    Q.    Thank you.

10         **MR. DAMAS:**  I move to admit, Your Honor.

11         **THE COURT:**  What do we have here?  How do you

12   describe the document?

13         **MR. DAMAS:**  This would be Amy Sanders' PMP data,

14   I guess.

15         **THE COURT:**  Okay.  We'll go ahead and receive

16   it.  That will be Number 93.

17         (The above-mentioned item was marked as

18   Exhibit No. 93.)

19   **BY MR. DAMAS:**

20   Q.    So as we can see, Special Agent Scales, you started

21   off the summary with June 30, 2016, prescription given to

22   Ms. Sanders by Jeff Young.  But there's also other

23   prescriptions for narcotics from other providers prior to

24   that, correct?

25   A.    Correct.

1   Q.    Is there any reason why that wasn't included in the

2   summaries?

3   A.    Because these are specific examples showing that

4   Jeff Young was prescribing to her.

5   Q.    You don't think it's relevant to show that she was

6   already receiving care prior to coming up with Jeff Young

7   and he's just continuing that care once he comes into --

8   once she comes under his care?

9   A.    We have the burden of proving and that he was

10  distributing drugs.

11  Q.    But it is relevant?

12  A.    Not to what we're trying to --

13  Q.    Okay.

14  A.    -- prove.

15  Q.    All right.  Let me just ask you this:  Is it

16  possible that you left out that kind of information on

17  other patients as well?

18  A.    It is possible, because it's only for Jeff Young.

19  Q.    So let's go to Cyndal Story.  Cyndal Story.  That's

20  previously marked Exhibit 76, Page 8.

21        All right.  And I'm going to hand this up to you.

22  Let me know if you recognize what this is.

23          (A document was passed to the witness.)

24  A.    Another CSMD, and at this time, for Cyndal Story.

25  **BY MR. DAMAS:**

1   Q.   For Cyndal Story.

2        **MR. DAMAS:**  I move to admit, Your Honor, PMP

3   data for Cyndal Story.

4        **THE COURT:**  We'll receive it.  It will be

5   Number 94.

6        (The above-mentioned item was marked as

7   Exhibit No. 94.)

8   **BY MR. DAMAS:**

9   Q.   All right.  So on this previously marked exhibit,

10  this is the first instance that Jeff Young prescribes

11  alprazolam and hydrocodone to Ms. Story; is that correct?

12  A.   Correct.

13  Q.   Okay.  And we can take a look at Ms. Story's PMP.

14  She had been receiving those types of medications prior

15  to coming under the care of Mr. Young; is that correct?

16  A.   Correct.

17  Q.   So continuation of care --

18  A.   Correct.

19  Q.   -- right?

20       And that was left out from the summaries, correct?

21  A.   Correct.

22  Q.   Okay.  And you said the reason you're leaving out

23  this information is because it's not relevant to your

24  case?

25  A.   We specifically stated that these PMPs were from

1   Jeff Young's prescribing, and those -- a prescriber

2   that's not Jeff Young is not being specific examples to

3   the crime we investigated.

4   Q.   Because -- once again, because it's not relevant to

5   your case, to your burden of proof, right?

6   A.   Correct.

7   Q.   But it is relevant as to whether Mr. Young was

8   continuing the care of prior -- prior prescribings,

9   patients?

10  A.   Not necessarily.

11  Q.   Okay.  Let's go to Ben Elston, Mr. Young's

12  bodyguard.  Previously Exhibit 83.

13       You recognize what this is?

14       (A document was passed to the witness.)

15  A.   Another PIP or CSMD.

16  **BY MR. DAMAS:**

17  Q.   For Mr. Ben Elston?

18  A.   Yes, sir.

19       **MR. DAMAS:**  Move to admit, Your Honor.

20       **THE COURT:**  95.

21       (The above-mentioned item was marked as

22  Exhibit No. 95.)

23  **BY MR. DAMAS:**

24  Q.   So for Mr. Elston, the first time Mr. Young gives

25  him a prescription is September 25, 2014?

1    A.    Correct.

2    Q.    And just quickly looking at his PMP data, prior to

3    2014, he's also receiving that type of medication from

4    other prescribers, correct?

5    A.    Correct.

6    Q.    And once again, the reason you left this out is

7    because it's not relevant to the case you were trying to

8    prove --

9    A.    Correct.

10   Q.    -- correct?

11         I know you did it with Mr. Chad Newsom.  You looked

12   at whether there was a clinical visit or not.  Did you do

13   that for the rest of these?

14   A.    Yes.

15   Q.    Were you able to verify that many times, most of

16   the time, these were in relation to an office visit?

17   A.    Can you repeat that question?

18   Q.    Were you able to verify that a lot of these

19   prescriptions are being prescribed after an office visit

20   was conducted?

21   A.    Yes.

22   Q.    Okay.  And I can go through and show the instances

23   of each time where the PMP wasn't completely shown here,

24   but just last one:  Mr. Jay Green.  I believe he was

25   previously marked Exhibit 84.

1        Is -- did you include, in Mr. Jay Green's summary

2   regarding his PMP, when he was receiving prescriptions

3   for opioids at the same time from other prescribers when

4   he didn't see Mr. Young?

5   A.    Are you saying in the --

6   Q.    In the time -- in the relevant time frame of this

7   summary?

8   A.    If it didn't have anything to do with Jeff Young,

9   it was not put into --

10  Q.    So it wasn't -- it wasn't included.

11        Okay.  I seem to recall -- it might have been

12  yesterday -- testimony over Ms. Daphne Montoya.  It might

13  have been this morning, honestly.  It's just been two

14  very long days.

15        You testified to the fact that Ms. Montoya was

16  using an alias.  Daphne Joyner versus Daphne Montoya?

17  A.    Correct.

18  Q.    Do you have any information as to whether or not

19  that's really just the difference between somebody's

20  maiden name and somebody's married name?

21  A.    Yeah, it'd still be an alias.

22  Q.    Okay.  And you don't know -- did you get any

23  information that during that relevant time period where

24  both names were being used of whether or not she was

25  going through a divorce?

1    A.    I'm not sure.

2    Q.    Would that explain why the two different names?

3    A.    Say that -- can you repeat that question?

4    Q.    With her -- with her going through a divorce during

5    that time period, would that explain?

6    A.    It's possible.

7    Q.    Okay.

8          **MR. DAMAS:**  No further questions, Your Honor.

9          **THE COURT:**  All right.  Thank you.

10         Any redirect?

11         **MR. PENNEBAKER:**  Just one question or two, Your

12   Honor.

13                    **REDIRECT EXAMINATION**

14   **BY MR. PENNEBAKER:**

15   Q.    Special Agent Scales, are we looking at

16   Exhibit Number 95 again?

17   A.    Yes.

18   Q.    Mr. Elston's CSMD data?

19   A.    Yes, sir.

20   Q.    And it looks like the first prescription from the

21   defendant is the oxycodone, 325, 7.5 on 9/25 of 2014?

22   A.    Yes.

23   Q.    And, indeed, you see that he is not the first

24   person to prescribe controlled drugs to Mr. Elston, is

25   he?

 1    A.    No.

 2    Q.    It looks like there are a few other providers, even

 3    just during this short time frame, about a month.

 4    Between August 12th and September 12th of 2014?

 5    A.    Correct.

 6    Q.    Buprenorphine is used to treat heroin and methadone

 7    addiction, isn't it?

 8    A.    Yes.

 9          **MR. PENNEBAKER:**  No further questions, Judge.

10          **THE COURT:**  Recross based on that, Mr. Damas?

11          **MR. DAMAS:**  No, Your Honor.

12          **THE COURT:**  All right.  Thank you.

13          Special Agent Scales, thank you very much.  You

14    can step down.

15          (The witness complies with the request.)

16

17

18

19

20

21

22

23

24

25

1                           **TRICIA AULTMAN, M.D.,**

2    having been first duly sworn, was examined and testified

3    as follows:

4                           **DIRECT EXAMINATION**

5    **BY MS. PAYERLE:**

6    Q.    Good morning, Dr. Aultman.

7    A.    Good morning.

8    Q.    Will you please introduce yourself to the jury,

9    your name, your job.

10   A.    Okay.  My name is Tricia Aultman.  I'm an internal

11   medicine doctor in Gulfport, Mississippi.  I work

12   currently as a hospitalist, so I see patients only in the

13   hospital.  I've previously had a clinic and done both as

14   well.

15   Q.    How long have you been practicing medicine?

16   A.    I graduated from medical school in 1996, and I

17   finished my training in 1999.

18   Q.    And do you -- could you describe for the jury your

19   experience prescribing controlled substances?

20   A.    It's definitely something I do every day, rounding

21   in the hospital.  We have a really sick cancer ward, and

22   when I'm on there, it's -- it's a daily thing.

23   Q.    And how about -- could you describe to the jury

24   your experience running a clinic?

25   A.    I did for many years.  Back before there were

1    hospitalists, you used to go to the hospital, and then

2    you would go to the clinic, and then you'd go back to the

3    hospital.  I did it.  I owned my own clinic for a while,

4    and I was also employed by a hospital for a while.

5    Q.    And you said you were in internal medicine; is that

6    right?

7    A.    Yes, ma'am.

8    Q.    Can you describe for the jury what internal

9    medicine is?

10   A.    So internal medicine is a doctor for an adult.  So

11   a family practice, you see all ages, and internal

12   medicine is usually over 15 or wherever you're kind of

13   comfortable.

14   Q.    But is it a -- is it a -- sort of, do you

15   concentrate on a particular part of the body, or is it a

16   general care kind of job?

17   A.    No, it's a total care of an adult patient.

18   Q.    And how about your experience working with nurse

19   practitioners?  Could you describe that to the jury?

20   A.    We have nurse practitioners that we work with every

21   day in our group.

22   Q.    Have you ever testified for the government before

23   in cases involving prescriptions for controlled

24   substances?

25   A.    Yes, ma'am.

1   Q.    And in particular in cases involving prescriptions

2   for controlled substances in a family practice setting?

3   A.    Yes, ma'am.

4           **MS. PAYERLE:**  At this time, Your Honor, the

5   government moves to qualify Dr. Aultman in the field of

6   internal medicine, including the professional practice

7   and legitimate medical purpose of prescribing opioids,

8   benzodiazepines, and other controlled substances.

9           **THE COURT:**  That's a mouthful.

10          **MS. PAYERLE:**  Yes, sir.

11          **THE COURT:**  Mr. Ferguson, anything on that?

12          **MR. FERGUSON:**  No.  We've met before.  She's

13  been a witness previously, and we would also accept her

14  as an expert.

15          **THE COURT:**  All right.  Thank you.

16          Ladies and gentlemen, we are going to receive

17  Dr. Aultman as an opinion or expert witness in the field.

18  Ladies and gentlemen, what this means is -- used to call

19  them expert witnesses.  Now they're called opinion

20  witnesses.  Because of training, experience, things like

21  that, education, this allows this witness to be able to

22  give opinions on the certain areas relative to the area

23  that she's being held out as an opinion or expert

24  witness.  I have an instruction for you on how to handle

25  opinion or expert testimony at the end of the case, but

1   this witness will be allowed to give opinions.

2              You may proceed.

3              **MS. PAYERLE:**  Thank you, Your Honor.

4   **BY MS. PAYERLE:**

5   Q.    Dr. Aultman, in preparing for your testimony today,

6   did you review patient records that were collected from

7   Mr. Young's clinic?

8   A.    I did.

9   Q.    And did you also review videos showing -- showing

10  the defendant interacting with patients?

11  A.    Yes, ma'am.

12  Q.    And distributing controlled substance

13  prescriptions?

14  A.    Yes, ma'am.

15  Q.    Focusing on opioid prescriptions, can you tell the

16  jury your opinion about whether, in anything you

17  reviewed, you saw Mr. Young distributing opioids in the

18  ordinary course of professional practice for a legitimate

19  medical purpose?

20  A.    No, I did not.  I feel like it was way outside what

21  a legitimate medical visit would be.

22  Q.    And we will talk more about sort of what that means

23  in a moment.  But how about some benzodiazepines like

24  Xanax and Klonopin?  Can you tell the jury your opinion,

25  generally, about Mr. Young's distribution of those

1    substances based on what you reviewed?

2    A.    I feel like they were used -- over used and used

3    for indications that weren't necessary and used in

4    combination with opioids, which is dangerous because when

5    you take those medicines together, it can actually cause

6    increased sleepiness.  And there's actually a "black box"

7    warning on those now, which means you shouldn't prescribe

8    them together.

9    Q.    And so in those cases, which, again, we'll describe

10   in more detail later, was Mr. Young distributing

11   benzodiazepines in the ordinary course of professional

12   practice for a legitimate medical purpose?

13   A.    No, ma'am.

14   Q.    And then did you also see him prescribing other

15   controlled substances like Adderall or muscle relaxants?

16   A.    Yes, ma'am.

17   Q.    And could you describe your opinions about his

18   prescriptions of Adderall and muscle relaxants?

19   A.    In regards to Adderall, there was never a history

20   taken for attention deficit disorder.  There was, you

21   know, no questioning of the person, like, when were you

22   diagnosed as a child?  How long have you taken this

23   medication?  It was basically just, you know, said that

24   they have ADD, and the medicine was given.  It was also

25   sometimes given to patients that had high blood pressure

1   or heart problems, which can be dangerous.  And the

2   muscle relaxants, again, in combination with opioids or

3   benzodiazepines, can cause excessive sedation.

4   Q.    Now, I want to dive into the basis of those

5   opinions, but first address his records generally.

6         If you had to sort of grade the quality of

7   Mr. Young's professional practice in terms of his medical

8   record-keeping skills, A to F, how would you grade him?

9   A.    I would say F.

10  Q.    Okay.  And now -- but if he had -- if those records

11  had been pristine and organized but contained the same

12  information, would that change your opinion?

13  A.    No.

14  Q.    Even if they had been sort of more fully papered,

15  would that have changed your opinion?

16  A.    It would not change my opinion about the

17  prescriptions being written inappropriately.

18  Q.    All right.  So let's set a baseline for your

19  opinion about -- I'm going to take that long phrase, the

20  legitimate medical purpose of opioids in the course of

21  professional practice.  It's just a long phrase, so I

22  want to break it in two.

23  A.    Yes, ma'am.

24  Q.    Let's start with the legitimate medical purpose of

25  opioids.

1      Do opioids, benzodiazepines, and Adderall and other

2   controlled substances have legitimate medical purposes?

3   A.    Yes.  Absolutely.

4   Q.    All right.  Let's start with opioids.  Can you give

5   the jury some examples of, first of all, some of the

6   opioid drugs that Mr. Young was prescribing?

7   A.    So he was prescribing hydrocodone and hydrocodone

8   with Tylenol, which is commonly known as Lortab or Norco,

9   some older Vicodin.  He was prescribing oxycodone

10  which -- alone and with Tylenol, which is commonly known

11  as Percocet.  He was also prescribing fentanyl patches.

12  Q.    Okay.  And how about hydromorphone.  Was he

13  prescribing the --

14  A.    Yes, there was some hydromorphone as well.

15  Q.    All right.  And is there -- in terms of the

16  strength of these drugs, the jury's heard some testimony

17  about --

18          **THE COURT REPORTER:**  Excuse me.  Slow down,

19  please.

20          **MS. PAYERLE:**  Oh, I'm so sorry.  Thank you.

21  **BY MS. PAYERLE:**

22  Q.    The jury has heard some testimony about what --

23  what some of these drugs are stronger than others.  Can

24  you explain how the strength of an opioid is measured

25  against each other?

1    A.    So there is a -- a grading scale called a morphine

2    milligram equivalent, and what that means is that they

3    compare everything to one milligram of morphine.  So

4    hydrocodone is the same, so it's a one for one.  So

5    5 milligrams of hydrogone (phonetic) is 5 milligrams of

6    morphine.  Oxycodone is one and a half times, so 10

7    milligrams of oxycodone is 15 milligrams of morphine.  A

8    fentanyl patch is strong.  A 25-microgram patch is the

9    same as 60 milligrams of morphine.  And they're measured

10   in milligrams of morphine per day.

11        It's hard sometimes to calculate it all, but

12   there's -- you know, calculators online now makes it

13   really easy.  You just plug in the drugs that they're

14   taking, and you can calculate out how much it equates to

15   in morphine.

16   Q.    And can you give us kind of a sense of how many

17   MMEs or milligram -- sorry -- morphine milligram

18   equivalents -- can you give you sense of, like, the --

19   put some numbers on that, you know, where it's normal,

20   what a new patient gets, what a tolerant patient gets,

21   things like that?

22   A.    Right.  So a new patient, probably 10 to 15 is

23   plenty.  People, over time, develop tolerance, and

24   sometimes you do you have to go up on that.  Definitely

25   over 90 starts to increase the risk of overdose and

1    oversedation, hospitalizations related to that.  So 90 is

2    sort of a general cutoff for when things start to get a

3    lot more dangerous.

4    Q.    And you're talking about 90 --

5    A.    Morphine milligram equivalents per day, yes, ma'am.

6    Q.    So let's talk about the purpose of opioids.  What

7    is the legitimate medical purpose of these opioid drugs

8    that you're describing?

9    A.    So they're used for pain relief.

10   Q.    Any kind of pain relief?

11   A.    They're used -- useful for acute pain.  So when you

12   have, like, an injury right away, opioids are good for

13   that, short-term, you know, three to five days a week or

14   less.  They're good for post-surgical pain.  Obviously

15   gets something cut on, you're going to need pain relief,

16   either IV or by mouth, for a while.

17         Opioids actually, for chronic pain, have been

18   studied a lot, and they really don't help.  They really

19   cause more problems than benefits.

20   Q.    When you say "chronic pain" and -- could you

21   compare that to what you mean by acute pain?  Just

22   familiarize the jury.

23   A.    Right.  So acute pain is like probably maybe less

24   than, depending on the definition you look at, 30 days,

25   and chronic pain is six weeks to three months, and you're

1   still having pain or longer than what you would expect

2   for something to get healed.

