**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cr. No.: 1:19-cr-10040-JTF** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **JEFFREY YOUNG,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**UNITED STATES' BRIEF IN SUPPORT OF THE GUIDELINE CALCULATIONS AND
SENTENCING RECOMMENDATION SET FORTH IN THE FINAL PSR**

Comes now the United States of America, through undersigned counsel, and would show the Court the following:

The Court requested briefing from the parties on the converted drug weight ("CDW") for which the Defendant ought to be held accountable under the United States Sentencing Guidelines ("USSG"). The government sets forth below three methods (each a "Method") for doing so. This analysis demonstrates that even the most conservative, trial-evidence-only option yields a Base Offense Level 32, *see* USSG § 2D1.1(a)(4) (more than 3,000kg but less than 10,000kg CDW). But, at least two other conservative options consistent with Sixth Circuit precedent yield a Base Offense Level 34, *see* USSG § 2D1.1(a)(3) (between 10,000kg and 30,000kg CDW). As explained further below,

- The Final PSR calculated the Defendant's Base Offense Level to be 34, using a conservative approach proposed by the government (the "PSR Approach"), which identified certain categories of patients that the evidence at trial showed received unlawful prescriptions.[1] The prescriptions were further narrowed by selecting only

---

[1] Some of the patients counted in the PSR Approach were discussed by the witnesses at trial or were participants in text message exchanges introduced as evidence; others, while not specifically discussed by a witness at trial, were counted in one of the illegal-

certain drugs for analysis; specifically, the opioids named in the indictment. Doc. 314 ¶¶ 47, 53 (recommending a CDW of 10,800kg, yielding a Base Offense Level 34 under USSG. § 2D1.1(a)(3)).

- Based on the Court's guidance at the November 30, 2023 hearing, the first Method the government proposes for calculating the Defendant's unlawful-prescribing CDW is a modification of (and proposed replacement for) the PSR Approach:

  - o **Method 1** narrows the proposed patient pool from the PSR Approach to comprise only the patients for which specific evidence at trial or a specific finding by an expert established unlawful prescribing.[2] Likewise, although many of these patients were prescribed multiple controlled substances, Method 1 uses only those drugs specifically named in the indictment— hydrocodone, oxycodone, fentanyl, alprazolam, clonazepam, and diazepam (collectively, the "Indictment Drugs")—each of which, as explained below, featured prominently in the trial evidence—to calculate CDW. This extremely conservative approach yields a CDW of 3,753kg, and a Base Offense Level 32 instead of 34. *See* **Sent Ex.**[3] **1**, **Method 1 Patient-by-patient Prescribing Summary**.[4]

- However, it would also be appropriate for the Court to adopt the Base Offense Level 34 in the PSR, based on other evidence presented at trial that supports including a larger percentage of the Defendant's prescribing to calculate CDW:

  - o **Method 2:** The evidence at trial established that the Defendant knew he had no precepting (*i.e.*, supervising) physician, as that term is defined by State of Tennessee, throughout the conspiracy period, but especially when

---

prescribing categories based on evidence from the investigation that was provided to the Defendant in discovery. The illegal-prescribing categories used in the PSR Approach included Preventagenix employees, "VIPs," back-door patients, patients who experts found to be receiving unlawful prescriptions, and very young patients.

[2] In this Brief, the phrases "unlawful prescriptions" and "unlawful prescribing" will be used as shorthand to refer to prescriptions written by the Defendant without a legitimate medical purpose or outside the course of professional practice.

[3] For clarity, exhibits to this Brief will be styled "Sent. Ex. __," and references to exhibits admitted at trial will be styled "Tr. Ex. __."

[4] All calculations of CDW in the Sentencing Exhibits accompanying this Brief come from data from the State of Tennessee's prescription-monitoring database ("CSMD data"), provided to the Defendant in discovery and used to create several of the government's summary exhibits that were admitted at trial. *See, e.g.*, Tr. Ex. 76 *et seq*.

On December 27, 2023 the government emailed defense counsel a sortable spreadsheet containing the raw data and the conversion index used to calculate CDW for each Method discussed here. Copies of the same will be provided to the Court and the PSR writer under separate cover.

he was under the supervision of the absentee Dr. Rudin from June 2016 through January 2017. During that time, the Defendant's prescribing of Indictment Drugs hydrocodone, oxycodone, and fentanyl corresponded to more than 22,000kg CDW. *See* **Sent. Ex. 2, Method 2 Rudin-era Prescribing Summary**.

o **Method 3**: The trial testimony from the government's experts established that the Defendant's common practice of prescribing of opioids (including the Indictment Drugs hydrocodone, oxycodone, and fentanyl) along with benzodiazepines (including Indictment Drugs alprazolam, clonazepam, and diazepam) was outside the scope of professional practice (i.e., unlawful prescribing), with such combination-prescribing of Indictment Drugs corresponding to more than 19,000kg CDW. *See* Sent. **Ex. 3, Method 3 Combination Prescribing Summary**.[5]

- Taking into account the other enhancements identified in the PSR (which are also addressed below) and a brief discussion of the factors set forth at Title 18, United States Code 3553(a) (which will be supplemented with argument and evidence at the hearing scheduled for January 16, 2024), the government concurs with the Final PSR's recommendation of **480 months' imprisonment** (the statutory maximum 240 months' imprisonment on Count 1 and each of Counts 8 through 15, and the statutory maximum 480 months' imprisonment on each of Counts 2 through 7, all to run concurrently). *See* Doc. 314-2 at 3.

---

[5] The proposed Methods are conservative because they omit entire categories of prescriptions that the trial evidence established included unlawful ones. For example, all Methods omit Schedule II opioids not named in the indictment and Schedule II stimulant drugs such as Adderall, even though the evidence at trial clearly indicated that on at least some occasions those were illegally prescribed. *See, e.g.*, Doc. 281 59-59; Tr. Ex. 88 (promising to bring "guitarist" through the "VIP entrance" to pick up Adderall refills).

Indeed, if the Court factored in *all* the Schedule II (stimulant and opioid) drugs the Defendant prescribed from Preventagenix, the final CDW would exceed 108,000kg, corresponding to a Base Offense Level 38. *See* **Sent. Ex. 4, Summary of Total Jeff Young Prescribing CDW from All Indictment Drugs Plus All Other Schedule IIs**.

