**Sent. Ex. 7**

Expert Witness Statement

RE: NP Jeff Young and Brittany Petway

Tricia Aultman, M.D.

January 30, 2018

Chronic pain is defined as pain that lasts longer than the expected tissue healing time, which is assumed to be three months. There are numerous treatment strategies for chronic non-cancer pain, including oral medication, injection of medication, physical therapy or surgery.  Many classes of medications can be used to treat pain, such as acetaminophen, non-steroidal anti-inflammatory medications (NSAIDS), anti-depressants, and opioids. The use of continuous opioid therapy for chronic non-cancer pain has increased significantly in the last fifteen years. Physicians prescribing opioids for chronic pain must be thorough in their evaluation of patients eligible for chronic opioid therapy, balancing the benefit and risk in each patient.  Physicians must also consider abuse, misuse, addiction and diversion of opioids in patients receiving chronic therapy.  Clearly, the evaluation and treatment of patients with chronic pain is complex.

The Tennessee State Medical Board is clear in their position in the treatment of pain with controlled substances.  First, the physician must document a medical history and perform a physical examination, documenting a "recognized medical indication" for using a controlled substance.  The physician should evaluate whether the patient has a history of or potential for substance abuse. Second, the physician must document a written treatment plan, and consider the need for further testing, consults, or other treatment options other than controlled substances.  Third, the physician must discuss the benefits and risks of the controlled substance with the patient.  Forth, the physician must intermittently evaluate the patient's progress toward treatment goals.  Finally, the physician must document the above in an accurate medical record.

Aside from pain, there are other medical disorders potentially treated with controlled substances. Generalized anxiety disorder is one such disorder, and the diagnosis and treatment can be complicated. The Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-5), requires a constellation of symptoms to be present to make the diagnosis.  The patient must have at least 6 months of excessive anxiety and worry and have difficulty in controlling the symptoms.  The patient must also have three or more of the following six symptoms present on most days in the last six months: feeling tense or restless, fatigue, concentration problems, irritability, muscle tension, or sleep difficulty.  In addition, the physician must determine that the symptoms are not part of any other mental disorder and are not due to substance abuse or a medical issue.  Finally, the symptoms must cause "clinically significant distress" in daily life.  The diagnosis of anxiety disorder cannot be made just by the patient saying they are "stressed." Once the diagnosis of anxiety disorder is made, the treatment of choice is SSRI's, or selective serotonin reuptake inhibitors.  Benzodiazepines can be used, as second line therapy, but because they are a controlled substance must be prescribed following the guidelines of the Tennessee Medical Board stated above.

The DSM-5 is also used to assist in the diagnosis of attention deficit-hyperactivity disorder (ADHD), similar to diagnosing anxiety disorder.  Patients must have five out of nine symptoms in each component, inattention and hyperactivity/impulsivity. (The length of the criteria precludes a complete

listing here.)  If an adult were not diagnosed as a child, a careful history of their childhood behavior must be obtained.  Patients with adult ADHD are also more likely to suffer from other psychiatric disorders, such as generalized anxiety disorder, mood disorders and substance abuse.  Clearly, the diagnosis requires a lengthy history.  Treatment with stimulant medications must be cautious, as the medications have a potential for abuse, especially in those with a history of substance-use disorder.  Stimulants can also raise the heart rate and blood pressure, which need to be closely monitored.

Obesity is an alarming problem in the United States.  Non-pharmacologic therapy should always be instituted first, including diet and exercise.  According to the National Institutes of Health, pharmacologic therapy for obesity should only be used when the body mass index (BMI) is greater than 30, or greater than 27 with co-existing medical conditions such as diabetes, hypertension, or sleep apnea.  Phentermine, an amphetamine, is one medication that meets the Food and Drug Administration's safety and efficacy requirements.  It is a schedule IV controlled substance, and can cause dependency, be abused, and can also raise the blood pressure.  It is indicated for short term use (less than a year) and an average weight loss at six months is only 7-8 pounds.

A medical record is a means to communicate the patient's care amongst physicians.  It is also a legal document, and if information is not recorded in the chart, "it didn't happen." The patient visit is recorded as a progress note, and is traditionally in a SOAP (Subjective, Objective, Assessment, Plan) format.  The subjective, is the history of the current problem, but also should include past medical history, family history, and social history as well as a review of systems.   Vitals sign lead off the objective portion, also known as the physical exam.  Lab or radiology reports are also part of the objective. The assessment and plan are the final part of the note, the physician pulling the information together to make a diagnosis and treatment plan. An average duration of a patient office visit is approximately fifteen minutes.

I have been asked to review charts from the Preventagenix clinic of NP Jeff Young and Brittany Petway.  Some visits were also performed by NP April Downing.  Along with the medical records, I have the prescription monitoring program (PMP) data for each patient, as well as the video recordings of the undercover agent visits.  My review is at times limited by illegible handwriting by Young.

**Jessica Allen (JA)** is a 34-year-old female who presents to Young on August 4, 2015, with multiple complaints including swollen lymph nodes, and fatigue.  JA reports that she was diagnosed with lupus in the last year and has a history of "ulcers" and "knots in her mammogram."  The review of systems is marked through as normal, and there is no further history, and no old medical records to explain or substantiate her diagnoses.  JA is taking adderall and percocet 10/325 (oxycodone with acetaminophen) according to her history.  The documented exam is brief and somewhat illegible, and benign, except for a documented heart rate of 122 (normal less than 100).  The elevated heart rate is a concern in JA as she is taking amphetamines which could cause this.  With no other documentation, Young diagnoses JA with chronic pain syndrome, systemic lupus erythematosus (SLE), peptic ulcer disease, rheumatoid arthritis (RA), and attention deficit disorder (ADD).  Young plans a urine drug screen (UDS), DNA swab, and orders a mammogram, and prescribes oxycodone 10mg, quantity of 90.

The prescription for oxycodone is invalid for several reasons.  First, there is no significant history as Young simply lists the patients' diagnoses.  Second, the exam does not substantiate her diagnosis of lupus or rheumatoid arthritis but does show tachycardia which would be something to investigate further especially in a patient taking amphetamines (Young does check JA's thyroid which if abnormal

2

could explain the finding).  Third, the UDS was not done as planned until several months later.  Finally, the strength of the medication is out of proportion with the patient's disease severity, especially as nothing abnormal was noted on exam.  Furthermore, SLE and RA are difficult to diagnose and require a thorough exam and laboratory work up, which is not seen here.  Both are forms of inflammatory arthritis, and cause pain, but are treated with disease modifying anti rheumatic drugs (DMARDS) which reduce inflammation, and not just cover up the pain.  In fact, neglecting to treat the inflammation can lead to severe deforming joint destruction in the long run.  JA had insurance and should have been referred to a rheumatologist for appropriate treatment.

JA follows up on August 17 complaining of a rash from the oxycodone, chest pain and shortness of breath.  Her pulse is 137, and a line is drawn through the normal column of the exam section, including the psychiatric and genitalia.  Given the amount of time Young spent with each patient, I doubt he performed a complete exam.  Young then documents a normal exam of the heart (a pulse of 137 is not normal) and orders a CT scan to rule out pulmonary embolus.  Young does not tell the patient to stop or decrease the adderall.  He lists the diagnoses and prescribes oxycodone with acetaminophen 7.5mg/325, quantity of 120, although it is not noted in the chart, it is present on the PMP.  If she were allergic to oxycodone, the same side effects could happen on oxycodone with acetaminophen.  Also, Young tells the patient to take an aspirin despite her history of peptic ulcer disease. The prescription for oxycodone with acetaminophen is invalid for the same reasons as stated previously. It is also invalid as she filled a month's supply of oxycodone two weeks prior.  JA fills a prescription for adderall 20mg quantity of 60 on August 29, with no documentation in the chart.  The prescription is invalid for he reasons stated above and because of the tachycardia (rapid heart rate).

JA refills the oxycodone with acetaminophen 10/325mg, quantity of 120 on September 13, 2015, before her next documented follow up on September 29. The history is limited to a few words, and Young marks a line through the normal column of the exam section.  He refills the adderall 20mg, quantity of 60, and adds tramadol 50mg quantity of 90 with no reason documented.  The prescriptions are invalid. Despite a month supply of oxycodone with acetaminophen given on September 13, JA refills a prescription on October 8, 2015, with no corresponding note in the chart.  JA is seen by Petway on October 12, who documents that the patient wants to change her medication secondary to side effects but does not document what they are.  Petway prescribes hydrocodone with acetaminophen 7.5/325mg quantity of 90. The prescription for hydrocodone with acetaminophen is invalid for the reasons stated above.  JA finally has a UDS at the October 12 visit.  It is appropriately positive for amphetamines, oxycodone, and tramadol, but is also positive for ketamine.  Young writes a note at the bottom of the page that the patient is using a compounded medicine.

When JA follows up on October 28, the progress not page is blank except for the word "refills." She is given a refill of adderall 20mg, quantity of 60, and the prescription is invalid.  JA is back just a few days later on November 3, 2015, and the history states she is there for a follow up of chronic pain.  It is still not clear where the pain is.  JA is again tachycardic, and Young draws a line though the normal boxes on the exam.  Next to it he writes diffuse point tenderness and a few other illegible words.  Young lists her diagnoses and prescribes hydrocodone with acetaminophen 10mg, quantity of 120, and adderall 20 mg quantity of 60.  The prescriptions are invalid because of the reasons stated previously, and because she received a month's supply of adderall just a week prior.  The adderall is also refilled on November 27, with no documentation in the chart.

3

JA returns to clinic on December 3, when she complains of difficulty focusing, mood swings, and heavy periods.  Young marks the exam as normal and adds that she has a tearful affect.  He refers the patient to another physician, possibly gynecology, for abnormal menses, and prescribes lexapro 5mg, along with alprazolam .5mg quantity of 45 and hydrocodone with acetaminophen 10/325mg quantity of 120.  Young does not give a history for starting the lexapro and alprazolam, whether it be anxiety or depression.  While alprazolam can be used short term in anxiety, it should be avoided long term in favor of medications like Lexapro, and benzodiazepines in general should not be used with opiates due to the increased risk of sedation.  The prescriptions are invalid for this reason and for the previously mentioned lack of history and exam, and medicine out of proportion to disease severity.  JA's last visit for 2015 is on December 30, when she requests to change the hydrocodone to percocet.  With no documentation to support his reason, Young changes the medication at the patient's request to oxycodone with acetaminophen 10/325, quantity of 120.  Young also refills the alprazolam .5 mg with an increased quantity of 60.  The prescriptions are invalid.

Prior to seeing Young in 2016, JA fills a prescription for Adderall 20mg, quantity of 60 and buprenorphine transdermal 20mcg per hour with a quantity of 4 on January 8.  There is no documentation to support the increase in dose to this potent opioid, in fact there is no note at all.  On January 25, JA follows up complaining of a sore throat.  The exam is marked as normal with the phrase "3 plus tonsils with exudate" added.  With no documented reason, Young changes the buprenorphine transdermal to a fentanyl transdermal at 75 mcg and prescribes oxycodone 10mg quantity of 120 with alprazolam .5mg quantity of 60.  There is no documented reason for the increase in opioid dose, and again the benzodiazepines are contraindicated due to the increased risk of sedation.

There are blank progress note for February 1 and 18 in the chart, but JA fills her adderall on February 1, and fills a prescription for clonazepam .5mg quantity of 90 on February 15, less than three weeks after filling a 90 day supply of alprazolam.  She also fills a prescription for fentanyl 50mcg, quantity of 10, all of these written by Young.  Adderall and hydrocodone with acetaminophen 10/325mg quantity of 90 are refilled again on March 1, 2016, with no documentation in the chart. Alprazolam 1mg, quantity of 90 is also filled on the 1st.  JA follows up on March 10, 2016, concerned that she has had a seizure.  Testing is ordered and is negative for seizure activity.  Fentanyl is filled again on March 24, with no documentation in the chart.  UDS is performed on March 25, 2016, and is appropriately positive for amphetamines and hydrocodone, but is negative for alprazolam and fentanyl metabolites.  Young wrote on the UDS form that JA was taking the alprazolam as needed as a justification for the negative findings, however she must have taken more than a one month supply in about 15 days.  There is no explanation for the negative fentanyl result and this should indicate to Young that JA is not taking her medications as prescribed.

