**Sent. Ex. 8**

Expert Witness Statement

RE: Dr. Alexander Alperovich and Jeff Young, N.P.

DRAFT #1

Tricia Aultman, MD

April 18, 2019

All nurse practitioners in the state of Tennessee are required to be supervised by a Tennessee licensed physician.  The rules and regulations governing the supervision of nurse practitioners are laid out by the Tennessee Board of Medical Examiners.  Although the physician is always not required to be on site, they must be available for consultation at any time.  In addition, the physician is required to review the "historical, physical, and therapeutic data…on any patient within 30 days when a controlled drug has been prescribed," or "twenty percent of charts monitored or written by the certified nurse practitioner every thirty days."

I have previously reviewed medical records and video recordings from the Preventagenix clinic of Jeff Young, NP and Brittany Petway, NP.  At this time, I have been asked to review records jointly signed by Petway, Young and Dr. Alexander Alperovich, who served as Young's supervising physician from December of 2015 through July of 2016.  Although the patients were seen at the clinic prior to December of 2015 and I have briefly reviewed each chart prior to that date, my review will focus on the time in which Dr. Alperovich was supervising.  My review is again limited by the (at times) illegible handwriting of Young.

**Anthony Bennett** (AB) is a 53-year-old man in 2015 when he has his first visit at the Preventagenix clinic.  His chart contains a significant amount of medical records from other providers, and most of his past medical history is obtained from those, and not from the visits at Preventagenix.  He has a history of hypertension, bipolar disorder, hyperlipidemia, gastroesophageal reflux, and sinus issues, and suffers a hip fracture in the Fall of 2015.  He is seen by Petway from July 2015 through November of 2015, and she is prescribing oxymorphone and hydrocodone with acetaminophen in November, despite a urine drug screen (UDS) that was inappropriately positive for zolipidem in September, inappropriately positive for cyclobenzaprine in October, and inappropriately positive for oxazepam and inappropriately negative for oxymorphone in November.  Petway also prescribes temazepam for sleep, and benzodiazepines need to be prescribed carefully with opioids as they increase the risk of respiratory depression.  Petway has also been treating AB with testosterone without a documented prostate exam or PSA blood testing.  When AB finally has a PSA test on November 20, it is elevated which can be a sign of prostate cancer, and the testosterone could be fueling the cancer.  Included in the labs on November 20 is an extensive panel of endocrinologic tests, likely expensive and unnecessary.  For example, one of the blood tests is used to follow patients with ovarian cancer, which he obviously does not have.

AB is seen by Young for the first time on December 14, 2015, when Alperovich is now the supervising physician.  The only history documented is that the patient wants an increase hydrocodone with acetaminophen to four times a day.  Young circles the word pain and writes right knee and left hip.  Young lists low back pain and disc bulge as one of the diagnoses, which has not been seen previously in

the medical record and is without explanation.  With no further discussion of AB's pain complaints, Young writes to discontinue the hydrocodone and add fentanyl 50mcg.  But instead of 50mcg, Young writes a prescription for fentanyl 75mcg, quantity of ten as well as oxycodone 30mg quantity of 120.  He also prescribes temazepam 30mg at night.  With no explanation, and multiple abnormal UDS, he has significantly increased the patient's daily morphine milligram equivalent (MME) from 120 to 360.

AB follows up on January 14, 2016, and states that he would like to change the fentanyl.  With no further explanation, Young changes the fentanyl to a buprenorphine patch, 20mcg quantity of 4 and continues oxycodone 30mg quantity of 120, again increasing the patients MME without justification in the medical record.  In addition, the oxycodone prescription is written in a different handwriting than Young's but signed by him.  AB's UDS is again inappropriately positive for cyclobenzaprine.  In February the patient requests an increase in his temazepam back up to 30mg, and Young complies without further documentation.  He also gives the patient a testosterone injection (which continue through June), despite the abnormal PSA in November.  In March AB states that his oxycodone came up missing when he had visitors, an obvious excuse used by patients who are misusing or diverting their medication, yet Young refills the oxycodone.  UDS on March 15 is negative for oxycodone, despite the fact that AB filled his prescription on March 10.  UDS is also inappropriately positive for cyclobenzaprine.  Young does write in his plan that AB will be referred to pain management.