3   Q.   And you said that there's been studies done showing

4   opioids aren't really appropriate or helpful for chronic

5   pain.  Can you kind of tell the jury when, in time -- you

6   know, what year or so those studies became pretty widely

7   understood and accepted in the medical community?

8   A.   I think it was the -- it was definitely, I would

9   say, around 2010 probably.  There was enough evidence to

10  prove that by then.

11  Q.   And when you say that opioids make chronic pain

12  worse, that's kind of counterintuitive.  Can you explain

13  how opioids make chronic pain worse?

14  A.   So sometimes what happens when you take opioids for

15  a long time is you become overly sensitive, so any

16  normal, maybe, brush or, you know, hit your hand on a

17  table becomes extraordinary painful.  And so instead of

18  actually get pain relief, you actually become

19  oversensitive to pain.  And the side effects of opioids

20  are, you know, significant.  They cause oversedation;

21  they're habit forming; they cause terrible constipation;

22  they cause nausea, vomiting.

23  Q.   What do you mean by "habit forming"?

24  A.   So even if you don't want to become addicted to an

25  opioid, if you take it long enough, eventually it won't

1    work at the same dose.  You'll need an increase dose.  We

2    see this in cancer patients who have chronic, severe pain

3    for a very long time, that eventually you have to

4    increase the dose to get pain relief.

5    Q.    And does -- is -- are there any consequences of

6    becoming dependent on opioids?  What -- what are the

7    risks of that?

8    A.    So if you take opioids every day, eventually if you

9    don't take them, you won't feel normal.  You'll have

10   withdrawal, which can be shaking; it can be chills; it

11   can be, like, goose flesh or goose bumps, nausea,

12   vomiting, diarrhea, and basically like an all-over pain.

13   So eventually you're taking it just to avoid having a

14   withdrawal.

15   Q.    And does that happen with everybody who takes

16   opioids for a certain amount of time?

17   A.    I mean -- so everybody will develop a tolerance.

18   So tolerance is something that happens in everybody,

19   whether you want it or not, when it just means that you

20   may need more medicine to get the same relief.

21         Dependence and misuse is different.  That means you

22   start to do things that are inappropriate in order to

23   continue to get the medication that you need.  That may

24   be, you know, crimes; it may be ignoring your family,

25   quitting your job, stealing from people, whatever it is,

1   and that's when it becomes a bad use of the medication.

2   Q.    And do we call that -- I mean, is that what

3   addiction is?

4   A.    Yes, ma'am.

5   Q.    Okay.  Aside from addiction and dependence, those

6   are two different things, right?

7         Physical dependence, and then addiction is the

8   acting out?

9   A.    Right.

10  Q.    Okay.  Aside from addiction and dependence, what

11  other risks are there of prescribing opioids?

12  A.    To the patient or the -- to the --

13  Q.    To the patient.

14  A.    Yeah.  So the risk of addiction, dependence, if,

15  for example, someone who takes a lot of opioids gets

16  hospitalized for another reason, it's really, really

17  difficult to control their pain.  That's probably the

18  biggest thing that I see, that people that take a lot of

19  medicine and then they have surgery and, you know, you

20  get the call and they're just horrifically in pain

21  because they haven't had their normal daily medicine, and

22  we're giving them a usual dose, which is not helping at

23  all.

24  Q.    And what about risks of overdose or respiratory

25  issues, things like that?

1   A.      So definitely risk of overdose, especially when you

2   get over 90 morphine milligram equivalents or MME,

3   especially when given with benzodiazepines, particularly

4   in someone who's overweight and may have sleep apnea or

5   may have some other medical issue, whether it be lungs

6   or heart, that would contribute to that.

7   Q.      And why -- why does the risk of overdose increase

8   if you combine the opioids with the benzodiazepines, as

9   you just said?

10  A.      It just causes excessive sedation, more than what

11  you would get if you took either one alone.  When you put

12  them together, it's kind of -- it's kind multiplicative

13  or adds on.

14  Q.      Does it also -- when you add them together, does it

15  also increase the high of both of them if that -- if

16  you're a person in whom it causes a high?

17  A.      It does.  And it's known to be abused, the opioids

18  in combination with benzodiazepines and sometimes in

19  combination with one of the muscle relaxers as well.

20  Q.      Okay.  Let's talk for a minute about fentanyl.

21  Could you describe for the jury -- give them a sense of

22  the strength of fentanyl as compared to the other opioids

23  we've been talking about.

24  A.      So fentanyl, like we talked about earlier, when

25  used in a patch is indicated for use in people that have

1    been on opioids at 16 -- I'm sorry; 6-0 -- 60 morphine

2    milligram equivalents of some opioid a day for at least a

3    week.  In other words, it's not for someone who's never

4    taken opioids before, and it's not for someone who's on a

5    small dose of opioids.  It's indicated for people who

6    have taken at least 60 MME for a week.

7         Probably the biggest use in the hospitals -- two

8    things:  One is in cancer pain.  It provides a continuous

9    release of pain for people that have things like invasion

10   of organs or bones or something that's extraordinarily

11   painful.

12        It's also used sometimes with our cardiothoracic or

13   our heart surgeons.  They put it on in the operating room

14   at a low dose.  And then the person's going to be in the

15   ICU for several days.  They can be easily monitored.  So

16   although those people are naived opioids, they're going

17   to be monitored in a ICU setting.

18   Q.   Even though it's a patch -- you don't swallow a

19   pill -- is it still as dangerous as any other opioid?

20   A.   It's actually -- it perhaps is more dangerous

21   because it has a slow onset.  So you could put the patch

22   on, and then by the time you go to sleep, its effects are

23   getting into your bloodstream.  And so it's a heightened

24   effect by then, and it's significantly stronger than

25   other opioids that are commonly taken.  Like a

1    25-microgram patch is equal to 60 morphine milligram

2    equivalents.  A 50-microgram patch is equal to 120

3    morphine milligram equivalents.

4    Q.    Okay.  Now, is it a legitimate medical purpose of

5    opioids to feed or create an addiction to them in your

6    patient?

7    A.    No.  It's actually harmful.

8    Q.    Is it a legitimate medical purpose of opioids to

9    get somebody through kind of get somebody through

10   withdrawals or detox indefinitely?

11   A.    No.  They're -- there's definitely ways to do that,

12   and, you know, continuing to prescribe different doses of

13   opioids is not the way.

14   Q.    And did you see Mr. Young doing that in this case?

15   A.    He did.

16   Q.    Okay.  Is it -- and these may be just completely

17   obvious, but is it a legitimate medical purpose of

18   opioids to induce someone to have sex with the person

19   prescribing the drugs?

20   A.    No, ma'am.

21   Q.    Or to create a reputation for being unconventional?

22   A.    No, ma'am.

23   Q.    Or to pay somebody back for being a friend or for

24   their loyalty?

25   A.    No, ma'am.

1    Q.    What about to get in good with a famous member of a

2    band?

3    A.    No, ma'am.

4    Q.    No.  Okay.

5          Let's talk about benzodiazepines next.  Can you

6    give an example of some benzodiazepines?

7    A.    So common names for benzodiazepines are Valium,

8    Ativan, Xanax, and Klonopin.

9    Q.    And those are brand names?

10   A.    Yes, ma'am.

11   Q.    And what are the -- sort of the drug names for

12   those the brands?

13   A.    So diazepam, lorazepam, oxazepam, alprazolam.  I

14   think we got them all.  And --

15         (Indiscernible cross-talk was had.)

16         **THE COURT REPORTER:**  One second.

17         **THE COURT:**  Y'all were talking over each other.

18         **MS. PAYERLE:**  I know.  I'm sorry.

19         **THE COURT:**  She can't get it down.

20   A.    Clonazepam.  And yes, most of the benzodiazepines

21   have a "pam" at the end.

22   **BY MS. PAYERLE:**

23   Q.    Okay.  You -- you testified you've prescribed these

24   drugs in the context of a family practice.  How often?

25   A.    That's difficult to answer.  I think you definitely

1    have to have an indication for it.  Probably the most

2    common way I would prescribe them is in an older person

3    that has restless legs.  If you use a really low dose of

4    Klonopin, that usually works.

5         Benzodiazepines don't work for anxiety disorder.

6    They're just not indicated.  It doesn't help.  There's

7    other drugs that are better for that.  You can use them

8    for panic attacks.  Like a good example, I had a patient

9    who couldn't drive over the bridge to get to her

10   grandkids in New Orleans.  But if she took a teeny-tiny

11   dose, she was able to drive through.  So I maybe

12   prescribed her five a year.

13        Same with airplane flights.  That was another,

14   probably, indication I would use it in my private

15   practice.

16   Q.   And you said you'd give them a teeny-tiny dose.

17   Let's talk for a minute about dosing.

18        For benzodiazepines, what is the kind of

19   introductory, if a doctor decides that a benzodiazepine

20   is appropriate?

21   A.   So probably for a Xanax, it would be .25.  For

22   Ativan, .5.  For Valium, probably 2 milligrams.

23   Q.   Okay.  So Xanax -- just to do some math, a Xanax

24   1-milligram pill is like four times the introductory

25   dose --

1    A.    Yes, ma'am.

2    Q.    -- of Xanax?

3          Okay.  And do you know what the highest dose pill

4    of Xanax available is?

5    A.    I think they make 2-milligram pills.  I'm not sure

6    if they make anything higher.

7    Q.    All right.  And then what about with OxyContin?

8    What are the kind of dose levels for -- or oxycodone;

9    sorry.  What are the kind of dose levels for oxycodone?

10   A.    So oxycodone, like an introductory dose of Percocet

11   for acute pain, would be 5 milligrams.  You can do 2.5 as

12   well, if it's small person with, like, no tolerance and a

13   mild pain.

14   Q.    And so what -- what dosages do oxycodone pills go

15   up to?  Do you know?

16   A.    Oxycodone itself, I think, probably goes at least

17   to 20.  OxyContin, the longer acting, goes up much

18   higher.

19   Q.    Okay.  And if you were -- if you saw somebody was

20   prescribed an oxycodone or oxy 30 milligram -- well,

21   maybe we'll just look at it later.  We'll take a look --

22   A.    Yes.

23   Q.    -- when you have an example.

24   A.    I think they go up higher.

25   Q.    Okay.

1   A.    It's just not used very frequently because if you

2   get to a higher dose of oxycodone, the use, you should be

3   using the long-acting formulation instead.

4   Q.    I see.  The long-acting formulation.

5   A.    Yes, ma'am.

6   Q.    Explain the difference there between the longer

7   acting and short acting.

8   A.    So the idea behind the long acting is that you

9   don't have breakthrough pain, that you can take it every

10  12 hours.  It's sort of easier for someone's lifestyle if

11  you're working or certainly easier on the nursing staff

12  to dose something twice a day than every four or six

13  hours.

14  Q.    And does it just sort of slowly absorb?  How does

15  it work?

16  A.    Right.  So I don't know the biochemistry of it, but

17  I know that they're meant to be long acting.  And part of

18  the long-acting thing is also an abuse deterrent, that

19  they're more difficult to abuse.  Of course there's

20  always a way around that, I think, but . . .

21  Q.    And you said you've been in charge of a clinic?

22  A.    Yes, ma'am.

23  Q.    To how many of your employees, when you were in

24  charge of a clinic, did you prescribe monthly doses of

25  Xanax?

1   A.    None.

2   Q.    And how about Adderall?

3   A.    No, ma'am.

4   Q.    All right.  Speaking of Adderall -- and actually,

5   can you give the jury your opinion about whether it would

6   be appropriate to do so?

7   A.    To prescribe to your employees?

8   Q.    Yes, to prescribe to most or all out of your

9   employees.

10  A.    No, I think it's very difficult to maintain

11  professional relationship if you're seeing somebody for a

12  substance that could be a -- potentially abused.  I think

13  it'd be really hard to be unbiased and fair as an

14  employer and the doctor.

15  Q.    And can you explain to the jury why it's so

16  important, with controlled substances specifically, to

17  have that distance or that professional relationship with

18  the people to whom you're prescribing?

19  A.    I think you have to be very careful when you're

20  prescribing a controlled substance, that you're doing it

21  honestly and that you're not doing it because you feel

22  bad for somebody or you don't want them to be angry with

23  you or you don't want them to be disappointed in any way.

24  You have to be doing it for a legitimate medical reason.

25  Q.    Is it harder to do that if you have personal

1   involvement with the person?

2   A.    Yes, it'd definitely be harder to distance

3   yourself.

4   Q.    All right.  Let's talk about Adderall quickly.

5   What is the legitimate medical purpose of Adderall?

6   A.    It's used for attention deficit hyperactivity

7   disorder.  Sometimes it's used in people that have

8   chronic sleep apnea and sleep disorders to take in the

9   morning.

10  Q.    And how do you determine whether somebody has --

11  let's take attention deficit disorder?

12  A.    So attention deficit sorter (as heard), the

13  definition at least back in the 2014-'16-'18 time era,

14  you had to have a pretty specific set of symptoms that

15  the psychiatry board lays out, and you have to have those

16  symptoms -- like five out of six or five out of ten

17  symptoms present every day for six months.

18        So when you diagnose, you have to be very careful

19  to take a history.  And there are definitely check-off

20  sheets you could get off the internet and check off.  You

21  know, they have six out of ten or whatnot.  Also, just

22  ask them, you know, did you have ADD as a kid, and how

23  was it treated, and how long did you take medicine, and

24  what did it do for you?

25  Q.    And if -- is this form you're talking about, it's a

1  test that's just a form?

2  A.    You can do that.  You can also send someone for

3  psychologic testing, which is pretty involved.  I think

4  it's a lot more common to do that in kids.

5  Q.    And does Adderall have risks associated with it?

6  A.    It does.  So it can cause elevated blood pressure;

7  it can cause a rapid heartbeat or tachycardia; it can

8  cause weight loss, shakiness, jitteriness, weight loss.

9  Q.    And is, in fact, it's sometimes prescribed for

10  purposes of weight loss or abused for that purpose?

11  A.    It's abused for that purpose.  It's not a

12  legitimate medical indication to use it.

13  Q.    All right.  Let's talk about the professional

14  practice.  So we talked about legitimate medical

15  purposes.  Now we're getting into the professional

16  practice or the ordinary course of professional practice

17  of prescribing these drugs.

18        When you talk about sort of the practice of

19  medicine generally, what -- what does that discipline

20  refer to?  What set of steps and sciences does that

21  discipline refer to?

22  A.    So the practice of medicine is using your skills

23  and a history taking and examination and ordering things

24  together to come to a diagnosis to treat the patient and

25  most importantly to do so without causing any harm.

1    Q.    What does it mean to diagnose a patient?

2    A.    So "diagnose" means to find the cause of the

3    illness.  What's the underlying disorder?

4    Q.    And it sounds silly, but why do you need to do

5    that?

6    A.    You need to find a diagnosis for two reasons,

7    really:  One is so you know what you're treating.  You

8    have to know what you're treating to know how to treat

9    it, right?  So back pain can be kidney stones, ovarian

10   cysts, uterine fibroids, pregnancy.  It can be a lot

11   things, so you have to know what you're treating.

12          And the second reason that you need a diagnosis is

13   so you don't miss something.  You don't ever want to miss

14   something horrible that someone has because you weren't

15   thorough when you worked it up.

16   Q.    And can you give an example of that kind of a

17   scenario?

18   A.    Yeah.  Actually, I was a third-year resident, and

19   it sticks with me well because I was young and

20   impressionable.  But I was called to the ER to admit a

21   patient, and I was on the cancer service.  And the story

22   was that this guy had come to the ER every Friday after

23   work.  He was a construction worker.  Every Friday, he

24   complained of back pain, and someone in the ER would say,

25   you know, just give him some Lortab and just he'll go

1    away.  And then somebody finally said, you know what?

2    Let's scan this guy and see what's wrong with him, and we

3    can tell him, you know, there's nothing wrong with you.

4    You have a pill problem.

5         And so lo and behold, they scan this guy.  He had

6    an enormous lymphoma, which is a tumor that was pressing

7    on all kinds of things.  And I had to admit him for sort

8    of urgent chemotherapy.  So that's why it's important to

9    go do an investigation so you don't miss something.

10   Q.    And through that diagnosis, were you able to treat

11   the cancer rather than give him pills?

12   A.    Yes, ma'am.

13   Q.    What does the process of finding a diagnosis look

14   like?

15   A.    So in the clinic or --

16   Q.    Uh-huh, in a clinic.

17   A.    Right.  So it's -- it compose of, first you got to

18   talk to the patient, right?  Sometimes it's -- so surveys

19   you have to fill out with a lot of questions.  Those have

20   become really popular.  But ultimately, the physician and

21   the provider has to take a history.  So you ask what

22   symptoms do you have; how long have they been there?  Is

23   there anything make them better, make them worse?  And

24   then you go through their past medical history.  So what

25   other problems you have?  Hypertension, diabetes,

 1    coronary disease.

 2          Then you go through their social history:  Do you

 3    smoke?  Do you drink?  Do you have any history of drug

 4    abuse?  Is there abuse in your family?  Have you ever

 5    been sexually abused?  And then a family history is, you

 6    know, basically your parents, brothers, sisters.  Then

 7    you do a physical examination.  You may actually, you

 8    know, also order tests or labs or review older labs or

 9    tests.  And then finally you kind of pull everything

10    together in an assessment and plan.  An assessment is

11    basically your diagnosis and then the plan to treat it.

12    Q.    I'm going to ask you about something called

13    continuity of care.  Is it within the scope of

14    professional to just prescribe whatever the last doctor

15    prescribed and call it a day?

16    A.    No.  You're actually under no obligation to

17    continue the therapy that somebody else was giving.  you

18    have to make your own independent evaluation.

19    Q.    So what does the phrase "continuity of care"

20    actually refer to?

21    A.    Continuity of care refers to a patient that comes

22    to me, and they may have hypertension, and I need to

23    continue that medication in a way of good treatment, if

24    it's the best thing for them.  Let's intervene if I feel

25    like something else needs to be added.