Nor do any of the government's Methods include the total potential CDW attributable to the Indictment Drugs, which would yield almost 60,000kg CDW. *See* **Sent. Ex. 5, Summary of Total Jeff Young Indictment Drug Prescribing from All Indictment Drugs Plus All Other Schedule IIs**.

I.    **All Three Methods the Government Proposes for Conservatively Establishing the Defendant's Relevant-Conduct Prescribing Yield *at least* a Base Offense Level 32.**[6]

A.    **Legal Standard**

In an illegal-prescribing case, the assessment of relevant conduct includes prescriptions that were "part of the same course of conduct or common scheme or plan as the offense of conviction." *United States v. Godofsky*, 943 F.3d 1011 (6th Cir. 2019) (no error where district court counted all the prescriptions written by the defendant—90% of which were for oxycodone—and not just the prescriptions included in the five counts for which he was convicted), *abrogated on other grounds by United States v Anderson*, 67 F.4th 755 (6th Cir. 2023).

The law in the Sixth Circuit is clear: using a "reasonable and conservative estimate," supported by competent evidence, to ascertain relevant-conduct prescribing, is something that "precedent permits." *United States v. Pamatmat*, 756 F. App'x 537, 551 (6th Cir. 2018); *see also United States v. Geralt*, 682 F. App'x 394 (6th Cir. 2017) ("If the exact amount of drugs [that were unlawfully prescribed] is undetermined, an estimate will suffice, but a preponderance of the evidence must support the estimate.").

The Sixth Circuit *does not* require the rigid patient-by-patient analysis for which the Defendant advocated at the November 30 hearing (and that the government nonetheless uses in Method 1 to arrive at its most conservative CDW in the 3,000kg to 10,000kg range). The court considered such an approach in *United States v. Rodriguez-Iznaga*, where the appellant pointed to a Seventh Circuit case holding that a sentencing court

---

[6] The government assumes the Court's familiarity with the facts of the case, and consequently, focuses this briefing on those facts and circumstances that relate directly to the issues for sentencing.

"must explain its findings with respect to each patient and make a reasoned determination whether or not the Government has carried its burden." 575 F. App'x 583, 586 (6th Cir. 2014) (quoting *United States v. Chube*, 538 F.3d 693, 694 (7th Cir. 2008)).

Expressing concern that such an approach would be "needlessly cumbersome" given the more than 600 patients involved in the case before it, the court in *Rodriguez-Iznaga* also distinguished *Chube* on the basis that "here the district court did explain why the prescriptions to the OH–KY–WV residents were not merely unnecessary but instead indicative of drug trafficking," pointing to the district court's finding "that no reasonable person in that much pain would travel 15–plus hours to Florida (every 30 days) when he or she could get the same medication 'down the street' or 'across the road.'" *Rodriguez-Iznaga*, 575 F. App'x at 586.[7]

In *Geralt*, the court acknowledged that a "district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record," upholding a sentence based on the PSR's estimate that 90% of the prescriptions for certain categories of drugs were illegally issued, based on, *e.g.*, a statistical analysis showing a "continuing pattern of wrongful action."[8]

---

[7] Notably, even in the Seventh Circuit, where (unlike in the Sixth Circuit) the government must address particular patients, it is "not necessary…for the government to systematically discuss every single prescription that every single patient received. That would be a duplicitous and meaningless procedural requirement." *United States v. Rosenberg*, 585 F.3d 355, 357 (7th Cir. 2009).

[8] Defense counsel also directed the Court's attention to the Third Circuit's recent decision in *U.S. v. Titus*, No. 22-1516 (3d Cir. Aug. 22, 2023).

In addition to being out of step with Sixth Circuit authority, *Titus*'s holding does not apply to any of the Methods proposed by the government in this case. Instead, *Titus* addressed the question of whether drug quantities may be "extrapolated" from a review of a few files. "Extrapolation" is a concept used in statistical analysis to draw conclusions about a whole based on a smaller sample size; for example, concluding that because 60% of the expert-reviewed prescriptions were illegal, then 60% of all prescriptions were illegal.

**B. Method 1: Calculating CDW Using Specific Patients Discussed or Referred to at Trial.**

The first, most conservative method of calculating CDW is essentially the PSR Approach, narrowed based on the Court's guidance on November 30 to include only (1) patients specifically discussed by witnesses at trial as examples of patients receiving unlawful prescriptions from the Defendant; and (2) patients whose files were reviewed by Dr. Aultman, the government's expert who reviewed "well over 20 charts" and was not able to see *any examples* "to suggest that Jeffrey Young was prescribing opioids in the course of professional practice for the State of Tennessee." Doc. 282 at 57.

Some of the Method 1 patients were identified in trial testimony by the Defendant's office managers and one of his employees, who established the pervasiveness of the Defendant's unlawful prescribing at Preventagenix. For example, the Defendant's first office manager, Heather Goslee, recalled that the Defendant prescribed her and other Preventagenix employees controlled drugs, without a consult. Doc. 275 at 26. Goslee didn't believe she needed what the Defendant prescribed her, nor was she aware of a single instance where the Defendant "ever turn[ed] down any of the employees for

---

Extrapolation is a mathematical technique that—if performed correctly—can be useful in determining drug amounts. But in *Titus,* the district court relied on a "medical expert's review of twenty-four files to infer the illegality of thousands of other prescriptions" even though a sample size of twenty-four was not a "statistically valid" sample." *Id.* at *7.

None of the three Methods the government proposes rely on statistical *extrapolation* from an expert review. If they did, the government would posit that 100% of the prescriptions written were illegal, because the government's medical expert, Dr. Aultman, testified she reviewed "well over 20 charts" and was not able to see *any examples* "to suggest that Jeffrey Young was prescribing opioids in the course of professional practice for the State of Tennessee." Doc. 282 at 57.

Rather, as set forth below, the government's first proposed Method is patient-by-patient; the other two involve conservatively *estimating*, as this Circuit's precedent allows, the quantity of unlawful prescriptions on the basis of the direct evidence at trial.

anything that they asked for," *id.* at 28. Goslee also testified that the Defendant prescribed Indictment Drugs for girlfriends like Daphne Joyner (who also happened to be an employee, and who did not appear to be in pain). *See id.* at 22-24, 27.