On March 30, 2016, JA requests at her visit to change her alprazolam back to clonazepam.  Young complies with her request, and prescribes clonazepam 1mg, quantity 90, which is a higher dose than last time.  He also refills adderall 20mg, quantity of 60, and oxycodone with acetaminophen 10/325mg quantity of 90.  The last noted visit with Young is on May 5, 2016.  The only history states to refill meds, the exam is marked through as normal except for low back pain written in, and JA is prescribed fentanyl 50mcg quantity of 10, oxycodone 5mg quantity of 90, adderall 30mg quantity of 60, and klonopin 1mg, quantity of 90.  The prescriptions are invalid due to lack of documentation of history, exam, and lack of appropriate diagnosis, as well as medication out of proportion to the disease severity.

4

In summary JA is a young woman with possible inflammatory arthritis, and if the arthritis is active, she is mistreated by Young and Petway. She is started on opioids and the strength is significantly increased over the next two years. She also receives several different benzodiazepines at varying intervals, and adderall often more than once every thirty days. The prescriptions for JA are not within the accepted standard of care.

**Andy Azbill (AA)** is a 35-year-old man with coronary artery disease, hypertension, hyperlipidemia, and a history of lumbar spine fusion who presents to Young as a new patient on February 11, 2015. The chief complaint states that the patient thinks he needs cholesterol medication, and although Young marks the review of systems normal, the patient self-reported fluid retention and weight gain. (Young does not address these complaints, which could be critical in a patient with heart disease.) Aside from a medication list and noting that the patient is disabled, there is no other history. The physical exam is marked through as normal, with +LBP (low back pain) next to it. The Impression lists the following diagnoses: Spinal fusion, coronary artery disease, family history of coronary artery disease, and hypertension. The plan simply says labs, the names of medications not written in the chart, although there are copies of prescriptions. Young prescribes percocet 10mg (oxycodone with acetaminophen) quantity of 90, and tramadol 50 quantity of 120. AA follows up on February 25 for a review of the labs, when a cholesterol medication is added.

The prescriptions for tramadol and oxycodone with acetaminophen are invalid for multiple reasons. First, there is no real history recorded for the pain complaint, just a notation of a previous surgery. There is no description of the pain including its character, timing, exacerbating or alleviating factors, radiation, or medications tried and failed. The recorded physical exam, everything marked as normal except for back pain, would take quite a bit of time to complete, and from what we know, Young did not spend that much time with each patient. Young does not discuss receiving narcotics only from his office, as AA follows up with an orthopedic surgeon (ortho) on March 3, receiving hydrocodone.

AA follows up with Young throughout 2015. Although there is no recoded progress note, AA receives tramadol from Young on March 12, then hydrocodone from ortho on March 12, and carisoprodol and oxycodone with acetaminophen from ortho on March 26. AA has an office visit on April 1, when Young writes something illegible about hydrocodone for breakthrough. The documentation is no better than the first visit, and Young prescribes oxycodone with acetaminophen 10mg quantity of 90, and the prescription is invalid. He follows up just two weeks later on April 13 and is given tramadol 50mg quantity of 120. In May, he sees Young on the 1st and is given 90 oxycodone with acetaminophen 10/325mg. The patient is hospitalized due to an inability to void which could be secondary to worsening spine problems. AA receives oxycodone 10mg quantity 30 from APN Lori Rushing on May 15, and oxycodone 10mg quantity of 120 from Young on the 20th. The documentation for the office visit on May 20th is brief and does not include and explanation of the multiple opioid prescriptions. Furthermore, UDS is positive for barbiturates and negative for tramadol, findings that are inconsistent with AA's prescriptions. The prescriptions written in April and May are invalid due to the reasons stated previously, and because the patient was receiving medication from more than one provider.

AA follows up on June 22, and Young prescribes oxycodone with acetaminophen 10mg quantity of 120, the documentation is poor. AA also fills a prescription for carisoprodol on July 2, which was not mentioned in the June note. On July 16, the history states that the pain is severe and effecting quality of life, and that the patient has an upcoming appointment with a surgeon. Although the exam is marked

through as normal, the patient's heart rate and blood pressure are very elevated, which is not addressed, and are certainly concerning in this patient with known coronary artery disease.  (These findings are documented on multiple visits over the next several years.) The plan states to "d/c perc," and AA is prescribed oxycontin 30mg, quantity of 60.  Young makes no mention of the surgical visit, if it occurred, on August 14.  Blood pressure is out of control, not addressed, and Young prescribes oxycontin 30mg, quantity of 60.  The prescriptions are invalid.

On the September 14, 2015 office visit Young refills the oxycontin 30mg, quantity of 60, again the documentation is no better.  UDS confirms he is taking the oxycontin, but is also positive for hydromorphone, which could be from hydrocodone or dilaudid, which are not prescribed.  AA also receives hydrocodone from a dentist on September 21.  The patient complains of chest pain at the October 14 visit, but no vital signs were taken, which seems negligent in a patient with heart disease.  Young refills the oxycontin at the same dose and quantity.  AA saw his cardiologist and reported back on October 28 that the cardiologist thought his medications were to blame, so Young changes the oxycontin to oxycodone 20mg, quantity of 30.  On November 11, the history states that AA would like to change medications, and Young complies, prescribing hydromorphone 2mg, quantity of 90.  There is no documented reason for the change other than the patients request.  On December 9, the history states that AA thinks the new medications are working better.  With no further explanation, Young doubles the dose to 4mg of hydromorphone quantity of 90.  AA also fills prescriptions written by Young for hydrocodone with acetaminophen 7.5/325mg quantity of 15 and carisoprodol on December 10, and a prescription for cough syrup with codeine on December 24 written by another provider.

The visits continue throughout 2016, the first on January 7 when the patient complains of weight gain.  Hydromorphone 4mg quantity of 90 is refilled.  Young orders an extensive set of laboratory tests, and AA follows up on January 25, when Young prescribes hydrocodone with acetaminophen 7.5/325 quantity 15, the reason is illegible and brief.   On February 8, the history states that AA's meds were stolen, and he wants to increase them.  With no reason documented, Young increases the quantity of hydromorphone 4mg to 120.  On February 15 AA receives the first of what would amount to more than twenty testosterone shots in the next ten months.  The extensive laboratory work-up actually showed that AA's total and free testosterone were normal.  AA follows up on March 7, after being admitted to the hospital for hypokalemia, a prescription for percocet written by the hospital physician filled on the 6th.  Young refills the hydromorphone 4mg quantity of 90 then and writes another prescription for a quantity of 120 on March 25.  There is no documentation in the chart to account for the change in quantity on the 7th, and no documentation at all for the 26th.  UDS on March 7 shows that he is taking the hydromorphone, but is also positive for oxycodone, Young writing on the paper "old rx." Just a month later, on April 23, the patient states he wants to decrease the pain medication.  The patient's blood pressure is particularly high on this date, and this is not addressed.  Young stops the hydromorphone and prescribes oxycodone 30mg, quantity of 120.

AA reports that he had surgery on May 13, 2016 at his May 18 follow up with Downing.  She changes the oxycodone to oxycontin 10mg, quantity of 60.  UDS is negative for oxycodone, which is inconsistent with his prescriptions.  AA also filled the following prescriptions in May:  Percocet 10mg on May 5, hydromorphone and carisoprodol on May 16, written by outside providers, butrans patches 20mcg/hr written by Young at a May 26 visit, and carisoprodol on May 30 written by Downing.  There is clearly no consistent plan for this patient.  Just a few days after filling the butrans, AA sees Downing on June 8 and is given a prescription for oxycodone with acetaminophen 7.5/325mg, quantity of 120.

On July 1, AA tells Downing that he wants to get off pain medication.  There is no elaboration, but Downing prescribes oxycodone with acetaminophen 10/325mg, quantity of 120.  Again, there does not seem to be any consistent plan for this patient's pain management.  Young refills the prescription on July 27, 7.5/325mg a quantity of 60.  Perhaps this is an attempt to wean the patient off opioids? On August 22, Young changes the oxycodone with acetaminophen to hydrocodone with acetaminophen 10/325mg, quantity of 90, which is not filled again until October 15.  Carisoprodol is filled on October 15 as well.  On November 21 AA sees Downing and she prescribes hydrocodone with acetaminophen 10/325mg, quantity of 90.  AA also fills the same prescription on December 21, written by Young.

In summary AA is a young man with legitimate medical problems as well as pain from a previous and then recurrent lumbar spine surgery.  As stated above, the history and physical exam do not justify the prescriptions for tramadol, carisoprodol, and opioids that are prescribed by Young and Downing.  The patient receives medications from multiple other providers and has several UDS that are inconsistent with his medications.  Furthermore, there is a significant neglect and mistreatment of the patient's medical problems.  His blood pressure and pulse are uncontrolled, and he should have placed on a class of medication called a beta blocker to control these (eventually cardiology would do this in October 2016).  Young ordered extensive lipid panel and other specialty testing to determine AA's cardiac risk, when we already knew he had coronary disease.  AA also had abnormal thyroid function tests, which Young attempted to work up.  The ultrasound report showed thyroid nodules and the patient should have been referred to an endocrinologist for further management, especially since he had a rapid heart rate.  Young also started AA on testosterone replacement with normal testosterone levels, which has not been shown to be beneficial.  He received more than 20 injections, and even if his testosterone level was low this is likely too much.  Again, the appropriate plan of action would be a referral to endocrinology or urology.  Finally, Young ordered a CT scan of the adrenal glands to work up hypokalemia, when urine and blood testing should have been done first, if it was not completed in the hospital.  The prescriptions for AA are not within the accepted standard of care.

**Aaron Beaver (AB)** is a 31-year-old at the time of his initial visit with Young on December 8, 2015. There is more lengthy history than usual for Young's charts, and it states that AB has been injecting heroin and morphine on and off for 11 years.  He has been in treatment centers twice, but the last time was over four years ago.  At the time of the visit the patient complains of withdrawal symptoms including joint pain.  AB also states that he has had knee surgery three times.  Young documents that the exam is normal, writes his impression as heroin addict, and appropriately states the plan is to detox.  Despite Young's assessment, AB fills a prescription written by Young for hydrocodone with acetaminophen 7.5/325mg, quantity of 30, on December 11.  AB is prescribed alprazolam 1mg, quantity 60, on December 21, 2015.  These prescriptions are invalid as there is no documentation in the chart, because the patient has a history of drug abuse, and because if AB were taking any opioids the benzodiazepine could increase the sedative qualities.

AB does not return to the clinic until August 16, 2016 and states he has been clean of heroin 6 months, but has headaches, insomnia, and is worried about his blood pressure.  Young documents an exam which is illegible, diagnoses AB with insomnia, hypertension, and low back pain.  He prescribes Inderal for the blood pressure and headaches, and baclofen for the back.  Although the Inderal is appropriate, the diagnosis of back pain is not supported by anything in the history.  AB returns just a few days later on August 22, and the note is blank except for the words "baclofen was…" and the rest is illegible.  AB returns on October 12, 2016, and the history states simply "acute LBP."  There are no vital signs, and the

exam states only +LBP, and AB is prescribed hydromorphone 2mg quantity of 15. The prescription is invalid due to the lack of history, and because Young did not try a non-narcotic option first.  Young did not perform a UDS to make sure that AB was not abusing again and putting hydromorphone in the hands of a recovering addict is a very poor choice.

AB returns two days later, October 12, 2016, and is given a higher dose of hydromorphone, 4mg, a quantity of 15, with no further explanation in the chart.  On October 20, he returns to clinic and is given another 15 pills of hydromorphone 4mg.  Could Young not see that the patient was very likely abusing the medication?  AB returns on October 25, and this time an office staff member documents a bit more history.  They document that the patient felt an extreme pain after jumping out of a truck, and it radiates to his middle back.  Young documents that the chiropractor was not helpful, and orders an x-ray, but still refills the hydromorphone 4mg, quantity of 20.  AB returns on November 1, 2016, and the history states that he is taking his mediation as instructed.  Young documents that the plan is to wean the hydromorphone, and prescribes 4mg, quantity of 20.  The progress note dated November 9 is blank, but the PMP data show that AB filled hydromorphone 4mg, quantity of 30, prescribed by Young.