There is a blank progress note in the chart dated April 15, 2016, but it is signed by Dr. Alperovich.  It seems odd to sign a blank note, and I can only guess that he was trying to sign them ahead of time which is inappropriate.  Despite the absence of documentation, AB fills buprenorphine on April 19, written by Young, but also fills oxycodone with acetaminophen written by another physician on April 20.  On May 11, AB follows up with Young who again prescribes buprenorphine patches and oxycodone with little documentation, cosigned by Alperovich.  His blood pressure is quite elevated, and this is not addressed.  AB also follows up on June 8, complaining of fluid around his ankles.  In a patient with hypertension, this is concerning for heart failure, yet this is not addressed.  UDS states that the patient is taking oxycodone, butrans, and valium, the valium being prescribed by AB's psychiatrist.  Next to the positive buprenorphine, Young writes "suboxone-has rx."  It is concerning here that Young does not know the generic name for butrans is buprenorphine, and there is no documentation of a suboxone prescription.  The UDS on that date is also inappropriately positive for tramadol, and Young writes "states he has old rx- but none on PMP."  Here again the patient is obviously non-compliant with his medications but is given one more chance.

AB is seen in follow up June 30, when he is prescribed fentanyl.  UDS on that date is inappropriately positive for hydrocodone.  He is seen a final time on July 28, and dismissed from the clinic, the chart stating "pt dismissed 7 failed tests."

In summary, AB is a patient with a significant psychiatric and medical history, taking multiple medications for these illnesses.  The historical documentation in the Preventagenix charts is poor, and there is frequently a one sentence history and a one- or two-word exam.  Without an x-ray of the knee or lumbar spine, he is treated with opioids and the dose increased without a documented reason throughout his time at the clinic.  In addition, AB is prescribed benzodiazepines for sleep which increases the risk of respiratory depression when given in combination with opioids.  AB is repeatedly non-compliant, documented by multiple abnormal UDS.  His blood pressure is elevated and not appropriately addressed, and he is given testosterone injections despite an elevated PSA.  Dr. Alperovich

is negligent is his role as supervisor, and the prescriptions for opioids, benzodiazepines, and the testosterone injections are written/given outside the generally accepted standard of care. Alperovich also signed a blank progress note which is unethical.

**Lee Ann German** (LG) is a 58-year-old female when she has her first visit with Young on October 7, 2014. She has multiple medical problems including coronary artery disease, chronic obstructive pulmonary disease (COPD), diabetes mellites type 2, hypertension, hyperlipidemia, and degenerative disc disease of the lumbar spine. She also is taking medication for depression. At the time of her first visit she is taking alprazolam 2mg three times a day and hydrocodone with acetaminophen 10/325 three times a day. There is no documented history or diagnosis given for the alprazolam, and no questions asked regarding her degenerative disc disease such as other treatments or medications tried and failed. Despite the lack of documentation, Young refills the alprazolam and hydrocodone with acetaminophen, and continues both through the next three years. Benzodiazepines increase the risk of respiratory depression when combined with opiates, especially in a patient with COPD, and should be avoided. In August of 2015, LG has a MRI which shows only degenerative disc disease, and Young adds tramadol for breakthrough pain. When LG states in September of 2015 that she wants to stop the tramadol and increase the hydrocodone to four times a day, Young complies. LG follows up monthly throughout her time at the clinic, which does not seem necessary.

LG is seen in follow up on December 8, 2015, shortly after Alperovich signs on with the clinic, for an episode of bronchitis and the treatment at that visit seems appropriate. She is then seen on December 28 for her routine follow up, and at that time her alprazolam and hydrocodone are refilled, with minimal documentation and the exam stating only "+LBP." On January 28, 2016, the alprazolam and hydrocodone are refilled again with minimal documentation, the note is cosigned by Alperovich. Alperovich also signed a blank note dated February 29,2016, which is inappropriate. LG receives refills in March, April, May, and June of 2016 on alprazolam and hydrocodone written by Young and the notes are co-signed by Alperovich. The notes never contain any further history for the back pain, and no diagnosis for the alprazolam.