1    Q.    So if it turned out that patient did not, in fact,

2    have hypertension in your opinion, would it be right to

3    continue the care?

4    A.    No, ma'am.

5    Q.    Have you ever heard of doctor shopping in a

6    controlled substance context?

7    A.    Yes, ma'am.

8    Q.    What is doctor shopping?

9    A.    So doctor shopping is when a patient goes from

10   various ERs or urgent cares or primary care practices to

11   try to obtain opioids or benzodiazepines or other desired

12   drugs.

13   Q.    So with controlled substances, is it more important

14   or less important than in the case of high blood pressure

15   to make an independent evaluation of whether the patient

16   in front of you needs opioids from you, the doctor?

17   A.    It's way more important.

18   Q.    Describe why for some --

19   A.    It's a controlled substance.  It's dangerous.

20   There's laws regarding its use.

21   Q.    Okay.

22          **MS. PAYERLE:**  I may have just a moment.

23          Okay.  At this time, Your Honor, I'd like to

24   show the witness Exhibit 21, which is already in

25   evidence.

1          THE COURT:  This may be -- excuse me.  This may

2    be a good time to go ahead and break for lunch.

3          MS. PAYERLE:  Absolutely.  It's perfect timing.

4    Thank you.

1      **THE COURT:**  Ladies and gentlemen, we're going to

2  go ahead and break for lunch at this time.  It's about

3  12:15, so we'll pick this up at 1:30.  Your lunch is

4  already in there waiting for you.  Please enjoy it.  It's

5  a long break.  And as I said, we'll pick it up at 1:30.

6  Leave your notebooks, don't discuss, and I'll see you

7  after lunch.

8      (Jury out at 12:14 p.m.)

9      **THE COURT:**  Dr. Aultman, don't discuss your

10 testimony with anyone over the break.

11     **THE WITNESS:**  Yes, sir.

12     **THE COURT:**  You can step down.

13     **THE WITNESS:**  Okay.

14     (The witness complies with the request.)

15     **THE COURT:**  Okay.  I'll see everyone at 1:30,

16 maybe a few minutes before, because I need to hear

17 further, if you have an update for me about defense

18 proof.

19     **MR. FERGUSON:**  I'll check on that right now.

20     **THE COURT:**  Appreciate it.  Thank you.

21     **MR. FERGUSON:**  Yes, sir.

22

23     (The morning session concluded at 12:15 p.m.)

24

25

*UNREDACTED TRANSCRIPT*

```
 1                    CONTINUED DIRECT EXAMINATION
 2   BY MS. PAYERLE:
 3    Q.   Okay.  Welcome back.  Dr. Aultman, good afternoon.
 4   Okay.  Just before the break, we were talking about the
 5   concept of continuity of care and the importance of making an
 6   individual determination for the client -- or to the patient,
 7   pardon me; is that right?
 8    A.   Yes, ma'am.
 9    Q.   Okay.  At this time, I'd like to introduce, or,
10   actually, just put up for the jury Exhibit 21.
11         Dr. Aultman, Exhibit 21, which is already admitted,
12   will appear on your screen in front of you momentarily.  Now,
13   is this a patient record for Hope Rogers, which you have
14   reviewed in connection with this case?
15    A.   Yes, ma'am.
16         MS. PAYERLE:  Excuse me.  Could we please go to
17   page 74 of this document.
18   BY MS. PAYERLE:
19    Q.   All right.  Dr. Aultman, could you orient the jury to
20   what -- are you going to be testifying about a few, not very
21   many, but just a few of these documents that look like this?
22    A.   Yes, ma'am.
23    Q.   All right.  Could you orient the jury to what kind of
24   a document this is within the patient file.
25    A.   So in this practice's medical records, all of the new
```

**UNREDACTED TRANSCRIPT**

```
 1   patient visits were in pink, which was actually nice.  It was
 2   easier for me to scroll to find the first visit because there
 3   was a lot of pages of a lot of files.
 4        So you see here, it has a patient name and
 5   demographics on top and then their chief complaint, which is,
 6   you know, why are you here, kind of thing.  And then after
 7   that is review of systems.  And a review of systems is when a
 8   doctor goes through and is trying to ask you if there is
 9   anything else wrong, like starting really head to toe, like,
10   headaches, visual changes, blurry vision, and then your ears.
11   Do you have allergies, runny nose, ear infections, sore
12   throat, thyroid problems?
13        So you kind of go head to toe and then you can see
14   they circled the sinus there.  And then it looks like they're
15   going through some medical history there and listing her
16   allergies.  There's a place to document her shots, and then
17   there's a second page usually to the initial patient visit.
18             MS. PAYERLE:  Let's go ahead and flip to the next
19   page.  There we go.
20             THE WITNESS:  So on the top, the intake tech or
21   nurse or office staff has put in their active medications
22   right there.  Their surgical history, medical history,
23   personal history, and then you can see there, there's a small
24   place -- can I point on this?  Can I write on it?
25   BY MS. PAYERLE:
```

*EXAMINATION OF TRICIA AULTMAN, M.D.*  9

1    Q.   You might -- no --

2              MS. PAYERLE:  Can she --

3    BY MS. PAYERLE:

4    Q.   Oh, great.  You can use your finger.

5    A.   So right here where, I guess, circle it.  That is

6    where Mr. Young would document his exam.  I think that word

7    is exam from looking at enough of the records, and then you

8    can see also there's a typed area where you can write part of

9    the physical exam with the vital signs.

10   Q.   And then --

11             THE COURT:  Could you mark that again, please.

12             THE WITNESS:  I have to press on?

13             MS. PAYERLE:  Yes, maybe on the right there.

14             THE WITNESS:  The pencil didn't work.

15             THE COURT:  It's not working; usually you can.

16             MS. PAYERLE:  Oh, there it goes.

17             THE COURT:  Oh, there we go.

18             THE WITNESS:  That looks like on all the records

19   where Mr. Young starts to document his exam.  And a physician

20   or a nurse practitioner's exam is basically a bunch of

21   abbreviations, which makes sense to me, but probably not

22   anyone else.  So the first word there "test", and it says

23   CTA, which means clear to auscultation.  The heart exam,

24   right there.  The next one is RRR, which means regular rate

25   rhythm.  The next one is abdomen, soft and not tender, and

**UNREDACTED TRANSCRIPT**

1    extremities over here.  It says the typical wording is no

2    clubbing, cyanosis, or edema.  And then the neurologic exam,

3    he writes is grossly -- I don't know if that's normal.  I'm

4    not sure what that word is.

5    BY MS. PAYERLE:

6      Q.    Okay.  Before getting into more specifics, I think I

7    just want to address one thing you said, which is, there

8    were, in cases, a lot of pages in these records; is that

9    right?

10     A.    Yes.

11     Q.    Did that correspond -- I mean, did you see within

12   those pages that this sort of meant that he was doing

13   extremely thorough, careful, detailed work?

14     A.    No.  There was a lot of pages, but not a lot of

15   information.

16     Q.    Okay.  And the information that was there, would you

17   say it was mostly -- well, first of all, you know, how is his

18   handwriting?

19     A.    It's difficult to read.  I mean, I'm a doctor.  I'm

20   pretty good at that.  We used to all, you know, have

21   handwritten charts, and I had a partner that was horrific,

22   but it is still difficult for me to read even kind of knowing

23   what I'm looking for.

24     Q.    And setting aside just issues of handwriting or

25   clarity in terms of organization, I want to focus on just the

 1  substance of what you could understand.  Was it -- did it

 2  always, like, make sense from a medical perspective?

 3    A.   You know, most of the time it didn't make sense, and I

 4  spent a lot of time in the records, and they're scanned in

 5  kind of reverse chronological order.  So the first step was

 6  going through and trying to find the first visit and then

 7  trying to figure out what, you know, happened in that visit.

 8  And sometimes that meant I had to go through way back in the

 9  chart and look at the prescription monitoring program, which

10  is like a printout of what patients -- what the medicines

11  that were prescribed that day from a controlled substance

12  standpoint.

13    Q.   And why did you have to -- why did you have to look at

14  the prescription monitoring sheet to figure out what he had

15  prescribed?  Wasn't it just in his notes?

16    A.   It wasn't always in the notes.  And this one, for

17  example, it is, and I can read it, but it wasn't always in

18  the note, and it wasn't always readable.  And then the urine

19  drug screens and other thing were also scanned in, in a

20  different area of the chart.  So there was just a lot of

21  scrolling and back and forth.  It was very time-consuming.

22    Q.   And I want to get back to just kind of setting aside

23  just the mechanical kind of handwriting and organization

24  issues.  In terms of the substance of the charts, can you

25  talk to the jury a little bit more about the effort to just,

1  like, figure out what he was doing?

2  A.  It's very difficult to figure out and to make sense of

3  kind of the train of thought.  So, for example, in this

4  chart, he gives the impression that she has carpal tunnel

5  syndrome, lower back pain, anxiety, endometriosis, ulcerative

6  colitis, and inflammatory bowel disease.  But if you go back

7  to the history on the previous page, like, there's no talking

8  about any of that other than kind of a list of previous

9  problems.  None of that's, you know, discussed.  There's no

10  questions, like, how long have you had it, who diagnosed it,

11  you know, where were you tested?  So it's very scant in terms

12  of telling anything about how he got to the impression and

13  plan.

14  Q.  And, in fact, talking specifically about Ms. Rogers,

15  you know, which hand does she have carpal tunnel syndrome in

16  allegedly?

17  A.  It looks like the right to me, the R right here.

18  Q.  And did you find anything else in the file that would

19  call into question this diagnosis?

20  A.  Eventually, he gets -- well, he never does a physical

21  exam or documents a test for carpal tunnel, which is easy.

22  You just bend the person's hand back and you kind of tap

23  right there, and if they have carpal tunnel, it hurts.  But

24  he does get kind of an electro kind of diagnostic test called

25  an EMG, a muscle test.  And it was actually negative, and she

1   didn't have carpal tunnel syndrome.

2      Q.   All right.  And let's talk about ulcerative colitis.

3   That's in there.  Did you see anything in the record to

4   suggest anything about that, that she allegedly has?

5      A.   He never documented anything about it other than its

6   existence according to whatever history was taken here.  But

7   when I reviewed her ob-gyn records and stuff that were in his

8   chart, I believe that she had had a colonoscopy.  It was

9   normal, so she didn't have ulcerative colitis.

10     Q.   So she did haven't that either?

11     A.   No.

12     Q.   And what about ulcerative colitis and irritable bowel

13  syndrome, talk about the interaction of those two.

14     A.   So ulcer- -- irritable bowel syndrome can be just

15  abdominal pain with either constipation or diarrhea.

16  Ulcerative colitis is a much more serious illness in terms of

17  the need for medication.  So it may be that she had a lot of

18  abdominal pain with diarrhea and then someone said, oh, you

19  must have colitis, but she really didn't.

20     Q.   She didn't.  Okay.  Is it normal to have irritable

21  bowel syndrome and ulcerative colitis at the same time?

22     A.   No, you would -- you would just -- if you have

23  ulcerative colitis, you would not say that she had irritable

24  bowel syndrome.

25     Q.   Okay.  And under -- right under that CTS, is that LBP?

**UNREDACTED TRANSCRIPT**

 1   A.   Yes, ma'am.

 2   Q.   And what is that an abbreviation for?

 3   A.   Lower back pain.

 4   Q.   Okay.  What does it say next to lower back pain?

 5   A.   In parentheses, broken tailbone.

 6   Q.   And do -- I think we had a little information about

 7   how long ago that was in the chart.  Do you remember what

 8   that was?

 9   A.   It was on the previous page, and I believe it was pain

10   6 out of 10 that had been going on for quite a while.

11   Q.   Okay.  And about how long --

12   A.   Two-and-a-half months, if you see right there.

13   Q.   There we go.  So is that normal?

14   A.   Probably not.  Usually, tailbone stuff heals up pretty

15   good, especially in a young, active 32-year-old person.

16   Q.   So if somebody presented --

17             MS. PAYERLE:  Let's go back down.

18   BY MS. PAYERLE:

19   Q.   So if somebody presented with a broken tailbone

20   complaint of lower back pain after two-and-a-half months, if

21   your goal is to get to a diagnosis and help the patient, what

22   would you do?

23   A.   Well, I think -- I think lower back is a different

24   place than your tailbone anyway.  So I think you have to

25   clarify, like, where you're actually hurting.  He did

1    document a normal neurological exam, but really, it starts

2    with the history, right?  Like, there's no history of,

3    like -- like, I don't know how he got from broken tailbone to

4    lower back pain because those are two different places.

5        Q.   Okay.  And then the last one there is -- up here,

6    what's that word?

7        A.   That's endometriosis.

8        Q.   Okay.  And did you see any -- well, first of all, what

9    is endometriosis?

10       A.   So endometriosis is anytime you have the growth of

11   uterine tissue outside the uterus.

12       Q.   Did you see anything in her chart that would call that

13   diagnosis into question?

14       A.   Usually, people with endometriosis have a difficult

15   time getting pregnant, and she was pregnant, eventually, in

16   the course of her time here in the clinic.

17       Q.   Okay.  So would any of these diagnoses -- first of

18   all, so when you were talking about having a hard time making

19   sense of many of his charts, is this the kind of thing that

20   you're talking about?

21       A.   Exactly.  There was sort of no investigation.  Then

22   all of a sudden, there was a diagnosis listed under the

23   impression.

24       Q.   Okay.  And were there times when the impressions were

25   contradictory to each other, contradictory to other things in

1  the record, didn't make sense in the context of the patient,

2  things like that?

3    A.   Yeah, they would just kind of show up or be very

4  vague, like, lower back pain really isn't a diagnosis.  It's

5  more of a complaint, right?  You need to know why do they

6  have lower back pain.

7    Q.   And is that kind of what you were testifying about

8  earlier; it could be cancer, or it could be kidney stones?

9    A.   Exactly.

10   Q.   All right.  All right.  So now we've got these

11  impressions or these potential diagnoses.  Underneath the

12  potential diagnoses for Hope Rogers, what was Mr. Young's

13  plan that he wrote down?

14   A.   So in line with, I guess, a normal, healthy physical

15  exam kind of plan, he orders labs, which is, number one, a

16  blood count, a CMP, which is like a metabolic panel, a kidney

17  function and stuff, a lipid panel.  You could argue, probably

18  in her age, is not indicated because she's child-bearing age,

19  and you're not going to treat her anyway.  And a thyroid

20  panel, which is definitely indicated in someone her age.

21   Q.   Okay.  So that's the panel at the top?

22   A.   Yeah, that's the number one plan, and that's like a

23  laboratory panel.

24   Q.   And then what's the second thing he said he was going

25  to do?

1    A.    Number two, it says, DC, which means discontinue
2    Tylenol 3, which is Tylenol with codeine.
3    Q.    And is codeine -- and what is codeine?
4    A.    Codeine is a very mild opioid.  It's often a first
5    line choice for acute pain.
6    Q.    But when you say mild, in MMEs, do you know if it's
7    more or less potent than morphine?
8    A.    I believe codeine is less potent than morphine.
9    Q.    So it would have an MME of something less than one?
10   A.    Yes, ma'am.
11   Q.    Okay.  And what does he do in number 3?
12   A.    In number 3, he -- it says, arrow up, increase
13   Klonopin and then it's one milligram TID.  TID means three
14   times a day.
15   Q.    And could you tell the jury, you know, sort of what
16   kind of a dose of Klonopin is that?  Is that an introductory,
17   medium, high dose?
18   A.    That's at least a medium-ish dose, maybe higher.  And
19   there's no indication, you know, why he increased the dose.
20   Now, it does say above here that she was taking it three
21   times a day, but she was only getting 60 at a time, and I
22   think he increased it so that she would have it 90.
23   Q.    Okay.  But even that note about three times a day is
24   also contradictory?
25   A.    Right.

**EXAMINATION OF TRICIA AULTMAN, M.D.**                    18

1    Q.   Not clear what she was getting?

2    A.   No.  It's not clear.  You would have to look at the

3    PMP and compare it to see what she actually had before.

4    Q.   All right.  And what's the next line there?  What did

5    he give her?

6    A.   Number 4 is HCD, which is an abbreviation for

7    hydrocodone, 7.5 milligrams, and TID is three times a day.

8    Q.   So is that a low, medium, high dose of hydrocodone?

9    A.   It's not the lowest dose.  It's not medium, but low

10   medium.  How is that?

11   Q.   Okay.  So in this case, he discontinued a very low

12   level opioid, codeine, and he began hydrocodone, and he

13   increased Klonopin.  Is that the drug scenario?

14   A.   Yes, ma'am.  So, really, with no clear reason that I

15   can understand, he's increased her opioid dose on the first

16   visit and increased the benzodiazepine dose as well.

17   Q.   So would it be the case -- maybe this is obvious.  But

18   did Mr. Young in this case, with Hope Rogers, just sort of do

19   what the last doctor was doing?

20   A.   He actually did a little more.  Yeah.  He just kind of

21   picked up.  He -- there's no evidence he did his own

22   investigation, and Klonopin and benzodiazepines aren't the

23   first choice of medicine for anxiety anyway.

24   Q.   Did he actually discontinue what the last doctor was

25   doing, that codeine?

**UNREDACTED TRANSCRIPT**

1    A.   He did.  He stopped the Tylenol 3, and he started

2    something stronger.

3    Q.   Right.  He started her on hydrocodone for the first

4    time?

5    A.   Yes, ma'am.

6    Q.   Okay.  And let's move down -- oh, I want to ask you

7    one other thing.  If a patient comes in with a bunch of

8    complaints like this that are contradictory, don't make

9    sense, things like that, could that, itself, be a symptom

10   that a doctor such take into account in formulating a

11   diagnosis?

12   A.   Yes, sometimes if things don't make sense, it kind of

13   always raises a red flag that maybe they are just abusing the

14   medicine, and they're coming up with kind of common

15   complaints.  There are certain things -- certain complaints

16   that people will say that they have that they think will

17   yield them the controlled substance that they want.