After Goslee left the clinic, Kristie Gutgsell took over as the Defendant's office manager. During the time she worked at Preventagenix, Gutgsell described the waiting room as "always full" and the "patients, a lot of them looked as if they had issues," specifically, "[a]s if they were strung out." Doc. 275 at 82.

Gutgsell explained that the Defendant had "a lot of friends and a lot of people that would come in" through a "back door" of the clinic, *id.* at 76 (naming Ben Elston, Daphne Joyner, and Alexandria Gray as individuals in this category), or bypass the front desk and go "directly to the Defendant's office." Doc. 275 at 84.[9] Gutgsell testified that she personally heard some of the women in this category having sex with the Defendant in the clinic during office hours. *Id.* at 87-88. And Gutgsell identified men she described as the Defendant's "bodyguards," like Jay Green and Ben Elston, who would drink with the Defendant and do his bidding, all while receiving prescriptions for the Indictment Drugs from the Defendant. *Id.* at 91-93.

The Method 1 patients also include the undercover officers to whom the Defendant prescribed oxycodone and fentanyl, among other Indictment Drugs. The Court will recall the introduction of video footage at trial of the officers sitting with the Defendant—sometimes two-at-a-time—for single-digit minutes, while the Defendant mostly discussed

---

[9] The "back door" patients whose names appear in the chart below were far from the only ones. Gutgsell estimated that about "10 people a week" were "back-door patients" who would "bypass these normal doctor's office procedures" on a "daily basis." Doc. 275 at 86. In the "little over a year" she worked there, she estimated there were "well over a hundred different people" that fell into this category. *Id.*

various aspects of his personal life before prescribing them powerful narcotics that the jury found beyond a reasonable doubt to be unlawful. *E.g.*, Doc. 276 at 103 *et seq.* (Tripp); Doc. 278 at 68 *et seq.* (St. Laurent); Doc. 4, Indictment, Counts 8-15.

The chart below identifies the specific basis for each patient's inclusion in the Method 1 group, and for each patient, **Sent. Ex. 1** sets forth the CDW attributable to each Indictment Drug:[10]

| Patient Name | Evidence Related To Prescribing |
|---|---|
| Azbill, Andy | D. Rogers testified that Azbill's patient file (Tr. Ex. 25) demonstrated numerous failed toxicology screens, including evidence the patient was scraping bits of pills into urine. Doc. 276 at 92-98. |
| Bartlett, Scott | S.A. Scales testified about Defendant promising to bring this "guitarist" through the "VIP entrance" to pick up Adderall refills. The Defendant writes "That's the way the Grizz executives do it and my other high end clients…We have a discreetness policy," and promises "I can post date you 3 months [sic] worth." Doc. 281 at 57-59; Tr. Ex. 88. |
| Beaver, Aaron | Gutgsell testified the Defendant lured Beaver to the clinic by claiming he could help him with opioid-addiction recovery; but the Defendant ended up prescribing Beaver more opioids. Doc. 276 at 8-9. Dr. Aultman also reviewed the patient chart and noted that from the beginning, the patient |

---

[10] Notably, the government's Method 1 analysis yields zero CDW for some of the individuals listed, because the Defendant unlawfully prescribed them controlled substances *other than* the Indictment Drugs.

One such patient is Scott Bartlett, a guitarist that the trial evidence showed repeatedly received unlawful prescriptions from the Defendant for the powerful Schedule II stimulant Adderall. *See generally* Tr. Ex. 88. (Schedule II controlled substances are the most dangerous category of drugs with a recognized medical purpose, including most opioids and stimulants.)

Were the Method 1 analysis to include *all* controlled drugs the Defendant prescribed the patients listed, the total calculation would reach 6,744kg. *See* **Sent. Ex. 6, Total Schedule II and Indictment Drug Prescribing for Method 1 Patients.**

| | |
|---|---|
| | was addicted to opioids, and all prescriptions fell outside the standard.[11] Doc. 282 at 35 – 37. |
| Brown, Anastasia | Gutgsell: Identified as patient with whom Defendant had a sexual relationship. Doc. 275 at 88. |
| Crowder (Tripp), Katie | Undercover officer who testified that she received controlled substance prescriptions. Jury convicted on related counts. |
| Davis, Chantal/Shantell | S.A. Scales discussed Ex. 81, which shows sexually explicit messages between the defendant and the patient, interspersed with prescriptions for controlled substances. |
| Donahoe, Mark | Gutgsell: Described as "back door" patient who was a lawyer helping the Defendant with his divorce. Doc. 275 at 18. |
| Elston, Ben | Gutgsell: Identified as a "back-door" patient, Doc. 275 at 86, and someone with whom the Defendant drank alcohol and that the Defendant viewed as his "bodyguard," *id.* at 93. She identified problematic drug screens in his patient record, Tr. Ex. 10, and explained staff's efforts to "dismiss" the patient, and the Defendant's insistence on continuing to prescribe. Doc. 275 at 95-99.<br><br>Tr. Ex. 83, page 3, is a text conversation in which Young asks the patient for help with his divorce, and Elston responds, "If she wants to play with the big dogs we'll be more than happy to make that happen." Before becoming a patient of the Defendant's, Elston was prescribed buprenorphine, which is used to treat opioid addiction. Doc. 281 at 88-89; Tr. Ex. 95 (Prescribing interspersed with messages). |
| Elston, Jerry | S.A. Scales testified that Jerry Elston is Ben Elston's father. It was a red flag that Ben Elston was securing additional prescriptions for pain medication on Jerry's behalf, without the Defendant seeing Jerry beforehand. Doc. 281 at 34-40. Tr. Ex. 83 contains examples where Jerry, allegedly communicating with the Defendant about his pain medications through Ben's phone, asks the Defendant for specific types, strengths, and quantities of pain pills, and the Defendant obliges. *E.g.*, Doc. 281 at 36; Tr. Ex. 83 at page 15. Prescribing to both men is |

---

[11] For the purpose of this chart, the phrase "the standard" refers to the legal standard at issue: whether the prescription was written for a legitimate medical purpose within the course of professional practice.