On November 30, the history states that AB needs refills, and Young adds that he is unable to get a MRI secondary to insurance (or lack of it, it is not clear).  Young refills the hydromorphone 4mg, this time a quantity of 90.  The same prescription is given at the December 27 visit.   When AB returns to clinic on January 5, 2017, the history states that AB would like a pain shot.  Young documents a mostly illegible sentence stating "finished (or flushed) his meds," and AB is given a shot of nubain.  There are no further progress notes however AB fills a prescription for tramadol on January 11, 2017.  The prescriptions for AB are not within the accepted standard of care.

In summary, AB has a known history of both prescription and illegal opioid abuse, and with only a complaint of low back pain and no real diagnosis Young prescribes a very potent opioid and increases the dose and the quantity without ever checking a UDS.  It is completely inappropriate to put this medication in the hands of a patient with a history of abuse.  Unfortunately, AB was found by his girlfriend dead in the bathroom on April 22, 2017.  Autopsy report states that the cause of death was toxic effects of fentanyl and morphine.

Undercover officer Katelynd Scott presents as patient **Katie Crowder (KC)** on May 4, 2016.  I have previously reviewed the video recordings of the office visits I will combine that with my current review of the medical record.  Her check in is routine, except for the large crowd in the waiting room.  When KC's vitals are taken, she is also asked to give a urine sample, which is unusual prior to seeing the provider.  She tells the medical assistant she is there to be seen for anxiety and low back pain.  KC is seen later by Downing, listing her complaints as bad anxiety, low back pain, and severe stress.  Downing takes no further history, and does not ask questions regarding the location, timing, duration, quality, exacerbating and relieving factors for the pain.  There are no follow up questions for the anxiety, either.  Downing does not perform a physical examination.  Downing prescribes clonazepam 1mg, tramadol 50mg, and baclofen 10mg.  Downing is in the room for less than nine minutes, evaluating KC and another undercover patient.

The prescriptions written by Downing for KC on May 4 are invalid for several reasons.  First, Downing does not perform an adequate history or physical exam to rule out other common causes of low back pain such as a urinary tract infection.  Downing assumes with very little information that KC has musculoskeletal back pain and insomnia or anxiety that requires benzodiazepines, without considering

8

any other diagnoses.  Downing then jumps straight to controlled substances without trying NSAIDS for the back pain, or non-narcotic sleep aids and good sleep hygiene for insomnia.

According to the reports provided to me, KC then contacts Young through social media to tell him that the medications are not strong enough.  Young advises her to return to clinic and ask only for him.  KC returns on June 7, 2016, complaining to the medical assistant that she has pain in her lower back from working as a waitress.  KC also admits to the staff that she never filled the tramadol, because she knew it would not work.  This should be a sign to the staff that KC is non-compliant and not a good candidate for chronic opioid therapy.  When Young enters the room, KC admits that she took hydrocodone given to her by a friend, which helped with her pain.  Young does inquire about imaging, KC states she had a MRI at some point, and Young requests that she bring it to the next visit.  Young documents only that the meds are not strong enough.   He does not perform a physical examination.  He prescribes hydrocodone with acetaminophen, 5/325mg, a quantity of 60.  The remainder of the visit is small talk about his television show, Young commenting that he was "pretty f...ed up" during the filming.   Although it is important to establish a rapport with patients, this kind of talk is obviously inappropriate.   Even with the non-medical related conversation, Young is in and out in seven minutes.  With almost no history or examination Young has diagnosed KC with musculoskeletal low back pain.  There are many causes of low back pain such as urinary tract infections, kidney stones, menstrual cramps, or uterine fibroids to name a few.  Young could be missing a serious diagnosis in this young woman.  In addition, KC has given several signs that she is a poor candidate for long term opioid therapy- she is non-compliant and has taken other's medications.  The prescription for hydrocodone with acetaminophen written on June 7 is invalid.

KC returns for follow up on July 12, 2016 (the note in the chart appears to be dated 6/12/16.)  While she is getting vital signs taken, she admits to the staff that she takes three hydrocodone per day instead of two.  Urine drug screening is not performed.  KC then asks Young if there is something stronger that she can take, and she mentions that a friend takes fentanyl.  Young without hesitation states that she can try fentanyl.  The only question that Young asks is for KC to rate her pain on a scale from 1 to 10, and he does not perform a physical exam.  He prescribes hydrocodone with acetaminophen 5/325mg, quantity of 60, and fentanyl patches 50mcg, quantity of 10, while chatting about a film crew visiting.  Face to face time is approximately four and a half minutes.  The prescriptions are invalid for the reasons stated previously, and because KC is taking her medication in a way that is not prescribed.  Young jumps to a very potent opioid at a significant dose without checking a urine drug screen for compliance.  The dose of mediation is greatly out of proportion for what should be needed for musculoskeletal back pain.

On August 16, 2016, KC returns to the clinic and tells Young that the fentanyl is helping a lot, but she does not notice any relief when she takes the hydrocodone for breakthrough pain.  With no further history, drug screen, or exam, to confirm the patient is actually wearing the patch, Young increases the dose of fentanyl from 50mcg to 75 mcg, and refills the hydrocodone with acetaminophen 5/325mg, quantity of 60.  Despite prescribing potentially dangerous doses of opioids, the entire visit lasts about two minutes.  The prescriptions are invalid for the reasons stated above.  KC returns a month later, on September 13, 2016.  Young inquires how the patch is working out, and KC states she still feels some pain when lying down.  KC also states she has tried soma without effect.  Young reminds KC to bring her MRI report, and states he will also have his staff work on getting a copy.  He then increases the quantity of hydrocodone with acetaminophen 5/325mg from 60 to 90 a month and tells her she can increase the night time dose to help with the pain.  There is no further history, urine drug screen, or exam

performed, although Young documents +LBP in the chart.  The fentanyl 75 mcg patches are refilled, this time a quantity of 10.  Both prescriptions are invalid for the reasons stated previously.

On October 11, KC returns to the clinic with another undercover officer posing as a patient.  The front desk does ask her about the MRI, stating that Young would like to see it.  When her vitals are taken, she is asked to give a urine sample for a urine drug screen.  Obviously, it would be negative for the prescribed medications, but this is never addressed.  It appears that the UDS order sheet was filled out, but we do not know whether the urine was sent, as there is no result in the chart. When Young enters the exam room, he asks only if the medications are working, and about the MRI.  He does not perform a physical exam to confirm she is wearing the patch.  He refills the hydrocodone with acetaminophen 5/325mg quantity of 90, and the fentanyl patches 75mcg.  The visit time for her and her friend on this day is less than five minutes.  The prescriptions are invalid for the reasons stated previously and because her drug screen would be negative, indicating non-compliance or diversion of the medications.

KC is not seen in November of 2016 but follows up with another undercover patient on December 14, 2016.  At the front desk, she is given forms to fill out, one of which appears to be a pain management agreement.  KC tells the medical assistant that she was not seen in November due to a family emergency, but she would like to get back on her medication.  Young does not ask KC why she missed last month, or if she had any withdrawal symptoms.  He does not take a history or perform a physical examination but refills her hydrocodone with acetaminophen and fentanyl at the same dose and quantity as in October.  The prescriptions are invalid for the reasons stated previously, and because KC is obviously non-compliant by missing an appointment and could be diverting her medicine.  It would also be dangerous to restart this high of a dose of fentanyl in a patient who has been off all opioids.  Young sees both patients in six and a half minutes.  The prescriptions for KC are not within the accepted standard of care.

**Eddie Davis (ED)** is a 46-year-old who presents to Young on November 13, 2014 as a new patient.  The note is quite brief, stating ear pain, and listing gall bladder as the only surgery.  Later in the chart we learn that ED has had multiple surgeries on the left leg including skin grafting, but nowhere in the chart does it ever state what happened.  Medications at the time of the initial visit include hydrocodone with acetaminophen, alprazolam, carisoprodol, and an inhaler for asthma.  Blood pressure is elevated, and the only thing noted on the physical exam is extensive scarring on the left calf and an abnormal exam of the ear and throat.  Young diagnoses the patient with hypertension and chronic pain and prescribes hydrocodone with acetaminophen 10/325mg quantity of 120, alprazolam 1mg quantity of 30, and carisoprodol 350mg quantity of 30.  The prescriptions are invalid for several reasons, including a lack of history for the pain in the leg, and no diagnosis at all for the use of alprazolam and carisoprodol.  Just because the patient was receiving these medications from his previous provider does not excuse Young from taking an independent history, exam and assessment.  Young does not perform a urine drug screen to make sure that ED is compliant with the medications, and not using other substances be it legal or illegal.  Finally, the use of hydrocodone in combination with carisoprodol is known to cause euphoria, and the combination of the two along with alprazolam has become known as the "holy trinity" of drug abuse.

ED follows up on December 12 and says that the hydrocodone helps his pain.  Young provides no further history, and the exam is marked normal except for +leg pain.  Young appropriately begins medication for hypertension, and refills the hydrocodone with acetaminophen, soma, and carisoprodol.  The patient

also refills a prescription for alprazolam written by his previous physician on October 13, on December 19. The prescriptions are invalid for the reasons stated above.

In 2015, ED follows up monthly with Young, starting on January 12. There is no additional documentation for the prescriptions for controlled substances, however Young does change ED's blood pressure medication. ED fills the hydrocodone with acetaminophen, alprazolam and carisoprodol at the same dose and quantity in January. On February 12, ED fills the same three prescriptions (hydrocodone with acetaminophen, alprazolam and carisoprodol) written on the 12th, but he also fills a prescription for alprazolam and carisoprodol on February 16, written on November 13, 2014 by Young. In March and April of 2015, the notes are similar, and the same prescriptions for hydrocodone with acetaminophen 10/325mg quantity 120, alprazolam 1mg quantity of 30 and carisoprodol 350mg quantity of 30 are filled. ED follows up on May 4, when he is diagnosed with gastroenteritis and given an injection of promethazine for nausea. UDS done on May 4 is positive for the prescribed medications but also for marijuana, which is not addressed by Young. ED fills a prescription for hydrocodone with acetaminophen written on that day, but on May 7 he fills prescriptions for alprazolam and carisoprodol that were written on February 12. Obviously Young is not keeping track of the number of refills on the prescriptions. ED is seen again on May 28, when he fills a prescription for hydrocodone with acetaminophen, and on the 29th he fills prescriptions for alprazolam and carisoprodol that were written on May 4th.

On June 18, 2015 ED once again follows up, a similar, partly illegible note is documented, and the same three prescriptions are given. Young also orders an unnecessary thyroid ultrasound after labs showed slightly abnormal thyroid function tests. Petway sees ED on July 17, and with no further history but a complete exam documented (likely not performed), she refills the hydrocodone with acetaminophen 10/325mg quantity 120. ED also fills the alprazolam and carisoprodol prescriptions on July 19 written by Young in June. UDS competed on August 8 is positive for fentanyl, which is not prescribed, yet this is not discussed with ED. Although there is a note documented again by Petway on August 10th, the prescriptions filled for the month are written by Young. ED fills hydrocodone with acetaminophen 10/325mg quantity 120 on the 10th. He makes an early follow up appointment and sees Young on August 17. ED says he would like and injection in the knee, and Young writes "hydros don't work anymore." Young prescribes oxycodone with acetaminophen 10/325mg, quantity of 90. ED also fills alprazolam and carisoprodol prescriptions on August 17.

ED sees Young again on September 23, and with no documented reason, he discontinues the oxycodone with acetaminophen and prescribes hydrocodone with acetaminophen 10/325mg again, quantity of 120, as well as alprazolam 1mg quantity 30 and carisoprodol 350mg quantity of 30. On October 14, ED requests a refill of hydrocodone but is told he will have to wait until the 23, but he fills the same prescriptions later in the month. Young refills the same medications on November 24 with minimal documentation, and the note for December 22 is blank. ED fills a prescription for alprazolam and carisoprodol in late December from refills on a September prescription.