In addition to the inappropriate prescribing of hydrocodone and alprazolam, LG's medical care was poor. Patients with diabetes should have a hemoglobin A1c test drawn quarterly to follow their diabetes control. No where in the chart does Young document what the patient's sugar is running at home, and she does not have a hemoglobin A1C drawn until December of 2015, and it is elevated, showing sub-optimal control of her blood sugar. In addition, she is given multiple steroid shots for pain relief and for her COPD, and steroids worsen blood sugar. Patients with COPD and diabetes are at risk for developing a yeast infection in the mouth called thrush, and LG battled this repeatedly, but continued to receive steroid injections that would make this worse. LG has frequent visits for COPD and bronchitis, yet Young does not order pulmonary function tests or a chest x ray for further work up. In December of 2015, LG has the "Preventagenix Panel" of labs drawn, likely quite expensive, yet contains multiple meaningless laboratory tests. Her vitamin D level was low, but this was not addressed. Another laboratory test done in December of 2015 calculates the patient's risk of coronary artery disease as 4%, ironic because the patient already has coronary artery disease and again this is a meaningless test. It does not appear that Alperovich improves the management of any of her chronic disease states after he signs on.

In summary, LG is a middle-aged woman with multiple medical illnesses who is seen monthly and receives refills for alprazolam with no diagnosis, and hydrocodone with acetaminophen for degenerative

disc disease.  There is a shocking lack of history for the prescription of these controlled substances, and little if any physical exam.  There was no attempt was made to use non-opioid medication for the back pain, and she was not referred to physical therapy, either.  It is not clear why the patient was required to come monthly, when no changes were made, so it appears it was for the financial gain of the clinic.  Despite the monthly visits, the care of her chronic diseases was poor.  As in other patients, Alperovich signed a blank progress note which is unethical and calls to question his oversight of Young.  Dr. Alperovich is negligent in his role as a supervisor, and the prescriptions for alprazolam and hydrocodone are written outside the generally accepted standard of care.

**Jeffery Ditto** (JD) is a 54-year-old male when he presents as a new patient on September 15, 2014 at Preventagenix. He has a past medical history of hypertension, hyperlipidemia, peripheral vascular disease, degenerative disc disease of the lumbar spine, and erectile dysfunction.  Despite his numerous problems, the history on his intake visit consists of "med refills" and "needs a spot on his chest looked at."  A brief exam is documented, and the diagnoses of degenerative disc disease, erectile dysfunction, abnormal skin lesion, long term use of medication, elevated lipids, and hypertension are listed.  Young orders labs and with no further documentation refills hydrocodone with acetaminophen 10/325 and alprazolam 1mg twice a day.  There is really no history documented for the degenerative disc disease, and no history or diagnosis documented for the alprazolam.  A large lab panel is completed in October of 2014, containing multiple meaningless tests, but Young does not check JD's blood glucose.  There is no documented prostate exam or PSA lab testing, yet Young begins testosterone injections in October.  JD is also referred to a pain management specialist in December of 2014, the physician diagnosing him with mechanical back pain without nerve impingement, based on exam and MRI findings.  The physician offers a procedure to help with the pain and JD refuses, saying that he has been told he will need to take pain medication for the rest of his life.  The physician declines to prescribe controlled substances because of JD's ongoing marijuana use.

JD is seen by Young monthly for the next several years, is tried briefly on oxycodone with acetaminophen and oxycodone, but is changed back hydrocodone, and continues alprazolam.  He has a UDS positive for marijuana in April of 2015 and May of 2015, as well as positive for oxymorphone in April of 2015 to which Young documents "old rx when he was out of HCD."  When labs are drawn in November of 2015, JD's HBA1C is very elevated, indicating diabetes.   It is not clear that the patient is called with this information, but when he is seen in follow up on December 15, he reports he was hospitalized for dehydration (which was likely secondary to uncontrolled diabetes).  He is started on medication for diabetes at that time, although not on the recommended first line drug.  His alprazolam 1mg quantity of 60, and hydrocodone 10/325mg quantity of 90 are refilled, again with little documentation.