18   Q.   And what about -- is there anything about Ms. Rogers'

19   demographics that would create even a higher alert?

20   A.   Right.  So women are more likely to abuse prescription

21   drugs than men, and young people more likely than old.  So

22   she's, like, right in the demographic where you have to be

23   very careful.

24   Q.   Let's take a look at page 59 of this same exhibit.

25   All right.  What are we looking at, at page 59?  First of

1  all, what kind of a document is this?

2    A.   So this is a follow-up note from February 11th for the

3  same patient.

4    Q.   And what is that -- so what's the follow-up note, I

5  guess?

6    A.   This means it's not the history and physical.  It's

7  just a note that's coming in for a follow-up of the same kind

8  of problems you already presented with.

9    Q.   And what does -- what shows up here in the nurse's

10  note, what is that?

11    A.   So the chief complaint is:  Patient CO, complained of,

12  wrist pain in right arm, needs a shot, patient just found out

13  she is pregnant.

14    Q.   All right.  So, actually, I do want to go back briefly

15  to -- well, no, we'll just keep on rolling.  All right.  This

16  is in February of 2015.  What is the patient on here?

17    A.   So at some point, already, he's gone from hydrocodone

18  7.5 milligrams to Percocet 7.5 milligrams.

19    Q.   And is that more potent?  Is that another increase, I

20  guess?

21    A.   Yes, ma'am, oxycodone is 1.5 times as strong as

22  hydrocodone.

23    Q.   And then what do we see kind of down here in this

24  chart?  Maybe we can pull that up.

25    A.   Yeah, it's pretty small.  But there's a line -- the

**UNREDACTED TRANSCRIPT**

1  typed line at the top says physical exam and the check mark

2  means examined and normal.  So basically what he's indicated

3  is that he's examined this patient in entirety, her eyes,

4  ears, throat, neck, a breast exam, a pelvic exam, the whole

5  thing, and it's all normal.

6     Q.   Based on what you know about this patient, is that

7  likely?

8     A.   No, number one, she's pregnant, right?  And so even at

9  early pregnancy, there would be changes you would recognize

10  on a pelvic exam.

11     Q.   If a patient were pregnant and taking Percocet, in the

12  ordinary course of professional practice, what would you do?

13     A.   So opioids are not -- are not a drug of choice in

14  pregnancy in any way.  They're supposed to be used only if

15  absolutely necessary.  And so the standard of care, if

16  someone is on opioids, is to switch them to either methadone

17  or Suboxone, and then there's a couple of reasons for that.

18  It's safer for the mom, and it's safer for the baby.  And

19  babies, when they're born to a mom that's on opioids, have

20  neonatal abstinence syndrome, which is basically withdrawal

21  in the newborn.  And if you switch them to methadone or

22  Suboxone, there's less severe withdrawal for the baby as

23  well.

24     Q.   And is Suboxone often used to treat addiction?

25     A.   It is.

1    Q.   Is it also known as buprenorphine?

2    A.   Suboxone has buprenorphine with Narcan in it,

3    naloxone, yes, ma'am.

4    Q.   Okay.  So let's take a look at -- I'm going to see if

5    I can grab one of these exhibits here.

6         I'd like to take a look at Exhibit 22.

7              MS. PAYERLE:  And let's page down one more, one

8    more, one more, and one more.  Okay.  Stop there.  Give me a

9    second.  Let's go down, I'm sorry, one more.  And one more.

10   One more.  One more.  There we go.  That's page 17.

11   BY MS. PAYERLE:

12   Q.   Let's take a look at page 17 of this Exhibit 22.  What

13   do we see here?  We see -- what is this prescription for, for

14   Hope Rogers dated March 5, 2015?

15   A.   So it's for Percocet, which is basically oxycodone

16   with Tylenol, 7.5 milligrams of oxycodone with 325 milligrams

17   of Tylenol, quantity of 90.  And then on the bottom, it says

18   SIG and one by mouth three times a day.

19   Q.   Did you see anything at all in Ms. Rogers' chart that

20   would indicate that this prescription for Percocet or

21   oxycodone was written within the ordinary course of

22   professional practice for a legitimate medical purpose?

23   A.   No, and she was pregnant, and it would be

24   contraindicated, to be honest.

25   Q.   In fact -- explain to the jury what you mean when you

1  say indicated and contraindicated?

2  A.   So indicated means there's a medical reason to

3  prescribe something.  And contraindicated means that there's

4  not a medical reason to prescribe something.  Opioids fall

5  into a class, and they rate pregnancy drugs in a certain

6  class, and they're not in a class that you should prescribe

7  unless you really, really, really have a good reason.

8  Q.   All right.  Let's take a look -- okay.  Now, let's

9  note the date of this prescription is March 5, 2015, and how

10  many days' supply is this?

11  A.   So if you're taking it three times a day and it's 90

12  pills, it's 30 days.

13  Q.   So for March 5, 2015, she has a 30-day supply.  Let's

14  take a look at page 9 of the same exhibit.  And what do we

15  have here?

16  A.   This is a prescription for hydrocodone or Lortab,

17  7.5 milligrams with 325 milligrams of Tylenol to take three

18  times a day, quantity of 90.  And it was written only about

19  20 days or a couple of weeks after the previous prescription.

20  So now she's on two opioids during pregnancy, and if she's

21  taking them at the same time, it's a lot of Tylenol as well.

22  Q.   And explain to the jury what you mean by the Tylenol

23  problem.

24  A.   I mean, Tylenol is a pregnancy Class B, so it's

25  probably okay, but it's -- you still have to be so careful in

1  pregnancy because we can't do good studies on pregnant women,

2  right?  It's not ethical.  So you can't give some pregnant

3  woman a drug and another pregnant woman not and see what

4  happens.  So the studies are all information we gain from

5  what people report after they've had the baby which, of

6  course, is not reliable all the time.

7          MS. PAYERLE:  All right.  I've located the hard

8  copy of this.  So I think it will be a little easier.  Let's

9  move down one more page.  Well, I thought I had it.

10          All right.  I'm just going to use the Elmo.

11  There we go.

12  BY MS. PAYERLE:

13  Q.   All right.  Let's take a look at these prescriptions

14  dated -- what's the date; do you see?

15  A.   April 23rd.

16  Q.   All right.  So what -- what did Mr. Young prescribe to

17  Hope Rogers on April 23, 2015?

18  A.   The top prescription is for Lortab 7.5, 325, and now

19  instead of 90, it's 120.  So it's an increase in dose.  And

20  then the bottom prescription is Xanax or alprazolam,

21  1 milligram three times a day, quantity of 90.  And then the

22  Phenergan is a medicine for nausea, but it's not a controlled

23  substance.  And the very bottom is ProAir, which is an

24  inhaler for asthma.

25  Q.   All right.  So for this -- actually, I don't remember

```
 1    if I asked you, Doctor, for the March 25th prescription that
 2    we just saw, was that prescription for hydrocodone within the
 3    course of professional practice for a legitimate medical
 4    purpose?
 5      A.    No, ma'am, especially because she was pregnant.
 6      Q.    And how about this one for Lortab?
 7      A.    Absolutely not.  Now he's increasing it.  He's putting
 8    both the patient at risk increase for overdose.  He's putting
 9    the child at risk for worsening neonatal abstinence syndrome,
10    which is kind of ugly, to be honest.
11      Q.    Well, go ahead and describe for the jury what is
12    neonatal abstinence syndrome look like?
13      A.    When a baby is born with neonatal abstinence, the
14    first, maybe day or two, may be okay and they are monitoring
15    it, and then they have to move it to the special nursery.
16    And they can have seizures, tremors, they're irritable, they
17    don't eat well, they don't sleep well, they're difficult to
18    feed, and developmentally, they're usually behind the other
19    babies for at least a year, and then they tend to catch up.
20    But it's not a pretty thing and results in long hospital
21    stays for the babies.
22      Q.    What about the Xanax?
23      A.    Same.  So benzodiazepines are actually Class D in
24    pregnancy, which is -- there's absolutely no indication to
25    prescribe a benzodiazepine in the first trimester of
```

 1   pregnancy for any reason ever.  There have been studies that

 2   show that the babies can have heart defects, and they can

 3   also have cleft palate and other kind of facial defects.  And

 4   so there really is no indication of prescribed

 5   benzodiazepines in the first trimester of pregnancy.  The

 6   first trimester being when all the organs are being formed.

 7       Q.   All right.

 8            MS. PAYERLE:  Let's take a look at -- go back to

 9   Exhibit 21.  And that means, sorry, we have to switch back.

10   Exhibit 21 at page 98.

11            MS. SILVERBERG:  Page 98?

12            MS. PAYERLE:  98.

13   BY MS. PAYERLE:

14       Q.   We were just talking about a prescription for -- where

15   he increased Lortab and added Xanax on April 23, 2015, and I

16   apologize.  We're just going to move on to the next

17   prescription.

18            MS. PAYERLE:  We can take that down.  All right.

19   Let's go back to this.  And can we go back.  I'm sorry.  I'm

20   going to have to be moving back and forth.

21   BY MS. PAYERLE:

22       Q.   All right.  Let's go to the next prescription in May.

23   What is this on May 20, 2015?

24       A.   It's Lortab 7.5 to take four times a day, and the

25   lower one is Xanax, 1 milligram for three times a day.

1  Q.   All right.  And, again, Dr. Aultman, were these

2  prescriptions, either one of them, written in the ordinary

3  course of professional practice for a legitimate medical

4  purpose?

5  A.   No, and they were dangerous for the patient and the

6  baby.

7  Q.   For the same reasons we discussed already?

8  A.   Yes, ma'am.

9  Q.   Okay.  And these were in May.  Here we go.  These were

10 in May of 2015; is that right?

11 A.   Yes, ma'am.

12          MS. PAYERLE:  All right.  Now let's take a look,

13 sorry.  We can go back to 419 to Exhibit 21 and take a look

14 at page 118.

15          THE WITNESS:  Okay.

16 BY MS. PAYERLE:

17 Q.   All right.  Are you familiar with this kind of

18 document in the patient record?

19 A.   Yes, ma'am.

20 Q.   And is this document a toxicology report for Hope

21 Rogers?

22 A.   Yes, ma'am.

23 Q.   Tell the jury just about this kind of document, how it

24 would figure into your analysis.

25 A.   Right.  So at the top, this is kind of demographic

 1   information:  her name, her date of birth, and it's urine.

 2   And then the important part to look at is right there, the

 3   medications.  So that's the medications that you're supposed

 4   to see in her urine.  And then they just -- the validity,

 5   this is to make sure that someone is not bringing fake urine.

 6   And then the results are at the bottom.

 7   Q.   What were the results of Hope Rogers' drug screen on

 8   April 29, 2015, which was, I guess, what, like, the week

 9   before the -- or a couple of weeks before the last

10   prescription was written?

11   A.   Yes, ma'am.  So she was supposed to be on alprazolam

12   and hydrocodone, and you can see that she does have

13   hydrocodone in her system, which is appropriate.

14   Hydromorphone is what hydrocodone is metabolized to, so that

15   is appropriate as well.  But she also has oxycodone in her

16   system, and she's not prescribed that.

17   Q.   How much oxycodone does she have in her system?

18   A.   It's -- it lists as very high.

19   Q.   And is that a red flag itself?

20   A.   It is a red flag that she's taking -- she's getting it

21   from somewhere.  She doesn't have a prescription and it's a

22   lot, and she's pregnant.

23   Q.   Is there another reason that there might be kind of

24   off the charts amounts of a drug in somebody's system?

25   A.   Yes.  Sometimes if they're trying to fake a drug

1   screen, if they might save one pill or keep one back and then

2   they spike their urine with it.  Sometimes you can tell by if

3   they check the metabolites.  Like, if there was oxycodone

4   present but then there was no oxymorphone, that might be an

5   indication that it wasn't real.

6      Q.   And we might see an example sort of specifically

7   there.  Here, where do you see that it's, like, a lot, sort

8   of a lot of oxycodone?  How can you tell?

9      A.   So the upper limit of normal on this is 500, and it

10  says greater than 500.  So the range here is 20 to 500.  So

11  that's a lot.

12             MS. PAYERLE:  All right.  Let's go back to the

13  Elmo.  And let me get rid of these little marks.

14  BY MS. PAYERLE:

15     Q.   And what are we looking at here at Exhibit 22?

16     A.   This is a prescription for hydrocodone 7.5 with 325

17  milligrams of Tylenol.  It says at the bottom SIG 1 PO QID,

18  which is four times a day.

19     Q.   And is that an increase in terms of potency or

20  quantity since the May 20th prescription?

21     A.   I think it was.  I think it was 90 to 120.

22     Q.   Or was it -- let's see.  I want to make sure we got

23  that right.  We may not.

24     A.   It was increased from her initial prescription, I know

25  that.  It was the same.

1    Q.   It was the same there?  So that wasn't an increase.

2  All right.  And then let's go back to the trial directory.

3  The patient chart, Exhibit 21, and look at Exhibit 113, or

4  sorry, page 113 of that exhibit.  And what do we see here?

5    A.   So this is another urine drug screen, and she is

6  supposed to be on Xanax and hydrocodone.  And you can see

7  here that her hydrocodone level is very, very high, and the

8  metabolite is hydromorphone, which is also really, really

9  high.

10   Q.   And does that mean anything in particular to you?

11   A.   Yeah, it's concerning that she's taking more than

12 prescribed and she's pregnant, and it's dangerous for her and

13 the child.

14   Q.   And do you see a stamp there in the middle?

15   A.   It says, we'll discuss these at your next office

16 visit.

17   Q.   Did you come to recognize that signature?

18   A.   Yes.

19   Q.   Whose is that?

20   A.   That is Jeffrey Young.

21   Q.   All right.  Let's take a look then at -- and so I

22 think the prescription we just saw written on June 19, 2015,

23 so after this drug screen came back, was that prescription

24 written within the ordinary course of professional practice

25 for a legitimate medical purpose?

1  A.   No.  And the appropriate thing to do would be to put

2  her on Suboxone or methadone or refer her to someone that

3  would because she's got a problem.

4  Q.   So at this point, you're convinced?

5  A.   Absolutely.

6  Q.   And how long ago in our conversation were you

7  convinced?

8  A.   From the -- I mean, I've reviewed these a lot and in a

9  pregnant person, there's just -- it's absolutely inexcusable

10 to prescribe these kinds of medicines.

11 Q.   And is this -- when I ask usual course of professional

12 practice for a legitimate medical purpose in Hope Rogers'

13 case, I mean, that's legal jargon.  Can I ask you, is it even

14 close?

15 A.   It's really not.  And he's really harming this person,

16 right?  Because she is at risk if she's on opioids for a

17 preterm delivery, for a stillbirth, for a low birth weight

18 baby, and for overdose.  And the baby is at risk for, you

19 know, dying in utero and such.  And so it's not just bad

20 medicine, it's harmful.  He's really hurting these people and

21 could have had a very bad outcome.

22 Q.   Let's take a look now at what we have on the Elmo.

23 And is this -- do we have here what -- what is this

24 prescription on what date?

25 A.   This is a prescription for Percocet 7.5 with 325 of

1    Tylenol written on July 17.

2    Q.   And is this an increase from the last one?

3    A.   It's an increase from hydrocodone, yes, ma'am.

4    Q.   Okay.  And is this prescription, given the context

5    that we've been discussing, was this written in the ordinary

6    course of professional practice for a legitimate medical

7    purpose?

8    A.   Absolutely not.

9    Q.   All right.  Let's take a look at what happens to

10   Ms. Rogers post pregnancy.  And take a look back at the

11   patient chart at page -- let's see, Exhibit 21 at page 108.

12        All right.  Is this after Ms. Rogers delivers her

13   baby?

14   A.   It looks like it was October, so, yes.

15   Q.   All right.  And what do we see here on this toxicology

16   scene?

17   A.   So at this time, she's supposed to be taking

18   alprazolam and Percocet, which is oxycodone with

19   acetaminophen, and it looks like the Xanax was detected.  So

20   she's taking it appropriately although the concentration is

21   very high.  And she's taking the oxycodone.  You can see

22   there.  So she's taking that although, again, the

23   concentration is rather high of the oxycodone.  But she also

24   has hydrocodone in her -- she has hydrocodone in her system,

25   which she's not supposed to be taking, right?  So it

1    shouldn't be there.

2         But then the curious thing about the Xanax or the

3    alprazolam is that the Xanax is positive, but the metabolite

4    is negative, right?  And so there's no way that that can

5    happen if it's a real true sample, right?  Because your body

6    is always going to be metabolizing it.  So with the Xanax,

7    anyway, it looks like she probably spiked her urine with it

8    and that's why it's positive for Xanax, but it doesn't have

9    the metabolite that your body would naturally make.  It would

10   come out in your urine.

11   Q.   Okay.  And I want to see if we can -- maybe we can

12   blow up this summary of qualitative results part here.  And

13   if you could just teach the jury kind of what -- what you

14   were seeing in terms of high concentration, no metabolites?

15   A.   Okay.  So the Xanax she was taking, so it's positive

16   in her urine, which is consistent with her prescription.  But

17   it, naturally in your body, alprazolam is metabolized to

18   hydroalprazolam, hydroxyalprazolam.  So if you're truly

19   taking the Xanax, this should be positive here too.  You

20   should have metabolite in your urine, and there's none, which

21   is indicating that she's probably spiking her urine with a

22   pill that she's kept left over.

23   Q.   And, again, we have a very -- it seems like a very

24   high level of oxycodone as well; is that right?

25   A.   It's a very high level of oxycodone.  If you see the

 1  upper range of normal is 2500, and then again, the

 2  hydrocodone is present, and she's not prescribed that.

 3  Q.   Let's take a look at page 103 of the same patient

 4  record.  And look at -- the date is January 17, 2016.

 5           MS. PAYERLE:  And let's blow up the bottom two

 6  boxes here.  There we go.  Now, let's go ahead and blow up

 7  both boxes.  Thank you.