| | |
|---|---|
| | interspersed between the Defendant's exchanges with Ben Elston's phone. Tr. Ex. 83. |
| Gray, Alexandria | Gutgsell identified her as a "back-door" patient. Doc. 275 at 86. |
| Green, Jay | Gutgsell identified him as a police officer of whom Defendant asked favors. Doc. 275 at 91-92. Dr. Aultman testified the prescriptions Defendant wrote were "not written in the usual course of medical practice for legitimate medical purpose." Doc. 282 at 55. Tr. Ex. 84 shows text messages between the patient and defendant, showing prescribing interspersed with requests for favors, including asking the patient to "find this fucker" who is allegedly "threatening" the defendant, *id.* at 5, and also admitting the patient is "buzzing hard," just the day before the defendant prescribes hydrocodone, *id.* at 18. |
| Henley, Whitney | S.A. Scales introduced Tr. Ex. 79, which shows sexually explicit text messages between the patient and the defendant interspersed with controlled substance prescriptions. |
| Howell, Courtney | Gutgsell identified her as a patient with whom the Defendant had a sexual relationship, and described an incident in which Howell became increasingly intoxicated in the Defendant's office, prior to a sexual encounter. Doc. 275 at 88-90. Tr. Ex. 75 demonstrates ongoing prescribing interspersed with sexual text messages. Dr. Aultman testified it would not be "appropriate medical practice" to engage in a sexual relationship with patients. Doc. 282 at 54. |
| Keeton, Doug | S.A. Scales introduced Tr. Ex. 89, which shows prescribing for Xanax, testosterone, and Adderall interspersed with messages about the patient giving the Defendant VIP access to his club. |

| | |
|---|---|
| McKenzie, Adrienne | S.A. Scales introduced Tr. Ex. 74, which is a text message exchange establishing a sexual relationship between the Defendant and the patient, including the Defendant texting "I expect less clothes" when he sees her the next day, and the patient texting from the pharmacy "Hey hot stuff I am at Cost Plus pharmacy. They need what they call a prior authorization." Tr. Ex. 74, at 8–9, demonstrates an increasingly sexual correspondence against a backdrop of prescribing. |
| Moffitt, Keith | Dr. Aultman reviewed and determined that all prescriptions did not meet the Standard. Doc. 282 at 56. S.A. Scales introduced Tr. Ex. 87, which shows text messages in which the defendant prescribes high doses of oxycodone, while talking openly about drinking alcohol, and asking the Defendant to "slip me past dt [drug test] one more month" to "help a player out." |
| Montoya, Daphne (Joyner) | Goslee testified Defendant prescribed to Montoya, who was an employee, and whom he was dating, even though Montoya moved around normally without any indication of pain. Doc. 275 at 23-24; Tr. Ex. 100 (patient record). Dr. Aultman testified the prescriptions to this patient were "completely inappropriate." Doc. 282 at 53. Gutgsell also identified her as a patient with whom the Defendant had a sexual relationship. Doc. 275 at 88. S.A. Scales introduced Tr. Ex. 77, which shows extensive prescribing interspersed with sexual messages between the Defendant and the patient. |
| Morris, Jonathan | S.A. Scales walked the jury through text messages demonstrating Morris set the Defendant up with Cyndal Storey, promising to "keep it on the DL [down low] since Lexington is such a small town." Doc. 278 at 108; Tr. Ex. 76 at 3. In Tr. Ex. 76, on Page 1, Morris tells the Defendant the cough syrup the Defendant prescribed makes him (Morris) feel "like I just did cocaine or something." On the same page, Morris (who the Defendant prescribed benzodiazepines and opioids) suggests to the Defendant that "[i]f you want to grab a beer sometime let me know." *See also* Doc. 281 at 107 (Dr. Aultman discussing sedative properties of both benzodiazepines and opioids, and "[w]hen you put them together, it's kind of – it's kind multiplicative or adds on"). |

| | |
|---|---|
| Newsom, Chad | S.A. Scales introduced Tr. Ex. 90, text messages between the Defendant and patient indicating Defendant will leave prescriptions at the counter, with the patient agreeing to a "free consult" to thank the Defendant. Tr. Ex. 91 was used to show how few office visits were recorded, compared to the large number of controlled substance prescriptions issued to the patient. |
| Norton, Christina | Undercover officer who testified she received controlled substance prescriptions. Jury convicted on related counts. |
| Powers, Christina | S.A. Scales introduced Tr. Ex. 80, which shows the defendant soliciting and receiving explicit photographs of the patient, interspersed with prescriptions for controlled substances. |
| Pusser, Bethany | Gutgsell identified Pusser as a patient who the staff urged the Defendant to dismiss, but the Defendant continued prescribing. Doc. 275 at 100. Pusser came to clinic from a Facebook ad touting addiction treatment, and Defendant prescribed to her when she began dating his friend Kevin Phillips. Doc. 275 at 121-122. Dr. Aultman reviewed and determined that all prescriptions did not meet the standard. Doc. 282 at 56. |
| Rogers, Hope | Rogers testified that she was drug-addicted and pregnant while receiving prescriptions that the jury found were unlawful beyond a reasonable doubt. Dr. Aultman also reviewed the patient chart and determined that none of the prescriptions written by the Defendant were within the course of professional practice for a legitimate medical purpose. Doc. 282 at 7-34; Tr. Ex. 101. S.A. Scales introduced Ex. 92, which at page 6 shows text messages between the Defendant and the patient, including the patient begging the Defendant not to "say I said anything to u about detox or anything," followed by the Defendant prescribing more controlled substances. |
| Sanders, Amy | Dr. Aultman reviewed and determined that all prescriptions did not meet the standard. Doc. 282 at 56. S.A. Scales introduced Tr. Ex. 78, which contains extremely sexually explicit text messages between the defendant and the patient, interspersed with prescriptions, including the high-strength, immediate-release opioid, oxycodone 30mg. |