In 2016, ED follows up monthly with Young, except for August in which he sees Downing. Young does not improve on his documentation. The quantity of carisoprodol is increased to 90 a month in February, and the dose of alprazolam is increased from 1mg to 2mg in June, with no documented reason. The patient has several UDS that are inconsistent with the prescribed medications including one that was negative for alprazolam and positive for marijuana on January 6, and several that are suspicious because

they contain the medications prescribed but no metabolites of the medication.  The September 6 UDS also contains undissolved particles in the specimen.  ED fills the hydrocodone with acetaminophen, alprazolam, and carisoprodol monthly in 2016.  His last recorded visit is on January 5, 2017, when Young decreases the hydrocodone with acetaminophen to 7.5/325 mg a quantity of 60 and writes "teaching/opiate wean."  ED died on March 28, 2017.

In summary ED is a young man with a history of some sort of leg injury resulting in multiple surgeries and pain.  Even after reviewing the entire chart, I still do not know what happened to ED.   Like the other patients, there is a shocking lack of history and physical, and ED was not given a trial of non-narcotic options first.  Is it possible that ED has a neuropathic component to his pain after so many surgeries?  If so, then gabapentin or lyrica would have been a good choice to help him.  We do not know why ED took alprazolam, if it was panic attacks, muscle spasm, or a sleep aid perhaps, although there are better medications for all these problems.  It is also not clear why ED took carisoprodol.  As stated above, carisoprodol should be avoided if possible when hydrocodone is used, and the use of benzodiazepines causes increased sedation with hydrocodone.  The prescriptions written for ED are not within the accepted standard of care.

Police officer Jessica Jackson, aka patient **Jessica Duke (JD)**, is a 34-year-old woman who first visits Young on April 4, 2016.  I have previously reviewed the video recordings of the office visits, which I will combine with my current chart review.  Check in at the clinic seems routine, although the waiting room is quite crowded, and some patients are dozing off.  JD pays $235 dollars for the visit.  A staff member takes her back for vital signs.  The staff inquire about where she lives, and states that some patients drive eight hours to see Young, which seems quite out of the ordinary.  JD reports that she is there to be treated for back pain and insomnia, as well as anxiety.  The medical assistant asks a few questions about her past medical history, family history, and social history.  JD also provides a urine sample, and it is unusual to request that a patient provide a sample prior to seeing the provider.  JD is then taken back to the waiting room.  Later, she is taken to an exam room, and eventually Young enters.

JD tells Young that she is there to establish with him as her new primary care provider.  She states she has been working as a server, is on her feet all the time causing back pain, and has problems sleeping.  Young does not ask any further questions about these two complaints but asks about her anxiety.  JD acknowledges that she has anxiety but does not elaborate, and Young does not question her further.  Young performs a very brief exam while JD is still sitting in her chair, listening to her heart and lungs with a stethoscope.  He then tells her that he is going to prescribe klonopin (clonazepam) for sleep, and that it is what he takes.  He also prescribes a "mild pain killer," and a "mild muscle relaxer."  Young tells JD to follow up in one month.  She leaves with prescriptions for clonazepam 1mg quantity of 30, tramadol 50mg quantity of 45, and baclofen 10mg quantity of 45.  The entire face to face time is only 7 minutes.

I have several concerns with this visit.   First, there is little history for any of the three complaints.  Young does not ask the location, timing, duration, quality, relieving, or exacerbating factors for the pain, anxiety, or insomnia.  Young does not ask JD what treatments have been tried in the past.  Second, he does not perform an appropriate physical exam for the back pain.  Young does not test JD's strength or reflexes, or even palpate her spine or lower back.  Several medical problems such as hyperthyroidism could cause anxiety and insomnia, and examining the thyroid gland is important in a young woman.  Finally, Young does not use non-narcotic medications or other therapies first.  For example, a careful history can detect reasons for insomnia that can be corrected with good sleep habits, and Tylenol or

NSAIDS are often the treatment of choice for musculoskeletal pain.  It is also unprofessional to tell a patient which medications you are taking, as Young did with the clonazepam.

JD follows up on May 4, 2016 and is seen by Downing.  The waiting room is very crowded, and Downing comments that patients have been lined up down the sidewalk in the past.  JD reports that she is sleeping a bit better, but the back pain is present, and she admits to taking her medication more frequently than prescribed. This should be a sign to Downing that JD is non-compliant and not a good candidate for long term pain management.  JD states that hydrocodone has worked for her in the past.  Downing tells her that she is unable to prescribe hydrocodone because the clinic has reached its maximum number of pain patients.  She does not perform a physical exam.  Downing refills the clonazepam 1mg, tramadol 50mg, and baclofen 10mg, spending less than nine minutes in the room with JD and another patient, KC.  The prescriptions for JD are not within the accepted standard of care.

**Ben Elston (BE)** is a 37-year-old with a history of "back problems" since he lived overseas.  During his intake visit with Young on September 25, 2014, he reports the pain is 5 out of 10, and worse on standing.  BE also is concerned about his blood pressure and thinks he needs some antibiotics for his eye.  Young documents a few words about several body systems, but most of it is illegible.  He lists chronic low back pain, hypertension, and left wrist pain as the diagnoses, and prescribes oxycodone with acetaminophen 7.5/325mg quantity of 90, and carisoprodol 350mg, quantity of 30.  The prescriptions are invalid due to a lack of history for the back pain, insufficient or illegible physical exam, because he did not try non-opioid medications first, and because he did not perform a UDS on the first visit to see if BE was taking any illicit substances.

BE follows up just a few days after his initial visit, October 1, 2014 to discuss his medications and anxiety he is experiencing.  There is no further history for the anxiety, but vital signs show that the patient's heart rate is elevated above normal.  Young prescribes clonazepam 1mg to take four times a day, quantity of 120.  The prescription is invalid due to lack of a proper history.  In addition, the heart rate could be attributed to multiple medical problems that were not considered, or even withdrawal syndrome.  Also, anxiety is best treated with SSRI's, and BE was taking one (Zoloft) and this could have been increased or changed.  As stated previously, benzodiazepines should be avoided with opioids because of the increased risk of sedation.  BE follows up on October 9, stating that he stepped off a tractor and developed right ankle pain and swelling.  He is given a shot of an anti-inflammatory, and is also given a prescription for tramadol 50mg, quantity of 60.  BE is also seen on October 14, complaining of a cough and wheezes, and is given a steroid shot in the office, and cough a prescription for cough syrup with codeine.  He fills oxycodone with acetaminophen 10/325mg, quantity of 90 on the 15th, and hydrocodone with acetaminophen 7.5/325mg quantity of 60 on the 21st.  He is seen in the office on October 23, and states that his oxycodone with acetaminophen was stolen, and he needs a refill.  Young documents a slightly more detailed exam and refills the stolen medication with a quantity of 90.  BE also fills a prescription for diazepam 5mg, quantity of 90 on October 28, written by Young.  In just over a month, BE has been prescribed 90 oxycodone with acetaminophen 7.5/325mg, 180 oxycodone with acetaminophen 10/325mg, 60 hydrocodone with acetaminophen 7.5/325mg, and 60 tramadol tablets, in addition to cough syrup with codeine, 120 clonazepam 1mg, and 90 diazepam 5mg.  There does not seem to be a clear plan for this patient, and he is obviously has been prescribed too much medication.

BE is seen by Young twice in November 2014.  On November 10, Young uses the diagnosis of "failed back syndrome," which is usually used in a patient that has ongoing pain despite surgery, but there is no

documented history of surgery.  On November 24, BE complains of knee pain and an abscessed tooth.
Despite only two visits BE fills the following prescriptions in November: hydrocodone with
acetaminophen 7.5/325 mg quantity of 90 on the 3rd and quantity 60 on the 28th, oxycodone with
acetaminophen 10/325mg quantity of 60 on the 10th and 7.5/325 mg quantity 90 on the 17th, diazepam
5mg quantity 90 on the 17th, tramadol 50mg quantity 60 on the 19th, and adderall 15mg quantity 30 on
the 21st.  The opioids and diazepam are invalid for the reasons stated previously.  There is no history or
diagnosis for the adderall, and therefore it is invalid.  UDS was performed on November 12, and it was
negative for oxycodone and clonazepam, when clearly BE should have been positive for oxycodone.
UDS was appropriately positive for hydrocodone and diazepam metabolites but was also positive for
cocaine metabolites, and this is not addressed.

In December of 2014, BE is seen on the 2nd, 3rd,8th, 15th, and 22nd.  There is no further history for the
pain, but an MRI of the knee is ordered.  BE complains of anxiety, depression, and inability to focus, but
there is no history recorded for any of these complaints.  Young writes, "long discussion regarding
polypharmacy prescription abuse", "will need narcotic contract", "long discussion RE dependence
treatment program", and "discussed weaning pain meds today."   Nevertheless, Young prescribes
oxycodone with acetaminophen 10/325mg quantity 60 on the 2nd and the 15th, hydrocodone with
acetaminophen 5/325mg quantity 90 on the 22nd, adderall 15mg quantity of 15 on the 3rd, quantity 30
on the 12th, and quantity 60 on the 26th, diazepam 5mg quantity 45 on the 17th, and tramadol 50mg
quantity 120 on the 19th.  There is absolutely no logical explanation for this combination of medications
given at these intervals, other than the patient has an abuse issue, which Young seems to realize but
continues to prescribe anyway.

BE follows up with Young four times in January of 2015, the 6th, 12th, 23rd, and 28th.  The patient
complains of anxiety related to family issues, knee pain, and refill requests.  Similar to December, Young
documents "decrease percocet to 7.5mg, continue to wean meds," and "change from percocet to
hydrocodone", and "decrease hydrocodone to 7.5."  BE is still prescribed quite a bit of medication,
diazepam 5mg quantity of 30, oxycodone with acetaminophen 7.5/325mg quantity of 90 (twice),
hydrocodone with acetaminophen 10/325mg quantity of 90 and 7.5/325mg quantity of 90, and adderall
10 mg quantity of 30 and 15mg quantity of 60.  At the January 28th visit, BE requests testosterone shots
for fatigue.  I was unable to locate any lab results prior to this visit, but Young begins intramuscular
testosterone injections.  The injections continue over the next two years, more than 30 before January
2017.

BE is also seen by Young multiple times in February of 2015, requesting refills, testosterone shots, and
on the 24th the history states that BE "wants to change to percocet."  Young writes things such as "we
have tried to wean", "we alt perc/HCD," and on the 24th Young writes to refer to a pain clinic.  The office
staff wrote below that BE "has to have imaging first."  Young also writes "last rx today."  Youngs words
are not consistent with his actions, BE fills diazepam 5mg quantity of 90 twice in February, oxycodone
with acetaminophen 10/325mg quantity of 100 and then quantity of 30, hydrocodone with
acetaminophen 7.5/325mg quantity of 45 and 10mg quantity of 90, and adderall 10mg, quantity of 30.
There are three visits in the month of March, and on the 30th Young writes "the HCD is just not working."
BE is questioned about the status of the MRI for the knee, and he states he will go to the hospital to
make arrange to have it done (the patient is uninsured and trying to make financial arrangements.)  BE
fills prescriptions for tramadol 50 mg quantity of 120, hydrocodone with acetaminophen 7.5/325mg

14

quantity of 120 and 10/325mg quantity of 30 and then 90, diazepam 5mg quantity of 90, adderall 20mg quantity of 30, and oxycodone with acetaminophen 10/325mg, quantity of 100 in March.

There is only one office visit documented for April of 2015. The history states that BE needs a testosterone shot and refills. Young does not mention anything about BE's diet or exercise, or his attempts at weight loss. Young prescribes phentermine 37.5mg quantity 30, in addition the adderall 10mg quantity 30 which he actually filled on both April 15 and April 28. The phentermine is contraindicated because of the current amphetamine use, and the patient's hypertension and tachycardia. Young also prescribes tramadol 50mg quantity of 20 on the 12th, and quantity 120 on the 21st, hydrocodone with acetaminophen 10/325mg quantity 60 on the 13th, diazepam 5mg quantity of 30 on the 15th and 10mg quantity of 30 on the 21st. There are several visits in May of 2015, some are just for testosterone shots and others for a follow up with Young. The documented history is just a few words, such as "states testo shots helping fatigue," but there is no further discussion of weaning BE off the medications. Young does check a testosterone level and it is well above normal, however the shots continue weekly to biweekly. UDS done on May 22 is appropriately positive for hydrocodone, carisoprodol, and amphetamines. The frequency and interval between prescriptions continue at random. In May 2015, BE fills hydrocodone with acetaminophen 7.5/325mg quantity 15 on the 1st, 10/325mg quantity 45 on the 11th, 7.5/325mg quantity 60 on the 14th and 7.5/325mg quantity of 90 on the 29th. BE fills soma twice, quantity of 15 on the 3rd, and quantity 60 on the 8th. Tramadol 50mg quantity 60 is filled on the 8th, and diazepam 5mg quantity 30 is filled on the 10th. Finally, BE fills oxycodone with acetaminophen 10/325mg quantity 90 on the 22nd.