On January 15, 2016, JD follows up and states that he was hospitalized for three days because he was unable to walk, although only the emergency room records are contained in the chart.  His UDS done on the 15th is very abnormal.  It is appropriately positive for alprazolam and hydrocodone, but also positive for marijuana to which Young responds "counseled regarding this-he states quit 2-3 months ago," cyclobenzaprine "given to at hospital," oxazepam "hospital," and fentanyl "got from sister."  Despite the multiple abnormalities on this UDS and the previous ones, JD is not dismissed from the clinic but follows up on February 2, 2016, asking for an increase in his pain and anxiety medications.  Young finally adds an appropriate medication for anxiety, Lexapro, but also increases the alprazolam to a quantity of 90 a month.  There is no discussion of the abnormal UDS in the progress note, which is signed by Alperovich.

Dr. Alperovich also cosigns the notes for March, April, May, and June of 2016, none of them providing any better documentation of the pain or anxiety complaints, while the alprazolam and hydrocodone are refilled. Despite the diagnosis of uncontrolled diabetes in November of 2015, Young does not recheck labs until September of 2016, only to find that his diabetes control is worse.

In summary, JD is a middle-aged man with multiple medical problems, who follows up monthly from 2014-2016 receiving refills for alprazolam and hydrocodone with acetaminophen, oxycodone with acetaminophen, and oxycodone, for a vague diagnosis of anxiety and degenerative disc disease. JD has multiple UDS positive for marijuana, and others positive for oxymorphone and fentanyl, but no action is taken by Young or Alperovich. As stated previously, benzodiazepines should be avoided with opiates because of the risk of respiratory depression, but neither Young or Alperovich takes this into consideration. Young does use gabapentin, meloxicam, and a topical pain medication in combination with opioids, yet the documentation in the progress notes is so limited that it is not clear if the patient received any benefit. Despite that fact that he is seen monthly, he is not diagnosed with diabetes until it is quite out of control, and it is not followed appropriately after that. Dr. Alperovich is negligent in his supervision of Young, and the prescriptions for alprazolam and hydrocodone are written outside the generally accepted standard of care.

**Rose Robbins** (RR) is a 53-year-old female in 2015 when she first visits Preventagenix in March of 2015. Her chart contains previous medical records which are quite detailed. The old records document multiple medical problems including uncontrolled diabetes mellitus, obesity, ankle and back arthritis, hypertension, heart disease, chronic obstructive pulmonary disease (COPD), anxiety and depression, and attention deficit disorder. A note from 2014 states that RR was tapered off alprazolam by pain management. When RR establishes with Young on March 13, 2015, however she lists alprazolam 1mg three times a day as well as oxycodone 30mg four times a day, and adderall once a day. Young documents a brief history of anxiety and low back pain from an accident years ago, lists multiple diagnoses as the impression, and the plan states merely "UDS and refills." The documented history is extremely limited, and there is only a brief exam, given the complexity of RR's medical problems. In addition, she has COPD and benzodiazepines are relatively contraindicated especially when given with opioids due to the risk of respiratory depression.

RR follows up with Young monthly in 2015, as her diabetes treatment is honed. She receives monthly refills for oxycodone, alprazolam, and adderall, with no significant history or exam documented. By June of 2015, the alprazolam has increased to 2mg three times a day, without significant justification in the medical record. Gabapentin is added as well, increasing RR's risk of respiratory depression. Subsequently on September 21, 2015, RR has an emergency room visit in which respiratory suppression is documented and she is diagnosed with "change in mental status, urinary tract infection, and accidental overdose of opiates." Despite this significant and potentially life-threatening medical encounter, there is no mention of it in Young's next visit note on September 23.

As of December 9, 2015, when Alperovich is supervising, RR is taking alprazolam 2 mg three times a day, oxycodone 30mg four times a day, and adderall 30mg once a day. RR is also prescribed gabapentin, baclofen and tizanidine, all potentially sedating medications. She has COPD and it is documented that she is on home oxygen. The January 7, 2016 note written by Young has no further details, and RR's medications are refilled, but the chart contains a blank note dated January 14, 2016, cosigned by Alperovich. Alperovich also signs Young's notes on February 8 and March 9, 2016, when alprazolam,

oxycodone, and adderall are refilled at the doses above.  The documentation in the notes is poor, with little history, a brief exam and just a list of diagnosis for the assessment, and a list of medications as the plan.  Alperovich also cosigns blank notes dated April 6, 2016, and April 11, 2016, as well as Young's note on April 13, 2016 and May 10, 2016.