 8  BY MS. PAYERLE:

 9  Q.   Okay.  What does this -- this particular test result

10  says under notes that caught your attention?

11  A.   Right.  So this one, they actually say, hey, pay

12  attention, the drug is positive, but there's no metabolite,

13  which is not normal.  That's not consistent with how a drug

14  would show up in your urinalysis if you put it in your mouth

15  and it came out in your urine.  So the Xanax is

16  metabolized -- sorry, the alprazolam is metabolized to

17  hydroxyalprazolam, and there's no metabolites.  And the same

18  with the oxycodone to the oxymorphone.

19  Q.   So what does that indicate happened here?

20  A.   That she was spiking her urine with medication.

21  Q.   Would any prescriptions written to her during this

22  time be consistent with the ordinary course of professional

23  practice for a legitimate medical purpose?

24  A.   Definitely not.  She's clearly abusing, diverting,

25  selling, doing something with her medicine, but she's not

 1  taking it in the prescribed manner.

 2          MS. PAYERLE:  Okay.  Let's pull this down.

 3  BY MS. PAYERLE:

 4     Q.   I'm going to show you -- the jury has heard about a

 5  patient named Aaron Beaver, and so I'm going to show you his

 6  medical record.  It's a 59-page document.  I promise we won't

 7  go through all 59 pages.

 8     A.   Okay.

 9     Q.   I that -- do you recognize that?

10     A.   Yes, ma'am.

11          MS. PAYERLE:  We move to admit.

12          THE COURT:  Okay.  We'll go ahead and receive the

13  documents.  I believe the Exhibit Number 98.

14          (Exhibit 98 marked and received.)

15          THE COURT:  What is the patient's name again?

16          MS. PAYERLE:  Aaron Beaver.  B-E-A-V-E-R.

17  BY MS. PAYERLE:

18     Q.   Let's take a look at page 39 of what is now Exhibit

19  98.  What did you see here that struck you?

20     A.   So this is the intake visit or the new patient visit

21  for Mr. Beaver, and he's very honest.  He says that he's

22  addicted to heroin, morphine, and that, you know, he's in,

23  basically, a crisis.  He wants to use, and he's having

24  withdrawal symptoms.

25     Q.   At that point, would any prescriptions of opioids,

1 other than addiction medication, be within the course of

2 professional practice for a legitimate medical purpose for

3 Aaron Beaver?

4  A. Absolutely not.

5  Q. Let's take a look at page 30 of this patient file.

6 And do we have, at page 30, a -- another visit by Aaron

7 Beaver on 10/10?  Oh, it looks like it was canceled?

8  A. No, it looks like the 9/21 was struck through as

9 canceled, but maybe he was there on 10/10, I think.

10  Q. Okay.  The next page, sorry.

11  A. It's what it looks like.

12  Q. And under Plan, did Mr. Young prescribe anything to

13 Aaron Beaver on that date?

14  A. Yes, ma'am.  It looks like he gave him a shot.  From

15 what I figured out, this is a combination of steroids and

16 anti-inflammatory medicine.  And then he prescribes Dilaudid,

17 which is a high potency opioid.  It's about four times as

18 strong as morphine, so basically, it's about 8 milligrams of

19 morphine three times a day.

20  Q. Would Aaron Beaver's back pain, under the

21 circumstances with what -- in which he presented to Mr. Young

22 as addicted and struggling with addiction, would this

23 prescription be within the course of professional practice

24 for a legitimate medical purpose?

25  A. No, it's actually just really tragic.  They've just

 1   put in the hands of an addict a very addictive substance, and

 2   he's been clean, we think, since, you know, maybe a couple --

 3   maybe eight months, six months, hard to know from the chart.

 4   But so you've just basically given him a ticket to go right

 5   back down the path, which is really tragic.

 6       Q.   Let's go to page 28 of the same patient file.  And

 7   this is 2 milligrams of Dilaudid; is that right?

 8       A.   Yes, ma'am.

 9       Q.   What's the date for 28?

10       A.   This date is October 12, so just a couple of days

11   later.

12       Q.   And let's go to the next page.  What happens here?

13       A.   So at the next visit, which is just two days later,

14   he's doubled the dose of Dilaudid and given a quantity of 15.

15   So the patient has already used up, you know, a supply, which

16   should have been, if it was just an acute episode, it's gone,

17   and now he's giving him more and a higher dose.

18       Q.   Is anything about this legitimate medicine?

19       A.   Definitely not.

20            MS. PAYERLE:  We can pull that down.

21   BY MS. PAYERLE:

22       Q.   Okay.  As we go on to the next patient, I want you

23   to -- I just want to clarify something.  We already are

24   talking about a mouthful, the usual course of professional

25   practice for legitimate medical purpose.  When we're talking

1   about the usual course of professional practice here, are you

2   talking about for this -- for the State of Tennessee, for

3   where we are?

4     A.   Yes.

5     Q.   And does it differ much from anywhere else?

6     A.   No, ma'am.  The rules and regulations in most state

7   medical boards are very similar.

8     Q.   But, you know, would it -- and I guess -- I guess

9   there's a question of from what we've observed, would this be

10  the usual course of professional practice anywhere?

11    A.   No, ma'am.

12    Q.   Okay.  But it is also not in the State of Tennessee;

13  is that right?

14    A.   Definitely not.

15    Q.   Okay.  Let me show you what we've marked as 404.  This

16  is a 54-page document.  Is this a medical file for a patient

17  who's listed there as Katie Crowder?

18    A.   Yes, ma'am.

19          MS. PAYERLE:  The Government moves to admit.

20          THE COURT:  That will be Number 99.

21          (Exhibit 99 marked and received.)

22  BY MS. PAYERLE:

23    Q.   And, Dr. Aultman, in the course of working on this

24  case, did you learn that Katie Crowder was actually an

25  undercover name for an officer working on an operation?

1    A.   Yes, ma'am.

2    Q.   But there's a patient record for her that was

3    recovered and sent to you?

4    A.   Yes, ma'am.

5    Q.   All right.  Let's take a look at page 9 of Exhibit 99.

6    What is page 9?

7    A.   So this is a Tennessee prescription monitoring program

8    printout, and it's what you check in the office to see if

9    your patient is getting a prescription anywhere else.  At the

10   time, you just check in the State of Tennessee.  Now you can

11   actually check multiple states, which is really convenient.

12   And so you can see, it's kind of reverse chronological order,

13   but you can see there is June and then through September

14   of 2016.

15   Q.   And let's go to the next page just to see where the

16   end is.  Was that June entry the first entry on her PMP?

17   A.   Yes, ma'am.

18   Q.   And who are the -- are there any other prescribers

19   besides Jeffrey Young listed for this person?

20   A.   No, the prescribers are just him right there.

21   Q.   All right.  Let's go back up to the front page.  So

22   who was the first person to prescribe Katie Crowder opioids

23   of any kind in the State of Tennessee?

24   A.   Jeff Young on June the 6th, he gave her hydrocodone,

25   5 milligrams, a quantity of 60 so, like, twice a day.

1   Q.   So here was he just picking up what some other doctor

2   was doing, or was he --

3   A.   I don't think so.  I think it was -- she was opioid

4   naive, according to our printout and according to her

5   history.

6   Q.   And could you explain to the jury what opioid naive

7   means.

8   A.   That means you've never taken opioids before.

9   Q.   Could you explain what the impact of an opioid on an

10  opioid naive person is.

11  A.   So 5 milligrams twice a day is a pretty healthy dose.

12  I mean, that's definitely a good acute pain pain relief dose

13  but for acute pain, you wouldn't need it for the whole month.

14  Q.   All right.  And so the quantity is high?

15  A.   So the MME for that is 10 MME a day.

16  Q.   Now, do you watch some videos where you could see

17  Mr. Young in action interacting with the patient known as

18  Katie Crowder?

19  A.   Yes, ma'am, I watched the videos.

20  Q.   Okay.  And do you remember the -- in the sort of first

21  video with Mr. Young, she said that she didn't fill an

22  earlier tramadol prescription?

23  A.   Correct.

24  Q.   All right.  What's your opinion about that?

25  A.   So if you lay out a plan of care for a patient and

1  they don't want to follow it, then you don't have any trust,

2  right?  And so that's not a good relationship from the

3  beginning.  And it would be a sign to me that they just want

4  an opioid, that they're fishing.

5  Q.   In that video, she says she's gotten a hydrocodone

6  before from a friend.  Do you have any opinions about that?

7  A.   That's a common thing that people say, unfortunately,

8  and I usually try and remind them, you know, that's illegal,

9  right, to take someone else's medication.  And it's also a

10  sign that she's fishing or shopping for a specific

11  medication.

12  Q.   And in the video, did you hear Mr. Young tell her,

13  hey, you probably shouldn't just take drugs from other

14  people?

15  A.   I did not hear him say that.

16  Q.   Let's look at page 46 in this medical record.  And is

17  this the sort of intake form that corresponds to that date?

18  A.   Yes, this is the follow-up visit, and he says here,

19  has taken hydrocodone in the past.

20  Q.   Does he say that she had taken it, like, from a

21  friend?

22  A.   No, he just says she's taken it.

23  Q.   So the chart isn't complete with respect to that bit

24  of information?

25  A.   No, it's not a complete history for sure.

1    Q.   And, in fact, he had information that he didn't put in

2    the chart?

3    A.   Exactly.

4    Q.   Does he document that it -- that he told her any risks

5    of taking pills?

6    A.   It doesn't document either here or on the next page

7    that goes with the visit that he counseled her in any way

8    about the risk of starting opioid therapy.

9    Q.   And you saw the video.  Did he counsel her?

10   A.   No, ma'am.

11   Q.   All right.  But what's interesting here is in this box

12   below.

13            MS. PAYERLE:  Ms. Silverberg, if you could blow

14   that up.

15   BY MS. PAYERLE:

16   Q.   Remind the jury, what does this line here under

17   Normal, what does that indicate that -- that Mr. Young is

18   saying that he did?

19   A.   So this is the review of systems part that we talked

20   about where you basically go head to toe and say, do you have

21   blurry vision, double vision, can you see anything, do you

22   have throat pain, neck pain, and you go through every organ

23   system, and he clearly didn't do that on the videos.

24   Q.   But he documented that he had?

25   A.   He did.

1    Q.   Okay.  If Mr. Young was practicing in the ordinary

2    course of professional practice, what would he have done with

3    the information that Katie Crowder was opioid naive but had

4    taken hydrocodone from a friend and didn't fill her tramadol

5    prescription?

6    A.   So sort of what would I do if I were the physician in

7    that position?

8    Q.   What would be the ordinary course of professional

9    practice?

10   A.   Right.  So you would counsel the patient.  You would

11   talk to them and document it in the chart and say, hey, like,

12   I think you may have a problem here, let's talk about this.

13   It's okay if you have a problem.  I can help you with that,

14   but we need to be honest and have a trusting relationship if

15   you want me to help you.  And I definitely wouldn't prescribe

16   opioids.

17   Q.   Do you remember, in this visit, when Mr. Young asked

18   for an MRI to put in the chart, you know, just because he

19   needs the piece of paper?

20   A.   Yes, ma'am.

21   Q.   Did you have any opinions about that?

22   A.   That's a very common thing that I see when I'm

23   reviewing records for things that are not appropriate is they

24   think if you just put stuff in there, if I just have an X-ray

25   or a piece of paper that says I have an MRI, it will make it

*EXAMINATION OF TRICIA AULTMAN, M.D.*                    44

1   look like I tried.

2      Q.   And in the video, she said the radiologist told her

3   nothing was wrong.  Does that change your -- do anything to

4   your opinion about the appropriateness of this prescription?

5      A.   No.  Well, I mean, it makes it worse, I guess.  So we

6   know she didn't really have back pain because she didn't

7   really have back pain.

8      Q.   At the very least, the MRI doesn't demonstrate any

9   problem?

10     A.   Yes, ma'am.

11     Q.   And after learning the MRI didn't demonstrate any

12  problem, did he then follow up with, hey, maybe we should get

13  different testing to figure out what's actually wrong with

14  you?

15     A.   He did not.

16     Q.   Let's take a look at page 45 of this exhibit.  The

17  prescription he wrote for her, is this prescription that

18  we're looking at within the course of professional practice

19  for a legitimate medical purpose in the State of Tennessee?

20     A.   No, ma'am, it's not.

21     Q.   In the next video in July of 2016, Ms. Crowder tells

22  him that the pain is worse at night when she lies down.  Do

23  you remember that?

24     A.   Yes, ma'am.

25     Q.   Do you have any opinions about that?

**UNREDACTED TRANSCRIPT**

 1    A.   That's kind of -- it kind of contradicts what most

 2  people have when they have low back pain.  Usually, it's

 3  worse when they're moving around, and it's better with rest.

 4    Q.   And let's say -- let's look at page 41 of this

 5  exhibit.  What do you see here in the chief complaint?

 6            MS. PAYERLE:  Let's blow up this chief complaint

 7  down to current medications.  Keep going, keep going, stop.

 8            THE WITNESS:  So, basically, it says, patient's

 9  here for follow-up and requesting refills, has a history of

10  low back pain, states that the hydrocodone wears off too

11  soon, can she try something else.  And it looks like he

12  wrote, having breakthrough pain.  And it looks like he's

13  trying to draw a pain scale, and it looks like maybe he wrote

14  9 or 7, 7 out of 10.

15  BY MS. PAYERLE:

16    Q.   Seven, okay.  And then --

17            MS. PAYERLE:  Let's back out of that.

18  BY MS. PAYERLE:  And do you --

19            MS. PAYERLE:  Let's go to the next page.

20  BY MS. PAYERLE:

21    Q.   What does -- what does Mr. Young do on this visit?

22  What does he prescribe her?

23    A.   So he adds a fentanyl patch at 50 micrograms.

24    Q.   Explain to the jury what your -- explain to the jury,

25  I guess, what went through your mind when you saw that?

1    A.   It's really actually, like, unbelievable.  There's no

2  medical indication to give a fentanyl patch at 50 micrograms

3  or any fentanyl patch to a healthy 20- or 30-year-old that

4  has what you think is musculoskeletal pain.  Her MME, before

5  this visit, was two Lortabs a day, right?  So it was an MME

6  of 10; 5 plus 5 is 10.  The MME of a 50 microgram patch is

7  120.

8        So he has taken her from 10 to 120 milligrams of

9  morphine and, essentially, if this young woman, who is small

10  anyway, put this patch on, she would be dead.  Like, she

11  wouldn't be back.  Like, she would just fall asleep, stop

12  breathing, and she would die because you just cannot use

13  fentanyl in that manner.  It's not how it was meant to be

14  used.

15    Q.   Dr. Aultman, were either of these prescriptions,

16  either the fentanyl that we see here, the hydrocodone we saw

17  earlier, or the hydrocodone that were written in this visit

18  prescribed within the ordinary course of professional

19  practice for a legitimate medical purpose in the State of

20  Tennessee?

21    A.   No, ma'am.

22    Q.   And she, I believe, goes back in August?

23         MS. PAYERLE:  Let's take a look at page 34.

24  Sorry.  All right.  So let's go to 37.

25  BY MS. PAYERLE:

1   Q.   You see here that there's a documented pain range of 5

2   out of 10.  Do you see that?

3   A.   Yes, ma'am.

4   Q.   And what else was written here?

5   A.   Looks like it says, doing better on fentanyl patch.

6   Q.   Again, does Mr. Young mark as though he has completely

7   examined her, all systems?

8   A.   Yeah, he marks through that he's questioned all the

9   systems, and they're negative.

10  Q.   And did he do that in the video?

11  A.   No, ma'am.

12  Q.   All right.

13          Ms. PAYERLE:  Let's go to the next page.  Go to

14  the next one, sorry.  There's a weird blank.  Just go to the

15  next one.

16          MS. SILVERBERG:  This is it.

17          MS. PAYERLE:  Oh, that's it.  I'm sorry.  You've

18  got it.  Thank you.

19  BY MS. PAYERLE:

20  Q.   All right.  What happens here with respect to her

21  prescriptions?

22  A.   So, you know, he actually increases the fentanyl from

23  50 to 75.  And just to give an example, the last patient I

24  had with a 75-microgram fentanyl patch, she was, like, a

25  34-year-old in the hospital with cervical cancer that had

1  spread throughout her organs and her bowels had ruptured.

2  And we were trying to get her home so she could spend some

3  time with her kids, and we didn't want her to have to keep

4  taking medicine.  But, like, that's an appropriate use of

5  fentanyl is just a horrific, horrible cancer that is, like,

6  killing somebody, and they need to have a little bit of time

7  with their family at home without being in pain.

8     Q.   And if he prescribed her fentanyl and hydrocodone on

9  this visit as well, would those prescriptions be in the

10 ordinary course of professional practice for a legitimate

11 medical purpose in Tennessee?

12    A.   Absolutely not.

13    Q.   And, actually, let's take a look at page 36.  Page 36.

14 Sorry.  Is that -- is that the prescription?

15    A.   Yes, ma'am.

16    Q.   Next, do you remember a visit in which there were two

17 women that came to Mr. Young's office?

18    A.   Yes, ma'am.

19    Q.   And he was talking about a Halloween party?

20    A.   Yes, ma'am.

21    Q.   All right.  Tell the jury your impressions of that

22 visit.

23    A.   So I think, like, all the video visits, the actual

24 medical conversation is almost nothing.  Right.  There's a

25 significant portion of time discussing other things.  And

**UNREDACTED TRANSCRIPT**

1  it's okay to discuss other things.  You know, my patients

2  know about my kids and all kind of stuff, but you have to

3  also remain professional, and you also have to do an

4  appropriate history and physical, which were not done.

5     Q.   And let's take a look at page 26 of the patient

6  record.  Also, before I move on, though, was it -- like, is

7  it normal for two girlfriends to show up together at a

8  doctor's visit both looking for pain drugs?

9     A.   No.  Seeing a husband, wife, or a couple together or

10  parent-child is pretty normal, but friends is kind of not

11  typical at all, and suspect.