| Spencer, Lydia | Gutgsell identified the patient's husband Brian as a police officer of whom Defendant asked favors. Doc. 275 at 91 -92. |
|---|---|
| Stansell, Tricia | Gutgsell: Identified as a patient who the staff urged the Defendant to dismiss, but the Defendant continued prescribing. Doc. 275 at 100. Defendant was repeatedly warned that she was addicted to the drugs he was prescribing. Doc. 275 at 120. Patient testified she was drug-seeking and it was easy with the Defendant. Doc. 277 at 82 *et seq.* Dr. Aultman confirmed these prescriptions were inappropriate under the standard. Doc. 282 at 55. |
| Stone, Will | S.A. Scales introduced Tr. Ex. 85, which identifies this patient as someone associated with the "Sheriff dept." and the Defendant asking to "call in a favor" a few weeks before he writes Stone prescriptions for hydrocodone. The Defendant also repeatedly left prescriptions for other people to pick up without an office appointment. *Id.* at, *e.g.*, 4. |
| Storey, Cyndal | Dr. Aultman reviewed and determined that all prescriptions did not meet the standard. Doc. 282 at 56. Tr. Ex. 76 shows text messages between the Defendant and patient with sexual content interspersed with prescriptions. |
| Webb, Tiffany | S.A. Scales introduced Tr. Ex. 82, which shows interspersed with prescriptions for controlled substances including oxycodone and fentanyl, sexually explicit text messages between the Defendant and patient in which the Defendant asks for a picture: "I had some [sic] a little more revealing in mind." |
| Bennett, Anthony<br><br>German, Lee Ann<br><br>Ditto, Jeffrey<br><br>Robbins, Rose<br><br>Smith, Katie<br><br>Allen, Jessica<br><br>Davis, Eddie | Dr. Aultman testified she reviewed "well over 20 charts" and was not able to see *any examples* "to suggest that Jeffrey Young was prescribing opioids in the course of professional practice for the State of Tennessee." Doc. 282 at 57.  These are the individuals whose charts Dr. Aultman reviewed, whose names were not specifically mentioned at trial, but are included in her reports at **Sent. Exs. 7 & 8**. |

| | |
|---|---|
| Jaco, Chelsey<br><br>Moody, Randall<br><br>Moss, Melissa<br><br>Ormerod, Alan<br><br>Townsley, Jennifer<br><br>Yancey, Michael | |
| Wright, Carla<br><br><br><br><br><br>Rogers, Daniel<br><br>Lindsey, Katie<br><br>Carroll, Chelsea<br><br>James, Tessa<br><br>Deforest, Dottie<br><br>Wooley, Madison<br><br>McCown, Rebecca<br><br>Gutgsell, Kristie<br><br>Goslee, Heather | Gutgsell identified each of these individuals as an employee to whom the Defendant was prescribing. Doc. 275 at 114-115. Dr. Aultman testified it would be inappropriate to prescribe a substance that could be potentially abused to an employee. Doc. 281 at 114. Goslee testified that the Defendant did not conduct office visits with the employees, would give them whatever they wanted, and prescribed her drugs she didn't need. Doc. 275 at 22-24, 27.<br><br>Gutgsell explained the Defendant increased her Xanax prescription without diagnosis, and she became addicted. Doc. 275 at 115–116.<br><br>. |

In sum, Method 1 focuses strictly on those patients for whom there was particularized evidence introduced *at trial* of the Defendant's unlawful prescribing. At less than four percent (4%) of the more than 108,000kg possible CDW from Defendant's total Schedule II prescribing while at Preventagenix, *see* **Sent. Ex. 4**, and less than ten percent

14

(10%) of approximately 57,500kg possible CDW in Indictment Drug prescribing during that time, *see* **Sent. Ex. 5**—a time when the trial evidence established that Preventagenix *predicated its business model* on controlled substance prescribing,[12] despite being a so-called preventative medicine clinic—it is beyond dispute that the Defendant is "more likely than not actually responsible for a quantity greater than or equal to" the 3,000kg to 10,000kg CDW range, corresponding to the Base Offense Level 32 that the government asks the Court to adopt at a minimum. *See Pamatmat*, 756 F. App'x at 549 (internal quotation marks omitted) (citing *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008)); *accord United States v. Darji*, 609 F. App'x 320, 327 (6th Cir. 2015) (in upholding quantity of more than three million hydrocodone pills, pointing to clinic's corrupt "business model" where "scripts were written with persons having asked for hydrocodone initially; that a very small amount of medical evidence was obtained, that very little medical time was spent with them").

### C. Method 2: Calculating CDW Using Prescriptions Issued by the Defendant While He Was Fraudulently Holding out Dr. Andrew Rudin as His Preceptor.

As discussed in the Addendum to the Presentence Report in response to the Defendant's objections, and then at length during the November 30 hearing, Rudin's "perfect" paper preceptorship provides a secondary, alternative means for calculating CDW. Doc. 314-1 at 5; Doc. 275 at 124–130; Tr. Ex. 17.

Method 2 is predicated upon the copious prescriptions issued by the Defendant for the Indictment Drugs hydrocodone, oxycodone, and fentanyl, while the Defendant falsely

---

[12] *See, e.g.*, Doc. 276 at 89-90 (Testimony of Daniel Rogers) (Q: Did the controlled substances patients make up a big part of the [Preventagenix] business model? A: Oh, yes, ma'am.).

claimed that Dr. Rudin—his friend who *lived in Chicago* and never visited the clinic—was his supervising physician. That limited analysis yields a CDW of over 22,062kg, corresponding to a Base Offense Level 34 under USSG § 2D1.1(a)(3). The Method 2 calculations are reflected in **Sent. Ex. 2, CDW from Drugs Used in Calculating Rudin Plea-Agreement Relevant Conduct.**

As the Court heard, Dr. Rudin pleaded guilty in a related case for lying to the Nursing Board, admitting that he knew that "without a supervising physician, Jeffrey Young could not prescribe controlled substances and could not bill insurance for much of his work." **Sent. Ex. 9**, Rudin Plea Agreement, 1:23-cr-10028-JDB, Document 4 (W.D.TN Mar. 22, 2023), at 3. Rudin further admitted that when he signed his written preceptor agreement with the Defendant, he understood he would be a supervising physician "in name only" and would not provide any meaningful supervision.

Of course, the Defendant knew that Tennessee law required him to have a supervising physician—*he provided Rudin a contract to sign that spelled that out. See* Doc. 275 at 132-133; Tr. Ex. 15 (requiring "supervision to the NP <u>in accordance with the requirements set forth by the Tennessee State Board of Medical Examiners</u> . . . as described in Rule 0880-6-.02 of the Tennessee State Board of Medical Examiners Division of Health Related Boards (emphasis added)," including reviewing and signing the patient chart whenever the Defendant prescribed a controlled drug).