BE has four visits in June 2015, with no further elaboration on his pain complaints or other diagnosis. On June 10, Young does document to change hydrocodone to 10 QID, however there is no explanation for the change. On June 23, BE states that his medications were stolen. Given Young's previous concerns that BE was abusing his medications, this should be a red flag, however Young prescribes oxycodone with acetaminophen 10/325mg quantity of 120 on that date even though BE was prescribed a quantity of 90 on June 3, hydrocodone with acetaminophen 10/325mg quantity of 120 on the 12th, and butrans 8mg quantity of 15 on the 29th. BE also fills diazepam 5mg quantity of 30, and diazepam 10mg quantity of 30 twice. BE also fills a prescription for phentermine 37.5 quantity of 30 for the obesity but no adderall.

In July 2015, BE is seen four times, receiving testosterone shots, and visiting with Young twice. At the visit on the 28th, Young states that BE is "leaving for Louisiana," and in July he fills diazepam 5mg, quantity of 5 and then 25, phentermine 37.5mg, tramadol 50mg, and a vial of testosterone. The testosterone is filled at the end of the July, so it is not clear where BE was getting the injections, and it was also filled in August for which there are no office visits. Young makes no mention of BE's plans, and does not discuss tapering the benzodiazepines to avoid withdrawal syndrome. Young also mentions that BE is going to have a colonoscopy, and certainly if he can afford a colonoscopy then he should be able to afford the MRI that Young wanted. BE then fills prescriptions for hydrocodone with acetaminophen 7.5/325mg written by Young in September and early October. BE shows up on October 20, 2015 complaining of knee pain. He is given another prescription for hydrocodone with acetaminophen 7.5/325mg on October 27. Young gives no details of BE's absence. UDS in November is positive for cocaine, and Young documents "counseled patient and offered rehab patient stated he didn't have a problem," but Young continues to prescribe. BE has three visits in November of 2015 and one in December of 2015. In those two months he fills 5 prescriptions for adderall 10mg, a total of 75

tablets.  He also fills 150 tablets of hydrocodone with acetaminophen 10/325mg, and 90 tablets of hydrocodone with acetaminophen 5/325mg.

BE continues to see Young through the remainder of 2016, multiple times a month receiving testosterone injections and refills for adderall, hydrocodone, testosterone, and cough syrup with codeine at seemingly random intervals.  In many years of reviewing medical charts, this is perhaps one of the worst examples of documentation I have ever seen.  It is never entirely clear why BE has so much pain, and why he takes such a large quantity of benzodiazepines.  UDS are performed but do not correlate with the patient's prescriptions, and the patient is "counseled" but never dismissed from the practice.  In addition, he is given countless, unnecessary testosterone injections, despite normal testosterone levels, by October of 2016 causing erythrocytosis, or elevated levels of red blood cells, which is a known serious complication of testosterone treatment.  BE also appears to develop significant endocrine dysfunction as a side effect of long term opioid therapy, as shown by the labs done in October of 2016.  For some time the patient is receiving two different amphetamines, despite known hypertension and tachycardia. The prescriptions written over the years for BE are not within the accepted standard of care and were dangerous to the patient.

**Chelsey Jaco (CJ)** is a 27-year-old female who presents to Young on September 10, 2014 complaining of a sore throat.  Migraines and a previous surgery are listed under her past medical history, but there is no elaboration, and medicines are listed as fioricet (a combination of butalbital, acetaminophen, and caffeine), and topamax (a non-controlled substance often used for headache prevention.)  Young documents a brief exam, lists upper respiratory infection, tonsillitis, and pharyngitis as the diagnoses, and gives the patient a shot of steroids and benadryl, and a prescription for antibiotics.  However, review of the PMP data show that prescriptions from Young start in July of 2014, with no documented notes found prior to September 10.  Young prescribes ascomp with codeine (a combination of butalbital, aspirin, caffeine, and codeine) on July 24, August 4, and August 29, a quantity of 30 each time, and the prescriptions are obviously invalid as there is no documentation whatsoever to support them.  In addition, ascomp with codeine and similar preparations such as fioricet are not meant to be taken daily.  In fact, taking them can often can cause a rebound headache, and the medication is often abused.  Young makes no mention of the headaches at the September 10 visit, but refills the ascomp quantity of 30 on September 30.  The prescriptions are invalid due to lack of a history for the headaches, lack of physical exam, and because he did not try non-controlled medications first.

CJ follows up on October 16, 2014, stating that she passed out, and her family thinks that she is depressed.  Young documents a normal exam, and documents that the syncope was due to stress, and prescribes a SSRI (lexapro) and clonazepam .5mg, quantity of 90, and tramadol 50mg quantity of 45.  It is difficult to determine because of the lack of history, but the SSRI is a good choice for depression with anxiety.  If she were having severe panic attacks the clonazepam in a small quantity would also be reasonable, but he wrote it to take three times a day, which is not appropriate.  There is no documented reason for the tramadol, and it is invalid as well.  CJ calls back on the 20th stating that she lost her job, and the ascomp with codeine is refilled early.  There are no further office visit notes until January of 2016, however there are multiple telephone notes and refills.  Young refills the ascomp with codeine on November 10, quantity of 90, and CJ calls on the 15th to request a change to fioricet due to the cost of ascomp.  CJ fills a prescription for tramadol 50mg, quantity of 45 on December 9, and fioricet with codeine on December 15.

On January 2, 2015 CJ follows up complaining of flu like symptoms, Young documents a brief exam, and lists the diagnoses of flu, depression, and anxiety.  He does not mention if CJ has done well on the Lexapro or not.  CJ fills a prescription for tramadol 50mg quantity 90 on that date.  CJ is also seen by Young on January 9 for an ear ache. She fills a prescription for fioricet with codeine on January 9, 13, 20, and 26, a total of 60 tablets, and tramadol on January 22 and 28, a total of 180 for the month.   The prescriptions are invalid for the reasons stated earlier, lack of history, exam and diagnosis, but also because Young is increasing the quantity prescribed without a reason.  CJ is not evaluated again in the office until April 13, 2015 although there are several documented telephone refill requests. CJ fills seven prescriptions for a total of 375 tramadol 50mg, and nine prescriptions for a total of 165 fioricet with codeine.  On April 13 at her follow up appointment, Young makes no mention of her headaches, but states that she has joint pain and muscle spasm.  Young prescribes fioricet with codeine at the visit, a quantity of 20, and then 20 more on April 21, 25 and 29.  Young does order labs on CJ in April, which are negative for inflammatory arthritis.  CJ is seen in the office on May 21, 2015, complaining of body aches. Young documents that he checked the PMP and gives her a diagnosis of chronic pain and substance dependence, and states "refer to Pathways ASAP."  Prior to her visit on May 21, Young prescribed 80 fioricet with codeine and 60 tramadol.  If he was concerned about her developing dependence, why did he continue to escalate the amount of medication in April and May?

CJ returns on June 23, 2015, stating that she stopped all her medications except for her iron supplement, and complaining of knee pain. Young makes no mention of his concerns for abuse or dependence.  She is given a steroid shot and a prescription for tramadol 50mg, quantity of 45.  If CJ has been off addicting medications, it would have been better to prescribe an NSAID.  Over the next ten weeks, he prescribes 240 tramadol 50mg and 8 hydrocodone with acetaminophen 5/325mg.  Although she does not return to the clinic in July or August, she calls multiple times requesting a refill of the tramadol.  On September 9, 2015, she complains of anxiety and fatigue, and requests a B12 shot.  Young refills the tramadol and gives her a b12 shot, despite normal labs in April.  On October 1, 2015, CJ states that she wants to discuss her adrenal fatigue test (adrenal fatigue is defined by some as a mild form of adrenal insufficiency caused by stress, however it is not a legitimate medical condition).  Young actually documents a few illegible lines of a physical examination, diagnoses adrenal fatigue, anxiety, obesity, fibromyalgia, and prescribes tramadol 50mg quantity of 60, clonazepam .5mg quantity of 90, and phentermine 37.5 quantity of 30.  The prescriptions are invalid for the reasons stated previously and putting three addictive medications in the hands of a patient with possible dependence issues is irresponsible.  Drug screen done on the day of the visit is positive for clonazepam and hydromorphone (metabolite of codeine), but she hadn't been prescribed clonazepam, and she hadn't been prescribed fioricet with codeine since May.  UDS was negative for tramadol, concerning that CJ is taking diverted medication and using hers up too quickly.  Young also refills the tramadol and phentermine a week early, on October 22.

CJ is not seen in the clinic in November of 2015, but Young prescribes phentermine and tramadol on November 3, just two weeks after her last prescription.  Young also prescribes cough syrup with hydrocodone on November 9 and refills the tramadol again on November 30.  He also prescribes hydrocodone with ibuprophen 7.5/200mg on December 9 and refills the phentermine on December 14. CJ does follow up on December 22 complaining of blood in her urine and pain.  Young documents something about urology but it is illegible, and he documents that she has back pain.  This time he prescribes hydrocodone with acetaminophen 5/325, a quantity of 20, and then refills 15 tramadol on

17

the 28th, and 60 on the 31st.  It is unclear why Young feels that the patient should have opioids for an uncomplicated urinary tract infection.

In 2016, CJ is also seen multiple times, the first visit on February 19, 2016 when she complains of the knots in her legs getting worse, bruising and hair loss.  Young's exam states "diffuse point tenderness," and he diagnosis her with a fibromyalgia syndrome flare.  Prior to the visit and since the beginning of 2016 Young has prescribed tramadol 50mg quantity of 150 as well as Tylenol with codeine 300/30mg quantity of 20.  UDS on the day of the visit is negative for tramadol and positive for butalbitol, which she has not received in many months, again a sign to Young of her non-compliance.  Phentermine is prescribed again on April 4, with no mention in the chart, and tramadol 50mg quantity on 90 is refilled on April 15.  On April 28, CJ reports that she has been passing out at work.  Young appropriately stops the tramadol as it can precipitate seizures and orders a CT scan of the head and a test for seizures.   CJ's CT scan shows Chiari malformation type I, a developmental abnormality at the base of the brain which often causes headaches.  Phentermine is refilled on May 5, and tramadol 50mg quantity of 90 on May 13.  Downing sees CJ at her follow up on May 27, and with no explanation she prescribes hydrocodone with acetaminophen 5/235mg quantity of 60.  Young sees CJ on June 2 to review the results of the CT scan and appropriately refers her to a neurosurgeon.  CJ's blood pressure is quite elevated at the visit yet is not addressed.  At the June 2 visit he refills the tramadol 50mg quantity of 90, on June 8 he refills the phentermine, and on June 9 he refills tramadol 50mg quantity of 90 despite the fact that he just wrote a prescription nine days prior.  CJ is also seen by Young on June 21 when he prescribes hydrocodone with acetaminophen 7.5/325mg quantity of 30 with no reason documented in the record.  Young also refills the tramadol 50mg quantity of 90 on June 28.