In summary RR is a middle-aged woman with multiple medical problems including COPD who is prescribed benzodiazepines in combination with opioids despite the known risk of respiratory depression.  RR even has an emergency room visit for respiratory depression, yet Young does not change his prescribing practices.  Alperovich does not recognize this danger in RR, and cosigns notes that continue benzodiazepines with opioids during his time at the clinic, which are prescribed outside the generally accepted standard of care.   He also signs several blank notes, which as above is unethical.

**Kate Smith** (KS) is a thirty-seven-year-old female with fibromyalgia syndrome (FMS), migraine headaches, obesity, hypertension, elevated blood sugar, and musculoskeletal back pain.  She establishes care at the clinic on July 9, 2015, when she requested and saw NP Petway.  From examining the PMP, it appears that KS was seeing Petway at another location prior to July of 2015, however that does not absolve Petway from documenting a history in the Preventagenix medical record, and there is no documented history except for "refill meds, check-up."  Petway documents a thorough examination including a neurologic exam and given the number of patients seen in a day it is unlikely that it was completed.  The assessment is a list of KS's problems, and Petway prescribes oxycodone with acetaminophen 7.5mg quantity 60, fioricet (butalbital/acetaminophen/caffeine) with codeine quantity 90, phentermine 37.5 quantity of 30, zolpidem 10mg quantity 30, and pregabalin 300mg quantity of 60.  There is no indication to treat FMS or musculoskeletal back pain with oxycodone, and the prescription is inappropriate.  There is not history given for the migraine headaches, and there are many treatments for prevention and treatment that are better than fioricet with codeine.   The problem with using fioricet with codeine is that it can cause a rebound headache necessitating another dose.  This appears to be happening to KS, as she is using 90 pills a month.  And although pregabalin is approved for FMS, it is not clear why she is on such a high dose.  There is no history for obesity or clarification for the need of phentermine, and if KS is taking fioricet three times a day the caffeine may be contributing to insomnia, and the zolpidem prescription.  Overall it is not clear that any of the five controlled substances are needed at the dose or quantity prescribed, if at all.

KS follows up monthly through November with Petway, and on September 3, 2015, the quantity of oxycodone with acetaminophen 7.5 is increased from 60 to 90 with no documented reason, while the pregabalin, phentermine, zolpidem and fioricet with codeine are refilled.  On November 30, 2015 Petway increases the oxycodone with acetaminophen to 10mg, quantity of 90, and adds alprazolam .25mg quantity of 30 with no supporting documentation.  Petway also performs the extensive laboratory panel on KS, much of it inappropriate and expensive but to the financial gain of the clinic.

Young takes over the care of KS on January 12, 2016, with a note that is cosigned by Alperovich.  Young does not add any history, but refills the oxycodone with acetaminophen, pregabalin, phentermine, zolpidem, fioricet with codeine, and increases the alprazolam to twice a day.  On February 8, 2016, Young does document that KS is having anxiety and or post-traumatic stress disorder after being held at gunpoint.  The alprazolam is increased to .5mg three times a day, Young even documenting that KS meets the DSM-5 (Diagnostic and Statistical Manual of Mental Disorders) criteria.  However, benzodiazepines should be avoided in the treatment of PTSD. The February 8 note is cosigned by

Alperovich, as is the February 23 note in which Young increases the alprazolam to 1mg three times a day.  KS is also seen on March 3, 2016 and April 4, 2016, both notes signed by Alperovich.  There is also a blank note dated April4, 2016, signed by Alperovich.

 In summary KS is a very young woman who is prescribed multiple controlled substances without an appropriate history, and for inappropriate reasons first by Petway and then by Young, overseen by Alperovich.   As seen with the other patients, Alperovich signs a blank note with is inappropriate and unethical.  Dr. Alperovich is negligent in his role as a supervisor, and the prescriptions for alprazolam, oxycodone with acetaminophen and fioricet with codeine are written outside the generally accepted standard of care.