12    Q.   Okay.  And then did you remember the other undercover

13  officer mentioning something about landing -- falling and

14  landing on her lower back?

15    A.   Yes, ma'am.

16    Q.   Okay.  What were your thoughts on that explanation of

17  why she had pain?

18    A.   I think it's really tricky to fall and land on your

19  lower back unless you land on something.  It's just a really

20  weird history that should have prompted further questioning,

21  like, what do you mean, like, how do you land on your lower

22  back, unless it's like landing on a curb or, I don't know,

23  something.

24    Q.   Were the prescriptions that were written in this video

25  within the course of professional practice for legitimate

1  medical purpose in the State of Tennessee?

2    A.   No, ma'am.

3    Q.   And that is in October of 2016 to Katie Crowder.

4       All right.  And then also at that visit, was an

5  undercover Kristina Norton, and she was the one we were

6  talking about landing on her lower back?

7    A.   Yes, ma'am.

8    Q.   Okay.  Were the prescriptions written to Kristina

9  Norton who were written -- sorry, for legitimate medical

10  purpose in the ordinary course of professional practice in

11  the State of Tennessee?

12    A.   No, ma'am.  In fact, she just said that she took some

13  Percocet, I think, from her mom, and then that was what she

14  was prescribed.

15    Q.   So was Mr. Young continuing care from another

16  physician?

17    A.   No.

18    Q.   During the video, she says, I've taken some tabs and

19  sometimes I turn to smoking.  What do -- what are tabs?  Do

20  you know?

21    A.   I think tab usually refers to a Lortab.

22    Q.   Would it raise a red flag if a patient told you they

23  took tabs?

24    A.   Yeah, a patient talking in kind of street lingo about

25  medication is always concerning.

1    Q.   Let's take a look at -- all right.  In the next visit,

2    you saw, I believe, Kristina Norton went back by herself.

3              MS. PAYERLE:  Can we look at Exhibit 70?  And I

4    don't know what our number is.  That's it.  Yeah.

5    BY MS. PAYERLE:

6    Q.   Okay.  What are looking at here?

7    A.   This is -- appears to be a copy of -- let's see, right

8    here, an X-ray of her lumbar spine, which is the very low

9    part of your back, and it says two or three views, which is

10   the common way that it's done.  And then the history is back

11   pain, and then this is kind of the radiologist stuff, so to

12   speak.  And then this is -- the impression is basically the

13   result, and it says, no acute osseous, which means bony

14   findings.

15   Q.   What does that mean?

16   A.   It, basically, is a normal X-ray.  She was a little

17   constipated right here.  That's all.

18   Q.   And was there anything on that X-ray that would

19   suggest that a prescription for oxycodone 10 milligrams would

20   be within the course of professional practice for a

21   legitimate medical purpose?

22   A.   Absolutely not.

23             MS. PAYERLE:  Let's take a look at page 71.  Or

24   sorry, Exhibit 71.  Let's go to the next page.  There it is.

25   BY MS. PAYERLE:

**UNREDACTED TRANSCRIPT**

1  Q.   Okay.  At the top of the screen there, this is a

2  receipt.  Do you see where there was an oxycodone

3  10 milligrams prescription written by Jeff Young to Kristina

4  Norton?

5  A.   Yes, ma'am.

6  Q.   Okay.  So is that your opinion about this prescription

7  that it was not appropriate?

8  A.   Yes, ma'am.

9      MS. PAYERLE:  All right.  We have seen --

10  actually, let me -- let me just do -- I'm going to do one

11  more, Judge, and I promise it's the last one.

12  BY MS. PAYERLE:

13  Q.   I'm going to show you a document that we've marked

14  413.  And it is 61 pages.  And it's a patient record for a

15  patient named Daphne Montoya.

16  A.   Okay.

17  Q.   And are you familiar with this document?

18  A.   Yes.

19      MS. PAYERLE:  Move to admit.

20      THE COURT:  100.

21      (Exhibit 100 marked and received.)

22  BY MS. PAYERLE:

23  Q.   Let's take a look at page 53 of Exhibit 100.  In

24  Daphne Montoya's file, did you find this document?

25  A.   Yes, ma'am.

**UNREDACTED TRANSCRIPT**

1    Q.   All right.  Explain to the jury -- I mean, you can

2    read it if you want, but explain to the jury if you want to

3    summarize what was happening here?

4    A.   Okay.  So the telephone notes that they took at

5    various times were usually on a yellow piece of paper.  They

6    kind of looked like this.  And so there was a problem with --

7    it says, Jeff's Schedule II narcotics.  And if you just read

8    through, it says, the patient here, Daphne Joyner Montoya,

9    filled oxycodone 10 four times a day, quantity of 120, and

10   she paid cash under her name Daphne Joyner.  But then Daphne

11   Montoya filled oxycodone, the same basic prescription, and

12   she was using her insurance.  So, basically, the person is

13   using maiden/married name, paying one with cash, using her

14   insurance for the other one to get double the quantity of

15   medicine.

16   Q.   And would that -- were both of those written by Jeff

17   Young?

18   A.   Yes, ma'am.

19   Q.   So one in one name, Daphne Joyner, and the other was

20   written in the other name, Daphne Montoya?

21   A.   Yes, ma'am.

22   Q.   Is there any red flags here?

23   A.   It's completely inappropriate.  I don't know how else

24   to say it, it's wrong.  It's not right.  It's putting a

25   patient in a position where they easily could abuse or sell

1   the medication.  Oxycodone has a huge street value.  That's a

2   pretty tight little income if you're selling that every day.

3   There's just a lot of wrong things about it.

4   Q.   What would be the appropriate way -- if Mr. Young were

5   actually practicing medicine, what would be the appropriate

6   way to deal with this?

7   A.   So, you know, you want to say, oh, I just fired a

8   patient.  But you'd bring them in, you'd say, look, I know

9   you're doing this.  You obviously have a problem or you're

10  selling it and you just need to come clean and tell me.

11  Like, if you need help, if you're addicted to this stuff, we

12  can do that, but you can't just keep going as you are as if

13  nothing happened.

14  Q.   Would it be appropriate medical practice to engage in

15  a sexual relationship with this patient?

16  A.   No, ma'am.

17  Q.   What if you also hired this patient as your front desk

18  employee; would that be appropriate way to deal with this?

19  A.   No, ma'am.

20  Q.   Does the fact that -- would the fact --

21  hypothetically, if Mr. Young had employed this Daphne

22  Montoya, was engaged in a sexual relationship with her and

23  was writing her prescriptions under two different names,

24  would that make it better or worse?

25  A.   That definitely makes it worse.

**UNREDACTED TRANSCRIPT**

1    Q.    Okay.  Generally -- and we can -- let me put that

2    down.  I have some just general questions about some patients

3    that you may have looked at without, you know, slogging

4    through the records.  Did you review a record for a gentleman

5    named Jay Green, who was a police officer listed on his

6    intake form?

7    A.    Yes, ma'am.  He had some kind of foot pain and maybe a

8    fracture.

9    Q.    How would a fentanyl patch impact the ability of a

10   police officer to do his job safely?

11   A.    A fentanyl patch would not be indicated to be used in

12   anyone that had any kind of firearm and especially not for

13   foot pain.  It's completely inappropriate.

14   Q.    Did you find that -- did you form an opinion as to the

15   prescriptions written for Jay Green?

16   A.    They were not written in the unusual course of medical

17   practice for legitimate medical purpose.

18   Q.    In the State of Tennessee?

19   A.    In the State of Tennessee.

20   Q.    All right.  And how about a patient, Tricia Stansell;

21   do you remember reviewing her file?

22   A.    I do.

23   Q.    Were there any prescriptions written to Tricia

24   Stansell in the ordinary course of professional practice for

25   a legitimate medical purpose in the State of Tennessee?

**UNREDACTED TRANSCRIPT**

 1    A.    No, ma'am, there were not.

 2    Q.    How about Keith Moffit, were there any prescriptions

 3 written to Keith Moffit in that -- that meet the standard I

 4 just said?

 5    A.    No, ma'am.

 6    Q.    And how about Bethany Pusser?

 7    A.    No, ma'am.

 8    Q.    Not her either?  How about Cyndal Story?

 9    A.    No, ma'am.  And she actually had all kind of stuff in

10 her initial drug screen that when she was addressed about it,

11 she actually laughed.

12    Q.    She laughed?

13    A.    She laughed.

14    Q.    And what would -- how would a practitioner, who was

15 actually practicing medicine, deal with that?

16    A.    Again, you would bring them in and say, you obviously

17 have a problem.  I can help you, but you have to be honest.

18    Q.    Would you continue trying to -- would a practitioner

19 continue trying to have sex with Cyndal Story under those

20 circumstances?

21    A.    Probably not, no.

22    Q.    All right.  How about Amy Sanders?

23    A.    No, nothing was written for legitimate medical purpose

24 in the usual course of professional practice in the State of

25 Tennessee.

1    Q.   Okay.  Now, I've asked you about specific -- some

2    specific patients.  We've gone through specific charts.  Were

3    these examples you identified, were they in this case one

4    offs or did you see these patterns repeated throughout your

5    review?

6    A.   The patterns were definitely repeated over and over

7    and over, and I think I reviewed well over 20 charts.

8    Q.   And in those, were you able to see any examples to

9    suggest that Jeffrey Young was prescribing opioids in the

10   course of professional practice for the State of Tennessee?

11   A.   No, ma'am.

12            MS. PAYERLE:  Just one moment, please, if I

13   could.

14   BY MS. PAYERLE:

15   Q.   Okay.  Just one more quick series of questions:  Sort

16   of bad things sometimes happen in the personal lives of

17   doctors like yourself?

18   A.   Yes, ma'am.

19   Q.   So they have people die and divorces and things that

20   happen all the time, right?

21   A.   Yes, ma'am.

22   Q.   When something bad happens to a medical professional

23   that impacts their judgment or their ability to practice

24   medicine, what are their obligations in the ordinary course

25   of professional practice?

1    A.   Their obligations are to get help.  And I know in

2    Tennessee and in most states, they have a method to get that.

3    They don't want practitioners out there depressed, suicidal,

4    you know, having alcohol problems.  There's a method to get

5    help that's relatively confidential.

6         In Tennessee, there's -- the Tennessee medical

7    federation, I think, has a place you call and they set you up

8    with a peer, and then everything that happens with that peer

9    is private as long as they feel like you're still practicing

10   safe medicine.  And it's not reportable to medical boards, so

11   you won't lose your license, all that kind of stuff.  They've

12   come a long way in those kind of accommodations for impaired

13   physicians.

14   Q.   Hypothetically, if Mr. Young was, at the time of these

15   prescriptions, going through something traumatic, like a

16   divorce, does that somehow make any of these prescriptions

17   legitimate?

18   A.   No, ma'am.

19   Q.   Okay.

20        MS. PAYERLE:  All right.  The Government passes

21   the witness.

22        THE COURT:  Thank you.  Before we do cross, I

23   think we'll go ahead and take a break.  We've been going for

24   about an hour-and-a-half or so.  Okay.

25        MR. FERGUSON:  I was going to ask, I need some

```
 1    time to get the exhibits together too.

 2              THE COURT:  Okay.  We're going to take an

 3    afternoon break, ladies and gentlemen of the jury.  You've

 4    heard quite a bit more testimony.  We'll pick this up in

 5    about 20 minutes or so.  Okay.  Leave your notebooks and

 6    don't discuss.  Don't discuss the testimony over the break.

 7                    (Jury out at 2:44 p.m.)

 8              THE COURT:  Okay.  See everyone in about 20

 9    minutes.

10         (A recess was taken from 2:45 p.m. to 3:15 p.m.)

11              THE COURT:  Okay.  Unless there's anything else,

12    are we ready?

13              MR. FERGUSON:  We're ready.

14              THE COURT:  Bring them in, please.

15                    (Jury in at 3:15 p.m.)

16              THE COURT:  Okay.  Folks, I think we're ready to

17    push forward.  So just have a seat.

18              I think it's time for cross, Mr. Ferguson?

19              MR. FERGUSON:  Thank you, Your Honor.

20                        CROSS-EXAMINATION

21    BY MR. FERGUSON:

22     Q.   Good to see you again.  I'm going to pass forward some

23    documents to you and have you take a look at them.  You

24    previously testified that you had reviewed Hope Rogers'

25    records?
```

1          THE COURT:  Is that an exhibit?

2          MR. FERGUSON:  It is not.

3          THE WITNESS:  Yes, sir.

4          MR. FERGUSON:  Your Honor, I ask that this be

5    made the next exhibit.  It's Hope Rogers' patient file.

6          THE COURT:  Patient file, and that will be 101.

7          (Exhibit 101 marked and received.)

8    BY MR. FERGUSON:

9     Q.   I don't have much for you today.  I'm going to try to

10   be quick, but I hopefully will get through it pretty fast.

11    A.   Okay.

12    Q.   Start off with a bad question.  How much are you

13   getting paid in this case?

14    A.   I've gotten paid, like, a lot of money, more than

15   probably my parents could have ever imagined.  I started

16   doing this 20 years ago, and it was a way for me to make

17   extra money while my kids were little.  They were asleep, and

18   almost never involved going to trial.

19    Q.   Right.

20    A.   Most expert witnesses make about $500 an hour.  I used

21   to charge less.  One of the district attorneys a long time

22   ago said you look cheap.  You have to charge more to be kind

23   of on par with the rest of them.  And, undoubtedly, it's been

24   insane the amount of money that I never thought I would be

25   doing.

1    Q.    Do you make more money serving as an expert witness

2    than you do as a hospitalist?

3    A.    Oh, definitely not.

4    Q.    Definitely not?

5    A.    No.  No, no.

6    Q.    In this case, you've already received about 44,000?

7    A.    I think over the course of seven years, it's probably

8    about that.

9    Q.    And I think you're contracted up to about 110 or

10   something?

11   A.    Yeah, I don't think I'll get anywhere near that.  They

12   always way overestimate.

13   Q.    Okay.  And to be fair, you're getting paid to be here

14   today?

15   A.    Yes, sir.

16   Q.    You got paid to review these records?

17   A.    Yes, sir.

18   Q.    It's a job.  It's a real job, and it's something

19   that's -- it's perfectly legal to do that?

20   A.    Yes, sir.

21   Q.    Okay.  So just on this one case, you're over $40,000?

22   A.    I'm taking your word for it.  I would have to pull my

23   tax records for the last seven years, but that's probably

24   about right.

25   Q.    Okay.  Opioids are used to treat pain, correct?

**UNREDACTED TRANSCRIPT**

**EXAMINATION OF TRICIA AULTMAN, M.D.**                    62

1    A.   Yes, sir.

2    Q.   I'm sorry.  I talked over you, and I didn't get a bad

3    look.  I'll try it again.

4         Opioids are used to treat pain?

5    A.   Yes, sir.

6    Q.   And, typically, or almost all times, you have to have

7    a prescription to get opioids?

8    A.   Yes, sir.

9    Q.   And in order to prescribe opioids, you have to be

10   licensed by the state as a medical or healthcare

11   professional?

12   A.   Yes.

13   Q.   And the states typically are the ones that are

14   responsible for overseeing licensed medical providers within

15   the state?

16   A.   Right.

17   Q.   If a -- somebody from the Tennessee Board of Nursing,

18   an investigator came in to speak to the jury, that would be

19   typically the first line of the people who oversee nurses?

20   A.   Yes.

21   Q.   You -- I want to go -- really, I just want to talk a

22   lot about Hope Rogers.

23   A.   Okay.

24   Q.   There's some real issues here.  Hope Rogers, there was

25   prescribing of the hydrocodone and Xanax?

**UNREDACTED TRANSCRIPT**

1    A.    It was hydrocodone and Xanax and oxycodone too.

2    Q.    Okay.  And Xanax, you say, is really counter -- it's

3    not what you want to be prescribing a pregnant woman?

4    A.    Right.  In terms of pregnancy class, A, B, C, D, X,

5    it's a D.

6    Q.    Okay.  Tell me what those mean.  I heard you saying

7    that, but it never really -- never really told me what that

8    meant.

9    A.    Right.  Pregnancy Class A, there's no problems to take

10   in humans.  There's very few medicines in that class.  Like,

11   a few vitamins, thyroid medicine and stool softeners.

12   Q.    All right.

13   A.    Class B is that there are no known problems I think in

14   animal studies, so probably safe:  Tylenol, prenatal

15   vitamins, some blood pressure medicines.

16         And C is that there's probably some animal studies

17   that shows that you shouldn't use them, and there's not good

18   human data.  And so C is where opioids fall.

19         And D is animal studies definitely show harm, and

20   there's probably harm in human studies, and you really

21   shouldn't use Class D.

22         Class X is, for example, like thalidomide and other

23   medicines that are a hundred percent we know will cause

24   something bad to happen to the infant.

25   Q.    That last one you said, that was the one in the '50s,

1    '60s that caused babies to be born deformed?

2       A.    Exactly.  It's the one that caused the limb

3    malformations and shortened arms.

4       Q.    Unfortunately, growing up we would have referred to

5    them as flipper babies.  I mean, that's a horrible word.  We

6    don't say it --

7       A.    Yes, sir.

8       Q.    That was the awful --

9       A.    Probably politically incorrect these days.

10      Q.    It is.  There's a lot that is, but different

11   generations.

12      A.    Yes.

13      Q.    So D is -- it has a real potential of being harmful,

14   but it's not counter -- it's not just a flat out no.  There

15   has to be some medical reason, and there has to be a real

16   serious review of the situation?

17      A.    Correct.  There has to be a very serious indication

18   that will show the benefit outweighs the risk.  And in my

19   research on benzodiazepines, there just isn't.  And the one I

20   read from the American College of Obstetrics and Gynecology,

21   it says there's really no indication to use benzodiazepines

22   in pregnancy.

23      Q.    Which one has the black box warning?

24      A.    So the benzodiazepines, when used with opioids, has a

25   black box warning.