This Method is conservative because it omits pre-Rudin prescribing when the evidence at trial showed that before securing the Rudin, the "perfect [*i.e.*, totally absent] preceptor," the Defendant was actively and knowingly hiding his controlled-drug

prescribing from his previous supervising physician and/or scheming to cover up periods where he had no supervisor at all.

For example, the Court heard from Dr. Alperovich, who testified that he agreed to supervise the Defendant in late 2015, after the Defendant falsely told Dr. Alperovich that his "practice was focused on…cardiology, preventative cardiology, and with some family practice medicine." Doc. 277 at 29. Dr. Alperovich didn't conduct his first chart review at Preventagenix until around four months later, when he learned then that the Defendant was predominantly prescribing controlled substances. *Id.* at 39. Afterward, Dr. Alperovich felt he had experienced a "bait and switch." *Id.*; *accord* Doc. 275 at 128 (Gutgsell testifying that the Defendant "didn't want Dr. Alperovich to realize how many pain patients he was seeing"). Of the charts he reviewed, Dr. Alperovich found all of them to be woefully inadequate. *Id.* at 40–46 (detailing the many problems with the patient records he reviewed, including prescribing dangerous combinations of drugs, inadequate diagnoses, and ignoring positive drug screens).

After Dr. Alperovich left the clinic that day feeling that he had landed in "neck-deep shit. . . . it's what I got myself into," Doc. 277 at 47, he did not return until June, 2016, at which time he reviewed "I don't remember how many charts. It's all controlled, and it was opioids, benzodiazepines, anxiety medications, antidepressants, stuff like that." *Id.* at 57. What he saw caused him to quit in June 2016. *Id.* at 58.

Thus, it would be reasonable and appropriate for the Court to count against the Defendant not only his prescribing during the Rudin era beginning in June 2016, but also prescriptions he wrote between November 2015 and June 2016, when Dr. Alperovich was

allegedly supervising him.[13] However, to be conservative, Method 2 takes into account only the prescriptions for Indictment Drugs that the Defendant wrote *after* Dr. Alperovich resigned, narrowing a lengthy period of supervisor-free prescribing down to only six months. *Cf. United States v. Fabode*, No. 21-1491, 2022 WL 16825408, at *5 (6th Cir. Nov. 8, 2022) (concluding that it would have been reasonable for "the district court split the converted weight—half for Fabode, half for the other pharmacist," and observing that if even "roughly 40% of those sales were illicit, then the proper converted drug weight fell within [Base Offense Level 34]").[14]

### D. Method 3: Calculating CDW Using Dangerous Cocktail Prescriptions Issued by the Defendant.

Method 3, the final proposed method for conservatively calculating CDW, relates to the Defendant's frequent, dangerous prescriptions for combinations of Indictment

---

[13] Dr. Alperovich's testimony also included details about how he (Dr. Alperovich) pled guilty in a case similar to Rudin's, for lying to Board investigators about his supervision of the Defendant. Doc. 277 at 50-52.

[14] The Court should reject the Defendant's interpretation of the Supreme Court's recent decision in *Ruan v. United States* as foreclosing the use of Tennessee's preceptor rules as a factor to consider in determining whether the Defendant committed the crime of prescribing outside the scope of professional practice. To the contrary, *Ruan* reaffirmed that it is a defendant's *knowledge* that a prescription is *not authorized*—both of which are elements, the Court held, that the government must prove beyond a reasonable doubt to secure a conviction—that makes a prescription unlawful under the Controlled Substances Act. *See Ruan v. U.S.*, 142 S. Ct. 2370, 2377 (2022).

The trial evidence conclusively demonstrated that Defendant knew and intended—not only by the time Rudin became involved but also well before that—that he was issuing unauthorized prescriptions for controlled substances, *including* because he was not being supervised as required in the scope of Tennessee professional practice. His knowing failure to avoid meaningful supervision of any kind is also strong evidence that the Defendant fully understood that a significant percentage of the prescriptions for controlled drugs he issued during this time were unlawful. *Cf. Geralt*, 682 F. App'x at 407 (emphasizing the defendant's "demonstrably false statements" when interviewed by authorities as evidence "that he realized what he was doing was wrong, and a violation of the physician's responsibility to patients as well as to the licensing authority").

Drugs that included an opioid and a benzodiazepine prescribed on the same date. In each instance when a patient received such a combination, both drugs were counted toward the Defendant's CDW. Doing so yielded over 19,000kg CDW, corresponding to a Base Offense Level of 34. *See* **Sent. Ex. 3, Method 3 – Combination Prescribing Summary**.

This Method is justified from the standpoint of notice as well as trial evidence: The indictment charged in Count 1, as part of the conspiratorial manner and means, that the Defendant "knowingly and intentionally ignored the inherent risks of overdose, drug abuse, and death that accompany prescriptions of highly addictive opioids, benzodiazepines, and muscle relaxers, both independently and in combination,"[15] by prescribing "dangerous combinations of opioids and benzodiazepines," including, "to pregnant patient H.R., Hydrocodone, Oxycodone, and Alprazolam, for no legitimate medical purpose and outside the course of professional conduct." Doc. 4 at 9-10.

The testimony at trial from medical professionals Dr. Aultman, Shirley Pickering, and Nurse Natalie Seabolt established both the fact and the dangerousness of the Defendant's habit of prescribing opioids and benzodiazepines in combination.

---

[15] The Indictment further recites that

> It was well known that the combination of high-dose opioids and benzodiazepines (e.g., Alprazolam, Diazepam, and Clonazepam) in any dose had a significant impact upon the risk of patient intoxication and overdose. For a treating physician to prescribe this combination of high-dose opioids and benzodiazepines for a legitimate medical purpose, the physician needed to determine, at a minimum, that the benefits of the drugs outweighed the risk(s) to the patient's life.

Doc. 4 at 5. The Indictment also references warnings issued in early to mid-2016 by the Centers for Disease Control and Prevention ("CDC") and the U.S. Food and Drug Administration ("FDA") about these dangers. *Id.* at 5-6.

Shirley Pickering testified that oxycodone, benzodiazepines, and a muscle relaxer called carisoprodol (elements of the "holy trinity," a dangerous and addictive drug combination) all appeared among the Defendant's top prescribed drugs. Doc. 278 at 57.