CJ follows up with Downing on July 15, when Downing prescribes hydrocodone with acetaminophen 7.5/325mg quantity of 60 and tramadol 50mg quantity of 60.  Downing has very little documentation, just listing the diagnoses recurrent bladder infections, headaches, and anxiety.  On July 28 CJ sees Downing and states that she has had several seizures.  Downing states that the patient will get a trial of trezix, a combination of acetaminophen, caffeine, and codeine, quantity of 90.  Despite the possibility of seizures, Young refills the tramadol 50mg quantity of 90 on August 15, which put CJ in danger of having more seizures.  CJ follows up with Young on August 15, and Young refills the trezix quantity of 90, and hydrocodone with acetaminophen 7.5/325mg quantity of 30.  Her blood pressure is again very elevated, but this is not addressed.  CJ also fills a prescription for hydrocodone with acetaminophen 10/325mg quantity of 60 on August 26.  The rest of 2016 is similar, CJ is seen in September by Downing, in October by Young, and in December by Young.  In three months, CJ fills prescriptions for phentermine quantity of 30 (despite the elevated blood pressure), trezix quantity of 600, hydrocodone with acetaminophen 7.5/325mg quantity of 300, and tramadol quantity of 390.

Overall CJ's chart shows a lack of a sufficient history for the headaches, knee pain, anxiety, and obesity.  In addition, she is given products that often cause rebound headaches when taken too frequently.  Young states that he thinks CJ has an abuse problem in May of 2015, yet he continues to prescribe controlled substances through the end of 2016.  He prescribes phentermine despite very elevated blood pressure and does not initiate medication for the blood pressure.  The prescriptions are often written at the request of the patient, in between visits, and there is no distinct regimen in place to control her headaches or pain.  The prescriptions for CJ are not within the accepted standard of care.

**Daphne Joyner Montoya (DM)** is a 26-year-old female who presents to Young on September 24, 2014 for a first visit. Her intake paperwork states that she works at the front desk of Preventagenix, although I cannot substantiate this fact. The history states she is concerned about a mole near her waist that has been there for years and does not hurt or bleed. There is no mention of attention deficit disorder or any pain complaints, despite the fact that her medications are listed as oxycodone, adderall, and hydrocodone. Review of systems is marked through as negative, and Young documents a few sentences of exam, including the cardiovascular system, abdomen, extremities, and the skin tags. The impression states that the skin tags will be removed, and there is a family history of rheumatoid arthritis. The next office visit is not until April 20, 2015, and it states only "labs." DM fills the following prescriptions written by Young from September 2014 until April of 2015: 300 tablets of adderall 10mg, 30 tablets of hydrocodone with acetaminophen 7.5/325mg, 30 tablets of hydrocodone with acetaminophen 10/325mg, 30 tablets of clonazepam 1mg, 120 tablets of oxycodone with acetaminophen 7.5/325mg, 255 tablets of oxycodone with acetaminophen 10/325mg, and 60 tablets of oxycodone 10mg. Obviously, the brief history stating only a few words about skin tags does not justify the prescriptions written over the next eight months, and the prescriptions are invalid due to lack of any history, minimal exam, and no assessment or plan for the medications.

On July 13, 2015, a staff member documents a detailed note regarding a call from a local pharmacist. According to the note, DM has filled two recent prescriptions for oxycodone 10mg, quantity of 120, one under the name Daphne Joyner using cash and one under the name Daphne Montoya using her insurance. The pharmacist states she is reporting this to the DEA. Young writes only "addressed" on the bottom of the page. Between the April "lab" visit and the telephone note in July, DM filled 360 tablets of oxycodone 10mg, 90 tablets of oxycodone 15mg, 60 tablets of adderall 10mg and 60 tablets of adderall 20mg. After the telephone note, DM begins to have regular follow ups. She is seen by Young on August 6, 2015, and he documents that she is there for low back pain and medicine refills. Young draws a line through the normal review of systems and writes something illegible in the exam portion. He lists the diagnoses low back pain, family history of rheumatoid arthritis and attention deficit disorder, and states that the plan is to refill her medications. DM fills oxycodone with acetaminophen 10/325mg quantity of 120, and Young changes the adderall to a different amphetamine, dexedrine 20mg a quantity of 30. Although we now know that the opioids are prescribed for back pain, it is not clear what the etiology of the pain is, or why an otherwise healthy 26-year-old requires opioid analgesia. There is still no documented history for the ADD. The date on the next visit is difficult to decipher but appears to be August 20, 2015. The note gives no further details. The note on September 28, 2015, states that DM is there for a follow up of low back pain, ADD, and migraines, however there is no history for the migraines. DM fills oxycodone 10mg quantity of 120 and dexedrine 10mg quantity of 60 on September 4. She also fills oxycodone with acetaminophen 10/325mg quantity of 90 and dexedrine 10mg quantity of 30 on October 1, 2015.

DM is seen on October 27 and December 2 of 2015, and January 19, February 16, March 14, and May 11 of 2016. There is no further explanation of her pain except in one note Young documents scoliosis. Each month she fills a prescription for oxycodone or oxycodone with acetaminophen and dexedrine or adderall. Some months she also fills a prescription for hydrocodone with acetaminophen, but the documentation never gets better. While it is convenient staff members to be seen as patients in the office in which they work (if DM did work there), it does not absolve the provider from documenting a complete history and examination. In the case of DM, Young only documented vital signs on the first

visit, and never performed a urine drug screen.  Young had just a few notes in the chart until the pharmacist called about the DEA threat, and then Young documented just about monthly although the content remained sparse.  The prescriptions written for opioids and amphetamines for DM are not within the accepted standard of care.

**Randall Moody (RM)** is a 47-year-old male who presents to the clinic for the first time on November 2, 2015 and sees Petway.  The chief complaint states that he is there for a check- up and back pain.  Later Petway would add that the pain is from a 4-wheeler accident in 2008, rates 7/10, and physical therapy has not helped in the past.  He also complains of 3/10 knee pain.  Review of systems is positive for headache, back and anxiety but Petway does not elaborate.  The physical exam is notable for hypertension and tachycardia, otherwise Petway check marks that multiple body systems were examined and normal.  Petway does comment that the patient is anxious and shaky.  She lists the diagnoses as hypertension, knee pain, anxiety and tachycardia, insomnia and osteoarthritis and prescribes hydrocodone with acetaminophen 7.5/325 quantity of 60 and alprazolam .5mg quantity of 60.  She also adds that RM has not had any imaging since the accident because he does not have insurance.  UDS done on the date of the visit is negative, and laboratories show a normal testosterone and b12 level.  Although Petway documents a few details about the back pain, the history is still quite limited.   There is no history for the knee pain or the anxiety.  Although a relatively detailed exam is documented as normal, the speed at which patients went in and out makes this depth of an exam unlikely.  Petway did not try non-opioid alternatives for the back pain, and benzodiazepines are not the drug of choice for anxiety.  For these reasons, the prescriptions for hydrocodone with acetaminophen and alprazolam are invalid.   RM follows up for lab results on November 17, and although vital signs are recorded including an elevated blood pressure, there is no documentation by Petway and the note is unsigned.  RM also follows up with Petway on December 1, 2015, and the first page of documentation is virtually the same as the other two visits.  The second page has vital signs but no further documentation.  Petway prescribes hydrocodone with acetaminophen 7.5/325mg this time a quantity of 120, and alprazolam .5mg quantity of 60, and the prescriptions are invalid.

RM follows up with Young on December 30, 2015, stating that he would like to increase the alprazolam to three times a day.  Young places a "+" sign in the exam, but nothing else, and lists the diagnoses as fatigue, hypertension, anxiety, osteoarthritis, and low back pain.  Young obliges RM and increases the alprazolam to .5mg quantity of 90 and refills the hydrocodone with acetaminophen 7.5/325mg quantity of 120.  The prescriptions are invalid because of the reasons above and because Young allows the patient to dictate medication changes.  Young also gives RM a testosterone shot, despite normal lab levels of testosterone.  RM follows up monthly with Young in 2016, except for November when he sees Downing, and the documentation remains scant.  On January 28, RM reports his pain as 9/10, and Young increases the strength of hydrocodone with acetaminophen to 10/325mg, quantity of 120, and refills the alprazolam.  On February 29, RM states that the norco is not effective, so Young changes it to oxycodone with acetaminophen 7.5/325mg, refills the alprazolam and orders x-rays.  UDS from the February visit is positive for alprazolam and hydrocodone, but is also positive for oxymorphone, suggesting RM is already taking someone else's oxycodone before Young prescribes it.  On March 29, RM states that he cannot stay asleep and would like to increase the alprazolam, so Young obliges again and increases it to 1mg quantity of 90 and refills the oxycodone with acetaminophen.

RM finally completes the x-rays on April 18, 2016 which show a normal lumbar spine and a calcified fragment in the right knee with mild arthritis.  When he follows up on April 29, he states he would like to

discuss the percocet.  With no further explanation, Young increases the percocet to oxycodone 10mg quantity of 120 and refills the alprazolam 1mg.  In June the prescriptions remain the same, and UDS is positive for the prescribed medicines but also marijuana. In July RM states he injured his back and Young increases the oxycodone to 15mg quantity of 120 and refills the alprazolam 1mg quantity of 90.  The prescriptions are the same in August.  Young documents two illegible phrases on September 27 and lists the diagnosis as "low back pain now with breakthrough pain," and adds a fentanyl patch 50mcg, to the oxycodone and alprazolam.  This regimen continues through October and November, the October UDS also positive for marijuana.  In December the PMP shows that RM filled only oxycodone and alprazolam. Although Downing documents the note on November 23, Young writes the prescriptions.

RM in summary has musculoskeletal back pain and mild arthritis in his knee, at best.  There is not enough history to determine if RM actually had anxiety disorder, and even if he did benzodiazepines would not be the drug of choice.  The documented history is poor, despite the fact that RM was seen by three different providers.  He was started on hydrocodone with acetaminophen, Young increased the dose and then changed it to oxycodone with acetaminophen, then oxycodone 15mg, then added a fentanyl patch as well.  There is no indication to use this strength of medication for musculoskeletal back pain and increase it at the patient's request.  The prescriptions written for RM are not within the accepted standard of care.

**Melissa Moss (MM)** is a 32-year-old female when she first sees Young on October 21, 2014.  Her chart contains many pages of old medical records, from which we learn she has been dealing with cervical spine pain from degenerative disc disease since at least 2010 when an MRI was performed.   Her physician prior to Young was prescribing oxycodone 10mg quantity of 120 and alprazolam 1mg quantity of 90 from at least May until October of 2014.  A different set of records show that MM was taking oxycontin 40mg twice a day in 2010, for a foot fracture.  In either case, the medication prescribed seems out of proportion to the disease process at hand.  MM also has the diagnoses of bipolar disorder, anxiety, and seizure disorder, per the old records.  Young documents very little history at the first visit, merely that she has headache, neck pain and tightness, and swelling which she thinks is from her pain medication.  He does document a list of medical problems, surgical, and social history.  The documented exam is partly illegible but appears to contain five phrases, and vital signs show that her blood pressure and pulse are elevated.  Young does address the cardiovascular issue by ordering an EKG and an echocardiogram (which would come back normal).  He also adds a blood pressure medication.  He changes the oxycodone to ms contin 30mg, quantity of 60.  As stated above, the medication seems to be out of proportion to the cervical disc disease, and Young did not try any non-opioid medications first. The history and exam are quite brief.  Young did not perform a UDS to assure that MM is complaint with her medications and not using any illicit substances.  For these reasons, the prescription for ms contin is invalid.  MM calls the clinic on October 31, and states that Young said he would change her alprazolam to diazepam, although this is not documented in the note from October 21.  Young complies and prescribes diazepam 5mg, quantity of 45 which is filled on the 31.  MM also fills a prescription for clonazepam 1mg quantity of 90 the next day, November 1.  There is no diagnosis for the diazepam or clonazepam, as neither would be first line for anxiety, and rarely used for seizures.  In addition, using benzodiazepines with opioids increases the risk of sedation and should be avoided. The prescriptions are invalid.

MM's chart is similar to other charts reviewed in that there are often several visits in a month, and prescriptions written on multiple days of the month.  She follows up on November 3, stating that she

thinks the ms contin is causing swelling too.  Despite normal labs, Young diagnoses her with hypothyroidism, and writes to discontinue the ms contin and begin hydrocodone with ibuprophen 10/200mg quantity of 60 and hydromorphone 4mg quantity of 50.  There is no explanation for using two potent opioids.  She follows up just a week later on the 11th, complaining of swelling and cold symptoms, and is given a prescription for cough syrup that is a controlled substance (perhaps with codeine).  MM comes back on the 19th, and Young documents "breakthrough pain."  For the exam he simply writes (-).  He lists the diagnosis now as chronic pain syndrome, and prescribes meperidine 50mg, quantity of 15.  She follows up one more time in November, on the 24, requesting a tb skin test and more cough syrup, and Young complies.  MM also fills a prescription for alprazolam 2mg quantity of 90 on November 29, hydrocodone with ibuprophen 10/200 on December 1, hydromorphone 4mg quantity of 60, and diazepam 5mg quantity of 45 on December 12.  So, in the first month MM is prescribed four different opioids (some more than one prescription) and three different benzodiazepines.  There does not appear to be any sound reason for this, and the prescriptions are invalid.  If MM were truly intolerant to one of these opioids, Young could have had her turn in the unused portion, but he did not.