**UNREDACTED TRANSCRIPT**

1    Q.   And I've seen that.  I don't know where it went to.

2   It was around here somewhere.  Let's tell the jury what that

3   means.  A black box warning is on the medication itself or on

4   the paperwork you get with it.  There is a literal black box,

5   like, glaring at you that says:  Warning, this could be a

6   dangerous combination, you must take special care with it,

7   and, please, if you can, find some other alternative?

8    A.   Right.  So it's there for benzodiazepines and opioids

9   in combination.  And the black boxes are also on other kinds

10   of medicines that can have significant side effects.

11    Q.   And the black box for the combination of opioids and

12   benzodiazepines, specifically, states that the risk is called

13   neonatal -- what's the babies born with?

14    A.   Well, the black box warning is not for neonatal

15   abstinence syndrome.  The black box warning is an overall

16   warning for all opioids and benzos because of the risk of

17   oversedation.

18    Q.   Have you read it in a while?  Have you looked at in a

19   while?

20    A.   The black box on those, probably sometime in the last

21   couple of months, but not recently, no.

22    Q.   Do you remember it saying if you're going to take it

23   in combination, you need to be, at least, prepared for that

24   outcome, and have a high-risk OB on board?

25    A.   There's definitely -- if you're taking opioids and

```
 1   benzodiazepines, there definitely needs to be a high-risk
 2   obstetrician or they call them a maternal-fetal medicine
 3   onboard and ready, so that you see them before, and then when
 4   you deliver, they're aware of the situation and can handle
 5   the infant.
 6      Q.   And that's, in your opinion, would be the only safe
 7   way to handle something like that -- not safe way.  That's
 8   the only way you could handle that if it had to be done?
 9      A.   Handle what exactly?
10      Q.   If somebody had to be on both those drugs and was
11   pregnant, under the -- your professional opinion and the
12   black box warning, you must have neonatal or some specialist
13   on board to take care of the baby during delivery?
14      A.   No.  The appropriate thing to do would be for you to
15   change them to Suboxone or methadone, or find someone that
16   could, as well as have someone from maternal-fetal medicine
17   see you while you're still pregnant.
18      Q.   Okay.  But, again, the black box warning, it indicates
19   if it's going to be done, if it had to be done, if it
20   accidentally got done, however it got done, have a high-risk
21   OB on board?
22      A.   Yes.
23      Q.   Do you have any opinion on what the maximum number of
24   patients a day a healthcare provider should see?
25      A.   So most of the studies I've read recently show that
```

1    the average healthcare provider sees, in primary care, is

2    usually around 30.  That depends.  Internal medicine are

3    going to be less because your patients are older and sicker.

4    Family practice, you have those young kids that are easy, you

5    know, the cough/cold kind of thing, so it might be a little

6    bit more.

7    Q.   Sixty would not be within the range of what a normal

8    healthcare provider should be seeing in a day?

9    A.   Not independently, no, sir.

10   Q.   Okay.  You would not be able to provide them the

11   quality and level of care that would be necessary in order to

12   meet the standard of care?

13   A.   No.

14   Q.   And when we talk about the standard of care, have you

15   ever testified in civil cases before, or is it just criminal

16   cases?

17   A.   I have given a deposition in a civil case.  It went to

18   trial, and I was not needed.

19   Q.   Okay.  And in that case, were you asked to also

20   testify as to kind of the standard of care within that

21   profession?

22   A.   Yes, it was a standard of care for hospital medicine,

23   and I was with the defense of the physician.

24   Q.   Suboxone, tell me again what two drugs that was?  You

25   said two different things.

1    A.   So it's naloxone, which is Narcan, and buprenorphine,

2    which is --

3    Q.   Say that one again?

4    A.   Buprenorphine.

5    Q.   Spell it if you can.

6    A.   Spelling is not my forte, B-U-P-R-E-N-O-R-P-H-I-N-E.

7    Close?

8    Q.   Buprenorphine?

9    A.   Buprenorphine, yes, sir.

10    Q.   Buprenorphine?

11    A.   How about just Suboxone?

12    Q.   Suboxone?

13    A.   There you go.

14    Q.   I don't want to talk about the other drug.  I just

15    want to talk about that drug.  Is that drug -- is it

16    prescribed by itself at times?

17    A.   It is prescribed.  So buprenorphine was released to

18    help with opioid addiction and withdrawal.  The problem was

19    that by itself it could still be injected and abused.  So

20    they added Narcan to it, and when they added Narcan to it,

21    you could still use it, they call sublingually under your

22    tongue, but you can't inject it any more.  That was a way to

23    make it abuse deterrent.  But buprenorphine, yes, sir, is

24    used for addiction treatment.

25    Q.   And is buprenorphine, if it's not Suboxone -- well, if

 1  | it is Suboxone, would it say buprenorphine and --

 2  | A.    -- naloxone.

 3  | Q.    -- naloxone in the PMP, or would it just show the

 4  | opioid?

 5  | A.    No, I think it should say both on the PMP.

 6  | Q.    Okay.  So if it's just by itself, then that's not

 7  | Suboxone, that's just the opioid?

 8  | A.    Correct.

 9  | Q.    Okay.  You told the jury it's common for people to

10  | take other people's medications.  You're not happy with that,

11  | but you agree that that's somewhat common within the field?

12  | A.    It unfortunately does happen.  Shouldn't, but it does.

13  | Q.    Husband takes wife's medicines, boyfriend, girlfriend.

14  | If you have access to it, you say, hey, let me try that back

15  | pain medication to see if it works for me?

16  | A.    I suppose it does happen, yes, sir.

17  | Q.    Okay.  The Government asked you a little bit about --

18  | or you were talking a little bit about why it's so important

19  | for doctors that are having problems, either personal or

20  | mental or drugs, to seek help.  Why -- again, why is that?

21  | A.    So the medical boards have learned through the years

22  | that just punishing people for their addiction, whether it's

23  | alcohol, drugs or mental health issues, it just doesn't work,

24  | right?  You just take their license away, and what that does

25  | is scares people away from treatment.  So it's much more

1    kinder, gentler medical board in general for all the states,

2    and they want you to come to them and say, hey, I'm hurting,

3    I need help.  And they're able to do that without you losing

4    your license or being affected.

5        Q.    It's a risk when somebody has one of those problems

6    that they're going to make mistakes in their practice?

7        A.    Yes, sir.

8        Q.    That they're going to overlook things that they

9    normally wouldn't overlook?

10       A.    Yes, sir, I would imagine.

11       Q.    That practices are run into the ground every day by

12   doctors who are mentally ill or have drug or alcohol

13   problems?

14       A.    I think that's an overgeneralization, but I'm sure it

15   happens.  I don't know about every day.

16       Q.    Okay.  Fair enough.  You've seen it happen before?

17       A.    Yes, sir.

18       Q.    Patients get hurt when it happens?

19       A.    Usually, yes, sir.

20       Q.    I'm going to pass back up Exhibit 101 to you.  I just

21   want to ask you a couple of questions about it.  Will you

22   just turn to the last page you have in there.  Let's make

23   sure we have the same number of pages.  At the very bottom,

24   do you see -- it may not be on there.  Just tell me if it

25   is -- GX419281?

1    A.    It's 282 on mine.

2    Q.    It is.  I didn't turn the page over.  So you're

3    holding a 282-page document?

4    A.    Yes, sir.

5    Q.    And the records kept within this clinic for Hope

6    Rogers is almost 300 pages?

7    A.    Yes, sir.

8    Q.    And if you go back to the beginning around page 3 or

9    4, there's an information sheet.  It's the pink sheet.  It

10   asks about insurance, secondary insurance, the normal stuff

11   that you'd expect to see in a patient's file.

12   A.    Yes, sir.

13   Q.    And that would be normal within the realm of a clinic.

14   You would expect to see this.  You would expect to have a

15   file, and you would expect to see this paperwork at the

16   beginning?

17   A.    Yes, sir.

18   Q.    There at page 5, 6, there's authorization to disclose

19   protected healthcare records or information?

20   A.    Yes.

21   Q.    Common to expect to see that in a file?

22   A.    Yes.

23   Q.    Flipping the page over a couple, there's -- they took

24   copies of her insurance, took copies of her driver's license,

25   again, all pretty standard within the field of medicine to

 1   put that in the record?

 2      A.   Yes.

 3      Q.   And then it just starts going through.  And you have

 4   your -- I guess these are called -- well, what would you call

 5   the forms at page 12 when it has the patient name and the

 6   date and date of birth at the top?  Is that a -- well, what

 7   do you call it?

 8      A.   It's called a progress note.

 9      Q.   Progress note.  And there should be one of these for

10   each time the patient comes in to visit with Mr. Young?

11      A.   Yes, sir.

12      Q.   Again, pretty standard in the industry to keep up with

13   your records like this?

14      A.   Right.

15      Q.   They're not the best records?  They're not really

16   thorough?

17      A.   No.

18      Q.   And, again, that's your opinion?

19      A.   Yes, sir.

20      Q.   Now, flipping through to page 36, what is that?

21      A.   Page 36 is a CT scan of the head that was done of Hope

22   Rogers on December 30, 2014.

23      Q.   And it was done at the regional hospital of Jackson.

24   That's what we call a referral; is that correct?

25           Or let me back up.  It was done at the regional

1  hospital of Jackson?

2     A.   Yes.

3     Q.   Okay.  And it's normal within the course of a medical

4  practitioner, especially maybe family practitioner, that if

5  they need testing done, if they want a CT done, they don't

6  have a CT in the back office, do they?

7     A.   Sometimes, but --

8     Q.   Family nurse practitioner?

9     A.   Sometimes they do.  Sometimes they have an MRI in the

10  parking lot.  But, normally, they go -- it's a financial --

11  it's a money-making industry, radiology.

12     Q.   Millions of dollars to have one of those, isn't it?

13     A.   Yes, sir.  But, normally, they just go down to the

14  local hospital with a prescription or a faxed order.

15     Q.   Right.  And so you're not surprised to see something

16  like this in a healthcare record that they needed some CT

17  scans done, so they sent them out to go get them done?

18     A.   Yes.

19     Q.   Let's go to -- let's go to 98.  Do you have it?

20     A.   Yes, sir.

21     Q.   Okay.  This is the one I think -- I think they asked

22  you questions about this or ones similar to this.  Now, this

23  is -- the collection date is 4/13/2016, long after the birth

24  of her child in ▮▮▮▮ of 2015, and it's got two inconsistent

25  tests that have been marked in yellow.  And if I understand

**UNREDACTED TRANSCRIPT**

1  correctly, your testimony was -- the warning there is that

2  those are the metabolites.  Had they consumed the pill, the

3  body would have broken it down so you want to see the drug

4  itself and the metabolite showing that it's in the body?

5     A.   Yes, sir.

6     Q.   Okay.  So the two inconsistents for the metabolites is

7  what causes you concern?

8     A.   Right.

9     Q.   And you believe and it would be your professional

10 opinion that a provider, if they see this, should take notice

11 and take warning of this?

12    A.   Right.  I don't know any other biologic way that it

13 could happen that you would not have the metabolite in your

14 system --

15    Q.   Right.

16    A.   -- but it would be in your urine.  And if you thought

17 it was a lab error, you could just repeat it.

18    Q.   If Hope Rogers had testified that at some point after

19 the birth of her baby, she began to sell her medication,

20 would this be consistent with her selling her medication?

21    A.   It would be, and then maybe holding one back for the

22 test.

23    Q.   And, again, it is in the records that you reviewed?

24    A.   Yes, sir.

25    Q.   And you see down here it appears that at some point

1  she was counseled or asked questions about this testing?

2  A.   Yes, sir.

3  Q.   And she denied it.  And the -- one of the

4  recommendations from the toxicology lab was to recollect or

5  retest the sample; is that correct?

6  A.   Yes, sir.

7  Q.   Any idea what that is right there?

8  A.   It's a list of dates.  I don't know what he's trying

9  to indicate, if it was previous drug tests or what.

10  Q.   Okay.  And so witnessed by -- and these are two

11  females, and this is a female patient.  Would you -- if you

12  had a concern that they were breaking pills off and spiking

13  their urine, if you will, you would have maybe your female

14  staff observe the next urine sample?

15         MS. PAYERLE:  Objection, Your Honor.  This is

16  very speculative.

17         MR. FERGUSON:  I'll rephrase.

18  BY MR. FERGUSON:

19  Q.   Is it normal, within the field of urine screens within

20  the medical profession, that you don't let somebody go into

21  the bathroom and pee alone because they can spike it?  If you

22  have concerns about that, you would ask for a witness sample?

23  A.   Sometimes you do have somebody witness the sample

24  because they can spike the urine or bring in urine from home

25  that's somebody else's, but it's not clear to me that they

**EXAMINATION OF TRICIA AULTMAN, M.D.** 76

1  witnessed her urinating or they witnessed her denying that

2  she took the medicine.

3  Q.  All right.  If you're concerned about fake pee

4  results, fake testing, what's the protocol?  What's the

5  standard in the field?

6  A.  I mean, I think I would call them in on a surprise,

7  say, like, not on their regular scheduled appointment.  Call

8  them in and say, hey, we need a sample today.  And if they're

9  taking their medicine as prescribed every day, then it would

10  be positive for the medicine and the metabolites.

11  Q.  Would it also be within the standard of care to have

12  the observed samples?

13  A.  You could, yes, sir.

14  Q.  Okay.  You say that you have great concern over the

15  hydrocodone and the alprazolam, correct?

16  A.  Yes, sir.

17  Q.  Can you explain to this jury why, I don't know, about

18  ██  months before she gave birth, the hospital in Jackson

19  was prescribing her hydrocodone along -- knowing that she was

20  on Xanax?

21  A.  I can't explain that, no, sir.  I know at one point

22  she did have an admission for some preterm labor.  I'm not

23  sure if that correlated with the prescriptions you're talking

24  about.

25  Q.  I'm going to show you page 52 in that exhibit.  It

**UNREDACTED TRANSCRIPT**

1  says that Jackson medical admitted by her doctor, Armie

2  Walker, given Demerol and hydrocodone.  You were able to

3  verify that, were you not?

4     A.   I read through the hospital medical records, and she

5  was given those in the hospital, yes, sir.

6     Q.   And you also see it at page 183 -- wow, I'm so

7  horrible these days -- 183.  And, again, you can see that --

8  let me blow it up.  Dr. Walker gives her 30 hydrocodone

9  pills, which has a MED, is that the daily MED?  What is that,

10 MEE and MED?

11    A.   Yes, the morphine milligram equivalent or morphine

12 equivalent dose.

13    Q.   He prescribes her 112.5 MEDs in the hospital while

14 she's pregnant?

15    A.   That doesn't make sense to me because it looks like

16 here she's getting hydrocodone 7.5 milligrams, a quantity of

17 30.  It doesn't make sense that he wrote it for two days.

18 Nobody is going to take 15 hydrocodone with that much Tylenol

19 a day.  So that's why the MED doesn't look right.

20    Q.   I agree with you.  Nobody takes it -- takes that much

21 in two days, do they?

22    A.   No, sir.  Well, they do, but it's not good.

23    Q.   No doctor is prescribing that much?

24    A.   No, sir.

25    Q.   Okay.  Thirty pills is probably more between 10 and 15

1    days, if she's taking two to three a day?

2      A.   I would think so.

3      Q.   Which would drop this down probably by half or more?

4      A.   Oh, way less.  So if she took three a day, it would be

5    7.5 times three, I don't know, 20 something, 23, 24.

6      Q.   Here's where she's taking, looks like, four a day.

7    And it's only 30?

8      A.   Thirty, yes, sir.

9      Q.   So -- but, again, her OB in the hospital is

10   prescribing her the medication that you're saying is outside

11   the normal scope and course of medical treatment?

12     A.   Right.  I think the only caveat to her OB prescribing

13   that is the situation surrounding her admission was preterm

14   labor, and if he thought the benefit outweighed the risk of

15   further labor.  I can't really speak for him.  I'm sorry.

16     Q.   Right.  All you can do is verify that Mr. Young wasn't

17   the only medical professional prescribing her these drugs

18   that you've just told the jury that no one prescribes?

19     A.   No, I said no one would prescribe benzodiazepines for

20   sure.  Opioids only in -- if you absolutely had to.

21     Q.   When you were reading over these records, did you read

22   over the records of her high-risk OB?

23     A.   Yes, sir, I did.

24     Q.   So you were aware she had a high-risk OB?

25     A.   She did, and it was a very thorough note.

**UNREDACTED TRANSCRIPT**

1  Q.   Why didn't you tell the jury she had a high-risk OB?

2  A.   Because she was on opioids and benzodiazepines, and

3  the baby was at risk for neonatal abstinence syndrome.

4  Q.   Right.  But you didn't tell the jury that?

5  A.   I don't know if we talked about it.

6  Q.   Did you tell the jury just a few minutes ago when the

7  Government was asking you questions that she had received the

8  same -- similar drugs from another doctor at the same time

9  that you're testifying here today while you're getting paid

10  against Mr. Young?

11  A.   Her OB only prescribed 30 hydrocodone one time and

12  he -- the OB never prescribed benzodiazepines, so there's a

13  difference between the duration and the medications that were

14  given.

15  Q.   And in the records you reviewed, they knew she was on

16  benzodiazepines?

17  A.   They did.

18  Q.   So he prescribed hydrocodone knowing she was on Xanax,

19  correct?