In the data, Nurse Seabolt, an expert nurse practitioner, also saw "patterns" where Mr. Young was prescribing combinations of opioids and benzodiazepines to the same people on a "frequent basis." Doc. 277 at 119-120. Nurse Seabolt testified that prescribing benzodiazepines with opioids "raises the risk for adverse effects," such as "slowing of breathing or stopping breathing." Doc. 277 at 119.

Dr. Aultman testified that there was a "black box" warning for prescriptions of opioids and benzodiazepines "because of the risk of oversedation," Doc. 282 at 65, and noted that taking them together would "increase the high" of both, Doc. 281 at 107.

The court can and should conservatively conclude that the prescriptions the defendant issued for these dangerous combinations of the Indictment Drugs provide an independent basis for reaching a Base Offense Level 34. *Cf. United States v. Oti*, 872 F.3d 678, 700 (5th Cir. 2017) (affirming district court's conclusion that all prescriptions were outside the scope, citing "evidence that all of the visits with patients lasted 4–8 minutes, that few, if any, notes were taken, and that clinic employees prescribed hydrocodone to almost every patient, the district court's finding is "plausible in light of the record as a whole" and is therefore not clearly erroneous").

### E. Conclusion – CDW

All the calculations set forth above are conservative and reasonable: they all omit fair inferences to be raised from the testimony and evidence indicating a common pattern and practice of overprescribing, and they do not include, unless incidentally, patients

falling into other illegal-prescribing categories established by the evidence at trial and that were used in the PSR Approach—for example, additional "VIPs";[16] sexual partners not specifically named at trial, but who can be ascertained from the discovery relating to the investigation;[17] female patients under age 30;[18] patients who traveled from other cities;[19] and several others mentioned above.

Therefore, the government respectfully asks the Court to make a specific finding on all three Methods proposed by the government, and to adopt a Base Offense Level of at least 32 based on the application of each.

## II.    The Most Conservative Means of Calculating CDW, Which Yields a Base Offense Level 32, Still Yields a Total Offense Level 43.

Even adopting the more conservative Base Offense Level of 32, adding the relevant sentencing enhancements yields a Total Offense Level 44, which is lowered to a Level 43 by operation of Chapter 5, part A (comment n.2) (43 as the maximum offense level under the Guidelines), calling for a range of imprisonment of life.

---

[16] *See, e.g.*, Doc 276 at 99-100 (medical assistant Daniel Rogers testifying trying to "dismiss or fire patients from the clinic because of dirty drug screens…every chance I got," *id.* at 99, and describing with frustration in his voice how it was "like cutting kudzu," in that "[y]ou cut one leaf off, and two grew back").

[17] *See, e.g.*, Doc. 281 at 28 (Q: So Special Agent Scales, are these the only women that you and other investigators identified that are exchanging explicit messages with the defendant while they're receiving prescriptions for opioids and other controlled drugs from the defendant? A. No, sir.).

[18] *See, e.g.*, Tr. Ex. 42; Doc. 277 at 121 (Nurse Seabolt explaining that it was unusual that so many people were driving for such a distance – past plenty of legitimate pain medicine practices – to get prescriptions from the Defendant)

[19] *See, e.g.*, Doc. 278 at 11-13 (Nurse Seabolt explaining that that 81% of the Defendant's 18-40 year old Medicaid patients were female, Tr. Ex. 44, and that nearly 80% of his female Medicaid patients received a prescription for controlled substances. Tr. Ex. 45).

At the hearing on November 30, 2023, the Defendant raised additional objections to some of the other enhancements, but these should be rejected as demonstrated below.

### A. Double-counting vulnerable victim

The defense argued that the PSR incorrectly "double-counted" a vulnerable victim enhancement, because the Defendant was also convicted of prescribing to a pregnant woman, which carries its own sentencing enhancement.

However, Hope Rogers was not the only vulnerable victim; her child was victimized by the prescribing for which the jury found the Defendant guilty. Dr. Aultman testified about the impact to children born of women who are addicted to opioids, explaining that the babies are also born with a dependence on opioids, and must go through withdrawals in the first days of their lives. Doc. 282 at 25 ("they can have seizures, and tremors, they're irritable, they don't eat well, they don't sleep well, they're difficult to feed, and developmentally, they're usually behind the other babies for at least a year…it's not a pretty thing and results in long hospital stays for babies.")

The evidence at trial further established a scheme whereby the Defendant would prey on people struggling with addiction (such as Aaron Beaver and Bethany Pusser, both of whom are included in the Method 1 table, *supra*), by falsely advertising on Facebook that he had the means to help them when he did not. The testimony of Daniel Rogers, discussed *supra*, established that the Defendant did not offer any drug addiction treatment services, and the testimony of Dr. Aultman and Kristie Gutgsell, discussed *supra*, established that the Defendant had increased opioid prescriptions to both Beaver and Pusser. In Beaver's case, he died by overdose after the Defendant began prescribing

him hydromorphone (Dilaudid)[20] in the months following Beaver's purported recovery. Beaver's autopsy report is attached to this Brief as **Sent. Ex. 10**.

### B.  Double-counting drug-involved premises

The Defendant further argued that because the Defendant was convicted of a count of maintaining a drug-involved premises, the two-level enhancement for maintaining a premises under USSG § 2D1.1(b)(12) constitutes double counting. Defendant is incorrect. *See, e.g.*, *United States v. Boyer*, 536 F. App'x 539, 542 (6th Cir. 2013) (applying enhancement for premises to conviction for premises is "simply no[t] double counting").

### C.  Role enhancement

The Defendant objected to the four-level role enhancement, stating that the government is required to prove that the criminal activity involved five or more participants and did not do so. Not only is the Defendant is factually wrong about five or more participants; he also admits the second prong of the enhancement, which provides that it may be added if the criminal activity was "otherwise extensive," as it plainly was here.

First, the evidence at trial showed that the Defendant conspired with a number of others who also assisted with the unlawful activity, including Kristie Gutgsell, Alexander Alperovich, Andrew Rudin, Daphne Montoya, Charles Alston, Brittany Petway,[21] and several patients who were known to be further distributing the drugs, such as Cyndal

---

[20] Note that in another example of the government's conservative approach to the three Methods discussed here, these hydromorphone prescriptions were omitted from the CDW calculations for all three, further emphasizing that they were not double-counted.

[21] Alston and Petway both pleaded guilty to a separate conspiracy involving a clinic that Petway opened after she left Young's employ. Case No. 1:19-cr-10041-JDB (W.D.TN Apr. 16, 2019).