On December 17, 2014, MM follows up for refills and Young writes "severe back pain" under the review of systems, and documents only tenderness in the low back on exam.   With that, he increases the meperidine 50mg to three times a day, quantity of 90 and refills the clonazepam 1mg quantity of 90.  It is not clear if MM's biggest problem is the chronic neck pain or a new problem in the lower back. MM had just filled diazepam a week prior and fills alprazolam 2mg quantity of 90 on the 28th.  She also fills hydromorphone 4mg quantity of 90 on December 30, and oxycontin 10mg quantity of 120 on January 9.  Again, there is no reason for the random dates, quantities, and varieties of opioids and benzodiazepines.  At the January 16, 2015 visit MM states that she was in the hospital.  The CT scan from the hospital stay shows an abscess in her right arm.  This is concerning that MM is injecting her medications as this is a common finding in injection drug users.  There is nothing documented in the physical exam, such as track marks or the site of the abscess.  Young writes to increase the meperidine to three times a day, so a quantity of 90.  MM fills clonazepam 1mg on the 19th, alprazolam 2mg on the 25th, and hydromorphone 4mg on the 28th of January.  MM will not be seen in the clinic again until March 25.  Prior to that she also fills cough syrup with codeine, oxycontin 10mg quantity of 90, meperidine 50mg quantity of 90 and then 63, clonazepam 1mg quantity of 90 (twice), alprazolam 2mg quantity of 90 (twice), and hydromorphone 4mg quantity of 120.  The prescriptions are invalid.

MM follows up on March 25, 2015 when Young documents "Demerol not cutting it."  He writes to discontinue the demerol (although MM should have a large quantity left as she just filled them a week prior) and begin oxycontin 20mg, quantity 20.  Young also refills the hydromorphone 4mg, quantity of 90.  MM calls the clinic later and is upset because she was only given a quantity of 20 oxycontin, and it was explained that these were to be used only for breakthrough pain.  The telephone note also states "she is being referred to pain clinic."  At her next appointment on April 23, there is no mention of this referral.  Young now uses the diagnosis of failed back syndrome, which is usually used in patients who have issues with pain even after a back surgery has been completed.  MM has not had any surgery (at least as far as we know) and for years her issue has been with her cervical spine, and now Young refers to her low back.  Has he in haste forgotten what problems she has? He also refills the alprazolam 2mg quantity of 90 on April 23.  The hydromorphone and alprazolam prescriptions are the same on May 20, June 19, July 20, August 19, and September 16.  Young adds carisoprodol in June and July.  UDS in July is negative for alprazolam, which should have been another indication to Young that MM does not take

her medications as prescribed.  Young prescribes phenobarbital on August 1, but there is no documentation about her seizure disorder.  He also prescribes hydrocodone with acetaminophen 7.5/325 quantity of 12 on August 28, and meperidine 50mg quantity of 15 on September 30.  On the September 17 visit, Young stops MM's lamictal, and replaces it with Seroquel.  Although lamictal can be used in bipolar disorder, it is also used for seizures, which MM has, and stopping the lamictal could be dangerous and should be done by her neurologist.

On September 19, MM follows up with Young and again complains of breakthrough pain.  With no further documentation, Young increases the hydromorphone to 4mg quantity of 120.  Two weeks later on November 5 MM's chart states that she is having issues at home and "high stress."  Young subsequently increases the quantity of alprazolam 2mg from 90 to 120 and adds buspar for her anxiety.  On November 17, Young changes the buspar to lexapro.  In a patient with bipolar disorder, these changes should be made by her psychiatrist to avoid precipitating a manic episode.  Finally, on November 30, the chart states that she is "at her wits end," and the dilaudid is not working.  Young complies and changes the dilaudid to meperidine 50mg quantity of 90, despite the fact that she filled a month prescription for hydromorphone on the 17th.  Just a week later on December 8, MM returns to clinic and states the meperidine is not working and she would like the hydromorphone back which Young prescribes on December 16, a quantity of 120.

MM returns on January 14, 2016, stating that she had a seizure at work.  The documentation states that she is "disoriented and passing out in clinic."  Young writes that she has been like this since her seizure, and requests that she follow up with her neurologist ASAP.  UDS performed on the 14th shows two medications not prescribed, morphine and lorazepam, as well as the prescribed medications alprazolam, hydromorphone and oxycodone.  MM's last visit on January 28 is a long note by the office staff, which states the patient "was wanting more pain meds," and said, "Jeff texted her."  It appears that the patient may have been dismissed from the practice at this time.

MM is a young woman with mild degenerative disease in her cervical spine and a history of opioid use.  Young never documents an adequate history, and eventually the chart indicates that her low back pain is severe and there is little information about her neck.  The low back pain is never worked up.   MM receives multiple opioid and benzodiazepine prescriptions monthly, and under Young's care the dose of alprazolam increases from 1mg three times a day to 2mg four times a day.  There were indications that MM could have been abusing her medications including the arm abscess and the frequent requests for medication changes.  Finally, Young misdiagnosed her with hypothyroidism and made a dangerous decision to discontinue one of her seizure medications.  The prescriptions for MM were not within the accepted standard of care.

Police officer Christina St. Lauren presents with KC on October 11, 2016, posing as new patient **Christina Norton (CN)**.  I have previously reviewed the video recording of her visits and will combine that with my chart review here.  When she signs in, her office visit costs less than KC's, and she is told it is because she is a weight loss patient.  The medical assistant takes a brief past medical history after her vital signs are taken, and CN says she is there to discuss low back pain.  She also states that the pain started after a fall a few years ago at work.  Young sees CN in the same room as KC.  He asks her only a few questions about the back pain, and if she had any imaging done.  Young also asks CN what medication she has taken in the past and she tells him oxycodone and marijuana.  Young tells her he is fine with the marijuana use and goes on to talk about his work in the legalization of marijuana in Tennessee.  Young

23

does briefly palpate on CN's lower thoracic and lumbar spine area, but that is the extent of the physical exam. He then agrees to start her on oxycodone 10 mg, quantity of 90. He also suggests she get x rays done at a local hospital. As stated previously, the time spent with KC and CN is less than five minutes.

I have several concerns about this visit with Young. First, the office charges different amounts of money for an initial visit depending on the complaint, which is unusual. The history is insufficient, and the patient's complaint of 8 out of 10 back pain is inconsistent with the apparent disease severity, which should raise a red flag to Young. The physical exam is brief and incomplete, and the time spent with the patient is clearly quite brief. Finally, Young allows the patient to suggest the medication that she would like to have prescribed, and then complies without trying an NSAID or lower strength opioid first. The prescription for oxycodone is invalid.

CN follows up in the clinic on November 15, 2016, when the check in and visit with the medical assistant seem routine. Unlike the other patents, she was not asked to provide a urine sample for a drug screen. Upon entering the exam room, Young asks CN if she is there for refills. CN does tell him that the muscle relaxer is not working well, and he suggests they try another. Young asks about the x rays, and CN tells him they were completed that morning. They discuss Halloween, but there is no other history taken, and no exam is performed. Young however documents that the review of systems is normal, and the exam is positive for low back pain, and obviously neither were done on the video. The entire face to face time is approximately two minutes. He also documents "teaching," which is obviously not done. Young then prescribes oxycodone 10mg, quantity of 90, and the prescription is invalid for the reasons stated above.

CN makes a final visit on December 14, 2016. At the front desk, she is given forms to fill out, and one appears to be a pain management agreement. The medical assistant asks if she is there for refills, and she confirms that she is, but also states that the Robaxin (muscle relaxer) is not working. She is seen along with KC, as previous. She asks Young if she can double up on the Robaxin, and he tells her "no", but they can change to a three times a day medication instead of a two times a day medication. He takes no further history and does not perform a physical exam. He does however, document a normal review of systems and "+LBP" for the exam, which were not done. He does not mention the x-rays that were done, the report in the chart states the lumbar spine is normal. Young refills her oxycodone, and the prescription is invalid for the reasons stated previously. He is in and out of the room with both patients in six and a half minutes.

In summary CN is a very young patient with musculoskeletal back pain. Young never performs a complete exam and prescribes opioids before trying NSAIDS or other medication first. The visits are certainly not long enough to perform any teaching. The prescriptions are not within the accepted standard of care.

**Alan Ormerod (AO)** is a 56-year-old male with a history of a subdural hematoma, hypertension, chronic low back pain after surgery, and a hip fracture and repair in early October of 2015. His hospital records from the hip fracture and repair are contained in the chart, and he presents to Young not long after this on October 27, 2015 as a new patient. The documented history states that he has no appetite, and pain all over from previous surgeries and injuries. His medicines are listed as hydrocodone and oxycodone, Mobic, zoloft for depression and two anti-hypertensives. Documented vital signs show that he is 5'8" and only 122 pounds. Young documents a brief exam of the lungs, heart, and states there is a deformity of the lumbar spine and multiple surgical scars. He lists the diagnoses osteoarthritis, hip pain, back pain,

hypertension and depression, and plans a UDS, labs, and prescribes oxycodone 10mg quantity of 60. UDS is positive for alprazolam, which was not prescribed, and negative for oxycodone which was prescribed.

AO clearly has an extensive medical history. Why did he have a subdural? Was he impaired at the time and subsequently fell down? And why is he so underweight? Amphetamine abuse could be a cause or multiple medical problems such as HIV or cancer. AO is also quite young for a male to sustain a hip fracture, and that is concerning as well. Young does not clarify what kind of back surgery AO had or when. Overall, the history is poor, and the exam does not give any additional information. For example, is AO missing all his teeth as a result of amphetamine abuse, anorexia, or malnutrition? Does he walk with an assist device, or is he in a wheelchair? The urine drug screen is also concerning, and for all these reasons the prescription for oxycodone is invalid.

He follows up on November 24, 2015 for lab results, which were essentially normal except for vitamin D deficiency and hyponatremia (low sodium). Young documents "fracture left hip," as the history and a brief exam. AO's weight is down to 117. Young begins B12 shots, although I did not see a B12 level in the lab results. He also writes to discontinue the hydrocodone and current oxycodone and prescribes oxycodone 20mg quantity of 120. Young makes no mention that AO filled prescriptions for oxycodone with acetaminophen twice in between his visits with him in October and November. There is no documented reason for the increased dose. Young appropriately prescribes megace which is an appetite stimulant, however the cause of the low weight is not worked up. AO also has hyponatremia which could be a side effect of the Zoloft but could also indicate a lung cancer or a multitude of other problems such as cirrhosis or heart failure, which are also not worked up. The prescription for oxycodone is invalid.

Young continues to prescribe the same dose and quantity of oxycodone throughout 2016 (Downing saw the patient in the months of July and November.) On January 21, a staff member documents "patient slurring words during assessment and very eccentric. Patient ran into door while exiting room to urinate," to which Young merely replies "noted." The documentation through the year gives no further insight to AO's medical problems, even when Young adds seizure disorder and pancreatitis to the list. UDS in August is positive for amphetamines, which were obviously not prescribed and are concerning for abuse. In September, Young lists anorexia as a medical problem, but it is not clear if this is a psychiatric diagnosis or simply the loss of appetite. Both Young and Downing document "teaching" on their plans, but it is not clear what they are teaching. AO died at home on December 11, 2016, just a few weeks after his last visit at the clinic. In poor taste, one of the staff members wrote "deceased" with a frown face on his chart cover. The prescriptions are not within the accepted standard of care.