20  A.   Yes.

21  Q.   Thank you.

22          THE COURT:  Thank you, Mr. Ferguson.

23          Any redirect?

24          MS. PAYERLE:  Yes, Your Honor.

25

**UNREDACTED TRANSCRIPT**

```
 1                        REDIRECT EXAMINATION

 2   BY MS. PAYERLE:

 3      Q.   Dr. Aultman, can you think of a legitimate medical

 4   reason why a doctor may prescribe hydrocodone for a couple of

 5   days while a patient in preterm labor is in the hospital?

 6      A.   Right.  If you think whatever pain they're having --

 7   it wasn't clear to me from the records, because I don't think

 8   I have those records.  I reviewed her hospital delivery

 9   records.  I'm not sure if I actually knew why she was in the

10   hospital.  But if you thought that the benefit outweighed the

11   risk for a brief period of time, opioids are probably

12   indicated at that point.  And I think it was also further

13   along in the pregnancy, which makes it much less dangerous

14   than the first trimester, which is the beginning of the

15   pregnancy when all the organs are being formed.

16      Q.   So does the fact that a doctor may have prescribed

17   Hope Rogers hydrocodone for a very short period of time while

18   she was in the hospital for preterm labor change your opinion

19   about whether Mr. Young's ongoing and increasing

20   prescriptions of hydrocodone alongside Xanax were for a

21   legitimate medical purpose and within the course of

22   professional conduct?

23      A.   It does not change my opinion.

24              MS. PAYERLE:  Nothing further.

25              THE COURT:  Thank you.
```

**UNREDACTED TRANSCRIPT**

1              Mr. Ferguson, anything further?

2              MR. FERGUSON:  No, I don't think so.  Thank you.

3              THE COURT:  All right.  You're quick on the draw

4    there, but you are excused.  Thank you.

5              Government, if you would, please, call your next

6    witness.

7              MS. PAYERLE:  Your Honor, at this time the

8    Government rests.

9              THE COURT:  Okay.  Thank you.  I think you heard

10   the Government rests its case as far as in chief is

11   concerned.  That alerts me that some issues I have to take up

12   with the lawyers.  It's going to take a little longer than us

13   just going to side-bar like we've been doing.  What that

14   means is I'm going to have to send you to the jury room for a

15   short time before we can proceed with the trial.  Okay?

16             I'll take care of those things and get back to

17   you just as quickly as possible.  Leave the notebooks.  Don't

18   discuss, and I'm going to go ahead and excuse you to the jury

19   room.

20                  (Jury out at 3:46 p.m.)

21             THE COURT:  All right.  Are there any motions?

22             MR. FERGUSON:  There are, Your Honor.  It's going

23   to take me just a moment to pull up the indictment.  I want

24   to have it in front of me when I walk through.

25             THE COURT:  Do you need a few minutes?

**UNREDACTED TRANSCRIPT**

1          MR. FERGUSON:  It just takes me about 30 seconds,

2  probably.

3          THE COURT:  Okay.

4          MR. FERGUSON:  Yes, please.  It's either that or

5  try to dig through all the paperwork to find it.

6          THE COURT:  We're not in recess.  Y'all can be

7  seated.

8          MR. FERGUSON:  Your Honor, if I may.

9          THE COURT:  Go ahead.

10          MR. FERGUSON:  Thank you.  On behalf of Jeffrey

11  Young, at this time, defense makes a motion for judgment of

12  acquittal on the indictment.  There's some specific issues in

13  which the Government's proof is lacking such that this case

14  should not be -- should not move forward at this point.

15          Count 1, obviously, charges a conspiracy in this

16  count.  One of the key -- obviously, the number one feature

17  of conspiracy is an agreement between two or more people to

18  do something that's illegal.  The case here, originally,

19  while I understand it, says -- it doesn't say known or

20  unknown.  It just says that defendants Jeffrey Young,

21  Alexander Alperovich and Andrew Rudin did knowingly and

22  intentionally combine, conspire, confederate and agree --

23  here it is -- with each other and others unknown -- there it

24  is.  I knew it was in there somewhere -- to distribute

25  Schedule II substances.  I haven't heard any proof of

**UNREDACTED TRANSCRIPT**

1  conspiracy or agreement among anyone.  In fact --

2          THE COURT:  Among what was it?

3          MR. FERGUSON:  Among anyone.

4          THE COURT:  Oh, anyone.

5          MR. FERGUSON:  Of course, they always throw in

6  the language known and unknown.  It's always kind of wait to

7  see who shows up to court to testify.  Well, out of the three

8  named people, Jeff Young didn't testify, nor is there any

9  proof in any of his many statements that he had made some

10  agreement with other people to sell or prescribe these drugs

11  to the patients.

12          And that's one of the things we have to keep in

13  mind here is that the patients are -- in the state's case,

14  they're the target of this conspiracy.  They're not the

15  coconspirators.  They're the target to sell them and to

16  prescribe them the medication to addict them to keep them

17  coming in so that other people can make money off the

18  practice and that -- and in their words, the illegal drug

19  sales.

20          Dr. Alperovich was very clear, and I was very

21  specific to ask him was it -- was it your understanding --

22  was it your intent, your agreement -- did you two have an

23  agreement to sell drugs, to prescribe drugs?  And he said no.

24          There's been no testimony from Dr. Rudin.  And

25  there's been nobody who has come in and said that there was a

1   conspiracy.

2          Even when Kristie Gutgsell came in, she was asked

3   had she pled guilty to something, and she said, yes, but she

4   did not -- there was no questioning of her as to what the --

5   what the agreement was, if there was an agreement, was

6   Mr. Young part of that agreement.  Just that she had pled

7   guilty and was awaiting sentencing.

8          So as far as the conspiracy goes, there's been no

9   testimony to support a conspiracy in this case.

10          In the second through, I think it's Count 7, that

11   is the dispensing to Hope Rogers and not for a legitimate

12   medical purpose.  The proof has been that she was a patient.

13   She was being seen by him.  He was treating her and

14   prescribing her medication while at the office.  There's no

15   allegation that he was trying to sleep with her, and that's

16   not part of Counts 2 through 7.  The proof has been to this

17   point and, again, through the Government's last witness that

18   there were other physicians prescribing her hydrocodone.

19          And so if it's -- apparently, there are other

20   physicians prescribing her the same medication that they're

21   trying to say was somehow outside the normal scope and course

22   of the medical professional within a medical setting, then I

23   don't think that that's adequate proof to present Counts 2

24   through 7 to the jury.

25          Eight through 14, again, those are the two

1   undercover officers.  So -- and in the indictment they have

2   patient in quotes because they weren't patients.  They were

3   undercover officers.  Again, the testimony has been they came

4   into the office.  They made complaints of pain.  The

5   prescriptions -- again, the experts testified that opioids

6   are to treat pain.  They complained of pain.  They were given

7   prescriptions for pain and that that would be consistent.

8   It's been on video.  It's, obviously, in his office.  It's

9   within the normal course and scope of his practice.  He was

10  licensed when he did it.  He interviewed them.

11          While it might have been pathetically short and

12  underwhelming by all accounts, it was still:  What are you

13  here for, what are your symptoms, what's helped you in the

14  past, let's start and try this.  There was testimony from

15  Mr. Young through the nursing board that he was asked what do

16  you do if it doesn't work.  I can titrate up to twice.  And I

17  believe -- I think on both these cases, they were only

18  titrated twice.

19          But, again, it's consistent with what he said

20  that was his means and manner of treating pain within his

21  clinic.  And nothing in it indicates that, again, that the

22  prescriptions were for anything outside the normal course and

23  scope of his practice.  If for some reason these officers --

24  that's why we were very keyed in to ask them:  Did he ask you

25  for sex, did he try to have sex with you.  Obviously, that

 1  makes it a very -- it would be very damaging to us if that

 2  had been the outcome or that had been the -- his

 3  conversations with them.  That would, obviously, be something

 4  the Government would be able to hang their hat on saying the

 5  reasoning for these prescriptions was for something other

 6  than to treat the complaint, that it was to bribe them, if

 7  you will, into sex.  That's not what happened here.  He had

 8  the -- there was nothing that indicated he was doing anything

 9  other than meeting with them, investigating their claims of

10  pain and prescribing medication as he thought was

11  appropriate.

12          Based on that, I think -- and, I guess, with all

13  of those, naturally, 15 would fall, which is holding out a --

14  maintaining a drug involved premise and that just naturally

15  would fall if the other falls.  So I'd ask Your Honor to

16  enter a judgment of acquittal on these cases.

17          THE COURT:  Thank you.

18          Government, who will it be?  Mr. Pennebaker?

19          MR. PENNEBAKER:  Yes, Your Honor.  Briefly.

20          The argument about the insufficient evidence of

21  conspiracy in Count 1, starting with the three individuals

22  that are named in the indictment, Ms. Gutgsell was -- I'm

23  sorry.  I'm just making sure I go back to the top of the

24  indictment here.  So you have a -- Dr. Alperovich testifying

25  that he couldn't have done -- that Mr. Young couldn't have

 1   done what he did without Dr. Alperovich supervising the

 2   practice.  So that's evidence of a conspiracy with

 3   Dr. Alperovich that's sufficient at least to go to the jury

 4   as a disputed fact, a question of fact.

 5            There are other individuals, Dr. Alston, one of

 6   the precepting physicians early on in the practice that

 7   Ms. Gutgsell testified he oversaw the practice of the clinic.

 8   He signed records.  The records at that time as the

 9   Government's expert testified were abysmal just like they

10   were the entire time.  That's evidence of a conspiratorial

11   agreement between that precepting physician, who was getting

12   paid for precepting, and the defendant.

13            Dr. Rudin, the perfect preceptor that we had

14   evidence on.  There's conspiracy evidence in the record as

15   far as that individual is concerned.  And then, in addition,

16   the Government's 800 series, there are indicia that Mr. Young

17   is prescribing to some of these patients after determining,

18   after finding out, after seeing red flags that they're

19   selling their pills.

20            So, again, that goes beyond a patient/physician

21   relationship and into a conspiring with someone else to

22   facilitate the ultimate distribution of those drugs for

23   purposes other than medical practice.  So that's the

24   Government's response to the motion to dismiss Count 1.

25            THE COURT:  Before we go on to the other counts,

**UNREDACTED TRANSCRIPT**

1    tell me again proof in the record with Dr. Rudin.

2              MR. PENNEBAKER:  Dr. Rudin was the perfect

3    preceptor that I believe Ms. Gutgsell testified.  We saw some

4    text messages between Mr. Young and Ms. Gutgsell where

5    Ms. Gutgsell talks about how hard Dr. Rudin is to track down

6    to get him to sign records, to get him to see -- you know, to

7    perform his supervisory function in the practice.  And

8    Mr. Young responds to Ms. Gutgsell's frustration with the

9    phrase "the perfect preceptor," which is an allusion to the

10   fact that he's basically nonexistent, just covering, signing

11   for the practice, allowing the defendant to continue to do

12   his -- to do his diversion with drugs.

13             There was also testimony that Dr. Rudin was a

14   friend, that he lived in Chicago, that he never came to the

15   clinic, that he took a thousand dollars for covering for the

16   practice, basically.

17             THE COURT:  And so that supports the conspiracy

18   agreement?

19             MR. PENNEBAKER:  Yes, Your Honor.

20             THE COURT:  Okay.  Go ahead.

21             MR. PENNEBAKER:  The arguments about the

22   dispensing to Ms. Rogers, we've got specific opinions in the

23   record from the Government on the issue of whether or not

24   those prescriptions that are charged in the indictment were

25   issued outside the scope of professional practice without a

1    legitimate medical purpose, and the expert concluded that,

2    yes, each one of them was issued outside the scope.  We've

3    also got the patient testifying she didn't need those drugs.

4    In addition to other evidence that suggested that it's

5    outside the scope.  There's a lot of it.  So I won't go over

6    it all, Your Honor.

7              Then the counts involving the undercover, I

8    believe that the expert testified as to one of those

9    prescriptions -- no, no, as to one of them that had the

10   undercover actually taken the drugs, that she would have been

11   killed.  I think that's probably sufficient to meet the

12   burden to show that the prescription there was outside the

13   scope.  The expert also opined that each one of those

14   prescriptions was issued outside the scope.

15             The jury saw the consults and there's been

16   testimony from Shirley Pickering, from the Government's

17   expert, and even Mr. Young on the recordings of medical

18   boards seems to acknowledge that these things were the scope

19   of professional practice claiming that he did these things

20   and contrast that with the video of the undercovers that

21   showed, basically, that he did none of them.  So all of that

22   is evidence that supports a conviction on any of those

23   counts.

24             Then the drug involved premises, the Government

25   established through multiple witnesses that Mr. Young owned

```
 1   and maintained that premises, that he was -- that he was
 2   paying the rent there.  That Ms. Goslee, I know, testified
 3   that he was the owner and the operator.  We even heard him
 4   say on the Rock Doc TV that -- you know, sort of saying, hey,
 5   this is my place.  I'm the owner, president, et cetera, of
 6   PREVENTAGENIX.
 7              THE COURT:  All right.  Thank you.
 8              Mr. Ferguson, anything further?
 9              MR. FERGUSON:  No, Your Honor.  I've made my
10   points.  Thank you.
11              THE COURT:  Okay.  Well, my job in dealing with
12   these motions, I have to determine whether a reasonable jury
13   viewing the evidence in the light most favorable to the
14   Government could find the defendant guilty beyond a
15   reasonable doubt.  I don't make any comments or anything
16   about credibility, and I'm not really weighing the evidence.
17   The real question is in the light most favorable to the
18   Government, are there really jury issues; and my finding is
19   that for all the counts, there are decisions that the jury is
20   going to ultimately have to make.
21              As for the conspiracy, things Mr. Pennebaker
22   makes with regard to Rudin are true.  The testimony came in
23   through the testimony.  I can't remember her name, but she
24   was the office manager that he was, as it turned out in the
25   communications, was said to be the perfect preceptor.  Never
```

 1    showed up, little or no review of the records.  That does

 2    support a conclusion of a -- an agreement between two or more

 3    people, Rudin and, of course, Mr. Young.  Now, of course, the

 4    agreement doesn't have to be formal or written or anything

 5    like that, but it does indicate that relationship.

 6              Also, Dr. Alperovich -- I'm probably

 7    mispronouncing that -- testified that they entered into an

 8    agreement, a written agreement, if I'm not mistaken.  I know

 9    it wasn't introduced into evidence.  He said early on he

10    didn't think anything would be wrong with it; but y'all

11    correct me if I'm wrong, he reviewed the documents the first

12    time he went there.  He saw that they were inadequate, bad.

13    He should have stopped it at that time, but he did not.

14              So the jury will have to determine when the

15    conspiracy came into being, but there are definitely facts,

16    testimony from witnesses that indicate that there's an

17    agreement to do this.  And, of course, the defendant,

18    Mr. Young, couldn't do this without having the doctors'

19    oversight, even though for some periods of time, he did.  He

20    used the stamp and continued to do it in those times when no

21    doctor was available.  But there are indications in the

22    record -- of course, the jury will ultimately make the

23    decision that there is an agreement between the defendant and

24    at least one other person to commit the crimes.

25              Counts 2 through 7, Rogers being pregnant at the

 1  time, the last witness was unequivocal that the way the --

 2  Ms. Rogers was treated was definitely outside the course of

 3  professional practice.  The testimony about the scripts that

 4  were given to Rogers specifically while she was pregnant, was

 5  outside that scope, and it could lead to criminal

 6  responsibility.

 7          So, again, based upon the evidence and looking at

 8  it in the light most favorable to the Government, there are

 9  issues that the jury is going to ultimately make, and so the

10  motion in that regard is also denied.

11          And, similarly, the undercover officers who

12  testified, we saw the videos, scripts were given to them.

13  Again, the last witness indicated that reviewing all of that,

14  again, the medical treatment and issuance of the

15  prescriptions was outside that course of professional

16  practice, at least for the State of Tennessee.

17          Again, the jury is just going to have to make the

18  final decision.  They viewed all the evidence, as I did,

19  while it was coming in.  And I -- but on all the counts --

20  and I agree with you, Mr. Ferguson, Count 15 rides with the

21  other counts.  And so the jury, in viewing all the evidence

22  in the light most favorable, there are issues that the jury

23  could return verdicts of guilty on.  And so for those

24  reasons, the motion is denied.

25          MR. FERGUSON:  Your Honor, if I may.  I just want

1    to make sure it's clear on the record.  The agreement between

2    my client and Dr. Alperovich that's been mentioned in this

3    trial was the supervision agreement, the legal document

4    detailing that there was a contractual relationship between

5    the doctor to be the preceptor of Mr. Young.

6               THE COURT:  Was that document introduced?  I

7    didn't think it was.  Maybe I'm wrong.

8               MR. FERGUSON:  I don't think it ever got in.

9               THE COURT:  I know there was testimony about it,

10   but I don't think anyone ever introduced it.

11              MR. FERGUSON:  Well, I wasn't expecting it to be

12   brought up in the motion of judgment for acquittal either.

13   That's the agreement was a preceptor agreement.  Clearly,

14   there wasn't a written agreement to distribute Schedule II

15   drugs.

16              THE COURT:  Right.  I didn't think it was an

17   agreement to distribute the drugs, but there was an agreement

18   between the two.  It started, at least, with that document;

19   but I also focus in when the doctor went there that first

20   time, saw the charts, the records.  And I think he said he

21   should have put a stop to it at that time, or at least talked

22   with your client about it but chose not to.  That was the

23   worst decision, of course, he said in his life, and it cost

24   him.  That all, taken together, indicates an agreement to --

25   you know, to issue these scripts as the way they were.

**UNREDACTED TRANSCRIPT**

1    MR. FERGUSON:  I was just -- I didn't want there

2 to be any argument that there was a written agreement to be

3 distributing Schedule II drugs illegally.

4    THE COURT:  No.  No.  But there was testimony

5 about an agreement that they both -- a written agreement that

6 they entered into.

7    MR. FERGUSON:  Yes, Your Honor.

8    THE COURT:  Okay.  I'm assuming, Mr. Ferguson, no

9 change, there will be no proof from the defense?

10    MR. FERGUSON:  That's correct, Your Honor.  I

11 thank you for the time to review it further with my client.

12    THE COURT:  Yeah, we need to put it on the

13 record.

14    MR. FERGUSON:  Do you want him to be on the

15 stand?

16    THE COURT:  Yes, please.  Have him come up, if

17 you would, please.  And before you get there, I need to place

18 you under oath.  So if you would, please, raise your right

19 hand.

20

21

22

23

24

25