Storey and Whitney Henley. *E.g.*, Tr. Ex. 76 (showing text messages from Steven Williams warning Defendant that Storey is "selling them like some kind of drug dealer"); Doc. 281 at 17 (exchange between patient Henley and the Defendant, where Henley says she is "trying to sell some. Do you know anybody? I need to get my son's stuff and new clothes and stuff for when we go party, LOL").

In addition, the enterprise was "otherwise extensive," in that the Defendant owned and operated an entire clinic, employing drug testing protocols (which he did not follow), and lying to the nursing licensing board about his activities. *See, e.g.*, *United States v. Roe*, 790 F. App'x 25, 27 (6th Cir. 2019) ("As the district court appropriately observed, 'this was an extensive ongoing large scale opioid pill mill. … [Roe] was the central figure in it and had the connection between patients, pills, transportation, [and sales].' Because he 'organiz[ed] key features of the conspiracy and direct[ed] the actions of his coconspirators,' *United States v. Sierra-Villegas*, 774 F.3d 1093, 1101 (6th Cir. 2014), we accord the district court's conclusion the deference it deserves.").

### III.   Argument Related to Title 18, United States Code Section 3553(a) Factors.

While the Guidelines begin the sentencing process, they do not end the Court's inquiry, which considers the arguments of the parties, the statutory factors in 18 U.S.C. § 3553(a), and an individualized assessment based on the facts presented. *See United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir.) (The "court must properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C. § 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence."), *reh'g denied* (Apr. 17, 2018), *cert. denied*, 139 S. Ct. 264 (2018).

Based on the Methods proposed, all of which yield at least a Base Offense Level of 32, and the other enhancements discussed above, the Defendant's Total Offense Level is 43, which carries with it a Guidelines range of life. Thus, the PSR appropriately concludes that the properly calculated Guideline sentence is over 5,000 months.

Like the Final PSR, the government recommends a sentence of 480 months. This is a lengthy sentence, but it represents a significant downward variance from the Guidelines. And a lengthy sentence is warranted in light of the factors set forth in 18 U.S.C. § 3553(a).

At the hearing on January 16, 2024, the government will be prepared to present evidence of the following facts, which indicate that the Defendant has not accepted responsibility for the seriousness of his offense, and that he lacks respect for this Court and the rule of law. Specifically:

- Several of the Defendant's jail calls, from which the government intends to play excerpts for the Court at sentencing, reflect that the Defendant has no remorse about his actions, and in fact he continues to believe the case against him is the result of "manipulation" in a broken system. *See* **Sent. Ex. 11**, Transcriptions of Excerpts from Jail Calls in March and April 2023.[22]

- Abundant trial evidence showed that the Defendant is vindictive, prone to threats of physical violence, and has repeatedly engaged in harassment of his perceived enemies. For example, when Goslee raised her concerns to the Defendant about his overprescribing, he fired her in a profane group text message, admonishing his remaining employees that "[t]he kindergarten bullshit and people forgetting who is in charge is over." Tr. Ex. 5; Doc. 275 at 40. Investigator Pickering also felt the Defendant employed an "intimidation tactic," specifically going out of his way to ask Ms. Pickering whether she was "aware that people mentioned [her] by name in the tabloids." *Id.* at 63; Tr. Ex. 68. And after Gutgsell left Preventagenix, she fell victim to the Defendant's ongoing "harass[ment]." Doc. 275 at 119. She testified this was common procedure because "you're either for Jeff or

---

[22] The government has provided defense counsel the audio clips corresponding to the transcriptions, as well as the unexcerpted calls from which they originate, and will provide the same to the Court and the PSR writer under separate cover.

against Jeff, and if you were not for him, there was no neutral ground with him….and he would make your life a living hell." Doc. 275 at 118. In her case, Gutgsell explained, "he would just attack through himself, through his people, through social media…through anything and any way. I was followed. I was harassed. I was scared to go to the grocery store." Doc. 275 at 118-119. She described how the Defendant "would fly off into a rage, would get drunk…He's spit vodka at me. He's kicked me. He's screamed at me. He's then turned around and made me feel guilty as to I'm the only one that can help him; I'm the only one that can save him. I'm the only one—he would kill himself if it wasn't for me." *Id.* at 119.

- In addition to the trial evidence, the government directs the Court to certain evidence of the Defendant's propensity to harm the community, which the government presented to Judge Breen in connection with its motion to revoke the Defendant's bond, which Judge Breen granted. *See generally* Docs. 97 & 99. After hearing that evidence, Judge Breen concluded that no condition or combinations of conditions—<ins>*including, but not limited to, prohibiting the Defendant from any kind of medical practice*</ins>—would ensure the safety of the community. *See, e.g.*, Doc. 97 at 336-339, excerpt attached to this Brief as **Sent. Ex. 12**; *see also, e.g., id.* at 187:25-188:2 (victim discussing Young's threats against his "haters" on social media); **Sent. Ex 13** (complaint re 2016 parking lot assault of AB); **Sent Ex. 14** (2018 Chancery Court Order finding Defendant willfully violates court orders, hides assets, and is not credible); **Sent. Ex. 15** (complaint and social media excerpt re Nov 2016 assault); **Sent. Ex. 16** (redacted DY police report and pics re 2011 assault by Defendant); **Sent. Ex. 17** (excerpt from Nursing Board investigation interview of Defendant re M.Y. suspicious death); and **Sent. Ex. 18** (redacted police report concerning alleged rape by Defendant).

## CONCLUSION

The government respectfully requests that the Court make a finding that, using all three of the government's proffered Methods to calculate CDW, the Defendant's Base Offense Level is at least 32; that the enhancements recommended by the PSR apply; that the Defendant's Total Offense Level is 43; that the Defendant's Guidelines range is life imprisonment; and finally, that the Court impose a sentence of 480 months' imprisonment, which is a sentence sufficient but not greater than necessary to meet the purposes and ends of the Guidelines.

Respectfully submitted,

/s/ *Drew Pennebaker*
Katherine Payerle
Assistant Chief
Andrew Pennebaker
Trial Attorney
U.S. Department of Justice

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was electronically filed

through ECF on December 29, 2023.

*/s/ Drew Pennebaker*
Andrew Pennebaker
Trial Attorney