**Jennifer Townsley (JT)** is a 38-year-old female who presents to Young on August 17, 2014. She states that she wants to discuss her anxiety, and also menstrual cramps that cause low back pain. There is no further history, and the intake form lists alprazolam .5 mg three times a day as her only medication. There are no documented vital signs, but Young writes VSS (vital signs stable), and documents four phrases of an exam which are illegible. He lists anxiety, stress syndrome, dysmenorrhea, and cramps in the impression, and refills her Effexor and alprazolam, adding Mobic. He also states he will order labs and plans a pap smear. The history is obviously incomplete, and therefore the prescription for alprazolam is invalid. JT then refills the alprazolam on September 13, 2014.

JT follows up in the clinic on October 2, 2014 complaining of increased anxiety.  There is no further documentation regarding her complaint, and this time Young lists anxiety, osteoarthritis, obesity and nicotine addiction as the diagnoses.  He changes the effexor to viibryd and changes the alprazolam to clonazepam 1mg quantity of 90.  But on October 30, JT refills the alprazolam .5mg quantity of 90, too.  It is not clear why Young is using two benzodiazepines. At the November 4 visit JT now complains that she needs something to help her focus, so Young diagnoses her with ADD and begins adderall 10mg once a day and refills the clonazepam.  JT states that she is still having trouble focusing and needs an increase in her adderall at her December 17 visit, and Young complies and increases the adderall to 10mg quantity of 60 a month.  JT also states the clonazepam is not working, so Young increases the alprazolam to 2mg quantity of 90 and adds buspar.  The prescriptions are invalid for the reasons stated above and because Young is writing prescriptions at the patients request.

JT follows up regularly in 2015, when she continues to complain of low back pain.  Young adds tramadol and carisoprodol on January 19 and continues her adderall 10mg twice a day with alprazolam 2mg quantity of 90.  In February, with no documented reason, he increases the adderall to 20mg quantity of 60, and in June he increases the adderall to 30mg quantity of 60.  Young would later decrease the adderall back down to 20mg twice daily. With no documentation, JT fills a prescription for hydrocodone with ibuprophen 5/200mg, quantity of 45 on July 2.  On July 29, 2015 JT complains again of menstrual cramps.  Young makes no mention of the prescription written earlier in the month and prescribes hydrocodone with acetaminophen 7.5/325mg quantity of 30.  JT is now taking multiple controlled substances- alprazolam, adderall, tramadol, carisoprodol, and hydrocodone with acetaminophen.

Petway evaluates JT on September 3, 2015, when she documents a very thorough exam by placing a check mark in boxes on the form.  According to her documentation, she even checked JT's reflexes.  Petway refills the adderall 20mg quantity of 60, hydrocodone with acetaminophen 7.5/325 quantity of 60, and alprazolam 2mg quantity of 90, and the prescriptions are invalid for the reasons stated previously.  On October 1 and November 3, JT sees Petway who again refills the medications.  Petway does order an ultrasound to further evaluate the pelvic pain, although JT does not get the exam until nine months later.  Petway also sees JT on December 2, when the first page of the office visit note is the same as the pervious months, and the second page is blank.  UDS is positive for cocaine and marijuana, and the chart contains a copy of a letter dismissing JT from the practice.  However, a staff member writes a note on the letter stating that the patient discussed the issue with "Jeff," and he let her back in.

JT follows up with Young on January 7, 2016 when he documents "needing root canal" and she states she would like to increase the hydrocodone.  Young refills tramadol 50mg quantity of 60, hydrocodone with acetaminophen 7.5/325mg quantity of 60, alprazolam 2mg quantity of 90, and adderall 20mg quantity of 60.  The following month on February 9, JT again requests an increase in the hydrocodone and adderall, and Young complies, increasing the adderall back up to 30mg quantity of 60 and the quantity of hydrocodone with acetaminophen to 90.  There is no documentation to support this change other than the patient's request.  The refills and visits continue monthly with Young, until August 5 when JT sees Downing who refills the same medications at the same dose and quantity.

JT finally gets her lumbar spine x ray and ultrasound on August 26, 2016 and follows up with Young for the results on September 6.  The lumbar spine film shows a benign disorder of the ileus (pelvic bone) which is a common cause of low back pain in young females, and normally treated with therapy and NSAIDS.   The pelvic ultrasound shows a hydrosalpinx, and JT is referred to a gynecologist.  Young

increases the hydrocodone with acetaminophen to 10/325mg, quantity of 90.  The refills continue through January of 2017 for the above-mentioned hydrocodone with acetaminophen, adderall 30mg quantity of 60, and alprazolam 2mg quantity of 90.  Of note JT's UDS was positive for marijuana in February, April, May, August, October, and December of 2016, and January of 2017.   Apparently, patients are not dismissed for marijuana use, just cocaine.

In summary JT is a young woman with anxiety disorder who presents on alprazolam at a low dose, and ends up on high dose alprazolam, high dose adderall, hydrocodone with acetaminophen, and occasionally tramadol and carisoprodol.   The cause of her back and pelvic pain are not discovered until two years after she started seeing Young and Petway.  Often her medications are increased at her request, and sometimes they are increased with no documented reason.   JT also had multiple visits when her blood pressure was elevated, and this was not addressed.  The prescriptions for JT are not within the accepted standard of care.

**Michael Yancey (MY)** is a 44-year-old male who with a history of a MVA in 2005 and lumbar spine surgery in 2013, who presents to Young on September 9, 2014 complaining of worsening low back pain. MY states he would like to discuss his medications and would like a referral to a pain specialist.  Current medications are listed as diazepam 10mg twice a day and oxycodone with acetaminophen 10/325mg three times a day.  Surgical history is documented, including the lumbar spine surgery.  Blood pressure is elevated, to which Young writes "pain," and the only exam states low back pain.  Young prescribes diazepam 10mg, quantity of 60, and refers the patient to pain management.  Just a few weeks before, the patient had filled a prescription for 90 oxycodone with acetaminophen 10/325mg, from a different provider, and on August 4 MY had filled the diazepam from yet another provider.  Young prescribed the oxycodone with acetaminophen on July 30, although there is no documentation in the chart, it is not clear that the patient was seen at the current office.  It is not clear if Young is taking over the care of this patient, the history is brief, and it is unclear why the patient is taking diazepam.  The exam is limited to one phrase, and the prescription is invalid.  MY calls the following day, September 10, and the staff document that he needs another pain medication called in, because he has used up his supply because he has been in so much pain.  This should be a sign to Young that MY is not compliant with his medication and is not a good candidate for long term opioid therapy.

Young prescribes oxycodone with acetaminophen 10/325mg on September 19, and diazepam on October 6, and MY follows up on October 7.  MY states that his left arm is numb, and he has no grip strength.   Young's exam is limited, but he does order a MRI and again documents a referral to a subspecialist.  The patient calls the following day and states he is headed to the emergency room, because he thinks he can get the MRI more quickly.  He follows up about the arm numbness with Young on October 13, and again the plan is the referral.  Despite the concern for a radiculopathy in the cervical spine (nerve impingement causing symptoms in a limb) Young does not state what the MRI showed, and the report is not contained in the chart.  MY also follows up on October 27, and states that he has a nerve block scheduled.  He has had some chest pain, and Young sets up a stress test.  Young documents "increased anxiety" in the history, and with no further history he increases the diazepam to 10mg, quantity of 90, and refills the oxycodone with acetaminophen 10/325 quantity of 90.

MY follows up twice in November of 2014.   On the 13, he complains of the left arm pain but states that he started physical therapy.  Despite the oxycodone on board, Young prescribes hydrocodone with acetaminophen 10/325mg quantity of 90, with no explanation in the chart.  MY is also seen on the 24,

for an upper respiratory infection (URI), and Young prescribes cough syrup with hydrocodone.   It is not clear to me why this is needed for an uncomplicated URI.  MY refills the diazepam on December 1, and for no clear reason Young changes the diazepam to lorazepam 2mg quantity of 90 at the December 4 visit.  MY also refills the oxycodone with acetaminophen 10/325mg on December 4.  MY sees the pain management group on December 11, and from their note we learn that MY has seen multiple pain management specialists, has a history of alcohol abuse and five DUI incidents.  Again, this should be a sign that MY is at risk for further substance abuse.

In 2015, MY continues to follow up at least monthly through August.  In the January visit, there is no mention of headaches until it is listed in the diagnosis, and Young prescribes butorphanol nasal spray, adding another controlled substance to his regimen of oxycodone with acetaminophen and lorazepam. The medications are the same in February, however there is an interesting telephone note documented. The staff documents that the patient states he took all of his lorazepam and felt that the pharmacy had given him a placebo, as he took one of his wife's pills and felt it was effective.  The following month, on March 2 MY states he is cutting back on the pain medications, however there is no elaboration by Young whether the patient thinks he is having addiction issues, and no mention of the telephone note.  Young decreases the oxycodone with acetaminophen to 60 a month, and there are no benzodiazepines prescribed until August.

During the April visit, MY states he needs a note to return to work, and the only medication prescribed is butorphanol nasal spray for headaches, for which there is no history.  On June 4, the patient returns complaining of anxiety, stating that valium and ativan do not work, only xanax.  Despite the fact that MY has a history of alcohol abuse, and he has been free of benzodiazepines for several months, Young prescribes alprazolam 1mg quantity of 90.  As stated previously, benzodiazepines are not the drug of choice for anxiety disorder.  Young also prescribes carisoprodol for no documented reason.  MY also follows up on June 23, after a motor vehicle accident, and his left arm numbness is worse.  He is given another prescription for carisoprodol on July 3. MY is also seen on July 7 and July 21, for weakness and sciatic nerve pain, although no medications are prescribed.

On August 3, 2015, MY presents to the clinic and complains of ten out of ten sciatic nerve pain, and states he wants to see about getting an internal pain pump.  Young prescribes hydrocodone with acetaminophen 10/325mg quantity of 30 and clonazepam 1mg quantity of 45.  On the 10th, MY also fills prescriptions for Tylenol with codeine and tramadol from another provider.  MY's last visit with Young is on August 12.  The patient states that he fell down the stairs, his left arm gave out, and he was seen in the emergency room and had no fractures.  Young documents to change his medication to hydrocodone extended release 40mg, quantity of 30, and refills the carisoprodol and clonazepam 1mg, quantity of 90. On the 15th, there is a do not resuscitate (DNR) form in the chart signed by Young.  MY died just ten days after the DNR was signed on August 25.  The poor history, inadequate physical exam, and poor documentation of the plan, as well as MY's history of alcohol abuse all contribute to the prescriptions written outside the accepted standard of care.

In summary, Nurse Practitioners Jeff Young and Brittany Petway present their clinic as one to promote wellness and longevity, even in the name, Preventagenix.  They do order an extensive battery of laboratory tests, of questionable utility, but often ignore elevated blood pressure which would be an important variable to treat to promote longevity.  Young also begins testosterone shots with normal testosterone levels, which has not been clinically proven to be effective, and can lead to complications

as we saw in BE.  The clinic also gave B12 shots without B12 deficiency, and often wrote "teaching" in their progress notes, when video reveals visits were definitely too short to allow for that.  While not preventive in nature, Young and Petway did, however, diagnose and treat a lot of pain, anxiety, ADD, and obesity.  There is never an adequate history for the patients' problems, and often the only documented history is by the office staff and not the provider.  Young frequently marks the review of systems as normal, which is unlikely to be performed because of the time constraint, and eventually the clinic note has an "x" preprinted in all the normal boxes in the review of systems.  From the documented exam, we never gain any useful information about the patients' illnesses, and often Young simply writes "+LBP."  The list of diagnoses in the notes is often surprising, as problems were not discussed anywhere prior.  And unfortunately, the plan does not provide much insight, but usually states to continue medications.  To make matters more confusing, the prescriptions were often written or filled in between visits, new medicines being added, or doses and quantities changed without explanation.  Sometimes it was not clear what the diagnosis was for the prescribed medication, and doses exceeded what would be necessary for the disease at hand.  Although the pair did perform urine drug screens, questionable results were often overlooked, marijuana use was overlooked, and in one case the patient just talked to Young and was allowed back into the clinic.  Ultimately, it did not seem that Young or Petway improved any of the patients' quality of life, and several of the patients died from overdose or suspected overdose.  The prescriptions written by Young and Petway were outside the medical standard of care and were irresponsible and dangerous.